UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                     :
CYNTHIA WASHINGTON, *et al*.,        :
                                     :
        Plaintiffs                   :
                                     :      No. 1:07cv1031 (RMU)
    v.                               :
                                     :
DISTRICT OF COLUMBIA, *et al.*,      :
                                     :
        Defendants.                  :
_____:

DEFENDANTS' MOTION TO DISMISS

Defendants District of Columbia, District of Columbia Department of Corrections, Devon Brown and Henry R. Lesansky, by and through the Office of the Attorney General for the District of Columbia, hereby move this Court pursuant to Fed. R. Civ. Pro. 12 (b) (6) for an order dismissing this action filed against them.  In support of this motion the Defendants rely on the attached memorandum of points and authorities.

                              Respectfully submitted,

                              LINDA SINGER
                              Attorney General for the
                              District of Columbia

                              GEORGE VALENTINE
                              Deputy Attorney General
                              Civil Litigation Division

                              /s/NICOLE L. LYNCH/s/_____
                              NICOLE L. LYNCH [471953]
                              Chief Civil Litigation Division Section II

/s/David A. Jackson/s/
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C.  20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail:  davida.jackson@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    :
CYNTHIA WASHINGTON, *et al*.,       :
                                                    :
              Plaintiffs                         :
                                                    :        No. 1:07cv1031 (RMU)
         v.                                        :
                                                    :
DISTRICT OF COLUMBIA, *et al.*,      :
                                                    :
              Defendants.                      :
_____:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

**PRELIMINARY STATEMENT**

Plaintiffs Cynthia Washington, Herbert Douglas, Lorenzo Jennings, Dionne Makins,

Alphonso Bryant, Lowanda Hinton-Saunders, Darryl Love, Malcolm Pointer and Shantell Hatton

("Plaintiffs or DC Employees") are currently employed by DC Department of Corrections.   All

of the DC employees are on paid administrative leave pending the outcome of adverse action –

termination – proceeding pursuant to the terms and provisions of  the District's Comprehensive

Merit Personnel Act "(CMPA"), DC. Code § 1-601.01, *et seq*., the District's personnel

regulations, 6 DCMR § 1612, and the Collective Bargains Agreement ("CBA") between the

District of Columbia Department of Corrections and the Fraternal Order of Police, Department of

Corrections Labor Committee, (Exhibit ("Exh") A; Complaint at 2).

The Plaintiffs have commenced this action against the District of Columbia ("the

District"), the District of Columbia Department of Corrections ("DCDOC"), Devon Brown the

Director of DCDOC ("Director Brown"), Warden Stanley Waldren ("Warden Waldren") and

Hearing Officer Henry Lesansky, Ph.D. ("Dr. Lesansky") for allegedly violating Plaintiffs' Fifth

Amendment due process rights (Count I), defamation (Count II) and intentional and negligent infliction of emotional distress (Count III).   Plaintiffs also seek injunctive relief in the form of enjoining the Defendants from taking disciplinary action against the Plaintiffs and restoring the Plaintiffs to their positions with back pay and benefits (Count IV).

## STATEMENT OF THE CASE

This case arises out of the escape of two inmates from the Central Detention Facility ("the jail") on June 3, 2006.  It is undisputed that, on June 3, 2006, two inmates, Joseph Leaks ("Leaks") and Ricardo Jones ("Jones"), escaped from the District of Columbia Central Detention Facility by shattering a window in the warden's office and sliding down a canopy outside the window.  (First Amended Complaint ¶ 3; Exhibit B, at 3, 13-15)  The Office of Internal Affairs ("OIA") at the Corrections Department conducted an investigation and issued a report as to how the escapes occurred. (Exh. B)

The OIA report showed that Leaks was allowed off his housing unit the day of the escape to participate in a work detail where he cleaned common areas of the administrative module, although Leaks should not have been approved for such a work detail in light of an order that he be kept separated from inmate Jones at all times. Exh. B at 5-6, 10.  Further, Leaks should have been classified for maximum security, where he would not have been eligible for a work detail, not medium security where he was placed.  *Id*. at 20-22.  Jones was allowed off his housing unit the day of the escape ostensibly to go to the infirmary for medical treatment, although he was not scheduled for medical care.  *Id*  at 11.  Leaks left his assigned work area, met up with Jones in an administrative area, and together they went to the Administrative Two area.  *Id.* at 10-15.   An officer controlling that area allowed them through the control door because both inmates had green environmental detail badges, indicating they were on work details. *Id.*   However, the

officer failed to note that Jones was in fact wearing a badge bearing the name and photograph of another inmate. *Id*.

Leaks and Jones then removed an 80 pound commercial floor buffer from an unlocked supply cabinet, took the buffer to the warden's office, forced the lock on the outer door of the office suite, and forced open the inner door of the warden's office by ramming it with the buffer. *Id*. They then changed into dark navy inmate jumpsuits (the type worn by inmates when released) which, according to Leaks' subsequent account, a correctional officer had hidden for them in a trash receptacle the day of the escape. *Id*. The inmates then rammed the security pane of the warden's window repeatedly with the buffer, and escaped through the broken window and down the canopy. *Id*. They were each re-apprehended the next day without incident. *Id* at 3.

OIA issued its report July 20, 2006, identifying the facts and circumstances that contributed to the escape. (Exh. B.) The DCDOC then summarily fired the Plaintiffs, because the Plaintiffs' negligent or intentional conduct had been identified in the report as contributing to the inmates' escape. *Id.* The specific charges supporting the summary terminations are as follows. Plaintiffs Love and Pointer each negligently performed a custody classification analysis for inmate Leaks, resulting in Leaks being improperly classified for medium security placement where he was eligible to work off his unit, when in fact Leaks should have been properly classified as a maximum custody inmate where he would not have been eligible for such work. (Exhs C and D, respectively). Plaintiff Bryant was negligent in improperly screening Leaks for participation in an off-unit work detail, when a thorough review of the relevant records would have revealed that Leaks should be denied such a privilege because of an order that Leaks and Jones be kept separated at all times. (Exh. E). Plaintiff Douglas negligently supervised Leaks on work detail the day of the escapes, and left a supply closet unlocked, giving Leaks access to the

buffer machine that the inmates used to break out the window. (Exh. F). Plaintiffs Hatton, Makins, and Washington, who were the three officers on duty on Jones' housing unit on the day of the escapes, negligently allowed Jones out of the unit to go to the infirmary without verifying whether Jones was scheduled to be seen at the infirmary that day, which in fact he was not. (Exhs. G, H and I respectively). Plaintiff Jennings was negligent in improperly disposing of an inmate work detail ID badge he confiscated from another inmate three weeks before the escape, which allowed Inmate Jones somehow to come into possession of that ID card and wear it the day of the escape to gain access to the administrative area. (Exh. J). Plaintiff Hinton-Saunders negligently allowed inmate Jones through the Administrative Two door without noting that Jones' work detail badge belonged to another inmate and bore the other inmate's name and photo. (Exh. K) The report also concluded that Lachonne Stewart[1] deliberately hid clothing in a trash can for the inmates to use during their escape. Exh. B.

The DCDOC summarily terminated these employees under 6 DCMR § 1616, which permits the District to terminate an employee *summarily* when there is general cause for termination under 6 DCMR § 1603 (including any on-duty act or omission that interferes with the efficiency or integrity of government operations) and also an agency head determines that the employee's conduct threatens the integrity of government operations or constitutes an immediate hazard to the agency. See 6 DCMR §§ 1616.1 and 1616.2. Am. Compl ¶ 14.

---

[1] Ms. Stewart is not a named plaintiff in this civil matter.

.

Plaintiffs administratively appealed their summary terminations to an Administrative Law Judge (ALJ), who agreed with the Plaintiffs for a variety of reasons.[2] Am. Compl. ¶ 21. The Director filed letters with the ALJs in some of the cases remanding the matters for further consideration (as authorized by § 1616.6), but the ALJs issued Reports and Recommendations on Remand declining to change their earlier conclusions. *Id.* at 12-24.

On March 15, 2007, Director Brown sent each Plaintiff a letter, rescinding and canceling the summary removal action against that employee, and indicating that the employee would be reinstated with appropriate back pay to that date. *Id.* at 25-31. However, Director Brown then immediately issued each Plaintiff a new 20 day notice of proposed termination (on a non-summary basis) based on the same factual allegations underlying the rescinded summary terminations. *Id.* Each employee was placed on administrative leave with pay pending the Director Brown's final decision in the matter, and remains on pay status at this time as no finakl agency decision has been issued. *Id* As such, the Plaintiffs have been and continue to be compensated by the District.

## STANDARD OF REVIEW

In reviewing the sufficiency of a complaint pursuant to Fed R. Civ. P. 12(b)(6), a court must consider the facts presented in the pleading as true and construe them and all reasonable inferences in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236

---

[2]  In three cases (Bryant, Love, and Pointer), the ALJs concluded there was insufficient factual support for the underlying charge of misconduct.  In four cases (Hatton, Hinton-Saunders,  Makins, and Washington), the ALJ found that, although there was evidence to establish that the employee engaged in misconduct as charged, *summary* termination was not appropriate because the record did not establish that the officers' conduct created the imminent harm required for *summary* removal under 6 DCMR § 1616.1.  See Tabs 35, 36, 38, 40. In three cases (Herbert Douglas, Lorenzo Jennings, and Lachonne Stewart), the ALJ recommended against sustaining the summary terminations because, although there were reasonable grounds to conclude that the employees' misconduct contributed to the inmates' escape, the termination letters did not reflect that the District had explicitly complied with 6 DCMR § 1603.9 in choosing the appropriate penalty before terminating these employees.

(1974) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) and citing *Gardner v. Toilet Goods Assn.,* 387 U.S. 167, 172 (1967)).  The court need not consider inferences that are unsupported by the facts or legal conclusions framed as facts.  *See Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  The motion can be granted, and the complaint dismissed, only if no relief could be granted upon those facts.  *Id.*

The Supreme Court recently held in *Bell Atlantic Corp. v. Twombly*, 2007 U.S. LEXIS 5901 (Decided May 21, 2007, that the proper test for the sufficiency of a pleading under Rule 12(b)(6) is whether the claim it purports to set forth is  "plausible" --- not whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.."

Under the standard of "plausibility" enunciated by the Supreme Court in *Trowmbly,* the amended complaint should be dismissed because under federal law and District law it is inherently implausible that Defendants have injured Plaintiffs.

## ARGUMENT

**I.**    **Count I Should Be Dismissed Because A Violation of Personnel Regulations Or A Collective Bargaining Agreement Does Not Establish A Deprivation Of Constitutional Due Process Under The Fifth Amendment.**

There is no merit to Plaintiffs' claim of a denial of constitutional due process.  The District's alleged violation of its own personnel regulations or the collective bargaining agreement between the District and the Plaintiffs' union does not establish a deprivation of constitutional due process.  See *Brandon v. District of Columbia*, 823 F.2d 644, 649 (D.C.Cir. 1987) (state does not violate individual's due process rights by deviating from its own regulatory procedures); *Crosby-Bey v. District of Columbia*, 786 F.2d 1182, 1186 (D.C. Cir. 1986) (prison's violation of its own regulations does not, in and of itself, violate federal law); and *Beo v. District*

*of Columbia*, 44 F.3d 1026 (D.C. 1995) (settlement agreement did not establish liberty interest

protected by due process).  Treating a violation of state law as a violation of the Constitution

would make the federal government the enforcer of state law.  *Kelly v. Parents United for the*

*District of Columbia Public Schools*, 641 A.2d 159, 172 (D.C. 1994) (J. Schwelb concurring),

citing *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988) (en banc), cert. denied 489

U.S. 1065 (1989).

In *Ellis, et al. v. District of Columbia, et al*. the Court of Appealsfor the District of

Columbia Circuit stated:

> In the absence of a due process violation, the district court has no
> authority to order the Board to comply with its own procedure.  The
> mere fact that a state or local government has established certain procedures
> does not mean that those procedures thereby become substantive liberty
> interests entitled to federal constitutional protection. *Brandon v. District*
> *of Columbia Bd. Of Parole,* 262 U.S. App. D.C. 236, 823 F.2d 644, 648-49
> (D.C. Cir. 1987).  To hold otherwise would " "federalize'—indeed,
> "constitutionalize'—every deviation from state procedures."  Instead, "such
> State procedural requirements must be enforced in state courts under state law."
> *Id.* at 649.

84 F.3d 1413, 1421 (D.C. Cir. 1996).

It is clear from the amended complaint that Plaintiffs are challenging the District's right

to proceed with disciplinary proceeding under the District's statute, D.C. Code § 1-616.51,

personnel regulations, DCPM §1616, and the Collective bargaining Agreement (CBA).  Am

Compl. ¶¶ 12-31.  This challenge by Plaintiffs is not of constitutional magnitude requiring the

involvement of federal courts but rather is an issue left squarely up to local law and local courts.

Since Plaintiffs' claims of a violation of local law do not rise to the level of a constitutional

violation, Count I should be dismissed.

**II.    The Amended Complaint Should Be Dismissed Because Plaintiffs' Exclusive Remedy Is Through The Comprehensive Merit Personnel Act (CMPA) And The CBA.**

Plaintiffs seek to challenge the District's right to initiate termination proceeding against them based on their conduct as detailed in an investigation report concerning the escape of two inmates from the DC jail. Exh. B.   Plaintiffs' exclusive remedy to challenge their termination is through the Comprehensive Merit Personnel Act (CMPA) and the CBA.

The CMPA provides that a District employee may challenge his or her termination in either of two ways: 1) by appeal to the Office of Employee Appeals ("OEA"), and from there to D.C. Superior Court; or 2) by any alternative procedure delineated in a collective bargaining agreement between the District and the employee's union. D.C. Code §§ 1-616.52 (2001 edition). In accordance with the CBA, Plaintiffs may appeal their termination, if any, through the grievance procedure, which includes the right to arbitration.  The Plaintiffs' may appeal an arbitration award obtained through the CBA procedure to the Public Employee Relations Board (PERB).  D.C. Code § 1-605..01.   See, *Johnson v. District of Columbia, et al*, Case No. 04-00250 (RCL) (Decide July 18, 2007) (Lamberth, J) (Dismissing plaintiff's due process violation and common law claims for failing to exhaust administrative remedies under the CMPA and CBA)(opinion attached).

The D.C. Court of Appeals has held that the CMPA is "the exclusive remedy for a District employees who has a work related complaint of any kind," *Robinson v. District of Columbia,* 748 A.2d 409, 411 (D.C. 2000), and, therefore, this court it bound to "apply the CMPA's exhaustion requirement strictly," *Johnson v. District of Columbia, et al*., 368 F. Supp. 2d 30, 43.  In *Johnson*, the court explained that:

> even if . . . the District refuses to abide by a valid term of the collective
> bargaining agreement, it is likely that the plaintiff could seek [to] petition

> the PERB for relief. As was mentioned above, the PERB has jurisdiction to
> resolve allegations of unfair labor practices, and breach of a collective
> bargaining agreement is likely to come within that jurisdiction. In any
> event, the PERB has primary jurisdiction to determine what claims are
> within its jurisdiction to resolve, such that remand to the agency is
> required regardless of the Court's views about the proper way t
> categorize such a complaint.

*Id.* at 50 n.8.

In this case, Plaintiffs' assert that the DCDOC's "do-over" hearing constitute a violation of Plaintiffs' due process rights as set forth in the CMPA and the CBA. Am. Compl. ¶ 26-31. Plaintiffs' sole remedies for redress of any violation of their due process rights must be presented through the administrative process as set forth in the CMPA and the CBA. In addition, any argument is premature as the Plaintiffs have not been terminated yet as there is simply a proposed termination. Therefore, Plaintiffs' complaint should be dismissed

## III.    The Plaintiffs' Claim Pursuant To 42 U.S.C § 1983 Fails.

### A.  The District Cannot Be Held Liable Under 42 U.S.C. § 1983

As explained in *Monell v. Dep't of Social Servs. of the City of New York*, the District can be held liable for the Plaintiffs' constitutional claims only if the Plaintiffs allege facts that indicate their injury was caused by a policy or custom of the District. 436 U.S. 658, 694 (1978); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). According to the Supreme Court decision in *Monell*:

> a local government may not be sued under § 1983 for an injury inflicted solely by
> its employees or agents. Instead, it is when execution of a government's policy or
> custom … inflicts the injury that the government as an entity is responsible under
> § 1983."

436 U.S. at 694.

The Supreme Court further held in *Oklahoma City* that, "at the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."

*Oklahoma City*, 471 U.S. at 824. The *Oklahoma City* decision interpreted *Monell* as holding that "municipal liability should not be imposed *when the municipality was not itself at fault*." *Id.* at 818 (emphasis added).

Although there is no heightened pleading requirement, a § 1983 complaint must allege an established municipal policy or custom that caused the constitutional violation at issue. *Dorman v. District of Columbia*, 888 F.2d 159, 162 (D.C. Cir. 1989); *Dant v. District of Columbia*, 829 F.2d 69, 77 (D.C. Cir. 1987). A complaint that does not allege such a policy or custom fails to allege a necessary element of liability under § 1983, and that claim must be dismissed. *Dant*, 829 F.2d at 76.

In *Dant*, the plaintiff was unlawfully detained by the District of Columbia police for several hours. *Id.* at 71. In his complaint against the District, the plaintiff alleged that the District, by its "malicious prosecution and abuse of lawfully issued process," had "violated plaintiff's rights under the Fifth and Fourteenth Amendments … and 42 U.S.C. § 1983." *Id.* at 77. The court held that the plaintiff's complaint was insufficient to support a claim against the District, writing:

> The complaint nowhere alleges, however, that Dant was subject to malicious prosecution and abuse of process pursuant to an established WMATA policy or practice. The complaint thus fails to allege a necessary element of a section 1983 violation, namely, that there be a deprivation of rights "under color of any statute, ordinance, regulation, custom, or usage of any State."

*Id.* (quoting *Monell*, 346 U.S. at 691).

Here, similar to the plaintiff in *Dant*, the Plaintiffs' amended complaint fails to state an actionable § 1983 claim against the District. The amended complaint does not allege that these actions were performed pursuant to an established District of Columbia policy or practice. As

such, the complaint "fails to allege a necessary element" of a § 1983 violation, and, therefore, Count I should be dismissed.

    B.  <u>Individuals Defendants Are Not Liable Under 42 U.S.C. § 1983</u>

      The Plaintiffs allege that the Defendants violated their Fifth Amendment due process rights, and demands relief for these violations pursuant to 42 U.S.C. § 1983.  (Complaint, ¶ 28.) While Plaintiffs do not identify the capacity in which the individual Defendants are sued the United States Court of Appeals for the District of Columbia Circuit has held that in such a case it is appropriate to look to the "course of proceeding" to determine the capacity in which government officials are being sued.  *Daskalea v. District of Columbia, et al.*, 227 F.3d 433, 447-449 (D.C. Cir. 2000).   In *Daskalea*, Plaintiff sued the District of Columbia and the Director of the DCDOC but did not identify the capacity in which the Director was being sued.  The Court of Appeals held that the complaint did not put the Director on notice that she was sued in her individual capacity.  *Id.*  Further, the Court of Appeals held that the Director was sued in her official capacity because the complaint did not seek to hold the District and the Director jointly and severally liable.  *Id.*

      Similarly, in this case, Plaintiffs state that Defendants Director Brown, Warden Waldren and Dr. Lasansky "operate the [DCDOC]."  Am. Compl. ¶ 2.  It is clear from the amended complaint that all of the alleged wrongful conduct complained of could only have been undertaken in the Defendants' official capacity.  As to Defendant Dr. Lesansky, Plaintiffs only factual allegation against him is that he was "appointed to be the new hearing officer."  Am. Compl. ¶ 30.   Additionally, the amended complaint does not seek to hold the District and the individual Defendants jointly and severally liable and does not seek separate judgments as to each individual Defendant.   Thus, it is clear from the amended complaint that the individual Defendants are only being sued in their official capacity.

It is well settled that a law suit "against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 468 U.S. 464 (1985)).  This is equally true of §1983 suits against municipal officials in their official capacity. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (§1983 action against government official in official capacity is simply "another way of pleading an action against an entity of which an officer is an agent.");  *Busby v. City  of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991);  *Czajkowski v. City of Chicago*, 810 F. Supp. 1428, 1431 (N.D. Ill. 1992)(court sua sponte dismissed all official capacity claims against all government official defendants since City of Chicago named as defendant in § 1983 complaint); *Orange v. Suffolk County*, 830 F. Supp. 701, 706-07 (E.D.N.Y. 1993) (dismissing § 1983 claims against Suffolk County officials in their official capacities); *Kohn v. Mucia*, 776 F. Supp. 348, 355-56 (N.D. Ill. 1991).  Thus, for the purpose of Plaintiffs' § 1983 claim under Count I, the only true defendant is the District of Columbia.

**IV.    Plaintiffs' Common Law Claims For Defamation (Count II) And Intentional And Negligent Infliction Of Emotional Distress (Count III) Should Be Dismissed Because Plaintiffs Have Failed To Give Notice Of These Claims To The Mayor As Required By DC Code § 12-309.**

Plaintiffs have asserted common law claims for defamation (Count II) and intentional and negligent infliction of emotional distress (Count III).  However, Plaintiffs have not complied with DC Code § 12-309 by first sending notice to the Mayor and, therefore, these claims should be dismissed.

In order to maintain any tort action against the District of Columbia for unliquidated damages, a plaintiff must satisfy the mandatory notice requirement of § 12-309 of the D.C. Code (2001 edition).  *See, e.g.*, *Hill v. District of Columbia*, 345 A.2d 867, 869 (D.C. 1975).  In pertinent part, § 12-309 provides that:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the ...[Mayor] of the approximate time, place, cause, and circumstances of the injury or damage.

The primary purpose of the §12-309 notice requirement is to protect the District of Columbia against unreasonable claims and to assist it in the defense of the public interest where claims are made within the applicable statute of limitations but so long after the event that it is difficult for the District to obtain evidence for use in the litigation that may result. *Shehyn v. District of Columbia*, 392 A.2d 1008, 1013 (D.C. 1978); *see also Pitts v. District of Columbia,* 391 A.2d 803, 807 (D.C. 1978) (general purposes of D.C. Code §12-309 are "(1) to allow the District to investigate potential claims so that evidence may be gathered while still available, for example before the relevant sidewalk is paved over or the meter cover fixed, (2) to enable the District to correct defective conditions, thus increasing public safety, and (3) to facilitate settlement of meritorious claims and resistance of frivolous ones . . .").

The requirements of the provision are not mere technicalities. Rather, because §12-309 departs from the common law norm of sovereign immunity by allowing suits against the District, the provision's notice requirements are a mandatory prerequisite to filing a lawsuit against the District. *District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995); *Gwinn v. District of Columbia*, 434 A.2d 1376, 1378 (D.C. 1981); *Pitts*, 391 A.2d at 807. Moreover, the notice requirements must be "construed narrowly against claimants," *Dunmore*, 662 A.2d at 1359, even where a "harsh result" may occur, *Hill*, 345 A.2d at 869. DC Code § 12-309 applies not only to negligent actions but, to intentional tort as wells. *Breen v. District of Columbia*, 400 A.2d 1058 (DC App. 1979).

In this case, Plaintiffs were required to give at least six months notice of their common law claims prior to bringing suit against the District and they failed to do so. (See attached Affidavit of Phyllis L. Dailey). Since Plaintiffs have not complied with § 12-309 Counts II and III must be dismissed.

**V.    Plaintiffs' Claim For Defamation Arising Out Of The June 6, 2006 Alleged Statement Made By Director Brown To The Washington Times Is Barred By The One-Year Statute Of Limitations.**

Plaintiffs have alleged two events upon which they asserted a claim for defamation against Director Brown. Plaintiffs allege that on June 6, 2006, Director Brown made defamatory statements to the Washington Times and on July 26, 2006 he made defamatory statements during the Mayor's Weekly Press Briefing. Amended Complaint ¶¶ 9-11. Because each statement represents a new claim for defamation and, therefore constitutes a separate right of action, each statement carries its own limitation period. *Wallace v. Skadden, Arps, Slate, Meager & Flom, et al.*, 715 A.2d 873 882-884 (D.C. App. 1998). The statute of limitation for a defamation claim is one year. See, D.C. Official Code Section 12-301 (4); *Mullin v. Washington Free Weekly, Inc., et al., 785* A.2d 296 (D.C. App. 2001).

In this case, Plaintiffs' filed their complaint on June 8, 2007, more than one year after the June 6, 2006 alleged act of defamation, and, therefore, Plaintiffs' claim for defamation based on the June 6, 2006 event is time barred.

**VI.   Plaintiffs' Claim For Defamation Based On The July 26, 2006 Alleged Statement Made By Director Brown Should Be Dismissed Because Plaintiffs Have Not Alleged That The Statement Is False.**

In regards to the June 26, 2006 statement at the Mayor's weekly press briefing, Plaintiffs claim that Director Brown "announced the summary firings" and stated "that there was an ongoing criminal investigation into the jail escapes."  Am. Compl. ¶¶ 9, 10.

To succeed on a defamation claim, the Plaintiff must allege and show:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Croixland Properties Ltd. Partnership v. Corcoran*, 174 F.3d 213, 215 (D.C. Cir. 1999) (quoting *Crowley v. North Am. Telecomm. Ass'n*, 691 A.2d 1169, 1172 n. 2 (D.C. 1997) and *Restatement (Second) of Torts* § 558 (1976)).  The D.C. Circuit Court has emphasized that a plaintiff must allege each of the elements of a defamation claim in order to survive a motion to dismiss. *Croixland Properties*, 174 F.3d at 215.

Here, the Plaintiffs have not alleged that the statements made by Director Brown were false and, therefore, have failed to allege sufficient facts as to the first element of a defamation claim.   In fact, the alleged statement announcing the summary terminated was not false because it was true that the Plaintiffs were summarily termination.  Am. Compl. ¶¶ 12-16.  Likewise, Plaintiffs do not allege that Director Brown's alleged disclosure of an ongoing criminal investigation was false.  The disclosure of an ongoing criminal investigation alone is not defamatory where, as here, there was an ongoing criminal investigation and there are no allegations that the statement was false.

Since Plaintiffs have failed to allege all of the elements of their defamation claim, Count II should be dismissed.

**VII.  The District of Columbia Department of Corrections Is Non *Sui Juris* And, Therefore, Claims Against It Must Be Dismissed.**

Plaintiffs have named the DCDOC as a defendant in this action but because the DCDOC is an sub-agency of the District of Columbia government it cannot be sued in it own name.  In this jurisdiction, it is well settled that bodies within the District of Columbia government are simply not suable as separate entities, absent statutory provisions for them to sue and be sued. (*See, e.g., Roberson v. District of Columbia Board of Higher Education*, 359 A.2d 28, 31 n. 4 (D.C. 1976), holding Board of Higher Education not a suable entity (dictum); *Miller v. Spencer*, 330 A.2d 250, 251 n. 1 (D.C. 1974), (holding Department of Sanitation not suable*; Ray v District of Columbia*, 535 A.2d 868, 869 n. 2 (D.C. 1987), (holding Fire Department, the Board of Police and Fire Surgeons, and the Police and Fire Clinic are not *sui juris* entities.) (*See* also *Trifax Corp. v. District of Columbia,* 53 F. Supp. 2d 20 (D.C. Cir. 1999), (holding DHS as non *sui juris*.)

This settled body of law has been applied not only to those cases filed in the DC Superior Court but also to cases filed in the United States District Court for the District of Columbia.  In *Foggy Bottom Association v. District of Columbia Office of Planning, et al*., 2006 U.S. Dist. LEXIS 51487, the court dismissed claims brought against the District of Columbia Office of Planning, the District of Columbia Zoning Commission, the District of Columbia Department of Health and the District of Columbia Department of Consumer and Regulatory Affairs. In *Hobby v. District of Columbia Government, et al*., 2003 U.S. Dist. LEXIS 26192, the court dismissed claims against the District of Columbia Public Schools, the District of Columbia  Employee Services, the District of Columbia  Superior Court and the District of Columbia Court of Appeals.  In *Trifax Corp., v. District of Columbia, et al*., 1999 U.S. Dist. LEXIS 9089, the court dismissed claims against the District of Columbia Office of the Inspector General, the District of

Columbia Department of Health, Department of Administrative Services and the District of

Columbia Department of Human Services.

The powers of the DC Department of Corrections are set forth in D.C. Official Code §

24-211.01, *et seq*.  The statute does not empower the Department of Corrections to sue or be

sued in its own name.  Because the Department of Corrections cannot be sued as a separate

entity, the Amended Complaint must be dismissed against it.

WHEREFORE, Defendants respectfully move this Court to grant the instant motion.

Respectfully submitted,

LINDA SINGER
Attorney General for the
District of Columbia


GEORGE VALENTINE
Deputy Attorney General
Civil Litigation Division


/s/NICOLE L. LYNCH/s/_____
NICOLE L. LYNCH [471953]
Chief Civil Litigation Division Section II

/s/David A. Jackson/s/_____
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C.  20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail:  davida.jackson@dc.gov

# EXHIBIT A

# Collective Bargaining Agreement





Between

**District of Columbia**
**Department of Corrections**

&

**Fraternal Order of Police**
**Department of Corrections Labor Committee**

The Government of the District of Columbia
Anthony A. Williams, Mayor

Effective
December 19, 2002 – September 30, 2005

COLLECTIVE BARGAINING AGREEMENT

BETWEEN

DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS
AND
FRATERNAL ORDER OF POLICE DEPARTMENT OF CORRECTIONS
LABOR COMMITTEE

## TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| | PREAMBLE | 1 |
| 1 | RECOGNITION | 1 |
| 2 | MANAGEMENT RIGHTS | 2 |
| 3 | EMPLOYEE RIGHTS | 2 |
| 4 | UNION SECURITY AND DUES DEDUCTION | 4 |
| 5 | UNION-MANAGEMENT MEETINGS | 5 |
| 6 | EQUAL EMPLOYMENT OPPORTUNITY | 6 |
| 7 | OFFICIAL TIME | 6 |
| 8 | USE OF OFFICIAL FACILITIES AND SERVICES | 11 |
| 9 | EMPLOYEE ROSTERS | 12 |
| 10 | GRIEVANCE PROCEDURE | 12 |
| 11 | DISCIPLINE (CORRECTIVE/ADVERSE ACTIONS) | 19 |
| 12 | LEAVE | 22 |
| 13 | TRAINING | 25 |
| 14 | HEALTH AND SAFETY | 26 |
| 15 | REDUCTION-IN-FORCE | 30 |
| 16 | UNIFORMS | 31 |
| 17 | DETAILS, TEMPORARY PROMOTIONS AND PAY IN HIGHER GRADE POSITIONS | 32 |
| 18 | DISTRIBUTION OF OVERTIME AND TOUR OF DUTY | 33 |
| 19 | MERIT STAFFING/PROMOTIONS | 35 |

ii

| ARTICLE | | PAGE |
|---|---|---|
| 20 | POSITION DESCRIPTIONS | 36 |
| 21 | PERSONNEL FILES | 37 |
| 22 | TRANSFERS AND INTER-INSTITUTIONAL ROTATIONS | 37 |
| 23 | RETIREMENT COUNSELING | 37 |
| 24 | DISTRIBUTION OF HEALTH BENEFIT BROCHURES | 38 |
| 25 | PERFORMANCE COUNSELING | 38 |
| 26 | PERFORMANCE RATING | 38 |
| 27 | NO STRIKE OR LOCKOUT | 39 |
| 28 | PROTECTED DISCLOSURE | 39 |
| 29 | DISTRIBUTION | 40 |
| 30 | LIABILITY | 40 |
| 31 | DRUG AND ALCOHOL SCREENING | 40 |
| 32 | WASH-UP TIME | 41 |
| 33 | CONTRACTING-OUT | 41 |
| 34 | INCENTIVE AWARD AND PERSONNEL ENTERPRISES COMMITTEE | 41 |
| 35 | SAVINGS CLAUSE | 41 |
| 36 | DURATION AND FINALITY OF AGREEMENT | 42 |

iii

---

## PREAMBLE

**Section 1:** This Collective Bargaining Agreement is entered into between the District of Columbia Department of Corrections (Employer, Agency, Management or Department) and the Fraternal Order of Police Department of Corrections Labor Committee (Union).

**Section 2:** The parties to this Agreement hereby recognize that the collective bargaining relationship reflected in this Agreement is of mutual benefit and the result of good faith collective bargaining between the parties. Further, both parties agree to establish and promote a sound and effective labor-management relationship in order to achieve mutual understanding of practices, procedures and matters affecting conditions of employment and to continue working toward this goal.

**Section 3:** The parties hereto affirm without reservations the provisions of this Agreement and agree to honor and support the commitments contained herein. The parties agree to resolve whatever differences may arise between them through the avenues for resolving disputes agreed to herein.

**Section 4:** It is the intent and purpose of the parties hereto to promote and improve the efficiency and quality of services provided by the Department. Therefore, in consideration of the mutual covenants and promises contained herein, the Employer and the Union do hereby agree as follows:

## ARTICLE 1
## RECOGNITION

The Fraternal Order of Police/Department of Corrections Labor Committee has been designated by the employees in the unit described below as their preference for exclusive representative for the purpose of collective bargaining over terms and conditions of employment, including compensation, with the District of Columbia Department of Corrections.

UNIT:

"All employees of the D.C. Department of Corrections excluding managerial employees, confidential employees, supervisors, temporary employees, physicians, dentist and podiatrist, institutional residents (inmates) employed by the Department, or any employees employed in personnel work in other than a purely clerical capacity and employees engaged in administering provisions of Title XVII of the District of Columbia Comprehensive Merit Personnel Act of 1978."

1

## ARTICLE 2
## MANAGEMENT RIGHTS

**Section 1:** The Department and the Union recognize the Comprehensive Merit Personnel Act, as codified at D.C. Code § 1-618.8, provides that the Department shall retain the sole right, within applicable laws and rules and regulations:

A. To direct employees of the agency;

B. To hire, promote, transfer, assign, and retain employees in positions within the agency and to suspend, demote, discharge, or take other disciplinary action against employees for cause;

C. To relieve employees of duties because of lack of work or other legitimate reasons;

D. To maintain the efficiency of the District government operations entrusted to them;

E. To determine the mission of the agency, its budget, its organization, the number of employees, and the number, types, and grades of positions of employees assigned to an organizational unit, work project, or tour of duty, and the technology of performing its work; or its internal security practices; and

F. To take whatever actions may be necessary to carry out the mission of the District government in emergency situations.

**Section 2:** The parties recognize that such management rights are beyond the scope of collective bargaining.

## ARTICLE 3
## EMPLOYEE RIGHTS

**Section 1:** The Department and the Union recognize the Comprehensive Merit Personnel Act, as codified at D.C. Code §1-618.6(a), provides that all employees shall have the right:

A. To organize a labor organization free from interference, restraint, or coercion;

2

B. To form, join, or assist any labor organization or to refrain from any such activity; and

C. To bargain collectively through representatives of their own choosing as provided in this subchapter.

**Section 2:** The Department and the Union recognize the Comprehensive Merit Personnel Act, as codified at D.C. Code §1-618.6(b), provides that:

Notwithstanding any other provision in this chapter, an individual employee may present a grievance at any time to his or her employer without the intervention of a labor organization. Provided, however, that the exclusive representative is afforded an effective opportunity to be present and to offer its view at any meetings held to adjust the complaint. Any employee or employees who utilize this avenue of presenting personal complaints to the employer may not do so under the name, or by representation, of a labor organization. Adjustments of grievances must be consistent with the terms of the applicable collective bargaining agreement. Where the employee is not represented by the union with exclusive recognition for the unit, no adjustment of a grievance shall be considered as a precedent or as relevant either to the interpretation of the collective bargaining agreement or to the adjustment of other grievances.

**Section 3:** The Department and the Union agree that employees have the right to participate in the management of the Union or acting as a representative of the Union.

**Section 4:** The terms of this contract do not preclude any employee from bringing matters of personal concern to the attention of the appropriate officials in accordance with applicable laws, regulations and procedures.

**Section 5:** It is understood that the employees in the bargaining unit shall have full protection of all articles of this Contract as long as they remain in the unit.

**Section 6:** Management shall not restrain, interfere with, coerce or discriminate against employees in the exercise of their right to organize and designate representatives of their own choosing for the purpose of collective bargaining, the prosecution of grievances, and labor-management cooperation, or upon duly designated employee representatives acting on behalf of an employee or group of employees within the bargaining unit.

**Section 7:** The Employer shall not take any action against bargaining unit employees in reprisal for exercising a right under this Agreement. This section does not modify or diminish management's rights to take personnel actions under applicable regulations, Department orders and other relevant articles in this Agreement.

3

## ARTICLE 4
## UNION SECURITY AND DUES DEDUCTIONS

**Section 1:** The terms and conditions of employment contained in this Agreement shall apply to all bargaining unit employees without regard to Union membership. Employees covered by this Agreement have the right to join or to refrain from joining the Union.

**Section 2:** Pursuant to D.C. Code § 1-618.7, the Employer shall deduct dues from the bi-weekly salaries of those employees who authorize the deduction of said dues. The union shall be solely responsible for notifying employees, prior to obtaining their authorization, that they have certain constitutional rights under Hudson v. Chicago Teachers Union Local No.1, 743 F.2d 1187, 1191, 117 LRRM 2314 (7th Cir. 1984), and related cases. The dues checkoff authorizations may be cancelled by the employee at any time during the duration of this contract.

**Section 3:** The employee's authorization shall be forwarded to the Office of Labor Relations and Collective Bargaining along with D.C. Form 277.

**Section 4:** The Union dues shall be transmitted to the Union, minus an fee of $1.00 for the administrative costs associated with the collection of said dues pursuant to executed dues checkoff authorizations.

**Section 5:** When a service fee is not in effect, the Union may require that an employee who does not pay dues or service fees shall pay reasonable costs incurred by the Union in representing such employees in grievance, adverse action or appeal proceedings in accordance with the provisions of the Comprehensive Merit Personnel Act (CMPA).

**Section 6:** The Employer and the District Government as a whole shall be indemnified or otherwise held harmless for any errors or omissions in carrying out this Article.

**Section 7:** The service fee applicable to non-union members shall be equal to the pro rata amount of dues based on the percentage of expenditures for chargeable activities under an annual audit completed by a certified public accountant. Should the Union's annual Hudson plan result in any challenges or objections, the arbitration award shall establish the amount of service fees for non-members.

**Section 8:** Following employees annual receipt of information required under Hudson and related cases, including the Union's audit performed by an independent certified public accountant, the Employer shall deduct service fees for non-members who submit a voluntary service fee checkoff authorization. Non-members shall indicate their payment of a fee equivalent to full union dues or the reduced Hudson fee, which will be equivalent to those chargeable fees determined through the appropriate procedure.

**Section 9:** Payment of dues or service fees shall not be a condition of employment.

4

## ARTICLE 5
## UNION-MANAGEMENT MEETINGS

**Section 1:** It is agreed that the Director and the Union shall meet every month or as otherwise agreed to by the parties to further labor-management cooperation as a standing Labor-Management Committee. The Labor-Management Partnership Committee shall be an entity distinguished from any Labor-Management Committee created by the parties. The Union shall each select seven (7) members to serve on this Committee.

**Section 2:** It shall be the function of this Labor-Management Committee to discuss different points of view and exchange views on working conditions, terms of employment, matters of common interest or other matters that either party believes will contribute to improvements in the relations between them within the framework of this Agreement. It is understood that appeals, grievances or problems of individual employees shall not be a subject of discussion at these meetings. Other meetings of the Committee may be scheduled as the need arises upon mutual agreement of the parties.

**Section 3:** The Warden/Administrator along with designated staff representatives will meet monthly at each institution, facility and unit with three (3) Union representatives as a standing Labor-Management Partnership Committee to discuss and review common interests for promoting labor-management cooperation at the institutional level. Other meetings may be held when the need arises upon mutual agreement of the parties.

**Section 4:** The Department and the Union agree to exchange agendas of topics to be discussed at least five (5) days in advance of the date set for the meetings. If unusual circumstances or timeliness of events do not allow for discussion of items on the agenda submitted in advance of the meeting, the issues thus presented might either be discussed by both parties or tabled for later discussion by either party.

**Section 5:** The members of the standing Labor-Management Committee appointed by the Union shall be granted official time to attend the above conference when the conferences occur during the regular working hours of the employees. The Union shall notify the Department at least one (1) day in advance of any scheduled meeting if an alternate will attend in the absence of the appointed member.

**Section 6:** A brief summary of the matters discussed and any understanding reached will be prepared and recorded by the Employer and a recording along with a summary will be furnished to the Union before the next meeting.

**Section 7:** The Agency shall notify and provide the Union with the opportunity to bargain regarding new policies or procedures that are subject to the duty of bargaining before implementation.

5

# ARTICLE 6
## EQUAL EMPLOYMENT OPPORTUNITY

**Section 1 – General Provisions:** The Employer agrees that it will not in any way discriminate against any employee because of his/her membership or affiliation in or with the Union or service in any capacity on behalf of the Union. Neither party to this Agreement will discriminate against any employee with regard to race, color, religion, national origin, age, marital status, sexual orientation, sex, political affiliation, physical handicap, or as otherwise provided by law.

**Section 2 – Equal Employment Practices:** The Employer agrees to vigorously continue the implementation of its Equal Employment Opportunity Program as approved by the Director, D.C. Office of Human Rights. For the purpose of this Agreement, the Department/Agency's Affirmative Action Plan will be observed.

The Union shall designate an Affirmative Action Coordinator who shall, upon request, attend meetings of the Department's Affirmative Action Counselors, and be permitted to meet with Department EEO officials to discuss implementation of the Affirmative Action Plan including Departmental policies and programs.

**Section 3 – Discrimination Charges:** Any charges of discrimination shall be presented to the appropriate administrative agency having jurisdiction over the matter and shall therefore not be subject to the negotiated grievance procedure.

# ARTICLE 7
## OFFICIAL TIME

**Section 1 – Number of Representatives:**

A.  Members of the Executive Board and Chief Shop Stewards shall be allowed up to four (4) hours per day to engage in representational activities as defined in Section 5, below. Requests for official time shall be made in accordance with the procedures in Section 4.

B.  Designated Union officials or stewards shall be provided a reasonable amount of official time to represent bargaining unit employees.

**Section 2 – Designation of Representatives:**

A.  The Union agrees to provide the Agency and the Office of Labor Relations and Collective Bargaining (OLRCB) with a written listing of its officers and stewards along with a copy of its Constitution and by-laws. Those Union officers and stewards provided for in the Union's Constitution and by-laws shall be eligible for official time. The listing and changes thereto normally will be submitted to the Agency's Labor Relations Officer

or other designated official at least two (2) workdays prior to the assumption of representational responsibilities by any new officers, stewards or other representatives. If an official is not on the list of designated representatives and is needed prior to the two (2) days notice, the Union President shall notify the Agency head or his/her designee by phone or facsimile before the official will be recognized. The Agency will not recognize any official/representative who is not listed as required or for whom notification was not provided in accordance with this Section.

B.  This Agreement shall not be interpreted in any manner which interferes with the Union's right to designate representatives of its own choosing on any particular representational matter.

C.  The Union will be notified prior to any change in shift assignments of duly appointed stewards. The Union will also be notified prior to the organization of new shifts that would affect the members of the unit.

D.  Employees required to appear at meetings and conferences at the request of District, U.S., or management officials, or pursuant to a request from the D.C. Council, D.C. Office of Personnel, the Office of Personnel Management or the U.S. Congress, shall not be charged annual leave for such purposes and shall be provided administrative leave to the extent consistent with law and regulation. The employee receiving such a request shall immediately notify the appropriate supervisor and, upon request, provide a copy of the request or other appropriate evidence of the request.

**Section 3 – Performance Appraisals:**

A.  No Union representative will be disadvantaged in the assessment of his/her performance based on his/her use of official time when conducting labor-management business authorized by this Article. However, it is understood that performance problems unrelated to the use of official time may be addressed in accordance with other relevant provisions of this Agreement.

B.  At the beginning of the rating year or when the Union representative is initially appointed, both workload and performance expectations will be adjusted to reflect actual use of official time. Additionally, the supervisor and the Union representative will meet at least quarterly to discuss needed adjustments to workload and representational needs, based upon documented use of official time.

C.  The performance of Union representatives will be rated on the basis of prorated work time; i.e., the work performed in available work time after official time has been subtracted.

## Section 4 – Requests for Official Time:

A. All official time for all Union representatives must be requested and approved in advance consistent with workload requirements except when exceptional circumstances (e.g., unscheduled meetings called by management where the Union's attendance is requested, representation of employees in interviews or circumstances where the employee might be subject to discipline) do not allow for advance approval.

B. The Union representative will request authorization from his or her supervisor. The Union representative will indicate to the supervisor or designee, on the "Official Time Report" Form (See Attachment) the general nature of the representational activity he or she wishes to carry out and approximate length of time he or she believes is required.

C. All advance requests for official time are understood to be estimates.

D. The Union will complete the form to accurately depict the actual official time used in a timely manner each pay period.

E. Workload needs will be balanced with official time needs prior to approval based on the following standard: official time requests will be granted unless they hinder the accomplishment of essential workload requirements that cannot otherwise be accommodated.

F. All affected employees (e.g., grievants, representatives, witnesses, and appellants) whose presence has been determined to be necessary at relevant proceedings (including hearings, meetings, arbitrations, oral replies, or other labor-management business) will receive necessary official/duty time to travel to and from the proceedings.

## Section 5 – Official Time for Representational Activity:

A. Pursuant to the statutory right and responsibility of the Union to represent bargaining unit employees, representatives of the Union will be granted reasonable amounts of official time to investigate, prepare for, and conduct representational functions in accordance with the provisions of this Article.

B. For the purpose of this Article, "representational functions" means those authorized activities undertaken by employees on behalf of other employees of the Union pursuant to representational rights under the terms of this Agreement and District of Columbia law. Examples of activities for which official time will be authorized include:

1. negotiations;

2. discussions with Employer representatives concerning personnel policies, practices, and matters affecting working conditions;

3. any appeal proceedings or other forum in which the Union is representing an employee or the Union pursuant to its obligations under relevant contract provisions, regulations, or law;

4. grievance meetings and arbitration hearings;

5. EEO complaint settlements, and administrative and/or court hearings if a complaint is processed under the negotiated grievance procedure, or if the Union is representing the employee;

6. a disciplinary or adverse action oral reply meeting, if the Union is designated as representative of the employee;

7. any meetings for the purpose of presenting replies to the proposed termination of probationers, if the Union is designated as representative of the employee;

8. any meetings for the purpose of presenting reconsideration replies in connection with the denial of within-grade increases, if the Union is designated as representative of the employees;

9. attendance at an examination of an employee who reasonably believes he or she may be the subject of a disciplinary or adverse action under Chapter 16 of the DPM and the employee has requested representation;

10. informal consultation meetings between the Employer and the Union;

11. conferring with affected employees about matters for which remedial relief is available under the terms of this Agreement;

12. to effectuate contacts with officials of government including the Mayor, Council of the District of Columbia, Congress and their staffs;

13. attendance at meetings of committees on which Union representatives are authorized membership by the Employer or this Agreement;

14. attendance at labor-management partnership meetings or other cooperative effort;

15. attendance at agency recognized/sponsored activities to which the Union has been invited;

16. to participate in joint labor-management committee meetings;

17. necessary travel to any of the activities listed above.

C. Official time shall not include time spent on internal Union business, including, but not limited to:

1. Attending Union meetings;

2. Soliciting members;

3. Collecting dues;

4. Posting notices of union meetings;

5. Carrying out elections;

6. Preparing and distributing internal Union newsletters or other such internal documents; and

7. Internal union strategy sessions for appeals, administrative hearings or arbitration proceedings.

D. The employee requesting official time for any of the purposes set forth in this Article will advise his/her immediate supervisor or designee of the time of return to the workstation and assigned duties.

**Section 6:** The parties acknowledge that there is mutual benefit in addressing questions as to what is "reasonable" and what procedures should be followed to resolve the problems associated with any perception by the Employer that an unreasonable amount of time is being used, or that the intent as to "reasonableness" is being abused. The parties agree that in any instance or pattern so perceived, it shall be the responsibility of the Employer to promptly communicate to the Chairman and OLRCB its specific concerns.

It shall be the responsibility of the Chairman so contacted to review the matter, to assure that prompt, noticeably effective action is taken to curb any actual abuse or substantial appearance thereof, and to report promptly to the Employer that action was taken as warranted. The parties hereto recognize that abuse may not necessarily be intentional, but that irrespective of intent, the fact or substantial appearance of abuse is disruptive of mutual interests, and in any event, must be effectively dealt with.

If the Union disagrees that there is the fact, or substantial appearance of abuse, it shall communicate this promptly to the Employer. Upon receipt of this communication, the Employer shall fully and fairly consider the Union's views. If the Employer thereafter still perceives the fact or substantial appearance of such abuse, or it is dissatisfied with

the action taken by the Union, it shall determine with respect to the specific case or cases at hand what is reasonable time, and shall so communicate this determination to the aforesaid Chairman and to the employees and the Union representatives involved.

In all cases of perceived abuse of official time, the Employer shall communicate with OLRCB, which shall assist the parties in their interpretation of the Official Time Article and attempt a mutual resolution of the problem.

**Section 7:** Upon ratification and approval of this Agreement the parties shall jointly conduct training concerning official time and other aspects of this Agreement for supervisors, representatives and employees.

**Section 8:** The shop steward shall be afforded the opportunity to address unit employees at roll call to explain labor-management business unless conditions in the institution dictate otherwise. Such time shall not exceed five (5) times per week.

**Section 9:** Stewards assigned tours of duty other than day shift and scheduled days off shall have their assigned tour of duty and scheduled day off (if applicable) changed to coincide with the time of a grievance hearing. However, no overtime or other such form of compensation shall be allowed for attendance at such hearing.

**Section 10:** This Article does not preclude employees from selecting someone other than a Union representative (excluding management and supervisory officials) to represent him/her in a grievance, except that no rival organization may represent an employee in the negotiated grievance procedure, and provided that if a Union representative is not used, a representative of the exclusive labor organization must be given an opportunity to be present at any meeting held to resolve the grievance.

## ARTICLE 8
## USE OF OFFICIAL FACILITIES AND SERVICES

**Section 1:** The Department agrees to permit distribution of Union notices and circulars substantially related to workplace issues to unit employees through regular distribution procedures provided that the Union receives prior approval from the Department.

**Section 2:** The Department agrees to provide meeting facilities if available upon request to the Director or appropriate facility official. Any cost incurred for the cleaning or maintenance of such facilities after such meeting will be borne by the Union.

**Section 3:** Under no circumstances will department manpower or supplies be utilized in support of or for internal Union business.

**Section 4:** The Department agrees to provide a private area for the employees and Union representative when engaging in grievance handling.

**Section 5:** A copy of Department Program Statements, Orders and Institutional/Facilities directives and DCOP's rules and regulations concerning terms and conditions of employment will be provided to the Labor Committee.

**Section 6:** The Department agrees to designate at least one (1) secured bulletin board for the exclusive use of the Union in each institution/facility in conspicuous work area locations. The Union shall provide a copy of posted materials to the Department as far in advance prior to posting as possible. Bulletin board postings must be readily identifiable as official Union literature by the use of letterhead, logo or signature of the Union official.

**Section 7:** The Department shall make available to the Union, as required by law, upon its reasonable request any information, statistics and records relevant to negotiations or necessary for proper enforcement of the terms of this Agreement.

## ARTICLE 9
## EMPLOYEE ROSTERS

**Section 1:** Upon written request to the appropriate Department Official, on an annual basis, the Union will be provided with the list of names, titles and grades of unit employees by institutions and offices.

**Section 2:** Upon written request to the appropriate Department Official, the Union will be provided, by each institution and office a list of names, titles, and grades of unit employees appointed, separated, detailed (including details to higher positions), promoted (including temporary promotions) or transferred during the preceding month. The Department shall include the effective dates of the above action and the projected duration dates, if applicable.

## ARTICLE 10
## GRIEVANCE PROCEDURE

**Section 1 – Purpose and Definition:** The purpose of this grievance procedure is to establish an effective procedure for the fair, expeditious and orderly adjustment of grievances. Only an allegation that there has been a violation, misapplication or misinterpretation of the terms of this Agreement or the applicable Compensation Agreement or disciplinary actions taken (written admonition, corrective or adverse action) shall constitute a grievance under provisions of this grievance procedure. Any other employee appeals or complaints shall be handled exclusively by the appropriate administrative agency.

**Section 2 – Categories:**

A. **Personal:** An individual's grievance. In the case of a grievance proceeding without Union representation, the Union must be given the opportunity to offer its view at any meeting held to adjust the grievance.

B. **Group:** A grievance involving a number of employees in any subdivision of the service components: Detention, Correctional, Community, Health, Administrative or Educational.

A group grievance must contain all the information specified in Step 2, Section 3 of the Grievance procedure. The Director, or his designee, shall respond in writing within twenty-one (21) days of receipt of the grievance.

C. **Class:** A grievance must contain all the information specified in Step 2 (Section 3) of the grievance procedure. A sufficient description of the group shall accompany the grievance. This kind of grievance may be filed at whatever step resolution is possible.

A class grievance must contain all the employees in the unit. It must be filed and signed by the Union Chairman or designee at Step 4 of the Grievance procedure. Grievances so filed will be processed only if the issues raised are common to all unit employees.

**Section 3 – Procedure:**

A. **Step 1:** The aggrieved employee, with or without a Union representative, shall orally present and discuss the grievance with the employee's supervisor within ten (10) days of the occurrence of the event giving rise to the grievance or within ten (10) days of the employee's knowledge of such event. The supervisor will make a decision on the grievance and reply to the employee and his/her representative within five (5) days after oral presentation of the grievance. In unusual circumstances, where the grievant cannot be physically present, a Union representative, authorized in writing by the Grievant, may present the grievance at this Step without the Grievant present.

B. **Step 2:** If the grievance is not settled, the aggrieved employee, with or without his/her Union representative, shall submit a signed, written grievance to the appropriate Administrator or Office Chief within seven (7) days following the date the response to the oral grievance is due. This specific Step 2 grievance shall be the sole and exclusive basis for all subsequent steps. The grievance at this and at every further step shall contain:

1. A statement of the specific provision(s) of the Agreement alleged to have been violated, misapplied or misinterpreted;

2. The date or dates on which the alleged violation, misapplication or misinterpretation occurred;

3. A brief description of how the alleged violation occurred;

4. The specific remedy or adjustment sought;

5. Authorization for the Union or other employee representatives, if desired by the employee, to act as his/her representative in the grievance; and

6. The signature of the aggrieved employee and the Union if applicable, according to the category of the grievance.

C. Should the grievance not contain the required information, the Grievant shall be notified and given five (5) days from receipt of notification to resubmit the grievance. Failure to resubmit the grievance within the five (5) day period shall void the grievance.

D. The Administrator or Office Chief shall respond to the employee in writing, within seven (7) days of receipt.

E. Step 3: If the grievance remains unsettled, the employee shall submit the grievance to the appropriate Deputy Director within five (5) days following the employee's receipt of the response of an Administrator or Office Chief. The Deputy Director must respond in writing within seven (7) days of receipt.

F. Step 4: If the grievance remains unsettled, the employee shall submit it to the Director within five (5) calendar days following the receipt of the response of a Deputy Director. Within fifteen (15) days of receipt the Director will respond in writing to the Grievant.

G. Step 5: If the grievance remains unresolved, the Union, within fifteen (15) days after receipt of the Director's response, shall notify the Director and OLRCB in writing whether the Union intends to request arbitration or requests that the Department agree to utilize the Grievance Mediation procedure described below on behalf of the employee(s).

14

**Section 4 – Grievance Mediation:**

A. The purpose of this Grievance Mediation procedure is to provide, an innovative method by which the parties may mutually reach satisfactory solutions to grievance prior to the invocation of arbitration. The parties recognize the necessity of carefully considering the circumstances of the particular grievances in deciding whether to utilize this procedure. This procedure, while broadening the channels of grievance resolution, must comply with District of Columbia laws, rules, regulations and the negotiated grievance procedure and shall only be invoked upon mutual agreement of the parties in writing on a case-by-case basis.

B. Selection

1. Should the parties fail to resolve the grievance utilizing the grievance procedure set forth above (Section 3), the parties may, within ten (10) days after the Union's request for grievance mediation pursuant to Step 5 of the grievance procedure, mutually agree to utilize the mediation process as set forth below.

2. A joint request shall be submitted to the Federal Mediation and Conciliation Service (FMCS) or other appropriate authority that provides grievance mediation services, with which the parties jointly agree. The mediator selected must have demonstrated expertise in public sector labor relations and in grievance mediation.

3. The mediation session must commence within forty-five (45) days of the Agreement to mediate. If the matter is not successfully resolved through mediation or is not scheduled for a mediation session within the forty-five (45) day period, OLRCB and the Union shall select an arbitrator consistent with the terms of this Agreement.

C. Mediation Procedure

1. Each party shall have representation at the mediation session.

2. The grievant(s) shall be present and participate at the mediation session. In the case of a class or group grievance, a maximum of three (3) grievants shall be present as representatives of the class or group.

3. Mediation sessions shall be informal; the rules of evidence shall not apply.

4. The mediation session shall be confidential. No record of the session shall be made.

15

5. During the session, the mediator may meet individually or jointly with participants, however, he/she is not authorized to compel or impose a settlement.

6. The mediation session shall not exceed one (1) day unless the parties agree otherwise.

D. Mediation Conclusion

1. The parties shall sign their respective copies of the Settlement Agreement.

2. Should both parties accept the settlement, it shall not have precedent setting value unless mutually agreed to on a case-by-case basis.

3. Should mediation and any further negotiations among the parties fail to resolve the matter, the arbitration proceedings in accordance with Section 3 may be invoked by the Union within five (5) calendar days of the termination of the mediation session.

4. The mediator shall be barred from arbitrating the grievance in a subsequent arbitration proceeding or testifying in a subsequent arbitration proceeding.

5. Documentation pertaining solely to the Mediation Process including evidence, settlement offers or the mediator's advisory opinion shall be inadmissible as evidence in any arbitration proceeding.

6. The parties shall share the fees and expenses of the mediator equally.

Section 5 – Arbitration:

A. The parties agree that arbitration is the method of resolving grievances that have not been satisfactorily resolved pursuant to the Grievance Procedure or Grievance Mediation.

B. Disputes of arbitrability shall be heard prior to a hearing on the merits. At the time the Department and OLRCB receive the demand for arbitration, if the Agency asserts non-arbitrability, the Union will be notified that the Agency believes that the issue is not arbitrable. Disputes regarding arbitrability shall be heard by any arbitrator selected through the procedures listed in 5(d) of this Article. The arbitrator shall consider the issue of arbitrability separately, prior to a hearing on the merits.

C. If the parties fail to agree on a joint stipulation of issue(s), the issue shall be framed by the Arbitrator.

16

D. Within ten (10) days after the Director and OLRCB have received the request for arbitration, the Union shall request the FMCS to refer a panel of seven (7) impartial arbitrators. Upon receipt of the FMCS panel the parties will select one (1) of the names on the list. Each party will alternately strike a name from the panel until one (1) remains. The privilege of first strike shall be determined by a coin toss or other mutually agreeable random method. If, before the selection begins, none of the arbitrators are acceptable, a new panel shall be sought.

Section 6:

A. The arbitrator shall hear and decide only one (1) grievance appeal in each case unless substantially similar issues are involved. In such circumstances cases shall be consolidated for arbitration upon agreement of the parties.

B. The hearing shall not be open to the public or persons not immediately involved unless all parties mutually agree to such. All parties shall have the right, at their own expense, to legal and/or stenographic assistance at this hearing.

C. The arbitrator shall not have the power to add to, subtract from or modify the provisions of this Agreement in arriving at a decision on the issue(s) presented and shall confine his/her decision solely to the precise issue(s) submitted for arbitration.

D. The arbitrator shall render his/her decision in writing, setting forth his/her opinion and conclusions on the issues submitted within thirty (30) days after the conclusion of the hearing or after the arbitrator receives the parties' briefs, if any, whichever is later. Absent mutual agreement by the parties, the arbitrator shall set the deadline for timely submission of briefs. The decision of the arbitrator shall be binding upon both parties and all employees during the life of this Agreement.

E. A statement of the arbitrator's fee and expenses shall accompany the award. The parties shall share the fee and the expenses of the arbitrator equally.

F. Appeals of the arbitration awards shall be made in accordance with District of Columbia law.

Section 7—General:

A. No matter shall be entertained as a grievance unless raised within ten (10) days of the occurrence of the event giving rise to the grievance, or within ten (10) days of the employee's knowledge of the occurrence of the event giving rise to the grievance

17

B. Any unsettled grievance not advanced to the next step by the employee, or in the event of a class or group grievance, the Union representative, within the time limit specified in the step, shall be deemed abandoned. If the Department does not respond within the time limit specified at each Step, the employee may invoke the next Step treating the lack of response as a denial of the grievance.

C. All time limits must be strictly observed unless the parties mutually agree to extend said time limits. "Days" means calendar days.

D. No recording device shall be utilized during any step of this procedure unless direction of the arbitrator for his/her use. No person shall be present at any step for the purpose of recording the discussion. However, nothing in this provision shall prohibit the parties or a party from employing the services of a professional court reporter or stenography service for the purpose of preparing a true and correct transcription of the proceeding.

E. The presentation and discussion of grievances shall be conducted at a time and place that will afford a fair and reasonable opportunity for both parties and their witnesses to attend. Such witness(es) shall be present only if necessary for them to present evidence. When discussions and hearings required under this procedure are held during work hours of the participants, they shall be excused with pay for that purpose. An employee scheduled to work shift or weekends will have his/her hours changed to coincide with the time of the hearing.

F. The settlement of a grievance prior to arbitration shall not constitute a precedent in the settlement of grievances.

G. In appropriate circumstances, Management may utilize the grievance/arbitration procedure by first filing a grievance with the Chairman of the Labor Committee. Such filing and response shall be under the same time limits as a Step-4 grievance.

## Section 8 – Expedited Arbitration Procedure:

This procedure shall only apply after the Director or his/her designee makes a final decision. The parties agree that expedited arbitration procedure upon the Union's or Management's written request shall be invoked in all cases of summary removals, summary suspensions, suspensions of thirty (30) days or more and class grievances. In all other disputes the expedited arbitration procedures shall only apply when both parties mutually agree.

Step 1: The employee and/or the Union shall present it (with supporting documentation and agency final decision) to the agency head in writing within fifteen (15) days after receiving the final decision. The agency head shall respond in writing within fifteen (15) days after receipt of the written grievances.

18

Step 2: The Union may, by written notice, request expedited arbitration within twenty (20) days after the reply in Step 1 is due or received, whichever is sooner.

Step 3: Within seven (7) days of the Department's receipt of the Union's notice of intent to arbitration request, the moving party shall solicit a panel of seven (7) impartial arbitrators from FMCS. Within seven (7) days after receipt of the list, both parties shall select an arbitrator. Both the Employer and the Union may strike three (3) names from the list using the alternate strike method. A coin toss shall determine the first strike.

Step 4: The arbitration hearing shall be held within thirty (30) days after selection of an arbitrator. Any party unprepared to present its case shall forfeit their issues for arbitration and remedies sought unless the parties mutually agree to extend said time limits. The arbitrator shall issue an award within twenty (20) days of the date set by the arbitrator for filing briefs.

Step 5: All other provisions in the expedited arbitration proceeding will be as specified in Section 6 of this Article.

## ARTICLE 11
## DISCIPLINE (CORRECTIVE/ADVERSE ACTIONS)

Both parties recognize the exclusive rights of Management to discipline employees for cause, as defined in the DPM. Discipline shall be imposed for cause, as provided in D.C. Code §1-617.51 and defined in Chapter 16 of the District Personnel Manual

## Section 1:

For the purpose of this Article, discipline shall include the following:

A. Corrective Actions: Written reprimands or suspensions of less than ten (10) days; and

B. Adverse Actions: Removal, suspensions for ten (10) days or more; or a reduction in grade.

## Section 2:

Employees have the right to contest corrective or adverse actions taken for cause through the negotiated grievance procedure as provided in Article 10. Employees have the right to contest adverse actions taken for cause through the Office of Employee Appeals (OEA) as specified by OEA rules.

A. Should the employee select to appeal the action to OEA, such appeal shall be filed in accordance with OEA rules and regulations.

19

B. Should the employee select to grieve under the negotiated grievance procedure, discipline may only be grieved at the next higher level than where the final decision was taken, except in the case of actions taken by the Director.

D. Should the employee or Union, in cases of appeals to arbitration, wish to grieve disciplinary action, such grievance/arbitration must be filed within the time limits specified in Article 10 starting with the date after the effective date of the action.

**Section 3:** If a supervisor has reason to discipline an employee, it shall be done in a manner that will not embarrass the employee before other employees or the public.

**Section 4:** Employees requested to reply to disciplinary actions will be informed of the right to have a Union representative present.

**Section 5:** If an employee can reasonably expect discipline to result from an investigatory interview, and a reasonable advance notification of the interview has not been given, at the request of the employee, questioning shall be delayed for no longer than twenty-four (24) hours to give the employee an opportunity to consult with a Union representative.

An employee's Union representative may be present at all investigatory questioning sessions held under this Article, but may not answer questions on behalf of the employee. However, the representative may counsel the employee and may assist the employees in presenting the facts. This section shall not supercede the requirement that employees shall submit reports in writing of all extraordinary occurrences or significant incidents.

**Section 6:** Prior to commencement of any questioning of unit members, the member shall be informed of:

A. The type of investigation being conducted (criminal or administrative). If administrative then the specific reason or type of complaint.

B. Whether the member is alleged to be the subject of the investigation if known at the time.

C. The name(s) of the complainant(s) unless this information would jeopardize the security of the investigation or the safety of the complainant or witness.

D. The name and title of the official who will be doing the questioning and the name and rank of persons that will be present.

20

**Section 7:** When management determines that the questioning session is to be recorded, all portions of the session shall be recorded with proper notation as to breaks and off the record discussion began and ended. If a recording device is used, a copy of the tape shall be made available upon written request to the employee or the Union when discipline is proposed, or upon conclusion of the investigation which should normally be concluded within 45 days.

**Section 8:** Corrective or Adverse Action shall be commenced within a reasonable time after the agency knew or should have known of the act or occurrence allegedly constituting cause.

**Section 9:**

A. Except in the case of summary discipline, an employee against whom adverse action is proposed shall be entitled to advance written notice of twenty (20) days. The notice shall inform the employee of the causes and the specific reasons for the proposed action; the right to provide a written response within six (6) days of receipt of the advance written notice; the person to whom the written response or any request is to be presented; right to review any material upon which the proposed action is based; in the case of a proposed adverse action only, the right to be represented by an attorney or other representative, the right to an administrative review by a hearing officer appointed by the agency head, as provided in DPM Section 1612, when the proposed action is a removal; and, the right to a written decision.

B. An employee shall be given up to ten (10) hours official time to prepare for his/her defense against any proposed disciplinary action.

C. Disinterested Designee/Hearing Officer shall review the proposed action, receive and review all relevant statements, conduct a hearing if a hearing is requested by the employee and issue a recommendation to the Deciding Official normally within ten (10) days after conducting a hearing of receiving the disciplinary action if a hearing is not requested. The Hearing Officer must be a DS-13 or higher and have no direct or personal knowledge of the matter contained in the disciplinary case, and not be in the chain of command between the proposing and deciding officials.

D. Deciding Official shall issue a final decision after reviewing the recommendation of the Disinterested Designee/Hearing Officer. The deciding official may sustain r reduce the penalty recommended by the Disinterested Designee, remand the matter for further consideration by the Hearing Officer, or dismiss the charge but may not increase the penalty recommended by the Disinterested Designee/Hearing Officer.

**Section 10:** Summary removal, summary suspension, enforced leave shall only be executed upon the Director's approval. The Union Chairman will be notified within forty-eight (48) hours and give the specific reason for the action.

21

**Section 11:** Applicable District Regulations shall govern discharge of probationary, temporary, and term employees.

**Section 12:** Pending disciplinary action will not preclude an employee from participating in the promotional process. After the eligibility list, register or certification is formed and a final penalty is imposed, the member need not be promoted from the list, register, or certification. If after an eligibility list, register or certification is formed and disciplinary action is proposed, the promotion shall be held in abeyance pending a final disposition. If the disposition is favorable to the employee, the employee shall be promoted forthwith but back pay retroactive to the date when the member would have otherwise have been promoted.

**Section 13:** After discovery of the incident, the investigations shall be conducted in a timely manner and discipline shall be imposed upon the conclusion of any investigation or the gathering of any required documents, consistent with the D.C. Office of Personnel regulations.

**Section 14:** The Employer agrees that disciplinary action shall not be punitive but based on conduct or performance deficiencies. The selection of the appropriate penalties shall be based on progressive discipline principles consistent within the department. Consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist.

## ARTICLE 12
## LEAVE

### Section 1 – Annual Leave:

A. All annual leave requests must be submitted in advance of the time requested. Failure to obtain advance approval for leave may result in having the absence charged to absence without leave (AWOL). Emergency annual leave may be approved by the designated supervisor when an oral request is made. If granted, the employee must submit a written application for leave (SF-17) within twenty-four (24) hours of return to duty.

B. Only supervisors designated by the Department will authorize annual leave in the absence of the designated supervisor, emergency annual leave will be approved by the next higher level of supervision.

C. All employees requesting a leave period of one (1) week or more will do so in accordance with the following:

1. Their request will be submitted by the date determined by the Department each year.

2. Supervisors will notify each employee of the disposition of his/her request within one (1) calendar month.

3. If more employees from the same shift than can be spared apply for leave for the same period and management determines that appropriate staff is available to do the work, the employee with the greatest service with the Department will have preference, except as provided below. The employee(s) required to make a new selection will have a preference over employees who did not submit requests if the new selection is resubmitted within 15 days after the disposition of the requests period, provided, the Department has determined that appropriate staff is available to do the work during the period that is proposed.

4. Employees wishing to change their request may do so provided their service can be spared and their new choice does not conflict with leave scheduled for another employee. Since these dates are tentative, the employee will request from his/her supervisor the proposed leave period he/she desires to change as far in advance as possible.

5. During the period of May 1st to October 1st, no employee will be granted more than one (1) leave period of a duration of one (1) week leave period during these months.

6. The granting of leave for the days of Thanksgiving, Christmas and the New Year holidays will be on a rotating basis so that all employees may have an equal opportunity for leave at these times. However, this does not preclude or interfere with the Department's right to determine appropriate staff on holidays to ensure the proper accomplishment of Agency work.

7. Although every effort will be made by supervisors to honor advance requests for leave periods, an advance request is not a guarantee of final approval. The Employer reserves the right to cancel previously approved for circumstances such as workload and unforeseen urgent needs. In the event it is necessary to cancel advanced requests, the supervisor will promptly advise the employee concerned. In such cases the employee's circumstances will be given due consideration. Every effort will be made to reschedule the leave period for the employee's convenience.

8. If an employee is transferred within the Department at his/her request or as a result of a promotion, training assignment or voluntary shift change other than the normal shift rotation, the employee may be required to adjust his/her leave scheduled in the unit to which he/she has been transferred. If the move has been a result of a management decision, seniority will be the controlling factor.

## Section 2 – Sick Leave:

A. Supervisors shall approve sick leave of employees who are unable to perform their duties due to illness. Employees assigned to rotating shifts or regular tours of duty shall request unplanned sick leave from the control center no later than two (2) hours prior to the start of their shift. All other employees shall request sick leave as soon as possible prior to the start of their shift on the first day of sick leave absence. The employees shall submit the appropriate sick leave request to his/her supervisor upon return to work.

B. A supervisor may require a doctor's certificate for absences of three (3) days or more. Additionally, those employees who have received 'sick certifications' due to potential or actual sick leave abuse shall provide documentation as required by the Department.

C. Sick leave may be used when an employee receives medical, dental or optical examinations or treatment, or is incapacitated for the performance of duty by sickness, injury, or pregnancy and confinement is required to give care and attendance to a member of his/her immediate family who is afflicted with a contagious disease (as defined by applicable regulations) or would jeopardize the health of others by his/her presence at his/her post of duty because of exposure to contagious disease.

D. Employees shall submit requests for, or substantiate, sick leave on SF-71, Application for Leave. The Employer will make the SF-71 available for completion and signature by employee(s).

E. Except in an emergency situation, an employee who will be or is absent due to illness or injury will notify the control center or designated person or unit a minimum of one (1) hour and fifteen (15) minutes prior to the start of the employee's shift, of the inability to report for duty. If an employee is too ill or injured to personally notify the supervisor of his/her absence, notification may be made by a third party.

F. Employees returning from sick leave will so notify their supervisor or the control center as far in advance of the start as possible. Although employees will not be required to call in to request sick leave each day, in case of an extended illness or more than three (3) days, employees will periodically update their supervisors as to their ability to return to work.

24

G. Sick leave will be requested in advance for visits to, and/or appointments with doctors, dentists, practitioners, opticians, chiropractors and for the purpose of securing diagnostic examination, treatment and x-rays.

## Section 3 – Leave Without Pay:    Leave without pay (LWOP) may be granted in accordance with applicable District Personnel Regulations, upon the employee's request.

## ARTICLE 13
## TRAINING

**Section 1:**    The Union shall have membership on any standing Labor-Management body, Board or Committee, and will be entitled to express its views, make recommendations, and otherwise participate, except in selection of participants for training and determining how the budget will be spent.

**Section 2:**    Normally, training which is authorized and approved by the Employer will be conducted during regular working hours (8:00am to 4:00pm) when practical. This does not apply to reading assignments given as a part of training nor does this Article or any aspects of this Agreement preclude an employee from participating in training on his/her time.

**Section 3:**    A record of an employee's training and details to other than regular assignments shall be documented and made a part of the employee's Official Personnel Folders to be used as reference qualifications.

**Section 4:**    Opportunities for employee development through outside educational programs which are related to performance of official duties will be made available in accordance with applicable D.C. laws and regulations.

**Section 5:**    The Employer will provide copies of locally generated training announcements to the Union as they are posted.

**Section 6:**    The Department shall provide appropriate correctional training (currently six (6) weeks) to all newly hired personnel commensurate with their inmate contact upon or prior to their entrance on duty. Periodic in-service training shall be provided consistent with duty assignments and the implementation of new policies and procedures, to provide the skills necessary to perform the duties of their jobs. Periodic in-service training shall be provided for all correctional officers who have completed their probationary period (currently forty (40) hour per year). Employees who are not correctional officers who work in an institutional setting and who have completed their probationary period shall be enrolled in in-service training (currently eight (8) hours per year). Management retains the discretion to determine the amount, frequency and timing of training necessary for the performance of work. Management shall consider individual requests for additional training. Scheduled in-service training may be temporarily

25

suspended or modified only by the Director or Deputy Director. The Union's Principal Executive Officer will be promptly notified.

**Section 7 - Firearms Training:**

A. Employees whose duties require the possession and use of firearms shall receive the appropriate range and firearms training along with instructions in safe and effective use of firearms, and refresher training in the Department policies concerning the use of deadly force.

B. An employee's failure to qualify and/or re-qualify with the semi-automatic firearm shall not be a basis or cause for disciplinary action. Employees that fail to qualify with the semi-automatic will be given the alternative of using the Department issued revolver after successfully completing the range training and qualification requirements for the revolver.

**ARTICLE 14**
**HEALTH AND SAFETY**

**Section 1 - Employees Working Alone:** If employees are required to work in areas beyond the call, observation or periodic check of others where dangerous chemicals, explosives, toxic gases, radiation, laser light, high voltage or rotary machinery area to be handled, the District shall take reasonable and necessary precautions to ensure the health and safety of an employee who might be endangered by working alone.

**Section 2 - Medical Service: On-the-Job Injury:** The District shall make first-aid kits reasonably available for use in case of on-the-job injuries. If additional treatment appears to be necessary, the District shall arrange immediately for transportation to an appropriate medical facility.

**Section 3 - Emergency and Preventive Services:**

A. The Employer agrees to provide emergency diagnosis and treatment, within the competence of the professional staff and the capability of the facilities health services unit, for employees who are injured or become ill during working hours.

B. The Employer shall determine the preventive services programs necessary to inform employees of health and/or safety issues in the work environment. Programs may include health education, disease screening and physical examinations.

**Section 4 - Light Duty:**

A. The District agrees to provide light duty assignments for employees injured on the job to the extent that such light duty is available and justified as follows:

1. To be eligible for light duty, the employee must be certified by the employee's attending physician as temporarily unable to perform the duties of his/her position. The certification must identify the nature and extent of the employee's impairment and the type of light duty he/she is capable of performing, an estimation of the time the he/she is likely to be incapacitated and type of activity he/she is incapable of performing. If the period of incapacitation extends beyond the estimated time, the physician shall provide an updated certification stating the additional time the employee is likely to be incapacitated. The Department shall have the option of confirming the diagnosis at the Employer's expense, however, the employee's request for light duty shall be granted during the agency's confirmation process.

2. The employee will be given light duty assignments for which he/she is qualified, initially when available, within his/her own organizational unit. If light duty is not available within the department, suitable work will be sought elsewhere in the department.

3. Light duty assignments shall not normally extend beyond 45 working days. Extensions shall be at the Employer's option. Employees unable to perform their regularly assigned duties after the expiration of the 45-day period shall make application for disability compensation or exercise such other options as may be available to employees under law, and in accordance with paragraph 5 below.

4. Where there are more requests for light duty than there are light duty assignments and the employees are equally qualified for the assignment, assignments shall be made in the order of earlier date of request.

5. When light duty is not available, an employee must return to full duty or seek compensation or retirement from appropriate channels. In the event compensation or retirement is not approved, the employee may be required to take a fitness for duty examination and may be separated if (1) found unfit to perform or (2) found fit but refuses to report for full duty.

**Section 5 - Excessive Temperatures in Buildings:** Employees, other than those determined by the Employer to be essential, shall be released from duty or reassigned to other duties of a similar nature at a suitably temperate site because of excessively hot or cold conditions in the building. This determination will be made by the Employer as expeditiously as possible and shall be based upon existing procedures. In lieu of dismissal, the Employer may reassign employees to other duties of similar nature at a

suitably temperate site. Administrative leave will be granted if authorized by the Mayor or his/her designee.

**Section 6 – Employee Health Services:** Employees covered by this Agreement shall have access to employee health services provided by the Employer consistent with the Comprehensive Merit Personnel Act (D.C. Code Section 1-621.7).

**Section 7 – Maintenance of Health Records:** Medical records of employees shall be maintained in accordance with the provisions of Chapter 31 of the D.C. Government regulations that maintain confidentiality of those records. Medical records shall not be disclosed to anyone except in compliance with applicable rules relating to disclosure of information.

**Section 8:** The Employer agrees to follow Mayor's Order 87-95 or other applicable Order regarding ergonomic policy for use of video display terminals.

**Section 9:** The Employer agrees to provide relief to correctional staff within a reasonable period of time for employees in areas where toilet facilities are not readily accessible.

**Section 10:** The Union may make recommendations to the Facility Administrator and the Director regarding detection methods used to prevent the introduction of contraband into the facilities.

**Section 11 - Working Conditions:**

A. The Employer will make every effort to provide and maintain safe working conditions. The Union will cooperate in these efforts by encouraging its members to work in a safe manner and to obey established safety practices and regulations.

B. Matters involving safety and health will be governed by the D.C. Occupational Safety and Health Plan in accordance with Subchapter XXI of the Comprehensive Merit Personnel Act (1980, as amended, D.C. Code section 1-621.1 *et seq.*).

**Section 12 – Corrective Actions:**

A. If an employee observes a condition that he or she, believes to be unsafe, the employee shall report the condition to the immediate supervisor.

B. If the supervisor determines that a condition constitutes an immediate hazard to the health and safety of the employee, the supervisor shall take immediate precautions to protect the employee.

28

C. If the supervisor determines that a condition does not constitute an immediate hazard to the health and safety of the employee and the employee disagrees, the matter may be immediately referred by the employee to the next level supervisor or designee. The supervisor or designee shall make an immediate determination as to whether the condition constitutes an immediate hazard to the health and safety of the employee. An employee will not be required to operate unsafe equipment or work in conditions reported as unsafe or hazardous until the next level supervisor or designee has determined that the conditions or equipment are safe.

D. Matters related to alleged unsafe working conditions or equipment may be brought to the attention of the safety committee.

E. Employees shall not be required to operate unsafe equipment that has been so determined by the Employer or the D.C. Risk Manager.

**Section 13 - Safety Devices and Equipment:** Protective devices and protective equipment as determined appropriate by the Employer or other competent authority shall be provided by the Department and shall be used by the employees.

**Section 14 - Safety Training:**

A. The Department shall provide safety training to employees as necessary for performance of their job. Issues involving safety training may be presented to the Safety Committee.

B. The Department shall make CPR training available.

**Section 15 - Safety Committees:**

A. The Department agrees that the Union shall have two (2) members, one (1) correctional and one (1) non-correctional, on the Department Safety Committee. Committee meetings will be held during working hours without loss of pay or leave to employees.

B. One (1) Union and one (1) Department representative shall each serve as co-chairpersons of the Committee.

C. The Safety Committee shall:

1. Meet on a monthly basis, unless mutually agreed otherwise. Prior to regularly scheduled monthly meetings, labor and management must submit their respective agendas to each other at least five (5) days in advance;

2. Conduct safety surveys, consider training needs, and make recommendations to the agency/department head;

29

3. Consult with and advise department/agency heads; and,

4. Receive appropriate health and safety training.

D. Final reports or responses from agency/department heads (or designees) shall be provided to the Safety Committee within a reasonable period of time on safety matters initiated by the Committee.

**Section 16:** The Employer agrees to provide the Union safety and health committee members with a copy of all current D.C. Safety Officers, or Departmental Risk Managers, and revisions as they occur.

**Section 17:** The Union and the Department will make every effort to prevent accidents of any kind. Should accidents occur, however, a prime consideration will be the welfare of injured employees consistent with medical protocol.

**Section 18:** The Union shall have membership on the Risk Assessment Committee.

**Section 19:** Transportation service shall be provided to transport injured employees on the compound for appropriate medical services. EMS services will be made available if determined appropriate by medical staff.

**Section 20:** The supervisor shall provide a complete copy of Form CA-16 to the Agency Human Resources Department for deposit into the employee's human resource file. The employee shall have access to this document as they do for any other human resource file.

## ARTICLE 15
## REDUCTION-IN-FORCE

**Section 1:** The Employer agrees to notify the Union of proposed reduction-in-force (RIF) actions that may adversely affect unit employees. The Employer will consider the Union's views regarding minimizing the number of adversely affected unit employees.

**Section 2:** Following the guidelines contained in the District of Columbia Personnel Manual, the Department agrees to minimize the effect on bargaining unit employees to the extent practicable. In the event of a RIF the procedures outlined in the laws and regulations of the District of Columbia will be utilized.

## ARTICLE 16
## UNIFORMS

**Section 1:** The Employer shall provide the following items of uniforms to unit employees as specified:

A. Correctional Officer - Male

| | |
|---|---|
| Blouse, blue | 1 each |
| Police-style coat, blue | 1 each |
| Trousers, blue (winter) | 4 pairs |
| Trousers, blue (Summer) | 4 pairs |
| Cap, winter (opt.) | 1 each |
| Cap, summer (opt.) | 1 each |
| Shirt, gray, short sleeve | 6 each |
| Shirt, gray, long sleeve | 6 each |
| Necktie, black | 1 each |
| Whistle, chrome | 1 each |
| Raincoat | 1 each |
| Badge, large, silver | 1 each |
| Badge, small, silver | 1 each |

B. Correctional Officer - Female

| | |
|---|---|
| Blouse, blue | 1 each |
| Overcoat, blue | 1 each |
| Trousers, blue (winter) | 4 pairs |
| Trousers, blue (summer) | 4 pairs |
| Cap, winter (opt.) | 1 each |
| Cap, summer (opt.) | 1 each |
| Shirt, gray, short sleeve | 6 each |
| Shirt, gray, long sleeve | 6 each |
| Necktie, black | 1 each |
| Whistle, chrome | 1 each |
| Raincoat | 1 each |
| Badge, large, silver | 1 each |
| Badge, small, silver | 1 each |

If a Correctional Officer is pregnant and on active duty, the Employer shall make available suitable uniform clothing, upon the employee's request.

C.   Khaki Uniforms (Wage employees and other employees assigned to jobs requiring these uniforms):

Trousers, Khaki                6 pairs
Shirt, Khaki, long sleeve      6 each
Shirt, Khaki, short sleeve     6 each
Raincoat                       1 each
Coveralls, Khaki               2 pairs
Shoes, Safety, steel toe       1 pair
Badge, large, gold             1 each
Badge, small, gold             1 each

## ARTICLE 17
## DETAILS, TEMPORARY PROMOTIONS AND PAY IN HIGHER GRADE POSITIONS

**Section 1:**   Details or temporary promotions shall be made in accordance with appropriate provisions of the District Personnel Manual.

**Section 2 - Acting Pay:**   An employee detailed or assigned to a higher grade position for more than ninety (90) consecutive days shall receive the higher rate of pay beginning the first full pay period following the ninety (90) day period. If Management decides to reassign an employee to a higher-grade position after the employee returns from the approved leave or disability compensation, such absences will not be considered a break in the consecutive day requirement.

**Section 3:**   Management will ensure that an employee assigned or detailed to a higher grade position is not arbitrarily removed from detail and then reinstated to the detail in order to avoid Acting Pay in accordance with Section 2 above.

**Section 4:**   Details or assignments to a higher-grade position shall not be used as a pre-selection device. For the purpose of the preceding term "pre-selection device" refers to recurring patterns of selecting individuals for promotion that are not qualified but assigned or detailed to the higher-grade position as provided in the Article.

**Section 5:**   Competitive placement procedures will be utilized for all higher grade details extending beyond 120 days to established positions and 240 days to unestablished positions.

**Section 6:**   Management will generate the appropriate paper work (Form 52) for employees detailed/assigned to another position extending beyond 90 days.

---

**Section 7:**   Management will notify the Union of all bargaining unit employees detailed or assigned to supervisory/managerial positions so that the Union can remove that employee from its roles during the period he/she is detailed or assigned to the supervisory position.

**Section 8:**   Bargaining unit employees shall be given the first opportunity to be assigned to details and temporary promotions into bargaining unit positions provided that they are qualified and available to perform the duties.

## ARTICLE 18
## DISTRIBUTION OF OVERTIME AND TOUR OF DUTY

**Section 1:**   Management retains the unfettered right to determine necessary job requirements for assignments and to determine the employees who are eligible to work the assignments.

**Section 2:**   Where management determines that employees are equally eligible to perform overtime assignments, overtime will be offered to employees on a volunteer basis and distributed equitably among those employees.

**Section 3 – Overtime:**

A.   Voluntary Overtime

A list shall be posted for employees to sign up for overtime. The employee must be present to sign his/her own name on the list. Correctional Officers, Grade 6 through 9 will be selected for overtime in descending order from the voluntary sign up list. Management will not arbitrarily deny employees overtime. If an employee's name is skipped over, the supervisor must justify to the employee and in writing the reason for denying that employee to work overtime.

B.   Mandatory Overtime (Draft)

Based on operational demand and/or emergencies when it becomes necessary for management to order mandatory overtime, prior to invoking a draft, management will first attempt to locate volunteers from other facilities or employees in an off duty status. If there is still a need, selections will be made among all employees (including those assigned to non-bid special skills post) in alphabetical order regardless of rank (Grades 6 through 9). Under no circumstances will an employee be forced to work mandatory overtime for two or more consecutive days. Nor will an employee be required to work more than eight (8) hours of overtime per day unless unforeseen emergencies arise (inclement weather, disturbances, interstate transports, etc.). Employees shall be paid at the appropriate overtime rate for mandatory overtime hours worked. An employee may be paid straight

time or compensatory time for ordered mandatory overtime if mutually agreed to by the parties in advance.

C. Records of employees voluntary and mandatory overtime performed shall be maintained by the Employer and made available to the Union upon request.

D. The provision of this Article shall apply to uniformed employees who are required to work overtime.

**Section 4 – Tours of Duty/Shift Change:** Changes in shift will be distributed and rotated equitably among qualified employees on an annual basis in accordance with Department Order 3020.3.

A. The Union's Chairman or designee will have an ex-Officio membership as an observer on any joint labor-management committee regarding applicable annual shift change regulations. Any newly created post or modification of an existing post (days off, duty hours, former bid post which are converted to non-bid special skill post, etc.) will be submitted to the Work Force Utilization Committee prior to implementation.

B. Employees will not be arbitrarily removed or reassigned from a post they obtained through the Master Roster bid process. When management determines a need to remove or reassign an employee from a post assignment they shall notify the employee in the Union of the reason for the reassignment and provide any supporting documentation. Notice shall include the specific allegation that precipitated the proposed reassignment, including performance deficiencies or the specific reason(s) for the manager's conclusion that a reassignment is in the best interest of the shift, facility or Agency. If the proposed reassignment is based on an allegation of employee misconduct, the employee shall be given an opportunity to rebut the allegations of misconduct, prior to a permanent reassignment and be allowed to offer alternatives to permanent reassignment. If management determines that a reassignment for the remainder of post term is necessary, management shall provide the employee with an written explanation of why the reassignment is necessary to meet the needs of the Agency.

C. The same provisions of this Article shall apply for all non-uniformed employees who are required to perform rotating shift work.

D. A record of employees shift change and assigned days of will be submitted to the Union for review.

**Section 5:** To be eligible for a post overtime assignment employees must be able to perform the duties of the post as set forth in the post orders.

34

# ARTICLE 19
## MERIT STAFFING/PROMOTIONS

**Section 1:** Merit staffing and promotions procedures shall be implemented in accordance with the applicable provisions of the DPM as implemented in the DCOP Merit Staffing Plan and this Article.

**Section 2:** The Employer will administer the following practices and principles:

A. The Employer will announce all job vacancies for at least ten (10) business days. A copy of the vacancy announcements will be provided to the Union by Management via Fax.

B. Based on established DCOP procedures and qualifications, applicants will be evaluated and list qualified or unqualified (if so evaluated). Applicants will be referred to the selecting official with all of the mandatory hiring preferences applied as required by DCOP rules and regulations.

C. The Employer will notify all applicants of the outcome of their applications for the position.

D. Copies of the DCOP regulations describing the procedural aspects of the Merit Staffing/Promotion Plan will be made available at each facility to all employees and a copy provided to the Union. Aspects of the merit staffing/promotion plan will be made to the Union's Chairman.

**Section 3 – Area Consideration:** To the extent not in violation of Equal Employment Opportunity laws and regulations and the Department's affirmative action plan, the Area of Consideration to fill vacancies in the bargaining unit shall be the DCDC; provided that the official requesting the personnel action certifies to the DCOP that an adequate number of qualified candidates is expected to result from such limited Area of Consideration. An adequate number shall be no less than five (5).

**Section 4:** Outside candidates competing for departmental promotional opportunities must be equally or better qualified than internal applicants before they will be appointed or promoted.

**Section 5:** The Union will have ex-officio membership as an observer on merit staffing panels for non-supervisory positions within the bargaining unit. The Union representative must be the same grade or higher than the position being filled. The Chairman of the Union is excluded from this restriction. The Union representative shall not participate in management's deliberations or the selection of candidates.

**Section 6:** For non-correctional vacancies, if one (1) eligible candidate who is certified for consideration is interviewed, then all such candidates will be interviewed.

35

**Section 7:** If the Agency returns a certification of eligible candidates for bargaining unit positions without selection the Agency shall provide the justification for return of the certificate to DCOP. The Agency shall also provide the Union the justification.

**Section 8:** No employee who is certified on the selection certificate can file a grievance for non-selection unless there has been a violation of the DPM.

**Section 9:** Upon a determination that a procedural violation occurred and a candidate was erroneously appointed or promoted, Management will initiate the remedial action in accordance with the DPM, Chapter 8, within 45 days.

## ARTICLE 20
## POSITION DESCRIPTIONS

**Section 1:** Each employee will be supplied with a copy of his/ her official position description by the Office of Personnel upon entry to duty or change in position description. Position descriptions will be furnished to the Union. Other requests for position descriptions will be made directly to the Director of the Office of Personnel.

**Section 2:** The clause found in job descriptions "performs other duties as assigned" shall be construed to mean the employee may be assigned to other duties that are nominally related to regular assignments. The Employer recognizes that job assignments should be commensurate with position descriptions. The Union recognizes that at times the Employer must deviate from this policy. When such deviation is necessary, the Employer will make every effort to assign employees whose normal duties and pay levels are most nearly associated with the job to be assigned.

**Section 3:** Position classification appeals are not subject to the negotiated grievance procedure. Such classification appeals filed with the Office of Employee Appeals (OEA) before October 22, 1998 shall be processed in accordance with applicable law and OEA Rules. Copies of procedures to be followed in filing appeals after October 22, 1998 will be made available to employees and Union representatives upon request to the Office of Personnel.

**Section 4:** An employee may request a review of his/her position classification. Such request will be submitted orally to the appropriate supervisor who will meet with the employee (and representative if any) to discuss the matter and the circumstances leading up to the request for review. If the matter is not resolved, the employee may file a request for review through the appropriate servicing personnel classification unit.

## ARTICLE 21
## PERSONNEL FILES

**Section 1:** An employee shall have the right to view his Official Personnel file and upon request, inspect or copy any documents appearing in his/her folder, consistent with release of official information as proscribed in the Comprehensive Merit Personnel Act.

**Section 2:** The rights of employees pertaining to their Official Personnel Folder as referenced above shall extend to apply to employees information and/or training folders maintained by the Employer on the employee.

**Section 3:** Upon request, the Employer shall provide the employee a copy of final reports and internal investigations related to the employee's performance, inmate complaints and other work related matters concerning the employee.

**Section 4:** An employee's personnel records may be disclosed to his/her representative upon written authorization from the employee. The written authorization shall specify the documents and/or records to be disclosed or the degree of access permitted by the employee.

**Section 5:** The employer will make a reasonable effort to ensure that inmates do not have access to employees' files and records.

## ARTICLE 22
## TRANSFERS AND INTER-INSTITUTIONAL ROTATIONS

**Section 1:** It is recognized that the Employer has the right to transfer or reassign employees whenever the interest of the Department so requires, but transfers or reassignments shall not be used as a form of reprisal.

**Section 2:** After fifteen (15) years of service with the Department, an employee shall be given priority placement consideration to the facility of his/her choice. Request for reassignments pursuant to this section will not be unreasonably denied. Employee's preference as to shift and days of shall be applied based on availability.

## ARTICLE 23
## RETIREMENT COUNSELING

The Employer will provide counseling to employees who are of retirement age. This counseling will include information on voluntary deductions, benefits, and insurance.

## ARTICLE 24
### DISTRIBUTION OF HEALTH BENEFIT BROCHURES

The Employer agrees to make available to all employees upon entrance on duty and during open enrollment season, copies of the health benefit plan brochures under the applicable program.

## ARTICLE 25
### PERFORMANCE COUNSELING

**Section 1:** If an employee is to be denied his/her periodic step increase he/she shall be so notified in advance in writing.

**Section 2:** Such notification shall include:

A. An explanation of each aspect of performance in which the employee's services fall below a satisfactory level and how this renders his/her performance on the job as a whole below a satisfactory level; and,

B. A statement of the satisfactory level of performance on each of those work aspects, and

C. Advice as to what the employee must do to bring his/her performance up to the satisfactory level.

**Section 3:** Notification as stipulated above shall be made in advance of denial of the periodic step increase and the employee shall be given at least sixty (60) days to bring such performance up to a satisfactory level.

## ARTICLE 26
### PERFORMANCE RATINGS

**Section 1:** The parties agree that until a new performance plan is developed, as required by Section 1-615.1 of the D.C. Code (1981 ed.) the rating plan currently in place will continue in effect.

**Section 2:** An employee may elect to appeal the Impartial Review Board Committee's decision to the Office of Employee Appeals (OEA) in the manner specified in OEA's regulations or, if applicable, grieve the decision under the provisions of Article 10 of this Agreement.

## ARTICLE 27
### NO STRIKE OR LOCKOUT

**Section 1:** Under the provisions of D.C. Code Section 1-618.5 it is unlawful to participate in, authorize or ratify a strike.

**Section 2:** The term "strike" as used herein means a concerted refusal to perform duties or any unauthorized concerted work stoppage or slowdown and shall be defined in accordance with D.C. Code Section 1-618.5.

**Section 3:** No lockout of employees shall be instituted by the Employer during the term of this Agreement except that the Department in a strike situation retains the right to close down any facilities to provide for the safety of employees, property or the public.

**Section 4:** In the event of a strike as defined by this Article and upon receipt of notice from the Employer of any strike, within eight (8) hours the Union shall publicly disavow the action by posting notices and issuing a news release to the media stating that the strike is unauthorized. Notwithstanding the acceptance of the existence of any strike, the Union will use every reasonable effort in cooperation with the Employer to terminate the strike.

**Section 5:** It is recognized that any employee, who participates in or initiates a strike as defined herein may be, subject to disciplinary action.

## ARTICLE 28
### PROTECTED DISCLOSURE

**Section 1:** Pursuant to D.C. Code § 1-616.11 et seq., employees shall be free to make a protected disclosure of information, that is not specifically prohibited by statute, by reporting gross mismanagement; gross misuse or waste of public resources or funds; abuse of authority in connection with the administration of public program or the execution of a public contract; a violation of law, rule or regulation or of a term of contract between the District government and a District government contractor which is not of merely technical or minimal nature; or, a substantial and specific danger to the public health and safety. Said disclosures shall be made to any of the official governmental entities prescribed by law.

**Section 2:** Pursuant to D.C. Code § 1-616.11 et seq., the Employer's representatives shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order. As defined by the D.C. Code § 1-616.11, prohibited personnel actions include recommended, threatened, or actual termination, demotion, suspension, or reprimand; involuntary transfer, reassignment, or detail; referral for psychiatric or psychological counseling; failure to promote or hire or

take other favorable personnel action, or retaliating in any other manner against an employee.

## ARTICLE 29
## DISTRIBUTION

The Employer agrees to have printed 1000 copies of the Agreement. The Union will be responsible for all copies over 1000. The parties shall jointly explore the best value for printing consistent with procurement laws.

## ARTICLE 30
## LIABILITY

**Section 1:** The Employer shall provide, at its cost, legal representation to any employee who is a named defendant in a civil action arising out of acts committed by the employee within the scope of his/her employment, provided however that such representation is requested by the employee no more than five (5) calendar days after the service of process and that such representation would not pose a conflict of interest or potential conflict of interest.

**Section 2:** The decision of the Corporation Counsel on whether to represent an employee shall be final. Should the Corporation Counsel decline to represent the employee, the employee may be represented by any private attorney of his/her choice. The Employer will reimburse the employee for reasonable attorney fees (as determined by the Court) incurred in the employee's defense of the action.

**Section 3:** Representation will generally not be provided where the employee has been found to have engaged in willful misconduct that has resulted in disciplinary action against him/her as a result of his/her conduct with respect to the matter in question.

## ARTICLE 31
## DRUG AND ALCOHOL SCREENING

**Section 1:** The Department agrees to assist career employees who voluntarily concede substance abuse dependency prior to either testing positive for illicit drugs or alcohol test. The employee will be required to enroll and complete a certified substance abuse program. The employee will be subjected to a one-year probationary period and will submit to drug and alcohol testing as frequently as the employer deems appropriate. The employee will be subjected to summary removal for any positive drug or alcohol testing results during this probationary period.

40

**Section 2:** A career employee testing positive for drug or alcohol use (in lieu of termination) may be allowed to enroll in a certified substance abuse program and the employee shall be subjected to an eighteen month probationary period. The employee will submit to drug and alcohol testing as frequently as the employer deems appropriate. In making the determination that rehabilitation (in lieu of termination) is appropriate management will consider the employee's performance record, the circumstances for the drug or alcohol use on a case by case basis, and any other objective evaluation factors. Management will retain the right to render the final decision.

## ARTICLE 32
## WASH-UP TIME

Wash-up time of 15 minutes prior to the end of the shift will made available to buildings and trades employees.

## ARTICLE 33
## CONTRACTING OUT

**Section 1:** Prior to contracting out which deviates from the Department's past practices, the Employer agrees to consider existing resources to consult with the Union and to consider the views, recommendations or suggestions offered by the Union.

**Section 2:** The Department agrees to notify the Union of any contracting out actions which will displace any bargaining unit employee(s). The Employer further agrees to minimize displacement of bargaining unit employees through realignment and retraining consistent with applicable laws and regulations.

## ARTICLE 34
## INCENTIVE AWARDS AND PERSONNEL ENTERPRISES COMMITTEE

The Union shall have membership on any standing Incentive Awards and Personnel Enterprises Committee (Committee) and will be entitled to express its views, make recommendations, and otherwise participate. The Committee shall address incentive awards to the extent not inconsistent with management rights.

## ARTICLE 35
## SAVINGS CLAUSE

In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction, such decision shall not invalidate the entire Agreement, it being the expressed intention of the parties hereto that all other provisions not declared invalid shall remain in full force and effect.

41

## ARTICLE 36
## DURATION AND FINALITY OF AGREEMENT

**Section 1:** This Agreement shall remain in full force and effect until September 30, 2005. The Agreement will become effective upon the Mayor's approval subject to the provisions of D.C. Code § 617.15 (2001 ed.) and ratification by the Union. Additionally, if submitted during fiscal year 2001, the Agreement shall not become effective absent approval by the District of Columbia Financial Responsibility and Management Assistance Authority. If disapproved because certain provisions are asserted to be contrary to applicable law of it not ratified by the Union, the parties shall meet within thirty (30) days to negotiate a legally constituted replacement provision or the offensive provision shall be deleted.

**Section 2:** The parties acknowledge that this contract represents the complete Agreement arrived at as a result of negotiations during which both had the unlimited right and opportunity to make demands and proposals with respect to any negotiable subject or matter. The Employer and the Union agree to waive the right to negotiate with respect to any subject or matter referred to or covered or not specifically referred to in this Agreement for the duration of this contract, unless by mutual consent or as provided in this Agreement.

**Section 3:** In the event that a state of civil emergency is declared by the Mayor (civil disorders, natural disasters, etc.) the provisions of this Agreement may be suspended by the Mayor during the time of the emergency.

**Section 4:** This Agreement shall remain in effect until September 30, 2005, in accordance with Section A of this article, and will be automatically renewed for one (1) year periods unless either party gives written notice of its intention to terminate or modify the Agreement no later than 120 days prior to the expiration of the agreement.

**Section 5:** All terms and conditions of employment not covered by the terms of this Agreement shall continue to be subject to the Employer's direction and control provided, however, that if the Employer desires to institute a major change that has a significant impact upon the terms(s) or condition(s) of employment of the entire bargaining unit or any group of bargaining unit employees, the Employer shall provide the Union with advance notice and upon written request of the Union, the parties shall negotiate the impact of such change.

**Section 6:** All citations to the D.C. Code within this Agreement are to the 1981 Edition, unless stated otherwise.

42

On this 17th day of September 2002 and in witness to this Collective Bargaining Agreement between the Fraternal Order of Police/Department of Corrections Labor Committee and the District of Columbia Department of Corrections, the parties hereto set their signatures.

For the Department of Corrections
and the Office of Labor Relations and
Collective Bargaining:

_____
Mary E. Leary
Director, OLRCB

_____
Michael A. Jacobs, Esq.
Supervisory Labor Relations Specialist
OLRCB

_____
Walter W. Wojcik, Jr., Esq.
Supervisory Labor Relations Specialist
OLRCB

_____
Ollie Washington
Director, DOC

_____
James L. Anthony
Deputy Director, Administration, DOC

_____
Merrill H. Litwin
Deputy Director for Operations, DOC

For the Fraternal Order of Police/
Department of Corrections
Labor Committee:

_____
William H. Dupree, Chief Negotiator
FOP/DOC Labor Committee

_____
Sergeant Larry Davis
CDF
Member, FOP/DOC Labor Committee

_____
Robert Hitt
Facilities Management
Member, FOP/DOC Labor Committee

_____
Pamela Chase, Chairperson
CDF
FOP/DOC Labor Committee

_____
Corporal Lawrence Garrison
CF
Member, FOP/DOC Labor Committee

_____
Corporal Annette Bishop
CF
Member, FOP/DOC Labor Committee

*[Signature]*
Josh E. Murphy
Special Projects Officer, DOC

*[Signature]*
Paulette S. Hutchings
Health Services Program Specialist, DOC

*[Signature]*
Stanley M. Walden
Supervisory Correctional Officer, DOC

## APPROVAL

The Collective Bargaining Agreement between the District of Columbia Department of Corrections and the Fraternal Order of Police/Department of Corrections Labor Committee, dated September 17, 2002, has been reviewed in accordance with Section 1715(e) of the District of Columbia Comprehensive Merit Personnel Act of 1978 (Section 1-617.15(e), D.C. Official Code, 2001 Edition) and is hereby approved this 10th day of December 2002.

*[Signature]*
Anthony H. Williams
Mayor

# EXHIBIT B



# DEPARTMENT OF CORRECTIONS
## OFFICE OF INTERNAL AFFAIRS

### Investigative Report
### 06-06-006

## I. DESCRIPTION OF THE FACILITY

The Central Detention Facility (CDF) is located at 1901 D Street, SE, Washington, DC. Constructed in 1976, it is the largest of the two secured correctional institutions comprising the Department of Corrections, the second being the Central Treatment Facility which is directly adjacent to it. The CDF has a design capacity of 2,498 inmates and a staffing complement of 909, 720 of which are uniformed personnel.

The complex is a highrise, three story building comprised of three modules; two inmate housing modules and an administrative module. All three modules are connected by circulation corridors on each floor. There are nine (9) housing units located in each housing module. The housing units are on three floors in each module. The north housing module consists of North One (1), North Two (2), North Three (3), Northeast One (1), Northeast Two (2), Northeast Three (3), Northwest One (1), Northwest Two (2), and Northwest Three (3).

The south housing module consists of South One (1), South Two (2), South Three (3), Southeast One (1), Southeast Two (2), Southeast Three (3), Southwest One (1), Southwest Two (2) and Southwest Three (3). The number designation of each housing unit reflects the floor location. Although the administrative module is structurally attached to both housing unit modules, access to the administrative module can only be gained through secured entrances located on the ground level and the first, second, and third floors. The administrative module houses the Warden's suite, staff entrance, the Visitor's Hall, the Officers' Dining Room, the Records Office, and various other administrative support entities.

Video surveillance cameras are strategically positioned in each housing unit as well as in the main threshold of the housing unit foyer. As of this writing, there are no surveillance cameras in the circulation corridors or administrative module. Although plans are underway to install them there.

The CDF complex is bordered by a residential community comprised of brick row homes and apartment dwellings on the west side. The Old Congressional Cemetery is located to the immediate south and the D.C. General Hospital grounds to the immediate east of the facility.

---

Case Number: 06-06-006

Case Agent(s): Wanda Patten/Benjamin Collins/Valarie Beard

Investigative Activity: Admin Report          Date Prepared: 07/20/2006

THIS DOCUMENT IS THE PROPERTY OF THE DEPARTMENT OF CORRECTIONS, INTERNAL AFFAIRS OFFICE, AND ITS CONTENTS ARE NOT TO BE DISTRIBUTED OUTSIDE, THE DEPARTMENT OF CORRECTIONS WITHOUT AUTHORIZATION OF THE DIRECTOR.

Case Number: 06-06-003
Date Prepared: 07/20/06

The complex is also adjoined to the Corrections Treatment Facility (CTF) to the east by a secured third level corridor.

## 2. PURPOSE OF INVESTIGATION

At the request of the Director of the DC Department of Corrections, Devon Brown, the DOC, Special Investigation Division, Office of Internal Affairs (SID/OIA), initiated an investigation to identify facts and circumstances contributing to the escape of inmates Joseph Leaks and Ricardo Jones from the Central Detention Facility (CDF) complex on Saturday, June 3, 2006.

This investigation is an independent inquiry that focuses upon issues that may not be addressed during the criminal investigation of this incident presently being pursued by the United States Attorney's Office. This report will discuss the following:

> The strategy and opportunity for escape by Joseph Leaks and Ricardo Jones.

> Structural, policy, technological, and security breaches within the CDF complex.

> Staff negligence that may have contributed to the escape.

> Whether staff may have performed as accomplices, directly or indirectly, in Joseph Leaks' and Ricardo Jones' escape from the CDF.

## 2. A. CASE INVESTIGATORS

Wanda Patten, Chief of the Special Investigations Division, Office of Internal Affairs was the lead investigator in this assignment and was supported by Senior Investigator Benjamin Collins and Investigator Valarie Beard. The Office is located at 1923 Vermont Avenue, NW, Washington, DC, 20001 and can be reached telephonically at 202-671-2054.

The SID/OIA also worked in conjunction with the United States Marshals Service, Capital Area Regional Fugitive Task Force (USMS/CARFTF), Federal Bureau of Investigation (FBI), United States Attorney's Office (USAO), and the Metropolitan Police Department (MPD).

## 2. B. STANDARDS

| | |
|---|---|
| DOC Post Order | Non-Industrial Pay System |
| DOC Post Order | Southeast One (1) Housing unit |
| DOC Post Order | Environmental Officer (Detail) |
| DOC Post Order | Perimeter Patrol |
| DOC Post Order | Administrative (2) Post |
| DOC Post Order | Floor Control (1) |
| DOC Post Order | Floor Control (2) |
| DOC Post Order | Administrative (3) Post |
| DOC Post Order | Infirmary Control |

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 00 00 000
Date Prepared: 07/20/06

Program Statement 5110.6B ...........................Perimeter/Tower Post Regulations
Program Statement 5010.2C ........................... Accountability for Inmates
Program Statement 4090.4 ............................... Custody Classification Instrument
Technical Reference Manual ...........................Offense Severity Scale

## 3. SEQUENTIAL SYNOPSIS OF EVENTS

> On Saturday, June 3 at approximately 10:05 a.m., inmates Joseph Leaks and Ricardo Jones shattered a security window in the Warden's Office of the Central Detention Facility then escaped from custody through this opening by repeatedly pummeling it with a commercial floor buffer then escaped from custody through this opening.

> Upon reporting for duty, a DC Department of Corrections (DOC) Corrections Officer (CO-1) observed the escapees sliding down a canopy located adjacent to the building, directly below the windows of the Warden's Office.

> The Metropolitan Police Department (MPD), Synchronized Operations Command Center (SOCC), and the United States Marshals Service Capital Area Regional Fugitive Task Force (USMS/CARFTF) were notified. DOC emergency notifications and procedures were also initiated. The Mayor's Command Center was notified at 10:55 a.m. by the DOC Supervisory Staff as was the SOCC at 11:15 a.m.

> A preliminary investigation was conducted and a strategic command center was established in the Warden's suite of the administrative module. The entire facility was placed on immediate lockdown and an institutional count was conducted. Subsequently, the escapees were officially established as being inmates Ricardo Jones (279-826), of the Southeast One (1) housing unit and Joseph Leaks (250-433), of the North One (1) housing unit.

> A protective perimeter was established at the CDF complex and in the immediate and surrounding community by members of the DOC and MPD. A description of the inmates and their direction of travel were broadcasted on the MPD citywide communications network.

> On June 4, 2006, at 1:25 a.m., inmate Leaks was re-apprehended without incident by the USMS/CARFTF while hiding in a motel room in Alexandria, Virginia.

> At 10:45 on the evening of June 4, 2006, inmate Ricardo Jones was taken into custody by the Prince Georges County Maryland Police Department while hiding in an automobile mechanic's shop in Seat Pleasant, Maryland. No physical harm occurred during his recapture.

> Both inmates are currently being housed in separate correctional facilities located beyond city boundaries.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

> Inmates Joseph Leaks and Ricardo Jones were indicted by the Grand Jury for the offense of escape on June 6, 2006. Further indictments stemming from this incident may be pending.

## 4. MAJOR FINDINGS

> There is strong evidence suggesting that staff intentionally aided and abetted in the planning and execution of the escapes.

> While departmental policy and procedure are for the most part sufficient, staff negligence in properly adhering to them and circumvention of established regulations were major contributors to the escape.

> Mistakes in the security classifications of both inmates repeatedly occurred by employees holding varying levels of authority, thereby allowing inappropriate housing, job assignments, and contact between inmates Leaks and Jones.

> Proper controls on inmate movement throughout the facility were lacking.

> Deficiencies in surveillance cameras and critically important IT systems detracted from the security of the facility as well as functions basic to its operations.

> Elements of the facility's physical structure were found to lessen its security capability. The building's windows, visitor's canopy, and inadequate perimeter fencing are vulnerabilities that were collectively exploited by the escapees.

> Despite departmental policy requiring the siren at the CDF to be tested on a quarterly basis, this exercise had not occurred in at least four years.

> Although Community Emergency Alert procedures were followed by CDF staff, greater collaboration between the Emergency Management Agency (EMA) and the department is needed in the development of improved public notification of correctional emergencies.

## 5. DETAIL OF OCCURRENCES

## *Suspect -1:*

*Inmate Joseph Leaks (DCDC # 250-433)*

| | | | |
|---|---|---|---|
| **Sex:** | Male | **Race:** | Black |
| **Birth Date:** | 08/13/1973 | **Ethnicity:** | African-American |
| **Birth Place:** | District of Columbia | **Education:** | 12th |
| **Hair:** | Black | **Eyes:** | Brown |
| **Weight:** | 160 | **Height:** | 5'09 |
| **PDID:** | 409-613 | | |

Case Number: 06-06-009
Date Prepared: 07/20/06

Joseph Edward Leaks, also known as Joseph Poindexter, was admitted to the CDF on August 18, 2005 charged with:

➤ Accessory After the Fact, (First Degree Murder, while Armed)

➤ 2005-Fel-004700.

➤ US Parole Violation

Inmate Leaks' parole violation was in reference to an underlying 1998 Assault with a Deadly Weapon charge. Inmate Leaks is a co-defendant with inmate Jones in case 2005-Fel-004700. They are also co-defendants in an Assault with Intent to Kill investigation in Greensboro, North Carolina.

*(Please see Appendix for this inmate's past criminal history)*

A separation order was placed in inmate Leaks' and inmate Jones' institutional files and in the Jail and Community Corrections System (JACCS) at the request of the United States Attorney's Office (USAO) on August 26, 2005. This order required that inmate Leaks and inmate Jones be kept apart at all times including while being transported to and from court.

From August 19, 2005, through June 3, 2006, inmate Leaks was housed in the following housing units:

| | | | | | | |
|---|---|---|---|---|---|---|
| Northwest Three | (3) | Cell | 24 | 08/19/2005 | to | 08/22/2005 |
| Southeast Three | (3) | Cell | 34 | 08/22/2005 | to | 01/06/2006 |
| DC General | | | | 01/06/2006 | to | 01/08/2006 |
| Northwest Three | (3) | Cell | 35 | 01/08/2006 | to | 01/24/2006 |
| Southwest Two | (2) | Cell | 68 | 01/24/2006 | to | 02/17/2006 |
| Northeast One | (1) | Cell | 38 | 02/17/2006 | to | 03/29/2006 |
| North One | (1) | Cell | 34 | 03/29/2006 | to | 06/03/2006 |

Inmate Leaks was placed in the North One (1) housing unit on March 29, 2006. The North One (1) housing unit is designated to house inmates assigned to various work details within and around the confines of the CDF complex. Inmates with Medium or lower custody levels only, are considered for this assignment.

Inmate Leaks was assigned to the environmental detail, a job which is tasked with assisting in maintaining a clean and sanitized environment within the CDF. Prior to his assignment to the North One (1) housing unit, inmate Leaks was considered for the position of Environmental Detail inmate at the request of EO-1 and ES-1. This request was submitted to NIPS-1 and approved by CTS-1 and ADW-1 on February 14, 2006.

Upon receiving the prerequisite Inmate Personnel Action Form from NIPS-1, CTS-1 approved the request and wrote in the comments section, "Separations (See Attached)." CTS-1 also

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

attached a copy of the separation order to the form. ADW-1 received the request form and approved it. At that time, ADW-2 was responsible for reviewing and approving such requests, however ADW-2 was on leave.

*According to the DC Central Detention Facility Post Order, Non-Industrial Pay System, inmates with Separation Orders from other inmates housed at the CDF are not considered appropriate for placement on off unit details.*

*In accordance with DOC Program Statement 4090.3B, Classification and Re-classification, when inmates enter the CDF they receive an initial Intake Screening. During the initial screening, an emphasis is placed on checking for the location of separatees and any other concerns relating to institutional order, safety and security.*

*The initial classification must occur within three (3) working days of the inmate's arrival. The inmate is assigned to a housing unit consistent with his/her custody level and appropriate programs shall be assigned.*

Inmate Leaks entered the CDF on Thursday, August 18, 2005. His initial classification was prepared by CTS-2 on Monday, August 22, 2005. CTS-2's initial custody numeric designations read as follows:

A. Severity of Current Offense ................................High (5) points
B. Severity of Prior Criminal Convictions ............ High (5) points
C. History of Escapes or Attempts to Escape ................ (1) point
D. History of Institutional Violence ........................... None (0) points
E. Prior Felony Convictions (past 10 years) .................. One (1) point
F. Drug/Alcohol History (past 5 years) ........................Occasional (1) point
G. Age ........................................................................ 25 to 35 (0) points
H. Education (High School Diploma/GED) ................. (-1) points
I. Employment ..................................................... (0) points

Subtotal, Items A-D (11) points
Total Points (12)
Custody Level (Maximum)

*Due to the severity of his most recent offense and the seriousness of his prior criminal convictions, to include the underlying charge of his parole violation, CTS (2) classified inmate Leaks correctly as a Maximum custody inmate.*

*\*\*A review of the Jail and Community Corrections System (JACCS) and the Pretrial Realtime Information System Manager (PRISM) indicated that inmate Leaks had a noted history of escape. Specifically, JACCS notes that inmate Leaks escaped from the CDF in October. Due to the length of time since this escape, its details are unavailable. According to the Offense Severity Scale (See Appendix A), "Escape from Institution or Officer-Secure Facility;" shall be classified with the highest offense level.*

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Date Prepared: 07/20/06

*Note: CTS only has access to the JACCS Offender Management Application.*

*According to the Technical Reference Manual, all sections of the initial classification instrument shall be filled out completely using a combination of information provided by the inmate, the inmate's record, prior criminal history, pre-sentence investigations, and other institutional files where available.*

*There are four categories used to determine if an inmate should be assigned a maximum custody level. These sections are A-D of the classification form. Each category class is given a numeric value. Once sections A-D are completed and the numeric value is 10 points or greater, the inmate is considered Maximum custody. Sections E-I will also be completed but do not affect the maximum custody level subtotal.*

*DOC Program Statement 4090.3B, Classification and Re-Classification states that the classification of all pre-trial inmates should be reviewed every 90 days.*

According to CTSS-1, she is required to conduct bi-weekly audits of questionable inmate classifications and re-classifications completed by Correctional Treatment Specialists. CTSS-1 further stated that all Correctional Treatment Specialists have been trained in the proper use of the current inmate classification instrument.

Questionable classifications and re-classifications entered into JACCS are identified by a predetermined set of parameters in a DOC generated CRYSTAL report. CTSS-1 utilized this CRYSTAL report as a tool to conduct her bi-weekly audits. The Crystal Report has proven to be a valuable quality assurance and training tool.

*The first re-classification of inmate Leaks was conducted by CTS-3 on December 1, 2005. The custody numeric designations read as follows:*

A. Severity of Current Offense ............................. Moderate (3) points
B. Severity of Prior Criminal Convictions .................. High (5) points
C. History of Escapes or Attempts to Escape .............. None (0) points
D. History of Institutional Violence ........................ None (0) points
E. Prior Felony Convictions (past 10 years) ............... One (1) point
F. Number of Disciplinary Reports ......................... None (-2) points
G. Age ....................................................... (0) points
H. Drug/Alcohol ............................................. (0) points
I. Education ................................................. (0) points

Subtotal, Items A-D (08) points
Total Points (07)
Custody Level (Sentenced Medium)

During the course of this investigation, at the request of the SID/OIA, CTSS-1 reviewed inmate Leaks' initial re-classification and subsequent re-classifications prepared by CTS-3 and CTS-4.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

CTSS-1 concluded that CTS-3's initial re-classification of inmate Leaks was performed without the inmate's institutional file. CTSS-1 noted that CTS-3 failed to score inmate Leaks' escape history. According to CTSS-1's assessment, the point totals were incorrect and inmate Leaks' custody level should have remained Maximum.

In a June 22, 2006 interview, CTS-3 stated that he was unsure if he had reviewed inmate Leaks' institutional file prior to his re-classification of Leaks. CTS-3 further stated that he did not consider the Accessory after the Fact (First Degree Murder While Armed) charge. According to CTS-3, it was his belief that the aforementioned charge had been released in JACCS because it had a bond that was satisfied. CTS-3 also acknowledged that he did not consider inmate Leaks' Parole Violation or its underlying charges.

CTS-4 conducted a re-classification of inmate Leaks on March 11, 2006. The custody numeric designations read as follows:

A. Severity of Current Offense ........................ Moderate (3) points
B. Severity of Prior Criminal Convictions ............ High (5) points
C. History of Escapes or Attempts to Escape ........ None (0) points
D. History of Institutional Violence ................... None (0) points
E. Prior Felony Convictions (past 10 years) ......... Two (2) points
F. Number of Disciplinary Reports ................... None (-2) points
G. Age ................................................ (0) points
H. Program Participation/Work Assignment ........ (-1) points
I. Education ........................................... (0) points

Subtotal, Items A-D (8) points
Total Points (7) points
Custody Level: (Sentenced Medium)

During this investigation, CTSS-1 reviewed the March 11, 2006 re-classification of inmate Leaks and concluded that this re-classification was also erroneously scored and similar to the December 1, 2005, re-classification instrument prepared by CTS-3.

CTS-4 prepared a subsequent re-classification of inmate Leaks on May 15, 2006. The custody evaluation numeric designations read as follows:

A. Severity of Current Offense ............................... Moderate (3) points
B. Severity of Prior Criminal Convictions .................. Moderate (3) points
C. History of Escapes or Attempts to Escape .............. None (0) points
D. History of Institutional Violence .......................... None (0) points
E. Prior Felony Convictions (past 10 years) ............... Two (2) points
F. Number of Disciplinary Reports .......................... None (-2) points
G. Age .......................................................... (0) points
H. Program Assignment/Work Detail ....................... (-1) points
I. Education .................................................... (0) points

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 06-06-006
Date Prepared: 07/20/06

Subtotal, Items A-D (6) points
Total Points (5)
Custody Level (Sentenced Medium)

According to CTSS-1 and the Technical Reference Manual, the May 15, 2006 re-classification of inmate Leaks was also incorrect. Inmate Leaks should have been classified as a Maximum custody inmate. According to CTS-4, his intention was to give inmate Leaks 5 points in part B but he inadvertently struck the 3 key on the computer keyboard in error. Inmate Leaks was, once again, given 0 points for escape history.

## SUSPECT-2:

*Inmate Ricardo Jones (DCDC # 279-826)*

| | | | | |
|---|---|---|---|---|
| Sex: | Male | Race: | Black | |
| Birth Date: | 02/05/1981 | Ethnicity: | African-American | |
| Birth Place: | District of Columbia | Education: | 9th | |
| Hair: | Black | Eyes: | Brown | |
| Weight: | 180 | Height | 5'10 | |
| PDID: | 470-302 | | | |

Inmate Ricardo Jones entered the CDF on August 26, 2005 charged with:

➢ Assault with Intent to Kill, DC Superior Court case number, *F0492105*

➢ Murder I, DC Superior Court case number 2006-*FEL-CFI 009984*.

➢ No Permit (Traffic), *T1949-05*

*(Please see Appendix for past criminal history)*

From August 26, 2005, through June 3, 2006, inmate Jones was housed in the following CDF housing units:

| | | | | | | |
|---|---|---|---|---|---|---|
| Northeast Three | (3) | Cell | 41 | 08/27/2005 | to | 08/30/2005 |
| North Three | (3) | Cell | 21 | 08/30/2005 | to | 08/31/2005 |
| Southwest Three | (3) | Cell | 34 | 08/31/2005 | to | 10/11/2005 |
| North Three | (3) | Cell | 41 | 10/11/2005 | to | 11/28/2005 |
| North Three | (3) | Cell | 33 | 11/28/2005 | to | 12/05/2005 |
| Southwest Three | (3) | Cell | 15 | 12/05/2005 | to | 04/15/2006 |
| Northwest Two | (2) | Cell | 07 | 04/15/2006 | to | 05/11/2006 |
| North One | (1) | Cell | 67 | 05/11/2006 | to | 05/29/2006 |
| Southeast One | (1) | Cell | 18 | 05/29/2006 | to | 06/03/2006 |

This document is the property of the OIA, and its contents are not to be distributed, within this agency without the approval of the director.

Case Number: 06-06-006
Date Prepared: 07/20/06

On May 11, 2006, inmate Jones was housed in North One (1). Inmate Jones remained there until May 29, 2006. Inmate Jones was placed in the North One (1) housing unit on Administrative Segregation as the result of a physical altercation with an inmate in Northwest Two (2).

Leaks was able to hold conversations periodically with inmate Jones when the former inmate's job required him to be on this unit. Officers assigned to the housing unit were inattentive in permitting this to occur. During several of those conversations, he and inmate Jones planned their future escape from the CDF. It is to be noted that separation orders had been placed on these inmates.

## 6. INVESTIGATION

On Saturday, June 3, 2006 at approximately 7 a.m., EO-1 entered the North One (1) housing unit and removed nine (9) detail inmates, including inmate Joseph Leaks. These inmates were employed in various off unit environmental work assignments throughout the CDF. EO-1 escorted the inmates to their assigned areas of responsibility.

Six (6) additional detail inmates were removed from the Southwest Two (2) housing unit by EO-1. These inmates were also assigned to work various environmental work details throughout the CDF.

Inmate Joseph Leaks, along with three other detail inmates, were escorted to their assigned work areas on the second floor of the administrative module by EO-1. Inmate Leaks' daily primary responsibility was to clean the common areas, to include the Officer's Dining Room (ODR), the Environmental Office, and employee locker rooms on the second floor of the administrative module. EO-1 unlocked the supply lockers containing various cleaning materials and equipment, to include floor buffers.

Inmate -2 related that EO-1 remained in the area for approximately twenty (20) minutes before leaving. According to EO-1, he went to the Visitor's Hall (3) to supervise a cleaning detail. At some point, inmate Leaks, who was wearing a green environmental identification card, left his assigned detail area and was allowed to enter through the Administrative Two (2) door; AO-2 was assigned to this post. Although AO-2 contends that she did not allow inmate Leaks through the Administrative Two (2) door, it is highly probable that she did so inasmuch as inmate Leaks was wearing the proper identification card to allow him access through the Administrative Two (2) door.

*Note: It should be noted that EO-1 and AO-2 were the only two people in the facility who had a key to the Administrative Two (2) door.*

Once on the Administrative Two (2) side, inmate Leaks was observed by FCO-2 pushing a trash bin near the Floor Control Two (2) area. Inmate Leaks went through the Floor Control One (1) post controlled by FCO-1, down the corridor, towards the foyer of the first floor, south module.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 06-06-006
Date Prepared: 07/20/06

CDF surveillance cameras show inmate Leaks in the foyer of the first floor south module at 9:35 a.m., mopping the immediate area. At 9:41 a.m., inmate Leaks walked past the foyer entrance of the Southeast One (1) housing unit and glanced into the unit. Inmate Leaks' presence in the foyer entrance of Southeast One (1) at that time suggest the probability that he was expecting inmate Jones' departure from the unit.

At 9:42 a.m., inmate Ricardo Jones is observed walking out of the Southeast One (1) housing unit holding what appears to be a small sheet of paper in his hand. Both inmates are then observed walking up the corridor towards Floor Control One (1).

*Prior to leaving the Southeast One (1) housing unit, inmate Ricardo Jones was in possession of a Movement Pass authorizing him to go to the Infirmary. Inmate Jones' name was also placed on the housing unit movement/running count sheet accounting for and authorizing his movement to the Infirmary.*

On June 3, 2006, during the day shift, 7:30 a.m. to 4:00 p.m., there were three correctional officers assigned to the Southeast One (1) housing unit.

According to Infirmary records, only six (6) inmates from the Southeast One (1) housing unit were scheduled for medical care in the Infirmary on June 3, 2006. Inmate Ricardo Jones was not among them.

All three officers assigned to the Southeast One (1) housing unit were interviewed and have given conflicting accounts of the circumstances surrounding how inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment. **This matter will be more fully examined the criminal investigation of this incident.**

During this investigation, an attempt was made to review pre-recorded activity in the Southeast One (1) housing unit prior to inmate Jones' departure from it on the morning of June 3, 2006. This investigation revealed that a critical portion of the pre-recorded video footage covering activity in the housing unit was missing.

Immediately after walking through Floor Control One (1), inmate Leaks and inmate Jones walked up the escalator, through Floor Control Two (2), towards the Administrative Two (2) area. As conveyed by inmate Leaks, AO-2, the Administrative Two (2) officer unlocked the door and allowed inmate Leaks and inmate Jones, who was also wearing a green environmental detail badge, through the Administrative Two (2) door, onto the second floor of the administrative module.

The environmental badge worn by inmate Jones belonged to Inmate-1. According to Inmate-1, approximately three weeks prior to June 3, 2006, while in the foyer area of the Northwest One (1) housing unit, he was asked by an unidentified Correctional Officer to stand in the hallway adjacent to the officers' bathroom and wait until this employee returned from North One (1) with additional detail inmates.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 06-06-006
Date Prepared: 07/20/06

Inmate-1 stated that while waiting in the hallway, he walked into the Officers' Restroom to find a mirror. Once he realized that there was no mirror on the wall, he walked out. As he did so, he was observed and challenged by EO-2.

Inmate-1 stated that EO-2 took possession of his detail pass and walked him back to his housing unit.

According to NIPS-2, prior to inmate Leaks' and Jones' escape, he received a call from the UOIC assigned to the Northwest One (1) housing unit concerning Inmate-1's detail status.

The UOIC stated that Inmate-1 was no longer being picked up for his assigned work detail and had expressed an interest in being placed in another detail assignment. NIPS-2 claims that he became aware of Inmate-1's missing detail badge on the day of the escape. **However, this investigation has determined that on June 2, 2006, Inmate-1 was issued a new detail pass by NIPS-2 and his status as an environmental detail inmate restored.**

When interviewed on June 3, 2006, EO-2 stated that he saw Inmate-1 coming out of the officer's bathroom and as a result challenged him. According to EO-2, Inmate-1 told him that he was using the mirror. EO-2 stated that he knew that there was no mirror in the Officers' Bathroom, therefore he removed Inmate-1's environmental identification card and walked him back to his housing unit "for that day."

EO-2 stated that he held the identification card and placed it on EOS-1's desk. This statement was not substantiated by EOS-1. EOS-1 stated that he never saw Inmate-1's environmental identification card on his desk.

*Note: A review of the Southeast One housing unit recording video component by the Office of the Chief Technology Officer, Computer Forensic Team (OCTO/CFT), revealed no evidence of digital tampering with files/data; no deletions or unauthorized modifications were as identified or observed.*

According to EO-2, his intent was to hold the pass for a few days to teach Inmate-1 a lesson. EO-2 failed to write a disciplinary report concerning Inmate-1's conduct prior to terminating him from his assigned environmental detail as mandated by policy.

*The Central Detention Facility Post Order, Non Industrial Pay System dated April 19, 2002 states the following:*

*(a) Squad officers may submit a termination form to the NIPS Coordinator for any inmate who does not perform duties assigned or who is no longer willing to work. If terminated from one squad, an inmate cannot switch to another squad or be considered for hire for at least 90 days.*

*(b) Termination of detail shall only be approved by the Deputy Warden for Support Services*

*(c) In cases of disciplinary actions, a copy of the disciplinary report must be attached to the request for personnel action form. Inmates with a pending disciplinary report will be*

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Date Prepared: 07/20/06

*suspended from the detail until the recommendations of the Adjustment Board and the decision of the final approving official is complete.*

### 6a. Administrative Two (2) Door

In a June 3, 2006 interview, AO-2 related that on the morning of the escape she did not allow any inmate entrance through the door leading to the administrative module. AO-2 stated that on several occasions during the shift she had to leave her assigned post to escort inmates to the Visitor's Hall and to review her annual performance evaluation. Her comments can not be verified. In addition, in light of the essential functions of this post AO-2 could not validate who relieved her of her duties to attend to other matters consistent with department policy. According to AO-2, at approximately 9:45 a.m., she saw EO-1 walk two Black male inmates through the door into the administrative module.

In a subsequent interview on July 3, 2006, AO-2 stated that on one occasion she unlocked the Administrative Two (2) door to allow Inmate-2 to enter. AO-2 stated that EO-1 was standing near the door with inmate-2 when this took place. This event allegedly occurred between 9:40 a.m., and 9:50 a.m. AO-2 spoke with the OIA investigator again by telephone on July 3, 2006 at which time she stated contrary to her earlier statement that she did not see EO-1 open the Administrative Two (2) door for two Black male inmates at approximately 9:45 a.m. on the day of the escape.

### 6b. The Escape

This investigation has concluded that inmate Leaks was wearing his green environmental detail pass and inmate Jones was wearing a green environmental detail pass belonging to Inmate-1. Although there is a photograph of Inmate-1 on the pass, Inmate-1's photograph closely resembles inmate Jones.

Leaks stated that prior to his initial departure from the second floor of the administrative module, he told EO-1 to "leave the area because something was about to happen." According to Leaks, EO-1 complied with his request and departed the area leaving him and the other inmates unattended. (It is to be noted that during the course of the present investigation inmate Leaks informed this reporter of the existence of contraband in the facility, its nature and location. He further stated that EO-1 was responsible for bringing the contraband into the facility. This investigator was able to retrieve this very contraband from the exact location that Leaks had provided.)

According to Leaks, upon his return to the second floor of the administrative module, he was accompanied by inmate Ricardo Jones. Inmate Leaks stated that he and inmate Jones removed a buffer from the supply locker left unsecured by EO-1. The inmates carried the buffer down the second floor stairwell to the first floor of the administrative module. Once on the first floor, the inmates took the buffer to the outer door of the Warden's suite. Leaks stated that they forced the locked, double doors of this area open by pulling them. Upon gaining entrance to the Warden's

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 00 00 000
Date Prepared: 07/20/06

suite, they approached the Warden's office door and forced it open by ramming the 80 pound commercial buffer against it several times.

After entering the Warden's office, both inmates removed their orange prison issued jumpsuits and changed into dark navy blue inmate issued jumpsuits. Inmate Leaks stated that he wore a blue jacket, blue DOC baseball cap, and a blue inmate jumpsuit while inmate Jones wore a blue DOC inmate jumpsuit and sunglasses. According to Leaks, he received the jumpsuits, jacket, hat and sunglasses from CO-2 who placed them in a trash receptacle in the female locker room on the morning of the escape for their use.

Once dressed, both inmates approached the window located directly above a canopy used to shield the general public entering the Visitor's Hall from inclement weather then breached the security pain of the window by repeatedly ramming it with the buffer.

Both inmates exited through the broken window, fell on the canopy breaking their fall then landed on the pavement. They subsequently ran in a northeast direction towards the D.C. Armory Metro Station.

At approximately 10:05 a.m., CO-1, who was reporting early for his assignment in the Visitor's Hall, heard several loud sounds coming from an area above him. CO-1 observed both inmates hit the ground and began running upon which he immediately gave chase. According to MPD radio transmissions obtained by the SID/OIA, an off-duty female MPD officer also pursued the inmates and was able to give responding MPD officers a physical description of both inmates Leaks and inmate Jones along with their last known direction of travel.

When CO-1 discontinued his foot pursuit, he returned to the canopy and observed a medical inhaler lying on the pavement. Affixed to the inhaler was a prescription label displaying the name *Ricardo Jones 279-826*. CO-1 then discovered the breach in the Warden's office window and notified the DOC Command Center. Upon notification of inmates Leaks' and Jones' escape, DOC personnel was ordered to sound the escape alarm (siren). In accordance with emergency procedures, the alarm was recorded to have been activated at 10:40 a.m.

According to USMS/CARFTF, immediately following the escape both inmates took a shuttle bus from the area of the DC Armory metro station to Minnesota Ave and Grant Street, NE, Washington, D.C. The inmates then "hitched" a ride with a citizen. According to the citizen, inmate Leaks and inmate Jones told him that they needed a ride to "Kenilworth."

The citizen further stated that he drove both inmates to an area near Kenilworth Avenue NE, where he dropped them off. According to inmate Leaks, both he and inmate Jones met inmate Leaks' brother, David Leaks, and drove to Baltimore, Maryland. Once there, they purchased new clothing and discarded the blue inmate jumpsuits in a trash receptacle somewhere in the area of the Baltimore Inner Harbor before driving back to the Washington, DC metropolitan area.

*The Baltimore City Police Department, Criminal Intelligence Unit is providing assistance in search efforts to locate the jumpsuits.*

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 06-06-009
Date Prepared: 07/20/06

On June 4, 2006 at 1:25 a.m., inmate Joseph Leaks was arrested by members of the CARFTF in the Virginia Lodge Motel in Alexandria, Virginia without incident.

On June 4, 2006 at 10:45 p.m., inmate Ricardo Jones was arrested in Seat Pleasant, Maryland by members of the Prince Georges County Police Department with the assistance of CARFTF.

Inmates Joseph Leaks and Ricardo Jones were indicted by the Grand Jury for the offense of escape on June 6, 2006. Further indictments stemming from this incident may be forthcoming.

*A detailed report of the efforts of the CARFTF in apprehending inmates Joseph Leaks, and Ricardo Jones will not be attached as a part of this administrative investigation for operational security reasons.*

### 6c. Crime Scene

The Southeast One (1) housing unit, the North One (1) housing unit, the second floor cleaning supply locker, the First and Second Floor Control, and administrative areas of the CDF are unremarkable.

The Warden's suite, located on the first floor of the administrative module, can be entered through the main corridor. In order to access the suite, it is necessary to walk through a set of "double-doors," secured by a dead bolt locking device.

Upon entering the Warden's suite, there is a corridor lined with six offices to the right that are designated for use by the Deputy Warden for Operations, the Deputy Warden for Programs, and the Deputy Warden for Support Services. The Warden's clerical support secretary, and his main office are located in the northeast corner of the suite.
The Inmate Finance Office and the Warden's conference room are located on the left side of the corridor. Past the threshold of this room, there is an open area designated as administrative and clerical work areas, an additional office, and storage room.

As a product of the escape, there was surface damage in and around the immediate area of the Warden's office door, and door knob. Upon entering the Warden's office, there was a significant breach in the third window (from right to left), just above a canopy covering the entrance to the Visitor's Hall on the ground level. Shattered glass was disbursed on the floor and in the immediate area of the breached window. Located on the floor just below the breached window was a metal 80 pound, commercial, metal buffer, three overturned chairs, and various debris.

According to preliminary investigative reports, there were two orange inmate jumpsuits lying in the upper corner of the office. One jumpsuit had an environmental inmate identification card belonging to inmate Leaks affixed to it. There was an additional environmental identification card belonging to Inmate-1 located in the Warden's office, attached to the second orange inmate jumpsuit.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

## 7. AGENCY ENHANCEMENTS

The DC Department of Corrections has completed several enhancements to further support its mission of ensuring order, safety, and security within the CDF complex. Enhancements have been made in the following areas:

### 7a. Security

> Installed two (2) pan, tilt and zoom (PTZ) cameras outside the visiting control area to maximize surveillance.

> On June 30, 2006 DOC procured the purchase of a fully automated Under Vehicle Surveillance System (UVSS) and installation to track real time vehicular ingress and egress from the Central Detention Facility. Delivery is expected mid in August 2006 (PO 1912930 awarded July 20, 2006).

> Revised Command Center Post Orders to reflect security Alert System activation procedures.

> An armed foot patrol officer Post has been added to the facility perimeter and post orders for the specific procedures and guidelines.

> Reinforced twenty seven (27) windows on the first floor of the administrative side of the facility with expanded metal screens for additional security.

> Four (4) large strobe lights added to the rooftop of the CDF, as an additional measure to alert citizens of an emergency at the CDF complex.

> Establishment of a agency Emergency Response Team (ERT). This is a specialized highly trained unit to expertly address correctional emergencies and promote greater proficiency in security operations.

> Twenty seven (27) additional hand held mobile radios added to the CDF Complex inventory.

### 7b. Policy and Procedures

#### Off-Unit Inmate Work Details

> Inmates assigned to work off-unit details are now classified by newly established criteria which better take into account relevant security factors.

> Inmates assigned to off-unit details can only be issued one inmate pass by the NIPS Coordinator thereby avoiding duplication.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 06-36-006
Date Prepared: 07/20/06

> The NIPS Coordinator will ensure that the inmates passes are updated as needed (lost or destroyed) and recovered when detail inmates are terminated, transferred or released. All detail identification cards must now be accounted for by the housing unit officers as part of their unit inventory.

> Any discrepancies noted involving detail identification cards will be immediately forwarded to the zone supervisor for investigation.

> Inmates assigned to off-unit details shall be under the direct supervision of a correctional officer or an authorized staff member at all times. The detail supervisor or authorized staff member shall at no time leave detail inmates unattended or allow them access to areas they have not been cleared to enter.

## Inmate Controlled Movement

> Inmates shall be issued call-out passes for authorized movement on a "one time" basis.

> The unit officer shall contact the officer at the inmate's intended destination to verify the inmate's movement.

> Call-out passes shall be distributed to the inmate as s/he departs the unit to go to an authorized designator.

> The inmate's name, DCDC number, destination, and departure time shall be recorded on the call-out pass. This information shall also be recorded in the unit logbook and on the Housing unit running movement sheet.

> To ensure inmates arrive in a timely manner, the receiving officer shall notify the housing unit officer of the inmate's arrival at his/her assigned destination.

## 7c. CDF Community Alert Systems Testing

> Immediately following the escape of inmates Leaks and Jones, the DOC completed a reconfiguration of the Community Alert System's switching mechanism used to activate the siren and pursued replacing this device with a newer, more audible model.

> On July 20, 2006 DOC submitted a Requisition (RQ 277340) to the Office of Contracting and Procurement to purchase a T-135 AC Siren which meets all FEMA requirements and will cover a 9,000 foot radius (equal to 9 square miles)

> On July 1, 2006, the DOC initiated weekly testing of the CDF Community Alert System. Testing occurs every Saturday at 12 noon and last for at least fifteen (15) seconds.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 06-06-006
Date Prepared: 07/20/06

> The DOC has coordinated with the Emergency Management Agency (EMA) to activate the reverse 911 notification for emergency incidents at the CDF. Utilizing this feature will provide immediate mass notification to Ward 6 residents of an emergency at the complex.

> On July 10, 2006, DOC issued EMA six sample text emergency messages to alert DC residents when there is an emergency at either of our two correctional facilities (CDF or CTF/CCA). The emergency notifications are for incidences of escape, major disturbances, major fire, hostage situation, major evacuations and power outages.

## 7d. Case Management

> Finalization of departmental policy, Program Statement 4210.2B, entitled, "Inmate Institutional Work Programs" to reflect new eligibility criteria, policies and procedures is near completion.

## 7e. Proposed Operational and Physical Plant Enhancements:

> Use of foot patrol with K-9 (Delivery of Patrol Dogs scheduled for late August 2006)

> Revision of Inmate Accountability Post Orders

> Revision of Inmate Non- Industrial Pay System Post Order

> Acquisition of state of the art motion detectors, door sensors, and glass breakage sensors

> Installation of additional razor ribbon fencing and exterior lighting.

> Installation of a Radio Frequency Identification System (RFID) to provide continuous monitoring of inmates and staff movement in the facility at all times, which will provide instant notification of escapes, breaches of security, and staff duress.

> Initiation of Routine Emergency Preparedness Exercises

> Training in Security Audits by the National Institute of Corrections

> Revalidation of Inmate Classification Instrument by a nationally recognized expert.

> Installation of Emergency Hotline Telephone System (WAWAS) in the Command Center at the CDF to timely notify EMA and other law enforcement officials.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 06-06-006
Date Prepared: 07/20/06

> Contracted with ERGO Metrics to provide objective testing for new Correctional Officer Recruits to better determine their suitability for employment in a correctional environment.

## 8. CONCLUSION

The Special Investigations Division, Office of Internal Affairs, conducted well over forty interviews of staff and inmates during the course of this investigation. Although the underlying act involved the efforts of two inmates, there were contributing factors that created an opportunity for inmates Joseph Leaks and Ricardo Jones to execute a plan of escape from the confines of the CDF.

These factors can be categorized in three areas-staff negligence; policies, procedures and practices; technology and support mechanisms.

### 8a. Staff Negligence

**EO-1**
EO-1 was responsible for supervising detail inmates on the second and third floors of the CDF. This assignment includes the corridors, Visitor's Hall and administrative module.

EO-1 stated that he left the inmates unattended on the second floor of the administrative module to oversee the cleaning of the third floor visiting hall by other inmates. According to EO-1, earlier that morning he left the inmates assigned to clean the third floor Visitor's Hall sitting in the hallway in the Administrative Three (3) area.

EO-1 alleged that upon leaving the Administrative Two (2) module area he retrieved the inmates from the hallway in the Administrative Three (3) area who have been left unattended. EO-1 in essence abandoned his responsibilities to insure that inmates under his custody will at all times supervised.

The Infirmary Control Officer Post is located in the Infirmary Control module of the Administrative Three (3) area. CO-3, who was assigned to this Post, was interviewed by the OIA. CO-3 stated that on the morning of Saturday, June 3, 2006, he observed two detail inmates cleaning the third (3rd) floor Administrative area and the inmate bathrooms.

CO-3 acknowledged that he was aware that EO-1 was assigned to supervise the Environmental detail on Saturday, June 3, 2006. However, on the morning of the escape, he did not see EO-1 supervising the detail inmates cleaning the 3rd floor area.

DOC Program Statement 5010.2c. Accountability of Inmates, states that "Correctional Officers are responsible for maintaining accountability, sight and count for all inmates in their area of responsibility." EO-1 was negligent in that he left detail inmates unattended on the 2nd and 3rd floors of the administrative module.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

**EO-2**

Approximately three weeks prior to the June 3, 2006 escape from the CDF, EO-2, observed Inmate-1 walk out of a staff bathroom. Inmate-1 was not authorized to be in the bathroom. EO-2, challenged Inmate-1, removed his environmental detail identification card and walked him to his housing unit.

According to EO-2, he placed Inmate-1's environmental detail identification card on EOS-1's desk, who, according to EO-2, was not present at the time. EO-2 failed to prepare a disciplinary report concerning this incident. EO-2 also failed to submit the required Inmate Personnel Action Request Form to appropriately terminate Inmate-1 from his environmental detail. Inmate-1 received a new environmental detail identification card on June 2, 2006 from NIPS-2 which restored Inmate-1's detail status but designated him to a different jog assignment.

*EO-2's actions violated the Central Detention Facility Post Order, Non-Industrial Pay System dated April 19, 2002, which states the following:*

*"(a) Squad officers may submit a termination form to the NIPS Coordinator for any inmate who does not perform duties assigned or who is no longer willing to work If terminated from one squad, an inmate cannot switch to another squad or be considered for hire for at least 90 days.*

*(b) Termination of detail shall only be approved by the Deputy Warden for Support Services*

*(c) In cases of disciplinary actions, a copy of the disciplinary report must be attached to the request for personnel action form. Inmates with a pending disciplinary report will be suspended from the detail until the recommendations of the Adjustment Board and the decision of the final approving official is complete."*

*EO-2's account of where he placed inmate-1's Environmental detail card was not substantiated.*

**8b. Classification and Reclassifications of Inmate Leaks**

On August 22, 2005, CTS-2 conducted a classification on inmate Leaks in accordance with established procedures. The purpose of an initial classification was to determine the inmate's security risk and specify an appropriate level of custody. *The DOC Custody Classification Instruments Technical Manual 4090 c. (1) and d. (1) specifically state that all offenses for which the inmate is currently being committed are to be considered to determine the most serious charge.*

*"If there is a detainer, warrant, or pending case in addition to the current charge, or if the inmate is being held solely on the detainer/warrant pending case, list the most serious charge using the Offense Severity Scale (Appendix A)."*

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Inmate Leaks was **correctly** classified as a Maximum level custody inmate by CTS-2 on August 22, 2005.

## CTS-3

Unlike the initial classification system, the re-classification instrument places greater emphasis on the inmate's institutional conduct (i.e. the number of disciplinary reports and severity of infractions). On December 1, 2005, *CTS-3* conducted inmate Leaks' initial re-classification. According to DOC Program Statement 4090.4, section 11b (1)…"Case Managers shall use the Custody Classification Technical Reference Manual of Instructions when completing the reclassification custody instrument."

*The DOC Program Statement 4090.4, Technical Reference Manual, Chapter 2, Section 1(f), states…Based upon the data in the inmate's record, the Case Manager shall complete all scoring items on the first page of the reclassification form.*

CTS-3 performed a re-classification on inmate Leaks without a complete review of inmate Leaks' institutional record CTS-3 **failed** in his responsibility to review the initial classification custody instrument completed by CTS-2 located in inmate Leaks' institutional file. CTS-2's decision not to review inmate Leaks' institutional file prior to reclassifying him was a monumental mistake in judgment. A review of inmate Leaks' complete institutional record would have revealed Leaks' noted record of escape, in addition to a USPV charge in reference to his underlying 1998 Assault with a Deadly Weapon conviction. Leaks' prior history of escape from the CDF, a secure facility should have heightened his security threat and possible placement on special handling status.

The DOC Program Statement 4090.4 Technical Reference Manual Instructions for completing the DOC Custody Re-classification instrument states that all offenses the inmate is currently being committed on, should be considered to determine the most serious current charge.

Inmate Leaks entered the CDF on August 18, 2005, charged with Accessory After the Fact, (First Degree Murder while Armed). Leaks' US Parole Violation underlying charge should have been scored as the most serious offense.

Inmate Leaks was sentenced to serve 24 years (Aggregate) for his underlying USPV charge (1998 ADW). Leaks was released on September 24, 2003, after serving a five (5) year prison sentence and was placed on parole with 4,383 days remaining to be served. Leaks violation of his parole coupled with his history of escape undoubtedly made him an extreme security risk.

## CTS-4

On March 11, 2006, CTS-4 conducted his initial re-classification of inmate Leaks and a subsequent re-classification of inmate Leaks on April 15, 2006. According to CTS-4 he personally interviewed inmate Leaks and reviewed inmate Leaks Institutional Record.

This document is the property of the OIA, and its contents are not to be disclosed [...] this agency without the approval of the director.

This investigation has concluded that the initial reclassification completed by CTS-4 on March 11, 2006, was **erroneously** scored, mirroring the December 1, 2005 re-classification instrument prepared by CTS-3.

CTS-4 failed to note that inmate Leaks had a history of escape. Additionally, he failed to score Leaks' USPV underlying charge. According to the DOC Custody Classification Instruments Technical Reference Manual, CTS-4's initial and subsequent re-classification of inmate Leaks was conducted in error.

Inmate Leaks most serious charge in which he was committed on August 18, 2005, was a U.S. Parole Violation in reference to an underlying 1998 ADW charge.

According to CTS-4, during his subsequent re-classification of inmate Leaks on April 15, 2006, he intended to give Leaks 5 points in part B of the re-classification instrument (Severity of Prior Criminal Convictions).

However, according to CTS-4, he inadvertently struck the 3 key on his computer keyboard in error. During CTS-4's subsequent re-classification of inmate Leaks, he once again failed to note inmate Leaks' history of escape.

### 8c. Approval of Inmate Leaks for Detail

**CTS -1**
According to CTS-1, on February, 14, 2006, he approved inmate Leaks for a detail assignment. CTS-1 readily acknowledged that he wrote the word "OK" on the top of inmate Leaks' NIPS Personnel Action Request Form, indicating that inmate Leaks was eligible for detail placement. CTS-1 failed to check the status of the Separation Orders.

CTS-1 stated that he utilized only JACCS and PRISM to determine inmate Leaks' eligibility for placement on detail. CTS-1 acknowledged that he was aware that inmate Leaks had Separation Orders. However, when he accessed the JACCS Enemy Alert Screen, the names of the inmates listed as inmate Leaks enemies were highlighted in red which indicated that they were no longer housed in the CDF.

This investigation has concluded that CTS-1's aforementioned claim is true. On August 18, 2005 inmate Leaks was booked into JACCS (Booking # 2005-11400) and booking procedures were followed which included restoring the most recently released booking from history into the new booking record.

On August 26, 2005, at 4:57 p.m., an unidentified user entered inmate Ricardo Jones as an Enemy (which is the JACCS function name for a Separation Order) on inmate Leaks record. At that time, inmate Jones had not been booked into JACCS. Inmate Jones had two older released bookings in JACCS (Booking # 27982600 and Booking #2005- 04850). The user did not follow correct Enemy data entry procedures.

Call Number: 06-26-006
**Date Prepared: 07/20/06**

*Note: The current version of JACCS does not save user identification information. This matter will be fully examined during the criminal investigation of this incident.*

Inmate Jones oldest Booking # 27082600, instead of his most recent Booking #2005-04850, was selected as the Enemy record. At that point, inmate Leaks' Booking # 2005-11400 showed Inmate Jones as an enemy (in red because it was Jones's released record), and inmate Jones' Booking #27982600 showed Inmate Leaks as an enemy (shown in Black because it was inmate Leaks active record).

On August 26, 2005 at 8:55 p.m., inmate Jones was booked into JACCS (Booking # 2005-11784). The correct booking procedure was followed which included restoring the most recent released Booking # 2005- 04850 from history into the new record. Because the Enemy Information was previously entered on Inmate Jones' older record instead of the new Booking # 2005-04850, the Enemy Information was not carried forward to inmate Jones' new Booking # 2005-11784 (in fact Jones' new Booking showed no enemies at that point). Inmate Leaks' Booking # 2005-11400 still showed Inmate Jones as an enemy but as a red (released) record.

JACCS functions that check for Enemies, such as the Housing Assignment Screen, display the Enemy Alert Window when the Enemy record is an active (Black) record. No Enemy Alert Window was displayed for either inmate when their housing was assigned. This explains how inmates Leaks and Jones were housed together in the North One (1) housing unit from May 11 – May 29, 2006. The current version of JACCS does not save user identification information in the Enemy Data Screen. This shortcoming has been recognized by the DOC and is currently being rectified (SEC Recommendation Section).

On June 27, 2006, CTS-1 was interviewed by the OIA. During this interview, CTS-1 stated that he determines if inmates are eligible for placement on detail by utilizing the NIPS Post Order, which clearly outlines the eligibility requirements for inmate placement on detail. According to the DC Central Detention Facility Post Order Non- Industrial Pay System 4-b3. Eligibility: Felons: "…Sentenced felons whose total sentence does not exceed five (5) years are eligible."

On August 18, 2005, inmate Leaks was committed to the CDF as a U.S. Parole Violator. Inmate Leaks was sentenced to serve 24 years (Aggregate) for his underlying 1998 Assault with a Deadly Weapons charge and was released on September 24, 2003 on parole with 4,383 days remaining to be served.

Further, CTS-1 stated that during his screening of inmate Leaks, he reviewed PRISM. This investigation has determined that CTS-1 **failed** to note Leaks' history of escape as listed in PRISM.

**ADW-1**
ADW-1 was interviewed by the OIA on Wednesday, June 21, 2006. During this interview, ADW-1 acknowledged that he approved inmate Leaks' Personnel Action

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 06-06-006
Date Prepared: 07/20/06

Request Form for placement on detail. According to ADW-1, prior to the request reaching his desk, it had been approved at the level of the NIPS Coordinator and by the CTS-1.

ADW-1 stated that he did not review any documentation that would have supported their recommendation/approval. ADW-1 stated that he was not familiar with DOC Post Order for Non-Industrial Pay System. According to ADW-1, he was informed that the CTS would identify the inmate's job function and place him/her on jobs that would keep the inmate away from any prisoner upon which s/he had separations orders.

ADW-1 stated that it was a practice that if either the Deputy Warden for Programs or the Deputy Warden for Support were not available, the other could sign off on approvals for inmate detail requests.

## 8d. Administrative Two (2) Door

### AO-2

This investigation has determined that AO-2 has not been consistent in her statements concerning this incident. AO-2 during her initial interview with the OIA related that on the morning of Saturday, June 3, 2006 she did not allow any inmate to enter through the door leading to the Administrative Two (2) module.

AO-2 conveyed that on several occasions she had to leave her post to escort inmates to the Visitor's Hall and to review her annual performance evaluation. According to AO-2, at approximately 9:45 a.m., she saw EO-1 walk two Black inmates through the Administrative Two (2) door into the second floor of the administrative module.

In a subsequent interview on July 3, 2006, AO-2 stated that on one occasion she unlocked the Administrative Two (2) door to allow inmate-2 entrance. She stated that EO-1 was standing near the door with inmate-2 when she opened it. This event allegedly occurred between 9:40 a.m., and 9:50 a.m. EO-2 spoke to the SID/OIA again by telephone on July 3, 2006 at which time she stated that contrary to her earlier association, she did not see EO-2 open the Administrative Two (2) door for two Black male inmates between 9:45 a.m. and 9:50 a.m.

As related by inmate Leaks, on the morning of Saturday, June 3, 2006 AO-2 opened the Administrative Two (2) door allowing him and inmate Jones unsupervised access to the administrative module of the CDF. **(This matter will be more fully examined during the criminal investigation of this incident.)**

## 8e. Policy, Procedures and Practices

1. **Inmate Accountability**
   When an inmate has a scheduled appointment with the Infirmary, a personal or legal visit, or other matters to attend off the unit, s/he shall be issued a *movement pass to authorize his/her* movement from his assigned housing unit to the specified location displayed on the pass.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 06-06-006
Date Prepared: 07/20/06

Although the physical plant has numerous checkpoints to observe and monitor the status of an inmate's movement, prisoners in many cases are allowed to walk to their destination unescorted.

The movement pass is a pre-printed template on an 8 1/2x11 sheet of paper. There are four pass templates on one 8 1/2x11 sheet. The passes are maintained in the control module of the housing unit.

Inmates are usually notified that they have a visitor or a scheduled appointment in the Infirmary by a telephone call from staff to the Correctional Officer assigned to the housing unit control module. The officer will either write the pass and hand deliver it to the inmate's cell, have the detail inmate deliver the pass to the inmate's cell, or have the inmate's cell door opened allowing the inmate to approach the control module to be issued the pass as s/he departs the Housing unit.

When an inmate leaves the unit, she is accounted for by the officer placing the inmate's name on the running count sheet. In an effort to save time, some officers will, upon entering their assigned housing unit, write and sign passes without placing the names of the inmates on the pass. Although these practices were in place at the time of the escapes, they have since been changed as they were atypical in the field of Corrections and not consistent with current best practices.

On Saturday, June 3, 2006, prior to 9:42 a.m., inmate Ricardo Jones was given a pass to the Infirmary; however, his name was not on the list of inmates scheduled for appointment. Officers assigned to the unit gave different accounts of how and why inmate Jones was issued the pass. Furthermore, neither of the assigned officers acknowledged writing the pass permitting him out of his housing unit.

The OIA interviewed the three (3) Officers who were assigned to the Infirmary on Saturday, June 3, 2006. Each officer stated that inmate Ricardo Jones was not scheduled to be seen in the Infirmary on Saturday, June 3, 2006. Each officer further claimed that on the morning of the escape they did not call unit Southeast One (1) to request that inmate Jones report to the Infirmary for an appointment.

There is a possibility that someone, perhaps Leaks, called the unit that morning and purposely misled the officer in the housing unit by pretending to be an employee of the Infirmary, asking for inmate Jones to respond for an appointment. There is also a possibility that inmate Jones complained of an illness and was allowed to leave the unit by one of the officers. **(This matter will be more fully examined during the criminal investigation of this incident.)**

2. On the day of the escape, Inmate Leaks was able to perform his detail assignment in the administrative module without the oversight of his assigned supervisor contrary to established procedure. Inmate Leaks was given unsupervised access to staff locker rooms,

Case Number: 06-06-000
Date Prepared: 07/20/06

the ODR, and adjoining offices on the 2nd floor administrative module as well. Inmate Leaks was able to walk the corridors of the CDF unchallenged by staff.

## 8f. Technology and Support Mechanisms

1. **Surveillance Cameras (Housing unit)**
   As part of this investigation, an attempt was made to review pre-recorded video footage from Southeast One (1) to determine when inmate Ricardo Jones received his movement pass and who issued him the pass. Investigators discovered that critical minutes of footage are unaccounted for. **(This matter will be examined fully during the criminal investigation of this incident.)**

2. **Surveillance Cameras (Corridors and Perimeters)**
   Upon leaving the foyer of the Southeast One (1) Housing unit, there is no additional video footage. There is no ability to track inmate Leaks as he walked the corridors of the CDF. There is no video footage to show both inmate Leaks and inmate Jones walking together as they entered the administrative module or the Warden's Office. There was also no perimeter video footage tracking them as they fled the immediate area of the CDF complex.

3. **Communications**
   After listening to MPD radio transmissions of the escape, it was determined that there was no communication between uniformed officers of both MPD and DOC. If DOC officers had handheld radios with the capability to correspond with MPD officers there would not have been need for the DOC to communicate with MPD uniformed officers through a third party emergency dispatcher. In the case of an emergency, the D.C. Government Public Safety Cluster should have the capability of direct inter-agency communication.

4. **Escape Alarm**
   This investigation has concluded that procedures addressing the activation of the Community Alert System were followed.

   A review of the chronicled sequence of events as delineated in the events log indicated that the Community Alert System was activated at 10:40 a.m. by CDF Command Center personnel. However, it can not be verified as to whether the siren, once engaged, properly sounded or was adequately heard as designed. Notification of the escape was made to the Mayor's Command Center by a CDF supervisor at 10:55 a.m. and to the SOCC at approximately 11:15 a.m. by members of the DOC Warrant Squad. It is to be noted that on weeknights from 7 p.m. to 7 a.m., and on weekends and holidays 24/7, calls to the Mayor's Command Center are automatically transferred to the Emergency Management Agency (EMA) 727-1000 as was in this instance.

5. **Structural Deficiencies**
   At the time that inmate Leaks and Jones escaped from the CDF, the administrative module windows were not reinforced with modern glass meshing that is standard in the corrections industry nor was there iron bars reinforcing the security of the windows. In addition, security walls, razor wire, and perimeter cameras were absence in vital areas.

This document is the property of the OIA, and its contents are not to be disseminated outside this agency without the approval of the director.

Case Number: 06 06 008
Date Prepared: 07/20/06

## 8g. Final Observations

Prisoner escapes, no matter their source, raise the fears of a community while lowering public confidence in the criminal justice system. When such occurrences originate from the secured confines of a correctional facility they hold the potential of not only jeopardizing public safety but that of correctional staff, visitors, and the general inmate population as well. The Department of Corrections' obligation to ensure the safe and continued, court ordered containment of those under its custody entails strict adherence to well formulated procedures that are proficiently performed by staff who fully understand their role as protectors of the public and faithfully carry out their duties accordingly.

The June 3, 2006 escapes of inmates Joseph Leaks and Ricardo Jones were neither opportunistic nor spontaneous but rather the outgrowth of a calculated, deliberate plan, arranged and orchestrated with the assistance of others. The escapes involved not only a carefully assessed determination as to how to breach institutional security but how to elude authorities once successfully in the community. Central in their scheme to flee from justice was collusion by corrupted staff and the negligence of correctional employees who failed to appropriately address their assigned responsibilities.

While both escapees were re-apprehended and returned to custody within 37 hours without harmful consequences, this incident serves to emphasize the vital importance of corrections in promoting public safety. Not only must the physical structure of the compound be adequately equipped and maintained to meet this most fundamental of governmental goals, so must the staff possess the capacity to meet the enormous pressures of their chosen occupation. No matter how fortified or well constructed the edifice, no matter how well developed its policies and procedures, it is the staff that constitutes the most important resource of the correctional environment.

The overwhelming majority of those employed by the Department of Corrections are assets to the community. They are individuals who are credits to their profession who perform an exceedingly demanding public service under extremely difficult conditions.

The DOC is intent upon purging its system to ensure that only those employees who demonstrate the highest standards of professionalism and dedication to upholding the public's trust are among its ranks. The inappropriate conduct of a few voluntarily compromised employees should not be viewed as indicative of the commitment and integrity possessed by the greater number of the DOC workforce.

The Department will continue to diligently pursue and implement corrective measures to avoid future occurrences of this nature.

This document is the property of the OIA, and its contents are not to be distributed, outside this agency without the approval of the director.

Case Number: 06-06-000
Date Prepared: 07/20/06

## 9. RECOMMENDATIONS

The recommendations of the Special Investigations Division, Office of Internal Affairs are based on the observations of members of the investigative team through interviews with staff and inmates along with a comprehensive review of existing policies and procedures.

> It is recommended that the Department immediately hire a Security Chief whose primary responsibility will be to ensure that proper security controls, staffing, equipment, and operational protocols are in place to better promote the integrity of the complex.

> It is recommended that legislation be immediately enacted mandating that correctional officers remain at the facility during their meal period and that they be given a meal at no cost. This measure would ensure that there is ample custodial staff available in case of emergency at the facility.

> It is recommended that the Perimeter Security, the Tower Officer, and the Chief of Security be assigned hand held radios with the capability and authority to communicate directly with the MPD in cases of emergency. This measure would shorten the delivery of timely and critical information as well as promote efficient coordination of agency response efforts.

> It is recommended that the Zone Four Lieutenant, Compliance Officers, and the Inmate Count Book Officers conduct random audits of Housing units to ensure that inmates are housed appropriately, commensurate with their custody and classification requirements.

> It is recommended that surveillance cameras be placed at every checkpoint within the CDF to include Floor Control 1, 2 and 3 in addition to administrative entrances, stairwells and elevators.

> It is recommended that the Correctional Program Officer who supervises Correctional Treatment Specialists conduct random weekly audits of classifications and re-classification documents. Additional efforts must be made to ensure adherence to established quality assurance measures.

> Complete the installation of new JACCS (6.0) "Release" functions that will provide enhanced audit capability. This improvement will enable DOC to identify staff via a code who make specific changes to an inmate's electronic record.

> Hire a consultant to train Correctional Treatment Specialists on the use of a risk assessment instrument designed to identify criminal risk and high threat offenders. (Training is scheduled for mid August 2006)

> Ensure on-going staff training regarding proper data input procedures, specifically classification, housing, and separations into JACCS.

This document is the property of the OIA, and its contents are not to be distributed outside this agency without the approval of the director.

Case Number: 06-06-006
Date Prepared: 07/20/06

# *APPENDIX A*

## *ACRONYMS*

| | |
|---|---|
| ADW | Acting Deputy Warden |
| BPD | Baltimore City Police Department |
| CARFTF | Capital Area Regional Fugitive Task Force |
| CDF | Central Detention Facility (DC Jail) |
| CCHPS | Center for Correctional Health and Policy Studies |
| CO | Correctional Officer |
| CAPT | Captain |
| CTF | Correctional Treatment Facility |
| CTS | Correctional Treatment Specialist |
| CTSS | Correctional Treatment Specialist Supervisor |
| DET | Detective, Police |
| DOA | Duty Administrator |
| DOC | District of Columbia, Department of Corrections |
| EO | Environmental Officer |
| EOS | Environmental Supervisor |
| FBI | Federal Bureau of Investigation |
| IIC | Initial Incident Commander |
| INV | Investigator |
| JACCS | Jail and Community Corrections System |
| LT | Lieutenant |
| NIPS | Non-Industrial Pay System |
| OCTO | Office of the Chief Technology Officer |
| OIA | Office of Internal Affairs |
| PIO | Public Information Officer |
| PRISM | Pretrial Real-time Information System Manager |
| PSA | Police Service Area |
| R&D | Receiving and Discharge |
| SID | Special Investigations Division |
| SOCC | Synchronized Operations Command Center |
| UOIC | Unit Officer in Charge |
| USAO | United States Attorney's Office |
| USMS | United States Marshals Service |
| USPV | United States Parole Violation |
| WAT | Warrant Apprehension Team |

This document is the property of the OIA, and its contents are not to be distributed outside this agency without the approval of the director.

**EXHIBIT C**

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Darryl Love
3221 Brothers Pl. SE
Washington, DC 20032

Dear Mr. Love:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Treatment Specialist DS-11, effective July 26, 2006. The Summary Removal Notice was sent via express mail (ED528768216US) to your last address of record on July 26, 2006. The United States Postal Service delivered this letter on July 27, 2006. The signature affixed to the receipt for this letter was L. Love. The summary removal action is based on a charge of Negligence for conduct that:

    a. Threatened the integrity of government operations;
    b. Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications**:  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006. The OIA investigation substantiated that you failed to correctly reclassify inmate Leaks and resultantly inmates Leaks and Jones on June 3, 2006 escaped from the Central Detention Facility.

The OIA Investigation determined that you conducted a custody reclassification on Inmate Leaks on March 11, 2006. Your scoring produced a total custody score of seven (7), indicating a custody level of medium. During the OIA Investigation, Leona Bennett, Correctional Program Officer reviewed your March 11, 2006 reclassification of inmate Leaks. Ms. Bennett concluded that the reclassification

Darryl Love
Page 2

was erroneously scored and similar to the December 1, 2005 reclassification instrument prepared by Correctional Treatment Specialist, Malcolm Pointer.

You conducted a subsequent reclassification of inmate Leaks on May 15, 2006. Your scoring of this reclassification produced a total custody score of five (5), indicating a custody level of medium. However, according to Ms. Bennett and the Technical Reference Manual, your May 15, 2006 reclassification of inmate Leaks was also incorrect. Inmate Leaks should have been classified as a Maximum custody inmate.

The OIA Investigation also determined that you failed to note that inmate Leaks had a history of escape. Additionally, you failed to score inmate Leaks' U.S. Parole Violation underlying charge according to the DOC Custody Classification Instrument- Technical Reference Manual.

Inmate Leaks' most serious charge in which he was committed on August 18, 2005, was the US Parole Violation in reference to an underlying 1998 Assault with a Deadly Weapon (ADW) charge.

You stated during your subsequent re-classification of inmate Leaks on May 15, 2006, that you intended to give inmate Leaks **5 points** in **Part B** on the re-classification instrument (severity of prior criminal conviction). However, you inadvertently struck the **3 key** on your computer keyboard in error. Nonetheless in your subsequent re-classification of inmate Leaks, you again failed to note inmate Leaks' history of escape.

The OIA Investigation concluded that you were negligent because it was your responsibility to ensure that accurate data was entered into JAACS reflecting the correct custody score.

Your negligence in performing your official duties caused inmate Leaks to be misclassified as medium custody. As a result of your misclassification, a maximum custody inmate, with a history of escape was permitted to work on an Off Unit Detail

Your negligence in the matter placed the staff, inmates and the public at large in considerable capricious danger. Notwithstanding are the detrimental public relations incurred by the agency, potential lack of confidence and a breach of public trust.

The position of Correctional Treatment Specialist is on of trust, reliance and confidence. Each correctional employee has fiduciary responsibility to the public in general and specifically to the citizens of the District of Columbia. The

Darryl Love
Page 3

citizens of the District of Columbia trust correctional employees to provide a safe, secure and orderly facility. This task is effectuated when policies and procedures are implemented, adhered to, and respected by staff.

Investigation concluded that you violated the following Departmental Policies:

**Program Statement 4090.4-** Custody Classification System which states that case managers shall use the Custody Classification Technical Reference Manual of Instruction when completing the reclassification instrument.
**Technical Reference Manual 4090.4** which states that if the inmate escaped or attempted escape from a medium or high security facility within the past 10 years then a 7 shall be entered.

In accordance with Basic Regulations for all employees 1.1 – Operational Knowledge, you are required to have a complete understanding of your position description, all regulations, rules, policies and procedures that pertain to the Department, Division, Service and unit to comply there with.

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal. Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal action. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer.

Darryl Love
Page 4

Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

> DC Office of Administrative Hearings
> 825 North Capitol Street, N.E.
> Suite 4150
> Washington, D.C.  20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one.  After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001.  You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Acting Warden

# EXHIBIT D

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Malcolm Pointer
904 French Street, NW
Washington, DC 20001

Dear Mr. Pointer

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Treatment Specialist DS-11, effective July 26, 2006. The Summary Removal Notice sent was via express mail (ED528768180US) to your last address of record on July 26, 2006. The United States Postal Service delivered this letter on July 28, 2006. The signature affixed to the receipt for this letter was M. Pointer.   The summary removal action is based on a charge of Negligence for conduct that:

    a. Threatened the integrity of government operations;
    b. Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006. The (OIA) Investigation into the escape, determined that you failed to correctly reclassify inmate Leaks and resultantly inmates Leaks and Jones on June 3, 2006, escaped from the Central Detention Facility.

The OIA Investigation further determined that on December 1, 2005 you re-classified Inmate Leaks without a complete review of his institutional record. In addition, you failed to review the initial classification custody instrument

Malcolm Pointer
Page 2

completed by Correctional Treatment Specialist (CTS) Vera Lightener, which was
located in inmate Leaks' institutional record. Your decision not to review inmate
Leaks' institutional record prior to re-classifying inmate Leaks was a monumental
mistake in judgment. A review of inmate Leaks complete institutional record
would have revealed inmate Leaks noted record of escape, in addition to a United
States Parole Violation (USPV) charge in reference to his underlying 1998
Assault with a Deadly Weapon conviction. Inmate Leaks' prior history of escape
from the CDF, a secure facility should have heightened his security threat and
possible placement on special handling status.

The Technical Reference Manual Instructions for completing the DOC Custody
Re-classification instrument states that all offenses the inmate is being committed
on should be considered to determine the most serious current charge.

Inmate Leaks entered the CDF on August 18, 2005, charged with Accessory After
the Fact, (First Degree Murder while Armed). Inmate Leaks' USPV underlying
charge should have been scored as the most serious offense.

Inmate Leaks was sentenced to serve 24 years (Aggregate) for his underlying
USPV charge (1998 ADW). He was released on September 24, 2003, after
serving a five (5) year prison sentence and was placed on parole with 4,383 days
remaining to be served. Inmate Leaks' violation of his parole coupled with his
history of escape undoubtedly made him an extreme security risk.

The OIA Investigation also determined that you erroneously scored the
reclassification you conducted on inmate Leaks; wherein you failed to review the
institutional record and the initial classification instrument that was prepared by
Correctional Treatment Specialist, Vera Lightener who had correctly scored
inmate Leaks at a maximum custody level.

In reclassifying inmate Leaks you failed to note that inmate Leaks had a history of
escape. Additionally, you failed to score inmate Leaks' USPV underlying charge
according to the DOC Custody Classification Instrument- Technical Reference
Manual.

Inmate Leaks' most serious charge in which he was committed on August 18,
2005, was the US Parole Violation in reference to an underlying 1998 Assault
with a Deadly Weapon (ADW) charge.

Leonna Bennett, Correctional Program Officer, collaborates that your initial
reclassification of inmate Leaks was performed without his institutional file. She
noted that you failed to score inmate Leaks' escape history. According to Ms.

Malcolm Pointer
Page 3

Bennett's assessment, the point total you assigned were incorrect and inmate
Leaks' custody level should have remained at Maximum.

OIA Investigators interviewed you regarding this matter on June 20, 2006.
During the interview you stated that you were unsure if you had reviewed inmate
Leaks' institutional file prior to reclassifying him. You further confirmed that
you did not consider the Accessory after the Fact (First Degree Murder While
Armed) charge. You stated that it was your belief that the charge had been
released in JACCS because it had a bond that was satisfied. You also
acknowledged that you did not consider inmate Leaks' parole violation or its
underlying charges.

Investigation determined that you were culpable because it was your
responsibility to ensure that accurate data was entered into JAACS reflecting the
correct custody score."

Your negligence in performing your official duties not only caused inmate Joseph
Leaks 250-433 to be misclassified, it contributed to the escape because if the
custody score had been correct, inmate Leaks would have never been permitted to
work on an Off Unit Detail with a Maximum custody score.

Your negligence placed the staff, inmates and the public at large in considerable
capricious danger. Not withstanding are the detrimental public relations incurred
by the agency, potential lack of confidence and a breach of public trust.

The position of Correctional Treatment Specialist is one of trust, reliance and
competence. Each correctional employee has fiduciary responsibility to the public
in general and specifically to the citizens of the District of Columbia. The
citizens of the District of Columbia trust correctional employees to provide a safe,
secure and orderly facility. This task is effectuated when policies and procedures
are implemented, adhered to, and respected by staff.

The OIA investigation concluded that you violated the following Departmental
Policies:

 **Program Statement 4090.4-** Custody Classification System which states that
case managers shall use the Custody Classification Technical Reference Manual
of Instruction when completing the reclassification instrument.
**Technical Reference Manual 4090.4** Chapter 2, section 1 (f) states….Based
upon the data in the inmate's record, the Case Manager shall complete all scoring
items on the first page of the reclassification form.

Malcolm Pointer
Page 5

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley Wadren
Acting Warden

# EXHIBIT E

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Alphonso Bryant
1273 Oats Street N.E.
Washington, DC 20002

Dear Mr. Bryant:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Treatment Specialist DS-11, effective July 28, 2006. The Summary Removal Notice was issued to you on July 28, 2006. The summary removal action is based on a charge of Negligence for conduct that:

    a. Threatened the integrity of government operations;
    b. Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006. The OIA Investigation into the escape, determined that you failed to correctly screen inmate Joseph Leaks for work detail and resultantly, inmates Leaks and Jones escaped from the Central Detention Facility on June 3, 2006. The OIA Investigation substantiated the following:

The OIA further determine that a separation order was placed in inmates Leaks and Jones' institutional files and in the Jail and Community Correctional System (JACCS), at the request of the United States Attorney's Office (USAO) on August 26, 2005. This order required that inmates Leaks and Jones be kept apart at all times, including while being transported to and from court.

Alphonso Bryant
Page 2

On February 14, 2006, you approved inmate Leaks' Personnel Action Request Form for placement on work detail. In the comments section of the form you wrote: "Separations (See Attached)."

During your interview with OIA Investigators on June 27, 2006, you were asked; "Specifically how do you determine if an inmate is eligible for work detail?" You stated that you use the NIPS Post Order, which clearly outlines the eligibility of inmates for possible detail placement. You stated that when you screened inmate Leaks in February 2006, you utilized the information data base systems, JAACS and PRISM. You acknowledged that you did not use inmate Leaks' institutional file. You explained that when screening an inmate for detail, you initially look at his custody level, then his offense to determine if he has any flags such as separation order or outstanding warrants, detainers, medical flags and prior criminal history.

You further explained that your responsibility was to screen inmates to determine if they are suitable candidates for placement on work detail. You stated that you either write **OK** or **No** on the inmate's NIP Personnel Action Form to indicate eligibility.

You admitted that you indicated "OK" on inmate Leaks' NIPS Personnel Action. You also admitted that you indicated on the form that inmate Leaks had a Separation Order

The Non-Industrial Pay System (NIPS)Post Order dated April 19, 2002, Section 4, Eligibility Subpart b. Office unit/Inside only Detail Paragraphs (3) (5) and (6) provides,

(3) Felons: Convicted felons are eligible. Sentenced Felons whose total sentence does not exceed five years are eligible for Off Unit/Inside only work detail.

(5) Inmates with Separation Orders from other inmates housed at CDF are not considered appropriate for placement. Inmates assigned to R&D must be free of Separation Orders.

(6) Parole Violators who are within two(2) years of a scheduled release date and who have obtained minimum custody status.

On August 18, 2005 inmate Leaks was committed to the CDF as a U. S. Parole Violator. He was sentenced to serve 24 years (Aggregate) for his underlying 1998 Assault with a Deadly Weapons charge and was released on September 24, 2003 on parole with 4,383 days remaining to be served. As previously stated, you were aware that inmate Leaks had a Separation Order.

Alphonso Bryant
Page 3

In addition, based on your statement, that during your screening of inmate Leaks, you reviewed PRISM, the OIA Investigation concluded that you failed to note Inmate Leaks' history of escape as listed in PRISM.

The OIA Investigation concluded that you were negligent in the performance of your duties, as you failed to thoroughly screen inmate Leaks for an Off Unit work detail in accordance with NIPS regulations.

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal. Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal actions. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer. Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

> DC Office of Administrative Hearings
> 825 North Capitol Street, N.E.
> Suite 4150
> Washington, D.C. 20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

Alphonso Bryant
Page 4

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Acting Warden

# EXHIBIT F

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Herbert Douglas
3808 71st Avenue
Landover, Hills, Maryland  20784

Dear Mr. Douglas:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Officer DS-08, effective July 26, 2006. The Summary Removal Notice was sent via express mail (ED528768193US) to your last address of record on July 26, 2006. The United States Postal Service delivered this letter on July 27, 2006. The item as signed for by H. Douglas.   The summary removal action is based on a charge of Negligence for conduct that:

  a.  Threatened the integrity of government operations;
  b.  Constitutes an immediate hazard to the agency, to other District employees, or
       to the employee

**Specifications**:  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006.

The OIA investigation substantiated the following:

On Saturday, June 3, 2006 at approximately 7:00 a.m., you entered the North One (1) housing unit and removed nine (9) detail inmates, including inmate Joseph Leaks. These inmates were employed in various off unit environmental work assignments throughout the CDF. You escorted these inmates to their assigned areas of responsibility. You

Herbert Douglas
Page 2

removed six (6) additional detail inmates from the Southwest Two (2) housing unit who were also assigned to work various environmental work detailed throughout the CDF.

You escorted Inmate Leaks, along with three other detail inmates to their assigned work areas on the second floor of the administrative module. Inmate Leaks' daily primary responsibility on this work detail was to clean the common areas, which included the Officer's Dining Room, the Environmental Office and the employee's locker rooms on the second floor. You unlocked the supply locker containing various cleaning materials and equipment to include floor buffers.

Inmate Leaks stated that prior to his initial departure from the second floor of the administrative module, he told you to "leave the area because something was about to happen." According to inmate Leaks, you complied with his request and departed the area leaving him and the other inmates unattended. According to Inmate Mohammad Rashid, you remained in the area for approximately twenty (20) minutes before leaving.

At some point after you left, Inmate Leaks, left his assigned detail post assignment and proceeded through the Administrative Two door into the inmate housing unit area where he ultimately met up with Inmate Ricardo Jones.

According to inmate Leaks upon his return to the second floor of the administrative module, he was accompanied by inmate Ricardo Jones. Inmate Leaks stated that he and inmate Jones removed a buffer from the supply locker that you left unsecured.

The OIA Investigators conducted taped interviews with you regarding this matter on Saturday, June 3, 2006. During the interview, you stated that your assignment on Saturday, June 3, 2006 was supervising the details that are assigned to clean the facility. You confirmed that Inmate Joseph Leaks was assigned to your environmental detail squad on June 3, 2006. You also confirm that Inmate Leaks accompanied you to the storage (cage) area where the buffer used by the two escapees was stored. You stated that you unlocked the cage and left it unsecured as this is the practice. When asked, "How long did you -- after Leaks went up to that locker, did you stay with him after that?" You responded that you went on to place the other inmates. You stated that you left inmate Leaks on the second floor; that he should have been cleaning the bathrooms, the ODR and the hallway. You stated that after you opened the Environmental Office inmate Leaks came in and got a cup of coffee. You admit that you left inmate Leaks unattended while you went to oversee inmates cleaning the visiting hall. You could not recall if that was the last time you saw inmate Leaks.

The OIA Investigation concluded that you abandoned you responsibilities, which were to ensure that inmates under your custody were properly supervised. As a result of your negligence, Joseph Leaks, and Ricardo Jones successfully escaped from the CDF.

Herbert Douglas
Page 3

Your negligence in this matter contributed to the successful escape of Inmate Ricardo Jones and placed staff, inmates and the public at large in considerable capricious danger. Notwithstanding, are the detrimental public relations incurred by the agency, potentially lack of confidence and insecurity the public now experience. The position of Correctional Officer is one of trust, reliance and confidence. Each correctional employee has fiduciary responsibilities to the public in general and to the citizens of the District of Columbia. The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility. This task is effectuated when policies and procedures are followed, respected and maintained by staff.

The vigilance of a Correctional Officer is indispensable to the safe keeping of inmates committed to the custody of the DOC. As a Correctional Officer you were charged with the safe keeping of inmates, which is of vital importance to the citizens and the Government of the District of Columbia.

Your negligence in this matter violates the following regulations and policies:

Program Statement 5010.2c: Accountability of Inmates, states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations of All Employees:

Section 1.1, Operational Knowledge Required: Employees are required to have complete understanding of their Position Description and all regulations, rules, policies and Procedures pertaining to the Department and their Division, Service and Unit, and to Comply herewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty, "employees are required to devote their entire attention to their official duties;

Section 2.1, Count and Security, it is the duty of the correctional officer to accept responsibility for keeping an accurate count of inmates not only at formal count periods during a shift, but at all times when inmates are assigned to his or pass through his post;

Section 2.18, Work Detail Posts, Correctional personnel assigned to work details in addition to all other duties prescribed and implied must: escort inmate to and from all work are in an orderly, prompt manner, supervise maintain check, prevent loafing, idleness, and adhere to all special or unique instructions pertaining to a job.

Herbert Douglas
Page 4

Correctional Officer General Order #8, "Account for all residents in their charge and immediately report any authorized absences to Shift Supervisor or other officials in the chain-of-commands.

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal. Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal action. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer. Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

> DC Office of Administrative Hearings
> 825 North Capitol Street, N.E.
> Suite 4150
> Washington, D.C. 20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

Herbert Douglas
Page 5

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Acting Warden

# EXHIBIT G

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Shantell Hatton
10394 Hallmark Lane
Waldorf, Maryland 20603

Dear Ms. Hatton:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Officer DS-08, effective July 26, 2006. The Summary Removal Notice was sent via express mail (ED528768281US) to your last address of record at 10394 Hallmark Lane, Waldorf, Maryland 20603, on July 26, 2006. The United States Postal Service delivered this letter on July 27, 2006. The signature affixed to the receipt for this letter was S. Hatton. The summary removal action is based on a charge of Negligence for conduct that:

    a. Threatened the integrity of government operations;
    b. Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF complex on Saturday, June 3, 2006. The OIA investigation substantiates that on June 3, 2006 you were assigned to the Southeast One (SE-1) housing unit. Your primary functions were to maintain custody, security and accountability of all inmates in your assigned housing unit. At approximately 9:42 a.m., Inmate Ricardo Jones walked out of the SE-1 housing under the pretense of going to the infirmary.

Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing him to go to the infirmary. Inmate Jones' name was placed on the housing unit movement/running count sheet, accounting for and authorizing his movement to the

Shantell Hatton
Page 2

Infirmary.  However, according to Infirmary records, only six (6) inmates from SE-1 were scheduled for medical care in the Infirmary on June 3, 2006, Inmate Jones was not one of them.

The OIA Investigators conducted taped interviews with you regarding this matter on Saturday, June 3, 2006 and on Sunday June 4, 2006.  During the interviews, you stated that Sergeant Dionne Makins and Corporal Washington worked in the unit with you on June 3, 2006.  When asked who made call-out passes?  You stated that you made passes, but could not recall how many passes you made or who you made them for.  You also stated that you observed Sergeant Makins prepare call-out passes; but you were not sure if Corporal Washington prepared any.  You stated that you received a call from Miss Toni in the Infirmary and she gave you the names of three inmates; however, you were not sure who the three names were, but that you had written the names on the running count sheet.  You stated that you could not recall if you received any other calls from the infirmary.

You acknowledged that you opened cell 18 where Inmate Ricardo Jones was housed.  You stated that you observed Inmate Jones walk out of his cell to the bubble, where you gave him his pass.  You stated that you were not sure if you had made his pass.  You said you gave him his pass and he walked out the door.

During your interview on Sunday, June 4, 2006, you explained to OIA Investigator Collins that you put the names on the running count sheet from the completed written passes on the table as opposed to writing down the names as the inmates were leaving the unit.  You further stated that when you put the names on the sheet you had not seen or called for the inmates.  During this interview you also remembered that the call you received from the infirmary on June 3, 2006 was for Inmates Donaldson, Tyrone; McKnight and Moore.  In regards to inmate Jones you still could not recall if you filled out his call out pass or if you took the call.  You stated that both you and Sergeant Makins took calls.

As stated previously, the OIA investigation revealed that there were 6 inmates scheduled and authorized movement to the infirmary for medical treatment on June 3, 2006.  Inmate Jones was not included with this group.  You confirmed that Inmate Jones was not included in the list of inmates Miss Toni provided to you to report to the infirmary, and inmate Jones was not experiencing a medical emergency.  Despite these significant factors, you issued Inmate Jones a call-out pass to the infirmary and put his name on the movement/running count sheet.  As an Officer assigned to the unit, it was your responsibility to immediately report this discrepancy to Sergeant Makins.  It was also your responsibility as well as the responsibility of Sergeant Makins and Officer Washington to confirm Inmate Jones' need for medical treatment; the availability of medical staff to check Inmate Jones and seek authorization for his movement to the infirmary via a call out pass or escort pursuant to sick call and infirmary protocols.

Shantell Hatton
Page 3

The OIA Investigation further revealed that neither you nor the other officers assigned to the unit (Makins and Washington) have knowledge or did not indicate as to why, or by what authorization inmate Jones was permitted to exit the unit, a controlled and secure environment that only staff can authorize or effectuate using mechanical devices to allow inmate to enter and exit. This performance clearly violates department regulations, specifically, General Order #8 Accountability of inmates; Basic Rules and Regulations for all Employees, Section; 1.4 Attention to Duty, and Section: 1.1 Operational Knowledge.

The OIA Investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment. The OIA Investigation further concluded that each correctional officer assigned to SE-1 housing unit, to include you was culpable, because it was the responsibility of each employee assigned individually, and collectively to ensure the accurate accountability of each inmate assigned to the housing unit. Therefore, you failed to properly carry out your assigned duties.

Your negligence in this matter violates the following Departmental policy:

Program Statement 5010.2c: Accountability for Inmates, which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations of All Employees:

Section 1.1, Operational Knowledge Required:  Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty:  Employees are required to devote their entire attention to their official duties; and,

Correctional Officer's General Orders:

Number 1, Take charge of this post and all government property on or near it.

Number 8, Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command.

Shantell Hatton
Page 4

Your negligence in this matter contributed to the successful escape of Inmate Ricardo Jones and placed staff, inmates and the public at large in considerable capricious danger. Notwithstanding, are the detrimental public relations incurred by the agency, potentially lack of confidence and insecurity the public now experience. The position of Correctional Officer is one of trust, reliance and confidence. Each correctional employee has fiduciary responsibilities to the public in general and to the citizens of the District of Columbia. The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility. This task is effectuated when policies and procedures are followed, respected and maintained by staff.

The charge of negligence involves conduct which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal. Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal action. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer. Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

DC Office of Administrative Hearings
825 North Capitol Street, N.E., Suite 4150
Washington, D.C. 20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review,

Shantell Hatton
Page 5

your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Acting Warden

# EXHIBIT H

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Dionne Makins
7301 Flag Harbor Dr
District Heights, Maryland 20747

Dear Ms. Makins:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Lead Correctional Officer DS-09, effective July 26, 2006. The Summary Removal Notice was sent via express mail (ED528768233US) to your last address of record at 7301 Flag Harbor Drive, District Heights, Maryland, 20747, on July 26, 2006. The United States Postal Service delivered the letter on July 28, 2006. The signature affixed to the receipt for the letter was D. Makins.   The summary removal action is based on a charge of Negligence for conduct that:

    a. Threatened the integrity of government operations; and
    b. Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications**:  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections (DOC), Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF complex on Saturday, June 3, 2006. The OIA Investigation substantiates that on June 3, 2006, you were the assigned Office-In-Charge (OIC) of Southeast One (1) (SE-1) housing unit. Your primary functions were to maintain custody, security and accountability of all inmates in your assigned housing unit and provide supervision to all subordinate officers assigned to your unit. At approximately 9:42 a.m., Inmate Ricardo Jones walked out of the SE-1 housing under the pretense of going to the Infirmary.

Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing him to go to the Infirmary. Inmate Jones' name was placed on the housing unit movement/running count sheet, accounting for and authorizing his movement to the

Dionne Makins
Page 2

Infirmary. However, according to Infirmary records, only six (6) inmates from SE-1 were scheduled for medical care in the Infirmary on June 3, 2006. Inmate Ricardo Jones was not one of them.

OIA Investigators conducted taped interviews with you regarding this matter on Saturday, June 3, 2006 and on Friday, June 16, 2006. During the interviews, you stated that Corporal Hatton and Corporal Washington worked in the unit with you on June 3, 2006. You further stated that after calling the count into the count book, you proceeded to cut the call-out passes and date them. You stated that you made all your passes that you were aware of and Miss Hatton put them on the movement sheet. You stated that the inmates that were going to the Infirmary already had their passes; so all they had to do was wave their hands with their passes. You stated Inmate Ricardo Jones, who was in cell 18 flagged out, he had a pass. You said you asked him where he was going, he responded, "to the Infirmary." You admitted that you only glanced at the call-out pass and stated, "I didn't pay attention to whether he had it. I told him to give it to Miss Hatton." You indicated that Miss Hatton signed the pass and put him on the movement sheet. Your recollection of events clearly demonstrates your failure to follow written and verbal instructions. Based on your own admission, you failed to confirm the authenticity of inmate Jones' comments and confirm his authorization for medical treatment.

You stated, after receiving the radio transmission to "Lock the jail down" you and Officer Washington proceeded to do so. You stated that you checked the movement sheet for the inmates that were coming back from the infirmary. You stated you called the Infirmary and found that Inmate Crawford was still there. However, when you called and inquired about Inmate Ricardo Jones, you were told that he was not there. You then heard the radio transmission, and called the command center and were informed that Inmate Jones had escaped.

The OIA investigation substantiates that Inmate Jones was not on the Sick Call List scheduled for medical care on June 3, 2006. You confirmed that you did not receive a phone call from the infirmary or anywhere else for Inmate Jones to report to medical; that you did not recall Inmate Jones complaining to you or any of the officers in the unit of being sick, and you never made a call-out pass for Inmate Ricardo Jones. However, Inmate Jones was in possession of a movement pass which authorized him to proceed to the infirmary. In addition, Inmate Jones' name was placed on the housing unit movement/running count sheet, which would explain or substantiate his absence from the housing unit.

As stated previously, the OIA investigation revealed that there were 6 inmates scheduled and authorized movement to the infirmary for medical treatment on June 3, 2006. Inmate

Dionne Makins
Page 3

Jones was not included with this group. As the OIC of the unit it was your responsibility as well as the subordinate officers (Washington and Hatton) assigned to the unit to confirm Inmate Jones' need for medical treatment; the availability of medical staff to check inmate Jones; and seek authorization for his movement to the infirmary via a call out pass or escort pursuant to sick call and infirmary protocols.

The investigation further revealed that neither you nor the officers assigned to the unit (Washington and Hatton) have knowledge or indicated as to why or by what authorization inmate Jones was permitted to exit the unit, a controlled secure environment that only staff can authorize or effectuate using mechanical devices to allow inmates to enter and exit.

The OIA Investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment. The Investigation further concluded that each correctional officer assigned to SE-1 housing unit to include you was culpable, because it was the responsibility of each employee assigned individually and collectively to ensure the accurate accountability of each inmate assigned to the housing unit. Therefore, you failed to properly carry out your assigned duties. Your negligence is aggravated by the fact that you were the **Lead** Officer-In-Charge.

Your negligence in this matter violates the following Departmental policy:

Program Statement 5010.2c: Accountability for Inmates, which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations for All Employees:

Section 1.1, Operational Knowledge Required: Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty: Employees are required to devote their entire attention to their official duties; and,

Correctional Officer's General Orders:

Number 1, Take charge of this post and all government property on or near it.

Dionne Makins
Page 4

Number 8, Account for all inmates in my charge and immediately report any
unauthorized absences to the shift commander or other officials in the chain-of-
command.

Your negligence in this matter contributed to the successful escape of Inmate Ricardo
Jones and placed staff, inmates and the public at large in considerable capricious danger.
Notwithstanding, are the detrimental public relations incurred by the agency, potentially
lack of confidence and insecurity the public now experience. The position of **Lead
Correctional Officer (Sergeant)** is one of trust, reliance and confidence. Each
correctional employee has fiduciary responsibilities to the public in general and to the
citizens of the District of Columbia. The citizens of the District of Columbia entrust
correctional employees to provide a safe and secure facility. This task is effectuated
when policies and procedures are followed, respected and maintained by staff.

The charge of negligence involves conduct/performance which falls below the
standard established by Law for the protection of others against unreasonable risk
of harm. Here, your actions substantially placed staff, inmates, the surrounding
community and the general public at large in momentous unpredictable danger. A
jail or correctional system's primary responsibility is custody, care and control of
inmates committed to its ward. Your conduct substantiates an unreasonable and
unjustifiable departure of correctional responsibilities, and therefore, warrants
your removal. Consequently, I am proposing that the summary removal action
effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and
to prepare a written response to the notice, including affidavits and other documentation
within 6 days of receipt of the notice. You are entitled to an administrative review by a
Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are
further informed of your right to be represented by an attorney or other representative.
Your response should you prepare one, may raise every defense, fact or supporting matter
in extenuation, exculpation, or mitigation of which you have knowledge or reasonably
should have knowledge, or which is relevant to the reasons in support of the proposed
action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or
hearing of the proposed removal actions. Therefore, you should contact the DC Office of
Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer.
Thereafter, any response you prepare must be submitted to your assigned Hearing Officer
at:

DC Office of Administrative Hearings
825 North Capitol Street, N.E., Suite 4150
Washington, D.C.  20002

Dionne Makins
Page 5

In conducting the administrative review and/or hearing, your appointed Hearing Officer
will review all of the documents giving rise to the charge of Negligence, this written
notice and your response, if there is one. After conducting the administrative review,
your assigned Hearing Officer will make a written report and recommendation to
Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of
Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC
20001. You may arrange to review the material by contacting Denise Shell, Management
Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Acting Warden

# EXHIBIT I

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Cynthia Washington
12303 Windbrook Drive
Clinton, Maryland 20735

Dear Ms. Washington:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Officer DS-08, effective July 26, 2006. The Summary Removal Notice was sent express mail (ED528768321US) to your last address of record at 12303 Windbrook Drive, Clinton, Maryland, 20735, on July 26, 2006. The United States Postal Service delivered this letter on July 27, 2006. The signature affixed to the receipt for the letter was C. Washington.  The summary removal action is based on a charge of Negligence for conduct that:

    a. Threatened the integrity of government operations;
    b. Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications**:  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF complex on Saturday, June 3, 2006. The OIA investigation substantiates that on June 3, 2006, you were assigned to the Southeast One (1) (SE-1) housing unit. Your primary functions were to maintain custody, security and accountability of all inmates in your assigned housing unit. At approximately 9:42 a.m., Inmate Ricardo Jones walked out of the SE-1 housing under the pretense of going to the Infirmary.

Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing him to go to the Infirmary.  Inmate Jones' name was placed on the housing unit movement/running court sheet accounting for and authorizing his movement to the Infirmary.   However, according to Infirmary records, only six (6) inmates from SE-1

Cynthia Washington
Page 2

were scheduled for medical care in the Infirmary on June 3, 2006, and Inmate Jones was not one of them.

The OIA Investigators conducted taped interviews with you regarding this matter on Saturday, June 3, 2006. During the interview, you stated that Corporal Shantell Hatton and Sergeant Dionne Makins worked in the unit with you on June 3, 2006. You stated that you did not recall the Infirmary calling for Inmate Jones. You stated that the only phone call you received was from a Lieutenant calling you to ask for your social security number in order to pay you for the overtime draft. You admitted that you made approximately three call-out passes, but not for any specific place and they were unnamed. You stated that Sergeant Makins also made some call-out passes, but could not confirm whether or not Officer Hatton made any. You also recalled that at some point all three of you were in and out of the bubble. When asked if you recalled any specific inmate(s) you gave a pass to, you responded, "I don't recall me giving anybody a pass; I'm thinking that Miss Hatton gave the passes." You explained that Officer Hatton had the running board, and she was the one that was checking them off on the running board.

As previously stated, the OIA investigation substantiated that Inmate Jones was not on the Sick Call List scheduled for medical care on June 3, 2006. You stated that you did not receive a phone call from the Infirmary or anywhere else for Inmate Jones to report to medical; you did not recall Inmate Jones complaining to you or any of the officers in the unit of being sick, and you never made a call-out pass for Inmate Ricardo Jones. However, Inmate Jones was in possession of a movement pass which authorized him to proceed to the Infirmary. In addition Inmate Jones' name was placed on the housing unit movement/running count sheet, which would explain/substantiate his absence from the housing unit.

As an Officer assigned to the SE-1 housing unit, it was your responsibility as well as the responsibility of Sergeant Makins and Officer Hatton to confirm Inmate Jones' need for medical treatment; the availability of medical staff to check Inmate Jones and seek authorization for his movement to the Infirmary via a call out pass or escort pursuant to sick call and Infirmary protocols.

The OIA Investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled Infirmary appointment. The investigation further concluded that each correctional officer assigned to SE-1 housing unit to include you, was culpable, because it was the responsibility of each officer assigned, individually and collectively, to ensure the accurate accountability of each inmate assigned to the housing unit. Therefore, you failed to properly carry out your assigned duties.

Your negligence in this matter violates the following Departmental policy;

Cynthia Washington
Page 3

Program Statement 5010.2c: Accountability for Inmates, which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations of All Employees:

Section 1.1 Operational Knowledge Required:  Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith.  Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4 Attention to Duty, "employees are required to devote their entire attention to their official duties; and,

Correctional Officer's General Orders #1, "Take charge of this post and all government property on or near it".  General Order #8, "Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command".

Your negligence in this matter contributed to the successful escape of Inmate Ricardo Jones and placed staff, inmates and the public at large in considerable capricious danger. Notwithstanding, are the detrimental public relations incurred by the agency, potentially lack of confidence and insecurity the public now experience.  The position of Correctional Officer is one of trust, reliance and confidence.  Each correctional employee has fiduciary responsibilities to the public in general and to the citizens of the District of Columbia.  The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility.  This task is effectuated when policies and procedures are followed, respected and maintained by staff.

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm.  Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger.  A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward.  Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal.  Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice.  You are entitled to an administrative review by a

Cynthia Washington
Page 4

Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal action. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer.

Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

> DC Office of Administrative Hearings
> 825 North Capitol Street, N.E.
> Suite 4150
> Washington, D.C. 20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Acting Warden

# JUDGE LAMBERTH'S DECISION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SALLIE L. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-0250 (RCL) |
| | ) | |
| DISTRICT OF COLUMBIA et al., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on plaintiff's Motion to Amend her Complaint [24] and her Motion to Compel Arbitration [22]. The Court has considered plaintiff's motions and accompanying memorandum, defendant's opposition thereto [36], plaintiff's reply [39], the applicable law, and the entire record herein. For the reasons set forth below, plaintiff's Motion to Amend her Complaint is hereby GRANTED in part and DENIED in part; her Amended Complaint is DISMISSED for failure to state a claim on which relief can be granted; and her Motion to Compel Arbitration is DENIED.

## BACKGROUND

When she was fired on March 8, 2002, plaintiff Sallie Johnson had worked as a correctional officer with the District of Columbia Department of Human Services Youth Services Administration for thirteen years. (Pl.'s Compl. 2.) At the time, Johnson was represented by the Fraternal Order of Police/Department of Human Services Labor Committee ("the union"), which had succeeded the American Federation of Government Employees ("AFGE") as exclusive union representative for Johnson's bargaining unit. (Id.) Recitation of the precise circumstances

1

surrounding Johnson's termination is unnecessary to resolution of the present motions, which

turn on her subsequent efforts to challenge that termination through the union and in this Court.

Johnson initiated formal grievance procedures through the union on March 27, 2002 and

sought arbitration as provided for in AFGE's collective bargaining agreement ("CBA") with the

District. *Johnson v. District of Columbia*, 368 F. Supp. 2d 30, 33 (D.D.C. 2005) (Lamberth, J.).

Over the next several months, Johnson fruitlessly sought information regarding her grievance's

progress from the union, but in January 2003, its general counsel advised her that arbitration had

resolved the matter in her favor. *Id.* Johnson's counsel later learned this assurance was

inaccurate and that Johnson's grievance had not been arbitrated at all. *Id.* In August 2003, she

discovered why the grievance's processing had stalled: because the CBA had been signed with

the union's predecessor, the District disputed that it remained bound by the agreement's

arbitration procedure . *Id.* at 34.

On February 17, 2004, Johnson filed a complaint [1] in this Court against the District

of Columbia[1] ("the District") and three individuals in her supervisory chain[2] ("the individual

defendants"). *Id.* On March 21, 2005, on the District's motion [5], this Court dismissed [12]

five of the complaint's six counts because it found Johnson had failed to exhaust her

administrative remedies under the District of Columbia Comprehensive Merit Personnel Act

---

[1] Johnson's complaint names former District of Columbia Mayor Anthony A. Williams, in his official capacity. (Pl.'s Compl. 1.) On April 8, 2004, the Court granted Williams' motion to substitute the District of Columbia as a defendant. Plaintiff's complaint also names Carolyn W. Colvin, Gayle L. Turner, and George Perkins, each in his or her official capacity. (Pl.'s Compl. 1-2.) The Court will refer to the District and the official capacity defendants collectively as "the District."

[2] Plaintiff's complaint also names Colvin, Turner, and Perkins in their individual capacities. (Pl.'s Compl. 1-2.)

2

("CMPA"). *Id.* at 32, 42-43. The Court determined that these five claims either were unripe or

alleged conduct for which Johnson could seek relief through arbitration. *Id.* at 44-48. Johnson's

suit could not proceed until the union and the District resolved their dispute over the CBA's

validity. *Id.* at 50. Then, if the CBA were upheld, Johnson could arbitrate her grievance and

pursue administrative appeals. *Id.* If the District nonetheless still refused to arbitrate, Johnson

could petition the Public Employee Relations Board ("PERB"), whose jurisdiction under the

CMPA "to resolve allegations of unfair labor practices" likely extended to "breach of a collective

bargaining agreement." *Id.* at 50 n.8. Because she had not pursued this administrative avenue to

its end, the Court could not hear her claims. *Id.* at 52.

Thereafter, only the second count of Johnson's complaint remained pending. It alleged

the individual defendants had conspired to deprive Johnson of her interest in continued

employment without due process of law, in violation of 42 U.S.C. section 1985 ("the section

1985 claim"). (Pl.'s Compl. 9.) On August 3, 2005, the individual defendants moved to dismiss

[19] this sole remaining claim because Johnson had never properly served them. (Defs.' Mot. to

Dismiss 1.) On August 18, Johnson sought additional time to file her opposition [20]. The

following day, the Court granted her a ninety (90) day extension [21], until November 17, 2005.

On November 22, Johnson filed motions with the Court seeking to compel the District to

arbitrate [22], to stay proceedings in federal court pending the latter motion's resolution [23], and

to amend her complaint [24]. She did not, however, oppose the individual defendants' motion to

dismiss, and on February 28, 2006, the Court granted [32] this motion because it found she had

not established proper service on them.

3

In that same order, the Court denied Johnson's motion for a stay[3] and ordered the District

to respond to her motions to compel arbitration and to amend her complaint. These two motions

are now before the Court.

## DISCUSSION

### I. Plaintiff's Motion to Amend her Complaint is Granted in Part and Denied in Part

#### A. Applicable Law

Federal Rule of Civil Procedure 15(a) permits a plaintiff to amend her complaint "once as

a matter of course at any time before a responsive pleading is served." Fed. R. Civ. Pro. 15(a).

"[A] motion to dismiss is not ordinarily considered a 'responsive pleading.'" *Confederate Mem'l*

*Assoc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993). Once such a pleading has been served,

however, the plaintiff's right of amendment is conditioned on "leave of court or [] written

consent of the adverse party." *Id.* Rule 15(a) thus ensures that "pleading is [not] a game of skill

in which one misstep by counsel may be decisive to the outcome." *Conley v. Gibson*, 355 U.S.

41, 48 (1957). Until a responsive pleading is served, "[t]he Federal Rules of Civil Procedure

guarantee a plaintiff *an absolute right* to amend [her] complaint once." *James V. Hurson*

*Assocs., Inc. v. Glickman*, 229 F.3d 277, 282 (D.C. Cir. 2000) (emphasis added). The plaintiff

need only file the amended pleading, and no accompanying motion for leave of court is required.[4]

*E.g.*, *Calloway v. Brownlee*, 366 F. Supp. 2d 43, 45 n.2 (D.D.C. 2005) (Walton, J.). *See also* 6

---

[3] The Court also denied Johnson's December 2005 motion for reconsideration [28] of the
Court's order dismissing her five claims against the District.

[4] *Cf. Pure Country v. Sigma Chi Fraternity*, 312 F.3d 952, 956 (8th Cir. 2002) ("seeking
leave to amend does not, by itself, invoke the court's discretionary authority to deny leave if the
amendment would otherwise fall within the purview of the first sentence of Rule 15(a)").

Wright, Miller, & Kane, *Federal Practice & Procedure Civil 2d* § 1482 (1990).

Ordinarily, the plaintiff's absolute right to amend once "would be terminated by a [prior]

judgment of dismissal . . . [and] [t]hereafter, efforts to amend the complaint must first be directed

to reopening the judgment." *Cassell v. Michaux*, 240 F.2d 406, 408 (D.C. Cir. 1956). Indeed,

after a district court has dismissed his suit, a plaintiff who wishes to amend must file "a 59(e)

motion to alter or amend [the] judgment combined with a Rule 15(a) motion requesting leave of

court to amend [his] complaint." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).

*See* Fed. R. Civ. Pro. 59(e) ("Any motion to alter or amend a judgment shall be filed no later than

10 days after entry of the judgment."). If the plaintiff persuades the court to vacate its judgment

of dismissal, only then can the court entertain the plaintiff's proposed amendment. *Id.* In doing

so, the Court has discretion to deny amendment based on "'undue delay, bad faith or dilatory

motive . . . repeated failure to cure deficiencies by [previous] amendments . . . [or] futility of

amendment." *Firestone*, 76 F.3d at 1208 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962));

*Cassell*, 240 F.2d at 408.

The Court of Appeals' decision in *Cassell* illustrates these principles and will guide this

Court's analysis. There, the district court dismissed Count 3 of the plaintiff's complaint with

prejudice on statute of limitations grounds. 240 F.2d at 407. The plaintiff moved to amend as to

Count 3, while the defendants sought entry of final judgment on that count. *Id.* at 407, 408.

Without considering the plaintiff's motion, the district court granted the defendants' motion and

finalized its prior order. *Id.* at 408. The D.C. Circuit reversed, holding that because the plaintiff

sought leave to amend before final judgment was entered, "it was incumbent upon the court to

give adequate consideration" to the merits of his motion. *Id.* The plaintiff filed his motion only

after the court had dismissed the count he sought to amend, so on remand, the district court could

exercise discretion in granting or denying the amendment. *Id.* But a Rule 59(e) motion was

unnecessary because when the plaintiff filed his motion, the court had not yet entered *final*

judgment on Count 3. *See id.*

> **B. Analysis**

In resolving Johnson's present motion to amend, the Court must therefore ascertain: 1)

whether it can even consider this motion absent an accompanying Rule 59(e) motion; and 2) if

so, whether it has discretion to deny the motion.

> *1. Rule 59(e) Motion Not Required*

Here, as in *Cassell*, this Court had not entered final judgment on any of Johnson's claims

when she moved to amend her complaint, so she had no need to simultaneously file a Rule 59(e)

motion.[5]  Indeed, at no point did the Court ever direct entry of final judgment or order this case

dismissed. *See Johnson*, 368 F. Supp. 2d at 52.  Yet the District contends Johnson's motion to

amend must now be denied as defective because no Rule 59(e) motion accompanies it. (Def.'s

Opp. Pl.'s Mot. to Am. Compl. 3-4.)  By implication, the District believes the Court's February

28, 2006 order constituted a final judgment.  This belief is erroneous for two reasons.

First, as the Court concludes below, plaintiff's amendment as to the individual defendants

was one of right, and as no motion was required, it was effectively filed on November 22, 2005

and was thus pending when this Court dismissed the original complaint's final claim three months

---

[5] *But cf. Fantasia v. Office of the Receiver of the Comm'n on Mental Health Svcs.*, No.
01-1079, 2002 U.S. Dist. LEXIS 27609, at *8-*9 (D.D.C. Mar. 11, 2002) (Oberdorfer, J.) ("after
a district court dismisses certain defendants . . . *with prejudice*, those defendant[s] . . . can be
reinstated through the vehicle of an amended complaint only if the plaintiff is also entitled to
relief from the *judgment*" pursuant to a Rule 59(e) motion) (emphasis added).

later.[6] *See, e.g., Calloway*, 366 F. Supp. 2d at 45 n.2 (no motion required when plaintiff is entitled to amend as a matter of course).

Second, though the Supreme Court has observed that no comprehensive definition of "final judgment" exists, finality "in most cases is plain enough." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 170 (1974). Generally, "[a] 'final decision' [] is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945) (citing *St. Louis I.M. & S.R. Co. v. Southern Express Co.*, 108 U.S. 24, 248 (1883)). In this context, the D.C. Circuit distinguishes between an order dismissing a *complaint* and one dismissing an *action. See Ciralsky v. C.I.A.*, 355 F.3d 661, 666-68 (D.C. Cir. 2004). While an order dismissing an action is necessarily final, finality of an order dismissing a complaint depends on the trial judge's expressed intent. *See id.* at 668.

This Court dismissed the last of the counts alleged in plaintiff's original complaint on February 28, 2006 for failure to state a claim. Under Federal Rule of Civil Procedure 41(b), dismissal under Rule 12(b)(6) "operates as an adjudication on the merits." Fed. R. Civ. Pro. 41(b). Yet plaintiff's two motions remained pending, and the Court ordered the District to respond to them. Moreover, the Court conspicuously did not dismiss the suit or expressly enter judgment against Johnson. Hence, under *Ciralsky*, the Court's February 28 order did not impose final judgment,[7] and Johnson was not required to supplement her motion to amend with a Rule

---

[6] Though the District argues otherwise, (Def.'s Opp. Pl.'s Mot. to Am. Compl. 4-5), because Johnson's amended complaint has been pending since November 2005, this case still presents a "controversy" over which the Court has subject matter jurisdiction.

[7] *See Hill v. City of Indianapolis*, 17 F.3d 1016, 1018 (7th Cir. 1994) (where defendants had responded to plaintiffs' complaint with only a motion to dismiss, plaintiffs' motion effected amendment as a matter of course, and district court's subsequent dismissal of the original

59(e) motion.

### 2. Amendment Within Court's Discretion Only as to the District

Like the plaintiff in *Cassell*, Johnson sought to file a first amended complaint before any

defendant had filed a responsive pleading and before this Court had fully disposed of all her

claims. As such, Rule 15(a) would ordinarily afford her a right to amend "as a matter of course."

Fed. R. Civ. Pro. 15(a). In *Cassell*, because the plaintiff sought to amend only a count that had

been dismissed with prejudice, this right had terminated, and the court could exercise discretion in

granting or denying him leave to amend. 240 F.2d at 408. Here, however, Johnson sought to

amend her single pending count as well as several counts this court had dismissed *without*

prejudice, so *Cassell* provides an imperfect analog .[8]  (*See generally* Pl.'s Compl.; Pl.'s Am.

Compl.)

Under Rule 15(a), while her section 1985 claim against the individual defendants

remained before the Court, as against them, Johnson could amend her complaint as a matter of

course. Hence, Johnson's motion to amend as to the individual defendants must be and is

GRANTED. Because leave of court was unnecessary, the Amended Complaint that accompanied

it is deemed filed as of November 22, 2005.[9]

---

complaint "could not possibly constitute a final judgment" absent a ruling on the amended complaint).

[8] In *Cassell*, the Court of Appeals read the trial court's dismissal with prejudice as indicating "it tentatively agreed . . . that the claims of Count 3 were *barred* by the statute of limitations." 240 F.2d at 408 (emphasis added). This Court dismissed five of Johnson's claims not because they could *never* be brought but because she had brought them prematurely, without having exhausted her administrative remedies. *See Johnson*, 368 F. Supp. 2d at 44-48.

[9] This Court's Local Rules provide that an "amended pleading shall be deemed to have been filed and served by mail on the date on which the order granting the motion is entered."

Yet when Johnson filed her amended complaint, her claims against the District had been dismissed. Indeed, the District claims it was not then a party to the case.[10] When a plaintiff's first amended complaint asserts claims against defendants who have been dismissed from the suit, some courts have exercised discretion in denying amendment as to those defendants. *See, e.g.,* *Bancoult v. McNamara*, 214 F.R.D. 5, 8-9 (D.D.C. 2003) (Urbina, J.) (granting plaintiff's motion to amend complaint "as a matter of course" as to defendants against whom claims remained pending, but denying the motion as futile as to dismissed defendant).

With some reservations, the Court agrees with this approach. It is well accepted that a plaintiff may add new defendants in amending her complaint "as a matter of course." *See* Fed. R. Civ. Pro. 15(a), (c); 6 Wright, Miller & Kane, *Federal Practice & Procedure Civil 2d* § 1474 (1990). Yet the distinction between naming wholly new defendants and reinstating dismissed defendants, if any exists, is minimal. "The purpose of the amendment as a matter of right provision is to avoid judicial involvement in the pleading process [at a stage] when . . . .it is unlikely that applications for leave to amend would be denied by a judge" for reasons such as undue delay, undue prejudice, or futility. *Id.* § 1480; *Foman*, 371 U.S. at 182. Compared to reinstatement of dismissed defendants, who have been substantially involved with the litigation in the past, naming wholly new defendants seems far more likely to cause delay or prejudice. As such, it is somewhat illogical that leave of court should be requisite to the former but not to the

---

Local Rule 15.1. Amendment "as a matter of course" does not require a motion and thus does not depend on an order from the court. *See, e.g., Calloway*, 366 F. Supp. 2d at 45 n.2. Hence, Johnson's amended complaint falls outside the ambit of this rule.

[10] The Court's Minute Order of July 21, 2005 directed the Clerk of the Court to correct a docket entry listing the District as a filing party because the District "was dismissed as a defendant in this case by the Court's Order issued 3/21/2005." (Minute Order of Mar. 21, 2005.)

9

latter.

Still, the Court of Appeals in *Cassell* found that the district court's interlocutory order

dismissing Count 3 abrogated the plaintiff's right to amend that count "as a matter of course."

240 F.2d at 408.   Thus, once this Court entered its interlocutory order dismissing Johnson's

claims against the District, Johnson could no longer amend these claims as a matter of right.   The

Court has discretion to grant or deny her motion to amend as to the District.

### 3. Amendment as to the District Denied as Futile

When amendment falls to the court's discretion, Rule 15(a) provides that "leave shall be

freely given when justice so requires." Fed. R. Civ. Pro. 15(a).   As the Supreme Court has sternly

directed, "this mandate is to be heeded." *Foman*, 371 U.S. at 182.   Thus, "[i]f the underlying facts

and circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be

afforded an opportunity to test his claim on the merits." *Id.*   But "if the proposed claim[s] would

not survive a motion to dismiss," the district court "may deny a motion to amend [the] complaint

as futile." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996).

Here, the claims against the District in Johnson's amended complaint suffer from the same

flaw that fatally afflicted her original complaint.   In its March 21, 2005 order, this Court dismissed

five of the six claims in plaintiff's complaint because she had failed to exhaust her administrative

remedies under the CMPA. *Johnson*, 368 F. Supp. 2d at 32, 42-43.   The CMPA provides that a

District of Columbia government employee may challenge her termination in either of two ways:

1) by appeal to the Office of Employee Appeals ("OEA"), and from there to D.C. Superior Court;

or 2) by any alternative procedure delineated in a collective bargaining agreement between the

District and the employee's union. *See id.* at 37 (citing D.C. Code §§ 1-601.1 *et seq.* (1981)).

The employee may appeal an arbitration award obtained through the CBA procedure to the PERB, and from there to D.C. Superior Court. *Id.* at 37-38. Relying on the D.C. Court of Appeals' determination that the CMPA is "the exclusive remedy for a District of Columbia public employee who has a work related complaint of any kind," *Robinson v. District of Columbia*, 748 A.2d 409, 411 (D.C. 2000), this Court held itself bound to "apply the CMPA's exhaustion requirement strictly," *Johnson*, 368 F. Supp. 2d at 43. In examining the five challenged claims, the Court concluded each could be redressed through the grievance arbitration process Johnson initially elected.[11] *Id.* at 44-48.

Johnson's amended complaint restates two of these five claims - for defamation and intentional infliction of emotional distress - and repackages two others.[12] The original complaint's first cause of action alleged the District had violated her procedural due process rights under the CMPA and CBA "by giving Ms. Johnson an untimely and defective fifteen (15) day advance notice of proposal to remove her from her position." (Pl.'s Compl. 8-9.) Its fifth cause of action

---

[11] Johnson now argues that the CMPA does not provide an exclusive remedy for her common law claims and that administrative exhaustion should not be required as to them. (Pl.'s Reply 7-8.) To support this proposition, she offers a D.C. Court of Appeals case holding that an employee covered by the CMPA who suffers injury or death and receives disability or death benefits may bring common law claims against the District. *See Newman v. Dist. of Columbia*, 518 A.2d 698 (1986). Yet that decision in no way indicates the employee need not have first exhausted his administrative remedies. *See id.* More to the point, in a subsequent case, the D.C. Court of Appeals held that an employee must exhaust his remedies under the CMPA before bringing claims against the District for, *inter alia*, defamation and intentional infliction of emotional distress. *See Robinson v. Dist. of Columbia*, 748 A.2d 609 (2000). *See also Thompson v. Dist. of Columbia*, 428 F.3d 283, 288 (D.C. Cir. 2005) (applying *Robinson*).

[12] The Court also dismissed the original complaint's wrongful termination claim, which contended that official security lapses and neglect outside Johnson's control had "facilitated" the incident for which she was fired. *Johnson*, 368 F. Supp. 2d at 45-46. (*See* Pl.'s Compl. at 11-12.) Johnson's amended complaint does not resurrect this claim. (*See generally* Pl.'s Am. Compl.)

11

alleged the District had "intentionally, deliberately, and with malice" denied her the "opportunity to clear her name and to protect her property interest in her continued employment" by refusing to arbitrate her grievance. (*Id.* at 12-13.)

Similarly, the amended complaint's third cause of action alleges the District violated Johnson's procedural due process rights "by terminating her pursuant to an untimely notice and refusing to participate in arbitration in violation of the [CBA]." (Pl.'s Am. Compl. 15.) Its first and second causes of action allege breach of contract through termination without adequate notice and refusal to arbitrate. (*Id.* at 9-11.)

Regardless of which legal theory she espouses, Johnson's claims against the District rest on the same underlying conduct as those in the original complaint[13] - conduct for which this Court determined she could pursue an administrative remedy under the CMPA. *Johnson*, 368 F. Supp. 2d at 44-45.

In her original complaint, Johnson contended she was unable to complete the arbitration process because the District disputed the CBA arbitration provision's validity. *Johnson*, 368 F. Supp. 2d at 45. This Court assumed the dispute was in good faith and that if it were resolved in the union's favor, the District would arbitrate Johnson's grievance per the CBA procedure. *Id.* at 50. Until then, Johnson could not seek relief in federal court because she could demonstrate

---

[13] To remedy this conduct, Johnson originally asked the Court to: 1) dismiss the "advance notice of proposed removal as untimely and in violation of her due process rights"; 2) declare the final removal notice "null and void"; 3) order the District to remove "any derogatory comments concerning her employment performance" and any reference to the incident for which she was fired from her personnel file; 4) order the District to return "all money deducted from her payroll for union dues, with interest; and 5) award compensatory and punitive damages. (Pl.'s Compl. at 9, 13-14.) Johnson now seeks this same relief along with "any grade and step increase she would have receive[d] but for her employer's illegal actions," costs, and attorney fees. (Pl.'s Am. Compl. at 10, 16.)

neither administrative exhaustion through completion of the grievance process nor that resort to

administrative remedies would be futile.  *See id.* at 45, 49-50.

Johnson's amended complaint attempts to plead futility by alleging that the dispute has

been resolved and that the District still refuses to engage in arbitration.  (*See* Pl.'s Am. Compl. at

39-40.)  Specifically, she describes two arbitration proceedings brought by other employees in

which the District "voluntarily submitted . . . the issue of whether [it] had an obligation to

arbitrate every grievance" to the arbitrators.  (*Id.* at 14.)  Both arbitrators found that the CBA was

valid and enforceable and obligated the District to arbitrate employee grievances.[14]  (*Id.* at 8, 14.)

The District appealed both decisions to the PERB, claiming the arbitrators "were without

authority and exceeded their jurisdiction in finding that" that it was bound by the CBA and thus

obligated to arbitrate.  (*Id.* at 8-9, 14.)  After reviewing the decisions, the PERB determined:

"neither Arbitrator exceeded his or her authority or jurisdiction, and their findings were based on a

thorough analysis and cannot be said to be clearly erroneous."  (*Id.* at 14.)  In a footnote, Johnson

notes that the District appealed the PERB's decision to the D.C. Superior Court, which granted

the union's motion to dismiss on October 3, 2003.  (*Id.* at 14 n.2.)  She contends the District "still

refuses to participate in arbitration of [her] grievance."  (*Id.* at 15.)

Johnson thus seeks to dispel the assumption - on which this Court's March 21, 2005 order

relied - that if the contract dispute were resolved in the union's favor, the District would arbitrate

---

[14] Paragraph 39 explicitly states: "Neither Arbitrator Hocchauser nor Shapiro find [sic] that the Agency had a duty to arbitrate under AFGE Local 383 (Pl. *Ex. "C" & Ex. "D").* Reading this sentence in context, and comparing it to the argument in plaintiff's reply memorandum, the Court concludes plaintiff intends it to mean that *both* Arbitrators Hochauser *and* Shapiro *found* the Agency had a duty to arbitrate under *the collective bargaining agreement signed by AFGE* and will treat it accordingly.

13

Johnson's grievance per the CBA procedure. *Id.* at 50. She attempts to plead that the District has

rendered administrative exhaustion impossible and that as a result, she must seek a remedy in

federal court. Unfortunately, Johnson has not fully answered the concerns expressed in this

Court's March 21, 2005 opinion. In particular, the Court explained that

> even if . . . the District refuses to abide by a valid term of the collective bargaining
> agreement, it is likely that the plaintiff could seek [to] petition the PERB for relief. As
> was mentioned above, the PERB has jurisdiction to resolve allegations of unfair labor
> practices, and breach of a collective bargaining agreement is likely to come within that
> jurisdiction. In any event, the PERB has primary jurisdiction to determine what claims are
> within its jurisdiction to resolve, such that remand to the agency is required regardless of
> the Court's views about the proper way to categorize such a complaint.

*Id.* at 50 n.8. Thus, the Court characterized appeal to the PERB as "Johnson's appropriate

remedy" in the present situation. *Id.* at 45 n.5.

In her reply to the District's opposition to her motion, Johnson cites two D.C. Code

sections for the proposition that the "PERB has no authority or jurisdiction to [redress] the

Plaintiff's claims." (Pl.'s Reply 6.) The quoted statutory language is inapposite: under the

doctrine of primary jurisdiction, the PERB, alone, can determine whether it has such authority.

*See Johnson*, 368 F. Supp. 2d at 45 n.5 (citing *United States v. W. Pac. Ry. Co.*, 352 U.S. 59, 63-

64 (1956) for its explanation of primary jurisdiction). Only if the PERB concludes that the

District's refusal to comply with the CBA's arbitration provision falls outside its jurisdiction can

Johnson seek relief in federal court.

Because this Court may not grant relief on the claims against the District in Johnson's

amended complaint, her motion to amend her complaint as to the District is DENIED as futile.

## II. The Court Dismisses Plaintiff's Amended Complaint for Failure to State a Claim

The D.C. Circuit has held that "it is practical and fully consistent with plaintiffs' rights and

14

the efficient use of judicial resources" for a district court to *sua sponte* dismiss a plaintiff's

complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) "'where the claimant cannot

possibly win relief.'" *Baker v. Director, United States Parole Com.*, 916 F.2d 725, 726 (D.C. Cir.

1990) (per curiam) (quoting *Omar v. Sea-Land Svc., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987)).

Because Johnson was entitled to amend her complaint as to the individual defendants as a

matter of right, this Court was without power to deny her amendment. Yet as the Court found

when it first dismissed her claim against them over a year ago - two full years after Johnson filed

her complaint - nothing indicates these defendants were ever properly served, and Johnson makes

no attempt to rebut this conclusion in her reply memorandum. (Order of Feb. 28, 2006; *see

generally* Pl.'s Reply.) Hence, plaintiff's amended complaint is hereby DISMISSED as to the

individual defendants.

### III. The Court Denies Plaintiff's Motion to Compel Arbitration

The same doctrines of administrative exhaustion and primary jurisdiction that compelled

the Court to deny amendment as to the District also render her motion to compel arbitration unripe

for judicial disposition. The CMPA empowers the PERB to, *inter alia*, "[d]ecide whether unfair

labor practices have been committed and issue an appropriate remedial order." D.C. Code § 1-

605.02(3) (2007). As the Court stated in its March 21, 2005 opinion, "appeal to the PERB on the

grounds that the District's refusal to abide by a valid collective bargaining agreement constitutes

an unfair labor practice" is Johnson's "appropriate remedy" at this stage. *Johnson*, 368 F. Supp.

2d at 45 n.5. Should the PERB rule in Johnson's favor, the CMPA authorizes it to issue "an

appropriate remedial order" - that is, an order compelling the District to arbitrate plaintiff's

grievance.[15] *See* D.C. Code § 1-605.02(3) (2007). Should the PERB determine instead that the District's refusal to arbitrate is *not* an unfair labor practice, then no administrative relief will be available to Johnson, and she may file a motion to compel arbitration in the appropriate court.[16] Hence, plaintiff's motion to compel arbitration is DENIED.

## CONCLUSION

For the forgoing reasons, this Court concludes that plaintiff is entitled to her amend her complaint as a matter of right as to defendants Colvin, Turner, and Perkins. Amendment as to the District is within the Court's discretion, and the Court has determined it would be futile, and it is therefore DENIED. Hence, plaintiff's motion to amend her complaint [24] is GRANTED in part and DENIED in part. To the extent permitted, plaintiff's amended complaint is deemed filed, as to the claims against defendants Colvin, Turner, and Perkins, as of November 22, 2005.

Because plaintiff has never established proper service on defendants Colvin, Turner, and Perkins, however, her amended complaint [24] is DISMISSED.

Finally, for the reasons stated, plaintiff's motion to compel arbitration [22] is DENIED.

Having resolved all pending motions and dismissed plaintiff's amended complaint, the Court orders this case DISMISSED. This is a final, appealable order.

SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, July 18, 2007

---

[15] Under the CMPA, the PERB may "[s]eek appropriate judicial process to enforce its orders and otherwise carry out its authority." D.C. Code § 1-605.02(16) (2007).

[16] Johnson's motion to compel arbitration cites the District of Columbia Arbitration Act. *See* D.C. Code §§ 16-4301 *et seq.* (2007). Having dismissed her amended complaint, this Court would likely lack subject matter jurisdiction to order arbitration between Johnson, a District of Columbia resident, and the District pursuant to a District of Columbia statute.

# AFFIDAVIT

# IN THE SUPERIOR COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Cynthia Washington, Shantell Hatton ) | |
| Lorenzo Jennings, Darryl Love,        ) | |
| Herbert Douglas, Dionne Makins         ) | |
| Alphonso Bryant, Lowanda Hinton-       ) | Civil Action No:  07-1031 |
| Saunders and Malcolm Pointer           ) | |
| )                                       | Judge: Ricardo M. Urbina |
| Plaintiff,                             ) | |
| v.                                     ) | |
| )                                       | |
| Defendants.                            ) | |
| )                                       | |

## AFFIDAVIT OF BRENDA SUTTON

I, BRENDA SUTTON, being duly sworn, states that the following is true to the best of my knowledge, information and belief:

1.      I am the Lead Claims Specialist, Settlements and Judgments for the Tort Liability Division, District of Columbia Office of Risk Management.  The Tort Liability Division receives, processes and investigates potential claims against the District of Columbia, pursuant to D.C. Official Code § 12-309 (2001 ed.).  The Office of Risk Management commenced to receive potential claims on January 15, 2004.

2.      Receipt of written notice of claims against the District of Columbia, are forwarded directly to the Tort Liability Division for processing.  When the Tort Liability Division receives notices of claims either from the Mayor's Office or directly, the Tort Liability Division records the receipt of such notice in its claims management system.

3.  Claims previously handled by the Claims Unit for the Office of the Attorney General still under investigation as of January 15, 2004, were also transferred to the Office of Risk Management and recorded in its claims management system.

4.  I have conducted a diligent search of the records placed in the Risk Management system in the DC Office of Risk Management.  The result of this search has revealed that the Tort Liability Division of the District of Columbia Office of Risk Management, has received no claim notice from Cynthia Washington and/or Shantell Hatton and/or Lorenzo Jennings and/or Darryl Love and/or Herbert Douglas and/or Dionne Makins and/or Alphonso Bryant and/or Lowanda Hinton- Saunders and/or Malcolm Pointer that referred to claims described in the complaint in Civil Action No. 07-1031

Complaint: Two inmates escaped from the DC Jail on June 3, 2006

**BRENDA SUTTON**

**DISTRICT OF COLUMBIA, ss:**

I, _Susana Suarez_ a Notary Public in and for the District of Columbia, do hereby certify that BRENDA SUTTON , whose name is signed to the foregoing affidavit, bearing the date of the _30_ day of July, 2007, personally appeared before me and executed the said release, and acknowledged the same to be her act and deed.

Given under my hand and official seal this _30_ day of July, 2007.

**NOTARY PUBLIC**

My Commission Expires: _____SUSANA SUAREZ
NOTARY PUBLIC OF COLUMBIA
My Commission Expires
August 14, 2010