## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CYNTHIA WASHINGTON, *et al.,*          :

                Plaintiffs,          :          Case Number: 1:07-cv-01031

      v.          :

DISTRICT OF COLUMBIA, *et al.,*          :

                Defendants.          :


### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Cynthia Washington, et al, through their attorneys HANNON LAW GROUP, LLP respectfully submit this Motion for Partial Summary Judgment.  In support of this Motion, Plaintiffs present the Statement of Material Facts, Exhibits thereto, and Memorandum of Points and Authorities filed herewith.

WHEREFORE, Plaintiff respectfully request that the Court grant Plaintiff's Motion for Partial Summary Judgment.

### REQUEST FOR HEARING

Plaintiff respectfully requests a hearing on this Motion.

                Respectfully submitted,

                HANNON LAW GROUP, LLP


                _____*/s/ J. Michael Hannon*_____
                J. Michael Hannon, #352526
                1901 18th Street, NW
                Washington, DC 20009
                (202) 232-1907
                Fax:  (202) 232-3704
                jhannon@hannonlawgroup.com
                *Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of **Plaintiffs' Motion for Partial Summary Judgment, Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss and in Support of Plaintiff's Motion for Partial Summary Judgment, Plaintiffs' Statement of Material Facts Not in Dispute, and Exhibits thereto,** were sent via electronic filing, this 28th day of August, 2007 to:

David Jackson, Esq.
Office of the Attorney General
441 Fourth Street, NW
6 South
Washington, DC 20001


        */s/ J. Michael Hannon*
J. Michael Hannon

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CYNTHIA WASHINGTON, *et al.,*                    :

                    Plaintiffs,                    :        Case Number: 1:07-cv-01031(RMU)

        v.                                        :

DISTRICT OF COLUMBIA, *et al.,*                    :

                    Defendants.                    :

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS, AND IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Plaintiffs Cynthia Washington, et al., [hereinafter "DOC Employees"] by and through their attorneys, HANNON LAW GROUP, LLP, respectfully present this Memorandum in Opposition to Defendants' Motion to Dismiss and in support of their Motion for Partial Summary Judgment.

The DOC Employees move for Partial Summary Judgment against these Defendants as to Count IV (Injunctive Relief).

**INTRODUCTION**

On June 3, 2006, two inmates escaped from the Department of Corrections ("DOC") Central Detention Facility ("CDF"). The escape was widely reported in the press and was a direct result of the DOC's and Director Brown's failure to remedy safety issues which had been repeatedly brought to their attention by the FOP/DOC Labor Committee ("Union"). Amidst the publicity backlash, the DOC Employees were publicly and summarily fired by Director Brown from their employment at DOC. None of the fired Employees or their Union were notified in advance of the public announcement.

Defendant Brown assigned the administrative hearings that followed the firings to the D.C. Office of Administrative Hearings ("OAH"). The OAH Judges issued a Report and Recommendation in each case on December 11, 2006, uniformly declaring that the DOC had violated the DOC Employees' constitutional rights and recommending they be returned to work. By the requirements of D.C. personnel laws and the Collective Bargaining Agreement ("CBA") between Defendant DOC and the FOP/DOC, Defendant Brown was compelled to follow the Recommendations and return the DOC Employees to work. Defendant Brown did not comply with that recommendation and refused to return the DOC Employees to work.

Instead, without any legal basis and in violation of established laws, Defendant Brown rescinded the original summary removal action, placed the DOC Employees on paid administrative leave, and served them with new notices of proposed termination based on the same allegations reviewed by the OAH Judges. The "Do Over" hearings were assigned to Defendant Henry R. Lesansky, Ph.D., the Health Services Administrator for Defendant DOC, with the expectation that Defendant Lesansky would do Brown's bidding and recommend that the DOC Employees be fired.

The Defendants refusal to return the DOC Employees to work and their manufacture of an unlawful "Do Over" before a compromised Hearing Officer violate the Fifth Amendment of the Constitution by depriving them of their constitutionally protected right to their jobs. There is no discovery required with respect to Defendants' blatant disregard of the property rights of these DOC Employees. Consequently, the DOC Employees contend that this Court should grant Summary Judgment on Count IV (Injunctive Relief). Disposition of this claim would expedite resolution of this matter.

## FACTUAL BACKGROUND

### A.     <u>Facts Underlying This Complaint</u>

The following information comes from the allegations contained in the First

Amended Complaint, filed herewith as Exhibit 47.  On June 3, 2006, two inmates

escaped from the Central Detention Facility ("CDF") by smashing out the door and

window of the Warden's office.  The two escapees, Joseph Leaks and Ricardo Jones,

were among the most dangerous offenders housed at the DC Jail.  Inmate Leaks was

awaiting trial in the D.C. Superior Court on a charge of Accessory After the Fact to First

Degree Murder While Armed.  He had also violated his parole arising from a 1998

conviction for Assault with a Deadly Weapon.  Defendant DOC contends that Leaks had

a prior escape from the CDF in October of 2005, although no record of such escape was

in Leaks' Institutional File.  Ricardo Jones was awaiting trial in the D.C. Superior Court

in two cases, one charging Assault with Intent to Kill and a second charging Murder in

the First Degree.  Leaks and Jones are co-defendants in the murder case.  Leaks and Jones

are also suspects in an Assault with Intent to Kill investigation in Greensboro, North

Carolina.

The escape was widely reported in the press, and was a direct result of the DOC's

and Director  Brown's failure to remedy safety issues which had been repeatedly brought

to his attention by the FOP/DOC Labor Committee.  For example, during monthly

meetings before the jail escape, FOP representatives repeatedly told Defendant Brown

that assaults on corrections officers were increasing daily, a warning of lack of

manpower.  Defendant Brown's response was to prepare posters warning inmates not to

assault corrections officers and to produce a videotape to be played to the inmates.  In

addressing news articles about increased assaults on corrections officers, Defendant Brown explained that it was an election year, and politicians seek any means to get their names in the paper.

Defendant Brown knew that in-service training of corrections officers was not being conducted. Defendant Brown knew that the DC Jail was woefully understaffed, and that corrections officers were subject to compulsory drafting to work double shifts. Defendant Brown knew that the DOC had no concrete plans for recruitment and training of new corrections officers. On May 18, 2006, Mr. Brown admitted that he was concerned regarding extensive overtime, and that he had concerns that overtime was adversely affecting the alertness and effectiveness of corrections officers. In February of 2006, the overtime budget for the DOC had been exhausted and the agency was $3,000,000 over budget.

The complaints by the FOP/DOC at these monthly meetings foresaw the jail escape. On the day of the escape, the DC Jail was understaffed by 58 out of the 121 positions required. The "solution" was to force 41 officers to work overtime on that shift and to "shutdown" 17 posts. Seven of the DOC Employees fired were working forced overtime, working posts for which they had not been trained, or working understaffed posts. On the morning of the escapes, representatives of the FOP/DOC requested that the Jail be locked down because of the shortage of personnel. This request was denied.

On June 4, 2006, the two escapees were recaptured without incident. In an effort to deflect continued public attention from deplorable working conditions, severe management deficiencies, and criticism of his leadership of the DOC, Director Brown on June 5, 2006, issued written notification to twelve DC Jail Employees putting them on

paid administrative leave pending further investigation of the escape. Those Employees included six (6) Correctional Officers, one (1) Lead Correctional Officer (Sgt.), three (3) Correctional Treatment Specialists, one (1) Correctional Program Specialist, and one (1) Captain. Among this group were the DOC Employees.

After the escape, public scrutiny continued. On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Phil Mendelson was held to continue review of the jail break and general safety issues at the DC Jail. At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes. Director Brown did not disclose to the Council that the Jail was dangerously understaffed that day, and that he knew that forced overtime was causing corrections officers to be less reactive and less efficient.

Facing pressure from both the public and the D.C. City Council, during his testimony at the June 26, 2006 hearing, Director Brown announced that as a result of the escape, the DOC evaluated its operation and made immediate improvements. None of these improvements addressed understaffing and the increasing incidents of assaults on corrections officers. A month later, on July 26, 2006, the Mayor, DOC Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC Employees who had been on suspension in connection with the jail break. Plaintiff Employees were among those fired. Not one of the DOC Employees or their Union was notified in advance of this public announcement.

During the Press Briefing, DOC Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing and the summary firings, together with the announcement of a criminal investigation, were intended to and had the result of humiliating and embarrassing the discharged Union members, casting them in the public light as felons who abetted a jail escape. These Union members learned of their firing from family and friends who had seen or heard the news in the media. The Chairperson of the FOP/DOC Labor Committee learned of the terminations from a television news reporter who called to obtain a reaction to the firings.

Defendant Brown made further statements to the press. On June 6, 2006, he was reported by the Washington Times to have stated that "authorities are investigating 'quite vigorously' the question of whether the two inmates had help in the escape." He criticized those DOC Employees who worked in classification of inmates, stating that "we can definitely say that Mr. Leaks should not have been authorized to have the classification that allowed him free movement on detail." Defendant Brown coupled this, again, with a statement that the DOC Employees were suspended "pending a criminal investigation of the jailbreak."

Defendant Brown, whose office is located on the other side of the city from the DC Jail, told a citizens group that "When I arrived on the scene, the first thing I asked was, 'Did the siren go off?'" Defendant Brown insisted that the siren had been sounded, when it had not. Defendant Brown is reported as having stated that he would "make staff changes at the jail, including bringing in younger corrections officers, who are physically up to the demands of the job." The Washington Post reported Defendant Brown as

stating "investigators want to determine if any of the officers deliberately aided the escape or unintentionally made mistakes that contributed to the breakout." In response to the increased level of assaults on corrections officers, Defendant Brown is reported by the D.C. Examiner to have stated "The older we get our reaction time is not as good, so if something is happening, a younger correctional force may be able to respond to it quicker before it escalates."

In order to accomplish this public humiliation and summary firing, the DOC engaged in an unlawful and unconstitutional revision of existing D.C. laws which would have prevented them from conducting a summary discharge in a public press briefing. The District of Columbia Personnel Manual ("DCPM"), until the Mayor's Weekly Press Briefing of July 26, 2006, provided that in cases of Summary Removal, proper written notification of the action was to be provided to the employee and the FOP/DOC within three (3) days of removal ("3 Day Rule"). DCPM § 1616.4. That notice must provide detailed information about the removal, including the reasons for Summary Removal along with identification of critical deadlines in the removal process and pertinent employee rights. Id. However, on the very date of the planned news conference, Director Brown and D.C. officials conspired to amend this provision of the DCPM so as to permit these firings in a summary fashion at the Mayor's Press Conference. The amendment, specifically applying to only these DOC Employees, provided that the information supporting summary removal need not be provided until 30 days after removal. (See App. 15 at 8).

A second change was made to the DCPM on July 28, 2006, to broaden the definition of Employees to whom the change applied. The July 28, 2006 variation

augments the July 26, 2006 amendment by including a twelfth employee who was summarily removed (on July 28, 2006) and provides that any subsequent firings resulting from the investigation into this jail break also will not be subject to the 3 Day Rule. Id. This variation is completely unlawful and constitutes an ex post facto deprivation of due process rights to the discharged DOC Employees, all to enable Director Brown to divert criticism from his leadership to the rank and file corrections officers and Employees of the DOC. Moreover, compliance with the 3 Day Rule would have required disclosure of tape recorded interviews of the DOC Employees, which would have laid to rest the public assertions by Director Brown that the jail escapes could only have occurred as a result of a criminal conspiracy among correctional officers and inmates: a ludicrous accusation in light of the facts then known to Director Brown regarding the security deficiencies at the DC Jail.

Summary Removal is permitted under D.C. law when an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District Employees or to the employee; or, is detrimental to public health, safety, or welfare, as provided for in D.C. Code § 1-616.51. None of these circumstances existed on or even near the date of the Respondents' Press Briefing that would justify an immediate firing. The summary removal of the DOC Employees was unjustified and unconstitutional. These suspended Employees were on paid administrative leave and posed a threat to no one. There was absolutely no lawful basis to summarily remove these Employees at that particular time, as later confirmed by the OAH Judges in their Reports and Recommendations. The use of the Summary Removal procedure was unwarranted, and the fact that Defendant DOC and D.C. Office

of Personnel officials manipulated the law to achieve this gratuitous end is a clear abuse

of power.

On or about August 1, 2006, Plaintiff DOC Employees were formally delivered –

or summoned to pick up – a packet of materials and a notice advising them that they had

been summarily discharged from their employment with the DOC.  This firing was

accomplished with no notice and no opportunity to be heard of any kind in violation of

the Constitution of the United States.  The written notice required by law was not

prepared for each of the DOC Employees until August 24, 2006.  That notice provided as

follows:

> The Office of Administrative Hearings will conduct the administrative
> review and/or hearing of the proposed removal actions. . . .  In conducting
> the administrative review and/or hearing, your appointed Hearing Officer
> will review all of the documents giving rise to the charge . . . , this written
> notice and your response, if there is one.  After conducting the
> administrative review, your assigned Hearing Officer will make a written
> report and recommendation to Director  Brown, the Deciding Official,
> who will issue a final decision.

(Emphasis supplied).

### B.     Facts Relevant to This Motion

After the summary firings, Defendants DOC and  Brown then entered into a

Memorandum of Understanding ("MOU") with the Office of Administrative Hearings

("OAH") to effectuate the promises made to the DOC Employees in the letters of August

24, 2006.  Pursuant to the MOU, the Judges of the OAH would conduct the

administrative hearings required in these cases consistent with Chapter 16 of the DCPM

and the Collective Bargaining Agreement between Defendant DOC and FOP/DOC

("CBA"), and as the DOC Employees were advised in their written notices of August 24,

2006.

Section 1612.2 of the DCPM requires that an "administrative review shall be conducted by a hearing officer." 6 DCMR 1612.2. Defendant Brown specifically noted in the MOU that "it is necessary and desirable that the administrative proceedings are held by a body that is independent of the Department of Corrections and that OAH possesses the expertise and resources for conducting these hearing." Defendants DOC and Brown promised that this Agreement would "remain in effect through the latest date that the Director of DOC issues a final decision in any of the Disciplinary Actions." (Emphasis supplied).

DOC Director Brown was required by the DCPM to issue a Final Decision within 45 days of the delivery of the summary removal notices:

> The final decision in the case of summary suspension or summary removal action taken pursuant to §§ 1615-1616, respectively, shall be rendered not later than forty-five (45) days from date of delivery of the summary suspension or summary removal notice, as appropriate except that the period may be extended as follows:
>
> > (a) when the employee requests and is granted an extension of time in which to respond under § 1611.2; or
> >
> > (b) when the employee agrees to an extension of time requested by the agency.

6 DCMR 1614.3. In addition, both the CBA and the DCPM require that DOC Director Brown follow the recommendation of the OAH Judges in this case. Article 11, Section 9(D) of the CBA specifically states (emphasis supplied):

> Deciding Official shall issue a final decision after reviewing the recommendation of the Disinterested Designee/Hearing Officer. The deciding official may sustain or reduce the penalty recommended by the Disinterested Designee, remand the matter for further consideration by the Hearing Officer, or dismiss the charge but may not increase the penalty recommended by the Disinterested Designee/Hearing Officer.

Furthermore, Section 1613.2 of the DCPM also states with specificity that (emphasis supplied):

> The deciding official shall either sustain the penalty proposed, reduce it, remand the action with instruction for further consideration, or dismiss the action with or without prejudice, but in no event shall he or she increase the penalty.

The original Summary Removals were dated July 26, 2006. The DOC arranged for the D.C. Personnel Regulations to be altered in order to extend the DOC's deadline to present the requisite elements of Summary Removal to the Employees. On or about August 24, 2006, the DOC issued its written "follow-up" Summary Removal notice to the Employees. The OAH issued a Report and Recommendation in each case on December 11, 2006, concluding that the summary removals could not be sustained and recommending that the Employees be returned to work.

Instead of issuing a final decision returning the Employees to work as he was required to do by the DCPM and the CBA, and as he promised in the MOU and in the August 24, 2006, written notices to the DOC Employees, DOC Director Brown submitted remand notices for most of the Employees. These notices were issued on January 7, 2007, well beyond the 45-day deadline. The remand notices directed the panel of administrative law judges to re-consider the determination and recommendations included in their Final Reports and Recommendation issued to the DOC pursuant to 6 DCMR 1616.6(a).

The Employees filed a Motion to Strike the Remand Notices on January 16, 2007, arguing that the Remand Notices were untimely. The DOC filed its response to the Motion to Strike the Remand Notices on January 29, 2007, and the Employees filed their Reply on February 2, 2007. A hearing was held by the OAH Judges on February 5, 2007

in reference to the Remand Notices and the subsequent Response by the DOC.  The OAH

Judges issued their Report and Recommendation on Remand in the individual

Employees' cases on March 2, 2007, and once again recommended that Director  Brown

reinstate the Plaintiff DOC Employees.  Further, the OAH Judges opined that the

Remand Notices were filed late and that Director Brown unlawfully violated the 45-Day

Rule requiring a final agency decision.

In each Report and Recommendation issued by the OAH in this matter, the Judges

found that Summary Removal could not be sustained.  Further, each report contained a

procedural summary which acknowledged that the October 26, 2006 Order established a

deadline for the final agency decision as December 15, 2006.  From the outset of this

entire process, Defendants DOC and  Brown have refused to comply with the established

rules of due process set out by the DCPM, the CBA, the MOU, and the August 24, 2006

notice of proposed removal.  The regulations are clear that a final decision in these types

of cases must be rendered within 45 days of delivery of the record.  The regulations and

the CBA are also clear that Director Brown may not depart from the recommendations of

the OAH Judges because they recommend reinstatement.  Director Brown is not free to

impose a harsher sanction.

When Director Brown failed to issue a final decision, DOC Employees filed a

Petition for Writ of Mandamus with the District of Columbia Court of Appeals on March

12, 2007, to compel Defendant Brown to return them to work.  Four days later, senior

management at the DOC simultaneously rescinded and cancelled the proposals for

summary removal of the Employees in order to avoid an adverse decision by the District

of Columbia Court of Appeals.  Director Brown, and others with the Department of

Corrections including their counsel, conspired among themselves to lead DOC Employees to believe that their proposed discipline was over and they were being returned to work permanently.  Specifically, DOC Employees Joan E. Murphy and Denise Shell were instructed to contact DOC Employees directly – who were then represented by counsel – and lead the Employees to believe they were being returned to work.  In violation of ethical rules prohibiting a party from contacting another party except through counsel, Murphy and Shell lured the joyful DOC Employees to report to DOC headquarters on Friday, March 16, 2007, to be "reinstated."

        In furtherance of this scheme, on the afternoon of March 15, 2007, Defendant Brown personally called Cpl. Nila Ritenour, Chairperson of the FOP/DOC.  The FOP/DOC was also represented by counsel in the jail escape matter at that time, as Director Brown well knew.  This telephone call was in violation of ethical rules prohibiting a party from contacting another party except through counsel, a rule that Director Brown was aware of by virtue of his having attended law school.  In that telephone call, Director Brown told Cpl. Ritenour that all of the DOC Employees would be reinstated to their positions with all back pay and benefits.  Director Brown said he wanted Cpl. Ritenour to hear the news directly from him.  He stated that he had just signed the papers for reinstatement.  It was a congratulatory telephone call, even though Director Brown well knew that he intended immediately to place the DOC Employees on leave pending a further effort to have them fired.  Director Brown did not disclose his intention to conduct an unlawful "Do Over", knowing full well that Cpl. Ritenour would report the "good news" to DOC Employees and others.

Similarly, on March 15, 2007, counsel for the DOC Employees telephoned counsel for Defendant Department of Corrections to confirm the "good news."  Counsel for Defendant DOC had been directed by Defendant Brown not to disclose the truth as to his intended conduct.  Consequently, counsel for Defendant DOC confirmed to counsel for DOC Employees that the DOC "is bringing them all back to work."

When DOC Employees reported to DOC headquarters in the morning of March 16, 2007, they were indeed given a reinstatement letter promising back pay and benefits.  At the same time, DOC Employees were given a second letter putting them all on leave pending a new hearing to sustain Defendant Brown's pre-ordained desire to have them all fired.  Defendant Warden Stanley Waldren signed the March 12, 2007, notices of proposed removal without reading them, without conducting any investigation, and under direct orders of Defendant  Brown.  As Defendant Brown no doubt anticipated, at roll call at the D.C. Jail early that morning, Cpl. Ritenour had announced the "good news", only to be humiliated when Defendant Brown's true intentions became known.  DOC Employees to this date, with one exception, have not received their full back pay and benefits.

Defendant Henry R. Lesansky, Ph.D., employed by the DOC, was appointed to be the new hearing officer for the proposed termination hearings.  Dr. Lesansky is not an "independent" hearing officer as promised to the DOC Employees in their August 24, 2006, notices of removal.  In February of 2002, Dr. Lesansky resigned from his position as the top official with the Maryland Department of Juvenile Justice after disclosures that he twice understated the number of assaults against teens at Maryland juvenile jails.  Dr.

14

Lesansky became unemployable in corrections work until hired by the District of Columbia.  He serves at the pleasure of Defendant  Brown.

The attempt by Defendants to avoid implementing the recommendation of the OAH Judges and seek a new recommendation from an interested party is not warranted by any law, regulation or provision of the CBA.   Defendants refusal to adhere to the procedures for adjudication of the firings of DOC Employees and their efforts to have a "Do Over" violate DOC Employees' Fifth Amendment rights to their Career Service positions with Defendant DOC.

## ARGUMENT

The DOC Employees have filed a Complaint against Defendants alleging violations of Constitutional Rights, Defamation Plus, Intentional Infliction of Emotional Distress, Injunctive Relief and seeking Declaratory Relief, Compensatory and Punitive Damages and Attorney's Fees.  The DOC Employees seek Partial Summary Judgment as to Count IV (Injunctive Relief).  Further, the DOC Employees Oppose Defendants' Motion to Dismiss.

### I.    THE DOC EMPLOYEES ARE ENTITLED TO SUMMARY JUDGMENT AS TO COUNT IV, INJUNCTIVE RELIEF.

In Count IV, the DOC Employees seek an order from the Court enjoining the Defendants from pursuing any disciplinary action against the DOC Employees as a result of the jail escape.  Further, the DOC Employees seek a declaration that they be unconditionally restored to their rightful positions within the Department of Corrections with restoration of all back pay, lost benefits, and the costs and attorneys' fees of this and all other actions resulting from defending the DOC Employees from their unconstitutional terminations.

A.    <u>Standard for Summary Judgment and Declaratory and Injunctive Relief</u>

Summary judgment is to be granted when the evidence and pleadings demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  <u>Beaty v. Republic of Iraq</u>, 2007 U.S. Dist. LEXIS 19191, 18-20 (D.D.C. 2007).  <u>See also</u> Fed R. Civ. P. 56 (c).  In determining whether summary judgment is appropriate, the Court will judge the evidence and facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor.  <u>Hunter v. Rice</u>, 2007 U.S. Dist. LEXIS 20859 (D.D.C 2007).  <u>See</u> <u>Waterhouse v. District of Columbia</u>, 298 F.3d 989, 991 (D.C. Cir. 2002).  Any opposition by the non-moving party to a motion for summary judgment must be supported by evidence which demonstrates a genuine issue for trial.  <u>Hunter v. Rice</u>, 2007 U.S. Dist. LEXIS 20859.  In the absence of a genuine issue of fact, summary judgment may be granted.  <u>Id</u>.

Declaratory judgments determine rights and obligations.  As established by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), courts may exercise jurisdiction and declare the rights of the parties when there is an actual controversy between the parties.  <u>Citizen Elecs. Co. v. Osram GmbH</u>, 377 F. Supp. 2d 149, 152 (D.D.C. 2005); <u>EMC Corp. v. Norand Group</u>., 89 F.3d 807, 810 (Fed. Cir. 1996).  In order to determine whether an actual controversy exists, the court must evaluate each case individually and determine "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." <u>Md. Cas. Co. v. Pac. Coal & Oil Co.</u>, 312 U.S. 270, 273 (1941); <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227 (1937).

Declaratory relief is appropriate and warranted in this case because it, "permits an early adjudication of the rights and legal remedies involved in a dispute, regardless of whether claims for damages or injunctive relief have arisen or would otherwise need to be tried in the future." See Moore's Federal Practice – Civil § 57.04.  Further, it "enables parties to adjudicate their disputes before either suffers great damages." Id at § 57.03.  In this case, the DOC Employees have already suffered through the lengthy OAH hearing process and have been unable to attend their jobs since their original summary removal on July 26, 2007.  Declaratory judgment promotes judicial economy in this matter, and this Court should grant Declaratory relief in the DOC Employees favor.

The DOC Employees are seeking a judicial declaration that they were: (1) wrongfully denied their jobs by the Defendants when the OAH Judges' recommendations were not implemented and (2) entitled to be reinstated unconditionally to their positions with back pay.  A declaration of these rights would merely award to these DOC Employees that which they have earned through the procedures established by Defendants.

Injunctive relief is also warranted in this matter to enjoin Defendants from pursuing any further discipline related to the jail escape matter, including termination. Absent this injunction, the DOC Employees will continue to suffer the irreparable injury of being denied their jobs and being subjected to a process for which there is no statutory authority.  As stated in Partido Revolucionario Dominicano Seccional Metropolitan de Washington –DC v. Partido Revolucionario Dominicano Seccional de Maryland y Virginia, 312 F. Supp. 2d 1, 11; (D.D.C. 2004):

> In determining whether to enter a permanent injunction, a court
> considers a modified iteration of the factors it utilizes in assessing

preliminary injunctions: (1) success on the merits, (2) whether the
DOC Employees will suffer irreparable injury absent an injunction,
(3) whether, balancing the hardships, there is harm to defendants or
other interested parties, and (4) whether the public interest favors
granting the injunction.

**B.**      <u>**The DOC Employees Have Been Deprived of Their Property Right.**</u>

The underlying facts in this case are clear and undisputed.  In August, 2006, the

DOC Employees were given notices of summary removal and administrative hearings

were held to examine the legality of the summary removals.  These hearings were

conducted by disinterested administrative law judges through the Office of

Administrative Hearings.  The judges examined whether these DOC Employees had

committed "misconduct" or "gross misconduct" which justified their summary removal.

In each case, the Report and Recommendation concluded that the employee could

not be summarily removed and that these DOC Employees should be returned to work.

The District of Columbia Municipal Regulations, the FOP/DOC Collective Bargaining

Agreement, and the Comprehensive Merit Protection Act required Director Brown to

return them to work.  He refused.  There is no statutory or other legal authority

supporting the Defendants' current effort to essentially re-litigate the discharge of these

Employees as related to the jail escape of June 3, 2006, and terminate them.

The DOC Employees have a property interest in their public employment.  Their

rights are born of the Due Process Clause of the United States Constitution, which states

that no person shall be, "deprived of life, liberty, or property, without due process of law;

nor shall private property be taken for public use, without just compensation."  United

States Constitution, Amendment V.  In the public employment context the "***resulting and***

***inherent property interest in employment***" derives from a legitimate claim of entitlement

that arises not from the United States Constitution, but from independent sources such as state statutes, agency rules or policies, or agreements as to employment.  Board of Regents v. Roth, 408 U.S. 564, 577-78 (1972). (emphasis added).  Pursuant to this formula, the District of Columbia Comprehensive Merit Protection Act and the CBA gives these DOC Employees a property interest in their jobs.  "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for Employees governed by it.  The CMPA establishes a Career Service for Employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause….  Under the CMPA, Employees can only be disciplined for cause and prior notice must be given."  Fonville v. D.C., 448 F. Supp. 2d 21 (D.D.C. 2006) (internal citations omitted).  See also, D.C. Department of Corrections v. Teamsters' Union Local, 554 A.2d 319, 323 (D.C. 1989).

Because the DOC Employees have a property interest in their public employment, the District of Columbia must establish such procedures as are necessary to afford procedural due process before taking any adverse action.  See Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985).  In Loudermill, the Supreme Court advanced the proposition that government Employees must be afforded procedural guarantees before they can be terminated, precisely because they have an inherent property interest in those jobs.  The administrative hearing process of the CMPA and the CBA, which the Employees fully complied with, are those procedures for DOC Employees.

Both the CMPA and the CBA outline the methods by which an employee's property rights are protected and how that termination can be appealed and reviewed.

Defendants are obligated by the Constitution to abide by internal, procedural regulations defining due process rights when proposing the dismissal of employees.  See Lopez v. FAA, 318 F.2d 242, 246 (D.C. Cir. 2003).  Abiding by the pre-termination procedures in these matters meant that Director Brown must follow the recommendation of the OAH judges.  After having chosen to remove these Employees via summary removal, Defendants were bound by the outcome of those proceedings.  DOC Director Brown was required by the DCPM to issue a Final Decision within 45 days of the delivery of the summary removal notices:

> The final decision in the case of summary suspension or summary removal action taken pursuant to §§ 1615-1616, respectively, shall be rendered not later than forty-five (45) days from date of delivery of the summary suspension or summary removal notice, as appropriate except that the period may be extended as follows:
>
>> (a) when the employee requests and is granted an extension of time in which to respond  under § 1611.2; or
>>
>> (b) when the employee agrees to an extension of time requested by the agency.

6 DCMR 1614.3.  In addition, both the CBA and the DCPM require that DOC Director Brown follow the recommendation of the OAH Judges in this case.  Article 11, Section 9(D) of the CBA specifically states (emphasis supplied):

> Deciding Official shall issue a final decision after reviewing the recommendation of the Disinterested Designee/Hearing Officer.  The deciding official may sustain or reduce the penalty recommended by the Disinterested Designee, remand the matter for further consideration by the Hearing Officer, or dismiss the charge but may not increase the penalty recommended by the Disinterested Designee/Hearing Officer.

Furthermore, Section 1613.2 of the DCPM also states with specificity that (emphasis supplied):

The deciding official shall either sustain the penalty proposed, reduce it, remand the action with instruction for further consideration, or dismiss the action with or without prejudice, but in no event shall he or she increase the penalty. 6 DCMR § 1613.2.

The CBA offers the DOC only three options in response to the Hearing Officer's (the Judges of the OAH) recommendations. The DOC is allowed to 1) sustain or reduce the penalty proposed; 2) remand the matter for further consideration; or 3) dismiss the charges. See Exhibit 18, CBA Article 11, Section 9(D). The DOC may not increase the recommended penalty and there is certainly no language in the CBA which allows for the cancellation of the proposed action and then re-adjudication of the matter.

Any manipulation of such procedures is an unconstitutional violation of due process. On December 11, 2006, Reports and Recommendations were issued by the administrative law judges assigned by the OAH to undertake review of the proposed summary removals. After complying fastidiously with the administrative process, each DOC Employee was found entitled to be returned to his or her position within the DOC.

C.    **The DOC Does Not Have A Right To A "Do Over"**

The Director chose to use the summary removal procedure to terminate these Employees and had every opportunity to substantiate the allegations during the administrative review process. Unable to justify the attempt to summarily remove these Employees, Defendants are not free to simply "take back" their initial termination attempt and try another method. Granting government employers the right to attempt to terminate Employees for the same infractions in repeated hearings denies the Employees due process in that no procedure is "meaningful" until the government agency finds the outcome it director desires. What resolution can a government employee with a protected

property interest in his employment hope to find from an administrative review procedure

if there is no guarantee the outcome is enforceable?

Each report clearly stated that the employee could not be summarily removed and

such removal would be a violation of due process. Given these recommendations,

Defendant Brown did not have the option of removing these Employees based on

allegations arising out of the June 3, 2006 escape. His actions were confined to those

clearly outlined in the Collective Bargaining Agreement, District Municipal Regulations

and the Memorandum of Understanding. The Supreme Court has long recognized that

"an agency is bound to the standards by which it professes its actions to be judged."

Service v. Dulles, 354 U.S. 363, 373-76 (1957). Furthermore, a government agency must

engage in "scrupulous compliance" with its own procedures for discipline and removal of

employees. Lerner v. District of Columbia, 362 F. Supp.2d 149, 161 (2005) U.S. Dist.

LEXIS 3565 (D.D.C. 2005).

Additionally, under the legal doctrine of res judicata, one party in a legal

proceeding is prevented from getting another day in court after receiving an

unsatisfactory result to his/her claim. There is an abundance of legal precedent

supporting this doctrine. Judge Harris has held that "a final judgment on the merits of

an action precludes the parties or their privies from re-litigating issues that were or

could have been raised in that action." Arakawa v. Reagan, 666 F. Supp. 254, 262

(1987), citing Allen v. McCurry, 449 U.S. 90, 94 (1980). Judge Harris reasons that

"[t]his preclusive effect attaches to administrative proceedings when, as with

proceedings before the MSPB, the administrative tribunal 'is acting in a judicial

capacity and resolves issues of fact properly before it which the parties have had an

22

adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata, which is itself a constitutional principle. Director Brown is doing nothing more than attempting a "do over" with this proposed termination.  It is important to note that the allegations made in the current attempt to terminate these Employees are *identical* to those made in the proposed summary removal.  The Director did not agree with the decision of the OAH Hearing Officers, and is now looking for a more receptive audience within the confines of the DOC in order to obtain the result he wants.  There are no duly ordained procedures which allow this.

Finally, the Defendants have contended in their Motion to Dismiss that DOC Employees have failed to exhaust administrative remedies.  As explained in greater detail in the DOC Employees' opposition in Section II below, there are no other remedies for the DOC Employees to exhaust, other than objecting to the procedures Defendants have made up.  Defendants argue that the DOC Employees must wait through another procedure that has no basis in the law, and then appeal what the DOC predicts will be an adverse outcome.  However, there is no need for them to do so.  They have already won. They have nothing to appeal.  Under Defendants' theory, this process could go on forever, wasting the taxpayers money paying employees not to work.

## II.     DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED

In this section, these DOC Employees address the Defendants' Motion to Dismiss.

A.   <u>**Standard of Review**</u>

DOC Employees have amply alleged constitutional claims of due process and defamation against these Defendants.  "When considering a Motion to Dismiss, the Court construes the facts in the complaint as true and construes all reasonable inferences in the light most favorable to the plaintiff."  <u>MacIntosh v. Bldg. Owners & Managers Ass'n Int'l</u>, 355 F. Supp. 2d 223, (D.D.C. 2005) <u>citing</u> <u>Swierkiewicz v. Sorema</u>, 534 U.S. 506, 508.  "A Motion to Dismiss is granted and the complaint dismissed only if no relief could be granted on those facts."  <u>See</u> <u>Sparrow v. United Air Lines Inc.,</u> 216 F.3d 1111, 1114 (D.C. Cir. 2002) (stating that complaints "need not plead law or match facts to every element of a legal theory") (<u>quoting</u> <u>Krieger v. Fadely</u>, 211 F.3d 134 (D.C. Cir. 2000).

Defendants further rely on <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955, 1965-66 (2007), a complex Sherman Act suit, in which the Supreme Court held that telephone subscribers failed to allege an unlawful agreement by their telephone companies.  An unlawful agreement is a statutory element of the Sherman Act:

> [W]e hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely."

<u>Id</u>. (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1202, at 94, 95) (footnote omitted).  The First Amended Complaint suffers from none of the defects of the cases relied upon by Defendants.  There is far more than a "reasonable expectation" that a jury will find that Defendants' refusal to return the DOC Employees to work, and Defendants' manufacture of an unlawful "Do Over" before a Hearing Officer who owes

his job to Defendant Devon Brown, violate the Fifth Amendment of the United States Constitution by depriving DOC Employees of their constitutionally protected right to their jobs.

### B.     Plaintiff's Constitutional Right to Due Process Has Been Violated.

The Defendants have cited several cases in support of their position that, "the District's alleged violation of its own personnel regulations or the collective bargaining agreement between the District and the DOC Employees' union does not establish a deprivation of constitutional due process."  Defendants Motion to Dismiss at 8, citing Brandon v. District of Columbia, 823 F.2d 644, 649 (D.C. Cir. 1987).  The cases cited by Defendants are irrelevant to the DOC Employees' claim before this Court.

In both Ellis and Brandon, cited by Defendants, neither plaintiff could assert any underlying liberty interest which was entitled to due process, which doomed their § 1983 claims before the Court.  The inmates in those cases were seeking due process protections for their claimed right to parole or re-parole.  See Ellis v. District of Columbia, et. al., 84 F.3d 1413 (D.C. Cir. 1996), Brandon v. District of Columbia Board of Parole, 823 F.2d 644 (D.C. Cir. 1987).  The Court held in both cases, however, that their due process rights had not been violated because they had no underlying liberty interest.  Id. Similarly in Beo, the inmate did not have a, "constitutionally protected liberty interest in his assignment to a particular prison" and therefore his rights had not been violating in transferring him to another prison.  Beo v. District of Columbia, et al, 44 F.3d 1026, 1028 (D.C. Cir. 1994).

In total contrast to those cases, the DOC Employees are not seeking any procedural protections or hearings before a right is granted or terminated.  Rather, these

DOC Employees are seeking *the property that has already been determined to be theirs*. Unlike Brandon, Beo and Ellis, these DOC Employees already have a protected property interest in their positions. They are not seeking declarations that they are entitled to a process, and they are not alleging that violation of a process denies them a potential right. Both the DOC Employees and the DOC have already completed the steps in the regulations and collective bargaining agreement designed to protect that right. What the DOC Employees are seeking from this Court is a declaration that their property must be immediately returned: i.e., they must be reinstated.

It is accepted that the DOC Employees have a protected property interest in their public employment. The due process analysis found in Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), applies to DC government Employees and, in this case, the DOC Employees specifically. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for Employees governed by it." "Under CMPA, Employees can only be disciplined for cause and prior notice must be given." Fonville v. D.C., 448 F. Supp. 2d 21 (D.D.C. 2006) (internal citations omitted). See also, D.C. Department of Corrections v. Teamsters' Union Local, 554 A.2d 319, 323 (D.C. 1989). DOC Employees therefore are not seeking access to a procedural system designed to protect their rights, they are seeking access to the property interest itself, an interest both the case law and the OAH reports assert is theirs already.

Finally, Defendants have yet to assert the legal authority that supports their attempt to "Do Over" the termination process for these DOC Employees. DOC Employees followed the rules and the administrative hearing process and received a ruling in their favor. How is it legally possible that the Defendants can simply undertake

a new termination without addressing the ruling from their first attempt? Why are the DOC Employees not immediately entitled to enforcement of the Report and Recommendation issued by the OAH Judges? Defendants are certainly not entitled to any relief from this Court upon such a record.

### C. The CMPA is Not The DOC Employees' Exclusive Remedy For a Violation of Constitutional Rights.

#### 1. 42 U.S.C. § 1983 Claims Do Not Require CMPA Exhaustion.

Defendants assert that "DOC Employees sole remedies for redress of any violation of their due process rights must be presented through the administrative process as set forth in the CMPA and the CBA." Defendants' Motion at 11. Defendants rely on the holding of Johnson which took the position that the Court must "apply the CMPA's exhaustion requirements strictly," Defendants Motion to Dismiss at 11 citing Johnson v. District of Columbia, 368 F. Supp. 2d 30, 43 (D.D.C. 2007). Defendants' argument fails to acknowledge the line of cases establishing the DOC Employees' position that a constitutional violation does not fall within the ambit of the CMPA.

Actions filed pursuant to 42 U.S.C. § 1983 do not require an exhaustion of administrative remedies as a prerequisite. See Roache v. District of Columbia, 654 A.2d 1283 (D.C. 1995) citing Patsy v. Board of Regents, 457 U.S. 496 (1982). Defendants' argument that DOC Employees are required to exhaust administrative remedies prior to bringing this suit is therefore without merit. It is inaccurate to suggest, as Defendants do, that DOC Employees are challenging their termination. Rather, it has already been determined their terminations were improper, and DOC Employees merely seek enforcement of that determination and an injunction against any efforts to restart

termination proceedings against them.  These constitutionally based claims of entitlement to due process are not subject to the exclusivity doctrine.

The Supreme Court has held that, "exhaustion of administrative remedies was not a prerequisite to a § 1983 action because Congress assigned to the courts the role of protecting constitutional rights and did not intend under most circumstances for civil rights claims to be initially addressed through state administrative procedures."  Patsy v. Board of Regents of the State of Florida, 457 U.S. 496 (1982).  While the CMPA procedures are designed to address employee grievances, its procedures do not address a deprivation of constitutional rights.  The DOC Employees need not exhaust administrative remedies before asserting their constitutional rights in federal court.  The legislative history of civil rights legislation supports that position, as quoted in Patsy. "The 1871 Congress intended § 1 (of the Civil Rights Acts of 1871) to 'throw open the doors of the United States courts' to individuals who were threatened with, or who had suffered, the deprivation of constitutional rights, and to provide these individuals *immediate access* to the federal courts notwithstanding any provision of state law to the contrary."  Patsy, 457 U.S. at 504.

## 2.    Regardless, the DOC Employees Have Exhausted Administrative Remedies.

Defendants argue that, "DOC Employees' exclusive remedy to challenge their termination is through the Comprehensive Merit Protection Act and the CBA."  See Defendants Motion to Dismiss at 10.  Again, the DOC has already pursued this route, and Defendants theory would require them to wait through another round of made up procedures.  The DOC Employees have already sought and won the remedies available through the CMPA and CBA.  The DOC Employees did not rush to the courthouse upon

learning of their summary removal via a public press conference. Rather, they followed the procedures established by the CMPA and CBA established by their employer.

It is disingenuous for the Defendants to argue that, "any violation of their due process rights must be presented through the administrative process as set forth in the CMPA and CBA." See Defendants Motion at 11. It is the Defendants, not the DOC Employees, who are neglecting the administrative process. The DOC Employees essentially "won" the administrative process when the OAH Judges clearly and without condition found that the DOC Employees could not be summarily removed and should be returned to work. At that point, there is no process left for the DOC Employees to exhaust. Why would they appeal to D.C. Superior Court a Report and Recommendation that finds them entitled to their positions? The DOC Employees have gone as far as they can go in the administrative process established by the CMPA and CBA. After a judicial determination that they are entitled to their jobs and the refusal by these Defendants to acknowledge that right, the DOC Employees have been left with their federal claim to enforce their constitutional rights.

**D.    DOC Employees' 42 U.S.C. § 1983 Claim Does Not Fail**

**1.    The District of Columbia is Liable Under 42. U.S.C. § 1983.**

Defendants argue that the District can be held liable for DOC Employees' constitutional claims, "only if the DOC Employees allege facts that indicate their injury was caused by a policy or custom of the District." See Defendants' Motion to Dismiss at 11 citing Monell v. Dep't of Social Servs. of the City of New York, 436 U.S. 658, 694 (1978). Monell is quoted for the proposition that a necessary element of a § 1983 violation is that, "there be a deprivation of rights under color of statute, ordinance,

regulation, custom, or usage of any State." Monell, 346 U.S. at 691. DOC Employees assert that the First Amended Complaint does establish that their constitutional rights have been infringed by "custom or usage" of the District of Columbia.

Defendants have repeatedly distorted the personnel regulations and manipulated established procedures in this case in an effort to deprive the DOC Employees of their constitutionally protected interest in their jobs. The injuries suffered by the DOC Employees in this matter are the result of a coordinated effort on behalf of DOC officials and are not the product of an isolated incident, such as the police shooting in City of Oklahoma City. However, the DOC Employees intend to seek leave to file a Second Amended Complaint which will more clearly state the basis of the Complaint and satisfy the elements discussed in Monell, City of Oklahoma City v Tuttle, 471 U.S. 808 (1985), Dorman v District of Columbia, 888 F.2d 159 (D.C. Cir. 1989), and Dant v. District of Columbia, 829 F.2d 69 (D.C. Cir. 1987).

## 2. **Individual Defendants are Liable Under 42 U.S.C. § 1983.**

As discussed previously, the DOC Employees will be seeking leave to file a Second Amended Complaint which will address Defendants' concern that, "DOC Employees do not identify the capacity in which the individual Defendants are sued." See Defendants Motion to Dismiss at 13. While case law supports the Defendants' claim that, "a law suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," the DOC Employees intend to name Director Devon Brown as a defendant in his individual capacity in this case. See Defendants' Motion to Dismiss at 14, citing Will v Michigan Dept. of State Police, 491 US. 58, 71(1989).

Director Brown's behavior with regard to these DOC Employees has been both manipulative and in dereliction of established rules.  He has personally sought to keep these Employees from returning to their jobs and therefore is personally liable for the injuries that have resulted.  A government official is immune from being sued in his individual capacity when his actions are reasonable, "assessed in light of the legal rules that were clearly established at the time it was taken."  Anderson v. Creighton, 483 U.S. 635 (1987), citing Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982).  There was simply no rule in place at the time Director Brown undertook to rescind the summary removal and instigate new terminations and therefore his action is patently unreasonable.  Director Brown refused to follow the Report and Recommendation of the OAH judges, in direct violation of the CMPA, CBA and MOU and no, "reasonable officer could have believed that the action taken was not in violation of clearly established constitutional law."  See Anderson v. Creighton, 483 U.S. 635, 638 (1987).  Moreover, there is amply evidence of Director Brown's delight in this little game.  He conspired to mislead the DOC Employees, their Union, and their counsel that he was returning them to work.  Such conduct is reprehensible in an agency Director acting on behalf of a new Mayor.

> **E.    DOC Employees' Common Law Claims For Defamation (Count II) And Intentional And Negligent Infliction of Emotional Distress Do Not Fail Because Notice of These Claims Was Given to the Mayor as Required by DC Code § 12-309.**

Defendants correctly assert that, "In order to maintain any tort action against the District of Columbia for unliquidated damages, a plaintiff must satisfy the mandatory notice requirement  of § 12-309 of the D.C. Code."  See, e.g. Hill v. District of Columbia, 345 A.2d 867, 869 (D.C. 1975).  § 12-309 provides that,

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the …[Mayor] of the approximate time, place, cause, and circumstances of the injury or damage.

DOC Employees' were effectively injured on March 15, 2007, the date at which it become painfully obvious that the Defendants were not going to comply with the Report and Recommendations issued by the OAH Judges.  On March 15, 2007, DOC Employees were invited back to work only to be given new termination notices, which in no way complied with the Recommendations of the OAH Judges.  DOC Employees had six months from the date of that injury to notify the Mayor of the approximate time, place, cause and circumstances of the injury or damage.  DOC Employees have served Mayor Adrian Fenty with the required statutory notice as of Friday August 24, 2007, on behalf of all DOC Employees.  This notice satisfies the six month time frame as DOC Employees had until September 15, 2007 to comply with § 12-309 of the D.C. Code.  Finally, the DOC Employees will be seeking leave to file a Second Amended Complaint which will address the steps taken to meet the statutory notice requirement.

### F.    DOC Employees' Defamation Claim is Not Time Barred.

Defendants seek dismissal of the DOC Employees' claim arising out of the June 6, 2006 defamatory comments made by Defendant Brown, alleging they are outside of the one year statute of limitations.  The DOC Employees' respond that Defendant Brown and others have repeatedly made defamatory statements about these DOC Employees and their claim for defamation does not rest solely on the June 6, 2006 statement.  Therefore, the DOC Employees' claim of defamation should not be dismissed and discovery should

continue on this claim allowing for introduction of evidence of additional defamatory statements.

More importantly, however, the DOC Employees' defamation claim grows out of a constitutional violation and is not subject to the one year statute of limitation for defamation. A "reputation plus" brand of defamation claim is based on the liberty interest protected by 42 U.S.C. § 1983. The DOC Employees can demonstrate, "defamation accompanied by an adverse employment action, or 'foreclosure claims,' in which the government's actions foreclosed potential job opportunities." Fonville v. District of Columbia, 448 F. Supp. 2d 21 (D.D.C. 2006). As stated in Fonville, "the government's behavior while terminating an employee-employer relationship can implicate that employee's *fifth amendment* liberty interest." Id. At 28, citing Roth, 408 U.S. at 573; Alexis v. District of Columbia, 44 F. Supp. 2d 331, 338 (D.D.C. 1999). (emphasis in original)

It is precisely that constitutional based liberty interest that is being injured in this case and why a three year statute of limitation applies. "Section 1983 provides a federal cause of action, but in several respects relevant here federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: It is that which the State provides for personal-injury torts." Owens v. Okure, 488 U.S. 235, 249 (1989). The Court then further held that, "where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." Id.

The United States District Court for the District of Columbia recently issued a similar holding in Richards v Duke Univ., 480 F. Supp. 2d 222 (D.D.C. 2007), where the

plaintiff brought a discrimination claim under the Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972. Judge Lamberth stated, "Neither of these statutes have their own statute of limitations, but courts have borrowed statutes of limitations from 42 U.S.C. § 1981 and *§ 1983, which in turn rely on the respective personal injury statute of limitations in a jurisdiction*." Richards at 238. (emphasis added). He then went on to state that, "In the District of Columbia, a personal injury action has a three year statute of limitations and therefore, a Title VI or Title IX claim also has a three-year statute of limitations in the District of Columbia." Id, citing Carney v American Univ., 151 F.3d 1090 (D.C. Cir 1998).

Applying those opinions to the instant matter, the reputation plus claim which arises out of a constitutional violation of the DOC Employees liberty interest is bound by a three-year statute of limitations and is therefore not time barred. Defendants' Motion to Dismiss on these grounds should be denied.

### G.    DOC Employees' Defamation Claim Does Not Fail For Lack of Asserting Falsity.

DOC Employees' defamation claim should not be dismissed because the statements made by the Defendants were false and furthermore they meet the standard for a "reputation plus" claim. Defendants' Motion to Dismiss speaks only to the standard concept of defamation. DOC Employees' Complaint however alleges the "reputation plus" brand of defamation, recently discussed in Fonville. The Complaint repeatedly asserts that the statements made by Director Brown were false and incredibly damaging to the DOC Employees' reputation for their ability to perform their jobs. See Complaint at 47. The Defendants have repeatedly implied through various media that the DOC

Employees were not simply negligent in performance of their jobs but also that they actively facilitated the escape of the inmates. This claim is clearly false.

Defendants' state, "DOC Employees have not alleged that the statements made by Director Brown were false,…" Motion to Dismiss at 17. This is patently untrue as DOC Employees Complaint describes several false statements made by Director Brown. Director Brown frequently and publicly has accused the DOC Employees of perpetrating criminal acts in connection with the jail escape, a false assertion. See Amended Complaint ¶ 48. He accused them of being too old to do their jobs. He accused them of being unable to apply the classification system. One example of this is a press release that has been on the DOC web site since July 27, 2006. It states, in relevant part, "As a result of this investigation, 11 individuals have been terminated from employment with the DOC *for their roles leading to the escape* and to the breach of security…. The United States Attorney's Office is currently conducting a criminal investigation into the escape." See DC DOC website at www.dc.gov (emphasis added).

In Fonville, Judge Sullivan defined the requirements for "reputation plus" as those "comments that imply an inherent or persistent personal condition." Id. Specific examples of those behaviors that rise to a constitutional violation include "accusations of dishonesty, commission of a serious felony, manifest racism, serious mental illness, or a lack of intellectual ability." See Fonville at 29. The DOC Employees allegations clearly rise to the level of the "reputation plus" claim and should not be dismissed. The Defendants comments go beyond, "statements about inadequate job performance" and rather imply a "personal persistent condition" which affects the Plaintiff's ability to do their jobs. Id. Suggesting the DOC Employees are too old to have prevented the escape

or even criminally responsible for the escape clearly qualifies as "stigmatizing" to the Plaintiffs and entitles them to pursue their defamation plus claim before this Court.

### H.    Sui Juris – Department of Corrections

The DOC Employees concede that the Department of Corrections, as a sub agency of the District of Columbia was improperly named as a Defendant in this matter. The Second Amended Complaint which the DOC Employees will be seeking leave to file will address this issue and remove the Department of Corrections as a named Defendant.

WHEREFORE, the Plaintiffs respectfully request that the Court grant their Motion for Partial Summary Judgment and deny Defendants' Motion to Dismiss.

Respectfully submitted,

HANNON LAW GROUP, LLP


_____/s/ J. Michael Hannon_____
J. Michael Hannon, #352526
1901 18th Street, NW
Washington, DC 20009
(202) 232-1907
Fax:  (202) 232-3704
jhannon@hannonlawgroup.com

*Attorneys for DOC Employees*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CYNTHIA WASHINGTON, *et al.,*                :

                    Plaintiffs,              :        Case Number: 1:07-cv-01031(RMU)

        v.                                   :

DISTRICT OF COLUMBIA, *et al.,*              :

                    Defendants.              :


## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1.      The DOC Employees were summarily fired by Department of Corrections Director Devon Brown at a news conference on July 26, 2006.

2.       The Department of Corrections did not provide the DOC Employees with a written notice of the proposed summary removals until August 24, 2006.

3.      The notice of summary removals[1] provided that:

> The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal actions…In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge…this written notice and your response, if there is one.  After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

---

[1]      See Exhibit 1, Cynthia Washington Written Notice; Exhibit 2, Herbert Douglas Written Notice; Exhibit 3, Dionne Makins Written Notice; Exhibit 4, Alphonso Bryant Written Notice; Exhibit 5, Lowanda Hinton-Saunders Written Notice; Exhibit 6, Darryl Love Written Notice; Exhibit 7, Malcolm Pointer Written Notice; Exhibit 8, Shantell Hatton Written Notice.

4.      Each Written Notice provided "Specifications" of the conduct the DOC alleged supported the summary removals.[2]

5.      Department of Corrections Director Devon Brown entered into a "Memorandum of Understanding"[3] with the Office of Administration Hearings, assigning the role of "hearing officer" to the Judges of the Office and utlining the administrative hearing process.  The MOU included the following language; "This Designation and MOU is effective October 1st, 2006 and will remain in effect through the latest date that the Director of DOC issues a final decision in any of the Disciplinary Actions.."

6.      The assigned administrative law judges each issued a Report and Recommendation regarding each DOC Employee on December 11, 2006.[4]

7.      The Report and Recommendation for each DOC Employee concluded that the employee could not be summarily removed and recommended they each be returned to work with the Department of Corrections.[5]

8.      Pursuant to the Collective Bargaining Agreement, the Comprehensive Merit Protection Act, § 1-601.01, *et seq*., and Memorandum of Understanding, Director Devon Brown was required to issue a Final Decision consistent with the recommendations.  The Final Decision must either: sustain the recommendation, reduce

---

[2]      See Exhibits 1-8.

[3]      See Exhibit 9, Designation of Authority And Memorandum of Understanding Between The Office of Administration Hearings and the Department of Corrections for the District of Columbia, specifically Section D, Duration of MOU and Early Termination For Cause.

[4]       See Exhibit 10, Report and Recommendation Cynthia Washington; Exhibit 11, Report and Recommendation Herbert Douglas and Lorenzo Jennings; Exhibit 12, Report and Recommendation Dionne Makins; Exhibit 13, Report and Recommendation Alphonso Bryant; Exhibit 14, Report and Recommendation Lowanda Hinton-Saunders; Exhibit 15, Report and Recommendation Darryl Love; Exhibit 16, Report and Recommendation Malcolm Pointer; Exhibit 17, Report and Recommendation Shantell Hatton.

[5]      See Exhibits 10-17, Section III Recommendation.

the penalty proposed, remand the action, or dismiss the action.  The final decision may not impose a harsher penalty than that recommended by the Administrative Judge.[6]

9.    Director Brown did not render a final decision returning the DOC Employees to work as he was obligated to do.

10.    In an effort to enforce their rights, the DOC Employees filed a Petition for Writ of Mandamus to Compel Agency Action in the District of Columbia Court of Appeals on March 12, 2007.[7]

11.    On March 15, 2007, Defendants Department of Correction and Devon Brown rescinded the summary removal action in an attempt to preempt the need for the Writ of Mandamus.  The DOC Employees were delivered these letters after being invited to return to work on March 16, 2007.[8]

12.    At the same time, the DOC Employees were served their notices that the summary removal action had been rescinded, the DOC Employees were each served a twenty day notice of proposed termination.  The specifications in support of the proposed terminations were the exact same acts used to support the summary removals.[9]

---

[6]    See Exhibit 18, Collective Bargaining Agreement Section 9 D., See 6 DCMR§ 1616.6.

[7]    See Exhibit 19, Petition for Writ of Mandamus to Compel Agency Action.

[8]    See Exhibit 20, Summary Removal Rescission Cynthia Washington; Exhibit 21, Summary Removal Rescission Herbert Douglas; Exhibit 22, Summary Removal Rescission Lorenzo Jennings; Exhibit 23, Summary Removal Rescission Dionne Makins; Exhibit 24, Summary Removal Rescission Alphonso Bryant; Exhibit 25, Summary Removal Rescission Lowanda Hinton-Saunders; Exhibit 26, Summary Removal Rescission Darryl Love; Exhibit 27, Summary Removal Rescission Malcolm Pointer; Exhibit 28, Summary Removal Rescission Shantell Hatton.

[9]    See Exhibit 29, Cynthia Washington Notice of Proposed Termination; Exhibit 30, Herbert Douglas Notice of Proposed Termination; Exhibit 31, Lorenzo Jennings Notice of Proposed Termination; Exhibit 32, Dionne Makins Notice of Proposed Termination; Exhibit 33, Alphonso Bryant Notice of Proposed Termination; Exhibit 34, Lowanda Hinton-Saunders Notice of Proposed Termination; Exhibit 35, Darryl Love Notice of Proposed Termination; Exhibit 36, Malcolm Pointer Notice of Proposed Termination; Exhibit 37, Shantell Hatton Notice of Proposed Termination.

13.    Furthermore, the DOC Employees were given letters placing them on administrative leave with pay as of March 16, 2007.[10]

14.    Plaintiffs' notice of proposed termination stated that Henry R. Lesansky, Ph.D., Health Services Administrator, and an employee of the Department of Corrections, had been appointed as Hearing Officer for the new administrative review and/or administrative hearing.[11]

15.    The Collective Bargaining Agreement between District of Columbia Department of Corrections and Fraternal Order of Police Department of Correction Labor Committee guarantees that a "Disinterested Designee/Hearing Officer shall review the proposed action….  The Hearing Officer must be a DS-13 or higher and have no direct or personal knowledge of the matter contained in the disciplinary case, and not be in the chain of command between the proposing and deciding officials."[12]  Dr. Lesansky serves at the pleasure of the Director, the deciding official.

16.    No statute, regulation, or provision of the CBA authorizes the DOC to require these DOC Employees to go through a second administrative process.

---

[10]    See Exhibit 38, Cynthia Washington Administrative Leave Notice; Exhibit 39, Herbert Douglas Administrative Leave Notice; Exhibit 40, Lorenzo Jennings Administrative Leave Notice; Exhibit 41, Dionne Makins Administrative Leave Notice; Exhibit 42, Alphonso Bryant Administrative Leave Notice; Exhibit 43, Lowanda Hinton-Saunders Administrative Leave Notice; Exhibit 44, Darryl Love Administrative Leave Notice; Exhibit 45, Malcolm Pointer Administrative Leave Notice; Exhibit 46, Shantell Hatton Administrative Leave Notice.

[11]    See Exhibits 29-37.

[12]    See Exhibit 18, Article II, Section 9, C.

Respectfully submitted,

HANNON LAW GROUP, LLP


_____/s/ J. Michael Hannon_____
J. Michael Hannon, #352526
1901 18th Street, NW
Washington, DC 20009
(202) 232-1907
Fax:  (202) 232-3704
jhannon@hannonlawgroup.com

*Attorneys for Plaintiffs*

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Cynthia Washington
12303 Windbrook Drive
Clinton, Maryland 20735

Dear Ms. Washington:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Officer DS-08, effective July 26, 2006. The Summary Removal Notice was sent express mail (ED528768321US) to your last address of record at 12303 Windbrook Drive, Clinton, Maryland, 20735, on July 26, 2006. The United States Postal Service delivered this letter on July 27, 2006. The signature affixed to the receipt for the letter was C. Washington.    The summary removal action is based on a charge of Negligence for conduct that:

   a.  Threatened the integrity of government operations;
   b.  Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF complex on Saturday, June 3, 2006. The OIA investigation substantiates that on June 3, 2006, you were assigned to the Southeast One (1) (SE-1) housing unit. Your primary functions were to maintain custody, security and accountability of all inmates in your assigned housing unit. At approximately 9:42 a.m., Inmate Ricardo Jones walked out of the SE-1 housing under the pretense of going to the Infirmary.

Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing him to go to the Infirmary. Inmate Jones' name was placed on the housing unit movement/running court sheet accounting for and authorizing his movement to the Infirmary. However, according to Infirmary records, only six (6) inmates from SE-1

Cynthia Washington
Page 2

were scheduled for medical care in the Infirmary on June 3, 2006, and Inmate Jones was not one of them.

The OIA Investigators conducted taped interviews with you regarding this matter on Saturday, June 3, 2006. During the interview, you stated that Corporal Shantell Hatton and Sergeant Dionne Makins worked in the unit with you on June 3, 2006. You stated that you did not recall the Infirmary calling for Inmate Jones. You stated that the only phone call you received was from a Lieutenant calling you to ask for your social security number in order to pay you for the overtime draft. You admitted that you made approximately three call-out passes, but not for any specific place and they were unnamed. You stated that Sergeant Makins also made some call-out passes, but could not confirm whether or not Officer Hatton made any. You also recalled that at some point all three of you were in and out of the bubble. When asked if you recalled any specific inmate(s) you gave a pass to, you responded, "I don't recall me giving anybody a pass; I'm thinking that Miss Hatton gave the passes." You explained that Officer Hatton had the running board, and she was the one that was checking them off on the running board.

As previously stated, the OIA investigation substantiated that Inmate Jones was not on the Sick Call List scheduled for medical care on June 3, 2006. You stated that you did not receive a phone call from the Infirmary or anywhere else for Inmate Jones to report to medical; you did not recall Inmate Jones complaining to you or any of the officers in the unit of being sick, and you never made a call-out pass for Inmate Ricardo Jones. However, Inmate Jones was in possession of a movement pass which authorized him to proceed to the Infirmary. In addition Inmate Jones' name was placed on the housing unit movement/running count sheet, which would explain/substantiate his absence from the housing unit.

As an Officer assigned to the SE-1 housing unit, it was your responsibility as well as the responsibility of Sergeant Makins and Officer Hatton to confirm Inmate Jones' need for medical treatment; the availability of medical staff to check Inmate Jones and seek authorization for his movement to the Infirmary via a call out pass or escort pursuant to sick call and Infirmary protocols.

The OIA Investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled Infirmary appointment. The investigation further concluded that each correctional officer assigned to SE-1 housing unit to include you, was culpable, because it was the responsibility of each officer assigned, individually and collectively, to ensure the accurate accountability of each inmate assigned to the housing unit. Therefore, you failed to properly carry out your assigned duties.

Your negligence in this matter violates the following Departmental policy:

Cynthia Washington
Page 3

Program Statement 5010.2c: Accountability for Inmates, which states that "Correctional
Officers are responsible for maintaining accountability for all inmates in their area of
responsibility."

Basic Regulations of All Employees:

Section 1.1 Operational Knowledge Required:  Employees are required to have complete
understanding of their Position Description and all regulations, rules, Policies and
Procedures pertaining to the Department and their Division, Service and Unit, and to
comply therewith.  Employees are responsible for the understanding and compliance with
all documents posted on official Bulletin Board.

Section 1.4 Attention to Duty, "employees are required to devote their entire attention to
their official duties; and,

Correctional Officer's General Orders #1, "Take charge of this post and all government
property on or near it".  General Order #8, "Account for all inmates in my charge and
immediately report any unauthorized absences to the shift commander or other officials
in the chain-of-command".

Your negligence in this matter contributed to the successful escape of Inmate Ricardo
Jones and placed staff, inmates and the public at large in considerable capricious danger.
Notwithstanding, are the detrimental public relations incurred by the agency, potentially
lack of confidence and insecurity the public now experience.  The position of
Correctional Officer is one of trust, reliance and confidence.  Each correctional employee
has fiduciary responsibilities to the public in general and to the citizens of the District of
Columbia.  The citizens of the District of Columbia entrust correctional employees to
provide a safe and secure facility.  This task is effectuated when policies and procedures
are followed, respected and maintained by staff.

The charge of negligence involves conduct/performance which falls below the
standard established by Law for the protection of others against unreasonable risk
of harm.  Here, your actions substantially placed staff, inmates, the surrounding
community and the general public at large in momentous unpredictable danger.  A
jail or correctional system's primary responsibility is custody, care and control of
inmates committed to its ward.  Your conduct substantiates an unreasonable and
unjustifiable departure of correctional responsibilities, and therefore, warrants
your removal.  Consequently, I am proposing that the summary removal action
effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and
to prepare a written response to the notice, including affidavits and other documentation
within 6 days of receipt of the notice.  You are entitled to an administrative review by a

Cynthia Washington
Page 4

Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal action. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer.

Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

> DC Office of Administrative Hearings
> 825 North Capitol Street, N.E.
> Suite 4150
> Washington, D.C. 20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Acting Warden

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Herbert Douglas
3808 71st Avenue
Landover, Hills, Maryland  20784

Dear Mr. Douglas:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Officer DS-08, effective July 26, 2006.  The Summary Removal Notice was sent via express mail (ED528768193US) to your last address of record on July 26, 2006.  The United States Postal Service delivered this letter on July 27, 2006.  The item as signed for by H. Douglas.    The summary removal action is based on a charge of Negligence for conduct that:

   a.  Threatened the integrity of government operations;
   b.  Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications:**  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006.

The OIA investigation substantiated the following:

On Saturday, June 3, 2006 at approximately 7:00 a.m., you entered the North One (1) housing unit and removed nine (9) detail inmates, including inmate Joseph Leaks.  These inmates were employed in various off unit environmental work assignments throughout the CDF.  You escorted these inmates to their assigned areas of responsibility.  You

Herbert Douglas
Page 2

removed six (6) additional detail inmates from the Southwest Two (2) housing unit who were also assigned to work various environmental work detailed throughout the CDF.

You escorted Inmate Leaks, along with three other detail inmates to their assigned work areas on the second floor of the administrative module. Inmate Leaks' daily primary responsibility on this work detail was to clean the common areas, which included the Officer's Dining Room, the Environmental Office and the employee's locker rooms on the second floor. You unlocked the supply locker containing various cleaning materials and equipment to include floor buffers.

Inmate Leaks stated that prior to his initial departure from the second floor of the administrative module, he told you to "leave the area because something was about to happen." According to inmate Leaks, you complied with his request and departed the area leaving him and the other inmates unattended. According to Inmate Mohammad Rashid, you remained in the area for approximately twenty (20) minutes before leaving.

At some point after you left, Inmate Leaks, left his assigned detail post assignment and proceeded through the Administrative Two door into the inmate housing unit area where he ultimately met up with Inmate Ricardo Jones.

According to inmate Leaks upon his return to the second floor of the administrative module, he was accompanied by inmate Ricardo Jones. Inmate Leaks stated that he and inmate Jones removed a buffer from the supply locker that you left unsecured.

The OIA Investigators conducted taped interviews with you regarding this matter on Saturday, June 3, 2006. During the interview, you stated that your assignment on Saturday, June 3, 2006 was supervising the details that are assigned to clean the facility. You confirmed that Inmate Joseph Leaks was assigned to your environmental detail squad on June 3, 2006. You also confirm that Inmate Leaks accompanied you to the storage (cage) area where the buffer used by the two escapees was stored. You stated that you unlocked the cage and left it unsecured as this is the practice. When asked, "How long did you -- after Leaks went up to that locker, did you stay with him after that? You responded that you went on to place the other inmates. You stated that you left inmate Leaks on the second floor; that he should have been cleaning the bathrooms, the ODR and the hallway. You stated that after you opened the Environmental Office inmate Leaks came in and got a cup of coffee. You admit that you left inmate Leaks unattended while you went to oversee inmates cleaning the visiting hall. You could not recall if that was the last time you saw inmate Leaks.

The OIA Investigation concluded that you abandoned you responsibilities, which were to ensure that inmates under your custody were properly supervised. As a result of your negligence, Joseph Leaks, and Ricardo Jones successfully escaped from the CDF.

Herbert Douglas
Page 3

Your negligence in this matter contributed to the successful escape of Inmate Ricardo Jones and placed staff, inmates and the public at large in considerable capricious danger. Notwithstanding, are the detrimental public relations incurred by the agency, potentially lack of confidence and insecurity the public now experience. The position of Correctional Officer is one of trust, reliance and confidence. Each correctional employee has fiduciary responsibilities to the public in general and to the citizens of the District of Columbia. The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility. This task is effectuated when policies and procedures are followed, respected and maintained by staff.

The vigilance of a Correctional Officer is indispensable to the safe keeping of inmates committed to the custody of the DOC. As a Correctional Officer you were charged with the safe keeping of inmates, which is of vital importance to the citizens and the Government of the District of Columbia.

Your negligence in this matter violates the following regulations and policies:

Program Statement 5010.2c: Accountability of Inmates, states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations of All Employees:

Section 1.1, Operational Knowledge Required: Employees are required to have complete understanding of their Position Description and all regulations, rules, policies and Procedures pertaining to the Department and their Division, Service and Unit, and to Comply herewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty, "employees are required to devote their entire attention to their official duties;

Section 2.1, Count and Security, it is the duty of the correctional officer to accept responsibility for keeping an accurate count of inmates not only at formal count periods during a shift, but at all times when inmates are assigned to his or pass through his post;

Section 2.18, Work Detail Posts, Correctional personnel assigned to work details in addition to all other duties prescribed and implied must: escort inmate to and from all work are in an orderly, prompt manner, supervise maintain check, prevent loafing, idleness, and adhere to all special or unique instructions pertaining to a job.

Herbert Douglas
Page 4

Correctional Officer General Order #8, "Account for all residents in their charge and immediately report any authorized absences to Shift Supervisor or other officials in the chain-of-commands.

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal. Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal action. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer. Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

> DC Office of Administrative Hearings
> 825 North Capitol Street, N.E.
> Suite 4150
> Washington, D.C.  20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

Herbert Douglas
Page 5

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Acting Warden

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Dionne Makins
7301 Flag Harbor Dr
District Heights, Maryland 20747

Dear Ms. Makins:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Lead Correctional Officer DS-09, effective July 26, 2006. The Summary Removal Notice was sent via express mail (ED528768233US) to your last address of record at 7301 Flag Harbor Drive, District Heights, Maryland, 20747, on July 26, 2006. The United States Postal Service delivered the letter on July 28, 2006. The signature affixed to the receipt for the letter was D. Makins.   The summary removal action is based on a charge of Negligence for  conduct that:

    a. Threatened the integrity of government operations; and
    b. Constitutes an immediate hazard to the agency, to other District employees, or
       to the employee

**Specifications:**  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections (DOC), Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF complex on Saturday, June 3, 2006. The OIA Investigation substantiates that on June 3, 2006, you were the assigned Office-In-Charge (OIC) of Southeast One (1) (SE-1) housing unit. Your primary functions were to maintain custody, security and accountability of all inmates in your assigned housing unit and provide supervision to all subordinate officers assigned to your unit. At approximately 9:42 a.m., Inmate Ricardo Jones walked out of the SE-1 housing under the pretense of going to the Infirmary.

Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing him to go to the Infirmary.  Inmate Jones' name was placed on the housing unit movement/running count sheet, accounting for and authorizing his movement to the

Dionne Makins
Page 2

Infirmary. However, according to Infirmary records, only six (6) inmates from SE-1 were scheduled for medical care in the Infirmary on June 3, 2006. Inmate Ricardo Jones was not one of them.

OIA Investigators conducted taped interviews with you regarding this matter on Saturday, June 3, 2006 and on Friday, June 16, 2006. During the interviews, you stated that Corporal Hatton and Corporal Washington worked in the unit with you on June 3, 2006. You further stated that after calling the count into the count book, you proceeded to cut the call-out passes and date them. You stated that you made all your passes that you were aware of and Miss Hatton put them on the movement sheet. You stated that the inmates that were going to the Infirmary already had their passes; so all they had to do was wave their hands with their passes. You stated Inmate Ricardo Jones, who was in cell 18 flagged out, he had a pass. You said you asked him where he was going, he responded, "to the Infirmary." You admitted that you only glanced at the call-out pass and stated, "I didn't pay attention to whether he had it. I told him to give it to Miss Hatton." You indicated that Miss Hatton signed the pass and put him on the movement sheet. Your recollection of events clearly demonstrates your failure to follow written and verbal instructions. Based on your own admission, you failed to confirm the authenticity of inmate Jones' comments and confirm his authorization for medical treatment.

You stated, after receiving the radio transmission to "Lock the jail down" you and Officer Washington proceeded to do so. You stated that you checked the movement sheet for the inmates that were coming back from the infirmary. You stated you called the Infirmary and found that Inmate Crawford was still there. However, when you called and inquired about Inmate Ricardo Jones, you were told that he was not there. You then heard the radio transmission, and called the command center and were informed that Inmate Jones had escaped.

The OIA investigation substantiates that Inmate Jones was not on the Sick Call List scheduled for medical care on June 3, 2006. You confirmed that you did not receive a phone call from the infirmary or anywhere else for Inmate Jones to report to medical; that you did not recall Inmate Jones complaining to you or any of the officers in the unit of being sick, and you never made a call-out pass for Inmate Ricardo Jones. However, Inmate Jones was in possession of a movement pass which authorized him to proceed to the infirmary. In addition, Inmate Jones' name was placed on the housing unit movement/running count sheet, which would explain or substantiate his absence from the housing unit.

As stated previously, the OIA investigation revealed that there were 6 inmates scheduled and authorized movement to the infirmary for medical treatment on June 3, 2006. Inmate

Dionne Makins
Page 3

Jones was not included with this group. As the OIC of the unit it was your responsibility as well as the subordinate officers (Washington and Hatton) assigned to the unit to confirm Inmate Jones' need for medical treatment; the availability of medical staff to check inmate Jones; and seek authorization for his movement to the infirmary via a call out pass or escort pursuant to sick call and infirmary protocols.

The investigation further revealed that neither you nor the officers assigned to the unit (Washington and Hatton) have knowledge or indicated as to why or by what authorization inmate Jones was permitted to exit the unit, a controlled secure environment that only staff can authorize or effectuate using mechanical devices to allow inmates to enter and exit.

The OIA Investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment. The Investigation further concluded that each correctional officer assigned to SE-1 housing unit to include you was culpable, because it was the responsibility of each employee assigned individually and collectively to ensure the accurate accountability of each inmate assigned to the housing unit. Therefore, you failed to properly carry out your assigned duties. Your negligence is aggravated by the fact that you were the **Lead** Officer-In-Charge.

Your negligence in this matter violates the following Departmental policy:

Program Statement 5010.2c: Accountability for Inmates, which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations for All Employees:

Section 1.1, Operational Knowledge Required: Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty: Employees are required to devote their entire attention to their official duties; and,

Correctional Officer's General Orders:

Number 1, Take charge of this post and all government property on or near it.

Dionne Makins
Page 4

Number 8, Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command.

Your negligence in this matter contributed to the successful escape of Inmate Ricardo Jones and placed staff, inmates and the public at large in considerable capricious danger. Notwithstanding, are the detrimental public relations incurred by the agency, potentially lack of confidence and insecurity the public now experience. The position of **Lead Correctional Officer (Sergeant)** is one of trust, reliance and confidence. Each correctional employee has fiduciary responsibilities to the public in general and to the citizens of the District of Columbia. The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility. This task is effectuated when policies and procedures are followed, respected and maintained by staff.

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal. Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal actions. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer. Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

DC Office of Administrative Hearings
825 North Capitol Street, N.E., Suite 4150
Washington, D.C. 20002

Dionne Makins
Page 5

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Acting Warden

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Alphonso Bryant
1273 Oats Street N.E.
Washington, DC 20002

Dear Mr. Bryant:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Treatment Specialist DS-11, effective July 28, 2006. The Summary Removal Notice was issued to you on July 28, 2006. The summary removal action is based on a charge of Negligence for conduct that:

    a.  Threatened the integrity of government operations;
    b.  Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006. The OIA Investigation into the escape, determined that you failed to correctly screen inmate Joseph Leaks for work detail and resultantly, inmates Leaks and Jones escaped from the Central Detention Facility on June 3, 2006. The OIA Investigation substantiated the following:

The OIA further determine that a separation order was placed in inmates Leaks and Jones' institutional files and in the Jail and Community Correctional System (JACCS), at the request of the United States Attorney's Office (USAO) on August 26, 2005. This order required that inmates Leaks and Jones be kept apart at all times, including while being transported to and from court.

Alphonso Bryant
Page 2

On February 14, 2006, you approved inmate Leaks' Personnel Action Request
Form for placement on work detail. In the comments section of the form you
wrote: "Separations (See Attached)."

During your interview with OIA Investigators on June 27, 2006, you were asked;
"Specifically how do you determine if an inmate is eligible for work detail?" You
stated that you use the NIPS Post Order, which clearly outlines the eligibility of
inmates for possible detail placement. You stated that when you screened inmate
Leaks in February 2006, you utilized the information data base systems, JAACS
and PRISM. You acknowledged that you did not use inmate Leaks' institutional
file. You explained that when screening an inmate for detail, you initially look at
his custody level, then his offense to determine if he has any flags such as
separation order or outstanding warrants, detainers, medical flags and prior
criminal history.

You further explained that your responsibility was to screen inmates to determine
if they are suitable candidates for placement on work detail. You stated that you
either write **OK** or **No** on the inmate's NIP Personnel Action Form to indicate
eligibility.

You admitted that you indicated "OK" on inmate Leaks' NIPS Personnel Action.
You also admitted that you indicated on the form that inmate Leaks had a
Separation Order

The Non-Industrial Pay System (NIPS)Post Order dated April 19, 2002, Section
4, Eligibility Subpart b. Office unit/Inside only Detail Paragraphs (3) (5) and (6)
provides,

(3) Felons: Convicted felons are eligible. Sentenced Felons whose total sentence
does not exceed five years are eligible for Off Unit/Inside only work detail.

(5) Inmates with Separation Orders from other inmates housed at CDF are not
considered appropriate for placement. Inmates assigned to R&D must be free of
Separation Orders.

(6) Parole Violators who are within two(2) years of a scheduled release date and
who have obtained minimum custody status.

On August 18, 2005 inmate Leaks was committed to the CDF as a U. S. Parole
Violator. He was sentenced to serve 24 years (Aggregate) for his underlying 1998
Assault with a Deadly Weapons charge and was released on September 24, 2003
on parole with 4,383 days remaining to be served. As previously stated, you were
aware that inmate Leaks had a Separation Order.

Alphonso Bryant
Page 3

In addition, based on your statement, that during your screening of inmate Leaks, you reviewed PRISM, the OIA Investigation concluded that you failed to note Inmate Leaks' history of escape as listed in PRISM.

The OIA Investigation concluded that you were negligent in the performance of your duties, as you failed to thoroughly screen inmate Leaks for an Off Unit work detail in accordance with NIPS regulations.

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal. Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal actions. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer. Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

> DC Office of Administrative Hearings
> 825 North Capitol Street, N.E.
> Suite 4150
> Washington, D.C. 20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

Alphonso Bryant
Page 4

The material upon which the proposed action is based may be reviewed in the Office of
Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC
20001. You may arrange to review the material by contacting Denise Shell, Management
Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Acting Warden

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Lawanda Hinton-Saunders
11789 Majestic Place
Waldorf, Maryland 20601

Dear Ms. Hinton-Saunders

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Officer DS-08, effective July 26, 2006. The Summary Removal Notice was sent via express mail (ED528768295US) to your last address of record on July 26, 2006. The United States Postal Service delivered this letter on July 29, 2006. The item as signed for by J. Tread.   The summary removal action is based on a charge of Negligence for conduct that:

  a. Threatened the integrity of government operations;
  b. Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications:** On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections (DOC), Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006.   The OIA Investigation into the escape revealed that on Saturday, June 3, 2006 your assigned post was Administrative Module Officer #2, on the #2 Shift.  As the Administrative Two Officer, you were responsible for controlling and maintaining the gate (Administrative Two Door) that separates the inmate housing units from the administrative areas of the CDF.  In this capacity you were responsible for ensuring that all inmates passing through your area were authorized to do so by examination of identification, armband, inmate callout pass, etc.

Lawanda Hinton-Saunders
Page 2

On June 3, 2006, Inmate Joseph Leaks was escorted to his assigned work detail on the Second Floor of the Administrative Module. Inmate Leaks' primary responsibility on this work detail was to clean the common areas, which included the Officer's Dining Room, Environmental Office and employee's locker rooms on the second floor. At some point, Inmate Leaks, who was wearing a green environmental identification card, left his assigned detail post assignment in this module area and proceeded through the Administrative Two door into the inmate housing unit area where he ultimately met up with Inmate Ricardo Jones. According to Inmate Leaks, you unlocked the door and allowed both he and Inmate Jones, who was also wearing a green environmental detail badge, through the Administrative Two door onto the second floor of the administrative module. Investigation disclosed that the badge worn by Inmate Jones belonged to and bears the photo of Inmate Carlton Beachum. The inmates removed a floor buffer from the Administrative Two supply room, walked down one flight of stairs to the first floor Administrative Module and used the buffer to knock out a window in the Warden's Office to effect their escape.

The OIA Investigators interviewed you regarding this matter on Saturday, June 3, 2006 and on Monday, July 3, 2006.

During the June 3, 2006 interview, you maintained that you did not allow any inmates entrance through the door leading to the administrative module. You stated that you left your post on several occasions during the shift in order to escort inmates to the Visitor's Hall and to review your annual performance evaluation. You further stated that at approximately 9:45 p.m., you observed Officer Herbert Douglas walk two black male inmates through the door into the administrative module.

In a subsequent interview with OIA on July 3, 2006, you admitted that on June 3, 2006, between 9:40 a.m., and 9:50 a.m., you unlocked the Administrative Two door in order to allow Inmate Mohammad Rashid entry. You stated that Officer Douglas was standing near the door with Inmate Rashid at this time. During a later telephone conversation with OIA on July 3, 2006, you stated that you did not see Officer Herbert Douglas open the Administrative Two door for two black male inmates on June 3, 2006 as you had previously stated in your June 3, 2006 interview.

The OIA Investigation concluded that you failed to carry out your responsibilities to ensure that the inmates you allowed through your area of responsibility were authorized to do so. You failed to verify the Detail Identification Pass that Inmate Jones had in his possession. If you had authenticated Inmate Jones' pass you would have discovered that he was carrying the Detail Identification Pass belonging to Inmate Carlton Beachum, alerting you to a possible security breach.

Your negligence in this matter contributed to the successful escape of Inmates Jones and Leaks and placed staff, inmates and the public at large in considerable capricious danger.

Lawanda Hinton-Saunders
Page 3

Notwithstanding, are the detrimental public relations incurred by the agency, potentially lack of confidence and insecurity the public now experience. The position of Correctional Officer is one of trust, reliance and confidence. Each correctional employee has fiduciary responsibilities to the public in general and to the citizens of the District of Columbia. The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility. This task is effectuated when policies and procedures are followed, respected and maintained by staff.

Your Negligence in this matter violated the following Departmental policy:

Program Statement 5010.2c: Accountability for Inmates, which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations of All Employees:

1.1, Operational Knowledge Required: Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

1.4, Attention to Duty, "employees are required to devote their entire attention to their official duties; and,

Correctional Officer's General Orders #1, "Take charge of this post and all government property on or near it". General Order #8, "Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command".

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal. Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

Lawanda Hinton-Saunders
Page 4

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal action. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer. Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

> DC Office of Administrative Hearings
> 825 North Capitol Street, N.E.
> Suite 4150
> Washington, D.C. 20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Acting Warden

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Darryl Love
3221 Brothers Pl. SE
Washington, DC  20032

Dear Mr. Love:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Treatment Specialist DS-11, effective July 26, 2006. The Summary Removal Notice was sent via express mail (ED528768216US) to your last address of record on July 26, 2006. The United States Postal Service delivered this letter on July 27, 2006. The signature affixed to the receipt for this letter was L. Love.   The summary removal action is based on a charge of Negligence for conduct that:

    a.  Threatened the integrity of government operations;
    b.  Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications**:  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006. The OIA investigation substantiated that you failed to correctly reclassify inmate Leaks and resultantly inmates Leaks and Jones on June 3, 2006 escaped from the Central Detention Facility.

The OIA Investigation determined that you conducted a custody reclassification on Inmate Leaks on March 11, 2006. Your scoring produced a total custody score of seven (7), indicating a custody level of medium.  During the OIA Investigation, Leona Bennett, Correctional Program Officer reviewed your March 11, 2006 reclassification of inmate Leaks. Ms. Bennett concluded that the reclassification

Darryl Love
Page 2

was erroneously scored and similar to the December 1, 2005 reclassification instrument prepared by Correctional Treatment Specialist, Malcolm Pointer.

You conducted a subsequent reclassification of inmate Leaks on May 15, 2006. Your scoring of this reclassification produced a total custody score of five (5), indicating a custody level of medium. However, according to Ms. Bennett and the Technical Reference Manual, your May 15, 2006 reclassification of inmate Leaks was also incorrect. Inmate Leaks should have been classified as a Maximum custody inmate.

The OIA Investigation also determined that you failed to note that inmate Leaks had a history of escape. Additionally, you failed to score inmate Leaks' U.S. Parole Violation underlying charge according to the DOC Custody Classification Instrument- Technical Reference Manual.

Inmate Leaks' most serious charge in which he was committed on August 18, 2005, was the US Parole Violation in reference to an underlying 1998 Assault with a Deadly Weapon (ADW) charge.

You stated during your subsequent re-classification of inmate Leaks on May 15, 2006, that you intended to give inmate Leaks **5 points** in **Part B** on the re-classification instrument (severity of prior criminal conviction). However, you inadvertently struck the **3 key** on your computer keyboard in error. Nonetheless in your subsequent re-classification of inmate Leaks, you again failed to note inmate Leaks' history of escape.

The OIA Investigation concluded that you were negligent because it was your responsibility to ensure that accurate data was entered into JAACS reflecting the correct custody score.

Your negligence in performing your official duties caused inmate Leaks to be misclassified as medium custody. As a result of your misclassification, a maximum custody inmate, with a history of escape was permitted to work on an Off Unit Detail

Your negligence in the matter placed the staff, inmates and the public at large in considerable capricious danger. Notwithstanding are the detrimental public relations incurred by the agency, potential lack of confidence and a breach of public trust.

The position of Correctional Treatment Specialist is on of trust, reliance and confidence. Each correctional employee has fiduciary responsibility to the public in general and specifically to the citizens of the District of Columbia. The

Darryl Love
Page 3

citizens of the District of Columbia trust correctional employees to provide a safe, secure and orderly facility. This task is effectuated when policies and procedures are implemented, adhered to, and respected by staff.

Investigation concluded that you violated the following Departmental Policies:

**Program Statement 4090.4-** Custody Classification System which states that case managers shall use the Custody Classification Technical Reference Manual of Instruction when completing the reclassification instrument.
**Technical Reference Manual 4090.4** which states that if the inmate escaped or attempted escape from a medium or high security facility within the past 10 years then a 7 shall be entered.

In accordance with Basic Regulations for all employees 1.1 – Operational Knowledge, you are required to have a complete understanding of your position description, all regulations, rules, policies and procedures that pertain to the Department, Division, Service and unit to comply there with.

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal. Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal action. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer.

Darryl Love
Page 4

Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

> DC Office of Administrative Hearings
> 825 North Capitol Street, N.E.
> Suite 4150
> Washington, D.C. 20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Acting Warden

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Malcolm Pointer
904 French Street, NW
Washington, DC 20001

Dear Mr. Pointer

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Treatment Specialist DS-11, effective July 26, 2006. The Summary Removal Notice sent was via express mail (ED528768180US) to your last address of record on July 26, 2006. The United States Postal Service delivered this letter on July 28, 2006. The signature affixed to the receipt for this letter was M. Pointer. The summary removal action is based on a charge of Negligence for conduct that:

a. Threatened the integrity of government operations;
b. Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006. The (OIA) Investigation into the escape, determined that you failed to correctly reclassify inmate Leaks and resultantly inmates Leaks and Jones on June 3, 2006, escaped from the Central Detention Facility.

The OIA Investigation further determined that on December 1, 2005 you re-classified Inmate Leaks without a complete review of his institutional record. In addition, you failed to review the initial classification custody instrument

Malcolm Pointer
Page 2

completed by Correctional Treatment Specialist (CTS) Vera Lightener, which was located in inmate Leaks' institutional record. Your decision not to review inmate Leaks' institutional record prior to re-classifying inmate Leaks was a monumental mistake in judgment. A review of inmate Leaks complete institutional record would have revealed inmate Leaks noted record of escape, in addition to a United States Parole Violation (USPV) charge in reference to his underlying 1998 Assault with a Deadly Weapon conviction. Inmate Leaks' prior history of escape from the CDF, a secure facility should have heightened his security threat and possible placement on special handling status.

The Technical Reference Manual Instructions for completing the DOC Custody Re-classification instrument states that all offenses the inmate is being committed on should be considered to determine the most serious current charge.

Inmate Leaks entered the CDF on August 18, 2005, charged with Accessory After the Fact, (First Degree Murder while Armed). Inmate Leaks' USPV underlying charge should have been scored as the most serious offense.

Inmate Leaks was sentenced to serve 24 years (Aggregate) for his underlying USPV charge (1998 ADW). He was released on September 24, 2003, after serving a five (5) year prison sentence and was placed on parole with 4,383 days remaining to be served. Inmate Leaks' violation of his parole coupled with his history of escape undoubtedly made him an extreme security risk.

The OIA Investigation also determined that you erroneously scored the reclassification you conducted on inmate Leaks; wherein you failed to review the institutional record and the initial classification instrument that was prepared by Correctional Treatment Specialist, Vera Lightener who had correctly scored inmate Leaks at a maximum custody level.

In reclassifying inmate Leaks you failed to note that inmate Leaks had a history of escape. Additionally, you failed to score inmate Leaks' USPV underlying charge according to the DOC Custody Classification Instrument- Technical Reference Manual.

Inmate Leaks' most serious charge in which he was committed on August 18, 2005, was the US Parole Violation in reference to an underlying 1998 Assault with a Deadly Weapon (ADW) charge.

Leonna Bennett, Correctional Program Officer, collaborates that your initial reclassification of inmate Leaks was performed without his institutional file. She noted that you failed to score inmate Leaks' escape history. According to Ms.

Malcolm Pointer
Page 3

Bennett's assessment, the point total you assigned were incorrect and inmate Leaks' custody level should have remained at Maximum.

OIA Investigators interviewed you regarding this matter on June 20, 2006. During the interview you stated that you were unsure if you had reviewed inmate Leaks' institutional file prior to reclassifying him. You further confirmed that you did not consider the Accessory after the Fact (First Degree Murder While Armed) charge. You stated that it was your belief that the charge had been released in JACCS because it had a bond that was satisfied. You also acknowledged that you did not consider inmate Leaks' parole violation or its underlying charges.

Investigation determined that you were culpable because it was your responsibility to ensure that accurate data was entered into JAACS reflecting the correct custody score."

Your negligence in performing your official duties not only caused inmate Joseph Leaks 250-433 to be misclassified, it contributed to the escape because if the custody score had been correct, inmate Leaks would have never been permitted to work on an Off Unit Detail with a Maximum custody score.

Your negligence placed the staff, inmates and the public at large in considerable capricious danger. Not withstanding are the detrimental public relations incurred by the agency, potential lack of confidence and a breach of public trust.

The position of Correctional Treatment Specialist is one of trust, reliance and competence. Each correctional employee has fiduciary responsibility to the public in general and specifically to the citizens of the District of Columbia. The citizens of the District of Columbia trust correctional employees to provide a safe, secure and orderly facility. This task is effectuated when policies and procedures are implemented, adhered to, and respected by staff.

The OIA investigation concluded that you violated the following Departmental Policies:

**Program Statement 4090.4-** Custody Classification System which states that case managers shall use the Custody Classification Technical Reference Manual of Instruction when completing the reclassification instrument.
**Technical Reference Manual 4090.4** Chapter 2, section 1 (f) states....Based upon the data in the inmate's record, the Case Manager shall complete all scoring items on the first page of the reclassification form.

Malcolm Pointer
Page 5

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Acting Warden

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Detention Facility

Office of the Warden



August 24, 2006

Shantell Hatton
10394 Hallmark Lane
Waldorf, Maryland  20603

Dear Ms. Hatton:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1616, this is the written notice in follow-up to the summary action that removed you from your position of Correctional Officer DS-08, effective July 26, 2006.  The Summary Removal Notice was sent via express mail (ED528768281US) to your last address of record at 10394 Hallmark Lane, Waldorf, Maryland  20603, on July 26, 2006.  The United States Postal Service delivered this letter on July 27, 2006.  The signature affixed to the receipt for this letter was S. Hatton.   The summary removal action is based on a charge of Negligence for conduct that:

    a.   Threatened the integrity of government operations;
    b.   Constitutes an immediate hazard to the agency, to other District employees, or to the employee

**Specifications:**  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF complex on Saturday, June 3, 2006.  The OIA investigation substantiates that on June 3, 2006 you were assigned to the Southeast One (SE-1) housing unit.  Your primary functions were to maintain custody, security and accountability of all inmates in your assigned housing unit.  At approximately 9:42 a.m., Inmate Ricardo Jones walked out of the SE-1 housing under the pretense of going to the infirmary.

Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing him to go to the infirmary.  Inmate Jones' name was placed on the housing unit movement/running count sheet, accounting for and authorizing his movement to the

Shantell Hatton
Page 2

Infirmary. However, according to Infirmary records, only six (6) inmates from SE-1 were scheduled for medical care in the Infirmary on June 3, 2006, Inmate Jones was not one of them.

The OIA Investigators conducted taped interviews with you regarding this matter on Saturday, June 3, 2006 and on Sunday June 4, 2006. During the interviews, you stated that Sergeant Dionne Makins and Corporal Washington worked in the unit with you on June 3, 2006. When asked who made call-out passes? You stated that you made passes, but could not recall how many passes you made or who you made them for. You also stated that you observed Sergeant Makins prepare call-out passes; but you were not sure if Corporal Washington prepared any. You stated that you received a call from Miss Toni in the Infirmary and she gave you the names of three inmates; however, you were not sure who the three names were, but that you had written the names on the running count sheet. You stated that you could not recall if you received any other calls from the infirmary.

You acknowledged that you opened cell 18 where Inmate Ricardo Jones was housed. You stated that you observed Inmate Jones walk out of his cell to the bubble, where you gave him his pass. You stated that you were not sure if you had made his pass. You said you gave him his pass and he walked out the door.

During your interview on Sunday, June 4, 2006, you explained to OIA Investigator Collins that you put the names on the running count sheet from the completed written passes on the table as opposed to writing down the names as the inmates were leaving the unit. You further stated that when you put the names on the sheet you had not seen or called for the inmates. During this interview you also remembered that the call you received from the infirmary on June 3, 2006 was for Inmates Donaldson, Tyrone; McKnight and Moore. In regards to inmate Jones you still could not recall if you filled out his call out pass or if you took the call. You stated that both you and Sergeant Makins took calls.

As stated previously, the OIA investigation revealed that there were 6 inmates scheduled and authorized movement to the infirmary for medical treatment on June 3, 2006. Inmate Jones was not included with this group. You confirmed that Inmate Jones was not included in the list of inmates Miss Toni provided to you to report to the infirmary, and inmate Jones was not experiencing a medical emergency. Despite these significant factors, you issued Inmate Jones a call-out pass to the infirmary and put his name on the movement/running count sheet. As an Officer assigned to the unit, it was your responsibility to immediately report this discrepancy to Sergeant Makins. It was also your responsibility as well as the responsibility of Sergeant Makins and Officer Washington to confirm Inmate Jones' need for medical treatment; the availability of medical staff to check Inmate Jones and seek authorization for his movement to the infirmary via a call out pass or escort pursuant to sick call and infirmary protocols.

Shantell Hatton
Page 3

The OIA Investigation further revealed that neither you nor the other officers assigned to the unit (Makins and Washington) have knowledge or did not indicate as to why, or by what authorization inmate Jones was permitted to exit the unit, a controlled and secure environment that only staff can authorize or effectuate using mechanical devices to allow inmate to enter and exit. This performance clearly violates department regulations, specifically, General Order #8 Accountability of inmates; Basic Rules and Regulations for all Employees, Section; 1.4 Attention to Duty, and Section: 1.1 Operational Knowledge.

The OIA Investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment. The OIA Investigation further concluded that each correctional officer assigned to SE-1 housing unit, to include you was culpable, because it was the responsibility of each employee assigned individually, and collectively to ensure the accurate accountability of each inmate assigned to the housing unit. Therefore, you failed to properly carry out your assigned duties.

Your negligence in this matter violates the following Departmental policy:

Program Statement 5010.2c: Accountability for Inmates, which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations of All Employees:

Section 1.1, Operational Knowledge Required: Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty: Employees are required to devote their entire attention to their official duties; and,

Correctional Officer's General Orders:

Number 1, Take charge of this post and all government property on or near it.

Number 8, Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command.

Shantell Hatton
Page 4

Your negligence in this matter contributed to the successful escape of Inmate Ricardo Jones and placed staff, inmates and the public at large in considerable capricious danger. Notwithstanding, are the detrimental public relations incurred by the agency, potentially lack of confidence and insecurity the public now experience. The position of Correctional Officer is one of trust, reliance and confidence. Each correctional employee has fiduciary responsibilities to the public in general and to the citizens of the District of Columbia. The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility. This task is effectuated when policies and procedures are followed, respected and maintained by staff.

The charge of negligence involves conduct which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal. Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal action. Therefore, you should contact the DC Office of Administrative Hearings at (202) 442-5962 for assignment of a Hearing Officer. Thereafter, any response you prepare must be submitted to your assigned Hearing Officer at:

> DC Office of Administrative Hearings
> 825 North Capitol Street, N.E., Suite 4150
> Washington, D.C. 20002

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review,

Shantell Hatton
Page 5

your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Acting Warden

Oct-12-06    02:12pm    From-DC DEPT OF CORRECTIONS    202 671 2514    T-743    P 002    F-969

## DESIGNATION OF AUTHORITY AND
## MEMORANDUM OF UNDERSTANDING BETWEEN THE
## OFFICE OF ADMINISTRATIVE HEARINGS
## AND THE DEPARTMENT OF CORRECTIONS
## FOR THE DISTRICT OF COLUMBIA

The District of Columbia Office of Administrative Hearings ("OAH") and the District of Columbia Department of Corrections ("DOC") (collectively, "the Parties"), by their duly authorized representatives, hereby agree as follows:

## RECITALS

**WHEREAS,** pursuant to the Comprehensive Merit Personnel Act, § 1-601.1, *et seq.* of the D.C. Official Code and Chapter 16 of the D.C. Municipal Regulations, the Department of Corrections is charged with responsibility for, *inter alia,* conducting Administrative Hearings pertaining to Disciplinary (Corrective/Adverse) Actions; and

**WHEREAS,** it is necessary and desirable that the administrative proceedings are held by a body that is independent of the Department of Corrections and that OAH possesses the expertise and resources for conducting these hearings; and

**WHEREAS,** pursuant to D.C. Official Code § 2-1831.3(c), the Chief Administrative Law Judge of OAH has the authority to accept for adjudication cases referred to OAH by the DOC.

**NOW THEREFORE,** the Parties agree to the following obligations, terms, and conditions:

## A. DESIGNATION

The Director of DOC hereby designates the Chief Administrative Law Judge of the Office of Administrative Hearings, or administrative judges that he designates, to serve as the hearing officer to perform, as required by law, administrative reviews of the disciplinary actions initiated by the DOC against eleven employees for alleged dereliction of duty relating to the inmate escapes from the D.C. Jail on June 3, 2006 ("the Disciplinary Actions"). This designation is made pursuant

to section 1612.2 of the District of Columbia Personnel Regulations and all other applicable law. This designation includes the authority to make the required determination under DPM § 1612.5 as to whether an "adversary hearing, including the confrontation of witnesses," will be necessary in each case.

## B. OAH DUTIES AND OBLIGATIONS TO DOC

1. **Adjudication Services:** During the effective dates of this MOU, OAH agrees to accept and provide adjudication services for the Disciplinary Actions in accordance with the Fraternal Order of Police ("FOP") Collective Bargaining Agreement, the Comprehensive Merit Personnel Act, §1.601.1, *et seq.* of the D.C. Official Code, Chapter 16 of the D.C. Municipal Regulations, applicable case law, and any other applicable law, as those laws may be amended from time to time. OAH agrees to provide DOC with administrative hearings, case management, associated services, and written reports and recommendation for the Disciplinary Actions, as appropriate.

2. **Case Reporting:** OAH agrees to provide regular case tracking reports to any officials designated by DOC, as reasonably agreed upon by the Parties.

3. **Documentation of Services:** OAH shall bill actual expenditures, using the rates specified in Section C.2 below, against an intra-District advance from DOC in the amount of $9,616.20, which advance shall be paid to OAH upon execution of this agreement. Any portion of the advance not used for payment of goods and services provided to DOC will be returned to DOC. DOC will pay to OAH any actual costs exceeding the advance upon receipt of billing by OAH.

## C. DOC DUTIES AND OBLIGATIONS TO OAH

1. **DOC Compliance with OAH Procedures:** DOC agrees to adhere to OAH adjudication procedures, orders, and practices, and to utilize OAH procedural forms where appropriate. DOC further agrees to provide attorney and managerial oversight and, if required, attorney counseling and representation for the prosecution of the Disciplinary action against the eleven former DOC employees. DOC agrees to be responsible for proper service of case filings, consistent with applicable law.

2. **Payment:** The cost estimate of $9,616.20, which DOC will advance to OAH pursuant to Section B.3 above, is based the rates specified below, assuming an administrative law judge will hear each of the eleven cases, with hearings lasting no longer than one business day or 8 hours each. (Staff attorneys are allocated 4 hours per hearing for research.) In addition, OAH will offer the use of its hearing rooms. As provided in Section B.3 above, OAH will bill actual costs to DOC against the intra-District advance. Any portion of the advance not used for payment of goods and services provided to DOC will be returned to DOC. DOC will pay to OAH any actual costs exceeding the advance upon receipt of billing by OAH.

Actual costs will be billed at the following rates:

- $54.13 hourly rate per judge ($112,593.00 [base + fringe])
- $18.14 hourly rate per legal assistant ($37,726.20 [base + fringe])
- $28.85 hourly rate per staff attorney ($60,001.00 [base + fringe])
- $10 per recorded hearing provided on digital CD

## D. DURATION OF MOU AND EARLY TERMINATION FOR CAUSE

1. **Duration:** This Designation and MOU is effective October 1st 2006 and will remain in effect through the latest date that the Director of DOC issues a final decision in any of the Disciplinary Actions. This agreement may be extended by written agreement of the Parties.

2. **Early Termination:** This Designation and MOU may be terminated by either Party upon thirty days (30) prior written notice if either party materially breaches this MOU and the breaching Party fails to cure after written notice and reasonable opportunity to do so. Unless otherwise noted, effective notice under this agreement must be in writing and must be delivered either by mail, hand-delivery, or by overnight courier to the addresses of the signatory Parties or to any other address later designated in writing by the signatory Parties. The current addresses of the Parties are identified under their signatures in this MOU.

3. If this Designation and MOU is terminated or expires without renewal, on the termination or expiration date OAH shall promptly transfer all pending cases and case files to the Director of the DOC, or his designee.

## E. MISCELLANEOUS

1. **Entire Agreement:**  The Parties agree that this Designation and MOU represent the entire agreement of the Parties and no other prior oral or written agreements or representations shall have any force or effect.

2. **No Third-Party Beneficiaries.**  The Parties agree that the sole intended beneficiary of this Designation and MOU is the District of Columbia Government, including its agencies and other organizational sub-units.  No entity or individual is intended as a third-party beneficiary, and this MOU creates no rights for such entities or individuals.

3. **Counterparts.**  This agreement may be executed in counterparts.

IN WITNESS THEREOF, the Parties represent that they have the authority to bind their respective agencies to this MOU and hereby execute this MOU on the dates indicated.

OFFICE OF ADMINISTRATIVE HEARINGS

BY: _____          DATE: 9/28/06
    TYRONE T. BUTLER
    CHIEF ADMINISTRATIVE LAW JUDGE
    Office of Administrative Hearings
    825 N. Capitol Street, NW, Suite 4150
    Washington, DC 20001

D.C. DEPARTMENT OF CORRECTIONS

BY: _____          DATE: 10 - 3 - 06
    DEVON BROWN
    DIRECTOR
    D.C. Department of Corrections
    1923 Vermont Ave., N.W.
    Washington D.C. 20001

DISTRICT OF COLUMBIA
OFFICE OF
ADMINISTRATIVE HEARINGS

2006 DEC 11  P 4: 06

## DISTRICT OF COLUMBIA
### OFFICE OF ADMINISTRATIVE HEARINGS
825 North Capitol Street, NE, Suite 4150
Washington, DC 20002

In the Matter of the Summary Removal of:

CYNTHIA WASHINGTON,

An Employee of the Department of Corrections

Case No.: DOC-06-800000

## REPORT AND RECOMMENDATION

Pursuant to Section 1612.10 of the District of Columbia Municipal Regulations ("DCMR"), the undersigned Administrative Law Judge has completed an administrative review of the summary removal of Cynthia Washington from her position as Correctional Officer in the District of Columbia Department of Corrections ("DOC") and now submits this Report and Recommendation. For the reasons set forth below, I recommend that the summary removal of Ms. Washington not be sustained as it is inconsistent with the Due Process Clause and the applicable provisions of District of Columbia law.

### I.    INTRODUCTION

On June 3, 2006, two inmates escaped from the District of Columbia Central Detention Facility ("CDF"). On June 5, 2006, DOC Director Devon Brown placed several employees on paid administrative leave, based upon the alleged negligence of these employees in connection with the escape. Seven weeks later, on July 26, 2006, DOC summarily removed Cynthia Washington, Correctional Officer, as well as others, from their positions.

On August 24, 2006, Stanley M. Waldren, Acting Warden, District of Columbia Department of Corrections ("DOC" or "Government"), issued a written notice (hereinafter "Removal Letter") proposing that the summary removal action against Ms. Washington be sustained. Attached to that Removal Letter were the DOC Office of Internal Affairs ("OIA") Investigative Report; a Transcript of an Interview with Ms. Washington dated June 3, 2006; a Warning and Assurance for Administrative Questioning dated June 3, 2006; a Form Position Description for Correctional Officer with a list of duties; a Program Statement on Accountability for Inmates issued July 1, 2004; a blank Inmate Movement Pass; Post Orders for the Southeast On[e] {sic} Housing Unit dated February 14, 2005; and two regulations and a document captioned "The Correctional Officers' General Orders" June 1984. The Removal Letter gave notice that the Office of Administrative Hearings ("OAH") would conduct the administrative review of the proposed removal actions. It further advised Ms. Washington that she could file a response to the proposed action and that she could "raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty."

On August 30, 2006, Sol Zalel Rosen, Esquire filed an appeal and request for hearing on behalf of Ms. Washington. On August 31, 2006, J. Michael Hannon, Esquire, of the Hannon Law Group, LLP, filed an entry of appearance as co-counsel on behalf of Ms. Washington and also requested a hearing on the matter.

Pursuant to the Comprehensive Merit Personnel Act, D.C. Official Code § 1-616.51(4), and 6 DCMR 1616.5 and 1612, Ms. Washington is entitled to an administrative review of the proposed affirmance of the summary removal. On August 31, 2006, the DOC Director

designated the Chief Administrative Law Judge of the Office of Administrative Hearings, or Administrative Law Judges that he designates, to serve as the hearing officers to perform such administrative reviews of the summary removals of the involved employees, including Ms. Washington.[1] The Chief Administrative Law Judge designated the undersigned Administrative Law Judge to serve as a hearing officer in the matter of Ms. Washington.

On September 8, 2006, certain of the assigned Administrative Law Judges conducted a joint status conference with the attorneys representing all eleven DOC employees and Maria Amato, Esq., DOC General Counsel. This administrative court issued a joint Order on September 11, 2006. The joint Order denied the employees' request for a discovery schedule and asked for an explanation of the need for adversary hearings. The Order also provided for the submission of documents missing from the Investigative Report. The Order set a deadline of September 25, 2006, for the submission of responses to the Removal Letter.

On September 11, 2006, DOC filed and served on all parties the documents missing from the Investigative Report. The documents provided were Exhibits B, C, and D, and the Key of witness names.

On September 25, 2006, Mr. Rosen filed a Response on behalf of Ms. Washington, as well as a Declaration signed by Officer Hatton which he requested be considered on behalf of Ms. Washington. On September 27, 2006, Mr. Hannon, counsel for 10 of the employees, including Ms. Washington, filed a Motion for Summary Dismissal, raising several issues that are discussed in detail below under "Preliminary Matters." Also on September 27, 2006, Mr. Hannon filed a Response to the Removal Letter on behalf of Ms. Washington. In essence, she

---

[1]    DOC extended the designation as of October 3, 2006, into Fiscal Year 2007.

stated in her Responses that her conduct at issue was not negligent as charged; that she had received general orientation but never received formal training or annual reviews; that she was a relief officer working two days a week in Southeast One housing unit; that on the morning of the escape she had worked the night shift and was drafted to work a second, consecutive shift as the CDF was short by over 50 officers that day; that the unit was also short-staffed that day; that she followed directions from Sergeant Makins, the Officer-In-Charge; that she followed all procedures for movement of inmates out of the housing unit to the best of her ability and that the summary dismissal action violated her constitutional rights.

Mr. Hannon, as counsel for Ms. Washington, also filed a request for extension of the deadline for responses to allow for the filing of his response on behalf of Ms. Washington. By Order dated October 4, 2006, the assigned Administrative Law Judges granted that request *nunc pro tunc* to the date of filing of the responses. That Order also established a deadline of October 13, 2006, for the DOC's reply to the responses, and scheduled a hearing on the Motion for Summary Dismissal for October 19, 2006.

On October 13, 2006, DOC filed its Opposition to the Motion for Summary Dismissal. DOC maintained that a hearing officer for DOC has no power to grant the relief of dismissal, but may only conduct the administrative review and make a written report and recommendation to the deciding official.

The assigned Administrative Law Judges conducted a hearing on the Motion for Summary Dismissal and a second joint status conference as scheduled on October 19, 2006. On October 26, 2006, this administrative court issued its Order Denying the Motion for Summary Dismissal. The denial Order stated that the DOC Employees' arguments would be considered as

part of the individual reports and recommendations. The denial Order also established a deadline for the final agency decision in this case of December 15, 2006.

## II.    DISCUSSION

### A. Preliminary Matters

Ms. Washington has raised three issues in the Motion for Summary Dismissal I will discuss here. Ms. Washington contends first that the summary removal action is a "post-termination" action, and that in this context, she has been denied her rights to a "pre-termination" notice and hearing pursuant to *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546 (1985).

The parties agree Ms. Washington has been removed from her position, is not working, and has not been paid since August 24, 2006. The Removal Letter speaks in terms of the reasons for the "proposed removal" of Ms. Washington. At the October joint status conference, DOC argued that the removal of Ms. Washington does not actually occur until the Director of DOC has rendered a final decision in this matter. Ms. Washington disputes that characterization of her position and argues that she has been terminated already because her property interest in employment has been taken from her. The consequence of that deprivation, according to Ms. Washington, is that she was denied the due process requirements to which a tenured public employee is entitled including "oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." *Loudermill,* 470 U.S at 546. Motion for Summary Dismissal at p. 10. Ms. Washington contends that she has already been denied her constitutional rights under *Loudermill* because she has been terminated without notice and without an opportunity to be heard. I disagree.

While, as a practical matter, Ms. Washington is not working and not being paid, there remains an administrative process to complete before Ms. Washington can be described as "terminated." The District of Columbia Personnel Regulations expressly provide for such a process, even when a summary removal action has been taken. 6 DCMR 1616. That administrative process includes the right to a Final Decision Notice, in writing, dated and signed by the deciding official, and addressing certain issues. 6 DCMR 1616.4(h) and 1614. Prior to the issuance of a Final Decision Notice, the administrative process must include an administrative review. 6 DCMR 1616.5, 1612. The "pre-termination" administrative process that is required is defined by *Loudermill, supra.*

Second, Ms. Washington argues that D.C. Official Code § 1-616.51 is unconstitutional on its face, because summary removal is a drastic personnel action that is permitted only when "an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee [herself]; or, is detrimental to public health, safety, or welfare." Motion for Summary Dismissal at p. 12. Ms. Washington states that there are no facts presented to DOC justifying use of this extraordinary remedy.

In fact, Ms. Washington has not made any showing that the statute is *facially* unconstitutional, as she concedes that there are circumstances where a DOC employee may be properly subject to summary removal. Ms. Washington asserts only that the statute cannot be applied to the facts in this case. To the extent Ms. Washington contends that her circumstances do not justify use of summary removal, this appears to be an argument that the facts do not meet the criteria for summary removal. This issue can be decided by applying the statute and

regulations to the facts. Therefore, I will consider her argument in addressing the merits of the case.

Third, Ms. Washington argues that the "*Douglas* factors" are applicable to her termination and must be used to evaluate the appropriateness of the penalty imposed. The *Douglas* factors were articulated by the U.S. Merit Systems Protection Board and comprise factors (that may be mitigating or aggravating) that must be considered in determining an appropriate penalty for a federal employee's misconduct. *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). Ms. Washington relies on *Dep't of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005) to support her assertion that the *Douglas* factors must be considered when determining a penalty for a District of Columbia employee. *Colbert* appears to be one of only a small number of published cases in this jurisdiction addressing the question of the application of the *Douglas* factors to District of Columbia employees. The District of Columbia Court of Appeals in *Colbert* did not directly hold that the *Douglas* factors must be applied to evaluate the appropriate penalties for misconduct by District employees.[2] An earlier decision by the Office of Employee Appeals stated that the agency uses the principles in *Douglas* as "guidance."

---

[2]     The *Colbert* case has an involved procedural history. The Court had remanded the case to the Board of the Office of Employee Appeals to consider whether 6 DCMR 1608.2 (limiting consideration of certain parts of an employee's disciplinary record in assessing a penalty based on their age) affected the application of the *Douglas* factors. 874 A.2d at 357 n.8. By contrast, *Douglas* provides generally for consideration of the employee's past disciplinary and work records. The Board apparently filed a Response on Remand. *Id.* The Court then mentioned that certain documents whose consideration was in question "were relevant in applying the *Douglas* factors," 874 A.2d at 359, and not inconsistent with 6 DCMR 1608.2. The Superior Court order is quoted, which mentions the initial failure to perform a *Douglas* analysis. 874 A.2d at 360. The Court ultimately remanded the case to the administrative law judge to consider "DPW's Agency Report on Remand applying the *Douglas* factors, including the additional evidence supplied by DPW and Colbert." 874 A.2d at 361.

*Employee v. Agency,* 29 D.C. Reg. 4565, 4570 (1982);[3] *see also Stokes v. District of Columbia,*
502 A.2d 1006, 1010 (D.C. 1985) (emphasizing that the role of the Office of Employee Appeals
is not to balance the relevant factors but to evaluate whether the agency considered relevant
factors and struck a balance within the realm of reasonableness, as set forth in *Douglas*). The
personnel regulations do currently state "consideration shall be given to any mitigating or
aggravating circumstances that have been determined to exist, to such extent and with such
weight as is deemed appropriate." 6 DCMR 1603.9.

The Removal Letter does not address either mitigating or aggravating factors, and does
not indicate that such factors were weighed or considered in deciding upon the penalty for Ms.
Washington. Moreover, the Removal Letter does not refer to Ms. Washington's personnel file,
and there is no indication that her employment history was viewed as a mitigating or aggravating
factor. Attorneys for DOC stated at the October joint status conference that the *Douglas* factors
will be applied at the agency level, but that DOC is not required to expressly articulate its
analysis of these factors in the notice of proposed summary removal action, nor is the hearing
officer charged with applying these factors to the proposed action.

I do not find it necessary to reach the question whether DOC must explicitly address such
factors in a proposed removal action, such as the Removal Letter at issue here, because I find
that DOC has not supported its summary removal action under *Loudermill*. At this stage, I find
that the first determination is the *Loudermill* question: if all the reasonably believable evidence
supporting the facts as alleged by the proposing official were taken as true, could a reasonable

---

[3]    In this context, it is not entirely clear whether the Office of Employee Appeals'
decision is referring to the *Douglas* discussion of the proper scope of review (cited in a
number of subsequent cases) or to the twelve specific factors.

person find by a preponderance of the evidence that Ms. Washington may be summarily removed? In other words, under 6 DCMR 1616.1, has DOC shown negligence by Ms. Washington that threatened the integrity of government operations or constituted an immediate hazard to DOC or government employees or detrimental to public health, safety or welfare? Because I answer that question in the negative, I do not consider the *Douglas* question.[4]

### B. The Need For An Adversary Hearing

On August 30 and 31, 2006, Ms. Washington filed requests for an "oral hearing and an opportunity to present a written submission."[5] At the September joint status conference, Ms. Washington argued that extensive discovery and evidentiary hearings were necessary in order to establish the causes of the escapes in general and the roles, if any, of the individual employees in the escapes. As noted above, the request for discovery was denied. At the October joint status conference, Ms. Washington stated that if the Motion for Summary Dismissal were denied, she

---

[4]    It is necessary, however, for me to apply the three factors for summary removal set forth in 6 DCMR 1616.1. I note that the *Douglas* factors are considered guidelines, and a District or federal agency is not required to give equal weight or even any weight to any particular factor. *See Stokes, supra* at 1010-11. Therefore, an agency could reach the same result in this case, after applying either the *Douglas* factors or the summary removal provisions of Section 1616.1. Using the *Douglas* factors, an agency could place greater emphasis on the conduct itself and give less weight to the employee's record. Of course, an agency would use the *Douglas* factors to consider penalties other than removal, whereas here I am only reviewing the summary removal action.

[5]    In addition to "an opportunity to present [her] side of the story," *Loudermill* grants Ms. Washington the right to "oral or written notice of the charges" and "an explanation of the employer's evidence." 470 U.S. at 546. Ms. Washington does not take issue with the notice she received. However, she argues that the change to 6 DCMR 1616.4 to expand the time to provide written notice from three days to 30 days was illegal. Under 6 DCMR 400.1, variances may be granted to the regulations under certain conditions. The variance granted in these cases appears to comply with the requirements in that DOC articulated a limited need to complete transcription of the interview tapes which were used to support the summary removal.

would request only a limited hearing with an opportunity to respond to specific factual allegations upon which DOC has relied. Ms. Washington did not request or desire a full evidentiary hearing, because she stated this would allow DOC to firm up its case.

*Loudermill* and subsequent cases establish that due process does not require an oral hearing or the presentation of witnesses at a pre-termination hearing where, as here, an employee has an opportunity for a full post-termination evidentiary hearing.[6] *Loudermill* itself states that an "opportunity to present reasons, *either in person or in writing*, why proposed action should not be taken is a fundamental due process requirement." 470 U.S. at 546 (emphasis added). Cases after *Loudermill* confirm that a full evidentiary hearing before termination is not required to satisfy due process. *E.g., Thompson v. District of Columbia,* 428 F.3d 283, 290 (D.C. Cir.2005) (Edwards, J., concurring); *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 566 (6th Cir. 2004); *Greer v. Amesqua,* 212 F.3d 358, 367 (7th Cir.), *cert. denied,* 531 U.S. 1012 (2000); *Schacht v. Wisconsin Dep't of Corr.,* 175 F.3d 497, 503 (7th Cir. 1999); *Schleck v. Ramsey County,* 939 F.2d 638, 641-42 (8th Cir. 1991); *Powell v. Mikulecky,* 891 F.2d 1454, 1458 (10th Cir. 1989).

It is not clear what type of hearing Ms. Washington is requesting. She has not presented a sufficient basis for ordering a pre-termination evidentiary hearing. The purpose of a *Loudermill* hearing is to serve as "an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the

---

[6]    Pursuant to D.C. Official Code § 1-616.52(b), Ms. Washington may appeal to the Office of Employee Appeals from any final DOC decision removing her from employment. If not satisfied, Ms. Washington may then appeal a decision of the Office of Employee Appeals to the D.C. Superior Court. *See generally Johnson v. District of Columbia,* 368 F. Supp. 2d 30 (D.C. 2005).

employee are true and support the proposed action." 470 U.S. at 545-46. The cases cited above demonstrate that the "initial check" ordinarily can be performed without a full evidentiary hearing, and Ms. Washington's submissions makes no attempt to show why her Motion for Summary Dismissal and her Responses, dated September 25 and September 27, 2006, are inadequate presentations of her side of the story. Accordingly, due process does not require a full pre-termination evidentiary hearing, where as here, there is an opportunity for a full evidentiary hearing after termination.[7]

District of Columbia law also does not require a pre-termination hearing with oral testimony in all instances. The Comprehensive Merit Personnel Act provides that there shall be "a *written* opportunity to be heard before the action becomes effective." D.C. Official Code § 1-616.51(4) (emphasis added). The regulations implementing Section 1-616.51(4) permit an evidentiary hearing in connection with a pre-termination administrative review only when "a decision based on a preponderance of the evidence cannot be made because the written record is inadequate for this purpose." 6 DCMR 1612.5(a). The adequacy of the record must be measured with reference to the limited purpose of this administrative review. The issue at this stage of the proceedings is not whether the proposed termination is proper, but only whether the Government has provided both credible and reasonable grounds for it. The pre-termination process is designed to allow the employee, not the Government, to explain her side of the story. As discussed below, the written record submitted by the Government adequately demonstrates

---

[7]    Ms. Washington disputes some of the factual allegations against her. It is not my role to weigh the credibility of evidence as to this factual dispute. Therefore, there is no need for a hearing at this stage to assess her account of the events of June 3, 2006. I will consider her account to the extent it bears on whether a reasonable person could conclude, based on this record, that the facts alleged by DOC are true, and whether those facts justify the proposed summary removal action.

that such reasonable grounds for the disciplinary action it proposes do not exist. Accordingly, in

the exercise of the authority delegated to me, I determine that a pre-termination evidentiary oral

hearing is not necessary.

### C. The Basis For The Proposed Removal of Ms. Washington

The substantive issue here is whether there is a reasonable basis for the affirmance of the

proposed summary removal.[8] Resolution of the issue requires consideration of two questions,

according to *Loudermill.* The first question is "whether there are reasonable grounds to believe

that the charges against the employee are true." 470 U.S. at 545-46. The second question is

whether there are reasonable grounds to believe that the charges "support the proposed action."

*Id.* at 546.

### 1. Are There Reasonable Grounds To Believe That The Charges Are True?

This administrative court is charged with "performing an initial check against mistaken

decisions -- essentially, [this court must determine] whether there are reasonable grounds to

believe that the charges against [Ms. Washington] are true and support the proposed action."

*Loudermill at 545-546.* DOC states that the removal is based upon Ms. Washington's negligence

---

[8] In analyzing the *Loudermill* question, I have considered the Government's record to consist of the following materials provided with respect to Ms. Washington: the Removal Letter signed by Stanley Waldren as Acting Warden, the attached Investigative Report, the attached Interview Transcript of Ms. Washington (June 3, 2006), the Warning and Assurance for Administrative Questioning, the Correctional Officer position description, the blank Inmate Movement Pass form, as well as all rules and regulations cited by DOC. The record also includes the later-filed Exhibits B, C, and D to the Investigative Report, and the Key of witness names used in that report. The interview of Ms. Washington was conducted without her swearing to testify under oath; the Interview Transcript is a transcription signed neither by the court reporter as true and accurate nor by the interviewee, Ms. Hatton, after opportunity for review and corrections.

and violation of CDF policy. The act of Ms. Washington that is identified as the basis for these

charges is described as follows:

> [O]n June 3, 2006, you were assigned to the Southeast One (SE-1) housing unit. Your primary functions were to maintain custody, security and accountability of all inmates in your assigned housing unit. At approximately 9:42 a.m., Inmate Ricardo Jones walked out of the SE-1 housing under the pretense of going to the Infirmary.
>
> Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing him to go to the Infirmary. Inmate Jones' name was placed on the housing unit movement/running count sheet, accounting for and authorizing his movement to the Infirmary. However, according to Infirmary records, only six (6) inmates from SE-1 were scheduled for medical care in the Infirmary on June 3, 2006. Inmate Ricardo Jones was not one of them.
>
> \*       \*       \*
>
> Corporal Shantell Hatton and Sergeant Dionne Makins worked in the unit with you on June 3, 2006. . . . [Y]ou made approximately three call-out passes, but not for any specific place and they were unnamed. Sergeant Makins also made some call-out passes, but could not confirm whether or not Officer Hatton made any. . . . Officer Hatton had the running board, and she was the one that was checking [the inmates] off on the running board.
>
> \*       \*       \*
>
> Inmate Jones was not on the Sick Call List scheduled for medical care on June 3, 2006. . . . [Y]ou did not receive a phone call from the Infirmary or anywhere else for Inmate Jones to report to medical; you did not recall Inmate Jones complaining to you or any of the officers in the unit of being sick, and you never made a call-out pass for Inmate Ricardo Jones. However, Inmate Jones was in possession of a movement pass which authorized him to proceed to the Infirmary. In addition, Inmate Jones' name was placed on the housing unit movement/running count sheet, which would explain/substantiate his absence from the housing unit.

Removal Letter at 1-2 [references to the OIA Investigative Report and interviews redacted].

The Removal Letter references the Investigative Report. According to the Investigative

Report, during the day shift on Saturday, June 3, 2006, there were three correctional officers

assigned to the Southeast One (1) housing unit. The Southeast One (1) housing unit records

show that Inmate Ricardo Jones had a Movement Pass authorizing him to go to the Infirmary and

that he was listed on the housing unit movement/running count sheet authorizing his movement

to the Infirmary. Nevertheless, from the Infirmary records OIA determined that only six inmates

from the Southeast One (1) housing unit were scheduled for medical care in the Infirmary on

June 3, 2006, and Inmate Jones was not one of those inmates. Investigative Report at 11.

According to the Investigative Report, at 9:42 a.m., Inmate Jones was observed walking

out of Southeast One (1) housing unit holding a small sheet of paper in his hand. He then met up

with Inmate Joseph Leaks and was observed walking up the corridor towards Floor Control One.

The Investigative Report notes that the three officers assigned to the Southeast One (1)

housing unit gave "conflicting accounts of the circumstances surrounding how inmate Jones was

allowed to leave his housing unit without a scheduled infirmary appointment" during their

interviews[9] and that the matter would be "more fully examined [in] the criminal investigation of

this incident." *Id.* at 11.

---

[9]     Ms. Washington argued in the Motion for Summary Dismissal that the Interview
Transcript should be suppressed because the OIA investigators failed to give her *Miranda*
warnings, in violation of her Fifth Amendment rights. The Fifth Amendment provides
that "no person ... shall be compelled *in any criminal case* to be a witness against
himself." U.S. Const., Amend. V [emphasis added]. In order to admit, in a criminal
case, incriminating statements made during a custodial interrogation, the police must
have first advised the suspect of certain constitutional rights associated with the Fifth
Amendment. *Miranda v. Arizona,* 384 U.S. 436 (1966). The exclusionary rule, applied
as a remedy in criminal cases, does not apply when the Government seeks to use the
statements in a civil or administrative proceeding. *See, e.g., Allen v. Illinois,* 478 U.S.
364, 368 (1986); *Chavez v. Martinez,* 538 U.S. 760, 772 (2003). *Kastigar v. United
States,* 406 U.S. 441 (1972), cited by Ms. Washington, involved an attempt by the
Government to compel Grand Jury testimony from witnesses who were granted use
immunity, and it has no application to the present situation. The motion for suppression
is denied.

The only other mention in the Investigative Report of the Southeast One (1) housing unit and the possible role of the three officers assigned to that unit is the following comment:

> During this investigation, an attempt was made to review pre-recorded activity in the Southeast One (1) housing unit prior to inmate Jones' departure from it on the morning of June 3, 2006. This investigation revealed that a critical portion of the pre-recorded video footage covering activity in the housing unit was missing.

Investigative Report at p. 11. Later in the Report, out of context and appearing as an afterthought, is the following notation:

> *Note: A review of the Southeast One housing unit recording video component by the office of the Chief Technology Officer, Computer Forensic Team (OCTO/CFT), revealed no evidence of digital tampering with files/data; no deletions or unauthorized modifications were as {sic} identified or observed.

Investigative Report at p. 12.[10]

In its conclusions, the Investigative Report notes that OIA conducted "well over forty interviews of staff and inmates during the course of this investigation." It goes on to find:

> Although the underlying act involved the efforts of two inmates, there were contributing factors that created an opportunity for inmates Joseph Leaks and Ricardo Jones to execute a plan of escape from the confines of the CDF.
>
> These factors can be categorized in three areas – staff negligence; policies, procedures and practices; technology and support mechanisms.

Investigative Report at p. 19. The report then proceeds to describe the instances of staff negligence, classification and reclassification errors and other procedural violations, describing the actions of several specifically identified employees. Investigative Report at pp. 19-26. Nowhere in this detailed discussion of misconduct by DOC employees is there any specific mention of Ms. Washington or any role she had in the inmates' escape.

---

[10]    The complete Computer Forensic Investigation Report, dated July 24, 2006, is Exhibit D to the Investigative Report.

The Investigative Report does contain generic information relating to housing unit procedures in its discussion of the factors contributing to the escapes under the section on Policies, Procedures and Practices and the section on Technology and Support Mechanisms:

8e.    Policy, Procedures and Practices

1.    Inmate Accountability

When an inmate has a scheduled appointment with the Infirmary, a personal or legal visit, or other matters to attend to off the unit, s/he shall be issued a *movement pass to authorize his/her* movement from his assigned housing unit to the specified location displayed on the pass.

Although the physical plant has numerous checkpoints to observe and monitor the status of an inmate's movement, prisoners in many cases are allowed to walk to their destination unescorted.

The movement pass is a pre-printed template on an 8 ½ x 11 sheet of paper. There are four pass templates on one 8 ½ x 11 sheet. The passes are maintained in the control module of the housing unit.

Inmates are usually notified that they have a visitor or a scheduled appointment in the Infirmary by a telephone call from staff to the Correctional Officer assigned to the housing unit control module. The officer will either write the pass and hand deliver it to the inmate's cell, have the detail inmate deliver the pass to the inmate's cell, or have the inmate's cell door opened allowing the inmate to approach the control module to be issued the pass as s/he departs the Housing unit.

When an inmate leaves the unit, she is accounted for by the officer placing the inmate's name on the running count sheet. In an effort to save time, some officers will, upon entering their assigned housing unit, write and sign passes without placing the names of the inmates on the pass. Although these practices were in place at the time of the escapes, they have since been changed as they were atypical in the field of Corrections and not consistent with current best practices.

On Saturday, June 3, 2006, prior to 9:42 a.m., inmate Ricardo Jones was given a pass to Infirmary; however, his name was not on the list of inmates scheduled for appointment. Officers assigned to the unit gave different accounts of how and why inmate Jones was issued the pass. Furthermore, neither of the assigned officers acknowledged writing the pass permitting him out of his housing unit.

The OIA interviewed the three (3) Officers who were assigned to the Infirmary on Saturday, June 3, 2006. Each officer stated that inmate Ricardo Jones was not scheduled to be seen in the Infirmary on Saturday, June 3, 2006. Each officer further claimed that on the morning of the escape, they did not call unit Southeast One (1) to request that inmate Jones report to the Infirmary for an appointment.

There is a possibility that someone, perhaps Leaks, called the unit that morning and purposely misled the officer in the housing unit by pretending to be an employee of the Infirmary, asking for inmate Jones to respond for an appointment. There is also the possibility that inmate Jones complained of an illness and was allowed to leave the unit by one of the officers. (This matter will be more fully examined during the criminal investigation of the incident.)

8f.    Technology and Support Mechanisms

1.    Surveillance Cameras (Housing unit)

As part of this investigation, an attempt was made to review pre-recorded video footage from Southeast One (1) to determine when inmate Ricardo Jones received his movement pass and who issued him the pass. Investigators discovered that critical minutes of footage are unaccounted for. (This matter will be examined fully during the criminal investigation of the incident.)

(Emphasis in the original.) Based on the contents of the Removal Letter and the Investigative Report, the first question is what precisely is the *act* that is the basis for the proposed summary removal. Although referencing in several instances the missing video footage in the Southeast One housing unit for the period of time at issue, that would have shown who gave Inmate Jones the pass, DOC does not contend that Ms. Washington tampered with the recording equipment or otherwise had any responsibility for the missing footage. Further, DOC does not charge Ms. Washington with having anything specific to do with the preparation of the call-out pass for Inmate Jones, placing the exit information on the pass or putting his name on the movement log.

During her interview on June 3, 2006, Ms. Washington was clear that she took no phone calls regarding any inmates, as the only call she took was from a lieutenant requesting her social security number. She noted that she filled out some call-out passes with generic information, but

not any names, locations or exit times. She did not hand out any call-out passes or note any inmate departures on the movement log. Neither the OIA Investigative Report nor the Removal letter determined that Ms. Washington created the call-out pass that was seen in Inmate Jones' hand after he left the Southeast One housing unit, and the pass was not part of the evidence submitted by DOC.

The only other and actual basis for the charge is the act of Inmate Ricardo Jones leaving the housing unit without anyone verifying that he had a confirmed appointment at the infirmary on the morning on June 3, 2006:

> As an Officer assigned to the SE-1 housing unit, it was your responsibility as well as the responsibility of Sergeant Makins and Officer Hatton to confirm Inmate Jones' need for medical treatment; the availability of medical staff to check Inmate Jones and seek authorization for his movement to the Infirmary via a call out pass or escort pursuant to sick call and infirmary protocols.

> \*      \*      \*

> The Investigation further concluded that each correctional officer assigned to SE-1 housing unit to include you, was culpable, because it was the responsibility of each officer assigned, individually and collectively, to ensure the accurate accountability of each inmate assigned to the housing unit. Therefore, you failed to properly carry out your assigned duties.

Removal Letter at p. 2. Thus, DOC charges Ms. Washington with the responsibility for and failure to verify Inmate Jones' infirmary appointment.

In the Response filed by counsel on September 27, 2006, and by way of explanation, Ms. Washington notes that she worked as a relief officer and after working the midnight shift, she was drafted to work a second consecutive shift in the Southeast One housing unit with Sergeant Makins and Officer Hatton. She performed the tasks assigned to her by the Officer-In-Charge, Sergeant Makins, working in the bubble to complete paperwork and other administrative tasks,

and spending some time on the floor, doing the morning inmate count. Any call-out passes she prepared were given to Officer Hatton as Officer Hatton was responsible for the movement log.

In her Response, Ms. Washington describes that the housing unit was short-staffed that day and that the Officer-In-Charge tried unsuccessfully to get additional help. She also describes various problems with the existing process of passes for the Infirmary at the time of the escape, including the inability of officers to inquire about the medical services needed due to Federal privacy laws, the possibility that inmates may have passes issued by other units that have to be signed by the housing unit or the officers there will be disciplined, that the call system from the Infirmary was flawed as the caller identification on housing unit telephones did not work and that it was routine for correctional officers to issue passes to inmates for the Infirmary on the basis of unverifiable telephone calls. She states that she had neither any formal training as a correctional officer nor any annual reviews.

As stated in the Removal Letter, at pp. 2-3, Ms. Washington's actions violated the following Departmental policy, Basic Regulations for All Employees and Correctional Officer's General Orders:

> Departmental Policy:
>
> Program Statement 5010.2c: Accountability for Inmates which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."
>
> Basic Regulations for All Employees:
>
> Section 1.1, Operational Knowledge Required: Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty: Employees are required to devote their entire attention to their official duties;

Correctional Officer's General Orders:

Number 1: Take charge of this post and all government property on or near it.

Number 8: Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command.

For the following reasons, I must conclude that a reasonable person could find that Ms. Washington committed the act with which she was charged – not verifying Inmate Jones' appointment with the Infirmary – and that this act violated the Policies of the institution.

A reasonable person could conclude that Ms. Washington was required to adhere to Departmental policy regardless of whether she had received the appropriate training for a correctional officer and even though she was a relief officer on duty that day in the Southeast One housing unit after having just completed the night shift, had no connection with preparation of the call-out pass for Inmate Jones and received no telephone calls relating to the movement of any inmates as she worked between the bubble and the floor on the morning of June 3, 2006. If an inmate contends that he has a pass to exit the housing unit, a reasonable person could conclude that any officer assigned to a housing unit must maintain accountability by verifying the existence of the appointment with the unit to which the inmate contends he has permission to go. Under the circumstances, this is part of the essential duties of a housing unit officer. How else could she maintain accountability of the inmates in her area of responsibility?

Based on this record, a reasonable person could conclude that Ms. Washington failed to perform her duty to maintain accountability for all inmates in her area by allowing Inmate Jones to leave the Southeast One housing unit without confirming his appointment with the Infirmary.

Based upon the foregoing Analysis, I conclude that a reasonable person could find that the factual basis for the charge is true. *Loudermill, supra,* at 546.

### 2. Are There Reasonable Grounds To Believe That The Charges Support The Proposed Action?

Since I have found there are reasonable grounds to believe that the factual basis for the charge is true, I will now address the second question: if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Ms. Washington may be summarily removed? The short answer to this question is, "No."

Under 6 DCMR 1603, an employee may be disciplined or removed only "for cause." 6 DCMR 1603.2. Cause is defined as, *inter alia,* "any on-duty or employment-related act or omission that interferes with the efficiency or integrity of government operations; and any other on-duty or employment-related reason for corrective or adverse action that is not arbitrary and capricious. This definition includes, without limitation . . . negligence, incompetence . . . misfeasance, malfeasance. . . ." 6 DCMR 1603.3. A *"de minimis"* violation of the cause standard cannot be the basis of a disciplinary action. 6 DCMR 1603.5. The burden is on the government to show that the disciplinary action is or was for cause. 6 DCMR 1603.10.

In addition, the regulations require that in selecting a penalty, "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The regulations governing summary removal also require the agency to find "cause" for the disciplinary action. 6 DCMR 1616.2. However, in the case of summary removal, the agency

head must also find that the employee's conduct "(a) [t]hreatens the integrity of government operations; (b) [c]onstitutes an immediate hazard to the agency, to other District employees, or to the employee; or (c) [i]s detrimental to public health, safety, or welfare." 6 DCMR 1616.1. While the Removal Letter specifically cites to the first two factors, Removal Letter at 1, it implicitly relies upon the third factor as well. *Id.* at 3 ("your negligence . . . placed staff, inmates and the public at large in considerable capricious danger."). The regulation permitting summary removal clearly envisions a situation where, rather than "interfering with" the integrity of government operations, the employee's conduct has created such risk of harm that the agency must act quickly.[11]

In this case, I have concluded that a reasonable person could find that on June 3, 2006, Ms. Washington, simply by her presence in the Southeast One housing unit, allowed Inmate Jones to exit from the housing unit without appropriately verifying that he had an appointment with the Infirmary.

The Removal Letter concluded that Ms. Washington violated: (1) DOC Program Statement 5010.2c, which requires correctional officers to maintain accountability for all inmates in their area of responsibility; (2) Basic Regulations of All Employees 1.1, which requires employees to have a complete understanding of their Position Description and applicable rules, and to abide by them; and (3) Basic Regulations for All Employees 1.4, which requires employees to devote their entire attention to their official duties. The Removal Letter further

---

[11]    Simply the seven-week gap between the jailbreak and the suspension of Ms. Washington raises some initial questions about DOC's evaluation of the "immediacy" of the hazard presented by Ms. Washington.

- 22 -

concluded that Ms. Washington's conduct fell below the standard for protection of others against reasonable risk of harm. Removal Letter at p. 3.

DOC is correct that Ms. Washington's alleged negligence contributed in part to the escape, in that she or the other correctional officers assigned to the Southeast One housing unit, "a controlled secure environment," allowed Inmate Jones to leave that unit and proceed to Floor Control One. From there, other personnel released Inmate Jones to move through the facility and eventually reach the Warden's office from which he and Inmate Leaks later executed their escape. If the facts are established as true, Ms. Washington failed to perform her basic duties to maintain accountability of the inmates under her charge.

However, the record does not establish that her conduct created the imminent harm that is required for summary removal, under 6 DCMR 1616.1, for the following reasons:

(1)      Although Ms. Washington's negligence allowed Inmate Jones to exit from the Southeast One housing unit, Inmate Jones had to pass through Floor Control One and Floor Control Two, through the Administrative Two door into the administrative module and into the Warden's suite, from which he and Inmate Leaks escaped. At each of those points, other personnel should have been checking to determine whether Inmates Jones was where he was supposed to be. This does not excuse her conduct, but it is a factor in determining the appropriate penalty;

(2)      The Investigative Report at p. 4 states that there is strong evidence that other employees intentionally aided and abetted the two inmates in the escape planning and execution. Such activities, if proven, would play a far larger role in the escape than the one act of negligence by Ms. Washington, and she is not charged with intentional misconduct; and

(3)    Although the evidence supporting the charge against Ms. Washington is legally

sufficient for purposes of my review, the evidence is extremely weak.  Given the understaffed

situation on her shift that morning, three people were trying to do the work of four correctional

officers.  Ms. Washington was a relief officer assigned to various locations in CDF and assigned

to the Southeast One housing unit on June 3, 2006, for the day shift after having worked the

midnight shift.  She followed the directions she was given by the Officer-In-Charge.  She took

none of the telephone calls requesting that inmates be sent to the Infirmary.  She had no

connection with the preparation of the call-out pass for Inmate Jones, with placing the exit

information on the pass or with putting the pass on the movement log.  For these reasons, it is not

reasonable to conclude that Ms. Washington's failure to personally verify that Inmate Jones had

an appointment that morning with the Infirmary was a significant factor in the escape so as to

support her summary removal.

Further, in determining whether the facts reasonably believed to be true support the

summary removal of Ms. Washington, I also considered her actions in light of the Government's

conclusions in the Investigative Report.  The first "Major Finding" by the DOC investigators, as

stated above, is that strong evidence suggests that staff "intentionally aided and abetted in the

planning and execution of the escapes."  Investigative Report at 4.  The DOC investigators also

find that "[w]hile departmental policy and procedure are for the most part sufficient, staff

negligence in properly adhering to them and circumvention of established regulations were major

contributors to the escape."  *Id.*  There is no basis provided for asserting that any action taken by

Ms. Washington is negligence that was a major contributor to the escape, particularly given the

finding that CDF staff colluded in the escape.  Ms. Washington's alleged negligence neither

threatened the integrity of government operations nor constituted an immediate hazard to DOC or other employees.

In the "Agency Enhancements" section of the Investigative Report, DOC investigators note several changes in the area of "Inmate Controlled Movement." These include:

> [i]nmates shall be issued call-out passes for authorized movement on a "one time" basis. The unit officer shall contact the officer at the inmate's intended destination to verify the inmate's movement. Call-out passes shall be distributed to the inmate as s/he departs the unit to go to an authorized designator. The inmate's name, DCDC number, destination, and departure time shall be recorded on the call-out pass. This information shall also be recorded in the unit logbook and on the Housing unit running movement sheet. To ensure inmates arrive in a timely manner, the receiving officer shall notify the housing unit officer of the inmate's arrival at his/her assigned destination.

*Id.* at 17. While the Investigative Report provides a basis for the need for a revision of the relevant regulations, these revisions do not change my conclusion that, even following all then-applicable rules, as a factual matter, Ms. Washington's actions did not contribute significantly to the escape.

In the "Recommendations" section of the Investigative Report, the DOC investigators make nine recommendations. The only recommendations that arguably address the alleged negligence of Ms. Washington are a provision to "hire a Security Chief whose primary responsibility will be to ensure that proper security controls, staffing, equipment, and operational protocols are in place to better promote the integrity of the complex" and one to increase staff training. Several of the recommendations, however, focus on the need for increased institutional security and better communication tools. Investigative Report at 28. In addition, in "Final Observations," DOC characterizes the inmate escapes as

neither opportunistic nor spontaneous but rather the outgrowth of a calculated deliberate plan, arranged and orchestrated with the assistance of others. The escapes involved not only a carefully assessed determination as to how to breach institutional security but how to elude authorities once successfully in the community. Central in their scheme to flee from justice was collusion by corrupted staff and the negligence of correctional employees who failed to appropriately address their assigned responsibilities.

Investigative Report at 27.

I conclude that the facts relied upon by the Government, reasonably believed to be true, do not support the proposal to summarily remove Ms. Washington from her position. Summary removal is a drastic personnel action that is permitted only when an employee's conduct threatens the integrity of government operations, is an immediate hazard to DOC, other government employees, or herself, or is detrimental to public health, safety, or the welfare of others. 6 DCMR 1616.1. Ms. Washington's conduct can best be described as inaction, in a long chain of actions, some of which contributed more significantly to the escape. The facts as presented by the Government do not establish that Ms. Washington's conduct threatened the integrity of government operations, was an immediate hazard to DOC, other government employees, or himself, or was detrimental to public health, safety, or welfare, and thus do not justify the use of this extraordinary remedy of summary removal against Ms. Washington.

## III.    RECOMMENDATION

In this administrative review, I have considered the two issues raised both by *Loudermill*, 470 U.S. 532, and Chapter 16, D.C. Personnel Regulations. Those issues are: (a) whether there is any reasonably believable evidence supporting the facts alleged by the proposing official; and (b) whether, if all the reasonably believable evidence supporting the facts alleged by the

proposing official were taken as true, a reasonable person could find, by a preponderance of the evidence, that the employee may be removed.

For the reasons discussed above, I have determined that (a) there is reasonably believable evidence supporting the factual conclusion that Ms. Washington improperly allowed Inmate Jones to exit the Southeast One housing unit without verifying that Inmate Jones had an appointment at the Infirmary that morning, as alleged by the DOC in its Removal Letter; and (b) if all the reasonably believable evidence supporting the facts alleged by the DOC were taken as true, a reasonable person could not find, by a preponderance of the evidence, that Ms. Washington may be summarily removed.

I recommend that the proposed summary removal of Ms. Washington not be sustained as it is inconsistent with the Due Process Clause and the applicable provisions of District of Columbia law.

Dated: December 11, 2006

Beverly Sherman Nash
Administrative Law Judge

## Certificate of Service:

**By U.S. Mail (Postage Paid)and Fax:**

Sol Zalel Rosen, Esquire
2501 Calvert Street, N.W. #212
Washington, DC 20006
FAX: 202-296-9375

James E. McCollum, Jr., Esquire
McCollum & Associates, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20741-1717
FAX: 301-864-4351

J. Michael Hannon, Esquire
Hannon Group Law Firm, LLP
1901 18th Street, N.W.
Washington, DC 20009
FAX: 202-232-3704

**By U.S. Mail (Postage Paid) and Fax:**

Kevin J. Turner, Esquire
Assistant Attorney General

Thelma C. Brown, Esquire
Assistant Attorney General, and

Andrea Comentale, Esquire
Assistant Attorney General

441 4th Street, N.W.
Suite1060 –N
Washington, DC 20001
FAX: 202-347-8922

Maria Amato, Esquire
General Counsel
Department of Corrections
1923 Vermont Avenue, NW
Washington, DC 20001
FAX: 202-671-2514

I hereby certify that on ___Dec, 11___,
2006, this document was caused to be served
upon the above-named parties at the
addresses and by the means stated.

Clerk/Deputy Clerk

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
825 North Capitol Street, NE, Suite 4150
Washington, DC 20002

2006 DEC -8 ⼁P 2: 13

|  |  |
|---|---|
| In the Matter of the Summary Removal of: | |
| | |
| HERBERT DOUGLAS;<br>LORENZO JENNINGS; and<br>LACHONNE STEWART | Case Nos.:  DOC-06-800004<br>DOC-06-800005<br>DOC-06-800008 |
| Employees of the Department of Corrections | (Consolidated) |

## REPORT AND RECOMMENDATION

## I.      INTRODUCTION

These cases concern the summary removal of employees of the District of Columbia Department of Corrections ("DOC") based on their alleged negligence, misfeasance or malfeasance that allowed two inmates of the District of Columbia Central Detention Facility ("CDF") to escape from the facility on Saturday, June 3, 2006. On June 5, 2006, the Director of DOC placed several DOC employees on paid administrative leave pending further investigation of the incident. Among these employees were Herbert Douglas, Lorenzo Jennings, and Lachonne Stewart (collectively referred to as the "Employees"). On July 26, 2006, the Employees, as well as eight (8) other DOC employees, were summarily removed from their positions (collectively referred to as the "Removed Employees").

On August 24, 2006, Stanley M. Waldren, Acting Warden, notified each Removed Employee that he was "proposing that the summary removal action effected . . . on July 26, 2006

be sustained" (the "Removal Letter").   Each Removal Letter contained the charges against the employee in question, with "Specifications" of the facts and circumstances allegedly supporting the charges.

Pursuant to D.C. Official Code § 1-616.51(4) and 6 District of Columbia Municipal Regulations ("DCMR") 1616.5 and 1612, the Employees are entitled to an administrative review of the proposed affirmance of the summary removal.  The Removal Letters gave notice that the Office of Administrative Hearings ("OAH") would conduct the administrative review.  It further advised the Employees that they could file responses to the proposed action and that they could "raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty."

On August 30, 2006, DOC filed with OAH documents relating to the proposed removal of each of the Removed Employees, including the Employees in question (the "DOC Record").[1]  On August 31, 2006, the Employees' attorney filed an appearance and requested a hearing.

---

[1]    The DOC Record pertaining to the Employees in question contained the following documents:

**DOUGLAS:**

1) 8/24/06 Removal Letter
2) 8/09/06 Memo from Waldren to Murphy Re: Notice of Emergency and Proposed Rulemaking
3) 6/06/06 DOC Office of Internal Affairs Investigative Report (pp 1-32). No Appendix B, C (diagrams) or D.
4) 6/03/06 Interview of Herbert Douglas (pp. 1-48).
5) Program Statement - Accountability for Inmates, dated 7/01/04 (pp. 1- 6 of 7).

On August 31, 2006, the Chief Administrative Law Judge of OAH designated

five (5) Administrative Law Judges ("ALJs") to serve as hearing officers in the cases involving

the Removed Employees, and each ALJ was assigned a specific case or cases.    The

undersigned was designated to serve as the hearing officer in the cases of the three Employees

in question.

On September 8, 2006, a joint status conference was held with certain of the

assigned ALJs, including the undersigned, the attorneys representing all the Removed

Employees, and Maria Amato, Esq., DOC General Counsel.    A joint Order was issued on

September 11, 2006, denying the request of counsel for a discovery schedule and asking for an

explanation for the need for adversary hearings.    The Order also provided for submission of

certain appendices to the Investigative Report prepared by DOC Office of Internal Affairs

6)  Update of Supervisory Certification – Correctional Officer (6 pages)
7)  D.C. Central Detention Facility – Post Order – Non-Industrial Pay System
     (7 pages)
8)  Chapters 1 and 2 Basic Regulations For All Employees (pp. 3-10)
9)  The Correctional Officers' General Orders (1 page)

**JENNINGS:**

1)  8/24/06 Removal Letter
2)  8/09/06 Memo from Waldren to Murphy Re: Notice of Emergency and Proposed
     Rulemaking
3)  7/26/06 Letter from Devon Brown to Lorenzo Jennings
4)  6/06/06 DOC Office of Internal Affairs Investigative Report (pp 1-32).
     No Appendix B, C (diagrams) or D.
5)  6/03/06 Interview of Herbert Douglas (pp. 1-32).
6)  D.C. Central Detention Facility – Post Order – Non-Industrial Pay System (7
     pages)

**STEWART:**

1)  8/24/06 Removal Letter
2)  6/06/06 DOC Office of Internal Affairs Investigative Report (pp 1-32).
     No Appendix B, C (diagrams) or D.
3)  6/06/06 Interview Memo – Mohammed Rashid (2 pages).
4)  DOC Department Order dated June 29, 1992 (3 pages)

("OIA") that were not part of the Record filed for each of the Removed Employees.[2] Finally, a deadline of September 25, 2006, was set for the submission by the Removed Employees of responses to the Removal Letter.

On September 11, 2006, DOC filed and served on all parties the missing appendices to the OIA Investigative Report: Appendices B, C, and D, and the Key of witness names.[3]

On September 27, 2006, counsel for ten (10) of the Removed Employees, including the Employees in question, filed a Motion for Summary Dismissal, and a Response to the Removal Letter ("Response") was filed on behalf of each of the said Employees. The Employees' attorney also moved for an extension of time for the filing of the responses. By Order dated October 4, 2006, the extension of time was granted *nunc pro tunc* to the date of filing of the Responses. That Order also established a deadline of October 13, 2006, for DOC's reply to the Responses, and it scheduled a hearing on the Motion for Summary Dismissal for October 19, 2006.

On October 13, 2006, DOC filed its Opposition to the Motion for Summary Dismissal. DOC maintained that in the cases at hand a hearing officer has no power to grant the relief of dismissal, but may only conduct the administrative review and make a written report and recommendation.

---

[2] *See* footnote 1.

[3] Appendix B is "Inmates Leaks' and Jones' Criminal History." Appendix C is "Escape Route of Inmates Ricardo Jones /Joseph Leaks." Appendix D is "DCERT Computer Forensic Investigation (OCTO)."

The hearing on the Motion for Summary Dismissal and a second joint status conference were held on October 19, 2006.  On October 26, 2006, this administrative court issued its Order denying the Motion for Summary Dismissal.  The Order stated that the Employees' arguments would be considered as part of the report and recommendation in each case.  The Order also established December 15, 2006, as the deadline for the final agency decisions in these cases.

Pursuant to OAH Rule 2819.1, the cases of the Employees have been consolidated because they involve common questions of law or fact, and such consolidation is warranted in the interests of judicial economy and efficiency.

## II.    DISCUSSION

### A. Preliminary Matters

In the Motion for Summary Dismissal, the Employees raised three issues:  (1) The administrative review here is in actuality a "post-termination" action, and, accordingly, the Employees have been denied their right to a "pre-termination" notice and hearing pursuant to *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546 (1985); (2) D.C. Official Code § 1-616.51 is unconstitutional on its face, because summary removal is a drastic personnel action that is permitted only when an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee [herself]; or, is detrimental to public health, safety, or welfare; and (3) Certain mitigating factors, referred to as the "*Douglas* factors," are applicable here and should have been used to evaluate the appropriateness of the penalty proposed.  The *Douglas* factors were articulated by the U.S. Merit Systems Protection Board and comprise

factors (that may be mitigating or aggravating) that must be considered in determining an appropriate penalty for a federal employee's misconduct. *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981).[4]

---

[4] The "*Douglas*" factors are:

1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2) The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3) The employee's past disciplinary record;

4) The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5) The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties;

6) Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7) Consistency of the penalty with any applicable agency table of penalties;

8) The notoriety of the offense or its impact upon the reputation of the agency;

9) The clarity with which the employer was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10) Potential for the employee's rehabilitation;

11) Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

12) The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

*Douglas v. Veterans Admin., supra,* 5 MSPR 280, 305-306.

For the reasons stated and upon the authority cited in the Report and Recommendation concerning other Removed Employees similarly situated, I hold that the Employees have not been denied their pre-termination notice and right to a hearing, and that there has not been a showing that the statute in question is facially unconstitutional. *See In the Matter of the Summary Removal of DuBose*, OAH No. DOC-06-800002 at 3-5 (Report and Recommendation, October 23, 2006); *In the Matter of the Summary Removal of Pointer*, OAH No. DOC-06-800003 at 3-5 (Report and Recommendation, November 17, 2006); *In the Matter of the Summary Removal of Love*, OAH No. DOC-06-8000010 at 3-5 (Report and Recommendation, November 17, 2006); and *In the Matter of the Summary Removal of Hinton-Saunders*, OAH No. DOC-06-800009 at 4-6 (Report and Recommendation, November 30, 2006).

Regarding the alleged failure of DOC to evaluate the appropriateness of the penalty proposed - summary removal - under the "*Douglas* factors," at the October 19, 2006, joint status conference, DOC's attorneys admitted that DOC had not considered mitigating or aggravating factors, or whether such even exist, in connection with the proposed action against each Employee. DOC argued that it is not required to expressly articulate its analyses of these factors in the notice of proposed summary removal, and that whether these factors exist and whether any consideration was given to them was not an issue in the administrative review process. DOC concedes, however, that the *Douglas* factors must and will be applied by it, but at the agency level after the administrative review.

I do not hold that DOC is required to apply the *Douglas* factors in the cases at hand. *Dep't of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005) appears to be one of only a small number of published cases in this jurisdiction addressing the question of the application

of the *Douglas* factors to District of Columbia employees. The *Colbert* Court does not directly hold that the *Douglas* factors must be applied to evaluate the appropriate penalties for misconduct by District employees.[5] An earlier decision by the Office of Employee Appeals stated that the agency uses the principles in *Douglas* as "guidance." *Employee v. Agency,* 29 D.C. Reg. 4565, 4570 (1982); *see also Stokes v. District of Columbia,* 502 A.2d 1006, 1010 (D.C. 1985) (emphasizing that the role of the Office of Employee Appeals is not to balance the relevant factors but to evaluate whether the agency considered relevant factors and struck a balance within the realm of reasonableness, as set forth in *Douglas*).

DOC is, however, bound by the applicable D.C. personnel regulations, and it must adhere to them in selecting the appropriate penalty to impose in disciplinary actions. 6 DCMR 1603.8 explicitly states that "(r)emoval is not mandated under any provision" of the regulations. Moreover, 6 DCMR 1603.9 clearly mandates that *"consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate"* in selecting the appropriate penalty. 6 DCMR 1603.9 (Emphasis added). In other words, DOC is charged with determining whether relevant mitigating or aggravating circumstances exist in each case, and then to give

---

[5] The *Colbert* case has an involved procedural history. The *Colbert* Court had remanded the case to the Board of the Office of Employee Appeals to consider whether 6 DCMR 1608.2 (limiting consideration of certain parts of an employee's disciplinary record in assessing a penalty based on their age) affected the application of the *Douglas* factors. 874 A.2d at 357 n.8. By contrast, *Douglas* provides generally for consideration of the employee's past disciplinary and work records. The Board apparently filed a Response on Remand. *Id.* The Court then mentioned that certain documents whose consideration was in question "were relevant in applying the *Douglas* factors," 874 A.2d at 359, and not inconsistent with 6 DCMR 1608.2. The Superior Court order is quoted, which mentions the initial failure to perform a *Douglas* analysis. 874 A.2d at 360. The Court ultimately remanded the case to the administrative law judge to consider "DPW's Agency Report on Remand applying the Douglas factors, including the additional evidence supplied by DPW and Colbert." 874 A.2d at 361.

the appropriate weight to such relevant circumstances. In this regard, it may use the Douglas factors as a guide.

This raises the issue whether compliance by DOC with 6 DCMR 1603.9 is a matter of concern in the administrative review of the proposed summary removals in question. The standard for administrative review here is the *Loudermill* standards: namely, (1) Whether there are reasonable grounds to believe that the charges against the employee are true; and (2) Whether there are reasonable grounds to believe that the charges support the proposed action. *Cleveland Board of Education v. Loudermill, supra, 470 U.S. at 545-546.* In the instant cases, where the proposed actions are summary removals under 6 DCMR 1616.2, it must be shown that DOC made a "good faith effort . . . to determine that at least one (1) of the conditions described in § 1616.1 is met (the employee threatens the integrity of government operations, constitutes an immediate hazard to the agency, to other District employees, or to the employee, or is detrimental to public health, safety, or welfare); and that the action taken is for cause pursuant to § 1603 (cause being defined to include, *inter alia*, "negligence . . .misfeasance, malfeasance . . . .").

Since removal is not mandated under any regulation, whether summary removal is appropriate in a particular case depends upon compliance with 6 DCMR 1603.9: namely, that the summary removal was initiated after the agency determined whether there were mitigating or aggravating factors that existed and after these factors were considered and given appropriate weight.

That consideration of mitigating or aggravating factors is required is clear when one considers that under the regulations two distinctly different actions, summary suspension and

summary removal, require compliance with the exact same conditions: (1) A good faith effort having been made to determine that the employee threatens the integrity of government operations, constitutes an immediate hazard to the agency, to other District employees, or to the employee, or is detrimental to public health, safety, or welfare; and (2) That the action is taken for "cause." *See* 6 DCMR 1615.2 (Summary Suspension) and 6 DCMR § 1616.2 (Summary Removal). Since removal is not mandated under any provision of the regulations, the legal sufficiency of the decision in a particular case to propose removal rather than suspension, for example, depends upon whether the mandatory imperative of 6 DCMR 1603.9 has been complied with, and it is shown that a determination has been made regarding the existence of mitigating/aggravating factors and an assessment has been made of any such factors. These determinations and assessments must precede the decision to initiate summary removal. *See Dep't of Public Works v. Colbert, supra*, 874 A.2d at 361

The effect in the instant cases of DOC's failure to apply the *Douglas* factors, or to demonstrate that it made the determinations and assessments required under 6 DCMR 1603.9, depends upon: (1) whether there are reasonable grounds to believe that the charges against the employee are true; and (2) whether there are reasonable grounds to believe that the charges support the proposed action under 6 DCMR 1616.2. *Cleveland Board of Education v. Loudermill, supra*, 470 U.S. at 545-546. If either *Loudermill* criterion is not satisfied in a particular case, then the failure to determine and assess mitigating factors is a moot point.

## B. The Need for an Adversary Hearing

On September 7, 2006, the Employees filed a request for an "oral hearing and an opportunity to present a written submission."[6]  At the September joint status conference, the Employees' attorney argued that extensive discovery and evidentiary hearings were necessary in order to establish the causes of the prisoner escapes in general and the roles, if any, of the individual employees in the escapes.  As noted above, the request for discovery was denied.  At the October joint status conference, the Employees' attorney stated that if the Motion for Summary Dismissal were denied, only a limited hearing was being requested with an opportunity to respond to specific factual allegations upon which DOC has relied.  The request for a full evidentiary hearing was withdrawn.

Due process does not require an oral hearing or the presentation of witnesses at a pre-termination hearing where, as here, an employee has an opportunity for a full post-termination evidentiary hearing.  District of Columbia law also does not require a pre-termination hearing with oral testimony in all instances.  *See In the Matter of the Summary Removal of DuBose, supra*, OAH No. DOC-06-800002 at 6; *In the Matter of Summary Removal of Pointer, supra*, OAH No. DOC-06-800003 at 7; *In the Matter of the Summary*

---

[6]  In addition to "an opportunity to present [the Employee's] side of the story," *Loudermill* grants the Employees the right to "oral or written notice of the charges" and "an explanation of the employer's evidence."  470 U.S. at 546.  The Employees do not take issue with the notice each received.  However, they argue that the change to 6 DCMR 1616.4 to expand the time for DOC to provide written notice from three days to 30 days was illegal.  Under 6 DCMR 400.1, variances may be granted to the regulations under certain conditions.  The variance granted in these cases appears to comply with the requirements in that DOC articulated a limited need to complete transcription of the interview tapes which are used to support the summary removal.

*Removal of Love*, *supra*, OAH No. DOC-06-8000010 at 7; and *In the Matter of the Summary Removal of Hinton-Saunders*, *supra*, OAH No. DOC-06-800009 at 8.

The Comprehensive Merit Personnel Act provides that there shall be "a *written opportunity to be heard before the action becomes effective*." D.C. Official Code § 1-616.51(4) (Emphasis added). The regulations implementing Section 1-616.51(4) permit an evidentiary hearing in connection with a pre-termination administrative review "only when a decision based on preponderance of the evidence cannot be made because the written record is inadequate for this purpose." 6 DCMR 1612.5. The adequacy of the record must be measured with reference to the limited purpose of this administrative review. The issue at this stage of the proceedings is not whether the proposed termination is proper, but only whether the Government has provided both credible and reasonable grounds for it. The pre-termination process is designed to allow the employee, not the Government, to explain his/her side of the story. As discussed below, a decision based on preponderance of the evidence can be made in each of the cases at hand because the written record is adequate for this purpose. Accordingly, I determine that a pre-termination evidentiary oral hearing is not necessary in these cases.

### C. The Basis for Review Of The Proposed Removals

The substantive issue here is whether there is a reasonable basis for the affirmance of the proposed summary removals. Resolution of the issue requires consideration of two questions, according to *Loudermill*. The first question is "whether there are reasonable grounds to believe that the charges against the employee are true." 470 U.S.

at 545-546. The second question is whether there are reasonable grounds to believe that the

charges "support the proposed action." *Id.* at 546.

### 1. Are There Reasonable Grounds To Believe That The Charges Are True?

The Removal Letter to each of the Employees states:

> [(T)he summary removal] is based on a charge of negligence for conduct
> that:
>
> a. Threatened the integrity of government operations;
>
> b. Constitutes an immediate hazard to the agency, to other District
> employees, or to the employee.

Based upon the Record concerning each Employee,[7] the facts and circumstances

upon which the charges are based are set forth in the "Specifications" section of the Removal

Letters. For each Employee, these are as follows:

**HERBERT DOUGLAS**

> On Saturday, June 3, 2006 at approximately 7:00 a.m., you entered North
> One (1) housing unit and removed nine (9) detail inmates, including
> inmate Joseph Leaks. These inmates were employed in various off unit
> environmental work assignments throughout the CDF. You escorted these
> inmates to their assigned areas of responsibility. You removed six (6)
> additional detail inmates from the Southwest Two (2) housing unit who
> were also assigned to work various environmental work detailed
> throughout the CDF.
>
> You escorted Inmate Leaks, along with three other detail inmates to their
> assigned work areas on the second floor of the administrative module.
> Inmate Leaks' daily primary responsibility on this work detail was to
> clean the common areas, which included the Officer's (sic) Dining Room,
> the Environmental Office and the employee's (sic) locker rooms on the

---

[7] *See* footnote 1.

second floor. You unlocked the supply locker containing various cleaning materials and equipment to include floor buffers.

Inmate Leaks stated that prior to his initial departure from the second floor of the administrative module, he told you to "leave the area because something was about to happen." According to inmate Leaks, you complied with his request and departed the area leaving him and the other inmates unattended. According to Inmate Mohammad Rashid, you remained in the area for approximately twenty (20) minutes before leaving.

At some point after you left, Inmate Leaks, left his assigned detail post assignment and proceeded through the Administrative Two door into the inmate housing unit area where he ultimately met up with Inmate Ricardo Jones.

According to inmate Leaks upon his return to the second floor of the administrative module, he was accompanied by inmate Ricardo Jones. Inmate Leaks stated that he and inmate Jones removed a buffer from the supply locker that you left unsecured.

In the OIA investigative report, Leaks' statement about what he told Douglas is credited because Leaks also revealed to the investigators that Douglas had provided "contraband," and the nature and location of the contraband was then verified by the OIA investigators:

Leaks stated that prior to his initial departure from the second floor of the administrative module, he told (Douglas) to "leave the area because something was about to happen." According to Leaks, (Douglas) complied with his request and departed the area leaving him and the other inmates unattended. (It is to be noted that during the course of the present investigation inmate Leaks informed this reporter of the existence of contraband in the facility, its nature and location. He further stated that (Douglas) was responsible for bringing the contraband into the facility. This investigator was able to retrieve this very contraband from the exact location that Leaks had provided.)

OIA Investigative Report, p. 13.

On June 3, 2006, the OIA investigators conducted a taped interview with Douglas. He stated, in pertinent part, that Leaks accompanied him to the storage cage where the buffer

used by the inmates to escape was stored, and that Douglas left the cage unsecured. Douglas left Leaks unattended while he allegedly went to oversee other inmates cleaning in another area.[8]

The Removal Letter refers to the conclusion in the OIA investigative report that Douglas abandoned his responsibilities, which were to ensure that inmates under his custody were properly supervised. The Removal Letter charges that these acts constituted negligence and violated various DOC regulations and policies.[9]

---

[8] Douglas Interview June 3, 2006, Transcript pp. 10, 13, 17, and 21.

[9] Program Statement 5010.2c: Accountability of Inmates:

> Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility.

Basic Regulations for All Employees:

> 1.1 *Operational Knowledge Required*:
>
> Employees are required to have complete understanding of their Position Description and all regulations, rules, policies and Procedures pertaining to the Department and their Division, Service and Unit, and to Comply herewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.
>
> 1.4 *Attention to Duty*:
>
> Employees are required to devote their entire attention to their official duties. Loafing, newspaper reading, the use of telephones for personal or idle conversation, or acts directed at any other personal pursuits prohibited.
>
> 2.1 *Count and Security:*
>
> It is the duty of the Correctional Officer to accept responsibility for keeping an accurate count of inmates, not only at the formal count periods during a shift, but at all times when inmates are assigned to him or pass through his post.
>
> 2.18 *Work Detail Posts:*

In Douglas' Response, he refers to his 35 years serving as an officer for several federal and state agencies, 15 years with DOC, and 5 years at CDF, during which he did not have "any personnel problems of any kind . . . ." He states that during the time he was a Correctional Officer with DOC he received several outstanding performance evaluations.

In his Response, however, Douglas does not dispute that he left inmates unattended or unsupervised while he floated from inmate group to inmate group working on different floors of the facility. He also admits that he left the storage cage unlocked and accessible to inmates. He states that he "received no formal training to adequately perform his duties." He argues, however, that his conduct was not in any way negligent. He states that how he performed his work and the manner in which he supervised the inmates, including Leaks, was with the knowledge and approval of his superior. In fact, he states that he was ordered by his superior to leave inmates unattended or unsupervised while he moved between floors to check on the work being done. Douglas categorically denies that allegation that Leaks gave Douglas advance warning of the escape.

---

Correctional personnel assigned to work details in addition to all other duties prescribed and implied must: escort inmate detail to and from work area in an orderly prompt manner: instruct inmates in methods of work or aid specialist personnel in such instruction: maintain check or help maintain check on tools, supplies, and equipment: supervise inmates in safe working practices: prevent loafing, idleness, conniving or other disciplinary infractions in all possible degree: and adhere to all special or unique instructions pertaining to a job.

The Correctional Officers' General Orders

8. Account for all residents in my charge and immediately report any unauthorized absences to the Shift Supervisor or other officials in the chain-of-command.

Based upon the foregoing, I conclude that there are reasonable grounds to believe that the facts upon which the charges against Mr. Douglas are based are true. A reasonable person could believe that Douglas abandoned his responsibilities to ensure that inmates under his custody were properly supervised. As a result, inmates successfully escaped from the CDF.

**LORENZO JENNINGS**

(A)pproximately three weeks prior to the escape, you observed Inmate Carlton Beachum, environmental squad inmate, walk out of an unauthorized area, the staff restroom. According to the investigative report you challenged Inmate Beachum, confiscated his environmental squad identification card and escorted Inmate Beachum back to his housing unit.

On June 3, 2006, prior to his escape, Inmate Ricardo Jones was wearing the squad identification card you confiscated from Inmate Beachum. This identification card allowed inmate Jones access to the administrative areas of the CDF. The OIA Investigation also determined that you failed to prepare the required disciplinary report and the required Inmate Personnel Action Request Form to terminate Inmate Beachum from his environmental detail.

Internal Affairs Investigators . . . interviewed you regarding this matter on June 3, 2006. During the interview you confirmed that you caught Inmate Beachum in violation by exiting the staff restroom. You stated that when you challenged Inmate Beachum, he became hostile, so you took his ID card and placed him back in the unit in his cell. When asked what you did with the ID card, you stated that you kept the card for that day then put it in Captain Holmes' office. You acknowledged that Capt. Holmes had not arrived at work at the time you put the ID in his office, but you were able to enter the office because you had a key. You acknowledged that when Corporal Hudson questioned you about the ID card you informed him that you would give the ID back to him when you checked with Captain Holmes. However, you did not discuss the incident with Capt. Holmes. You stated a couple of days later that, "I just passed on the information to him and that was that." When asked if you returned the ID to North One, you responded, "Not that I know of."

You told OIA investigators that you did not write a disciplinary report on Inmate Beachum because you figured that maybe you could just let him stay in a day or two and would give the ID card back to the squad officer.

The Removal Letter refers to the conclusion in the OIA investigative report that Jennings' account of where he placed Inmate Beachum's Environmental detail card was not substantiated. It was further concluded that his actions were contributing factors that created an opportunity for inmate Leaks and Jones to execute a plan of escape from the CDF. The Removal Letter charges that these acts constituted negligence and violated various DOC policies.[10]

---

[10] D.C. Central Detention Facility - Post Order - Non-Industrial Pay System:

   6.     Squad Removals/Changes:

          a.     Squad officers may submit a termination form to the NIPS Coordinator for any inmate who does not perform duties assigned or who is no longer willing to work. If terminated from one squad, an inmate cannot switch to another squad or be considered for hire for at least 90 days.

          b.     Termination of detail shall only be approved by the Deputy Warden for Support Services.

          c.     In cases of disciplinary actions, a copy of the Disciplinary Report must be attached to the Request for Personnel Action form. Inmates with a pending Disciplinary Report, shall be suspended from detail until the recommendation of the Adjustment Board and the decision of the final approving official is complete.

Basic Regulations for All Employees:

   1.1 *Operational Knowledge Required*:

   Employees are required to have complete understanding of their Position Description and all regulations, rules, policies and Procedures pertaining to the Department and their Division, Service and Unit, and to Comply herewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

   1.4 *Attention to Duty*:

Case No. DOC-06-800004, *et al.*

In Jennings' Response, he states that he has been employed with DOC for more than twenty (20) years, and that he was not at work on the day of the escape. Regarding Jennings' discipline of the inmate whose environmental badge Jennings confiscated and which was used by Inmate Jones to facilitate his escape, Jennings contradicted his statement to the OIA investigators about the manner in which he reported the incident to and how he returned the badge to Captain Holmes. During the interview, Jennings stated that he had a key to Captain Holmes' office and he placed the badge on Holmes' desk because Holmes was not yet in the office. He further stated that Holmes never questioned him about the badge being on his desk, but that two days later Jennings "passed on the information. . . ." to Holmes.[11]

> In Jennings' Response, it is stated:

> Officer Jennings reported this incident to Captain Holmes and submitted inmate Beachum's badge to the Captain. Officer Herbert Douglas was present at the meeting in which Officer Jennings gave inmate Beachum's badge to Captain Holmes. The Captain was eating during the debrief meeting in which Officer Jennings submitted inmate Bochum's badge. The Captain did not take the badge in his hand; the Captain ordered Officer Jennings to place Beachum's badge on the corner of the Captain's desk.

Response, p. 4.

---

> Employees are required to devote their entire attention to their official duties. Loafing, newspaper reading, the use of telephones for personal or idle conversation, or acts directed at any other personal pursuits prohibited.

The Correctional Officers' General Orders

> 9. Prepare and submit to the shift supervisor disciplinary reports on all inmates who commit violations of orders, rules and regulations.

[11]   Jennings Interview June 3, 2006, Transcript pp. 7-10.

Case No. DOC-06-800004, *et al.*

Jennings further stated that others besides himself and Captain Holmes had a key to the office: Fire Marshall Jenkins, who shared the office, Officer Douglas, and maybe others.

Regarding his failure to file a disciplinary report in connection with the Inmate Beachum incident, Jennings disputes that there was "one specific protocol in disciplining an inmate" and that the issuance of a disciplinary report is within the discretion of the officer. Response, p. 3.

Based upon the foregoing, I conclude that there are reasonable grounds to believe that the facts upon which the charges against Mr. Jennings are based are true. A reasonable person could believe that Mr. Jennings did not comply with required procedures in disciplining inmate Beachum and safeguarding Beachum's Environmental detail badge after confiscating it. As a result, inmates successfully escaped from the CDF.

### LACHONNE STEWART

> (A)fter entering the Warden's office, both inmates Leaks and Jones removed their orange prison issued jumpsuits and changed into dark navy blue inmate issued jumpsuits. Inmate Leaks stated that he wore a blue jacket, blue DOC baseball cap, and a blue inmate jumpsuit while Inmate Jones wore a blue DOC inmate jumpsuit and sunglasses (Dark navy blue inmate jump suit (sic) are issued at the time of release from CDC). *According to Leaks, (Stewart) placed these items in a trash receptacle in the female locker room located on the second floor, on the morning of the escape for their expressed (sic) use.*
>
> Inmate Rashid stated that on June 3, 2006, the environmental detail inmates were taken out of the North One Housing unit around 7:00 a.m., by Corporal Herbert Douglas and escorted to the area in front of Visiting Hall Two (2). They were given their assignments and supplies and he (Rashid) and two detail inmates from Southwest Two (2) were escorted over to the second floor administrative module by Corporal Douglas. Inmate Rashid said that Inmate Leaks joined him on the second floor

administrative module, approximately forty minutes later, after he issued supplies to the other environmental detail inmates.

According to Rashid, the last time he saw Inmate Leaks was sometime between 9:00 a.m., and 9:30 a.m., in front of the female locker room. Rashid stated that inmate Leaks was talking to you as you stood in the doorway of the female locker room. He also said that you were carrying a large woman's bag. . . .

(Emphasis added).

The Removal Letter charges that Stewart used her official position to aid inmates Jones and Leaks in their escape, that her actions constitute "an utterly reprehensible betrayal of public trust . . . ," in violation of applicable DOC orders.[12]

In Stewart's Response, she states that she has been employed by DOC for almost 24 years, has received "several commendations for attendance and service," and although "she has been suspended on more than one occasion, in each of those cases she was vindicated completely and fully reinstated to her position as a Correctional Officer." Stewart Response, p. 1. Stewart categorically denies that she assisted either of the inmates plan or execute their escape, and she disputes Inmate Rashid's statement that she was speaking with

---

[12] DOC Department Order Number 3350.1. (June 29, 1992).

II.    Policy:  It is the policy of the DOC to strictly prohibit its employees from engaging in behaviors which conflict or appear to conflict with the interests of their official positions.  Employees are expected to contribute to the agency's mission by facilitating an environment which fosters security and inmate rehabilitation.

* * *

VII.   Procedures:

A.    Relationships with Inmates . . .

2.    Employees shall not compromise their professional position by providing preferential treatment to inmates or former inmates, their relatives, representatives, or agents.

Inmate Leaks outside the women's locker room holding a large bag. Stewart Response, pp. 2-3.

Based upon the foregoing, I conclude that there are reasonable grounds to believe that the facts upon which the charges against Ms. Stewart are based are true. A reasonable person could believe that Ms. Stewart aided the inmates in their escape from the CDC.

### 2. Are There Reasonable Grounds To Believe That The Charges Support The Proposed Action?

The regulations governing summary removal require the agency to show that "a good faith effort has been made to determine that at least one (1) of the conditions described in §1616.1 is met . . . ." 6 DCMR §1616.2. These conditions are that the employee's conduct: "(a) [t]hreatens the integrity of government operations; (b) [c]onstitutes an immediate hazard to the agency, to other District employees, or to the employee; or (c) [i]s detrimental to public health, safety, or welfare." 6 DCMR 1616.1. While the Removal Letters specifically cite the first two factors, they also implicitly rely upon the third factor as well.

DOC concluded that one or more of the conditions set forth in 6 DCMR 1616.1 existed with respect to each of the Employees. The OIA investigation demonstrates that DOC made a good faith effort in connection with those determinations. In addition, as explained above, the alleged facts and circumstances regarding each Employee's conduct support the charges made.

6 DCMR §1616.2 also requires that the action taken be "for cause pursuant to

§ 1603." Under 6 DCMR 1603.3 cause is defined as, *inter alia*:

> any on-duty or employment-related act or omission that interferes with the
> efficiency or integrity of government operations; and any other on-duty or
> employment-related reason for corrective or adverse action that is not
> arbitrary and capricious. This definition includes, without limitation . . .
> negligence, incompetence . . . misfeasance, malfeasance . . . .

Clearly, the conduct of each Employee for which he or she is being disciplined

falls within this definition.

Having found in each case that there are reasonable grounds to believe that the

charges against the employee are true and that there are reasonable grounds to believe

that the charges support the proposed action under 6 DCMR 1616.2, the final issue is the

effect of DOC's failure to make the determinations and assessments required under 6

DCMR 1603.9 regarding mitigating/aggravating factors.

As explained above, since removal is not mandated under any regulation, whether

summary removal is appropriate in a particular case is dependent upon DOC determining

and assessing mitigating and aggravating factors required by 6 DCMR 1603.9, prior to

the decision to initiate summary removal.

## III.    RECOMMENDATION

Based upon the foregoing, I recommend that the proposed summary removals of

Herbert Douglas, Lorenzo Jennings, and Lachonne Stewart not be sustained due to

DOC's failure to comply with the requirements of 6 DCMR 1603.9.  6 DCMR 1603.8

makes it abundantly clear that "(r)emoval is not mandated under any provision" of the

regulations.    6 DCMR 1603.9 requires that *"consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate"* in selecting the appropriate penalty against the Employees.    These determinations and assessments must precede the decision to initiate summary removal, and cannot be made after the administrative review of DOC's proposed action.

Dated: December ____8th____, 2006

Robert E. Sharkey
Administrative Law Judge

Case No. DOC-06-800004, *et al.*

## Certificate of Service:

**By U.S. Mail (Postage Paid) and Fax:**

Sol Zalel Rosen, Esquire
2501 Calvert Street, N.W. #212
Washington, DC 20006
**FAX: 202-296-9375**

James E. McCollum, Jr., Esquire
McCollum & Associates, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20741-1717
**FAX: 301-864-4351**

J. Michael Hannon, Esquire
Hannon Group Law Firm, LLP
1901 18th Street, N.W.
Washington, DC 20009
**FAX: 202-232-3704**

I hereby certify that on
_December 8_, 2006, this
document was served upon above-named
parties at the addresses and by the means
stated.

Clerk/Deputy Clerk

**By U.S. Mail (Postage Paid) and Fax:**

Kevin J. Turner, Esquire
Assistant Attorney General

Thelma C. Brown, Esquire
Assistant Attorney General, and

Andrea Comentale, Esquire
Assistant Attorney General

441 4th Street, N.W.
Suite1060 –N
Washington, DC 20001
**FAX: 202-347-8922**

Maria Amato, Esquire
General Counsel
Department of Corrections
1923 Vermont Avenue, NW
Washington, DC 20001
**FAX: 202-671-2514**

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
825 North Capitol Street, NE, Suite 4150
Washington, DC 20002

DISTRICT OF COLUMBIA
OFFICE OF
ADMINISTRATIVE HEARINGS

2006 DEC 11 P 2: 19

In the Matter of the Summary Removal of:

DIONNE MAKINS,

Case No.: DOC-06-800006

An Employee of the Department of Corrections

---

### REPORT AND RECOMMENDATION

Pursuant to Section 1612.10 of the District of Columbia Municipal Regulations ("DCMR"), the undersigned Administrative Law Judge has completed an administrative review of the summary removal of Dionne Makins from her position as Lead Correctional Officer in the District of Columbia Department of Corrections ("DOC") and now submits this Report and Recommendation. For the reasons set forth below, I recommend that the summary removal of Ms. Makins not be sustained as it is inconsistent with the Due Process Clause and the applicable provisions of District of Columbia law.

### I.    INTRODUCTION

On June 3, 2006, two inmates escaped from the District of Columbia Central Detention Facility ("CDF"). On June 5, 2006, DOC Director Devon Brown placed several employees on paid administrative leave, based upon the alleged negligence of these employees in connection with the escape. Seven weeks later, on July 26, 2006, DOC summarily removed Dionne Makins, Lead Correctional Officer DS-09, as well as others, from their positions.

On August 24, 2006, Stanley M. Waldren, Acting Warden, District of Columbia Department of Corrections ("DOC" or "Government"), issued a written notice (hereinafter "Removal Letter") proposing that the summary removal action against Ms. Makins be sustained. Attached to that Removal Letter were a Memorandum to Joan Murphy, Special Projects Officer, from Deputy Warden for Operations Waldren dated August 14, 2006; the DOC Office of Internal Affairs ("OIA") Investigative Report; Transcripts of Interviews with Ms. Makins dated June 3 and June 16, 2006; a Program Statement on Accountability for Inmates issued July 1, 2004, a blank Inmate Movement Pass, Post Orders for the Southeast On[e] {sic} Housing Unit dated February 14, 2005, two regulations and a document captioned "The Correctional Officers' General Orders" June 1984. The Removal Letter gave notice that the Office of Administrative Hearings ("OAH") would conduct the administrative review of the proposed removal actions. It further advised the Employees that they could file responses to the proposed action and that they could "raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty."

On August 31, 2006, J. Michael Hannon, Esquire, of the Hannon Law Group, LLP, counsel for Ms. Makins, filed an entry of appearance and requested a hearing on the matter.

Pursuant to the Comprehensive Merit Personnel Act, D.C. Official Code § 1-616.51(4), and 6 DCMR 1616.5 and 1612, Ms. Makins is entitled to an administrative review of the proposed affirmance of the summary removal. On August 31, 2006, the DOC Director designated the Chief Administrative Law Judge of the Office of Administrative Hearings, or Administrative Law Judges that he designates, to serve as the hearing officers to perform such administrative reviews of the summary removals of the involved employees, including Ms.

Makins.[1]  The Chief Administrative Law Judge designated the undersigned Administrative Law Judge to serve as a hearing officer in the matter of Ms. Makins.

On September 8, 2006, certain of the assigned Administrative Law Judges conducted a joint status conference with the attorneys representing all eleven DOC employees and Maria Amato, Esq., DOC General Counsel.  This administrative court issued a joint Order on September 11, 2006.  The joint Order denied the employees' request for a discovery schedule and asked for an explanation of the need for adversary hearings.  The Order also provided for the submission of documents missing from the Investigative Report.  The Order set a deadline of September 25, 2006, for the submission of responses to the Removal Letter.

On September 11, 2006, DOC filed and served on all parties the documents missing from the Investigative Report.  The documents provided were Exhibits B, C, and D, and the Key of witness names.

On September 27, 2006, counsel for 10 of the employees, including Ms. Makins, filed a Motion for Summary Dismissal raising several issues that are discussed in detail below under "Preliminary Matters."  Also on September 27, 2006, Ms. Makins filed her Response to the Removal Letter.  In essence, she stated in her Response that her conduct at issue was not negligent as charged, that she was operating the housing unit short-handed that day, that she followed all procedures for movement of inmates out of the housing unit and that the summary dismissal action violated her constitutional rights.

---

[1]    DOC extended the designation as of October 3, 2006, into Fiscal Year 2007.

Counsel for Ms. Makins also filed a request for extension of the deadline for responses. By Order dated October 4, 2006, the assigned Administrative Law Judges granted that request *nunc pro tunc* to the date of filing of the responses. That Order also established a deadline of October 13, 2006, for the DOC's reply to the responses, and scheduled a hearing on the Motion for Summary Dismissal for October 19, 2006.

On October 13, 2006, DOC filed its Opposition to the Motion for Summary Dismissal. DOC maintained that a hearing officer for DOC has no power to grant the relief of dismissal, but may only conduct the administrative review and make a written report and recommendation to the deciding official.

The assigned Administrative Law Judges conducted a hearing on the Motion for Summary Dismissal and a second joint status conference as scheduled on October 19, 2006. On October 26, 2006, this administrative court issued its Order Denying the Motion for Summary Dismissal. The denial Order stated that the DOC Employees' arguments would be considered as part of the individual reports and recommendations. The denial Order also established a deadline for the final agency decision in this case of December 15, 2006.

## II.    DISCUSSION

### A. Preliminary Matters

Ms. Makins has raised three issues in the Motion for Summary Dismissal I will discuss here. Ms. Makins contends first that the summary removal action is a "post-termination" action, and that in this context, she has been denied her rights to a "pre-termination" notice and hearing pursuant to *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546 (1985).

The parties agree Ms. Makins has been removed from her position, is not working, and has not been paid since August 24, 2006. The Removal Letter speaks in terms of the reasons for the "proposed removal" of Ms. Makins. At the October joint status conference, DOC argued that the removal of Ms. Makins does not actually occur until the Director of DOC has rendered a final decision in this matter. Ms. Makins disputes that characterization of her position and argues that she has been terminated already because her property interest in employment has been taken from her. The consequence of that deprivation, according to Ms. Makins, is that she was denied the due process requirements to which a tenured public employee is entitled including "oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." *Loudermill,* 470 U.S at 546. Motion for Summary Dismissal at p. 10. Ms. Makins contends that she has already been denied her constitutional rights under *Loudermill* because she has been terminated without notice and without an opportunity to be heard. I disagree.

While, as a practical matter, Ms. Makins is not working and not being paid, there remains an administrative process to complete before Ms. Makins can be described as "terminated." The District of Columbia Personnel Regulations expressly provide for such a process, even when a summary removal action has been taken. 6 DCMR 1616. That administrative process includes the right to a Final Decision Notice, in writing, dated and signed by the deciding official, and addressing certain issues. 6 DCMR 1616.4(h) and 1614. Prior to the issuance of a Final Decision Notice, the administrative process must include an administrative review. 6 DCMR 1616.5, 1612. The "pre-termination" administrative process that is required is defined by *Loudermill, supra.*

Second, Ms. Makins argues that D.C. Official Code § 1-616.51 is unconstitutional on its face, because summary removal is a drastic personnel action that is permitted only when "an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee [herself]; or, is detrimental to public health, safety, or welfare." Motion for Summary Dismissal at p. 12. Ms. Makins states that there are no facts presented to DOC justifying use of this extraordinary remedy.

In fact, Ms. Makins has not made any showing that the statute is *facially* unconstitutional, as she concedes that there are circumstances where a DOC employee may be properly subject to summary removal. Ms. Makins asserts only that the statute cannot be applied to the facts in this case. To the extent Ms. Makins contends that her circumstances do not justify use of summary removal, this appears to be an argument that the facts do not meet the criteria for summary removal. This issue can be decided by applying the statute and regulations to the facts. Therefore, I will consider her argument in addressing the merits of the case.

Third, Ms. Makins argues that the "*Douglas* factors" are applicable to her termination and must be used to evaluate the appropriateness of the penalty imposed. The *Douglas* factors were articulated by the U.S. Merit Systems Protection Board and comprise factors (that may be mitigating or aggravating) that must be considered in determining an appropriate penalty for a federal employee's misconduct. *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). Ms. Makins relies on *Dep't of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005) to support her assertion that the *Douglas* factors must be considered when determining a penalty for a District of Columbia employee. *Colbert* appears to be one of only a small number of published cases in this jurisdiction addressing the question of the application of the *Douglas* factors to District of

Columbia employees. The District of Columbia Court of Appeals in *Colbert* did not directly hold that the *Douglas* factors must be applied to evaluate the appropriate penalties for misconduct by District employees.[2] An earlier decision by the Office of Employee Appeals stated that the agency uses the principles in *Douglas* as "guidance." *Employee v. Agency*, 29 D.C. Reg. 4565, 4570 (1982);[3] *see also Stokes v. District of Columbia*, 502 A.2d 1006, 1010 (D.C. 1985) (emphasizing that the role of the Office of Employee Appeals is not to balance the relevant factors but to evaluate whether the agency considered relevant factors and struck a balance within the realm of reasonableness, as set forth in *Douglas*). The personnel regulations do currently state "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The Removal Letter does not address either mitigating or aggravating factors, and does not indicate that such factors were weighed or considered in deciding upon the penalty for Ms. Makins. Moreover, the Removal Letter does not refer to Ms. Makins' personnel file, and there is

---

[2]    The *Colbert* case has an involved procedural history. The Court had remanded the case to the Board of the Office of Employee Appeals to consider whether 6 DCMR 1608.2 (limiting consideration of certain parts of an employee's disciplinary record in assessing a penalty based on their age) affected the application of the *Douglas* factors. 874 A.2d at 357 n.8. By contrast, *Douglas* provides generally for consideration of the employee's past disciplinary and work records. The Board apparently filed a Response on Remand. *Id.* The Court then mentioned that certain documents whose consideration was in question "were relevant in applying the *Douglas* factors," 874 A.2d at 359, and not inconsistent with 6 DCMR 1608.2. The Superior Court order is quoted, which mentions the initial failure to perform a *Douglas* analysis. 874 A.2d at 360. The Court ultimately remanded the case to the administrative law judge to consider "DPW's Agency Report on Remand applying the *Douglas* factors, including the additional evidence supplied by DPW and Colbert." 874 A.2d at 361.

[3]    In this context, it is not entirely clear whether the Office of Employee Appeals' decision is referring to the *Douglas* discussion of the proper scope of review (cited in a number of subsequent cases) or to the twelve specific factors.

no indication that her employment history was viewed as a mitigating or aggravating factor. Attorneys for DOC stated at the October joint status conference that the *Douglas* factors will be applied at the agency level, but that DOC is not required to expressly articulate its analysis of these factors in the notice of proposed summary removal action, nor is the hearing officer charged with applying these factors to the proposed action.

I do not find it necessary to reach the question whether DOC must explicitly address such factors in a proposed removal action, such as the Removal Letter at issue here, because I find that DOC has not supported its summary removal action under *Loudermill*. At this stage, I find that the first determination is the *Loudermill* question: if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Ms. Makins may be summarily removed? In other words, under 6 DCMR 1616.1, has DOC shown negligence by Ms. Makins that threatened the integrity of government operations or constituted an immediate hazard to DOC or government employees or that was detrimental to public health, safety or welfare? Because I answer that question in the negative, I do not consider the *Douglas* question.[4]

---

[4]    It is necessary, however, for me to apply the three factors for summary removal set forth in 6 DCMR 1616.1. I note that the *Douglas* factors are considered guidelines, and a District or federal agency is not required to give equal weight or even any weight to any particular factor. *See Stokes, supra* at 1010-11. Therefore, an agency could reach the same result in this case, after applying either the *Douglas* factors or the summary removal provisions of Section 1616.1. Using the *Douglas* factors, an agency could place greater emphasis on the conduct itself and give less weight to the employee's record. Of course, an agency would use the *Douglas* factors to consider penalties other than removal, whereas here I am only reviewing the summary removal action.

## B. The Need For An Adversary Hearing

On August 31, 2006, Ms. Makins filed a request for an "oral hearing and an opportunity to present a written submission."[5] At the September joint status conference, Ms. Makins argued that extensive discovery and evidentiary hearings were necessary in order to establish the causes of the escapes in general and the roles, if any, of the individual employees in the escapes. As noted above, the request for discovery was denied. At the October joint status conference, Ms. Makins stated that if the Motion for Summary Dismissal were denied, she would request only a limited hearing with an opportunity to respond to specific factual allegations upon which DOC has relied. Ms. Makins did not request or desire a full evidentiary hearing, because she stated this would allow DOC to firm up its case.

*Loudermill* and subsequent cases establish that due process does not require an oral hearing or the presentation of witnesses at a pre-termination hearing where, as here, an employee has an opportunity for a full post-termination evidentiary hearing.[6] *Loudermill* itself states that an "opportunity to present reasons, *either in person or in writing*, why proposed action should not be taken is a fundamental due process requirement." 470 U.S. at 546 (emphasis added).

---

[5]    In addition to "an opportunity to present [her] side of the story," *Loudermill* grants Ms. Makins the right to "oral or written notice of the charges" and "an explanation of the employer's evidence." 470 U.S. at 546. Ms. Makins does not take issue with the notice she received. However, she argues that the change to 6 DCMR 1616.4 to expand the time to provide written notice from three days to 30 days was illegal. Under 6 DCMR 400.1, variances may be granted to the regulations under certain conditions. The variance granted in these cases appears to comply with the requirements in that DOC articulated a limited need to complete transcription of the interview tapes which were used to support the summary removal.

[6]    Pursuant to D.C. Official Code § 1-616.52(b), Ms. Makins may appeal to the Office of Employee Appeals from any final DOC decision removing her from employment. If not satisfied, Ms. Makins may then appeal a decision of the Office of Employee Appeals to the D.C. Superior Court. *See generally Johnson v. District of Columbia,* 368 F. Supp. 2d 30 (D.C. 2005).

Cases after *Loudermill* confirm that a full evidentiary hearing before termination is not required to satisfy due process. *E.g., Thompson v. District of Columbia,* 428 F.3d 283, 290 (D.C. Cir.2005) (Edwards, J., concurring); *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 566 (6th Cir. 2004); *Greer v. Amesqua,* 212 F.3d 358, 367 (7th Cir.), *cert. denied,* 531 U.S. 1012 (2000); *Schacht v. Wisconsin Dep't of Corr.,* 175 F.3d 497, 503 (7th Cir. 1999); *Schleck v. Ramsey County,* 939 F.2d 638, 641-42 (8th Cir. 1991); *Powell v. Mikulecky,* 891 F.2d 1454, 1458 (10th Cir. 1989).

It is not clear what type of hearing Ms. Makins is requesting. She has not presented a sufficient basis for ordering a pre-termination evidentiary hearing. The purpose of a *Loudermill* hearing is to serve as "an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." 470 U.S. at 545-46. The cases cited above demonstrate that the "initial check" ordinarily can be performed without a full evidentiary hearing, and Ms. Makins' submission makes no attempt to show why her Motion for Summary Dismissal and her Response, both dated September 27, 2006, are inadequate presentations of her side of the story. Accordingly, due process does not require a full pre-termination evidentiary hearing, where as here, there is an opportunity for a full evidentiary hearing after termination.[7]

District of Columbia law also does not require a pre-termination hearing with oral testimony in all instances. The Comprehensive Merit Personnel Act provides that there shall be

---

[7]    Ms. Makins disputes some of the factual allegations against her. It is not my role to weigh the credibility of evidence as to this factual dispute. Therefore, there is no need for a hearing at this stage to assess her account of the events of June 3, 2006. I will consider her account to the extent it bears on whether a reasonable person could conclude, based on this record, that the facts alleged by DOC are true, and whether those facts justify the proposed summary removal action.

"a *written* opportunity to be heard before the action becomes effective." D.C. Official Code § 1-616.51(4) (emphasis added). The regulations implementing Section 1-616.51(4) permit an evidentiary hearing in connection with a pre-termination administrative review only when "a decision based on a preponderance of the evidence cannot be made because the written record is inadequate for this purpose." 6 DCMR 1612.5(a). The adequacy of the record must be measured with reference to the limited purpose of this administrative review. The issue at this stage of the proceedings is not whether the proposed termination is proper, but only whether the Government has provided both credible and reasonable grounds for it. The pre-termination process is designed to allow the employee, not the Government, to explain her side of the story. As discussed below, the written record submitted by the Government adequately demonstrates that such reasonable grounds for the disciplinary action it proposes do not exist. Accordingly, in the exercise of the authority delegated to me, I determine that a pre-termination evidentiary oral hearing is not necessary.

### C. The Basis For The Proposed Removal of Ms. Makins

The substantive issue here is whether there is a reasonable basis for the affirmance of the proposed summary removal.[8] Resolution of the issue requires consideration of two questions,

---

[8] In analyzing the *Loudermill* question, I have considered the Government's record to consist of the following materials provided with respect to Ms. Makins: the Removal Letter signed by Stanley Waldren as Acting Warden, the attached Memorandum from Deputy Warden for Operations Waldren to Joan Murphy, the attached Investigative Report, and the attached two Interview Transcripts of Ms. Makins (June 3 and June 16, 2006), the blank Inmate Movement Pass form as well as all rules and regulations cited by DOC. The record also includes the later-filed Exhibits B, C, and D to the Investigative Report, and the Key of witness names used in that report. The interviews of Ms. Makins were conducted without her swearing to testify under oath; the Interview Transcripts are transcriptions signed neither by the court reporter as true and accurate nor by the interviewee, Ms. Makins, after opportunity for review and corrections.

according to *Loudermill.* The first question is "whether there are reasonable grounds to believe that the charges against the employee are true." 470 U.S. at 545-46. The second question is whether there are reasonable grounds to believe that the charges "support the proposed action." *Id.* at 546.

### 1.  Are There Reasonable Grounds To Believe That The Charges Are True?

This administrative court is charged with "performing an initial check against mistaken decisions -- essentially, [this court must determine] whether there are reasonable grounds to believe that the charges against [Mr. Bryant] are true and support the proposed action." *Loudermill at 545-546.* DOC states that the removal is based upon Ms. Makins' negligence and violation of CDF policy. The act of Ms. Makins that is identified as the basis for these charges is described as follows:

> [O]n June 3, 2006, you were the assigned Office[r] {sic}-In-Charge (OIC) of Southeast One (1) (SE-1) housing unit. Your primary functions were to maintain custody, security and accountability of all inmates in your assigned housing unit and provide supervision to all subordinate officers assigned to your unit. At approximately 9:42 a.m., Inmate Ricardo Jones walked out of the SE-1 housing under the pretense of going to the Infirmary.

> Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing him to go to the Infirmary. Inmate Jones' name was placed on the housing unit movement/running count sheet, accounting for and authorizing his movement to the Infirmary. However, according to Infirmary records, only six (6) inmates from SE-1 were scheduled for medical care in the Infirmary on June 3, 2006. Inmate Ricardo Jones was not one of them.

> \*       \*       \*

> Corporal Hatton and Corporal Washington worked in the unit with you on June 3, 2006. [A]fter calling the count into the count book, you proceeded to cut the call-out passes and date them. You . . . made all your passes that you were aware of and Miss Hatton put them on the movement sheet. . . . . [T]he inmates that were going to the Infirmary already had their passes; so all they had to do was wave their hands with their passes. Inmate Ricardo Jones, who was in cell 18

flagged out, he had a pass. You asked him where he was going, he responded, "to the Infirmary." You only glanced at the call-out pass. . . Miss Hatton signed the pass and put him on the movement sheet. [You failed] to follow written and verbal instructions. [Y]ou failed to confirm the authenticity of inmate Jones' comments and confirm his authorization for medical treatment.

Removal Letter at 1-2 [references to the OIA Investigative Report and interviews redacted].

The Removal Letter references the Investigative Report. According to the Investigative Report, during the day shift on Saturday, June 3, 2006, there were three correctional officers assigned to the Southeast One (1) housing unit. The Southeast One (1) housing unit records show that Inmate Ricardo Jones had a Movement Pass authorizing him to go to the Infirmary and that he was listed on the housing unit movement/running count sheet authorizing his movement to the Infirmary. Nevertheless, from the Infirmary records OIA determined that only six inmates from the Southeast One (1) housing unit were scheduled for medical care in the Infirmary on June 3, 2006, and Inmate Jones was not one of those inmates. Investigative Report at 11.

According to the Investigative Report, at 9:42 a.m., Inmate Jones was observed walking out of Southeast One (1) housing unit holding a small sheet of paper in his hand. He then met up with Inmate Joseph Leaks and was observed walking up the corridor towards Floor Control One.

The Investigative Report notes that the three officers assigned to the Southeast One (1) housing unit gave "conflicting accounts of the circumstances surrounding how inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment" during their

interviews[9] and that the matter would be "more fully examined [in] the criminal investigation of this incident." *Id.* at 11.

The only other mention in the Investigative Report of the Southeast One (1) housing unit and the possible role of the three officers assigned to that unit is the following comment:

> During this investigation, an attempt was made to review pre-recorded activity in the Southeast One (1) housing unit prior to inmate Jones' departure from it on the morning of June 3, 2006. This investigation revealed that a critical portion of the pre-recorded video footage covering activity in the housing unit was missing.

Investigative Report at p. 11. Later in the Report, out of context and appearing as an afterthought, is the following notation:

> *Note: A review of the Southeast One housing unit recording video component by the office of the Chief Technology Officer, Computer Forensic Team (OCTO/CFT), revealed no evidence of digital tampering with files/data; no deletions or unauthorized modifications were as {sic} identified or observed.

Investigative Report at p. 12.[10]

---

[9]    Ms. Makins argued in the Motion for Summary Dismissal that the Interview Transcript should be suppressed because the OIA investigators failed to give her *Miranda* warnings, in violation of her Fifth Amendment rights. The Fifth Amendment provides that "no person ... shall be compelled *in any criminal case* to be a witness against himself." U.S. Const., Amend. V [emphasis added]. In order to admit, in a criminal case, incriminating statements made during a custodial interrogation, the police must have first advised the suspect of certain constitutional rights associated with the Fifth Amendment. *Miranda v. Arizona,* 384 U.S. 436 (1966). The exclusionary rule, applied as a remedy in criminal cases, does not apply when the Government seeks to use the statements in a civil or administrative proceeding. *See, e.g., Allen v. Illinois,* 478 U.S. 364, 368 (1986); *Chavez v. Martinez,* 538 U.S. 760, 772 (2003). *Kastigar v. United States,* 406 U.S. 441 (1972), cited by Ms. Makins, involved an attempt by the Government to compel Grand Jury testimony from witnesses who were granted use immunity, and it has no application to the present situation. The motion for suppression is denied.

[10]    The complete Computer Forensic Investigation Report, dated July 24, 2006, is Exhibit D to the Investigative Report.

In its conclusions, the Investigative Report notes that OIA conducted "well over forty interviews of staff and inmates during the course of this investigation." It goes on to find:

> Although the underlying act involved the efforts of two inmates, there were contributing factors that created an opportunity for inmates Joseph Leaks and Ricardo Jones to execute a plan of escape from the confines of the CDF.
>
> These factors can be categorized in three areas – staff negligence; policies, procedures and practices; technology and support mechanisms.

Investigative Report at p. 19. The report then proceeds to describe the instances of staff negligence, classification and reclassification errors and other procedural violations, describing the actions of several specifically identified employees. Investigative Report at pp. 19-26. Nowhere in this detailed discussion of misconduct by DOC employees is there any specific mention of Ms. Makins or any role she had in the inmates' escape.

The Investigative Report does contain generic information relating to housing unit procedures in its discussion of the factors contributing to the escapes under the section on Policies, Procedures and Practices and the section on Technology and Support Mechanisms:

### 8e.    Policy, Procedures and Practices

#### 1.    Inmate Accountability

> When an inmate has a scheduled appointment with the Infirmary, a personal or legal visit, or other matters to attend to off the unit, s/he shall be issued a *movement pass to authorize his/her* movement from his assigned housing unit to the specified location displayed on the pass.
>
> Although the physical plant has numerous checkpoints to observe and monitor the status of an inmate's movement, prisoners in many cases are allowed to walk to their destination unescorted.

The movement pass is a pre-printed template on an 8 ½ x 11 sheet of paper. There are four pass templates on one 8 ½ x 11 sheet. The passes are maintained in the control module of the housing unit.

Inmates are usually notified that they have a visitor or a scheduled appointment in the Infirmary by a telephone call from staff to the Correctional Officer assigned to the housing unit control module. The officer will either write the pass and hand deliver it to the inmate's cell, have the detail inmate deliver the pass to the inmate's cell, or have the inmate's cell door opened allowing the inmate to approach the control module to be issued the pass as s/he departs the Housing unit.

When an inmate leaves the unit, she is accounted for by the officer placing the inmate's name on the running count sheet. In an effort to save time, some officers will, upon entering their assigned housing unit, write and sign passes without placing the names of the inmates on the pass. Although these practices were in place at the time of the escapes, they have since been changed as they were atypical in the field of Corrections and not consistent with current best practices.

On Saturday, June 3, 2006, prior to 9:42 a.m., inmate Ricardo Jones was given a pass to Infirmary; however, his name was not on the list of inmates scheduled for appointment. Officers assigned to the unit gave different accounts of how and why inmate Jones was issued the pass. Furthermore, neither of the assigned officers acknowledged writing the pass permitting him out of his housing unit.

The OIA interviewed the three (3) Officers who were assigned to the Infirmary on Saturday, June 3, 2006. Each officer stated that inmate Ricardo Jones was not scheduled to be seen in the Infirmary on Saturday, June 3, 2006. Each officer further claimed that on the morning of the escape, they did not call unit Southeast One (1) to request that inmate Jones report to the Infirmary for an appointment.

There is a possibility that someone, perhaps Leaks, called the unit that morning and purposely misled the officer in the housing unit by pretending to be an employee of the Infirmary, asking for inmate Jones to respond for an appointment. There is also the possibility that inmate Jones complained of an illness and was allowed to leave the unit by one of the officers. (This matter will be more fully examined during the criminal investigation of the incident.)

8f.    Technology and Support Mechanisms

1.    Surveillance Cameras (Housing unit)

As part of this investigation, an attempt was made to review pre-recorded video footage from Southeast One (1) to determine when inmate Ricardo Jones received his movement pass and who issued him the pass. Investigators discovered that

> critical minutes of footage are unaccounted for. (This matter will be examined
> fully during the criminal investigation of the incident.)

(Emphasis in the original.) Based on the contents of the Removal Letter and the Investigative

Report, the first question is what precisely is the *act* that is the basis for the proposed summary

removal. Although referencing in several instances the missing video footage in the Southeast

One housing unit for the period of time at issue, that would have shown who gave Inmate Jones

the pass, DOC does not contend that Ms. Makins tampered with the recording equipment or

otherwise had any responsibility for the missing footage. The only other and actual basis for the

charge is the act of allowing Inmate Ricardo Jones to leave the housing unit without verifying

that he had a valid pass for the Infirmary and a confirmed appointment at the Infirmary on the

morning on June 3, 2006:

> As the OIC of the unit it was your responsibility as well as the subordinate
> officers (Washington and Hatton) assigned to the unit to confirm Inmate Jones'
> need for medical treatment; the availability of medical staff to check inmate
> Jones; and seek authorization for his movement to the infirmary via a call out pass
> or escort pursuant to sick call and infirmary protocols.
>
> \*       \*       \*
>
> The Investigation further concluded that each correctional officer assigned to SE-
> 1 housing unit to include you was culpable, because it was the responsibility of
> each employee assigned individually and collectively to ensure the accurate
> accountability of each inmate assigned to the housing unit. Therefore, you failed
> to properly carry out your assigned duties. Your negligence is aggravated by the
> fact that you were **Lead** Officer-In-Charge.

Removal Letter at p. 3. (Emphasis in the original.) The Investigative Report states that Inmate

Ricardo Jones was observed after leaving the housing unit with a piece of paper in his hand

which resembled the movement passes described in the Report. Although a sample of the form

is included in the Government's evidence, the actual pass Inmate Jones had in his possession that

day has not been provided. DOC charges Ms. Makins with the responsibility for and failure to

verify Inmate Jones' infirmary appointment and the information on the pass in Inmate Jones'

possession. Ms. Makins does not dispute the contention that she did not scrutinize the document

Inmate Jones had in his hand when he informed her it was a pass to go to the infirmary. June 3,

2006, Interview Transcript at p. 6. Nor does she address that issue in her Response to Summary

Removal and in Support of Motion for Summary Dismissal ("Response").

By way of explanation, Ms. Makins contends in her Response that when she was

promoted to Sergeant in March 2006, she received no special training as prior classes of

sergeants had received. She acknowledged, however, that she had been regularly assigned as

Officer-In-Charge in the Southeast One housing unit since her promotion. On the day in

question, Ms. Makins points out that CDF was severely short of officers, resulting in there being

only three correctional officers assigned to the Southeast One housing unit during the day shift

instead of the required four. Further, all three were female officers on a male unit of 145

inmates. Ms. Makins describes in some detail her unsuccessful attempts to get a male officer in

addition to or at least in place of one of the female officers assigned.

She notes that she followed the normal procedure of filling out the call-out or movement

passes for those inmates who have daily appointments at the Infirmary while waiting for the

count to clear, but it was unclear from her interview statements whether she or another officer

listed the names on the movement log and she did not address that question in the Response.

As stated in the Memorandum of Deputy Warden Waldren to Officer Murphy, at pp. 1-2,

and the Removal Letter, at pp. 3-4, Ms. Makins' actions violated the following Departmental

policy, Basic Regulations for All Employees and Correctional Officer's General Orders:

Case No. DOC-06-800006

Departmental Policy:

Program Statement 5010.2c: Accountability for Inmates which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations for All Employees:

Section 1.1, Operational Knowledge Required: Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith.    Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty: Employees are required to devote their entire attention to their official duties;

Correctional Officer's General Orders:

Number 1:  Take charge of this post and all government property on or near it.

Number 8:  Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command.

For the following reasons, I must conclude that a reasonable person could find that Ms. Makins committed the acts with which she was charged – failure to scrutinize Inmate Jones' pass and failure to verify the appointment with the Infirmary – and that these acts violated the Policies of the institution.

A reasonable person could conclude that Ms. Makins was required to adhere to Departmental policy regardless of whether she had received the additional training that had previously been provided to those officers promoted to sergeant.  If an inmate contends that he has a pass to exit the housing unit, a reasonable person could conclude that an officer assigned to a housing unit must maintain accountability by checking the contents of the pass and confirming the appointment with the unit to which the inmate contends he has permission to go.  Under the

circumstances, this is part of the essential duties of a housing unit officer. How else could she maintain accountability of the inmates in her area of responsibility? Ms. Makins' statements during her interviews placing responsibility on the officer in the bubble who would note the time the inmate was leaving the housing unit on the pass and the movement log does not lessen her own responsibility as Officer-In-Charge to ensure that an inmate has a proper pass to an authorized destination.

Ms. Makins also asserts that she was working understaffed, despite repeated efforts to get assistance from superior officers. Again, this defense is not pertinent to the charge. Her responsibilities did not change because she was short one officer on the Southeast One housing unit. It may be true that her supervisors share responsibility, or that the shortage of staff played a role in making the performance of her duties more difficult, but this does not excuse Ms. Makins from performing her basic duties.

Based on this record, a reasonable person could conclude that Ms. Makins failed to perform her duty to maintain accountability for all inmates in her area by allowing Inmate Jones to leave the Southeast One housing unit without checking the pass he waved to ensure that it was valid and without confirming his appointment with the Infirmary.

Based upon the foregoing Analysis, I conclude that a reasonable person could find that the factual basis for the charge is true. *Loudermill, supra,* at 546.

### 2. Are There Reasonable Grounds To Believe That The Charges Support The Proposed Action?

Since I have found there are reasonable grounds to believe that the factual basis for the charge is true, I will now address the second question: if all the reasonably believable evidence

supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Ms. Makins may be summarily removed? The short answer to this question is, "No."

Under 6 DCMR 1603, an employee may be disciplined or removed only "for cause." 6 DCMR 1603.2. Cause is defined as, *inter alia*, "any on-duty or employment-related act or omission that interferes with the efficiency or integrity of government operations; and any other on-duty or employment-related reason for corrective or adverse action that is not arbitrary and capricious. This definition includes, without limitation . . . negligence, incompetence . . . misfeasance, malfeasance . . . ." 6 DCMR 1603.3. A *"de minimis"* violation of the cause standard cannot be the basis of a disciplinary action. 6 DCMR 1603.5. The burden is on the government to show that the disciplinary action is or was for cause. 6 DCMR 1603.10.

In addition, the regulations require that in selecting a penalty, "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The regulations governing summary removal also require the agency to find "cause" for the disciplinary action. 6 DCMR 1616.2. However, in the case of summary removal, the agency head must also find that the employee's conduct "(a) [t]hreatens the integrity of government operations; (b) [c]onstitutes an immediate hazard to the agency, to other District employees, or to the employee; or (c) [i]s detrimental to public health, safety, or welfare." 6 DCMR 1616.1. While the Removal Letter specifically cites to the first two factors, Removal Letter at 1, it implicitly relies upon the third factor as well. *Id.* at 3 ("your negligence . . . placed staff, inmates and the public at large in considerable capricious danger."). The regulation permitting summary

removal clearly envisions a situation where, rather than "interfering with" the integrity of government operations, the employee's conduct has created such risk of harm that the agency must act quickly.[11]

In this case, I have concluded that a reasonable person could find that on June 3, 2006, Ms. Makins allowed Inmate Jones to exit from Southeast One housing unit without appropriately verifying the validity of a movement pass or confirming an appointment with the Infirmary.

The Removal Letter concluded that Ms. Makins violated: (1) DOC Program Statement 5010.2c, which requires correctional officers to maintain accountability for all inmates in their area of responsibility; (2) Basic Regulations of All Employees 1.1, which requires employees to have a complete understanding of their Position Description and applicable rules, and to abide by them; (3) Basic Regulations for All Employees 1.4, which requires employees to devote their entire attention to their official duties. The Removal Letter further concluded that Ms. Makins' conduct fell below the standard for protection of others against reasonable risk of harm. Removal Letter at p. 4.

DOC is correct that Ms. Makins' alleged negligence contributed in part to the escape, in that she or the other correctional officers assigned to the Southeast One housing unit, "a controlled secure environment," allowed Inmate Jones to leave that unit and proceed to Floor Control One. From there, other personnel released Inmate Jones to move through the facility and eventually reach the Warden's office from which he and Inmate Leaks later executed their

---

[11]    Simply the seven-week gap between the jailbreak and the suspension of Ms. Makins raises some initial questions about DOC's evaluation of the "immediacy" of the hazard presented by Ms. Makins.

escape. If the facts are established as true, Ms. Makins failed to perform her basic duties to maintain accountability of the inmates under her charge.

However, the record does not establish that her conduct created the imminent harm that is required for summary removal, under 6 DCMR 1616.1, for the following reasons:

(1)    Although Ms. Makins' negligence allowed Inmate Jones to exit from the Southeast One housing unit, Inmate Jones had to pass through Floor Control One and Floor Control Two, through the Administrative Two door into the administrative module and into the Warden's suite, from which he and Inmate Leaks escaped. At each of those points, other personnel should have been checking to determine whether Inmates Jones was where he was supposed to be. This does not excuse her conduct, but it is a factor in determining the appropriate penalty;

(2)    The Investigative Report at p. 4 states that there is strong evidence that other employees intentionally aided and abetted the two inmates in the escape planning and execution. Such activities, if proven, would play a far larger role in the escape than the one act of neglect by Ms. Makins, and she is not charged with intentional misconduct; and

(3)    Although the evidence supporting the charge against Ms. Makins is legally sufficient for purposes of my review, the evidence is weak. Given the understaffed situation on her shift that morning, three people were trying to do the work of four correctional officers. Ms. Makins could not do the required floor and inventory inspections and maintain a presence in the bubble at the same time in order to answer the phone calls and check the passes with the entries on the movement log. There is no evidence presented by the Government that Inmate Jones did not have an apparently valid pass for the Infirmary. While Inmate Jones was newly housed in

the Southeast One housing unit and was not one of the inmates who had daily visits to the Infirmary, Ms. Makins had noted in her interviews that she was out the day before the escape, and it would not have been unreasonable for her to assume that the inmate had been issued a pass for the Saturday Infirmary visit by someone the previous day. Further, the Investigative Report notes that that someone, perhaps Inmate Leaks, may well have called the Southeast One housing unit that morning and feigned being an employee of the Infirmary asking Inmate Jones to report to the Infirmary for an appointment.

For these reasons, it is not reasonable to conclude that Ms. Makins' failure to personally check the pass in Inmate Jones' possession or to personally verify that he had an appointment that morning with the Infirmary was a significant factor in the escape so as to support her summary removal.

Further, in determining whether the facts reasonably believed to be true support the summary removal of Ms. Makins, I also considered her actions in light of the Government's conclusions in the Investigative Report. The first "Major Finding" by the DOC investigators, as stated above, is that strong evidence suggests that staff "intentionally aided and abetted in the planning and execution of the escapes." Investigative Report at 4. The DOC investigators also find that "[w]hile departmental policy and procedure are for the most part sufficient, staff negligence in properly adhering to them and circumvention of established regulations were major contributors to the escape." *Id.* There is no basis provided for asserting that the action taken by Ms. Makins is negligence that was a major contributor to the escape, particularly given the finding that CDF staff colluded in the escape. Ms. Makins' alleged negligence neither threatened the integrity of government operations nor constituted an immediate hazard to DOC or other employees.

In the "Agency Enhancements" section of the Investigative Report, DOC investigators note several changes in the area of "Inmate Controlled Movement." These include: In the "Agency Enhancements" section of the Investigative Report, DOC investigators note several changes in the area of "Inmate Controlled Movement." These include:

> [i]nmates shall be issued call-out passes for authorized movement on a "one time" basis. The unit officer shall contact the officer at the inmate's intended destination to verify the inmate's movement. Call-out passes shall be distributed to the inmate as s/he departs the unit to go to an authorized designator. The inmate's name, DCDC number, destination, and departure time shall be recorded on the call-out pass. This information shall also be recorded in the unit logbook and on the Housing unit running movement sheet. To ensure inmates arrive in a timely manner, the receiving officer shall notify the housing unit officer of the inmate's arrival at his/her assigned destination.

*Id.* at 17. While the Investigative Report provides a basis for the need for a revision of the relevant regulations, these revisions do not change my conclusion that, even following all then-applicable rules, as a factual matter, Ms. Makins' actions did not contribute significantly to the escape.

In the "Recommendations" section of the Investigative Report, the DOC investigators make nine recommendations. The only recommendations that arguably address the alleged negligence of Ms. Makins, are a provision to "hire a Security Chief whose primary responsibility will be to ensure that proper security controls, staffing, equipment, and operational protocols are in place to better promote the integrity of the complex" and one to increase staff training. Several of the recommendations, however, focus on the need for increased institutional security and better communication tools. Investigative Report at 28. In addition, in "Final Observations," DOC characterizes the inmate escapes as

> neither opportunistic nor spontaneous but rather the outgrowth of a calculated deliberate plan, arranged and orchestrated with the assistance of others. The

escapes involved not only a carefully assessed determination as to how to breach institutional security but how to elude authorities once successfully in the community. Central in their scheme to flee from justice was collusion by corrupted staff and the negligence of correctional employees who failed to appropriately address their assigned responsibilities.

Investigative Report at 27.

I conclude that the facts relied upon by the Government, reasonably believed to be true, do not support the proposal to summarily remove Ms. Makins from her position. Summary removal requires that the employee's conduct threatens the integrity of government operations, is an immediate hazard to DOC, other government employees, or herself, or is detrimental to public health, safety, or the welfare of others. 6 DCMR 1616.1. Ms. Makins' conduct can best be described as inaction, in a long chain of actions, some of which contributed more significantly to the escape. The Government has not established that Ms. Makins' conduct threatened the integrity of government operations, was an immediate hazard to DOC, other government employees, or himself, or was detrimental to public health, safety, or welfare.

## III. RECOMMENDATION

In this administrative review, I have considered the two issues raised both by *Loudermill,* 470 U.S. 532, and Chapter 16, D.C. Personnel Regulations. Those issues are: (a) whether there is any reasonably believable evidence supporting the facts alleged by the proposing official; and (b) whether, if all the reasonably believable evidence supporting the facts alleged by the proposing official were taken as true, a reasonable person could find, by a preponderance of the evidence, that the employee may be removed.

For the reasons discussed above, I have determined that (a) there is reasonably believable evidence supporting the factual conclusion that Ms. Makins, as Officer-In-Charge, improperly

allowed Inmate Jones to exit the Southeast One housing unit without verifying that the paper he held was a call-out pass for the Infirmary and without verifying with the Infirmary that Inmate Jones had an appointment at the Infirmary that morning, as alleged by the DOC in its Removal Letter; and (b) if all the reasonably believable evidence supporting the facts alleged by the DOC were taken as true, a reasonable person could not find, by a preponderance of the evidence, that Ms. Makins may be summarily removed.

I recommend that the proposed summary removal of Ms. Makins not be sustained as it is inconsistent with the Due Process Clause and the applicable provisions of District of Columbia law.

Dated: December 11, 2006

Beverly Sherman Nash
Administrative Law Judge

Case No. DOC-06-800006

## Certificate of Service:

**By U.S. Mail (Postage Paid)and Fax:**

Sol Zalel Rosen, Esquire
2501 Calvert Street, N.W. #212
Washington, DC 20006
FAX: 202-296-9375

James E. McCollum, Jr., Esquire
McCollum & Associates, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20741-1717
FAX: 301-864-4351

J. Michael Hannon, Esquire
Hannon Group Law Firm, LLP
1901 18th Street, N.W.
Washington, DC 20009
FAX: 202-232-3704

**By U.S. Mail (Postage Paid) and Fax:**

Kevin J. Turner, Esquire
Assistant Attorney General

Thelma C. Brown, Esquire
Assistant Attorney General, and

Andrea Comentale, Esquire
Assistant Attorney General

441 4th Street, N.W.
Suite1060 –N
Washington, DC 20001
FAX: 202-347-8922

Maria Amato, Esquire
General Counsel
Department of Corrections
1923 Vermont Avenue, NW
Washington, DC 20001
FAX: 202-671-2514

I hereby certify that on _Dec. 11_, 2006, this document was caused to be served upon the above-named parties at the addresses and by the means stated.

Clerk/Deputy Clerk

- 28 -

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
825 North Capitol Street, NE, Suite 4150
Washington, DC 20002

2006 DEC 11 ⊃ 5: 01

In the Matter of the Summary Removal of:

ALPHONSO BRYANT,                              Case No.:   DOC-06-800007

An Employee of the Department of Corrections

---

### REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Two inmates escaped from the District of Columbia Central Detention Facility ("CDF")
on June 3, 2006.  Shortly thereafter, Alphonso Bryant, Correctional Treatment Specialist at the
facility, and several other employees were placed on paid administrative leave based upon their
alleged negligence in connection with the escape.  On July 26, 2006, Mr. Bryant, as well as other
DOC employees, was summarily removed from his position.  On August 24, 2006, Stanley
Waldren, Acting Warden, District of Columbia Department of Corrections ("DOC" or
"Government"), issued a written notice (hereinafter "Removal Letter") proposing that the
summary removal action be sustained.

Pursuant to D.C. Official Code § 1-616.51(4) and to 6 District of Columbia Municipal
Regulations ("DCMR") 1616.5, 1612, Mr. Bryant is entitled to an administrative review of the
proposed affirmance of the summary removal.  On August 31, 2006, the DOC Director
designated the Chief Administrative Law Judge of the Office of Administrative Hearings, or
Administrative Law Judges that he designates, to serve as the hearing officers to perform such

administrative reviews of the summary removals of the involved employees, including Mr. Bryant.[1] The Chief Administrative Law Judge designated the undersigned Acting Principal Administrative Law Judge to serve as a hearing officer in the matter of Mr. Bryant. On September 7, 2006, counsel for Mr. Bryant filed an entry of appearance, and requested an oral hearing and an opportunity to present a written submission in connection to the proposed summary removal.

On September 8, 2006, a joint status conference was held with certain of the assigned Administrative Law Judges, the attorneys representing all eleven DOC employees, and Maria Amato, Esquire, DOC General Counsel. Three Assistant Attorneys General filed a notice of appearance for the DOC on September 11, 2006. The Administrative Law Judges serving as hearing officers in these matters issued a joint Order on September 11, 2006. The joint Order denied the request of the employees' counsel for a discovery schedule and asked for an explanation for the need for adversary hearings. The Order also provided for submission of documents missing from the Investigative Report. A date of September 25, 2006, was set for the submission of responses to the Removal Letter.

On September 11, 2006, DOC filed and served on all parties the documents missing from the Investigative Report. The documents provided were Exhibits B, C, and D, and the key of witness names. On September 27, 2006, counsel for ten of the employees, including Mr. Bryant, filed a Motion for Summary Dismissal, raising several issues that are discussed in detail below under "Preliminary Matters." Also on September 27, 2006, counsel filed Mr. Bryant's Response to the Removal Letter. Counsel for Mr. Bryant also filed a request for extension of the deadline for responses, and that request was granted *nunc pro tunc* to the date of filing of the responses,

---

[1] The designation was extended as of October 3, 2006, into Fiscal Year 2007.

by Order dated October 4, 2006. That Order also established a deadline of October 13, 2006, for the DOC's reply to the responses, and scheduled a hearing on the Motion for Summary Dismissal for October 19, 2006.

On October 13, 2006, DOC filed its Opposition to the Motion for Summary Dismissal. DOC maintained that the Administrative Law Judges, acting as hearing officers for DOC, have no power to grant the relief of dismissal, but may only conduct the administrative review and make a written report and recommendation to the deciding official.

The hearing on the Motion for Summary Dismissal and a second joint status conference were held as scheduled on October 19, 2006. On October 26, 2006, this administrative court issued its Order Denying the Motion for Summary Dismissal. The Order stated that the DOC Employees' arguments would be considered as part of the individual reports and recommendations. The Order also established a deadline for the final agency decision in this case of December 15, 2006.

## II.     DISCUSSION

### A.  Preliminary Matters

Mr. Bryant has raised several preliminary issues that I will discuss before reaching the substantive issues. Mr. Bryant argues that the summary removal action is a "post-termination" action, and that he has been denied his right to a "pre-termination" notice and hearing pursuant to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985).

The parties agree that Mr. Bryant has been removed from his position, is not working and has not been paid since August 24, 2006. The Removal Letter speaks in terms of the reasons for

the "proposed removal" of Mr. Bryant. Mr. Bryant disputes that characterization of his position and argues that he has been terminated already because his property interest in employment has been taken from him. The consequence of that deprivation, according to Mr. Bryant, is that he is now entitled to "the full panoply of Constitutional protections." *Id.* During the joint status conference, DOC argued that the removal of Mr. Bryant and the other employees does not occur until the Director of DOC renders a final decision. I agree with DOC on this issue.

While, as a practical matter, Mr. Bryant is not working and not being paid, there remains an administrative process to complete before Mr. Bryant can be described as "terminated." The District of Columbia Personnel Regulations expressly provide for such a process, even when a summary removal action has been taken. 6 DCMR 1616. That administrative process includes the right to a Final Decision Notice, in writing, dated and signed by the deciding official, and addressing certain issues. 6 DCMR 1616.4(h), 1614.3. Prior to the issuance of a Final Decision Notice, the administrative process must include an administrative review. 6 DCMR 1616.5, 1612. The "pre-termination" administrative process that is required is defined by *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532 (1985).

Second, Mr. Bryant argues that D.C. Official Code § 1-616.51 is unconstitutional on its face, because summary removal is a drastic personnel action that is permitted only when "an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee himself; or, is detrimental to public health, safety, or welfare." Mr. Bryant states that there are no facts that justify use of this extraordinary remedy.

Mr. Bryant has not made any showing that the statute is *facially* unconstitutional, as he concedes that there are circumstances where a DOC employee may be properly subject to summary removal. Mr. Bryant asserts only that the statute cannot be applied to the facts in this case. To the extent Mr. Bryant contends that his circumstances do not justify use of summary removal, this appears to be an argument that the facts do not meet the criteria for summary removal. This issue can be decided by applying the statute and regulations to the facts. Therefore, I will consider his argument in addressing the merits of the case.

Finally, Mr. Bryant argues that the criteria established in *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981) are applicable to his termination and must be used to evaluate the appropriateness of the penalty imposed. The *Douglas* factors, as they are commonly called, were articulated by the United States Merit Systems Protection Board and comprise mitigating or aggravating factors that must be considered in determining an appropriate penalty for a federal employee's misconduct. Mr. Bryant relies on *Dep't of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005), to support his assertion that the *Douglas* factors must be considered when determining a penalty for a District of Columbia employee. *Colbert* appears to be one of a small number of published cases in this jurisdiction addressing the question of the application of the *Douglas* factors to District of Columbia employees. The *Colbert* Court does not directly hold that the *Douglas* factors must be applied to evaluate the appropriate penalties for misconduct by

District employees.[2] An earlier decision by the Office of Employee Appeals stated that the agency uses the principles in *Douglas* as "guidance." *Employee v. Agency,* 29 D.C. Reg. 4565, 4570 (1982);[3] *see also Stokes v. District of Columbia,* 502 A.2d 1006, 1010 (D.C. 1985) (emphasizing that the role of the Office of Employee Appeals is not to balance the relevant factors but to evaluate whether the agency considered relevant factors and struck a balance within the realm of reasonableness, as set forth in *Douglas*). The personnel regulations do state that "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The Removal Letter does not address either mitigating or aggravating factors, and there is no indication that such factors were weighed or considered in selecting the penalty for Mr. Bryant. Moreover, the Removal Letter does not refer to Mr. Bryant's personnel file, and there is no indication that his employment history was viewed as a mitigating or aggravating factor. I do not find it necessary to reach the question of whether DOC must explicitly address such factors

---

[2] The *Colbert* case has an involved procedural history. The *Colbert* Court had remanded the case to the Board of the Office of Employee Appeals to consider whether 6 DCMR 1608.2 (limiting consideration of certain parts of an employee's disciplinary record in assessing a penalty based on their age) affected the application of the *Douglas* factors. 874 A.2d at 357 n.8. By contrast, *Douglas* provides generally for consideration of the employee's past disciplinary and work records. The Board apparently filed a Response on Remand. *Id.* The Court then mentioned that certain documents whose consideration was in question "were relevant in applying the *Douglas* factors," 874 A.2d at 359, and not inconsistent with 6 DCMR 1608.2. The Superior Court order is quoted, which mentions the initial failure to perform a *Douglas* analysis. 874 A.2d at 360. The Court ultimately remanded the case to the administrative law judge to consider "DPW's Agency Report on Remand applying the *Douglas* factors, including the additional evidence supplied by DPW and Colbert." 874 A.2d at 361.

[3] In this context, it is not entirely clear whether the Office of Employee Appeals' decision is referring to the *Douglas* discussion of the proper scope of review (cited in a number of subsequent cases) or to the twelve specific factors.

in a proposed removal action, such as the Removal Letter at issue here, because I find that DOC has not supported its summary removal action under *Loudermill*.

I must first determine if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Mr. Bryant may be summarily removed in accordance with *Loudermill*? In other words, under 6 DCMR 1616.1, has DOC shown negligence that threatened the integrity of government operations and constituted an immediate hazard to DOC, other District employees, or to the employee? Because I find that DOC has not shown such negligence, I do not consider the *Douglas* question.

### B. The Need For An Adversary Hearing

On September 7, 2006, Mr. Bryant filed a request for an "oral hearing and an opportunity to present a written submission."[4] At the September joint status conference, Mr. Bryant argued that extensive discovery and evidentiary hearings were necessary in order to establish the causes of the escapes in general and the roles, if any, of the individual employees in the escapes. As noted above, the request for discovery was denied. At the October joint status conference, Mr. Bryant stated that if the Motion for Summary Dismissal were denied, he would request only a limited hearing with an opportunity to respond to specific factual allegations upon which DOC

---

[4] In addition to "an opportunity to present his side of the story," *Loudermill* grants Mr. Bryant the right to "oral or written notice of the charges" and "an explanation of the employer's evidence." 470 U.S. at 546. Mr. Bryant does not take issue with the notice he received. However, Mr. Bryant argues that the change to 6 DCMR 1616.4 to expand the time to provide written notice from three days to thirty days was illegal. Under 6 DCMR 400.1, variances may be granted to the regulations under certain conditions. The variance granted in these cases appears to comply with the requirements in that DOC articulated a limited need to complete transcription of the interview tapes which are used to support the summary removal.

has relied. Mr. Bryant did not request or desire a full evidentiary hearing, because he stated this would allow DOC to firm up its case.

Loudermill and subsequent cases establish that due process does not require an oral hearing or the presentation of witnesses at a pre-termination hearing where, as here, an employee has an opportunity for a full post-termination evidentiary hearing.[5] Loudermill itself states that an "opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." 470 U.S. at 546 (emphasis added). Cases after Loudermill confirm that a full evidentiary hearing before termination is not required to satisfy due process. E.g., Thompson v. District of Columbia, 428 F.3d 283, 290 (D.C. Cir.2005) (Edwards, J., concurring); Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 566 (6th Cir. 2004); Greer v. Amesqua, 212 F.3d 358, 367 (7th Cir.), cert. denied, 531 U.S. 1012 (2000); Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 503 (7th Cir. 1999); Schleck v. Ramsey County, 939 F.2d 638, 641-42 (8th Cir. 1991); Powell v. Mikulecky, 891 F.2d 1454, 1458 (10th Cir. 1989).

It is not clear what type of hearing Mr. Bryant is requesting. Mr. Bryant has not presented a sufficient basis for ordering a pre-termination evidentiary hearing. The purpose of a Loudermill hearing is to serve as "an initial check against mistaken decisions – essentially a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." 470 U.S. at 545-46. The cases cited above demonstrate that the "initial check" ordinarily can be performed without a full evidentiary

---

[5]    Pursuant to D.C. Official Code § 1-616.52(b), Mr. Bryant may appeal to the Office of Employee Appeals from any final DOC decision removing him from employment. If not satisfied, Mr. Bryant may then appeal a decision of the Office of Employee Appeals to the D.C. Superior Court. See generally Johnson v. District of Columbia. 368 F. Supp. 2d 30, 40 (D.C. 2005).

hearing, and Mr. Bryant's submission makes no attempt to show why his Motion for Summary Dismissal and his Response, both dated September 27, 2006, are inadequate presentations of his side of the story. Accordingly, due process does not require a full pre-termination evidentiary hearing, when as here, there is an opportunity for a full evidentiary hearing after termination.

District of Columbia law also does not require a pre-termination hearing with oral testimony in all instances. The Comprehensive Merit Personnel Act provides that there shall be "a *written* opportunity to be heard before the action becomes effective." D.C. Official Code § 1-616.51(4) (emphasis added). The regulations implementing Section 1-616.51(4) permit an evidentiary hearing in connection with a pre-termination administrative review "only when a decision based on preponderance of the evidence cannot be made because the written record is inadequate for this purpose." 6 DCMR 1612.5. The adequacy of the record must be measured with reference to the limited purpose of this administrative review. The issue at this stage of the proceedings is not whether the proposed termination is proper, but only whether the Government has provided both credible and reasonable grounds for it. The pre-termination process is designed to allow the employee, not the Government, to explain his side of the story. As discussed below, the written record submitted by the Government adequately demonstrates that such reasonable grounds for the disciplinary action do not exist. Accordingly, in the exercise of the authority delegated to me, I determine that a pre-termination evidentiary oral hearing is not necessary.

### C. The Basis For The Proposed Removal of Mr. Bryant

The substantive issue here is whether there is a reasonable basis for the affirmance of the proposed summary removal.[6]  Resolution of the issue requires consideration of two questions, according to *Loudermill*.  The first question is "whether there are reasonable grounds to believe that the charges against the employee are true."  470 U.S. at 545-46.  The second question is whether there are reasonable grounds to believe that the charges "support the proposed action." *Id.* at 546.

### 1. Are There Reasonable Grounds To Believe That The Charges Are True?

This administrative court is charged with "performing an initial check against mistaken decisions -- essentially, [this court must determine] whether there are reasonable grounds to believe that the charges against [Mr. Bryant] are true and support the proposed action." *Loudermill at 545-546.*  In the Removal Letter dated August 24, 2006, DOC stated the following:

> At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006.  The OIA Investigation into the escape determined that you failed to correctly screen inmate Joseph Leaks for work detail and resultantly, inmates Leaks and Jones escaped from the Central Detention Facility on June 3, 2006.

Removal Letter at 1.

---

[6]  In analyzing the *Loudermill* question, I have considered the Government's record to consist of the following materials provided with respect to Mr. Bryant:  the Removal Letter, the Investigative Report, and the DOC Office of Internal Affairs Statement of Mr. Bryant, as well as all rules and regulations cited by DOC.  The record also includes the later-filed Exhibits B, C, and D to the Investigative Report, and the Key of witness names used in that report.

After reviewing the record, this administrative court finds that DOC's summary removal of Mr. Bryant was a "mistaken decision." *Loudermill at 545.* DOC has not demonstrated reasonable grounds to believe that the charges against Mr. Bryant are true and support the summary removal action.

Mr. Bryant was employed with DOC for approximately twenty-three years. From 1989 or 1990 until the time of his summary removal, Mr. Bryant was a Correctional Treatment Specialist assigned to the Detail Unit. In this capacity, he conducted a screening of Inmate Leaks on February 14, 2006. Mr. Bryant conducts what can be described as preliminary screenings to determine if inmates are "suitable candidates" for placement on work detail.

In accordance with the D.C. Central Detention Facility Post Order Non-Industrial Pay System dated April 19, 2002, "[t]he NIPS Coordinator and Casemanager [sic] shall screen all inmates seeking consideration for applicable detail assignments. The Casemanager [sic] shall initiate a "Request for Personnel Action" Form after all criteria have been met in Section 4." *Id.* at 2. The Deputy Warden for Support Services bears the "responsibility for determining the inmates [sic] eligibility." Internal Affairs Statement at 2. In addition, the Investigative Report stated:

> [I]nmate Leaks was considered for the position of Environmental Detail inmate at the request of EO-1 and ES-1. This request was submitted to NIPS-1 and approved by CTS-1 [Bryant] and ADW-1 on February 14, 2006.

> Upon receiving the prerequisite Inmate Personnel Action Form from NIPS-1, CTS-1 [Bryant] approved the request and wrote in the comments section, "Separation (See Attached)." CTS-1 [Bryant] also attached a copy of the separation order to the form. ADW-1 received the request form and approved it. At that time ADW-2 was responsible for reviewing and approving such requests, however ADW-2 was on leave.

( ...                                        ( _ :

Case No. DOC-06-800007

Investigative Report at 5-6. Mr. Bryant was responsible for conducting the screening. However, before Inmate Leaks could be approved for the work detail, the NIPS coordinator and the Assistant Deputy Warden for Support Services had to approve the detail. In other words, higher-ranking DOC officials stood between Mr. Bryant's screening and the approval for the work detail.

In spite of these facts, DOC states that Mr. Bryant's summary removal action is based on a charge of negligence for conduct that threatened the integrity of government operations and constituted *an immediate* hazard to the agency, to other District employees, or to Mr. Bryant. (emphasis added). Specifically, DOC stated, "The OIA Investigation concluded that [Mr. Bryant was] negligent in the performance of [his] duties, as [he] failed to thoroughly screen Inmate Leaks for an Off Unit work detail in accordance with NIPS regulations." Removal Letter at 3. In addition, "[t]he OIA Investigation into the escape, determined that [Mr. Bryant] failed to *correctly* screen inmate Joseph Leaks for work detail and *resultantly*, inmate Leaks and Jones escaped from the Central Detention Facility on June 3, 2006." Removal Letter at 1 (emphasis added).

The facts in the record do not support DOC's assertion that Mr. Bryant's action constituted an *immediate* hazard to the agency, *resulted* in Inmates Leaks' and Jones' escape or that he violated the provision of the D.C. Central Detention Facility Post Order Non-Industrial Pay System dated April 19, 2002 (NIPS).

The NIPS regulations provide in relevant part: "[i]nmates with Separation Orders from other inmates housed in CDF *are not considered appropriate for placement*" on off-unit work details. April 2002 Post Order at § 4b(5) (emphasis added). It is crucial to note that NIPS does

( ⎯⎯                                ( ⎯⎯

not mandate that inmates with Separation Orders "shall not be placed" on off-unit details. NIPS provides that "[i]nmates with Separation Orders from other inmates housed in CDF *are not considered appropriate for placement*" on off-unit work details. Consequently, Mr. Bryant did not violate the provisions of NIPS when he screened Inmate Leaks, properly identified him as an inmate with a Separation Order, and placed "OK" on Leaks' NIPS Personnel Action Form. Moreover, as illustrated below, the DOC data bases that Mr. Bryant accessed when he conducted the screening failed to reflect that Inmate Jones was housed at CDF. As shown below, the Jail and Community Corrections System indicated that Inmate Jones was not housed at CDF on February 14, 2006, when Mr. Bryant screened Inmate Leaks' Personnel Action Request Form for placement on work detail. In his statement to the OIA,[7] Mr. Bryant acknowledged that he did not use Inmate Leaks' institutional file, and the OIA investigation concluded that Mr. Bryant failed to note Inmate Leaks' history of escape as listed in PRISM. However, DOC has not demonstrated how these actions impacted the escape or how they served as grounds for the summary removal.

---

[7] Mr. Bryant argued in the Motion for Summary Dismissal that the Interview Transcript should be suppressed because the OIA investigators failed to give him *Miranda* warnings, in violation of his Fifth Amendment rights. The Fifth Amendment provides that "no person ... shall be compelled *in any criminal case* to be a witness against himself." U.S. Const., Amend. V [emphasis added]. In order to admit, in a criminal case, incriminating statements made during a custodial interrogation, the police must have first advised the suspect of certain constitutional rights associated with the Fifth Amendment. *Miranda v. Arizona,* 384 U.S. 436 (1966). The exclusionary rule, applied as a remedy in criminal cases, does not apply when the Government seeks to use the statements in a civil or administrative proceeding. *See, e.g., Allen v. Illinois,* 478 U.S. 364, 368 (1986); *Chavez v. Martinez,* 538 U.S. 760, 772 (2003). *Kastigar v. United States,* 406 U.S. 441 (1972), cited by Ms. Washington, involved an attempt by the Government to compel Grand Jury testimony from witnesses who were granted use immunity, and it has no application to the present situation. The motion to suppress is denied.

Mr. Bryant told the Government investigators that he used two systems, the Jail and Community Corrections System ("JACCS")[8] and the Pretrial Real-time Information System Manager ("PRISM"), to determine whether Inmate Leaks was eligible for placement on an "off-unit" detail. Investigative Report at 22. According to policy, "Inmates with Separation Orders from other inmates housed in CDF are not considered appropriate for placement" on an off-unit, inside only detail. April 2002 Post Order at § 4b(5).[9] Mr. Bryant acknowledged that he knew that Inmate Leaks had Separation Orders. If a Separation Order exists for an inmate, the JACCS system should display the identified inmates also housed at CDF as "enemies" in black. "However, when [Mr. Bryant] accessed the JACCS Enemy Alert Screen, the names of the inmates listed as inmate Leaks [*sic*] enemies were highlighted in red which indicated that they were no longer housed in the CDF." Investigative Report at 22. The investigators agree that "[Mr. Bryant's] . . . claim is true" and, on February 14, 2006, Inmate Jones did not appear in JACCS as an "enemy" in black, currently housed in CDF.[10] The consequence of the DOC

---

[8] "CTS [Correctional Treatment Specialist] only has access to the JACCS Offender Manager Application." Investigative Report at 7.

[9] The April 2002 Post Order describes three levels of work detail: unit (work performed within the inmate's assigned housing unit only), off unit/inside only (work performed within the locked, controlled areas of the CDF), and outside (work performed outside the locked, controlled area of the CDF). Eligibility requirements for the three levels differ.

[10] According to the Investigative Report, the breakdown in maintaining accurate data in JACCS developed as follows. Inmate Leaks was properly booked into JACCS on August 18, 2005 (Booking No. 2005-11400). Inmate Jones did not enter CDF until August 26, 2005, although he had been incarcerated there on previous occasions. On August 26, 2005, in the afternoon, an unknown user entered Inmate Jones into JACCS on Inmate Leaks' record as an enemy. There were several prior booking records for Inmate Jones. Instead of using the most recent prior booking (a prior booking because Inmate Jones had not been booked into JACCS as of the afternoon of August 26, 2005), this unknown user referenced an older booking (from a prior incarceration) as the enemy record for Inmate Jones. Therefore, Inmate Leaks' booking record (No. 2005-11400) showed Inmate Jones as an enemy in red, because it reflected Inmate Jones' older record.

When Inmate Jones was booked that evening into JACCS (No. 2005-11784), the problem was not resolved. The most recent prior booking for Inmate Jones (No. 2005-04850) was restored from history into the new record (the correct procedure). Because the enemy information about Inmate Leaks had

investigators' conclusion is that JACCS did not identify Inmate Jones as a current prisoner in

CDF and as an "enemy" of Inmate Leaks.

The Investigative Report does not fault Mr. Bryant for taking, or failing to take, any other

steps to "correctly screen inmate Joseph Leaks for work detail." Removal Letter at 1.  Based on

the facts in the record, the results of the OIA Investigation, and Mr. Bryant's actions, the

articulated basis for DOC's summary removal action cannot be reconciled.  There simply are not

reasonable grounds to believe that the charge that Mr. Bryant failed to screen Inmate Leaks

correctly is true.

### 2.  Are There Reasonable Grounds To Believe That The Charges Support The Proposed Action?

I have found there are not reasonable grounds to believe that the factual basis for the

charge is true.  I will now address the second question, which is, if all the reasonably believable

evidence supporting the facts as alleged by the proposing official were taken as true, could a

reasonable person find by a preponderance of the evidence that Mr. Bryant may be summarily

removed?  In other words, are there reasonable grounds to believe that the charges "support the

proposed action." *Loudermill* at 546.  The answer is "no."

In the Removal Letter, DOC stated the following:

> The charge of negligence involves conduct/performance which falls below
> the standard established by Law for the protection of others against unreasonable
> risk of harm.   Here, *your actions substantially placed staff, inmates, the*
> *surrounding community and the general public at large in momentous*
> *unpredictable danger.*  A jail or correctional system's primary responsibility is

---

been incorrectly entered into Inmate Jones' older record, there was nothing in the most recent prior
booking to carry forward. As a result, Inmate Leaks' JACCS record showed Inmate Jones as an "enemy"
in red reflecting incorrectly that Inmate Jones was not a current inmate. Inmate Jones' JACCS record did
not show Inmate Leaks as an "enemy." Investigative Report at 22-23.

Case No. DOC-06-800007

custody, care and control of inmates committed to its ward. *Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal.* Consequently, I am proposing that the summary removal action effected against you on July 26, 2006 be sustained.

Removal Letter at 3 (emphasis added).

Mr. Bryant screened Inmate Leaks on February 14, 2006, properly noted the Separation Order, and attached a copy of the print out listing the separation orders from JACCCS to the NIPS Personnel Action Form. When Mr. Bryant printed out the JACCS form, the names were in red, which indicated that the subjects were not housed at the CDF. Statement at 3. Inmate Leaks escaped on June 3, 2006. The Summary Removal Notice was issued on July 28, 2006. If all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, a reasonable person could not find by a preponderance of the evidence that Mr. Bryant may be summarily removed.

Summary removal is a drastic personnel action that is permitted only when "an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee himself; or, is detrimental to public health, safety, or welfare." 6 DCMR 1616.1.

The DOC claims that Mr. Bryant's action on February 14, 2006 constituted an *immediate* hazard to the agency and *resulted* in inmate Leaks and Jones escape on June 3, 2006, because Mr. Bryant was negligent in the performance of his duties in that he failed to thoroughly screen inmate Leaks for an Off Unit work detail in accordance with the D.C. Central Detention Facility Post Order Non-Industrial Pay System dated April 19, 2002. Removal Letter at 3. The facts do not justify use of this extraordinary remedy against Mr. Bryant.

(— ·                              (·····

Under 6 DCMR 1603, an employee may be disciplined or removed only "for cause." 6 DCMR 1603.2. Cause is defined as, *inter alia*, "any on-duty or employment-related act or omission that interferes with the efficiency or integrity of government operations." 6 DCMR 1603.3. A "*de minimis*" violation of the cause standard cannot be the basis of a disciplinary action. 6 DCMR 1603.5. The burden is on the government to show that the disciplinary action is or was for cause. 6 DCMR 1603.10.

In addition, the regulations require that in selecting a penalty, "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The regulations governing summary removal also require the agency to find "cause" for the disciplinary action. 6 DCMR 1616.2. However, in the case of summary removal, the agency head must also find that the employee's conduct "(a) [t]hreatens the integrity of government operations; (b) [c]onstitutes an immediate hazard to the agency, to other District employees, or to the employee; or (c) [i]s detrimental to public health, safety, or welfare." 6 DCMR 1616.1. While the Removal Letter specifically cites to the first two factors, Removal Letter at 1, it implicitly relies upon the third factor as well. *Id.* at 3 (stating "your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger"). The regulation permitting summary removal clearly envisions a situation where, rather than "interfering with" the integrity of government operations, the

employee's conduct has created such risk of harm that the agency must act quickly.[11]  There has been no such showing in Mr. Bryant's case.

There is no basis for the assertion that Mr. Bryant's action violated the D.C. Central Detention Facility Post Order Non-Industrial Pay System dated April 19, 2002 (NIPS).  First, Mr. Bryant properly identified Inmate Leaks as an inmate with a Separation Order.  Second, NIPS does mandate that inmates with Separation Orders "shall not be placed" on off-unit details.  Finally, and perhaps most dispositive of this issue, is the fact neither the Investigative Report nor the Removal Letter explain how the information available to Mr. Bryant on February 14, 2006, would have allowed him to identify Inmate Leaks as an inmate with a Separation Order from other inmates (e.g., Inmate Jones) then housed in CDF.  As illustrated above, the JACCS system indicated that Inmate Jones was not housed at CDF on February 14, 2006, when Mr. Bryant approved Inmate Leaks' Personnel Action Request Form for placement on work detail.  The investigators agree that "[Mr. Bryant's] . . . claim is true" and, on February 14, 2006, Inmate Jones did not appear in JACCS as an "enemy" in black, currently housed in CDF.

Although the Removal Letter states generally that Mr. Bryant "failed to thoroughly screen inmate Leaks for an Off Unit work detail in accordance with NIPS regulations," there is no identification of other documents that Mr. Bryant should have or could have reviewed other than JACCS.  Removal Letter at 3.  If Inmate Leaks' Separation Order was attached to the PARF as alleged, it would have identified Inmate Jones as a potential inmate from whom Inmate Leaks should be separated, but not as someone who was currently housed at CDF.  There are no facts in the Removal Letter or in the Investigative Report that indicate the nature of information,

---

[11] The seven-week gap between the jail break and the suspension of Mr. Bryant raises some initial questions about DOC's evaluation of the "immediacy" of the hazard presented by Mr. Bryant.

if any, relevant to Separation Orders contained in PRISM. Based upon the information in the

Investigative Report, therefore, even though Mr. Bryant reviewed the information in JACCS, it

did not have given him the pertinent information, *i.e.*, the presence of another prisoner currently

housed in the CDF from whom Inmate Leaks was supposed to be separated.

> The Removal Letter identifies as a predicate act that

> The OIA further determined that a separation order was placed in inmates Leaks
> and Jones' institutional files and in the Jail and Community Correctional System
> (JACCS), at the request of the United States Attorney's Office (USAO) on
> August 26, 2005. This order required that inmates Leaks and Jones be kept apart
> at all times, including while being transported to and from court.

Removal Letter at 1. There is no contention that Mr. Bryant had any responsibility for the entry

of such information or maintenance of data in JACCS.

In determining whether the facts reasonably believed to be true support the summary

removal of Mr. Bryant, I also considered his actions in light of the Government's conclusions in

the Investigative Report. The first "Major Finding" by the DOC investigators is that strong

evidence suggests that staff "intentionally aided and abetted in the planning and execution of the

escapes." Investigative Report at 4. The DOC investigators also find that "[w]hile departmental

policy and procedure are for the most part sufficient, staff negligence in properly adhering to

them and circumvention of established regulations were major contributors to the escape." *Id.*

There is no basis provided for asserting that the action taken by Mr. Bryant is negligence that

was a major contributor to the escape, particularly given the finding that CDF staff colluded in

the escape. Mr. Bryant's alleged negligence neither threatened the integrity of government

operations nor constituted an immediate hazard to DOC or other employees.

In the "Agency Enhancements" section of the Investigative Report, the DOC investigators note that "[i]nmates assigned to work off-unit details are now classified by newly established criteria which better take into account relevant security factors." *Id.* at 16. They also point out that a new program statement is being prepared to "reflect new eligibility criteria, policies and procedures." *Id.* at 18. While the Investigative Report provides a basis for the need for a revision of the relevant regulations, these revisions do not change my conclusion that Mr. Bryant's screening of Inmate Leaks on February 14, 2006, was not the direct result of the escapes on June 3, 2006.

In the "Recommendations" section of the Investigative Report, the DOC investigators make nine recommendations. None of those recommendations directly address the alleged negligence of Mr. Bryant in screening Inmate Leaks. There are two recommendations that are related to Correctional Treatment Specialists. The first recommendation is that the Correctional Program Officer supervising Correctional Treatment Specialists conduct random audits of classifications and reclassifications documents. However, Mr. Bryant did not classify Inmate Leaks in February 2006. Statement at 2. The second recommendation is to hire a consultant to train Correctional Treatment Specialists on the use of a risk assessment instrument designed to identify criminal risk and high threat offenders. At least three of the recommendations focus on the problems with the data contained in JACCS. Investigative Report at 28. In addition, in "Final Observations," DOC characterizes the inmate escapes as

> neither opportunistic nor spontaneous but rather the outgrowth of a calculated deliberate plan, arranged and orchestrated with the assistance of others. The escapes involved not only a carefully assessed determination as to how to breach institutional security but how to elude authorities once successfully in the community. Central in their scheme to flee from justice was collusion by corrupted staff and the negligence of correctional employees who failed to appropriately address their assigned responsibilities.

Investigative Report at 27.

I conclude that the facts relied upon by the Government, reasonably believed to be true, do not support the proposal to summarily remove Mr. Bryant from his position. Summary removal requires that the employee's conduct threatens the integrity of government operations, is an immediate hazard to DOC, other government employees, or himself, or is detrimental to public health, safety, or welfare of others. 6 DCMR 1616.1. Mr. Bryant took one action, in February 2006, in a chain of actions, some of which contributed more directly to the escape of two inmates in June 2006. In February 2006, data in JACCS had been entered incorrectly and did not reflect accurately the Separation Orders of August 2005. The Government has not established that Mr. Bryant's action threatened the integrity of government operations, was an immediate hazard to DOC, other government employees, or himself, or was detrimental to public health, safety, or welfare of others.

## III.    RECOMMENDATION

In this administrative review, I have considered the two issues raised by *Loudermill*, 470 U.S. 532, and Chapter 16, D.C. Personnel Regulations. Those issues are: (a) whether there is any reasonably believable evidence supporting the facts alleged by the proposing official; and (b) whether, if all the reasonably believable evidence supporting the facts alleged by the proposing official were taken as true, a reasonable person could find, by a preponderance of the evidence, that the employee may be removed.

For the reasons discussed above, I have determined that (a) there is not reasonably believable evidence supporting the facts related to Mr. Bryant and alleged by the DOC in its Removal Letter; and (b) even if all the reasonably believable evidence supporting the facts

alleged by the DOC were taken as true, a reasonable person could not find, by a preponderance of the evidence, that Mr. Bryant may be summarily removed.

I recommend that the proposed summary removal of Mr. Bryant not be sustained as it is inconsistent with the Due Process Clause and the applicable provisions of District of Columbia law.

Dated: December 11, 2006

Jennifer M. Long
Acting Principal Administrative Law Judge

## Certificate of Service:

**By U.S. Mail (Postage Paid)and Fax:**

Sol Zalel Rosen, Esquire
2501 Calvert Street, N.W. #212
Washington, DC 20006
FAX: 202-296-9375

James E. McCollum, Jr., Esquire
McCollum & Associates, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20741-1717
FAX: 301-864-4351

J. Michael Hannon, Esquire
Hannon Group Law Firm, LLP
1901 18th Street, N.W.
Washington, DC 20009
FAX: 202-232-3704

**By U.S. Mail (Postage Paid) and Fax:**

Kevin J. Turner, Esquire
Assistant Attorney General

Thelma C. Brown, Esquire
Assistant Attorney General, and

Andrea Comentale, Esquire
Assistant Attorney General

441 4th Street, N.W.
Suite1060 –N
Washington, DC 20001
FAX: 202-347-8922

Maria Amato, Esquire
General Counsel
Department of Corrections
1923 Vermont Avenue, NW
Washington, DC 20001
FAX: 202-671-2514

I hereby certify that on December 11th, 2006, this document was served upon the above-named parties at the addresses and by the means stated.

_Chanel Baker_
Clerk/Deputy Clerk

# DISTRICT OF COLUMBIA
## OFFICE OF ADMINISTRATIVE HEARINGS
825 North Capitol Street, NE, Suite 4150
Washington, DC 20002

DISTRICT OF COLUMBIA
OFFICE OF
ADMINISTRATIVE HEARINGS

2006 DEC -5  A 11: 01

| | |
|---|---|
| In the Matter of the Summary Removal of: | |
| LOWANDA HINTON-SAUNDERS, | Case No.:   DOC-06-800009 |
| An Employee of the Department of Corrections | |

## REPORT AND RECOMMENDATION

### I.     INTRODUCTION

In early June 2006, two inmates escaped from the District of Columbia Central Detention Facility ("CDF").  Shortly thereafter, Lowanda Hinton-Saunders, Correctional Officer DS-08, was placed on paid administrative leave, as were several other employees, based upon their alleged negligence in connection with the escape.  Seven weeks later, on July 26, 2006, Ms. Hinton-Saunders, as well as others, was summarily removed from her position.  On August 24, 2006, Stanley M. Waldren, Acting Warden, District of Columbia Department of Corrections ("DOC" or "Government"), issued a written notice (hereinafter "Removal Letter") proposing that the summary removal action be sustained.    Attached to that Removal Letter were a Memorandum to Joan Murphy, Special Projects Officer, from Warden Waldren, dated August 10, 2006; the DOC Office of Internal Affairs ("OIA") Investigative Report; Transcripts of Interviews with Ms. Hinton-Saunders, June 3 and July 3, 2006; and two regulations.  On September 7, 2006, counsel for Ms. Hinton-Saunders filed an entry of appearance and requested a hearing on the matter.

Pursuant to D.C. Official Code § 1-616.51(4) and to 6 District of Columbia Municipal Regulations ("DCMR") 1616.5 and 1612, Ms. Hinton-Saunders is entitled to an administrative review of the proposed affirmance of the summary removal. On August 31, 2006, the DOC Director designated the Chief Administrative Law Judge of the Office of Administrative Hearings, or administrative law judges that he designates, to serve as the hearing officers to perform such administrative reviews of the summary removals of the involved employees, including Ms. Hinton-Saunders.[1]  The Chief Administrative Law Judge designated the undersigned Administrative Law Judge to serve as a hearing officer in the matter of Ms. Hinton-Saunders.

On September 8, 2006, a joint status conference was held with certain of the assigned administrative law judges, the attorneys representing all eleven DOC employees, and Maria Amato, Esq., DOC General Counsel. A joint Order was issued on September 11, 2006. The joint Order denied the request of counsel for a discovery schedule and asked for an explanation for the need for adversary hearings. The Order also provided for submission of documents missing from the Investigative Report. A deadline of September 25, 2006, was set for the submission of responses to the Removal Letter.

On September 11, 2006, DOC filed and served on all parties the documents missing from the Investigative Report. The documents provided were Exhibits B, C, and D, and the Key of witness names.

On September 27, 2006, counsel for 10 of the employees, including Ms. Hinton-Saunders, filed a Motion for Summary Dismissal. Also on September 27, 2006, Ms. Hinton-

---

[1] The designation was extended as of October 3, 2006, into Fiscal Year 2007.

Saunders filed her Response to the Removal Letter. In essence, she stated in her Response that her conduct at issue was not negligent as charged, that she did not cause the two inmates to pass through her post to enter the administrative module of the CDF, that her job responsibilities did not include inspection of badges, and that the summary dismissal action violated her constitutional rights.

Counsel for Ms. Hinton-Saunders also filed a request for extension of the deadline for responses, and that request was granted *nunc pro tunc* to the date of filing of the responses, by Order dated October 4, 2006. That Order also established a deadline of October 13, 2006, for the DOC's reply to the responses, and scheduled a hearing on the Motion for Summary Dismissal for October 19, 2006.

On October 13, 2006, DOC filed its Opposition to the Motion for Summary Dismissal. DOC maintained that a hearing officer for DOC has no power to grant the relief of dismissal, but may only conduct the administrative review and make a written report and recommendation to the deciding official.

The hearing on the Motion for Summary Dismissal, and second joint status conference, was held as scheduled on October 19, 2006. On October 26, 2006, this administrative court issued its Order Denying the Motion for Summary Dismissal. The denial Order stated that the DOC Employees' arguments would be considered as part of the individual reports and recommendations. The denial Order also established a deadline for the final agency decision in this case of December 15, 2006.

## II.     DISCUSSION

### A. Preliminary Matters

Ms. Hinton-Saunders has raised three issues in the Motion for Summary Dismissal I will discuss here.  Ms. Hinton-Saunders contends first that the summary removal action is a "post-termination" action, and that in this context, she has been denied her rights to a "pre-termination" notice and hearing pursuant to *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546 (1985).

The parties agree Ms. Hinton-Saunders has been removed from her position, is not working, and has not been paid since August 24, 2006.  The Removal Letter speaks in terms of the reasons for the "proposed removal" of Ms. Hinton-Saunders.  At the October joint status conference, DOC argued that the removal of Ms. Hinton-Saunders does not actually occur until the Director of DOC has rendered a final decision in this matter.  Ms. Hinton-Saunders disputes that characterization of her position and argues that she has been terminated already because her property interest in employment has been taken from her.  The consequence of that deprivation, according to Ms. Hinton-Saunders, is that she was denied the "minimum due process requirements for a tenured public employee" including "(1) oral or written notice of the charges against her; (2) an explanation of the employer's evidence; and (3) an opportunity to present her side of the story." *Id.* at 546.  Ms. Hinton-Saunders contends that she has already been denied her constitutional rights under *Loudermill* because she has been terminated without notice and without an opportunity to be heard.  I disagree.

While, as a practical matter, Ms. Hinton-Saunders is not working and not being paid, there remains an administrative process to complete before Ms. Hinton-Saunders can be

described as "terminated." The District of Columbia Personnel Regulations expressly provide for such a process, even when a summary removal action has been taken. 6 DCMR 1616. That administrative process includes the right to a Final Decision Notice, in writing, dated and signed by the deciding official, and addressing certain issues. 6 DCMR 1616.4(h) and 1614.3. Prior to the issuance of a Final Decision Notice, the administrative process must include an administrative review. 6 DCMR 1616.5, 1612. The "pre-termination" administrative process that is required is defined by *Loudermill, supra.*

Second, Ms. Hinton-Saunders argues that D.C. Official Code § 1-616.51 is unconstitutional on its face, because summary removal is a drastic personnel action that is permitted only when "an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee [herself]; or, is detrimental to public health, safety, or welfare." Ms. Hinton-Saunders states that there are no facts presented to DOC justifying use of this extraordinary remedy.

In fact, Ms. Hinton-Saunders has not made any showing that the statute is *facially* unconstitutional, as she concedes that there are circumstances where a DOC employee may be properly subject to summary removal. Ms. Hinton-Saunders asserts only that the statute cannot be applied to the facts in this case. To the extent Ms. Hinton-Saunders contends that her circumstances do not justify use of summary removal, this appears to be an argument that the facts do not meet the criteria for summary removal. This issue can be decided by applying the statute and regulations to the facts. Therefore, I will consider her argument in addressing the merits of the case.

Third, Ms. Hinton-Saunders argues that the "*Douglas* factors" are applicable to her termination and must be used to evaluate the appropriateness of the penalty imposed. The *Douglas* factors were articulated by the U.S. Merit Systems Protection Board and comprise factors (that may be mitigating or aggravating) that must be considered in determining an appropriate penalty for a federal employee's misconduct. *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). Ms. Hinton-Saunders relies on *Dep't of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005) to support her assertion that the *Douglas* factors must be considered when determining a penalty for a District of Columbia employee. *Colbert* appears to be one of only a small number of published cases in this jurisdiction addressing the question of the application of the *Douglas* factors to District of Columbia employees. The *Colbert* Court does not directly hold that the *Douglas* factors must be applied to evaluate the appropriate penalties for misconduct by District employees.[2] An earlier decision by the Office of Employee Appeals stated that the agency uses the principles in *Douglas* as "guidance." *Employee v. Agency,* 29 D.C. Reg. 4565, 4570 (1982);[3] *see also Stokes v. District of Columbia*, 502 A.2d 1006, 1010 (D.C. 1985) (emphasizing that the role of the Office of Employee Appeals is not to balance the relevant factors but to evaluate whether the agency considered relevant factors and struck a balance

---

[2] The *Colbert* case has an involved procedural history. The *Colbert* Court had remanded the case to the Board of the Office of Employee Appeals to consider whether 6 DCMR 1608.2 (limiting consideration of certain parts of an employee's disciplinary record in assessing a penalty based on their age) affected the application of the *Douglas* factors. 874 A.2d at 357 n.8. By contrast, *Douglas* provides generally for consideration of the employee's past disciplinary and work records. The Board apparently filed a Response on Remand. *Id.* The Court then mentioned that certain documents whose consideration was in question "were relevant in applying the *Douglas* factors," 874 A.2d at 359, and not inconsistent with 6 DCMR 1608.2. The Superior Court order is quoted, which mentions the initial failure to perform a *Douglas* analysis. 874 A.2d at 360. The Court ultimately remanded the case to the administrative law judge to consider "DPW's Agency Report on Remand applying the *Douglas* factors, including the additional evidence supplied by DPW and Colbert." 874 A.2d at 361.

[3] In this context, it is not entirely clear whether the Office of Employee Appeals' decision is referring to the *Douglas* discussion of the proper scope of review (cited in a number of subsequent cases) or to the twelve specific factors.

within the realm of reasonableness, as set forth in *Douglas*). The personnel regulations do currently state that "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The Removal Letter does not address explicitly whether mitigating or aggravating factors, if any, were considered in deciding upon the penalty. While the Removal Letter, for example, refers to Ms. Hinton-Saunders' personnel file, it is not clear whether Ms. Hinton-Saunders' work record was viewed as a mitigating or aggravating factor. Removal Letter, at 2. Attorneys for DOC stated at the October joint status conference, that the *Douglas* factors will be applied at the agency level, but that DOC is not required to expressly articulate its analysis of these factors in the notice of proposed summary removal action, nor is the hearing officer charged with applying these factors to the proposed action.

I do not find it necessary to reach the question whether DOC must explicitly address such factors in a proposed removal action, such as the Removal Letter at issue here, because I find that DOC has not supported its summary removal action under *Loudermill*. At this stage, I believe the first determination is the *Loudermill* question: if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Ms. Hinton-Saunders may be summarily removed? In other words, under 6 DCMR 1616.1, has DOC shown negligence that threatened the integrity of government operations and constituted an immediate hazard to DOC

or government employees or the public health and safety? Because I answer that question in the negative, I do not consider the *Douglas* question.[4]

### B. The Need For An Adversary Hearing

On September 7, 2006, Ms. Hinton-Saunders filed a request for an "oral hearing and an opportunity to present a written submission."[5] At the September joint status conference, Ms. Hinton-Saunders argued that extensive discovery and evidentiary hearings were necessary in order to establish the causes of the escapes in general and the roles, if any, of the individual employees in the escapes. As noted above, the request for discovery was denied. At the October joint status conference, Ms. Hinton-Saunders stated that if the Motion for Summary Dismissal were denied, she would request only a limited hearing with an opportunity to respond to specific factual allegations upon which DOC has relied. Ms. Hinton-Saunders did not request or desire a full evidentiary hearing, because she stated this would allow DOC to firm up its case.

---

[4] It is necessary, however, for me to apply the three factors for summary removal set forth in 6 DCMR 1616.1. I note that the *Douglas* factors are considered guidelines, and the employing District or federal agency is not required to give equal weight or even any weight to any particular factor. *See Stokes, supra* at 1011. Therefore, the agency could reach the same result in this case, after applying either the *Douglas* factors or the summary removal provisions of § 1616.1. Using the *Douglas* factors, the agency could place greater emphasis on the conduct itself and give less weight to the employee's record. Of course, the agency would use the *Douglas* factors to consider penalties other than removal, whereas here I am only reviewing the summary removal action.

[5] In addition to "an opportunity to present [her] side of the story," *Loudermill* grants Ms. Hinton-Saunders the right to "oral or written notice of the charges" and "an explanation of the employer's evidence." 470 U.S. at 546. Ms. Hinton-Saunders does not take issue with the notice she received. However, she argues that the change to 6 DCMR 1616.4 to expand the time to provide written notice from three days to 30 days was illegal. Under 6 DCMR 400.1, variances may be granted to the regulations under certain conditions. The variance granted in these cases appears to comply with the requirements in that DOC articulated a limited need to complete transcription of the interview tapes which are used to support the summary removal.

*Loudermill* and subsequent cases establish that due process does not require an oral hearing or the presentation of witnesses at a pre-termination hearing where, as here, an employee has an opportunity for a full post-termination evidentiary hearing.[6] *Loudermill* itself states that an "opportunity to present reasons, *either in person or in writing*, why proposed action should not be taken is a fundamental due process requirement." 470 U.S. at 546 (emphasis added). Cases after *Loudermill* confirm that a full evidentiary hearing before termination is not required to satisfy due process. *E.g.,Thompson v. District of Columbia*, 428 F.3d 283, 290 (D.C. Cir.2005) (Edwards, J., concurring); *Singfield v. Akron Metropolitan Housing Auth.,* 389 F.3d 555, 566 (6th Cir. 2004); *Greer v. Amesqua,* 212 F.3d 358, 367 (7th Cir.), *cert. denied,* 531 U.S. 1012 (2000); *Schact v. Wisconsin Dep't of Corrections,* 175 F.3d 497, 503 (7th Cir. 1999); *Schleck v. Ramsey County,* 939 F.2d 638, 641-42 (8th Cir. 1991); *Powell v. Mikulecky,* 891 F.2d 1454, 1458 (10th Cir. 1989).

It is not clear what type of hearing Ms. Hinton-Saunders is requesting. She has not presented a sufficient basis for ordering a pre-termination evidentiary hearing. The purpose of a *Loudermill* hearing is to serve as "an initial check against mistaken decisions – essentially a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." 470 U.S. at 545-46. The cases cited above demonstrate that the "initial check" ordinarily can be performed without a full evidentiary hearing, and Ms. Hinton-Saunders' submission makes no attempt to show why her Motion for Summary Dismissal and her Response, both dated September 27, 2006, are inadequate presentations of her side of the story. Accordingly, due process does not require a full pre-

---

[6] Pursuant to D.C. Official Code § 1-616.52(b), Ms. Hinton-Saunders may appeal to the Office of Employee Appeals from any final DOC decision removing her from employment. If not satisfied, Ms. Hinton-Saunders may then appeal a decision of the Office of Employee Appeals to the D.C. Superior Court. *See generally Johnson v. District of Columbia,* 368 F. Supp. 2d 30, 40 (D.C. 2005).

'termination evidentiary hearing, when as here, there is an opportunity for a full evidentiary hearing after termination.[7]

District of Columbia law also does not require a pre-termination hearing with oral testimony in all instances. The Comprehensive Merit Personnel Act provides that there shall be "a *written* opportunity to be heard before the action becomes effective." D.C. Official Code § 1-616.51(4) (emphasis added). The regulations implementing Section 1-616.51(4) permit an evidentiary hearing in connection with a pre-termination administrative review "only when a decision based on preponderance of the evidence cannot be made because the written record is inadequate for this purpose." 6 DCMR 1612.5. The adequacy of the record must be measured with reference to the limited purpose of this administrative review. The issue at this stage of the proceedings is not whether the proposed termination is proper, but only whether the Government has provided both credible and reasonable grounds for it. The pre-termination process is designed to allow the employee, not the Government, to explain her side of the story. As discussed below, the written record submitted by the Government adequately demonstrates that such reasonable grounds for the disciplinary action do not exist. Accordingly, in the exercise of the authority delegated to me, I determine that a pre-termination evidentiary oral hearing is not necessary.

---

[7] Ms. Hinton-Saunders disputes some of the factual allegations against her. It is not my role to weigh the credibility of evidence as to this factual dispute. Therefore, there is no need for a hearing at this stage to assess her account of the events of June 3, 2006. I will consider her account to the extent it bears on whether a reasonable person could conclude, based on this record, that the facts alleged by DOC are true, and whether those facts justify the proposed summary removal action.

## C. The Basis For The Proposed Removal of Ms. Hinton-Saunders

The substantive issue here is whether there is a reasonable basis for the affirmance of the proposed summary removal.[8]  Resolution of the issue requires consideration of two questions, according to *Loudermill*.  The first question is "whether there are reasonable grounds to believe that the charges against the employee are true".  470 U.S. at 545-46.  The second question is whether there are reasonable grounds to believe that the charges "support the proposed action." *Id.* at 546.

### 1.  Are There Reasonable Grounds To Believe That The Charges Are True?

DOC states that the removal is based upon Ms. Hinton-Saunders' negligence and violation of CDF policy.  The act of Ms. Hinton-Saunders that is identified as the basis for these charges is described as follows:

> [O]n Saturday, June 3, 2006 your assigned post was Administrative Module Officer #2, on the #2 Shift.  As the Administrative Two Officer, you were responsible for controlling and maintaining the gate (Administrative Two Door) that separates the inmate housing units from the administrative areas of the CDF. In this capacity you were responsible for ensuring that all inmates passing through your area were authorized to do so by examination of identification, armband, inmate callout pass, etc.
>
> On June 3, 2006, Inmate Joseph Leaks was escorted to his assigned work detail on the Second Floor of the Administrative Module.  Inmate Leaks' primary responsibility on the work detail was to clean the common areas, which included

---

[8]  In analyzing the *Loudermill* question, I have considered the Government's record to consist of the following materials provided with respect to Ms. Hinton-Saunders:  the Removal Letter, the attached Memorandum from the Warden, the attached Investigative Report, and the attached two Interview Transcripts of Ms. Hinton-Saunders (June 3 and July 3, 2006), as well as all rules and regulations cited by DOC.  The record also includes the later-filed Exhibits B, C, and D to the Investigative Report, and the Key of witness names used in that report.  The interviews of Ms. Hinton-Saunders were conducted without her swearing to testify under oath; the Interview Transcripts are transcriptions signed neither by the court reporter as true and accurate nor by the interviewee, Ms. Hinton-Saunders, after opportunity for review and corrections.

the Officer's Dining Room, Environmental Office and employee's locker rooms on the second floor. At some point, Inmate Leaks, who was wearing a green environmental identification card, left his assigned detail post assignment in this module area and proceeded through the Administrative Two door into the inmate housing unit area where he ultimately met up with Inmate Ricardo Jones. According to Inmate Leaks, you unlocked the door and allowed both he and Inmate Jones, who was also wearing a green environmental detail badge, through the Administrative Two door onto the second floor of the administrative module. Investigation disclosed that the badge worn by Inmate Jones belonged to and bears the photo of Inmate Carlton Beachum. The inmates removed a floor buffer from the Administrative Two supply room, walked down one flight of stairs to the first floor Administrative Module and used the buffer to knock out a window in the Warden's Office to effect their escape.

*      *      *

[Y]ou failed to carry out your responsibilities to ensure that the inmates you allowed through your area of responsibility were authorized to do so. You failed to verify the Detail Identification Pass that Inmate Jones had in his possession. If you had authenticated Inmate Jones' pass you would have discovered that he was carrying the Detail Identification Pass belonging to Inmate Carlton Beachum, alerting you to a possible security breach.

Removal Letter at 1-2 [references to the OIA Investigative Report and interviews redacted].

The Removal Letter refers to the Investigative Report. According to the Investigative Report, on Saturday, June 3, 2006, at approximately 7:00 a.m., another employee identified as EO-1 entered the North One housing unit and removed nine (9) work detail inmates, including inmate Leaks. EO-1 then escorted the inmates to their work assignments. EO-1 escorted inmate Leaks, and three other inmates, to the second floor of the administrative module. Inmate Leaks was assigned to clean the common areas. Investigative Report, at 10.

The Investigative Report states that Inmate Leaks, who was wearing a green environmental identification card, left his assigned detail area and was allowed to enter through the Administrative Two (2) door; Ms. Hinton-Saunders was assigned to this post. According to the Report, although Ms. Hinton-Saunders denied that she let inmate Leaks into the inmate area,

it is highly probable that she did so because inmate Leaks was wearing the proper identification

badge to allow him access through the Administrative Two (2) door. In addition, EO-1 and Ms.

Hinton-Saunders were the only employees who had a key to this door. Investigative Report, at

10.

The Investigative Report concludes that later in the morning, inmate Leaks and inmate

Jones approached the Administrative Two (2) door. Inmate Leaks stated to investigators that

Ms. Hinton-Saunders unlocked the door and allowed inmate Leaks and inmate Jones, who was

also wearing a green environmental detail badge, through the Administrative Two (2) door, onto

the second floor of the administrative module. The environmental badge worn by inmate Jones

belonged to inmate Beachum. Investigative Report, at 11.

The Investigative Report provides the following discussion with regard to the

Administrative Two (2) door:

> In a June 3, 2006 interview,[9] [Ms. Hinton-Saunders] related that on the morning
> of the escape she did not allow any inmate entrance through the door leading to
> the administrative module.   [Ms. Hinton-Saunders] stated that on several
> occasions during the shift she had to leave her assigned post to escort inmates to
> the Visitor's Hall and to review her annual performance evaluation.   Her
> comments can not be verified.   In addition, in light of the essential functions of

---

[9] Ms. Hinton-Saunders argued in the Motion for Summary Dismissal that the Interview Transcripts
should be suppressed because the OIA investigators failed to give her *Miranda* warnings, in violation
of her Fifth Amendment rights.   The Fifth Amendment provides that "no person ... shall be
compelled *in any criminal case* to be a witness against himself." U.S. Const., amend. V [emphasis
added].   In order to admit, in a criminal case, incriminating statements made during a custodial
interrogation, the police must have first advised the suspect of certain constitutional rights associated
with the Fifth Amendment.   *Miranda v. Arizona,* 384 U.S. 436 (1966).   The exclusionary rule,
applied as a remedy in criminal cases, does not apply when the Government seeks to use the
statements in a civil or administrative proceeding.   *See, e.g., Allen v. Illinois,* 478 U.S. 364, 368
(1986); *Chavez v. Martinez,* 538 U.S. 760, 772 (2003).   *Kastigar v. United States,* 406 U.S. 441
(1972), cited by Ms. Hinton-Saunders, involved an attempt by the Government to compel Grand Jury
testimony from witnesses who were granted use immunity, and it has no application to the present
situation. The motion for suppression is denied.

this post [Ms. Hinton-Saunders] could not validate who relieved her of her duties to attend to other matters consistent with department policy.  According to [Ms. Hinton-Saunders], at approximately 9:45 a.m., she saw EO-1 walk two Black male inmates through the door into the administrative module.

In a subsequent interview on July 3, 2006, [Ms. Hinton-Saunders] stated that on one occasion she unlocked the Administrative Two (2) door to allow Inmate-2[10] to enter. [Ms. Hinton-Saunders] stated that EO-1 was standing near the door with inmate-2 when this took place.  This event allegedly occurred between 9:40 a.m., and 9:50 a.m.  [Ms. Hinton-Saunders] spoke with the OIA investigator again by telephone on July 3, 2006 at which time she stated contrary to her earlier statement that she did not see EO-1 open the Administrative Two (2) door for two Black male inmates at approximately 9:45 a.m. on the day of the escape.

Investigative Report, at 13.

In its conclusions regarding Ms. Hinton-Saunders' conduct, the Investigative Report concludes that Ms. Hinton Saunders was not consistent in her statements concerning the incident. Investigative Report, at 24.  The Report notes that in her June 3, 2006 interview, she denied allowing any inmate to enter through the door leading to the Administrative Two (2) module. She asserted that on several occasions she had to leave her post.  Ms. Hinton-Saunders told the investigator that at approximately 9:45 a.m., she saw EO-1 walk two Black inmates through the door into the second floor of the administrative module.  However, in her July 3, 2006 interview, Ms. Hinton-Saunders stated that on one occasion, at approximately 9:40 to 9:50 a.m., she unlocked the door to allow inmate-2 entrance, and that EO-1 was standing near the door.[11]  Ms. Hinton-Saunders then recounted, contrary to her earlier assertion, that she did not see EO-1 open the Administrative Two (2) doors for two Black inmates at that time.  In contradiction of her accounts, inmate Leaks told investigators that Ms. Hinton-Saunders opened the door to allow inmate Jones and inmate Leaks access to the administrative module.

---

[10] This was not inmate Leaks or inmate Jones.

[11] The telephone interview cited by the Investigative Report was apparently not transcribed.

Based on the contents of the Removal Letter and the Investigative Report, the first question is: What precisely is the *act* that is the basis for the proposed summary removal? The DOC apparently does not find fault in the initial opening of the Administrative Two (2) door to allow inmate Leaks into his work assignment area in the administrative module, since he was wearing the proper identification for entry. The DOC also does not fault the act of opening the door for inmate Leaks to leave his assigned work area unescorted and to enter the inmate area of the CDF; the Investigative Report rejected Ms. Hinton-Saunders' denial that she committed this act, on the basis that his badge allowed him such access. The DOC relies upon Ms. Hinton-Saunders' inconsistent and uncorroborated statements about these two acts, to cast doubt on the credibility of her accounts. The DOC does not contend that these two acts were improper.

The actual basis for the charge is the act of opening the door for both inmate Leaks and inmate Jones to allow them entry into the administrative module, because inmate Jones had an environmental badge assigned to, and showing the photograph of, another inmate.[12] The DOC contends that the fact that the badge displayed the photograph of inmate Beachum should have raised her suspicion as to the badge's authenticity. On this basis, the DOC charges that Ms. Hinton-Saunders had a duty to check inmate Jones' environmental badge in the CDF's computer database, which would have showed that the badge was assigned to inmate Beachum. For the following reasons, I must conclude that a reasonable person could find that Ms. Hinton-Saunders committed this act and that this act violated the Policies of the institution.

---

[12] The record does not include photographs of inmate Jones and inmate Beachum for comparison. At the October status conference, Mr. Hannon stated that the two inmates resemble each other physically. If so, this may be a factual issue for a post-termination hearing as to whether the badge displayed by inmate Jones should have aroused suspicion.

- 15 -

As a threshold matter, Ms. Hinton-Saunders urges in her Response that this was her first time working at the Administrative Module #2 post, and that she was not apprised of any post orders for the post. This defense is not pertinent because the DOC does not rely upon any specific post orders as the basis for disciplinary action. As stated in the Memorandum of the Warden, at 1-2, and the Removal Letter, at 1, this action violated the following Departmental policy:

> Program Statement 5010.2c: "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

A reasonable person could conclude that Ms. Hinton-Saunders was required to adhere to Departmental policy regardless of whether she had experience at that post and regardless of the post. If an inmate appears at the post door and his badge bears an image of another inmate, a reasonable person could conclude that an administrative officer must maintain accountability by checking the status of the inmate's identification badge. Under the circumstances, this is part of the essential duties of an administrative officer. How else could she maintain accountability of the inmates in her area of responsibility?

Ms. Hinton-Saunders next answers that she did not review the badges of the inmates with EO-1 on the morning of the escape, and that she was not required to do so as part of her duties. However, this was not the basis for the charge. Rather, it was the fact that inmate Jones wore the badge of another inmate that created the duty for her to investigate the badge.

Third, Ms. Hinton-Saunders asserts that she was working the second half of a double shift, as she had done the day before. Again, this defense is not pertinent to the charge. Her administrative responsibilities did not change because she was fatigued. It may be true that her supervisor shares responsibility for the conditions present that day by mandating extra shifts, or

that the shortage of staff played a role in those conditions, but this does not excuse Ms. Hinton-Saunders from performing her basic duties.

As a final preliminary matter, Ms. Hinton-Saunders avers that the Interview Transcripts both are missing content. For example, during the second interview on July 3, 2006, she contends that the OIA investigator promised her she would go back to work, but this portion of the interview was not transcribed. I agree with Ms. Hinton-Saunders that there are procedural problems with the Interview Transcripts, as noted above in footnote 8, and if there are also gaps in the substance of the interviews, this is a serious concern for any reviewer of the record. In fact, the June Interview Transcript contains the notation, "(Inaudible)," throughout the transcript. Since my scope of review is limited, and since Ms. Hinton-Saunders does not challenge the accuracy of the material actually in the transcripts, I will address this concern by crediting her additions to the Interview Transcripts, as supplements to the record.

With regard to the substance of the charge, Ms. Hinton-Saunders states the following:

> On the day of the escape, Officer Hinton-Saunders observed some of the inmates in the detail assigned to [EO-1], which included inmate Leaks, in the Visiting Hall of the facility. The inmates were cleaning the room. [EO-1] was on the other side of the door. Officer Hinton-Saunders let [EO-1] through the door. One of the inmates assigned to the [EO-1] detail arrived at Officer Hinton-Saunders post with a refrigerator that had just been cleaned. While Officer Hinton-Saunders was inspecting the refrigerator for contraband, the rest of the detail came in from the Visiting Hall and [EO-1] attended to the inmates in his care. After Officer Hinton-Saunders completed her inspection of the refrigerator, [EO-1] indicated he was ready to take his detail through to the administrative side of the building. Officer Hinton-Saunders unlocked the door for [EO-1] and his detail, at which point, they all went through to the other side of the facility. This was the last contact Officer Hinton-Saunders had with the detail.

This account differs from the other two accounts given by Ms. Hinton-Saunders, and none of the three accounts are reconcilable. For example:

- In her first interview, on June 3, 2006, she told investigators that she was off her post from 9:30 a.m. to approximately 9:55 a.m., when she reviewed her performance evaluation. June Interview Transcript, at 12. In that interview, she also stated that during her entire shift, she did not see any work detail inmates that needed to get through the Administrative Two (2) door, and that the last inmates she saw were two Hispanic inmates mopping the visiting hall area. June Interview Transcript, at 15. (The Investigative Report referred to them as "two Black inmates.")

- In her July 3, 2006 interview, Ms. Hinton-Saunders described the refrigerator incident set forth above, and said it occurred about 9:45 a.m., as it was fifteen (15) minutes before the lockdown was called at 10:04 a.m. July Interview Transcript, at 20-26.[13] Ms. Hinton-Saunders at that time said she also saw an inmate with a buffer come through her post, although she recanted her earlier account that she saw two inmates together. July Interview Transcript, at 4 and 22.

- According to the Investigative Report, Ms. Hinton-Saunders recanted some of these statements in a telephone interview later that day, but no transcript was provided of this interview. Notwithstanding the obvious errors in the transcripts, it is not possible to review Ms. Hinton-Saunders' various statements about the timeline of that morning and obtain a coherent picture of what occurred and when.

Ms. Hinton Saunders' ultimate position is that she was not present at her post for the entire shift and that she did not in fact allow the two inmates to pass through her Administrative

---

[13] The Investigators also questioned her about an entry in the shift log book that recorded a time of 9:44 a.m. when Ms. Hinton-Saunders escorted an inmate for a legal visit, but this entry was between two entries in the 8:00 a.m. time range. Ms. Hinton-Saunders agreed with the investigators that the "9" was probably an error, and that the correct time of the escort was, "8:44 a.m." June Interview Transcript, at 5-7.

Two (2) Door.  The OIA investigators discounted this assertion for three reasons: (1) Ms. Hinton-Saunders could not account for the person(s) who relieved her from duty;[14] (2) she and EO-1 were the only persons who had a key to the Administrative Two (2) door; and (3) she made contradictory statements as to whether she allowed any inmates through the door or whether she saw EO-1 escort two Black inmates through the door.  Ms. Hinton-Saunders gave approximately the same time, around 9:45 a.m., as the time: (a) she allowed inmate-2 through the door; or (b) she saw EO-1 escort the two inmates through the door; or (c) she participated in her employee evaluation conference.  The OIA investigators could not support her versions of events, and therefore they relied upon the statements of inmate Leaks that Ms. Hinton-Saunders allowed him through the Administrative Two (2) door on each occasion.

Based on this record, a reasonable person could find that Ms. Hinton-Saunders was present during her shift at her work station, at least during the time when EO-1 escorted inmate Leaks and inmate Jones through her door into the administrative module.  The only other person who could have opened the door was EO-1.  However, Ms. Hinton-Saunders damaged her own credibility with the investigators and the DOC, by giving conflicting accounts of the incident. The DOC credited the account of inmate Leaks, whose credibility would otherwise be suspect, as he identified Ms. Hinton-Saunders as the staff member who opened the door.  A reasonable person could also conclude that the environmental badge worn by inmate Jones should have

---

[14] This factual conclusion is dubious.  Ms. Hinton-Saunders told the investigators that only the control shift supervisor and she were present during the shift, and that the supervisor was in the control room; further, she explained that when the post officer leaves the post, the control shift supervisor closes off the post for entry.  June Interview Transcript, at 17.  This would account for the gaps in coverage.

raised suspicions that it belonged to another inmate.[15]    Further, since it was Ms. Hinton-Saunders' duty to maintain accountability for all inmates in her area, a reasonable person could conclude that Ms. Hinton-Saunders failed to perform her duty by allowing inmate Jones to enter the administrative module wearing a badge assigned to another inmate without checking the badge through the computer database.

Based upon the foregoing Analysis, I conclude that a reasonable person could find that the factual basis for the charge is true. *Loudermill, supra,* at 546.

## 2.  Are There Reasonable Grounds To Believe That The Charges Support The Proposed Action?

As I have found there are reasonable grounds to believe that the factual basis for the charge is true, I will now address the second question: if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Ms. Hinton-Saunders may be summarily removed?  The short answer to this question is, "No."

Under 6 DCMR 1603, an employee may be disciplined or removed only "for cause." 6 DCMR 1603.2.  Cause is defined as, *inter alia*, "any on-duty or employment-related act or omission that interferes with the efficiency or integrity of government operations."  6 DCMR 1603.3.  A "*de minimis*" violation of the cause standard cannot be the basis of a disciplinary action.  6 DCMR 1603.5.  The burden is on the government to show that the disciplinary action is or was for cause.  6 DCMR 1603.10.

---

[15] I am reviewing credibility only insofar as the Investigative Report indicated that Ms. Hinton-Saunders' accounts were rejected, in order to determine whether a reasonable person could find that the facts alleged by the DOC are true.  In other words, the inquiry is whether a reasonable person could reject Ms. Hinton-Saunders' account in favor of that of inmate Leaks.

In addition, the regulations require that in selecting a penalty, "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The regulations governing summary removal also require the agency to find "cause" for the disciplinary action. 6 DCMR 1616.2. However, in the case of summary removal, the agency head must also find that the employee's conduct "(a) [t]hreatens the integrity of government operations; (b) [c]onstitutes an immediate hazard to the agency, to other District employees, or to the employee; or (c) [i]s detrimental to public health, safety, or welfare of others." 6 DCMR 1616.1. While the Removal Letter specifically cites to the first two factors, Removal Letter at 1, it implicitly relies upon the third factor as well. *Id.* at 3 ("your negligence . . . placed staff, inmates and the public at large in considerable capricious danger."). The regulation permitting summary removal clearly envisions a situation where, rather than "interfering with" the integrity of government operations, the employee's conduct has created such risk of harm that the agency must act quickly.[16]

In this case, I have concluded that a reasonable person could find that on June 3, 2006, Ms. Hinton-Saunders allowed inmate Leaks and inmate Jones, escorted by EO-1, to enter through the Administrative Module #2 door into the administrative module. At the time, inmate Leaks had a proper environmental badge that authorized him access to the administrative module to perform his work duties. However, inmate Jones had an environmental badge assigned to inmate Beachum, and the badge displayed inmate Beachum's photograph. Because of this fact, Ms. Hinton-Saunders violated her duty to check the badge worn by inmate Jones for authenticity.

---

[16] *Simply the seven-week gap between the jail break and the suspension of Ms. Hinton-Saunders raises some initial questions about DOC's evaluation of the "immediacy" of the hazard she presented.*

The Removal Letter concluded that Ms. Hinton-Saunders violated: (1) DOC Program Statement 5010.2c, which requires correctional officers to maintain accountability for all inmates in their area of responsibility; (2) Basic Regulations of All Employees 1.1, which requires employees to have a complete understanding of their Position Description and applicable rules, and to abide by them; (3) Basic Regulations for All Employees 1.4, which requires employees to devote their entire attention to their official duties. The Removal Letter further concluded that Ms. Hinton-Saunders' conduct fell below the standard for protection of others against reasonable risk of harm.

The DOC is correct in part that Ms. Hinton-Saunders' alleged negligence contributed in part to the escape, in that she allowed inmate Leaks and inmate Jones to enter the administrative module where they later effected their escape. If the facts are established as true, Ms. Hinton-Saunders failed to perform her basic duties to maintain accountability of the inmates passing through her assigned post.

However, the record does not establish that her conduct created the imminent harm that is required for summary removal, under 6 DCMR 1616.1, for the following reasons:

(1)  EO-1 was escorting inmate Leaks and inmate Jones, and EO-1 bore a greater responsibility for maintaining control over these inmates at that time, as he supervised the work detail. In addition, EO-1 allegedly failed to adequately supervise the inmates in the work detail, which created opportunities for inmate Leaks to plan the escape, Investigative Report, at 19;

(2) Ms. Hinton-Saunders' alleged negligence was mitigated in part by the fact that both inmate Leaks and inmate Jones wore green environmental badges and therefore appeared to have

access to the administrative module for work detail. This does not excuse her conduct, but it is a factor in determining the appropriate penalty;

(3) The Investigative Report, at 4 and 11, stated that three other employees are suspected of intentionally colluding with inmate Jones to allow him to leave his unit without cause. This activity played a far larger role in the escape than the one act of neglect by Ms. Hinton-Saunders, and she is not charged with intentional misconduct; and

(4) Although the evidence supporting the charge against Ms. Hinton-Saunders is legally sufficient for purposes of my review, the evidence is weak. Another plausible scenario supported by the record is that Ms. Hinton-Saunders was not at her post and that EO-1 opened the Administrative Two (2) door to allow inmate Leaks and inmate Jones to enter the administrative module. EO-1 had a key to this door. The resolution of this factual issue requires the trier of fact to credit the account of one of the escaping inmates, inmate Leaks, over the accounts of Ms. Hinton-Saunders, since the Investigative Report does not provide any account by EO-1 on this issue.

For these reasons, it is not reasonable to conclude that Ms. Hinton-Saunders' failure to check inmate Jones' identification badge before admitting him into the administrative module was a significant factor in the escape so as to support her summary removal.

Further, in determining whether the facts reasonably believed to be true support the summary removal of Ms. Hinton-Saunders, I also considered her actions in light of the Government's conclusions in the Investigative Report. The first "Major Finding" by the DOC investigators, as stated above, is that strong evidence suggests that staff "intentionally aided and abetted in the planning and execution of the escapes." Investigative Report at 4. The DOC

investigators also find that "[w]hile departmental policy and procedure are for the most part sufficient, staff negligence in properly adhering to them and circumvention of established regulations were major contributors to the escape." *Id.* There is no basis provided for asserting that the action taken by Ms. Hinton-Saunders is negligence that was a major contributor to the escape, particularly given the finding that CDF staff colluded in the escape. Ms. Hinton-Saunders' alleged negligence neither threatened the integrity of government operations nor constituted an immediate hazard to DOC or other employees.

In the "Agency Enhancements" section of the Investigative Report, the DOC investigators note that "[i]nmates assigned to work off-unit details are now classified by newly established criteria which better take into account relevant security factors." *Id.* at 16. They also point out that a new program statement is being prepared to "reflect new eligibility criteria, policies and procedures." *Id.* at 18. While the Investigative Report provides a basis for the need for a revision of the relevant regulations, these revisions do not change my conclusion that, even following all then-applicable rules, as a factual matter, Ms. Hinton-Saunders action did not contribute significantly to the escape.

In the "Recommendations" section of the Investigative Report, the DOC investigators make nine recommendations. The only recommendation directly addressing the alleged negligence of Ms. Hinton-Saunders, arguably, is a provision for increased staff training. Several of the recommendations, however, focus on the need for increased security and better communication tools. Investigative Report at 28. In addition, in "Final Observations," DOC characterizes the inmate escapes as

> neither opportunistic nor spontaneous but rather the outgrowth of a calculated deliberate plan, arranged and orchestrated with the assistance of others. The

escapes involved not only a carefully assessed determination as to how to breach institutional security but how to elude authorities once successfully in the community.  Central in their scheme to flee from justice was collusion by corrupted staff and the negligence of correctional employees who failed to appropriately address their assigned responsibilities.

Investigative Report at 27.

I conclude that the facts relied upon by the Government, reasonably believed to be true, do not support the proposal to summarily remove Ms. Hinton-Saunders from her position. Summary removal requires that the employee's conduct threatens the integrity of government operations, is an immediate hazard to DOC, other government employees, or herself, or is detrimental to public health, safety, or welfare of others.  6 DCMR 1616.1.  Ms. Hinton-Saunders took one action, in a chain of actions, some of which contributed more significantly to the escape. The Government has not established that Ms. Hinton-Saunders' action threatened the integrity of government operations, was an immediate hazard to DOC, other government employees, or himself, or was detrimental to public health, safety, or welfare of others.

## III.    RECOMMENDATION

In this administrative review, I have considered the two issues raised both by *Loudermill*, 470 U.S. 532, and Chapter 16, D.C. Personnel Regulations.  Those issues are: (a) whether there is any reasonably believable evidence supporting the facts alleged by the proposing official; and (b) whether, if all the reasonably believable evidence supporting the facts alleged by the proposing official were taken as true, a reasonable person could find, by a preponderance of the evidence, that the employee may be removed.

For the reasons discussed above, I have determined that (a) there is reasonably believable evidence supporting the factual conclusion that Ms. Hinton-Saunders improperly allowed inmate

Leaks and inmate Jones to enter the administrative module without verifying the authenticity of inmate Jones' environmental badge assigned to inmate Beachum, as alleged by the DOC in its Removal Letter; and (b) if all the reasonably believable evidence supporting the facts alleged by the DOC were taken as true, a reasonable person could not find, by a preponderance of the evidence, that Ms. Hinton-Saunders may be summarily removed.

I recommend that the proposed summary removal of Ms. Hinton-Saunders not be sustained as it is inconsistent with the Due Process Clause and the applicable provisions of District of Columbia law.

Dated: November 30, 2006

Paul B. Handy
Administrative Law Judge

# Certificate of Service:

**By U.S. Mail (Postage Paid)and Fax:**

Sol Zalel Rosen, Esquire
2501 Calvert Street, N.W. #212
Washington, DC 20006
FAX: 202-296-9375

James E. McCollum, Jr., Esquire
McCollum & Associates, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20741-1717
FAX: 301-864-4351

J. Michael Hannon, Esquire
Hannon Group Law Firm, LLP
1901 18th Street, N.W.
Washington, DC 20009
FAX: 202-232-3704

**By U.S. Mail (Postage Paid) and Fax:**

Kevin J. Turner, Esquire
Assistant Attorney General

Thelma C. Brown, Esquire
Assistant Attorney General, and

Andrea Comentale, Esquire
Assistant Attorney General

441 4th Street, N.W.
Suite1060 –N
Washington, DC 20001
FAX: 202-347-8922

Maria Amato, Esquire
General Counsel
Department of Corrections
1923 Vermont Avenue, NW
Washington, DC 20001
FAX: 202-671-2514

I hereby certify that on __12/5__, 2006, this document was served upon the above-named parties at the addresses and by the means stated.

Clerk/Deputy Clerk

**DISTRICT OF COLUMBIA**

**OFFICE OF ADMINISTRATIVE HEARINGS**

825 North Capitol Street, NE, Suite 4150

Washington, DC 20002

DISTRICT OF COLUMBIA
OFFICE OF
ADMINISTRATIVE HEARINGS

2006 NOV 22  A 9: 09

In the Matter of the Summary Removal of:

DARRYL LOVE,

Case No.:  DOC-06-800010

An Employee of the Department of Corrections

---

**REPORT AND RECOMMENDATION**

## I.    INTRODUCTION

In early June 2006, two inmates escaped from the District of Columbia Central Detention Facility ("CDF").  Shortly thereafter, Darryl Love, Correctional Treatment Specialist DS-11, was placed on paid administrative leave, as were several other employees, based upon their alleged negligence in connection with the escape.  Seven weeks later, on July 26, 2006, Mr. Love, as well as others, was summarily removed from his position.  On August 24, 2006, Stanley M. Waldren, Acting Warden, District of Columbia Department of Corrections ("DOC" or "Government"), issued a written notice (hereinafter "Removal Letter") proposing that the summary removal action be sustained.  Attached to that Removal Letter were the DOC Office of Internal Affairs ("OIA") Investigative Report; Transcript of Interview with Mr. Love, June 20, 2006; the DOC Technical Reference Manual for Case Management (the "Manual"); and two regulations.  On September 7, 2006, counsel for Mr. Love filed an entry of appearance and requested a hearing on the matter.

Pursuant to D.C. Official Code § 1-616.51(4) and to 6 District of Columbia Municipal Regulations ("DCMR") 1616.5 and 1612, Mr. Love is entitled to an administrative review of the proposed affirmance of the summary removal.  On August 31, 2006, the DOC Director designated the Chief Administrative Law Judge of the Office of Administrative Hearings, or administrative law judges that he designates, to serve as the hearing officers to perform such administrative reviews of the summary removals of the involved employees, including Mr. Love.[1]  The Chief Administrative Law Judge designated the undersigned Administrative Law Judge to serve as a hearing officer in the matter of Mr. Love.

On September 8, 2006, a joint status conference was held with certain of the assigned administrative law judges, the attorneys representing all eleven DOC employees, and Maria Amato, Esq., DOC General Counsel.  A joint Order was issued on September 11, 2006.  The joint Order denied the request of counsel for a discovery schedule and asked for an explanation for the need for adversary hearings.  The Order also provided for submission of documents missing from the Investigative Report.  A deadline of September 25, 2006, was set for the submission of responses to the Removal Letter.

On September 11, 2006, DOC filed and served on all parties the documents missing from the Investigative Report.  The documents provided were Exhibits B, C, and D, and the Key of witness names.

On September 27, 2006, counsel for 10 of the employees, including Mr. Love, filed a Motion for Summary Dismissal.  Also on September 27, 2006, Mr. Love filed his Response to the Removal Letter.  In essence, he stated in his Response that his conduct at issue was not

---

[1] The designation was extended as of October 3, 2006, into Fiscal Year 2007.

negligent as charged, because he utilized the mandated classification procedures used at the facility, and that the summary dismissal action violated his constitutional rights.

Counsel for Mr. Love also filed a request for extension of the deadline for responses, and that request was granted *nunc pro tunc* to the date of filing of the responses, by Order dated October 4, 2006. That Order also established a deadline of October 13, 2006, for the DOC's reply to the responses, and scheduled a hearing on the Motion for Summary Dismissal for October 19, 2006.

On October 13, 2006, DOC filed its Opposition to the Motion for Summary Dismissal. DOC maintained that a hearing officer for DOC has no power to grant the relief of dismissal, but may only conduct the administrative review and make a written report and recommendation to the deciding official.

The hearing on the Motion for Summary Dismissal, and second joint status conference, was held as scheduled on October 19, 2006. On October 26, 2006, this administrative court issued its Order Denying the Motion for Summary Dismissal. The denial Order stated that the DOC Employees' arguments would be considered as part of the individual reports and recommendations. The denial Order also established a deadline for the final agency decision in this case of December 15, 2006.

## II.    DISCUSSION

### A. Preliminary Matters

Mr. Love has raised three issues in the Motion for Summary Dismissal I will discuss here. Mr. Love contends first that the summary removal action is a "post-termination" action,

and that in this context, he has been denied his rights to a "pre-termination" notice and hearing pursuant to *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546 (1985).

The parties agree Mr. Love has been removed from his position, is not working and has not been paid since August 24, 2006. The Removal Letter speaks in terms of the reasons for the "proposed removal" of Mr. Love. At the October joint status conference, DOC argued that the removal of Mr. Love does not actually occur until the Director of DOC has rendered a final decision in this matter. Mr. Love disputes that characterization of his position and argues that he has been terminated already because his property interest in employment has been taken from him. The consequence of that deprivation, according to Mr. Love, is that he was denied the "minimum due process requirements for a tenured public employee" including "(1) oral or written notice of the charges against him; (2) an explanation of the employer's evidence; and (3) an opportunity to present his side of the story." *Id.* at 546. Mr. Love contends that he has already been denied his constitutional rights under *Loudermill* because he has been terminated without notice and without an opportunity to be heard. I disagree.

While, as a practical matter, Mr. Love is not working and not being paid, there remains an administrative process to complete before Mr. Love can be described as "terminated." The District of Columbia Personnel Regulations expressly provide for such a process, even when a summary removal action has been taken. 6 DCMR 1616. That administrative process includes the right to a Final Decision Notice, in writing, dated and signed by the deciding official, and addressing certain issues. 6 DCMR 1616.4(h) and 1614.3. Prior to the issuance of a Final Decision Notice, the administrative process must include an administrative review. 6 DCMR 1616.5, 1612. The "pre-termination" administrative process that is required is defined by *Loudermill, supra.*

Second, Mr. Love argues that D.C. Official Code § 1-616.51 is unconstitutional on its face, because summary removal is a drastic personnel action that is permitted only when "an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee himself; or, is detrimental to public health, safety, or welfare." Mr. Love states that there are no facts presented to DOC justifying use of this extraordinary remedy.

In fact, Mr. Love has not made any showing that the statute is *facially* unconstitutional, as he concedes that there are circumstances where a DOC employee may be properly subject to summary removal. Mr. Love asserts only that the statute cannot be applied to the facts in this case. To the extent Mr. Love contends that his circumstances do not justify use of summary removal, this appears to be an argument that the facts do not meet the criteria for summary removal. This issue can be decided by applying the statute and regulations to the facts. Therefore, I will consider his argument in addressing the merits of the case.

Third, Mr. Love argues that the "*Douglas* factors" are applicable to his termination and must be used to evaluate the appropriateness of the penalty imposed. The *Douglas* factors were articulated by the U.S. Merit Systems Protection Board and comprise factors (that may be mitigating or aggravating) that must be considered in determining an appropriate penalty for a federal employee's misconduct. *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). Mr. Love relies on *Dep't of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005) to support his assertion that the *Douglas* factors must be considered when determining a penalty for a District of Columbia employee. *Colbert* appears to be one of only a small number of published cases in this jurisdiction addressing the question of the application of the *Douglas* factors to District of Columbia employees. The *Colbert* Court does not directly hold that the *Douglas* factors must be

applied to evaluate the appropriate penalties for misconduct by District employees.[2]  An earlier

decision by the Office of Employee Appeals stated that the agency uses the principles in *Douglas*

as "guidance." *Employee v. Agency,* 29 D.C. Reg. 4565, 4570 (1982);[3] *see also Stokes v. District*

*of Columbia,* 502 A.2d 1006, 1010 (D.C. 1985) (emphasizing that the role of the Office of

Employee Appeals is not to balance the relevant factors but to evaluate whether the agency

considered relevant factors and struck a balance within the realm of reasonableness, as set forth

in *Douglas*).  The personnel regulations do currently state that "consideration shall be given to

any mitigating or aggravating circumstances that have been determined to exist, to such extent

and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The Removal Letter does not address explicitly whether mitigating or aggravating

factors, if any, were considered in deciding upon the penalty.  While the Removal Letter, for

example, refers to Mr. Love's personnel file, it is not clear whether Mr. Love's work record was

viewed as a mitigating or aggravating factor.  Removal Letter at 2.  Attorneys for DOC stated at

the October joint status conference, that the *Douglas* factors will be applied at the agency level,

but that DOC is not required to expressly articulate its analysis of these factors in the notice of

---

[2] The *Colbert* case has an involved procedural history.  The *Colbert* Court had remanded the case to the Board of the Office of Employee Appeals to consider whether 6 DCMR 1608.2 (limiting consideration of certain parts of an employee's disciplinary record in assessing a penalty based on their age) affected the application of the *Douglas* factors.  874 A.2d at 357 n.8.  By contrast, *Douglas* provides generally for consideration of the employee's past disciplinary and work records.  The Board apparently filed a Response on Remand.  *Id.*  The Court then mentioned that certain documents whose consideration was in question "were relevant in applying the *Douglas* factors," 874 A.2d at 359, and not inconsistent with 6 DCMR 1608.2.  The Superior Court order is quoted, which mentions the initial failure to perform a *Douglas* analysis.  874 A.2d at 360.  The Court ultimately remanded the case to the administrative law judge to consider "DPW's Agency Report on Remand applying the *Douglas* factors, including the additional evidence supplied by DPW and Colbert." 874 A.2d at 361.

[3] In this context, it is not entirely clear whether the Office of Employee Appeals' decision is referring to the *Douglas* discussion of the proper scope of review (cited in a number of subsequent cases) or to the twelve specific factors.

proposed summary removal action, nor is the hearing officer charged with applying these factors to the proposed action.

I do not find it necessary to reach the question whether DOC must explicitly address such factors in a proposed removal action, such as the Removal Letter at issue here, because I find that DOC has not supported its summary removal action under *Loudermill*. At this stage, I believe the first determination is the *Loudermill* question: if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Mr. Love may be summarily removed? In other words, under 6 DCMR 1616.1, has DOC shown negligence that threatened the integrity of government operations and constituted an immediate hazard to DOC or government employees or the public health and safety? Because I answer that question in the negative, I do not consider the *Douglas* question.[4]

**B. The Need For An Adversary Hearing**

On September 7, 2006, Mr. Love filed a request for an "oral hearing and an opportunity

---

[4] It is necessary, however, for me to apply the three factors for summary removal set forth in 6 DCMR 1616.1. I note that the *Douglas* factors are considered guidelines, and the employing District or federal agency is not required to give equal weight or even any weight to any particular factor. *See Stokes, supra* at 1011. Therefore, the agency could reach the same result in this case, after applying either the *Douglas* factors or the summary removal provisions of § 1616.1. Using the *Douglas* factors, the agency could place greater emphasis on the conduct itself and give less weight to the employee's record. Of course, the agency would use the *Douglas* factors to consider penalties other than removal, whereas here I am only reviewing the summary removal action.

to present a written submission."[5]  At the September joint status conference, Mr. Love argued

that extensive discovery and evidentiary hearings were necessary in order to establish the causes

of the escapes in general and the roles, if any, of the individual employees in the escapes.  As

noted above, the request for discovery was denied.  At the October joint status conference, Mr.

Love stated that if the Motion for Summary Dismissal were denied, he would request only a

limited hearing with an opportunity to respond to specific factual allegations upon which DOC

has relied.  Mr. Love did not request or desire a full evidentiary hearing, because he stated this

would allow DOC to firm up its case.

*Loudermill* and subsequent cases establish that due process does not require an oral

hearing or the presentation of witnesses at a pre-termination hearing where, as here, an employee

has an opportunity for a full post-termination evidentiary hearing.[6]  *Loudermill* itself states that

an "opportunity to present reasons, *either in person or in writing*, why proposed action should

not be taken is a fundamental due process requirement."  470 U.S. at 546 (emphasis added).

Cases after *Loudermill* confirm that a full evidentiary hearing before termination is not required

to satisfy due process.  *E.g., Thompson v. District of Columbia,* 428 F.3d 283, 290 (D.C.

Cir.2005) (Edwards, J., concurring); *Singfield v. Akron Metropolitan Housing Auth.,* 389 F.3d

555, 566 (6th Cir. 2004); *Greer v. Amesqua,* 212 F.3d 358, 367 (7th Cir.), *cert. denied,* 531 U.S.

---

[5]  In addition to "an opportunity to present his side of the story," *Loudermill* grants Mr. Love the right to "oral or written notice of the charges" and "an explanation of the employer's evidence."  470 U.S. at 546. Mr. Love does not take issue with the notice he received.  However, Mr. Love argues that the change to 6 DCMR 1616.4 to expand the time to provide written notice from three days to 30 days was illegal.  Under 6 DCMR 400.1, variances may be granted to the regulations under certain conditions.  The variance granted in these cases appears to comply with the requirements in that DOC articulated a limited need to complete transcription of the interview tapes which are used to support the summary removal.

[6]  Pursuant to D.C. Official Code § 1-616.52(b), Mr. Love may appeal to the Office of Employee Appeals from any final DOC decision removing him from employment.  If not satisfied, Mr. Love may then appeal a decision of the Office of Employee Appeals to the D.C. Superior Court.  *See generally Johnson v. District of Columbia,* 368 F. Supp. 2d 30, 40 (D.C. 2005).

- 8 -

1012 (2000); *Schact v. Wisconsin Dep't of Corrections,* 175 F.3d 497, 503 (7th Cir. 1999);

*Schleck v. Ramsey County,* 939 F.2d 638, 641-42 (8th Cir. 1991); *Powell v. Mikulecky,* 891 F.2d

1454, 1458 (10th Cir. 1989).

It is not clear what type of hearing Mr. Love is requesting. Mr. Love has not presented a

sufficient basis for ordering a pre-termination evidentiary hearing. The purpose of a *Loudermill*

hearing is to serve as "an initial check against mistaken decisions – essentially a determination of

whether there are reasonable grounds to believe that the charges against the employee are true

and support the proposed action." 470 U.S. at 545-46. The cases cited above demonstrate that

the "initial check" ordinarily can be performed without a full evidentiary hearing, and Mr.

Love's submission makes no attempt to show why his Motion for Summary Dismissal and his

Response, both dated September 27, 2006, are inadequate presentations of his side of the story.

Accordingly, due process does not require a full pre-termination evidentiary hearing, when as

here, there is an opportunity for a full evidentiary hearing after termination.

District of Columbia law also does not require a pre-termination hearing with oral

testimony in all instances. The Comprehensive Merit Personnel Act provides that there shall be

"a *written* opportunity to be heard before the action becomes effective." D.C. Official Code

§ 1-616.51(4) (emphasis added). The regulations implementing Section 1-616.51(4) permit an

evidentiary hearing in connection with a pre-termination administrative review "only when a

decision based on preponderance of the evidence cannot be made because the written record is

inadequate for this purpose." 6 DCMR 1612.5. The adequacy of the record must be measured

with reference to the limited purpose of this administrative review. The issue at this stage of the

proceedings is not whether the proposed termination is proper, but only whether the Government

has provided both credible and reasonable grounds for it. The pre-termination process is

designed to allow the employee, not the Government, to explain his side of the story. As discussed below, the written record submitted by the Government adequately demonstrates that such reasonable grounds for the disciplinary action do not exist. Accordingly, in the exercise of the authority delegated to me, I determine that a pre-termination evidentiary oral hearing is not necessary.

### C. The Basis For The Proposed Removal of Mr. Pointer

The substantive issue here is whether there is a reasonable basis for the affirmance of the proposed summary removal.[7] Resolution of the issue requires consideration of two questions, according to *Loudermill*. The first question is "whether there are reasonable grounds to believe that the charges against the employee are true". 470 U.S. at 545-46. The second question is whether there are reasonable grounds to believe that the charges "support the proposed action." *Id.* at 546.

### 1. Are There Reasonable Grounds To Believe That The Charges Are True?

DOC states that the removal is based upon Mr. Love's negligence and violation of CDF policy. The act of Mr. Love that is identified as the basis for these charges is described as follows:

---

[7] In analyzing the *Loudermill* question, I have considered the Government's record to consist of the following materials provided with respect to Mr. Love: the Removal Letter, the attached Investigative Report, the attached Interview Transcript of Mr. Love, and the Manual, as well as all rules and regulations cited by DOC. The record also includes the later-filed Exhibits B, C, and D to the Investigative Report, and the Key of witness names used in that report. The interview of Mr. Love was conducted without his swearing to testify under oath; the Interview Transcript is a transcription signed neither by the court reporter as true and accurate nor by the interviewee, Mr. Love, after opportunity for review and corrections.

[Y]ou conducted a custody reclassification on Inmate Leaks on March 11, 2006.  Your scoring produced a total custody score of seven (7), indicating a custody level of medium...  [T]he reclassification was erroneously scored and similar to the December 1, 2005 reclassification instrument prepared by [CTS 3].

You conducted a subsequent reclassification on inmate Leaks on May 15, 2006.  Your scoring of this reclassification produced a total custody score of five (5), indicating a custody level of medium.  However, ... your May 15, 2006 reclassification of inmate Leaks was also incorrect.  Inmate Leaks should have been classified as a Maximum custody inmate.

[Y]ou failed to note that inmate Leaks had a history of escape. Additionally, you failed to score inmate Leaks' U.S. Parole Violation underlying charge according to the DOC Custody Classification Instrument – Technical Reference Manual [hereinafter, the "Manual"].

Inmate Leaks' most serious charge in which he was committed on August 18, 2005, was the US Parole Violation in reference to an underlying 1998 Assault with a Deadly Weapon (ADW) charge.

You stated during your subsequent re-classification of inmate Leaks on May 15, 2006, that you intended to give inmate Leaks **5 points** in **Part B** on the re-classification instrument (severity of prior criminal conviction).  However, you inadvertently struck the **3 key** on your computer keyboard in error.  Nonetheless, in your subsequent re-classification of inmate Leaks, you again failed to note inmate Leaks' history of escape.

[Y]ou were negligent because it was your responsibility to ensure that accurate data was entered into [Jail and Community Corrections System ("JACCS")] reflecting the correct custody score.

Your negligence in performing your official duties caused inmate Leaks to be misclassified as medium custody.  As a result of your misclassification, a maximum custody inmate, with a history of escape was permitted to work on an Off Unit Detail.

Removal Letter at 1-2 [emphasis in original; references to the OIA Investigative Report and to other employee's name redacted, and the full name of the JACCS system added].

The Removal Letter references the Investigative Report.  According to the Investigative Report, the initial classification officer, CTS 2, correctly scored inmate Leaks as a maximum security inmate on August 22, 2005, according to the following criteria:

Case No. DOC-06-800010

A. Severity of Current Offense                          High (5) points
B. Severity of Prior Criminal Convictions              High (5) points
C. History of Escapes or Attempts to Escape            (1) point
D. History of Institutional Violence                   None (0) points
E. Prior Felony Convictions (past 10 years)            One (1) point
F. Drug/Alcohol History (past 5 years)                 Occasional (1) point
G. Age                                                 25 to 35 (0) points
H. Education (High School Diploma/GED)                 (-1) points
I. Employment                                          (0) points

Subtotal, Items A-D (11) points
Total Points (12)
Custody Level (Maximum)

However, according to the Investigative Report, during a December 2005 reclassification,

CTS 3 erroneously gave inmate Leaks the following scores:

A. Severity of Current Offense                         Moderate (3) points
B. Severity of Prior Criminal Convictions              High (5) points
C. History of Escapes or Attempts to Escape            None (0) points
D. History of Institutional Violence                   None (0) points
E. Prior Felony Convictions (past 10 years)            One (1) point
F. Number of Disciplinary Reports                      None (-2) points
G. Age                                                 (0) points
H. Drugs/Alcohol                                       (0) points
I. Education                                           (0) points

Subtotal, Items A-D (08) points
Total Points (07)
Custody Level (Sentenced Medium)

OIA Report, pp. 7-8.

The Investigative Report charges that on March 11, 2006, Mr. Love incorrectly scored

inmate Leaks as follows:

A. Severity of Current Offense                         Moderate (3) points
B. Severity of Prior Criminal Convictions              High (5) points
C. History of Escapes or Attempts to Escape            None (0) points
D. History of Institutional Violence                   None (0) points
E. Prior Felony Convictions (past 10 years)            Two (2) points
F. Number of Disciplinary Reports                      None (-2) points

Case No. DOC-06-800010

| | |
|---|---|
| G. Age | (0) points |
| H. Program Assignment/Work Detail | (-1) point |
| I. Education | (0) points |

Subtotal, Items A-D (08) points
Total Points (07)
Custody Level (Sentenced Medium)

Investigative Report at 8-9.

The Investigative Report further charges that Mr. Love incorrectly re-classified inmate Leaks on May 15, 2006:

| | |
|---|---|
| A. Severity of Current Offense | Moderate (3) points |
| B. Severity of Prior Criminal Convictions | Moderate (3) points |
| C. History of Escapes or Attempts to Escape | None (0) points |
| D. History of Institutional Violence | None (0) points |
| E. Prior Felony Convictions (past 10 years) | Two (2) points |
| F. Number of Disciplinary Reports | None (-2) points |
| G. Age | (0) points |
| H. Program Assignment/Work Detail | (-1) point |
| I. Education | (0) points |

Subtotal, Items A-D (06) points
Total Points (05)
Custody Level (Sentenced Medium)

The Investigative Report stated that, in this reclassification, Mr. Love admitted he intended to give inmate Leaks 5 points in part B but inadvertently struck the 3 key, and Mr. Love did not give inmate Leaks any points for escape history. Investigative Report at 9.

Thus, the Removal Letter makes two factual allegations as to both re-classifications: first, that Mr. Love incorrectly scored inmate Leaks' custody level based on inmate Leaks' actual criminal record during two reclassifications; and second, that as a result of Mr. Love's negligent acts, inmate Leaks was improperly classified and was able to work off of his unit. For the following reasons, I must conclude that a reasonable person could not find ultimately that inmate

Case No. DOC-06-800010

Leaks was improperly classified, although errors did occur.  Since inmate Leaks was properly

classified as a Medium custody inmate, I do not need to reach the second factual issue.

**Failure to accurately assess inmate Leaks' custody level.**

I will address both re-classifications together because the results were identical, with one

exception: in the May 2006 re-classification, Mr. Love only scored three (3) points for inmate

Leaks' Prior Convictions under part B of the re-classification form.

The Removal Letter charges generally that Mr. Love failed to properly score inmate

Leaks' current and prior criminal record, under parts A and B, and failed to give inmate Leaks

one (1) point for a prior escape.  Mr. Love contends in his Response that he followed the Manual

and applied the criminal record for inmate Leaks contained in the JACCS and PRISM databases.

He states that he did not have access to inmate Leaks' paper file.  Mr. Love further states that his

supervisor failed to review his re-classification until after the escapes had occurred in June 2006.

In his interview, Mr. Love told the OIA investigators that he normally conducted a face-to-face

interview with the inmate being re-classified, but he did not do so on this occasion because he

was handling 60 reclassifications at one time.  Interview Transcript, at 4-5 .[8]

---

[8] Mr. Love argued in the Motion for Summary Dismissal that the Interview Transcript should be suppressed because the OIA investigators failed to give him *Miranda* warnings, in violation of his Fifth Amendment rights.  The Fifth Amendment provides that "no person ... shall be compelled *in any criminal case* to be a witness against himself."  U.S. Const., amend. V [emphasis added].  In order to admit, in a criminal case, incriminating statements made during a custodial interrogation, the police must have first advised the suspect of certain constitutional rights associated with the Fifth Amendment.  *Miranda v. Arizona,* 384 U.S. 436 (1966).  The exclusionary rule, applied as a remedy in criminal cases, does not apply when the Government seeks to use the statements in a civil or administrative proceeding.  *See, e.g., Allen v. Illinois,* 478 U.S. 364, 368 (1986); *Chavez v. Martinez,* 538 U.S. 760, 772 (2003).  *Kastigar v. United States,* 406 U.S. 441 (1972), cited by Mr. Love, involved an attempt by the Government to compel Grand Jury testimony from witnesses who were granted use immunity, and it has no application to the present situation.  Mr. Love's motion for suppression is denied.

Mr. Love concedes that in the May 2006 reclassification he intended to give inmate Leaks five (5) points for the prior record [part B], but erroneously pressed the code key on his computer keyboard for three (3) points. Interview Transcript, at 8-9 and 19. There is no dispute that inmate Leaks should have had two additional points assessed against him as to this re-classification, and a reasonable person could clearly make this finding.

The key point of contention is the allegation that Mr. Love should have given inmate Leaks five (5) points ("HIGH") for *both* his current and prior record. A detailed review of the Interview Transcript and the Investigative Report shows that the issue boils down to this: if an inmate is convicted of a serious charge, and then violates parole on the same charge, does the employee consider the severity of the underlying charge for both the prior and current record?

Under the Manual: Chapter 2 (Reclassification), Part A – Severity of Current Offense, the employee must consider all of the charges for which the inmate is committed and assign a point value based on the severity level of the most serious charge. Manual, p. 20 – Chapter 2, 3.a 3). A schedule is provided assigning severity points to each type of charge. Manual, Appendix A.

The Manual - Chapter 2 – 3. a. 6) provides the following with regard to scoring parole violators under the category of current offense:

6)    Parole Violators

   a)    If the violation was the result of new criminal conduct (arrest or conviction), use the new criminal conduct for scoring this item.

   b)    If the violation behavior was a technical violation, with no new charges, score the technical violation offense as Lowest.

The next section of the manual instructs the employee with regard to prior convictions to: "score the inmate's prior criminal convictions, *not including the current offense*, in the past 10 years to determine the most severe conviction in the inmate's history." Manual, at Chapter 2 3.b.1)a) [emphasis added].

In this case, inmate Leaks had incurred new charges when his parole warrant was executed. Both DOC and Mr. Love assumed that the underlying charge for the parole violation is considered when scoring the current offense. Mr. Love stated in his interview that the underlying charge is scored if it is disclosed in the file to the employee when re-classification is done. Interview Transcript, at 9. However, the Manual - Chapter 2 – 3. a. 6) does not provide for this scoring of the current offense, under either scenario described in the Manual (whether there are new charges or no new charges).

Therefore, Mr. Love is correct, albeit for the wrong reason, that the underlying charge is not considered as a current charge. According to the Manual, Mr. Love is required to consider the new charges, and not the underlying charge for the parole violation. Therefore, inmate Leaks' current offense score would be based on the current charges, the most severe of which was Obstruction of Justice. The Manual does require the employee to consider the prior conviction of Accessory After the Fact (First Degree Murder While Armed) as a prior charge.[9]

Based on this Discussion, a reasonable person could *not* find that Mr. Love incorrectly scored inmate Leaks' custody level with regard to the current offense. Mr. Love correctly

---

[9] The Removal Letter also alleges that the underlying charge for the parole violation was Assault with a Deadly Weapon ("ADW"). It appears that both the ADW and the Accessory After the Fact (First Degree Murder While Armed) charges were part of the same case. It makes no difference which charge is considered because both charges have a severity rating of five (5) points. Manual, at Appendix A.

determined both in March and May 2006 that inmate Leaks' current offense score under part A was three (3) points for Obstruction of Justice, the most severe offense at issue.

With regard to the escape charge, the OIA investigators did not question Mr. Love about why he failed to score one (1) point for prior institutional escapes. The Investigative Report states that inmate Leaks had a history of prior escape from an institution, and that the initial classification employee in August 2005 properly scored one (1) point for prior escapes. The Manual, at Chapter 2 – 3.c. 3) provides that if the inmate escaped or attempted to escape from a low security or community corrections facility over 1 year ago, the employee should score one (1) point for escape history under part C. A reasonable person could find that Mr. Love erred in failing to score inmate Leaks with the prior escape as to both the March and May 2006 re-classifications.

In summary, with regard to the assigned errors, a reasonable person could conclude that Mr. Love erred in failing to score one (1) point under part C – Escape History, as to both the March and May 2006 reclassifications. With regard to the May 2006 re-classification only, a reasonable person could conclude that Mr. Love erred in hitting the code key for three (3) points, and not five (5) points, for Prior Criminal Convictions under part B. However, a reasonable person could *not* conclude that Mr. Love incorrectly scored inmate Leaks' current record under part A for either re-classification. Mr. Love correctly used the most severe offense among the new charges, Obstruction of Justice – three (3) points, as the current offense score, in accordance with the Manual.

Case No. DOC-06-800010

According to my review of the record, applying all factors correctly, inmate Leaks should have been scored the following with regard to the March 11, 2006 re-classification (matters in bold show corrected scores):

| | |
|---|---|
| A. Severity of Current Offense | Medium (3) points |
| B. Severity of Prior Criminal Convictions | High (5) points |
| C. History of Escapes or Attempts to Escape | **One (1) point** |
| D. History of Institutional Violence | None (0) points |
| E. Prior Felony Convictions (past 10 years) | Two (2) points |
| F. Number of Disciplinary Reports | None (-2) points |
| G. Age | (0) points |
| H. Program Assignment/Work Detail | (-1) point |
| I. Education | (0) points |

Subtotal, Items A-D (09) points
Total Points (08)

With regard to the May 16, 2006 re-classification, Mr. Love should have scored inmate Leaks as follows (matters in bold show corrected scores):

| | |
|---|---|
| A. Severity of Current Offense | Medium (3) points |
| B. Severity of Prior Criminal Convictions | **High (5) points** |
| C. History of Escapes or Attempts to Escape | **One (1) point** |
| D. History of Institutional Violence | None (0) points |
| E. Prior Felony Convictions (past 10 years) | Two (2) points |
| F. Number of Disciplinary Reports | None (-2) points |
| G. Age | (0) points |
| H. Program Assignment/Work Detail | (-1) point |
| I. Education | (0) points |

Subtotal, Items A-D (09) points
Total Points (08)

The next step is to determine the inmate's custody scale. As stated in the Manual, at 26 – Section 4 a.2), the employee determines the inmate's custody scale in the following manner:

Case No. DOC-06-800010

2)  Enter the three-letter Scored Custody Level Code in the right-hand column.

    a)  *Maximum Custody*

        (1) Enter *MAX,* if inmate scored 10 or more points on items A –D.

        (2) Enter *MAX,* if inmate scored 12 points or more on items A - I.

    b)  *Medium Custody*

        (1)  Enter *MED,* if inmate scored 5 to 11 points on items A – I.

        (2)  Enter *MED,* if inmate scored 4 or fewer point with restrictions on items A – I.

Thus, Inmate Leaks did qualify for a Medium custody level in March and May 2006, because his score on items A – D was under ten (10) points and his overall score on all items was under twelve (12) points. The ultimate result reached by Mr. Love was correct. A reasonable person could *not* find that inmate Leaks should have been classified at the Maximum custody level, as alleged in the Removal Letter.

Based upon the foregoing Analysis, I conclude that a reasonable person could find that some of the factual bases for the charges are true, but that no reasonable person could find that the ultimate factual conclusion, that Mr. Love incorrectly re-classified inmate Leaks, is true. *Loudermill, supra,* at 546.

## 2. Are There Reasonable Grounds To Believe That The Charges Support The Proposed Action?

As I have found there are not reasonable grounds to believe that the factual basis for the charge is true, I will now address the second question: if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable

person find by a preponderance of the evidence that Mr. Love may be summarily removed?  The short answer to this question is, "No."

The primary reason is this:  The essence of the charge is that Mr. Love's improper classification of inmate Leaks caused him to gain off-unit privileges that enabled him to plan and execute his escape, and this charge is not supported by the record.  The record shows clearly that, even if Mr. Love had correctly followed the Manual in re-classifying inmate Leaks, the inmate would have been classified as a Medium custody level inmate.

Under 6 DCMR 1603, an employee may be disciplined or removed only "for cause." 6 DCMR 1603.2.  Cause is defined as, *inter alia*, "any on-duty or employment-related act or omission that interferes with the efficiency or integrity of government operations."  6 DCMR 1603.3.  A "*de minimis*" violation of the cause standard cannot be the basis of a disciplinary action.  6 DCMR 1603.5.  The burden is on the government to show that the disciplinary action is or was for cause.  6 DCMR 1603.10.

In addition, the regulations require that in selecting a penalty, "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate."  6 DCMR 1603.9.

The regulations governing summary removal also require the agency to find "cause" for the disciplinary action.  6 DCMR 1616.2.  However, in the case of summary removal, the agency head must also find that the employee's conduct "(a) [t]hreatens the integrity of government operations; (b) [c]onstitutes an immediate hazard to the agency, to other District employees, or to the employee; or (c) [i]s detrimental to public health, safety, or welfare of others."  6 DCMR 1616.1.  While the Removal Letter specifically cites to the first two factors, Removal Letter at 1,

it implicitly relies upon the third factor as well. *Id.* at 3 ("your negligence . . . placed staff, inmates and the public at large in considerable capricious danger."). The regulation permitting summary removal clearly envisions a situation where, rather than "interfering with" the integrity of government operations, the employee's conduct has created such risk of harm that the agency must act quickly.[10]

Both sides agree that, on March 11 and May 16, 2006, Mr. Love re-classified inmate Leaks at the Medium custody level, consistent with the December 5, 2005 re-classification but as a change from the initial Maximum custody level. The Investigative Report contends that Inmate Leaks was erroneously placed on Medium custody level, and as a result he was subsequently approved for a work detail, was able to leave his unit, and was able to have conversations with Inmate Jones. Investigative Report at 10. The Removal Letter cited Mr. Love's act of improperly re-classifying inmate Leaks as the basis for the charge of negligence. Removal Letter at 3.

The Removal Letter concluded that Mr. Love violated: (1) DOC Program Statement 4090.4, which requires case managers to use the Manual when completing the re-classification instrument; (2) the Manual at Chapter 2, section 1(f) requirement that the case manager rely upon the data in the inmate's record in completing the scoring of the first page of the reclassification instrument; and (3) the Basic Regulations for all employees 1.1 requirement that the employee must have operational knowledge of the position and all applicable regulations, rules, policies and procedures. The Removal Letter further concluded that Mr. Love's conduct fell below the standard for protection of others against reasonable risk of harm.

---

[10] Simply the seven-week gap between the jail break and the suspension of Mr. Pointer raises some initial questions about DOC's evaluation of the "immediacy" of the hazard presented by Mr. Pointer.

However, the conclusions of the Investigative Report and the Removal Letter were not supported by the record, because these conclusions relied upon a faulty application of the Manual's provisions. As stated above, the Manual does not direct the employee to consider the underlying charge for a parole warrant when scoring the current offense. That underlying charge is only considered for prior convictions. The corrected scores for inmate Leaks in his March 11 and May 16, 2006 re-classifications still placed him within the Medium custody level.

The errors that Mr. Love did commit did not contribute to the escape in June 2006. First, the ultimate results of the re-classifications were correct. Second, one must consider the fact that the JACCS system was not functioning correctly. Investigative Report, at 28. If in fact inmate Leaks had other charges not considered in the re-classifications, the computer database used by Mr. Love was not accurate. Third, Mr. Love's re-classification instrument was approved by his supervisor. It is not reasonable to conclude that Mr. Love's failure to properly re-classify inmate Leaks in March and May 2006 was a significant factor in the escape so as to support his summary removal.

Further, in determining whether the facts reasonably believed to be true support the summary removal of Mr. Love, I also considered his actions in light of the Government's conclusions in the Investigative Report. The first "Major Finding" by the DOC investigators is that strong evidence suggests that staff "intentionally aided and abetted in the planning and execution of the escapes." Investigative Report at 4. The DOC investigators also find that "[w]hile departmental policy and procedure are for the most part sufficient, staff negligence in properly adhering to them and circumvention of established regulations were major contributors to the escape." _Id_. There is no basis provided for asserting that the action taken by Mr. Love is negligence that was a major contributor to the escape, particularly given the finding that CDF

staff colluded in the escape (along with the other intervening events). Mr. Love's alleged negligence neither threatened the integrity of government operations nor constituted an immediate hazard to DOC or other employees.

In the "Agency Enhancements" section of the Investigative Report, the DOC investigators note that "[i]nmates assigned to work off-unit details are now classified by newly established criteria which better take into account relevant security factors." *Id.* at 16. They also point out that a new program statement is being prepared to "reflect new eligibility criteria, policies and procedures." *Id.* at 18. While the Investigative Report provides a basis for the need for a revision of the relevant regulations, these revisions do not change my conclusion that, even following all then-applicable classification procedures, as a factual matter, Mr. Love's actions did not contribute to Inmate Leaks' escape.

In the "Recommendations" section of the Investigative Report, the DOC investigators make nine recommendations. The only recommendation directly addressing the alleged negligence of Mr. Love, arguably, is a provision for increased staff training. At least three of the recommendations, however, focus on the problems with the data contained in JACCS. Investigative Report at 28. In addition, in "Final Observations," DOC characterizes the inmate escapes as

> neither opportunistic nor spontaneous but rather the outgrowth of a calculated deliberate plan, arranged and orchestrated with the assistance of others. The escapes involved not only a carefully assessed determination as to how to breach institutional security but how to elude authorities once successfully in the community. Central in their scheme to flee from justice was collusion by corrupted staff and the negligence of correctional employees who failed to appropriately address their assigned responsibilities.

Investigative Report at 27.

I conclude that the facts relied upon by the Government, reasonably believed to be true, do not support the proposal to summarily remove Mr. Love from his position. Summary removal requires that the employee's conduct threatens the integrity of government operations, is an immediate hazard to DOC, other government employees, or himself, or is detrimental to public health, safety, or welfare of others. 6 DCMR 1616.1. Mr. Love took two actions that ultimately proved to be correct. The Government has not established that Mr. Love's actions threatened the integrity of government operations, was an immediate hazard to DOC, other government employees, or himself, or was detrimental to public health, safety, or welfare of others.

## III.    RECOMMENDATION

In this administrative review, I have considered the two issues raised both by *Loudermill*, 470 U.S. 532, and Chapter 16, D.C. Personnel Regulations. Those issues are: (a) whether there is any reasonably believable evidence supporting the facts alleged by the proposing official; and (b) whether, if all the reasonably believable evidence supporting the facts alleged by the proposing official were taken as true, a reasonable person could find, by a preponderance of the evidence, that the employee may be removed.

For the reasons discussed above, I have determined that (a) while some of the factual allegations are reasonably supported by the record, there is no reasonably believable evidence supporting the factual conclusion that Mr. Love improperly classified inmate Leaks, as alleged by the DOC in its Removal Letter; and (b) if all the reasonably believable evidence supporting the facts alleged by the DOC were taken as true, a reasonable person could not find, by a preponderance of the evidence, that Mr. Love may be summarily removed.

I recommend that the proposed summary removal of Mr. Love not be sustained as it is inconsistent with the Due Process Clause and the applicable provisions of District of Columbia law.

Dated: November 17, 2006

Paul B. Handy
Administrative Law Judge

Case No. DOC-06-800010

## Certificate of Service:

**By U.S. Mail (Postage Paid)and Fax:**

Sol Zalel Rosen, Esquire
2501 Calvert Street, N.W. #212
Washington, DC 20006
FAX: 202-296-9375

James E. McCollum, Jr., Esquire
McCollum & Associates, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20741-1717
FAX: 301-864-4351

J. Michael Hannon, Esquire
Hannon Group Law Firm, LLP
1901 18th Street, N.W.
Washington, DC 20009
FAX: 202-232-3704

**By U.S. Mail (Postage Paid) and Fax:**

Kevin J. Turner, Esquire
Assistant Attorney General

Thelma C. Brown, Esquire
Assistant Attorney General, and

Andrea Comentale, Esquire
Assistant Attorney General

441 4th Street, N.W.
Suite1060 –N
Washington, DC 20001
FAX: 202-347-8922

Maria Amato, Esquire
General Counsel
Department of Corrections
1923 Vermont Avenue, NW
Washington, DC 20001
FAX: 202-671-2514

I hereby certify that on *November 27*, 2006, this document was served upon the above-named parties at the addresses and by the means stated.

_____
Clerk/Deputy Clerk

- 26 -

# DISTRICT OF COLUMBIA
## OFFICE OF ADMINISTRATIVE HEARINGS
825 North Capitol Street, NE, Suite 4150
Washington, DC  20002

DISTRICT OF COLUMBIA
OFFICE OF
ADMINISTRATIVE HEARINGS

2006 NOV 22  A 10: 15

In the Matter of the Summary Removal of:

MALCOLM POINTER,

Case No.:   DOC-06-800003

An Employee of the Department of Corrections

---

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

In early June 2006, two inmates escaped from the District of Columbia Central Detention Facility ("CDF").  Shortly thereafter, Malcolm Pointer, Correctional Treatment Specialist DS-11, was placed on paid administrative leave, as were several other employees, based upon their alleged negligence in connection with the escape.  Seven weeks later, on July 26, 2006, Mr. Pointer, as well as others, was summarily removed from his position.  On August 24, 2006, Stanley M. Waldren, Acting Warden, District of Columbia Department of Corrections ("DOC" or "Government"), issued a written notice (hereinafter "Removal Letter") proposing that the summary removal action be sustained.  Attached to that Removal Letter were the DOC Office of Internal Affairs ("OIA") Investigative Report; Transcript of Interview with Mr. Pointer, June 20, 2006; the DOC Technical Reference Manual for Case Management (the "Manual"); and two regulations.  On September 7, 2006, counsel for Mr. Pointer filed an entry of appearance and requested a hearing on the matter.

Pursuant to D.C. Official Code § 1-616.51(4) and to 6 District of Columbia Municipal Regulations ("DCMR") 1616.5 and 1612, Mr. Pointer is entitled to an administrative review of the proposed affirmance of the summary removal. On August 31, 2006, the DOC Director designated the Chief Administrative Law Judge of the Office of Administrative Hearings, or administrative law judges that he designates, to serve as the hearing officers to perform such administrative reviews of the summary removals of the involved employees, including Mr. Pointer.[1] The Chief Administrative Law Judge designated the undersigned Administrative Law Judge to serve as a hearing officer in the matter of Mr. Pointer.

On September 8, 2006, a joint status conference was held with certain of the assigned administrative law judges, the attorneys representing all eleven DOC employees, and Maria Amato, Esq., DOC General Counsel. A joint Order was issued on September 11, 2006. The joint Order denied the request of counsel for a discovery schedule and asked for an explanation for the need for adversary hearings. The Order also provided for submission of documents missing from the Investigative Report. A deadline of September 25, 2006, was set for the submission of responses to the Removal Letter.

On September 11, 2006, DOC filed and served on all parties the documents missing from the Investigative Report. The documents provided were Exhibits B, C, and D, and the Key of witness names.

On September 27, 2006, counsel for 10 of the employees, including Mr. Pointer, filed a Motion for Summary Dismissal. Also on September 27, 2006, Mr. Pointer filed his Response to the Removal Letter. In essence, he stated in his Response that his conduct at issue was not

---

[1] The designation was extended as of October 3, 2006, into Fiscal Year 2007.

negligent as charged, because he utilized the mandated classification procedures used at the facility, and that the summary dismissal action violated his constitutional rights.

Counsel for Mr. Pointer also filed a request for extension of the deadline for responses, and that request was granted *nunc pro tunc* to the date of filing of the responses, by Order dated October 4, 2006. That Order also established a deadline of October 13, 2006, for the DOC's reply to the responses, and scheduled a hearing on the Motion for Summary Dismissal for October 19, 2006.

On October 13, 2006, DOC filed its Opposition to the Motion for Summary Dismissal. DOC maintained that a hearing officer for DOC has no power to grant the relief of dismissal, but may only conduct the administrative review and make a written report and recommendation to the deciding official.

The hearing on the Motion for Summary Dismissal, and second joint status conference, was held as scheduled on October 19, 2006. On October 26, 2006, this administrative court issued its Order Denying the Motion for Summary Dismissal. The denial Order stated that the DOC Employees' arguments would be considered as part of the individual reports and recommendations. The denial Order also established a deadline for the final agency decision in this case of December 15, 2006.

## II.    DISCUSSION

### A. Preliminary Matters

Mr. Pointer has raised three issues in the Motion for Summary Dismissal I will discuss here. Mr. Pointer contends first that the summary removal action is a "post-termination" action,

and that in this context, he has been denied his rights to a "pre-termination" notice and hearing pursuant to *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546 (1985).

The parties agree Mr. Pointer has been removed from his position, is not working and has not been paid since August 24, 2006. The Removal Letter speaks in terms of the reasons for the "proposed removal" of Mr. Pointer. At the October joint status conference, DOC argued that the removal of Mr. Pointer does not actually occur until the Director of DOC has rendered a final decision in this matter. Mr. Pointer disputes that characterization of his position and argues that he has been terminated already because his property interest in employment has been taken from him. The consequence of that deprivation, according to Mr. Pointer, is that he was denied the "minimum due process requirements for a tenured public employee" including "(1) oral or written notice of the charges against him; (2) an explanation of the employer's evidence; and (3) an opportunity to present his side of the story." *Id.* at 546. Mr. Pointer contends that he has already been denied his constitutional rights under *Loudermill* because he has been terminated without notice and without an opportunity to be heard. I disagree.

While, as a practical matter, Mr. Pointer is not working and not being paid, there remains an administrative process to complete before Mr. Pointer can be described as "terminated." The District of Columbia Personnel Regulations expressly provide for such a process, even when a summary removal action has been taken. 6 DCMR 1616. That administrative process includes the right to a Final Decision Notice, in writing, dated and signed by the deciding official, and addressing certain issues. 6 DCMR 1616.4(h) and 1614.3. Prior to the issuance of a Final Decision Notice, the administrative process must include an administrative review. 6 DCMR 1616.5, 1612. The "pre-termination" administrative process that is required is defined by *Loudermill, supra.*

Second, Mr. Pointer argues that D.C. Official Code § 1-616.51 is unconstitutional on its face, because summary removal is a drastic personnel action that is permitted only when "an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee himself; or, is detrimental to public health, safety, or welfare." Mr. Pointer states that there are no facts presented to DOC justifying use of this extraordinary remedy.

In fact, Mr. Pointer has not made any showing that the statute is *facially* unconstitutional, as he concedes that there are circumstances where a DOC employee may be properly subject to summary removal. Mr. Pointer asserts only that the statute cannot be applied to the facts in this case. To the extent Mr. Pointer contends that his circumstances do not justify use of summary removal, this appears to be an argument that the facts do not meet the criteria for summary removal. This issue can be decided by applying the statute and regulations to the facts. Therefore, I will consider his argument in addressing the merits of the case.

Third, Mr. Pointer argues that the "*Douglas* factors" are applicable to his termination and must be used to evaluate the appropriateness of the penalty imposed. The *Douglas* factors were articulated by the U.S. Merit Systems Protection Board and comprise factors (that may be mitigating or aggravating) that must be considered in determining an appropriate penalty for a federal employee's misconduct. *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). Mr. Pointer relies on *Dep't of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005) to support his assertion that the *Douglas* factors must be considered when determining a penalty for a District of Columbia employee. *Colbert* appears to be one of only a small number of published cases in this jurisdiction addressing the question of the application of the *Douglas* factors to District of Columbia employees. The *Colbert* Court does not directly hold that the *Douglas* factors must be

applied to evaluate the appropriate penalties for misconduct by District employees.[2] An earlier decision by the Office of Employee Appeals stated that the agency uses the principles in *Douglas* as "guidance." *Employee v. Agency,* 29 D.C. Reg. 4565, 4570 (1982);[3] *see also Stokes v. District of Columbia,* 502 A.2d 1006, 1010 (D.C. 1985) (emphasizing that the role of the Office of Employee Appeals is not to balance the relevant factors but to evaluate whether the agency considered relevant factors and struck a balance within the realm of reasonableness, as set forth in *Douglas*). The personnel regulations do currently state that "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The Removal Letter does not address explicitly whether mitigating or aggravating factors, if any, were considered in deciding upon the penalty. While the Removal Letter, for example, refers to Mr. Pointer's personnel file, it is not clear whether Mr. Pointer's work record was viewed as a mitigating or aggravating factor. Removal Letter at 2. Attorneys for DOC stated at the October joint status conference, that the *Douglas* factors will be applied at the agency level, but that DOC is not required to expressly articulate its analysis of these factors in

---

[2] The *Colbert* case has an involved procedural history. The *Colbert* Court had remanded the case to the Board of the Office of Employee Appeals to consider whether 6 DCMR 1608.2 (limiting consideration of certain parts of an employee's disciplinary record in assessing a penalty based on their age) affected the application of the *Douglas* factors. 874 A.2d at 357 n.8. By contrast, *Douglas* provides generally for consideration of the employee's past disciplinary and work records. The Board apparently filed a Response on Remand. *Id.* The Court then mentioned that certain documents whose consideration was in question "were relevant in applying the *Douglas* factors," 874 A.2d at 359, and not inconsistent with 6 DCMR 1608.2. The Superior Court order is quoted, which mentions the initial failure to perform a *Douglas* analysis. 874 A.2d at 360. The Court ultimately remanded the case to the administrative law judge to consider "DPW's Agency Report on Remand applying the *Douglas* factors, including the additional evidence supplied by DPW and Colbert." 874 A.2d at 361.

[3] In this context, it is not entirely clear whether the Office of Employee Appeals' decision is referring to the *Douglas* discussion of the proper scope of review (cited in a number of subsequent cases) or to the twelve specific factors.

the notice of proposed summary removal action, nor is the hearing officer charged with applying these factors to the proposed action.

I do not find it necessary to reach the question whether DOC must explicitly address such factors in a proposed removal action, such as the Removal Letter at issue here, because I find that DOC has not supported its summary removal action under *Loudermill*. At this stage, I believe the first determination is the *Loudermill* question: if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Mr. Pointer may be summarily removed? In other words, under 6 DCMR 1616.1, has DOC shown negligence that threatened the integrity of government operations and constituted an immediate hazard to DOC or government employees or the public health and safety? Because I answer that question in the negative, I do not consider the *Douglas* question.[4]

### B. The Need For An Adversary Hearing

On September 7, 2006, Mr. Pointer filed a request for an "oral hearing and an opportunity

---

[4] It is necessary, however, for me to apply the three factors for summary removal set forth in 6 DCMR 1616.1. I note that the *Douglas* factors are considered guidelines, and the employing District or federal agency is not required to give equal weight or even any weight to any particular factor. *See Stokes, supra,* at 1011. Therefore, the agency could reach the same result in this case, after applying either the *Douglas* factors or the summary removal provisions of § 1616.1. Using the *Douglas* factors, the agency could place greater emphasis on the conduct itself and give less weight to the employee's record. Of course, the agency would use the *Douglas* factors to consider penalties other than removal, whereas here I am only reviewing the summary removal action.

to present a written submission."[5]  At the September joint status conference, Mr. Pointer argued that extensive discovery and evidentiary hearings were necessary in order to establish the causes of the escapes in general and the roles, if any, of the individual employees in the escapes.  As noted above, the request for discovery was denied.  At the October joint status conference, Mr. Pointer stated that if the Motion for Summary Dismissal were denied, he would request only a limited hearing with an opportunity to respond to specific factual allegations upon which DOC has relied.  Mr. Pointer did not request or desire a full evidentiary hearing, because he stated this would allow DOC to firm up its case.

Loudermill and subsequent cases establish that due process does not require an oral hearing or the presentation of witnesses at a pre-termination hearing where, as here, an employee has an opportunity for a full post-termination evidentiary hearing.[6]  Loudermill itself states that an "opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."  470 U.S. at 546 (emphasis added).  Cases after Loudermill confirm that a full evidentiary hearing before termination is not required to satisfy due process.  E.g.,Thompson v. District of Columbia, 428 F.3d 283, 290 (D.C. Cir.2005) (Edwards, J., concurring); Singfield v. Akron Metropolitan Housing Auth., 389 F.3d 555, 566 (6th Cir. 2004); Greer v. Amesqua, 212 F.3d 358, 367 (7th Cir.), cert. denied, 531 U.S.

---

[5]  In addition to "an opportunity to present his side of the story," Loudermill grants Mr. Pointer the right to "oral or written notice of the charges" and "an explanation of the employer's evidence."  470 U.S. at 546.  Mr. Pointer does not take issue with the notice he received.  However, Mr. Pointer argues that the change to 6 DCMR 1616.4 to expand the time to provide written notice from three days to 30 days was illegal.  Under 6 DCMR 400.1, variances may be granted to the regulations under certain conditions.  The variance granted in these cases appears to comply with the requirements in that DOC articulated a limited need to complete transcription of the interview tapes which are used to support the summary removal.

[6]  Pursuant to D.C. Official Code § 1-616.52(b), Mr. Pointer may appeal to the Office of Employee Appeals from any final DOC decision removing him from employment.  If not satisfied, Mr. Pointer may then appeal a decision of the Office of Employee Appeals to the D.C. Superior Court.  See generally Johnson v. District of Columbia, 368 F. Supp. 2d 30, 40 (D.C. 2005).

1012 (2000); *Schact v. Wisconsin Dep't of Corrections,* 175 F.3d 497, 503 (7th Cir. 1999); *Schleck v. Ramsey County,* 939 F.2d 638, 641-42 (8th Cir. 1991); *Powell v. Mikulecky,* 891 F.2d 1454, 1458 (10th Cir. 1989).

It is not clear what type of hearing Mr. Pointer is requesting.  Mr. Pointer has not presented a sufficient basis for ordering a pre-termination evidentiary hearing.  The purpose of a *Loudermill* hearing is to serve as "an initial check against mistaken decisions – essentially a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." 470 U.S. at 545-46.  The cases cited above demonstrate that the "initial check" ordinarily can be performed without a full evidentiary hearing, and Mr. Pointer's submission makes no attempt to show why his Motion for Summary Dismissal and his Response, both dated September 27, 2006, are inadequate presentations of his side of the story.  Accordingly, due process does not require a full pre-termination evidentiary hearing, when as here, there is an opportunity for a full evidentiary hearing after termination.

District of Columbia law also does not require a pre-termination hearing with oral testimony in all instances.  The Comprehensive Merit Personnel Act provides that there shall be "a *written* opportunity to be heard before the action becomes effective." D.C. Official Code § 1-616.51(4) (emphasis added).  The regulations implementing Section 1-616.51(4) permit an evidentiary hearing in connection with a pre-termination administrative review "only when a decision based on preponderance of the evidence cannot be made because the written record is inadequate for this purpose." 6 DCMR 1612.5.  The adequacy of the record must be measured with reference to the limited purpose of this administrative review.  The issue at this stage of the proceedings is not whether the proposed termination is proper, but only whether the Government has provided both credible and reasonable grounds for it.  The pre-termination process is

designed to allow the employee, not the Government, to explain his side of the story. As discussed below, the written record submitted by the Government adequately demonstrates that such reasonable grounds for the disciplinary action do not exist. Accordingly, in the exercise of the authority delegated to me, I determine that a pre-termination evidentiary oral hearing is not necessary.

### C. The Basis For The Proposed Removal of Mr. Pointer

The substantive issue here is whether there is a reasonable basis for the affirmance of the proposed summary removal.[7] Resolution of the issue requires consideration of two questions, according to *Loudermill*. The first question is "whether there are reasonable grounds to believe that the charges against the employee are true." 470 U.S. at 545-46. The second question is whether there are reasonable grounds to believe that the charges "support the proposed action." *Id.* at 546.

### 1. Are There Reasonable Grounds To Believe That The Charges Are True?

DOC states that the removal is based upon Mr. Pointer's negligence and violation of CDF policy. The act of Mr. Pointer that is identified as the basis for these charges is described as follows:

---

[7] In analyzing the *Loudermill* question, I have considered the Government's record to consist of the following materials provided with respect to Mr. Pointer: the Removal Letter, the attached Investigative Report, the attached Interview Transcript of Mr. Pointer, and the Manual, as well as all rules and regulations cited by DOC. The record also includes the later-filed Exhibits B, C, and D to the Investigative Report, and the Key of witness names used in that report. The interview of Mr. Pointer was conducted without his swearing to testify under oath; the Interview Transcript is a transcription signed neither by the court reporter as true and accurate nor by the interviewee, Mr. Pointer, after opportunity for review and corrections.

[O]n December 1, 2005, you reclassified inmate Leaks without a complete review of his institutional record. In addition, you failed to review the initial classification custody instrument completed by [CTS 2], which was located in inmate Leaks' institutional record. Your decision not to review inmate Leaks' institutional record prior to re-classifying inmate Leaks was a monumental mistake in judgment. A review of inmate Leaks complete institutional record would have revealed inmate Leaks noted record of escape, in addition to a United States Parole Violation (USPV) charge in reference to his underlying 1998 Assault with a Deadly Weapon conviction. Inmate Leaks' prior history of escape from the CDF, a secure facility should have heightened his security threat and possible placement on special handling status.

The [Manual] Instructions for completing the DOC Custody Re-classification instrument states that all offenses the inmate is being committed on should be considered to determine the most serious charge.

Inmate Leaks entered the CDF on August 18, 2005, charged with Accessory After the Fact, (First Degree Murder while Armed). Inmate Leaks' USPV underlying charge should have been scored as the most serious offense.

Inmate Leaks was sentenced to serve 24 years (Aggregate) for his underlying USPV charge (1998 ADW). He was released on September 24, 2003, after serving a five (5) year prison sentence and was placed on parole with 4,383 days remaining to be served. Inmate Leaks' violation of his parole coupled with his history of escape undoubtedly made him an extreme security risk.

The [OIA] Investigation also determined that you erroneously scored the reclassification you conducted on inmate Leaks; wherein you failed to review the institutional record and the initial classification instrument that was prepared by [CTS 2] who had correctly scored inmate Leaks at a maximum custody level.

Removal Letter at 1-2.

The Removal Letter references the Investigative Report. According to the Investigative Report, the initial classification officer, CTS 2, correctly scored inmate Leaks as a maximum security inmate on August 22, 2005, according to the following criteria:

| | |
|---|---|
| A. Severity of Current Offense | High (5) points |
| B. Severity of Prior Criminal Convictions | High (5) points |
| C. History of Escapes or Attempts to Escape | (1) point |
| D. History of Institutional Violence | None (0) points |
| E. Prior Felony Convictions (past 10 years) | One (1) point |
| F. Drug/Alcohol History (past 5 years) | Occasional (1) point |

| G. Age | 25 to 35 (0) points |
| H. Education (High School Diploma/GED) | (-1) points |
| I. Employment | (0) points |

Subtotal, Items A-D (11) points
Total Points (12)
Custody Level (Maximum)

However, according to the Investigative Report, during reclassification, Mr. Pointer erroneously gave inmate Leaks the following scores:

| A. Severity of Current Offense | Moderate (3) points |
| B. Severity of Prior Criminal Convictions | High (5) points |
| C. History of Escapes or Attempts to Escape | None (0) points |
| D. History of Institutional Violence | None (0) points |
| E. Prior Felony Convictions (past 10 years) | One (1) point |
| F. Number of Disciplinary Reports | None (-2) points |
| G. Age | (0) points |
| H. Drugs/Alcohol | (0) points |
| I. Education | (0) points |

Subtotal, Items A-D (08) points
Total Points (07)  ·
Custody Level (Sentenced Medium)

OIA Report, pp. 7-8.  The Removal Letter charges that Mr. Pointer's failure to properly re-classify inmate Leaks contributed to his escape from the CDF because inmate Leaks was allowed to work on an Off Unit Detail with a medium custody score, but he would not have been given this privilege with a maximum custody score.

Thus, the Removal Letter makes three factual allegations: (a) that Mr. Pointer failed to review inmate Leaks' institutional record and the initial classification document when he conducted the re-classification; (b) that Mr. Pointer incorrectly scored inmate Leaks' custody level based on inmate Leaks' actual criminal record; and (c) as a result of Mr. Pointer's negligent acts, inmate Leaks was improperly classified and was able to work off of his unit.

(a)    **Failure to review institutional record and initial classification document.**

In his interview with OIA officials, Mr. Pointer did not dispute that, on December 1, 2005, he re-classified inmate Leaks as a medium risk inmate, as charged in the Removal Letter. Interview Transcript, at 3.[8]  Mr. Pointer stated that he was unsure whether he reviewed the institutional record of inmate Leaks or the initial classification instrument, but he was certain that he used the "WALES" computer database that stored inmate classification information for CDF. Interview Transcript, at 6 and 8-10.    Mr. Pointer told the Government investigators that he also used the system, Jail and Community Corrections System ("JACCS").  Interview Transcript, at 6.  He did not utilize the Pretrial Real-time Information System Manager ("PRISM"), which he stated was not available at the time.  Interview Transcript, at 11.

Since there is no dispute that Mr. Pointer re-classified inmate Leaks as a medium risk offender, and since Mr. Pointer cannot definitively state that he reviewed inmate Leaks' institutional record or the initial classification instrument when he performed the re-classification, I find that there are reasonable grounds to believe that the first factual basis for the charge is true.  In other words, a reasonable person could find based on this record, that Mr.

---

[8] Mr. Pointer argued in the Motion for Summary Dismissal that the Interview Transcript should be suppressed because the OIA investigators failed to give him *Miranda* warnings, in violation of his Fifth Amendment rights.  The Fifth Amendment provides that "no person ... shall be compelled *in any criminal case* to be a witness against himself."  U.S. Const., amend. V [emphasis added].  In order to admit, in a criminal case, incriminating statements made during a custodial interrogation, the police must have first advised the suspect of certain constitutional rights associated with the Fifth Amendment.  *Miranda v. Arizona,* 384 U.S. 436 (1966).  The exclusionary rule, applied as a remedy in criminal cases, does not apply when the Government seeks to use the statements in a civil or administrative proceeding.  *See, e.g., Allen v. Illinois,* 478 U.S. 364, 368 (1986); *Chavez v. Martinez,* 538 U.S. 760, 772 (2003).  *Kastigar v. United States,* 406 U.S. 441 (1972), cited by Mr. Pointer, involved an attempt by the Government to compel Grand Jury testimony from witnesses who were granted use immunity, and it has no application to the present situation.  Mr. Pointer's motion for suppression is denied.

Pointer re-classified inmate Leaks as a medium risk inmate without referring to inmate Leaks' institutional file or the initial classification instrument.

The Manual does not specifically state that the employee must consult with the inmate's institutional file or any prior classification instruments when making re-classification determinations. However, the Manual does require the employee to rely on "data in the inmate record." Manual, at Chapter 2, 1.(f).

    **(b)**     **Failure to accurately assess inmate Leaks' custody level.**

As to the second factual issue, Mr. Pointer stated that he did not consider inmate Leaks' charge of Accessory after the Fact (First Degree Murder While Armed), because Mr. Pointer believed the charge had been released, in other words, that inmate Leaks had posted bond on that charge. Interview Transcript, at 33-39. Instead, Mr. Pointer scored inmate Leaks' current offense (using the most severe offense for which inmate Leaks was currently incarcerated) as the U.S. parole violation underlying charge of Assault with a Deadly Weapon ("ADW"). Mr. Pointer stated that the ADW charge merited three (3) points, not five (5) points. Interview Transcript, at 10-11. [9] Further, Mr. Pointer represented that he did not score one (1) point for the prior escape, because inmate Leaks was not convicted of the escape charge. Interview Transcript, at 5-6.

Under the Manual: Chapter 2 (Reclassification), Part A – Severity of Current Offense, the employee must consider all of the charges for which the inmate is committed and assign a point value based on the severity level of the most serious charge. Manual, Chapter 2, 3.a. Mr.

---

[9] Early in the interview, Mr. Pointer stated that the most serious charge was Obstruction of Justice. Interview Transcript, at 6.

Pointer conceded that the charge of Accessory After the Fact (First Degree Murder While Armed) was rated "High" in severity, under Appendix A, and therefore was assigned five (5) points. Mr. Pointer missed this charge, presumably because he did not review inmate Leaks' institutional record and because the WALES and JACCS databases did not include it. If Mr. Pointer had found this charge, he stated he would have assigned a "High" value to inmate Leaks' current offense and scored five (5) points, rather than three (3) points. In addition, if Mr. Pointer did consider the ADW charge, which was also part of the underlying charges associated with the parole violation, he erroneously scored this as three (3) points, rather than five (5) points. Manual, at Appendix A.

However, a detailed review of the Interview Transcript and the Investigative Report shows that the parties have both misapplied the Manual. The issue boils down to this: if an inmate is convicted of a serious charge, and then violates parole on the same charge, does the employee consider the severity of the underlying charge for both the prior and current record?

Under the Manual: Chapter 2 (Reclassification), Part A – Severity of Current Offense, the employee must consider all of the charges for which the inmate is committed and assign a point value based on the severity level of the most serious charge. Manual, p. 20 – Chapter 2, 3.a 3). A schedule is provided assigning severity points to each type of charge. Manual, Appendix A.

The Manual - Chapter 2 – 3. a. 6) provides the following with regard to scoring parole violators under the category of current offense:

6)    Parole Violators

a)    If the violation was the result of new criminal conduct (arrest or conviction), use the new criminal conduct for scoring this item.

b)    If the violation behavior was a technical violation, with no new charges, score the technical violation offense as Lowest.

The next section of the manual instructs the employee with regard to prior convictions to: "score the inmate's prior criminal convictions, *not including the current offense*, in the past 10 years to determine the most severe conviction in the inmate's history." Manual, at Chapter 2 3.b.1)a) [emphasis added].

In this case, inmate Leaks had incurred new charges when his parole warrant was executed. Both DOC and Mr. Pointer assumed that the underlying charge for the parole violation is considered when scoring the current offense, and the only issue for Mr. Pointer was whether the charge had been released. Interview Transcript, at 22. However, the Manual - Chapter 2 – 3. a. 6) does not provide for this scoring of the current offense, under either scenario described in the Manual (whether there are new charges or no new charges).

Therefore, Mr. Pointer is correct, albeit for the wrong reason, that the underlying charge is not considered as a current charge. According to the Manual, Mr. Pointer is required to consider the new charges, and not the underlying charge for the parole violation. Therefore, inmate Leaks' current offense score would be based on the current charges, the most severe of which was Obstruction of Justice. The Manual does require the employee to consider the prior conviction of Accessory After the Fact (First Degree Murder While Armed) as a prior charge.[10]

---

[10] The Removal Letter also alleges that the underlying charge for the parole violation was Assault with a Deadly Weapon ("ADW"). It appears that both the ADW and the Accessory After the Fact (First Degree Murder While Armed) charges were part of the same case. It makes no difference which charge is considered because both charges have a severity rating of five (5) points. Manual, at Appendix A.

Based on this Discussion, a reasonable person could *not* find that Mr. Pointer incorrectly scored inmate Leaks' custody level with regard to the current offense. Mr. Pointer correctly determined that inmate Leaks' current offense score under part A was three (3) points for Obstruction of Justice, the most severe offense at issue.

With regard to the escape charge, Mr. Pointer told the OIA investigators that a prior escape is only counted if there has been a conviction for the criminal charge of escape. DOC contends that a conviction is not required. The language in the Manual refers to an inmate's "prior record of escape" and then describes various types of situations in which an escape from an institution occurred. Manual, at 8. Since the Manual does not use the word, "conviction," under this section but uses this term in other contexts, a reasonable person could find that a conviction for an escape charge is not required. Rather, it appears that the Manual is requiring the employee to consider a prior act of escape, regardless of whether the inmate was convicted for a criminal charge related to the act.[11]

Mr. Pointer gave credit for inmate Leaks' lack of disciplinary reports with a score of minus two (-2) points. Mr. Pointer did not give credit for his educational record, which should have resulted in minus 1 point (-1), or drug history – one (1) point. The overall correct score for inmate Leaks should have been ten (09) points, and not seven (7) points.

According to my review of the record, applying all factors correctly, inmate Leaks should have been scored the following (matters in bold show corrected scores):

---

[11] Under the standard of review applicable here, I do not determine the credibility of Mr. Pointer's assertion that the facility had a *de facto* policy of excluding prior escapes where no criminal conviction for the conduct had been entered. In general, where Mr. Pointer has interposed factual defenses to the charges, I have considered his defenses, but I have reviewed the record under the standard whether a reasonable person could find the facts alleged by the DOC, pursuant to *Loudermill.*

Case No. DOC-06-800003

Based on this Discussion, a reasonable person could *not* find that Mr. Pointer incorrectly scored inmate Leaks' custody level with regard to the current offense. Mr. Pointer correctly determined that inmate Leaks' current offense score under part A was three (3) points for Obstruction of Justice, the most severe offense at issue.

With regard to the escape charge, Mr. Pointer told the OIA investigators that a prior escape is only counted if there has been a conviction for the criminal charge of escape. DOC contends that a conviction is not required. The language in the Manual refers to an inmate's "prior record of escape" and then describes various types of situations in which an escape from an institution occurred. Manual, at 8. Since the Manual does not use the word, "conviction," under this section but uses this term in other contexts, a reasonable person could find that a conviction for an escape charge is not required. Rather, it appears that the Manual is requiring the employee to consider a prior act of escape, regardless of whether the inmate was convicted for a criminal charge related to the act.[11]

Mr. Pointer gave credit for inmate Leaks' lack of disciplinary reports with a score of minus two (-2) points. Mr. Pointer did not give credit for his educational record, which should have resulted in minus 1 point (-1), or drug history – one (1) point. The overall correct score for inmate Leaks should have been eight (08) points, and not seven (7) points.

According to my review of the record, applying all factors correctly, inmate Leaks should have been scored the following (matters in bold show corrected scores):

---

[11] Under the standard of review applicable here, I do not determine the credibility of Mr. Pointer's assertion that the facility had a *de facto* policy of excluding prior escapes where no criminal conviction for the conduct had been entered. In general, where Mr. Pointer has interposed factual defenses to the charges, I have considered his defenses, but I have reviewed the record under the standard whether a reasonable person could find the facts alleged by the DOC, pursuant to *Loudermill*.

17

A. Severity of Current Offense                          Medium (3) points
B. Severity of Prior Criminal Convictions               High (5) points
C. History of Escapes or Attempts to Escape             **One (1) point**
D. History of Institutional Violence                    None (0) points
E. Prior Felony Convictions (past 10 years)             One (1) point
F. Number of Disciplinary Reports                       None (-2) points
G. Age                                                  (0) points
H. Drugs/Alcohol                                        **One (1) point**
I. Education                                            **Minus One (-1) Point**

Subtotal, Items A-D (09) points
Total Points (08)

As stated in the Manual, at 26 – Section 4 a.2), the employee determines the inmate's custody scale in the following manner:

> 2)    Enter the three-letter Scored Custody Level Code in the right-hand column.
>
>   a)    *Maximum Custody*
>
>       (1) Enter *MAX*, if inmate scored 10 or more points on items A –D.
>
>       (2) Enter *MAX*, if inmate scored 12 points or more on items A - I.
>
>   b)    *Medium Custody*
>
>       (1)    Enter *MED*, if inmate scored 5 to 11 points on items A – I.
>
>       (2)    Enter *MED*, if inmate scored 4 or fewer point with restrictions on items A – I.

Thus, Inmate Leaks did qualify for a Medium custody level in December 2005, because his score on items A – D was under ten (10) points and his overall score on all items was under twelve (12) points. The ultimate result reached by Mr. Pointer was correct. A reasonable person could *not* find that inmate Leaks should have been classified at the Maximum custody level, as alleged in the Removal Letter.

(c)    **Negligence causing Inmate Leaks to work off unit.**

The record shows that Mr. Pointer made errors in his re-classification of inmate Leaks but his ultimate conclusion was correct. Since Mr. Pointer correctly re-classified inmate Leaks at the Medium custody level, Mr. Pointer's actions played no role in allowing inmate Leaks to obtain work duties off of his unit as a Medium security inmate.

Based upon the foregoing Analysis, I conclude that a reasonable person could find that some of the factual bases for the charges are true, but that no reasonable person could find that the ultimate factual conclusion, that Mr. Pointer incorrectly re-classified inmate Leaks, is true. *Loudermill, supra,* at 546.

## 2.    Are There Reasonable Grounds To Believe That The Charges Support The Proposed Action?

As I have found there are not reasonable grounds ultimately to believe that the factual basis for the charge is true, I will now address the second question: if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Mr. Pointer may be summarily removed? The short answer to this question is, "No."

The first and primary reason is this:   The essence of the charge is that Mr. Pointer's improper re-classification of inmate Leaks caused him to gain off-unit privileges that enabled him to plan and execute his escape, and this charge is not supported by the record. The record shows clearly that, even if Mr. Pointer had correctly followed the Manual in re-classifying inmate Leaks, the inmate would have been classified as a Medium custody level inmate.   The

second major reason for this answer is that Mr. Pointer's re-classification of inmate Leaks in December 2005, which was followed by two subsequent re-classifications, played no role in the June 2006 escape.

Under 6 DCMR 1603, an employee may be disciplined or removed only "for cause." 6 DCMR 1603.2. Cause is defined as, *inter alia*, "any on-duty or employment-related act or omission that interferes with the efficiency or integrity of government operations." 6 DCMR 1603.3. A "*de minimis*" violation of the cause standard cannot be the basis of a disciplinary action. 6 DCMR 1603.5. The burden is on the government to show that the disciplinary action is or was for cause. 6 DCMR 1603.10.

In addition, the regulations require that in selecting a penalty, "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The regulations governing summary removal also require the agency to find "cause" for the disciplinary action. 6 DCMR 1616.2. However, in the case of summary removal, the agency head must also find that the employee's conduct "(a) [t]hreatens the integrity of government operations; (b) [c]onstitutes an immediate hazard to the agency, to other District employees, or to the employee; or (c) [i]s detrimental to public health, safety, or welfare of others." 6 DCMR 1616.1. While the Removal Letter specifically cites to the first two factors, Removal Letter at 1, it implicitly relies upon the third factor as well. *Id.* at 3 ("your negligence . . . placed staff, inmates and the public at large in considerable capricious danger."). The regulation permitting summary removal clearly envisions a situation where, rather than "interfering with" the integrity

of government operations, the employee's conduct has created such risk of harm that the agency must act quickly.[12]

Both sides agree that, on December 1, 2005, Mr. Pointer re-classified inmate Leaks at the Medium custody level, as a change from the initial Maximum custody level.  The Investigative Report contends that Inmate Leaks was erroneously placed on Medium custody level, and as a result he was subsequently approved for a work detail, was able to leave his unit, and was able to have conversations with Inmate Jones.  Investigative Report at 10.  The Removal Letter cited Mr. Love's act of improperly re-classifying inmate Leaks as the basis for the charge of negligence. Removal Letter at 3.

The Removal Letter concluded that Mr. Pointer violated: (1) DOC Program Statement 4090.4, which requires case managers to use the Manual when completing the re-classification instrument; (2) the Manual at Chapter 2, section 1(f) requirement that the case manager rely upon the data in the inmate's record in completing the scoring of the first page of the reclassification instrument; and (3) the Basic Regulations for all employees 1.1 requirement that the employee must have operational knowledge of the position and all applicable regulations, rules, policies and procedures.  The Removal Letter further concluded that Mr. Pointer's conduct fell below the standard for protection of others against reasonable risk of harm.

However, the conclusions of the Investigative Report and the Removal Letter were not supported by the record, because these conclusions relied upon a faulty application of the Manual's provisions.  As stated above, the Manual does not direct the employee to consider the

---

[12]  Simply the seven-week gap between the jail break and the suspension of Mr. Pointer raises some initial questions about DOC's evaluation of the "immediacy" of the hazard presented by Mr. Pointer.

underlying charge for a parole warrant when scoring the current offense. That underlying charge is only considered for prior convictions. The corrected scores for inmate Leaks in his December 1, 2005 re-classification still placed him within the Medium custody level.

The errors that Mr. Pointer did commit did not contribute to the escape in June 2006. First, the ultimate results of the re-classifications were correct. Second, one must consider the fact that the JACCS system was not functioning correctly. Investigative Report, at 28. If in fact inmate Leaks had other charges not considered in the re-classification, the computer database used by Mr. Pointer was not accurate. Third, Mr. Pointer's re-classification instrument was approved by his supervisor. It is not reasonable to conclude that Mr. Pointer's failure to properly re-classify inmate Leaks in December 2005 was a significant factor in the escape so as to support his summary removal.

Further, in determining whether the facts reasonably believed to be true support the summary removal of Mr. Pointer, I also considered his actions in light of the Government's conclusions in the Investigative Report. The first "Major Finding" by the DOC investigators is that strong evidence suggests that staff "intentionally aided and abetted in the planning and execution of the escapes." Investigative Report at 4. The DOC investigators also find that "[w]hile departmental policy and procedure are for the most part sufficient, staff negligence in properly adhering to them and circumvention of established regulations were major contributors to the escape." *Id.* There is no basis provided for asserting that the action taken by Mr. Pointer is negligence that was a major contributor to the escape, particularly given the finding that CDF staff colluded in the escape (along with the other intervening events). Mr. Pointer's alleged negligence neither threatened the integrity of government operations nor constituted an immediate hazard to DOC or other employees.

In the "Agency Enhancements" section of the Investigative Report, the DOC investigators note that "[i]nmates assigned to work off-unit details are now classified by newly established criteria which better take into account relevant security factors." *Id.* at 16. They also point out that a new program statement is being prepared to "reflect new eligibility criteria, policies and procedures." *Id.* at 18. While the Investigative Report provides a basis for the need for a revision of the relevant regulations, these revisions do not change my conclusion that, even following all then-applicable classification procedures, as a factual matter, Mr. Pointer's actions did not contribute to Inmate Leaks' escape.

In the "Recommendations" section of the Investigative Report, the DOC investigators make nine recommendations. The only recommendation directly addressing the alleged negligence of Mr. Pointer, arguably, is a provision for increased staff training. At least three of the recommendations, however, focus on the problems with the data contained in JACCS. Investigative Report at 28. In addition, in "Final Observations," DOC characterizes the inmate escapes as

> neither opportunistic nor spontaneous but rather the outgrowth of a calculated deliberate plan, arranged and orchestrated with the assistance of others. The escapes involved not only a carefully assessed determination as to how to breach institutional security but how to elude authorities once successfully in the community. Central in their scheme to flee from justice was collusion by corrupted staff and the negligence of correctional employees who failed to appropriately address their assigned responsibilities.

Investigative Report at 27.

I conclude that the facts relied upon by the Government, reasonably believed to be true, do not support the proposal to summarily remove Mr. Pointer from his position. Summary removal requires that the employee's conduct threatens the integrity of government operations, is an immediate hazard to DOC, other government employees, or himself, or is detrimental to

public health, safety, or welfare of others. 6 DCMR 1616.1. Mr. Pointer took one action, in December 2005, in a chain of actions, some of which contributed more directly to the escape of two inmates in June 2006. The Government has not established that Mr. Pointer's action threatened the integrity of government operations, was an immediate hazard to DOC, other government employees, or himself, or was detrimental to public health, safety, or welfare of others.

## III.    RECOMMENDATION

In this administrative review, I have considered the two issues raised both by *Loudermill*, 470 U.S. 532, and Chapter 16, D.C. Personnel Regulations. Those issues are: (a) whether there is any reasonably believable evidence supporting the facts alleged by the proposing official; and (b) whether, if all the reasonably believable evidence supporting the facts alleged by the proposing official were taken as true, a reasonable person could find, by a preponderance of the evidence, that the employee may be removed.

For the reasons discussed above, I have determined that (a) while some of the factual allegations are reasonably supported by the record, there is no reasonably believable evidence supporting the factual conclusion that Mr. Pointer improperly classified inmate Leaks, as alleged by the DOC in its Removal Letter; and (b) if all the reasonably believable evidence supporting the facts alleged by the DOC were taken as true, a reasonable person could not find, by a preponderance of the evidence, that Mr. Pointer may be summarily removed.

I recommend that the proposed summary removal of Mr. Pointer not be sustained as it is inconsistent with the Due Process Clause and the applicable provisions of District of Columbia law.

Dated: November 17, 2006

Paul B. Handy
Administrative Law Judge

## Certificate of Service:

**By U.S. Mail (Postage Paid)and Fax:**

Sol Zalel Rosen, Esquire
2501 Calvert Street, N.W. #212
Washington, DC 20006
FAX: 202-296-9375

James E. McCollum, Jr., Esquire
McCollum & Associates, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20741-1717
FAX: 301-864-4351

J. Michael Hannon, Esquire
Hannon Group Law Firm, LLP
1901 18th Street, N.W.
Washington, DC 20009
FAX: 202-232-3704

**By U.S. Mail (Postage Paid) and Fax:**

Kevin J. Turner, Esquire
Assistant Attorney General

Thelma C. Brown, Esquire
Assistant Attorney General, and

Andrea Comentale, Esquire
Assistant Attorney General

441 4th Street, N.W.
Suite1060 –N
Washington, DC 20001
FAX: 202-347-8922

Maria Amato, Esquire
General Counsel
Department of Corrections
1923 Vermont Avenue, NW
Washington, DC 20001
FAX: 202-671-2514

I hereby certify that on *November 22*, 2006, this document was served upon the above-named parties at the addresses and by the means stated.

_____
Clerk/Deputy Clerk

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
825 North Capitol Street, NE, Suite 4150
Washington, DC 20002

DISTRICT OF COLUMBIA
OFFICE OF
ADMINISTRATIVE HEARINGS

2006 DEC 11  P 2: 45

| | |
|---|---|
| In the Matter of the Summary Removal of: | |
| SHANTELL HATTON, | Case No.: DOC-06-800001 |
| An Employee of the Department of Corrections | |

## REPORT AND RECOMMENDATION

Pursuant to Section 1612.10 of the District of Columbia Municipal Regulations ("DCMR"), the undersigned Administrative Law Judge has completed an administrative review of the summary removal of Shantell Hatton from her position as Correctional Officer in the District of Columbia Department of Corrections ("DOC") and now submits this Report and Recommendation. For the reasons set forth below, I recommend that the summary removal of Ms. Hatton not be sustained as it is inconsistent with the Due Process Clause and the applicable provisions of District of Columbia law.

## I.    INTRODUCTION

On June 3, 2006, two inmates escaped from the District of Columbia Central Detention Facility ("CDF"). On June 5, 2006, DOC Director Devon Brown placed several employees on paid administrative leave, based upon the alleged negligence of these employees in connection with the escape. Seven weeks later, on July 26, 2006, DOC summarily removed Shantell Hatton, Correctional Officer, as well as others, from their positions.

On August 24, 2006, Stanley M. Waldren, Acting Warden, District of Columbia Department of Corrections ("DOC" or "Government"), issued a written notice (hereinafter "Removal Letter") proposing that the summary removal action against Ms. Hatton be sustained. Attached to that Removal Letter were a Memorandum to Joan Murphy, Special Projects Officer, from Deputy Warden for Operations Waldren dated August 10, 2006; the DOC Office of Internal Affairs ("OIA") Investigative Report; Transcripts of Interviews with Ms. Hatton dated June 3 and June 4, 2006; a Program Statement on Accountability for Inmates issued July 1, 2004; a blank Inmate Movement Pass; Form Position Description for Correctional Officer with a list of duties; Post Orders for the Southeast On[e] {sic} Housing Unit dated February 14, 2005; and two regulations and a document captioned "The Correctional Officers' General Orders" June 1984. The Removal Letter gave notice that the Office of Administrative Hearings ("OAH") would conduct the administrative review of the proposed removal actions. It further advised the Employees that they could file responses to the proposed action and that they could "raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty."

On August 30, 2006, Sol Zalel Rosen, Esquire, filed an appeal and request for hearing on behalf of Ms. Hatton. On August 31, 2006, J. Michael Hannon, Esquire, of the Hannon Law Group, LLP, filed an entry of appearance as co-counsel on behalf of Ms. Hatton and also requested a hearing on the matter.

Pursuant to the Comprehensive Merit Personnel Act, D.C. Official Code § 1-616.51(4), and 6 DCMR 1616.5 and 1612, Ms. Hatton is entitled to an administrative review of the proposed affirmance of the summary removal. On August 31, 2006, the DOC Director

designated the Chief Administrative Law Judge of the Office of Administrative Hearings, or Administrative Law Judges that he designates, to serve as the hearing officers to perform such administrative reviews of the summary removals of the involved employees, including Ms. Hatton.[1] The Chief Administrative Law Judge designated the undersigned Administrative Law Judge to serve as a hearing officer in the matter of Ms. Hatton.

On September 8, 2006, certain of the assigned Administrative Law Judges conducted a joint status conference with the attorneys representing all eleven DOC employees and Maria Amato, Esq., DOC General Counsel. This administrative court issued a joint Order on September 11, 2006. The joint Order denied the employees' request for a discovery schedule and asked for an explanation of the need for adversary hearings. The Order also provided for the submission of documents missing from the Investigative Report. The Order set a deadline of September 25, 2006, for the submission of responses to the Removal Letter.

On September 11, 2006, DOC filed and served on all parties the documents missing from the Investigative Report. The documents provided were Exhibits B, C, and D, and the Key of witness names.

On September 25, 2006, Mr. Rosen filed a Response on behalf of Ms. Hatton, as well as a Declaration signed by Ms. Hatton. On September 27, 2006, Mr. Hannon, counsel for 10 of the employees, including Ms. Hatton, filed a Motion for Summary Dismissal, raising several issues that are discussed in detail below under "Preliminary Matters." Also on September 27, 2006, Mr. Hannon filed a Response to the Removal Letter on behalf of Ms. Hatton. In essence, she stated in her Responses that her conduct at issue was not negligent as charged; that as relief

---

[1]    DOC extended the designation as of October 3, 2006, into Fiscal Year 2007.

officer, she worked only periodically in the Southeast One housing unit where she was assigned that day; that she had no prior dealings or connection with Inmate Jones; that Inmate Jones should have been in a high custody unit and not in the Southeast One housing unit; that as the junior officer, she followed directions from Sergeant Makins, the Officer-In-Charge; that the unit was short-staffed that day; that she correctly noted the time Inmate Jones left the unit on his pass and on the movement log; that she followed all procedures for movement of inmates out of the housing unit to the best of her ability and that the summary dismissal action violated her constitutional rights.

Mr. Hannon, as counsel for Ms. Hatton, also filed a request for extension of the deadline for responses to allow for the filing of his response on behalf of Ms. Hatton.  By Order dated October 4, 2006, the assigned Administrative Law Judges granted that request *nunc pro tunc* to the date of filing of the responses.  That Order also established a deadline of October 13, 2006, for the DOC's reply to the responses, and scheduled a hearing on the Motion for Summary Dismissal for October 19, 2006.

On October 13, 2006, DOC filed its Opposition to the Motion for Summary Dismissal. DOC maintained that a hearing officer for DOC has no power to grant the relief of dismissal, but may only conduct the administrative review and make a written report and recommendation to the deciding official.

The assigned Administrative Law Judges conducted a hearing on the Motion for Summary Dismissal and a second joint status conference as scheduled on October 19, 2006.  On October 26, 2006, this administrative court issued its Order Denying the Motion for Summary Dismissal.  The denial Order stated that the DOC Employees' arguments would be considered as

part of the individual reports and recommendations. The denial Order also established a deadline for the final agency decision in this case of December 15, 2006.

## II.  DISCUSSION

### A. Preliminary Matters

Ms. Hatton has raised three issues in the Motion for Summary Dismissal I will discuss here. Ms. Hatton contends first that the summary removal action is a "post-termination" action, and that in this context, she has been denied her rights to a "pre-termination" notice and hearing pursuant to *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546 (1985).

The parties agree Ms. Hatton has been removed from her position, is not working, and has not been paid since August 24, 2006. The Removal Letter speaks in terms of the reasons for the "proposed removal" of Ms. Hatton. At the October joint status conference, DOC argued that the removal of Ms. Hatton does not actually occur until the Director of DOC has rendered a final decision in this matter. Ms. Hatton disputes that characterization of her position and argues that she has been terminated already because her property interest in employment has been taken from her. The consequence of that deprivation, according to Ms. Hatton, is that she was denied the due process requirements to which a tenured public employee is entitled including "oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." *Loudermill,* 470 U.S at 546. Motion for Summary Dismissal at p. 10. Ms. Hatton contends that she has already been denied her constitutional rights under *Loudermill* because she has been terminated without notice and without an opportunity to be heard. I disagree.

While, as a practical matter, Ms. Hatton is not working and not being paid, there remains an administrative process to complete before Ms. Hatton can be described as "terminated." The District of Columbia Personnel Regulations expressly provide for such a process, even when a summary removal action has been taken. 6 DCMR 1616. That administrative process includes the right to a Final Decision Notice, in writing, dated and signed by the deciding official, and addressing certain issues. 6 DCMR 1616.4(h) and 1614. Prior to the issuance of a Final Decision Notice, the administrative process must include an administrative review. 6 DCMR 1616.5, 1612. The "pre-termination" administrative process that is required is defined by *Loudermill, supra.*

Second, Ms. Hatton argues that D.C. Official Code § 1-616.51 is unconstitutional on its face, because summary removal is a drastic personnel action that is permitted only when "an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee [herself]; or, is detrimental to public health, safety, or welfare." Motion for Summary Dismissal at p. 12. Ms. Hatton states that there are no facts presented to DOC justifying use of this extraordinary remedy.

In fact, Ms. Hatton has not made any showing that the statute is *facially* unconstitutional, as she concedes that there are circumstances where a DOC employee may be properly subject to summary removal. Ms. Hatton asserts only that the statute cannot be applied to the facts in this case. To the extent Ms. Hatton contends that her circumstances do not justify use of summary removal, this appears to be an argument that the facts do not meet the criteria for summary removal. This issue can be decided by applying the statute and regulations to the facts. Therefore, I will consider her argument in addressing the merits of the case.

Third, Ms. Hatton argues that the "*Douglas* factors" are applicable to her termination and must be used to evaluate the appropriateness of the penalty imposed. The *Douglas* factors were articulated by the U.S. Merit Systems Protection Board and comprise factors (that may be mitigating or aggravating) that must be considered in determining an appropriate penalty for a federal employee's misconduct. *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). Ms. Hatton relies on *Dep't of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005) to support her assertion that the *Douglas* factors must be considered when determining a penalty for a District of Columbia employee. *Colbert* appears to be one of only a small number of published cases in this jurisdiction addressing the question of the application of the *Douglas* factors to District of Columbia employees. The District of Columbia Court of Appeals in *Colbert* did not directly hold that the *Douglas* factors must be applied to evaluate the appropriate penalties for misconduct by District employees.[2] An earlier decision by the Office of Employee Appeals stated that the agency uses the principles in *Douglas* as "guidance." *Employee v. Agency,* 29 D.C. Reg. 4565, 4570 (1982);[3] *see also Stokes v. District of Columbia*, 502 A.2d 1006, 1010

---

[2]    The *Colbert* case has an involved procedural history. The Court had remanded the case to the Board of the Office of Employee Appeals to consider whether 6 DCMR 1608.2 (limiting consideration of certain parts of an employee's disciplinary record in assessing a penalty based on their age) affected the application of the *Douglas* factors. 874 A.2d at 357 n.8. By contrast, *Douglas* provides generally for consideration of the employee's past disciplinary and work records. The Board apparently filed a Response on Remand. *Id.* The Court then mentioned that certain documents whose consideration was in question "were relevant in applying the *Douglas* factors," 874 A.2d at 359, and not inconsistent with 6 DCMR 1608.2. The Superior Court order is quoted, which mentions the initial failure to perform a *Douglas* analysis. 874 A.2d at 360. The Court ultimately remanded the case to the administrative law judge to consider "DPW's Agency Report on Remand applying the *Douglas* factors, including the additional evidence supplied by DPW and Colbert." 874 A.2d at 361.

[3]    In this context, it is not entirely clear whether the Office of Employee Appeals' decision is referring to the *Douglas* discussion of the proper scope of review (cited in a number of subsequent cases) or to the twelve specific factors.

(D.C. 1985) (emphasizing that the role of the Office of Employee Appeals is not to balance the relevant factors but to evaluate whether the agency considered relevant factors and struck a balance within the realm of reasonableness, as set forth in *Douglas*). The personnel regulations do currently state "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The Removal Letter does not address either mitigating or aggravating factors, and does not indicate that such factors were weighed or considered in deciding upon the penalty for Ms. Hatton. Moreover, the Removal Letter does not refer to Ms. Hatton's personnel file, and there is no indication that her employment history was viewed as a mitigating or aggravating factor. Attorneys for DOC stated at the October joint status conference that the *Douglas* factors will be applied at the agency level, but that DOC is not required to expressly articulate its analysis of these factors in the notice of proposed summary removal action, nor is the hearing officer charged with applying these factors to the proposed action.

I do not find it necessary to reach the question whether DOC must explicitly address such factors in a proposed removal action, such as the Removal Letter at issue here, because I find that DOC has not supported its summary removal action under *Loudermill*. At this stage, I find that the first determination is the *Loudermill* question: if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Ms. Hatton may be summarily removed? In other words, under 6 DCMR 1616.1, has DOC shown negligence by Ms. Hatton that threatened the integrity of government operations or constituted an immediate hazard to DOC or

government employees or that was detrimental to public health, safety or welfare? Because I answer that question in the negative, I do not consider the *Douglas* question.[4]

### B. The Need For An Adversary Hearing

On August 30 and 31, 2006, Ms. Hatton filed requests for an "oral hearing and an opportunity to present a written submission."[5] At the September joint status conference, Ms. Hatton argued that extensive discovery and evidentiary hearings were necessary in order to establish the causes of the escapes in general and the roles, if any, of the individual employees in the escapes. As noted above, the request for discovery was denied. At the October joint status conference, Ms. Hatton stated that if the Motion for Summary Dismissal were denied, she would request only a limited hearing with an opportunity to respond to specific factual allegations upon which DOC has relied. Ms. Hatton did not request or desire a full evidentiary hearing, because she stated this would allow DOC to firm up its case.

---

[4]    It is necessary, however, for me to apply the three factors for summary removal set forth in 6 DCMR 1616.1. I note that the *Douglas* factors are considered guidelines, and a District or federal agency is not required to give equal weight or even any weight to any particular factor. *See Stokes, supra* at 1010-11. Therefore, an agency could reach the same result in this case, after applying either the *Douglas* factors or the summary removal provisions of Section 1616.1. Using the *Douglas* factors, an agency could place greater emphasis on the conduct itself and give less weight to the employee's record. Of course, an agency would use the *Douglas* factors to consider penalties other than removal, whereas here I am only reviewing the summary removal action.

[5]    In addition to "an opportunity to present [her] side of the story," *Loudermill* grants Ms. Hatton the right to "oral or written notice of the charges" and "an explanation of the employer's evidence." 470 U.S. at 546. Ms. Hatton does not take issue with the notice she received. However, she argues that the change to 6 DCMR 1616.4 to expand the time to provide written notice from three days to 30 days was illegal. Under 6 DCMR 400.1, variances may be granted to the regulations under certain conditions. The variance granted in these cases appears to comply with the requirements in that DOC articulated a limited need to complete transcription of the interview tapes which were used to support the summary removal.

*Loudermill* and subsequent cases establish that due process does not require an oral hearing or the presentation of witnesses at a pre-termination hearing where, as here, an employee has an opportunity for a full post-termination evidentiary hearing.[6] *Loudermill* itself states that an "opportunity to present reasons, *either in person or in writing*, why proposed action should not be taken is a fundamental due process requirement." 470 U.S. at 546 (emphasis added). Cases after *Loudermill* confirm that a full evidentiary hearing before termination is not required to satisfy due process. *E.g., Thompson v. District of Columbia,* 428 F.3d 283, 290 (D.C. Cir.2005) (Edwards, J., concurring); *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 566 (6th Cir. 2004); *Greer v. Amesqua,* 212 F.3d 358, 367 (7th Cir.), *cert. denied,* 531 U.S. 1012 (2000); *Schacht v. Wisconsin Dep't of Corr.,* 175 F.3d 497, 503 (7th Cir. 1999); *Schleck v. Ramsey County,* 939 F.2d 638, 641-42 (8th Cir. 1991); *Powell v. Mikulecky,* 891 F.2d 1454, 1458 (10th Cir. 1989).

It is not clear what type of hearing Ms. Hatton is requesting. She has not presented a sufficient basis for ordering a pre-termination evidentiary hearing. The purpose of a *Loudermill* hearing is to serve as "an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." 470 U.S. at 545-46. The cases cited above demonstrate that the "initial check" ordinarily can be performed without a full evidentiary hearing, and Ms. Hatton's submissions makes no attempt to show why her Motion for Summary Dismissal and her Responses, dated September 25 and September 27, 2006, are inadequate presentations of her side

---

[6]    Pursuant to D.C. Official Code § 1-616.52(b), Ms. Hatton may appeal to the Office of Employee Appeals from any final DOC decision removing her from employment. If not satisfied, Ms. Hatton may then appeal a decision of the Office of Employee Appeals to the D.C. Superior Court. *See generally Johnson v. District of Columbia,* 368 F. Supp. 2d 30 (D.C. 2005).

of the story. Accordingly, due process does not require a full pre-termination evidentiary hearing, where as here, there is an opportunity for a full evidentiary hearing after termination.[7]

District of Columbia law also does not require a pre-termination hearing with oral testimony in all instances. The Comprehensive Merit Personnel Act provides that there shall be "a *written* opportunity to be heard before the action becomes effective." D.C. Official Code § 1-616.51(4) (emphasis added). The regulations implementing Section 1-616.51(4) permit an evidentiary hearing in connection with a pre-termination administrative review only when "a decision based on a preponderance of the evidence cannot be made because the written record is inadequate for this purpose." 6 DCMR 1612.5(a). The adequacy of the record must be measured with reference to the limited purpose of this administrative review. The issue at this stage of the proceedings is not whether the proposed termination is proper, but only whether the Government has provided both credible and reasonable grounds for it. The pre-termination process is designed to allow the employee, not the Government, to explain her side of the story. As discussed below, the written record submitted by the Government adequately demonstrates that such reasonable grounds for the disciplinary action it proposes do not exist. Accordingly, in the exercise of the authority delegated to me, I determine that a pre-termination evidentiary oral hearing is not necessary.

---

[7] Ms. Hatton disputes some of the factual allegations against her. It is not my role to weigh the credibility of evidence as to this factual dispute. Therefore, there is no need for a hearing at this stage to assess her account of the events of June 3, 2006. I will consider her account to the extent it bears on whether a reasonable person could conclude, based on this record, that the facts alleged by DOC are true, and whether those facts justify the proposed summary removal action.

### C. The Basis For The Proposed Removal of Ms. Hatton

The substantive issue here is whether there is a reasonable basis for the affirmance of the proposed summary removal.[8]  Resolution of the issue requires consideration of two questions, according to *Loudermill*.  The first question is "whether there are reasonable grounds to believe that the charges against the employee are true."  470 U.S. at 545-46.  The second question is whether there are reasonable grounds to believe that the charges "support the proposed action."  *Id.* at 546.

### 1.  Are There Reasonable Grounds To Believe That The Charges Are True?

This administrative court is charged with "performing an initial check against mistaken decisions -- essentially, [this court must determine] whether there are reasonable grounds to believe that the charges against [Mr. Bryant] are true and support the proposed action."  *Loudermill at 545-546.*  DOC states that the removal is based upon Ms. Hatton's negligence and violation of CDF policy.  The act of Ms. Hatton that is identified as the basis for these charges is described as follows:

---

[8]  In analyzing the *Loudermill* question, I have considered the Government's record to consist of the following materials provided with respect to Ms. Hatton:  the Removal Letter signed by Stanley Waldren as Acting Warden, the attached Memorandum from Deputy Warden for Operations Waldren to Joan Murphy, the attached Investigative Report, the attached Correctional Officer position description, and the attached two Interview Transcripts of Ms. Hatton (June 3 and June 4, 2006), the blank Inmate Movement Pass form, as well as all rules and regulations cited by DOC.  The record also includes the later-filed Exhibits B, C, and D to the Investigative Report, and the Key of witness names used in that report.  The interviews of Ms. Hatton were conducted without her swearing to testify under oath; the Interview Transcripts are transcriptions signed neither by the court reporter as true and accurate nor by the interviewee, Ms. Hatton, after opportunity for review and corrections.

[O]n June 3, 2006, you were assigned to the Southeast One (SE-1) housing unit. Your primary functions were to maintain custody, security and accountability of all inmates in your assigned housing unit. At approximately 9:42 a.m., Inmate Ricardo Jones walked out of the SE-1 housing under the pretense of going to the Infirmary.

Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing him to go to the infirmary. Inmate Jones' name was placed on the housing unit movement/running count sheet, accounting for and authorizing his movement to the Infirmary. However, according to Infirmary records, only six (6) inmates from SE-1 were scheduled for medical care in the Infirmary on June 3, 2006. Inmate Ricardo Jones was not one of them.

*     *     *

Sergeant Dionne Makins and Corporal Washington worked in the unit with you on June 3, 2006. . . . [Y]ou made [call-out] passes, but could not recall how many passes you made or who you made them for. . . . [Y]ou observed Sergeant Makins prepare call-out passes, but you were not sure if Corporal Washington prepared any. . . . [Y]ou received a call from Miss Toni in the Infirmary and she gave you the names of three inmates; . . . you had written the names on the running count sheet. You . . . could not recall if you received any other calls from the infirmary.

You . . . opened cell 18 where Inmate Ricardo Jones was housed. You . . . observed Inmate Jones walk out of his cell to the bubble, where you gave him his pass. You . . . were not sure if you had made his pass. You . . . gave him his pass and he walked out the door.

*     *     *

[Y]ou put the names on the running count sheet from the completed written passes on the table as opposed to writing down the names as the inmates were leaving the unit. . . . [W]hen you put the names on the sheet you had not seen or called for the inmates. . . . In regards to inmate Jones you [] could not recall if you filled out his call pass or if you took the call. . . . [B]oth you and Sergeant Makins took calls.

[T]here were 6 inmates scheduled and authorized movement {sic} to the infirmary for medical treatment on June 3, 2006. Inmate Jones was not included in this group. Inmate Jones was not included in the list of inmates Miss Toni provided to you to report to the infirmary, and inmate Jones was not experiencing a medical emergency. Despite these significant factors, you issued Inmate Jones a call-out pass to the infirmary and put his name on the movement/running count sheet. As an Officer assigned to the unit, it was your responsibility to immediately report this discrepancy to Sergeant Makins. It was also your responsibility as well as the responsibility of Sergeant Makins and Officer

Case No. DOC-06-800001

Washington to confirm Inmate Jones' need for medical treatment; the availability of medical staff to check Inmate Jones and seek authorization for his movement to the infirmary via a call out pass or escort pursuant to sick call and infirmary protocols.

Removal Letter at 1-2 [references to the OIA Investigative Report and interviews redacted].

The Removal Letter references the Investigative Report. According to the Investigative Report, during the day shift on Saturday, June 3, 2006, there were three correctional officers assigned to the Southeast One (1) housing unit. The Southeast One (1) housing unit records show that Inmate Ricardo Jones had a Movement Pass authorizing him to go to the Infirmary and that he was listed on the housing unit movement/running count sheet authorizing his movement to the Infirmary. Nevertheless, from the Infirmary records OIA determined that only six inmates from the Southeast One (1) housing unit were scheduled for medical care in the Infirmary on June 3, 2006, and Inmate Jones was not one of those inmates. Investigative Report at 11.

According to the Investigative Report, at 9:42 a.m., Inmate Jones was observed walking out of Southeast One (1) housing unit holding a small sheet of paper in his hand. He then met up with Inmate Joseph Leaks and was observed walking up the corridor towards Floor Control One.

The Investigative Report notes that the three officers assigned to the Southeast One (1) housing unit gave "conflicting accounts of the circumstances surrounding how inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment" during their

interviews[9] and that the matter would be "more fully examined [in] the criminal investigation of this incident." *Id.* at 11.

The only other mention in the Investigative Report of the Southeast One (1) housing unit and the possible role of the three officers assigned to that unit is the following comment:

> During this investigation, an attempt was made to review pre-recorded activity in the Southeast One (1) housing unit prior to inmate Jones' departure from it on the morning of June 3, 2006. This investigation revealed that a critical portion of the pre-recorded video footage covering activity in the housing unit was missing.

Investigative Report at p. 11. Later in the Report, out of context and appearing as an afterthought, is the following notation:

> *Note: A review of the Southeast One housing unit recording video component by the office of the Chief Technology Officer, Computer Forensic Team (OCTO/CFT), revealed no evidence of digital tampering with files/data; no deletions or unauthorized modifications were as {sic} identified or observed.

Investigative Report at p. 12.[10]

---

[9]    Ms. Hatton argued in the Motion for Summary Dismissal that the Interview Transcript should be suppressed because the OIA investigators failed to give her *Miranda* warnings, in violation of her Fifth Amendment rights. The Fifth Amendment provides that "no person ... shall be compelled *in any criminal case* to be a witness against himself." U.S. Const., Amend. V [emphasis added]. In order to admit, in a criminal case, incriminating statements made during a custodial interrogation, the police must have first advised the suspect of certain constitutional rights associated with the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436 (1966). The exclusionary rule, applied as a remedy in criminal cases, does not apply when the Government seeks to use the statements in a civil or administrative proceeding. *See, e.g., Allen v. Illinois,* 478 U.S. 364, 368 (1986); *Chavez v. Martinez,* 538 U.S. 760, 772 (2003). *Kastigar v. United States,* 406 U.S. 441 (1972), cited by Ms. Hatton, involved an attempt by the Government to compel Grand Jury testimony from witnesses who were granted use immunity, and it has no application to the present situation. The motion for suppression is denied.

[10]    The complete Computer Forensic Investigation Report, dated July 24, 2006, is Exhibit D to the Investigative Report.

In its conclusions, the Investigative Report notes that OIA conducted "well over forty interviews of staff and inmates during the course of this investigation." It goes on to find:

> Although the underlying act involved the efforts of two inmates, there were contributing factors that created an opportunity for inmates Joseph Leaks and Ricardo Jones to execute a plan of escape from the confines of the CDF.

> These factors can be categorized in three areas – staff negligence; policies, procedures and practices; technology and support mechanisms.

Investigative Report at p. 19. The report then proceeds to describe the instances of staff negligence, classification and reclassification errors and other procedural violations, describing the actions of several specifically identified employees. Investigative Report at pp. 19-26. Nowhere in this detailed discussion of misconduct by DOC employees is there any specific mention of Ms. Hatton or any role she had in the inmates' escape.

The Investigative Report does contain generic information relating to housing unit procedures in its discussion of the factors contributing to the escapes under the section on Policies, Procedures and Practices and the section on Technology and Support Mechanisms:

8e.    Policy, Procedures and Practices

1.    Inmate Accountability

> When an inmate has a scheduled appointment with the Infirmary, a personal or legal visit, or other matters to attend to off the unit, s/he shall be issued a *movement pass to authorize his/her* movement from his assigned housing unit to the specified location displayed on the pass.

> Although the physical plant has numerous checkpoints to observe and monitor the status of an inmate's movement, prisoners in many cases are allowed to walk to their destination unescorted.

The movement pass is a pre-printed template on an 8 ½ x 11 sheet of paper. There are four pass templates on one 8 ½ x 11 sheet. The passes are maintained in the control module of the housing unit.

Inmates are usually notified that they have a visitor or a scheduled appointment in the Infirmary by a telephone call from staff to the Correctional Officer assigned to the housing unit control module. The officer will either write the pass and hand deliver it to the inmate's cell, have the detail inmate deliver the pass to the inmate's cell, or have the inmate's cell door opened allowing the inmate to approach the control module to be issued the pass as s/he departs the Housing unit.

When an inmate leaves the unit, she is accounted for by the officer placing the inmate's name on the running count sheet. In an effort to save time, some officers will, upon entering their assigned housing unit, write and sign passes without placing the names of the inmates on the pass. Although these practices were in place at the time of the escapes, they have since been changed as they were atypical in the field of Corrections and not consistent with current best practices.

On Saturday, June 3, 2006, prior to 9:42 a.m., inmate Ricardo Jones was given a pass to Infirmary; however, his name was not on the list of inmates scheduled for appointment. Officers assigned to the unit gave different accounts of how and why inmate Jones was issued the pass. Furthermore, neither of the assigned officers acknowledged writing the pass permitting him out of his housing unit.

The OIA interviewed the three (3) Officers who were assigned to the Infirmary on Saturday, June 3, 2006. Each officer stated that inmate Ricardo Jones was not scheduled to be seen in the Infirmary on Saturday, June 3, 2006. Each officer further claimed that on the morning of the escape, they did not call unit Southeast One (1) to request that inmate Jones report to the Infirmary for an appointment.

There is a possibility that someone, perhaps Leaks, called the unit that morning and purposely misled the officer in the housing unit by pretending to be an employee of the Infirmary, asking for inmate Jones to respond for an appointment. There is also the possibility that inmate Jones complained of an illness and was allowed to leave the unit by one of the officers. (This matter will be more fully examined during the criminal investigation of the incident.)

<u>8f.    Technology and Support Mechanisms</u>

1.    Surveillance Cameras (Housing unit)

As part of this investigation, an attempt was made to review pre-recorded video footage from Southeast One (1) to determine when inmate Ricardo Jones received his movement pass and who issued him the pass. Investigators discovered that

> critical minutes of footage are unaccounted for. (This matter will be examined
> fully during the criminal investigation of the incident.)

(Emphasis in the original.) Based on the contents of the Removal Letter and the Investigative

Report, the first question is what precisely is the *act* that is the basis for the proposed summary

removal. Although referencing in several instances the missing video footage in the Southeast

One housing unit for the period of time at issue, that would have shown who gave Inmate Jones

the pass, DOC does not contend that Ms. Hatton tampered with the recording equipment or

otherwise had any responsibility for the missing footage. Further, it is unclear whether part of

DOC's specific charge against Ms. Hatton is that she prepared the call-out pass for Inmate Jones

or simply filled out the exit time on a pass that already had his name on it.

During her interviews on June 3, and June 4, 2006, Ms. Hatton could not recall whether

she either took a call from someone regarding an Infirmary appointment for Inmate Jones or

wrote out a call-out pass for Inmate Jones herself. The Investigative Report states that Inmate

Ricardo Jones was observed after leaving the housing unit with a piece of paper in his hand

which resembled the movement passes described in the Report. Although a sample of the form

is included in the Government's evidence, the actual pass Inmate Jones had in his possession that

day has not been provided. Neither the OIA Investigative Report nor the Removal letter

determined that Ms. Hatton created the call-out pass at issue.

The only other and actual basis for the charge is the act of signing the call-out pass which

allowed Inmate Ricardo Jones to leave the housing unit without verifying that he had a

confirmed appointment at the infirmary on the morning on June 3, 2006:

> [N]either you or the other officers assigned to the unit (Makins and
> Washington) have knowledge or did not indicate as to why, or by what
> authorization inmate Jones was permitted to exit the unit, a controlled and secure

> environment that only staff can authorize or effectuate using mechanical devices
> to allow inmate {sic} to enter and exit.   This performance clearly violates
> department regulations, specifically, General Order #8 Accountability of inmates;
> Basic Rules and Regulations for all Employees, Section; 1.4 Attention to Duty,
> and Section: 1.1 Operational Knowledge.

*       *       *

> The OIA Investigation further concluded that each correctional officer assigned to
> SE-1 housing unit, to include you was culpable, because it was the responsibility
> of each employee assigned individually, and collectively to ensure the accurate
> accountability of each inmate assigned to the housing unit.   Therefore, you failed
> to properly carry out your assigned duties.

Removal Letter at p. 3.  Thus, DOC charges Ms. Hatton with the responsibility for and failure to verify Inmate Jones' infirmary appointment.

By way of explanation, Ms. Hatton contends in her Declaration filed on September 25, 2006, that she had no prior dealings with Inmate Jones or his family and had nothing to do with the classification or placement of Inmate Jones in the wrong housing unit.  She acknowledges that when Inmate Jones came into the bubble where she was working, she did write the time of 9:42 on a pass which someone else had written, to enable him to leave the Southeast One housing unit at that time.

Ms. Hatton notes that all the officers can write call-out passes, that she and Sergeant Makins both received calls for inmates to go to the Infirmary that day and that they saw nothing unusual about any of the inmates going to the Infirmary.  She contends that she had no training on the procedures for signing passes.

In the Response filed by counsel on September 27, 2006, Ms. Hatton notes that she worked as a relief officer and did not receive sufficient training for her position as a correctional officer.  She states that as the most junior officer on duty that day in the Southeast One housing

unit, she performed the tasks assigned to her by the Officer-In-Charge, Sergeant Makins, working in the bubble to complete paperwork and other administrative tasks. She was responsible for and did make the appropriate entries on the movement log for the inmates leaving the Southeast One housing unit on the morning of June 3, 2006.

In her Response, Ms. Hatton describes that the housing unit was short-staffed that day and that the Officer-In-Charge tried unsuccessfully to get additional help. She also describes various problems with the existing process of passes for the Infirmary at the time of the escape, including the inability of officers to inquire about the medical services needed due to Federal privacy laws, the possibility that inmates may have passes issued by other units that have to be signed by the housing unit or the officers there will be disciplined, that the call system from the Infirmary was flawed as the caller identification on housing unit telephones did not work and that it was routine for correctional officers to issue passes to inmates for the Infirmary on the basis of unverifiable telephone calls.

As stated in the Memorandum of Deputy Warden Waldren to Officer Murphy, at pp. 1-2,[11] and the Removal Letter, at pp. 3-4, Ms. Hatton's actions violated the following Departmental policy, Basic Regulations for All Employees and Correctional Officer's General Orders:

---

[11]    The following violation of Basic Regulations for All Employees was listed in the Memorandum to Officer Murphy but not in Ms. Hatton's Removal Letter.

Section 2.1, Count and Security: It is the duty of the correctional officers to accept responsibility for keeping an accurate count of inmates not only at formal count periods during a shift, but at all times when inmates are assigned to his or pass through his post.

Departmental Policy:

Program Statement 5010.2c: Accountability for Inmates which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations for All Employees:

Section 1.1, Operational Knowledge Required: Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith.  Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty: Employees are required to devote their entire attention to their official duties;

Correctional Officer's General Orders:

Number 1:  Take charge of this post and all government property on or near it.

Number 8:  Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command.

For the following reasons, I must conclude that a reasonable person could find that Ms. Hatton committed the act with which she was charged – signing off on a call-out pass without verifying Inmate Jones' appointment with the Infirmary – and that this act violated the Policies of the institution.

A reasonable person could conclude that Ms. Hatton was required to adhere to Departmental policy regardless of whether she had received the appropriate training for a correctional officer and even though she was the junior officer on duty that day.  If an inmate contends that he has a pass to exit the housing unit, a reasonable person could conclude that an officer assigned to a housing unit must maintain accountability by verifying the existence of the appointment with the unit to which the inmate contends he has permission to go.  Under the

circumstances, this is part of the essential duties of a housing unit officer. How else could she maintain accountability of the inmates in her area of responsibility?

Based on this record, a reasonable person could conclude that Ms. Hatton failed to perform her duty to maintain accountability for all inmates in her area by allowing Inmate Jones to leave the Southeast One housing unit without confirming his appointment with the Infirmary.

Based upon the foregoing Analysis, I conclude that a reasonable person could find that the factual basis for the charge is true. *Loudermill, supra,* at 546.

### 2. Are There Reasonable Grounds To Believe That The Charges Support The Proposed Action?

Since I have found there are reasonable grounds to believe that the factual basis for the charge is true, I will now address the second question: if all the reasonably believable evidence supporting the facts as alleged by the proposing official were taken as true, could a reasonable person find by a preponderance of the evidence that Ms. Hatton may be summarily removed? The short answer to this question is, "No."

Under 6 DCMR 1603, an employee may be disciplined or removed only "for cause." 6 DCMR 1603.2. Cause is defined as, *inter alia,* "any on-duty or employment-related act or omission that interferes with the efficiency or integrity of government operations; and any other on-duty or employment-related reason for corrective or adverse action that is not arbitrary and capricious. This definition includes, without limitation . . . negligence, incompetence . . . misfeasance, malfeasance . . . ." 6 DCMR 1603.3. A "*de minimis*" violation of the cause standard cannot be the basis of a disciplinary action. 6 DCMR 1603.5. The burden is on the government to show that the disciplinary action is or was for cause. 6 DCMR 1603.10.

In addition, the regulations require that in selecting a penalty, "consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist, to such extent and with such weight as is deemed appropriate." 6 DCMR 1603.9.

The regulations governing summary removal also require the agency to find "cause" for the disciplinary action. 6 DCMR 1616.2. However, in the case of summary removal, the agency head must also find that the employee's conduct "(a) [t]hreatens the integrity of government operations; (b) [c]onstitutes an immediate hazard to the agency, to other District employees, or to the employee; or (c) [i]s detrimental to public health, safety, or welfare." 6 DCMR 1616.1. While the Removal Letter specifically cites to the first two factors, Removal Letter at 1, it implicitly relies upon the third factor as well. *Id.* at 3 ("your negligence . . . placed staff, inmates and the public at large in considerable capricious danger."). The regulation permitting summary removal clearly envisions a situation where, rather than "interfering with" the integrity of government operations, the employee's conduct has created such risk of harm that the agency must act quickly.[12]

In this case, I have concluded that a reasonable person could find that on June 3, 2006, Ms. Hatton allowed Inmate Jones to exit from Southeast One housing unit without appropriately verifying that he had an appointment with the Infirmary.

The Removal Letter concluded that Ms. Hatton violated: (1) DOC Program Statement 5010.2c, which requires correctional officers to maintain accountability for all inmates in their area of responsibility; (2) Basic Regulations of All Employees 1.1, which requires employees to

---

[12]    Simply the seven-week gap between the jailbreak and the suspension of Ms. Hatton raises some initial questions about DOC's evaluation of the "immediacy" of the hazard presented by Ms. Hatton.

have a complete understanding of their Position Description and applicable rules, and to abide by them; (3) Basic Regulations for All Employees 1.4, which requires employees to devote their entire attention to their official duties. The Removal Letter further concluded that Ms. Hatton's conduct fell below the standard for protection of others against reasonable risk of harm. Removal Letter at p. 4.

DOC is correct that Ms. Hatton's alleged negligence contributed in part to the escape, in that she or the other correctional officers assigned to the Southeast One housing unit, "a controlled secure environment," allowed Inmate Jones to leave that unit and proceed to Floor Control One. From there, other personnel released Inmate Jones to move through the facility and eventually reach the Warden's office from which he and Inmate Leaks later executed their escape. If the facts are established as true, Ms. Hatton failed to perform her basic duties to maintain accountability of the inmates under her charge.

However, the record does not establish that her conduct created the imminent harm that is required for summary removal, under 6 DCMR 1616.1, for the following reasons:

(1)    Although Ms. Hatton's negligence allowed Inmate Jones to exit from the Southeast One housing unit, Inmate Jones had to pass through Floor Control One and Floor Control Two, through the Administrative Two door into the administrative module and into the Warden's suite, from which he and Inmate Leaks escaped. At each of those points, other personnel should have been checking to determine whether Inmates Jones was where he was supposed to be. This does not excuse her conduct, but it is a factor in determining the appropriate penalty;

(2)    The Investigative Report at p. 4 states that there is strong evidence that other employees intentionally aided and abetted the two inmates in the escape planning and execution. Such activities, if proven, would play a far larger role in the escape than the one act of negligence by Ms. Hatton, and she is not charged with intentional misconduct; and

(3)    Although the evidence supporting the charge against Ms. Hatton is legally sufficient for purposes of my review, the evidence is weak. Given the understaffed situation on her shift that morning, three people were trying to do the work of four correctional officers. Ms. Hatton was a relief officer assigned to various locations in CDF and the junior officer assigned to the Southeast One housing unit on June 3, 2006. She followed the directions she was given by the Officer-In-Charge. She took some, but not all of the telephone calls requesting that inmates be sent to the Infirmary. She followed instructions to list the call-out passes on the movement log. It is undisputed that she listed Inmate Jones on that log, as required. There is no evidence presented by the Government that Inmate Jones did not have an apparently valid pass for the Infirmary. Further, the Investigative Report notes that that someone, perhaps Inmate Leaks, may well have called the Southeast One housing unit that morning and feigned being an employee of the Infirmary asking Inmate Jones to report to the Infirmary for an appointment.

For these reasons, it is not reasonable to conclude that Ms. Hatton's failure to personally verify that Inmate Jones had an appointment that morning with the Infirmary was a significant factor in the escape so as to support her summary removal.

Further, in determining whether the facts reasonably believed to be true support the summary removal of Ms. Hatton, I also considered her actions in light of the Government's conclusions in the Investigative Report. The first "Major Finding" by the DOC investigators, as

Case No. DOC-06-800001

stated above, is that strong evidence suggests that staff "intentionally aided and abetted in the planning and execution of the escapes." Investigative Report at 4. The DOC investigators also find that "[w]hile departmental policy and procedure are for the most part sufficient, staff negligence in properly adhering to them and circumvention of established regulations were major contributors to the escape." *Id.* There is no basis provided for asserting that the action taken by Ms. Hatton is negligence that was a major contributor to the escape, particularly given the finding that CDF staff colluded in the escape. Ms. Hatton's alleged negligence neither threatened the integrity of government operations nor constituted an immediate hazard to DOC or other employees.

In the "Agency Enhancements" section of the Investigative Report, DOC investigators note several changes in the area of "Inmate Controlled Movement." These include:

> [i]nmates shall be issued call-out passes for authorized movement on a "one time" basis. The unit officer shall contact the officer at the inmate's intended destination to verify the inmate's movement. Call-out passes shall be distributed to the inmate as s/he departs the unit to go to an authorized designator. The inmate's name, DCDC number, destination, and departure time shall be recorded on the call-out pass. This information shall also be recorded in the unit logbook and on the Housing unit running movement sheet. To ensure inmates arrive in a timely manner, the receiving officer shall notify the housing unit officer of the inmate's arrival at his/her assigned destination.

*Id.* at 17. While the Investigative Report provides a basis for the need for a revision of the relevant regulations, these revisions do not change my conclusion that, even following all then-applicable rules, as a factual matter, Ms. Hatton's actions did not contribute significantly to the escape.

In the "Recommendations" section of the Investigative Report, the DOC investigators make nine recommendations. The only recommendations that arguably address the alleged

negligence of Ms. Hatton are a provision to "hire a Security Chief whose primary responsibility will be to ensure that proper security controls, staffing, equipment, and operational protocols are in place to better promote the integrity of the complex" and one to increase staff training. Several of the recommendations, however, focus on the need for increased institutional security and better communication tools.    Investigative Report at 28.    In addition, in "Final Observations," DOC characterizes the inmate escapes as

> neither opportunistic nor spontaneous but rather the outgrowth of a calculated deliberate plan, arranged and orchestrated with the assistance of others.  The escapes involved not only a carefully assessed determination as to how to breach institutional security but how to elude authorities once successfully in the community.  Central in their scheme to flee from justice was collusion by corrupted staff and the negligence of correctional employees who failed to appropriately address their assigned responsibilities.

Investigative Report at 27.

I conclude that the facts relied upon by the Government, reasonably believed to be true, do not support the proposal to summarily remove Ms. Hatton from her position.  Summary removal requires that the employee's conduct threatens the integrity of government operations, is an immediate hazard to DOC, other government employees, or herself, or is detrimental to public health, safety, or the welfare of others.  6 DCMR 1616.1.  Ms. Hatton's conduct can best be described as inaction, in a long chain of actions, some of which contributed more significantly to the escape.  The Government has not established that Ms. Hatton's conduct threatened the integrity of government operations, was an immediate hazard to DOC, other government employees, or himself, or was detrimental to public health, safety, or welfare.

## III.    RECOMMENDATION

In this administrative review, I have considered the two issues raised both by *Loudermill*, 470 U.S. 532, and Chapter 16, D.C. Personnel Regulations. Those issues are: (a) whether there is any reasonably believable evidence supporting the facts alleged by the proposing official; and (b) whether, if all the reasonably believable evidence supporting the facts alleged by the proposing official were taken as true, a reasonable person could find, by a preponderance of the evidence, that the employee may be removed.

For the reasons discussed above, I have determined that (a) there is reasonably believable evidence supporting the factual conclusion that Ms. Hatton improperly allowed Inmate Jones to exit the Southeast One housing unit without verifying that Inmate Jones had an appointment at the Infirmary that morning, as alleged by the DOC in its Removal Letter; and (b) if all the reasonably believable evidence supporting the facts alleged by the DOC were taken as true, a reasonable person could not find, by a preponderance of the evidence, that Ms. Hatton may be summarily removed.

I recommend that the proposed summary removal of Ms. Hatton not be sustained as it is inconsistent with the Due Process Clause and the applicable provisions of District of Columbia law.

Dated: December 11, 2006

Beverly Sherman Nash
Administrative Law Judge

## Certificate of Service:

**By U.S. Mail (Postage Paid)and Fax:**

Sol Zalel Rosen, Esquire
2501 Calvert Street, N.W. #212
Washington, DC 20006
FAX: 202-296-9375

James E. McCollum, Jr., Esquire
McCollum & Associates, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20741-1717
FAX: 301-864-4351

J. Michael Hannon, Esquire
Hannon Group Law Firm, LLP
1901 18th Street, N.W.
Washington, DC 20009
FAX: 202-232-3704

**By U.S. Mail (Postage Paid) and Fax:**

Kevin J. Turner, Esquire
Assistant Attorney General

Thelma C. Brown, Esquire
Assistant Attorney General, and

Andrea Comentale, Esquire
Assistant Attorney General

441 4th Street, N.W.
Suite1060 –N
Washington, DC 20001
FAX: 202-347-8922

Maria Amato, Esquire
General Counsel
Department of Corrections
1923 Vermont Avenue, NW
Washington, DC 20001
FAX: 202-671-2514

I hereby certify that on _Dec. 11_____,
2006, this document was caused to be served
upon the above-named parties at the
addresses and by the means stated.

_Clerk/Deputy Clerk_





# Collective Bargaining Agreement

### Between

## District of Columbia
## Department of Corrections

### &

## Fraternal Order of Police
## Department of Corrections Labor Committee

#### The Government of the District of Columbia
#### Anthony A. Williams, Mayor

##### Effective

##### December 19, 2002 – September 30, 2005

COLLECTIVE BARGAINING AGREEMENT

BETWEEN

DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS

AND

FRATERNAL ORDER OF POLICE DEPARTMENT OF CORRECTIONS
LABOR COMMITTEE

**TABLE OF CONTENTS**

| ARTICLE | | PAGE |
|---|---|---|
| | PREAMBLE | 1 |
| 1 | RECOGNITION | 1 |
| 2 | MANAGEMENT RIGHTS | 2 |
| 3 | EMPLOYEE RIGHTS | 2 |
| 4 | UNION SECURITY AND DUES DEDUCTION | 4 |
| 5 | UNION-MANAGEMENT MEETINGS | 5 |
| 6 | EQUAL EMPLOYMENT OPPORTUNITY | 6 |
| 7 | OFFICIAL TIME | 6 |
| 8 | USE OF OFFICIAL FACILITIES AND SERVICES | 11 |
| 9 | EMPLOYEE ROSTERS | 12 |
| 10 | GRIEVANCE PROCEDURE | 12 |
| 11 | DISCIPLINE (CORRECTIVE/ADVERSE ACTIONS) | 19 |
| 12 | LEAVE | 22 |
| 13 | TRAINING | 25 |
| 14 | HEALTH AND SAFETY | 26 |
| 15 | REDUCTION-IN-FORCE | 30 |
| 16 | UNIFORMS | 31 |
| 17 | DETAILS, TEMPORARY PROMOTIONS AND PAY IN HIGHER GRADE POSITIONS | 32 |
| 18 | DISTRIBUTION OF OVERTIME AND TOUR OF DUTY | 33 |
| 19 | MERIT STAFFING/PROMOTIONS | 35 |

ii

## PREAMBLE

**Section 1:**    This Collective Bargaining Agreement is entered into between the District of Columbia Department of Corrections (Employer, Agency, Management or Department) and the Fraternal Order of Police Department of Corrections Labor Committee (Union).

**Section 2:**    The parties to this Agreement hereby recognize that the collective bargaining relationship reflected in this Agreement is of mutual benefit and the result of good faith collective bargaining between the parties. Further, both parties agree to establish and promote a sound and effective labor-management relationship in order to achieve mutual understanding of practices, procedures and matters affecting conditions of employment and to continue working toward this goal.

**Section 3:**    The parties hereto affirm without reservations the provisions of this Agreement and agree to honor and support the commitments contained herein. The parties agree to resolve whatever differences may arise between them through the avenues for resolving disputes agreed to herein.

**Section 4:**    It is the intent and purpose of the parties hereto to promote and improve the efficiency and quality of services provided by the Department. Therefore, in consideration of the mutual covenants and promises contained herein, the Employer and the Union do hereby agree as follows:

### ARTICLE 1
### RECOGNITION

The Fraternal Order of Police/Department of Corrections Labor Committee has been designated by the employees in the unit described below as their preference for exclusive representative for the purpose of collective bargaining over terms and conditions of employment, including compensation, with the District of Columbia Department of Corrections.

UNIT:

"All employees of the D.C. Department of Corrections excluding managerial employees, confidential employees, supervisors, temporary employees, physicians, dentist and podiatrist, institutional residents (inmates) employed by the Department, or any employees employed in personnel work in other than a purely clerical capacity and employees engaged in administering provisions of Title XVII of the District of Columbia Comprehensive Merit Personnel Act of 1978."

**ARTICLE**

**PAGE**

| | | |
|---|---|---|
| 20 | POSITION DESCRIPTIONS | 36 |
| 21 | PERSONNEL FILES | 37 |
| 22 | TRANSFERS AND INTER-INSTITUTIONAL ROTATIONS | 37 |
| 23 | RETIREMENT COUNSELING | 37 |
| 24 | DISTRIBUTION OF HEALTH BENEFIT BROCHURES | 38 |
| 25 | PERFORMANCE COUNSELING | 38 |
| 26 | PERFORMANCE RATING | 38 |
| 27 | NO STRIKE OR LOCKOUT | 39 |
| 28 | PROTECTED DISCLOSURE | 39 |
| 29 | DISTRIBUTION | 40 |
| 30 | LIABILITY | 40 |
| 31 | DRUG AND ALCOHOL SCREENING | 40 |
| 32 | WASH-UP TIME | 41 |
| 33 | CONTRACTING-OUT | 41 |
| 34 | INCENTIVE AWARD AND PERSONNEL ENTERPRISES COMMITTEE | 41 |
| 35 | SAVINGS CLAUSE | 41 |
| 36 | DURATION AND FINALITY OF AGREEMENT | 42 |

## ARTICLE 2
## MANAGEMENT RIGHTS

**Section 1:** The Department and the Union recognize the Comprehensive Merit Personnel Act, as codified at D.C. Code § 1-618.8, provides that the Department shall retain the sole right, within applicable laws and rules and regulations:

A. To direct employees of the agency;

B. To hire, promote, transfer, assign, and retain employees in positions within the agency and to suspend, demote, discharge, or take other disciplinary action against employees for cause;

C. To relieve employees of duties because of lack of work or other legitimate reasons;

D. To maintain the efficiency of the District government operations entrusted to them;

E. To determine the mission of the agency, its budget, its organization, the number of employees, and the number, types, and grades of positions of employees assigned to an organizational unit, work project, or tour of duty, and the technology of performing its work; or its internal security practices; and

F. To take whatever actions may be necessary to carry out the mission of the District government in emergency situations.

All matters shall be deemed negotiable except those that are proscribed by the subchapter referenced at D.C. Code § 1-618.8. Negotiations concerning compensation are authorized to the extent provided in D.C. Code §1-618.16.

**Section 2:** The parties recognize that such management rights are beyond the scope of collective bargaining.

## ARTICLE 3
## EMPLOYEE RIGHTS

**Section 1:** The Department and the Union recognize the Comprehensive Merit Personnel Act, as codified at D.C. Code §1-618.6(a), provides that all employees shall have the right:

A. To organize a labor organization free from interference, restraint, or coercion;

B. To form, join, or assist any labor organization or to refrain from such activity; and

C. To bargain collectively through representatives of their own choosing as provided in this subchapter.

**Section 2:** The Department and the Union recognize the Comprehensive Merit Personnel Act, as codified at D.C. Code §1-618.6(b), provides that:

Notwithstanding any other provision in this chapter, an individual employee may present a grievance at any time to his or her employer without the intervention of a labor organization: Provided, however, that the exclusive representative is afforded an effective opportunity to be present and to offer its view at any meetings held to adjust the complaint. Any employee or employees who utilize this avenue of presenting personal complaints to the employer may not do so under the name, or by representation, of a labor organization. Adjustments of grievances must be consistent with the terms of the applicable collective bargaining agreement. Where the employee is not represented by the union with exclusive recognition for the unit, no adjustment of a grievance shall be considered as a precedent or as relevant either to the interpretation of the collective bargaining agreement or to the adjustment of other grievances.

**Section 3:** The Department and the Union agree that employees have the right to participate in the management of the Union or acting as a representative of the Union.

**Section 4:** The terms of this contract do not preclude any employee from bringing matters of personal concern to the attention of the appropriate officials in accordance with applicable laws, regulations and procedures.

**Section 5:** It is understood that the employees in the bargaining unit shall have full protection of all articles of this Contract as long as they remain in the unit.

**Section 6:** Management shall not restrain, interfere with, coerce or discriminate against employees in the exercise of their right to organize and designate representatives of their own choosing for the purpose of collective bargaining, the prosecution of grievances, and labor-management cooperation, or upon duly designated employee representatives acting on behalf of an employee or group of employees within the bargaining unit.

**Section 7:** The Employer shall not take any action against bargaining unit employees in reprisal for exercising a right under this Agreement. This section does not modify or diminish management's rights to take personnel actions under applicable regulations, Department orders and other relevant articles in this Agreement.

## ARTICLE 5
## UNION-MANAGEMENT MEETINGS

**Section 1:** It is agreed that the Director and the Union shall meet every month or as otherwise agreed to by the parties to further labor-management cooperation as a standing Labor-Management Committee. The Labor-Management Committee shall be an entity distinguished from any Labor-Management Partnership Council created by the parties. The Union shall each select seven (7) members to serve on this Committee.

**Section 2:** It shall be the function of this Labor-Management Committee to discuss different points of view and exchange views on working conditions, terms of employment, matters of common interest or other matters that either party believes will contribute to improvements in the relations between them within the framework of this Agreement. It is understood that appeals, grievances or problems of individual employees shall not be a subject of discussion at these meetings. Other meetings of the Committee may be scheduled as the need arises upon mutual agreement of the parties.

**Section 3:** The Warden/Administrator along with designated staff representatives will meet monthly at each institution, facility and unit with three (3) Union representatives and a standing Labor-Management Partnership Committee to discuss and review common interests for promoting labor-management cooperation at the institutional level. Other meetings may be held when the need arises upon mutual agreement of the parties.

**Section 4:** The Department and the Union agree to exchange agendas of topics to be discussed at least five (5) days in advance of the date set for the meetings. If unusual circumstances or timeliness of events do not allow for discussion of items on the agenda submitted in advance of the meeting, the issues thus presented might either be discussed by both parties or tabled for later discussion by either party.

**Section 5:** The members of the standing Labor-Management Committee appointed by the Union shall be granted official time to attend the above conference when the conferences occur during the regular working hours of the parties. The Union shall notify the Department at least one (1) day in advance of any scheduled meeting if an alternate will attend in the absence of the appointed member.

**Section 6:** A brief summary of the matters discussed and any understanding reached will be prepared and recorded by the Employer and a recording along with a summary will be furnished to the Union before the next meeting.

**Section 7:** The Agency shall notify and provide the Union with the opportunity to bargain regarding new policies or procedures that are subject to the duty of bargaining before implementation.

5

## ARTICLE 4
## UNION SECURITY AND DUES DEDUCTIONS

**Section 1:** The terms and conditions of employment contained in this Agreement shall apply to all bargaining unit employees without regard to Union membership. Employees covered by this Agreement have the right to join or to refrain from joining the Union.

**Section 2:** Pursuant to D.C. Code § 1-618.7, the Employer shall deduct dues from the bi-weekly salaries of those employees who authorize the deduction of said dues. The union shall be solely responsible for notifying employees, prior to obtaining their authorization, that they have certain constitutional rights under Hudson v. Chicago Teachers Union Local No. 1, 743 F.2d 1187, 1191, 117 LRRM 2314 (7th Cir. 1984), and related cases. The dues checkoff authorizations may be cancelled by the employee at any time during the duration of this contract.

**Section 3:** The employee's authorization shall be forwarded to the Office of Labor Relations and Collective Bargaining along with D.C. Form 277.

**Section 4:** The Union dues shall be transmitted to the Union, minus a fee of $1.00 for the administrative costs associated with the collection of said dues pursuant to executed dues checkoff authorizations.

**Section 5:** When a service fee is not in effect, the Union may require that an employee who does not pay dues or service fees shall pay reasonable costs incurred by the Union in representing such employees in grievance, adverse action or appeal proceedings in accordance with the provisions of the Comprehensive Merit Personnel Act (CMPA).

**Section 6:** The Employer and the District Government as a whole shall be indemnified or otherwise held harmless for any errors or omissions in carrying out this Article.

**Section 7:** The service fee applicable to non-union members shall be equal to the pro rata amount of dues based on the percentage of expenditures for chargeable activities under an annual audit completed by a certified public accountant. Should the Union's annual Hudson plan result in any challenges or objections, the arbitration award shall establish the amount of service fees for non-members.

**Section 8:** Following the employees annual receipt of information required under Hudson and related cases, including the Union's audit performed by an independent certified public accountant, the Employer shall deduct service fees for non-members who submit a voluntary service fee checkoff authorization. Non-members shall indicate their payment of a fee equivalent to full union dues or the reduced Hudson fee, which will be equivalent to those chargeable fees determined through the appropriate procedure.

**Section 9:** Payment of dues or service fees shall not be a condition of employment.

1/30/09

4

# ARTICLE 6
## EQUAL EMPLOYMENT OPPORTUNITY

**Section 1 – General Provisions:** The Employer agrees that it will not in any way discriminate against any employee because of his/her membership or affiliation in or with the Union or service in any capacity on behalf of the Union. Neither party to this Agreement will discriminate against any employee with regard to race, color, religion, national origin, age, marital status, sexual orientation, sex, political affiliation, physical handicap, or as otherwise provided by law.

**Section 2 – Equal Employment Practices:** The Employer agrees to vigorously continue the implementation of its Equal Employment Opportunity Program as approved by the Director, D.C. Office of Human Rights. For the purpose of this Agreement, the Department/Agency's Affirmative Action Plan will be observed.

The Union shall designate an Affirmative Action Coordinator who shall, upon request, attend meetings of the Department's Affirmative Action Counselors, and be permitted to meet with Department EEO officials to discuss implementation of the Affirmative Action Plan including Departmental policies and programs.

**Section 3 – Discrimination Charges:** Any charges of discrimination shall be presented to the appropriate administrative agency having jurisdiction over the matter and shall therefore not be subject to the negotiated grievance procedure.

# ARTICLE 7
## OFFICIAL TIME

**Section 1 – Number of Representatives:**

A.    Members of the Executive Board and Chief Shop Stewards shall be allowed up to four (4) hours per day to engage in representational activities as defined in Section 5, below. Requests for official time shall be made in accordance with the procedures in Section 4.

B.    Designated Union officials or stewards shall be provided a reasonable amount of official time to represent bargaining unit employees.

**Section 2 – Designation of Representatives:**

A.    The Union agrees to provide the Agency and the Office of Labor Relations and Collective Bargaining (OLRCB) with a written listing of its officers and stewards along with a copy of its Constitution and by-laws. Those Union officers and stewards provided for in the Union's Constitution and by-laws shall be eligible for official time. The listing and changes thereto normally will be submitted to the Agency's Labor Relations Officer

6

or other designated official at least two (2) workdays prior to the assumption of representational responsibilities by any new officers, stewards or other representatives. If an official is not on the list of designated representatives and is needed prior to the two (2) days notice, the Union President shall notify the Agency head or his/her designee by phone or facsimile before the official will be recognized. The Agency will not recognize any official/representative who is not listed as required or for whom notification was not provided in accordance with this Section.

B.    This Agreement shall not be interpreted in any manner which interferes with the Union's right to designate representatives of its own choosing on any particular representational matter.

C.    The Union will be notified prior to any change in shift assignments of duly appointed stewards. The Union will also be notified prior to the organization of new shifts that would affect the members of the unit.

D.    Employees required to appear at meetings and conferences at the request of District, U.S, or management officials, or pursuant to a request from the D.C. Council, D.C. Office of Personnel, the Office of Personnel Management or the U.S. Congress, shall not be charged annual leave for such purposes and shall be provided administrative leave to the extent consistent with law and regulation. The employee receiving such a request shall immediately notify the appropriate supervisor and, upon request, provide a copy of the request or other appropriate evidence of the request.

**Section 3 – Performance Appraisals:**

A.    No Union representative will be disadvantaged in the assessment of his/her performance based on his/her use of official time when conducting labor-management business authorized by this Article. However, it is understood that performance problems unrelated to the use of official time may be addressed in accordance with other relevant provisions of this Agreement.

B.    At the beginning of the rating year or when the Union representative is initially appointed, both workload and performance expectations will be adjusted to reflect actual use of official time. Additionally, the supervisor and the Union representative will meet at least quarterly to discuss needed adjustments to workload and representational needs, based upon documented use of official time.

C.    The performance of Union representatives will be rated on the basis of prorated work time; i.e., the work performed in available work time after official time has been subtracted.

7

3.  any appeal proceedings or other forum in which the Union is representing an employee or the Union pursuant to its obligations under relevant contract provisions, regulations, or law;

4.  grievance meetings and arbitration hearings;

5.  EEO complaint settlements, and administrative and/or court hearings if a complaint is processed under the negotiated grievance procedure, or if the Union is representing the employee;

6.  a disciplinary or adverse action oral reply meeting, if the Union is designated as representative of the employee;

7.  any meetings for the purpose of presenting replies to the proposed termination of probationers, if the Union is designated as representative of the employee;

8.  any meetings for the purpose of presenting reconsideration replies in connection with the denial of within-grade increases, if the Union is designated as representative of the employees;

9.  attendance at an examination of an employee who reasonably believes he or she may be the subject of a disciplinary or adverse action under Chapter 16 of the DPM and the employee has requested representation;

10.  informal consultation meetings between the Employer and the Union;

11.  conferring with affected employees about matters for which remedial relief is available under the terms of this Agreement;

12.  to effectuate contacts with officials of government including the Mayor, Council of the District of Columbia, Congress and their staffs;

13.  attendance at meetings of committees on which Union representatives are authorized membership by the Employer or this Agreement;

14.  attendance at labor-management partnership meetings or other cooperative effort;

15.  attendance at agency recognized/sponsored activities to which the Union has been invited;

9

---

**Section 4 – Requests for Official Time:**

A.  All official time for all Union representatives must be requested and approved in advance consistent with workload requirements except when exceptional circumstances (e.g., unscheduled meetings called by management where the Union's attendance is requested, representation of employees in interviews or circumstances where the employee might be subject to discipline) do not allow for advance approval.

B.  The Union representative will request authorization from his or her supervisor. The Union representative will indicate to the supervisor or designee, on the "Official Time Report" form (See Attachment) the general nature of the representational activity he or she wishes to carry out and approximate length of time he or she believes is required.

C.  All advance requests for official time are understood to be estimates.

D.  The Union will complete the form to accurately depict the actual official time used in a timely manner each pay period.

E.  Workload needs will be balanced with official time needs prior to approval based on the following standard: official time requests will be granted unless they hinder the accomplishment of essential workload requirements that cannot otherwise be accommodated.

F.  All affected employees (e.g., grievants, representatives, witnesses, and appellants) whose presence has been determined to be necessary at relevant proceedings (including hearings, meetings, arbitrations, oral replies, or other labor-management business) will receive necessary official/duty time to travel to and from the proceedings.

**Section 5 – Official Time for Representational Activity:**

A.  Pursuant to the statutory right and responsibility of the Union to represent bargaining unit employees, representatives of the Union will be granted reasonable amounts of official time to investigate, prepare for, and conduct representational functions in accordance with the provisions of this Article.

B.  For the purpose of this Article, "representational functions" means those authorized activities undertaken by employees on behalf of other employees or the Union pursuant to representational rights under the terms of this Agreement and District of Columbia law. Examples of activities for which official time will be authorized include:

1.  negotiations;

2.  discussions with Employer representatives concerning personnel policies, practices, and matters affecting working conditions;

8

the action taken by the Union, it shall determine with respect to the specific case or cases at hand what is reasonable time, and shall so communicate this determination to the aforesaid Chairman and to the employees and the Union representatives involved.

In all cases of perceived abuse of official time, the Employer shall communicate with OLRCB, which shall assist the parties in their interpretation of the Official Time Article and attempt a mutual resolution of the problem.

**Section 7:** Upon ratification and approval of this Agreement the parties shall jointly conduct training concerning official time and other aspects of this Agreement for supervisors, representatives and employees.

**Section 8:** The shop steward shall be afforded the opportunity to address unit employees at roll call to explain labor-management business unless conditions in the institution dictate otherwise. Such time shall not exceed five (5) minutes and may be utilized up to three (3) times per week.

**Section 9:** Stewards assigned tours of duty other than day shift and scheduled days off shall have their assigned tour of duty and scheduled day off (if applicable) changed to coincide with the time of a grievance hearing. However, no overtime or other such form of compensation shall be allowed for attendance at such hearing.

**Section 10:** This Article does not preclude employees from selecting someone other than a Union representative (excluding management and supervisory officials) to represent him/her in a grievance, except that no rival organization may represent an employee in the negotiated grievance procedure, and provided that if a Union representative is not used, a representative of the exclusive labor organization must be given an opportunity to be present at any meeting held to resolve the grievance.

## ARTICLE 8
## USE OF OFFICIAL FACILITIES AND SERVICES

**Section 1:** The Department agrees to permit distribution of Union notices and circulars substantially related to workplace issues to unit employees through regular distribution procedures provided that the Union receives prior approval from the Department.

**Section 2:** The Department agrees to provide meeting facilities if available upon request to the Director or appropriate facility official. Any cost incurred for the cleaning or maintenance of such facilities after such meeting will be borne by the Union.

**Section 3:** Under no circumstances will department manpower or supplies be utilized in support of or for internal Union business.

11

16. to participate in joint labor-management committee meetings;

17. necessary travel to any of the activities listed above.

C. Official time shall not include time spent on internal Union business, including, but not limited to:

1. Attending Union meetings;

2. Soliciting members;

3. Collecting dues;

4. Posting notices of union meetings;

5. Carrying out elections;

6. Preparing and distributing internal Union newsletters or other such internal documents; and

7. Internal union strategy sessions for appeals, administrative hearings or arbitration proceedings.

D. The employee requesting official time for any of the purposes set forth in this Article will advise his/her immediate supervisor or designee of the time of return to the workstation and assigned duties.

**Section 6:** The parties acknowledge that there is mutual benefit in addressing questions as to what is "reasonable" and what procedures should be followed to resolve the problems associated with any perception by the Employer that an unreasonable amount of time is being used, or that the intent as to "reasonableness" is otherwise being abused. The parties agree that in any instance or pattern so perceived, it shall be the responsibility of the Employer to promptly communicate to the Chairman and OLRCB its specific concerns.

It shall be the responsibility of the Chairman so contacted to review the matter, to assure that prompt, noticeably effective action is taken to curb any actual abuse or substantial appearance thereof, and to report promptly to the Employer that action was taken as warranted. The parties hereto recognize that abuse may not necessarily be intentional, but that irrespective of intent, the fact or substantial appearance of abuse is disruptive of mutual interest, and in any event, must be effectively dealt with.

If the Union disagrees that there is the fact, or substantial appearance of abuse, it shall communicate this promptly to the Employer. Upon receipt of this communication, the Employer shall fully and fairly consider the Union's views. If the Employer thereafter still perceives the fact or substantial appearance of such abuse, or it is dissatisfied with

10

**Section 4:** The Department agrees to provide a private area for the employees and Union representative when engaging in grievance handling.

**Section 5:** A copy of Department Program Statements, Orders and Institutional/Facilities directives and DCOP's rules and regulations concerning terms and conditions of employment will be provided to the Labor Committee.

**Section 6:** The Department agrees to designate at least one (1) secured bulletin board for the exclusive use of the Union in each institution/facility in conspicuous work area locations. The Union shall provide a copy of posted materials to the Department as far in advance prior to posting as possible. Bulletin board postings must be readily identifiable as official Union literature by the use of letterhead, logo or signature of the Union official.

**Section 7:** The Department shall make available to the Union, as required by law, upon its reasonable request any information, statistics and records relevant to negotiations or necessary for proper enforcement of the terms of this Agreement.

### ARTICLE 9
### EMPLOYEE ROSTERS

**Section 1:** Upon written request to the appropriate Department Official, on an annual basis, the Union will be provided with the list of names, titles and grades of unit employees by institutions and offices.

**Section 2:** Upon written request to the appropriate Department Official, the Union will be provided, by each institution and office a list of names, titles, and grades of unit employees appointed, separated, detailed (including details to higher positions), promoted (including temporary promotions) or transferred during the proceeding month. The Department shall include the effective dates of the above action and the projected duration dates, if applicable.

### ARTICLE 10
### GRIEVANCE PROCEDURE

**Section 1 – Purpose and Definition:** The purpose of this grievance procedure is to establish an effective procedure for the fair, expeditious and orderly adjustment of grievances. Only an allegation that there has been a violation, misapplication or misinterpretation of the terms of this Agreement or the applicable Compensation Agreement or disciplinary actions taken (written admonition, corrective or adverse action) shall constitute a grievance under provisions of this grievance procedure. Any other employee appeals or complaints shall be handled exclusively by the appropriate administrative agency.

12

**Section 2 – Categories:**

A. **Personal:** An Individual's grievance. In the case of a grievance proceeding without Union representation, the Union must be given the opportunity to offer its view at any meeting held to adjust the grievance.

B. **Group:** A grievance involving a number of employees in any subdivision of the service components: Detention, Correctional, Community, Health, Administrative or Educational.

A group grievance must contain all the information specified in Step 2 (Section B) of the grievance procedure. A sufficient description of the group shall accompany the grievance. This kind of grievance may be filed at whatever step resolution is possible.

C. **Class:** A grievance involving all the employees in the unit. It must be filed and signed by the Union Chairman or designee at Step 4 of the Grievance procedure. Grievances so filed will be processed only if the issues raised are common to all unit employees.

A class grievance must contain all information specified in Step 2, Section 3 of the Grievance procedure. The Director, or his designee, shall respond in writing within twenty-one (21) days of receipt of the grievance.

**Section 3 – Procedure:**

A. **Step 1:** The aggrieved employee, with or without a Union representative, shall first orally present and discuss the grievance with the employee's supervisor within ten (10) days of the occurrence of the event giving rise to the grievance or within ten (10) days of the employee's knowledge of such event. The supervisor will make a decision on the grievance and reply to the employee and his/her representative within five (5) days after oral presentation of the grievance. In unusual circumstances, where the grievant cannot be physically present, a Union representative, authorized in writing by the Grievant, may present the grievance at this Step without the Grievant present.

B. **Step 2:** If the grievance is not settled, the aggrieved employee, with or without his/her Union representative, shall submit a signed, written grievance to the appropriate Administrator or Office Chief within seven (7) days following the date the response to the oral grievance is due. This specific Step 2 grievance shall be the sole and exclusive basis for all subsequent steps. The grievance at this stage at every further step shall contain:

    1. A statement of the specific provision(s) of the Agreement alleged to have been violated, misapplied or misinterpreted;

13

2. The date or dates on which the alleged violation, misapplication or misinterpretation occurred;

3. A brief description of how the alleged violation occurred;

4. The specific remedy or adjustment sought;

5. Authorization for the Union or other employee representatives, if desired by the employee, to act as his/her representative in the grievance; and

6. The signature of the aggrieved employee and the Union if applicable, according to the category of the grievance.

C. Should the grievance not contain the required information, the Grievant shall be notified and given five (5) days from receipt of notification to resubmit the grievance. Failure to resubmit the grievance within the five (5) day period shall void the grievance.

D. The Administrator or Office Chief shall respond to the employee in writing, within seven (7) days of receipt.

E. Step 3: If the grievance remains unsettled, the employee shall submit the grievance to the appropriate Deputy Director within five (5) days following the employee's receipt of the response of an Administrator or Office Chief. The Deputy Director must respond in writing within seven (7) days of receipt.

F. Step 4: If the grievance remains unsettled, the employee shall submit it to the Director within five (5) calendar days following the receipt of the response of a Deputy Director. Within fifteen (15) days of receipt the Director will respond in writing to the Grievant.

G. Step 5: If the grievance remains unresolved, the Union, within fifteen (15) days after receipt of the Director's response, shall notify the Director and OLRCB in writing whether the Union intends to request arbitration or requests that the Department agree to utilize the Grievance Mediation procedure described below on behalf of the employee(s).

14

Section 4 – Grievance Mediation:

A. The purpose of this Grievance Mediation procedure is to provide, an innovative method by which the parties may mutually reach satisfactory solutions to grievance prior to the invocation of arbitration. The parties recognize the necessity of carefully considering the circumstances of the particular grievances, in deciding whether to utilize this procedure. This procedure, while broadening the channels of grievance resolution, must comply with District of Columbia laws, rules, regulations and the negotiated grievance procedure and shall only be invoked upon mutual agreement of the parties in writing on a case-by-case basis.

B. Selection

1. Should the parties fail to resolve the grievance utilizing the grievance procedure set forth above (Section 3), the parties may, within ten (10) days after the Union's request for grievance mediation pursuant to Step 5 of the grievance procedure, mutually agree to utilize the mediation process as set forth below.

2. A joint request shall be submitted to the Federal Mediation and Conciliation Service (FMCS) or other appropriate authority that provides grievance mediation services, with which the parties jointly agree. The mediator selected must have demonstrated expertise in public sector labor relations and in grievance mediation.

3. The mediation session must commence within forty-five (45) days of the Agreement to mediate. If the matter is not successfully resolved through mediation or is not scheduled for a mediation session within the forty-five (45) day period, OLRCB and the Union shall select an arbitrator consistent with the terms of this Agreement.

C. Mediation Procedure

1. Each party shall have representation at the mediation session.

2. The grievant(s) shall be present and participate at the mediation session. In the case of a class or group grievance, a maximum of three (3) grievants shall be present as representatives of the class or group.

3. Mediation sessions shall be informal: the rules of evidence shall not apply.

4. The mediation session shall be confidential. No record of the session shall be made.

15

D. Within ten (10) days after the Director and OLRCB have received the request for arbitration, the Union shall request the FMCS to refer a panel of seven (7) impartial arbitrators. Upon receipt of the FMCS panel the parties will select one (1) of the names on the list. Each party will alternately strike a name from the panel until one (1) remains. The privilege of first strike shall be determined by a coin toss or other mutually agreeable random method. If, before the selection begins, none of the arbitrators are acceptable, a new panel shall be sought.

### Section 6:

A. The arbitrator shall hear and decide only one (1) grievance appeal in each case unless substantially similar issues are involved. In such circumstances cases shall be consolidated for arbitration upon agreement of the parties.

B. The hearing shall not be open to the public or persons not immediately involved unless all parties mutually agree to such. All parties shall have the right, at their own expense, to legal and/or stenographic assistance at this hearing.

C. The arbitrator shall not have the power to add to, subtract from or modify the provisions of this Agreement in arriving at a decision on the issue(s) presented and shall confine his/her decision solely to the precise issue(s) submitted for arbitration.

D. The arbitrator shall render his/her decision in writing, setting forth his/her opinion and conclusions on the issues submitted within thirty (30) days after the conclusion of the hearing or after the arbitrator receives the parties' briefs, if any, whichever is later. Absent mutual agreement by the parties, the arbitrator shall set the deadline for timely submission of briefs. The decision of the arbitrator shall be binding upon both parties and all employees during the life of this Agreement.

E. A statement of the arbitrator's fee and expenses shall accompany the award. The parties shall share the fee and the expenses of the arbitrator equally.

F. Appeals of the arbitration awards shall be made in accordance with District of Columbia law.

### Section 7 — General:

A. No matter shall be entertained as a grievance unless raised within ten (10) days of the occurrence of the event giving rise to the grievance, or within ten (10) days of the employee's knowledge of the occurrence of the event giving rise to the grievance

17

---

5. During the session, the mediator may meet individually or jointly with participants, however, he/she is not authorized to compel or impose a settlement.

6. The mediation session shall not exceed one (1) day unless the parties agree otherwise.

### D. Mediation Conclusion

1. The parties shall sign their respective copies of the Settlement Agreement.

2. Should both parties accept the settlement, it shall not have precedent setting value unless mutually agreed to on a case-by-case basis.

3. Should mediation and any further negotiations among the parties fail to resolve the matter, the arbitration proceedings in accordance with Section 3 may be invoked by the Union within five (5) calendar days of the termination of the mediation session.

4. The mediator shall be barred from arbitrating the grievance in a subsequent arbitration proceeding or testifying in a subsequent arbitration proceeding.

5. Documentation pertaining solely to the Mediation Process including evidence, settlement offers or the mediator's advisory opinion shall be inadmissible as evidence in any arbitration proceeding.

6. The parties shall share the fees and expenses of the mediator equally.

### Section 5 – Arbitration:

A. The parties agree that arbitration is the method of resolving grievances that have not been satisfactorily resolved pursuant to the Grievance Procedure or Grievance Mediation.

B. Disputes of arbitrability shall be heard prior to a hearing on the merits. At the time the Department and OLRCB receive the demand for arbitration, if the Agency asserts non-arbitrability, the Union will be notified that the Agency believes that the issue is not arbitrable. Disputes regarding arbitrability shall be heard by any arbitrator selected through the procedures listed in 5(d) of this Article. The arbitrator shall consider the issue of arbitrability separately, prior to a hearing on the merits.

C. If the parties fail to agree on a joint stipulation of issue(s), the issue shall be framed by the Arbitrator.

16

B. Any unsettled grievance not advanced to the next step by the employee, or in the event of a class or group grievance, the Union representative, within the time limit specified in the step, shall be deemed abandoned. If the Department does not respond within the time limit specified at each Step, the employee may invoke the next Step treating the lack of response as a denial of the grievance.

C. All time limits must be strictly observed unless the parties mutually agree to extend said time limits. "Days" means calendar days.

D. No recording device shall be utilized during any step of this procedure unless direction of the arbitrator for his/her use. No person shall be present at any step for the purpose of recording the discussion. However, nothing in this provision shall prohibit the parties or a party from employing the services of a professional court reporter or stenography service for the purpose of preparing a true and correct transcription of the proceeding.

E. The presentation and discussion of grievances shall be conducted at a time and place that will afford a fair and reasonable opportunity for both parties and their witnesses to attend. Such witness(es) shall be present only if necessary for them to present evidence. When discussions and hearings required under this procedure are held during work hours of the participants, they shall be excused with pay for that purpose. An employee scheduled to work shift or weekends will have his/her hours changed to coincide with the time of the hearing.

F. The settlement of a grievance prior to arbitration shall not constitute a precedent in the settlement of grievances.

G. In appropriate circumstances, Management may utilize the grievance/arbitration procedure by first filing a grievance with the Chairman of the Labor Committee. Such filing and response shall be under the same time limits as a Step 4 grievance.

Section 8 – Expedited Arbitration Procedure:

This procedure shall only apply after the Director or his/her designee makes a final decision. The parties agree that expedited arbitration upon the Union's or Management's written request shall be invoked in all cases of summary removals, summary suspensions, suspensions of thirty (30) days or more and class grievances. In all other disputes the expedited arbitration procedures shall only apply when both parties mutually agree.

Step 1: The employee and/or the Union shall present it (with supporting documentation and agency final decision) to the agency head within fifteen (15) days after receiving the final decision. The agency head shall respond in writing (with a copy to the local Chairman) within fifteen (15) days after receipt of the written grievances.

Step 2: The Union may, by written notice, request expedited arbitration within twenty (20) days after the reply in Step 1 is due or received, whichever is sooner.

Step 3: Within seven (7) days of the Department's receipt of the Union's notice of intent to arbitration request, the moving party shall solicit a panel of seven (7) impartial arbitrators from FMCS. Within seven (7) days after receipt of the list, both parties shall select an arbitrator. Both the Employer and the Union may strike three (3) names from the list using the alternate strike method. A coin toss shall determine the first strike.

Step 4: The arbitration hearing shall be held within thirty (30) days after selection of an arbitrator. Any party unprepared to present its case shall forfeit their issues for arbitration and remedies sought unless the parties mutually agree to extend said time limits. The arbitrator shall issue an award within twenty (20) days of the date set by the arbitrator for filing briefs.

Step 5: All other provisions in the expedited arbitration proceeding will be as specified in Section 6 of this Article.

ARTICLE 11
DISCIPLINE (CORRECTIVE/ADVERSE ACTIONS)

Both parties recognize the exclusive rights of Management to discipline employees for cause, as defined in the DPM. Discipline shall be imposed for cause, as provided in D.C. Code §1-617.51 and defined in Chapter 16 of the District Personnel Manual

Section 1:

For the purpose of this Article, discipline shall include the following:

A. Corrective Actions: Written reprimands or suspensions of less than ten (10) days; and

B. Adverse Actions: Removal, suspensions for ten (10) days or more; or a reduction in grade.

Section 2:

Employees have the right to contest corrective or adverse actions taken for cause through the negotiated grievance procedure as provided in Article 10. Employees have the right to contest adverse actions taken for cause through the Office of Employee Appeals (OEA) as specified by OEA rules.

A. Should the employee select to appeal the action to OEA, such appeal shall be filed in accordance with OEA rules and regulations.

B. Should the employee select to grieve under the negotiated grievance procedure, discipline may only be grieved at the next higher level than where the final decision was taken, except in the case of actions taken by the Director.

D. Should the employee or Union, in cases of appeals to arbitration, wish to grieve disciplinary action, such grievance/arbitration must be filed within the time limits specified in Article 10 starting with the date after the effective date of the action.

Section 3: If a supervisor has reason to discipline an employee, it shall be done in a manner that will not embarrass the employee before other employees or the public.

Section 4: Employees requested to reply to disciplinary actions will be informed of the right to have a Union representative present.

Section 5: If an employee can reasonably expect discipline to result from an investigatory interview, and a reasonable advance notification of the interview has not been given, at the request of the employee, questioning shall be delayed for no longer than twenty-four (24) hours to give the employee an opportunity to consult with a Union representative.

An employee's Union representative may be present at all investigatory questioning sessions held under this Article, but may not answer questions on behalf of the employee. However, the representative may counsel the employee and may assist the employee in presenting the facts. This section shall not supercede the requirement that employees shall submit reports in writing of all extraordinary occurrences or significant incidents.

Section 6: Prior to commencement of any questioning of unit members, the member shall be informed of:

A. The type of investigation being conducted (criminal or administrative). If administrative then the specific reason or type of complaint.

B. Whether the member is alleged to be the subject of the investigation if known at the time.

C. The name(s) of the complainant(s) unless this information would jeopardize the security of the investigation or the safety of the complainant or witness.

D. The name and title of the official who will be doing the questioning and the name and rank of persons that will be present.

20

Section 7: When management determines that the questioning session is to be recorded, all portions of the session shall be recorded with proper notation as to breaks and off the record discussion began and ended. If a recording device is used, a copy of the tape shall be made available upon written request to the employee or the Union when discipline is proposed, or upon conclusion of the investigation which should normally be concluded within 45 days.

Section 8: Corrective or Adverse Action shall be commenced within a reasonable time after the agency knew or should have known of the act or occurrence allegedly constituting cause.

Section 9:

A. Except in the case of summary discipline, an employee against whom adverse action is proposed shall be entitled to advance written notice of twenty (20) days. The notice shall inform the employee of the causes and the specific reasons for the proposed action; the right to provide a written response within six (6) days of receipt of the advance written notice; the person to whom the written response or any request is to be presented; right to review any material upon which the proposed action is based; in the case of a proposed adverse action only, the right to be represented by an attorney or other representative; the right to an administrative review by a hearing officer appointed by the agency head, as provided in DPM Section 1612, when the proposed action is a removal; and, the right to a written decision.

B. An employee shall be given up to ten (10) hours official time to prepare for his/her defense against any proposed disciplinary action.

C. Disinterested Designee/Hearing Officer shall review the proposed action, receive and review all relevant statements, conduct a hearing if a hearing is requested by the employee and issue a recommendation to the Deciding Official normally within ten (10) days after conducting a hearing of receiving the disciplinary action if a hearing is not requested. The Hearing Officer must be a DS-13 or higher and have no direct or personal knowledge of the matter contained in the disciplinary case, and not be in the chain of command between the proposing and deciding officials.

D. Deciding Official shall issue a final decision after reviewing the recommendation of the Disinterested Designee/Hearing Officer. The deciding official may sustain r educe the penalty recommended by the Disinterested Designee, remand the matter for further consideration by the Hearing Officer, or dismiss the charge but may not increase the penalty recommended by the Disinterested Designee/Hearing Officer.

Section 10: Summary removal, summary suspension, enforced leave shall only be executed upon the Director's approval. The Union Chairman will be notified within forty-eight (48) hours and give the specific reason for the action.

21

**Section 11:** Applicable District Regulations shall govern discharge of probationary, temporary, and term employees.

**Section 12:** Pending disciplinary action will not preclude an employee from participating in the promotional process. After the eligibility list, register or certification is formed and a final penalty is imposed, the member need not be promoted from the list, register, or certification. If after an eligibility list, register or certification is formed and disciplinary action is proposed, the promotion shall be held in abeyance pending a final disposition. If the disposition is favorable to the employee, the employee shall be promoted forthwith back pay retroactive to the date when the member would have otherwise have been promoted.

**Section 13:** After discovery of the incident, the investigations shall be conducted in a timely manner and discipline shall be imposed upon the conclusion of any investigation or the gathering of any required documents, consistent with the D.C. Office of Personnel regulations.

**Section 14:** The Employer agrees that disciplinary action shall not be punitive but based on conduct or performance deficiencies. The selection of the appropriate penalties shall be based on progressive discipline principles consistent within the department. Consideration shall be given to any mitigating or aggravating circumstances that have been determined to exist.

## ARTICLE 12
## LEAVE

**Section 1 – Annual Leave:**

A. All annual leave requests must be submitted in advance of the time requested. Failure to obtain advance approval for leave may result in having the absence charged to absence without leave (AWOL). Emergency annual leave may be approved by the designated supervisor when an oral request is made. If granted, the employee must submit a written application for leave (SF-17) within twenty-four (24) hours of return to duty.

B. Only supervisors designated by the Department will authorize annual leave in the absence of the designated supervisor; emergency annual leave will be approved by the next higher level of supervision.

C. All employees requesting a leave period of one (1) week or more will do so in accordance with the following:

1. Their request will be submitted by the date determined by the Department each year.

22

2. Supervisors will notify each employee of the disposition of his/her request within one (1) calendar month.

3. If more employees from the same shift than can be spared apply for leave for the same period and management determines that appropriate staff is available to do the work, the employee with the greatest service with the Department will have preference, except as provided below. The employee(s) required to make a new selection will have a preference over employees who did not submit requests if the new selection is resubmitted within 15 days after the disposition of the requests period, provided, the Department has determined that appropriate staff is available to do the work during the period that is proposed.

4. Employees wishing to change their request may do so provided their service can be spared and their new choice does not conflict with leave scheduled for another employee. Since these dates are tentative, the employee will request from his/her supervisor the proposed leave period he/she desires to change as far in advance as possible.

5. During the period of May 1st to October 1st, no employee will be granted more than one (1) leave period of a duration of one (1) week until every employee in the work area has had an opportunity to take a leave period during these months.

6. The granting of leave for the days of Thanksgiving, Christmas and the New Year holidays will be on a rotating basis so that all employees may have an equal opportunity for leave at these times. However, this does not preclude or interfere with the Department's right to determine appropriate staff on holidays to ensure the proper accomplishment of Agency work.

7. Although every effort will be made by supervisors to honor advance requests for leave periods, an advance request is not a guarantee of final approval. The Employer reserves the right to cancel leave previously approved for circumstances such as workload and unforeseen urgent needs. In the event it is necessary to cancel advanced requests, the supervisor will promptly advise the employee concerned. In such cases the employee's circumstances will be given due consideration. Every effort will be made to reschedule the leave period for the employee's convenience.

23

8. If an employee is transferred within the Department at his/her request or as a result of a promotion, training assignment or voluntary shift change other than the normal shift rotation, the employee may be required to adjust his/her leave scheduled in the unit to which he/she has been transferred. If the move has been a result of a management decision, seniority will be the controlling factor.

Section 2 – Sick Leave:

A. Supervisors shall approve sick leave of employees who are unable to perform their duties due to illness. Employees assigned to rotating shifts or regular tours of duty shall request unplanned sick leave from the control center no later than two (2) hours prior to the start of their shift. All other employees shall request sick leave as soon as possible prior to the start of their shift on the first day of absence. The employees shall submit the appropriate sick leave request to his/her supervisor upon return to work.

B. A supervisor may require a doctor's certificate for absences of three (3) days or more. Additionally, those employees who have received "sick certifications" due to potential or actual sick leave abuse shall provide documentation as required by the Department.

C. Sick leave may be used when an employee receives medical, dental or optical examinations or treatment, or is incapacitated for the performance of duty by sickness, injury, or pregnancy and confinement is required to give care and attendance to a member of his/her immediate family who is afflicted with a contagious disease (as defined by applicable regulations) or would jeopardize the health of others by his/her presence at his/her post of duty because of exposure to contagious disease.

D. Employees shall submit requests for, or substantiate, sick leave on SF-71, Application for Leave. The Employer will make the SF-71 available for completion and signature by employee(s).

E. Except in an emergency situation, an employee who will be or is absent due to illness or injury will notify the control center or designated person or unit a minimum of one (1) hour and fifteen (15) minutes prior to the start of the employee's shift, of the inability to report for duty. If an employee is too ill or injured to personally notify the supervisor of his/her absence, notification may be made by a third party.

F. Employees returning from sick leave will so notify their supervisor or the control center as far in advance of the start as possible. Although employees will not be required to call in to request sick leave each day, in case of an extended illness or more than three (3) days, employees will periodically update their supervisors as to their ability to return to work.

24

G. Sick leave will be requested in advance for visits to, and/or appointments with doctors, dentists, practitioners, opticians, chiropractors and for the purpose of securing diagnostic examination, treatment and x-rays.

Section 3 – Leave Without Pay:    Leave without pay (LWOP) may be granted in accordance with applicable District Personnel Regulations, upon the employee's request.

ARTICLE 13
TRAINING

Section 1:    The Union shall have membership on any standing Labor-Management body, Board or Committee, and will be entitled to express its views, make recommendations, and otherwise participate, except in selection of participants for training and determining how the budget will be spent.

Section 2:    Normally, training which is authorized and approved by the Employer will be conducted during regular working hours (8:00am to 4:00pm) when practical. This does not apply to reading assignments given as a part of training nor does this Article any aspects of this Agreement preclude an employee from participating in training on his/her time.

Section 3:    A record of an employee's training and details to other than regular assignments shall be documented and made a part of the employee's Official Personnel Folders to be used as reference qualifications.

Section 4:    Opportunities for employee development through outside educational programs which are related to performance of official duties will be made available in accordance with applicable D.C. laws and regulations.

Section 5:    The Employer will provide copies of locally generated training announcements to the Union as they are posted.

Section 6:    The Department shall provide appropriate correctional training (currently six (6) weeks) to all newly hired personnel commensurate with their inmate contact up or prior to their entrance on duty. Periodic in-service training shall be provided consistent with duty assignments and the implementation of new policies and procedures, to provide the skills necessary to perform the duties of their jobs. Periodic in-service training shall be provided for all correctional officers who have completed their probationary period (currently forty (40) hour per year). Employees who are not correctional officers who work in an institutional setting and who have completed their probationary period shall be enrolled in in-service training (currently eight (8) hours per year). Management retains the discretion to determine the amount, frequency and timing of training necessary for the performance of work. Management shall consider individual requests for additional training. Scheduled in-service training may be temporarily

25

suspended or modified only by the Director or Deputy Director. The Union's Principal Executive Officer will be promptly notified.

### Section 7 – Firearms Training:

A. Employees whose duties require the possession and use of firearms shall receive the appropriate range and firearms training along with instructions in safe and effective use of firearms, and refresher training in the Department policies concerning the use of deadly force.

B. An employee's failure to qualify and/or re-qualify with the semi-automatic firearm shall not be a basis or cause for disciplinary action. Employees that fail to qualify with the semi-automatic will be given the alternative of using the Department issued revolver after successfully completing the range training and qualification requirements for the revolver.

## ARTICLE 14
## HEALTH AND SAFETY

**Section 1 – Employees Working Alone:** If employees are required to work in areas beyond the call, observation or periodic check of others where dangerous chemicals, explosives, toxic gases, radiation, laser light, high voltage or rotary machinery area to be handled, the District shall take reasonable and necessary precautions to ensure the health and safety of an employee who might be endangered by working alone.

**Section 2 – Medical Service: On-the-Job Injury:** The District shall make first-aid kits reasonably available for use in case of on-the-job injuries. If additional treatment appears to be necessary, the District shall arrange immediately for transportation to an appropriate medical facility.

### Section 3 – Emergency and Preventive Services:

A. The Employer agrees to provide emergency diagnosis and treatment, within the competence of the professional staff and the capability of the facilities health services unit, for employees who are injured or become ill during working hours.

B. The Employer shall determine the preventive services programs necessary to inform employees of health and/or safety issues in the work environment. Programs may include health education, disease screening and physical examinations.

### Section 4 – Light Duty:

A. The District agrees to provide light duty assignments for employees injured on the job to the extent that such light duty is available and justified as follows:

1. To be eligible for light duty, the employee must be certified by the employee's attending physician as temporarily unable to perform the duties of his/her position. The certification must identify the nature and extent of the employee's impairment and the type of light duty he/she is capable of performing, an estimation of the time the employee is likely to be incapacitated and type of activity he/she is incapable of performing. If the period of incapacitation extends beyond the estimated time, the physician shall provide an updated certification stating the additional time the employee is likely to be incapacitated. The Department shall have the option of confirming the diagnosis at the Employer's expense; however, the employee's request for light duty shall be granted during the agency's confirmation process.

2. The employee will be given light duty assignments for which he/she is qualified, initially when available, within his/her own organizational unit. If light duty is not available within the organizational unit, suitable work will be sought elsewhere in the department.

3. Light duty assignments shall not normally extend beyond 45 working days. Extensions shall be at the Employer's option. Employees unable to perform their regularly assigned duties after the expiration of the 45-day period shall make application for disability compensation or exercise such other options as may be available to employees under law, and in accordance with paragraph 5 below.

4. Where there are more requests for light duty than there are light duty assignments and the employees are equally qualified for the assignment, assignments shall be made in the order of earlier date of request.

5. When light duty is not available, an employee must return to full duty or seek compensation or retirement from appropriate channels. In the event compensation or retirement is not approved, the employee may be required to take a fitness for duty examination and may be separated if (1) found unfit to perform or (2) found fit but refuses to report for full duty.

**Section 5 – Excessive Temperatures in Buildings:** Employees, other than those determined by the Employer to be essential, shall be released from duty or reassigned to other duties of a similar nature at a suitably temperate site because of excessively hot or cold conditions in the building. This determination will be made by the Employer as expeditiously as possible and shall be based upon existing procedures. In lieu of dismissal, the Employer may reassign employees to other duties of similar nature at a

C. If the supervisor determines that a condition does not constitute an immediate hazard to the health and safety of the employee and the employee disagrees, the matter may be immediately referred by the employee to the next level supervisor or designee. The supervisor or designee shall make an immediate determination as to whether the condition constitutes an immediate hazard to the health and safety of the employee. An employee will not be required to operate unsafe equipment or work in conditions reported as unsafe or hazardous until the next level supervisor or designee has determined that the conditions or equipment are safe.

D. Matters related to alleged unsafe working areas or equipment may be brought to the attention of the safety committee.

E. Employees shall not be required to operate unsafe equipment that has been so determined by the Employer or the D. C. Risk Manager.

Section 13 - Safety Devices and Equipment:    Protective devices and protective equipment as determined appropriate by the Employer or other competent authority shall be provided by the Department and shall be used by the employees.

Section 14 - Safety Training:

A. The Department shall provide safety training to employees as necessary for performance of their job. Issues involving safety training may be presented to the Safety Committee.

B. The Department shall make CPR training available.

Section 15 - Safety Committee:

A. The Department agrees that the Union shall have two (2) members, one (1) correctional and one (1) non-correctional, on the Department Safety Committee. Committee meetings will be held during working hours without loss of pay or leave to employees.

B. One (1) Union and one (1) Department representative shall serve as co-chairpersons of the Committee.

C. The Safety Committee shall:

1. Meet on a monthly basis, unless mutually agreed otherwise. Prior to regularly scheduled monthly meetings, labor and management must submit their respective agendas to each other at least five (5) days in advance;

2. Conduct safety surveys, consider training needs, and make recommendations to the agency/department head;

29

---

suitably temperate site. Administrative leave will be granted if authorized by the Mayor or his/her designee.

Section 6 – Employee Health Services:    Employees covered by this Agreement shall have access to employee health services provided by the Employer consistent with the Comprehensive Merit Personnel Act (D.C. Code Section 1-621.7).

Section 7 – Maintenance of Health Records:    Medical records of employees shall be maintained in accordance with the provisions of Chapter 31 of the D.C. Government regulations that maintain confidentiality of those records. Medical records shall not be disclosed to anyone except in compliance with applicable rules relating to disclosure of information.

Section 8:    The Employer agrees to follow Mayor's Order 87-95 or other applicable Order regarding ergonomic policy for use of video display terminals.

Section 9:    The Employer agrees to provide relief to correctional staff within a reasonable period of time for employees in areas where toilet facilities are not readily accessible.

Section 10:    The Union may make recommendations to the Facility Administrator and the Director regarding detection methods used to prevent the introduction of contraband into the facilities.

Section 11 - Working Conditions:

A. The Employer will make every effort to provide and maintain safe working conditions. The Union will cooperate in these efforts by encouraging its members to work in a safe manner and to obey established safety practices and regulations.

B. Matters involving safety and health will be governed by the D.C. Occupational Safety and Health Plan in accordance with Subchapter XXI of the Comprehensive Merit Personnel Act (1980, as amended, D.C. Code section 1-621.1 et seq.).

Section 12 - Corrective Actions:

A. If an employee observes a condition that he or she, believes to be unsafe, the employee shall report the condition to the immediate supervisor.

B. If the supervisor determines that a condition constitutes an immediate hazard to the health and safety of the employee, the supervisor shall take immediate precautions to protect the employee.

28

3.    Consult with and advise department/agency heads; and,

4.    Receive appropriate health and safety training.

D.    Final reports or responses from agency/department heads (or designees) shall be provided to the Safety Committee within a reasonable period of time on safety matters initiated by the Committee.

**Section 16:**    The Employer agrees to provide the Union safety and health committee members with a copy of all current D.C. Safety Officers, or Departmental Risk Managers, and revisions as they occur.

**Section 17:**    The Union and the Department will make every effort to prevent accidents of any kind. Should accidents occur, however, a prime consideration will be the welfare of injured employees consistent with medical protocol.

**Section 18:**    The Union shall have membership on the Risk Assessment Committee.

**Section 19:**    Transportation service shall be provided to transport injured employees on the compound for appropriate medical services. EMS services will be made available if determined appropriate by medical staff.

**Section 20:**    The supervisor shall provide a complete copy of Form CA-16 to the Agency Human Resources Department for deposit into the employee's human resource file. The employee shall have access to this document as they do for any other human resource file.

## ARTICLE 15
## REDUCTION-IN-FORCE

**Section 1:**    The Employer agrees to notify the Union of proposed reduction-in-force (RIF) actions that may adversely affect unit employees. The Employer will consider the Union's views regarding minimizing the number of adversely affected unit employees.

**Section 2:**    Following the guidelines contained in the District of Columbia Personnel Manual, the Department agrees to minimize the effect on bargaining unit employees to the extent practicable. In the event of a RIF the procedures outlined in the laws and regulations of the District of Columbia will be utilized.

30

## ARTICLE 16
## UNIFORMS

**Section 1:**    The Employer shall provide the following items of uniforms to unit employees as specified:

**A.    Correctional Officer - Male**

| | |
|---|---|
| Blouse, blue | 1 each |
| Police-style coat, blue | 1 each |
| Trousers, blue (winter) | 4 pairs |
| Trousers, blue (Summer) | 4 pairs |
| Cap, winter (opt.) | 1 each |
| Cap, summer (opt.) | 1 each |
| Shirt, gray, short sleeve | 6 each |
| Shirt, gray, long sleeve | 6 each |
| Necktie, black | 1 each |
| Whistle, chrome | 1 each |
| Raincoat | 1 each |
| Badge, large, silver | 1 each |
| Badge, small, silver | 1 each |

**B.    Correctional Officer - Female**

| | |
|---|---|
| Blouse, blue | 1 each |
| Overcoat, blue | 1 each |
| Trousers, blue (winter) | 4 pairs |
| Trousers, blue (summer) | 4 pairs |
| Cap, winter (opt.) | 1 each |
| Cap, summer (opt.) | 1 each |
| Shirt, gray, short sleeve | 6 each |
| Shirt, gray, long sleeve | 6 each |
| Necktie, black | 1 each |
| Whistle, chrome | 1 each |
| Raincoat | 1 each |
| Badge, large, silver | 1 each |
| Badge, small, silver | 1 each |

If a Correctional Officer is pregnant and on active duty, the Employer shall make available suitable uniform clothing, upon the employee's request.

**C.** Khaki Uniforms (Wage employees and other employees assigned to jobs requiring these uniforms):

| | |
|---|---|
| Trousers, Khaki | 6 pairs |
| Shirt, Khaki, long sleeve | 6 each |
| Shirt, Khaki, short sleeve | 6 each |
| Raincoat | 1 each |
| Coveralls, Khaki | 2 pairs |
| Shoes, Safety, steel toe | 1 pair |
| Badge, large, gold | 1 each |
| Badge, small, gold | 1 each |

## ARTICLE 17
## DETAILS, TEMPORARY PROMOTIONS AND PAY IN HIGHER GRADE POSITIONS

**Section 1:** Details or temporary promotions shall be made in accordance with appropriate provisions of the District Personnel Manual.

**Section 2 – Acting Pay:** An employee detailed or assigned to a higher grade position for more than ninety (90) consecutive days shall receive the higher rate of pay beginning the first full pay period following the ninety (90) day period. If Management decides to reassign an employee to a higher-grade position after the employee returns from the approved leave or disability compensation, such absences will not be considered a break in the consecutive day requirement.

**Section 3:** Management will ensure that an employee assigned or detailed to a higher grade position is not arbitrarily removed from detail and then reinstated to the detail in order to avoid Acting Pay in accordance with Section 2 above.

**Section 4:** Details or assignments to a higher-grade position shall not be used as a pre-selection device. For the purpose of the preceding term "pre-selection device" refers to recurring patterns of selecting individuals for promotion that are not qualified but assigned or detailed to the higher-grade position as provided in the Article.

**Section 5:** Competitive placement procedures will be utilized for all higher grade details extending beyond 120 days to established positions and 240 days to unestablished positions.

**Section 6:** Management will generate the appropriate paper work (Form 52) for employees detailed/assigned to another position extending beyond 90 days.

32

**Section 7:** Management will notify the Union of all bargaining unit employees detailed or assigned to supervisory/managerial positions so that the Union can remove that employee from its roles during the period he/she is detailed or assigned to the supervisory position.

**Section 8:** Bargaining unit employees shall be given the first opportunity to be assigned to details and temporary promotions into bargaining unit positions provided that they are qualified and available to perform the duties.

## ARTICLE 18
## DISTRIBUTION OF OVERTIME AND TOUR OF DUTY

**Section 1:** Management retains the unfettered right to determine necessary job requirements for assignments and to determine the employees who are eligible to work the assignments.

**Section 2:** Where management determines that employees are equally capable to perform overtime assignments, overtime will be offered to employees on a volunteer basis and distributed equitably among those employees.

**Section 3 – Overtime:**

**A.** **Voluntary Overtime**

A list shall be posted for employees to sign up for overtime. The employee must be present to sign his/her own name on the list. Correctional Officers, Grade 6 through 9 will be selected for overtime in descending order from the voluntary sign up list. Management will not arbitrarily deny employees overtime. If an employee's name is skipped over, the supervisor must justify to the employee and in writing the reason for denying that employee to work overtime.

**B.** **Mandatory Overtime (Draft)**

Based on operational demand and/or emergencies when it becomes necessary for management to order mandatory overtime, prior to invoking a draft, management will first attempt to locate volunteers from other facilities or employees in an off-duty status. If there is still a need, selections will be made among all employees (including those assigned to non-bid special skills post) in alphabetical order regardless of rank (Grades 6 through 9). Under no circumstances will an employee be forced to work mandatory overtime for two or more consecutive days. Nor will an employee be required to work more than eight (8) hours of overtime per day unless unforeseen emergencies arise (inclement weather, disturbances, interstate transports, etc.). Employees shall be paid at the appropriate overtime rate for mandatory overtime hours worked. An employee may be paid straight

33

time or compensatory time for ordered mandatory overtime if mutually agreed to by the parties in advance.

C. Records of employees voluntary and mandatory overtime performed shall be maintained by the Employer and made available to the Union upon request.

D. The provision of this Article shall apply to uniformed employees who are required to work overtime.

**Section 4 – Tours of Duty/Shift Change:** Changes in shift will be distributed and rotated equitably among qualified employees on an annual basis in accordance with Department Order 3020.3.

A. The Union's Chairman or designee will have ex-Officio membership as an observer on any joint labor-management committee regarding applicable annual shift change regulations. Any newly created post or modification of an existing post (days off, duty hours, former bid post which are converted to non-bid special skill post, etc.) will be submitted to the Work Force Utilization Committee prior to impementation.

B. Employees will not be arbitrarily removed or reassigned from a post they obtained through the Master Roster bid process. When management determines a need to remove or reassign an employee from a post assignment they shall notify the employee in the Union of the reason for the reassignment and provide any supporting documentation. Notice shall include the specific allegation that precipitated the proposed reassignment, including performance deficencies or the specific reason(s) for the manager's conclusion that a reassignment is in the best interest of the shift, facility or Agency. If the proposed reassignment is based on an allegation of employee misconduct, the employee shall be given an opportunity to rebut the allegations of misconduct, prior to a permanent reassignment and be allowed to offer alternatives to permanent reassignment. If management determines that a reassignment for the remainder of post term is necessary, management shall provide the employee with an written explanation of why the reassignment is necessary to meet the needs of the Agency

C. The same provisions of this Article shall apply for all non-uniformed employees who are required to perform rotating shift work.

D. A record of employees shift change and assigned days off will be submitted to the Union for review.

**Section 5:** To be eligible for a post overtime assignment employees must be able to perform the duties of the post as set forth in the post orders.

# ARTICLE 19
## MERIT STAFFING/PROMOTIONS

**Section 1:** Merit staffing and promotions procedures shall be implemented in accordance with the applicable provisions of the DPM as implemented in the DCOP Merit Staffing Plan and this Article.

**Section 2:** The Employer will administer the following practices and principles.

A. The Employer will announce all job vacancies for at least ten (10) business days. A copy of the vacancy announcements will be provided to the Union by Management via Fax.

B. Based on established DCOP procedures and qualifications, applicants will be evaluated and list qualified or unqualified (if so evaluated). Applicants will be referred to the selecting official with all of the mandatory hiring preferences applied as required by DCOP rules and regulations.

C. The Employer will notify all applicants of the outcome of their applications for the position.

D. Copies of the DCOP regulations describing the procedural aspects of the Merit Staffing/Promotion Plan will be made available at each facility to employees and a copy provided to the Union. Aspects of the merit staffing/promotion plan will be made to the Union's Chairman.

**Section 3 – Area Consideration:** To the extent not in violation of Equal Employment Opportunity laws and regulations and the Department's affirmative action plan, the Area of Consideration to fill vacancies in the bargaining unit shall be the DCDC; provided that the official requesting the personnel action certifies to the DCOP that an adequate number of qualified candidates is expected to result from such limited Area Consideration. An adequate number shall be no less than five (5).

**Section 4:** Outside candidates competing for departmental promotional opportunities must be equally or better qualified than internal applicants before they will be appointed or promoted.

**Section 5:** The Union will have ex-officio membership as an observer on merit staffing panels for non-supervisory positions within the bargaining unit. The Union representative must be the same grade or higher than the position being filled. The Chairman of the Union is excluded from this restriction. The Union representative shall not participate in management's deliberations or the selection of candidates.

**Section 6:** For non-correctional vacancies, if one (1) eligible candidate who certified for consideration is interviewed, then all such candidates will be interviewed.

## ARTICLE 21
## PERSONNEL FILES

**Section 1:** An employee shall have the right to view his Official Personnel file and upon request, inspect or copy any documents appearing in his/her folder, consistent with release of official information as proscribed in the Comprehensive Merit Personnel Act.

**Section 2:** The rights of employees pertaining to their Official Personnel Folder as referenced above shall extend to apply to employees information and/or training folders maintained by the Employer on the employee.

**Section 3:** Upon request, the Employer shall provide the employee a copy of final reports and internal investigations related to the employee's performance, inmate complaints against employees and other work related matters concerning the employee.

**Section 4:** An employee's personnel records may be disclosed to his/her representative upon written authorization from the employee. The written authorization shall specify the documents and/or records to be disclosed or the degree of access permitted by the employee.

**Section 5:** The employer will make a reasonable effort to ensure that inmates do not have access to employees' files and records.

## ARTICLE 22
## TRANSFERS AND INTER-INSTITUTIONAL ROTATIONS

**Section 1:** It is recognized that the Employer has the right to transfer or reassign employees whenever the interest of the Department so requires, but transfers or reassignments shall not be used as a form of reprisal.

**Section 2:** After fifteen (15) years of service with the Department, an employee shall be given priority placement consideration to the facility of his/her choice. Request for reassignments pursuant to this section will not be unreasonably denied. Employee's preference as to shift and days off shall be applied based on availability.

## ARTICLE 23
## RETIREMENT COUNSELING

The Employer will provide counseling to employees who are of retirement age. This counseling will include information on voluntary deductions, benefits, and insurance.

37

---

**Section 7:** If the Agency returns a certification of eligible candidates for bargaining unit positions without selection the Agency shall provide the justification for return of the certificate to DCOP. The Agency shall also provide the Union the justification.

**Section 8:** No employee who is certified on the selection certificate can file a grievance for non-selection unless there has been a violation of the DPM.

**Section 9:** Upon a determination that a procedural violation occurred and a candidate was erroneously appointed or promoted, Management will initiate the remedial action in accordance with the DPM, Chapter 8, within 45 days.

## ARTICLE 20
## POSITION DESCRIPTIONS

**Section 1:** Each employee will be supplied with a copy of his/her official position description by the Office of Personnel upon entry to duty or change in position description. Position descriptions will be furnished to the Union. Other requests for position descriptions will be made directly to the Director of the Office of Personnel.

**Section 2:** The clause found in job descriptions "performs other duties as assigned" shall be construed to mean the employee may be assigned to other duties that are nominally related to regular assignments. The Employer recognizes that job assignments should be commensurate with position descriptions. The Union recognizes that at times the Employer must deviate from this policy. When such deviation is necessary, the Employer will make every effort to assign employees whose normal duties and pay levels are most nearly associated with the job to be assigned.

**Section 3:** Position classification appeals are not subject to the negotiated grievance procedure. Such classification appeals filed with the Office of Employee Appeals (OEA) before October 22, 1998 shall be processed in accordance with applicable law and OEA Rules. Copies of procedures to be followed in filing appeals after October 22, 1998 will be made available to employees and Union representatives upon request to the Office of Personnel.

**Section 4:** An employee may request a review of his/her position classification. Such request will be submitted orally to the appropriate supervisor who will meet with the employee (and representative if any) to discuss the matter and the circumstances leading up to the request for review. If the matter is not resolved, the employee may file a request for review through the appropriate servicing personnel classification unit.

36

## ARTICLE 27
## NO STRIKE OR LOCKOUT

**Section 1:** Under the provisions of D.C. Code Section 1-618.5 it is unlawful to participate in, authorize or ratify a strike.

**Section 2:** The term "strike" as used herein means a concerted refusal to perform duties or any unauthorized concerted work stoppage or slowdown and shall be defined in accordance with D.C. Code Section 1-618.5.

**Section 3:** No lockout of employees shall be instituted by the Employer during the term of this Agreement except that the Department in a strike situation retains the right to close down any facilities to provide for the safety of employees, property or the public.

**Section 4:** In the event of a strike as defined by this Article and upon receipt of notice from the Employer of any strike, within eight (8) hours the Union shall publicly disavow the action by posting notices and issuing a news release to the media stating that the strike is unauthorized. Notwithstanding the acceptance of the existence of any strike, the Union will use every reasonable effort in cooperation with the Employer to terminate the strike.

**Section 5:** It is recognized that any employee, who participates in or initiates strike as defined herein may be, subject to disciplinary action.

## ARTICLE 28
## PROTECTED DISCLOSURE

**Section 1:** Pursuant to D.C. Code § 1-616.11 et seq, employees shall be free to make a protected disclosure of information, that is not specifically prohibited by statute, by reporting gross mismanagement; gross misuse or waste of public resources or funds; abuse of authority in connection with the administration of a public program or the execution of a public contract; a violation of law, rule or regulation or of a term of contract between the District government and a District government contractor which is of not merely technical or minimal nature; or, a substantial and specific danger to the public health and safety. Said disclosures shall be made to any of the official governmental entities prescribed by law.

**Section 2:** Pursuant to D.C. Code § 1-616.11 et seq, the Employer's representatives shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order. As defined by the D.C. Code § 1-616.11, prohibited personnel actions include recommended, threatened, or actual termination, demotion, suspension, or reprimand; involuntary transfer, reassignment, or detail; referral for psychiatric or psychological counseling; failure to promote or hire or

## ARTICLE 24
## DISTRIBUTION OF HEALTH BENEFIT BROCHURES

The Employer agrees to make available to all employees upon entrance on duty and during open enrollment season, copies of the health benefit plan brochures under the applicable program.

## ARTICLE 25
## PERFORMANCE COUNSELING

**Section 1:** If an employee is to be denied his/her periodic step increase he/she shall be so notified in advance in writing.

**Section 2:** Such notification shall include:

A. An explanation of each aspect of performance in which the employee's services fall below a satisfactory level and how this renders his/her performance on the job as a whole below a satisfactory level; and,

B. A statement of the satisfactory level of performance on each of those work aspects; and

C. Advice as to what the employee must do to bring his/her performance up to the satisfactory level.

**Section 3:**

Notification as stipulated above shall be made in advance of denial of the periodic step increase and the employee shall be given at least sixty (60) days to bring such performance up to a satisfactory level.

## ARTICLE 26
## PERFORMANCE RATINGS

**Section 1:** The parties agree that until a new performance plan is developed, as required by Section 1-615.1 of the D.C. Code (1981 ed.) the rating plan currently in place will continue in effect.

**Section 2:** An employee may elect to appeal the Impartial Review Board Committee's decision to the Office of Employee Appeals (OEA) in the manner specified in OEA's regulations or, if applicable, grieve the decision under the provisions of Article 10 of this Agreement.

take other favorable personnel action; or retaliating in any other manner against an employee.

## ARTICLE 29
## DISTRIBUTION

The Employer agrees to have printed 1000 copies of the Agreement. The Union will be responsible for all copies over 1000. The parties shall jointly explore the best value for printing consistent with procurement laws.

## ARTICLE 30
## LIABILITY

**Section 1:** The Employer shall provide, at its cost, legal representation to any employee who is a named defendant in a civil action arising out of acts committed by the employee within the scope of his/her employment, provided however that such representation is requested by the employee no more than five (5) calendar days after the service of process and that such representation would not pose a conflict of interest or potential conflict of interest.

**Section 2:** Representation will be provided through the Office of the Corporation Counsel. The decision of the Corporation Counsel on whether to represent an employee shall be final. Should the Corporation Counsel decline to represent the employee, the employee may be represented by any private attorney of his/her choice. The Employer will reimburse the employee for reasonable attorney fees (as determined by the Court) incurred in the employee's defense of the action.

**Section 3:** Representation will generally not be provided where the employee has been found to have engaged in willful misconduct that has resulted in disciplinary action against him/her as a result of his/her conduct with respect to the matter in question.

## ARTICLE 31
## DRUG AND ALCOHOL SCREENING

**Section 1:** The Department agrees to assist career employees who voluntarily concede substance abuse dependency prior to either testing positive for illicit drugs or alcohol test. The employee will be required to enroll and complete a certified substance abuse program. The employee will be subjected to a one-year probationary period and will submit to drug and alcohol testing as frequently as the employer deems appropriate. The employee will be subjected to summary removal for any positive drug or alcohol testing results during this probationary period.

40

**Section 2:** A career employee testing positive for drug or alcohol use (in lieu of termination) may be allowed to enroll in a certified substance abuse program and the employee shall be subjected to an eighteen month probationary period. The employee will submit to drug and alcohol testing as frequently as the employer deems appropriate. In making the determination that rehabilitation (in lieu of termination) is appropriate management will consider the employee's performance record, the circumstances for the drug or alcohol use on a case by case basis, and any other objective evaluation factors. Management will retain the right to render the final decision.

## ARTICLE 32
## WASH-UP TIME

Wash-up time of 15 minutes prior to the end of the shift will made available to buildings and trades employees.

## ARTICLE 33
## CONTRACTING OUT

**Section 1:** Prior to contracting out which deviates from the Department's past practices, the Employer agrees to consider existing resources, to consult with the Union and to consider the views, recommendations or suggestions offered by the Union.

**Section 2:** The Department agrees to notify the Union of any contracting out actions which will displace any bargaining unit employee(s). The Employer further agrees to minimize displacement of bargaining unit employees through realignment and retraining consistent with applicable laws and regulations.

## ARTICLE 34
## INCENTIVE AWARDS AND PERSONNEL ENTERPRISES COMMITTEE

The Union shall have membership on any standing Incentive Awards and Personnel Enterprises Committee (Committee) and will be entitled to express its views, make recommendations, and otherwise participate. The Committee shall address incentive awards to the extent not inconsistent with management rights.

## ARTICLE 35
## SAVINGS CLAUSE

In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction, such decision shall not invalidate the entire Agreement, it being the expressed intention of the parties hereto that all other provisions not declared invalid shall remain in full force and effect.

41

On this 17th day of September 2002 and in witness to this Collective Bargaining Agreement between the Fraternal Order of Police/Department of Corrections Labor Committee and the District of Columbia Department of Corrections, the parties hereto set their signatures.

**For the Department of Corrections and the Office of Labor Relations and Collective Bargaining:**

_Mary E. Leary_
Mary E. Leary
Director, OLRCB

_Michael A. Jacobs_
Michael A. Jacobs, Esq.
Supervisory Labor Relations Specialist
OLRCB

_Walter W. Wojcik, Jr._
Walter W. Wojcik, Jr., Esq.
Supervisory Labor Relations Specialist
OLRCB

_Odie Washington_
Odie Washington
Director, DOC

_James L. Anthony_
James L. Anthony
Deputy Director, Administration, DOC

_Martha E. Brown_
Martha E. Brown
Deputy Director for Operations, DOC

**For the Fraternal Order of Police/ Department of Corrections Labor Committee:**

_William H. Dupree_
William H. Dupree, Chief Negotiator
FOP/DOC Labor Committee

_Jerry Davis_
Sergeant Jerry Davis
CDF
Member, FOP/DOC Labor Committee

Robert Hitt
Facilities Management
Member, FOP/DOC Labor Committee

_Pamela Chase_
Pamela Chase, Chairperson
CDF
FOP/DOC Labor Committee

Corporal Lawrence Garrison
CF
Member, FOP/DOC Labor Committee

Corporal Annette Bishop
CF
Member, FOP/DOC Labor Committee

## ARTICLE 36
## DURATION AND FINALITY OF AGREEMENT

**Section 1:** This Agreement shall remain in full force and effect until September 30, 2005. The Agreement will become effective upon the Mayor's approval subject to the provisions of D.C. Code § 617.15 (2001 ed.) and ratification by the Union. Additionally, if submitted during fiscal year 2001, the Agreement shall not become effective absent approval by the District of Columbia Financial Responsibility and Management Assistance Authority. If disapproved because certain provisions are asserted to be contrary to applicable law or if not ratified by the Union, the parties shall meet within thirty (30) days to negotiate a legally constituted replacement provision or the offensive provision shall be deleted.

**Section 2:** The parties acknowledge that this contract represents the complete Agreement arrived at as a result of negotiations during which both had the unlimited right and opportunity to make demands and proposals with respect to any negotiable subject or matter. The Employer and the Union agree to waive the right to negotiate with respect to any subject or matter referred to or covered or not specifically referred to in this Agreement for the duration of this contract, unless by mutual consent or as provided in this Agreement.

**Section 3:** In the event that a state of civil emergency is declared by the Mayor (civil disorders, natural disasters, etc.) the provisions of this Agreement may be suspended by the Mayor during the time of the emergency.

**Section 4:** This Agreement shall remain in effect until September 30, 2005, in accordance with Section A of this article, and will be automatically renewed for one (1) year periods unless either party gives written notice of its intention to terminate or modify the Agreement no later than 120 days prior to the expiration of the agreement.

**Section 5:** All terms and conditions of employment not covered by the terms of this Agreement shall continue to be subject to the Employer's direction and control provided, however, that if the Employer desires to institute a major change that has a significant impact upon the terms(s) or condition(s) of employment of the entire bargaining unit or any group of bargaining unit employees, the Employer shall provide the Union with advance notice and upon written request of the Union, the parties shall negotiate the impact of such change.

**Section 6:** All citations to the D.C. Code within this Agreement are to the 1981 Edition, unless stated otherwise.

42

John E. Murphy
Special Projects Officer, DOC

Paulette S. Hutchings
Health Services Program Specialist, DOC

Stanley M. Walden
Supervisory Correctional Officer, DOC

**APPROVAL**

The Collective Bargaining Agreement between the District of Columbia Department of Corrections and the Fraternal Order of Police/Department of Corrections Labor Committee, dated September 17, 2002, has been reviewed in accordance with Section 1715(a) of the District of Columbia Comprehensive Merit Personnel Act of 1978 (Section 1-617.15(a), D.C. Official Code, 2001 Edition) and is hereby approved this 16th day of December, 2002.

Anthony H. Williams
Mayor

Appeal No.: _____

## DISTRICT OF COLUMBIA COURT OF APPEALS
_____

In the Matter of the Summary Removal of:

CYNTHIA WASHINGTON;
SHANTELL HATTON;
MALCOLM POINTER;
HERBERT DOUGLAS;
LORENZO JENNINGS;
DIONNE MAKINS;
ALPHONSO BRYANT;
LACHONNE STEWART;
LOWANDA HINTON-SAUNDERS; and
DARRYL LOVE

Petitioners,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS
AND DEVON BROWN, DIRECTOR

Respondents.

## <u>PETITION FOR WRIT OF MANDAMUS TO COMPEL AGENCY ACTION</u>

The D.C. Department of Corrections ("DOC") employees ("Employees") identified in this matter, through their attorneys HANNON LAW GROUP, LLP, respectfully submit this Petition pursuant to D.C. Court of Appeals Rule 21.  This matter arises out of the escape of two inmates from the DOC Central Detention Facility ("CDF") last summer.  Amidst the publicity backwash, Petitioner Employees were publicly and summarily fired by Respondent, Director Devon Brown from their employment at DOC.  Petitioners seek the extraordinary Writ of Mandamus ordering DOC Director Devon Brown to return the Employees to work.

## I.    <u>RELIEF SOUGHT</u>

The Constitutional Due Process rights for the summary removal of Petitioner Employees are set forth in Chapter 16 of the District of Columbia Personnel Manual (6 DCMR 16; hereafter "DCPM") and the Collective Bargaining Agreement ("CBA")[1] negotiated between the DOC and the DOC Fraternal Order of Police Labor Committee.  Both the regulations and the CBA envision speedy summary removal proceedings, and set forth strict deadlines and procedures governing summary removal.  Petitioner Employees seek relief from this Court for Respondent Devon Brown's refusal to comply with the DCPM and the CBA and to order these Employees back to work.

In June 2006, two highly dangerous inmates escaped from the CDF.  The Employees named in this matter were placed on administrative leave with pay directly following the escape.  Following a cursory investigation of the highly publicized escape, the Director of the DOC, Devon Brown, summarily fired the Employees at a Press Briefing in an effort to cover up the DOC's operational deficiencies and to calm the concerns of the City Council and D.C. Metropolitan citizens.  To accomplish the summary removals, the DOC and its attorneys amended existing personnel regulations which would have required that the Employees be issued written notice of the reasons for their removal within three days.  The amended regulation allowed the DOC thirty days to issue the written notice.

Upon request of the DOC, the summary removal was assigned to the Judges of the D.C. Office of Administrative Hearings ("OAH") to act as the "hearing officers" in compliance with the CBA and Chapter 16 of the DCPM.  After a series of hearings and an exchange of pleadings, the OAH Judges issued recommendations in each case that the Employees be returned to work.

---

[1]    The Collective Bargaining Agreement (CBA) which partly governs the proceedings in this matter is included as App. 59.

Instead of returning the Employees to work, as he is required to do by law, Director Devon Brown filed Remand Notices with the OAH, requesting that the OAH Judges reconsider their recommendations that the Employees be returned to work. This request came several weeks after the DCPM regulatory deadline for him to make a Final Decision. The OAH Judges upheld their original recommendations.

Under the CBA and Chapter 16 of the DCPM, which both govern this matter, Director Devon Brown is not permitted to impose a sanction or penalty more severe than that recommended by the "hearing officer": i.e., the Judges of the OAH. In this case, the OAH Judges have recommended that all the Employees be returned to work. The Judges of the OAH also have uniformly ruled that Director Devon Brown acted unlawfully and in violation of the constitutional rights of the Employees in firing them and in delaying the disciplinary process. The DOC Director, as of the date of this filing, has failed to issue a Final Decision in this matter, let alone a Final Decision within the deadline required by the DCPM. At the Oversight Hearing of March 8, 2007, before the D.C. Council Committee on Public Safety, Councilmember Phil Mendelson asked Director Brown when he would make a decision in regard to Petitioner Employees. Director Brown could not provide any substantive answer to the question. In this case, where the DOC has unlawfully acted in withholding agency action, the only remedy is a Writ of Mandamus compelling Director Devon Brown to issue a Final Decision returning the Employees to work. There is no other option for him under the governing law.

## II.   **ISSUES PRESENTED**

Petitioner Employees respectfully submit, pursuant to this Court's Rule 21(a)(2)(A), that

the following issues are presented for review:

> WHETHER THE DISTRICT OF COLUMBIA COURT OF APPEALS HAS THE
> AUTHORITY TO ISSUE A WRIT OF MANDAMUS COMPELLING DOC
> DIRECTOR BROWN TO ISSUE A FINAL DECISION IN THIS MATTER.

> WHETHER DEPARTMENT OF CORRECTIONS DIRECTOR DEVON BROWN
> MUST, WITHOUT ANY OTHER OPTION, RETURN THE EMPLOYEES TO WORK.

## III.   **FACTS**

Petitioner Employees submit that the following facts are necessary for a decision on this

Petition for Writ of Mandamus.

### A.   **Factual Background**[2]

On June 3, 2006, two inmates escaped from the CDF by smashing out the door and

window of the Warden's office.  The two escapees, Joseph Leaks and Ricardo Jones, were

among the most dangerous offenders housed at the DC Jail.  Inmate Leaks was awaiting trial in

the D.C. Superior Court on a charge of Accessory After the Fact to First Degree Murder While

Armed.  He had also violated his parole arising from a 1998 conviction for Assault with a Deadly

Weapon.  Leaks also had a prior escape from the CDF from October of 2005.  Ricardo Jones was

awaiting trial in the D.C. Superior Court in two cases, one charging Assault with Intent to Kill

and a second charging Murder in the First Degree.  Leaks and Jones are co-defendants in the

murder case.  Leaks and Jones are also suspects in an Assault with Intent to Kill investigation in

Greensboro, North Carolina.  (See App. 15 at 1-2).

The escape was widely reported in the press, and was a direct result of the DOC's and

Director Devon Brown's failure to remedy safety issues which had been repeatedly brought to

---

[2]     The record necessary for the Court to make a decision in this matter is included as a two volume Appendix
to this Petition.   Citation to the documents in the Appendix shall be "App. at ___".

their attention by the FOP/DOC Labor Committee ("Union").  (See Id. at 2).  On June 4, 2006, the two escapees were recaptured without incident.  In an effort to deflect continued public attention from deplorable working conditions, severe management deficiencies, and criticism of his leadership of the DOC, Director Devon Brown on June 5, 2006, issued written notification to twelve DC Jail employees putting them on paid administrative leave pending further investigation of the escape.  Those employees included six (6) Correctional Officers, one (1) Lead Correctional Officer (Sgt.), three (3) Correctional Treatment Specialists, one (1) Correctional Program Specialist, and one (1) Captain.  (See Id. at 4).

After the escape, public scrutiny continued.  On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Phil Mendelson was held to continue review of the jail break and general safety issues at the DC Jail.  At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.  (See Id. at 5).

Facing pressure from both the public and the D.C. City Council, during his testimony at the June 26, 2006 hearing, Director Brown announced that as a result of the escape, the DOC evaluated its operation and made immediate improvements.  A month later, on July 26, 2006, the Mayor, DOC Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break. Petitioner Employees were among those fired.  None of the fired employees or their Union was notified in advance of this public announcement.  They were given no notice, or an opportunity to be heard on these summary firings.  (See Id. at 6).

During the Press Briefing, DOC Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing and the summary firings, together with the announcement of a criminal investigation, were intended to and had the result of humiliating and embarrassing the discharged Union members, casting them in the public light as felons who abetted a jail escape. These Union members learned of their firing from family and friends who had seen or heard the news in the media. The Chairperson of the FOP/DOC Labor Committee learned of the terminations from a television news reporter who called to obtain a reaction to the firings. (See App. 52 at 3).

In order to accomplish this public humiliation and summary firing, the DOC engaged in an unlawful and unconstitutional revision of existing D.C. laws which would have prevented them from conducting a summary discharge in a public press briefing. Id. The DCPM, until the Mayor's Weekly Press Briefing of July 26, 2006, provided that in cases of Summary Removal, proper written notification of the action was to be provided within three (3) days of removal ("3 Day Rule"). DCPM § 1616.4. That notice must provide detailed information about the removal, including the reasons for Summary Removal along with identification of critical deadlines in the removal process and pertinent employee rights. Id. However, on the very date of the planned news conference, Director Brown and D.C. officials conspired to amend this provision of the DCPM so as to permit these firings in a summary fashion at the Mayor's Press Conference. The amendment, specifically applying to only these Employees, provided that the information supporting summary removal need not be provided until 30 days after removal. (See App. 15 at 8).

A second change was made to the DCPM on July 28, 2006, to broaden the definition of employees to whom the change applied. The July 28, 2006 variation augments the July 26, 2006

amendment by including a twelfth employee who was summarily removed (on July 28, 2006) and provides that any subsequent firings resulting from the investigation into this jail break also will not be subject to the 3 Day Rule. Id. This variation is completely unlawful and constitutes an ex post facto deprivation of due process rights to the discharged Union members, all to enable Director Brown to divert criticism from his leadership to the rank and file corrections officers and employees of the DOC. Moreover, compliance with the 3 Day Rule would have required disclosure of tape recorded interviews of the discharged Employees, which would have laid to rest the public assertions by Director Brown that the jail escapes could only have occurred as a result of a criminal conspiracy among correctional officers and inmates: a ludicrous accusation in light of the facts then known to Director Brown regarding the security deficiencies at the DC Jail.

Summary Removal is a drastic personnel action which is permitted under D.C. law only when an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee; or, is detrimental to public health, safety, or welfare, as provided for in D.C. Code § 1-616.51. None of these circumstances existed on or even near the date of the Respondents' Press Briefing that would justify an immediate firing. The summary removal of the DOC Employees was unjustified. These suspended Employees were on paid administrative leave and posed a threat to no one. There was absolutely no lawful basis to summarily remove these employees at that particular time, as later confirmed by the OAH Judges. The use of the Summary Removal procedure was unwarranted, and the fact that DOC and D.C. Office of Personnel officials manipulated the law to achieve this gratuitous end is a clear abuse of power, and a violation of the constitutional rights of these DOC Employees.

On or about August 1, 2006, Petitioner Employees were formally delivered – or summoned to pick up – a packet of materials and a notice advising them that they had been summarily discharged from their employment with the DOC.  (See Apps.1-9).  The action of the DOC was not a suspension or a proposed removal.  The action of the DOC was a firing.  This firing was accomplished with no notice and no opportunity to be heard of any kind.

### B.    Procedural Background

The DOC entered into a Memorandum of Understanding with the Office of Administrative Hearings ("OAH") for that office to conduct administrative the hearings required in these cases consistent with Chapter 16 of the DCPM and the CBA.  (See App. 60).  Section 1612.2 of the DCPM requires that an "administrative review shall be conducted by a hearing officer."  6 DCMR 1612.2.  Likewise, the CBA gives the Employees "the right to an administrative review by a hearing officer appointed by the agency head, as provided in [DCPM] Section 1612, when the proposed action is a removal."  (App. 59, CBA at Article 11, Section 9).

DOC Director Devon Brown is required by the DCPM to issue a Final Decision within 45 days of the delivery of the summary removal notices:

> The final decision in the case of summary suspension or summary removal action taken pursuant to §§ 1615-1616, respectively, shall be rendered not later than forty-five (45) days from date of delivery of the summary suspension or summary removal notice, as appropriate except that the period may be extended as follows:
>
> > (a) when the employee requests and is granted an extension of time in which to respond  under § 1611.2; or
> >
> > (b) when the employee agrees to an extension of time requested by the agency.

6 DCMR 1614.3.

In addition, both the CBA and the DCPM require that DOC Director Devon Brown follow the recommendation of the OAH Judges in this case. Article 11, Section 9(D) of the CBA specifically states (emphasis supplied):

> Deciding Official shall issue a final decision after reviewing the recommendation of the Disinterested Designee/Hearing Officer. The deciding official may sustain or reduce the penalty recommended by the Disinterested Designee, remand the matter for further consideration by the Hearing Officer, or dismiss the charge but may not increase the penalty recommended by the Disinterested Designee/Hearing Officer.

Furthermore, Section 1613.2 of the DCPM also states with specificity that (emphasis supplied):

> The deciding official shall either sustain the penalty proposed, reduce it, remand the action with instruction for further consideration, or dismiss the action with or without prejudice, but in no event shall he or she increase the penalty. 6 DCMR § 1613.2.

The original Summary Removals were dated July 26, 2006. The DOC arranged for the D.C. Personnel Regulations to be altered in order to extend the DOC's deadline to present the requisite elements of Summary Removal to the Employees. (See App. 15 at 8). On or about August 24, 2006, the DOC issued its written "follow-up" Summary Removal notice to the Employees. (See Apps. 1-9). The notice required a six (6) day deadline for the employees to respond, and the Employees abided by that deadline. Id. Forty-five days from the date of the "follow-up" Summary Removal notice would have been October 7, 2006.

However, at a September 8 status hearing, the DOC admitted that the record upon which the Agency based the Summary Removal was incomplete. As no administrative review could take place with an incomplete record, the OAH granted the DOC until September 15, 2006 to complete the record. (See App. 13 at 3). The Judges of the OAH recognized that this action implicated the 45-day deadline to issue a final decision, unless the employees requested an extension of time, pursuant to 6 DCMR 1614.3(a). (See Id. at 4). The parties agreed at the

September 8, 2006 status conference to extend the deadline for the Agency Final Decision to

October 25, 2006, because of the DOC's need for additional time to complete the record.  Id.

The OAH's September 11, 2006 scheduling order memorializes this agreement and the deadline.

Id.  On September 27, 2006, the employees filed individual responses to the removal notice, a

motion for an extension of the deadline for responses, as well as a Motion for Summary

Dismissal.  (See App. 15; Apps. 16-25).  The OAH granted the extension of the deadline for

responses and accepted them accordingly.  (See App. 26  at 3).

The DOC filed its reply to the Motion for Summary Dismissal of the matter on October

13, 2006.  (See App. 28).  The parties again met at a second status hearing on the Motion for

Summary Dismissal on October 19, 2006.  (See App. 32).  Following the administrative hearing,

the OAH Judges issued an order on October 26, 2006 denying the Employee's Motion for

Summary Dismissal submitting to the parties that it would consider the arguments contained in

the Motion as part of the individual reports and recommendations to be issued for each

Employee.  (See App.30 at 2).  In the October 26, 2006 Order, denying Employees' Motion for

Summary Dismissal, the OAH Judges also noted that "the administrative review must be

completed before a final decision can be issued," and that it would issues its report and

recommendation at that time.  Id. Consequently, the 45-day deadline for a final decision was

once again modified and required that the DOC Director issue his final decision by December

15, 2006.  (See Id. at 3).  The OAH issued a Report and Recommendation in each case on

December 11, 2006, concluding that the summary removals could not be sustained and

recommending that the Employees be returned to work.  (See Apps. 33-40).

Instead of issuing a final decision returning the Employees to work, DOC Director Devon Brown submitted remand notices for most of the employees[3], well beyond the 45 day deadline, on January 9, 2007, directing the panel of administrative law judges to re-consider the determination and recommendations included in their Final Reports and Recommendation issued to the DOC pursuant to 6 DCMR 1616.6(a).  (See Apps. 41-48).   The Employees filed a Motion to Strike the Remand Notices on January 16, 2007, arguing that the Remand Notices were untimely.  (See App. 50).  The DOC filed its response to the Motion to Strike the Remand Notices on January 29, 2007 and the Employees filed their Reply on February 2, 2007.  (See App. 52; App. 53).  A hearing was held on February 5, 2007 in reference to the Remand Notices and the subsequent Response by the DOC.  (See App. 54).  The OAH Judges issued their Report and Recommendation on Remand in the individual Employees' cases on March 2, 2007, and once again recommended that Director Devon Brown reinstate them.  (See App. 57; App. 58). Further, the OAH Judges opined that the Remand Notices were filed late and that Director Brown unlawfully violated the 45-Day Rule requiring a final agency decision.  (See App. 57 at 5; App. 58 at 6-7).

In each Report and Recommendation issued by the OAH in this matter, the Judges found that Summary Removal could not be sustained.  (See Apps. 33-40).  Further, each report contained a procedural summary which acknowledged that the October 26, 2006 Order established a deadline for the final agency decision as December 15, 2006.  Id.  From the outset

---

[3]     Director Brown sent by letter Remand Notices to the single OAH Judge (Hon. Paul B. Handy) hearing the cases for Darryl Love and Malcolm Pointer on December 14, 2006.  The Remand Notices contained no certificate of service.  They were not filed with the OAH, nor were they served on their counsel or any other counsel in the cases.  However, the OAH Judge assumed that the parties were provided with copies of the Notice.  (See App. 54 at 14-17).  On December 28, 2006 the OAH Judge signed and dated a Report and Recommendation After Remand ("Report") in each of the two cases.  (See App. 55 at 2)  The Report did not contain a completed Certificate of Service.  Id.  At the February 5, 2007 status hearing, it was brought to the attention of the OAH Judge that none of the parties received a copy of the Report.  (See App. 54 at 14-17; 45-46).  Consequently, the OAH Judge ultimately refused to consider the Remand Notices.  (See App. 55 at 6).  He also found that there was no basis to reconsider his previous recommendation.  Id.

of this entire process, the DOC has refused to comply with the established rules of due process set out by the DCPM and the CBA between the DOC and the FOP/DOC Labor Committee. The regulations are clear that a final decision in these types of cases must be rendered within 45 days of delivery of the record. The regulations and the CBA are also clear that Director Brown may not depart from the recommendations of the OAH Judges because they recommend reinstatement. Director Brown is not free to impose a harsher sanction.

## IV. REASONS WRIT OF MANDAMUS SHOULD BE ISSUED

Petitioner Employees respectfully submit the following reasons why the extraordinary Writ of Mandamus should be issued in this case, pursuant to this Court's Rule 21 (a)(2)(A)(iv).

### A. The Proper Remedy In This Case Is An Order By The Court Compelling The DOC Director To Issue A Final Decision.

Though the OAH has conducted the administrative proceedings in this matter in compliance with the applicable D.C. regulations and the CBA, as the designated hearing officer, the Judges of the OAH have no authority to enforce administrative deadlines or compel agency action in this case. The DOC Director has violated District of Columbia laws, as well as the CBA which governs this matter, by failing to issue a final agency decision to return the Employees to work. Accordingly, it is up to the Court to provide the proper legal remedy and to compel Director Brown and the agency to issue the required final decision.

The proper remedy for administrative delay is an order compelling agency action. Ubediuwa v. D.C. Board of Directors, 818 A.2d 160, 164 (D.C. 2003). The Court of Appeals of the District of Columbia, pursuant to D.C. Code § 2-510(a)(2), has jurisdiction over matters of administrative delay and has the authority to issue a writ of mandamus "to compel agency action unlawfully withheld or unreasonably delayed." See also Dillard v. Yeldell, 334 A.2d 578 (D.C.

12

1975).  The Court's direct review of such matters is limited to those arising out of contested

cases.  United States v. D.C. Board of Zoning, 644 A.2d 995 (D.C. 1994).

Statutorily defined, a contested case is "a proceeding before the Mayor or any agency in

which the legal rights, duties or privileges of specific parties required by law, or by constitutional

right are to be determined after a hearing."  See D.C. Code §2-502 (8).  See also Renard v. D.C.

Department of Employment Services, 731 A.2d 413, 414 (D.C. 1999).  Jurisdiction of this Court

over such matters requires that an administrative hearing be either statutorily or constitutionally

compelled and that such a hearing be adjudicatory as opposed to legislative in nature.  Donnelly

v. D.C. Historic Preservation Review Board, 520 A.2d 270, 276 (D.C. 1987).  An administrative

proceeding is adjudicatory in nature if it is concerned with weighing particular information and

arriving at a decision about the rights of the specific parties.  Chevy Chase Citizens Association

v. D.C. Council, 377 A.2d 310, 313 (D.C. 1974).  See also Citizens Association of Georgetown

v. Washington, 291 A.2d 699 (D.C. 1972); United States v. D.C. Board of Zoning, 644 A.2d at

997.  Any proceeding which functions to make policy decisions directed toward the general

public is legislative in nature and is not a contested case under D.C. law.  Id.

This case is directly related to the rights of the Employees defined by the applicable

District of Columbia governmental regulations and the Constitution of the United States.  The

Employees in this case have done all they can to compel the DOC to issue a final decision in

compliance with the D.C. Personnel Regulations to no avail.  The proceedings in this case are

clearly related to their rights as D.C. public employees and not at all to any public regulatory

scheme.  The administrative proceeding that is the subject of this case is adjudicatory and has no

legislative implications.  Moreover, DOC Director Brown has unlawfully withheld an agency

decision in this matter.  Mandated by law, the DOC Director must issue a decision immediately,

and that decision must be that the Employees in this matter be returned to work immediately.

> **B.    The DOC Director Has Acted Unlawfully In His Failure to Render A Decision And Has No Choice Other Than To Return The Employees To Work.**

The summary removal of these Employees involves due process rights established to

protect property rights: in particular the Employees' property interest in their employment.  The

employees' property interest in employment derives from a legitimate claim of entitlement that

arises from independent sources such as the relevant regulations, agency rules and policies, or

employment agreements.  Board of Regents v. Roth, 408 U.S. 564, 577-78 (1972).  In this

current matter, the named Employees have a property interest in employment created by

statutory and regulatory mandate to which the DOC must adhere.  See Id at 578.

The regulations which govern the timing for final decisions in summary removal

proceedings require that a final decision be issued within forty-five days of the issuance of the

summary removal notice.  Furthermore, the 45-day deadline may only be extended with the

permission of the Employees who have been summarily removed:

> The final decision in the case of summary suspension or summary removal action taken pursuant to §§ 1615 1616, respectively, shall be rendered not later than forty-five (45) days from date of delivery of the summary suspension or summary removal notice, as appropriate except that the may be extended as follows:
>
> (a) when the employee requests and is granted an extension of time in which to respond  under § 1611.2; or
>
> (b) when the employee agrees to an extension of time requested by the agency.

6 DCMR 1614.3.

The OAH Judges have stated correctly and very clearly that the DOC is obligated to meet

a deadline, in this case the 45-day rule that has been set forth in a regulation.  (See App. 58 at 4).

A government agency cannot ignore a statutory mandate.  <u>Mannan v. D.C. Board of Medicine</u>, 588 A.2d 329, 334 (D.C. 1989).  Furthermore, Director Devon Brown has acted unlawfully in his failure to issue a final decision in this matter.  <u>See</u> <u>In Re Barr Laboratories v. National Association of Pharmaceutical Manufacturers</u>, 930 F.2d 72, 74 (D.C. Cir. 1991).

The DCPM, including the deadlines of 6 DCMR 1614.3, constitutes part of a mandatory system of procedures to which public employees are entitled as a matter of due process.  For example, in <u>Pitts v. D.C. General Hospital</u>, a case upon which the DOC has relied, the hearing officer found that the procedural deadlines for discharge of an employee were part of the constitutional due process rights of the employee.  Consequently, the hearing officer found that D.C. General's violation of a similar 45-day rule, D.C. Code Ann. § 1-617.1 (b-1) (1), required reinstatement of the employee.  The hearing officer reasoned that any violation of the package of due process rights afforded the employee required reversal of the disciplinary action.  OEA Matter No. 1601-0147-95, 47 D.C. Reg. 1696, 1704 (3/10/00).

This reading comports with the constitutional analysis the OAH Judges, serving as hearing officers, have already indulged in this case.  A government agency must engage in "scrupulous compliance" with its own procedures for discipline and removal of employees.  <u>Lerner v. District of Columbia</u>, 362 F. Supp.2d 149, 161 (D.D.C. 2005).  Furthermore, the Employees in this matter have every reason to expect that the administrative process will conclude in a timely manner.  <u>Wisconsin Avenue Nursing Home v. D.C. Commission on Human Rights</u>, 527 A.2d 282, 285 (D.C. 1987).

Any manipulation of the regulatory procedures in this matter is an unconstitutional violation of due process.  <u>Lerner v. District of Columbia</u>, 362 F. Supp at 161.  The OAH Judges have already found in each case that the DOC has made a mockery of the due process protections

afforded these Employees by D.C. law and the Constitution. (<u>See</u> App.57; App. 58). Moreover, it is unconstitutional for an agency to delay post-termination proceedings. <u>FDIC v. Mallen</u>, 486 U.S. 230, 242 (1988). This Court is clear that an agency must abide by the District of Columbia's statutory and regulatory mandates in disciplinary proceedings. <u>Mannan v. District of Columbia Board of Medicine</u>, 558 A.2d at 334. Accordingly, in this case, the DOC has no choice but to issue a decision in this case in compliance with the DCPM and CBA.

Moreover, the decision must be that the Employees be returned to work. Under the DCPM and the CBA, Director Brown has no discretion to depart from the recommendations of the OAH Judges. Section 1613.2 of the DCPM states with specificity that:

> The deciding official shall either sustain the penalty proposed, reduce it, remand the action with instruction for further consideration, or dismiss the action with or without prejudice, <u>but in no event shall he or she increase the penalty</u>.

(Emphasis supplied). 6 DCMR 1613.2. In addition, Article 11, Section 9(D) of the CBA specifically states:

> Deciding official shall issue a final decision after reviewing the decision of the Disinterested Designee/Hearing Officer. The deciding official may sustain or reduce the penalty recommended by the Disinterested Designee, remand the matter for further consideration by the Hearing Officer, or dismiss the charge <u>but may not increase the penalty recommended by the Disinterested Designee/Hearing Officer</u>.

In reviewing Director Brown's failure to issue a timely decision, the OAH Judges were initially interested in whether the 45-day time limit for a final decision was "mandatory or directory". (See App. 49 at 2). This dichotomy derives primarily from decisions of federal courts distinguishing between mere procedural deadlines and those that constitute part of a constitutional protection. This Court has discussed the dichotomy in <u>Mannan v. District of Columbia Board of Medicine</u>, 558 A.2d at 329. <u>Mannan</u> states that a time period is directory unless there is no consequence attached to the agency's failure to comply. <u>Id</u>.

Using this analysis, 6 DCMR 1614.3 is mandatory because DOC must comply with the 45-day rule <u>unless the employees affected by the proposed removal action agree to an extension of time request by the agency</u>.  6 DCMR 1614.3 (b).  Part of the regulatory procedure attached to the 45-day rule is that the DOC obtains consent from the Employees.  Since the DOC and Director Brown cannot disregard the employee's veto of a time extension, there is clear consequence to the statute.  The DOC and Director Brown can hardly argue they were not on notice of this deadline, as the OAH Judges addressed it twice in this proceeding and gave a specific date of December 15, 2006, for each Employee.  ( <u>See</u> App. 57 at 1; App. 58 at 1; App. 32 at 3).  Thus, the 45-day rule is mandatory under this analysis.  More properly stated, however, is that this provision is part of the procedures to which these Employees are constitutionally entitled, and cannot be altered by the DOC on a whim.  A plain reading of the 45-day rule supports the Employee's position that the time requirement is mandatory, and that the DOC has failed to adhere to a regulatory mandate by not issuing a final decision.[4]

In any event, the dichotomy and the 45 day rule are now irrelevant as Director Brown can render only one decision: reinstatement of the Employees as recommended by the OAH Judges.

---

[4]     The Court will uphold the interpretation of a statute by an administrative agency charged with statutory execution as long as the agency's reading and interpretation in not inconsistent with the plain language of the statute. <u>See</u> <u>D.C. Department of Corrections v. Teamster Union Local No. 246</u>, 554 A.2d 319, 322-23 (D.C. 1989).

V.    **<u>CONCLUSION</u>**

DOC Director Brown must follow the requirements laid out by the CBA and the DCPM. Both regulatory instruments require him to issue a final agency decision within an established time period.  The Director has failed to issue a decision.  Furthermore, the regulations, which the District of Columbia created to govern this process, require that the Director, in this case, return the Employees to work in compliance with the recommendation of the Office of Administrative Hearings acting as Hearing Officer.  Since the Director has wrongly withheld lawful agency action, the Writ of Mandamus should issue.

Respectfully submitted,

HANNON LAW GROUP, LLP

_____
J. Michael Hannon, D.C. Bar #: 353526
1901 18th Street, NW
Washington, DC 20009
(202) 232-1907
(202) 232-3704 Facsimile
jhannon@hannonlawgroup.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Petition for Writ of Mandamus to Compel Agency Action was served by hand this 12th day of February, 2007, to the following:

Director Devon Brown
c/o Maria Amato, Esq.
General Counsel
District of Columbia Department of Corrections
1923 Vermont Avenue, NW
Washington, D.C. 20001


_____
J. Michael Hannon

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Cynthia Washington
Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Officer Washington:

This correspondence constitutes official notification that the summary removal action that
removed you from your position of Correctional Officer, effective July 26, 2006, is
hereby rescinded and cancelled. You are further notified that you are to report to the
D.C. Department of Correction's Human Resources Office at 9:00 a.m., on Friday,
March 16, 2007 for reinstatement processing. The Office is located at 1923 Vermont
Avenue, N.W., Suite NB13, Washington, DC 20001. You will be reinstated to the
position of Correctional Officer with full back pay and benefits minus any offsets of
earnings (i.e., Unemployment Compensation, employment, etc.) retroactive to
July 27, 2006.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Herbert Douglas
Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Officer Douglas:

This correspondence constitutes official notification that the summary removal action that removed you from your position of Correctional Officer, effective July 26, 2006, is hereby rescinded and cancelled. You are further notified that you are to report to the D.C. Department of Correction's Human Resources Office at 9:00 a.m., on Friday, March 16, 2007 for reinstatement processing. The Office is located at 1923 Vermont Avenue, N.W., Suite NB13, Washington, DC 20001. You will be reinstated to the position of Correctional Officer with full back pay and benefits minus any offsets of earnings (i.e., Unemployment Compensation, employment, etc.) retroactive to July 27, 2006.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Lorenzo Jennings
Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Officer Jennings:

This correspondence constitutes official notification that the summary removal action that removed you from your position of Correctional Officer, effective July 26, 2006, is hereby rescinded and cancelled. You are further notified that you are to report to the D.C. Department of Correction's Human Resources Office at 9:00 a.m., on Friday, March 16, 2007 for reinstatement processing. The Office is located at 1923 Vermont Avenue, N.W., Suite NB13, Washington, DC 20001. You will be reinstated to the position of Correctional Officer with full back pay and benefits minus any offsets of earnings (i.e., Unemployment Compensation, employment, etc.) retroactive to July 27, 2006.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Dionne Makins
Lead Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Sergeant Makins:

This correspondence constitutes official notification that the summary removal action that removed you from your position of Correctional Officer, effective July 26, 2006, is hereby rescinded and cancelled. You are further notified that you are to report to the D.C. Department of Correction's Human Resources Office at 9:00 a.m., on Friday, March 16, 2007 for reinstatement processing. The Office is located at 1923 Vermont Avenue, N.W., Suite NB13, Washington, DC 20001. You will be reinstated to the position of Correctional Officer with full back pay and benefits minus any offsets of earnings (i.e., Unemployment Compensation, employment, etc.) retroactive to July 27, 2006.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Alphonso Bryant
Correctional Treatment Specialist
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Mr. Bryant:

This correspondence constitutes official notification that the summary removal action that removed you from your position of Correctional Treatment Specialist , effective July 28, 2006, is hereby rescinded and cancelled.  You are further notified that you are to report to the D.C. Department of Correction's Human Resources Office at 9:00 a.m., on Friday,
March 16, 2007 for reinstatement processing.  The Office is located at 1923 Vermont Avenue, N.W., Suite NB13, Washington, DC 20001.  You will be reinstated to the position of Correctional Officer with full back pay and benefits minus any offsets of earnings (i.e., Unemployment Compensation, employment, etc.) retroactive to July 29, 2006.

Sincerely,

Devon Brown
Director

cc:  Patricia Britton, Deputy Director
     William Smith, Warden
     Stanley Waldren, Deputy Warden
     J. Michael Hannon, Esq.
     Nila Ritenour, Union Chairperson
     Gary Brinson, Major
     Payroll Office
     HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Lowanda Hinton Saunders
Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Ms. Saunders:

This correspondence constitutes official notification that the summary removal action that removed you from your position of Correctional Officer, effective July 26, 2006, is hereby rescinded and cancelled. You are further notified that you are to report to the D.C. Department of Correction's Human Resources Office at 9:00 a.m., on Friday, March 16, 2007 for reinstatement processing. The Office is located at 1923 Vermont Avenue, N.W., Suite NB13, Washington, DC 20001. You will be reinstated to the position of Correctional Officer with full back pay and benefits minus any offsets of earnings (i.e., Unemployment Compensation, employment, etc.) retroactive to July 27, 2006.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Darryl Love
Correctional Treatment Specialist
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Mr. Love:

This correspondence constitutes official notification that the summary removal action that
removed you from your position of Correctional Treatment Specialist, effective
July 26, 2006, is hereby rescinded and cancelled. You are further notified that you are to
report to the D.C. Department of Correction's Human Resources Office at 9:00 a.m., on
Friday, March 16, 2007 for reinstatement processing. The Office is located at 1923
Vermont Avenue, N.W., Suite NB13, Washington, DC 20001. You will be reinstated to
the position of Correctional Officer with full back pay and benefits minus any offsets of
earnings (i.e., Unemployment Compensation, employment, etc.) retroactive to
July 27, 2006.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Malcolm Pointer
Correctional Treatment Specialist
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Mr. Pointer:

This correspondence constitutes official notification that the summary removal action that removed you from your position of Correctional Treatment Specialist, effective July 26, 2006, is hereby rescinded and cancelled.  You are further notified that you are to report to the D.C. Department of Correction's Human Resources Office at 9:00 a.m., on Friday, March 16, 2007 for reinstatement processing.  The Office is located at 1923 Vermont Avenue, N.W., Suite NB13, Washington, DC 20001.  You will be reinstated to the position of Correctional Officer with full back pay and benefits minus any offsets of earnings (i.e., Unemployment Compensation, employment, etc.) retroactive to July 27, 2006.

Sincerely,

Devon Brown
Director

cc:  Patricia Britton, Deputy Director
      William Smith, Warden
      Stanley Waldren, Deputy Warden
      J. Michael Hannon, Esq.
      Nila Ritenour, Union Chairperson
      Gary Brinson, Major
      Payroll Office
      HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Shantell Hatton
Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Officer Hatton:

This correspondence constitutes official notification that the summary removal action that
removed you from your position of Correctional Officer, effective July 26, 2006, is
hereby rescinded and cancelled. You are further notified that you are to report to the
D.C. Department of Correction's Human Resources Office at 9:00 a.m., on Friday,
March 16, 2007 for reinstatement processing. The Office is located at 1923 Vermont
Avenue, N.W., Suite NB13, Washington, DC 20001. You will be reinstated to the
position of Correctional Officer with full back pay and benefits minus any offsets of
earnings (i.e., Unemployment Compensation, employment, etc.) retroactive to
July 27, 2006.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM



March 15, 2007

Cynthia Washington
12303 Windbrook Drive
Clinton, Maryland 20735

Dear Ms. Washington:

This correspondence constitutes a twenty (20) day notice of proposal to terminate you
from your position of Correctional Officer with the D.C. Department of Corrections. The
action is proposed in accordance with provisions set forth in the District Personnel
Manual (DPM) Chapter 16. The proposed action is based on a charge of Negligence; tow
wit: any on-duty or employment related act or omission that interferes with the efficiency
or integrity of government operations. The specifications in support of the proposed
action are stated below:

**Specifications**:  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph
Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central
Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the
DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and
circumstances contributing to the escape of Inmates Leaks and Jones from the CDF
complex on Saturday, June 3, 2006. The OIA investigation substantiates that on
June 3, 2006, you were assigned to the Southeast One (1) (SE-1) housing unit. Your
primary functions were to maintain custody, security and accountability of all inmates in
your assigned housing unit. At approximately 9:42 a.m., Inmate Ricardo Jones walked
out of the SE-1 housing under the pretense of going to the Infirmary.

Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing
him to go to the Infirmary. Inmate Jones' name was placed on the housing unit
movement/running court sheet accounting for and authorizing his movement to the
Infirmary. However, according to Infirmary records, only six (6) inmates from SE-1
were scheduled for medical care in the Infirmary on June 3, 2006, and Inmate Jones was
not one of them.

The OIA Investigators conducted taped interviews with you regarding this matter on
Saturday, June 3, 2006. During the interview, you stated that Corporal Shantell Hatton

Cynthia Washington
Page 2

and Sergeant Dionne Makins worked in the unit with you on June 3, 2006. You stated that you did not recall the Infirmary calling for Inmate Jones. You stated that the only phone call you received was from a Lieutenant calling you to ask for your social security number in order to pay you for the overtime draft. You admitted that you made approximately three call-out passes, but not for any specific place and they were unnamed. You stated that Sergeant Makins also made some call-out passes, but could not confirm whether or not Officer Hatton made any. You also recalled that at some point all three of you were in and out of the bubble. When asked if you recalled any specific inmate(s) you gave a pass to, you responded, "I don't recall me giving anybody a pass; I'm thinking that Miss Hatton gave the passes." You explained that Officer Hatton had the running board, and she was the one that was checking them off on the running board.

As previously stated, the OIA investigation substantiated that Inmate Jones was not on the Sick Call List scheduled for medical care on June 3, 2006. You stated that you did not receive a phone call from the Infirmary or anywhere else for Inmate Jones to report to medical; you did not recall Inmate Jones complaining to you or any of the officers in the unit of being sick, and you never made a call-out pass for Inmate Ricardo Jones. However, Inmate Jones was in possession of a movement pass which authorized him to proceed to the Infirmary. In addition Inmate Jones' name was placed on the housing unit movement/running count sheet, which would explain/substantiate his absence from the housing unit.

As an Officer assigned to the SE-1 housing unit, it was your responsibility as well as the responsibility of Sergeant Makins and Officer Hatton to confirm Inmate Jones' need for medical treatment; the availability of medical staff to check Inmate Jones and seek authorization for his movement to the Infirmary via a call out pass or escort pursuant to sick call and Infirmary protocols.

The OIA Investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled Infirmary appointment. The investigation further concluded that each correctional officer assigned to SE-1 housing unit to include you, was culpable, because it was the responsibility of each officer assigned, individually and collectively, to ensure the accurate accountability of each inmate assigned to the housing unit. Therefore, you failed to properly carry out your assigned duties.

Your negligence in this matter violates the following Departmental policy:

Program Statement 5010.2c: Accountability for Inmates, which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Cynthia Washington
Page 3

Basic Regulations of All Employees:

Section 1.1 Operational Knowledge Required:   Employees are required to have complete
understanding of their Position Description and all regulations, rules, Policies and
Procedures pertaining to the Department and their Division, Service and Unit, and to
comply therewith.  Employees are responsible for the understanding and compliance with
all documents posted on official Bulletin Board.

Section 1.4  Attention to Duty, "employees are required to devote their entire attention to
their official duties; and,

Correctional Officer's General Orders #1, "Take charge of this post and all government
property on or near it".  General Order #8, "Account for all inmates in my charge and
immediately report any unauthorized absences to the shift commander or other officials
in the chain-of-command".

Your negligence in this matter contributed to the successful escape of Inmate Ricardo
Jones and placed staff, inmates and the public at large in considerable capricious danger.
Notwithstanding, are the detrimental public relations incurred by the agency, potentially
lack of confidence and insecurity the public now experience.  The position of
Correctional Officer is one of trust, reliance and confidence.  Each correctional employee
has fiduciary responsibilities to the public in general and to the citizens of the District of
Columbia.  The citizens of the District of Columbia entrust correctional employees to
provide a safe and secure facility.  This task is effectuated when policies and procedures
are followed, respected and maintained by staff.

The charge of negligence involves conduct/performance which falls below the
standard established by Law for the protection of others against unreasonable risk
of harm.  Here, your actions substantially placed staff, inmates, the surrounding
community and the general public at large in momentous unpredictable danger.  A
jail or correctional system's primary responsibility is custody, care and control of
inmates committed to its ward.  Your conduct substantiates an unreasonable and
unjustifiable departure of correctional responsibilities, and therefore, warrants
your removal.

You have the right to review any material upon which the proposed action is based, and
to prepare a written response to the notice, including affidavits and other documentation
within 6 days of receipt of the notice.  You are entitled to an administrative review by a
Hearing Officer.  Upon request, the Hearing Officer will conduct a hearing.  You are
further informed of your right to be represented by an attorney or other representative.

Cynthia Washington
Page 4

Your response, should you prepare one, may raise every defense, fact or supporting
matter in extenuation, exculpation, or mitigation of which you have knowledge or
reasonably should have knowledge, or which is relevant to the reasons in support of the
proposed action, specification(s), or proposed penalty.

Henry R. Lesansky, Ph.D, Health Services Administrator has been appointed as the
Hearing Officer to conduct the administrative review and/or administrative hearing for
the proposed removal action.  Accordingly, any response you prepare must be submitted
to:

> Henry R. Lessansky, Ph.D
> Health Services Administration
> 1923 Vermont Avenue, N.W.
> Suite N-121
> Washington, D.C. 20001
> (202) 671-2069 Telephone

In conducting the administrative review and/or hearing, your appointed Hearing Officer
will review all of the documents giving rise to the charge of Negligence, this written
notice and your response, if there is one.  After conducting the administrative review,
your assigned Hearing Officer will make a written report and recommendation to
Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of
Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC
20001.  You may arrange to review the material by contacting Denise Shell, Management
Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Deputy Warden for Operations



March 15, 2007

Herbert Douglas
3808 71st Avenue
Landover, Hills, Maryland  20784

Dear Mr. Douglas:

This correspondence constitutes a twenty (20) day notice of proposal to terminate you
from your position of Correctional Officer with the D.C. Department of Corrections.  The
action is proposed in accordance with provisions set forth in the District Personnel
Manual (DPM) Chapter 16.  The proposed action is based on the charge of Negligence; to
wit: any on-duty or employment related act or omission that interferes with the efficiency
or integrity of government operations.  The specifications in support of the proposed
action are stated below.

**Specifications**:  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph
Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central
Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the
DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and
circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on
Saturday, June 3, 2006.

The OIA investigation substantiated the following:

On Saturday, June 3, 2006 at approximately 7:00 a.m., you entered the North One (1)
housing unit and removed nine (9) detail inmates, including Inmate Joseph Leaks.  These
inmates were employed in various off unit environmental work assignments throughout
the CDF.  You escorted these inmates to their assigned areas of responsibility.  You
removed six (6) additional detail inmates from the Southwest Two (2) housing unit who
were also assigned to work various environmental work detailed throughout the CDF.

You escorted Inmate Leaks, along with three other detail inmates to their assigned work
areas on the second floor of the administrative module.  Inmate Leaks' daily primary

Herbert Douglas
Page 2

responsibility on this work detail was to clean the common areas, which included the Officer's Dining Room, the Environmental Office and the employee's locker rooms on the second floor. You unlocked the supply locker containing various cleaning materials and equipment to include floor buffers.

Inmate Leaks stated that prior to his initial departure from the second floor of the administrative module, he told you to "leave the area because something was about to happen." According to Inmate Leaks, you complied with his request and departed the area leaving him and the other inmates unattended. According to Inmate Mohammad Rashid, you remained in the area for approximately twenty (20) minutes before leaving.

At some point after you left, Inmate Leaks, left his assigned detail post assignment and proceeded through the Administrative Two door into the inmate housing unit area where he ultimately met up with Inmate Ricardo Jones.

According to Inmate Leaks upon his return to the second floor of the administrative module, he was accompanied by Inmate Ricardo Jones. Inmate Leaks stated that he and Inmate Jones removed a buffer from the supply locker that you left unsecured.

The OIA Investigators conducted taped interviews with you regarding this matter on Saturday, June 3, 2006. During the interview, you stated that your assignment on Saturday, June 3, 2006 was supervising the details that are assigned to clean the facility. You confirmed that Inmate Joseph Leaks was assigned to your environmental detail squad on June 3, 2006. You also confirm that Inmate Leaks accompanied you to the storage (cage) area where the buffer used by the two escapees was stored. You stated that you unlocked the cage and left it unsecured as this is the practice. When asked, "How long did you -- after Leaks went up to that locker, did you stay with him after that? You responded that you went on to place the other inmates. You stated that you left Inmate Leaks on the second floor; that he should have been cleaning the bathrooms, the ODR and the hallway. You stated that after you opened the Environmental Office Inmate Leaks came in and got a cup of coffee. You admit that you left Inmate Leaks unattended while you went to oversee the inmates cleaning the visiting hall. You could not recall if that was the last time you saw Inmate Leaks.

The OIA Investigation concluded that you abandoned you responsibilities, which were to ensure that inmates under your custody were properly supervised. As a result of your negligence, Inmates Joseph Leaks and Ricardo Jones successfully escaped from the CDF.

Your negligence in this matter contributed to the successful escape of Inmate Ricardo Jones and placed staff, inmates and the public at large in considerable capricious danger. Notwithstanding, are the detrimental public relations incurred by the agency, potential lack of confidence and insecurity the public now experience. The position of Correctional Officer is one of trust, reliance and confidence. Each correctional employee

Herbert Douglas
Page 3

has fiduciary responsibilities to the public in general and to the citizens of the District of
Columbia. The citizens of the District of Columbia entrust correctional employees to
provide a safe and secure facility. This task is effectuated when policies and procedures
are followed, respected and maintained by staff.

The vigilance of a Correctional Officer is indispensable to the safe keeping of inmates
committed to the custody of the DOC. As a Correctional Officer you were charged with
the safe keeping of inmates, which is of vital importance to the citizens and the
Government of the District of Columbia.

Your negligence in this matter violates the following regulations and policies:

Program Statement 5010.2c: Accountability of Inmates, states that "Correctional
Officers are responsible for maintaining accountability for all inmates in their area of
responsibility."

 Basic Regulations of All Employees:

Section 1.1, Operational Knowledge Required: Employees are required to have complete
understanding of their Position Description and all regulations, rules, policies and
Procedures pertaining to the Department and their Division, Service and Unit, and to
Comply herewith. Employees are responsible for the understanding and compliance with
all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty, "employees are required to devote their entire attention to
their official duties;

Section 2.1, Count and Security, it is the duty of the correctional officer to accept
responsibility for keeping an accurate count of inmates not only at formal count periods
during a shift, but at all times when inmates are assigned to his or pass through his post;

Section 2.18, Work Detail Posts, Correctional personnel assigned to work details in
addition to all other duties prescribed and implied must: escort inmate to and from all
work are in an orderly, prompt manner, supervise maintain check, prevent loafing,
idleness, and adhere to all special or unique instructions pertaining to a job.

Correctional Officer General Order #8, "Account for all residents in their charge and
immediately report any authorized absences to Shift Supervisor or other officials in the
chain-of-commands.

The charge of negligence involves conduct/performance which falls below the
standard established by Law for the protection of others against unreasonable risk
of harm. Here, your actions substantially placed staff, inmates, the surrounding

Herbert Douglas
Page 4

community and the general public at large in momentous unpredictable danger. A
jail or correctional system's primary responsibility is custody, care and control of
inmates committed to its ward. Your conduct substantiates an unreasonable and
unjustifiable departure of correctional responsibilities, and therefore, warrants
your removal.

You have the right to review any material upon which the proposed action is based, and
to prepare a written response to the notice, including affidavits and other documentation
within 6 days of receipt of the notice. You are entitled to an administrative review by a
Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are
further informed of your right to be represented by an attorney or other representative.
Your response should you prepare one, may raise every defense, fact or supporting matter
in extenuation, exculpation, or mitigation of which you have knowledge or reasonably
should have knowledge, or which is relevant to the reasons in support of the proposed
action, specification(s), or proposed penalty.

Henry R. Lesansky, Ph.D, Health Services Administrator has been appointed as the
Hearing Officer to conduct the administrative review and/or administrative hearing for
the proposed removal action. Accordingly, any response you prepare must be submitted
to:

> Henry R. Lesansky, Ph.D
> Health Services Administration
> 1923 Vermont Avenue, N.W.
> Suite N-121
> Washington, D.C. 20001
> (202) 671-2069 Telephone

In conducting the administrative review and/or hearing, your appointed Hearing Officer
will review all of the documents giving rise to the charge of Negligence, this written
notice and your response, if there is one. After conducting the administrative review,
your assigned Hearing Officer will make a written report and recommendation to
Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of
Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC
20001. You may arrange to review the material by contacting Denise Shell, Management
Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Deputy Warden for Operations



March 15, 2007

Lorenzo Jennings
9701 Varus Place
Upper Marlboro, Maryland  20772

Dear Mr. Jennings

This correspondence constitutes a twenty (20) day notice of proposal to terminate you from your position of Correctional Officer with the D.C. Department of Corrections. The action is proposed in accordance with provisions set forth in the District Personnel Manual (DPM) Chapter 16. The proposed action is based on the charge of Negligence; to wit: any on-duty or employment related act or omission that interferes with the efficiency or integrity of government operations. The specifications in support of the proposed action are stated below.

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF complex on Saturday, June 3, 2006. The OIA investigation determined that approximately three weeks prior to the escape, you observed Inmate Carlton Beachum, environmental squad inmate, walk out of an unauthorized area, the staff restroom. According to the Investigative Report you challenged Inmate Beachum, confiscated his environmental squad identification card and escorted Inmate Beachum back to his housing unit.

On June 3, 2006, prior to his escape, Inmate Ricardo Jones was wearing the squad identification card you confiscated from Inmate Beachum. This identification card allowed inmate Jones access to the administrative area of the CDF. The OIA Investigation also determined that you failed to prepare the required disciplinary report and the required Inmate Personnel Action Request Form to terminate Inmate Beachum from his environmental detail.

Lorenzo Jennings
Page 2

Internal Affairs Investigators Benjamin Collins and Valarie Beard interviewed you
regarding this matter on June 3, 2006. During the interview you confirmed that you
caught Inmate Beachum in violation by exiting the staff restroom. You stated that when
you challenged Inmate Beachum, he became hostile, so you took his ID card and placed
him back in the unit in his cell. When asked what you did with the ID card, you stated
that you kept the card for that day then put it in Captain Holmes' office. You
acknowledged that Capt. Holmes had not arrived at work at the time that you put the ID
in his office, but you were able to enter the office because you had a key. You
acknowledged that when Corporal Hudson questioned you about the ID card you
informed him that you would give the ID back to him when you checked with Captain
Holmes. However, you did not discuss the incident with Capt. Holmes. You stated a
couple of days later, "I just passed on the information to him and that was that." When
asked if you returned the ID to North One, you responded, "Not that I know of."

You told OIA Investigators that you did not write a disciplinary report on Inmate
Beacham because you figured that maybe you could just let him stay in a day or two and
would give the ID card back to the squad officer.

You also informed OIA Investigators that you have been assigned to Environmental since
July 2005. You explained your assigned duties as Environmental Officer as; "to get the
guys out and supervise the guys while they clean up and do the detail." You
acknowledged that you were assigned to the inmates that would come to the
administrative side of the CDF. You further acknowledged that Inmates Leaks, was
assigned to your squad. You recalled that Inmate Leaks cleaned the Warden's Office on
Friday, June 2, 2006. You stated that you were in the office with him while he was
cleaning. You further stated that a vacuum cleaner and trash bags were the only
equipment Inmate Leaks used to clean the area.

The OIA Investigation concluded that your account of where you placed Inmate
Beachum's Environmental detail card was not substantiated. It was further concluded
that your actions were contributing factors that created an opportunity for Inmates Leaks
and Jones to execute a plan of escape from the CDF.

Your negligence in this matter violated the following departmental policies:

Central Detention Facility Post Orders, Non-Industrial Pay System dated, April 19, 2002,
which states the following:

> **Squad Removal/Changes** "6a", Squad Officers may submit a termination form
> to the NIPS Coordinator for any inmate who does not perform duties assigned or
> who is no longer willing to work. If terminated from one squad, an inmate cannot
> switch to another squad or be considered for hire for at least 90 days.

Lorenzo Jennings
Page 3

> (b) Termination of detail shall only be approved by the Deputy Warden for
> Support Services.
>
> (c) In cases of disciplinary actions, a copy of the disciplinary report must be
> attached to the request for personnel action form. Inmates with a pending
> disciplinary report will be suspended from the detail until the recommendations
> of the Adjustment Board and the decision of the final official is complete."

Basic Regulations for all Employees

Section 1.1, Operational Knowledge Required: Employees are required to have
complete understanding of their Position Description and all regulations, rules, Policies
and Procedures pertaining to the Department and their Division, Service and Unit, and to
comply therewith. Employees are responsible for the understanding and compliance with
all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty, "employees are required to devote their entire attention to
their official duties; and,

Correctional Officer's General Orders #1, "Take charge of this post and all government
property on or near it".

Correctional Officers' General Order # 9, Prepare and submit to the shift supervisor
disciplinary reports on all inmates who commit violations of orders, rules and regulations.

Your negligence in this matter not only contributed to the successful escape of Inmates
Leaks and Jones, it also placed staff, inmates and the public at large in considerable
danger. The vigilance of a Correctional Officer is indispensable to the safe keeping of
inmates committed to the custody of the DOC. As a Correctional Officer you were
charged with a duty to safe keeping of inmates, which is of vital importance to the
citizens and the Government of the District of Columbia.

The charge of negligence involves conduct/performance which falls below the
standard established by Law for the protection of others against unreasonable risk
of harm. Here, your actions substantially placed staff, inmates, the surrounding
community and the general public at large in momentous unpredictable danger. A
jail or correctional system's primary responsibility is custody, care and control of
inmates committed to its ward. Your conduct substantiates an unreasonable and
unjustifiable departure of correctional responsibilities, and therefore, warrants
your removal.

Lorenzo Jennings
Page 4

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

Henry R. Lesansky, Ph.D, Health Services Administrator had been appointed as the Hearing Officer to conduct the administrative review and/or administrative hearing for the proposed removal action. Accordingly, any response you prepare must be submitted to:

> Henry R. Lesansky, Ph.D
> Health Services Administration
> 1923 Vermont Avenue, N.W.
> Suite N-121
> Washington, D.C. 20001
> (202) 671-2069  Telephone

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001. You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Deputy Warden for Operations



March 15, 2007

Dionne Makins
7301 Flag Harbor Dr
District Heights, Maryland 20747

Dear Ms. Makins:

This correspondence constitutes a twenty (20) day notice of proposal to terminate you
from your position of Correctional Officer (Sergeant) with the D.C. Department of
Corrections. The action is proposed in accordance with provisions set forth in the
District Personnel Manual (DPM) Chapter 16. The proposed action is based on the
charge of Negligence; to wit: any on-duty or employment related act or omission that
interferes with the efficiency or integrity of government operations. The specifications in
support of the proposed action are stated below.

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph
Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central
Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections (DOC), Devon
Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify
facts and circumstances contributing to the escape of Inmates Leaks and Jones from the
CDF complex on Saturday, June 3, 2006. The OIA Investigation substantiates that on
June 3, 2006, you were the assigned Office-In-Charge (OIC) of Southeast One (1) (SE-1)
housing unit. Your primary functions were to maintain custody, security and
accountability of all inmates in your assigned housing unit and provide supervision to all
subordinate officers assigned to your unit. At approximately 9:42 a.m., Inmate Ricardo
Jones walked out of the SE-1 housing under the pretense of going to the Infirmary.

Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing
him to go to the Infirmary. Inmate Jones' name was placed on the housing unit
movement/running count sheet, accounting for and authorizing his movement to the
Infirmary. However, according to Infirmary records, only six (6) inmates from SE-1
were scheduled for medical care in the Infirmary on June 3, 2006. Inmate Ricardo Jones
was not one of them.

OIA Investigators conducted taped interviews with you regarding this matter on

Dionne Makins
Page 2

Saturday, June 3, 2006 and on Friday, June 16, 2006. During the interviews, you stated that Corporal Hatton and Corporal Washington worked in the unit with you on June 3, 2006. You further stated that after calling the count into the count book, you proceeded to cut the call-out passes and date them. You stated that you made all your passes that you were aware of and Miss Hatton put them on the movement sheet. You stated that the inmates that were going to the Infirmary already had their passes; so all they had to do was wave their hands with their passes. You stated Inmate Ricardo Jones, who was in cell 18 flagged out, he had a pass. You said you asked him where he was going, he responded, "to the Infirmary." You admitted that you only glanced at the call-out pass and stated, "I didn't pay attention to whether he had it. I told him to give it to Miss Hatton." You indicated that Miss Hatton signed the pass and put him on the movement sheet. Your recollection of events clearly demonstrates your failure to follow written and verbal instructions. Based on your own admission, you failed to confirm the authenticity of Inmate Jones' comments and confirm his authorization for medical treatment.

You stated, after receiving the radio transmission to "Lock the jail down" you and Officer Washington proceeded to do so. You stated that you checked the movement sheet for the inmates that were coming back from the infirmary. You stated you called the Infirmary and found that Inmate Crawford was still there. However, when you called and inquired about Inmate Ricardo Jones, you were told that he was not there. You then heard the radio transmission, and called the command center and were informed that Inmate Jones had escaped.

The OIA investigation substantiates that Inmate Jones was not on the Sick Call List scheduled for medical care on June 3, 2006. You confirmed that you did not receive a phone call from the infirmary or anywhere else for Inmate Jones to report to medical; that you did not recall Inmate Jones complaining to you or any of the officers in the unit of being sick, and you never made a call-out pass for Inmate Ricardo Jones. However, Inmate Jones was in possession of a movement pass which authorized him to proceed to the infirmary. In addition, Inmate Jones' name was placed on the housing unit movement/running count sheet, which would explain or substantiate his absence from the housing unit.

As stated previously, the OIA investigation revealed that there were 6 inmates scheduled and authorized movement to the infirmary for medical treatment on June 3, 2006. Inmate Jones was not included with this group. As the OIC of the unit it was your responsibility as well as the subordinate officers (Washington and Hatton) assigned to the unit to confirm Inmate Jones' need for medical treatment; the availability of medical staff to check Inmate Jones; and seek authorization for his movement to the infirmary via a call out pass or escort pursuant to sick call and infirmary protocols.

Dionne Makins
Page 3

The investigation further revealed that neither you nor the officers assigned to the unit (Washington and Hatton) have knowledge or indicated as to why or by what authorization Inmate Jones was permitted to exit the unit, a controlled secure environment that only staff can authorize or effectuate using mechanical devices to allow inmates to enter and exit.

The OIA Investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment.  The Investigation further concluded that each correctional officer assigned to SE-1 housing unit to include you was culpable, because it was the responsibility of each employee assigned individually and collectively to ensure the accurate accountability of each inmate assigned to the housing unit. Therefore, you failed to properly carry out your assigned duties.  Your negligence is aggravated by the fact that you were the **Lead** Officer-In-Charge.

Your negligence in this matter violates the following Departmental policy:

Program Statement 5010.2c:  Accountability for Inmates, which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations for All Employees:

Section 1.1, Operational Knowledge Required:  Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith.  Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty:  Employees are required to devote their entire attention to their official duties; and,

Correctional Officer's General Orders:

Number 1, Take charge of this post and all government property on or near it.

Number 8, Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command.

Your negligence in this matter contributed to the successful escape of Inmate Ricardo Jones and placed staff, inmates and the public at large in considerable capricious danger. Notwithstanding, are the detrimental public relations incurred by the agency, potentially

Dionne Makins
Page 4

lack of confidence and insecurity the public now experience. The position of **Lead**
Correctional Officer (Sergeant) is one of trust, reliance and confidence. Each
correctional employee has fiduciary responsibilities to the public in general and to the
citizens of the District of Columbia. The citizens of the District of Columbia entrust
correctional employees to provide a safe and secure facility. This task is effectuated
when policies and procedures are followed, respected and maintained by staff.

The charge of negligence involves conduct/performance which falls below the
standard established by Law for the protection of others against unreasonable risk
of harm. Here, your actions substantially placed staff, inmates, the surrounding
community and the general public at large in momentous unpredictable danger. A
jail or correctional system's primary responsibility is custody, care and control of
inmates committed to its ward. Your conduct substantiates an unreasonable and
unjustifiable departure of correctional responsibilities, and therefore, warrants
your removal.

You have the right to review any material upon which the proposed action is based, and
to prepare a written response to the notice, including affidavits and other documentation
within 6 days of receipt of the notice. You are entitled to an administrative review by a
Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are
further informed of your right to be represented by an attorney or other representative.
Your response should you prepare one, may raise every defense, fact or supporting matter
in extenuation, exculpation, or mitigation of which you have knowledge or reasonably
should have knowledge, or which is relevant to the reasons in support of the proposed
action, specification(s), or proposed penalty.

Henry R. Lesansky, Ph.D, Health Services Administrator has been appointed as the
Hearing Officer to conduct the administrative review and/or administrative hearing for
the proposed removal action. Accordingly, any response you prepare must be submitted
to:

> Henry R. Lesansky, Ph.D
> Health Services Administration
> 1923 Vermont Avenue, N.W.
> Suite N-121
> Washington, D.C. 20001
> (202) 671-2069

In conducting the administrative review and/or hearing, your appointed Hearing Officer
will review all of the documents giving rise to the charge of Negligence, this written
notice and your response, if there is one. After conducting the administrative review,
your assigned Hearing Officer will make a written report and recommendation to
Director Devon Brown, the Deciding Official, who will issue a final decision.

Dionne Makins
Page 5

The material upon which the proposed action is based may be reviewed in the Office of
Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC
20001. You may arrange to review the material by contacting Denise Shell, Management
Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Deputy Warden for Operations



March 15, 2007

Alphonso Bryant
1273 Oats Street N.E.
Washington, DC 20002

Dear Mr. Bryant:

This correspondence constitutes a twenty (20) notice of proposal to terminate you from your position of Correctional Treatment Specialist with the D.C. Department of Corrections. The action proposed is in accordance with provisions set forth in the District Personnel Manual (DPM) Chapter 16. The proposed action is based on a charge of Negligence; to wit: any on-duty or employment related act or omission that interferes with the efficiency or integrity of government operations. The specifications in support of the proposed action are stated below.

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006. The OIA Investigation into the escape, determined that you failed to correctly screen inmate Joseph Leaks for work detail and resultantly, inmates Leaks and Jones escaped from the Central Detention Facility on June 3, 2006. The OIA Investigation substantiated the following:

A separation order was placed in Inmates Leaks and Jones' institutional files and in the Jail and Community Correctional System (JACCS), at the request of the United States Attorney's Office (USAO) on August 26, 2005. This order required that inmates Leaks and Jones be kept apart at all times, including while being transported to and from court.

On February 14, 2006, you approved Inmate Leaks' Personnel Action Request Form for placement on work detail. In the comments section of the form you wrote: "Separations (See Attached)."

Alphonso Bryant
Page 2

During your interview with OIA Investigators on June 27, 2006, you were asked;
"Specifically how do you determine if an inmate is eligible for work detail?" You
stated that you use the NIPS Post Order, which clearly outlines the eligibility of
inmates for possible detail placement. You stated that when you screened inmate
Leaks in February 2006, you utilized the information data base systems, JAACS
and PRISM. You acknowledged that you did not use Inmate Leaks' institutional
file. You explained that when screening an inmate for detail, you initially look at
his custody level, then his offense to determine if he has any flags such as
separation order or outstanding warrants, detainers, medical flags and prior
criminal history.

You further explained that your responsibility was to screen inmates to determine
if they are suitable candidates for placement on work detail. You stated that you
either write **OK** or **No** on the inmate's NIP Personnel Action Form to indicate
eligibility.

You admitted that you indicated "OK" on Inmate Leaks' NIPS Personnel Action.
You also admitted that you indicated on the form that Inmate Leaks had a
Separation Order

The Non-Industrial Pay System (NIPS)Post Order dated April 19, 2002, Section
4, Eligibility Subpart b. Office unit/Inside only Detail Paragraphs (3) (5) and (6)
provides,

(3) Felons: Convicted felons are eligible. Sentenced Felons whose total sentence
does not exceed five years are eligible for Off Unit/Inside only work detail.

(5) Inmates with Separation Orders from other inmates housed at CDF are not
considered appropriate for placement. Inmates assigned to R&D must be free of
Separation Orders.

(6) Parole Violators who are within two(2) years of a scheduled release date and
who have obtained minimum custody status.

On August 18, 2005 Inmate Leaks was committed to the CDF as a U. S. Parole
Violator. He was sentenced to serve 24 years (Aggregate) for his underlying 1998
Assault with a Deadly Weapons charge and was released on September 24, 2003
on parole with 4,383 days remaining to be served. As previously stated, you were
aware that inmate Leaks had a Separation Order.

In addition, based on your statement, that during your screening of Inmate Leaks,
you reviewed PRISM. The OIA Investigation concluded that you failed to note
Inmate Leaks' history of escape as listed in PRISM.

Alphonso Bryant
Page 3

The OIA Investigation concluded that you were negligent in the performance of your duties, as you failed to thoroughly screen Inmate Leaks for an Off Unit work detail in accordance with NIPS regulations.

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

Henry R. Lesansky, Ph.D, Health Services Administrator has been appointed as the Hearing Officer to conduct the administrative review and/or administrative hearing for the proposed removal action. Accordingly, any response you prepare must be submitted to:

> Henry R. Lesansky, Ph.D
> Health Services Administration
> 1923 Vermont Avenue, N.W.
> Suite N-121
> Washington, D.C. 20001
> (202) 671-2069  Telephone

In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge of Negligence, this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

Alphonso Bryant
Page 4

The material upon which the proposed action is based may be reviewed in the Office of
Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC
20001. You may arrange to review the material by contacting Denise Shell, Management
Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Deputy Warden for Operations



March 15, 2007

Lawanda Hinton-Saunders
11789 Majestic Place
Waldorf, Maryland 20601

Dear Ms. Hinton-Saunders

This correspondence constitutes a twenty (20) days notice of proposal to terminate you from your position of Correctional Officer with the D.C. Department of Corrections. The action is proposed in accordance with provisions set forth in the District Personnel Manual (DPM) Chapter 16. The proposed action is based on the charge of Negligence; to wit: any on-duty or employment related act or omission that interferes with the efficiency or integrity of government operations. The specifications in support of the proposed actions are stated below:

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections (DOC), Devon Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and circumstances contributing to the escape of Inmates Leaks and Jones from the CDF on Saturday, June 3, 2006. The OIA Investigation into the escape revealed that on Saturday, June 3, 2006 your assigned post was Administrative Module Officer #2, on the #2 Shift. As the Administrative Two Officer, you were responsible for controlling and maintaining the gate (Administrative Two Door) that separates the inmate housing units from the administrative areas of the CDF. In this capacity you were responsible for ensuring that all inmates passing through your area were authorized to do so by examination of identification, armband, inmate callout pass, etc.

On June 3, 2006, Inmate Joseph Leaks was escorted to his assigned work detail on the Second Floor of the Administrative Module. Inmate Leaks' primary responsibility on this work detail was to clean the common areas, which included the Officer's Dining Room, Environmental Office and employee's locker rooms on the second floor. At some point, Inmate Leaks, who was wearing a green environmental identification card, left his

Lawanda Hinton-Saunders
Page 2

assigned detail post assignment in this module area and proceeded through the
Administrative Two door into the inmate housing unit area where he ultimately met up
with Inmate Ricardo Jones. According to Inmate Leaks, you unlocked the door and
allowed both he and Inmate Jones, who was also wearing a green environmental detail
badge, through the Administrative Two door onto the second floor of the administrative
module. Investigation disclosed that the badge worn by Inmate Jones belonged to and
bears the photo of Inmate Carlton Beachum. The inmates removed a floor buffer from
the Administrative Two supply room, walked down one flight of stairs to the first floor
Administrative Module and used the buffer to knock out a window in the Warden's
Office to effect their escape.

The OIA Investigators interviewed you regarding this matter on Saturday, June 3, 2006
and on Monday, July 3, 2006.

During the June 3, 2006 interview, you maintained that you did not allow any inmates
entrance through the door leading to the administrative module. You stated that you left
your post on several occasions during the shift in order to escort inmates to the Visitor's
Hall and to review your annual performance evaluation. You further stated that at
approximately 9:45 p.m., you observed Officer Herbert Douglas walk two black male
inmates through the door into the administrative module.

In a subsequent interview with OIA on July 3, 2006, you admitted that on June 3, 2006,
between 9:40 a.m., and 9:50 a.m., you unlocked the Administrative Two door in order to
allow Inmate Mohammad Rashid entry. You stated that Officer Douglas was standing
near the door with Inmate Rashid at this time. During a later telephone conversation with
OIA on July 3, 2006, you stated that you did not see Officer Herbert Douglas open the
Administrative Two door for two black male inmates on June 3, 2006 as you had
previously stated in your June 3, 2006 interview.

The OIA Investigation concluded that you failed to carry out your responsibilities to
ensure that the inmates you allowed through your area of responsibility were authorized
to do so. You failed to verify the Detail Identification Pass that Inmate Jones had in his
possession. If you had authenticated Inmate Jones' pass you would have discovered that
he was carrying the Detail Identification Pass belonging to Inmate Carlton Beachum,
alerting you to a possible security breach.

Your negligence in this matter contributed to the successful escape of Inmates Jones and
Leaks and placed staff, inmates and the public at large in considerable capricious danger.

Notwithstanding, are the detrimental public relations incurred by the agency, potentially
lack of confidence and insecurity the public now experience. The position of
Correctional Officer is one of trust, reliance and confidence. Each correctional employee
has fiduciary responsibilities to the public in general and to the citizens of the District of

Lawanda Hinton-Saunders
Page 3

Columbia. The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility. This task is effectuated when policies and procedures are followed, respected and maintained by staff.

Your Negligence in this matter violated the following Departmental policy:

Program Statement 5010.2c: Accountability for Inmates, which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations of All Employees:

1.1, Operational Knowledge Required:  Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

1.4, Attention to Duty, "employees are required to devote their entire attention to their official duties; and,

Correctional Officer's General Orders #1, "Take charge of this post and all government property on or near it". General Order #8, "Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command".

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk of harm. Here, your actions substantially placed staff, inmates, the surrounding community and the general public at large in momentous unpredictable danger. A jail or correctional system's primary responsibility is custody, care and control of inmates committed to its ward. Your conduct substantiates an unreasonable and unjustifiable departure of correctional responsibilities, and therefore, warrants your removal.

You have the right to review any material upon which the proposed action is based, and to prepare a written response to the notice, including affidavits and other documentation within 6 days of receipt of the notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative. Your response should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed

Lawanda Hinton-Saunders
Page 4

action, specification(s), or proposed penalty.

Henry R. Lesansky, Ph,D, Health Services Administrator has been appointed as the
Hearing Officer to conduct the administrative review and/or administrative hearing for
the proposed removal action. Accordingly, any response you prepare must be submitted
to:

> Henry R. Lesansky, Ph.D
> Health Services Administration
> 1923 Vermont Avenue, N.W.
> Suite N-121
> Washington, D.C. 20001
> (202) 671-2069

In conducting the administrative review and/or hearing, your appointed Hearing Officer
will review all of the documents giving rise to the charge of Negligence, this written
notice and your response, if there is one. After conducting the administrative review,
your assigned Hearing Officer will make a written report and recommendation to
Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of
Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC
20001. You may arrange to review the material by contacting Denise Shell, Management
Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Deputy Warden for Operations



March 15, 2007

Darryl Love
3221 Brothers Pl. SE
Washington, DC  20032

Dear Mr. Love:

This correspondence constitutes a twenty (20) day notice of proposal to terminate you
from your position of Correctional Treatment Specialist with the D.C. Department of
Corrections.  The action proposed is in accordance with provisions set forth in the
District Personnel Manual (DPM) Chapter 16.  The proposed action is based on a charge
of Negligence; to wit: any on-duty or employment related act or omission that interferes
with the efficiency or integrity of government operations.  The specifications in support
of the proposed action is stated below.

**Specifications**:  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph
Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central
Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon
Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to
identify facts and circumstances contributing to the escape of Inmates Leaks and
Jones from the CDF on Saturday, June 3, 2006.  The OIA investigation
substantiated that you failed to correctly reclassify inmate Leaks and resultantly
inmates Leaks and Jones on June 3, 2006 escaped from the Central Detention
Facility.

The OIA Investigation determined that you conducted a custody reclassification
on Inmate Leaks on March 11, 2006.  Your scoring produced a total custody score
of seven (7), indicating a custody level of medium.  During the OIA Investigation,
Leona Bennett, Correctional Program Officer reviewed your March 11, 2006
reclassification of Inmate Leaks.  Ms. Bennett concluded that the reclassification
was erroneously scored and similar to the December 1, 2005 reclassification
instrument prepared by Correctional Treatment Specialist, Malcolm Pointer.

Darryl Love
Page 2

You conducted a subsequent reclassification of Inmate Leaks on May 15, 2006.
Your scoring of this reclassification produced a total custody score of five (5),
indicating a custody level of medium. However, according to Ms. Bennett and
the Technical Reference Manual, your May 15, 2006 reclassification of Inmate
Leaks was also incorrect. Inmate Leaks should have been classified as a
Maximum custody inmate.

The OIA Investigation also determined that you failed to note that Inmate Leaks
had a history of escape. Additionally, you failed to score Inmate Leaks' U.S.
Parole Violation underlying charge according to the DOC Custody Classification
Instrument-Technical Reference Manual.

Inmate Leaks' most serious charge in which he was committed on August
18, 2005, was the US Parole Violation in reference to an underlying 1998 Assault
with a Deadly Weapon (ADW) charge.

You stated during your subsequent re-classification of Inmate Leaks on May
15, 2006, that you intended to give Inmate Leaks **5 points** in **Part B** on the re-
classification instrument (severity of prior criminal conviction). However, you
inadvertently struck the **3 key** on your computer keyboard in error. Nonetheless
in your subsequent re-classification of Inmate Leaks, you again failed to note
Inmate Leaks' history of escape.

The OIA Investigation concluded that you were negligent because it was your
responsibility to ensure that accurate data was entered into JAACS reflecting the
correct custody score.

Your negligence in performing your official duties caused Inmate Leaks to be
misclassified as medium custody. As a result of your misclassification, a
maximum custody inmate, with a history of escape was permitted to work on an
Off Unit Detail

Your negligence in the matter placed the staff, inmates and the public at large in
considerable capricious danger. Notwithstanding are the detrimental public
relations incurred by the agency, potential lack of confidence and a breach of
public trust.

The position of Correctional Treatment Specialist is one of trust, reliance and
confidence. Each correctional employee has fiduciary responsibility to the public
in general and specifically to the citizens of the District of Columbia. The
citizens of the District of Columbia trust correctional employees to provide a safe,
secure and orderly facility. This task is effectuated when policies and procedures
are implemented, adhered to, and respected by staff.

Darryl Love
Page 3

Investigation concluded that you violated the following Departmental Policies:
**Program Statement 4090.4-** Custody Classification System which states that
case managers shall use the Custody Classification Technical Reference Manual
of Instruction when completing the reclassification instrument.
**Technical Reference Manual 4090.4** which states that if the inmate escaped or
attempted escape from a medium or high security facility within the past 10 years
then a 7 shall be entered.

In accordance with Basic Regulations for all employees 1.1 – Operational
Knowledge, you are required to have a complete understanding of your position
description, all regulations, rules, policies and procedures that pertain to the
Department, Division, Service and unit to comply there with.

The charge of negligence involves conduct/performance which falls below the
standard established by Law for the protection of others against unreasonable risk
of harm. Here, your actions substantially placed staff, inmates, the surrounding
community and the general public at large in momentous unpredictable danger. A
jail or correctional system's primary responsibility is custody, care and control of
inmates committed to its ward. Your conduct substantiates an unreasonable and
unjustifiable departure of correctional responsibilities, and therefore, warrants
your removal.

You have the right to review any material upon which the proposed action is based, and
to prepare a written response to the notice, including affidavits and other documentation
within 6 days of receipt of the notice. You are entitled to an administrative review by a
Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are
further informed of your right to be represented by an attorney or other representative.
Your response should you prepare one, may raise every defense, fact or supporting matter
in extenuation, exculpation, or mitigation of which you have knowledge or reasonably
should have knowledge, or which is relevant to the reasons in support of the proposed
action, specification(s), or proposed penalty.

Henry R. Lesansky, Ph.D, Health Services Administrator has been appointed as the
Hearing Officer to conduct the administrative review and/or administrative hearing for
the proposed removal action. Accordingly, any response you prepare must be submitted
to:

Henry R. Lesansky, Ph.D
Health Services Administration
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001
(202) 671-2069  Telephone

Darryl Love
Page 4

In conducting the administrative review and/or hearing, your appointed Hearing Officer
will review all of the documents giving rise to the charge of Negligence, this written
notice and your response, if there is one.  After conducting the administrative review,
your assigned Hearing Officer will make a written report and recommendation to
Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of
Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC
20001.  You may arrange to review the material by contacting Denise Shell, Management
Liaison Specialist, at 671-2131.

Sincerely,

Stanley M. Waldren
Deputy Warden for Operations



March 15, 2007

Malcolm Pointer
904 French Street, NW
Washington, DC 20001

Dear Mr. Pointer

This correspondence constitutes a twenty (20) day notice of proposal to terminate you
from your position of Correctional Treatment Specialist with the D.C. Department of
Corrections. The action proposed is in accordance with provisions set forth in the
District Personnel Manual (DPM) Chapter 16. The proposed action is based on a charge
of Negligence; to wit: any on-duty or employment related act or omission that interferes
with the efficiency or integrity of government operations. The specifications in support
of the proposed action are stated below.

**Specifications**: On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph
Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central
Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon
Brown, the DOC Office of Internal Affairs (OIA) conducted an investigation to
identify facts and circumstances contributing to the escape of Inmates Leaks and
Jones from the CDF on Saturday, June 3, 2006. The (OIA) Investigation into the
escape, determined that you failed to correctly reclassify Inmate Leaks and
resultantly Inmates Leaks and Jones on June 3, 2006, escaped from the Central
Detention Facility.

The OIA Investigation further determined that on December 1, 2005 you re-
classified Inmate Leaks without a complete review of his institutional record. In
addition, you failed to review the initial classification custody instrument
completed by Correctional Treatment Specialist (CTS) Vera Lightener, which was
located in Inmate Leaks' institutional record. Your decision not to review Inmate
Leaks' institutional record prior to re-classifying Inmate Leaks was a monumental
mistake in judgment. A review of Inmate Leaks' complete institutional record
would have revealed Inmate Leaks noted record of escape, in addition to a United

Malcolm Pointer
Page 2

States Parole Violation (USPV) charge in reference to his underlying 1998
Assault with a Deadly Weapon conviction. Inmate Leaks' prior history of escape
from the CDF, a secure facility should have heightened his security threat and
possible placement on special handling status.

The Technical Reference Manual Instructions for completing the DOC Custody
Re-classification instrument states that all offenses the inmate is being committed
on should be considered to determine the most serious current charge.

Inmate Leaks entered the CDF on August 18, 2005, charged with Accessory After
the Fact, (First Degree Murder while Armed). Inmate Leaks' USPV underlying
charge should have been scored as the most serious offense.

Inmate Leaks was sentenced to serve 24 years (Aggregate) for his underlying
USPV charge (1998 ADW). He was released on September 24, 2003, after
serving a five (5) year prison sentence and was placed on parole with 4,383 days
remaining to be served. Inmate Leaks' violation of his parole coupled with his
history of escape undoubtedly made him an extreme security risk.

The OIA Investigation also determined that you erroneously scored the
reclassification you conducted on Inmate Leaks; wherein you failed to review the
institutional record and the initial classification instrument that was prepared by
Correctional Treatment Specialist, Vera Lightener who had correctly scored
Inmate Leaks at a maximum custody level.

In reclassifying Inmate Leaks you failed to note that Inmate Leaks had a history
of escape. Additionally, you failed to score Inmate Leaks' USPV underlying
charge according to the DOC Custody Classification Instrument- Technical
Reference Manual.

Inmate Leaks' most serious charge in which he was committed on August
18, 2005, was the US Parole Violation in reference to an underlying 1998 Assault
with a Deadly Weapon (ADW) charge.

Leonna Bennett, Correctional Program Officer, collaborates that your initial
reclassification of Inmate Leaks was performed without his institutional file. She
noted that you failed to score Inmate Leaks' escape history. According to
Ms. Bennett's assessment, the point total you assigned were incorrect and Inmate
Leaks' custody level should have remained at Maximum.

OIA Investigators interviewed you regarding this matter on June 20, 2006.
During the interview you stated that you were unsure if you had reviewed Inmate
Leaks' institutional file prior to reclassifying him. You further confirmed that

Malcolm Pointer
Page 3

you did not consider the Accessory After the Fact (First Degree Murder While Armed) charge. You stated that it was your belief that the charge had been released in JACCS because it had a bond that was satisfied. You also acknowledged that you did not consider Inmate Leaks' parole violation or its underlying charges.

Investigation determined that you were culpable because it was your responsibility to ensure that accurate data was entered into JAACS reflecting the correct custody score."

Your negligence in performing your official duties not only caused Inmate Joseph Leaks DCDC# 250-433 to be misclassified, it contributed to the escape because if the custody score had been correct, Inmate Leaks would have never been permitted to work on an Off Unit Detail with a Maximum custody score.

Your negligence placed the staff, inmates and the public at large in considerable capricious danger. Not withstanding are the detrimental public relations incurred by the agency, potential lack of confidence and a breach of public trust.

The position of Correctional Treatment Specialist is one of trust, reliance and competence. Each correctional employee has fiduciary responsibility to the public in general and specifically to the citizens of the District of Columbia. The citizens of the District of Columbia trust correctional employees to provide a safe, secure and orderly facility. This task is effectuated when policies and procedures are implemented, adhered to, and respected by staff.

The OIA investigation concluded that you violated the following Departmental Policies:

**Program Statement 4090.4-** Custody Classification System which states that case managers shall use the Custody Classification Technical Reference Manual of Instruction when completing the reclassification instrument.
**Technical Reference Manual 4090.4** Chapter 2, section 1 (f) states....Based upon the data in the inmate's record, the Case Manager shall complete all scoring items on the first page of the reclassification form.

In accordance with Basic Regulations for all employees 1.1 – Operational Knowledge is required that you have a complete understanding of your position description, all regulations, rules, policies and procedures that pertain to the Department, Division, Service and unit to comply there with.

The charge of negligence involves conduct/performance which falls below the standard established by Law for the protection of others against unreasonable risk

Malcolm Pointer
Page 4

of harm. Here, your actions substantially placed staff, inmates, the surrounding
community and the general public at large in momentous unpredictable danger. A
jail or correctional system's primary responsibility is custody, care and control of
inmates committed to its ward. Your conduct substantiates an unreasonable and
unjustifiable departure of correctional responsibilities, and therefore, warrants
your removal.

You have the right to review any material upon which the proposed action is based, and
to prepare a written response to the notice, including affidavits and other documentation
within 6 days of receipt of the notice. You are entitled to an administrative review by a
Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are
further informed of your right to be represented by an attorney or other representative.
Your response should you prepare one, may raise every defense, fact or supporting matter
in extenuation, exculpation, or mitigation of which you have knowledge or reasonably
should have knowledge, or which is relevant to the reasons in support of the proposed
action, specification(s), or proposed penalty.

Henry R. Lesansky, Ph.D, Health Services Administrator has been appointed as the
Hearing Officer to conduct the administrative review and/or administrative hearing for
the proposed removal action. Accordingly, any response you prepare must be submitted
to:

> Henry R. Lesansky, Ph.D
> Health Services Administration
> 1923 Vermont Avenue, N.W.
> Suite N-121
> Washington, D.C. 20001
> (202) 671-2069 Telephone

In conducting the administrative review and/or hearing, your appointed Hearing Officer
will review all of the documents giving rise to the charge of Negligence, this written
notice and your response, if there is one. After conducting the administrative review,
your assigned Hearing Officer will make a written report and recommendation to
Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of
Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC
20001. You may arrange to review the material by contacting Denise Shell, Management
Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Deputy Warden for Operations



March 15, 2007

Shantell Hatton
10394 Hallmark Lane
Waldorf, Maryland  20603

Dear Ms. Hatton:

This correspondence constitutes a twenty (20) day notice of proposal to terminate you
from your position of Correctional Officer with the D.C. Department of Corrections.  The
action is proposed in accordance with provisions set forth in the District Personnel
Manual (DPM) Chapter 16.  The proposed action is based on the charge of Negligence; to
wit: any on-duty or employment related act or omission that interferes with the efficiency
or integrity of government operations.  The specifications in support of the proposed
action are stated below.

**Specifications**:  On Saturday, June 3, 2006 at approximately 10:05 a.m., Inmates Joseph
Leaks, DCDC# 250-433 and Ricardo Jones DCDC# 279-826, escaped from the Central
Detention Facility (CDF).

At the request of the Director of the D.C. Department of Corrections, Devon Brown, the
DOC Office of Internal Affairs (OIA) conducted an investigation to identify facts and
circumstances contributing to the escape of Inmates Leaks and Jones from the CDF
complex on Saturday, June 3, 2006.  The OIA investigation substantiates that on June 3,
2006 you were assigned to the Southeast One (SE-1) housing unit.  Your primary
functions were to maintain custody, security and accountability of all inmates in your
assigned housing unit.  At approximately 9:42 a.m., Inmate Ricardo Jones walked out of
the SE-1 housing under the pretense of going to the infirmary.

Prior to leaving SE-1, Inmate Jones was in possession of a Movement Pass authorizing
him to go to the infirmary.  Inmate Jones' name was placed on the housing unit
movement/running count sheet, accounting for and authorizing his movement to the
Infirmary.  However, according to Infirmary records, only six (6) inmates from SE-1
were scheduled for medical care in the Infirmary on June 3, 2006, Inmate Jones was not
one of them.

The OIA Investigators conducted taped interviews with you regarding this matter on

Shantell Hatton
Page 2

Saturday, June 3, 2006 and on Sunday June 4, 2006. During the interviews, you stated
that Sergeant Dionne Makins and Corporal Washington worked in the unit with you on
June 3, 2006. When asked who made call-out passes? You stated that you made passes,
but could not recall how many passes you made or who you made them for. You also
stated that you observed Sergeant Makins prepare call-out passes; but you were not sure
if Corporal Washington prepared any. You stated that you received a call from
Miss Toni in the Infirmary and she gave you the names of three inmates; however, you
were not sure who the three names were, but that you had written the names on the
running count sheet. You stated that you could not recall if you received any other calls
from the infirmary.

You acknowledged that you opened Cell 18 where Inmate Ricardo Jones was housed.
You stated that you observed Inmate Jones walk out of his cell to the bubble, where you
gave him his pass. You stated that you were not sure if you had made his pass. You said
you gave him his pass and he walked out the door.

During your interview on Sunday, June 4, 2006, you explained to OIA Investigator
Collins that you put the names on the running count sheet from the completed written
passes on the table as opposed to writing down the names as the inmates were leaving the
unit. You further stated that when you put the names on the sheet you had not seen or
called for the inmates. During this interview you also remembered that the call you
received from the infirmary on June 3, 2006 was for Inmates Donaldson, Tyrone;
McKnight and Moore. In regards to inmate Jones you still could not recall if you filled
out his call out pass or if you took the call. You stated that both you and Sergeant
Makins took calls.

As stated previously, the OIA investigation revealed that there were 6 inmates scheduled
and authorized movement to the infirmary for medical treatment on June 3, 2006.
Inmate Jones was not included with this group. You confirmed that Inmate Jones was not
included in the list of inmates Miss Toni provided to you to report to the infirmary, and
inmate Jones was not experiencing a medical emergency. Despite these significant
factors, you issued Inmate Jones a call-out pass to the infirmary and put his name on the
movement/running count sheet. As an Officer assigned to the unit, it was your
responsibility to immediately report this discrepancy to Sergeant Makins. It was also
your responsibility as well as the responsibility of Sergeant Makins and Officer
Washington to confirm Inmate Jones' need for medical treatment; the availability of
medical staff to check Inmate Jones and seek authorization for his movement to the
infirmary via a call out pass or escort pursuant to sick call and infirmary protocols.
The OIA Investigation further revealed that neither you nor the other officers assigned to
the unit (Makins and Washington) have knowledge or did not indicate as to why, or by
what authorization inmate Jones was permitted to exit the unit, a controlled and secure
environment that only staff can authorize or effectuate using mechanical devices to

Shantell Hatton
Page 3

allow inmate to enter and exit. This performance clearly violates department regulations, specifically, General Order #8 Accountability of inmates; Basic Rules and Regulations for all Employees, Section; 1.4 Attention to Duty, and Section: 1.1 Operational Knowledge.

The OIA Investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment. The OIA Investigation further concluded that each correctional officer assigned to SE-1 housing unit, to include you was culpable, because it was the responsibility of each employee assigned individually, and collectively to ensure the accurate accountability of each inmate assigned to the housing unit. Therefore, you failed to properly carry out your assigned duties.

Your negligence in this matter violates the following Departmental policy:

Program Statement 5010.2c: Accountability for Inmates, which states that "Correctional Officers are responsible for maintaining accountability for all inmates in their area of responsibility."

Basic Regulations of All Employees:

Section 1.1, Operational Knowledge Required:   Employees are required to have complete understanding of their Position Description and all regulations, rules, Policies and Procedures pertaining to the Department and their Division, Service and Unit, and to comply therewith. Employees are responsible for the understanding and compliance with all documents posted on official Bulletin Board.

Section 1.4, Attention to Duty:  Employees are required to devote their entire attention to their official duties; and,

Correctional Officer's General Orders:

Number 1, Take charge of this post and all government property on or near it.

Number 8, Account for all inmates in my charge and immediately report any unauthorized absences to the shift commander or other officials in the chain-of-command.

Your negligence in this matter contributed to the successful escape of Inmate Ricardo Jones and placed staff, inmates and the public at large in considerable capricious danger. Notwithstanding, are the detrimental public relations incurred by the agency, potentially lack of confidence and insecurity the public now experience. The position of

Shantell Hatton
Page 4

Correctional Officer is one of trust, reliance and confidence. Each correctional employee
has fiduciary responsibilities to the public in general and to the citizens of the District of
Columbia. The citizens of the District of Columbia entrust correctional employees to
provide a safe and secure facility. This task is effectuated when policies and procedures
are followed, respected and maintained by staff.

The charge of negligence involves conduct which falls below the standard
established by Law for the protection of others against unreasonable risk of harm.
Here, your actions substantially placed staff, inmates, the surrounding community
and the general public at large in momentous unpredictable danger. A jail or
correctional system's primary responsibility is custody, care and control of
inmates committed to its ward. Your conduct substantiates an unreasonable and
unjustifiable departure of correctional responsibilities, and therefore, warrants
your removal. Consequently,

You have the right to review any material upon which the proposed action is based, and
to prepare a written response to the notice, including affidavits and other documentation
within 6 days of receipt of the notice. You are entitled to an administrative review by a
Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are
further informed of your right to be represented by an attorney or other representative.
Your response, should you prepare one, may raise every defense, fact or supporting
matter in extenuation, exculpation, or mitigation of which you have knowledge or
reasonably should have knowledge, or which is relevant to the reasons in support of the
proposed action, specification(s), or proposed penalty.

Henry R. Lesansky, Ph.D, Health Services Administrator has been appointed as the
Hearing Officer to conduct the administrative review and/or administrative hearing for
the proposed removal action. Accordingly, any response you prepare must be submitted
to:

> Henry R. Lesansky, Ph.D
> Health Services Administration
> 1923 Vermont Avenue, N.W.
> Suite N-121
> Washington, D.C. 20001
> (20) 671-2069   Telephone

In conducting the administrative review and/or hearing, your appointed Hearing Officer
will review all of the documents giving rise to the charge of Negligence, this written
notice and your response, if there is one. After conducting the administrative review,
your assigned Hearing Officer will make a written report and recommendation to
Director Devon Brown, the Deciding Official, who will issue a final decision.

The material upon which the proposed action is based may be reviewed in the Office of

Shantell Hatton
Page 5

Human Resource Management, located at 1923 Vermont Avenue N.W., Washington, DC 20001.  You may arrange to review the material by contacting Denise Shell, Management Liaison Specialist, at 671-2131.

Sincerely,

Stanley Waldren
Deputy Warden for Operations

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Cynthia Washington
Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Officer Washington:

Effective Friday, March 16, 2007, you are placed on Administrative Leave with pay.

You are directed to contact Major Gary Brinson on (202) 673-8311 between the hours of 8:30 a.m. and 9:00 a.m. each day, Monday through Friday, during this period of Administrative Leave.  You are directed to comply with any and all instructions that you receive from Major Brinson.

During this period of Administrative Leave, you are prohibited from entering any Department of Corrections facility without prior approval from a Department of Corrections Official.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Herbert Douglas
Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Officer Douglas:

Effective Friday, March 16, 2007, you are placed on Administrative Leave with pay.

You are directed to contact Major Gary Brinson on (202) 673-8311 between the hours of
8:30 a.m. and 9:00 a.m. each day, Monday through Friday, during this period of
Administrative Leave.  You are directed to comply with any and all instructions that you
receive from Major Brinson.

During this period of Administrative Leave, you are prohibited from entering any
Department of Corrections facility without prior approval from a Department of
Corrections Official.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Lorenzo Jennings
Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Officer Jennings:

Effective Tuesday, March 19, 2007, you are placed on administrative leave with pay.

You are directed to contact Major Gary Brinson on (202) 673-8311 between the hours of 8:30 a.m. and 9:00 a.m. each day, Monday through Friday, during this period of Administrative Leave. You are directed to comply with any and all instructions that you receive from Major Brinson.

During this period of administrative leave, you are prohibited from entering any Department of Corrections facility without prior approval from a Department of Corrections Official.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Dionne Makins
Lead Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Sergeant Makins:

Effective Friday, March 16, 2007, you are placed on Administrative Leave with pay.

You are directed to contact Major Gary Brinson on (202) 673-8311 between the hours of
8:30 a.m. and 9:00 a.m. each day, Monday through Friday, during this period of
Administrative Leave.  You are directed to comply with any and all instructions that you
receive from Major Brinson.

During this period of Administrative Leave, you are prohibited from entering any
Department of Corrections facility without prior approval from a Department of
Corrections Official.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Alphonso Bryant
Correctional Treatment Specialist
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Mr. Bryant:

Effective Friday, March 16, 2007, you are placed on Administrative Leave with pay.

You are directed to contact Leona Bennett, Correctional Program Officer on
(202) 698-4929 between the hours of 8:30 a.m. and 9:00 a.m. each day, Monday through
Friday, during this period of Administrative Leave.  You are directed to comply with any
and all instructions that you receive from Ms. Bennett.

During this period of Administrative Leave, you are prohibited from entering any
Department of Corrections facility without prior approval from a Department of
Corrections Official.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Lowanda Hinton Saunders
Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Officer Hinton Saunders:

Effective Friday, March 16, 2007, you are placed on Administrative Leave with pay.

You are directed to contact Major Gary Brinson on (202) 673-8311 between the hours of
8:30 a.m. and 9:00 a.m. each day, Monday through Friday, during this period of
Administrative Leave. You are directed to comply with any and all instructions that you
receive from Major Brinson.

During this period of Administrative Leave, you are prohibited from entering any
Department of Corrections facility without prior approval from a Department of
Corrections Official.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Darryl Love
Correctional Treatment Specialist
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Mr. Love:

Effective Friday, March 16, 2007, you are placed on Administrative Leave with pay.

You are directed to contact Leona Bennett, Correctional Program Officer on (202) 698-4929 between the hours of 8:30 a.m. and 9:00 a.m. each day, Monday through Friday, during this period of Administrative Leave. You are directed to comply with any and all instructions that you receive from Ms. Bennett.

During this period of Administrative Leave, you are prohibited from entering any Department of Corrections facility without prior approval from a Department of Corrections Official.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Malcolm Pointer
Correctional Treatment Specialist
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Mr. Pointer:

Effective Friday, March 16, 2007, you are placed on Administrative Leave with pay.

You are directed to contact Leona Bennett, Correctional Program Officer on
(202) 698-4929 between the hours of 8:30 a.m. and 9:00 a.m. each day, Monday through
Friday, during this period of Administrative Leave. You are directed to comply with any
and all instructions that you receive from Ms. Bennett.

During this period of Administrative Leave, you are prohibited from entering any
Department of Corrections facility without prior approval from a Department of
Corrections Official.

Sincerely,

Devon Brown
Director

cc: Patricia Britton, Deputy Director
    William Smith, Warden
    Stanley Waldren, Deputy Warden
    J. Michael Hannon, Esq.
    Nila Ritenour, Union Chairperson
    Gary Brinson, Major
    Payroll Office
    HRM

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



March 15, 2007

Shantell Hatton
Correctional Officer
DC Department of Corrections
1901 D Street S.E.
Washington, D.C. 20003

Dear Officer Hatton:

Effective Friday, March 16, 2007, you are placed on Administrative Leave with pay.

You are directed to contact Major Gary Brinson on (202) 673-8311 between the hours of
8:30 a.m. and 9:00 a.m. each day, Monday through Friday, during this period of
Administrative Leave.  You are directed to comply with any and all instructions that you
receive from Major Brinson.

During this period of Administrative Leave, you are prohibited from entering any
Department of Corrections facility without prior approval from a Department of
Corrections Official.

Sincerely,

Devon Brown
Director

cc:  Patricia Britton, Deputy Director
     William Smith, Warden
     Stanley Waldren, Deputy Warden
     J. Michael Hannon, Esq.
     Nila Ritenour, Union Chairperson
     Gary Brinson, Major
     Payroll Office
     HRM

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CYNTHIA WASHINGTON, *et al.,*                    :

    and                                                      :

SHANTELL HATTON                                       :
10394 Hallmark Lane
Waldorf, MD 20603                                       :

       Plaintiffs,                    :          Case Number: 1:07-cv-01031 (RMU)

    v.                                                         :

DISTRICT OF COLUMBIA, *et al.,*                  :

       Defendants.                    :

**FIRST AMENDED COMPLAINT FOR**
**COMPENSATORY, INJUNCTIVE AND DECLARATORY RELIEF**

    Come now Plaintiffs Cynthia Washington, Herbert Douglas, Lorenzo Jennings, Dionne

Makins, Alphonso Bryant, Lowanda Hinton-Saunders, Darryl Love, Malcolm Pointer and

Shantell Hatton ("DOC Employees") through their attorneys with HANNON LAW GROUP,

LLP and present their First Amended Complaint adding Shantell Hatton as an additional

Plaintiff, and for their First Amended Complaint against Defendants state as follows:

**NATURE OF THE CASE**

    This is an action for declaratory and injunctive relief and compensatory and punitive

damages on behalf of Plaintiffs, all employees of the District of Columbia Department of

Corrections ("DOC") and members of the bargaining unit of the Fraternal Order of

Police/Department of Corrections Labor Committee ("FOP/DOC").

    These DOC Employees were summarily fired by Defendant DOC and Defendant Devon

Brown at a press conference on July 26, 2006, following a highly publicized Jail Escape by two

of the most dangerous offenders housed at the D.C. Jail.  Defendant Devon Brown assigned the

administrative removal hearings for the DOC Employees to the D.C. Office of Administrative

Hearings.  He did so because "it is necessary and desirable that the administrative proceedings

are held by a body that is independent of the Department of Corrections and that OAH possesses

the expertise and resources for conducting these hearing."  The OAH Judges issued a Report and

Recommendation in each case on December 11, 2006, uniformly declaring that the DOC had

violated their constitutional rights and recommending they be returned to work.  By the

requirements of D.C. personnel laws and the Collective Bargaining Agreement between

Defendant DOC and the FOP/DOC, Defendant Devon Brown was compelled to follow the

Recommendations and return the DOC Employees to work.  Defendant Brown refused to return

the DOC Employees to work.

On March 12, 2007, the DOC Employees filed a Petition for Writ of Mandamus with the

District of Columbia Court of Appeals seeking an order compelling Defendants DOC and Devon

Brown to return them to work.  On March 15, 2007, Defendants DOC and Devon Brown

rescinded the summary removal action, placed the DOC Employees on paid administrative leave,

and served them with new notices of proposed termination based on the same allegations on

which the OAH Judges had ruled.  Defendant Devon Brown assigned the hearing (hereafter the

"Do Over") to Defendant Henry R. Lesansky, Ph.D., the Health Services Administrator for

Defendant DOC.  Defendant Devon Brown did so with the expectation that Defendant Lesansky,

hand-picked by Brown, would do Brown's bidding and recommend that Plaintiff DOC

Employees be fired.

As a consequence of the Reports and Recommendations of the OAH Judges, Defendants

DOC and Devon Brown are bound by law to return the DOC Employees to work.  Defendants'

refusal to return the DOC Employees to work and Defendants' manufacture of an unlawful "Do Over" before a Hearing Officer who owes his job to Defendant Devon Brown violate the Fifth Amendment of the United States Constitution by depriving Plaintiffs of their constitutionally protected right to their jobs without due process.

## JURISDICTION

Jurisdiction of this Court is found in Title 28 U.S.C. §§ 1331, 1342 and 1367 and in Title 42 U.S.C. §§ 1983 and 1988.

## PARTIES

1.    Plaintiffs are employees of the D.C. Department of Corrections and members of the Bargaining Unit of the Fraternal Order of Police, Department of Corrections Labor Committee.

2.    Defendant DISTRICT OF COLUMBIA is a municipal corporation that employs Defendants DEVON BROWN, STANLEY WALDREN, HENRY R. LESANSKY, Ph.D., and Plaintiffs to operate the Department of Corrections.  Defendant DEPARTMENT OF CORRECTIONS is an agency of the DISTRICT OF COLUMBIA.

## FACTS COMMON TO ALL COUNTS

Plaintiffs submit that the following facts are common to all counts:

### A.    Factual Background

3.    On June 3, 2006, two inmates escaped from the Central Detention Facility ("CDF") by smashing out the door and window of the Warden's office.  The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the DC Jail.  Inmate Leaks was awaiting trial in the D.C. Superior Court on a charge of Accessory After the Fact to First Degree Murder While Armed.  He had also violated his parole arising from a

1998 conviction for Assault with a Deadly Weapon.  Defendant DOC also contends that Leaks had a prior escape from the CDF in October of 2005, although no record of such escape was in Leaks' Institutional File.  Ricardo Jones was awaiting trial in the D.C. Superior Court in two cases, one charging Assault with Intent to Kill and a second charging Murder in the First Degree. Leaks and Jones are co-defendants in the murder case.  Leaks and Jones are also suspects in an Assault with Intent to Kill investigation in Greensboro, North Carolina.

    4.    The escape was widely reported in the press, and was a direct result of the DOC's and Director Devon Brown's failure to remedy safety issues which had been repeatedly brought to his attention by the FOP/DOC Labor Committee.  For example, during monthly meetings before the jail escape, FOP representatives repeatedly told Defendant Brown that assaults on corrections officers were increasing daily, a warning of lack of manpower.  Defendant Brown's response was to prepare posters warning inmates not to assault corrections officers and to produce a videotape to be played to the inmates.  In explaining news articles about increased assaults, Defendant Brown explained that it was an election year, and politicians seek any means to get their names in the paper. Defendant Brown knew that in-service training of corrections officers was not being conducted.  Defendant Brown knew that the DC Jail was woefully understaffed, and that corrections officers were subject to compulsory drafting to work double shifts.  Defendant Brown knew that the DOC had no concrete plans for recruitment and training of new corrections officers.  On May 18, 2006, Mr. Brown admitted that he was concerned regarding extensive overtime, and that he had concerns that overtime was adversely affecting the alertness and effectiveness of corrections officers.  In February of 2006, the overtime budget for the DOC had been exhausted and the agency was $3,000,000 over budget.

5.      The complaints by the FOP/DOC at these monthly meetings foresaw the jail escape.  On the day of the escape, the DC Jail was understaffed by 58 out of the 121 positions required.  The "solution" was to force 41 officers to work overtime on that shift and to "shutdown" 17 posts.  Seven of the DOC Employees fired were either working forced overtime, working posts for which they had not been trained, or working understaffed posts.  On the morning of the escapes, representatives of the FOP/DOC requested that the Jail be locked down because of the shortage of personnel.  This request was denied.

6.      On June 4, 2006, the two escapees were recaptured without incident.  In an effort to deflect continued public attention from deplorable working conditions, severe management deficiencies, and criticism of his leadership of the DOC, Director Devon Brown on June 5, 2006, issued written notification to twelve DC Jail employees putting them on paid administrative leave pending further investigation of the escape.  Those employees included six (6) Correctional Officers, one (1) Lead Correctional Officer (Sgt.), three (3) Correctional Treatment Specialists, one (1) Correctional Program Specialist, and one (1) Captain.  Among this group were the Plaintiffs.

7.      After the escape, public scrutiny continued.  On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Phil Mendelson was held to continue review of the jail break and general safety issues at the DC Jail.  At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.  Director Brown did not disclose to the Council that the Jail was dangerously understaffed that day, and that he knew that forced overtime was causing corrections officers to be less reactive and less efficient.

8.     Facing pressure from both the public and the D.C. City Council, during his testimony at the June 26, 2006 hearing, Director Brown announced that as a result of the escape, the DOC evaluated its operation and made immediate improvements.  None of these improvements addressed understaffing and the increasing incidents of assaults on corrections officers.

9.     A month later, on July 26, 2006, the Mayor, DOC Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break.  Plaintiff Employees were among those fired.  Not one of the Plaintiffs or their Union was notified in advance of this public announcement.

10.     During the Press Briefing, DOC Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing and the summary firings, together with the announcement of a criminal investigation, were intended to and had the result of humiliating and embarrassing the discharged Union members, casting them in the public light as felons who abetted a jail escape.  These Union members learned of their firing from family and friends who had seen or heard the news in the media.  The Chairperson of the FOP/DOC Labor Committee learned of the terminations from a television news reporter who called to obtain a reaction to the firings.

11.     Defendant Devon Brown made further statements to the press.  On June 6, 2006, he was reported by the Washington Times to have stated that "authorities are investigating 'quite vigorously' the question of whether the two inmates had help in the escape."  He criticized those Plaintiffs who worked in classification of inmates, stating that "we can definitely say that Mr. Leaks should not have been authorized to have the classification that allowed him free movement

on detail." Defendant Brown coupled this, again, with a statement that the Plaintiffs were

suspended "pending a criminal investigation of the jailbreak." Defendant Brown, whose office is

located on the other side of the city from the DC Jail, told a citizens group that "When I arrived

on the scene, the first thing I asked was, 'Did the siren go off?'" Defendant Brown insisted that

the siren had been sounded, when it had not. Defendant Brown is reported as having stated that

he would "make staff changes at the jail, including bringing in more younger corrections

officers, who are physically up to the demands of the job." The Washington Post reported

Defendant Brown as stating "investigators want to determine if any of the officers deliberately

aided in the escape or unintentionally made mistakes that contributed to the breakout." In

response to the increased level of assaults on corrections officers, Defendant Brown is reported

by the D.C. Examiner to have stated "The older we get our reaction time is not as good, so if

something is happening, a younger correctional force may be able to respond to it quicker before

it escalates."

       12.    In order to accomplish this public humiliation and summary firing, the DOC

engaged in an unlawful and unconstitutional revision of existing D.C. laws which would have

prevented them from conducting a summary discharge in a public press briefing. Id. The

District of Columbia Personnel Manual ("DCPM"), until the Mayor's Weekly Press Briefing of

July 26, 2006, provided that in cases of Summary Removal, proper written notification of the

action was to be provided to the employee and the FOP/DOC within three (3) days of removal

("3 Day Rule"). DCPM § 1616.4. That notice must provide detailed information about the

removal, including the reasons for Summary Removal along with identification of critical

deadlines in the removal process and pertinent employee rights. Id. However, on the very date

of the planned news conference, Director Brown and D.C. officials conspired to amend this

provision of the DCPM so as to permit these firings in a summary fashion at the Mayor's Press Conference.  The amendment, specifically applying to only these Plaintiffs, provided that the information supporting summary removal need not be provided until 30 days after removal.  (See App. 15 at 8).

13.    A second change was made to the DCPM on July 28, 2006, to broaden the definition of employees to whom the change applied.  The July 28, 2006 variation augments the July 26, 2006 amendment by including a twelfth employee who was summarily removed (on July 28, 2006) and provides that any subsequent firings resulting from the investigation into this jail break also will not be subject to the 3 Day Rule.  Id.  This variation is completely unlawful and constitutes an ex post facto deprivation of due process rights to the discharged DOC Employees, all to enable Director Brown to divert criticism from his leadership to the rank and file corrections officers and employees of the DOC.  Moreover, compliance with the 3 Day Rule would have required disclosure of tape recorded interviews of the Plaintiffs, which would have laid to rest the public assertions by Director Brown that the jail escapes could only have occurred as a result of a criminal conspiracy among correctional officers and inmates: a ludicrous accusation in light of the facts then known to Director Brown regarding the security deficiencies at the DC Jail.

14.    Summary Removal is permitted under D.C. law when an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee; or, is detrimental to public health, safety, or welfare, as provided for in D.C. Code § 1-616.51.  None of these circumstances existed on or even near the date of the Respondents' Press Briefing that would justify an immediate firing.  The summary removal of the Plaintiffs was unjustified and unconstitutional.

These suspended employees were on paid administrative leave and posed a threat to no one.

There was absolutely no lawful basis to summarily remove these employees at that particular

time, as later confirmed by the OAH Judges in their Reports and Recommendations.  The use of

the Summary Removal procedure was unwarranted, and the fact that Defendant DOC and D.C.

Office of Personnel officials manipulated the law to achieve this gratuitous end is a clear abuse

of power, and a violation of the constitutional rights of these DOC Employees.

   15. On or about August 1, 2006, Plaintiff DOC Employees were formally delivered –

or summoned to pick up – a packet of materials and a notice advising them that they had been

summarily discharged from their employment with the DOC.  This firing was accomplished with

no notice and no opportunity to be heard of any kind in violation of the constitution of the United

States.  The written notice required by law was not prepared for each of the DOC Employees

until August 24, 2006.  That notice provided as follows:

> The Office of Administrative Hearings will conduct the administrative review
> and/or hearing of the proposed removal actions. . . .  In conducting the
> administrative review and/or hearing, your appointed Hearing Officer will review
> all of the documents giving rise to the charge . . . , this written notice and your
> response, if there is one.  After conducting the administrative review, your
> assigned Hearing Officer will make a written report and recommendation to
> Director Devon Brown, the Deciding Official, <u>who will issue a final decision</u>.

(Emphasis supplied).

   **B.**  **Procedural Background**

   16. After the summary firings, Defendants DOC and Devon Brown then entered into

a Memorandum of Understanding ("MOU") with the Office of Administrative Hearings

("OAH") to effectuate the promises made to the Plaintiffs in the letters of August 24, 2006, as set

forth in ¶ 15 above.  Pursuant to the MOU the Judge of the OAH would conduct the

administrative hearings required in these cases consistent with Chapter 16 of the DCPM and the

Collective Bargaining Agreement between Defendant DOC and FOP/DOC ("CBA"), and as the

DOC Employees were advised in their written notices of August 24, 2006.  Section 1612.2 of the

DCPM requires that an "administrative review shall be conducted by a hearing officer."  6

DCMR 1612.2.  Defendant Brown specifically noted in the MOU that "it is necessary and

desirable that the administrative proceedings are held by a body that is independent of the

Department of Corrections and that OAH possesses the expertise and resources for conducting

these hearing."  Defendants DOC and Devon Brown promised that this Agreement would

"remain in effect <u>through the latest date that the Director of DOC issues a final decision</u> in any of

the Disciplinary Actions."  (Emphasis supplied).

17.     DOC Director Devon Brown was required by the DCPM to issue a Final Decision

within 45 days of the delivery of the summary removal notices:

> The final decision in the case of summary suspension or summary removal action
> taken pursuant to §§ 1615-1616, respectively, shall be rendered not later than
> forty-five (45) days from date of delivery of the summary suspension or summary
> removal notice, as appropriate except that the period may be extended as follows:
>
> > (a) when the employee requests and is granted an extension of time in
> > which to respond  under § 1611.2; or
> >
> > (b) when the employee agrees to an extension of time requested by the
> > agency.

6 DCMR 1614.3.

18.     In addition, both the CBA and the DCPM require that DOC Director Devon

Brown follow the recommendation of the OAH Judges in this case.  Article 11, Section 9(D) of

the CBA specifically states (emphasis supplied):

> Deciding Official shall issue a final decision after reviewing the recommendation
> of the Disinterested Designee/Hearing Officer.  The deciding official may sustain
> or reduce the penalty recommended by the Disinterested Designee, remand the
> matter for further consideration by the Hearing Officer, or dismiss the charge <u>but</u>

> <u>may not increase the penalty recommended by the Disinterested</u>
> <u>Designee/Hearing Officer</u>.

Furthermore, Section 1613.2 of the DCPM also states with specificity that (emphasis supplied):

> The deciding official shall either sustain the penalty proposed, reduce it, remand the action with instruction for further consideration, or dismiss the action with or without prejudice, <u>but in no event shall he or she increase the penalty</u>. 6 DCMR § 1613.2.

19.    The original Summary Removals were dated July 26, 2006.  The DOC arranged for the D.C. Personnel Regulations to be altered in order to extend the DOC's deadline to present the requisite elements of Summary Removal to the Employees.  On or about August 24, 2006, the DOC issued its written "follow-up" Summary Removal notice to the Employees.  The notice required a six (6) day deadline for the employees to respond, and the Employees abided by that deadline.  The Forty-five within which Defendant Brown must make a final decision from the date of the "follow-up" Summary Removal notice would have been October 7, 2006.

20.    However, at a September 8 status hearing, the DOC admitted that the record upon which the Agency based the Summary Removal was incomplete.  As no administrative review could take place with an incomplete record, the OAH granted the DOC until September 15, 2006 to complete the record.  The Judges of the OAH recognized that this action implicated the 45-day deadline to issue a final decision, unless the employees requested an extension of time, pursuant to 6 DCMR 1614.3(a).  The parties agreed at the September 8, 2006 status conference to extend the deadline for the Agency Final Decision to October 25, 2006, because of the DOC's need for additional time to complete the record.  The OAH's September 11, 2006 scheduling order memorializes this agreement and the deadline.  On September 27, 2006, the employees filed individual responses to the removal notice, a motion for an extension of the deadline for

responses, as well as a Motion for Summary Dismissal.  The OAH granted the extension of the

deadline for responses and accepted them accordingly.

21.     The DOC filed its reply to the Motion for Summary Dismissal of the matter on

October 13, 2006.  The parties again met at a second status hearing on the Motion for Summary

Dismissal on October 19, 2006.  Following the administrative hearing, the OAH Judges issued

an order on October 26, 2006 denying the Employee's Motion for Summary Dismissal

submitting to the parties that it would consider the arguments contained in the Motion as part of

the individual reports and recommendations to be issued for each Employee.  In the October 26,

2006 Order, denying Employees' Motion for Summary Dismissal, the OAH Judges also noted

that "the administrative review must be completed before a final decision can be issued," and

that it would issues its report and recommendation at that time.  Consequently, the 45-day

deadline for a final decision was once again modified and required that the DOC Director issue

his final decision by December 15, 2006.  The OAH issued a Report and Recommendation in

each case on December 11, 2006, concluding that the summary removals could not be sustained

and recommending that the Employees be returned to work.

22.     Instead of issuing a final decision returning the Employees to work as he was

required to do by the DCPM and the CBA, and as he promised in the MOU and in the August 24,

2006, written notices to the DOC Employees, DOC Director Devon Brown submitted remand

notices for most of the employees,[1] well beyond the 45 day deadline, on January 9, 2007,

---

[1]     Director Brown sent by letter Remand Notices to the single OAH Judge (Hon. Paul B. Handy) hearing the cases for Darryl Love and Malcolm Pointer on December 14, 2006.  The Remand Notices contained no certificate of service.  They were not filed with the OAH, nor were they served on their counsel or any other counsel in the cases. However, the OAH Judge assumed that the parties were provided with copies of the Notice.  On December 28, 2006 the OAH Judge signed and dated a Report and Recommendation After Remand ("Report") in each of the two cases. The Report did not contain a completed Certificate of Service.  At the February 5, 2007 status hearing, it was brought to the attention of the OAH Judge that none of the parties received a copy of the Report.  Consequently, the OAH Judge ultimately refused to consider the Remand Notices.  He also found that there was no basis to reconsider his previous recommendation.

directing the panel of administrative law judges to re-consider the determination and recommendations included in their Final Reports and Recommendation issued to the DOC pursuant to 6 DCMR 1616.6(a).

23.    The Employees filed a Motion to Strike the Remand Notices on January 16, 2007, arguing that the Remand Notices were untimely.  The DOC filed its response to the Motion to Strike the Remand Notices on January 29, 2007 and the Employees filed their Reply on February 2, 2007.  A hearing was held by the OAH Judges on February 5, 2007 in reference to the Remand Notices and the subsequent Response by the DOC.  The OAH Judges issued their Report and Recommendation on Remand in the individual Employees' cases on March 2, 2007, and once again recommended that Director Devon Brown reinstate the Plaintiff DOC Employees.  Further, the OAH Judges opined that the Remand Notices were filed late and that Director Brown unlawfully violated the 45-Day Rule requiring a final agency decision.

24.    In each Report and Recommendation issued by the OAH in this matter, the Judges found that Summary Removal could not be sustained.  Further, each report contained a procedural summary which acknowledged that the October 26, 2006 Order established a deadline for the final agency decision as December 15, 2006.  From the outset of this entire process, Defendants DOC and Devon Brown have refused to comply with the established rules of due process set out by the DCPM, the CBA, the MOU, and the August 24 notice of proposed removal.  The regulations are clear that a final decision in these types of cases must be rendered within 45 days of delivery of the record.  The regulations and the CBA are also clear that Director Brown may not depart from the recommendations of the OAH Judges because they recommend reinstatement.  Director Brown is not free to impose a harsher sanction.

25.     When Director Brown failed to issue a final decision, Plaintiffs filed a Petition for Writ of Mandamus with the District of Columbia Court of Appeals on March 12, 2007, to compel Defendant Brown to return them to work.  Four days later, senior management at the DOC simultaneously rescinded and cancelled the proposals for summary removal of the Employees in order to avoid an adverse decision by the District of Columbia Court of Appeals. Director Brown, and others with the Department of Corrections including their counsel, conspired among themselves to lead Plaintiffs to believe that their proposed discipline was over and they were being returned to work permanently.  Specifically, DOC employees Joan E. Murphy and Denise Shell were instructed to contact Plaintiffs directly – who were then represented by counsel – and lead the employees to believe they were being returned to work.  In violation of ethical rules prohibiting a party from contacting another party except through counsel, Murphy and Shell lured the joyful Plaintiffs to report to DOC headquarters on Friday, March 16, 2007, to be "reinstated."

26.     In furtherance of this scheme, on the afternoon of March 15, 2007, Defendant Devon Brown himself placed a personal telephone call to Cpl. Nila Ritenour, Chairperson of the FOP/DOC.  The FOP/DOC was also represented by counsel in the jail escape matter at that time, as Director Brown well knew.  This telephone call was in violation of ethical rules prohibiting a party from contacting another party except through counsel, a rule that Director Brown was aware of by virtue of his having attended law school.  In that telephone call, Director Brown told Cpl. Ritenour that all of the Plaintiffs would be reinstated to their positions with all back pay and benefits.  Director Brown said he wanted Cpl. Ritenour to hear the news directly from him.  He stated that he had just signed the papers for reinstatement.  It was a congratulatory telephone call, even though Director Brown well knew that he intended to immediately place the Plaintiffs on

leave pending a further effort to have them fired.  Director Brown did not disclose his intention

to conduct an unlawful "Do Over", knowing full well that Cpl. Ritenour would report the "good

news" to Plaintiffs and others.

27.     Similarly, on March 15, 2007, counsel for the Plaintiffs telephoned counsel for

Defendant Department of Corrections to confirm the "good news."  Counsel for Defendant DOC

had been directed by Defendant Brown not to disclose the truth as to his intended conduct.

Consequently, counsel for Defendant DOC confirmed to counsel for Plaintiffs that the DOC "is

bringing them all back to work."

28.     When Plaintiffs reported to DOC headquarters in the morning of March 16, 2007,

they were indeed given a reinstatement letter promising back pay and benefits.  At the same time,

Plaintiffs were given a second letter putting them all on leave pending a new hearing to sustain

Defendant Brown's pre-ordained desire to have them all fired.  As Defendant Brown no doubt

anticipated, at roll call at the D.C. Jail early that morning, Cpl. Ritenour had announced the

"good news", only to be humiliated when Defendant Brown's true intentions became known.

Plaintiffs to this date, with one exception, have not received their back pay and benefits.

29.     Defendant Warden Stanley Waldren signed the March 12, 2007, notices of

proposed removal without reading them, without conducting any investigation, and under direct

orders of Defendant Devon Brown.

30.     Defendant Henry R. Lesansky, Ph.D., employed by the DOC, was appointed to be

the new hearing officer for the proposed termination hearings.  Dr. Lesansky is not an

"independent" hearing officer as promised to the DOC Employees in their August 24, 2006,

notices of removal.  In February of 2002, Dr. Lesansky resigned from his position as the top

official with the Maryland Department of Juvenile Justice after disclosures that he twice

understated the number of assaults against teens at Maryland juvenile jails. Dr. Lesansky became unemployable in corrections work until hired by the District of Columbia. He serves at the pleasure of Defendant Devon Brown.

31.     Defendants refusal to adhere to the procedures for adjudication of the firings of Plaintiffs and their efforts to have a "Do Over" violate Plaintiffs' Fifth Amendment rights to due process of law and an abridgement of their Fifth Amendment property interest in their Career Service positions with Defendant DOC.

## COUNT I—Violation of 42 U.S.C. §1983

32.     Plaintiffs repeat each and every allegation contained in all preceding paragraphs and incorporate the same herein.

33.     Defendants in their own right and in conspiracy and agreement with each other and others within the DC DOC and the DC Government sought to and did violate the constitutional rights of Plaintiffs in that Defendants sought to and did deprive Plaintiffs of life, liberty and property without due process of law.

34.     The actions of Defendants and those of their co-conspirators were done with evil motive, actual malice, oppression, with intent to injure, in willful disregard for the rights of Plaintiffs, and these actions were outrageous, grossly fraudulent, and reckless towards the well-being and rights of Plaintiffs.

35.     In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court advanced the proposition that government employees are afforded procedural guarantees before they can be terminated. These guarantees are born of the Due Process Clause of the United States Constitution. The resulting and inherent property interest in employment derives from a legitimate claim of entitlement that arises not from the United States Constitution,

but from independent sources such as state statutes, agency rules or policies, or agreements as to employment. *Board of Regents v. Roth*, 408 U.S. 564, 577-78 (1972).

36.     The Due Process analysis found in *Loudermill* applies to DC government employees and, in this case, the DOC employees specifically.  "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause….  Under CMPA, employees can only be disciplined for cause and prior notice must be given." *Fonville v. D.C.*, 448 F. Supp. 2d 21 (D.D.C. 2006) (internal citations omitted).  See also, *D.C. Department of Corrections v. Teamsters' Union Local*, 554 A.2d 319, 323 (D.C. 1989).

In this context, "agencies cannot relax or modify regulations….  [W]hen agencies establish … pre-termination procedures they are bound to follow them."  *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161, 2005 U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005), citing *Lopez v. FAA*, 355 U.S. App. D.C. 51, 318 F.3d 242, 247 (D.C. Cir. 2003).  Also, "[t]he D.C. Circuit has not required any additional due process requirements [beyond those defined in *Loudermill*] for the termination of its public employees."  *Crockett v. D.C. Metro. Police Dep't.*, 293 F. Supp. 2d 63, 68 U.S. Dist. LEXIS 23632 (2003), citing *Kropat v. Fed. Aviation Admin.,* 333 U.S. App. D.C. 239, 162 F.3d 129, 132-34 (D.C. Cir. 1998).

37.     Plaintiff DOC Employees were fired without notice and without an opportunity to be heard.

38.     In order to accomplish a very public humiliation and summary firing of the Plaintiffs, Defendants engaged in an unlawful and unconstitutional revision of existing DC laws which would have prevented them from such conduct otherwise.  Plaintiff DOC Employees

contend that the summary removal provisions of DCPM § 1616.4 are unconstitutional and unconstitutional as applied to them.

39.    Plaintiff DOC Employees contend that the summary revision of the 3 Day Rule by promulgation of variations to the DCPM was unconstitutional and unconstitutional as applied to them.

40.    Plaintiff DOC Employees contend that Defendants are without legal authority to require that the Plaintiffs be subject to the administrative process a second time for a disciplinary action that has been adjudicated in their favor.  The DOC has been unable to cite any legal authority which gives them the right to a "Do Over".

41.    Defendants are obligated by the constitution to abide by internal, procedural regulations defining their due process rights when proposing the dismissal of employees.  See Lopez v. FAA, 318 F.2d 242, 246 (D.C. Cir. 2003).  The Supreme Court has long recognized that "an agency is bound to the standards by which it professes its actions to be judged."  Service v. Dulles, 354 U.S. 363, 373-76 (1957).  Furthermore, a government agency must engage in "scrupulous compliance" with its own procedures for discipline and removal of employees. Lerner v. District of Columbia, 362 F. Supp.2d 149, 161 (2005) U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005).  (See also Mazaleski v. Treusdell, 562 F.2d 701, 720 (D.C. Cir. 1977) (stating, "[w]here …. a government employee has no procedural due process rights apart from those which the agency has chosen to create by its own regulations, scrupulous compliance with those regulations is required to avoid any injustice.")).  Any manipulation of such procedures is an unconstitutional violation of due process.

42.    Government agencies are precluded from modifying or relaxing regulations that "provide the only safeguard [employees] have against unlimited agency discretion in hiring and

termination." *Lopez v. FAA*, 318 F2d. at 247.  Defendant DOC solicited the assistance of the

OAH and asked that it serve as the Hearing Officer in this matter.  At the conclusion of the

administrative proceedings outlined by the CBA, the ALJ's issued recommendations that all the

Employees be returned to work.  The CBA has specifically articulated the authority of the DC

DOC with respect to the Hearing Officer's recommendations.  Defendant DOC and Director

Devon Brown may not, at their own whim, confer upon themselves more authority than the

controlling regulation allows.  In this case, the controlling regulations, the CBA and the CMPA,

require that the Employees' be returned work.

43.     As a direct and proximate result of Defendants' violating Plaintiffs' Fifth

Amendment rights, Plaintiffs suffered loss of income and other employment benefits and damage

to their professional and personal reputations.  Further, as a direct and proximate cause of

Defendants' violating their Fifth Amendment rights, Plaintiffs have endured mental and physical

pain and suffering, embarrassment, humiliation, mental anguish, and the costs and attorneys' fees

of this action.

### COUNT II—Defamation Plus

44.     Plaintiffs repeat each and every allegation contained in all preceding paragraphs

and incorporate the same herein.

45.     Defendants immediately following the jail escape and thereafter negligently made

and published false statements to others both inside the D.C. government and publicly about

Plaintiffs that were defamatory and defamatory per se, as a consequence of which the Plaintiffs

suffered actual injury in their trade, profession, community standing and which lowered the

Plaintiffs in the estimation of their community.

46.    While defamation and slander typically do not provide a basis for recovery in a due process claim, "a plaintiff may prevail, however, if he can demonstrate either a 'reputation plus' claim, that is defamation accompanied by an adverse employment action, or 'foreclosure claims,' in which the government's actions foreclosed potential job opportunities." See *Fonville* at 28 (internal citations omitted).

47.    In *Fonville*, this court defined the requirements for "reputation plus" as those "comments that imply an inherent or persistent personal condition." *Id.* Specific examples of those behaviors that rise to a constitutional violation include "accusations of dishonesty, commission of a serious felony, manifest racism, serious mental illness, or a lack of intellectual ability." See *Fonville* at 29.

48.    Here, the Defendants have engaged in behavior that rises to the level of a constitutional violation. Director Brown frequently and publicly has accused the Plaintiffs of perpetrating criminal acts in connection with the jail escape. He accused them of being too old to do their jobs. He accused them of being unable to apply the classification system. One example of this is a press release that has been on the DOC web site since July 27, 2006. It states, in relevant part, "As a result of this investigation, 11 individuals have been terminated from employment with the DOC *for their roles leading to the escape* and to the breach of security…. The United States Attorney's Office is currently conducting a criminal investigation into the escape." See DC DOC website at www.dc.gov (emphasis added).

49.    As a direct and proximate result of Defendants' defamatory acts, Plaintiffs suffered loss of income and other employment benefits and damage to their professional and personal reputations. Further, as a direct and proximate cause of Defendants' defamatory acts,

Plaintiffs have endured mental and physical pain and suffering, embarrassment, humiliation, mental anguish, and the costs and attorneys' fees of this action.

### COUNT III—Intentional and Negligent Infliction of Emotional Distress.

50.    Plaintiffs repeat each and every allegation contained in all preceding paragraphs and incorporate the same herein.

51.    Defendants acted in an extreme and outrageous fashion and negligently in terminating Plaintiffs with the intent and/or result of causing them emotional distress.

52.    As a direct and proximate result of Defendants' acts, Plaintiffs suffered loss of income and other employment benefits and damage to their professional and personal reputations.  Further, as a direct and proximate cause of Defendants' acts, Plaintiffs have endured mental and physical pain and suffering, embarrassment, humiliation, mental anguish, and the costs and attorneys' fees of this action.

### COUNT IV- Injunctive Relief

53.    Plaintiffs repeat each and every allegation contained in all preceding paragraphs and incorporate the same herein.

54.    Plaintiffs request the Court to enjoin the Defendants' from pursuing any discipline as a result of the jail escape.

55.    Plaintiffs request that they be restored to their rightful positions within the Department of Corrections with restoration of all back pay, lost benefits, and the costs and attorneys' fees of this and all other actions resulting from defending the Plaintiffs from their unconstitutional terminations.

**COUNT V—Compensatory and Punitive Damages and Attorneys' Fees**

56.     Plaintiffs repeat each and every allegation contained in all preceding paragraphs and incorporate the same herein.

57.     Defendants acted with evil motive, actual malice, deliberate oppression, with intent to injure Plaintiffs and in willful disregard for the rights of Plaintiffs.  Defendants' conduct was itself outrageous, grossly fraudulent, and reckless toward Plaintiffs, for which Plaintiffs demand punitive damages and the costs and attorneys' fees of this action in an amount to be determined by a jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that they be awarded compensatory damages in an amount in excess of the jurisdictional amount in controversy, punitive damages to be determined by a jury, costs and attorneys' fees of this action, a declaration that they are entitled to be reinstated unconditionally to their positions, and a permanent injunction returning them to their former positions with all back pay and benefits to which they are entitled, including attorneys' fees of this action and all other actions resulting from defending the Plaintiffs from their wrongful terminations, and such further relief as the Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of all Counts triable by jury and of all factual allegations required for the determination of this Complaint.

Respectfully submitted,

HANNON LAW GROUP, LLP


_____/s/ J. Michael Hannon_____
J. Michael Hannon, #352526
1901 18th Street, NW
Washington, DC 20009
(202) 232-1907
Fax:  (202) 232-3704
jhannon@hannonlawgroup.com

*Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **First Amended Complaint for Compensatory, Injunctive and Declaratory Relief** was sent via electronic filing, this 12th day of July, 2007 to:

David Jackson, Esq.
Office of the Attorney General
441 Fourth Street, NW
6 South
Washington, DC 20001


_____/s/ J. Michael Hannon_____
J. Michael Hannon

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CYNTHIA WASHINGTON, *et al.,*            :

                Plaintiffs,            :        Case Number: 1:07-cv-01031(RMU)

    v.            :

DISTRICT OF COLUMBIA, *et al.,*            :

                Defendants.            :

## <u>ORDER</u>

On consideration of Plaintiffs' Motion for Partial Summary Judgment and the Court being duly advised in the premises, it is, by the Court, this _____ day of _____, 2007,

**ORDERED**, that the Plaintiffs, Cynthia Washington, et al's Motion for Partial Summary Judgment is hereby, **GRANTED.**

It is further **ORDERED** that,

Defendants are enjoined from pursuing any disciplinary action against these Plaintiffs as a result of the jail escape.

Defendants are **ORDERED** to reinstate Plaintiffs Cynthia Washington, et al, to their rightful positions with the Department of Corrections, with restoration of all back pay, lost benefits, and the costs and attorney's fees of this action.

_____
The Honorable Ricardo M. Urbina

Copies to:

J. Michael Hannon, Esq.
HANNON LAW GROUP, LLP
1901 18th Street, NW
Washington, DC 20009

David Jackson, Esq.
Office of the Attorney General
441 Fourth Street, NW
6 South
Washington, DC 20001

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CYNTHIA WASHINGTON, *et al.,*                    :

                Plaintiffs,                    :            Case Number: 1:07-cv-01031(RMU)

      v.                    :

DISTRICT OF COLUMBIA, *et al.,*                    :

              Defendants.                    :

<u>**ORDER**</u>

Upon consideration of Plaintiffs' Opposition to Defendants' Motion to Dismiss,

**IT IS ORDERED** that the Motion is **DENIED**.

SIGNED this _____ day of _____, 2007.

_____
The Honorable Ricardo M. Urbina

Copies to:

J. Michael Hannon, Esq.
HANNON LAW GROUP, LLP
1901 18th Street, NW
Washington, DC 20009

David Jackson, Esq.
Office of the Attorney General
441 Fourth Street, NW
6 South
Washington, DC 20001