# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CYNTHIA WASHINGTON, *et al.,*                    :

               Plaintiffs,                    :          Case Number: 1:07-cv-01031(RMU)

    v.                    :

DISTRICT OF COLUMBIA, *et al.,*                    :

               Defendants.                    :

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, AND IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Plaintiffs Cynthia Washington, et al., [hereinafter "DOC Employees"] by and through their attorneys, HANNON LAW GROUP, LLP, respectfully present this Memorandum in Opposition to Defendants' Motion to Dismiss and in support of their Motion for Partial Summary Judgment.

The DOC Employees move for Partial Summary Judgment against these Defendants as to Count IV (Injunctive Relief).

## INTRODUCTION

On June 3, 2006, two inmates escaped from the Department of Corrections ("DOC") Central Detention Facility ("CDF"). The escape was widely reported in the press and was a direct result of the DOC's and Director Brown's failure to remedy safety issues which had been repeatedly brought to their attention by the FOP/DOC Labor Committee ("Union"). Amidst the publicity backlash, the DOC Employees were publicly and summarily fired by Director Brown from their employment at DOC. None of the fired Employees or their Union were notified in advance of the public announcement.

Defendant Brown assigned the administrative hearings that followed the firings to the D.C. Office of Administrative Hearings ("OAH"). The OAH Judges issued a Report and Recommendation in each case on December 11, 2006, uniformly declaring that the DOC had violated the DOC Employees' constitutional rights and recommending they be returned to work. By the requirements of D.C. personnel laws and the Collective Bargaining Agreement ("CBA") between Defendant DOC and the FOP/DOC, Defendant Brown was compelled to follow the Recommendations and return the DOC Employees to work. Defendant Brown did not comply with that recommendation and refused to return the DOC Employees to work.

Instead, without any legal basis and in violation of established laws, Defendant Brown rescinded the original summary removal action, placed the DOC Employees on paid administrative leave, and served them with new notices of proposed termination based on the same allegations reviewed by the OAH Judges. The "Do Over" hearings were assigned to Defendant Henry R. Lesansky, Ph.D., the Health Services Administrator for Defendant DOC, with the expectation that Defendant Lesansky would do Brown's bidding and recommend that the DOC Employees be fired.

The Defendants refusal to return the DOC Employees to work and their manufacture of an unlawful "Do Over" before a compromised Hearing Officer violate the Fifth Amendment of the Constitution by depriving them of their constitutionally protected right to their jobs. There is no discovery required with respect to Defendants' blatant disregard of the property rights of these DOC Employees. Consequently, the DOC Employees contend that this Court should grant Summary Judgment on Count IV (Injunctive Relief). Disposition of this claim would expedite resolution of this matter.

## FACTUAL BACKGROUND

### A.    Facts Underlying This Complaint

The following information comes from the allegations contained in the First Amended Complaint, filed herewith as Exhibit  48.  On June 3, 2006, two inmates escaped from the Central Detention Facility ("CDF") by smashing out the door and window of the Warden's office.  The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the DC Jail.  Inmate Leaks was awaiting trial in the D.C. Superior Court on a charge of Accessory After the Fact to First Degree Murder While Armed.  He had also violated his parole arising from a 1998 conviction for Assault with a Deadly Weapon.  Defendant DOC contends that Leaks had a prior escape from the CDF in October of 2005, although no record of such escape was in Leaks' Institutional File.  Ricardo Jones was awaiting trial in the D.C. Superior Court in two cases, one charging Assault with Intent to Kill and a second charging Murder in the First Degree.  Leaks and Jones are co-defendants in the murder case.  Leaks and Jones are also suspects in an Assault with Intent to Kill investigation in Greensboro, North Carolina.

The escape was widely reported in the press, and was a direct result of the DOC's and Director  Brown's failure to remedy safety issues which had been repeatedly brought to his attention by the FOP/DOC Labor Committee.  For example, during monthly meetings before the jail escape, FOP representatives repeatedly told Defendant Brown that assaults on corrections officers were increasing daily, a warning of lack of manpower.  Defendant Brown's response was to prepare posters warning inmates not to assault corrections officers and to produce a videotape to be played to the inmates.  In

addressing news articles about increased assaults on corrections officers, Defendant Brown explained that it was an election year, and politicians seek any means to get their names in the paper.

Defendant Brown knew that in-service training of corrections officers was not being conducted. Defendant Brown knew that the DC Jail was woefully understaffed, and that corrections officers were subject to compulsory drafting to work double shifts. Defendant Brown knew that the DOC had no concrete plans for recruitment and training of new corrections officers. On May 18, 2006, Mr. Brown admitted that he was concerned regarding extensive overtime, and that he had concerns that overtime was adversely affecting the alertness and effectiveness of corrections officers. In February of 2006, the overtime budget for the DOC had been exhausted and the agency was $3,000,000 over budget.

The complaints by the FOP/DOC at these monthly meetings foresaw the jail escape. On the day of the escape, the DC Jail was understaffed by 58 out of the 121 positions required. The "solution" was to force 41 officers to work overtime on that shift and to "shutdown" 17 posts. Seven of the DOC Employees fired were working forced overtime, working posts for which they had not been trained, or working understaffed posts. On the morning of the escapes, representatives of the FOP/DOC requested that the Jail be locked down because of the shortage of personnel. This request was denied.

On June 4, 2006, the two escapees were recaptured without incident. In an effort to deflect continued public attention from deplorable working conditions, severe management deficiencies, and criticism of his leadership of the DOC, Director Brown on June 5, 2006, issued written notification to twelve DC Jail Employees putting them on

paid administrative leave pending further investigation of the escape. Those Employees included six (6) Correctional Officers, one (1) Lead Correctional Officer (Sgt.), three (3) Correctional Treatment Specialists, one (1) Correctional Program Specialist, and one (1) Captain. Among this group were the DOC Employees.

After the escape, public scrutiny continued. On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Phil Mendelson was held to continue review of the jail break and general safety issues at the DC Jail. At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes. Director Brown did not disclose to the Council that the Jail was dangerously understaffed that day, and that he knew that forced overtime was causing corrections officers to be less reactive and less efficient.

Facing pressure from both the public and the D.C. City Council, during his testimony at the June 26, 2006 hearing, Director Brown announced that as a result of the escape, the DOC evaluated its operation and made immediate improvements. None of these improvements addressed understaffing and the increasing incidents of assaults on corrections officers. A month later, on July 26, 2006, the Mayor, DOC Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC Employees who had been on suspension in connection with the jail break. Plaintiff Employees were among those fired. Not one of the DOC Employees or their Union was notified in advance of this public announcement.

During the Press Briefing, DOC Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes.  The Press Briefing and the summary firings, together with the announcement of a criminal investigation, were intended to and had the result of humiliating and embarrassing the discharged Union members, casting them in the public light as felons who abetted a jail escape.  These Union members learned of their firing from family and friends who had seen or heard the news in the media.  The Chairperson of the FOP/DOC Labor Committee learned of the terminations from a television news reporter who called to obtain a reaction to the firings.

Defendant  Brown made further statements to the press.  On June 6, 2006, he was reported by the Washington Times to have stated that "authorities are investigating 'quite vigorously' the question of whether the two inmates had help in the escape."  He criticized those DOC Employees who worked in classification of inmates, stating that "we can definitely say that Mr. Leaks should not have been authorized to have the classification that allowed him free movement on detail."  Defendant Brown coupled this, again, with a statement that the DOC Employees were suspended "pending a criminal investigation of the jailbreak."

Defendant Brown, whose office is located on the other side of the city from the DC Jail, told a citizens group that "When I arrived on the scene, the first thing I asked was, 'Did the siren go off?'"  Defendant Brown insisted that the siren had been sounded, when it had not.  Defendant Brown is reported as having stated that he would "make staff changes at the jail, including bringing in younger corrections officers, who are physically up to the demands of the job."  The Washington Post reported Defendant Brown as

stating "investigators want to determine if any of the officers deliberately aided the escape or unintentionally made mistakes that contributed to the breakout." In response to the increased level of assaults on corrections officers, Defendant Brown is reported by the D.C. Examiner to have stated "The older we get our reaction time is not as good, so if something is happening, a younger correctional force may be able to respond to it quicker before it escalates."

In order to accomplish this public humiliation and summary firing, the DOC engaged in an unlawful and unconstitutional revision of existing D.C. laws which would have prevented them from conducting a summary discharge in a public press briefing. The District of Columbia Personnel Manual ("DCPM"), until the Mayor's Weekly Press Briefing of July 26, 2006, provided that in cases of Summary Removal, proper written notification of the action was to be provided to the employee and the FOP/DOC within three (3) days of removal ("3 Day Rule"). DCPM § 1616.4. That notice must provide detailed information about the removal, including the reasons for Summary Removal along with identification of critical deadlines in the removal process and pertinent employee rights. Id. However, on the very date of the planned news conference, Director Brown and D.C. officials conspired to amend this provision of the DCPM so as to permit these firings in a summary fashion at the Mayor's Press Conference. The amendment, specifically applying to only these DOC Employees, provided that the information supporting summary removal need not be provided until 30 days after removal. (See App. 15 at 8).

A second change was made to the DCPM on July 28, 2006, to broaden the definition of Employees to whom the change applied. The July 28, 2006 variation

augments the July 26, 2006 amendment by including a twelfth employee who was summarily removed (on July 28, 2006) and provides that any subsequent firings resulting from the investigation into this jail break also will not be subject to the 3 Day Rule.  Id. This variation is completely unlawful and constitutes an ex post facto deprivation of due process rights to the discharged DOC Employees, all to enable Director Brown to divert criticism from his leadership to the rank and file corrections officers and Employees of the DOC.  Moreover, compliance with the 3 Day Rule would have required disclosure of tape recorded interviews of the DOC Employees, which would have laid to rest the public assertions by Director Brown that the jail escapes could only have occurred as a result of a criminal conspiracy among correctional officers and inmates: a ludicrous accusation in light of the facts then known to Director Brown regarding the security deficiencies at the DC Jail.

Summary Removal is permitted under D.C. law when an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District Employees or to the employee; or, is detrimental to public health, safety, or welfare, as provided for in D.C. Code § 1-616.51. None of these circumstances existed on or even near the date of the Respondents' Press Briefing that would justify an immediate firing.  The summary removal of the DOC Employees was unjustified and unconstitutional.  These suspended Employees were on paid administrative leave and posed a threat to no one. There was absolutely no lawful basis to summarily remove these Employees at that particular time, as later confirmed by the OAH Judges in their Reports and Recommendations.  The use of the Summary Removal procedure was unwarranted, and the fact that Defendant DOC and D.C. Office

of Personnel officials manipulated the law to achieve this gratuitous end is a clear abuse

of power.

On or about August 1, 2006, Plaintiff DOC Employees were formally delivered –

or summoned to pick up – a packet of materials and a notice advising them that they had

been summarily discharged from their employment with the DOC.  This firing was

accomplished with no notice and no opportunity to be heard of any kind in violation of

the Constitution of the United States.  The written notice required by law was not

prepared for each of the DOC Employees until August 24, 2006.  That notice provided as

follows:

> The Office of Administrative Hearings will conduct the administrative
> review and/or hearing of the proposed removal actions. . . .  In conducting
> the administrative review and/or hearing, your appointed Hearing Officer
> will review all of the documents giving rise to the charge . . . , this written
> notice and your response, if there is one.  After conducting the
> administrative review, your assigned Hearing Officer will make a written
> report and recommendation to Director  Brown, the Deciding Official,
> <u>who will issue a final decision</u>.

(Emphasis supplied).

### B.    <u>Facts Relevant to This Motion</u>

After the summary firings, Defendants DOC and  Brown then entered into a

Memorandum of Understanding ("MOU") with the Office of Administrative Hearings

("OAH") to effectuate the promises made to the DOC Employees in the letters of August

24, 2006.  Pursuant to the MOU, the Judges of the OAH would conduct the

administrative hearings required in these cases consistent with Chapter 16 of the DCPM

and the Collective Bargaining Agreement between Defendant DOC and FOP/DOC

("CBA"), and as the DOC Employees were advised in their written notices of August 24,

2006.

Section 1612.2 of the DCPM requires that an "administrative review shall be conducted by a hearing officer." 6 DCMR 1612.2. Defendant Brown specifically noted in the MOU that "it is necessary and desirable that the administrative proceedings are held by a body that is independent of the Department of Corrections and that OAH possesses the expertise and resources for conducting these hearing." Defendants DOC and Brown promised that this Agreement would "remain in effect through the latest date that the Director of DOC issues a final decision in any of the Disciplinary Actions." (Emphasis supplied).

DOC Director Brown was required by the DCPM to issue a Final Decision within 45 days of the delivery of the summary removal notices:

> The final decision in the case of summary suspension or summary removal action taken pursuant to §§ 1615-1616, respectively, shall be rendered not later than forty-five (45) days from date of delivery of the summary suspension or summary removal notice, as appropriate except that the period may be extended as follows:
>
> > (a) when the employee requests and is granted an extension of time in which to respond under § 1611.2; or
> >
> > (b) when the employee agrees to an extension of time requested by the agency.

6 DCMR 1614.3. In addition, both the CBA and the DCPM require that DOC Director Brown follow the recommendation of the OAH Judges in this case. Article 11, Section 9(D) of the CBA specifically states (emphasis supplied):

> Deciding Official shall issue a final decision after reviewing the recommendation of the Disinterested Designee/Hearing Officer. The deciding official may sustain or reduce the penalty recommended by the Disinterested Designee, remand the matter for further consideration by the Hearing Officer, or dismiss the charge but may not increase the penalty recommended by the Disinterested Designee/Hearing Officer.

Furthermore, Section 1613.2 of the DCPM also states with specificity that (emphasis supplied):

> The deciding official shall either sustain the penalty proposed, reduce it, remand the action with instruction for further consideration, or dismiss the action with or without prejudice, but in no event shall he or she increase the penalty.

The original Summary Removals were dated July 26, 2006. The DOC arranged for the D.C. Personnel Regulations to be altered in order to extend the DOC's deadline to present the requisite elements of Summary Removal to the Employees. On or about August 24, 2006, the DOC issued its written "follow-up" Summary Removal notice to the Employees. The OAH issued a Report and Recommendation in each case on December 11, 2006, concluding that the summary removals could not be sustained and recommending that the Employees be returned to work.

Instead of issuing a final decision returning the Employees to work as he was required to do by the DCPM and the CBA, and as he promised in the MOU and in the August 24, 2006, written notices to the DOC Employees, DOC Director Brown submitted remand notices for most of the Employees. These notices were issued on January 7, 2007, well beyond the 45-day deadline. The remand notices directed the panel of administrative law judges to re-consider the determination and recommendations included in their Final Reports and Recommendation issued to the DOC pursuant to 6 DCMR 1616.6(a).

The Employees filed a Motion to Strike the Remand Notices on January 16, 2007, arguing that the Remand Notices were untimely. The DOC filed its response to the Motion to Strike the Remand Notices on January 29, 2007, and the Employees filed their Reply on February 2, 2007. A hearing was held by the OAH Judges on February 5, 2007

in reference to the Remand Notices and the subsequent Response by the DOC.  The OAH

Judges issued their Report and Recommendation on Remand in the individual

Employees' cases on March 2, 2007, and once again recommended that Director  Brown

reinstate the Plaintiff DOC Employees.  Further, the OAH Judges opined that the

Remand Notices were filed late and that Director Brown unlawfully violated the 45-Day

Rule requiring a final agency decision.

     In each Report and Recommendation issued by the OAH in this matter, the Judges

found that Summary Removal could not be sustained.  Further, each report contained a

procedural summary which acknowledged that the October 26, 2006 Order established a

deadline for the final agency decision as December 15, 2006.  From the outset of this

entire process, Defendants DOC and  Brown have refused to comply with the established

rules of due process set out by the DCPM, the CBA, the MOU, and the August 24, 2006

notice of proposed removal.  The regulations are clear that a final decision in these types

of cases must be rendered within 45 days of delivery of the record.  The regulations and

the CBA are also clear that Director Brown may not depart from the recommendations of

the OAH Judges because they recommend reinstatement.  Director Brown is not free to

impose a harsher sanction.

     When Director Brown failed to issue a final decision, DOC Employees filed a

Petition for Writ of Mandamus with the District of Columbia Court of Appeals on March

12, 2007, to compel Defendant Brown to return them to work.  Four days later, senior

management at the DOC simultaneously rescinded and cancelled the proposals for

summary removal of the Employees in order to avoid an adverse decision by the District

of Columbia Court of Appeals.  Director Brown, and others with the Department of

Corrections including their counsel, conspired among themselves to lead DOC Employees to believe that their proposed discipline was over and they were being returned to work permanently. Specifically, DOC Employees Joan E. Murphy and Denise Shell were instructed to contact DOC Employees directly – who were then represented by counsel – and lead the Employees to believe they were being returned to work. In violation of ethical rules prohibiting a party from contacting another party except through counsel, Murphy and Shell lured the joyful DOC Employees to report to DOC headquarters on Friday, March 16, 2007, to be "reinstated."

In furtherance of this scheme, on the afternoon of March 15, 2007, Defendant Brown personally called Cpl. Nila Ritenour, Chairperson of the FOP/DOC. The FOP/DOC was also represented by counsel in the jail escape matter at that time, as Director Brown well knew. This telephone call was in violation of ethical rules prohibiting a party from contacting another party except through counsel, a rule that Director Brown was aware of by virtue of his having attended law school. In that telephone call, Director Brown told Cpl. Ritenour that all of the DOC Employees would be reinstated to their positions with all back pay and benefits. Director Brown said he wanted Cpl. Ritenour to hear the news directly from him. He stated that he had just signed the papers for reinstatement. It was a congratulatory telephone call, even though Director Brown well knew that he intended immediately to place the DOC Employees on leave pending a further effort to have them fired. Director Brown did not disclose his intention to conduct an unlawful "Do Over", knowing full well that Cpl. Ritenour would report the "good news" to DOC Employees and others.

Similarly, on March 15, 2007, counsel for the DOC Employees telephoned counsel for Defendant Department of Corrections to confirm the "good news."  Counsel for Defendant DOC had been directed by Defendant Brown not to disclose the truth as to his intended conduct.  Consequently, counsel for Defendant DOC confirmed to counsel for DOC Employees that the DOC "is bringing them all back to work."

When DOC Employees reported to DOC headquarters in the morning of March 16, 2007, they were indeed given a reinstatement letter promising back pay and benefits. At the same time, DOC Employees were given a second letter putting them all on leave pending a new hearing to sustain Defendant Brown's pre-ordained desire to have them all fired.  Defendant Warden Stanley Waldren signed the March 12, 2007, notices of proposed removal without reading them, without conducting any investigation, and under direct orders of Defendant  Brown.  As Defendant Brown no doubt anticipated, at roll call at the D.C. Jail early that morning, Cpl. Ritenour had announced the "good news", only to be humiliated when Defendant Brown's true intentions became known.  DOC Employees to this date, with one exception, have not received their full back pay and benefits.

Defendant Henry R. Lesansky, Ph.D., employed by the DOC, was appointed to be the new hearing officer for the proposed termination hearings.  Dr. Lesansky is not an "independent" hearing officer as promised to the DOC Employees in their August 24, 2006, notices of removal.  In February of 2002, Dr. Lesansky resigned from his position as the top official with the Maryland Department of Juvenile Justice after disclosures that he twice understated the number of assaults against teens at Maryland juvenile jails.  Dr.

Lesansky became unemployable in corrections work until hired by the District of Columbia. He serves at the pleasure of Defendant Brown.

The attempt by Defendants to avoid implementing the recommendation of the OAH Judges and seek a new recommendation from an interested party is not warranted by any law, regulation or provision of the CBA. Defendants refusal to adhere to the procedures for adjudication of the firings of DOC Employees and their efforts to have a "Do Over" violate DOC Employees' Fifth Amendment rights to their Career Service positions with Defendant DOC.

## ARGUMENT

The DOC Employees have filed a Complaint against Defendants alleging violations of Constitutional Rights, Defamation Plus, Intentional Infliction of Emotional Distress, Injunctive Relief and seeking Declaratory Relief, Compensatory and Punitive Damages and Attorney's Fees. The DOC Employees seek Partial Summary Judgment as to Count IV (Injunctive Relief). Further, the DOC Employees Oppose Defendants' Motion to Dismiss.

## I.     THE DOC EMPLOYEES ARE ENTITLED TO SUMMARY JUDGMENT AS TO COUNT IV, INJUNCTIVE RELIEF.

In Count IV, the DOC Employees seek an order from the Court enjoining the Defendants from pursuing any disciplinary action against the DOC Employees as a result of the jail escape. Further, the DOC Employees seek a declaration that they be unconditionally restored to their rightful positions within the Department of Corrections with restoration of all back pay, lost benefits, and the costs and attorneys' fees of this and all other actions resulting from defending the DOC Employees from their unconstitutional terminations.

**A.**    <u>**Standard for Summary Judgment and Declaratory and Injunctive Relief**</u>

Summary judgment is to be granted when the evidence and pleadings demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  <u>Beaty v. Republic of Iraq</u>, 2007 U.S. Dist. LEXIS 19191, 18-20 (D.D.C. 2007).  <u>See also</u> Fed R. Civ. P. 56 (c).  In determining whether summary judgment is appropriate, the Court will judge the evidence and facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor.  <u>Hunter v. Rice</u>, 2007 U.S. Dist. LEXIS 20859 (D.D.C 2007).  <u>See</u> <u>Waterhouse v. District of Columbia</u>, 298 F.3d 989, 991 (D.C. Cir. 2002).  Any opposition by the non-moving party to a motion for summary judgment must be supported by evidence which demonstrates a genuine issue for trial.  <u>Hunter v. Rice</u>, 2007 U.S. Dist. LEXIS 20859.  In the absence of a genuine issue of fact, summary judgment may be granted.  <u>Id</u>.

Declaratory judgments determine rights and obligations.  As established by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), courts may exercise jurisdiction and declare the rights of the parties when there is an actual controversy between the parties. <u>Citizen Elecs. Co. v. Osram GmbH</u>, 377 F. Supp. 2d 149, 152 (D.D.C. 2005); <u>EMC Corp. v. Norand Group</u>., 89 F.3d 807, 810 (Fed. Cir. 1996).  In order to determine whether an actual controversy exists, the court must evaluate each case individually and determine "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." <u>Md. Cas. Co. v. Pac. Coal & Oil Co.</u>, 312 U.S. 270, 273 (1941); <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227 (1937).

Declaratory relief is appropriate and warranted in this case because it, "permits an early adjudication of the rights and legal remedies involved in a dispute, regardless of whether claims for damages or injunctive relief have arisen or would otherwise need to be tried in the future." See Moore's Federal Practice – Civil § 57.04. Further, it "enables parties to adjudicate their disputes before either suffers great damages." Id at § 57.03. In this case, the DOC Employees have already suffered through the lengthy OAH hearing process and have been unable to attend their jobs since their original summary removal on July 26, 2007. Declaratory judgment promotes judicial economy in this matter, and this Court should grant Declaratory relief in the DOC Employees favor.

The DOC Employees are seeking a judicial declaration that they were: (1) wrongfully denied their jobs by the Defendants when the OAH Judges' recommendations were not implemented and (2) entitled to be reinstated unconditionally to their positions with back pay. A declaration of these rights would merely award to these DOC Employees that which they have earned through the procedures established by Defendants.

Injunctive relief is also warranted in this matter to enjoin Defendants from pursuing any further discipline related to the jail escape matter, including termination. Absent this injunction, the DOC Employees will continue to suffer the irreparable injury of being denied their jobs and being subjected to a process for which there is no statutory authority. As stated in Partido Revolucionario Dominicano Seccional Metropolitan de Washington –DC v. Partido Revolucionario Dominicano Seccional de Maryland y Virginia, 312 F. Supp. 2d 1, 11; (D.D.C. 2004):

> In determining whether to enter a permanent injunction, a court considers a modified iteration of the factors it utilizes in assessing

17

preliminary injunctions: (1) success on the merits, (2) whether the DOC Employees will suffer irreparable injury absent an injunction, (3) whether, balancing the hardships, there is harm to defendants or other interested parties, and (4) whether the public interest favors granting the injunction.

**B.    The DOC Employees Have Been Deprived of Their Property Right.**

The underlying facts in this case are clear and undisputed.  In August, 2006, the DOC Employees were given notices of summary removal and administrative hearings were held to examine the legality of the summary removals.  These hearings were conducted by disinterested administrative law judges through the Office of Administrative Hearings.  The judges examined whether these DOC Employees had committed "misconduct" or "gross misconduct" which justified their summary removal.

In each case, the Report and Recommendation concluded that the employee could not be summarily removed and that these DOC Employees should be returned to work. The District of Columbia Municipal Regulations, the FOP/DOC Collective Bargaining Agreement, and the Comprehensive Merit Protection Act required Director Brown to return them to work.  He refused.  There is no statutory or other legal authority supporting the Defendants' current effort to essentially re-litigate the discharge of these Employees as related to the jail escape of June 3, 2006, and terminate them.

The DOC Employees have a property interest in their public employment.  Their rights are born of the Due Process Clause of the United States Constitution, which states that no person shall be, "deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  United States Constitution, Amendment V.  In the public employment context the "***resulting and inherent property interest in employment"*** derives from a legitimate claim of entitlement

that arises not from the United States Constitution, but from independent sources such as state statutes, agency rules or policies, or agreements as to employment.  Board of Regents v. Roth, 408 U.S. 564, 577-78 (1972). (emphasis added).  Pursuant to this formula, the District of Columbia Comprehensive Merit Protection Act and the CBA gives these DOC Employees a property interest in their jobs.  "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for Employees governed by it.  The CMPA establishes a Career Service for Employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause….  Under the CMPA, Employees can only be disciplined for cause and prior notice must be given." Fonville v. D.C., 448 F. Supp. 2d 21 (D.D.C. 2006) (internal citations omitted).  See also, D.C. Department of Corrections v. Teamsters' Union Local, 554 A.2d 319, 323 (D.C. 1989).

Because the DOC Employees have a property interest in their public employment, the District of Columbia must establish such procedures as are necessary to afford procedural due process before taking any adverse action.  See Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985).  In Loudermill, the Supreme Court advanced the proposition that government Employees must be afforded procedural guarantees before they can be terminated, precisely because they have an inherent property interest in those jobs.  The administrative hearing process of the CMPA and the CBA, which the Employees fully complied with, are those procedures for DOC Employees.

Both the CMPA and the CBA outline the methods by which an employee's property rights are protected and how that termination can be appealed and reviewed.

Defendants are obligated by the Constitution to abide by internal, procedural regulations defining due process rights when proposing the dismissal of employees.  See Lopez v. FAA, 318 F.2d 242, 246 (D.C. Cir. 2003).  Abiding by the pre-termination procedures in these matters meant that Director Brown must follow the recommendation of the OAH judges.  After having chosen to remove these Employees via summary removal, Defendants were bound by the outcome of those proceedings.  DOC Director Brown was required by the DCPM to issue a Final Decision within 45 days of the delivery of the summary removal notices:

> The final decision in the case of summary suspension or summary removal action taken pursuant to §§ 1615-1616, respectively, shall be rendered not later than forty-five (45) days from date of delivery of the summary suspension or summary removal notice, as appropriate except that the period may be extended as follows:
>
>> (a) when the employee requests and is granted an extension of time in which to respond  under § 1611.2; or
>>
>> (b) when the employee agrees to an extension of time requested by the agency.

6 DCMR 1614.3.  In addition, both the CBA and the DCPM require that DOC Director Brown follow the recommendation of the OAH Judges in this case.  Article 11, Section 9(D) of the CBA specifically states (emphasis supplied):

> Deciding Official shall issue a final decision after reviewing the recommendation of the Disinterested Designee/Hearing Officer.  The deciding official may sustain or reduce the penalty recommended by the Disinterested Designee, remand the matter for further consideration by the Hearing Officer, or dismiss the charge but may not increase the penalty recommended by the Disinterested Designee/Hearing Officer.

Furthermore, Section 1613.2 of the DCPM also states with specificity that (emphasis supplied):

The deciding official shall either sustain the penalty proposed, reduce it, remand the action with instruction for further consideration, or dismiss the action with or without prejudice, but in no event shall he or she increase the penalty. 6 DCMR § 1613.2.

The CBA offers the DOC only three options in response to the Hearing Officer's (the Judges of the OAH) recommendations. The DOC is allowed to 1) sustain or reduce the penalty proposed; 2) remand the matter for further consideration; or 3) dismiss the charges. See Exhibit 18, CBA Article 11, Section 9(D). The DOC may not increase the recommended penalty and there is certainly no language in the CBA which allows for the cancellation of the proposed action and then re-adjudication of the matter.

Any manipulation of such procedures is an unconstitutional violation of due process. On December 11, 2006, Reports and Recommendations were issued by the administrative law judges assigned by the OAH to undertake review of the proposed summary removals. After complying fastidiously with the administrative process, each DOC Employee was found entitled to be returned to his or her position within the DOC.

**C**.    **The DOC Does Not Have A Right To A "Do Over"**

The Director chose to use the summary removal procedure to terminate these Employees and had every opportunity to substantiate the allegations during the administrative review process. Unable to justify the attempt to summarily remove these Employees, Defendants are not free to simply "take back" their initial termination attempt and try another method. Granting government employers the right to attempt to terminate Employees for the same infractions in repeated hearings denies the Employees due process in that no procedure is "meaningful" until the government agency finds the outcome it director desires. What resolution can a government employee with a protected

property interest in his employment hope to find from an administrative review procedure if there is no guarantee the outcome is enforceable?

Each report clearly stated that the employee could not be summarily removed and such removal would be a violation of due process.  Given these recommendations, Defendant Brown did not have the option of removing these Employees based on allegations arising out of the June 3, 2006 escape.  His actions were confined to those clearly outlined in the Collective Bargaining Agreement, District Municipal Regulations and the Memorandum of Understanding.  The Supreme Court has long recognized that "an agency is bound to the standards by which it professes its actions to be judged." Service v. Dulles, 354 U.S. 363, 373-76 (1957).  Furthermore, a government agency must engage in "scrupulous compliance" with its own procedures for discipline and removal of employees.  Lerner v. District of Columbia, 362 F. Supp.2d 149, 161 (2005) U.S. Dist. LEXIS 3565 (D.D.C. 2005).

Additionally, under the legal doctrine of res judicata, one party in a legal proceeding is prevented from getting another day in court after receiving an unsatisfactory result to his/her claim.  There is an abundance of legal precedent supporting this doctrine.  Judge Harris has held that "a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action." Arakawa v. Reagan, 666 F. Supp. 254, 262 (1987), citing Allen v. McCurry, 449 U.S. 90, 94 (1980).  Judge Harris reasons that "[t]his preclusive effect attaches to administrative proceedings when, as with proceedings before the MSPB, the administrative tribunal 'is acting in a judicial capacity and resolves issues of fact properly before it which the parties have had an

adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata, which is itself a constitutional principle. Director Brown is doing nothing more than attempting a "do over" with this proposed termination. It is important to note that the allegations made in the current attempt to terminate these Employees are *identical* to those made in the proposed summary removal. The Director did not agree with the decision of the OAH Hearing Officers, and is now looking for a more receptive audience within the confines of the DOC in order to obtain the result he wants. There are no duly ordained procedures which allow this.

Finally, the Defendants have contended in their Motion to Dismiss that DOC Employees have failed to exhaust administrative remedies. As explained in greater detail in the DOC Employees' opposition in Section II below, there are no other remedies for the DOC Employees to exhaust, other than objecting to the procedures Defendants have made up. Defendants argue that the DOC Employees must wait through another procedure that has no basis in the law, and then appeal what the DOC predicts will be an adverse outcome. However, there is no need for them to do so. They have already won. They have nothing to appeal. Under Defendants' theory, this process could go on forever, wasting the taxpayers money paying employees not to work.

## II. DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED

In this section, these DOC Employees address the Defendants' Motion to Dismiss.

A.    __Standard of Review__

DOC Employees have amply alleged constitutional claims of due process and

defamation against these Defendants.  "When considering a Motion to Dismiss, the Court

construes the facts in the complaint as true and construes all reasonable inferences in the

light most favorable to the plaintiff."  MacIntosh v. Bldg. Owners & Managers Ass'n

Int'l, 355 F. Supp. 2d 223, (D.D.C. 2005) citing Swierkiewicz v. Sorema, 534 U.S. 506,

508.  "A Motion to Dismiss is granted and the complaint dismissed only if no relief could

be granted on those facts."  See Sparrow v. United Air Lines Inc., 216 F.3d 1111, 1114

(D.C. Cir. 2002) (stating that complaints "need not plead law or match facts to every

element of a legal theory") (quoting Krieger v. Fadely, 211 F.3d 134 (D.C. Cir. 2000).

Defendants further rely on Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965-66

(2007), a complex Sherman Act suit, in which the Supreme Court held that telephone

subscribers failed to allege an unlawful agreement by their telephone companies.  An

unlawful agreement is a statutory element of the Sherman Act:

> [W]e hold that stating such a claim requires a complaint with enough
> factual matter (taken as true) to suggest that an agreement was made.
> Asking for plausible grounds to infer an agreement does not impose a
> probability requirement at the pleading stage; it simply calls for enough
> fact to raise a reasonable expectation that discovery will reveal evidence
> of illegal agreement. And, of course, a well-pleaded complaint may
> proceed even if it strikes a savvy judge that actual proof of those facts is
> improbable, and "that a recovery is very remote and unlikely."

Id. (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1202, at 94, 95)

(footnote omitted).  The First Amended Complaint suffers from none of the defects of the

cases relied upon by Defendants.  There is far more than a "reasonable expectation" that a

jury will find that Defendants' refusal to return the DOC Employees to work, and

Defendants' manufacture of an unlawful "Do Over" before a Hearing Officer who owes

his job to Defendant Devon Brown, violate the Fifth Amendment of the United States Constitution by depriving DOC Employees of their constitutionally protected right to their jobs.

###### B.    <ins>Plaintiff's Constitutional Right to Due Process Has Been Violated.</ins>

The Defendants have cited several cases in support of their position that, "the District's alleged violation of its own personnel regulations or the collective bargaining agreement between the District and the DOC Employees' union does not establish a deprivation of constitutional due process."  Defendants Motion to Dismiss at 8, citing <ins>Brandon v. District of Columbia</ins>, 823 F.2d 644, 649 (D.C. Cir. 1987).  The cases cited by Defendants are irrelevant to the DOC Employees' claim before this Court.

In both <ins>Ellis</ins> and <ins>Brandon</ins>, cited by Defendants, neither plaintiff could assert any underlying liberty interest which was entitled to due process, which doomed their § 1983 claims before the Court.  The inmates in those cases were seeking due process protections for their claimed right to parole or re-parole.  <ins>See</ins> <ins>Ellis v. District of Columbia</ins>, et. al., 84 F.3d 1413 (D.C. Cir. 1996), <ins>Brandon v. District of Columbia Board of Parole</ins>, 823 F.2d 644 (D.C. Cir. 1987).  The Court held in both cases, however, that their due process rights had not been violated because they had no underlying liberty interest.  <ins>Id</ins>. Similarly in <ins>Beo</ins>, the inmate did not have a, "constitutionally protected liberty interest in his assignment to a particular prison" and therefore his rights had not been violating in transferring him to another prison.  <ins>Beo v. District of Columbia</ins>, et al, 44 F.3d 1026, 1028 (D.C. Cir. 1994).

In total contrast to those cases, the DOC Employees are not seeking any procedural protections or hearings before a right is granted or terminated.  Rather, these

DOC Employees are seeking ***the property that has already been determined to be theirs***. Unlike Brandon, Beo and Ellis, these DOC Employees already have a protected property interest in their positions. They are not seeking declarations that they are entitled to a process, and they are not alleging that violation of a process denies them a potential right. Both the DOC Employees and the DOC have already completed the steps in the regulations and collective bargaining agreement designed to protect that right. What the DOC Employees are seeking from this Court is a declaration that their property must be immediately returned: i.e., they must be reinstated.

It is accepted that the DOC Employees have a protected property interest in their public employment. The due process analysis found in <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532 (1985), applies to DC government Employees and, in this case, the DOC Employees specifically. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for Employees governed by it." "Under CMPA, Employees can only be disciplined for cause and prior notice must be given." <u>Fonville v. D.C.,</u> 448 F. Supp. 2d 21 (D.D.C. 2006) (internal citations omitted). <u>See also</u>, <u>D.C. Department of Corrections v. Teamsters' Union Local</u>, 554 A.2d 319, 323 (D.C. 1989). DOC Employees therefore are not seeking access to a procedural system designed to protect their rights, they are seeking access to the property interest itself, an interest both the case law and the OAH reports assert is theirs already.

Finally, Defendants have yet to assert the legal authority that supports their attempt to "Do Over" the termination process for these DOC Employees. DOC Employees followed the rules and the administrative hearing process and received a ruling in their favor. How is it legally possible that the Defendants can simply undertake

a new termination without addressing the ruling from their first attempt?  Why are the

DOC Employees not immediately entitled to enforcement of the Report and

Recommendation issued by the OAH Judges?  Defendants are certainly not entitled to

any relief from this Court upon such a record.

> **C.      The CMPA is Not The DOC Employees' Exclusive Remedy For a Violation of Constitutional Rights.**

> **1.      42 U.S.C. § 1983 Claims Do Not Require CMPA Exhaustion.**

Defendants assert that "DOC Employees sole remedies for redress of any

violation of their due process rights must be presented through the administrative process

as set forth in the CMPA and the CBA."  Defendants' Motion at 11.  Defendants rely on

the holding of Johnson which took the position that the Court must "apply the CMPA's

exhaustion requirements strictly," Defendants Motion to Dismiss at 11 citing Johnson v.

District of Columbia, 368 F. Supp. 2d 30, 43 (D.D.C. 2007).  Defendants' argument fails

to acknowledge the line of cases establishing the DOC Employees' position that a

constitutional violation does not fall within the ambit of the CMPA.

Actions filed pursuant to 42 U.S.C. § 1983 do not require an exhaustion of

administrative remedies as a prerequisite.  See Roache v. District of Columbia, 654 A.2d

1283 (D.C. 1995) citing Patsy v. Board of Regents, 457 U.S. 496 (1982).  Defendants'

argument that DOC Employees are required to exhaust administrative remedies prior to

bringing this suit is therefore without merit.  It is inaccurate to suggest, as Defendants do,

that DOC Employees are challenging their termination.  Rather, it has already been

determined their terminations were improper, and DOC Employees merely seek

enforcement of that determination and an injunction against any efforts to restart

termination proceedings against them.  These constitutionally based claims of entitlement to due process are not subject to the exclusivity doctrine.

The Supreme Court has held that, "exhaustion of administrative remedies was not a prerequisite to a § 1983 action because Congress assigned to the courts the role of protecting constitutional rights and did not intend under most circumstances for civil rights claims to be initially addressed through state administrative procedures."  Patsy v. Board of Regents of the State of Florida, 457 U.S. 496 (1982).  While the CMPA procedures are designed to address employee grievances, its procedures do not address a deprivation of constitutional rights.  The DOC Employees need not exhaust administrative remedies before asserting their constitutional rights in federal court.  The legislative history of civil rights legislation supports that position, as quoted in Patsy. "The 1871 Congress intended § 1 (of the Civil Rights Acts of 1871) to 'throw open the doors of the United States courts' to individuals who were threatened with, or who had suffered, the deprivation of constitutional rights, and to provide these individuals *immediate access* to the federal courts notwithstanding any provision of state law to the contrary."  Patsy, 457 U.S. at 504.

### 2.    Regardless, the DOC Employees Have Exhausted Administrative Remedies.

Defendants argue that, "DOC Employees' exclusive remedy to challenge their termination is through the Comprehensive Merit Protection Act and the CBA."  See Defendants Motion to Dismiss at 10.  Again, the DOC has already pursued this route, and Defendants theory would require them to wait through another round of made up procedures.  The DOC Employees have already sought and won the remedies available through the CMPA and CBA.  The DOC Employees did not rush to the courthouse upon

learning of their summary removal via a public press conference. Rather, they followed the procedures established by the CMPA and CBA established by their employer.

It is disingenuous for the Defendants to argue that, "any violation of their due process rights must be presented through the administrative process as set forth in the CMPA and CBA." See Defendants Motion at 11. It is the Defendants, not the DOC Employees, who are neglecting the administrative process. The DOC Employees essentially "won" the administrative process when the OAH Judges clearly and without condition found that the DOC Employees could not be summarily removed and should be returned to work. At that point, there is no process left for the DOC Employees to exhaust. Why would they appeal to D.C. Superior Court a Report and Recommendation that finds them entitled to their positions? The DOC Employees have gone as far as they can go in the administrative process established by the CMPA and CBA. After a judicial determination that they are entitled to their jobs and the refusal by these Defendants to acknowledge that right, the DOC Employees have been left with their federal claim to enforce their constitutional rights.

### D.    DOC Employees' 42 U.S.C. § 1983 Claim Does Not Fail

#### 1.    The District of Columbia is Liable Under 42. U.S.C. § 1983.

Defendants argue that the District can be held liable for DOC Employees' constitutional claims, "only if the DOC Employees allege facts that indicate their injury was caused by a policy or custom of the District." See Defendants' Motion to Dismiss at 11 citing Monell v. Dep't of Social Servs. of the City of New York, 436 U.S. 658, 694 (1978). Monell is quoted for the proposition that a necessary element of a § 1983 violation is that, "there be a deprivation of rights under color of statute, ordinance,

regulation, custom, or usage of any State." Monell, 346 U.S. at 691. DOC Employees assert that the First Amended Complaint does establish that their constitutional rights have been infringed by "custom or usage" of the District of Columbia.

Defendants have repeatedly distorted the personnel regulations and manipulated established procedures in this case in an effort to deprive the DOC Employees of their constitutionally protected interest in their jobs. The injuries suffered by the DOC Employees in this matter are the result of a coordinated effort on behalf of DOC officials and are not the product of an isolated incident, such as the police shooting in City of Oklahoma City. However, the DOC Employees intend to seek leave to file a Second Amended Complaint which will more clearly state the basis of the Complaint and satisfy the elements discussed in Monell, City of Oklahoma City v Tuttle, 471 U.S. 808 (1985), Dorman v District of Columbia, 888 F.2d 159 (D.C. Cir. 1989), and Dant v. District of Columbia, 829 F.2d 69 (D.C. Cir. 1987).

### 2.    Individual Defendants are Liable Under 42 U.S.C. § 1983.

As discussed previously, the DOC Employees will be seeking leave to file a Second Amended Complaint which will address Defendants' concern that, "DOC Employees do not identify the capacity in which the individual Defendants are sued." See Defendants Motion to Dismiss at 13. While case law supports the Defendants' claim that, "a law suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," the DOC Employees intend to name Director Devon Brown as a defendant in his individual capacity in this case. See Defendants' Motion to Dismiss at 14, citing Will v Michigan Dept. of State Police, 491 US. 58, 71(1989).

Director Brown's behavior with regard to these DOC Employees has been both manipulative and in dereliction of established rules. He has personally sought to keep these Employees from returning to their jobs and therefore is personally liable for the injuries that have resulted. A government official is immune from being sued in his individual capacity when his actions are reasonable, "assessed in light of the legal rules that were clearly established at the time it was taken." <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987), <u>citing</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 819 (1982). There was simply no rule in place at the time Director Brown undertook to rescind the summary removal and instigate new terminations and therefore his action is patently unreasonable. Director Brown refused to follow the Report and Recommendation of the OAH judges, in direct violation of the CMPA, CBA and MOU and no, "reasonable officer could have believed that the action taken was not in violation of clearly established constitutional law." <u>See</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987). Moreover, there is amply evidence of Director Brown's delight in this little game. He conspired to mislead the DOC Employees, their Union, and their counsel that he was returning them to work. Such conduct is reprehensible in an agency Director acting on behalf of a new Mayor.

    **E.**    **DOC Employees' Common Law Claims For Defamation (Count II) And Intentional And Negligent Infliction of Emotional Distress Do Not Fail Because Notice of These Claims Was Given to the Mayor as Required by DC Code § 12-309.**

Defendants correctly assert that, "In order to maintain any tort action against the District of Columbia for unliquidated damages, a plaintiff must satisfy the mandatory notice requirement of § 12-309 of the D.C. Code." <u>See</u>, <u>e.g.</u> <u>Hill v. District of Columbia</u>, 345 A.2d 867, 869 (D.C. 1975). § 12-309 provides that,

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the …[Mayor] of the approximate time, place, cause, and circumstances of the injury or damage.

DOC Employees' were effectively injured on March 15, 2007, the date at which it become painfully obvious that the Defendants were not going to comply with the Report and Recommendations issued by the OAH Judges.  On March 15, 2007, DOC Employees were invited back to work only to be given new termination notices, which in no way complied with the Recommendations of the OAH Judges.  DOC Employees had six months from the date of that injury to notify the Mayor of the approximate time, place, cause and circumstances of the injury or damage.  DOC Employees have served Mayor Adrian Fenty with the required statutory notice as of Friday August 24, 2007, on behalf of all DOC Employees.  This notice satisfies the six month time frame as DOC Employees had until September 15, 2007 to comply with § 12-309 of the D.C. Code.  Finally, the DOC Employees will be seeking leave to file a Second Amended Complaint which will address the steps taken to meet the statutory notice requirement.

### F.    DOC Employees' Defamation Claim is Not Time Barred.

Defendants seek dismissal of the DOC Employees' claim arising out of the June 6, 2006 defamatory comments made by Defendant Brown, alleging they are outside of the one year statute of limitations.  The DOC Employees' respond that Defendant Brown and others have repeatedly made defamatory statements about these DOC Employees and their claim for defamation does not rest solely on the June 6, 2006 statement.  Therefore, the DOC Employees' claim of defamation should not be dismissed and discovery should

continue on this claim allowing for introduction of evidence of additional defamatory statements.

More importantly, however, the DOC Employees' defamation claim grows out of a constitutional violation and is not subject to the one year statute of limitation for defamation. A "reputation plus" brand of defamation claim is based on the liberty interest protected by 42 U.S.C. § 1983. The DOC Employees can demonstrate, "defamation accompanied by an adverse employment action, or 'foreclosure claims,' in which the government's actions foreclosed potential job opportunities." Fonville v. District of Columbia, 448 F. Supp. 2d 21 (D.D.C. 2006). As stated in Fonville, "the government's behavior while terminating an employee-employer relationship can implicate that employee's *fifth amendment* liberty interest." Id. At 28, citing Roth, 408 U.S. at 573; Alexis v. District of Columbia, 44 F. Supp. 2d 331, 338 (D.D.C. 1999). (emphasis in original)

It is precisely that constitutional based liberty interest that is being injured in this case and why a three year statute of limitation applies. "Section 1983 provides a federal cause of action, but in several respects relevant here federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: It is that which the State provides for personal-injury torts." Owens v. Okure, 488 U.S. 235, 249 (1989). The Court then further held that, "where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." Id.

The United States District Court for the District of Columbia recently issued a similar holding in Richards v Duke Univ., 480 F. Supp. 2d 222 (D.D.C. 2007), where the

plaintiff brought a discrimination claim under the Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972. Judge Lamberth stated, "Neither of these statutes have their own statute of limitations, but courts have borrowed statutes of limitations from 42 U.S.C. § 1981 and *§ 1983, which in turn rely on the respective personal injury statute of limitations in a jurisdiction*." Richards at 238. (emphasis added). He then went on to state that, "In the District of Columbia, a personal injury action has a three year statute of limitations and therefore, a Title VI or Title IX claim also has a three-year statute of limitations in the District of Columbia." Id, citing Carney v American Univ., 151 F.3d 1090 (D.C. Cir 1998).

Applying those opinions to the instant matter, the reputation plus claim which arises out of a constitutional violation of the DOC Employees liberty interest is bound by a three-year statute of limitations and is therefore not time barred. Defendants' Motion to Dismiss on these grounds should be denied.

### G.    DOC Employees' Defamation Claim Does Not Fail For Lack of Asserting Falsity.

DOC Employees' defamation claim should not be dismissed because the statements made by the Defendants were false and furthermore they meet the standard for a "reputation plus" claim. Defendants' Motion to Dismiss speaks only to the standard concept of defamation. DOC Employees' Complaint however alleges the "reputation plus" brand of defamation, recently discussed in Fonville. The Complaint repeatedly asserts that the statements made by Director Brown were false and incredibly damaging to the DOC Employees' reputation for their ability to perform their jobs. See Complaint at 47. The Defendants have repeatedly implied through various media that the DOC

Employees were not simply negligent in performance of their jobs but also that they actively facilitated the escape of the inmates.  This claim is clearly false.

Defendants' state, "DOC Employees have not alleged that the statements made by Director Brown were false,…"  Motion to Dismiss at 17.  This is patently untrue as DOC Employees Complaint describes several false statements made by Director Brown. Director Brown frequently and publicly has accused the DOC Employees of perpetrating criminal acts in connection with the jail escape, a false assertion.  See Amended Complaint ¶ 48. He accused them of being too old to do their jobs.  He accused them of being unable to apply the classification system.  One example of this is a press release that has been on the DOC web site since July 27, 2006.  It states, in relevant part, "As a result of this investigation, 11 individuals have been terminated from employment with the DOC *for their roles leading to the escape* and to the breach of security….  The United States Attorney's Office is currently conducting a criminal investigation into the escape." See DC DOC website at www.dc.gov (emphasis added).

In Fonville, Judge Sullivan defined the requirements for "reputation plus" as those "comments that imply an inherent or persistent personal condition."  Id.  Specific examples of those behaviors that rise to a constitutional violation include "accusations of dishonesty, commission of a serious felony, manifest racism, serious mental illness, or a lack of intellectual ability."  See Fonville at 29.  The DOC Employees allegations clearly rise to the level of the "reputation plus" claim and should not be dismissed.  The Defendants comments go beyond, "statements about inadequate job performance" and rather imply a "personal persistent condition" which affects the Plaintiff's ability to do their jobs.  Id.  Suggesting the DOC Employees are too old to have prevented the escape

or even criminally responsible for the escape clearly qualifies as "stigmatizing" to the Plaintiffs and entitles them to pursue their defamation plus claim before this Court.

**H.      Sui Juris – Department of Corrections**

The DOC Employees concede that the Department of Corrections, as a sub agency of the District of Columbia was improperly named as a Defendant in this matter. The Second Amended Complaint which the DOC Employees will be seeking leave to file will address this issue and remove the Department of Corrections as a named Defendant.

WHEREFORE, the Plaintiffs respectfully request that the Court grant their Motion for Partial Summary Judgment and deny Defendants' Motion to Dismiss.

Respectfully submitted,

HANNON LAW GROUP, LLP


_____/s/ J. Michael Hannon_____
J. Michael Hannon, #352526
1901 18th Street, NW
Washington, DC 20009
(202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com

*Attorneys for DOC Employees*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CYNTHIA WASHINGTON, *et al.,* | : | |
| and | : | |
| SHANTELL HATTON<br>10394 Hallmark Lane<br>Waldorf, MD 20603 | :<br><br>: | |
| Plaintiffs, | : | Case Number: 1:07-cv-01031 (RMU) |
| v. | : | |
| DISTRICT OF COLUMBIA, *et al.,* | : | |
| Defendants. | : | |

## FIRST AMENDED COMPLAINT FOR
## <u>COMPENSATORY, INJUNCTIVE AND DECLARATORY RELIEF</u>

Come now Plaintiffs Cynthia Washington, Herbert Douglas, Lorenzo Jennings, Dionne Makins, Alphonso Bryant, Lowanda Hinton-Saunders, Darryl Love, Malcolm Pointer and Shantell Hatton ("DOC Employees") through their attorneys with HANNON LAW GROUP, LLP and present their First Amended Complaint adding Shantell Hatton as an additional Plaintiff, and for their First Amended Complaint against Defendants state as follows:

## <u>NATURE OF THE CASE</u>

This is an action for declaratory and injunctive relief and compensatory and punitive damages on behalf of Plaintiffs, all employees of the District of Columbia Department of Corrections ("DOC") and members of the bargaining unit of the Fraternal Order of Police/Department of Corrections Labor Committee ("FOP/DOC").

These DOC Employees were summarily fired by Defendant DOC and Defendant Devon Brown at a press conference on July 26, 2006, following a highly publicized Jail Escape by two

of the most dangerous offenders housed at the D.C. Jail.  Defendant Devon Brown assigned the

administrative removal hearings for the DOC Employees to the D.C. Office of Administrative

Hearings.  He did so because "it is necessary and desirable that the administrative proceedings

are held by a body that is independent of the Department of Corrections and that OAH possesses

the expertise and resources for conducting these hearing."  The OAH Judges issued a Report and

Recommendation in each case on December 11, 2006, uniformly declaring that the DOC had

violated their constitutional rights and recommending they be returned to work.  By the

requirements of D.C. personnel laws and the Collective Bargaining Agreement between

Defendant DOC and the FOP/DOC, Defendant Devon Brown was compelled to follow the

Recommendations and return the DOC Employees to work.  Defendant Brown refused to return

the DOC Employees to work.

On March 12, 2007, the DOC Employees filed a Petition for Writ of Mandamus with the

District of Columbia Court of Appeals seeking an order compelling Defendants DOC and Devon

Brown to return them to work.  On March 15, 2007, Defendants DOC and Devon Brown

rescinded the summary removal action, placed the DOC Employees on paid administrative leave,

and served them with new notices of proposed termination based on the same allegations on

which the OAH Judges had ruled.  Defendant Devon Brown assigned the hearing (hereafter the

"Do Over") to Defendant Henry R. Lesansky, Ph.D., the Health Services Administrator for

Defendant DOC.  Defendant Devon Brown did so with the expectation that Defendant Lesansky,

hand-picked by Brown, would do Brown's bidding and recommend that Plaintiff DOC

Employees be fired.

As a consequence of the Reports and Recommendations of the OAH Judges, Defendants

DOC and Devon Brown are bound by law to return the DOC Employees to work.  Defendants'

refusal to return the DOC Employees to work and Defendants' manufacture of an unlawful "Do Over" before a Hearing Officer who owes his job to Defendant Devon Brown violate the Fifth Amendment of the United States Constitution by depriving Plaintiffs of their constitutionally protected right to their jobs without due process.

## JURISDICTION

Jurisdiction of this Court is found in Title 28 U.S.C. §§ 1331, 1342 and 1367 and in Title 42 U.S.C. §§ 1983 and 1988.

## PARTIES

1.      Plaintiffs are employees of the D.C. Department of Corrections and members of the Bargaining Unit of the Fraternal Order of Police, Department of Corrections Labor Committee.

2.      Defendant DISTRICT OF COLUMBIA is a municipal corporation that employs Defendants DEVON BROWN, STANLEY WALDREN, HENRY R. LESANSKY, Ph.D., and Plaintiffs to operate the Department of Corrections.  Defendant DEPARTMENT OF CORRECTIONS is an agency of the DISTRICT OF COLUMBIA.

## FACTS COMMON TO ALL COUNTS

Plaintiffs submit that the following facts are common to all counts:

### A.    Factual Background

3.      On June 3, 2006, two inmates escaped from the Central Detention Facility ("CDF") by smashing out the door and window of the Warden's office.  The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the DC Jail.  Inmate Leaks was awaiting trial in the D.C. Superior Court on a charge of Accessory After the Fact to First Degree Murder While Armed.  He had also violated his parole arising from a

1998 conviction for Assault with a Deadly Weapon. Defendant DOC also contends that Leaks had a prior escape from the CDF in October of 2005, although no record of such escape was in Leaks' Institutional File. Ricardo Jones was awaiting trial in the D.C. Superior Court in two cases, one charging Assault with Intent to Kill and a second charging Murder in the First Degree. Leaks and Jones are co-defendants in the murder case. Leaks and Jones are also suspects in an Assault with Intent to Kill investigation in Greensboro, North Carolina.

4.    The escape was widely reported in the press, and was a direct result of the DOC's and Director Devon Brown's failure to remedy safety issues which had been repeatedly brought to his attention by the FOP/DOC Labor Committee. For example, during monthly meetings before the jail escape, FOP representatives repeatedly told Defendant Brown that assaults on corrections officers were increasing daily, a warning of lack of manpower. Defendant Brown's response was to prepare posters warning inmates not to assault corrections officers and to produce a videotape to be played to the inmates. In explaining news articles about increased assaults, Defendant Brown explained that it was an election year, and politicians seek any means to get their names in the paper. Defendant Brown knew that in-service training of corrections officers was not being conducted. Defendant Brown knew that the DC Jail was woefully understaffed, and that corrections officers were subject to compulsory drafting to work double shifts. Defendant Brown knew that the DOC had no concrete plans for recruitment and training of new corrections officers. On May 18, 2006, Mr. Brown admitted that he was concerned regarding extensive overtime, and that he had concerns that overtime was adversely affecting the alertness and effectiveness of corrections officers. In February of 2006, the overtime budget for the DOC had been exhausted and the agency was $3,000,000 over budget.

5.      The complaints by the FOP/DOC at these monthly meetings foresaw the jail escape.  On the day of the escape, the DC Jail was understaffed by 58 out of the 121 positions required.  The "solution" was to force 41 officers to work overtime on that shift and to "shutdown" 17 posts.  Seven of the DOC Employees fired were either working forced overtime, working posts for which they had not been trained, or working understaffed posts.  On the morning of the escapes, representatives of the FOP/DOC requested that the Jail be locked down because of the shortage of personnel.  This request was denied.

6.      On June 4, 2006, the two escapees were recaptured without incident.  In an effort to deflect continued public attention from deplorable working conditions, severe management deficiencies, and criticism of his leadership of the DOC, Director Devon Brown on June 5, 2006, issued written notification to twelve DC Jail employees putting them on paid administrative leave pending further investigation of the escape.  Those employees included six (6) Correctional Officers, one (1) Lead Correctional Officer (Sgt.), three (3) Correctional Treatment Specialists, one (1) Correctional Program Specialist, and one (1) Captain.  Among this group were the Plaintiffs.

7.      After the escape, public scrutiny continued.  On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Phil Mendelson was held to continue review of the jail break and general safety issues at the DC Jail.  At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.  Director Brown did not disclose to the Council that the Jail was dangerously understaffed that day, and that he knew that forced overtime was causing corrections officers to be less reactive and less efficient.

8.    Facing pressure from both the public and the D.C. City Council, during his testimony at the June 26, 2006 hearing, Director Brown announced that as a result of the escape, the DOC evaluated its operation and made immediate improvements.  None of these improvements addressed understaffing and the increasing incidents of assaults on corrections officers.

9.    A month later, on July 26, 2006, the Mayor, DOC Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break.  Plaintiff Employees were among those fired.  Not one of the Plaintiffs or their Union was notified in advance of this public announcement.

10.    During the Press Briefing, DOC Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing and the summary firings, together with the announcement of a criminal investigation, were intended to and had the result of humiliating and embarrassing the discharged Union members, casting them in the public light as felons who abetted a jail escape.  These Union members learned of their firing from family and friends who had seen or heard the news in the media.  The Chairperson of the FOP/DOC Labor Committee learned of the terminations from a television news reporter who called to obtain a reaction to the firings.

11.    Defendant Devon Brown made further statements to the press.  On June 6, 2006, he was reported by the Washington Times to have stated that "authorities are investigating 'quite vigorously' the question of whether the two inmates had help in the escape."  He criticized those Plaintiffs who worked in classification of inmates, stating that "we can definitely say that Mr. Leaks should not have been authorized to have the classification that allowed him free movement

on detail." Defendant Brown coupled this, again, with a statement that the Plaintiffs were suspended "pending a criminal investigation of the jailbreak." Defendant Brown, whose office is located on the other side of the city from the DC Jail, told a citizens group that "When I arrived on the scene, the first thing I asked was, 'Did the siren go off?'" Defendant Brown insisted that the siren had been sounded, when it had not. Defendant Brown is reported as having stated that he would "make staff changes at the jail, including bringing in more younger corrections officers, who are physically up to the demands of the job." The Washington Post reported Defendant Brown as stating "investigators want to determine if any of the officers deliberately aided in the escape or unintentionally made mistakes that contributed to the breakout." In response to the increased level of assaults on corrections officers, Defendant Brown is reported by the D.C. Examiner to have stated "The older we get our reaction time is not as good, so if something is happening, a younger correctional force may be able to respond to it quicker before it escalates."

12.    In order to accomplish this public humiliation and summary firing, the DOC engaged in an unlawful and unconstitutional revision of existing D.C. laws which would have prevented them from conducting a summary discharge in a public press briefing. Id. The District of Columbia Personnel Manual ("DCPM"), until the Mayor's Weekly Press Briefing of July 26, 2006, provided that in cases of Summary Removal, proper written notification of the action was to be provided to the employee and the FOP/DOC within three (3) days of removal ("3 Day Rule"). DCPM § 1616.4. That notice must provide detailed information about the removal, including the reasons for Summary Removal along with identification of critical deadlines in the removal process and pertinent employee rights. Id. However, on the very date of the planned news conference, Director Brown and D.C. officials conspired to amend this

provision of the DCPM so as to permit these firings in a summary fashion at the Mayor's Press Conference.  The amendment, specifically applying to only these Plaintiffs, provided that the information supporting summary removal need not be provided until 30 days after removal.  (See App. 15 at 8).

13.     A second change was made to the DCPM on July 28, 2006, to broaden the definition of employees to whom the change applied.  The July 28, 2006 variation augments the July 26, 2006 amendment by including a twelfth employee who was summarily removed (on July 28, 2006) and provides that any subsequent firings resulting from the investigation into this jail break also will not be subject to the 3 Day Rule.  Id.  This variation is completely unlawful and constitutes an ex post facto deprivation of due process rights to the discharged DOC Employees, all to enable Director Brown to divert criticism from his leadership to the rank and file corrections officers and employees of the DOC.  Moreover, compliance with the 3 Day Rule would have required disclosure of tape recorded interviews of the Plaintiffs, which would have laid to rest the public assertions by Director Brown that the jail escapes could only have occurred as a result of a criminal conspiracy among correctional officers and inmates: a ludicrous accusation in light of the facts then known to Director Brown regarding the security deficiencies at the DC Jail.

14.     Summary Removal is permitted under D.C. law when an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District employees or to the employee; or, is detrimental to public health, safety, or welfare, as provided for in D.C. Code § 1-616.51.  None of these circumstances existed on or even near the date of the Respondents' Press Briefing that would justify an immediate firing.  The summary removal of the Plaintiffs was unjustified and unconstitutional.

These suspended employees were on paid administrative leave and posed a threat to no one. There was absolutely no lawful basis to summarily remove these employees at that particular time, as later confirmed by the OAH Judges in their Reports and Recommendations. The use of the Summary Removal procedure was unwarranted, and the fact that Defendant DOC and D.C. Office of Personnel officials manipulated the law to achieve this gratuitous end is a clear abuse of power, and a violation of the constitutional rights of these DOC Employees.

15.    On or about August 1, 2006, Plaintiff DOC Employees were formally delivered – or summoned to pick up – a packet of materials and a notice advising them that they had been summarily discharged from their employment with the DOC. This firing was accomplished with no notice and no opportunity to be heard of any kind in violation of the constitution of the United States. The written notice required by law was not prepared for each of the DOC Employees until August 24, 2006. That notice provided as follows:

> The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal actions. . . .  In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge . . . , this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, <u>who will issue a final decision</u>.

(Emphasis supplied).

**B.    Procedural Background**

16.    After the summary firings, Defendants DOC and Devon Brown then entered into a Memorandum of Understanding ("MOU") with the Office of Administrative Hearings ("OAH") to effectuate the promises made to the Plaintiffs in the letters of August 24, 2006, as set forth in ¶ 15 above. Pursuant to the MOU the Judge of the OAH would conduct the administrative hearings required in these cases consistent with Chapter 16 of the DCPM and the

Collective Bargaining Agreement between Defendant DOC and FOP/DOC ("CBA"), and as the

DOC Employees were advised in their written notices of August 24, 2006.  Section 1612.2 of the

DCPM requires that an "administrative review shall be conducted by a hearing officer."  6

DCMR 1612.2.  Defendant Brown specifically noted in the MOU that "it is necessary and

desirable that the administrative proceedings are held by a body that is independent of the

Department of Corrections and that OAH possesses the expertise and resources for conducting

these hearing."  Defendants DOC and Devon Brown promised that this Agreement would

"remain in effect <u>through the latest date that the Director of DOC issues a final decision</u> in any of

the Disciplinary Actions."  (Emphasis supplied).

17.    DOC Director Devon Brown was required by the DCPM to issue a Final Decision

within 45 days of the delivery of the summary removal notices:

> The final decision in the case of summary suspension or summary removal action
> taken pursuant to §§ 1615-1616, respectively, shall be rendered not later than
> forty-five (45) days from date of delivery of the summary suspension or summary
> removal notice, as appropriate except that the period may be extended as follows:
>
> > (a) when the employee requests and is granted an extension of time in
> > which to respond  under § 1611.2; or
> >
> > (b) when the employee agrees to an extension of time requested by the
> > agency.

6 DCMR 1614.3.

18.    In addition, both the CBA and the DCPM require that DOC Director Devon

Brown follow the recommendation of the OAH Judges in this case.  Article 11, Section 9(D) of

the CBA specifically states (emphasis supplied):

> Deciding Official shall issue a final decision after reviewing the recommendation
> of the Disinterested Designee/Hearing Officer.  The deciding official may sustain
> or reduce the penalty recommended by the Disinterested Designee, remand the
> matter for further consideration by the Hearing Officer, or dismiss the charge <u>but</u>

> <u>may not increase the penalty recommended by the Disinterested</u>
> <u>Designee/Hearing Officer</u>.

Furthermore, Section 1613.2 of the DCPM also states with specificity that (emphasis supplied):

> The deciding official shall either sustain the penalty proposed, reduce it, remand
> the action with instruction for further consideration, or dismiss the action with or
> without prejudice, <u>but in no event shall he or she increase the penalty</u>. 6 DCMR §
> 1613.2.

19.     The original Summary Removals were dated July 26, 2006.  The DOC arranged

for the D.C. Personnel Regulations to be altered in order to extend the DOC's deadline to present

the requisite elements of Summary Removal to the Employees.  On or about August 24, 2006,

the DOC issued its written "follow-up" Summary Removal notice to the Employees.  The notice

required a six (6) day deadline for the employees to respond, and the Employees abided by that

deadline.  The Forty-five within which Defendant Brown must make a final decision from the

date of the "follow-up" Summary Removal notice would have been October 7, 2006.

20.     However, at a September 8 status hearing, the DOC admitted that the record upon

which the Agency based the Summary Removal was incomplete.  As no administrative review

could take place with an incomplete record, the OAH granted the DOC until September 15, 2006

to complete the record.  The Judges of the OAH recognized that this action implicated the 45-day

deadline to issue a final decision, unless the employees requested an extension of time, pursuant

to 6 DCMR 1614.3(a).  The parties agreed at the September 8, 2006 status conference to extend

the deadline for the Agency Final Decision to October 25, 2006, because of the DOC's need for

additional time to complete the record.  The OAH's September 11, 2006 scheduling order

memorializes this agreement and the deadline.  On September 27, 2006, the employees filed

individual responses to the removal notice, a motion for an extension of the deadline for

responses, as well as a Motion for Summary Dismissal.  The OAH granted the extension of the deadline for responses and accepted them accordingly.

21.     The DOC filed its reply to the Motion for Summary Dismissal of the matter on October 13, 2006.  The parties again met at a second status hearing on the Motion for Summary Dismissal on October 19, 2006.  Following the administrative hearing, the OAH Judges issued an order on October 26, 2006 denying the Employee's Motion for Summary Dismissal submitting to the parties that it would consider the arguments contained in the Motion as part of the individual reports and recommendations to be issued for each Employee.  In the October 26, 2006 Order, denying Employees' Motion for Summary Dismissal, the OAH Judges also noted that "the administrative review must be completed before a final decision can be issued," and that it would issues its report and recommendation at that time.  Consequently, the 45-day deadline for a final decision was once again modified and required that the DOC Director issue his final decision by December 15, 2006.  The OAH issued a Report and Recommendation in each case on December 11, 2006, concluding that the summary removals could not be sustained and recommending that the Employees be returned to work.

22.     Instead of issuing a final decision returning the Employees to work as he was required to do by the DCPM and the CBA, and as he promised in the MOU and in the August 24, 2006, written notices to the DOC Employees, DOC Director Devon Brown submitted remand notices for most of the employees,[1] well beyond the 45 day deadline, on January 9, 2007,

---

[1]     Director Brown sent by letter Remand Notices to the single OAH Judge (Hon. Paul B. Handy) hearing the cases for Darryl Love and Malcolm Pointer on December 14, 2006.  The Remand Notices contained no certificate of service.  They were not filed with the OAH, nor were they served on their counsel or any other counsel in the cases.  However, the OAH Judge assumed that the parties were provided with copies of the Notice.  On December 28, 2006 the OAH Judge signed and dated a Report and Recommendation After Remand ("Report") in each of the two cases.  The Report did not contain a completed Certificate of Service.  At the February 5, 2007 status hearing, it was brought to the attention of the OAH Judge that none of the parties received a copy of the Report.  Consequently, the OAH Judge ultimately refused to consider the Remand Notices.  He also found that there was no basis to reconsider his previous recommendation.

directing the panel of administrative law judges to re-consider the determination and recommendations included in their Final Reports and Recommendation issued to the DOC pursuant to 6 DCMR 1616.6(a).

23.    The Employees filed a Motion to Strike the Remand Notices on January 16, 2007, arguing that the Remand Notices were untimely.  The DOC filed its response to the Motion to Strike the Remand Notices on January 29, 2007 and the Employees filed their Reply on February 2, 2007.  A hearing was held by the OAH Judges on February 5, 2007 in reference to the Remand Notices and the subsequent Response by the DOC.  The OAH Judges issued their Report and Recommendation on Remand in the individual Employees' cases on March 2, 2007, and once again recommended that Director Devon Brown reinstate the Plaintiff DOC Employees.  Further, the OAH Judges opined that the Remand Notices were filed late and that Director Brown unlawfully violated the 45-Day Rule requiring a final agency decision.

24.    In each Report and Recommendation issued by the OAH in this matter, the Judges found that Summary Removal could not be sustained.  Further, each report contained a procedural summary which acknowledged that the October 26, 2006 Order established a deadline for the final agency decision as December 15, 2006.  From the outset of this entire process, Defendants DOC and Devon Brown have refused to comply with the established rules of due process set out by the DCPM, the CBA, the MOU, and the August 24 notice of proposed removal.  The regulations are clear that a final decision in these types of cases must be rendered within 45 days of delivery of the record.  The regulations and the CBA are also clear that Director Brown may not depart from the recommendations of the OAH Judges because they recommend reinstatement.  Director Brown is not free to impose a harsher sanction.

25.     When Director Brown failed to issue a final decision, Plaintiffs filed a Petition for Writ of Mandamus with the District of Columbia Court of Appeals on March 12, 2007, to compel Defendant Brown to return them to work.  Four days later, senior management at the DOC simultaneously rescinded and cancelled the proposals for summary removal of the Employees in order to avoid an adverse decision by the District of Columbia Court of Appeals. Director Brown, and others with the Department of Corrections including their counsel, conspired among themselves to lead Plaintiffs to believe that their proposed discipline was over and they were being returned to work permanently.  Specifically, DOC employees Joan E. Murphy and Denise Shell were instructed to contact Plaintiffs directly – who were then represented by counsel – and lead the employees to believe they were being returned to work.  In violation of ethical rules prohibiting a party from contacting another party except through counsel, Murphy and Shell lured the joyful Plaintiffs to report to DOC headquarters on Friday, March 16, 2007, to be "reinstated."

26.     In furtherance of this scheme, on the afternoon of March 15, 2007, Defendant Devon Brown himself placed a personal telephone call to Cpl. Nila Ritenour, Chairperson of the FOP/DOC.  The FOP/DOC was also represented by counsel in the jail escape matter at that time, as Director Brown well knew.  This telephone call was in violation of ethical rules prohibiting a party from contacting another party except through counsel, a rule that Director Brown was aware of by virtue of his having attended law school.  In that telephone call, Director Brown told Cpl. Ritenour that all of the Plaintiffs would be reinstated to their positions with all back pay and benefits.  Director Brown said he wanted Cpl. Ritenour to hear the news directly from him.  He stated that he had just signed the papers for reinstatement.  It was a congratulatory telephone call, even though Director Brown well knew that he intended to immediately place the Plaintiffs on

leave pending a further effort to have them fired.  Director Brown did not disclose his intention to conduct an unlawful "Do Over", knowing full well that Cpl. Ritenour would report the "good news" to Plaintiffs and others.

27.    Similarly, on March 15, 2007, counsel for the Plaintiffs telephoned counsel for Defendant Department of Corrections to confirm the "good news."  Counsel for Defendant DOC had been directed by Defendant Brown not to disclose the truth as to his intended conduct. Consequently, counsel for Defendant DOC confirmed to counsel for Plaintiffs that the DOC "is bringing them all back to work."

28.    When Plaintiffs reported to DOC headquarters in the morning of March 16, 2007, they were indeed given a reinstatement letter promising back pay and benefits.  At the same time, Plaintiffs were given a second letter putting them all on leave pending a new hearing to sustain Defendant Brown's pre-ordained desire to have them all fired.  As Defendant Brown no doubt anticipated, at roll call at the D.C. Jail early that morning, Cpl. Ritenour had announced the "good news", only to be humiliated when Defendant Brown's true intentions became known. Plaintiffs to this date, with one exception, have not received their back pay and benefits.

29.    Defendant Warden Stanley Waldren signed the March 12, 2007, notices of proposed removal without reading them, without conducting any investigation, and under direct orders of Defendant Devon Brown.

30.    Defendant Henry R. Lesansky, Ph.D., employed by the DOC, was appointed to be the new hearing officer for the proposed termination hearings.  Dr. Lesansky is not an "independent" hearing officer as promised to the DOC Employees in their August 24, 2006, notices of removal.  In February of 2002, Dr. Lesansky resigned from his position as the top official with the Maryland Department of Juvenile Justice after disclosures that he twice

understated the number of assaults against teens at Maryland juvenile jails.  Dr. Lesansky

became unemployable in corrections work until hired by the District of Columbia.  He serves at

the pleasure of Defendant Devon Brown.

31.    Defendants refusal to adhere to the procedures for adjudication of the firings of

Plaintiffs and their efforts to have a "Do Over" violate Plaintiffs' Fifth Amendment rights to due

process of law and an abridgement of their Fifth Amendment property interest in their Career

Service positions with Defendant DOC.

## COUNT I—Violation of 42 U.S.C. §1983

32.    Plaintiffs repeat each and every allegation contained in all preceding paragraphs

and incorporate the same herein.

33.    Defendants in their own right and in conspiracy and agreement with each other

and others within the DC DOC and the DC Government sought to and did violate the

constitutional rights of Plaintiffs in that Defendants sought to and did deprive Plaintiffs of life,

liberty and property without due process of law.

34.    The actions of Defendants and those of their co-conspirators were done with evil

motive, actual malice, oppression, with intent to injure, in willful disregard for the rights of

Plaintiffs, and these actions were outrageous, grossly fraudulent, and reckless towards the well-

being and rights of Plaintiffs.

35.    In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the

Supreme Court advanced the proposition that government employees are afforded procedural

guarantees <u>before</u> they can be terminated.  These guarantees are born of the Due Process Clause

of the United States Constitution.  The resulting and inherent property interest in employment

derives from a legitimate claim of entitlement that arises not from the United States Constitution,

but from independent sources such as state statutes, agency rules or policies, or agreements as to employment. *Board of Regents v. Roth*, 408 U.S. 564, 577-78 (1972).

36.    The Due Process analysis found in *Loudermill* applies to DC government employees and, in this case, the DOC employees specifically.  "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause…. Under CMPA, employees can only be disciplined for cause and prior notice must be given." *Fonville v. D.C.*, 448 F. Supp. 2d 21 (D.D.C. 2006) (internal citations omitted).  See also, *D.C. Department of Corrections v. Teamsters' Union Local*, 554 A.2d 319, 323 (D.C. 1989).

In this context, "agencies cannot relax or modify regulations…. [W]hen agencies establish … pre-termination procedures they are bound to follow them."  *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161, 2005 U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005), citing *Lopez v. FAA*, 355 U.S. App. D.C. 51, 318 F.3d 242, 247 (D.C. Cir. 2003).  Also, "[t]he D.C. Circuit has not required any additional due process requirements [beyond those defined in *Loudermill*] for the termination of its public employees."  *Crockett v. D.C. Metro. Police Dep't.*, 293 F. Supp. 2d 63, 68 U.S. Dist. LEXIS 23632 (2003), citing *Kropat v. Fed. Aviation Admin.,* 333 U.S. App. D.C. 239, 162 F.3d 129, 132-34 (D.C. Cir. 1998).

37.    Plaintiff DOC Employees were fired without notice and without an opportunity to be heard.

38.    In order to accomplish a very public humiliation and summary firing of the Plaintiffs, Defendants engaged in an unlawful and unconstitutional revision of existing DC laws which would have prevented them from such conduct otherwise.  Plaintiff DOC Employees

contend that the summary removal provisions of DCPM § 1616.4 are unconstitutional and unconstitutional as applied to them.

39.    Plaintiff DOC Employees contend that the summary revision of the 3 Day Rule by promulgation of variations to the DCPM was unconstitutional and unconstitutional as applied to them.

40.    Plaintiff DOC Employees contend that Defendants are without legal authority to require that the Plaintiffs be subject to the administrative process a second time for a disciplinary action that has been adjudicated in their favor.  The DOC has been unable to cite any legal authority which gives them the right to a "Do Over".

41.    Defendants are obligated by the constitution to abide by internal, procedural regulations defining their due process rights when proposing the dismissal of employees.  See Lopez v. FAA, 318 F.2d 242, 246 (D.C. Cir. 2003).  The Supreme Court has long recognized that "an agency is bound to the standards by which it professes its actions to be judged."  Service v. Dulles, 354 U.S. 363, 373-76 (1957).  Furthermore, a government agency must engage in "scrupulous compliance" with its own procedures for discipline and removal of employees. *Lerner v. District of Columbia*, 362 F. Supp.2d 149, 161 (2005) U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005).  (See also *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) (stating, "[w]here …. a government employee has no procedural due process rights apart from those which the agency has chosen to create by its own regulations, scrupulous compliance with those regulations is required to avoid any injustice.")).  Any manipulation of such procedures is an unconstitutional violation of due process.

42.    Government agencies are precluded from modifying or relaxing regulations that "provide the only safeguard [employees] have against unlimited agency discretion in hiring and

termination." *Lopez v. FAA*, 318 F2d. at 247.  Defendant DOC solicited the assistance of the OAH and asked that it serve as the Hearing Officer in this matter.  At the conclusion of the administrative proceedings outlined by the CBA, the ALJ's issued recommendations that all the Employees be returned to work.  The CBA has specifically articulated the authority of the DC DOC with respect to the Hearing Officer's recommendations.  Defendant DOC and Director Devon Brown may not, at their own whim, confer upon themselves more authority than the controlling regulation allows.  In this case, the controlling regulations, the CBA and the CMPA, require that the Employees' be returned work.

43.     As a direct and proximate result of Defendants' violating Plaintiffs' Fifth Amendment rights, Plaintiffs suffered loss of income and other employment benefits and damage to their professional and personal reputations.  Further, as a direct and proximate cause of Defendants' violating their Fifth Amendment rights, Plaintiffs have endured mental and physical pain and suffering, embarrassment, humiliation, mental anguish, and the costs and attorneys' fees of this action.

## COUNT II—Defamation Plus

44.     Plaintiffs repeat each and every allegation contained in all preceding paragraphs and incorporate the same herein.

45.     Defendants immediately following the jail escape and thereafter negligently made and published false statements to others both inside the D.C. government and publicly about Plaintiffs that were defamatory and defamatory per se, as a consequence of which the Plaintiffs suffered actual injury in their trade, profession, community standing and which lowered the Plaintiffs in the estimation of their community.

46.    While defamation and slander typically do not provide a basis for recovery in a due process claim, "a plaintiff may prevail, however, if he can demonstrate either a 'reputation plus' claim, that is defamation accompanied by an adverse employment action, or 'foreclosure claims,' in which the government's actions foreclosed potential job opportunities." See *Fonville* at 28 (internal citations omitted).

47.    In *Fonville*, this court defined the requirements for "reputation plus" as those "comments that imply an inherent or persistent personal condition." *Id.* Specific examples of those behaviors that rise to a constitutional violation include "accusations of dishonesty, commission of a serious felony, manifest racism, serious mental illness, or a lack of intellectual ability." See *Fonville* at 29.

48.    Here, the Defendants have engaged in behavior that rises to the level of a constitutional violation. Director Brown frequently and publicly has accused the Plaintiffs of perpetrating criminal acts in connection with the jail escape. He accused them of being too old to do their jobs. He accused them of being unable to apply the classification system. One example of this is a press release that has been on the DOC web site since July 27, 2006. It states, in relevant part, "As a result of this investigation, 11 individuals have been terminated from employment with the DOC *for their roles leading to the escape* and to the breach of security…. The United States Attorney's Office is currently conducting a criminal investigation into the escape." See DC DOC website at www.dc.gov (emphasis added).

49.    As a direct and proximate result of Defendants' defamatory acts, Plaintiffs suffered loss of income and other employment benefits and damage to their professional and personal reputations. Further, as a direct and proximate cause of Defendants' defamatory acts,

Plaintiffs have endured mental and physical pain and suffering, embarrassment, humiliation, mental anguish, and the costs and attorneys' fees of this action.

### **COUNT III—Intentional and Negligent Infliction of Emotional Distress**.

50. Plaintiffs repeat each and every allegation contained in all preceding paragraphs and incorporate the same herein.

51. Defendants acted in an extreme and outrageous fashion and negligently in terminating Plaintiffs with the intent and/or result of causing them emotional distress.

52. As a direct and proximate result of Defendants' acts, Plaintiffs suffered loss of income and other employment benefits and damage to their professional and personal reputations. Further, as a direct and proximate cause of Defendants' acts, Plaintiffs have endured mental and physical pain and suffering, embarrassment, humiliation, mental anguish, and the costs and attorneys' fees of this action.

### **COUNT IV- Injunctive Relief**

53. Plaintiffs repeat each and every allegation contained in all preceding paragraphs and incorporate the same herein.

54. Plaintiffs request the Court to enjoin the Defendants' from pursuing any discipline as a result of the jail escape.

55. Plaintiffs request that they be restored to their rightful positions within the Department of Corrections with restoration of all back pay, lost benefits, and the costs and attorneys' fees of this and all other actions resulting from defending the Plaintiffs from their unconstitutional terminations.

**COUNT V—Compensatory and Punitive Damages and Attorneys' Fees**

56.     Plaintiffs repeat each and every allegation contained in all preceding paragraphs and incorporate the same herein.

57.     Defendants acted with evil motive, actual malice, deliberate oppression, with intent to injure Plaintiffs and in willful disregard for the rights of Plaintiffs.  Defendants' conduct was itself outrageous, grossly fraudulent, and reckless toward Plaintiffs, for which Plaintiffs demand punitive damages and the costs and attorneys' fees of this action in an amount to be determined by a jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that they be awarded compensatory damages in an amount in excess of the jurisdictional amount in controversy, punitive damages to be determined by a jury, costs and attorneys' fees of this action, a declaration that they are entitled to be reinstated unconditionally to their positions, and a permanent injunction returning them to their former positions with all back pay and benefits to which they are entitled, including attorneys' fees of this action and all other actions resulting from defending the Plaintiffs from their wrongful terminations, and such further relief as the Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of all Counts triable by jury and of all factual allegations required for the determination of this Complaint.

Respectfully submitted,

HANNON LAW GROUP, LLP


_____/s/ J. Michael Hannon_____
J. Michael Hannon, #352526
1901 18th Street, NW
Washington, DC 20009
(202) 232-1907
Fax:  (202) 232-3704
jhannon@hannonlawgroup.com

*Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **First Amended Complaint for Compensatory, Injunctive and Declaratory Relief** was sent via electronic filing, this 12th day of July, 2007 to:

David Jackson, Esq.
Office of the Attorney General
441 Fourth Street, NW
6 South
Washington, DC 20001


_____/s/ J. Michael Hannon_____
J. Michael Hannon