**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CYNTHIA WASHINGTON, *et al.*, :
:
:
Plaintiffs, : Case Number: 1:07-cv-01031 (RMU)
:
v. :
:
DISTRICT OF COLUMBIA, *et al.*, :
:
Defendants. :

**PLAINTIFFS' MOTION FOR**
**AN EMERGENCY TEMPROARY RESTRAINING ORDER**

Come now Plaintiffs Cynthia Washington, Herbert Douglas, Lorenzo Jennings, Dionne Makins, Alphonso Bryant, Lowanda Hinton-Saunders, Darryl Love, and Shantell Hatton ("DOC Employees")[1] through their attorneys, HANNON LAW GROUP, LLP and submit this motion for an emergency temporary restraining order pursuant to Federal Rule of Civil Procedure 65 and Local Rule of Civil Procedure 65.1 (a). The DOC Employees respectfully request that the Court grant a temporary restraining order maintaining the status quo by preventing the District of Columbia Department of Corrections ("DC DOC") from terminating Plaintiffs from their jobs pending the outcome of this litigation. Termination of the DOC Employees before the outcome of the lawsuit will cause the Plaintiffs irreparable harm.

In support of this motion, the DOC employees rely upon the Memorandum of Points and Authorities, Declaration and Exhibits filed herewith.

**CERTIFICATION**

I HEREBY CERTIFY that I provided notice of this motion by letter to Assistant Attorney General David A. Jackson sent electronically on December 19, 2007, and by personal service of

[1] Plaintiff Malcolm Pointer has retired from the DOC. Therefore, he is not seeking emergency relief.

this application and all pleadings and papers presented to the Court for the purposes of a hearing on this motion on this date, December 20, 2007.

WHEREFORE, the DOC Employees respectfully request that their motion for an emergency temporary restraining order be granted.

**REQUEST FOR HEARING**

The DOC Employees further request that a hearing on the motion be set for Friday, December 21, 2007, or at the earliest practicable time.

Respectfully submitted,

December 20, 2007

HANNON LAW GROUP, LLP

*/s/ J. Michael Hannon*

J. Michael Hannon, #352526
1901 18th Street, NW
Washington, DC 20009
(202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing, **Plaintiffs' Motion for an Emergency Temporary Restraining Order, Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Temporary Restraining Order, Amended Statement of Material Facts Not in Dispute in Support of Plaintiffs' Motion for Partial Summary Judgment, corresponding Exhibits and Proposed Order** was sent via messenger and electronic filing, this 20th day of December, 2007 to:

David A. Jackson, Esq.
Office of the Attorney General
441 Fourth Street, NW
6 South
Washington, DC 20001

*/s/ J. Michael Hannon*
J. Michael Hannon

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CYNTHIA WASHINGTON, *et al.*, :
:
:
Plaintiffs, : Case Number: 1:07-cv-01031 (RMU)
:
v. :
:
DISTRICT OF COLUMBIA, *et al.*, :
:
Defendants. :

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs Cynthia Washington, Herbert Douglas, Lorenzo Jennings, Dionne Makins, Alphonso Bryant, Lowanda Hinton-Saunders, Darryl Love, and Shantell Hatton ("DOC Employees")[1] through their attorneys, HANNON LAW GROUP, LLP, respectfully submit this Memorandum of Points and Authorities in support of their Motion for an Emergency Restraining Order and Preliminary Injunction. The DOC Employees seek an order from the Court enjoining the Defendants from terminating them from their current positions until the outcome of this litigation.

Plaintiffs have filed a Motion for Partial Summary Judgment seeking a ruling in their favor on their claim for Injunctive Relief. With the motion, the DOC Employees also filed a Statement of Material Facts Not in Dispute, supported by 46 Exhibits. The basis for this motion is much the same as that for the motion for partial summary judgment. We would ask the Court to accept those pleadings in support of this motion. In addition, we have filed with this motion

[1] Plaintiff Malcolm Pointer has retired from the DOC since the filing of this lawsuit. Therefore, he is not participating in this motion.

an Amended Statement of Material Facts Not in Dispute which includes additional information requiring this motion.

**FACTUAL BACKGROUND**

The following statement of facts is a summary of the facts contained in Plaintiff's Motion for Partial Summary Judgment and the Memorandum in Support thereof ("MPSJ"). In addition, Plaintiffs include summary information about events that have transpired since the filing of the Motion for Summary Judgment and included in further detail in the Amended Statement of Material Facts being filed contemporaneously.

Two of the Central Detention Facility's ("CDF") most dangerous inmates, Joseph Leaks and Ricardo Jones, escaped from the D.C. Jail on June 3, 2006. The escape was widely reported in the press, and was a direct result of the DOC's and Director Brown's failure to remedy safety issues, such as a skeleton work force and forced overtime, which had been repeatedly brought to his attention by the FOP/DOC Labor Committee. See MPSJ at 3. The complaints by the FOP/DOC foresaw the jail escape.

On the day of the escape, the DC Jail was understaffed by 58 out of the 121 positions required. The "solution" was to force 41 officers to work overtime on that shift and to "shutdown" 17 posts. Seven of the DOC Employees fired were working forced overtime, working posts for which they had not been trained, or working understaffed posts. In an effort to deflect continued public attention from deplorable working conditions, severe management deficiencies, and criticism of his leadership of the DOC, Director Brown on June 5, 2006, issued written notification to the DOC Employees named in this lawsuit putting them on paid administrative leave pending further investigation of the escape.

On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Phil Mendelson was held to continue review of the jail escape and the general safety and management of the CDF. At this hearing, Councilmember Mendelson questioned DOC Director Brown. See MPSJ at 5. Director Brown failed to disclose to the Council that the CDF was dangerously understaffed that day, and that he knew that forced overtime was causing corrections officers to be less reactive and less efficient. A month later, on July 26, 2006, at the Mayor's Weekly Press Briefing, the Mayor, DOC Director Brown and the City Administrator, Robert Bobb, announced the summary firings of the DOC Employees who had been on paid administrative leave. The DOC Employees were not notified of their firing prior to the Weekly Press Briefing. Instead, DOC Director Brown intentionally humiliated and embarrassed the fired DOC Employees on television casting them in the public light as felons who abetted a jail escape as he coupled their firings with an announcement that a criminal investigation, targeting them, was pending. See MPSJ at 5-6.

In order to accomplish this public humiliation and summary firing, the DOC engaged in an unlawful and unconstitutional revision of existing D.C. laws which would have prevented them from conducting a summary discharge in a public press briefing. The District of Columbia amended provisions to the District of Columbia Personnel Manual ("DCPM"). The DCPM provided that in cases of Summary Removal, proper written notification of the action was to be provided to the employee and the FOP/DOC within three (3) days of removal ("3 Day Rule"). DCPM § 1616.4. See MPSJ at 7-8; Amended Statement of Material Facts (ASMF) at ¶ 1a. On the date of the news conference, the DCPM was amended so that the information supporting summary removal need not be provided until 30 days after removal. See MPSJ at 7-8.

The variation which allowed for this ex post facto deprivation of due process rights to the discharged DOC Employees was issued by the Director of Personnel relying on information provided by Joan Murphy of the DOC Human Resources Office that tape recorded interviews of the Employees had not been transcribed. See AMSF at ¶ 1b. However, during a December 6 hearing before the D.C. Public Employee Relations Board in PERB Case No. 06-U-50, testimony by Neal R. Gross of Neal R. Gross and Co., Inc., a court reporting company which transcribed the aforementioned interviews, contradicted the DOC's claims. In fact, Mr. Gross testified that the vast majority of the tapes (13) had been transcribed and delivered to the DOC on June 27, 2006, a month before the Variation was issued. Mr. Gross further testified, that tapes of four other interviews of some of the DOC Employees were ordered by the DOC on July 25, 2006, and were delivered by email on July 27, 2006, the day after the Variation was executed. See AMSF at ¶¶ 1c-1e. The DOC lied to the Director of Personnel in order to effect the summary dismissal of the DOC Employees at the Mayor's News Conference.

Summary Removal is permitted under D.C. law when an employee's conduct offers an immediate threat to the integrity of governmental operations; constitutes an immediate hazard to the agency, to other District Employees or to the employee; or, is detrimental to public health, safety, or welfare, as provided for in D.C. Code § 1-616.51. None of these circumstances existed on or even near the date of the DOC Employees' firings. See MPSJ at 8. The DOC Employees contend that this statute is unconstitutional as a violation of due process and as applied to them.

On or about August 1, 2006, almost two months after the jail escape, the DOC Employees were finally provided written notice by the DOC that they had been summarily discharged from their employment with the DOC. In violation of their constitutional rights they were given no notice or a right to be heard. See MPSJ at 8-9. Not until almost four weeks later,

On August 24, 2006, did the DOC Employees receive the constitutionally required notice informing them that an administrative review would be conducted by the Office of Administrative Hearings (OAH). OAH agreed to conduct the review at the request of the DOC. See Id.[2]

The Judges of the OAH conducted administrative hearings required in these cases consistent with Chapter 16 of the DCPM and the Collective Bargaining Agreement between Defendant DOC and FOP/DOC ("CBA).[3] The Judges of OAH issued a Report and Recommendation in each case on December 11, 2006, concluding that the summary removals could not be sustained and recommending that the Employees be returned to work. Instead of issuing a final decision returning the Employees to work as he was required to do by the DCPM and the CBA, Director Brown submitted remand notices for most of the Employees. These notices were issued on January 7, 2007, in violation of a 45-day deadline required by D.C. laws. See MPSJ at 11-12. The remand notices directed the panel of administrative law judges to re-consider the determination and recommendations included in their Final Reports and Recommendation issued to the DOC pursuant to 6 DCMR § 1616.6(a).

The OAH Judges issued a second round of Reports and Recommendations on Remand in the individual Employees' cases on March 2, 2007, again finding that Summary Removal could not be sustained and directing that the DOC Employees be reinstated to their positions immediately. Further, the OAH judges noted that Director Devon Brown filed the Remand notices late and that he was in direct violation of the 45-day rule requiring a final agency

---

[2] The OAH is an independent office of the District of Columbia Government created to provide experienced and independent hearing officers to review disputed matters of various D.C. Agencies. The appointment of the OAH Judges was optimistically received by the DOC/FOP because of the practice of the DOC assigning hearings to its own administrative staff who are conflicted by their relationship to the Director.

[3] See Memorandum MPSJ at 10-11 for an articulation of the requirements set forth in Chapter 16 of the DCPM and the CBA.

decision within the statutory time frame. See MPSJ at 11-12. Unmoved by the reprimand of the OAH Judges, Director Devon Brown simply refused to issue a final decision at all as required by law.

Upon Director Brown's refusal to issue a final decision returning them to work, DOC Employees filed a Petition for Writ of Mandamus with the District of Columbia Court of Appeals on March 12, 2007, to compel Defendant Brown to return them to work. In response, senior management at the DOC simultaneously rescinded and cancelled the proposals for summary removal of the Employees in order to avoid an adverse decision by the District of Columbia Court of Appeals. In addition, the DOC Employees were lead to believe by DOC personnel that they were being returned to work, as they were each told to report to DOC headquarters to be "reinstated." See MPSJ at 12-13.

Upon reporting to DOC headquarters on the morning of March 16, 2007 as instructed, the DOC Employees were given a letter of rescission and reinstatement in one hand and a letter putting them all on administrative leave in the other. Director Brown rescinded the summary removals and replaced them with 20-day termination notices based on the exact same allegations. See ASMF at ¶ 13. New hearings would be held under the review of hearing officer Defendant Henry R. Lesansky, Ph.D., in order to ensure that Director Brown's desire to terminate the employees would be fulfilled. As an Excepted Service employee of the DOC, under Director Brown's direct supervision, it was guaranteed that Dr. Lesansky would do his bidding. He serves at the pleasure of Defendant Brown. See MPSJ at 14.

There is no statutory provision nor is there a section of the applicable CBA which allows the DOC the "do-over" which Director Brown has gifted himself and imposed upon the DOC employees. See ASMF at ¶ 16. Nonetheless, the DOC Employees participated in the unlawful

second-round hearings. See ASMF at ¶ 17. Predictably, Dr. Lesansky recommended removal for all DOC Employees, and Director Brown promptly issued second round decisions on December 14, 2007 terminating the DOC Employees under the same misguided allegations presented to the Office of Administrative in the initial hearings. See ASMF at ¶ 18.

A complaint was filed with this Court on June 8, 2007 commencing a lawsuit in this matter. The lawsuit is based in large part on the unlawful revision of the 3 Day Rule, the Director's refusal to return the Employees to work as required by law, and the "do-over" by Director Brown. Plaintiffs "own" their jobs and have earned them back through the procedures required under D.C. law. There is no basis in law for terminating them in Director Brown's abhorrent and vindictive effort to avoid personal responsibility for the Jail Escape. In addition, the record presented by these Employees is replete with abusive conduct by Director Brown: failing to copy counsel with pleadings filed with the OAH; making public statements defaming these Employees; intentionally misleading these Employees into believing they were being returned to work; directing his counsel to mislead undersigned counsel regarding the so-called return to work; evading a decision by the D.C. Court of Appeals by constructing an unlawful "Do Over"; postponing his coup de grace until December 14, 2007, the day before the DOC/FOP Holiday Party and the peak of the Christmas season.

## ARGUMENT

### I. STANDARD GOVERNING THE ISSUANCE OF A PRELIMINARY INJUNCTION

In deciding whether a preliminary injunction is appropriate, the Court must consider four factors: (1) plaintiff's likelihood of success on the merits; (2) the threat that plaintiffs will suffer irreparable harm if an injunction is denied; (3) the likelihood that defendants will suffer

substantial harm if an injunction is granted; and (4) the public interest. Nat'l Treas. Employees Union v. United States Dept. of Treas., 838 F. Supp. 631, 636 (D.D.C. 1993) (H.Greene, J.). Injunctive relief is warranted in this matter to enjoin Defendants from terminating the DOC Employees until the outcome of this litigation. Absent such an injunction, the DOC Employees will suffer irreparable injury. Plaintiffs refer to and adopt the arguments in their Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss, and in Support of Plaintiffs' Motion for Partial Summary Judgment and their Reply to Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment previously filed in this matter. In addition, the DOC Employees submit the arguments below.

**A. The DOC Employees are Likely to Succeed on the Merits of This Case.**

**1. The DOC Employees Have Been Deprived Their Property Right.**

The underlying facts in this case are clear and undisputed. In August, 2006, the DOC Employees were given notices of summary removal and administrative hearings were held to examine the legality of the summary removals. These hearings were conducted by disinterested administrative law judges through the Office of Administrative Hearings. The judges examined whether these DOC Employees had committed "misconduct" or "gross misconduct" justifying their summary removal.

In each case, the Report and Recommendation of the assigned Judge with the Office of Administrative Hearings concluded that the employee could not be summarily removed and that the DOC Employees should be returned to work. The District of Columbia Municipal Regulations, the FOP/DOC Collective Bargaining Agreement, and the Comprehensive Merit Protection Act required Director Brown to return the Employees to work based on the recommendations of the Judges of the OAH. He refused. Instead, DOC Director Devon Brown

rescinded the original summary removal action, placed the DOC Employees on paid administrative leave, and served them with new notices of proposed termination based on the same allegations reviewed by the OAH Judges. Defendants have conceded that there is no statutory or other legal authority supporting their effort to re-litigate the discharge of the DOC Employees as related to the jail escape of June 3, 2006, and now terminate them.

The DOC Employees have a property interest in their public employment. Their rights are born of the Due Process Clause of the United States Constitution, which states that no person shall be, "deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." United States Constitution, Amendment V. In the public employment context the "***resulting and inherent property interest in employment***" derives from a legitimate claim of entitlement that arises not from the United States Constitution, but from independent sources such as state statutes, agency rules or policies, or agreements as to employment. Board of Regents v. Roth, 408 U.S. 564, 577-78 (1972). (emphasis added).

Pursuant to this formula, the District of Columbia Comprehensive Merit Protection Act and the CBA gives the DOC Employees a property interest in their jobs. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for Employees governed by it. The CMPA establishes a Career Service for Employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause…. Under the CMPA, Employees can only be disciplined for cause and prior notice must be given." Fonville v. D.C., 448 F. Supp. 2d 21 (D.D.C. 2006) (internal citations omitted). See also, D.C. Department of Corrections v. Teamsters' Union Local, 554 A.2d 319, 323 (D.C. 1989).

Because the DOC Employees have a property interest in their public employment, the District of Columbia must abide by procedures as are necessary to afford procedural due process before taking any adverse action. See Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985). In Loudermill, the Supreme Court advanced the proposition that government Employees must be afforded procedural guarantees before they can be terminated, precisely because they have an inherent property interest in those jobs. The administrative hearing process of the CMPA and the CBA, which the Employees fully complied with, are those procedures for the DOC Employees.

Both the CMPA and the CBA outline the methods by which an employee's property rights are protected and how that termination can be appealed and reviewed. Defendants are obligated by the Constitution to abide by internal, procedural regulations defining due process rights when proposing the dismissal of employees. See Lopez v. FAA, 318 F.2d 242, 246 (D.C. Cir. 2003). Abiding by the pre-termination procedures in these matters meant that Director Brown must follow the recommendations of the OAH judges. After having chosen to remove these Employees via summary removal, Defendants were bound by the outcome of those proceedings. DOC Director Brown was required by the DCPM to issue a Final Decision within 45 days of the delivery of the initial summary removal notices:

> The final decision in the case of summary suspension or summary removal action taken pursuant to §§ 1615-1616, respectively, shall be rendered not later than forty-five (45) days from date of delivery of the summary suspension or summary removal notice, as appropriate except that the period may be extended as follows:
>
> > (a) when the employee requests and is granted an extension of time in which to respond under § 1611.2; or
> >
> > (b) when the employee agrees to an extension of time requested by the agency.

6 DCMR 1614.3. In addition, both the CBA and the DCPM require that DOC Director Brown follow the recommendation of the OAH Judges in this case. Article 11, Section 9(D) of the CBA specifically states (emphasis supplied):

> Deciding Official shall issue a final decision after reviewing the recommendation of the Disinterested Designee/Hearing Officer. The deciding official may sustain or reduce the penalty recommended by the Disinterested Designee, remand the matter for further consideration by the Hearing Officer, or dismiss the charge <u>but may not increase the penalty recommended by the Disinterested Designee/Hearing Officer</u>.

Furthermore, Section 1613.2 of the DCPM also states with specificity that (emphasis supplied):

> The deciding official shall either sustain the penalty proposed, reduce it, remand the action with instruction for further consideration, or dismiss the action with or without prejudice, <u>but in no event shall he or she increase the penalty</u>. 6 DCMR § 1613.2.

The CBA offers the DOC only three options in response to the Hearing Officer's (the Judges of the OAH) recommendations. The DOC is allowed to 1) sustain or reduce the penalty proposed; 2) remand the matter for further consideration; or 3) dismiss the charges. CBA Article 11, Section 9(D). DOC Director Brown may not increase the recommended penalty, and there is certainly no language in the CBA which allows for the cancellation of the proposed action and then re-adjudication of the matter.

Any manipulation of such procedures is an unconstitutional violation of due process. On December 11, 2006, Reports and Recommendations were issued by the administrative law judges assigned by the OAH to undertake review of the proposed summary removals. After complying fastidiously with the administrative process, each DOC Employee was found entitled to be returned to his or her position within the DOC.

### 2. <u>The DOC Does Not Have a Right to a "Do Over"</u>

The Director chose to use the summary removal procedure to terminate these Employees and had every opportunity to substantiate the allegations during the administrative review process. Unable to justify the summary removal of the Employees, Defendants are not free to simply “take back” their initial termination attempt and try another method. Granting government employers the right to attempt to terminate Employees for the same infractions in repeated hearings denies the Employees due process in that no procedure is “meaningful” until the government agency finds the outcome it desires. What resolution can a government employee with a protected property interest in his employment hope to find from an administrative review procedure if there is no guarantee the outcome is enforceable?

Each report of the Judges of the OAH clearly stated that the employee could not be summarily removed and such removal would be a violation of due process. Given the recommendations, Defendant Brown did not have the option of removing the DOC Employees based on allegations arising out of the June 3, 2006 escape. His actions were confined to those clearly outlined in the Collective Bargaining Agreement, District Municipal Regulations and the Memorandum of Understanding. The Supreme Court has long recognized that “an agency is bound to the standards by which it professes its actions to be judged.” Service v. Dulles, 354 U.S. 363, 373-76 (1957). Furthermore, a government agency must engage in “scrupulous compliance” with its own procedures for discipline and removal of employees. Lerner v. District of Columbia, 362 F. Supp.2d 149, 161 (2005) U.S. Dist. LEXIS 3565 (D.D.C. 2005).

Additionally, under the legal doctrine of res judicata, one party in a legal proceeding is prevented from obtaining another day in court after receiving an unsatisfactory result to his/her claim. There is an abundance of legal precedent supporting this doctrine. Judge Harris has held that "a final judgment on the merits of an action precludes the parties or their

privies from re-litigating issues that were or could have been raised in that action." Arakawa v. Reagan, 666 F. Supp. 254, 262 (1987), citing Allen v. McCurry, 449 U.S. 90, 94 (1980). Judge Harris reasons that "[t]his preclusive effect attaches to administrative proceedings when, as with proceedings before the MSPB, the administrative tribunal 'is acting in a judicial capacity and resolves issues of fact properly before it which the parties have had an adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata, which is itself a constitutional principle. Director Brown has done nothing more than gift the Agency with a "do over" with the most recent proposed and effected termination of the DOC Employees. It is important to note that the bases for the most recent termination of the DOC Employees are *identical* to the allegations made in the initial proposed summary removal. The Director did not agree with the decision of the OAH Hearing Officers, and found a more receptive audience within the confines of the DOC in order to obtain the result he wants – unlawful termination of the DOC Employees. There are no duly ordained procedures which allow this.

**B. Plaintiffs Will Suffer Irreparable Harm if the DOC is Allowed to Terminate the Employees Before the Conclusion of This Lawsuit.**

One of the most salient factors in the injunctive relief analysis is that of irreparable harm. Farris v. Rice, 433 F. Supp. 2d 76, 78 (D.D.C. 2006)(Urbina, J.). In the context of government employment, irreparable harm requires more than a showing of financial distress or inability to find other employment. McElrath v. Kemp, 714 F. Supp. 23, 28 (D.D.C. 1989) (Sporkin, J). A preliminary injunction will not be issued unless the applicant can show irreparable harm in the form of "extraordinary" circumstances. Farris v. Rice, 433 F. Supp.

2d at 80. Specifically in employment cases, the Court is charged with giving significant consideration to the "obviously disruptive effect which the grant of temporary relief is likely to have on the administrative process." Id. (citing, Sampson v. Murray, 415 U.S. 61, 83-84 (1974).

The DOC Employees submit to the Court that administrative procedures have already taken place in this matter. The administrative hearings in these proceedings have already been held and decisions made. In fact, the OAH Judges who heard this matter, at the request of the Defendants, determined that the DOC Employees cannot be summarily removed and are entitled to be reinstated in their positions. The second round of removal notices with the predictable outcome of termination is a second bite at the apple to which the Defendants are not entitled.

The recent termination of the DOC Employees falls squarely within the realm of extraordinary circumstances. The circumstances depart so far from any normal case of injury to a discharged employee that a grant of injunctive relief is appropriate. See Bonds v. Heyman, 950 F. Supp. 1202, 1211 (D.D.C. 1997) (Lamberth, J.). In Bonds, Judge Lamberth granted preliminary injunctive relief, barring the Defendant employer, Smithsonian Institution, from terminating an employee pending the outcome of a civil rights lawsuit against the federal employer. The court granted such relief after observing that the plaintiff (1) was 58 years old, (2) was an employee of the Smithsonian Institution for 40 years, (3) was not college educated, (4) worked her way up from a typist to a program analyst, and (5) was unlikely to find work with a commensurate level of responsibility, if she could find work at all. Id. at 1215. The DOC Employees share similar circumstances with the additional exception that they have already earned their jobs back through the administrative process

established by Defendants. Unlike the employee in Bonds, the DOC Employees have already earned reinstatement. The "Do Over" created by Defendants has taken away that to which these Employees are entitled: the substantive due process right of return to work.

This Court's decision in Farris v. Rice and Judge Lamberth's decision in Bonds both flow from the Supreme Court's opinion in Sampson v. Murray, 415 U.S. 61 (1974), although the results differ. In Sampson, the Supreme Court considered whether injunctive relief was available to enjoin the wrongful discharge of a government employee. The Court stated that a plaintiff "at the very least must make a showing of irreparable injury sufficient in kind and degree to override [the] factors cutting against the general availability of preliminary injunctions in Government personnel cases." Id. at 84. The Court recognized that "extraordinary cases" may arise in which the circumstances with respect to the injury of the discharged employee "so far depart from the normal situation" that the grant of injunctive relief would be appropriate. Id. at 92 n. 68.

Since Sampson, several courts have been reluctant to issue preliminary injunctions in employment termination cases citing a failure of the plaintiff to show irreparable injury. See Gonzalez v. Chasen 506 F.Supp. 990, 998 (D.P.R. 1980). However, in accordance with Sampson, several courts have recognized the distinguishing circumstances of extraordinary cases. Sampson did not establish a per se rule against the issuance of preliminary injunctions in employment termination cases; therefore, the duty to scrutinize the facts and distinguishing circumstances of each case continues to rest on the courts.

In considering requests for relief, courts have held that the violation or deprivation of a constitutional right is sufficient to show irreparable harm. In fact, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of

irreparable injury is necessary." Jessen v. Lyndon Station, 519 F. Supp. 1183, 1189 (D. Wis. 1981) (citing Wright & Miller, Federal Practice and Procedure: Civil, §2948 at 440). Loss of a constitutional right is a loss that cannot adequately be compensated, in that once the loss is suffered, no adequate means of restoring that right is available. See Jessen, 519 F. Supp. at 1189.

In a case involving the dismissal of law enforcement employees, the United States District Court for the Eastern District of New York applied Sampson's own expressly qualifying language in enjoining the summary dismissal of the employees, stating that, in addition to other factors, the "total denial of due process" constituted sufficient irreparable injury to justify extraordinary relief. Keyer v. Civil Service Commission of City of New York, 397 F. Supp. 1362 (E.D.N.Y. 1975).

Similarly, the United States District Court for the Western District of North Carolina issued a preliminary injunction in a case involving the discharge of a state employee finding that a constitutional violation had been established when the employee was discharged without a hearing. The court found that a constitutional violation had been established and that the "continuing denial of liberty and property without due process [was] causing [the plaintiff] irreparable harm." Faulkner v. North Carolina Dep't of Corrections, 428 F. Supp. 100, 103 (D.N.C. 1977). Distinguishing Sampson, the court noted that unlike the interests and rights involved in the case before the court, there was no liberty interest infringed in Sampson.

Moreover, the United States Supreme Court has also recognized that violation or deprivation of constitutional rights is sufficient to show irreparable injury. Specifically, the Court determined that a threat of discharge for exercising First Amendment rights was

sufficient to establish irreparable harm. Elrod v. Burns, 427 U.S. 347 (1976). The Court stated that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Id. at 374. The situation in Elrod implicated First Amendment rights, and although "courts often give First Amendment values preferred or special status . . . , it does not follow . . . that other fundamental constitutional rights must necessarily receive less protection in all instances." Jessen, 519 F. Supp. at 1189 n.3.

The Supreme Court has noted that it is the threat of harm that cannot be undone that authorizes exercise of the equitable power of the courts to enjoin before the merits are fully determined. See Sampson v. Murray, supra, and Beacon Theaters v. Westover, 359 U.S. 500, 506-507 (1959). In National Treasury Employees Union, Judge Harold Greene found that the "threatened loss of constitutional rights" constituted injury that cannot be undone. 838 F. Supp. at 640. In the instant case, the Plaintiffs have suffered not just a threat but an actual loss of constitutional rights. As the Plaintiffs have suffered irreparable harm per se, they have a constitutional right to be sent back to work pending the outcome of this litigation.

The DOC Employees have served the DC DOC for decades in most cases. As a result, they have served the District of Columbia for enough years to soon retire and receive full retirement benefits. Termination of the employees at this point denies them the benefits that they are due upon retirement. Further, as District of Columbia Department of Corrections Correctional Officers, Plaintiffs are eligible to retire as law enforcement officials. Such status gives them the right to carry a registered firearm under federal law. The ability to carry a firearm as a retired law enforcement official not only permits them to protect themselves and their families from the residue of their employment history, but also provides them with significant benefits in future employment with significantly higher

salaries than they would be able to earn as disgraced ex-correctional officers. The lives of the DOC Employees are tied into their careers. See Bonds v. Heyman, 950 F. Supp. at 1215. Allowing them to be terminated and taking away their ability to retire as law enforcement officials in essence takes away their ability to be employed in the only profession that they have known for most of their working lives.

With only one exception, none of these Employees has been able to obtain new employment either in private security or in law enforcement. In the parlance, they have been "fried", and potential employers will not accept these persons as new employees. One officer who was previously "fried" had her marriage ruined as a result of the economic pressure caused. All of the employees have homes with mortgages, some with second mortgages. Children's tuitions are at risk, as well as relationships and emotional well-being. One employee who has the most time in corrections is nearly despondent of being able to return to this profession due to the destruction of his faith in the Government.

Moreover, these Employees and their families shall lose critical medical and retirement benefits. During the many months when these Employees were removed without pay, several depleted their retirement accounts. Several went without health care, or resorted to health care through their veterans' status. None has been able to get a foot in the door of any other law enforcement agency because of the pendency of this matter. They have been stigmatized by the press and denounced as felons by DOC Director Brown and former City Administrator Robert Bobb on television. They have also been played as fools by Director Brown.

Perhaps Director Brown will argue that these same circumstances exist with any disciplined government employee. However, he has picked on the cream of the crop, those

in the prime of their experience, and those whose employability has been destroyed. These employees are also entitled to special consideration by the Court because of the manner in which Director Brown has been permitted by this Government to conduct these proceedings. There is absolutely no precedent for the vengeful process he has charted. This escape occurred under his watch. Where is his sense of responsibility?

**C. Preliminary Injunctive Relief Will Not Injure The Defendants.**

The Defendants will suffer no harm at all if the preliminary injunction is granted, as they have already had the opportunity to litigate and determine whether these DOC Employees may be terminated. It was decided by the OAH Judges that the DOC Employees could not be terminated. It was further decided that the Plaintiffs should be reinstated. The Defendants have already had every opportunity in the initial administrative hearings to terminate these DOC employees in a manner which comported with DC Law. At that time they were able to make any argument available to them as to why these DOC Employees should no longer hold their positions. An injunction denying Defendants the opportunity to terminate the Plaintiffs unlawfully causes them no harm.

Moreover, granting this injunction shall actually benefit Defendants. These DOC Employees have not worked for over 18 months; yet, they have received their full salaries for the entire time period. Director Brown's determination to scape goat these employees for the Jail Escape has cost the District of Columbia well over a million dollars. These employees are willing actually to return to work, rather than continue on paid administrative leave which was their status until the most recent termination. This can only benefit the District of Columbia and alleviate the desperate understaffing at the Jail which was one of the real reasons for the Jail Escape. Their assistance would be welcomed by their colleagues.

**D. <u>The Public Interest is Best Served by Granting Injunctive Relief</u>.**

In this case, the public interest is best served by the enforcement of the administrative process which has already been completed. The public interest is best served when the government faithfully and dutifully implements the laws to which it is subject, including the laws its officers are trusted to create and administer. The DOC Employees placed their faith in the procedures established by the CMPA and the Collective Bargaining Agreement. They dutifully participated in the administrative process and were ultimately vindicated with a decision by the OAH judges that they were entitled to reinstatement. At the time that the administrative law judges rendered their decision, the process was complete. The public interest is best served by proper enforcement of the administrative proceedings upon their completion. The DOC Employees cannot be terminated until this lawsuit is concluded and decisions are made about the lawfulness of the Defendants' self-serving "Do Over" in this matter.

WHEREFORE, the DOC Employees, respectfully request that their motion for an emergency restraining order and preliminary injunctive relief be granted.

Respectfully submitted,

December 20, 2007

HANNON LAW GROUP, LLP

*/s/ J. Michael Hannon*

J. Michael Hannon, #352526
1901 18th Street, NW
Washington, DC 20009
(202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CYNTHIA WASHINGTON, *et al.*, | : | |
| Plaintiffs, | : | Case Number: 1:07-cv-01031(RMU) |
| v. | : | |
| DISTRICT OF COLUMBIA, *et al.*, | : | |
| Defendants. | : | |

**AMENDED STATEMENT OF MATERIAL**
**FACTS NOT IN DISPUTE IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1. The DOC Employees were summarily fired by Department of Corrections Director Devon Brown and City Administrator Robert Bobb at a news conference on July 26, 2006.

1a. The District of Columbia amended provisions of the D.C. Personnel Manual ("DCPM") in order to effectuate the summary firing of the DOC Employees that occurred at the Press Briefing of July 26, 2006. (First Amended Complaint at ¶¶ 12, 13, 14, 19, 38 and 39). DCPM § 1616.4 provided that in cases of Summary Removal, written notification of the action was to be provided to the employee and the FOP/DOC within three (3) days of removal ("3 Day Rule"). That notice must provide detailed information about the removal, including the reasons for Summary Removal along with identification of critical deadlines in the removal process and pertinent employee rights. Id.

1b. On the very date of the planned news conference, pursuant to the direction of Director Brown, the D.C. Office of Personnel issued a Variation to DCPM § 1616.4

which allowed the DOC 30 days to provide written notification to the DOC Employees who were fired. (See Variation, Exhibit 48, filed herewith). The Director of Personnel found that the variation was necessary and fulfilled the "sprit of the regulations and the efficiency of the D.C. Government; and the integrity of the Career . . . Services." She found that the variation was necessary for the following reason:

> As part of the investigation that resulted in the summary removal actions taken by the DOC, the agency conducted an examination of witnesses (interviews) via tape recorder; however, as of July 26, 2006, the process to transcribe the tapes of the examination of witnesses has not been completed.

Id.[1]

1c. The Director of Personnel based her decision on information provided by Joan Murphy with the Human Resources Office of the DOC. Ms. Murphy advised the Director that the transcription of the tapes had not occurred and could not be completed for at least 30 days. (Affidavit of , Exhibit A filed herewith).

1d. During a hearing before the D.C. Public Employee Relations Board in PERB Case No. 06-U-50, both Director Devon Brown and Joan Murphy stated under oath that the request for the Variation was made on July 26 because the tapes had not been transcribed. This testimony occurred on December 6, 2007, in which the undersigned acted as counsel for the Complainant.

1e. In conflict with the testimony of Director Brown and Murphy, at the same hearing and on the same date, Neal R. Gross of Neal R. Gross and Co., Inc., a court reporting company, testified that the vast majority of the tapes (13) had already been

---

[1] The Variation also provided: "The DOC anticipates that it will take approximately 30 days from July 26, 2006, for the transcription process to be completed (plus time for the affected employees to review/approve the transcripts) and for the written summary removal notices to be drafted and issued to the employees." However, the employees were never requested to review and approve the transcripts and preparation of written notices must be done even where the 3 Day Rule applies.

transcribed and delivered to the DOC on June 27, 2006, a month before the Variation.. (See Affidavit of Neal R. Gross, Exhibit 49 filed herewith). Tapes of four other interviews of some of the Plaintiffs were ordered by the DOC on July 25, 2006, and were delivered by email on July 27, 2006, the day after the Variation was executed. Therefore, the rationale presented by the DOC for the Variation was false.

2. The Department of Corrections did not provide the DOC Employees with a written notice of the proposed summary removals until August 24, 2006.

3. The notice of summary removals[2] provided that:

> The Office of Administrative Hearings will conduct the administrative review and/or hearing of the proposed removal actions…In conducting the administrative review and/or hearing, your appointed Hearing Officer will review all of the documents giving rise to the charge…this written notice and your response, if there is one. After conducting the administrative review, your assigned Hearing Officer will make a written report and recommendation to Director Devon Brown, the Deciding Official, who will issue a final decision.

4. Each Written Notice provided "Specifications" of the conduct the DOC alleged supported the summary removals.[3]

5. Department of Corrections Director Devon Brown entered into a "Memorandum of Understanding"[4] with the Office of Administration Hearings, assigning the role of "hearing officer" to the Judges of the Office and outlining the

---

[2] See Exhibit 1, Cynthia Washington Written Notice; Exhibit 2, Herbert Douglas Written Notice; Exhibit 3, Dionne Makins Written Notice; Exhibit 4, Alphonso Bryant Written Notice; Exhibit 5, Lowanda Hinton-Saunders Written Notice; Exhibit 6, Darryl Love Written Notice; Exhibit 7, Malcolm Pointer Written Notice; Exhibit 8, Shantell Hatton Written Notice.

[3] See Exhibits 1-8.

[4] See Exhibit 9, Designation of Authority And Memorandum of Understanding Between The Office of Administration Hearings and the Department of Corrections for the District of Columbia, specifically Section D. Duration of MOU and Early Termination For Cause.

administrative hearing process. The MOU included the following language; "This Designation and MOU is effective October 1st, 2006 and will remain in effect through the latest date that the Director of DOC issues a final decision in any of the Disciplinary Actions.."

6. The assigned administrative law judges each issued a Report and Recommendation regarding each DOC Employee on December 11, 2006.[5]

7. The Report and Recommendation for each DOC Employee concluded that the employee could not be summarily removed and recommended they each be returned to work with the Department of Corrections.[6]

8. Pursuant to the Collective Bargaining Agreement, the Comprehensive Merit Protection Act, § 1-601.01, *et seq*., and Memorandum of Understanding, Director Devon Brown was required to issue a Final Decision consistent with the recommendations. The Final Decision must either: sustain the recommendation, reduce the penalty proposed, remand the action, or dismiss the action. The final decision may not impose a harsher penalty than that recommended by the Administrative Judge.[7]

9. Director Brown did not render a final decision returning the DOC Employees to work as he was obligated to do.

---

[5] See Exhibit 10, Report and Recommendation Cynthia Washington; Exhibit 11, Report and Recommendation Herbert Douglas and Lorenzo Jennings; Exhibit 12, Report and Recommendation Dionne Makins; Exhibit 13, Report and Recommendation Alphonso Bryant; Exhibit 14, Report and Recommendation Lowanda Hinton-Saunders; Exhibit 15, Report and Recommendation Darryl Love; Exhibit 16, Report and Recommendation Malcolm Pointer; Exhibit 17, Report and Recommendation Shantell Hatton.

[6] See Exhibits 10-17, Section III Recommendation.

[7] See Exhibit 18, Collective Bargaining Agreement Section 9 D., See 6 DCMR§ 1616.6.

10. In an effort to enforce their rights, the DOC Employees filed a Petition for Writ of Mandamus to Compel Agency Action in the District of Columbia Court of Appeals on March 12, 2007.[8]

11. On March 15, 2007, Defendants Department of Correction and Devon Brown rescinded the summary removal action in an attempt to preempt the need for the Writ of Mandamus. The DOC Employees were delivered these letters after being invited to return to work on March 16, 2007.[9]

12. At the same time, the DOC Employees were served their notices that the summary removal action had been rescinded, the DOC Employees were each served a twenty day notice of proposed termination. The specifications in support of the proposed terminations were the exact same acts used to support the summary removals.[10]

13. Furthermore, the DOC Employees were given letters placing them on administrative leave with pay as of March 16, 2007.[11]

---

8 See Exhibit 19, Petition for Writ of Mandamus to Compel Agency Action.

9 See Exhibit 20, Summary Removal Rescission Cynthia Washington; Exhibit 21, Summary Removal Rescission Herbert Douglas; Exhibit 22, Summary Removal Rescission Lorenzo Jennings; Exhibit 23, Summary Removal Rescission Dionne Makins; Exhibit 24, Summary Removal Rescission Alphonso Bryant; Exhibit 25, Summary Removal Rescission Lowanda Hinton-Saunders; Exhibit 26, Summary Removal Rescission Darryl Love; Exhibit 27, Summary Removal Rescission Malcolm Pointer; Exhibit 28, Summary Removal Rescission Shantell Hatton.

10 See Exhibit 29, Cynthia Washington Notice of Proposed Termination; Exhibit 30, Herbert Douglas Notice of Proposed Termination; Exhibit 31, Lorenzo Jennings Notice of Proposed Termination; Exhibit 32, Dionne Makins Notice of Proposed Termination; Exhibit 33, Alphonso Bryant Notice of Proposed Termination; Exhibit 34, Lowanda Hinton-Saunders Notice of Proposed Termination; Exhibit 35, Darryl Love Notice of Proposed Termination; Exhibit 36, Malcolm Pointer Notice of Proposed Termination; Exhibit 37, Shantell Hatton Notice of Proposed Termination.

11 See Exhibit 38, Cynthia Washington Administrative Leave Notice; Exhibit 39, Herbert Douglas Administrative Leave Notice; Exhibit 40, Lorenzo Jennings Administrative Leave Notice; Exhibit 41, Dionne Makins Administrative Leave Notice; Exhibit 42, Alphonso Bryant Administrative Leave Notice; Exhibit 43, Lowanda Hinton-Saunders Administrative Leave Notice; Exhibit 44, Darryl Love Administrative Leave Notice; Exhibit 45, Malcolm Pointe Administrative Leave Notice; Exhibit 46, Shantell Hatton Administrative Leave Notice.

14.    Plaintiffs' notice of proposed termination stated that Henry R. Lesansky, Ph.D., Health Services Administrator, and an employee of the Department of Corrections, had been appointed as Hearing Officer for the new administrative review and/or administrative hearing.[12]

15.    The Collective Bargaining Agreement between District of Columbia Department of Corrections and Fraternal Order of Police Department of Correction Labor Committee guarantees that a "Disinterested Designee/Hearing Officer shall review the proposed action….  The Hearing Officer must be a DS-13 or higher and have no direct or personal knowledge of the matter contained in the disciplinary case, and not be in the chain of command between the proposing and deciding officials."[13]  Dr. Lesansky serves at the pleasure of the Director, the deciding official.

16.    No statute, regulation, or provision of the CBA authorizes the DOC to require these DOC Employees to go through a second administrative process.

17.    Nevertheless, the DOC Employees participated in good faith in the new hearings scheduled by Dr. Lesansky.  They presented written submissions and all but two Employees made oral presentations which were recorded.  (See Submission of Cynthia Washington, Exhibit 50; Submission of Herbert Douglas, Exhibit 51; Submission of Lorenzo Jennings, Exhibit 52; Submission of Dionne Makins, Exhibit 53; Submission of Alphonso Bryant, Exhibit 54; Submission of Lawanda Hinton-Saunders, Exhibit 55; Submission of Darryl Love, Exhibit 56; Submission of Shantell Hatton, Exhibit 57, filed herewith).  The available transcriptions are attached as Exhibits.  (See Oral Presentation of Cynthia Washington, Exhibit 58; Oral Presentation of Herbert Douglas, Exhibit 59;

---

[12]    See Exhibits 29-37.

[13]    See Exhibit 18, Article II, Section 9, C.

Oral Presentation of Lorenzo Jennings, Exhibit 60; Oral Presentation of Dionne Makins, Exhibit 61; Oral Presentation of Alphonso Bryant, Exhibit 62 ; Oral Presentation of Lawanda Hinton-Saunders, Exhibit 63; Oral Presentation of Darryl Love, Exhibit 64; Oral Presentation of Shantell Hatton, Exhibit 65 ).

18. On December 14, 2007, the DOC Employees were again served with decisions by Director Brown finding unanimously that each employee was to be discharged from service with the DOC for the very same conduct which was previously presented to the judges of the Office of Administrative Hearings. (See Dismissal of Cynthia Washington, Exhibit 66; Dismissal of Herbert Douglas, Exhibit 67; Dismissal of Lorenzo Jennings, Exhibit 68; Dismissal of Dionne Makins, Exhibit 69; Dismissal of Alphonso Bryant, Exhibit 70; Dismissal of Lowanda Hinton-Saunders, Exhibit 71; Dismissal of Darryl Love, Exhibit 72; Dismissal of Shantell Hatton, Exhibit 73, filed herewith).

Respectfully submitted,

HANNON LAW GROUP, LLP

*/s/ J. Michael Hannon*

J. Michael Hannon, #352526
1901 18th Street, NW
Washington, DC 20009
(202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com

*Attorneys for Plaintiffs*

# EXHIBIT 48

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**D.C. Office of Personnel**

## District Personnel Manual Issuance System

This bulletin should be filed behind the divider for part III of DPM
Chapter(s) 4 & 16

**DPM Bulletin No. 4-26 & 16-1**

[illegible] July 26, 2006

**SUBJECT:** Variation to the Provisions in Section 1616.4 of Chapter 16 of the D.C. Personnel Regulations. General Discipline and Grievances – **Department of Corrections**

Section 400.1 of Chapter 4 of the D.C. personnel regulations, Organization for Personnel Management, authorizes the Director, D.C. Office of Personnel, to grant a **variation** from the strict letter of the regulations if such variation is within the spirit of the regulations and the efficiency of the District government; and the integrity of the Career, Legal, Excepted, Management Supervisory, and Executive Services, as applicable, are protected and promoted.

Section 400.3 of the regulations specifies that whenever a variation is granted, the Director of Personnel must publish a statement in the District Personnel Manual (DPM) that includes all of the following:

a. The particular practical difficulty or hardship involved;

b. The variation being permitted, the difference from the requirements of the regulations, and to whom it applies;

c. The specific circumstances which protect or promote the efficiency of the District government and the integrity of a particular Service or Services, and

d. The steps that will be taken to limit the application of the variation only to the duration of the conditions that gave rise to it.

Pursuant to section 400.2 of the regulations, the Director of Personnel hereby grants a variation to section 1616.4 of Chapter 16 of the regulations, General Discipline and Grievances, as requested by the Department of Corrections (DOC). Section 1616.4 of the regulations provides that, in the case of a summary removal in accordance with the chapter, the agency head (or designee) taking the action shall provide a written summary removal notice to the employee "*within three (3) days of the summary removal.*"

The variation, which is applicable to employees in the DOC who were summarily removed effective close of business on **Wednesday, July 26, 2006**, ONLY, provides as follows:

> *The 3-day period in section 1616.4 of the regulations required to provide the written summary removal notices to the aforementioned DOC employees is extended to a period not-to-exceed 30 days from July 26, 2006.*

---

*Note: DPM Bulletins that are strictly procedural in nature have direct applicability only to agencies and employees under the personnel authority of the Mayor. Other personnel authorities or independent agencies may adopt any or all of these procedures or guidance materials for agencies and employees under their respective jurisdictions. [See DPM Chapter 2, Part II, Subpart 1, § 1.3]*

**Inquiries:** DCOP, Employee & Labor Relations Administration (202) 727-1735
**Distribution:** Heads of Departments and Agencies, HR Advisors and DPM Subscribers
**Bulletin Expires:** September 30, 2006

In accordance with the provisions of section 400.3 of the regulations, this bulletin constitutes the statement required under that section of the regulations concerning the variation being granted, and the information below is provided with respect to the variation:

1. The regulations establish that an agency head may summarily remove an employee only if at the time the summary removal action is taken, a good faith effort has been made to determine that the employee's conduct meets at least one (1) of these conditions: (a) the conduct is a threat to the integrity of government operations; (b) the conduct constitutes an immediate hazard to the agency, other employees, or to the employee; or (c) the conduct is detrimental to public health, safety, or welfare of others.

2. While an employee may be summarily removed from his or her position by written or oral directive, a written summary removal notice under section 1616.4 of the regulations must be issued within 3 days of the summary removal. The notice shall include, among other things, detailed information on the *reasons for the summary removal action* ("specifications").

3. As part of the investigation that resulted in the summary removal actions taken by the DOC, the agency conducted an examination of witnesses (interviews) via tape recorder; however, a[illegible] process to transcribe the tapes of the examination of witnesses has not been completed.

4. The information contained in the record of the examination of witnesses will be part of the specifications included in the written summary removal notices that must be provided to these employees.

5. The DOC anticipates [illegible] approximately 30 days from July 26, 2006 for the transcription process to be completed (plus time for the affected employees to review/approve the transcripts) and for the written summary removal notices to be drafted and issued to the employees.

6. The variation being granted will allow the time needed to complete the transcription process, etc., so that these employees are afforded the due process required under section 1616 of the regulations.

7. Given the circumstances of this variation, its application will be strictly limited to the period needed to complete the actions/processes described in Paragraph 5 above.

Lisa R. Marin, SPHR
Director of Personnel

# EXHIBIT 49

GOVERNMENT OF THE DISTRICT OF COLUMBIA PERB CASE NO.: 06-U-50
PUBLIC EMPLOYEE RELATIONS BOARD

AFFIDAVIT

ITMO: PERB Case no. 06-U-50: FOP/DOC Labor Committee vs. DC Department of Correctons

I, Neal R. Gross, undersigned, do hereby swear and affirm that the following is true and accurate to the best of my knowledge and belief:

1. On June 8, 2006, my transcription company, Neal R. Gross and Co, Inc., [address below], was contacted by phone by Ms Wanda Patten of the DC Department of Corrections in regard to providing verbatim transcription to her by email attachment of 5 or 6 mini micro cassette recordings made by the Office of Internal Affairs of the Department, with turnaround delivery required of 5 working days. The details are contained on the attached pages numbered by hand as 1, 2 and 3 in the upper right corner of the sheet which I have personally copied and numbered for the express purpose of complying with the subpoena for which this affidavit is intended as complete response.

2. On June 20, 2006, said mini micro cassettes were picked up by our courier at 1923 Vermont Ave, NW, who returned with them immediately to our office.

3. As agreed, we did as instructed and sent an email with attachment in MSWord to wanda.patten@dc.gov on June 27 and on that same date the mini micro cassettes were returned to 1923 Vermont Ave, NW. We subsequently sent an invoice to the Department for this work.

4. On July 25, my transcription company was contacted by phone by Agent Beard of the same department in regard to providing similar services for 7 mini micro cassettes with a turnaround delivery requested of 2 working days.

5. On July 25, said mini micro cassettes were picked up by our courier at the same address who did with them the same as number 2 above.

6. As agreed, and as described in number 3 above, we provided transcription and emailed the text to ben.collins@dc.gov , as instructed, on July 27 and subsequently sent an invoice to Benjamin Collins.

7. At some later time for which I do not have exact record, I was contacted by Wanda Patten again to request of me a "hard copy" of the transcriptions we had provided earlier. I complied with this request and did not charge either the Department or any other party for this courtesy service. Each written "hard copy" is an exact printed replica of the texts that we had accomplished in the 2 original assignments, no changes having been made.

8. On or about November 20, 2007, Attorney Ann-Kathryn So of the law offices of Michael Hannon contacted me personally to verify a list of which witnesses we had in fact transcribed under the 2 above described assignments and the cited date of the interview, as well as the time frames of receipt and delivery of the respective materials. I provided such information willingly and in as complete a fashion as I could at that time, using the originals of the documents that accompany this affidavit as my source. A print out of the email of our correspondence is attached and marked with "7" [circled] in the upper right corner of the sheet.

9. I have no other records, nor any more information than I have provided in this affidavit and the accompanying documents.

10. I certify to the authenticity of the accompanying documents as being true and accurate copies of documents kept in the ordinary course of business in my office although I have redacted billing, contract, and other proprietary notations that are not for public dissemination. The balance of the information contained on the unredacted portions is true and correct and relevant to the subpoena to which this is a response.

11. This exhausts all knowledge of this matter that I have.

12. It is my understanding that with the delivering of this material the requirement that I be present at 10am on December 6, 2008, is to be voided. I am not able to be present at that time, but nonetheless I have and will continue to cooperate with all parties, absent issuances of formal subpoenas.

Faithfully,

Neal R. Gross
1323 R.I. AVE NW
WASHINGTON, DC 20005
202-234-4433

cc: Julio A. Castillo, Esq

SUBSCRIBED AND SWORN THIS 3rd DAY OF DECEMBER, 2007, BEFORE ME,

RICHARD RUSSELL, NOTARY PUBLIC IN AND FOR THE

DISTRICT OF COLUMBIA.

My commission expires: 11/30/08

(1)

6/27

DUE: 3 wk WK/CAL ___ TRIAL: ___ [x] EXP [ ] DAILY JOB NO.:

CLIENT: DC Dept corrections pt

TITLE: Ofc Internal Affairs r.6 MIN, MICRO

| DATE(S) '06 | D | TIMES | LOCATION: [ ] AMP [ ] VIDEO [YOUR INITIALS: ] |
|---|---|---|---|
| 6/20 | | | RM: |
| | | | CITY/ST: 2057 / 2049 |
| | | | TO GET IN: PH: 28/5 |

CALLER: WANDA Patten ON: 6/8 PH: 671-2054

WORK WITH: PH: FAX:

ORIG+__ [x] EMO [ ] EMAIL [ ] DISK/CD (WP/MSW/ASC/PDF/ETRAN) [ ] MINI [ ] TAPES/CDS

22 / 25 [ ] SUMM (DUE:______) [ ] PROOF [ ] GSA [ ] XMAS [x] ROL/BRO (on 0627)

SHIP TO:

1923 VT Av

5 sets

RLRB

| | VIA/DATE: |
|---|---|
| TRANS | EMO 0627 |
| DISK | |
| EMAIL | |
| PT'S | 06 0627 |
| SUMMARY | |
| SIG LTR | |

EMAIL1: WANDA.PATTEN@dc.gov EMAIL2:

BILL TO: [x] CARDHOLDER CALL#:

wanda

[ ] PF [ ] COD [ ] ITMZ [ ] LINE [ ] FLAT

PO/CC#: EXP:

PHONE: FAX: 673F2097

INV SENT: 0911 VIA: fax / USPS

(2)

**SALE TO:** ☐XMAS ☐ROL/BRO (on________)

**BILL TO:**

PH: FAX: PH: FAX:

☐EMO ☐EMAIL ☐MINI ☐DISK/CD (WP/MSW/ASC/PDF/ETRAN) ☐ **PF** ☐ COD ☐ ITMZ ☐ LINE

EMAIL1:

EMAIL2:

| | | |
|---|---|---|
| TRNSCRPT | VIA | ON |
| EMAIL | VIA | ON |
| INVOICE | VIA | ON |

PGS: ______ x ______ = ______

______ x ______ = ______

______ x ______ = ______

SALES TAX: ______ x 5.75% = ______

**TOTAL:** = ______

**SALE TO:** ☐XMAS ☐ROL/BRO (on________)

**BILL TO:**

PHONE: FAX: PH: FAX:

EMO ☐EMAIL ☐MINI ☐DISK/CD (WP/MSW/ASC/PDF/ETRAN) ☐ **PF** ☐ COD ☐ ITMZ ☐ LINE

EMAIL1:

EMAIL2:

| | | |
|---|---|---|
| TRNSCRPT | VIA | ON |
| EMAIL | VIA | ON |
| INVOICE | VIA | ON |

PGS: ______ x ______ = ______

______ x ______ = ______

______ x ______ = ______

SALES TAX: ______ x 5.75% = ______

**TOTAL:** = ______

| HRG DATE | VOLUME/WITNESS TITLE/DEPONENT | RPT | TRNS | TYPIST PAGES | OFFICE PAGES | END TIME | TOTAL PAGES | DEL VIA | DEL ON |
|---|---|---|---|---|---|---|---|---|---|
| | Alonso Brumfield | | | 13 | | | | | |
| | Herbert Douglas | | | 47 | | | | | |
| | Shantell Hatton | | | 20 | | | | | |
| | Lawanda Hinton-Sanders | | | 25 | | | | | |
| | Lorenzo Jennings | | | 26 | | | | | |
| | Sonya Kingsland | | | 24 | | | | | |
| | Dionne Makins | | | 25 | | | | | |
| | " " | | | 49 | | | | | |
| | Kirkland Marlon | | | 7 | | | | | |
| | Leonard Nelson | | | 12 | | | | | |
| | Andra Parker | | | 27 | | | | | |

(3)

**SALE TO:** ☐XMAS ☐ROL/BRO (on________)

**BILL TO:**

PH: FAX:

PH: FAX:

☐EMO ☐EMAIL ☐MINI ☐DISK/CD (WP/MSW/ASC/PDF/ETRAN) ☐ **PF** ☐ COD ☐ ITMZ ☐ LINE

EMAIL1:

EMAIL2:

| TRNSCRPT | VIA | ON |
|---|---|---|
| EMAIL | VIA | ON |
| INVOICE | VIA | ON |

PGS: ______ x ______ = ______
______ x ______ = ______
______ x ______ = ______
SALES TAX: ______ x 5.75% = ______
**TOTAL:** = ______

**SALE TO:** ☐XMAS ☐ROL/BRO (on________)

**BILL TO:**

PHONE: FAX:

PH: FAX:

☐EMO ☐EMAIL ☐MINI ☐DISK/CD (WP/MSW/ASC/PDF/ETRAN) ☐ **PF** ☐ COD ☐ ITMZ ☐ LINE

EMAIL1:

EMAIL2:

| TRNSCRPT | VIA | ON |
|---|---|---|
| EMAIL | VIA | ON |
| INVOICE | VIA | ON |

PGS: ______ x ______ = ______
______ x ______ = ______
______ x ______ = ______
SALES TAX: ______ x 5.75% = ______
**TOTAL:** = ______

| HRG DATE | VOLUME/WITNESS TITLE/DEPONENT | RPT | TRNS | TYPIST PAGES | OFFICE PAGES | END TIME | TOTAL PAGES | DEL VIA | DEL ON |
|---|---|---|---|---|---|---|---|---|---|
| | William Pearson | | | 13 | | | | | |
| | Cynthia Washington | | | 14 | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

(4)

DUE: 2 WK/CAL TRIAL:___ EXP DAILY JOB NO.: 0725 DCDC/PT

| CLIENT: | Dept of Correction (Internal Affairs) |
|---|---|
| TITLE: | Interviews |

| DATE(S) '06 | D | TIMES | LOCATION: AMP VIDEO [YOUR INITIALS: PP] |
|---|---|---|---|
| PT | | | ~~ETA~~ ~9:30 AM RM:<br>7 ~~6~~ micro-cassette (60 + 90 min)<br>CITY/ST: |
| | | | TO GET IN: PH: |

CALLER: Agt. Beard ON: 7/25 PH: 471-2058

WORK WITH: PH: FAX:

ORIG+__ EMO EMAIL DISK/CD (WP/MSW/ASC/PDF/ETRAN) MINI TAPES/CDS

22 / 25 SUMM (DUE:______) PROOF GSA XMAS ROL/BRO (on________)

**SHIP TO:**

| | VIA/DATE: |
|---|---|
| TRANS | EMO 0727 |
| DISK | |
| EMAIL | |
| PT'S | PU 0728 |
| SUMMARY | |
| SIG LTR | |

EMAIL1: ben.collins@dc.gov EMAIL2:

**BILL T(** ILL#: PF COD ITMZ LINE FLAT

PO/CC#: EXP:

PHONE: FAX: 673-2097

INV SENT: 10/20/06 VIA: fax/mail

(5)

**SALE TO:** ☐XMAS ☐ROL/BRO (on________)

**BILL TO:**

PH: FAX:

PH: FAX:

☐EMO ☐EMAIL ☐MINI ☐DISK/CD (WP/MSW/ASC/PDF/ETRAN) ☐ **PF** ☐ COD ☐ ITMZ ☐ LINE

EMAIL1:

EMAIL2:

| TRNSCRPT | VIA | ON |
|---|---|---|
| EMAIL | VIA | ON |
| INVOICE | VIA | ON |

PGS: ______ x ______ = ______
______ x ______ = ______
______ x ______ = ______
SALES TAX: ______ x 5.75% = ______
**TOTAL:** = ______

**SALE TO:** ☐XMAS ☐ROL/BRO (on________)

**BILL TO:**

PHONE: FAX:

PH: FAX:

☐EMO ☐EMAIL ☐MINI ☐DISK/CD (WP/MSW/ASC/PDF/ETRAN) ☐ **PF** ☐ COD ☐ ITMZ ☐ LINE

EMAIL1:

EMAIL2:

| TRNSCRPT | VIA | ON |
|---|---|---|
| EMAIL | VIA | ON |
| INVOICE | VIA | ON |

PGS: ______ x ______ = ______
______ x ______ = ______
______ x ______ = ______
SALES TAX: ______ x 5.75% = ______
**TOTAL:** = ______

| HRG DATE | VOLUME/WITNESS TITLE/DEPONENT | RPT | TRNS | TYPIST PAGES | OFFICE PAGES | END TIME | TOTAL PAGES | DEL VIA | DEL ON |
|---|---|---|---|---|---|---|---|---|---|
| 0620 | Malcom Pointer | | | 40 | | 3:19 | | | |
| 0604 | Shandell Hatton | | | 20 | | 12:40 | | | |
| 0620 | Darryl Love | | | 19 | | 2:30 | | | |
| 0621 | Leona Bennett | | | 50 | | 3:17 | | | |
| 0703 | Lawanda Hinton-Saunders | | | 21 | | 2:40 | | | |
| 0621 | Michael Dubose | | | 23 | | 2:00 | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

0725 DC DC #1
Add to Job Form

(6)

DC DEPARTMENT OF CORRECTIONS INTERVIEWS TYPED

FOR 0620DCDC PT

| INTERVIEWEE | DATE OF INTERVIEW |
|---|---|
| BRUMSFIELD | 6/4 |
| DOUGLAS | 6/13 |
| HATTON | 6/3 |
| HINTON-SAUNDERS | 6/3 |
| JENNINGS | 6/3 |
| KINGSLAND | 6/3 |
| MAKINS | 6/3 & 6/16 |
| MARION | 6/3 |
| NELSON | 6/3 |
| PARKER | 6/14 |
| PEARSON | 6/3 |
| WASHINGTON | 6/3 |

FOR 0725DCDC PT

| | |
|---|---|
| BENNETT | 6/21 |
| DUBOSE | 6/21 |
| HINTON-SAUNDERS | 7/3 |
| HATTON | 6/21 |
| LOVE | 6/20 |
| POINTER | 6/20 |

# EXHIBIT 50

HANNON LAW GROUP, LLP
COUNSELORS AND ATTORNEYS AT LAW
1901 18TH STREET, NW
WASHINGTON, D.C. 20009

(202) 232-1907
FACSIMILE (202) 232-3704
www.hannonlawgroup.com

J. MICHAEL HANNON *

TREBIE A. VALANCIUS +
CAROLYN K. MANNING
ADMITTED ONLY IN CONNECTICUT;
SUPERVISION BY J. MICHAEL HANNON,
A MEMBER OF THE D.C. BAR

* ALSO ADMITTED IN MARYLAND
+ ALSO ADMITTED IN VIRGINIA
• ALSO ADMITTED IN CALIFORNIA

27 WOOD LANE
ROCKVILLE, MARYLAND 20850

11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 522-2112

OF COUNSEL

CHARLES I. CATE •
DONALD LEWIS WRIGHT
WILLIAM CLAYTON BATCHELOR *+

March 22, 2007

**BY HAND**

Henry R. Lesansky, Ph.D.
Health Services Administrator
District of Columbia Department of Corrections
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001

RE: Response to Notice of Proposed Termination for Cynthia Washington

Dear Dr. Lesansky,

This firm represents the Fraternal Order of Police, District of Columbia Department of Corrections Labor Committee (FOP/DOC Labor Committee). In that capacity, we also represent Cynthia Washington in the proposed removal action pending against him with the D.C. Department of Corrections (DOC), for which you have been assigned as the Hearing Officer. This letter serves as Officer Washington's written response to the 20-day advance notice of proposed removal dated March 15, 2007. In addition, this letter serves as Officer Washington's formal request for a hearing in this matter, as well as copies of all material you will be using in reaching a decision.

## PROCEDURAL BACKGROUND

As you are well aware, this is the DOC's attempt to have a second bite of the apple. On August 24, 2006, Director Devon Brown proposed and recommended summary removal for Officer Washington, for her alleged "role" in the June 2006 D.C. Jail escape. Officer Washington properly followed the procedures set forth in both the Collective Bargaining Agreement ("CBA") of the parties and D.C. law, as set forth in the D.C. Personnel Manual ("DCPM"), in response to that proposal. The DOC and the D.C. Office of Administrative Hearings ("OAH") reached an agreement for the Administrative Law Judges at the OAH to serve as the Hearing Officers in the proposed summary removal action of Officer Washington. Officer Washington presented her case

before the OAH, and the Administrative Law Judges of the OAH rendered a decision recommending that Director Brown return Officer Washington to work.[1] Director Brown issued a Remand Notice for Officer Washington. See Appendix, Volume II, App. 41. Counsel for Officer Washington filed a Motion to Strike the Remand Notice. See Appendix, Volume II, App. 50 and 51. The DOC filed a Reply to Employee's Motion to Strike Remand Notices. See Appendix, Volume II, App. 52. Counsel for Officer Washington filed a Response to the DOC's Reply. See Appendix, Volume II, App. 53. A hearing was held on the matter before the Administrative Law Judges of the OAH on February 5, 2007.[2]

On March 2, 2007, the OAH issued its second Report and Recommendation in this matter.[3] The Administrative Law Judges determined that Director Brown acted unlawfully in not rendering her final decision in 45 days, as mandated by law. In addition, the Administrative Law Judges upheld their original decision recommending that Director Brown reinstate Officer Washington as her summary removal could not be sustained.

As you are also aware, on March 16, 2007, senior management at the DOC simultaneously rescinded and cancelled this proposal for summary removal, and replaced it with the 20-day notice of proposed termination, for which you are serving as Hearing Officer. This unlawful action is no more than an attempt by the DOC to have a "Do Over" because Director Brown disagrees with the decision of the original Hearing Officers that the DOC *handpicked* to serve in that capacity in this matter. In fact, the proposed removal of Officer Washington dated March 15, 2007 is virtually *identical* to the one issued on August 24, 2006.

It is unconstitutional and unlawful for you to proceed at all in this matter. You must promptly advise Director Brown that he must return Officer Washington to work pursuant to the OAH Judges' prior recommendations.

## FACTUAL BACKGROUND[4]

On June 3, 2006, two inmates escaped from the D.C. Jail by smashing out the door and window of the Warden's office.[5] A correctional officer, while reporting for duty,

---

1 The decision of the OAH Administrative Law Judges is attached in the Appendix to the responses of all ten employees at Appendix, Volume I, App. 40. Hereafter, appendices will be cited accordingly.

2 The hearing transcript can be found at Appendix, Volume II, App. 54.

3 See Appendix, Volume II, App. 58.

4 A more detailed factual background is available in the pleadings filed on behalf of Officer Washington (See Appendix, Volume I, App. 25) with the OAH in the DOC's first attempt to terminate him for the exact same behavior and for which Officer Washington's conduct was found not to rise to the level warranting such a termination.

5 It should be noted that on June 4, 2006, the two escapees were recaptured without incident.

witnessed the inmates escaping, and pursued the two escapees on foot until he lost sight of them. The officer then returned to the D.C. Jail to report the escape.

The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the D.C. Jail. The escape was widely reported in the press, and the source of embarrassment for both DOC and City Administrators. The escape was a direct result of the DOC's failure to remedy safety issues which had been repeatedly brought to the Agency's attention by the FOP/DOC Labor Committee and its Chairperson. The failure to implement these safety measures not only allowed this escape, but also continues to subject the FOP/DOC Unit members to unsafe work conditions, increased risk of assault, and threat to their lives. The DOC Office of Internal Affairs ("OIA") conducted an investigation of the escapes. The institutional deficiencies cited in its report– all raised by Complainants prior to the escape – were the actual and proximate cause of the escape according to the OIA Investigative Report:[6]

   a.   Chronic understaffing and inadequate recruiting and training plans;

   b.   The absence of a Security Chief who would ensure utilization of modern security controls, implementation of coherent staffing protocols, implementation of intelligence gathering within the Jail, supply of necessary equipment including communications equipment, and development of operational protocols to promote an integral security program;

   c.   Failure to provide in-house dining facilities for around the clock availability of back-up correctional staff in the event of an emergency;

   d.   Failure to provide hand held radios to correctional officers with capability and authority to communicate directly with the Metropolitan Police Department and other agencies on a 24-hour basis;

   e.   Failure to conduct regular audits of Housing units to ensure that inmates are housed commensurate with their dangerousness;

   f.   The absence of sufficient surveillance cameras at known checkpoints and in administrative entrances, stairwells and elevators;

   g.   Understaffing of specialists responsible for classifying inmates and implementation of an improved computer system for inmate classification;

---

[6]     There is an absolute distinction between the OIA Investigation Report and the recommendations for discharge of these DOC Employees. The recommendations for discharge were not rendered by the OIA, but rather by the Acting Deputy Warden, no doubt in consultation with Director Devon Brown.  Also, it is crucial to note that several non-union members in leadership authority were allowed to resign and/or retire as a consequence of the jail escapes. No person in supervisory authority has been fired or otherwise disciplined despite the findings of the OIA Investigation.

h.    Lack of training of Correctional Treatment Specialists on the use of risk assessment instruments designed to identify criminal risk and high threat offenders;

i.    The absence of on-going staff training for classification, housing and separation of inmates;

j.    The uncontrolled access by inmates to telephones within the Jail;

k.    An incoherent and inadequate system for security of inmates reporting for Infirmary Care;

l.    An incoherent and inadequate system for allowing inmates virtually free access through the Jail and free access into the Administrative module;

m.    Inadequate controls of inmates approved for detail assignments in the Jail, which allow such inmates free access through the Jail Housing Module and, in some instances, the Administrative Module;

n.    The absence of modern and affordable electronic tracking systems for inmates;

o.    The absence of modern, electronic locking systems for the Housing Module and checkpoints to the Administrative Module;

p.    Failure of the Community Alert System, also known as the Escape Alarm;

q.    The absence of modern safety glass or other reinforcement of windows in the Administrative Module; in addition, security walls, razor wire, and perimeter cameras are absent in vital security areas;

Without conducting an adequately thorough investigation, and in an effort to deflect continued public attention from the actual reasons that led to the escape, Director Brown, on June 5, 2006, placed twelve D.C. Jail employees on paid administrative leave pending further investigation. These employees were issued written notification of their administrative suspensions with pay.

After the escape, most of the twelve suspended employees, other employees and witnesses were interviewed by Investigators with the DOC OIA.[7] The Union members (who

---

[7]    Corporal Lachonne Stewart was not interviewed by OIA neither prior to or after being put on administrative leave with pay, nor was she interviewed following the summary removal action. To date Officer Stewart has not been interviewed by OIA.

were suspended) were not provided with required warnings regarding the use of their statements and their right to remain silent under D.C. and federal law before the interviews. See *Kastigar v. United* States, 406 U.S. 441 (1972).[8] Nor were they uniformly advised of their right to have a Union representative present for the interview. The interviews were tape recorded. Despite the CBA requirement to produce the tapes, they have never been provided to the Union, despite repeated requests since June 28, 2006. Transcripts purportedly prepared from the tapes, and appended to the OIA Investigation Report for these employees, show that Investigators turned off the tape recorder on numerous occasions, in order to engage in off-the-record attempts to intimidate the officers being interviewed.

Public scrutiny of the inmate escapes continued, and, on June 19, 2006, D.C. City Councilmember Phil Mendelson and Director Brown, addressed questions on the jail break in a public forum. In the following week, the FOP/DOC Labor Committee continued to raise a number of concerns about the serious safety and security issues facing correctional officers. On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Mendelson, was held to continue review of the jail break and general safety issues at the D.C. Jail. At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.

Facing public pressure and pressure from the D.C. City Council, during his testimony at the June 26, 2006, hearing, Director Brown announced that as a result of the escape, the DOC "conducted a comprehensive review and assessment of its operations ... and with swift and decisive action it has proceeded to initiate major improvements [to the D.C. Jail]." Despite Director Brown's assertion that substantive changes were made, the "improvements" made were largely cosmetic. While these superficial modifications were needed, no real attempt has been made to address and correct any of the critical safety concerns and infrastructure issues that had long existed and which were raised by the FOP/DOC prior to the June 2006 escape.

On July 26, 2006, the Mayor[9], Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break. None of the fired employees or their Union were notified in advance of this public announcement. During the Press Briefing, Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing, summary firings, and the announcement of a criminal investigation, were intended to and had the result of humiliating

---

8 As an arm of the local government the DOC Office of Internal Affairs' power to compel testimony from employees during an investigation of this kind is not absolute. The employee has the right of refusal based on the Fifth Amendment privilege against self-incrimination. Further, any statutory provision compelling testimony that may be incriminatory must match the strength of the Fifth Amendment and provide full immunity against subsequent prosecution in order to be valid. The DOC employees should have been informed of this before they were interviewed by the OIA.

9 The Mayor referenced herein is former Mayor Anthony Williams.

and embarrassing the discharged Union members, of which Officer Washington is one, casting them in the public light as felons who abetted a jail escape.[10]

Director Brown, the Mayor, the City Administrator and other city officials deliberately chose a course of action designed to maximize press coverage while intimidating the employees, including Officer Washington. This scheme was intended to thrust the city and its administrators into a positive light and to suggest to the public that the jail escapes could only have been accomplished by a criminal conspiracy within the rank and file of the D.C. Jail employees. In reality, the jail escapes were a predictable product of unsafe conditions at the D.C. Jail which have been the topic of ongoing complaints to Director Brown by Union members and representatives. Officer Washington is nothing more than a casualty of a failed system and a scapegoat for DOC Administrators to avoid taking responsibility for their actions.

**EMPLOYEE'S HISTORY WITH THE DC DOC**

Officer Washington has worked in the DC DOC for 19 years, and is due to retire within the next year. Officer Washington has performed a variety of duties in her tenure with the Department including working at the 1010 North Capitol Street facility prior to its closing. Officer Washington then returned to uniformed positions at the DC Jail. Upon her return, she participated in a general orientation, but did not receive any formal training, nor has she had any annual training. Officer Washington has never had any personnel or inmate-related problems in all of her years with the DC DOC.

Officer Washington took some time off during her employment with the Department to raise her own children and to work with foster children. However, she missed working with the DC DOC and returned to work as soon as she could do so.

**THIS EMPLOYEE'S CONDUCT WAS NOT NEGLIGENT**

Officer Washington was a relief officer at the time of the escapes. She was guaranteed to work two days per week in SE1, the unit that housed Ricardo Jones. On the morning of the escape, Officer Washington was drafted to work a second, consecutive shift and was assigned to work in SE1 with Sergeant Dionne Makins and Officer Shantell Hatton.

Although four correctional officers are required to operate each housing unit, there were not enough officers to do so on the day of the escape. The jail was 56 officers short that day; a large number of staff had requested time off (on the day of the escape) because of the National Race for the Cure taking place that day.

Despite a grave shortage of officers that day, there were ample supervisors. However, no supervisors offered to or did fill in for the officers. DC Jail management had the opportunity to

---

[10] In order to accomplish this public humiliation and summary firing, Director Brown and other DOC Administrators engaged in an unlawful and unconstitutional revision of existing D.C. laws. This matter currently is being litigated in another forum.

put the jail on lockdown that day because of the critical staff shortages. However, Captain Betty Ames made the decision that morning not to do so.

Officer Washington reported to SE1 at the appropriate time, and performed the tasks to which she was assigned by the Officer in Charge in the unit, Sergeant Dionne Makins. Officer Washington worked in the "bubble" that morning completing paperwork and other administrative tasks. In addition, Officer Washington worked on the floor of the housing unit to assist in the 8:00 a.m. inmate count. The count matched the count from the evening before; all inmates were present and accounted for at the beginning of the shift. Although it was required for a supervisor to come to the housing unit to verify the morning count, no one did.

In addition, Officer Washington assisted in the getting those inmates housed in SE1 to the proper place; i.e., the visiting hall, infirmary, work detail, religious services, etc. It is routine for paper passes to be issued for the various departments within the jail, given to the inmate, and the inmate released from the housing unit to go unsupervised to the department for which the pass was issued. Because of privacy laws, the correctional officers are not permitted to make any inquiries as to the inmate requests to attend religious services. All an inmate has to do to receive a pass to attend religious services is ask for one. Likewise, the officers cannot request any information with regard to infirmary services received by the inmates because of HIPAA. Obtaining an infirmary pass is just as easy as getting one to attend religious services, but there are more options.

There is any number of reasons for an inmate to obtain a pass for the infirmary. These passes are issued for emergency or regular medical care. Inmates may have passes in their possession to submit to a correctional officer or the officer can issue a pass. Correctional Officers have discretion to issue infirmary passes for urgent care or inmate distress. However, the much more common way in which a pass is issued is as a result of a telephone call from the infirmary to the housing unit. The flaw with this system is that the caller identification on the telephones in the housing units does not work properly. In addition, the correctional officers issuing the passes are not familiar with every single staff member in the infirmary. Therefore, it is routine for correctional officers to issue passes to inmates for the infirmary based on a telephone call that cannot be verified. Supervisors and managers are well aware of this pattern and practice; however, no adjustments to the system have been made; Correctional Officers are disciplined if inmate passes are not issued.

Typically, the Officer in Charge pre-completes the passes to be issued that day. Then, the Officer in Charge directs the other officers to complete those passes with the relevant current information. On the morning of the escape, Sergeant Makins instructed Officer Washington to complete the infirmary passes issued as a result of calls from the infirmary. Officer Washington put the time on the passes and handed them to Officer Shantell Hatton to log inmates onto the movement board, which is a piece of paper that tracks which inmates are in or out of the housing unit. Officer Shantell Hatton made the appropriate entries and the inmates were sent on their way.

Once the inmate is released from the housing unit, he is unsupervised and left on his honor to report to the area for which he has a pass. The inmate must be released by Floor Control personnel to move about freely in the jail. However, all an inmate needs to do is flash

the pass and he will be released. There is no way for the personnel in Floor Control to verify the information on the passes. So long as an inmate has a white piece of paper that looks like a pass, he is assumed to have one. Further, there is no way to track an inmate once he is released from the housing unit. It is not uncommon for inmates to leave at the beginning of an officer's shift and not return until the end of the shift or later. There is no pattern or practice of issuing an alert for that inmate until he has missed the next scheduled count. If a DC DOC employee had not witnessed the two inmates escaping, no one would have looked for either of them for quite some time.

Supervisors were ill-prepared for the escape. In fact, Corporal Pierson was challenged when he reported the escape to the Command Center. Supervisors thought Corporal Pierson was joking. Even when management recognized that there was an escape, no alarm ever sounded. Nor was a supervisor ever dispatched to the SE1 housing unit.

As was the case with a number of the DC DOC employees who were terminated, the audio equipment was not functioning properly or for the entire duration of Officer Washington's interviews.

Officer Washington has followed the pattern and practice of the jail everyday of her employment with the DC DOC, and did so on the day of the escape. She executed her duties to the best of her ability with the resources available to her at the time.

## LEGAL ARGUMENTS AND DEFENSES

### A. This Action is in Violation of the CBA and D.C. Law.

Neither the CBA nor D.C. law permits "a second bite of the apple." See March 20, 2007 Ltr. to Maria Amato.[11] This is nothing more than a retaliatory exercise by Director Brown to "forum shop" in an effort to get the result that he wants—termination of Officer Washington—and to deflect attention from his mismanagement of the agency.

The CBA and D.C. law clearly set forth the consideration for summary removals. Officer Washington and the DOC already have engaged in the only legal administrative process available in these circumstances. That process ended when the OAH Judges recommended reinstatement of Officer Washington. Neither the CBA nor D.C. law provides *any* authority for the Director to initiate this same disciplinary action again.

In addition, the Administrative Law Judges of the OAH determined that Director Brown violated the 45-day rule, which is mandated by D.C. law, and states, in relevant part, that in all summary removals a final decision must be rendered in 45 days. Once the 45th day passed, with no decision, the only remedy for violation of the law is reinstatement.

In the prior proceedings in this matter, the DOC undertook no effort to justify the narrow circumstances under which summary removal is permitted, as required by D.C. Law.

---

[11] The Letter from J. Michael Hannon, Esq. to Maria Amato, Esq. dated March 20, 2007 is attached.

Obviously, the Administrative Law Judges of the OAH agreed by recommending twice that Officer Washington be reinstated and that summary removal not be upheld. The DOC is just repackaging the same allegations and support thereto, albeit minimally. Doing so does not make the information any more legal or palatable.

**B. <u>This Proposed Termination is a Violation of Due Process Rights.</u>**

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court found that government employees are afforded procedural guarantees <u>before</u> they can be terminated. The Due Process analysis found in *Loudermill* applies to D.C. government employees and, in this case, the DOC employees specifically. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause...Under the CMPA, employees can only be disciplined for cause and prior notice must be given." *Fonville v. D.C.*, 2006 U.S. Dist. LEXIS 58564 (D.D.C. Aug. 22, 2006) (internal citations omitted). See also, *D.C. Department of Corrections v. Teamsters' Union Local*, 554 A.2d 319, 323 (D.C. 1989).

In this context, "agencies cannot relax or modify regulations... [W]hen agencies establish ... pre-termination procedures they are bound to follow them." *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161, 2005 U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005), citing *Lopez v. FAA*, 355 U.S. App. D.C. 51, 318 F.3d 242, 247 (D.C. Cir. 2003). Also, "[t]he D.C. Circuit has not required any additional due process requirements [beyond those defined in *Loudermill*] for the termination of its public employees." *Crockett v. D.C. Metro. Police Dep't.*, 293 F. Supp. 2d 63, 68 U.S. Dist. LEXIS 23632 (2003), citing *Kropat v. Fed. Aviation Admin.*, 333 U.S. App. D.C. 239, 162 F.3d 129, 132-34 (D.C. Cir. 1998). There is no regulation, nor any legal authority, that permits an Agency to retrace the procedures for discharging the employee, once the Agency and the employee have followed the established procedures.

There is no legal authority whatsoever that allows for the DOC to continue to propose discipline for the same offense until they get the result Director Brown desires. The administrative process has been completed in this matter, and any attempt to re-adjudicate is unlawful. What the DOC is doing here is clearly a violation of the United States Constitution. The remedy for such a violation is reinstatement of the employee with full back pay and benefits. See Petition for Writ of Mandamus.[12]

**C. <u>The DOC Is Precluded from Rendering a Different Decision Under the Doctrine of Res Judicata.</u>**

Under the legal doctrine of res judicata, one party in a legal proceeding is prevented from getting another day in court after receiving an unsatisfactory result to his/her claim.

---

[12] Counsel for the FOP/DOC LC, on behalf of the employees terminated as a result of the jail escape, has filed a Petition for a Writ of Mandamus in the District of Columbia Court of Appeals. A copy of that Petition is attached.

There is an abundance of legal precedent supporting this doctrine. The U.S. District Court for the D.C. Circuit has held that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Arakawa v. Reagan*, 666 F. Supp. 254, 262 (1987), citing *Allen v. McCurry*, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980). The *Arakawa* court goes on to find that, "[t]his preclusive effect attaches to administrative proceedings when, as with proceedings before the MSPB, the administrative tribunal 'is acting in a judicial capacity and resolves issues of fact properly before it which the parties have had an adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata. Director Brown is doing nothing more than attempting a "do over" with this proposed termination. The Director did not agree with the decision of the OAH Hearing Officers, and is now looking for a more receptive audience within the confines of the DOC in order to obtain the result he wants. Fundamental principles of law do not allow this, and Director Brown's attempt to "do over" the termination proceedings should be struck down as unlawful.

**D. The "Douglas Factors" Must Be Considered by the DOC.**

The D.C. Court of Appeals has made clear that a D.C. agency must take into consideration the so-called "*Douglas* Factors" when making a disciplinary determination. *D.C. Department of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005). In *Douglas v. Veterans Administration*, the Merit Systems Protection Board ("MSPB"), in the context of federal employment, ruled that an agency must consider specific mitigating and aggravating factors in determining an appropriate penalty. The D.C. Court of Appeals in *Colbert* emphasizes the importance of responsibly balancing the relevant factors in each individual case. In its evaluation of the dismissal of a D.C. Department of Public Works employee and subsequent proceedings, the Appellate Court further explained that an agency must consider the *Douglas* Factors at the onset of termination and in consideration of pretermination protections. *Colbert* at 359. The agency must provide evidence of the *Douglas* Factors in advance of termination in order to preserve the procedural protections of due process. Failure of the agency to meet this standard before this termination is grounds for reinstatement.

Here, the DOC has failed to provide any information relevant to each of the *Douglas* Factors and failed to present evidence that it has engaged in an assessment of progressive discipline with regard to Officer Washington. Officer Washington has a commendable service record. Moreover, the CBA between FOP/DOC Labor Committee and the city requires consideration of progressive discipline. Collective Bargaining Agreement, Article 11, Section 14.

The *Douglas* Factors are:

1.  The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2.  The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3.  The employee's past disciplinary record;

4.  The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5.  The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties;

6.  Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7.  Consistency of the penalty with any applicable agency table of penalties;

8.  The notoriety of the offense or its impact upon the reputation of the agency;

9.  The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. Potential for the employee's rehabilitation;

11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and,

12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

5 MSPR 280, 305-06 (1981). "The *Douglas* factors parallel the Office of Personnel Management's 'suitability' regulations establishing a separate procedure for determining the relevance of criminal convictions to federal employment of applicants and present employees. Any discipline of an employee must be justified in all these realms." 39 Am. U.L. Rev. 869 (1990).

In their Report and Recommendation to strike down the summary removal previously proposed by the DOC in this case, the OAH Hearing Officers unanimously concluded that the there was insufficient information to permit evaluation of the *Douglas* factors in the evidence presented. That evidence has not changed. Therefore, because the same imperfections exist, the same results must occur.

**E. The Hearing Officer Assigned to this Matter Is Not "Disinterested".**

Officer Washington respectfully asserts that the Hearing Officer assigned in this matter is not a disinterested party. You are an employee of the DOC, and ultimately are subject to supervision by the Director of the DOC, Devon Brown, who is the Deciding Official in this matter. Notwithstanding being put forth as the disinterested designee by Deputy Warden Waldren (the Proposing Official), all employees of the DOC fall under the management and direction of Director Brown, the deciding official, which violates the letter and spirit of the CBA.[13]

Because there is no constitutional or other legal authority for a second hearing in this matter and because you are not a disinterested Hearing Officer and for all the other reasons mentioned above, Officer Washington must be reinstated unconditionally.

Pursuant to the 20-day advance notice of proposed removal, I understand that we are entitled to all documentation being used in making this decision. Of course, this would include but not be limited to Officer Washington's personnel file, any and all reports related to the incident, any video or audio tapes of interviews, and any other documentation being used by you in reaching a decision. We respectfully request copies of all such material. Please contact me upon receipt of this letter to discuss the arrangements for obtaining all of this material.

If you have any questions, please do not hesitate to contact me. Thank you for your courtesies.

Sincerely,

J. Michael Hannon

cc: Cpl. Nila Ritenour
Cynthia Washington

---

13 The evidence at any hearing will show that Deputy Warden Waldren was not the proposing official. He was summoned to the Grimke Building the day these notices were sent out, with no knowledge that he was to sign these letters. In fact, the evidence will show that Deputy Warden Waldren was not even given the opportunity to read these letters. The Proposing Official is Director Brown. This is also a violation of the CBA, the Due Process Clause, and D.C. Law.

# EXHIBIT 51

HANNON LAW GROUP, LLP
COUNSELORS AND ATTORNEYS AT LAW
1901 18TH STREET, NW
WASHINGTON, D.C. 20009

(202) 232-1907
FACSIMILE (202) 232-3704
www.hannonlawgroup.com

J. MICHAEL HANNON *

TREBIE A. VALANCIUS +
CAROLYN K. MANNING
ADMITTED ONLY IN CONNECTICUT;
SUPERVISION BY J. MICHAEL HANNON,
A MEMBER OF THE D.C. BAR

* ALSO ADMITTED IN MARYLAND
+ ALSO ADMITTED IN VIRGINIA
• ALSO ADMITTED IN CALIFORNIA

27 WOOD LANE
ROCKVILLE, MARYLAND 20850

11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 522-2112

OF COUNSEL

CHARLES I. CATE •
DONALD LEWIS WRIGHT
WILLIAM CLAYTON BATCHELOR *+

March 22, 2007

**BY HAND**

Henry R. Lesansky, Ph.D.
Health Services Administrator
District of Columbia Department of Corrections
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001

RE: Response to Notice of Proposed Termination for Herbert Douglas

Dear Dr. Lesansky,

This firm represents the Fraternal Order of Police, District of Columbia Department of Corrections Labor Committee (FOP/DOC Labor Committee). In that capacity, we also represent Herbert Douglas in the proposed removal action pending against him with the D.C. Department of Corrections (DOC), for which you have been assigned as the Hearing Officer. This letter serves as Officer Douglas's written response to the 20-day advance notice of proposed removal dated March 15, 2007. In addition, this letter serves as Officer Douglas's formal request for a hearing in this matter, as well as copies of all material you will be using in reaching a decision.

**PROCEDURAL BACKGROUND**

As you are well aware, this is the DOC's attempt to have a second bite of the apple. On August 24, 2006, Director Devon Brown proposed and recommended summary removal for Officer Douglas, for his alleged "role" in the June 2006 D.C. Jail escape. Officer Douglas properly followed the procedures set forth in both the Collective Bargaining Agreement ("CBA") of the parties and D.C. law, as set forth in the D.C. Personnel Manual ("DCPM"), in response to that proposal. The DOC and the D.C. Office of Administrative Hearings ("OAH") reached an agreement for the Administrative Law Judges at the OAH to serve as the Hearing Officers in the proposed summary removal action of Officer Douglas. Officer Douglas presented his case

before the OAH, and the Administrative Law Judges of the OAH rendered a decision recommending that Director Brown return Officer Douglas to work.[1]  Director Brown issued a Remand Notice for Officer Douglas.  See Appendix, Volume II, App. 41.  Counsel for Officer Douglas filed a Motion to Strike the Remand Notice.  See Appendix, Volume II, App. 50 and 51.  The DOC filed a Reply to Employee's Motion to Strike Remand Notices.  See Appendix, Volume II, App. 52.  Counsel for Officer Douglas filed a Response to the DOC's Reply.  See Appendix, Volume II, App. 53.  A hearing was held on the matter before the Administrative Law Judges of the OAH on February 5, 2007.[2]

On March 2, 2007, the OAH issued its second Report and Recommendation in this matter.[3]  The Administrative Law Judges determined that Director Brown acted unlawfully in not rendering his final decision in 45 days, as mandated by law.  In addition, the Administrative Law Judges upheld their original decision recommending that Director Brown reinstate Officer Douglas as his summary removal could not be sustained.

As you are also aware, on March 16, 2007, senior management at the DOC simultaneously rescinded and cancelled this proposal for summary removal, and replaced it with the 20-day notice of proposed termination, for which you are serving as Hearing Officer.  This unlawful action is no more than an attempt by the DOC to have a "Do Over" because Director Brown disagrees with the decision of the original Hearing Officers that the DOC *handpicked* to serve in that capacity in this matter.  In fact, except for some minor changes, the proposed removal of Officer Douglas dated March 15, 2007 is *identical* to the one issued on August 24, 2006.

It is unconstitutional and unlawful for you to proceed at all in this matter.  You must promptly advise Director Brown that he must return Officer Douglas to work pursuant to the OAH Judges' prior recommendations.

## FACTUAL BACKGROUND[4]

On June 3, 2006, two inmates escaped from the D.C. Jail by smashing out the door and window of the Warden's office.[5]  A correctional officer, while reporting for duty,

---

[1]     The decision of the OAH Administrative Law Judges is attached in the Appendix to the responses of all ten employees at Appendix, Volume I, App. 34.  Hereafter, appendices will be cited accordingly.

[2]     The hearing transcript can be found at Appendix, Volume II, App. 54.

[3]     See Appendix, Volume II, App. 57.

[4]     A more detailed factual background is available in the pleadings filed on behalf of Officer Douglas (See Appendix, Volume I, App. 17) with the OAH in the DOC's first attempt to terminate him for the exact same behavior and for which Officer Douglas's conduct was found not to rise to the level warranting such a termination.

[5]     It should be noted that on June 4, 2006, the two escapees were recaptured without incident.

witnessed the inmates escaping, and pursued the two escapees on foot until he lost sight of them. The officer then returned to the D.C. Jail to report the escape.

The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the D.C. Jail. The escape was widely reported in the press, and the source of embarrassment for both DOC and City Administrators. The escape was a direct result of the DOC's failure to remedy safety issues which had been repeatedly brought to the Agency's attention by the FOP/DOC Labor Committee and its Chairperson. The failure to implement these safety measures not only allowed this escape, but also continues to subject the FOP/DOC Unit members to unsafe work conditions, increased risk of assault, and threat to their lives. The DOC Office of Internal Affairs ("OIA") conducted an investigation of the escapes. The institutional deficiencies cited in its report– all raised by Complainants prior to the escape – were the actual and proximate cause of the escape according to the OIA Investigative Report:[6]

a. Chronic understaffing and inadequate recruiting and training plans;

b. The absence of a Security Chief who would ensure utilization of modern security controls, implementation of coherent staffing protocols, implementation of intelligence gathering within the Jail, supply of necessary equipment including communications equipment, and development of operational protocols to promote an integral security program;

c. Failure to provide in-house dining facilities for around the clock availability of back-up correctional staff in the event of an emergency;

d. Failure to provide hand held radios to correctional officers with capability and authority to communicate directly with the Metropolitan Police Department and other agencies on a 24-hour basis;

e. Failure to conduct regular audits of Housing units to ensure that inmates are housed commensurate with their dangerousness;

f. The absence of sufficient surveillance cameras at known checkpoints and in administrative entrances, stairwells and elevators;

g. Understaffing of specialists responsible for classifying inmates and implementation of an improved computer system for inmate classification;

---

6 There is an absolute distinction between the OIA Investigation Report and the recommendations for discharge of these DOC Employees. The recommendations for discharge were not rendered by the OIA, but rather by the Acting Deputy Warden, no doubt in consultation with Director Devon Brown. Also, it is crucial to note that several non-union members in leadership authority were allowed to resign and/or retire as a consequence of the jail escapes. No person in supervisory authority has been fired or otherwise disciplined despite the findings of the OIA Investigation.

h. Lack of training of Correctional Treatment Specialists on the use of risk assessment instruments designed to identify criminal risk and high threat offenders;

i. The absence of on-going staff training for classification, housing and separation of inmates;

j. The uncontrolled access by inmates to telephones within the Jail;

k. An incoherent and inadequate system for security of inmates reporting for Infirmary Care;

l. An incoherent and inadequate system for allowing inmates virtually free access through the Jail and free access into the Administrative module;

m. Inadequate controls of inmates approved for detail assignments in the Jail, which allow such inmates free access through the Jail Housing Module and, in some instances, the Administrative Module;

n. The absence of modern and affordable electronic tracking systems for inmates;

o. The absence of modern, electronic locking systems for the Housing Module and checkpoints to the Administrative Module;

p. Failure of the Community Alert System, also known as the Escape Alarm;

q. The absence of modern safety glass or other reinforcement of windows in the Administrative Module; in addition, security walls, razor wire, and perimeter cameras are absent in vital security areas;

Without conducting an adequately thorough investigation, and in an effort to deflect continued public attention from the actual reasons that led to the escape, Director Brown, on June 5, 2006, placed twelve D.C. Jail employees on paid administrative leave pending further investigation. These employees were issued written notification of their administrative suspensions with pay.

After the escape, most of the twelve suspended employees, other employees and witnesses were interviewed by Investigators with the DOC OIA.[7] The Union members (who

[7] Corporal Lachonne Stewart was not interviewed by OIA neither prior to or after being put on administrative leave with pay, nor was she interviewed following the summary removal action. To date Officer Stewart has not been interviewed by OIA.

were suspended) were not provided with required warnings regarding the use of their statements and their right to remain silent under D.C. and federal law before the interviews. See *Kastigar v. United* States, 406 U.S. 441 (1972).[8] Nor were they uniformly advised of their right to have a Union representative present for the interview. The interviews were tape recorded. Despite the CBA requirement to produce the tapes, they have never been provided to the Union, despite repeated requests since June 28, 2006. Transcripts purportedly prepared from the tapes, and appended to the OIA Investigation Report for these employees, show that Investigators turned off the tape recorder on numerous occasions, in order to engage in off-the-record attempts to intimidate the officers being interviewed.

Public scrutiny of the inmate escapes continued, and, on June 19, 2006, D.C. City Councilmember Phil Mendelson and Director Brown, addressed questions on the jail break in a public forum. In the following week, the FOP/DOC Labor Committee continued to raise a number of concerns about the serious safety and security issues facing correctional officers. On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Mendelson, was held to continue review of the jail break and general safety issues at the D.C. Jail. At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.

Facing public pressure and pressure from the D.C. City Council, during his testimony at the June 26, 2006, hearing, Director Brown announced that as a result of the escape, the DOC "conducted a comprehensive review and assessment of its operations … and with swift and decisive action it has proceeded to initiate major improvements [to the D.C. Jail]." Despite Director Brown's assertion that substantive changes were made, the "improvements" made were largely cosmetic. While these superficial modifications were needed, no real attempt has been made to address and correct any of the critical safety concerns and infrastructure issues that had long existed and which were raised by the FOP/DOC prior to the June 2006 escape.

On July 26, 2006, the Mayor[9], Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break. None of the fired employees or their Union were notified in advance of this public announcement. During the Press Briefing, Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing, summary firings, and the announcement of a criminal investigation, were intended to and had the result of humiliating

---

[8] As an arm of the local government the DOC Office of Internal Affairs' power to compel testimony from employees during an investigation of this kind is not absolute. The employee has the right of refusal based on the Fifth Amendment privilege against self-incrimination. Further, any statutory provision compelling testimony that may be incriminatory must match the strength of the Fifth Amendment and provide full immunity against subsequent prosecution in order to be valid. The DOC employees should have been informed of this before they were interviewed by the OIA.

[9] The Mayor referenced herein is former Mayor Anthony Williams.

and embarrassing the discharged Union members, of which Officer Douglas is one, casting them in the public light as felons who abetted a jail escape.[10]

Director Brown, the Mayor, the City Administrator and other city officials deliberately chose a course of action designed to maximize press coverage while intimidating the employees, including Officer Douglas. This scheme was intended to thrust the city and its administrators into a positive light and to suggest to the public that the jail escapes could only have been accomplished by a criminal conspiracy within the rank and file of the D.C. Jail employees. In reality, the jail escapes were a predictable product of unsafe conditions at the D.C. Jail which have been the topic of ongoing complaints to Director Brown by Union members and representatives. Officer Douglas is nothing more than a casualty of a failed system and a scapegoat for DOC Administrators to avoid taking responsibility for their actions.

## EMPLOYEE'S HISTORY WITH THE DC DOC

Officer Herbert Douglas has worked in law enforcement for more than 35 years, serving as an officer for several state and federal agencies. He has been with the DC DOC for 15 years, since September 1992. He worked at the Lorton facility until it closed in 2001 and was then assigned to the D.C. Jail. He has been at the D.C. Jail ever since.

Officer Douglas has never had any personnel problems of any kind throughout his career. In fact, as a Correctional Officer with DC DOC, Officer Douglas has received several outstanding performance evaluations.

## THIS EMPLOYEE'S CONDUCT WAS NOT NEGLIGENT

According to the Master Duty Roster, Officer Douglas was assigned to work in South 3, the Mental Health Unit. However, a former Assistant Warden requested that Officer Douglas manage a detail on the "Environmental Squad" because Officer Douglas had prior experience with this at the Lorton facility. Officer Douglas' detail was to clean the jail, and to assist in getting the facility ready for accreditation. Once Officer Washington (who was permanently assigned responsibility for an environmental detail) retired, Officer Douglas unofficially took Officer Washington's place and assumed his responsibilities.

Officer Douglas never received any formal training when he transferred to the D.C. Jail from Lorton. Despite being requested for this work by management, no provisions were made to secure training for Officer Douglas. He managed the detail to the best of his ability and followed the direct orders of his immediate supervisor (as to Officer Douglas' environmental detail duties). Captain Holmes was Officer Douglas' immediate supervisor for this purpose, and during the period before the escape, the Captain was responsible for the Environmental Work

---

[10]    In order to accomplish this public humiliation and summary firing, Director Brown and other DOC Administrators engaged in an unlawful and unconstitutional revision of existing D.C. laws. This matter currently is being litigated in another forum.

Details at the D.C. Jail. Captain Holmes was the only member of management who was implicated in this investigation, and, coincidentally, the only employee reinstated.

Officer Douglas' environmental detail responsibilities included picking up the inmates assigned to work on the detail. Then, Officer Douglas would get the inmates situated in the area to which they were assigned for the day. If supplies or equipment were needed, it was accepted practice that either Officer Douglas or the inmates would get the supplies or equipment. The fact that the supply locker was open for the inmates to access the buffer on the day of the escape was not a violation of the pattern and practice of managing the detail as Officer Douglas was instructed by Captain Holmes.

At that point, Officer Douglas "floated" from inmate group to inmate group. Captain Holmes explicitly instructed Officer Douglas not to micromanage the work details. Instead, Officer Douglas was told to "float" from group to group to ensure that all inmates were adequately performing their assigned tasks. Detail inmates were often left unsupervised because they were at a "low" or "medium" custody level. This is an accepted practice throughout the jail among officers, administration and inmates. Officer Douglas was instructed by Captain Holmes not to "stand over inmates" because if he stood in one area with all the inmates the rest of the facility would not be cleaned. Getting the facility clean was at the top of Captain Holmes' priority list. It was Officer Douglas' responsibility to implement that task.

Captain Holmes also regularly reminded Officer Douglas that the inmates were not going to go anywhere; therefore, Captain Holmes indicated that it was not an issue to leave the inmates unsupervised while they were doing their detail work. Officer Douglas almost always had to move between floors to check on detail inmates leaving all of the other inmates in his charge unsupervised. Officer Douglas was ordered to do this and he did it every time he was responsible for a detail, all the while with the knowledge and approval of Captain Holmes.

At no time was Officer Douglas responsible for assigning inmates to work details. In fact, Officer Douglas is unsure as to the exact process that the inmates and staff undergo in order for detail assignments to be issued. The only underlying factor that Officer Douglas knew for sure that was taken into account in assigning an inmate to work on a detail was that the inmate's security classification. The precise method for determining that was out of Officer Douglas' purview. Officer Douglas took for granted that these determinations were made appropriately.

Nothing that Officer Douglas did with regard to his management of the detail inmates on the day of the escape and throughout the duration of his employment was improper. Officer Douglas received no formal training to adequately perform his duties. Despite this, he faithfully executed the orders given to him by Captain Holmes. The Captain was well aware of Officer Douglas' management of the work detail. Captain Holmes held a debrief meeting with Officer Douglas and Officer Lorenzo Jennings (and Officer Washington prior to his retirement) every day. Officers Douglas and Jennings did nothing without the advise, consent and counsel of Captain Holmes.

During the period preceding the escape, Captain Holmes was tasked with properly preparing the facility for accreditation and relied upon Officer Douglas and the other officers in

his charge to assist him in successfully meeting this goal. To do this, Captain Holmes relied upon inmates outside of the assigned work detail to work in the jail. Quite often, Captain Holmes would pull inmates from the high security parts of the jail to perform this work. Captain Holmes had a personal relationship with some of the inmates on both the regular and special details. Frequently, when this occurred, Officer Douglas was held accountable for these inmates (along with his regularly assigned detail) and the work they were tasked with performing.

About three weeks prior to the escape, Officer Lorenzo Jennings reported an incident to Captain Holmes in which Officer Jennings described a confrontation with an inmate assigned to the laundry detail, Carleton Beachum. The confrontation with inmate Beachum resulted in Officer Jennings confiscating Beachum's detail badge. During the meeting with Captain Holmes and Officer Douglas, Officer Jennings attempted to hand Beachum's badge to Captain Holmes. The Captain was eating during this meeting, and did not take the badge in his hand. However, the Captain ordered Officer Jennings to place Beachum's badge on the corner of the Captain's desk. Officer Douglas does not recall seeing the badge at any time after that meeting.

Inmate Leaks reportedly gave a statement that Officer Douglas was warned in advance of the escape. Copies of this interview have never been produced to Officer Douglas or his counsel. Officer Douglas categorically denies that allegation. If Officer Douglas had any conversation with inmate Leaks at all, at any place in the jail, it was for a professional purpose only.

Officer Douglas has no knowledge of any interaction of any kind with inmate Jones. Any claims to the contrary by any inmates are wholly false. At no time did Officer Douglas assist either inmate Leaks or inmate Jones plan or execute an escape from the DC jail.

## LEGAL ARGUMENTS AND DEFENSES

### A. This Action is in Violation of the CBA and D.C. Law.

Neither the CBA nor D.C. law permits "a second bite of the apple." See March 20, 2007 Ltr. to Maria Amato.[11] This is nothing more than a retaliatory exercise by Director Brown to "forum shop" in an effort to get the result that he wants—termination of Officer Douglas—and to deflect attention from his mismanagement of the agency.

The CBA and D.C. law clearly set forth the consideration for summary removals. Officer Douglas and the DOC already have engaged in the only legal administrative process available in these circumstances. That process ended when the OAH Judges recommended reinstatement of Officer Douglas. Neither the CBA nor D.C. law provides *any* authority for the Director to initiate this same disciplinary action again.

In addition, the Administrative Law Judges of the OAH determined that Director Brown violated the 45-day rule, which is mandated by D.C. law, and states, in relevant part, that in all summary removals a final decision must be rendered in 45 days. Once the 45th day passed, with no decision, the only remedy for violation of the law is reinstatement.

[11] The Letter from J. Michael Hannon, Esq. to Maria Amato, Esq. dated March 20, 2007 is attached.

In the prior proceedings in this matter, the DOC undertook no effort to justify the narrow circumstances under which summary removal is permitted, as required by D.C. Law. Obviously, the Administrative Law Judges of the OAH agreed by recommending twice that Officer Douglas be reinstated and that summary removal not be upheld. The DOC is just repackaging the same allegations and support thereto, albeit minimally. Doing so does not make the information any more legal or palatable.

**B. This Proposed Termination is a Violation of Due Process Rights.**

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court found that government employees are afforded procedural guarantees before they can be terminated. The Due Process analysis found in *Loudermill* applies to D.C. government employees and, in this case, the DOC employees specifically. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause...Under the CMPA, employees can only be disciplined for cause and prior notice must be given." *Fonville v. D.C.*, 2006 U.S. Dist. LEXIS 58564 (D.D.C. Aug. 22, 2006) (internal citations omitted). See also, *D.C. Department of Corrections v. Teamsters' Union Local*, 554 A.2d 319, 323 (D.C. 1989).

In this context, "agencies cannot relax or modify regulations... [W]hen agencies establish ... pre-termination procedures they are bound to follow them." *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161, 2005 U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005), citing *Lopez v. FAA*, 355 U.S. App. D.C. 51, 318 F.3d 242, 247 (D.C. Cir. 2003). Also, "[t]he D.C. Circuit has not required any additional due process requirements [beyond those defined in *Loudermill*] for the termination of its public employees." *Crockett v. D.C. Metro. Police Dep't.*, 293 F. Supp. 2d 63, 68 U.S. Dist. LEXIS 23632 (2003), citing *Kropat v. Fed. Aviation Admin.*, 333 U.S. App. D.C. 239, 162 F.3d 129, 132-34 (D.C. Cir. 1998). There is no regulation, nor any legal authority, that permits an Agency to retrace the procedures for discharging the employee, once the Agency and the employee have followed the established procedures.

There is no legal authority whatsoever that allows for the DOC to continue to propose discipline for the same offense until they get the result Director Brown desires. The administrative process has been completed in this matter, and any attempt to re-adjudicate is unlawful. What the DOC is doing here is clearly a violation of the United States Constitution. The remedy for such a violation is reinstatement of the employee with full back pay and benefits. See Petition for Writ of Mandamus.[12]

**C. The DOC Is Precluded from Rendering a Different Decision Under the Doctrine of Res Judicata.**

---

12 Counsel for the FOP/DOC LC, on behalf of the employees terminated as a result of the jail escape, has filed a Petition for a Writ of Mandamus in the District of Columbia Court of Appeals. A copy of that Petition is attached.

Under the legal doctrine of res judicata, one party in a legal proceeding is prevented from getting another day in court after receiving an unsatisfactory result to his/her claim. There is an abundance of legal precedent supporting this doctrine. The U.S. District Court for the D.C. Circuit has held that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Arakawa v. Reagan*, 666 F. Supp. 254, 262 (1987), citing *Allen v. McCurry*, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980). The *Arakawa* court goes on to find that, "[t]his preclusive effect attaches to administrative proceedings when, as with proceedings before the MSPB, the administrative tribunal 'is acting in a judicial capacity and resolves issues of fact properly before it which the parties have had an adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata. Director Brown is doing nothing more than attempting a "do over" with this proposed termination. The Director did not agree with the decision of the OAH Hearing Officers, and is now looking for a more receptive audience within the confines of the DOC in order to obtain the result he wants. Fundamental principles of law do not allow this, and Director Brown's attempt to "do over" the termination proceedings should be struck down as unlawful.

**D. <u>The "Douglas Factors" Must Be Considered by the DOC.</u>**

The D.C. Court of Appeals has made clear that a D.C. agency must take into consideration the so-called "*Douglas* Factors" when making a disciplinary determination. *D.C. Department of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005). In *Douglas v. Veterans Administration,* the Merit Systems Protection Board ("MSPB"), in the context of federal employment, ruled that an agency must consider specific mitigating and aggravating factors in determining an appropriate penalty. The D.C. Court of Appeals in *Colbert* emphasizes the importance of responsibly balancing the relevant factors in each individual case. In its evaluation of the dismissal of a D.C. Department of Public Works employee and subsequent proceedings, the Appellate Court further explained that an agency must consider the *Douglas* Factors at the onset of termination and in consideration of pretermination protections. *Colbert* at 359. The agency must provide evidence of the *Douglas* Factors in advance of termination in order to preserve the procedural protections of due process. Failure of the agency to meet this standard before this termination is grounds for reinstatement.

Here, the DOC has failed to provide any information relevant to each of the *Douglas* Factors and failed to present evidence that it has engaged in an assessment of progressive discipline with regard to Officer Douglas. Officer Douglas has a commendable service record. Moreover, the CBA between FOP/DOC Labor Committee and the city requires consideration of progressive discipline. Collective Bargaining Agreement, Article 11, Section 14.

The *Douglas* Factors are:

1. The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3. The employee's past disciplinary record;

4. The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties;

6. Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7. Consistency of the penalty with any applicable agency table of penalties;

8. The notoriety of the offense or its impact upon the reputation of the agency;

9. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. Potential for the employee's rehabilitation;

11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and,

12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

5 MSPR 280, 305-06 (1981). "The *Douglas* factors parallel the Office of Personnel Management's 'suitability' regulations establishing a separate procedure for determining the relevance of criminal convictions to federal employment of applicants and present employees. Any discipline of an employee must be justified in all these realms." 39 Am. U.L. Rev. 869 (1990).

In their Report and Recommendation to strike down the summary removal previously proposed by the DOC in this case, the OAH Hearing Officers unanimously concluded that the there was insufficient information to permit evaluation of the *Douglas* factors in the evidence presented. That evidence has not changed. Therefore, because the same imperfections exist, the same results must occur.

**E. The Hearing Officer Assigned to this Matter Is Not "Disinterested".**

Officer Douglas respectfully asserts that the Hearing Officer assigned in this matter is not a disinterested party. You are an employee of the DOC, and ultimately are subject to supervision by the Director of the DOC, Devon Brown, who is the Deciding Official in this matter. Notwithstanding being put forth as the disinterested designee by Deputy Warden Waldren (the Proposing Official), all employees of the DOC fall under the management and direction of Director Brown, the deciding official, which violates the letter and spirit of the CBA.[13]

Because there is no constitutional or other legal authority for a second hearing in this matter and because you are not a disinterested Hearing Officer and for all the other reasons mentioned above, Officer Douglas must be reinstated unconditionally.

Pursuant to the 20-day advance notice of proposed removal, I understand that we are entitled to all documentation being used in making this decision. Of course, this would include but not be limited to Officer Douglas's personnel file, any and all reports related to the incident, any video or audio tapes of interviews, and any other documentation being used by you in reaching a decision. We respectfully request copies of all such material. Please contact me upon receipt of this letter to discuss the arrangements for obtaining all of this material.

If you have any questions, please do not hesitate to contact me. Thank you for your courtesies.

Sincerely,

J. Michael Hannon

cc: Cpl. Nila Ritenour
Herbert Douglas

---

13 The evidence at any hearing will show that Deputy Warden Waldren was not the proposing official. He was summoned to the Grimke Building the day these notices were sent out, with no knowledge that he was to sign these letters. In fact, the evidence will show that Deputy Warden Waldren was not even given the opportunity to read these letters. The Proposing Official is Director Brown. This is also a violation of the CBA, the Due Process Clause, and D.C. Law.

# EXHIBIT 52

 

HANNON LAW GROUP, LLP
COUNSELORS AND ATTORNEYS AT LAW
1901 18TH STREET, NW
WASHINGTON, D.C. 20009

(202) 232-1907
FACSIMILE (202) 232-3704
www.hannonlawgroup.com

J. MICHAEL HANNON *

TREBIE A. VALANCIUS +
CAROLYN K. MANNING
ADMITTED ONLY IN CONNECTICUT;
SUPERVISION BY J. MICHAEL HANNON,
A MEMBER OF THE D.C. BAR

* ALSO ADMITTED IN MARYLAND
+ ALSO ADMITTED IN VIRGINIA
• ALSO ADMITTED IN CALIFORNIA

27 WOOD LANE
ROCKVILLE, MARYLAND 20850

11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 522-2112

OF COUNSEL

CHARLES I. CATE •
DONALD LEWIS WRIGHT
WILLIAM CLAYTON BATCHELOR *+

March 22, 2007

**BY HAND**

Henry R. Lesansky, Ph.D.
Health Services Administrator
District of Columbia Department of Corrections
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001

RE: Response to Notice of Proposed Termination for Lorenzo Jennings

Dear Dr. Lesansky,

This firm represents the Fraternal Order of Police, District of Columbia Department of Corrections Labor Committee (FOP/DOC Labor Committee). In that capacity, we also represent Lorenzo Jennings in the proposed removal action pending against him with the D.C. Department of Corrections (DOC), for which you have been assigned as the Hearing Officer. This letter serves as Officer Jennings's written response to the 20-day advance notice of proposed removal dated March 15, 2007. In addition, this letter serves as Officer Jennings's formal request for a hearing in this matter, as well as copies of all material you will be using in reaching a decision.

## PROCEDURAL BACKGROUND

As you are well aware, this is the DOC's attempt to have a second bite of the apple. On August 24, 2006, Director Devon Brown proposed and recommended summary removal for Officer Jennings, for his alleged "role" in the June 2006 D.C. Jail escape. Officer Jennings properly followed the procedures set forth in both the Collective Bargaining Agreement ("CBA") of the parties and D.C. law, as set forth in the D.C. Personnel Manual ("DCPM"), in response to that proposal. The DOC and the D.C. Office of Administrative Hearings ("OAH") reached an agreement for the Administrative Law Judges at the OAH to serve as the Hearing Officers in the proposed summary removal action of Officer Jennings. Officer Jennings presented his case

before the OAH, and the Administrative Law Judges of the OAH rendered a decision recommending that Director Brown return Officer Jennings to work.[1] Director Brown issued a Remand Notice for Officer Jennings. See Appendix, Volume II, App. 41. Counsel for Officer Jennings filed a Motion to Strike the Remand Notice. See Appendix, Volume II, App. 50 and 51. The DOC filed a Reply to Employee's Motion to Strike Remand Notices. See Appendix, Volume II, App. 52. Counsel for Officer Jennings filed a Response to the DOC's Reply. See Appendix, Volume II, App. 53. A hearing was held on the matter before the Administrative Law Judges of the OAH on February 5, 2007.[2]

On March 2, 2007, the OAH issued its second Report and Recommendation in this matter.[3] The Administrative Law Judges determined that Director Brown acted unlawfully in not rendering his final decision in 45 days, as mandated by law. In addition, the Administrative Law Judges upheld their original decision recommending that Director Brown reinstate Officer Jennings as his summary removal could not be sustained.

As you are also aware, on March 16, 2007, senior management at the DOC simultaneously rescinded and cancelled this proposal for summary removal, and replaced it with the 20-day notice of proposed termination, for which you are serving as Hearing Officer. This unlawful action is no more than an attempt by the DOC to have a "Do Over" because Director Brown disagrees with the decision of the original Hearing Officers that the DOC *handpicked* to serve in that capacity in this matter. In fact, the proposed removal of Officer Jennings dated March 15, 2007 is virtually *identical* to the one issued on August 24, 2006.

It is unconstitutional and unlawful for you to proceed at all in this matter. You must promptly advise Director Brown that he must return Officer Jennings to work pursuant to the OAH Judges' prior recommendations.

**FACTUAL BACKGROUND[4]**

On June 3, 2006, two inmates escaped from the D.C. Jail by smashing out the door and window of the Warden's office.[5] A correctional officer, while reporting for duty,

---

1 The decision of the OAH Administrative Law Judges is attached in the Appendix to the responses of all ten employees at Appendix, Volume I, App. 34. Hereafter, appendices will be cited accordingly.

2 The hearing transcript can be found at Appendix, Volume II, App. 54.

3 See Appendix, Volume II, App. 57.

4 A more detailed factual background is available in the pleadings filed on behalf of Officer Jennings (See Appendix, Volume I, App. 17) with the OAH in the DOC's first attempt to terminate him for the exact same behavior and for which Officer Jennings's conduct was found not to rise to the level warranting such a termination.

5 It should be noted that on June 4, 2006, the two escapees were recaptured without incident.

witnessed the inmates escaping, and pursued the two escapees on foot until he lost sight of them. The officer then returned to the D.C. Jail to report the escape.

The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the D.C. Jail. The escape was widely reported in the press, and the source of embarrassment for both DOC and City Administrators. The escape was a direct result of the DOC's failure to remedy safety issues which had been repeatedly brought to the Agency's attention by the FOP/DOC Labor Committee and its Chairperson. The failure to implement these safety measures not only allowed this escape, but also continues to subject the FOP/DOC Unit members to unsafe work conditions, increased risk of assault, and threat to their lives. The DOC Office of Internal Affairs ("OIA") conducted an investigation of the escapes. The institutional deficiencies cited in its report– all raised by Complainants prior to the escape – were the actual and proximate cause of the escape according to the OIA Investigative Report:[6]

    a.    Chronic understaffing and inadequate recruiting and training plans;

    b.    The absence of a Security Chief who would ensure utilization of modern security controls, implementation of coherent staffing protocols, implementation of intelligence gathering within the Jail, supply of necessary equipment including communications equipment, and development of operational protocols to promote an integral security program;

    c.    Failure to provide in-house dining facilities for around the clock availability of back-up correctional staff in the event of an emergency;

    d.    Failure to provide hand held radios to correctional officers with capability and authority to communicate directly with the Metropolitan Police Department and other agencies on a 24-hour basis;

    e.    Failure to conduct regular audits of Housing units to ensure that inmates are housed commensurate with their dangerousness;

    f.    The absence of sufficient surveillance cameras at known checkpoints and in administrative entrances, stairwells and elevators;

    g.    Understaffing of specialists responsible for classifying inmates and implementation of an improved computer system for inmate classification;

---

[6] There is an absolute distinction between the OIA Investigation Report and the recommendations for discharge of these DOC Employees. The recommendations for discharge were not rendered by the OIA, but rather by the Acting Deputy Warden, no doubt in consultation with Director Devon Brown. Also, it is crucial to note that several non-union members in leadership authority were allowed to resign and/or retire as a consequence of the jail escapes. No person in supervisory authority has been fired or otherwise disciplined despite the findings of the OIA Investigation.



h. Lack of training of Correctional Treatment Specialists on the use of risk assessment instruments designed to identify criminal risk and high threat offenders;

i. The absence of on-going staff training for classification, housing and separation of inmates;

j. The uncontrolled access by inmates to telephones within the Jail;

k. An incoherent and inadequate system for security of inmates reporting for Infirmary Care;

l. An incoherent and inadequate system for allowing inmates virtually free access through the Jail and free access into the Administrative module;

m. Inadequate controls of inmates approved for detail assignments in the Jail, which allow such inmates free access through the Jail Housing Module and, in some instances, the Administrative Module;

n. The absence of modern and affordable electronic tracking systems for inmates;

o. The absence of modern, electronic locking systems for the Housing Module and checkpoints to the Administrative Module;

p. Failure of the Community Alert System, also known as the Escape Alarm;

q. The absence of modern safety glass or other reinforcement of windows in the Administrative Module; in addition, security walls, razor wire, and perimeter cameras are absent in vital security areas;

Without conducting an adequately thorough investigation, and in an effort to deflect continued public attention from the actual reasons that led to the escape, Director Brown, on June 5, 2006, placed twelve D.C. Jail employees on paid administrative leave pending further investigation. These employees were issued written notification of their administrative suspensions with pay.

After the escape, most of the twelve suspended employees, other employees and witnesses were interviewed by Investigators with the DOC OIA.[7] The Union members (who

[7] Corporal Lachonne Stewart was not interviewed by OIA neither prior to or after being put on administrative leave with pay, nor was she interviewed following the summary removal action. To date Officer Stewart has not been interviewed by OIA.



were suspended) were not provided with required warnings regarding the use of their statements and their right to remain silent under D.C. and federal law before the interviews. See *Kastigar v. United* States, 406 U.S. 441 (1972).[8] Nor were they uniformly advised of their right to have a Union representative present for the interview. The interviews were tape recorded. Despite the CBA requirement to produce the tapes, they have never been provided to the Union, despite repeated requests since June 28, 2006. Transcripts purportedly prepared from the tapes, and appended to the OIA Investigation Report for these employees, show that Investigators turned off the tape recorder on numerous occasions, in order to engage in off-the-record attempts to intimidate the officers being interviewed.

Public scrutiny of the inmate escapes continued, and, on June 19, 2006, D.C. City Councilmember Phil Mendelson and Director Brown, addressed questions on the jail break in a public forum. In the following week, the FOP/DOC Labor Committee continued to raise a number of concerns about the serious safety and security issues facing correctional officers. On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Mendelson, was held to continue review of the jail break and general safety issues at the D.C. Jail. At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.

Facing public pressure and pressure from the D.C. City Council, during his testimony at the June 26, 2006, hearing, Director Brown announced that as a result of the escape, the DOC "conducted a comprehensive review and assessment of its operations ... and with swift and decisive action it has proceeded to initiate major improvements [to the D.C. Jail]." Despite Director Brown's assertion that substantive changes were made, the "improvements" made were largely cosmetic. While these superficial modifications were needed, no real attempt has been made to address and correct any of the critical safety concerns and infrastructure issues that had long existed and which were raised by the FOP/DOC prior to the June 2006 escape.

On July 26, 2006, the Mayor[9], Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break. None of the fired employees or their Union were notified in advance of this public announcement. During the Press Briefing, Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing, summary firings, and the announcement of a criminal investigation, were intended to and had the result of humiliating

---

8 As an arm of the local government the DOC Office of Internal Affairs' power to compel testimony from employees during an investigation of this kind is not absolute. The employee has the right of refusal based on the Fifth Amendment privilege against self-incrimination. Further, any statutory provision compelling testimony that may be incriminatory must match the strength of the Fifth Amendment and provide full immunity against subsequent prosecution in order to be valid. The DOC employees should have been informed of this before they were interviewed by the OIA.

9 The Mayor referenced herein is former Mayor Anthony Williams.

and embarrassing the discharged Union members, of which Officer Jennings is one, casting them in the public light as felons who abetted a jail escape.[10]

Director Brown, the Mayor, the City Administrator and other city officials deliberately chose a course of action designed to maximize press coverage while intimidating the employees, including Officer Jennings. This scheme was intended to thrust the city and its administrators into a positive light and to suggest to the public that the jail escapes could only have been accomplished by a criminal conspiracy within the rank and file of the D.C. Jail employees. In reality, the jail escapes were a predictable product of unsafe conditions at the D.C. Jail which have been the topic of ongoing complaints to Director Brown by Union members and representatives. Officer Jennings is nothing more than a casualty of a failed system and a scapegoat for DOC Administrators to avoid taking responsibility for their actions.

## EMPLOYEE'S HISTORY WITH THE DC DOC

Officer Lorenzo Jennings has more than 20 years of experience with the DOC. Officer Jennings was employed as a Correctional Officer. Officer Jennings was not at work on the day of the escape.

## THIS EMPLOYEE'S CONDUCT WAS NOT NEGLIGENT

Officer Jennings reported directly to Captain Holmes, the Environmental Squad Supervisor. As such, Officer Jennings was responsible for managing the inmate work details for the environmental squad. These inmates were assigned to perform regular cleaning duties throughout the jail. Officer Jennings took his instruction directly from Captain Holmes. Typically, the two met at the end of every shift for a debriefing. If other officers were assigned to Captain Holmes, they were included in those meetings as well.

Officer Jennings' daily routine consisted of going into the housing unit to retrieve the inmates who were assigned to work on the environmental detail that day. Officer Jennings did not select the inmates; the officers in the housing unit were responsible for informing Officer Jennings as to who would be working for him that day. Officer Jennings would pick up the inmates' laminated identification badges, which were secured in the housing unit.

Once Officer Jennings had the inmates and the badges, he would get an accurate count of both. Then, the officer would match the face on the identification badges with the inmates. There are identification badges with no faces on them; these are temporary badges. However, most often, Officer Jennings worked with inmates who had permanent badges.

Each of the officers in Captain Holmes' charge was assigned a floor in the jail to clean. Officer Jennings was no exception. Cleaning the facility was of the utmost concern to Captain

[10] In order to accomplish this public humiliation and summary firing, Director Brown and other DOC Administrators engaged in an unlawful and unconstitutional revision of existing D.C. laws. This matter currently is being litigated in another forum.



Holmes. The Captain instructed the Correctional Officers in his charge to meet that goal by any means necessary, including dispatching groups of inmates to perform various tasks. Captain Holmes directed the correctional officers to leave the inmates unsupervised and "float" from group to group. It was not uncommon to have different groups of inmates throughout the facility regularly unsupervised.

Three weeks prior to the escape, Officer Jennings was on his way to get the inmates in his charge at approximately 6:30 a.m. At this time, Officer Jennings witnessed inmate Carleton Beachum exiting the staff bathroom unsupervised. Officer Jennings immediately questioned inmate Beachum as to why he was in the bathroom unsupervised. Inmate Beachum, who was assigned to the Laundry detail, responded that Officer Hudson (the officer responsible for Beachum's detail) left inmate Beachum in the hallway to get the others on the detail from the North 1 housing unit. While inmate Beachum was waiting for Officer Hudson to return, he claims he had to go to the bathroom to "look at himself" in the mirror. Officer Jennings knows there is no mirror in the staff bathroom and that inmate Beachum was lying to him. Officer Jennings performed a complete shake down of inmate Beachum; however, Officer Jennings found no contraband.

The camera outside the staff bathroom should have provided Floor Control with a view of the incident between Officer Jennings and Beachum. Corporal Simms, a construction officer nearby, assisted Officer Jennings in returning inmate Beachum to his housing unit.

Correctional officers have the discretion to discipline inmates when the situation so warrants. As inmate Beachum was insubordinate and in the staff bathroom without supervision, Officer Jennings sent inmate Beachum back to his housing unit and confiscated Beachum's badge. Correctional officers are not required to follow one specific protocol in disciplining an inmate. Common practice is to confiscate the inmate's badge and remove the inmate from his detail for a number of days. The duration of the punishment depends on the nature of the infraction. Although a disciplinary report can be generated, it is not required. The issuance of a disciplinary report is within the full discretion of the correctional officer. Officer Jennings utilized his discretion and confiscated inmate Beachum's badge, thus removing him from detail work.

Officer Jennings reported this incident to Captain Holmes and submitted inmate Beachum's badge to the Captain. Officer Herbert Douglas was present at the meeting in which Officer Jennings gave inmate Beachum's badge to Captain Holmes. The Captain was eating during the debrief meeting in which Officer Jennings submitted inmate Beachum's badge. The Captain did not take the badge in his hand; the Captain ordered Officer Jennings to place Beachum's badge on the corner of the Captain's desk.

The office in which Captain Holmes worked was to be kept locked if not in use by Captain Holmes or Fire Marshall Jenkins, with whom Captain Holmes shared an office. Both of these employees had keys to the office, as did Officers Jennings and Douglas. Other officers may have had keys as well; however, they are not subject to this disciplinary action.

The office also houses some equipment and supplies that the inmates need to perform their duties. In addition, coffee is made in that office and is available for officers and occasionally inmates. As was ordered by Captain Holmes, Correctional Officers had occasion to leave inmates (assigned to the detail) in the office unsupervised in order to attend to other inmates and duties. Clearly, the office was not a secure environment. Inmate identification badges were either on top or in the desk used by Captain Holmes and were available for the taking by anyone in that office.

There is no written procedure for the disposal of inmate identification badges, nor is there a protocol for replacement. Inmates typically reported losing identification badges, and could easily obtain another one. Whenever Officer Jennings took a badge from an inmate, he reported the incident and delivered the badge to Captain Holmes.

Other inmates performed duties throughout the prison who were not assigned to a permanent detail. These inmates were hand-selected by Captain Holmes, and typically from a higher security housing unit than the unit that housed the majority of inmates assigned to work in details. For example, at the time of the escape, the painters that Captain Holmes had working on the administrative side of the building were not part of nor had they been classified and approved to work a detail. Despite this, Captain Holmes selected them for this work and left the inmates unsupervised to complete the task.

When Officer Jennings was interviewed by the DC DOC Internal Affairs, he provided all of the relevant facts with regard to his interaction with inmate Beachum and how he processed Beachum's badge. However, the transcript did not reflect Officer Jennings' submission of Beachum's badge to Captain Holmes. Captain Holmes was interviewed by Internal Affairs, but has been completely exonerated.

It was common practice for Captain Holmes to keep all of the surplus inmate identification badges in his desk drawer. Officer Jennings estimates that Captain Holmes had in excess of 15 badges in his desk in the period immediately preceding the escape. On the day of the escape, Captain Holmes was witnessed with all of the extra inmate identification badges, except for the one given to him by Officer Jennings. Captain Holmes was heard to say, "I have all the ID badges except the last one you gave me awhile back." A Fraternal Order of Police Union representative witnessed Captain Holmes with 15 to 20 inmate identification badges immediately after the escape.

Officer Jennings followed the pattern and practice of the jail everyday of his employment with the DC DOC. He executed his duties to the best of his ability with the resources available to him at the time.

## LEGAL ARGUMENTS AND DEFENSES

### A. This Action is in Violation of the CBA and D.C. Law.

Neither the CBA nor D.C. law permits "a second bite of the apple." See March 20, 2007 Ltr. to Maria Amato.[11] This is nothing more than a retaliatory exercise by Director Brown to "forum shop" in an effort to get the result that he wants—termination of Officer Jennings—and to deflect attention from his mismanagement of the agency.

The CBA and D.C. law clearly set forth the consideration for summary removals. Officer Jennings and the DOC already have engaged in the only legal administrative process available in these circumstances. That process ended when the OAH Judges recommended reinstatement of Officer Jennings. Neither the CBA nor D.C. law provides *any* authority for the Director to initiate this same disciplinary action again.

In addition, the Administrative Law Judges of the OAH determined that Director Brown violated the 45-day rule, which is mandated by D.C. law, and states, in relevant part, that in all summary removals a final decision must be rendered in 45 days. Once the 45th day passed, with no decision, the only remedy for violation of the law is reinstatement.

In the prior proceedings in this matter, the DOC undertook no effort to justify the narrow circumstances under which summary removal is permitted, as required by D.C. Law. Obviously, the Administrative Law Judges of the OAH agreed by recommending twice that Officer Jennings be reinstated and that summary removal not be upheld. The DOC is just repackaging the same allegations and support thereto, albeit minimally. Doing so does not make the information any more legal or palatable.

**B. <u>This Proposed Termination is a Violation of Due Process Rights.</u>**

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court found that government employees are afforded procedural guarantees <u>before</u> they can be terminated. The Due Process analysis found in *Loudermill* applies to D.C. government employees and, in this case, the DOC employees specifically. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause...Under the CMPA, employees can only be disciplined for cause and prior notice must be given." *Fonville v. D.C.*, 2006 U.S. Dist. LEXIS 58564 (D.D.C. Aug. 22, 2006) (internal citations omitted). See also, *D.C. Department of Corrections v. Teamsters' Union Local*, 554 A.2d 319, 323 (D.C. 1989).

In this context, "agencies cannot relax or modify regulations... [W]hen agencies establish ... pre-termination procedures they are bound to follow them." *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161, 2005 U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005), citing *Lopez v. FAA*, 355 U.S. App. D.C. 51, 318 F.3d 242, 247 (D.C. Cir. 2003). Also, "[t]he D.C. Circuit has not required any additional due process requirements [beyond those defined in *Loudermill*] for the termination of its public employees." *Crockett v. D.C. Metro. Police Dep't.*, 293 F. Supp. 2d 63, 68 U.S. Dist. LEXIS 23632 (2003), citing *Kropat v. Fed.*

[11] The Letter from J. Michael Hannon, Esq. to Maria Amato, Esq. dated March 20, 2007 is attached.

*Aviation Admin.*, 333 U.S. App. D.C. 239, 162 F.3d 129, 132-34 (D.C. Cir. 1998). There is no regulation, nor any legal authority, that permits an Agency to retrace the procedures for discharging the employee, once the Agency and the employee have followed the established procedures.

There is no legal authority whatsoever that allows for the DOC to continue to propose discipline for the same offense until they get the result Director Brown desires. The administrative process has been completed in this matter, and any attempt to re-adjudicate is unlawful. What the DOC is doing here is clearly a violation of the United States Constitution. The remedy for such a violation is reinstatement of the employee with full back pay and benefits. See Petition for Writ of Mandamus.[12]

**C. <u>The DOC Is Precluded from Rendering a Different Decision Under the Doctrine of Res Judicata.</u>**

Under the legal doctrine of res judicata, one party in a legal proceeding is prevented from getting another day in court after receiving an unsatisfactory result to his/her claim. There is an abundance of legal precedent supporting this doctrine. The U.S. District Court for the D.C. Circuit has held that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Arakawa v. Reagan*, 666 F. Supp. 254, 262 (1987), citing *Allen v. McCurry*, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980). The *Arakawa* court goes on to find that, "[t]his preclusive effect attaches to administrative proceedings when, as with proceedings before the MSPB, the administrative tribunal 'is acting in a judicial capacity and resolves issues of fact properly before it which the parties have had an adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata. Director Brown is doing nothing more than attempting a "do over" with this proposed termination. The Director did not agree with the decision of the OAH Hearing Officers, and is now looking for a more receptive audience within the confines of the DOC in order to obtain the result he wants. Fundamental principles of law do not allow this, and Director Brown's attempt to "do over" the termination proceedings should be struck down as unlawful.

**D. <u>The "Douglas Factors" Must Be Considered by the DOC.</u>**

The D.C. Court of Appeals has made clear that a D.C. agency must take into consideration the so-called "*Douglas* Factors" when making a disciplinary determination. *D.C. Department of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005). In *Douglas v. Veterans Administration,* the Merit Systems Protection Board ("MSPB"), in the context of federal employment, ruled that an agency must consider specific mitigating and aggravating factors in determining an appropriate penalty. The D.C. Court of Appeals in *Colbert*

---

12 Counsel for the FOP/DOC LC, on behalf of the employees terminated as a result of the jail escape, has filed a Petition for a Writ of Mandamus in the District of Columbia Court of Appeals. A copy of that Petition is attached.

emphasizes the importance of responsibly balancing the relevant factors in each individual case. In its evaluation of the dismissal of a D.C. Department of Public Works employee and subsequent proceedings, the Appellate Court further explained that an agency must consider the *Douglas* Factors at the onset of termination and in consideration of pretermination protections. *Colbert* at 359. The agency must provide evidence of the *Douglas* Factors in advance of termination in order to preserve the procedural protections of due process. Failure of the agency to meet this standard before this termination is grounds for reinstatement.

Here, the DOC has failed to provide any information relevant to each of the *Douglas* Factors and failed to present evidence that it has engaged in an assessment of progressive discipline with regard to Officer Jennings. Officer Jennings has a commendable service record. Moreover, the CBA between FOP/DOC Labor Committee and the city requires consideration of progressive discipline. Collective Bargaining Agreement, Article 11, Section 14.

The *Douglas* Factors are:

1.  The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2.  The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3.  The employee's past disciplinary record;

4.  The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5.  The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties;

6.  Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7.  Consistency of the penalty with any applicable agency table of penalties;

8.  The notoriety of the offense or its impact upon the reputation of the agency;

9.  The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. Potential for the employee's rehabilitation;

11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and,

12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

5 MSPR 280, 305-06 (1981). "The *Douglas* factors parallel the Office of Personnel Management's 'suitability' regulations establishing a separate procedure for determining the relevance of criminal convictions to federal employment of applicants and present employees. Any discipline of an employee must be justified in all these realms." 39 Am. U.L. Rev. 869 (1990).

In their Report and Recommendation to strike down the summary removal previously proposed by the DOC in this case, the OAH Hearing Officers unanimously concluded that the there was insufficient information to permit evaluation of the *Douglas* factors in the evidence presented. That evidence has not changed. Therefore, because the same imperfections exist, the same results must occur.

**E. The Hearing Officer Assigned to this Matter Is Not "Disinterested".**

Officer Jennings respectfully asserts that the Hearing Officer assigned in this matter is not a disinterested party. You are an employee of the DOC, and ultimately are subject to supervision by the Director of the DOC, Devon Brown, who is the Deciding Official in this matter. Notwithstanding being put forth as the disinterested designee by Deputy Warden Waldren (the Proposing Official), all employees of the DOC fall under the management and direction of Director Brown, the deciding official, which violates the letter and spirit of the CBA.[13]

Because there is no constitutional or other legal authority for a second hearing in this matter and because you are not a disinterested Hearing Officer and for all the other reasons mentioned above, Officer Jennings must be reinstated unconditionally.

Pursuant to the 20-day advance notice of proposed removal, I understand that we are entitled to all documentation being used in making this decision. Of course, this would include but not be limited to Officer Jennings's personnel file, any and all reports related to the incident, any video or audio tapes of interviews, and any other documentation being used by you in reaching a decision. We respectfully request copies of all such material. Please

13 The evidence at any hearing will show that Deputy Warden Waldren was not the proposing official. He was summoned to the Grimke Building the day these notices were sent out, with no knowledge that he was to sign these letters. In fact, the evidence will show that Deputy Warden Waldren was not even given the opportunity to read these letters. The Proposing Official is Director Brown. This is also a violation of the CBA, the Due Process Clause, and D.C. Law.

contact me upon receipt of this letter to discuss the arrangements for obtaining all of this material.

If you have any questions, please do not hesitate to contact me. Thank you for your courtesies.

Sincerely,

J. Michael Hannon

cc: Cpl. Nila Ritenour
Lorenzo Jennings

# EXHIBIT 53

 

HANNON LAW GROUP, LLP
COUNSELORS AND ATTORNEYS AT LAW
1901 18TH STREET, NW
WASHINGTON, D.C. 20009

(202) 232-1907
FACSIMILE (202) 232-3704
www.hannonlawgroup.com

J. MICHAEL HANNON *

TREBIE A. VALANCIUS +
CAROLYN K. MANNING
ADMITTED ONLY IN CONNECTICUT;
SUPERVISION BY J. MICHAEL HANNON,
A MEMBER OF THE D.C. BAR

* ALSO ADMITTED IN MARYLAND
+ ALSO ADMITTED IN VIRGINIA
• ALSO ADMITTED IN CALIFORNIA

27 WOOD LANE
ROCKVILLE, MARYLAND 20850

11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 522-2112

OF COUNSEL

CHARLES I. CATE •
DONALD LEWIS WRIGHT
WILLIAM CLAYTON BATCHELOR *+

March 22, 2007

**BY HAND**

Henry R. Lesansky, Ph.D.
Health Services Administrator
District of Columbia Department of Corrections
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001

RE: Response to Notice of Proposed Termination for Dionne Makins

Dear Dr. Lesansky,

This firm represents the Fraternal Order of Police, District of Columbia Department of Corrections Labor Committee (FOP/DOC Labor Committee). In that capacity, we also represent Dionne Makins in the proposed removal action pending against him with the D.C. Department of Corrections (DOC), for which you have been assigned as the Hearing Officer. This letter serves as Sergeant Makins's written response to the 20-day advance notice of proposed removal dated March 15, 2007. In addition, this letter serves as Sergeant Makins's formal request for a hearing in this matter, as well as copies of all material you will be using in reaching a decision.

**PROCEDURAL BACKGROUND**

As you are well aware, this is the DOC's attempt to have a second bite of the apple. On August 24, 2006, Director Devon Brown proposed and recommended summary removal for Sergeant Makins, for her alleged "role" in the June 2006 D.C. Jail escape. Sergeant Makins properly followed the procedures set forth in both the Collective Bargaining Agreement ("CBA") of the parties and D.C. law, as set forth in the D.C. Personnel Manual ("DCPM"), in response to that proposal. The DOC and the D.C. Office of Administrative Hearings ("OAH") reached an agreement for the Administrative Law Judges at the OAH to serve as the Hearing Officers in the proposed summary removal action of Sergeant Makins. Sergeant Makins presented her case



before the OAH, and the Administrative Law Judges of the OAH rendered a decision recommending that Director Brown return Sergeant Makins to work.[1] Director Brown issued a Remand Notice for Sergeant Makins. See Appendix, Volume II, App. 41. Counsel for Sergeant Makins filed a Motion to Strike the Remand Notice. See Appendix, Volume II, App. 50 and 51. The DOC filed a Reply to Employee's Motion to Strike Remand Notices. See Appendix, Volume II, App. 52. Counsel for Sergeant Makins filed a Response to the DOC's Reply. See Appendix, Volume II, App. 53. A hearing was held on the matter before the Administrative Law Judges of the OAH on February 5, 2007.[2]

On March 2, 2007, the OAH issued its second Report and Recommendation in this matter.[3] The Administrative Law Judges determined that Director Brown acted unlawfully in not rendering her final decision in 45 days, as mandated by law. In addition, the Administrative Law Judges upheld their original decision recommending that Director Brown reinstate Sergeant Makins as her summary removal could not be sustained.

As you are also aware, on March 16, 2007, senior management at the DOC simultaneously rescinded and cancelled this proposal for summary removal, and replaced it with the 20-day notice of proposed termination, for which you are serving as Hearing Officer. This unlawful action is no more than an attempt by the DOC to have a "Do Over" because Director Brown disagrees with the decision of the original Hearing Officers that the DOC *handpicked* to serve in that capacity in this matter. In fact, the proposed removal of Sergeant Makins dated March 15, 2007 is virtually *identical* to the one issued on August 24, 2006.

It is unconstitutional and unlawful for you to proceed at all in this matter. You must promptly advise Director Brown that he must return Sergeant Makins to work pursuant to the OAH Judges' prior recommendations.

## FACTUAL BACKGROUND[4]

On June 3, 2006, two inmates escaped from the D.C. Jail by smashing out the door and window of the Warden's office.[5] A correctional officer, while reporting for duty,

---

1 The decision of the OAH Administrative Law Judges is attached in the Appendix to the responses of all ten employees at Appendix, Volume I, App. 38. Hereafter, appendices will be cited accordingly.

2 The hearing transcript can be found at Appendix, Volume II, App. 54.

3 See Appendix, Volume II, App. 58.

4 A more detailed factual background is available in the pleadings filed on behalf of Sergeant Makins (See Appendix, Volume I, App. 21) with the OAH in the DOC's first attempt to terminate him for the exact same behavior and for which Sergeant Makins's conduct was found not to rise to the level warranting such a termination.

5 It should be noted that on June 4, 2006, the two escapees were recaptured without incident.

 

witnessed the inmates escaping, and pursued the two escapees on foot until he lost sight of them. The officer then returned to the D.C. Jail to report the escape.

The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the D.C. Jail. The escape was widely reported in the press, and the source of embarrassment for both DOC and City Administrators. The escape was a direct result of the DOC's failure to remedy safety issues which had been repeatedly brought to the Agency's attention by the FOP/DOC Labor Committee and its Chairperson. The failure to implement these safety measures not only allowed this escape, but also continues to subject the FOP/DOC Unit members to unsafe work conditions, increased risk of assault, and threat to their lives. The DOC Office of Internal Affairs ("OIA") conducted an investigation of the escapes. The institutional deficiencies cited in its report– all raised by Complainants prior to the escape – were the actual and proximate cause of the escape according to the OIA Investigative Report:[6]

a. Chronic understaffing and inadequate recruiting and training plans;

b. The absence of a Security Chief who would ensure utilization of modern security controls, implementation of coherent staffing protocols, implementation of intelligence gathering within the Jail, supply of necessary equipment including communications equipment, and development of operational protocols to promote an integral security program;

c. Failure to provide in-house dining facilities for around the clock availability of back-up correctional staff in the event of an emergency;

d. Failure to provide hand held radios to correctional officers with capability and authority to communicate directly with the Metropolitan Police Department and other agencies on a 24-hour basis;

e. Failure to conduct regular audits of Housing units to ensure that inmates are housed commensurate with their dangerousness;

f. The absence of sufficient surveillance cameras at known checkpoints and in administrative entrances, stairwells and elevators;

g. Understaffing of specialists responsible for classifying inmates and implementation of an improved computer system for inmate classification;

---

[6]    There is an absolute distinction between the OIA Investigation Report and the recommendations for discharge of these DOC Employees. The recommendations for discharge were not rendered by the OIA, but rather by the Acting Deputy Warden, no doubt in consultation with Director Devon Brown. Also, it is crucial to note that several non-union members in leadership authority were allowed to resign and/or retire as a consequence of the jail escapes. No person in supervisory authority has been fired or otherwise disciplined despite the findings of the OIA Investigation.



h.  Lack of training of Correctional Treatment Specialists on the use of risk assessment instruments designed to identify criminal risk and high threat offenders;

i.  The absence of on-going staff training for classification, housing and separation of inmates;

j.  The uncontrolled access by inmates to telephones within the Jail;

k.  An incoherent and inadequate system for security of inmates reporting for Infirmary Care;

l.  An incoherent and inadequate system for allowing inmates virtually free access through the Jail and free access into the Administrative module;

m.  Inadequate controls of inmates approved for detail assignments in the Jail, which allow such inmates free access through the Jail Housing Module and, in some instances, the Administrative Module;

n.  The absence of modern and affordable electronic tracking systems for inmates;

o.  The absence of modern, electronic locking systems for the Housing Module and checkpoints to the Administrative Module;

p.  Failure of the Community Alert System, also known as the Escape Alarm;

q.  The absence of modern safety glass or other reinforcement of windows in the Administrative Module; in addition, security walls, razor wire, and perimeter cameras are absent in vital security areas;

Without conducting an adequately thorough investigation, and in an effort to deflect continued public attention from the actual reasons that led to the escape, Director Brown, on June 5, 2006, placed twelve D.C. Jail employees on paid administrative leave pending further investigation. These employees were issued written notification of their administrative suspensions with pay.

After the escape, most of the twelve suspended employees, other employees and witnesses were interviewed by Investigators with the DOC OIA.[7] The Union members (who

---

[7]    Corporal Lachonne Stewart was not interviewed by OIA neither prior to or after being put on administrative leave with pay, nor was she interviewed following the summary removal action. To date Officer Stewart has not been interviewed by OIA.



were suspended) were not provided with required warnings regarding the use of their statements and their right to remain silent under D.C. and federal law before the interviews. See *Kastigar v. United* States, 406 U.S. 441 (1972).[8] Nor were they uniformly advised of their right to have a Union representative present for the interview. The interviews were tape recorded. Despite the CBA requirement to produce the tapes, they have never been provided to the Union, despite repeated requests since June 28, 2006. Transcripts purportedly prepared from the tapes, and appended to the OIA Investigation Report for these employees, show that Investigators turned off the tape recorder on numerous occasions, in order to engage in off-the-record attempts to intimidate the officers being interviewed.

Public scrutiny of the inmate escapes continued, and, on June 19, 2006, D.C. City Councilmember Phil Mendelson and Director Brown, addressed questions on the jail break in a public forum. In the following week, the FOP/DOC Labor Committee continued to raise a number of concerns about the serious safety and security issues facing correctional officers. On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Mendelson, was held to continue review of the jail break and general safety issues at the D.C. Jail. At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.

Facing public pressure and pressure from the D.C. City Council, during his testimony at the June 26, 2006, hearing, Director Brown announced that as a result of the escape, the DOC "conducted a comprehensive review and assessment of its operations ... and with swift and decisive action it has proceeded to initiate major improvements [to the D.C. Jail]." Despite Director Brown's assertion that substantive changes were made, the "improvements" made were largely cosmetic. While these superficial modifications were needed, no real attempt has been made to address and correct any of the critical safety concerns and infrastructure issues that had long existed and which were raised by the FOP/DOC prior to the June 2006 escape.

On July 26, 2006, the Mayor[9], Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break. None of the fired employees or their Union were notified in advance of this public announcement. During the Press Briefing, Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing, summary firings, and the announcement of a criminal investigation, were intended to and had the result of humiliating

---

8 As an arm of the local government the DOC Office of Internal Affairs' power to compel testimony from employees during an investigation of this kind is not absolute. The employee has the right of refusal based on the Fifth Amendment privilege against self-incrimination. Further, any statutory provision compelling testimony that may be incriminatory must match the strength of the Fifth Amendment and provide full immunity against subsequent prosecution in order to be valid. The DOC employees should have been informed of this before they were interviewed by the OIA.

9 The Mayor referenced herein is former Mayor Anthony Williams.



and embarrassing the discharged Union members, of which Sergeant Makins is one, casting them in the public light as felons who abetted a jail escape.[10]

Director Brown, the Mayor, the City Administrator and other city officials deliberately chose a course of action designed to maximize press coverage while intimidating the employees, including Sergeant Makins. This scheme was intended to thrust the city and its administrators into a positive light and to suggest to the public that the jail escapes could only have been accomplished by a criminal conspiracy within the rank and file of the D.C. Jail employees. In reality, the jail escapes were a predictable product of unsafe conditions at the D.C. Jail which have been the topic of ongoing complaints to Director Brown by Union members and representatives. Sergeant Makins is nothing more than a casualty of a failed system and a scapegoat for DOC Administrators to avoid taking responsibility for their actions.

## EMPLOYEE'S HISTORY WITH THE DC DOC

Sergeant Dionne Makins has been with the DC DOC since 1990. She has never been the subject of any reductions in force (RIFs) and has 12 years until retirement. She has received either "Excellent" or "Outstanding" for all of her performance evaluations. Sergeant Makins was promoted to the rank of Sergeant in March 2006 in a class of 20 sergeants. She received no special training upon her promotion, despite the fact that prior classes of Sergeants had received up to a week of formal training upon promotion.

On the Master Roster for the jail, Sergeant Makins is assigned as the Officer in Charge of the SE1 housing unit, and regularly works from 7:30 a.m. until 4:00 p.m. (the Number Two shift) Tuesday through Saturday. During her tenure with the DC DOC, Sergeant Makins has worked in the Command Center and had occasion to work there a number of times even after being promoted to Officer in Charge of SE1. She has also been responsible for confidential work. Sergeant Makins was working in her position as the Officer in Charge of the SE1 housing unit on the day of the escape.

Sergeant Makins did not attend Roll Call that morning, as she had prior approval to arrive at work later than her scheduled time. Sergeant Makins did not learn of the staff shortages until she reported to the housing unit, but she immediately was informed of them by Officer Shantell Hatton, who was also assigned to the SE1 unit that morning.

Although four correctional officers are required to operate each housing unit, there were not enough officers to do so on the day of the escape. The jail was 56 officers short that day; a large number of staff had requested time off (on the day of the escape) because of the national Race for the Cure taking place that day. To make up for most of the shortages, management "drafted" officers from the prior shift. Despite the grave shortage of officers that day, there were ample supervisors. However, no supervisors offered to or did fill in for the officers. DC Jail

---

[10]  In order to accomplish this public humiliation and summary firing, Director Brown and other DOC Administrators engaged in an unlawful and unconstitutional revision of existing D.C. laws. This matter currently is being litigated in another forum.

 

management had the opportunity to put the jail on lockdown that day because of the critical staff shortages. However, Captain Betty Ames made the decision that morning not to do so.

Upon discovering the shortage, Sergeant Makins contacted management and repeatedly asked for additional coverage, but was refused. Sergeant Makins asked for a fourth officer to be assigned to SE1. In addition, she requested that the (male) relief officer on duty that day switch duty assignments with one of the other two (female) officers in SE1 that day. She was concerned that she was short one officer and the two she did have were also females. All of Sergeant Makins efforts were summarily dismissed by management. After attempting to get proper coverage for the unit and being denied, Sergeant Makins continued to execute her normal tasks for the day in SE1. Upon entering the unit, Sergeant Makins performed some administrative duties, including preparing paperwork and competing those non-critical portions of the written passes for the inmates to be used that day; i.e., date, the housing unit, etc. In addition, she signed the passes in advance. This was the procedure followed every day in every housing unit. It was especially critical that day because of the officer shortage in the unit and because a high number of passes were expected to be requested as religious services were scheduled for that morning.

The next order of business for unit is the first morning count of the inmates. This number is to correspond with the count from the previous shift. Officers Hatton and Cynthia Washington (the second officer assigned to SE1 for that shift) assisted Sergeant Makins with the count that morning. The count matched; all inmates were present and accounted for at the beginning of Sergeant Makins' shift. Although it was required for a supervisor to come the housing unit to verify the morning count, no one did. Sergeant Makins called the Command Center to inform them that the morning count of 145 inmates matched the previous count. In addition, she made a last ditch effort to secure additional officer support in the unit, and again, she was refused.

Upon realizing that no more help was coming, Sergeant Makins took Officer Washington and began to walk the floor of the housing unit. Immediately prior to doing so, Sergeant Makins completed five passes for the inmates to go to the infirmary. None of these was for inmate Ricardo Jones. As Sergeant Makins was the regularly assigned Officer in Charge of SE1, she knew of those inmates who normally required medical care. Four of the five passes she completed were for those inmates. The fifth infirmary pass was for an inmate who Sergeant Makins suspected was being assaulted by his cellmate. Upon completing these five passes, she and Officer Washington began walking the floor.

There are a number of tasks to be performed while working on the floor. The officers have to inspect all of the windows and bars. In addition, they must perform an environmental inspection. This requires checking all of the toilets, faucets and lights. An inventory must be performed and all equipment must be checked to ensure it is in proper working order. It is at this time that the cell doors are opened for the inmates to leave for work details, to go to the Department for which they have a pass and for groups of inmates to be release for indoor recreation.

Once the inmate is released from the housing unit, he is unsupervised and left on his honor to report to the area for which he has a pass. The inmate must be released by Floor Control personnel to move about freely in the jail. However, all an inmate needs to do is flash



the pass and he will be released. There is no way for the personnel in Floor Control to verify the information on the passes. So long as an inmate has a white piece of paper that looks like a pass, he is assumed to have one. Further, there is no way to track an inmate once he is released from the housing unit. It is not uncommon for inmates to leave at the beginning of an officer's shift and not return until the end of the shift or later. There is no pattern or practice of issuing an alert for that inmate until he has missed the next scheduled count. If a DC DOC employee had not witnessed the two inmates escaping, no one would have looked for either of them for quite some time.

Once the inmates were participating in indoor recreation, Sergeant Makins heard a call to put the jail on lockdown. She followed this order immediately. Upon completing this task, Lieutenant Profit called SE1 and asked for the whereabouts of Ricardo Jones. Sergeant Makins called the infirmary to verify that all of the SE1 inmates arrived at the infirmary. She was informed that they had.

Shortly thereafter, Lieutenant Diaz requested information about Ricardo Jones. It was at this time that Sergeant Makins was informed that inmate Jones was one of the possible escapees. Sergeant Makins then performed an inspection of the cell of inmate Jones, and verified that everything was secure. The inmates assigned to the infirmary were returned to SE1 except for inmates Jones and Crawford. Then, the officers in SE1 performed another count and verified that all inmates were present except for inmate Jones. The Command Center called SE1 and requested a census count. As that count began, Sergeant Makins was called to come to the Command Center. An officer came to relieve Sergeant Makins, and she reported to the Command Center. Captain Ames requested that Sergeant Makins prepare a chronological report for SE1. Shortly thereafter, Director (of the DC DOC) Devon Brown came to the jail. Captain Ames asked Sergeant Makins to stop what she was doing and ordered the Sergeant to follow Director Brown throughout the jail and take notes. At some later time, upon learning of her position in SE1, Sergeant Makins was ordered to stop taking notes for Director Brown and was sent to Internal Affairs.

Sergeant Makins has followed the pattern and practice of the jail everyday of her employment with the DC DOC, and did so on the day of the escape. She executed her duties to the best of her ability with the resources available to her at the time.

## LEGAL ARGUMENTS AND DEFENSES

### A. This Action is in Violation of the CBA and D.C. Law.

Neither the CBA nor D.C. law permits "a second bite of the apple." See March 20, 2007 Ltr. to Maria Amato.[11] This is nothing more than a retaliatory exercise by Director Brown to "forum shop" in an effort to get the result that he wants—termination of Sergeant Makins—and to deflect attention from his mismanagement of the agency.

[11] The Letter from J. Michael Hannon, Esq. to Maria Amato, Esq. dated March 20, 2007 is attached.



The CBA and D.C. law clearly set forth the consideration for summary removals. Sergeant Makins and the DOC already have engaged in the only legal administrative process available in these circumstances. That process ended when the OAH Judges recommended reinstatement of Sergeant Makins. Neither the CBA nor D.C. law provides *any* authority for the Director to initiate this same disciplinary action again.

In addition, the Administrative Law Judges of the OAH determined that Director Brown violated the 45-day rule, which is mandated by D.C. law, and states, in relevant part, that in all summary removals a final decision must be rendered in 45 days. Once the 45th day passed, with no decision, the only remedy for violation of the law is reinstatement.

In the prior proceedings in this matter, the DOC undertook no effort to justify the narrow circumstances under which summary removal is permitted, as required by D.C. Law. Obviously, the Administrative Law Judges of the OAH agreed by recommending twice that Sergeant Makins be reinstated and that summary removal not be upheld. The DOC is just repackaging the same allegations and support thereto, albeit minimally. Doing so does not make the information any more legal or palatable.

**B. This Proposed Termination is a Violation of Due Process Rights.**

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court found that government employees are afforded procedural guarantees before they can be terminated. The Due Process analysis found in *Loudermill* applies to D.C. government employees and, in this case, the DOC employees specifically. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause...Under the CMPA, employees can only be disciplined for cause and prior notice must be given." *Fonville v. D.C.*, 2006 U.S. Dist. LEXIS 58564 (D.D.C. Aug. 22, 2006) (internal citations omitted). See also, *D.C. Department of Corrections v. Teamsters' Union Local*, 554 A.2d 319, 323 (D.C. 1989).

In this context, "agencies cannot relax or modify regulations... [W]hen agencies establish ... pre-termination procedures they are bound to follow them." *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161, 2005 U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005), citing *Lopez v. FAA*, 355 U.S. App. D.C. 51, 318 F.3d 242, 247 (D.C. Cir. 2003). Also, "[t]he D.C. Circuit has not required any additional due process requirements [beyond those defined in *Loudermill*] for the termination of its public employees." *Crockett v. D.C. Metro. Police Dep't.*, 293 F. Supp. 2d 63, 68 U.S. Dist. LEXIS 23632 (2003), citing *Kropat v. Fed. Aviation Admin.*, 333 U.S. App. D.C. 239, 162 F.3d 129, 132-34 (D.C. Cir. 1998). There is no regulation, nor any legal authority, that permits an Agency to retrace the procedures for discharging the employee, once the Agency and the employee have followed the established procedures.

There is no legal authority whatsoever that allows for the DOC to continue to propose discipline for the same offense until they get the result Director Brown desires. The



administrative process has been completed in this matter, and any attempt to re-adjudicate is unlawful. What the DOC is doing here is clearly a violation of the United States Constitution. The remedy for such a violation is reinstatement of the employee with full back pay and benefits. See Petition for Writ of Mandamus.[12]

**C.    The DOC Is Precluded from Rendering a Different Decision Under the Doctrine of Res Judicata.**

Under the legal doctrine of res judicata, one party in a legal proceeding is prevented from getting another day in court after receiving an unsatisfactory result to his/her claim. There is an abundance of legal precedent supporting this doctrine. The U.S. District Court for the D.C. Circuit has held that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Arakawa v. Reagan*, 666 F. Supp. 254, 262 (1987), citing *Allen v. McCurry*, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980). The *Arakawa* court goes on to find that, "[t]his preclusive effect attaches to administrative proceedings when, as with proceedings before the MSPB, the administrative tribunal 'is acting in a judicial capacity and resolves issues of fact properly before it which the parties have had an adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata. Director Brown is doing nothing more than attempting a "do over" with this proposed termination. The Director did not agree with the decision of the OAH Hearing Officers, and is now looking for a more receptive audience within the confines of the DOC in order to obtain the result he wants. Fundamental principles of law do not allow this, and Director Brown's attempt to "do over" the termination proceedings should be struck down as unlawful.

**D.    The "Douglas Factors" Must Be Considered by the DOC.**

The D.C. Court of Appeals has made clear that a D.C. agency must take into consideration the so-called "*Douglas* Factors" when making a disciplinary determination. *D.C. Department of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005). In *Douglas v. Veterans Administration,* the Merit Systems Protection Board ("MSPB"), in the context of federal employment, ruled that an agency must consider specific mitigating and aggravating factors in determining an appropriate penalty. The D.C. Court of Appeals in *Colbert* emphasizes the importance of responsibly balancing the relevant factors in each individual case. In its evaluation of the dismissal of a D.C. Department of Public Works employee and subsequent proceedings, the Appellate Court further explained that an agency must consider the *Douglas* Factors at the onset of termination and in consideration of pretermination protections. *Colbert* at 359. The agency must provide evidence of the *Douglas* Factors in advance of termination in order to preserve the procedural protections of due process.

---

[12]    Counsel for the FOP/DOC LC, on behalf of the employees terminated as a result of the jail escape, has filed a Petition for a Writ of Mandamus in the District of Columbia Court of Appeals. A copy of that Petition is attached.



Failure of the agency to meet this standard before this termination is grounds for reinstatement.

Here, the DOC has failed to provide any information relevant to each of the *Douglas* Factors and failed to present evidence that it has engaged in an assessment of progressive discipline with regard to Sergeant Makins. Sergeant Makins has a commendable service record. Moreover, the CBA between FOP/DOC Labor Committee and the city requires consideration of progressive discipline. Collective Bargaining Agreement, Article 11, Section 14.

The *Douglas* Factors are:

1.    The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2.    The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3.    The employee's past disciplinary record;

4.    The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5.    The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties;

6.    Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7.    Consistency of the penalty with any applicable agency table of penalties;

8.    The notoriety of the offense or its impact upon the reputation of the agency;

9.    The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10.   Potential for the employee's rehabilitation;

11.   Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and,



12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

5 MSPR 280, 305-06 (1981). "The *Douglas* factors parallel the Office of Personnel Management's 'suitability' regulations establishing a separate procedure for determining the relevance of criminal convictions to federal employment of applicants and present employees. Any discipline of an employee must be justified in all these realms." 39 Am. U.L. Rev. 869 (1990).

In their Report and Recommendation to strike down the summary removal previously proposed by the DOC in this case, the OAH Hearing Officers unanimously concluded that the there was insufficient information to permit evaluation of the *Douglas* factors in the evidence presented. That evidence has not changed. Therefore, because the same imperfections exist, the same results must occur.

**E. <u>The Hearing Officer Assigned to this Matter Is Not "Disinterested".</u>**

Sergeant Makins respectfully asserts that the Hearing Officer assigned in this matter is not a disinterested party. You are an employee of the DOC, and ultimately are subject to supervision by the Director of the DOC, Devon Brown, who is the Deciding Official in this matter. Notwithstanding being put forth as the disinterested designee by Deputy Warden Waldren (the Proposing Official), all employees of the DOC fall under the management and direction of Director Brown, the deciding official, which violates the letter and spirit of the CBA.[13]

Because there is no constitutional or other legal authority for a second hearing in this matter and because you are not a disinterested Hearing Officer and for all the other reasons mentioned above, Sergeant Makins must be reinstated unconditionally.

Pursuant to the 20-day advance notice of proposed removal, I understand that we are entitled to all documentation being used in making this decision. Of course, this would include but not be limited to Sergeant Makins's personnel file, any and all reports related to the incident, any video or audio tapes of interviews, and any other documentation being used by you in reaching a decision. We respectfully request copies of all such material. Please contact me upon receipt of this letter to discuss the arrangements for obtaining all of this material.

---

13 The evidence at any hearing will show that Deputy Warden Waldren was not the proposing official. He was summoned to the Grimke Building the day these notices were sent out, with no knowledge that he was to sign these letters. In fact, the evidence will show that Deputy Warden Waldren was not even given the opportunity to read these letters. The Proposing Official is Director Brown. This is also a violation of the CBA, the Due Process Clause, and D.C. Law.

If you have any questions, please do not hesitate to contact me. Thank you for your courtesies.

Sincerely,

J. Michael Hannon

cc:     Cpl. Nila Ritenour
        Dionne Makins

# EXHIBIT 54

HANNON LAW GROUP, LLP
COUNSELORS AND ATTORNEYS AT LAW
1901 18TH STREET, NW
WASHINGTON, D.C. 20009

(202) 232-1907
FACSIMILE (202) 232-3704
www.hannonlawgroup.com

J. MICHAEL HANNON *

TREBIE A. VALANCIUS +
CAROLYN K. MANNING
ADMITTED ONLY IN CONNECTICUT;
SUPERVISION BY J. MICHAEL HANNON,
A MEMBER OF THE D.C. BAR

* ALSO ADMITTED IN MARYLAND
+ ALSO ADMITTED IN VIRGINIA
• ALSO ADMITTED IN CALIFORNIA

27 WOOD LANE
ROCKVILLE, MARYLAND 20850

11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 522-2112

OF COUNSEL

CHARLES I. CATE •
DONALD LEWIS WRIGHT
WILLIAM CLAYTON BATCHELOR *+

March 22, 2007

**BY HAND**

Henry R. Lesansky, Ph.D.
Health Services Administrator
District of Columbia Department of Corrections
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001

RE: Response to Notice of Proposed Termination for Alphonso Bryant

Dear Dr. Lesansky,

This firm represents the Fraternal Order of Police, District of Columbia Department of Corrections Labor Committee (FOP/DOC Labor Committee). In that capacity, we also represent Alphonso Bryant in the proposed removal action pending against him with the D.C. Department of Corrections (DOC), for which you have been assigned as the Hearing Officer. This letter serves as Mr. Bryant's written response to the 20-day advance notice of proposed removal dated March 15, 2007. In addition, this letter serves as Mr. Bryant's formal request for a hearing in this matter, as well as copies of all material you will be using in reaching a decision.

**PROCEDURAL BACKGROUND**

As you are well aware, this is the DOC's attempt to have a second bite of the apple. On August 24, 2006, Director Devon Brown proposed and recommended summary removal for Mr. Bryant, for his alleged "role" in the June 2006 D.C. Jail escape. Mr. Bryant properly followed the procedures set forth in both the Collective Bargaining Agreement ("CBA") of the parties and D.C. law, as set forth in the D.C. Personnel Manual ("DCPM"), in response to that proposal. The DOC and the D.C. Office of Administrative Hearings ("OAH") reached an agreement for the Administrative Law Judges at the OAH to serve as the Hearing Officers in the proposed summary removal action of Mr. Bryant. Mr. Bryant presented his case

before the OAH, and the Administrative Law Judges of the OAH rendered a decision recommending that Director Brown return Mr. Bryant to work.[1] Director Brown issued a Remand Notice for Mr. Bryant. See Appendix, Volume II, App. 41. Counsel for Mr. Bryant filed a Motion to Strike the Remand Notice. See Appendix, Volume II, App. 50 and 51. The DOC filed a Reply to Employee's Motion to Strike Remand Notices. See Appendix, Volume II, App. 52. Counsel for Mr. Bryant filed a Response to the DOC's Reply. See Appendix, Volume II, App. 53. A hearing was held on the matter before the Administrative Law Judges of the OAH on February 5, 2007.[2]

On March 2, 2007, the OAH issued its second Report and Recommendation in this matter.[3] The Administrative Law Judges determined that Director Brown acted unlawfully in not rendering his final decision in 45 days, as mandated by law. In addition, the Administrative Law Judges upheld their original decision recommending that Director Brown reinstate Mr. Bryant as his summary removal could not be sustained.

As you are also aware, on March 16, 2007, senior management at the DOC simultaneously rescinded and cancelled this proposal for summary removal, and replaced it with the 20-day notice of proposed termination, for which you are serving as Hearing Officer. This unlawful action is no more than an attempt by the DOC to have a "Do Over" because Director Brown disagrees with the decision of the original Hearing Officers that the DOC *handpicked* to serve in that capacity in this matter. In fact, except for three words and some changes to capitalization, the proposed removal of Mr. Bryant dated March 15, 2007 is *identical* to the one issued on August 24, 2006.

It is unconstitutional and unlawful for you to proceed at all in this matter. You must promptly advise Director Brown that he must return Mr. Bryant to work pursuant to the OAH Judges' prior recommendations.

## FACTUAL BACKGROUND[4]

On June 3, 2006, two inmates escaped from the D.C. Jail by smashing out the door and window of the Warden's office.[5] A correctional officer, while reporting for duty, witnessed the inmates escaping, and pursued the two escapees on foot until he lost sight of them. The officer then returned to the D.C. Jail to report the escape.

---

1 The decision of the OAH Administrative Law Judges is attached in the Appendix to the responses of all ten employees at Appendix, Volume I, App. 33. Hereafter, appendices will be cited accordingly.

2 The hearing transcript can be found at Appendix, Volume II, App. 54.

3 See Appendix, Volume II, App. 58.

4 A more detailed factual background is available in the pleadings filed on behalf of Mr. Bryant (See Appendix, Volume I, App. 16) with the OAH in the DOC's first attempt to terminate him for the exact same behavior and for which Mr. Bryant's conduct was found not to rise to the level warranting such a termination.

5 It should be noted that on June 4, 2006, the two escapees were recaptured without incident.

The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the D.C. Jail. The escape was widely reported in the press, and the source of embarrassment for both DOC and City Administrators. The escape was a direct result of the DOC's failure to remedy safety issues which had been repeatedly brought to the Agency's attention by the FOP/DOC Labor Committee and its Chairperson. The failure to implement these safety measures not only allowed this escape, but also continues to subject the FOP/DOC Unit members to unsafe work conditions, increased risk of assault, and threat to their lives. The DOC Office of Internal Affairs ("OIA") conducted an investigation of the escapes. The institutional deficiencies cited in its report– all raised by Complainants prior to the escape – were the actual and proximate cause of the escape according to the OIA Investigative Report:[6]

a. Chronic understaffing and inadequate recruiting and training plans;

b. The absence of a Security Chief who would ensure utilization of modern security controls, implementation of coherent staffing protocols, implementation of intelligence gathering within the Jail, supply of necessary equipment including communications equipment, and development of operational protocols to promote an integral security program;

c. Failure to provide in-house dining facilities for around the clock availability of back-up correctional staff in the event of an emergency;

d. Failure to provide hand held radios to correctional officers with capability and authority to communicate directly with the Metropolitan Police Department and other agencies on a 24-hour basis;

e. Failure to conduct regular audits of Housing units to ensure that inmates are housed commensurate with their dangerousness;

f. The absence of sufficient surveillance cameras at known checkpoints and in administrative entrances, stairwells and elevators;

g. Understaffing of specialists responsible for classifying inmates and implementation of an improved computer system for inmate classification;

h. Lack of training of Correctional Treatment Specialists on the use of risk assessment instruments designed to identify criminal risk and high threat offenders;

---

6 There is an absolute distinction between the OIA Investigation Report and the recommendations for discharge of these DOC Employees. The recommendations for discharge were not rendered by the OIA, but rather by the Acting Deputy Warden, no doubt in consultation with Director Devon Brown. Also, it is crucial to note that several non-union members in leadership authority were allowed to resign and/or retire as a consequence of the jail escapes. No person in supervisory authority has been fired or otherwise disciplined despite the findings of the OIA Investigation.

i. The absence of on-going staff training for classification, housing and separation of inmates;

j. The uncontrolled access by inmates to telephones within the Jail;

k. An incoherent and inadequate system for security of inmates reporting for Infirmary Care;

l. An incoherent and inadequate system for allowing inmates virtually free access through the Jail and free access into the Administrative module;

m. Inadequate controls of inmates approved for detail assignments in the Jail, which allow such inmates free access through the Jail Housing Module and, in some instances, the Administrative Module;

n. The absence of modern and affordable electronic tracking systems for inmates;

o. The absence of modern, electronic locking systems for the Housing Module and checkpoints to the Administrative Module;

p. Failure of the Community Alert System, also known as the Escape Alarm;

q. The absence of modern safety glass or other reinforcement of windows in the Administrative Module; in addition, security walls, razor wire, and perimeter cameras are absent in vital security areas;

Without conducting an adequately thorough investigation, and in an effort to deflect continued public attention from the actual reasons that led to the escape, Director Brown, on June 5, 2006, placed twelve D.C. Jail employees on paid administrative leave pending further investigation. These employees were issued written notification of their administrative suspensions with pay.

After the escape, most of the twelve suspended employees, other employees and witnesses were interviewed by Investigators with the DOC OIA.[7] The Union members (who were suspended) were not provided with required warnings regarding the use of their statements and their right to remain silent under D.C. and federal law before the interviews. See *Kastigar v. United* States, 406 U.S. 441 (1972).[8] Nor were they uniformly advised of their right to have a

---

[7] Corporal Lachonne Stewart was not interviewed by OIA neither prior to or after being put on administrative leave with pay, nor was she interviewed following the summary removal action. To date Officer Stewart has not been interviewed by OIA.

[8] As an arm of the local government the DOC Office of Internal Affairs' power to compel testimony from employees during an investigation of this kind is not absolute. The employee has the right of refusal based on the Fifth Amendment privilege against self-incrimination. Further, any statutory provision compelling testimony that may be incriminatory must match the strength of the Fifth Amendment and provide full immunity against subsequent

Union representative present for the interview. The interviews were tape recorded. Despite the CBA requirement to produce the tapes, they have never been provided to the Union, despite repeated requests since June 28, 2006. Transcripts purportedly prepared from the tapes, and appended to the OIA Investigation Report for these employees, show that Investigators turned off the tape recorder on numerous occasions, in order to engage in off-the-record attempts to intimidate the officers being interviewed.

Public scrutiny of the inmate escapes continued, and, on June 19, 2006, D.C. City Councilmember Phil Mendelson and Director Brown, addressed questions on the jail break in a public forum. In the following week, the FOP/DOC Labor Committee continued to raise a number of concerns about the serious safety and security issues facing correctional officers. On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Mendelson, was held to continue review of the jail break and general safety issues at the D.C. Jail. At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.

Facing public pressure and pressure from the D.C. City Council, during his testimony at the June 26, 2006, hearing, Director Brown announced that as a result of the escape, the DOC "conducted a comprehensive review and assessment of its operations ... and with swift and decisive action it has proceeded to initiate major improvements [to the D.C. Jail]." Despite Director Brown's assertion that substantive changes were made, the "improvements" made were largely cosmetic. While these superficial modifications were needed, no real attempt has been made to address and correct any of the critical safety concerns and infrastructure issues that had long existed and which were raised by the FOP/DOC prior to the June 2006 escape.

On July 26, 2006, the Mayor[9], Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break. None of the fired employees or their Union were notified in advance of this public announcement. During the Press Briefing, Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing, summary firings, and the announcement of a criminal investigation, were intended to and had the result of humiliating and embarrassing the discharged Union members, of which Mr. Bryant is one, casting them in the public light as felons who abetted a jail escape.[10]

Director Brown, the Mayor, the City Administrator and other city officials deliberately chose a course of action designed to maximize press coverage while intimidating the employees, including Mr. Bryant. This scheme was intended to thrust the city and its administrators into a

---

prosecution in order to be valid. The DOC employees should have been informed of this before they were interviewed by the OIA.

9 The Mayor referenced herein is former Mayor Anthony Williams.

10 In order to accomplish this public humiliation and summary firing, Director Brown and other DOC Administrators engaged in an unlawful and unconstitutional revision of existing D.C. laws. This matter currently is being litigated in another forum.

positive light and to suggest to the public that the jail escapes could only have been accomplished by a criminal conspiracy within the rank and file of the D.C. Jail employees. In reality, the jail escapes were a predictable product of unsafe conditions at the D.C. Jail which have been the topic of ongoing complaints to Director Brown by Union members and representatives. Mr. Bryant is nothing more than a casualty of a failed system and a scapegoat for DOC Administrators to avoid taking responsibility for their actions.

**EMPLOYEE'S HISTORY WITH THE D.C. DOC**

Mr. Bryant has been with the DOC since June 1984. For the first few years of his employment, Mr. Bryant served as an officer. He then served as a Corrections Counselor for approximately two years. Since 1989, he worked as a Correctional Treatment Specialist. He was part of a department-wide RIF, and was inactive from April through December 2002; however, upon his return, he continued as a Correctional Treatment Specialist. At the time of the initial summary removal, Mr. Bryant was eligible for retirement in 12 to 18 months.

Mr. Bryant is experienced in all three of the major components of the DOC—detention, community corrections and institutional corrections. Throughout his 22 year tenure with the DOC, Mr. Bryant had either excellent or outstanding ratings in his performance evaluations.

Mr. Bryant regularly worked Monday through Friday from 8:30am until 4:30pm. There is no dispute that Mr. Bryant was not at work on the day of the escape.

His immediate supervisor was Leona Bennett. He has an outstanding relationship with her, and even filled in for her whenever she was out of the office. Mr. Bryant had been identified by Ms. Bennett as an expert in the field of Correctional Treatment Specialists, and as such Mr. Bryant was requested to and did teach classification of inmates to other DOC employees.

**THIS EMPLOYEE'S CONDUCT WAS NOT NEGLIGENT**

Mr. Bryant was the only Correctional Treatment Specialist responsible for assigning inmates to permanent details. Once Mr. Bryant did so, every attempt was made to house that inmate in the NW1 housing unit for which Mr. Bryant is the responsible case manager. As such, Mr. Bryant performed routine re-evaluations and re-classifications of the inmates assigned to NW1. Mr. Bryant did not act as the Case Manager for those inmates assigned to permanent detail who were housed outside of NW1. Those inmate reclassifications are handled by the Case Manager assigned to the inmate's housing unit.

For his part, Mr. Bryant believes that in his capacity as Detail Coordinator, he is the only employee capable of authorizing inmates for detail work. In doing so, Mr. Bryant followed the official policies and procedures of the DOC. He is an exemplary employee as recognized by his supervisor, Mr. Bryant's role as a trainer, and his performance record. Mr. Bryant is unaware of any pattern and practice of dispensing temporary detail badges, and, as such, cannot speak to any issues regarding them. If any other arrangements are made to form details outside of the established policies and procedures, Mr. Bryant has no knowledge of or role in such conduct.

At the time of the escape, Mr. Bryant was also responsible for processing inmates upon intake into the jail and preparing halfway house reports. Prior to his termination, Mr. Bryant accepted responsibilities beyond his own in an effort to assist the department through its staff shortage.

With regard to the escapees, Mr. Bryant had no contact whatsoever with inmate Jones. Mr. Bryant acknowledges that he classified inmate Leaks for detail following the policies and procedures of the DOC. Specifically, Mr. Bryant verified the finding of the NIPS Coordinator and reviewed Leaks' file in the PRISM and JACCS computer systems. Mr. Bryant did not review inmate Leaks' physical paper file because it was not available for review. The DOC Records office could not produce the file, which was an extremely common occurrence at the jail during the time of the escapes and still is to this day.

Even if Mr. Bryant incorrectly classified Leaks and assigned him to a permanent detail in error, Mr. Bryant was not the final authority. All Mr. Bryant could do was request that an inmate serve on a detail. The final authority for assigning that inmate to the detail belongs to the Deputy Warden. At the time of the escape, the position was filled by Patricia Timony. Coincidentally, Ms. Timony was allowed to retire abruptly after the escapes.

## LEGAL ARGUMENTS AND DEFENSES

### A. This Action is in Violation of the CBA and D.C. Law.

Neither the CBA nor D.C. law permits "a second bite of the apple." See March 20, 2007 Ltr. to Maria Amato.[11] This is nothing more than a retaliatory exercise by Director Brown to "forum shop" in an effort to get the result that he wants—termination of Mr. Bryant—and to deflect attention from his mismanagement of the agency.

The CBA and D.C. law clearly set forth the consideration for summary removals. Mr. Bryant and the DOC already have engaged in the only legal administrative process available in these circumstances. That process ended when the OAH Judges recommended reinstatement of Mr. Bryant. Neither the CBA nor D.C. law provides *any* authority for the Director to initiate this same disciplinary action again.

In addition, the Administrative Law Judges of the OAH determined that Director Brown violated the 45-day rule, which is mandated by D.C. law, and states, in relevant part, that in all summary removals a final decision must be rendered in 45 days. Once the 45th day passed, with no decision, the only remedy for violation of the law is reinstatement.

In the prior proceedings in this matter, the DOC undertook no effort to justify the narrow circumstances under which summary removal is permitted, as required by D.C. Law. Obviously, the Administrative Law Judges of the OAH agreed by recommending twice that Mr. Bryant be reinstated and that summary removal not be upheld. The DOC is just repackaging the same

---

11 The Letter from J. Michael Hannon, Esq. to Maria Amato, Esq. dated March 20, 2007 is attached.

allegations and support thereto, albeit minimally. Doing so does not make the information any more legal or palatable.

**B. <u>This Proposed Termination is a Violation of Due Process Rights.</u>**

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court found that government employees are afforded procedural guarantees <u>before</u> they can be terminated. The Due Process analysis found in *Loudermill* applies to D.C. government employees and, in this case, the DOC employees specifically. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause...Under the CMPA, employees can only be disciplined for cause and prior notice must be given." *Fonville v. D.C.*, 2006 U.S. Dist. LEXIS 58564 (D.D.C. Aug. 22, 2006) (internal citations omitted). See also, *D.C. Department of Corrections v. Teamsters' Union Local*, 554 A.2d 319, 323 (D.C. 1989).

In this context, "agencies cannot relax or modify regulations... [W]hen agencies establish ... pre-termination procedures they are bound to follow them." *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161, 2005 U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005), citing *Lopez v. FAA*, 355 U.S. App. D.C. 51, 318 F.3d 242, 247 (D.C. Cir. 2003). Also, "[t]he D.C. Circuit has not required any additional due process requirements [beyond those defined in *Loudermill*] for the termination of its public employees." *Crockett v. D.C. Metro. Police Dep't.*, 293 F. Supp. 2d 63, 68 U.S. Dist. LEXIS 23632 (2003), citing *Kropat v. Fed. Aviation Admin.*, 333 U.S. App. D.C. 239, 162 F.3d 129, 132-34 (D.C. Cir. 1998). There is no regulation, nor any legal authority, that permits an Agency to retrace the procedures for discharging the employee, once the Agency and the employee have followed the established procedures.

There is no legal authority whatsoever that allows for the DOC to continue to propose discipline for the same offense until they get the result Director Brown desires. The administrative process has been completed in this matter, and any attempt to re-adjudicate is unlawful. What the DOC is doing here is clearly a violation of the United States Constitution. The remedy for such a violation is reinstatement of the employee with full back pay and benefits. See Petition for Writ of Mandamus.[12]

**C. <u>The DOC Is Precluded from Rendering a Different Decision Under the Doctrine of Res Judicata.</u>**

Under the legal doctrine of res judicata, one party in a legal proceeding is prevented from getting another day in court after receiving an unsatisfactory result to his/her claim. There is an abundance of legal precedent supporting this doctrine. The U.S. District Court for the D.C. Circuit has held that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Arakawa v.*

---

[12] Counsel for the FOP/DOC LC, on behalf of the employees terminated as a result of the jail escape, has filed a Petition for a Writ of Mandamus in the District of Columbia Court of Appeals. A copy of that Petition is attached.

*Reagan*, 666 F. Supp. 254, 262 (1987), citing *Allen v. McCurry*, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980). The *Arakawa* court goes on to find that, "[t]his preclusive effect attaches to administrative proceedings when, as with proceedings before the MSPB, the administrative tribunal 'is acting in a judicial capacity and resolves issues of fact properly before it which the parties have had an adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata. Director Brown is doing nothing more than attempting a "do over" with this proposed termination. The Director did not agree with the decision of the OAH Hearing Officers, and is now looking for a more receptive audience within the confines of the DOC in order to obtain the result he wants. Fundamental principles of law do not allow this, and Director Brown's attempt to "do over" the termination proceedings should be struck down as unlawful.

**D. <u>The "Douglas Factors" Must Be Considered by the DOC.</u>**

The D.C. Court of Appeals has made clear that a D.C. agency must take into consideration the so-called "*Douglas* Factors" when making a disciplinary determination. *D.C. Department of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005). In *Douglas v. Veterans Administration,* the Merit Systems Protection Board ("MSPB"), in the context of federal employment, ruled that an agency must consider specific mitigating and aggravating factors in determining an appropriate penalty. The D.C. Court of Appeals in *Colbert* emphasizes the importance of responsibly balancing the relevant factors in each individual case. In its evaluation of the dismissal of a D.C. Department of Public Works employee and subsequent proceedings, the Appellate Court further explained that an agency must consider the *Douglas* Factors at the onset of termination and in consideration of pretermination protections. *Colbert* at 359. The agency must provide evidence of the *Douglas* Factors in advance of termination in order to preserve the procedural protections of due process. Failure of the agency to meet this standard before this termination is grounds for reinstatement.

Here, the DOC has failed to provide any information relevant to each of the *Douglas* Factors and failed to present evidence that it has engaged in an assessment of progressive discipline with regard to Mr. Bryant. Mr. Bryant has a commendable service record. Moreover, the CBA between FOP/DOC Labor Committee and the city requires consideration of progressive discipline. Collective Bargaining Agreement, Article 11, Section 14.

The *Douglas* Factors are:

1. The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3. The employee's past disciplinary record;

4. The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties;

6. Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7. Consistency of the penalty with any applicable agency table of penalties;

8. The notoriety of the offense or its impact upon the reputation of the agency;

9. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. Potential for the employee's rehabilitation;

11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and,

12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

5 MSPR 280, 305-06 (1981). "The *Douglas* factors parallel the Office of Personnel Management's 'suitability' regulations establishing a separate procedure for determining the relevance of criminal convictions to federal employment of applicants and present employees. Any discipline of an employee must be justified in all these realms." 39 Am. U.L. Rev. 869 (1990).

In their Report and Recommendation to strike down the summary removal previously proposed by the DOC in this case, the OAH Hearing Officers unanimously concluded that the there was insufficient information to permit evaluation of the *Douglas* factors in the evidence presented. That evidence has not changed. Therefore, because the same imperfections exist, the same results must occur.

**E. <u>The Hearing Officer Assigned to this Matter Is Not "Disinterested".</u>**

Mr. Bryant respectfully asserts that the Hearing Officer assigned in this matter is not a disinterested party. You are an employee of the DOC, and ultimately are subject to supervision by the Director of the DOC, Devon Brown, who is the Deciding Official in this matter. Notwithstanding being put forth as the disinterested designee by Deputy Warden Waldren (the

Proposing Official), all employees of the DOC fall under the management and direction of Director Brown, the deciding official, which violates the letter and spirit of the CBA.[13]

Because there is no constitutional or other legal authority for a second hearing in this matter and because you are not a disinterested Hearing Officer and for all the other reasons mentioned above, Mr. Bryant must be reinstated unconditionally.

Pursuant to the 20-day advance notice of proposed removal, I understand that we are entitled to all documentation being used in making this decision. Of course, this would include but not be limited to Mr. Bryant's personnel file, any and all reports related to the incident, any video or audio tapes of interviews, and any other documentation being used by you in reaching a decision. We respectfully request copies of all such material. Please contact me upon receipt of this letter to discuss the arrangements for obtaining all of this material.

If you have any questions, please do not hesitate to contact me. Thank you for your courtesies.

Sincerely,

J. Michael Hannon

cc: Cpl. Nila Ritenour
Alphonso Bryant

---

13 The evidence at any hearing will show that Deputy Warden Waldren was not the proposing official. He was summoned to the Grimke Building the day these notices were sent out, with no knowledge that he was to sign these letters. In fact, the evidence will show that Deputy Warden Waldren was not even given the opportunity to read these letters. The Proposing Official is Director Brown. This is also a violation of the CBA, the Due Process Clause, and D.C. Law.

# EXHIBIT 55

HANNON LAW GROUP, LLP
COUNSELORS AND ATTORNEYS AT LAW
1901 18TH STREET, NW
WASHINGTON, D.C. 20009

(202) 232-1907
FACSIMILE (202) 232-3704
www.hannonlawgroup.com

J. MICHAEL HANNON *

TREBIE A. VALANCIUS +
CAROLYN K. MANNING
ADMITTED ONLY IN CONNECTICUT;
SUPERVISION BY J. MICHAEL HANNON,
A MEMBER OF THE D.C. BAR

* ALSO ADMITTED IN MARYLAND
+ ALSO ADMITTED IN VIRGINIA
• ALSO ADMITTED IN CALIFORNIA

27 WOOD LANE
ROCKVILLE, MARYLAND 20850

11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 522-2112

OF COUNSEL

CHARLES I. CATE •
DONALD LEWIS WRIGHT
WILLIAM CLAYTON BATCHELOR *+

March 22, 2007

**BY HAND**

Henry R. Lesansky, Ph.D.
Health Services Administrator
District of Columbia Department of Corrections
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001

RE: Response to Notice of Proposed Termination for Lowanda Hinton-Saunders

Dear Dr. Lesansky,

This firm represents the Fraternal Order of Police, District of Columbia Department of Corrections Labor Committee (FOP/DOC Labor Committee). In that capacity, we also represent Lowanda Hinton-Saunders in the proposed removal action pending against him with the D.C. Department of Corrections (DOC), for which you have been assigned as the Hearing Officer. This letter serves as Officer Hinton-Saunders's written response to the 20-day advance notice of proposed removal dated March 15, 2007. In addition, this letter serves as Officer Hinton-Saunders's formal request for a hearing in this matter, as well as copies of all material you will be using in reaching a decision.

**PROCEDURAL BACKGROUND**

As you are well aware, this is the DOC's attempt to have a second bite of the apple. On August 24, 2006, Director Devon Brown proposed and recommended summary removal for Officer Hinton-Saunders, for her alleged "role" in the June 2006 D.C. Jail escape. Officer Hinton-Saunders properly followed the procedures set forth in both the Collective Bargaining Agreement ("CBA") of the parties and D.C. law, as set forth in the D.C. Personnel Manual ("DCPM"), in response to that proposal. The DOC and the D.C. Office of Administrative Hearings ("OAH") reached an agreement for the Administrative Law Judges at the OAH to serve as the Hearing Officers in the proposed summary removal action of Officer Hinton-Saunders. Officer Hinton-Saunders presented her case

before the OAH, and the Administrative Law Judges of the OAH rendered a decision recommending that Director Brown return Officer Hinton-Saunders to work.[1] Director Brown issued a Remand Notice for Officer Hinton-Saunders. See Appendix, Volume II, App. 41. Counsel for Officer Hinton-Saunders filed a Motion to Strike the Remand Notice. See Appendix, Volume II, App. 50 and 51. The DOC filed a Reply to Employee's Motion to Strike Remand Notices. See Appendix, Volume II, App. 52. Counsel for Officer Hinton-Saunders filed a Response to the DOC's Reply. See Appendix, Volume II, App. 53. A hearing was held on the matter before the Administrative Law Judges of the OAH on February 5, 2007.[2]

On March 2, 2007, the OAH issued its second Report and Recommendation in this matter.[3] The Administrative Law Judges determined that Director Brown acted unlawfully in not rendering her final decision in 45 days, as mandated by law. In addition, the Administrative Law Judges upheld their original decision recommending that Director Brown reinstate Officer Hinton-Saunders as her summary removal could not be sustained.

As you are also aware, on March 16, 2007, senior management at the DOC simultaneously rescinded and cancelled this proposal for summary removal, and replaced it with the 20-day notice of proposed termination, for which you are serving as Hearing Officer. This unlawful action is no more than an attempt by the DOC to have a "Do Over" because Director Brown disagrees with the decision of the original Hearing Officers that the DOC *handpicked* to serve in that capacity in this matter. In fact, the proposed removal of Officer Hinton-Saunders dated March 15, 2007 is virtually *identical* to the one issued on August 24, 2006.

It is unconstitutional and unlawful for you to proceed at all in this matter. You must promptly advise Director Brown that he must return Officer Hinton-Saunders to work pursuant to the OAH Judges' prior recommendations.

## FACTUAL BACKGROUND[4]

On June 3, 2006, two inmates escaped from the D.C. Jail by smashing out the door and window of the Warden's office.[5] A correctional officer, while reporting for duty,

---

1 The decision of the OAH Administrative Law Judges is attached in the Appendix to the responses of all ten employees at Appendix, Volume I, App. 36. Hereafter, appendices will be cited accordingly.

2 The hearing transcript can be found at Appendix, Volume II, App. 54.

3 See Appendix, Volume II, App. 58.

4 A more detailed factual background is available in the pleadings filed on behalf of Officer Hinton-Saunders (See Appendix, Volume I, App. 23) with the OAH in the DOC's first attempt to terminate him for the exact same behavior and for which Officer Hinton-Saunders's conduct was found not to rise to the level warranting such a termination.

5 It should be noted that on June 4, 2006, the two escapees were recaptured without incident.

witnessed the inmates escaping, and pursued the two escapees on foot until he lost sight of them. The officer then returned to the D.C. Jail to report the escape.

The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the D.C. Jail. The escape was widely reported in the press, and the source of embarrassment for both DOC and City Administrators. The escape was a direct result of the DOC's failure to remedy safety issues which had been repeatedly brought to the Agency's attention by the FOP/DOC Labor Committee and its Chairperson. The failure to implement these safety measures not only allowed this escape, but also continues to subject the FOP/DOC Unit members to unsafe work conditions, increased risk of assault, and threat to their lives. The DOC Office of Internal Affairs ("OIA") conducted an investigation of the escapes. The institutional deficiencies cited in its report– all raised by Complainants prior to the escape – were the actual and proximate cause of the escape according to the OIA Investigative Report:[6]

a. Chronic understaffing and inadequate recruiting and training plans;

b. The absence of a Security Chief who would ensure utilization of modern security controls, implementation of coherent staffing protocols, implementation of intelligence gathering within the Jail, supply of necessary equipment including communications equipment, and development of operational protocols to promote an integral security program;

c. Failure to provide in-house dining facilities for around the clock availability of back-up correctional staff in the event of an emergency;

d. Failure to provide hand held radios to correctional officers with capability and authority to communicate directly with the Metropolitan Police Department and other agencies on a 24-hour basis;

e. Failure to conduct regular audits of Housing units to ensure that inmates are housed commensurate with their dangerousness;

f. The absence of sufficient surveillance cameras at known checkpoints and in administrative entrances, stairwells and elevators;

g. Understaffing of specialists responsible for classifying inmates and implementation of an improved computer system for inmate classification;

[6] There is an absolute distinction between the OIA Investigation Report and the recommendations for discharge of these DOC Employees. The recommendations for discharge were not rendered by the OIA, but rather by the Acting Deputy Warden, no doubt in consultation with Director Devon Brown. Also, it is crucial to note that several non-union members in leadership authority were allowed to resign and/or retire as a consequence of the jail escapes. No person in supervisory authority has been fired or otherwise disciplined despite the findings of the OIA Investigation.

h. Lack of training of Correctional Treatment Specialists on the use of risk assessment instruments designed to identify criminal risk and high threat offenders;

i. The absence of on-going staff training for classification, housing and separation of inmates;

j. The uncontrolled access by inmates to telephones within the Jail;

k. An incoherent and inadequate system for security of inmates reporting for Infirmary Care;

l. An incoherent and inadequate system for allowing inmates virtually free access through the Jail and free access into the Administrative module;

m. Inadequate controls of inmates approved for detail assignments in the Jail, which allow such inmates free access through the Jail Housing Module and, in some instances, the Administrative Module;

n. The absence of modern and affordable electronic tracking systems for inmates;

o. The absence of modern, electronic locking systems for the Housing Module and checkpoints to the Administrative Module;

p. Failure of the Community Alert System, also known as the Escape Alarm;

q. The absence of modern safety glass or other reinforcement of windows in the Administrative Module; in addition, security walls, razor wire, and perimeter cameras are absent in vital security areas;

Without conducting an adequately thorough investigation, and in an effort to deflect continued public attention from the actual reasons that led to the escape, Director Brown, on June 5, 2006, placed twelve D.C. Jail employees on paid administrative leave pending further investigation. These employees were issued written notification of their administrative suspensions with pay.

After the escape, most of the twelve suspended employees, other employees and witnesses were interviewed by Investigators with the DOC OIA.[7] The Union members (who

[7] Corporal Lachonne Stewart was not interviewed by OIA neither prior to or after being put on administrative leave with pay, nor was she interviewed following the summary removal action. To date Officer Stewart has not been interviewed by OIA.

were suspended) were not provided with required warnings regarding the use of their statements and their right to remain silent under D.C. and federal law before the interviews. See *Kastigar v. United* States, 406 U.S. 441 (1972).[8] Nor were they uniformly advised of their right to have a Union representative present for the interview. The interviews were tape recorded. Despite the CBA requirement to produce the tapes, they have never been provided to the Union, despite repeated requests since June 28, 2006. Transcripts purportedly prepared from the tapes, and appended to the OIA Investigation Report for these employees, show that Investigators turned off the tape recorder on numerous occasions, in order to engage in off-the-record attempts to intimidate the officers being interviewed.

Public scrutiny of the inmate escapes continued, and, on June 19, 2006, D.C. City Councilmember Phil Mendelson and Director Brown, addressed questions on the jail break in a public forum. In the following week, the FOP/DOC Labor Committee continued to raise a number of concerns about the serious safety and security issues facing correctional officers. On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Mendelson, was held to continue review of the jail break and general safety issues at the D.C. Jail. At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.

Facing public pressure and pressure from the D.C. City Council, during his testimony at the June 26, 2006, hearing, Director Brown announced that as a result of the escape, the DOC "conducted a comprehensive review and assessment of its operations ... and with swift and decisive action it has proceeded to initiate major improvements [to the D.C. Jail]." Despite Director Brown's assertion that substantive changes were made, the "improvements" made were largely cosmetic. While these superficial modifications were needed, no real attempt has been made to address and correct any of the critical safety concerns and infrastructure issues that had long existed and which were raised by the FOP/DOC prior to the June 2006 escape.

On July 26, 2006, the Mayor[9], Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break. None of the fired employees or their Union were notified in advance of this public announcement. During the Press Briefing, Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing, summary firings, and the announcement of a criminal investigation, were intended to and had the result of humiliating

---

8 As an arm of the local government the DOC Office of Internal Affairs' power to compel testimony from employees during an investigation of this kind is not absolute. The employee has the right of refusal based on the Fifth Amendment privilege against self-incrimination. Further, any statutory provision compelling testimony that may be incriminatory must match the strength of the Fifth Amendment and provide full immunity against subsequent prosecution in order to be valid. The DOC employees should have been informed of this before they were interviewed by the OIA.

9 The Mayor referenced herein is former Mayor Anthony Williams.

and embarrassing the discharged Union members, of which Officer Hinton-Saunders is one, casting them in the public light as felons who abetted a jail escape.[10]

Director Brown, the Mayor, the City Administrator and other city officials deliberately chose a course of action designed to maximize press coverage while intimidating the employees, including Officer Hinton-Saunders. This scheme was intended to thrust the city and its administrators into a positive light and to suggest to the public that the jail escapes could only have been accomplished by a criminal conspiracy within the rank and file of the D.C. Jail employees. In reality, the jail escapes were a predictable product of unsafe conditions at the D.C. Jail which have been the topic of ongoing complaints to Director Brown by Union members and representatives. Officer Hinton-Saunders is nothing more than a casualty of a failed system and a scapegoat for DOC Administrators to avoid taking responsibility for their actions.

**EMPLOYEE'S HISTORY WITH THE DC DOC**

Officer Lowanda Hinton-Saunders began her employment with the DC DOC in August, 1990. She voluntarily separated from the DC DOC from April 2000 until November 1, 2004. Upon returning to full duty, Officer Hinton-Saunders was given only two days training, when the average training period is six weeks. As to the DC DOC's claim of Officer Hinton-Saunders negligence for failure to comply with Basic Regulations of All Employees or Correctional Officer's General Orders, Officer Hinton-Saunders denies ever having received either of those two documents. Despite this, Officer Hinton-Saunders regularly received positive performance evaluations, including the last rating of record, which indicates she was operating at an "excellent" level, and which she received on or about the date as the escape.

**THIS EMPLOYEE'S CONDUCT WAS NOT NEGLIGENT**

Officer Hinton-Saunders was responsible for the door separating the jail side of the building from the administrative side. This was the first time she had ever worked that post, and she had not been trained for that position. In fact, Officer Hinton Saunders is unaware of any post orders for that post, which would have given her appropriate operational guidelines. Officer Hinton-Saunders was not the only member of the staff with keys to the lock on that door.

It was commonplace DC DOC employees to be placed anywhere, especially when working an overtime shift. Officer Hinton-Saunders was working an overtime shift (her second in a row) during the escape. Typically, Officer Hinton-Saunders was assigned to female R & D, and although there was an opening there that day because of staff shortage, Officer Hinton-Saunders was assigned to an unfamiliar section of the jail. Officers were routinely placed in unfamiliar assignments throughout the facility. This was especially true when officers worked a second (OT) shift.

---

[10] In order to accomplish this public humiliation and summary firing, Director Brown and other DOC Administrators engaged in an unlawful and unconstitutional revision of existing D.C. laws. This matter currently is being litigated in another forum.

Officer Hinton-Saunders was told by Mr. Ben Collins of Internal Affairs during her second interview at the Grimke Building that he was recommending that she (Officer Hinton-Saunders) would be going back to work. There is no record of that in the interview.

Officer Hinton-Saunders staffed her post to the best of her ability and knowledge. In addition to being responsible for the administrative door, she was tasked with patrolling the immediate surrounding area, including the visiting hall. Officer Hinton-Saunders was not the only officer with keys to the administrative door for which she was responsible that day. The DC DOC acknowledges this in their report. At one point, Officer Hinton-Saunders was in the Visiting Hall with Judy Brown (for whom there is no record of a DC DOC interview), when four attorneys came into door. Someone had to let these attorneys through the administrative door, but it was not Officer Hinton-Saunders. There is also no record of those four attorneys being interviewed.

On the day of the escape, Officer Hinton-Saunders observed some of the inmates in the detail assigned to Officer Herbert Douglas (which included inmate Leaks) in the Visiting Hall of the facility. The inmates were cleaning the room. Officer Douglas was on the other side of the door. Officer Hinton-Saunders let Officer Douglas through the door. One of the inmates assigned to the Officer Douglas' detail arrived at Officer Hinton-Saunders post with a refrigerator that had just been cleaned. While Officer Hinton-Saunders was inspecting the refrigerator for contraband, the rest of the detail came in from the Visiting Hall and Officer Douglas attended to the inmates in his care. After Officer Hinton-Saunders completed her inspection of the refrigerator, Officer Douglas indicated he was ready to take his detail through to the administrative side of the building. Officer Hinton-Saunders unlocked the door for Officer Douglas and his detail, at which point, they all went through to the other side of the facility. This was the last contact Officer Hinton-Saunders had with the detail.

Officer Hinton-Saunders did not review the badges of the inmates with Officer Douglas on the morning of the escape. She was responsible for manning her post at the door; she was not responsible for verifying the detail badges for the inmates in the care of another officer.

Officer Hinton-Saunders has followed the pattern and practice of the jail everyday of her employment with the DC DOC, and did so on the day of the escape. She executed her duties to the best of her ability with the resources available to her at the time.

## LEGAL ARGUMENTS AND DEFENSES

### A. This Action is in Violation of the CBA and D.C. Law.

Neither the CBA nor D.C. law permits "a second bite of the apple." See March 20, 2007 Ltr. to Maria Amato.[11] This is nothing more than a retaliatory exercise by Director Brown to "forum shop" in an effort to get the result that he wants—termination of Officer Hinton-Saunders—and to deflect attention from his mismanagement of the agency.

[11] The Letter from J. Michael Hannon, Esq. to Maria Amato, Esq. dated March 20, 2007 is attached.

The CBA and D.C. law clearly set forth the consideration for summary removals. Officer Hinton-Saunders and the DOC already have engaged in the only legal administrative process available in these circumstances. That process ended when the OAH Judges recommended reinstatement of Officer Hinton-Saunders. Neither the CBA nor D.C. law provides *any* authority for the Director to initiate this same disciplinary action again.

In addition, the Administrative Law Judges of the OAH determined that Director Brown violated the 45-day rule, which is mandated by D.C. law, and states, in relevant part, that in all summary removals a final decision must be rendered in 45 days. Once the 45th day passed, with no decision, the only remedy for violation of the law is reinstatement.

In the prior proceedings in this matter, the DOC undertook no effort to justify the narrow circumstances under which summary removal is permitted, as required by D.C. Law. Obviously, the Administrative Law Judges of the OAH agreed by recommending twice that Officer Hinton-Saunders be reinstated and that summary removal not be upheld. The DOC is just repackaging the same allegations and support thereto, albeit minimally. Doing so does not make the information any more legal or palatable.

**B. This Proposed Termination is a Violation of Due Process Rights.**

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court found that government employees are afforded procedural guarantees before they can be terminated. The Due Process analysis found in *Loudermill* applies to D.C. government employees and, in this case, the DOC employees specifically. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause...Under the CMPA, employees can only be disciplined for cause and prior notice must be given." *Fonville v. D.C.*, 2006 U.S. Dist. LEXIS 58564 (D.D.C. Aug. 22, 2006) (internal citations omitted). See also, *D.C. Department of Corrections v. Teamsters' Union Local*, 554 A.2d 319, 323 (D.C. 1989).

In this context, "agencies cannot relax or modify regulations… [W]hen agencies establish … pre-termination procedures they are bound to follow them." *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161, 2005 U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005), citing *Lopez v. FAA*, 355 U.S. App. D.C. 51, 318 F.3d 242, 247 (D.C. Cir. 2003). Also, "[t]he D.C. Circuit has not required any additional due process requirements [beyond those defined in *Loudermill*] for the termination of its public employees." *Crockett v. D.C. Metro. Police Dep't.*, 293 F. Supp. 2d 63, 68 U.S. Dist. LEXIS 23632 (2003), citing *Kropat v. Fed. Aviation Admin.*, 333 U.S. App. D.C. 239, 162 F.3d 129, 132-34 (D.C. Cir. 1998). There is no regulation, nor any legal authority, that permits an Agency to retrace the procedures for discharging the employee, once the Agency and the employee have followed the established procedures.

There is no legal authority whatsoever that allows for the DOC to continue to propose discipline for the same offense until they get the result Director Brown desires. The

administrative process has been completed in this matter, and any attempt to re-adjudicate is unlawful. What the DOC is doing here is clearly a violation of the United States Constitution. The remedy for such a violation is reinstatement of the employee with full back pay and benefits. See Petition for Writ of Mandamus.[12]

## C. The DOC Is Precluded from Rendering a Different Decision Under the Doctrine of Res Judicata.

Under the legal doctrine of res judicata, one party in a legal proceeding is prevented from getting another day in court after receiving an unsatisfactory result to his/her claim. There is an abundance of legal precedent supporting this doctrine. The U.S. District Court for the D.C. Circuit has held that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Arakawa v. Reagan*, 666 F. Supp. 254, 262 (1987), citing *Allen v. McCurry*, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980). The *Arakawa* court goes on to find that, "[t]his preclusive effect attaches to administrative proceedings when, as with proceedings before the MSPB, the administrative tribunal 'is acting in a judicial capacity and resolves issues of fact properly before it which the parties have had an adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata. Director Brown is doing nothing more than attempting a "do over" with this proposed termination. The Director did not agree with the decision of the OAH Hearing Officers, and is now looking for a more receptive audience within the confines of the DOC in order to obtain the result he wants. Fundamental principles of law do not allow this, and Director Brown's attempt to "do over" the termination proceedings should be struck down as unlawful.

## D. The "Douglas Factors" Must Be Considered by the DOC.

The D.C. Court of Appeals has made clear that a D.C. agency must take into consideration the so-called "*Douglas* Factors" when making a disciplinary determination. *D.C. Department of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005). In *Douglas v. Veterans Administration,* the Merit Systems Protection Board ("MSPB"), in the context of federal employment, ruled that an agency must consider specific mitigating and aggravating factors in determining an appropriate penalty. The D.C. Court of Appeals in *Colbert* emphasizes the importance of responsibly balancing the relevant factors in each individual case. In its evaluation of the dismissal of a D.C. Department of Public Works employee and subsequent proceedings, the Appellate Court further explained that an agency must consider the *Douglas* Factors at the onset of termination and in consideration of pretermination protections. *Colbert* at 359. The agency must provide evidence of the *Douglas* Factors in advance of termination in order to preserve the procedural protections of due process.

---

[12] Counsel for the FOP/DOC LC, on behalf of the employees terminated as a result of the jail escape, has filed a Petition for a Writ of Mandamus in the District of Columbia Court of Appeals. A copy of that Petition is attached.

Failure of the agency to meet this standard before this termination is grounds for reinstatement.

Here, the DOC has failed to provide any information relevant to each of the *Douglas* Factors and failed to present evidence that it has engaged in an assessment of progressive discipline with regard to Officer Hinton-Saunders. Officer Hinton-Saunders has a commendable service record. Moreover, the CBA between FOP/DOC Labor Committee and the city requires consideration of progressive discipline. Collective Bargaining Agreement, Article 11, Section 14.

The *Douglas* Factors are:

1. The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3. The employee's past disciplinary record;

4. The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties;

6. Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7. Consistency of the penalty with any applicable agency table of penalties;

8. The notoriety of the offense or its impact upon the reputation of the agency;

9. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. Potential for the employee's rehabilitation;

11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and,

12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

5 MSPR 280, 305-06 (1981). "The *Douglas* factors parallel the Office of Personnel Management's 'suitability' regulations establishing a separate procedure for determining the relevance of criminal convictions to federal employment of applicants and present employees. Any discipline of an employee must be justified in all these realms." 39 Am. U.L. Rev. 869 (1990).

In their Report and Recommendation to strike down the summary removal previously proposed by the DOC in this case, the OAH Hearing Officers unanimously concluded that the there was insufficient information to permit evaluation of the *Douglas* factors in the evidence presented. That evidence has not changed. Therefore, because the same imperfections exist, the same results must occur.

**E. The Hearing Officer Assigned to this Matter Is Not "Disinterested".**

Officer Hinton-Saunders respectfully asserts that the Hearing Officer assigned in this matter is not a disinterested party. You are an employee of the DOC, and ultimately are subject to supervision by the Director of the DOC, Devon Brown, who is the Deciding Official in this matter. Notwithstanding being put forth as the disinterested designee by Deputy Warden Waldren (the Proposing Official), all employees of the DOC fall under the management and direction of Director Brown, the deciding official, which violates the letter and spirit of the CBA.[13]

Because there is no constitutional or other legal authority for a second hearing in this matter and because you are not a disinterested Hearing Officer and for all the other reasons mentioned above, Officer Hinton-Saunders must be reinstated unconditionally.

Pursuant to the 20-day advance notice of proposed removal, I understand that we are entitled to all documentation being used in making this decision. Of course, this would include but not be limited to Officer Hinton-Saunders's personnel file, any and all reports related to the incident, any video or audio tapes of interviews, and any other documentation being used by you in reaching a decision. We respectfully request copies of all such material. Please contact me upon receipt of this letter to discuss the arrangements for obtaining all of this material.

[13] The evidence at any hearing will show that Deputy Warden Waldren was not the proposing official. He was summoned to the Grimke Building the day these notices were sent out, with no knowledge that he was to sign these letters. In fact, the evidence will show that Deputy Warden Waldren was not even given the opportunity to read these letters. The Proposing Official is Director Brown. This is also a violation of the CBA, the Due Process Clause, and D.C. Law.

If you have any questions, please do not hesitate to contact me. Thank you for your courtesies.

Sincerely,

J. Michael Hannon

cc:    Cpl. Nila Ritenour
       Lowanda Hinton-Saunders

# EXHIBIT 56



HANNON LAW GROUP, LLP
COUNSELORS AND ATTORNEYS AT LAW
1901 18TH STREET, NW
WASHINGTON, D.C. 20009

(202) 232-1907
FACSIMILE (202) 232-3704
www.hannonlawgroup.com

J. MICHAEL HANNON *

TREBIE A. VALANCIUS +
CAROLYN K. MANNING
ADMITTED ONLY IN CONNECTICUT;
SUPERVISION BY J. MICHAEL HANNON,
A MEMBER OF THE D.C. BAR

* ALSO ADMITTED IN MARYLAND
+ ALSO ADMITTED IN VIRGINIA
• ALSO ADMITTED IN CALIFORNIA

27 WOOD LANE
ROCKVILLE, MARYLAND 20850

11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 522-2112

OF COUNSEL

CHARLES I. CATE •
DONALD LEWIS WRIGHT
WILLIAM CLAYTON BATCHELOR *+

March 22, 2007

**BY HAND**

Henry R. Lesansky, Ph.D.
Health Services Administrator
District of Columbia Department of Corrections
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001

RE: Response to Notice of Proposed Termination for Darryl Love

Dear Dr. Lesansky,

This firm represents the Fraternal Order of Police, District of Columbia Department of Corrections Labor Committee (FOP/DOC Labor Committee). In that capacity, we also represent Darryl Love in the proposed removal action pending against him with the D.C. Department of Corrections (DOC), for which you have been assigned as the Hearing Officer. This letter serves as Mr. Love's written response to the 20-day advance notice of proposed removal dated March 15, 2007. In addition, this letter serves as Mr. Love's formal request for a hearing in this matter, as well as copies of all material you will be using in reaching a decision.

## PROCEDURAL BACKGROUND

As you are well aware, this is the DOC's attempt to have a second bite of the apple. On August 24, 2006, Director Devon Brown proposed and recommended summary removal for Mr. Love, for his alleged "role" in the June 2006 D.C. Jail escape. Mr. Love properly followed the procedures set forth in both the Collective Bargaining Agreement ("CBA") of the parties and D.C. law, as set forth in the D.C. Personnel Manual ("DCPM"), in response to that proposal. The DOC and the D.C. Office of Administrative Hearings ("OAH") reached an agreement for the Administrative Law Judges at the OAH to serve as the Hearing Officers in the proposed summary removal action of Mr. Love. Mr. Love presented his case

before the OAH, and the Administrative Law Judges of the OAH rendered a decision recommending that Director Brown return Mr. Love to work.[1] Director Brown issued a Remand Notice for Mr. Love. See Appendix, Volume II, App. 41. Counsel for Mr. Love filed a Motion to Strike the Remand Notice. See Appendix, Volume II, App. 50 and 51. The DOC filed a Reply to Employee's Motion to Strike Remand Notices. See Appendix, Volume II, App. 52. Counsel for Mr. Love filed a Response to the DOC's Reply. See Appendix, Volume II, App. 53. A hearing was held on the matter before the Administrative Law Judges of the OAH on February 5, 2007.[2]

On March 2, 2007, the OAH issued its second Report and Recommendation in this matter.[3] The Administrative Law Judges determined that Director Brown acted unlawfully in not rendering his final decision in 45 days, as mandated by law. In addition, the Administrative Law Judges upheld their original decision recommending that Director Brown reinstate Mr. Love as his summary removal could not be sustained.

As you are also aware, on March 16, 2007, senior management at the DOC simultaneously rescinded and cancelled this proposal for summary removal, and replaced it with the 20-day notice of proposed termination, for which you are serving as Hearing Officer. This unlawful action is no more than an attempt by the DOC to have a "Do Over" because Director Brown disagrees with the decision of the original Hearing Officers that the DOC *handpicked* to serve in that capacity in this matter. In fact, the proposed removal of Mr. Love dated March 15, 2007 is virtually *identical* to the one issued on August 24, 2006.

It is unconstitutional and unlawful for you to proceed at all in this matter. You must promptly advise Director Brown that he must return Mr. Love to work pursuant to the OAH Judges' prior recommendations.

## FACTUAL BACKGROUND[4]

On June 3, 2006, two inmates escaped from the D.C. Jail by smashing out the door and window of the Warden's office.[5] A correctional officer, while reporting for duty, witnessed the inmates escaping, and pursued the two escapees on foot until he lost sight of them. The officer then returned to the D.C. Jail to report the escape.

---

1 The decision of the OAH Administrative Law Judges is attached in the Appendix to the responses of all ten employees at Appendix, Volume I, App. 37. Hereafter, appendices will be cited accordingly.

2 The hearing transcript can be found at Appendix, Volume II, App. 54.

3 See Appendix, Volume II, App. 55.

4 A more detailed factual background is available in the pleadings filed on behalf of Mr. Love (See Appendix, Volume I, App. 20) with the OAH in the DOC's first attempt to terminate him for the exact same behavior and for which Mr. Love's conduct was found not to rise to the level warranting such a termination.

5 It should be noted that on June 4, 2006, the two escapees were recaptured without incident.

The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the D.C. Jail. The escape was widely reported in the press, and the source of embarrassment for both DOC and City Administrators. The escape was a direct result of the DOC's failure to remedy safety issues which had been repeatedly brought to the Agency's attention by the FOP/DOC Labor Committee and its Chairperson. The failure to implement these safety measures not only allowed this escape, but also continues to subject the FOP/DOC Unit members to unsafe work conditions, increased risk of assault, and threat to their lives. The DOC Office of Internal Affairs ("OIA") conducted an investigation of the escapes. The institutional deficiencies cited in its report– all raised by Complainants prior to the escape – were the actual and proximate cause of the escape according to the OIA Investigative Report:[6]

a.    Chronic understaffing and inadequate recruiting and training plans;

b.    The absence of a Security Chief who would ensure utilization of modern security controls, implementation of coherent staffing protocols, implementation of intelligence gathering within the Jail, supply of necessary equipment including communications equipment, and development of operational protocols to promote an integral security program;

c.    Failure to provide in-house dining facilities for around the clock availability of back-up correctional staff in the event of an emergency;

d.    Failure to provide hand held radios to correctional officers with capability and authority to communicate directly with the Metropolitan Police Department and other agencies on a 24-hour basis;

e.    Failure to conduct regular audits of Housing units to ensure that inmates are housed commensurate with their dangerousness;

f.    The absence of sufficient surveillance cameras at known checkpoints and in administrative entrances, stairwells and elevators;

g.    Understaffing of specialists responsible for classifying inmates and implementation of an improved computer system for inmate classification;

---

[6]    There is an absolute distinction between the OIA Investigation Report and the recommendations for discharge of these DOC Employees. The recommendations for discharge were not rendered by the OIA, but rather by the Acting Deputy Warden, no doubt in consultation with Director Devon Brown. Also, it is crucial to note that several non-union members in leadership authority were allowed to resign and/or retire as a consequence of the jail escapes. No person in supervisory authority has been fired or otherwise disciplined despite the findings of the OIA Investigation.

h. Lack of training of Correctional Treatment Specialists on the use of risk assessment instruments designed to identify criminal risk and high threat offenders;

i. The absence of on-going staff training for classification, housing and separation of inmates;

j. The uncontrolled access by inmates to telephones within the Jail;

k. An incoherent and inadequate system for security of inmates reporting for Infirmary Care;

l. An incoherent and inadequate system for allowing inmates virtually free access through the Jail and free access into the Administrative module;

m. Inadequate controls of inmates approved for detail assignments in the Jail, which allow such inmates free access through the Jail Housing Module and, in some instances, the Administrative Module;

n. The absence of modern and affordable electronic tracking systems for inmates;

o. The absence of modern, electronic locking systems for the Housing Module and checkpoints to the Administrative Module;

p. Failure of the Community Alert System, also known as the Escape Alarm;

q. The absence of modern safety glass or other reinforcement of windows in the Administrative Module; in addition, security walls, razor wire, and perimeter cameras are absent in vital security areas;

Without conducting an adequately thorough investigation, and in an effort to deflect continued public attention from the actual reasons that led to the escape, Director Brown, on June 5, 2006, placed twelve D.C. Jail employees on paid administrative leave pending further investigation. These employees were issued written notification of their administrative suspensions with pay.

After the escape, most of the twelve suspended employees, other employees and witnesses were interviewed by Investigators with the DOC OIA.[7] The Union members (who were suspended) were not provided with required warnings regarding the use of their

[7] Corporal Lachonne Stewart was not interviewed by OIA neither prior to or after being put on administrative leave with pay, nor was she interviewed following the summary removal action. To date Officer Stewart has not been interviewed by OIA.

statements and their right to remain silent under D.C. and federal law before the interviews. See *Kastigar v. United* States, 406 U.S. 441 (1972).[8] Nor were they uniformly advised of their right to have a Union representative present for the interview. The interviews were tape recorded. Despite the CBA requirement to produce the tapes, they have never been provided to the Union, despite repeated requests since June 28, 2006. Transcripts purportedly prepared from the tapes, and appended to the OIA Investigation Report for these employees, show that Investigators turned off the tape recorder on numerous occasions, in order to engage in off-the-record attempts to intimidate the officers being interviewed.

Public scrutiny of the inmate escapes continued, and, on June 19, 2006, D.C. City Councilmember Phil Mendelson and Director Brown, addressed questions on the jail break in a public forum. In the following week, the FOP/DOC Labor Committee continued to raise a number of concerns about the serious safety and security issues facing correctional officers. On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Mendelson, was held to continue review of the jail break and general safety issues at the D.C. Jail. At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.

Facing public pressure and pressure from the D.C. City Council, during his testimony at the June 26, 2006, hearing, Director Brown announced that as a result of the escape, the DOC "conducted a comprehensive review and assessment of its operations ... and with swift and decisive action it has proceeded to initiate major improvements [to the D.C. Jail]." Despite Director Brown's assertion that substantive changes were made, the "improvements" made were largely cosmetic. While these superficial modifications were needed, no real attempt has been made to address and correct any of the critical safety concerns and infrastructure issues that had long existed and which were raised by the FOP/DOC prior to the June 2006 escape.

On July 26, 2006, the Mayor[9], Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break. None of the fired employees or their Union were notified in advance of this public announcement. During the Press Briefing, Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing, summary firings, and the announcement of a criminal investigation, were intended to and had the result of humiliating

[8] As an arm of the local government the DOC Office of Internal Affairs' power to compel testimony from employees during an investigation of this kind is not absolute. The employee has the right of refusal based on the Fifth Amendment privilege against self-incrimination. Further, any statutory provision compelling testimony that may be incriminatory must match the strength of the Fifth Amendment and provide full immunity against subsequent prosecution in order to be valid. The DOC employees should have been informed of this before they were interviewed by the OIA.

[9] The Mayor referenced herein is former Mayor Anthony Williams.

and embarrassing the discharged Union members, of which Mr. Love is one, casting them in the public light as felons who abetted a jail escape.[10]

Director Brown, the Mayor, the City Administrator and other city officials deliberately chose a course of action designed to maximize press coverage while intimidating the employees, including Mr. Love. This scheme was intended to thrust the city and its administrators into a positive light and to suggest to the public that the jail escapes could only have been accomplished by a criminal conspiracy within the rank and file of the D.C. Jail employees. In reality, the jail escapes were a predictable product of unsafe conditions at the D.C. Jail which have been the topic of ongoing complaints to Director Brown by Union members and representatives. Mr. Love is nothing more than a casualty of a failed system and a scapegoat for DOC Administrators to avoid taking responsibility for their actions.

**EMPLOYEE'S HISTORY WITH THE DC DOC**

Officer Darryl S. Love has had an exemplary record with DC DOC. Mr. Love had been employed with the DC DOC for 23 ½ years and is eligible for retirement April, 2007. He was hired as a Correctional Officer with the DC DOC on November 1, 1982. After a six week training program he was assigned to the Central Detention Facility (CDF), known now as the D.C. Jail. During his first year on the job, Mr. Love, at one point or another, worked all three shifts (#1, #2 and #3). He worked exclusively in housing units (cell blocks) that first year. For the next five years he worked several "critical posts" in "sensitive areas" including Visitor Control, The Tower, and as a supervisor on Compliance Team. He worked in each of these posts proficiently and developed a working knowledge of the D.C. Jail.

In Spring 1988, Mr. Love was promoted to a Correctional Treatment Specialist (CTS) position and reassigned to the Office of Community Services. Soon after, he was assigned to Community Correctional Center #2, a correctional halfway house serving juvenile offenders participating in the work release program. For the next 13 years, Mr. Love continued his excellent work history, serving as a CTS at Community Correctional Centers 1-4, all halfway houses serving different populations. In addition to his assignment as CTS, Mr. Love also served as interim Acting Administrator, Acting Assistant Administrator, and worked with the Office of Community Release Programs, where he developed and implemented programs and processes for inmate review and recommendations.

In 2002, Mr. Love was reassigned to the D.C. Jail after all DC DOC halfway houses were closed. Until the Summary Removal earlier this year, Mr. Love served as a Cellblock Case Manager. His duties included conducting intake interviews, initial inmate classifications, inmate reclassifications, adjustment board housing assignments, addressing state, local and federal correspondence, providing legal claims and special projects as assigned.

During his tenure with the DC DOC, Mr. Love has amassed over 15 outstanding performance ratings. Rarely taking time off, he has also accumulated, through the years, over

[10] In order to accomplish this public humiliation and summary firing, Director Brown and other DOC Administrators engaged in an unlawful and unconstitutional revision of existing D.C. laws. This matter currently is being litigated in another forum.



2,000 hours of sick time. Even with limited training, Mr. Love has successfully performed his duties and in some cases on an interim basis the duties of others.

**THIS EMPLOYEE'S CONDUCT WAS NOT NEGLIGENT**

In a written notice to serve as follow-up to the July 26, 2006, summary removal that terminated him from his position as CTS, Mr. Love is charged with negligent conduct. Mr. Love was not negligent in performing the duties of his job nor did his conduct contribute to the escape of inmates Joseph Leaks DCDC# 250-433 and Ricardo Jones DCDC# 279-826.

Mr. Love reclassified inmate Leaks on March 11, 2006 and May 15, 2006. These reclassifications of security status are conducted to make security status changes based on, but not limited to, an inmate's behavior, any additional charges incurred, and any disciplinary reports available. As a matter of procedure, inmates are classified every 60 days, a change from a prior 90-day reclassification requirement. Inmate Leaks' initial classification was done when he was processed through intake at the D.C. Jail. Though the DC DOC contends that inmate Leaks should have been classified as a "high" custody inmate, Mr. Love rated inmate Leaks as a "medium" custody inmate. In each of the reclassifications he performed, Mr. Love used an uncertified "Technical Reference Manual" that he was mandated to use by D.C. Jail officials. The "Technical Reference Manual" replaced a former certified Bureau of Prison classification manual which Mr. Love and all Correctional Treatment Specialists used from the time he was promoted to CTS in 1988 until the new "Technical Reference Manual" was implemented in March 2004. Mr. Love was given only a one hour training session on the use of the "Technical Reference Manual." Most of his instruction came from a "Program Statement" issued in March 2004, along with the "Technical Reference Manual."

Mr. Love applied the charges and the conviction summaries set out for inmate Leaks in the JAACS and PRISM systems to the criteria in the "Technical Reference Manual." Whenever reclassifying inmates, a CTS should have access to information from the D.C. Jail's JAACS system, the PRISM system and an inmate's paper file. However, inmates' paper files are often lost and unavailable to CTSs when they are conducting reclassifications. Inmate Leaks' paper file was unavailable on both occasions that Mr. Love reclassified him. According to the criteria in the "Technical Reference Manual" inmate Leaks' reclassification as a medium security inmate was correct.

Mr. Love's direct supervisor, Leona Bennett, had access to all reclassifications and as a matter of procedure was supposed to make weekly checks of reclassifications to ensure accuracy. Ms. Bennett failed to review Mr. Love's work. In fact, she reviewed Leaks' classifications only after the inmates Leaks and Jones escaped.

**LEGAL ARGUMENTS AND DEFENSES**

**A. This Action is in Violation of the CBA and D.C. Law.**

Neither the CBA nor D.C. law permits "a second bite of the apple." See March 20, 2007 Ltr. to Maria Amato.[11] This is nothing more than a retaliatory exercise by Director Brown to "forum shop" in an effort to get the result that he wants—termination of Mr. Love—and to deflect attention from his mismanagement of the agency.

The CBA and D.C. law clearly set forth the consideration for summary removals. Mr. Love and the DOC already have engaged in the only legal administrative process available in these circumstances. That process ended when the OAH Judges recommended reinstatement of Mr. Love. Neither the CBA nor D.C. law provides *any* authority for the Director to initiate this same disciplinary action again.

In addition, the Administrative Law Judges of the OAH determined that Director Brown violated the 45-day rule, which is mandated by D.C. law, and states, in relevant part, that in all summary removals a final decision must be rendered in 45 days. Once the 45th day passed, with no decision, the only remedy for violation of the law is reinstatement.

In the prior proceedings in this matter, the DOC undertook no effort to justify the narrow circumstances under which summary removal is permitted, as required by D.C. Law. Obviously, the Administrative Law Judges of the OAH agreed by recommending twice that Mr. Love be reinstated and that summary removal not be upheld. The DOC is just repackaging the same allegations and support thereto, albeit minimally. Doing so does not make the information any more legal or palatable.

**B. <u>This Proposed Termination is a Violation of Due Process Rights.</u>**

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court found that government employees are afforded procedural guarantees <u>before</u> they can be terminated. The Due Process analysis found in *Loudermill* applies to D.C. government employees and, in this case, the DOC employees specifically. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause...Under the CMPA, employees can only be disciplined for cause and prior notice must be given." *Fonville v. D.C.*, 2006 U.S. Dist. LEXIS 58564 (D.D.C. Aug. 22, 2006) (internal citations omitted). See also, *D.C. Department of Corrections v. Teamsters' Union Local*, 554 A.2d 319, 323 (D.C. 1989).

In this context, "agencies cannot relax or modify regulations... [W]hen agencies establish ... pre-termination procedures they are bound to follow them." *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161, 2005 U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005), citing *Lopez v. FAA*, 355 U.S. App. D.C. 51, 318 F.3d 242, 247 (D.C. Cir. 2003). Also, "[t]he D.C. Circuit has not required any additional due process requirements [beyond those defined in *Loudermill*] for the termination of its public employees." *Crockett v. D.C. Metro. Police Dep't.*, 293 F. Supp. 2d 63, 68 U.S. Dist. LEXIS 23632 (2003), citing *Kropat v. Fed.*

[11] The Letter from J. Michael Hannon, Esq. to Maria Amato, Esq. dated March 20, 2007 is attached.

*Aviation Admin.,* 333 U.S. App. D.C. 239, 162 F.3d 129, 132-34 (D.C. Cir. 1998). There is no regulation, nor any legal authority, that permits an Agency to retrace the procedures for discharging the employee, once the Agency and the employee have followed the established procedures.

There is no legal authority whatsoever that allows for the DOC to continue to propose discipline for the same offense until they get the result Director Brown desires. The administrative process has been completed in this matter, and any attempt to re-adjudicate is unlawful. What the DOC is doing here is clearly a violation of the United States Constitution. The remedy for such a violation is reinstatement of the employee with full back pay and benefits. See Petition for Writ of Mandamus.[12]

**C. <u>The DOC Is Precluded from Rendering a Different Decision Under the Doctrine of Res Judicata.</u>**

Under the legal doctrine of res judicata, one party in a legal proceeding is prevented from getting another day in court after receiving an unsatisfactory result to his/her claim. There is an abundance of legal precedent supporting this doctrine. The U.S. District Court for the D.C. Circuit has held that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Arakawa v. Reagan,* 666 F. Supp. 254, 262 (1987), citing *Allen v. McCurry,* 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980). The *Arakawa* court goes on to find that, "[t]his preclusive effect attaches to administrative proceedings when, as with proceedings before the MSPB, the administrative tribunal 'is acting in a judicial capacity and resolves issues of fact properly before it which the parties have had an adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata. Director Brown is doing nothing more than attempting a "do over" with this proposed termination. The Director did not agree with the decision of the OAH Hearing Officers, and is now looking for a more receptive audience within the confines of the DOC in order to obtain the result he wants. Fundamental principles of law do not allow this, and Director Brown's attempt to "do over" the termination proceedings should be struck down as unlawful.

**D. <u>The "Douglas Factors" Must Be Considered by the DOC.</u>**

The D.C. Court of Appeals has made clear that a D.C. agency must take into consideration the so-called "*Douglas* Factors" when making a disciplinary determination. *D.C. Department of Public Works v. Colbert,* 874 A.2d 353 (D.C. 2005). In *Douglas v. Veterans Administration,* the Merit Systems Protection Board ("MSPB"), in the context of federal employment, ruled that an agency must consider specific mitigating and aggravating factors in determining an appropriate penalty. The D.C. Court of Appeals in *Colbert*

[12] Counsel for the FOP/DOC LC, on behalf of the employees terminated as a result of the jail escape, has filed a Petition for a Writ of Mandamus in the District of Columbia Court of Appeals. A copy of that Petition is attached.

emphasizes the importance of responsibly balancing the relevant factors in each individual case. In its evaluation of the dismissal of a D.C. Department of Public Works employee and subsequent proceedings, the Appellate Court further explained that an agency must consider the *Douglas* Factors at the onset of termination and in consideration of pretermination protections. *Colbert* at 359. The agency must provide evidence of the *Douglas* Factors in advance of termination in order to preserve the procedural protections of due process. Failure of the agency to meet this standard before this termination is grounds for reinstatement.

Here, the DOC has failed to provide any information relevant to each of the *Douglas* Factors and failed to present evidence that it has engaged in an assessment of progressive discipline with regard to Mr. Love. Mr. Love has a commendable service record. Moreover, the CBA between FOP/DOC Labor Committee and the city requires consideration of progressive discipline. Collective Bargaining Agreement, Article 11, Section 14.

The *Douglas* Factors are:

1.  The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2.  The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3.  The employee's past disciplinary record;

4.  The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5.  The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties;

6.  Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7.  Consistency of the penalty with any applicable agency table of penalties;

8.  The notoriety of the offense or its impact upon the reputation of the agency;

9.  The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. Potential for the employee's rehabilitation;

11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and,

12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

5 MSPR 280, 305-06 (1981). "The *Douglas* factors parallel the Office of Personnel Management's 'suitability' regulations establishing a separate procedure for determining the relevance of criminal convictions to federal employment of applicants and present employees. Any discipline of an employee must be justified in all these realms." 39 Am. U.L. Rev. 869 (1990).

In their Report and Recommendation to strike down the summary removal previously proposed by the DOC in this case, the OAH Hearing Officers unanimously concluded that the there was insufficient information to permit evaluation of the *Douglas* factors in the evidence presented. That evidence has not changed. Therefore, because the same imperfections exist, the same results must occur.

**E. <u>The Hearing Officer Assigned to this Matter Is Not "Disinterested".</u>**

Mr. Love respectfully asserts that the Hearing Officer assigned in this matter is not a disinterested party. You are an employee of the DOC, and ultimately are subject to supervision by the Director of the DOC, Devon Brown, who is the Deciding Official in this matter. Notwithstanding being put forth as the disinterested designee by Deputy Warden Waldren (the Proposing Official), all employees of the DOC fall under the management and direction of Director Brown, the deciding official, which violates the letter and spirit of the CBA.[13]

Because there is no constitutional or other legal authority for a second hearing in this matter and because you are not a disinterested Hearing Officer and for all the other reasons mentioned above, Mr. Love must be reinstated unconditionally.

Pursuant to the 20-day advance notice of proposed removal, I understand that we are entitled to all documentation being used in making this decision. Of course, this would include but not be limited to Mr. Love's personnel file, any and all reports related to the incident, any video or audio tapes of interviews, and any other documentation being used by you in reaching a decision. We respectfully request copies of all such material. Please contact me upon receipt of this letter to discuss the arrangements for obtaining all of this material.

---

[13] The evidence at any hearing will show that Deputy Warden Waldren was not the proposing official. He was summoned to the Grimke Building the day these notices were sent out, with no knowledge that he was to sign these letters. In fact, the evidence will show that Deputy Warden Waldren was not even given the opportunity to read these letters. The Proposing Official is Director Brown. This is also a violation of the CBA, the Due Process Clause, and D.C. Law.

If you have any questions, please do not hesitate to contact me.  Thank you for your courtesies.

Sincerely,

J. Michael Hannon

cc:    Cpl. Nila Ritenour
       Darryl Love

# EXHIBIT 57

**HANNON LAW GROUP, LLP**
COUNSELORS AND ATTORNEYS AT LAW
1901 18TH STREET, NW
WASHINGTON, D.C. 20009

(202) 232-1907
FACSIMILE (202) 232-3704
www.hannonlawgroup.com

J. MICHAEL HANNON *

TREBIE A. VALANCIUS +
CAROLYN K. MANNING
ADMITTED ONLY IN CONNECTICUT;
SUPERVISION BY J. MICHAEL HANNON,
A MEMBER OF THE D.C. BAR

* ALSO ADMITTED IN MARYLAND
+ ALSO ADMITTED IN VIRGINIA
• ALSO ADMITTED IN CALIFORNIA

27 WOOD LANE
ROCKVILLE, MARYLAND 20850

11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 522-2112

OF COUNSEL

CHARLES I. CATE •
DONALD LEWIS WRIGHT
WILLIAM CLAYTON BATCHELOR *+

March 22, 2007

**BY HAND**

Henry R. Lesansky, Ph.D.
Health Services Administrator
District of Columbia Department of Corrections
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001

RE: Response to Notice of Proposed Termination for Shantell Hatton

Dear Dr. Lesansky,

This firm represents the Fraternal Order of Police, District of Columbia Department of Corrections Labor Committee (FOP/DOC Labor Committee). In that capacity, we also represent Shantell Hatton in the proposed removal action pending against him with the D.C. Department of Corrections (DOC), for which you have been assigned as the Hearing Officer. This letter serves as Officer Hatton's written response to the 20-day advance notice of proposed removal dated March 15, 2007. In addition, this letter serves as Officer Hatton's formal request for a hearing in this matter, as well as copies of all material you will be using in reaching a decision.

**PROCEDURAL BACKGROUND**

As you are well aware, this is the DOC's attempt to have a second bite of the apple. On August 24, 2006, Director Devon Brown proposed and recommended summary removal for Officer Hatton, for her alleged "role" in the June 2006 D.C. Jail escape. Officer Hatton properly followed the procedures set forth in both the Collective Bargaining Agreement ("CBA") of the parties and D.C. law, as set forth in the D.C. Personnel Manual ("DCPM"), in response to that proposal. The DOC and the D.C. Office of Administrative Hearings ("OAH") reached an agreement for the Administrative Law Judges at the OAH to serve as the Hearing Officers in the proposed summary removal action of Officer Hatton. Officer Hatton presented her case

before the OAH, and the Administrative Law Judges of the OAH rendered a decision recommending that Director Brown return Officer Hatton to work.[1] Director Brown issued a Remand Notice for Officer Hatton. See Appendix, Volume II, App. 41. Counsel for Officer Hatton filed a Motion to Strike the Remand Notice. See Appendix, Volume II, App. 50 and 51. The DOC filed a Reply to Employee's Motion to Strike Remand Notices. See Appendix, Volume II, App. 52. Counsel for Officer Hatton filed a Response to the DOC's Reply. See Appendix, Volume II, App. 53. A hearing was held on the matter before the Administrative Law Judges of the OAH on February 5, 2007.[2]

On March 2, 2007, the OAH issued its second Report and Recommendation in this matter.[3] The Administrative Law Judges determined that Director Brown acted unlawfully in not rendering her final decision in 45 days, as mandated by law. In addition, the Administrative Law Judges upheld their original decision recommending that Director Brown reinstate Officer Hatton as her summary removal could not be sustained.

As you are also aware, on March 16, 2007, senior management at the DOC simultaneously rescinded and cancelled this proposal for summary removal, and replaced it with the 20-day notice of proposed termination, for which you are serving as Hearing Officer. This unlawful action is no more than an attempt by the DOC to have a "Do Over" because Director Brown disagrees with the decision of the original Hearing Officers that the DOC *handpicked* to serve in that capacity in this matter. In fact, the proposed removal of Officer Hatton dated March 15, 2007 is virtually *identical* to the one issued on August 24, 2006.

It is unconstitutional and unlawful for you to proceed at all in this matter. You must promptly advise Director Brown that he must return Officer Hatton to work pursuant to the OAH Judges' prior recommendations.

**FACTUAL BACKGROUND[4]**

On June 3, 2006, two inmates escaped from the D.C. Jail by smashing out the door and window of the Warden's office.[5] A correctional officer, while reporting for duty,

---

1 The decision of the OAH Administrative Law Judges is attached in the Appendix to the responses of all ten employees at Appendix, Volume I, App. 35. Hereafter, appendices will be cited accordingly.

2 The hearing transcript can be found at Appendix, Volume II, App. 54.

3 See Appendix, Volume II, App. 58.

4 A more detailed factual background is available in the pleadings filed on behalf of Officer Hatton (See Appendix, Volume I, App. 18) with the OAH in the DOC's first attempt to terminate him for the exact same behavior and for which Officer Hatton's conduct was found not to rise to the level warranting such a termination.

5 It should be noted that on June 4, 2006, the two escapees were recaptured without incident.

witnessed the inmates escaping, and pursued the two escapees on foot until he lost sight of them. The officer then returned to the D.C. Jail to report the escape.

The two escapees, Joseph Leaks and Ricardo Jones, were among the most dangerous offenders housed at the D.C. Jail. The escape was widely reported in the press, and the source of embarrassment for both DOC and City Administrators. The escape was a direct result of the DOC's failure to remedy safety issues which had been repeatedly brought to the Agency's attention by the FOP/DOC Labor Committee and its Chairperson. The failure to implement these safety measures not only allowed this escape, but also continues to subject the FOP/DOC Unit members to unsafe work conditions, increased risk of assault, and threat to their lives. The DOC Office of Internal Affairs ("OIA") conducted an investigation of the escapes. The institutional deficiencies cited in its report– all raised by Complainants prior to the escape – were the actual and proximate cause of the escape according to the OIA Investigative Report:[6]

a.   Chronic understaffing and inadequate recruiting and training plans;

b.   The absence of a Security Chief who would ensure utilization of modern security controls, implementation of coherent staffing protocols, implementation of intelligence gathering within the Jail, supply of necessary equipment including communications equipment, and development of operational protocols to promote an integral security program;

c.   Failure to provide in-house dining facilities for around the clock availability of back-up correctional staff in the event of an emergency;

d.   Failure to provide hand held radios to correctional officers with capability and authority to communicate directly with the Metropolitan Police Department and other agencies on a 24-hour basis;

e.   Failure to conduct regular audits of Housing units to ensure that inmates are housed commensurate with their dangerousness;

f.   The absence of sufficient surveillance cameras at known checkpoints and in administrative entrances, stairwells and elevators;

g.   Understaffing of specialists responsible for classifying inmates and implementation of an improved computer system for inmate classification;

---

[6]   There is an absolute distinction between the OIA Investigation Report and the recommendations for discharge of these DOC Employees. The recommendations for discharge were not rendered by the OIA, but rather by the Acting Deputy Warden, no doubt in consultation with Director Devon Brown. Also, it is crucial to note that several non-union members in leadership authority were allowed to resign and/or retire as a consequence of the jail escapes. No person in supervisory authority has been fired or otherwise disciplined despite the findings of the OIA Investigation.

h. Lack of training of Correctional Treatment Specialists on the use of risk assessment instruments designed to identify criminal risk and high threat offenders;

i. The absence of on-going staff training for classification, housing and separation of inmates;

j. The uncontrolled access by inmates to telephones within the Jail;

k. An incoherent and inadequate system for security of inmates reporting for Infirmary Care;

l. An incoherent and inadequate system for allowing inmates virtually free access through the Jail and free access into the Administrative module;

m. Inadequate controls of inmates approved for detail assignments in the Jail, which allow such inmates free access through the Jail Housing Module and, in some instances, the Administrative Module;

n. The absence of modern and affordable electronic tracking systems for inmates;

o. The absence of modern, electronic locking systems for the Housing Module and checkpoints to the Administrative Module;

p. Failure of the Community Alert System, also known as the Escape Alarm;

q. The absence of modern safety glass or other reinforcement of windows in the Administrative Module; in addition, security walls, razor wire, and perimeter cameras are absent in vital security areas;

Without conducting an adequately thorough investigation, and in an effort to deflect continued public attention from the actual reasons that led to the escape, Director Brown, on June 5, 2006, placed twelve D.C. Jail employees on paid administrative leave pending further investigation. These employees were issued written notification of their administrative suspensions with pay.

After the escape, most of the twelve suspended employees, other employees and witnesses were interviewed by Investigators with the DOC OIA.[7] The Union members (who

---

[7] Corporal Lachonne Stewart was not interviewed by OIA neither prior to or after being put on administrative leave with pay, nor was she interviewed following the summary removal action. To date Officer Stewart has not been interviewed by OIA.

were suspended) were not provided with required warnings regarding the use of their statements and their right to remain silent under D.C. and federal law before the interviews. See *Kastigar v. United* States, 406 U.S. 441 (1972).[8] Nor were they uniformly advised of their right to have a Union representative present for the interview. The interviews were tape recorded. Despite the CBA requirement to produce the tapes, they have never been provided to the Union, despite repeated requests since June 28, 2006. Transcripts purportedly prepared from the tapes, and appended to the OIA Investigation Report for these employees, show that Investigators turned off the tape recorder on numerous occasions, in order to engage in off-the-record attempts to intimidate the officers being interviewed.

Public scrutiny of the inmate escapes continued, and, on June 19, 2006, D.C. City Councilmember Phil Mendelson and Director Brown, addressed questions on the jail break in a public forum. In the following week, the FOP/DOC Labor Committee continued to raise a number of concerns about the serious safety and security issues facing correctional officers. On June 26, 2006, a DOC Oversight Hearing chaired by Councilmember Mendelson, was held to continue review of the jail break and general safety issues at the D.C. Jail. At this hearing, Councilmember Mendelson questioned DOC Director Brown and asserted that the DOC was unduly delaying the completion of its investigation into the inmate escapes.

Facing public pressure and pressure from the D.C. City Council, during his testimony at the June 26, 2006, hearing, Director Brown announced that as a result of the escape, the DOC "conducted a comprehensive review and assessment of its operations … and with swift and decisive action it has proceeded to initiate major improvements [to the D.C. Jail]." Despite Director Brown's assertion that substantive changes were made, the "improvements" made were largely cosmetic. While these superficial modifications were needed, no real attempt has been made to address and correct any of the critical safety concerns and infrastructure issues that had long existed and which were raised by the FOP/DOC prior to the June 2006 escape.

On July 26, 2006, the Mayor[9], Director Brown and the City Administrator, Robert Bobb, spoke at the Mayor's Weekly Press Briefing, at which time they announced the summary firings of eleven of the thirteen DOC employees who had been on suspension in connection with the jail break. None of the fired employees or their Union were notified in advance of this public announcement. During the Press Briefing, Director Brown coupled the announcement of the firings with a statement that there was an ongoing criminal investigation into the jail escapes. The Press Briefing, summary firings, and the announcement of a criminal investigation, were intended to and had the result of humiliating

---

8 As an arm of the local government the DOC Office of Internal Affairs' power to compel testimony from employees during an investigation of this kind is not absolute. The employee has the right of refusal based on the Fifth Amendment privilege against self-incrimination. Further, any statutory provision compelling testimony that may be incriminatory must match the strength of the Fifth Amendment and provide full immunity against subsequent prosecution in order to be valid. The DOC employees should have been informed of this before they were interviewed by the OIA.

9 The Mayor referenced herein is former Mayor Anthony Williams.

and embarrassing the discharged Union members, of which Officer Hatton is one, casting them in the public light as felons who abetted a jail escape.[10]

Director Brown, the Mayor, the City Administrator and other city officials deliberately chose a course of action designed to maximize press coverage while intimidating the employees, including Officer Hatton. This scheme was intended to thrust the city and its administrators into a positive light and to suggest to the public that the jail escapes could only have been accomplished by a criminal conspiracy within the rank and file of the D.C. Jail employees. In reality, the jail escapes were a predictable product of unsafe conditions at the D.C. Jail which have been the topic of ongoing complaints to Director Brown by Union members and representatives. Officer Hatton is nothing more than a casualty of a failed system and a scapegoat for DOC Administrators to avoid taking responsibility for their actions.

## EMPLOYEE'S HISTORY WITH THE DC DOC

Officer Shantell Hatton has been employed with the DC DOC since 1995 as a Correctional Officer. She worked previously at the Lorton and Oak Hill facilities, and has done two tours of duty at the DC Jail. Officer Hatton did not receive sufficient training for her position as a Correctional Officer. In 1995, Officer Hatton was laid off for about one year because of a RIF. However, as soon as she could, she returned to work at the DC DOC. Officer Hatton always has received excellent performance evaluations, and has never been in trouble with the law.

## THIS EMPLOYEE'S CONDUCT WAS NOT NEGLIGENT

Officer Hatton was a relief officer at the time of the escapes and worked from 7:30 a.m. until 4:00 p.m. Wednesday through Saturday. She was guaranteed to work two days per week in SE1, the unit that housed Ricardo Jones. On the morning of the escape, Officer Hatton was assigned to work in SE1 with Sergeant Dionne Makins and Officer Cynthia Washington.

Although four correctional officers are required to operate each housing unit, there were not enough officers to do so on the day of the escape. The jail was 56 officers short that day; a large number of staff had requested time off (on the day of the escape) because of the National Race for the Cure taking place that day.

Despite the grave shortage of officers that day, there were ample supervisors. However, no supervisors offered to or did fill in for the officers. DC Jail management had the opportunity to put the jail on lockdown that day because of the critical staff shortages. However, Captain Betty Ames made the decision that morning not to do so.

---

[10] In order to accomplish this public humiliation and summary firing, Director Brown and other DOC Administrators engaged in an unlawful and unconstitutional revision of existing D.C. laws. This matter currently is being litigated in another forum.

Officer Hatton reported to SE1 at the appropriate time, and performed administrative tasks until the arrival of the Officer in Charge of the housing unit, Sergeant Makins. Officer Hatton witnessed Sergeant Makins' attempts to secure additional assistance for SE1 that morning. Sergeant Makins asked for a fourth officer to be assigned to SE1. In addition, she requested that the (male) relief officer on duty that day switch duty assignments with one of the other two (female) officers in SE1 that day. She was concerned that she was short one officer and the two she did have were also female. All of Sergeant Makins' efforts were summarily dismissed by management. Officer Hatton was aware that those efforts were unsuccessful.

Despite the shortage, the three officers in that unit began to execute their official duties within the unit. Officer Hatton performed the tasks to which she was assigned by the Officer in Charge in the unit, Sergeant Dionne Makins. Officer Hatton worked in the "bubble" that morning completing paperwork and other administrative tasks. As the most junior officer on duty that day, Officer Hatton followed exactly the orders of the Officer in Charge, Sergeant Makins.

In addition, Officer Hatton assisted the other two officers in their task of preparing to get those inmates housed in SE1 to the proper place, i.e, the visiting hall, infirmary, work detail, religious services, etc. It is routine for "call out" passes to be issued for the various departments within the jail, given to the inmate, and the inmate released from the housing unit to go unsupervised to the department for which the pass was issued. Because of privacy laws, the correctional officers are not permitted to make any inquiries as to the inmate requests to attend religious services. All an inmate has to do to receive a pass to attend religious services is ask for one. Likewise, the officers cannot request any information with regard to infirmary services received by the inmates because of HIPAA.

There are any number of reasons for an inmate to obtain a pass for the infirmary. These passes are issued for emergency or regular medical care. Inmates may have passes in their possession to submit to a correctional officer or the officer can issue a pass. Correctional officers have discretion to issue infirmary passes for urgent care or inmate distress. However, the much more common way in which a pass is issued is as a result of a telephone call from the infirmary to the housing unit. The flaw with this system is that the caller identification on the telephones in the housing units do not work properly. In addition, the correctional officers issuing the passes are unfamiliar with every staff member in the infirmary. Therefore, it is routine for correctional officers to issue passes to inmates for the infirmary based on a telephone call that cannot be verified. Supervisors and managers are well aware of this pattern and practice; however, no adjustments to the system have been made. Correctional officers are disciplined if inmate passes are not issued.

Typically, the Officer in Charge pre-completes the passes to be issued that day. Then, the Officer in Charge directs the other officers to complete those passes with the relevant current information. On the morning of the escape, Sergeant Makins performed some administrative duties, including preparing paperwork and completing those non-critical portions of the written passes for the inmates to be used that day: i.e., date, the housing unit, etc. In addition, she signed a number of passes in advance. This was the procedure followed everyday in every housing unit. It was especially critical that day because of the officer shortage in the unit and

because a high number of passes were expected to be requested as religious services were scheduled for that morning.

Sergeant Makins, Officer Washington and Officer Hatton worked together to complete the infirmary passes issued as a result of calls from the infirmary. Officer Hatton was responsible for tracking inmates scheduled whereabouts on the movement board, which is a piece of paper that records which inmates are in or out of the housing unit. Officer Hatton made the appropriate entries and the inmates were sent on their way.

Once the inmate is released from the housing unit, he is unsupervised and left on his honor to report to the area for which he has a pass. The inmate must be released by Floor Control personnel to move about freely in the jail. However, all an inmate needs to do is flash the pass, and he will be released. There is no way for the personnel in Floor Control to verify the information on the passes. So long as an inmate has a white piece of paper that looks like a pass, he is assumed to have one. Further, there is no way to track an inmate once he is released from the housing unit. It is not uncommon for inmates to leave at the beginning of an officer's shift and not return until the end of the shift or later. There is no pattern or practice of issuing an alert for that inmate until he has missed the next scheduled count. If a DC DOC employee had not witnessed the two inmates escaping, no one would have looked for either of them for quite some time.

After a number of the inmates who were issued passes for other parts of the facility exited the SE1 housing unit, another group of inmates were released from their cells so that they could participate in indoor recreation. Shortly thereafter, there was a call to put the jail on lockdown. The inmates assigned to the infirmary from SE1 were returned to the unit.

The officers in SE1 followed the proper procedures immediately upon hearing of the lockdown. Officer Hatton collected passes from any inmate who still had one. Officer Hatton then logged all of the inmates back into the unit on the Movement Sheet, including Ricardo Jones. Then, Officers Hatton and Washington performed a cell by cell search of the housing unit.

Immediately upon reaching the cell of inmate Jones, Officer Hatton realized inmate Jones had not yet returned from the infirmary. Officer Hatton reported this to Sergeant Makins as well as her clerical error on the Movement Sheet. Sergeant Makins then instructed Officer Hatton to correct the report as she (Officer Hatton) saw fit.

There was no immediate cause for alarm because it was not unusual for inmates to stay in the infirmary even in a lockdown situation. The usual and customary practice was to call the infirmary to see if the inmate still had not returned by the afternoon count. Even if inmate Jones still had not returned at that point, there was still no reason to suspect an escape. It was at that point that telephone calls would be made throughout the facility as the inmates had access to various parts of the jail and could be anywhere.

At that point, a call came into the unit and immediately thereafter another count was initiated. As that count began, Sergeant Makins was called to another part of the jail. An officer

came to relieve Sergeant Makins and Officer Hatton continued with her duties. At some point later that day, Officer Hatton took a telephone call from Lt. Profit to the housing unit. Lt. Profit made inquiries about inmate Jones' pass to the infirmary and claimed to have had the pass itself. The telephone call ended and Officer Hatton completed her shift and cooperated fully in the DC DOC's investigation from that day to the present.

Officer Hatton followed the pattern and practice of the jail everyday of her employment with the DC DOC, and did so on the day of the escape. She executed her duties to the best of her ability with the resources available to her at the time.

## LEGAL ARGUMENTS AND DEFENSES

### A.        This Action is in Violation of the CBA and D.C. Law.

Neither the CBA nor D.C. law permits "a second bite of the apple." See March 20, 2007 Ltr. to Maria Amato.[11] This is nothing more than a retaliatory exercise by Director Brown to "forum shop" in an effort to get the result that he wants—termination of Officer Hatton—and to deflect attention from his mismanagement of the agency.

The CBA and D.C. law clearly set forth the consideration for summary removals. Officer Hatton and the DOC already have engaged in the only legal administrative process available in these circumstances. That process ended when the OAH Judges recommended reinstatement of Officer Hatton. Neither the CBA nor D.C. law provides *any* authority for the Director to initiate this same disciplinary action again.

In addition, the Administrative Law Judges of the OAH determined that Director Brown violated the 45-day rule, which is mandated by D.C. law, and states, in relevant part, that in all summary removals a final decision must be rendered in 45 days. Once the 45th day passed, with no decision, the only remedy for violation of the law is reinstatement.

In the prior proceedings in this matter, the DOC undertook no effort to justify the narrow circumstances under which summary removal is permitted, as required by D.C. Law. Obviously, the Administrative Law Judges of the OAH agreed by recommending twice that Officer Hatton be reinstated and that summary removal not be upheld. The DOC is just repackaging the same allegations and support thereto, albeit minimally. Doing so does not make the information any more legal or palatable.

---

[11]    The Letter from J. Michael Hannon, Esq. to Maria Amato, Esq. dated March 20, 2007 is attached.

**B. <u>This Proposed Termination is a Violation of Due Process Rights.</u>**

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court found that government employees are afforded procedural guarantees <u>before</u> they can be terminated. The Due Process analysis found in *Loudermill* applies to D.C. government employees and, in this case, the DOC employees specifically. "It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause...Under the CMPA, employees can only be disciplined for cause and prior notice must be given." *Fonville v. D.C.*, 2006 U.S. Dist. LEXIS 58564 (D.D.C. Aug. 22, 2006) (internal citations omitted). See also, *D.C. Department of Corrections v. Teamsters' Union Local*, 554 A.2d 319, 323 (D.C. 1989).

In this context, "agencies cannot relax or modify regulations... [W]hen agencies establish ... pre-termination procedures they are bound to follow them." *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 161, 2005 U.S. Dist. LEXIS 3565 (D.D.C. March 4, 2005), citing *Lopez v. FAA*, 355 U.S. App. D.C. 51, 318 F.3d 242, 247 (D.C. Cir. 2003). Also, "[t]he D.C. Circuit has not required any additional due process requirements [beyond those defined in *Loudermill*] for the termination of its public employees." *Crockett v. D.C. Metro. Police Dep't.*, 293 F. Supp. 2d 63, 68 U.S. Dist. LEXIS 23632 (2003), citing *Kropat v. Fed. Aviation Admin.*, 333 U.S. App. D.C. 239, 162 F.3d 129, 132-34 (D.C. Cir. 1998). There is no regulation, nor any legal authority, that permits an Agency to retrace the procedures for discharging the employee, once the Agency and the employee have followed the established procedures.

There is no legal authority whatsoever that allows for the DOC to continue to propose discipline for the same offense until they get the result Director Brown desires. The administrative process has been completed in this matter, and any attempt to re-adjudicate is unlawful. What the DOC is doing here is clearly a violation of the United States Constitution. The remedy for such a violation is reinstatement of the employee with full back pay and benefits. See Petition for Writ of Mandamus.[12]

**C. <u>The DOC Is Precluded from Rendering a Different Decision Under the Doctrine of Res Judicata.</u>**

Under the legal doctrine of res judicata, one party in a legal proceeding is prevented from getting another day in court after receiving an unsatisfactory result to his/her claim. There is an abundance of legal precedent supporting this doctrine. The U.S. District Court for the D.C. Circuit has held that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Arakawa v. Reagan*, 666 F. Supp. 254, 262 (1987), citing *Allen v. McCurry*, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980). The *Arakawa* court goes on to find

---

[12] Counsel for the FOP/DOC LC, on behalf of the employees terminated as a result of the jail escape, has filed a Petition for a Writ of Mandamus in the District of Columbia Court of Appeals. A copy of that Petition is attached.

that, "[t]his preclusive effect attaches to administrative proceedings when, as with proceedings before the MSPB, the administrative tribunal 'is acting in a judicial capacity and resolves issues of fact properly before it which the parties have had an adequate opportunity to litigate' and there is an opportunity for judicial review of adverse decisions." Id. (internal citations omitted).

This is a clear case of res judicata. Director Brown is doing nothing more than attempting a "do over" with this proposed termination. The Director did not agree with the decision of the OAH Hearing Officers, and is now looking for a more receptive audience within the confines of the DOC in order to obtain the result he wants. Fundamental principles of law do not allow this, and Director Brown's attempt to "do over" the termination proceedings should be struck down as unlawful.

**D.          The "Douglas Factors" Must Be Considered by the DOC.**

The D.C. Court of Appeals has made clear that a D.C. agency must take into consideration the so-called "*Douglas* Factors" when making a disciplinary determination. *D.C. Department of Public Works v. Colbert*, 874 A.2d 353 (D.C. 2005). In *Douglas v. Veterans Administration,* the Merit Systems Protection Board ("MSPB"), in the context of federal employment, ruled that an agency must consider specific mitigating and aggravating factors in determining an appropriate penalty. The D.C. Court of Appeals in *Colbert* emphasizes the importance of responsibly balancing the relevant factors in each individual case. In its evaluation of the dismissal of a D.C. Department of Public Works employee and subsequent proceedings, the Appellate Court further explained that an agency must consider the *Douglas* Factors at the onset of termination and in consideration of pretermination protections. *Colbert* at 359. The agency must provide evidence of the *Douglas* Factors in advance of termination in order to preserve the procedural protections of due process. Failure of the agency to meet this standard before this termination is grounds for reinstatement.

Here, the DOC has failed to provide any information relevant to each of the *Douglas* Factors and failed to present evidence that it has engaged in an assessment of progressive discipline with regard to Officer Hatton. Officer Hatton has a commendable service record. Moreover, the CBA between FOP/DOC Labor Committee and the city requires consideration of progressive discipline. Collective Bargaining Agreement, Article 11, Section 14.

The *Douglas* Factors are:

1.       The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2.       The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3. The employee's past disciplinary record;

4. The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties;

6. Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7. Consistency of the penalty with any applicable agency table of penalties;

8. The notoriety of the offense or its impact upon the reputation of the agency;

9. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. Potential for the employee's rehabilitation;

11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and,

12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

5 MSPR 280, 305-06 (1981). "The *Douglas* factors parallel the Office of Personnel Management's 'suitability' regulations establishing a separate procedure for determining the relevance of criminal convictions to federal employment of applicants and present employees. Any discipline of an employee must be justified in all these realms." 39 Am. U.L. Rev. 869 (1990).

In their Report and Recommendation to strike down the summary removal previously proposed by the DOC in this case, the OAH Hearing Officers unanimously concluded that the there was insufficient information to permit evaluation of the *Douglas* factors in the evidence presented. That evidence has not changed. Therefore, because the same imperfections exist, the same results must occur.

**E. <u>The Hearing Officer Assigned to this Matter Is Not "Disinterested".</u>**

Officer Hatton respectfully asserts that the Hearing Officer assigned in this matter is not a disinterested party. You are an employee of the DOC, and ultimately are subject to supervision by the Director of the DOC, Devon Brown, who is the Deciding Official in this

matter. Notwithstanding being put forth as the disinterested designee by Deputy Warden Waldren (the Proposing Official), all employees of the DOC fall under the management and direction of Director Brown, the deciding official, which violates the letter and spirit of the CBA.[13]

Because there is no constitutional or other legal authority for a second hearing in this matter and because you are not a disinterested Hearing Officer and for all the other reasons mentioned above, Officer Hatton must be reinstated unconditionally.

Pursuant to the 20-day advance notice of proposed removal, I understand that we are entitled to all documentation being used in making this decision. Of course, this would include but not be limited to Officer Hatton's personnel file, any and all reports related to the incident, any video or audio tapes of interviews, and any other documentation being used by you in reaching a decision. We respectfully request copies of all such material. Please contact me upon receipt of this letter to discuss the arrangements for obtaining all of this material.

If you have any questions, please do not hesitate to contact me. Thank you for your courtesies.

Sincerely,

J. Michael Hannon

cc: Cpl. Nila Ritenour
Shantell Hatton

[13] The evidence at any hearing will show that Deputy Warden Waldren was not the proposing official. He was summoned to the Grimke Building the day these notices were sent out, with no knowledge that he was to sign these letters. In fact, the evidence will show that Deputy Warden Waldren was not even given the opportunity to read these letters. The Proposing Official is Director Brown. This is also a violation of the CBA, the Due Process Clause, and D.C. Law.

# EXHIBIT 58

D.C. DEPARTMENT OF CORRECTIONS

ORAL PRESENTATION
on behalf of
CORPORAL CYNTHIA WASHINGTON

Washington, D.C.
Tuesday, July 10th, 2007
2:10 p.m.

Job No. 1-107049
Pages 1 - 64
Reported by: Laurie Bangart-Smith

Oral Presentation on Behalf of
CORPORAL CYNTHIA WASHINGTON

Held at the offices of:
D.C. Department of Corrections
192 Vermont Avenue, N.W.
Grimke Building, Room N119
Washington, D.C. 20001

Taken pursuant to notice, before Laurie Bangart-Smith, Registered Professional Reporter, Certified Realtime Reporter, and Notary public in and for the District of Columbia.

A P P E A R A N C E S

ON BEHALF OF DIONNE MAKINS:
J. MICHAEL HANNON, ESQUIRE
The Hannon Law Group, L.L.P.
1901 18th Street, N.W.
Washington, D.C. 20009
(202)232-1907

HEARING OFFICER:
Henry R. Lesansky, Ph.D.
Health Services Administrator
D.C. Department of Corrections
1923 Vermont Avenue, N.W.
Washington, D.C. 20001
(202)671-2069

E X H I B I T S
(None)

5

P R O C E E D I N G S

MR. HANNON: This is the oral hearing for Corporal Cynthia N. Washington, who is present. The Hearing Officer is Dr. Henry Lesansky. My name is J. Michael Hannon, counsel for Ms. Washington.

What we're going to do, Ms. Washington, is I'm going to sort of assist you in letting Dr. Lesansky know who you are, and then we'll talk about the allegations that were made against you, and Dr. Lesansky will probably have some questions before we finish. What I'd like you to do is basically direct your comments to Dr. Lesansky, since he is the Hearing Officer, and he has our written submission that you've seen.

How long have you been in the Washington area?

MS. WASHINGTON: All my life.

MR. HANNON: Where did you go to high school?

MS. WASHINGTON: I went to Suitland High School.

MR. HANNON: And any education after that?

6

MS. WASHINGTON: I attended UDC for a while, and then I went to P.G. College for a while.

MR. HANNON: And how did you get into correctional work?

MS. WASHINGTON: All my siblings worked in corrections.

MR. HANNON: Really?

MS. WASHINGTON: Every last one of us.

MR. HANNON: How many of them were there?

MS. WASHINGTON: There was three.

MR. HANNON: You're not related to Odie Washington?

MS. WASHINGTON: No.

MR. HANNON: Where do you fit in with the three?

MS. WASHINGTON: My oldest brother retired, the chaplain here.

MR. HANNON: Really?

MS. WASHINGTON: Yes, and my second oldest brother, who came in corrections first, got killed on Southwest Freeway, you know.

MR. HANNON: Yeah.

7

MS. WASHINGTON: And I came in. I was the third one to come in. I'm due to retire next month, and my youngest brother left corrections to go work with the police department.

MR. HANNON: When did you start working with corrections? What year?

MS. WASHINGTON: 1983.

MR. HANNON: Was that the first employment you had since your college work?

MS. WASHINGTON: No.

MR. HANNON: What had you done before that?

MS. WASHINGTON: I used to do -- back then it was called "private duty work," and I had one patient. Actually it was my mother's patient, but she gave the patient to me, turned it over to me, and I sat there with this lady by the name of Eleanor Wolf. She was 88 years old, and then I was about maybe 21 then, and I worked with her until I came into corrections.

In fact, before I came into corrections, I took a computer training at Yorkstown Business Institute. I completed that, and I had hands-off

8

training with that, because Corrections called me before I could have the opportunity to work in word processing.

MR. HANNON: So what work did you do for the Department of Corrections in the beginning?

MS. WASHINGTON: I was a correctional officer.

MR. HANNON: Where were you assigned in the beginning?

MS. WASHINGTON: D.C. Jail.

MR. HANNON: How long were you with the D.C. Jail on your first tour?

MS. WASHINGTON: My first tour I worked D.C. Jail from 1983 to 1985, and then I left D.C. Jail and went to work at YC2, and I worked at YC2 for maybe a year or so. Then I left there to open up the modular, the old modular, and I stayed at the old modular, and then I came up to work at the halfway house. I worked in the work release program for ten years, and then they closed 1010 down, then I was transferred back to maximum security.

And then when maximum security closed, I --

no. Before max closed is when I resigned, and I left there to go home and continue my foster care, because I worked with foster children for 20 years as well. And during that course of time I adopted three girls and continued to do foster care. Year 2000 I came back in the department, and like I said, I'm due to retire next month.

MR. HANNON: So when you came back into the department in 2000, where did you go?

MS. WASHINGTON: I came back to the jail.

MR. HANNON: And you've been at the jail since 2000 up to the time that you were put on administrative leave?

MS. WASHINGTON: Correct.

MR. HANNON: And you're married?

MS. WASHINGTON: This is my second marriage. I got married the first time 17 years old, and the marriage wasn't at all what I hoped it to be, so by the age of 20, 21, somewhere around there, I was wise enough to get out of a bad relationship with two small children, and I, you know, left that husband. Then I went to work at Westwood Retirement Home for Senior

Citizens. And then that husband told me that I would be back, because no man don't want no young woman with two small children. I was making hardly no money back then, but I left and I never looked back. In fact, when I left him I was still very much in love with him, but I had to choose between my husband and my children's well being, and I decided to take the children and go.

MR. HANNON: And you eventually found another --

MS. WASHINGTON: And I've remarried since then, and I've been with my husband for about 24, 25 years or so.

MR. HANNON: He was in corrections as well?

MS. WASHINGTON: Yes, my present husband and I came out of the same class. We met in the same class. I was 24 years old and he was 42 years old, and I didn't go there looking for no husband or nobody. I was trying to take care of my children and myself, and my husband and I have been together ever since.

MR. HANNON: And over the course of the

years how many foster care children have you and your husband --

MS. WASHINGTON: I can't say how many children have been in and out of my house, but as we speak, I have two teenagers there and a four-month-old baby. When the teenager came to me, it was not told to me that she was pregnant, and we welcomed her with open arms, because I have no grandchildren. I have a 31-year-old biological son and a 29-year-old biological daughter, but no grandchildren.

MR. HANNON: Well, bless you.

When you went back to the jail, did you receive any training of any kind?

MS. WASHINGTON: The only thing that I recall is range, you know, range training and CPR.

MR. HANNON: Since you went back did you have any in-service training?

MS. WASHINGTON: No.

MR. HANNON: Have you had any disciplinary actions taken against you during your total of 20 years?

MS. WASHINGTON: No.

MR. HANNON: Okay, and I wanted to go right to the day of the so-called jail escape, June 3rd of 2006. How did you happen to be working in Southeast 1 that day?

MS. WASHINGTON: I worked Southeast 1 at night where I worked the midnight shift. I was drafted that day, and that was my shift, I mean my post for that day.

MR. HANNON: So you were working a second straight shift?

MS. WASHINGTON: I was working a second straight shift, and -- yes.

MR. HANNON: When you say "drafted," what does that mean?

MS. WASHINGTON: The shift was short. They didn't have adequate amount of staffing, so I was forced to work another shift.

MR. HANNON: And who worked that shift with you?

MS. WASHINGTON: Ms. Makins and Ms. Hatton worked that shift with us.

MR. HANNON: To your knowledge, had

13

Ms. Hatton ever worked at Southeast 1?
MS. WASHINGTON: Yes.
MR. HANNON: And Sergeant Makins was regularly assigned to Southeast 1?
MS. WASHINGTON: Yes.
MR. HANNON: Okay. The allegations that had been made against you were that you were negligent in allowing Ricardo Jones to go out of the unit on a pass, on a medical pass. Could you tell Dr. Lesansky what you remember about Ricardo Jones going out of the unit that day on a medical pass.
MS. WASHINGTON: I remember Sergeant Makins saying to us to open cell 19. That's Ricardo Jones' cell number, that he had to go up for sick call, and, you know, to sign him out for sick call.
MR. HANNON: Then what happened?
MS. WASHINGTON: Ms. Hatton opened cell 19, and, well, Ms. Makins took the pass up, and the inmate was given the pass, and he prepared himself to get dressed or whatever he had to do to prepare himself to leave out of the unit, and when he came to the Bubble to hand us the pass, I was standing outside the Bubble

14

and I took the pass and put my initial on it. I may have put the date -- not the date, but I may have put the time on it as well. That sound like something I would do, put my initial and then put my time on it, and then I hand the pass back to Ms. Hatton.
MR. HANNON: And to your knowledge, what did Ms. Hatton do with it?
MS. WASHINGTON: She took the pass and put his name on the Movement Board and put the time on the Movement Board and hand the pass back to the inmate.
MR. HANNON: So you knew Ricardo Jones by face because you had worked there midnights?
MS. WASHINGTON: Not necessarily, no, because I don't work that block every day. I only worked that block Friday nights and Saturday nights. I don't have a certain post. I bounce from one block to another block.
MR. HANNON: Now, what was the procedure for inmates on the housing unit being called up for medical appointments?
MS. WASHINGTON: I mean normally the phone would ring and they would tell us send so-and-so up to

15

the medical unit, but a lot of times when people -- when officers work the block on a regular basis, they already know who goes up on certain days.
MR. HANNON: Right.
MS. WASHINGTON: So they don't have to wait for that phone call, because it's just common practice.
MR. HANNON: And to your knowledge, was there a phone call for Ricardo Jones?
MS. WASHINGTON: Not to my knowledge, other than me hearing it. I don't know who received the call, no.
MR. HANNON: Well, under the procedures that you followed in the housing units, could an inmate get a medical pass without there being a phone call? Putting aside the inmates that the correctional officers know go up there routinely, but for somebody that the medical unit is summoning, could that person be given a pass without a phone call from Medical?
MS. WASHINGTON: Yes. Many times an inmate could approach any one of us and say I'm having chest pains or my head hurt or my stomach hurt, and we

16

would, you know, hand him a pass.
MR. HANNON: And what would be the procedure there in terms of notifying the medical unit?
MS. WASHINGTON: Are we speaking through in the course of the years, or are we speaking -- because remember I been doing this for 20 years.
MR. HANNON: Oh. Has the process changed?
MS. WASHINGTON: It probably could have. I don't know. I mean they tried to change the deal since this happened, so that's why I'm asking you.
MR. HANNON: They tried to change the process after this?
MS. WASHINGTON: I mean that's what I heard. That's what I thought. I don't know.
MR. HANNON: Okay.
MS. WASHINGTON: But it's been common practice, anybody can come up and ask for a pass. And then with that HIPAA law, you can't challenge an inmate and say, well, what's wrong with you. It's none of our business. It's illegal to challenge them as to why they need medical attention.
MR. HANNON: And when an inmate reports to

17

the corrections officer that he or she is ill --
MS. WASHINGTON: We generally make the phone call back upstairs and say so-and-so needs to come up to see so-and-so.
MR. HANNON: Okay. So we've got situations where an inmate comes up and tells you that he or she is sick, situations where the corrections officers know certain people have to go up on certain days. What about a situation where there's an appointment that the corrections officer doesn't know about? How would a pass be created then?
MS. WASHINGTON: A lot of times an inmate will come to the Bubble and inform the officer that they have an appointment, and the officer would call upstairs and touch base in a situation like that.
MR. HANNON: Okay, and would there be occasions when an inmate might have an appointment that he might not know about?
MS. WASHINGTON: Yes.
MR. HANNON: Well, how does the unit learn about that?
MS. WASHINGTON: At that time maybe somebody

18

from the medical unit call back down and say send so-and-so upstairs to so-and-so office.
MR. HANNON: Then what happens?
MS. WASHINGTON: Then, you know, we'll write the call-out pass and give him the call-out pass.
MR. HANNON: In Ricardo Jones' situation, do you know which of those ways it was that he got a call-out pass, whether he was known by people to have a regular appointment or whether they called down or whether he said he had an appointment and somebody called up? Do you know?
MS. WASHINGTON: I can tell you my sense or feeling at that time.
MR. HANNON: Certainly.
MS. WASHINGTON: Being that I know that they have people that goes up for insulin every day and people go up for other medical reasons, just something they do on a regular basis, I assumed that he was one of the guys that would go up on a regular basis.
MR. HANNON: Okay. That's what you thought?
MS. WASHINGTON: That was my perception at that time.

19

MR. HANNON: Did you receive a phone call from the medical unit?
MS. WASHINGTON: No, not in regards to him.
MR. HANNON: Okay. Did you make a phone call to the medical unit in regards to him?
MS. WASHINGTON: No.
MR. HANNON: So I take it then that no one can go up to the medical unit without getting a pass?
MS. WASHINGTON: That's not necessarily so. Like I said --
MR. HANNON: You can go with an escort.
MS. WASHINGTON: In that unit you don't need an escort.
MR. HANNON: Right, but in order to go to the medical unit, do you have to have a pass?
MS. WASHINGTON: Yes.
MR. HANNON: And are there any other ways that somebody could get a pass other than the ones that we've described?
MS. WASHINGTON: Sure. I mean it's nothing but a piece of paper, you know, a blank piece of paper that sometimes people might throw paper in the trash

20

and an inmate might go to the trash and get the paper out or whatever, or just have it laying around in the unit, because lots of times officers take passes on the floor and they write passes out on the floor, you're sitting at the table writing passes out, an emergency can arise, and they can just get up and just leave the passes at the table, whatever, and anybody can just take a piece of paper and put it in their pocket or whatever the case is.
For instance, we sitting here and all this paper is here, a fire drill could come on -- and I'm saying that in reference to this building here -- and all of us leave out of here to the fire drill, and all the paper left here, anybody can just take and pick a piece of paper up and stick it in their pocket. It's nothing but a pass. It's a plain piece of paper.
MR. HANNON: Well, how would that pass be completed so the inmate could then purportedly go out to the medical unit?
MS. WASHINGTON: I mean the only thing you're putting on the pass is the inmate name and the DC number. I mean there's nothing confidential you

21

putting on there. They know the DC number and I know the DC number.

MR. HANNON: Right.

MS. WASHINGTON: So that's all -- and they could put infirmary, the infirmary at the third floor. They'll put third floor infirmary.

MR. HANNON: Have you ever known that to happen?

MS. WASHINGTON: I'm saying anything can happen. You asked me if there was a way that it could happen. I was just giving you a possibility.

MR. HANNON: Have you ever known that to happen?

MS. WASHINGTON: No.

MR. HANNON: Any other ways -- so other than that situation, have we covered all the circumstances under which somebody on a housing unit would get a medical pass?

MS. WASHINGTON: I mean a supervisor can call down and say send so-and-so to the infirmary. I mean you don't question why, you know. A lot of times a supervisor will come on the housing unit and make

22

their rounds, and an inmate might say to the supervisor I haven't had my heart medication today or whatever the case is, and the supervisor might say, well, send so-and-so to the infirmary.

MR. HANNON: And when you were summarily fired, how did you hear about that?

MS. WASHINGTON: Over the radio.

MR. HANNON: And what impact has that had on you?

MS. WASHINGTON: I was devastated. I'm surprised that I still have a husband, because, you know, I just wore him out, and it mentally drained me and it scarred me, because -- I didn't tell you this, but I came to work sick that day. That night I came to work sick, and I was preparing myself for my retirement next month, and I had sick leave that I could have used, and my loyalty to the job, you know, during that time my loyalty to the job, and I was just trying to do what was right, what I thought was right. And I went to work and I just, you know, calmed myself, trying to weather the storm.

MR. HANNON: So you could have sicked out?

23

MS. WASHINGTON: I could have sicked out very easy, but it was a new shift. I didn't know the supervisors per se. Not that it mattered, because all I had to do is pick the phone up and say I'm sick. You know, if you're sick, you're sick, but I came to work, and like I said, I wasn't feeling well at all, and --

MR. HANNON: But did you do your job that day?

MS. WASHINGTON: I did my job.

MR. HANNON: Did the fact that you guys were short-handed, what impact did that have on your ability to do your job?

MS. WASHINGTON: It stagnated us. In fact, we had called to the supervisors and requested for them to shut the jail down that day.

MR. HANNON: Who did?

MS. WASHINGTON: Sergeant Makins asked the supervisors if they would shut down the jail due to the shortage, because we was one man down or one officer down that day, and they chose not to shut down the jail that morning.

24

MR. HANNON: So how were the three of you able to get your work done?

MS. WASHINGTON: We did the best -- in fact, I thought we did an outstanding job. That's why I recall ourselves trying to get the passes done up and, you know, make our rounds. In fact, when the guys, when we heard that the two men escaped, we had no idea that the guys came out of our block, because we thought it was something going on in the next block. It was a quiet, peaceful day, you know, nothing out of the ordinary going on other than what I told you earlier.

MR. HANNON: Okay. Dr. Lesansky might have some questions for you.

MS. WASHINGTON: Yes.

DR. LESANSKY: Yeah, thanks a lot for coming.

Ms. Washington, could you basically go through for me, in terms of your duties as an officer on Southeast 1 --

MS. WASHINGTON: Yes.

DR. LESANSKY: -- what your duties and

25

responsibilities are as you understand them, and including in that what -- you have a supervisor there, I assume, correct?

MS. WASHINGTON: Correct, but interesting enough, the day of the escape the supervisor never came to that unit. Never. We haven't seen that supervisor yet. And that's another thing that really bothered me is the fact that I got drafted that day, I was the third officer that day, and although we went through all of this escape process, the whole ordeal, no supervisor came down, and I just don't understand why I'm holding the brick and nobody else being accountable for this. I have a serious problem with this.

DR. LESANSKY: Well, can I ask you on that -- I don't want to know about how you understood your duties and responsibilities. You said you never had a supervisor that day, but there was somebody in charge of that day, right, when you reported to work?

MS. WASHINGTON: Yes. Correct.

DR. LESANSKY: And who was that?

MS. WASHINGTON: Remember, I got drafted. I

26

didn't go to roll call. I never left out that block. From my understanding, it was Betty Ames, but I never left out the block. It was Betty Ames that was the supervisor that day.

DR. LESANSKY: Okay, Betty Ames was the supervisor, but --

MS. WASHINGTON: One of the supervisors that day, yes.

DR. LESANSKY: And how about on the block; there was nobody on charge on the block?

MS. WASHINGTON: I want to say Lieutenant -- I'm not sure. I want to say Lieutenant Datcher, but the only reason why I want to throw his name out is because I had a conversation with him on the phone in reference to something else.

DR. LESANSKY: Okay, so there was no Officer In Charge?

MS. WASHINGTON: Sergeant Makins is in charge.

DR. LESANSKY: As you understand it, what does that mean?

MS. WASHINGTON: Sergeant Makins is the OIC

27

of the block, so she's the supervisor of the block, but I'm speaking of our superior didn't come down to check the block out, the situation.

DR. LESANSKY: So in terms of -- you said Sergeant Makins was the Officer In Charge that day, correct?

MS. WASHINGTON: Yes.

DR. LESANSKY: And in terms of what you are supposed to do on the block when you're -- you said you got drafted that day, so you never actually left the block, because you never went to roll call?

MS. WASHINGTON: Correct.

DR. LESANSKY: What is Sergeant Makins as the OIC -- what's her connection to you?

MS. WASHINGTON: She is my supervisor.

DR. LESANSKY: Okay, she's your supervisor?

MS. WASHINGTON: Yes.

DR. LESANSKY: She's your supervisor on the block?

MS. WASHINGTON: On the block, correct.

DR. LESANSKY: So you take direction from her?

28

MS. WASHINGTON: Correct.

DR. LESANSKY: She can give you orders?

MS. WASHINGTON: Correct.

DR. LESANSKY: Okay. So now I actually interrupted you when I asked you about what -- what are you supposed to do as an officer on Southeast 1?

MS. WASHINGTON: We supposed to count and maintain security, to make sure no one is hanging themselves, make sure the inmates are safe.

DR. LESANSKY: And when you say "maintain security," can you elaborate a little bit what kinds of things that involves.

MS. WASHINGTON: We go from cell to cell, make sure that everybody is in their cell where they supposed to be, we making sure nobody hanging themselves, nobody getting assaulted, you know, that type of thing.

DR. LESANSKY: And when Mr. Hannon was asking you earlier about this process for inmates going to the infirmary, can you tell me how you would normally handle that process or did handle that process on Southeast 1.

29

MS. WASHINGTON: You talking about Southeast 1 in particular or just any unit?

DR. LESANSKY: Well, Southeast 1, but also elsewhere. Maybe you can tell me if there was a difference between what you did on Southeast 1 as far as the infirmary and elsewhere.

MS. WASHINGTON: There's no difference. Well, there is a difference. The difference is, Southeast 1, the inmates are low custody there, so they don't need no escort. So if someone say send so-and-so to the infirmary, you write them a pass, you hand them the pass and sign them out with no problem, but whereas female units, for instance, I've worked in, they can't leave the unit by themselves. Someone always have to escort them to where they're going and back. So yeah, that's the difference between those two.

And in reference to a high-custody block, they have to be in three piece or handcuffs at least, in a three-piece suit. It all depends on what custody level they in, and they will be escorted. And being that we didn't know what custody level these

30

particular inmates was in, they was housed in the wrong unit, because they had no business being in the unit. You understand what I'm saying?

DR. LESANSKY: Just help me a little bit, because I got confused. I thought you said that one of the differences in what you were doing in Southeast 1 versus other places, other blocks is that Southeast 1 is low custody.

MS. WASHINGTON: Low custody, yes.

DR. LESANSKY: Is that what you said, low custody?

MS. WASHINGTON: Yes.

DR. LESANSKY: But then you were saying something about -- I just didn't hear you fully. Then you said certain inmates didn't have any business being there?

MS. WASHINGTON: Yeah, this inmate in particular we speaking of, Ricardo Jones.

DR. LESANSKY: So Ricardo Jones was not low custody?

MS. WASHINGTON: No. We learned this after that night.

31

MR. HANNON: Do you know?

MS. WASHINGTON: Well, according to what was written and everything, as far as the charges and stuff, I'm saying.

MR. HANNON: According to the IA investigation?

MS. WASHINGTON: Yes.

MR. HANNON: Okay.

DR. LESANSKY: But as far as certainly you knew at the time when you came on -- I mean you did a double shift, so as far as you knew, correct, the inmates on Southeast 1 were low custody?

MS. WASHINGTON: Correct.

DR. LESANSKY: And you then dealt with them accordingly as you have at least described at least to some extent; for example, they would not have an escort --

MS. WASHINGTON: Yes.

DR. LESANSKY: -- as would be the case in other blocks of a different custody level?

MS. WASHINGTON: Yes.

DR. LESANSKY: And you said, I believe, that

32

you would get a call or somebody would get a call, and then a pass would be written.

MS. WASHINGTON: Yes, or sometimes they would send you a sick call list. They have sick call lists as well.

DR. LESANSKY: Sometimes they would send the sick call list?

MS. WASHINGTON: Yes.

DR. LESANSKY: It would go to the block?

MS. WASHINGTON: Yes.

DR. LESANSKY: Really?

MS. WASHINGTON: And in certain blocks the sick call staff will come to the block and see the inmates.

DR. LESANSKY: So had you seen a sick call list ever on Southeast 1?

MS. WASHINGTON: Yeah, I've seen sick call lists, but that particular day I don't recall. I believe they did have a sick call list there, but his name wasn't on it.

MR. HANNON: Under what circumstances would the sick call list actually be on the block?

MS. WASHINGTON: Well, remember, I work different blocks, and I'm not speaking of this block in particular. They have sick call lists where the guys or whoever might go, like I said, for insulin, they might go for wound changes, they might go to take their methadone, just whatever is going on with them. They got clinics, you know, clinics, different clinics they go to. I'm kind of talking about day shift stuff now, too.

MR. HANNON: Well, what we're trying to understand is: If you have experience with there actually being a sick call list on the block, can you tell us under what circumstances that occurred?

MS. WASHINGTON: You asking me why they would have a sick call list?

MR. HANNON: On the block.

MS. WASHINGTON: They do have sick call lists -- I mean a lot of times they will take and receive the phone calls, the names of the inmates that's coming up for sick call over the phone.

MR. HANNON: Right, but when you get the names over the phone, does that mean you don't have a

list?

MS. WASHINGTON: You're making -- you know, you could be making up the list then. It all depends on where you working.

MR. HANNON: Okay, but the medical office has a sick call list, right?

MS. WASHINGTON: Yes.

MR. HANNON: Are there ever any times when that list is sent down to the block?

MS. WASHINGTON: Maybe a copy of it, yes.

MR. HANNON: Under what circumstances have you seen that happen?

MS. WASHINGTON: A lot of times they, you know, send the list down.

MR. HANNON: Okay. Do you remember if there was such a list that had been sent down by the medical unit on the day that Ricardo Jones went out?

MS. WASHINGTON: I don't remember seeing the list per se. I don't recall the list per se.

MR. HANNON: Okay.

MS. WASHINGTON: But I do recall them saying he was not on the list after the fact. I do recall

that.

MR. HANNON: Okay.

DR. LESANSKY: Thank you. I just want to get a little more understanding in terms of this particular case here with Ricardo Jones.

MS. WASHINGTON: Yes.

DR. LESANSKY: If you could just expand a little bit for me, talk to me a little bit about how he came, at least to the extent that you know, how did he get a pass or, or I should ask you: Did he have a pass to the infirmary?

MS. WASHINGTON: He did have a pass.

DR. LESANSKY: And did you look at it?

MS. WASHINGTON: Yes, I did.

DR. LESANSKY: And can you tell me; was it signed?

MS. WASHINGTON: I recall putting my initial on the pass, yes.

DR. LESANSKY: Were there any other initials or signatures, I mean as you remember?

MS. WASHINGTON: Everybody had either their signature on the pass -- I mean somebody would have

the signature on the pass or their initials.

DR. LESANSKY: Do you remember who?

MS. WASHINGTON: Sergeant Makins had -- it was just the three of us there. All of us had our hands on that pass.

DR. LESANSKY: Okay, and when you initialed the pass, what's the purpose of it? Why are you initialing the pass? What does it mean for you to initial it?

MS. WASHINGTON: To be honest with you, that day it was really quiet. I only think ten inmates was out at that time. We really -- there wasn't really that much to do, so I think that's how our hands got on that pass, trying -- you know what I mean, because the block was secured and -- you know what I mean? The block was peaceful. The vast majority of the inmates was still asleep. So anytime we have time that everybody can put their initials on one pass, that means you having a pretty good day, from my experience. Does that make sense?

MR. HANNON: It does to me.

DR. LESANSKY: You're saying the majority of

the inmates were asleep?

MS. WASHINGTON: Yes.

DR. LESANSKY: What time was this?

MS. WASHINGTON: If I remember correctly, it was close to 10:00 but not too much later than 10:00.

DR. LESANSKY: 10:00 in the morning?

MS. WASHINGTON: Right, something like that.

DR. LESANSKY: Okay.

MS. WASHINGTON: So I mean our day hadn't gotten started good.

DR. LESANSKY: So by the time you touched the pass, it already had been signed by Sergeant Makins, correct?

MS. WASHINGTON: As far as I know, yes. As far as I can remember, yes.

DR. LESANSKY: And it had also been signed by Officer Hatton or not?

MS. WASHINGTON: Well, I want to say that when I initialed the pass, I handed the pass back in the Bubble to Corporal Hatton, and Corporal Hatton wrote the inmate's name on her Movement Board, because she was keeping track of where the inmates go, so she

put his name on the Movement Board, and at that point she could have signed it. I don't know.

DR. LESANSKY: And then how many inmates in addition, if you remember, to Ricardo Jones left to go to the infirmary? Because you said they wouldn't have to be escorted. They just left.

MS. WASHINGTON: Right. I want to say eight. The number eight kind of sticks out in my mind, and during that course of time religious service was into play also, and we had signed out inmates going to religious service.

DR. LESANSKY: I wanted to ask you -- I have a copy of a letter that the Department sent you on March 15th, which was the letter giving you the 20-day notice of the proposal to terminate you, and the letter says that you were being charged with negligence, and as you remember or know from the copy there, they went through various "specifications" is the word that they use.

MS. WASHINGTON: Yes.

DR. LESANSKY: And actually at the bottom of Page 1 they talk about "the OIA" -- and I'm quoting.

It's the last paragraph. "The OIA investigators conducted taped interviews with you regarding this matter on Saturday, June 3rd, 2006." And that's correct, from what you remember? They did interview you on June 3rd, which is the day, the same day of the escape?

MS. WASHINGTON: Yes.

DR. LESANSKY: And on the top of Page 2 it says what you said here today, that Corporal Hatton and Sergeant Makins, who was the OIC, worked in the unit with you, and it says you stated that you did not recall the infirmary calling for inmate Jones; is that correct?

MS. WASHINGTON: Yes.

DR. LESANSKY: Okay, and it says you did receive a phone call. The only one that you received was from a lieutenant calling you about -- asking for your Social Security number in order to pay you for your overtime, correct?

MS. WASHINGTON: Yes, and I remember that I did receive another phone call from a staff member in reference to another inmate.

DR. LESANSKY: Okay, and do you remember who called you or what the inmate --

MS. WASHINGTON: I can't remember who called me, but the officer called me because we sent an inmate to the infirmary that supposed to have been assaulted during the course of that time, and we didn't send an injury report, and he called requesting an injury report on the day of the escape.

DR. LESANSKY: You said he called --

MS. WASHINGTON: Requesting an injury report. We sent the inmate to the infirmary, because he's supposed to have been assaulted, allegedly assaulted, and the injury report didn't go with him, and they called looking for an injury report.

DR. LESANSKY: Okay. Did that happen on the second shift or the first shift, or when did that inmate go to the infirmary?

MS. WASHINGTON: On the second shift.

DR. LESANSKY: On your shift?

MS. WASHINGTON: Yes.

DR. LESANSKY: The one you were drafted for?

MS. WASHINGTON: Yes.

DR. LESANSKY: And do you know who -- do you recall the incident, or --

MS. WASHINGTON: No.

DR. LESANSKY: But on that shift there was this other inmate, not, obviously, Ricardo Jones, but another inmate who allegedly had been assaulted, and that inmate got a pass --

MS. WASHINGTON: Yes.

DR. LESANSKY: -- to go to the infirmary because the -- did the infirmary call? How did that --

MS. WASHINGTON: Sergeant Makins brought that to our attention. I don't know how she got her information.

DR. LESANSKY: And then you received a phone call from the infirmary officer?

MS. WASHINGTON: Yes, yes.

DR. LESANSKY: You don't remember who, do you?

MS. WASHINGTON: I can't remember who it is.

DR. LESANSKY: If you can't remember, that's fine. You received a phone call saying that this --

MS. WASHINGTON: Inmate came up there.

DR. LESANSKY: -- inmate is up here, but he doesn't have an injury report. I assume it was a he.

MS. WASHINGTON: It was. And Lieutenant Datcher, if I'm not mistaken, completed the injury report on his end, because he was up there.

DR. LESANSKY: But why did they call you about the injury report; is that something that is supposed to be prepared?

MS. WASHINGTON: If I'm not mistaken, I think I was the one that signed the pass for that inmate to go up, and the injury report didn't go up with him.

DR. LESANSKY: Why? Is there supposed to be an injury report?

MS. WASHINGTON: There's supposed to be an injury report, but the guy, he didn't get injured in front of us. I don't recall seeing no injury or anything, and I can't speak for nobody else. I don't know why an injury report didn't go up.

DR. LESANSKY: And is there a Program Statement or a Post Order, or what -- why is there --

what says there's supposed to be an injury report?

MS. WASHINGTON: There's supposed to be an injury report so the medical staff would know why he's there, what happened to him, give them some kind of synopsis as to why he's there, what happened to him.

DR. LESANSKY: But do you know of -- I mean is it written down somewhere?

MS. WASHINGTON: Yes. An injury report is supposed to go with them.

DR. LESANSKY: Do you know where -- like if I wanted to look at what it said, do you know where I would find it?

MS. WASHINGTON: In the blocks. It should be in the housing units. It could be anywhere.

DR. LESANSKY: Is it a policy, is it a procedure, is it a Post Order?

MS. WASHINGTON: Yes, yes.

DR. LESANSKY: And you're familiar with it, you've seen it, you've read it?

MS. WASHINGTON: Yes.

MR. HANNON: Let me ask you a question. If you don't witness the injury, nobody witnesses the

injury?

MS. WASHINGTON: I mean all you do is go based on what you see and what's been told to you. You know what I mean?

MR. HANNON: Well, suppose no one sees any incident, but they see a black eye, for example, and the inmate denies that there was any incident; how do you do an incident report?

MS. WASHINGTON: You just write what you see and send them up there for medical attention. If he did not have medical attention, then that's on them. At least he had the right to the medical attention.

MR. HANNON: So the important thing is to get them up there?

MS. WASHINGTON: Correct.

DR. LESANSKY: On Page 2 of the letter that the Department sent you, they say -- on Page 2 on the second paragraph, it says, "As previously stated, the OIA investigation substantiated that Inmate Jones was not on the sick call list scheduled for medical care on June 3rd, 2006."

I believe you said earlier that on this

day -- that's June 3rd -- you don't remember or you don't remember whether there was a sick call list on the block, correct, although I believe you said there had been occasions on Southeast 1 where a sick call list was on the block?

MS. WASHINGTON: I believe there was a sick call list on the block, but I know for a fact, after the fact, that his name was not on the sick call list. After the escape, after everything had been said and done, then we know that his name was not on the sick call list.

DR. LESANSKY: Okay, Officer Washington, if you can just help me. Are you saying that you do recall that there was a sick call list on Southeast 1 on Shift 1? I mean you worked Shift 1 as well, right?

MS. WASHINGTON: Right.

DR. LESANSKY: And you got drafted for Shift 2?

MS. WASHINGTON: Correct.

DR. LESANSKY: So on Shift 1 do you recall whether there was a --

MS. WASHINGTON: There wouldn't be, no.

DR. LESANSKY: So there wasn't one, in your memory, on Shift 1?

MS. WASHINGTON: No, not on Shift 1.

DR. LESANSKY: And do you recall whether there was one on Shift 2 when you were drafted on Shift 2? I know you said you never left the block.

MS. WASHINGTON: Right. I want to say that there was one, because they kept saying that his name wasn't on the sick call list.

DR. LESANSKY: Who was saying that?

MS. WASHINGTON: The infirmary staff. I'm almost sure there was a sick call list in the unit. Almost sure.

MR. HANNON: Let's talk about two things. You know that the medical unit has a sick call list?

MS. WASHINGTON: Yes.

MR. HANNON: Okay, and they might call down and tell you who's on the sick call list?

MS. WASHINGTON: Yes.

MR. HANNON: And so somebody in the unit would write that down?

MS. WASHINGTON: Yes.

MR. HANNON: So you would have your own list --

MS. WASHINGTON: Yes.

MR. HANNON: -- that you make?

MS. WASHINGTON: Yes.

MR. HANNON: And you might add people to it who come up to you and say I want to go to sick call?

MS. WASHINGTON: Well, it's not something you do every day.

MR. HANNON: I understand. So when we're talking about the sick call list, I think Dr. Lesansky is talking about the list that's generated by the medical unit.

MS. WASHINGTON: Yes.

MR. HANNON: And what he wants to know is whether you know of your own knowledge whether there was a copy of that in the unit.

MS. WASHINGTON: I want to say yes, but I can't swear, and the medical staff at any given time can always pick the phone up and call you and tell you to add an inmate name to the list at any time.

DR. LESANSKY: Add a name? You said at any

time the officer --

MS. WASHINGTON: Yes, the medical staff.

DR. LESANSKY: -- or one of the officers from the third floor medical can call the block and tell you to add a name --

MS. WASHINGTON: Yes.

DR. LESANSKY: -- to the sick call list, meaning just your list or --

MS. WASHINGTON: Yes, or just send so-and-so up. It don't have to be a list. They can just say send so-and-so up to the infirmary for wound care or for podiatry, any medical attention, any medical reason.

DR. LESANSKY: And it is correct on Page 2 that you didn't receive a phone call from the infirmary regarding Inmate Ricardo Jones, right?

MS. WASHINGTON: That's correct.

DR. LESANSKY: And do you know whether anyone else received a call?

MS. WASHINGTON: No.

DR. LESANSKY: And they went -- the Department in the letter on Page 2 goes on to say that

you did not recall Inmate Jones complaining to you or any of the officers in the unit of being sick.
MS. WASHINGTON: Correct.
DR. LESANSKY: And that was true on Shift 1 as well as Shift 2, because I know you worked consecutive shifts.
MS. WASHINGTON: Yeah, right.
DR. LESANSKY: They then say that you never made a call-out pass for Inmate Ricardo Jones, and is that true?
MS. WASHINGTON: As far as I know. I don't recall, because, like I said, I do know for a fact I had my signature on there, but as far as me making the pass out up front, I don't recall.
DR. LESANSKY: I thought you did say that you did see your initials on the pass, correct?
MS. WASHINGTON: I just said that, yes.
DR. LESANSKY: So what this says -- because I want to read it correctly. It just says that you never made or you don't recall making a call-out pass for Inmate Ricardo Jones?
MS. WASHINGTON: No, and let me elaborate on

that. At that point nobody remembered their signature being on that pass until we went to Internal Affairs and I actually seen the call-out pass.
DR. LESANSKY: So when you were interviewed by Internal Affairs, this taped interview on the 3rd, Saturday, the 3rd, which was later the day of the escape, they showed you a pass?
MS. WASHINGTON: I'm talking about when I went to --
DR. LESANSKY: You said Internal Affairs.
MS. WASHINGTON: No. The FBI.
DR. LESANSKY: On the 3rd?
MS. WASHINGTON: Not the 3rd, but since then.
DR. LESANSKY: Okay, and it was the FBI that showed you --
MS. WASHINGTON: We seen the pass.
DR. LESANSKY: -- the pass?
MS. WASHINGTON: Yes.
DR. LESANSKY: And that's when you saw your initials on it?
MS. WASHINGTON: Yes.

DR. LESANSKY: And I guess I may have forgotten to ask you. Were there any other passes that you initialed, or was his the only one?
MS. WASHINGTON: That pass I initialed. As far as I know, that's the only pass I initialed, but I wrote out some call-out passes as well. Like I said, they had sick call, but they religious service going on, and then they was going to have visiting going on that day as well. I forgot to say that earlier. Visiting was going on that day as well. It hadn't started, but we knew it was going on.
DR. LESANSKY: So visiting was going to happen; is that right? Visiting was going to happen that day? I just want to make sure I get it correct.
MS. WASHINGTON: As far as I know, yeah, because I know we were short, but I don't think they closed the visiting down, because visiting was something big on Saturday.
DR. LESANSKY: Okay. I just want to make sure I understand it correctly that Inmate Ricardo Jones' pass to go to the infirmary that day was the only infirmary pass that you initialed?

MS. WASHINGTON: As far as I know, yes. As far as I can remember.
DR. LESANSKY: You don't remember initialing -- did you sign any passes as opposed to initialing them, if you remember?
MS. WASHINGTON: It's been over a year. I can't remember at this point now.
DR. LESANSKY: Okay. Further along on Page 2 of the letter the Department sent on March 15th, they said, quoting, "The OIA investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment."
MS. WASHINGTON: I don't understand how they can say that.
DR. LESANSKY: So that's something you would not agree with?
MS. WASHINGTON: No.
DR. LESANSKY: So you stated -- what did you state to the investigator?
MR. HANNON: Well, there's the transcript.

53

DR. LESANSKY: Do you recall --

MS. WASHINGTON: I can't tell you what I said yesterday, let alone over a year ago.

DR. LESANSKY: Okay. No, I'm not -- I'm just asking.

The Department's letter goes on to say that, "The investigation further concluded that each correctional officer assigned to Southeast 1 housing unit, to include you, was culpable, because it was the responsibility of each officer assigned, individually and collectively, to ensure the accurate accountability of each inmate assigned to the housing unit."

Do you agree with that or --

MS. WASHINGTON: I disagree, because if my sergeant tell us to sign somebody out, then you doing what your supervisor telling you to do, and as far as we was concerned, we was doing what we was supposed to do. I mean we had no idea that these guys was going to escape.

And not only that, when the inmates leave out of our unit, we're responsible for them as long as

54

they in our view, but once they leave out that housing unit, you have a control officer in that Bubble in the hallway -- you know what I'm trying to say -- in the corridor, and they're then responsible for the inmates, and then you have the officers who's in the admin area responsible for the inmates.

They didn't escape from out of our -- you understand what I'm saying? They did not go out our window. And that's what's really bothering me, is disturbing me. It wasn't like we sitting here and they went out of the window.

DR. LESANSKY: Can you just tell me a little bit about after Inmate Jones and the other inmates -- were there other inmates that left with Inmate Jones to go to the infirmary?

MS. WASHINGTON: Yes, the regular inmates that was supposed to go to sick call, yes.

DR. LESANSKY: So he didn't go out alone; he went with other inmates?

MS. WASHINGTON: I can't really say if he walked side by side with somebody, but I know people went ahead of him and behind him.

55

DR. LESANSKY: Okay. You talked earlier about HIPAA.

MS. WASHINGTON: Yes.

DR. LESANSKY: And you said that basically your understanding of HIPAA is you're not supposed to know anything about or tell other people about an inmate's medical condition; is that a fair --

MS. WASHINGTON: Yes.

DR. LESANSKY: And you were trained in HIPAA; did I understand that?

MS. WASHINGTON: Yes.

DR. LESANSKY: You got a certificate in it?

MS. WASHINGTON: I'm not going to go as far as to say I got a certificate, as I recall, but I did have knowledge on that.

DR. LESANSKY: And then also I understand from your comments that you talked about knowing about inmates going to various clinics, and you said they're going to an insulin clinic and they're going to podiatry, I think you said.

MS. WASHINGTON: Yeah.

DR. LESANSKY: So you do know about certain

56

inmates who have certain conditions, such as needing insulin or --

MS. WASHINGTON: Certain things you do have to know.

DR. LESANSKY: But that's not a violation of HIPAA?

MS. WASHINGTON: As far as -- I guess as far as the procedures, evidently not. We do know that much. We know that they have to go up for insulin or they going to pass out in the unit. If I don't eat food and take my medication, I'm going to pass out. So certain things you do have to know to get them the adequate amount of care that they deserve.

DR. LESANSKY: Okay. You talked about -- earlier I think Mr. Hannon was asking you about the various ways that inmates can get passes. Did I understand you to say that an inmate can come up to an officer and ask for a pass to go to the infirmary?

MS. WASHINGTON: They do, yes. For 20 years they come up to me and ask me for passes.

DR. LESANSKY: My understanding is that there is a sick call process.

MS. WASHINGTON: But remember, now, we speaking of 20 years that I've been in the agency.

DR. LESANSKY: I see that.

MS. WASHINGTON: Right, we speaking of 20 years, and, you know, 20 years ago, 15 years ago, whatever the case is, it's been common practice, somebody can say, look, I hurt my toe, I need a pass to go see the doctor, and you just write the pass and send them up, and then at this time we speaking over almost twice the amount of inmates that was housed in the housing unit.

DR. LESANSKY: Are you aware of a process called the "sick call request process"?

MS. WASHINGTON: Yes.

DR. LESANSKY: Can you tell me what you know about it.

MS. WASHINGTON: They supposed to sign the sick call to this day. I mean the process now, they have a sick call list, they sign the sick call list, and the medical staff will call them to come up, or the medical staff will actually come in the unit and give them medical attention.

DR. LESANSKY: And you're saying --

MS. WASHINGTON: And sometimes even if the inmate did not sign the sick call list and if the medical staff come in the unit and I was approached when the medical staff say so-and-so got something going on with them, can you please talk to them, they says, well, tell them to, you know, wait at the end of the line, and then they'll see them.

DR. LESANSKY: And so you're saying in addition to this sick call process where an inmate fills out a slip -- is that how it works?

MS. WASHINGTON: Yes.

DR. LESANSKY: A piece of paper?

MS. WASHINGTON: Yes.

DR. LESANSKY: And where does it go?

MS. WASHINGTON: In a sick call box.

DR. LESANSKY: So there's a sick call box?

MS. WASHINGTON: Yes.

DR. LESANSKY: And how does the paper get out of the sick call box?

MS. WASHINGTON: A staff member will come in and --

DR. LESANSKY: A correctional officer?

MS. WASHINGTON: No. A staff will come in with their key and go to the sick call list, non-uniformed staff. Somebody will come in with their key and go get the sick call slips out.

DR. LESANSKY: Okay. You say they come in with a key?

MS. WASHINGTON: Right. Remember, it's confidential stuff.

DR. LESANSKY: And then they take the slips out?

MS. WASHINGTON: Right.

DR. LESANSKY: So you're saying in addition to that process, which is the sick call slip process with the box where someone comes with a key, you're saying in your 20 years of experience, an inmate can also come up to an officer such as yourself and ask for a pass to go to the infirmary?

MS. WASHINGTON: Yes. It has happened throughout the years, yes, sir.

DR. LESANSKY: And if they do that, what does an officer do?

MS. WASHINGTON: It all depends.

DR. LESANSKY: Well, I should ask you first, in the cases where it's happened to you, where an inmate -- has it ever happened that an inmate came up and asked you for a pass?

MS. WASHINGTON: Yes.

DR. LESANSKY: And what did you do?

MS. WASHINGTON: I write the pass and I send the inmate to the infirmary. Back in those days, prior to June 3rd and prior to this year per se, it was common practice just to write the pass up. If the doctor see the inmate, all well and fine, and if the doctor don't choose to see the inmate, it's the doctor's decision. It's not ours.

DR. LESANSKY: Okay. Just help me. I want to stick to Southeast 1. Is that the case for Southeast 1?

MS. WASHINGTON: No.

DR. LESANSKY: Okay. It was a different process at Southeast 1? For these low custody inmates, it was a different process?

MS. WASHINGTON: Right. They signed a sick

61

call list or you called and asked them if so-and-so could come up. They might say send so-and-so up over the phone, or they might say tell them to sign the sick call list.

DR. LESANSKY: But in Southeast 1 --

MS. WASHINGTON: I'm speaking of Southeast 1.

DR. LESANSKY: -- inmates who came up and asked you for a pass to go to the infirmary, what would happen, from your experience on Southeast 1?

MS. WASHINGTON: From my experience, it all depends on who the officer is. It all depends on who the person is. It all depends on what the circumstances is.

DR. LESANSKY: But you've heard of or you know of cases where an inmate on Southeast 1, the low-custody inmates, would come up to an officer on the block -- not you, correct? No one ever -- no inmate ever did that while you were on Southeast 1, did they?

MS. WASHINGTON: Remember, I worked the midnight shift, so on the midnight shift nobody walked

62

into the infirmary without, you know, being called from the infirmary.

DR. LESANSKY: So on the midnight shift, if an inmate came up and asked you for a pass to go to the infirmary --

MS. WASHINGTON: They're not going, not unless somebody from the infirmary said send them up. I think on the midnight shift they'll be escorted up.

DR. LESANSKY: Okay. So had an inmate ever come up on the second shift and asked for a pass to go to the infirmary?

MS. WASHINGTON: Yeah.

DR. LESANSKY: That has happened?

MS. WASHINGTON: Yes.

DR. LESANSKY: And did they come to you? Has it ever happened that an inmate comes up to you?

MS. WASHINGTON: Not one person in particular, but it has happened, yes.

DR. LESANSKY: And you and other officers would write a pass?

MS. WASHINGTON: Would write the pass, the inmate would go upstairs, and if there was a problem,

63

the officer would pick the phone up and say why are you sending so-and-so up there, and then it's their discretion to let the guy see the medical staff or for the medical staff to say send the guy back downstairs.

DR. LESANSKY: And the person, because it's low custody on Southeast 1, the pass would enable them to leave the block to go up to medical on the third floor?

MS. WASHINGTON: Yes.

DR. LESANSKY: Okay. I think that's all my questions.

MR. HANNON: And I have never seen a written policy with respect to that, and I assume that you haven't either in your position.

DR. LESANSKY: I don't know.

MR. HANNON: Thank you.

(Whereupon, the ORAL PRESENTATION of CORPORAL CYNTHIA WASHINGTON was concluded at 3:17 p.m.)

64

CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

I, Laurie Bangart-Smith, Registered Professional Reporter, the officer before whom the foregoing oral presentation was taken, do hereby certify that the foregoing transcript is a true and correct record of the presentation given; that said presentation was taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 15th day of July, 2007.

My commission expires: March 14, 2011

____________________________

LAURIE BANGART-SMITH
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

**A**
**ability** 23:13
**able** 24:2
**accountability** 53:12
**accountable** 25:13
**accounts** 52:11
**accurate** 53:11
**actions** 11:20
**add** 47:6,21,22 48:5
**addition** 38:4 58:10 59:13
**adequate** 12:16 56:13
**admin** 54:6
**administrative** 9:13
**Administrator** 3:13
**adopted** 9:4
**Affairs** 50:2,5,10
**affixed** 64:11
**age** 9:19
**agency** 57:2
**ago** 53:3 57:5,5
**agree** 52:18 53:14
**ahead** 54:22
**allegations** 5:9 13:6
**allegedly** 40:12 41:6
**allowed** 52:12
**allowing** 13:8
**Ames** 26:2,3,5
**amount** 12:16 56:13 57:10
**anybody** 16:17 20:7,14
**anytime** 36:17
**appointment** 17:9 17:14,17 18:9 18:10 52:14
**appointments** 14:20
**approach** 15:21
**approached** 58:4
**area** 5:16 54:6
**arms** 11:8
**aside** 15:16
**asked** 21:10 23:18 28:5 60:5 61:1,9 62:4,10
**asking** 16:10 28:19 33:14 39:17 53:5 56:15
**asleep** 36:17 37:1
**assaulted** 28:16 40:6,12,13 41:6
**assigned** 8:8 13:4 53:8,10,12
**assist** 5:7
**assume** 25:3 42:3 63:13
**assumed** 18:18
**attended** 6:1
**attention** 16:21 41:13 44:10,11 44:12 48:12 57:22
**Avenue** 2:6 3:15
**aware** 57:12

**B**
**B** 4:4
**baby** 11:6
**back** 7:12 8:21 9:6,8,10 10:2,3 10:4 11:12,16 14:5,10 17:3 18:1 29:16 37:19 60:9 63:4
**bad** 9:20
**Bangart-Smith** 1:22 2:18 64:2 64:17
**base** 17:15
**based** 44:3
**basically** 5:11 24:18 55:4
**basis** 15:2 18:18 18:19
**beginning** 8:5,9
**behalf** 1:6 2:1 3:2
**believe** 31:22 32:19 44:22 45:3,6
**best** 24:3
**Betty** 26:2,3,5
**big** 51:18
**biological** 11:9,10
**bit** 28:11 30:4 35:8,8 54:13
**black** 44:6
**blank** 19:21
**bless** 11:11
**block** 14:14,15,16 14:17 15:2 24:8 24:9 26:1,3,9,10 27:1,1,3,9,11,19 27:20 29:18 32:9,13,22 33:2 33:12,16 34:9 36:15,16 45:3,5 45:7 46:6 48:4 61:18 63:7
**blocks** 30:7 31:20 32:12 33:2 43:13
**Board** 14:9,10 37:21 38:1
**bothered** 25:8
**bothering** 54:9
**bottom** 38:21
**bounce** 14:16
**box** 58:16,17,20 59:15
**brick** 25:12
**brother** 6:16,20 7:3
**brought** 41:12
**Bubble** 13:21,22 17:13 37:20 54:2
**building** 2:7 20:12
**business** 7:21 16:20 30:2,15

**C**
**C** 3:1 5:1
**call** 13:14,15 15:6 15:9,12,15,19 17:3,14 18:1 19:1,5 21:20 26:1 27:11 32:1 32:1,4,4,7,13,15 32:17,19,22 33:3,12,15,17 33:20 34:6 39:16,21 41:10 41:16,22 42:7 44:20 45:2,4,7,8 45:11,14 46:9 46:12,15,17,18 47:7,11,20 48:4 48:7,15,19 51:7 54:17 56:22 57:13,18,19,19 57:20 58:3,10 58:16,17,20 59:3,5,14 61:1,4
**called** 7:13 8:1 14:19 18:9,11 23:15 40:2,3,4,7 40:9,14 57:13 61:1 62:1
**calling** 39:12,17
**calls** 33:19
**call-out** 18:5,5,8 49:9,20 50:3 51:6
**calmed** 22:20
**can't** 11:3 16:18 29:14 40:3 41:20,21 42:19 47:19 52:7 53:2 54:20
**care** 9:2,5 10:19 11:1 44:20 48:11 56:13
**case** 20:9 22:3 31:19 35:5 57:6 60:16 64:9
**cases** 60:3 61:16
**cell** 13:13,14,17 28:13,13,14
**certain** 14:16 15:3 17:8,8 30:15 32:12 55:22 56:1,3,12
**certainly** 18:14 31:9
**certificate** 55:12 55:14 64:1
**Certified** 2:19
**certify** 64:5
**challenge** 16:18 16:20
**change** 16:9,11
**changed** 16:7
**changes** 33:5
**chaplain** 6:17
**charge** 25:19 26:10,17,19 27:5
**charged** 38:16
**charges** 31:3
**check** 27:3
**chest** 15:21
**children** 9:3,21 10:3,8,19 11:1,4
**children's** 10:7
**choose** 10:6 60:13
**chose** 23:21
**circumstances** 21:16 32:21 33:13 34:11 52:12 61:14
**Citizens** 10:1
**class** 10:16,17
**clinic** 55:19
**clinics** 33:7,7,7 55:18
**close** 37:5
**closed** 8:20,22 9:1 51:17
**collectively** 53:11
**college** 6:2 7:9
**Columbia** 2:20 64:18
**come** 7:2 16:17 17:3,13 20:11 21:22 27:2 32:13 47:7 56:17,20 57:20 57:21 58:4,21 59:2,4,6,17 61:2

61:17 62:10,15
**comes** 17:6 59:15 62:16
**coming** 24:17 33:20
**comments** 5:12 55:17
**commission** 64:13
**common** 15:6 16:16 57:6 60:11
**complaining** 49:1
**completed** 7:22 20:18 42:5
**computer** 7:21
**concerned** 53:18
**concluded** 52:11 53:7 63:18
**condition** 55:7
**conditions** 56:1
**conducted** 39:2
**confidential** 20:22 59:9
**conflicting** 52:11
**confused** 30:5
**connection** 27:14
**consecutive** 49:6
**continue** 9:2
**continued** 9:5
**control** 54:2
**conversation** 26:14
**copy** 34:10 38:13 38:17 47:17
**Corporal** 1:7 2:2 5:3 37:20,20 39:9 63:18
**correct** 9:14 25:3 25:4,20 27:6,12 27:20 28:1,3 31:11,13 37:13 39:4,13,19 44:15 45:3,19 48:14,17 49:3 49:16 51:14 61:18 64:6
**correctional** 6:4 8:6 15:16 53:8
59:1
**corrections** 1:1 2:5 3:14 6:6,20 7:3,6,19,20 8:1 8:5 10:14 17:1,7 17:10
**correctly** 37:4 49:19 51:20
**corridor** 54:4
**counsel** 5:5 64:8
**count** 28:7
**course** 9:4 10:22 16:5 38:9 40:6
**covered** 21:16
**CPR** 11:15
**created** 17:11
**culpable** 53:9
**custody** 29:9,20 29:22 30:8,9,11 30:20 31:12,20 60:20 63:6
**Cynthia** 1:7 2:2 5:3 63:18

**D**

**D** 5:1
**Datcher** 26:12 42:5
**date** 14:2,2
**daughter** 11:10
**day** 12:2,4,7,8 13:11 14:14 18:16 22:14 23:9,16,21 24:10 25:5,8,9 25:18,19 26:4,8 27:5,10 32:18 33:8 34:17 36:11,19 37:9 39:5,5 40:8 45:1 47:9 50:6 51:9 51:10,14,21 57:18 64:11
**days** 15:3 17:8 60:9
**DC** 20:22 21:1,2
**deal** 16:9
**dealt** 31:14
**decided** 10:7
**decision** 60:14
**denies** 44:7
**department** 1:1 2:5 3:14 7:4 8:5 9:6,9 38:13 44:17 48:22 52:9
**Department's** 53:6
**depends** 29:20 34:3 60:1 61:12 61:12,13
**described** 19:19 31:15
**deserve** 56:13
**devastated** 22:10
**didn't** 10:18 12:16 22:13 23:2 26:1 27:2 29:22 30:14,15 40:7,13 42:12 42:17,20 48:15 54:7,18
**difference** 29:5,7 29:8,8,16
**differences** 30:6
**different** 31:20 33:2,7 60:19,21
**DIONNE** 3:2
**direct** 5:12
**direction** 27:21
**disagree** 53:15
**disciplinary** 11:19
**discretion** 63:3
**District** 2:20 64:18
**disturbing** 54:10
**doctor** 57:8 60:12 60:13
**doctor's** 60:14
**doesn't** 17:10 42:3
**doing** 16:6 30:6 53:16,18
**don't** 10:2 14:14 14:16 15:5,11
16:9,14 19:12 21:21 25:11,16 29:10 32:18 33:22 34:18,19 38:2 41:13,18 42:18,19 43:22 45:1,2 48:10 49:11,14,20 51:16 52:3,15 56:10 60:13 63:15
**double** 31:11
**downstairs** 63:4
**Dr** 5:4,8,10,12 13:9 24:13,16 24:22 25:15,21 26:5,9,16,20 27:4,8,13,16,18 27:21 28:2,4,10 28:18 29:3 30:4 30:10,13,19 31:9,14,19,22 32:6,9,11,15 35:3,7,13,15,19 36:2,6,22 37:3,6 37:8,11,16 38:3 38:12,21 39:8 39:15 40:1,9,15 40:19,21 41:1,4 41:9,15,18,21 42:2,7,14,21 43:6,10,15,18 44:16 45:12,17 45:20 46:1,4,10 47:11,22 48:3,7 48:14,18,21 49:4,8,15,18 50:4,10,12,15 50:18,20 51:1 51:12,19 52:3,8 52:17,20 53:1,4 54:12,18 55:1,4 55:9,12,16,22 56:5,14,21 57:3 57:12,15 58:1,9 58:13,15,17,19 59:1,6,10,13,21 60:2,7,15,19
61:5,8,15 62:3,9 62:13,15,19 63:5,10,15
**drafted** 12:7,13 25:8,22 27:10 40:21 45:17 46:5
**drained** 22:12
**dressed** 13:20
**drill** 20:11,13
**due** 7:2 9:6 23:19
**duties** 24:19,22 25:17
**duty** 7:13
**D.C** 1:1,10 2:5,8 3:6,14,16 8:10 8:12,14,14

**E**

**E** 3:1,1 4:4 5:1,1
**earlier** 24:12 28:19 44:22 51:9 55:1 56:15
**easy** 23:2
**eat** 56:10
**education** 5:22
**eight** 38:8,8
**either** 35:21 63:14
**elaborate** 28:11 49:22
**Eleanor** 7:16
**emergency** 20:6
**employed** 64:9
**employment** 7:8
**enable** 63:6
**ensure** 53:11
**escape** 12:2 25:5 25:10 39:6 40:8 45:9 50:7 53:20 54:7
**escaped** 24:7
**escort** 19:11,13 29:10,15 31:17
**escorted** 29:21 38:6 62:8
**ESQUIRE** 3:3
**eventually** 10:9

**everybody** 28:14 35:21 36:18
**evidently** 56:8
**example** 31:16 44:6
**expand** 35:7
**experience** 33:11 36:20 59:16 61:10,11
**expires** 64:13
**extent** 31:16 35:9
**eye** 44:6

**F**

**face** 14:12
**fact** 7:20 10:4 23:11,14 24:3,6 25:8 34:22 45:7 45:8 49:12
**fair** 55:7
**familiar** 43:18
**far** 29:5 31:3,9,11 37:14,15 49:11 49:13 51:5,15 52:1,2 53:17 55:13 56:7,7
**FBI** 50:11,15
**feeling** 18:13 23:6
**female** 29:13
**fills** 58:11
**financial** 64:9
**find** 43:12
**fine** 41:22 60:12
**finish** 5:11
**fire** 20:11,13
**fired** 22:6
**first** 6:20 7:8 8:12 8:13 9:17 40:16 60:2
**fit** 6:14
**floor** 20:4,4 21:5 21:6 48:4 63:8
**followed** 15:14
**food** 56:11
**forced** 12:17
**foregoing** 64:4,5
**forgot** 51:9
**forgotten** 51:2
**foster** 9:2,3,5 11:1
**found** 10:9
**four-month-old** 11:5
**Freeway** 6:21
**Friday** 14:15
**front** 42:18 49:14
**fully** 30:14
**further** 52:8 53:7

**G**

**G** 5:1
**generally** 17:2
**generated** 47:12
**getting** 19:8 28:16
**girls** 9:4
**give** 18:5 28:2 43:4 57:22
**given** 13:19 15:19 47:19 64:6
**giving** 21:11 38:14
**go** 5:18 7:3 9:2,9 10:8,18 12:1 13:8,14 15:17 17:8 18:17,19 19:8,11,14 20:1 20:18 24:18 26:1 28:13 32:9 33:4,5,5,8 37:22 38:4 40:13,17 41:9 42:12,12 42:20 43:9 44:2 47:7 51:21 54:8 54:15,17,18 55:13 56:9,18 57:8 58:15 59:3 59:5,18 61:9 62:4,10,22 63:7
**goes** 15:3 18:16 48:22 53:6
**going** 5:6,7 13:10 24:9,11 28:20 29:15 33:6 38:11 51:7,8,8 51:10,11,12,13 53:19 55:13,18 55:19,19 56:10 56:11 58:6 62:6
**good** 36:19 37:10
**gotten** 37:10
**grandchildren** 11:8,10
**Grimke** 2:7
**Group** 3:4
**guess** 51:1 56:7
**guy** 42:17 63:3,4
**guys** 18:19 23:11 24:6,8 33:4 53:19

**H**

**H** 4:4
**hadn't** 37:9 51:10
**halfway** 8:18
**hallway** 54:3
**hand** 13:22 14:5 14:10 16:1 29:12 64:11
**handcuffs** 29:19
**handed** 37:19
**handle** 28:21,21
**hands** 36:5,13
**hands-off** 7:22
**hanging** 28:8,15
**Hannon** 3:3,4 5:2 5:5,18,22 6:3,7 6:9,11,14,18,22 7:5,8,11 8:4,8 8:11 9:8,11,15 10:9,14,22 11:11,16,19 12:1,9,13,18,22 13:3,6,16 14:6 14:11,18 15:4,8 15:13 16:2,7,11 16:15,22 17:5 17:16,20 18:3,6 18:14,20 19:1,4 19:7,11,14,17 20:17 21:3,7,12 21:15 22:5,8,22 23:8,11,17 24:1 24:13 28:18 31:1,5,8 32:21 33:10,16,21 34:5,8,11,15,20 35:2 36:21 43:21 44:5,13 46:14,17,20 47:1,4,6,10,15 52:22 56:15 63:12,16
**happen** 12:3 21:8 21:10,11,13 34:12 40:15 51:13,13 61:10
**happened** 13:16 16:10 43:4,5 59:19 60:3,4 62:13,16,18
**happens** 18:3
**Hatton** 12:20 13:1,17 14:5,7 37:17,20,20 39:9
**haven't** 22:2 25:6 63:14
**head** 15:22
**Health** 3:13
**hear** 22:6 30:14
**heard** 16:13 24:7 61:15
**hearing** 3:11 5:2 5:4,13 15:11
**heart** 22:2
**Held** 2:4
**help** 30:4 45:13 60:15
**Henry** 3:12 5:4
**hereunto** 64:11
**he's** 40:12 43:3,5
**high** 5:18,20
**high-custody** 29:18
**HIPAA** 16:18 55:2,5,10 56:6
**holding** 25:12
**home** 9:2,22
**honest** 36:10
**hoped** 9:18
**house** 8:19 11:4
**housed** 30:1 57:10
**housing** 14:19 15:14 21:17,22 43:14 52:13 53:8,12 54:1 57:11
**hurt** 15:22,22 57:7
**husband** 9:21 10:1,6,12,15,18 10:20 11:2 22:11

**I**

**IA** 31:5
**idea** 24:7 53:19
**illegal** 16:20
**impact** 22:8 23:12
**important** 44:13
**incident** 41:2 44:6 44:7,8
**include** 53:9
**including** 25:2
**individually** 53:10
**infirmary** 21:5,5 21:6,20 22:4 28:20 29:6,11 35:11 38:5 39:12 40:5,11 40:17 41:9,10 41:16 46:11 48:11,16 51:21 51:22 52:14 54:15 56:18 59:18 60:9 61:9 62:1,2,5,7,11
**inform** 17:13
**information** 41:14
**initial** 14:1,4 35:17 36:9
**initialed** 36:6 37:19 51:3,4,5 51:22
**initialing** 36:8 52:4,5
**initials** 35:19 36:1 36:18 49:16

50:21
**injured** 42:17
**injury** 40:7,8,10 40:13,14 42:3,5 42:8,12,15,17 42:18,20 43:1,3 43:8,22 44:1
**inmate** 13:18 14:10 15:14,20 16:19,22 17:6 17:12,17 20:1 20:18,21 22:1 30:17 39:12,22 40:2,5,11,17 41:5,6,7 42:1,2 42:12 44:7,19 47:21 48:16 49:1,9,21 51:20 52:12 53:12 54:13,14 56:17 58:3,10 59:16 60:4,4,9,12,13 61:16,19 62:4,9 62:16,22
**inmates** 14:19 15:16 28:9,19 29:9 30:1,15 31:12 32:14 33:19 36:11,17 37:1,22 38:3,10 53:21 54:5,6,13 54:14,16,19 55:18 56:1,16 57:10 60:21 61:8,17
**inmate's** 37:21 55:7
**instance** 20:10 29:13
**Institute** 7:22
**insulin** 18:16 33:4 55:19 56:2,9
**interest** 64:9
**interesting** 25:4
**Internal** 50:2,5 50:10
**interrupted** 28:5
**interview** 39:4 50:5
**interviewed** 50:4
**interviews** 39:2
**investigation** 31:6 44:19 52:10 53:7
**investigator** 52:21
**investigators** 39:1
**involves** 28:12
**in-service** 11:17
**it's** 15:6 16:16,19 16:20 19:20 20:15,16 39:1 47:8 52:6 57:6 59:8 60:3,13,14 63:2,5
**I'd** 5:11
**I'm** 5:7 7:2 9:6 15:21 16:10 20:11 21:9 22:10 23:4 25:12 26:12 27:2 30:3 31:4 33:2,8 38:22 42:5,10 46:11 50:8 53:4,4 54:3 54:8 55:13 56:11 61:6
**I've** 10:11,12 29:13 32:17 57:2

**J**

**J** 3:3 5:5
**jail** 8:10,12,14,14 9:10,11 11:12 12:2 23:16,19 23:22
**job** 1:20 22:17,18 23:8,10,13 24:4
**Jones** 13:8,10,13 14:11 15:9 18:6 30:18,19 34:17 35:5 38:4 39:12 41:5 44:19 48:16 49:1,9,21 51:21 52:12 54:13,14
**July** 1:11 64:12
**June** 12:2 39:3,5 44:21 45:1 60:10

**K**

**keeping** 37:22
**kept** 46:8
**key** 59:3,5,7,15
**killed** 6:20
**kind** 11:13 33:8 38:8 43:4
**kinds** 28:11
**knew** 14:11 31:10 31:11 51:11
**know** 5:8 6:21 9:21 11:15 13:15 15:3,11 15:17 16:1,9,14 17:8,10,18 18:4 18:7,11,15 19:21 21:1,1,21 22:12,17,20 23:2,5 24:6,10 25:16 28:16 29:22 31:1 33:7 34:2,14 35:9 36:14,15 37:14 38:2,17 41:1,13 42:20 43:3,6,10 43:11 44:4 45:7 45:10 46:6,15 47:15,16 48:18 49:5,11,12 51:5 51:15,16 52:1 54:3,21 55:6,22 56:4,8,9,12 57:5 57:15 58:7 61:16 62:1 63:15
**knowing** 55:17
**knowledge** 12:22 14:6 15:8,10 47:16 55:15
**known** 18:8 21:7 21:12

**L**

**lady** 7:16
**Laurie** 1:22 2:17 64:2,17
**law** 3:4 16:18
**laying** 20:2
**learn** 17:20
**learned** 30:21
**leave** 9:13 13:21 20:7,13 22:16 29:14 52:13 53:21 54:1 63:7
**left** 7:3 8:14,16 9:1,21 10:4,5 20:14 26:1,3 27:10 38:4,6 46:6 54:14
**Lesansky** 3:12 5:4,8,10,12 13:9 24:13,16,22 25:15,21 26:5,9 26:16,20 27:4,8 27:13,16,18,21 28:2,4,10,18 29:3 30:4,10,13 30:19 31:9,14 31:19,22 32:6,9 32:11,15 35:3,7 35:13,15,19 36:2,6,22 37:3,6 37:8,11,16 38:3 38:12,21 39:8 39:15 40:1,9,15 40:19,21 41:1,4 41:9,15,18,21 42:2,7,14,21 43:6,10,15,18 44:16 45:12,17 45:20 46:1,4,10 47:11,22 48:3,7 48:14,18,21 49:4,8,15,18 50:4,10,12,15 50:18,20 51:1 51:12,19 52:3,8 52:17,20 53:1,4 54:12,18 55:1,4 55:9,12,16,22 56:5,14,21 57:3 57:12,15 58:1,9 58:13,15,17,19 59:1,6,10,13,21 60:2,7,15,19 61:5,8,15 62:3,9 62:13,15,19 63:5,10,15
**letter** 38:13,14,16 44:16 48:22 52:9 53:6
**letting** 5:7
**Let's** 46:14
**level** 29:21,22 31:20
**lieutenant** 26:11 26:12 39:17 42:4
**life** 5:17
**line** 58:8
**list** 32:4,7,16,19 32:22 33:12,15 34:1,3,6,9,14,16 34:19,19,22 44:20 45:2,5,7,8 45:11,14 46:9 46:12,15,18 47:2,11,12,21 48:7,8,10 57:19 57:19 58:3 59:3 61:1,4
**lists** 32:5,18 33:3 33:18
**little** 28:11 30:4 35:4,8,8 54:12
**long** 5:15 8:11 53:22
**look** 35:13 43:11 57:7
**looked** 10:4
**looking** 10:18 40:14
**lot** 15:1 17:12 21:21 24:16 33:18 34:13
**lots** 20:3
**love** 10:5
**low** 29:9 30:8,9 30:10,19 31:12

60:20 63:6
**low-custody** 61:17
**loyalty** 22:17,18
**L.L.P** 3:4

**M**

**maintain** 28:8,10
**majority** 36:16,22
**making** 10:3 28:15 34:2,3 49:13,20
**Makins** 3:2 12:20 13:3,12,18 23:18 26:18,22 27:5,13 36:3 37:13 39:10 41:12
**man** 10:2 23:20
**March** 38:14 52:10 64:13
**marriage** 9:16,18
**married** 9:15,17
**matter** 39:3
**mattered** 23:3
**max** 9:1
**maximum** 8:21 8:22
**may** 14:1,2 51:1
**mean** 12:7,14 14:21 16:9,13 19:20 20:20,22 21:19,21 26:21 31:10 33:18,22 35:20,22 36:8 36:14,15 37:9 43:6 44:2,4 45:15 53:19 57:18
**meaning** 48:8
**means** 36:19
**medical** 13:9,11 14:20 15:1,15 15:18,19 16:3 16:21 18:1,17 19:2,5,8,15 20:19 21:18 34:5,16 43:3 44:10,11,12,20 46:15 47:13,19 48:2,4,12,12 55:7 57:20,21 57:22 58:4,5 63:3,4,7
**medication** 22:2 56:11
**member** 39:21 58:21
**memory** 46:2
**men** 24:7
**mentally** 22:12
**met** 10:16
**methadone** 33:6
**Michael** 3:3 5:5
**midnight** 12:6 61:22,22 62:3,8
**midnights** 14:12
**mind** 38:9
**mistaken** 42:5,10
**modular** 8:17,17 8:18
**money** 10:3
**month** 7:2 9:7 22:16
**morning** 23:22 37:6
**mother's** 7:14
**Movement** 14:9 14:10 37:21 38:1

**N**

**N** 3:1 5:1,3
**name** 5:4 7:16 14:9 20:21 26:13 32:20 37:21 38:1 45:8 45:10 46:8 47:21,22 48:5
**names** 33:19,22
**necessarily** 14:13 19:9
**need** 16:21 19:12 29:10 57:7
**needing** 56:1
**needs** 17:3
**negligence** 38:17
**negligent** 13:7
**neither** 64:8
**never** 10:4 25:5,6 25:17 26:1,2 27:10,11 46:6 49:8,20 63:12
**new** 23:2
**night** 12:6 22:14 30:22
**nights** 14:15,15
**non-uniformed** 59:4
**normally** 14:21 28:21
**notarial** 64:11
**Notary** 2:19 64:1 64:17
**notice** 2:17 38:15
**notifying** 16:3
**number** 13:14 20:22 21:1,2 38:8 39:18
**N.W** 2:6 3:5,15
**N119** 2:7

**O**

**O** 5:1
**obviously** 41:5
**occasions** 17:17 45:4
**occurred** 33:13
**Odie** 6:11
**offered** 52:11
**office** 18:2 34:5
**officer** 3:11 5:4 5:13 8:7 17:1,10 17:13,14 23:21 24:19 25:9 26:16 27:5 28:6 37:17 40:4 41:16 45:12 48:1 53:8,10 54:2 56:18 59:1 59:17,22 61:12 61:17 63:1 64:3
**officers** 15:2,17 17:7 20:3 48:3 49:2 54:5 62:19
**offices** 2:4
**Oh** 16:7
**OIA** 38:22 39:1 44:19 52:10
**OIC** 26:22 27:14 39:10
**Okay** 12:1 13:6 16:15 17:5,16 18:20 19:4 24:13 26:5,16 27:16 28:4 31:8 34:5,15,20 35:2 36:6 37:8 39:15 40:1,15 45:12 46:17 50:15 51:19 52:8 53:4 55:1 56:14 59:6 60:15,19 62:9 63:10
**old** 7:17 8:17,17 9:17 10:17,17
**oldest** 6:16,19
**once** 54:1
**ones** 19:18
**open** 8:16 11:8 13:13
**opened** 13:17
**opportunity** 8:2
**opposed** 52:4
**oral** 1:5 2:1 5:2 63:17 64:4
**ordeal** 25:10
**order** 19:14 39:18 42:22 43:16
**orders** 28:2
**ordinary** 24:11
**outcome** 64:10
**outside** 13:22
**outstanding** 24:4
**overtime** 39:19

**P**

**P** 3:1,1 5:1
**Page** 38:22 39:8 44:16,17 48:14 48:22 52:9
**Pages** 1:21
**pains** 15:22
**paper** 19:21,21 19:22 20:1,8,11 20:14,15,16 58:13,19
**paragraph** 39:1 44:18
**particular** 29:2 30:1,18 32:18 33:3 35:5 62:18
**parties** 64:9
**pass** 13:9,9,11,18 13:19,22 14:1,5 14:8,10 15:15 15:19 16:1,17 17:11 18:5,5,8 19:8,15,18 20:16,17,21 21:18 29:11,12 32:2 35:10,11 35:12,18,22 36:1,5,7,8,14,18 37:12,19,19 41:7 42:11 49:9 49:14,16,20 50:2,3,7,17,18 51:4,5,21,22 56:10,11,18 57:7,8 59:18 60:5,8,11 61:9 62:4,10,20,21 63:6
**passes** 20:3,4,5,7 24:5 51:2,6 52:4 56:16,20
**patient** 7:14,14 7:15
**pay** 39:18
**peaceful** 24:10 36:16
**people** 15:1 17:8 18:8,16,17 19:22 47:6 54:21 55:6
**perception** 18:21
**person** 15:18 61:13 62:17 63:5

**phone** 14:21 15:6 15:9,15,19 17:2 19:1,4 23:4 26:14 33:19,20 33:22 39:16,21 41:15,22 47:20 48:15 61:3 63:1
**Ph.D** 3:12
**pick** 20:14 23:4 47:20 63:1
**piece** 19:21,21 20:8,15,16 29:19 58:13
**places** 30:7
**plain** 20:16
**play** 38:10
**please** 58:6
**pocket** 20:9,15
**podiatry** 48:12 55:20
**point** 38:1 50:1 52:7
**police** 7:4
**policy** 43:15 63:13
**position** 63:14
**possibility** 21:11
**post** 12:8 14:16 42:22 43:16
**practice** 15:7 16:17 57:6 60:11
**pregnant** 11:7
**prepare** 13:20
**prepared** 13:19 42:9
**preparing** 22:15
**present** 5:3 10:15
**presentation** 1:5 2:1 63:17 64:4,6 64:7
**pretty** 36:19
**previously** 44:18
**prior** 60:10,10
**private** 7:13
**probably** 5:10 16:8
**problem** 25:13 29:12 62:22
**procedure** 14:18 16:2 43:16
**procedures** 15:13 56:8
**process** 16:7,12 25:10 28:19,21 28:22 56:22 57:12,13,18 58:10 59:14,14 60:20,21
**processing** 8:3
**Professional** 2:18 64:3
**program** 8:19 42:21
**proposal** 38:15
**public** 2:19 64:1 64:17
**purportedly** 20:18
**purpose** 36:7
**pursuant** 2:17
**put** 9:12 14:1,2,2 14:4,4,8,9 20:8 21:5,6 36:18 38:1
**putting** 15:16 20:21 21:1 35:17
**P.G** 6:2
**p.m** 1:12 63:19

**Q**

**question** 21:21 43:21
**questions** 5:10 24:14 63:11
**quiet** 24:10 36:11
**quoting** 38:22 52:10

**R**

**R** 3:1,12 5:1
**radio** 22:7
**range** 11:15,15
**read** 43:19 49:19
**really** 6:7,18 25:7 32:11 36:11,12 36:12 54:9,20
**Realtime** 2:19
**reason** 26:13 48:13
**reasons** 18:17
**recall** 11:15 24:5 32:18 34:19,21 34:22 35:17 39:12 41:2 42:18 45:14,20 46:4 49:1,12,14 49:20 53:1 55:14
**receive** 11:13 19:1 33:19 39:16,21 48:15
**received** 15:11 39:16 41:15,22 48:19
**record** 64:6
**reduced** 64:8
**reference** 20:12 26:15 29:18 39:22
**regarding** 39:2 48:16
**regards** 19:3,5
**Registered** 2:18 64:2
**regular** 15:2 18:9 18:18,19 54:16
**regularly** 13:4
**related** 6:11 64:9
**relationship** 9:20
**release** 8:19
**religious** 38:9,11 51:7
**remarried** 10:11
**remember** 13:10 13:12 16:6 25:22 33:1 34:15,18 35:20 36:2 37:4,15 38:4,17 39:4,20 40:1,3 41:18,20 41:21 45:1,2 52:2,3,5,7 57:1 59:8 61:21
**remembered** 50:1
**report** 40:7,8,11 40:13,14 42:3,6 42:8,12,15,17 42:20 43:1,3,8 44:8
**reported** 1:22 25:19
**Reporter** 2:18,19 64:1,3
**reports** 16:22
**request** 57:13
**requested** 23:15
**requesting** 40:7 40:10
**resigned** 9:1
**respect** 63:13
**responsibilities** 25:1,17
**responsibility** 53:10
**responsible** 53:22 54:4,6
**retire** 7:2 9:7
**retired** 6:16
**retirement** 9:22 22:16
**Ricardo** 13:8,10 13:13 14:11 15:9 18:6 30:18 30:19 34:17 35:5 38:4 41:5 48:16 49:9,21 51:20
**right** 12:1 15:4 19:14 21:3 22:19,19 25:19 33:21 34:6 37:7 38:7 44:12 45:15,16 46:7 48:16 49:7 51:13 57:4 59:8 59:12 60:22
**ring** 14:22
**roll** 26:1 27:11
**Room** 2:7
**rounds** 22:1 24:6
**routinely** 15:17

**S**

**S** 3:1 4:4 5:1
**safe** 28:9
**sat** 7:16
**Saturday** 14:15 39:3 50:6 51:18
**saw** 50:20
**saying** 13:13 20:12 21:9 30:3 30:13 31:4 34:21 36:22 41:22 45:13 46:8,10 54:8 58:1,9 59:13,16
**says** 38:16 39:9 39:11,15 43:1 44:18 49:18,19 58:7
**scarred** 22:13
**scheduled** 44:20 52:13
**school** 5:19,21
**se** 23:3 34:19,19 60:10
**seal** 64:11
**second** 6:19 9:16 12:9,11 40:16 40:18 44:18 62:10
**secured** 36:15
**security** 8:21,22 28:8,11 39:18
**see** 17:4 32:13 44:3,6,9 49:16 57:3,8 58:8 60:12,13 63:3
**seeing** 34:18 42:18
**seen** 5:14 25:6 32:15,17 34:12 43:19 50:3,17 63:12
**sees** 44:5
**send** 14:22 18:1 21:20 22:4 29:10 32:4,6 34:14 40:7 44:10 48:9,11

57:9 60:8 61:2 62:7 63:4
**sending** 63:2
**Senior** 9:22
**sense** 18:12 36:20
**sent** 34:9,16 38:13 40:4,11 44:17 52:9
**sergeant** 13:3,12 23:18 26:18,22 27:5,13 36:3 37:12 39:10 41:12 53:16
**serious** 25:13
**service** 38:9,11 51:7
**Services** 3:13
**set** 64:11
**she's** 27:1,16,18
**shift** 12:6,7,10,12 12:15,17,18,21 23:2 31:11 33:8 40:16,16,18,19 41:4 45:15,15 45:18,20 46:2,3 46:5,6 49:4,5 61:22,22 62:3,8 62:10
**shifts** 49:6
**short** 12:15 51:16
**shortage** 23:20
**SHORTHAND** 64:1
**short-handed** 23:12
**showed** 50:7,16
**shut** 23:16,19,21
**siblings** 6:5
**sick** 13:14,15 17:7 22:14,15,16 23:4,5,5 32:4,4 32:7,13,15,17 32:19,22 33:3 33:12,15,17,20 34:6 44:20 45:2 45:4,6,8,10,14 46:9,12,15,18 47:7,11 48:7 49:2 51:7 54:17 56:22 57:13,18 57:19,19 58:3 58:10,16,17,20 59:3,5,14 60:22 61:4
**sicked** 22:22 23:1
**side** 54:21,21
**sign** 13:15 29:12 52:4 53:16 57:17,19 58:3 61:3
**signature** 35:22 36:1 49:13 50:1
**signatures** 35:20
**signed** 35:16 37:12,16 38:2 38:10 42:11 60:22
**sir** 59:20
**sitting** 20:5,10 54:10
**situation** 17:9,15 18:6 21:16 27:3
**situations** 17:5,7
**slip** 58:11 59:14
**slips** 59:5,10
**small** 9:20 10:3
**Social** 39:18
**somebody** 15:17 17:22 18:10 19:18 21:17 25:18 32:1 35:22 46:20 53:16 54:21 57:7 59:4 62:7
**son** 11:9
**sort** 5:7
**sound** 14:3
**Southeast** 12:3,5 13:1,4 24:20 28:6,22 29:2,3,5 29:9 30:7,8 31:12 32:16 45:4,14 53:8 60:16,17,20 61:5,7,10,16,19 63:6
**Southwest** 6:21
**so-and-so** 14:22 17:3,4 18:2,2 21:20 22:4 29:11 48:9,11 58:5 61:1,2 63:2
**so-called** 12:2
**speak** 11:5 42:19
**speaking** 16:4,5 27:2 30:18 33:2 57:2,4,9 61:6
**specifications** 38:18
**staff** 32:13 39:21 43:3 46:11 47:19 48:2 57:20,21 58:4,5 58:21 59:2,4 63:3,4
**staffing** 12:16
**stagnated** 23:14
**standing** 13:22
**start** 7:5
**started** 37:10 51:11
**state** 52:21
**stated** 39:11 44:18 52:20
**Statement** 42:22
**stayed** 8:17
**stenographically** 64:7
**stick** 20:15 60:16
**sticks** 38:8
**stomach** 15:22
**storm** 22:21
**straight** 12:10,12
**Street** 3:5
**stuff** 31:4 33:8 59:9
**submission** 5:13
**substantiated** 44:19
**suit** 29:20
**Suitland** 5:20
**summarily** 22:5
**summoning** 15:18
**superior** 27:2
**supervision** 64:8
**supervisor** 21:19 21:22 22:2,3 25:2,5,7,11,18 26:4,6 27:1,15 27:16,18 53:17
**supervisors** 23:3 23:15,19 26:7
**suppose** 44:5
**supposed** 27:9 28:6,7,15 40:5 40:12 42:9,14 42:16 43:1,2,9 53:18 54:17 55:5 57:17
**sure** 19:20 26:12 28:8,9,14,15 46:12,13 51:14 51:20
**surprised** 22:11
**surrounding** 52:12
**swear** 47:19
**synopsis** 43:5

**T**

**T** 4:4
**table** 20:5,7
**take** 10:7,19 19:7 20:3,8,14 27:21 33:5,18 56:11 59:10
**taken** 2:17 11:20 64:4,7
**talk** 5:8 35:8 38:22 46:14 58:6
**talked** 55:1,17 56:14
**talking** 29:1 33:8 47:11,12 50:8
**taped** 39:2 50:5
**teenager** 11:6
**teenagers** 11:5
**tell** 13:9 14:22 18:12 22:13 28:20 29:4 33:13 35:15 46:18 47:20 48:5 53:2,16 54:12 55:6 57:15 58:7 61:3
**telling** 53:17
**tells** 17:6
**ten** 8:19 36:11
**terminate** 38:15
**terms** 16:3 24:19 27:4,8 35:4
**Thank** 35:3 63:16
**thanks** 24:16
**that's** 13:13 16:10 16:13,14 18:20 19:9 21:4 24:4 25:7 29:16 33:20 36:13 39:3 41:21 44:11 45:1 47:12 48:17 50:20 51:5 52:17 54:9 56:5 63:10
**there's** 17:9 20:22 29:7 42:16 43:1 43:2 52:22 58:17
**they'll** 21:6 58:8 62:8
**they're** 29:15 54:4 55:18,19 62:6
**thing** 11:14 20:20 25:7 28:17 44:13
**things** 28:12 46:14 56:3,12
**think** 36:11,13 42:11 47:11 51:16 55:20 56:15 62:8 63:10
**third** 7:2 21:5,6 25:9 48:4 63:7
**thought** 16:14 18:20 22:19 24:4,9 30:5 49:15

**three** 6:10,15 9:4 24:1 29:19 36:4
**three-piece** 29:20
**throw** 19:22 26:13
**time** 9:4,12,17 14:3,4,9 17:22 18:13,22 22:18 31:10 36:12,17 37:3,11 38:9 40:6 47:19,21 48:1 57:9
**times** 15:1,20 17:12 20:3 21:21 33:18 34:8,13
**today** 22:2 39:9
**toe** 57:7
**told** 10:1 11:6 24:11 44:3
**top** 39:8
**total** 11:20
**touch** 17:15
**touched** 37:11
**tour** 8:12,13
**track** 37:22
**trained** 55:9
**training** 7:21 8:1 11:13,15,17
**transcript** 52:22 64:5
**transferred** 8:21
**trash** 19:22 20:1
**tried** 16:9,11
**true** 49:4,10 64:5
**trying** 10:19 22:19,21 24:5 33:10 36:14 54:3
**Tuesday** 1:11
**turned** 7:15
**twice** 57:10
**two** 9:20 10:3 11:5 24:7 29:17 46:14
**type** 28:17
**typewriting** 64:8

U

**UDC** 6:1
**understand** 25:1 25:11 26:20 30:3 33:11 47:10 51:20 52:15 54:8 55:10,16 56:17
**understanding** 26:2 35:4 55:5 56:21
**understood** 25:16
**unit** 13:8,11,21 14:19 15:1,18 16:3 17:20 18:1 19:2,5,8,12,15 20:3,19 21:17 21:22 25:6 29:2 29:14 30:2,3 34:17 39:11 46:12,15,20 47:13,17 49:2 52:13 53:9,13 53:22 54:2 56:10 57:11,21 58:4
**units** 15:14 29:13 43:14
**upstairs** 17:3,15 18:2 62:22
**use** 38:19

V

**various** 38:18 55:18 56:16
**vast** 36:16
**Vermont** 2:6 3:15
**versus** 30:7
**view** 54:1
**violation** 56:5
**visiting** 51:8,10 51:12,13,17,17

W

**wait** 15:5 58:7
**walked** 54:21 61:22
**want** 10:2 25:16 26:11,12,13 35:3 37:18 38:7 46:7 47:7,18 49:19 51:14,19 60:15
**wanted** 12:1 38:12 43:11
**wants** 47:15
**Washington** 1:7 1:10 2:2,8 3:6 3:16 5:3,5,6,15 5:17,20 6:1,5,8 6:10,12,13,16 6:19 7:1,7,10,12 8:6,10,13 9:10 9:14,16 10:11 10:15 11:3,14 11:18,22 12:5 12:11,15,20 13:2,5,12,17 14:8,13,21 15:5 15:10,20 16:4,8 16:13,16 17:2 17:12,19,22 18:4,12,15,21 19:3,6,9,12,16 19:20 20:20 21:4,9,14,19 22:7,10 23:1,10 23:14,18 24:3 24:15,18,21 25:4,20,22 26:7 26:11,18,22 27:7,12,15,17 27:20 28:1,3,7 28:13 29:1,7 30:9,12,17,21 31:2,7,13,18,21 32:3,8,10,12,17 33:1,14,17 34:2 34:7,10,13,18 34:21 35:6,12 35:14,17,21 36:3,10 37:2,4,7 37:9,14,18 38:7 38:20 39:7,14 39:20 40:3,10 40:18,20,22 41:3,8,12,17,20 42:1,4,10,16 43:2,8,13,17,20 44:2,9,15 45:6 45:12,16,19,22 46:3,7,11,16,19 46:22 47:3,5,8 47:14,18 48:2,6 48:9,17,20 49:3 49:7,11,17,22 50:8,11,13,17 50:19,22 51:4 51:15 52:1,6,15 52:19 53:2,15 54:16,20 55:3,8 55:11,13,21 56:3,7,19 57:1,4 57:14,17 58:2 58:12,14,16,18 58:21 59:2,8,12 59:19 60:1,6,8 60:18,22 61:6 61:11,21 62:6 62:12,14,17,21 63:9,18
**wasn't** 9:18 23:6 32:20 36:12 46:1,9 54:10
**way** 21:10
**ways** 18:7 19:17 21:15 56:16
**weather** 22:21
**welcomed** 11:7
**went** 5:20 6:2 8:15 9:22 11:12 11:16 22:20 25:9 27:11 34:17 38:18 48:21 50:2,9 54:11,19,22
**Westwood** 9:22
**we'll** 5:8 18:4
**we're** 5:6 33:10 47:10 53:22
**we've** 17:5 19:19
**what's** 16:19 27:14 36:7 44:3 54:9
**WHEREOF** 64:11
**who's** 46:18 54:5
**window** 54:9,11
**wise** 9:19
**witness** 43:22 64:11
**witnesses** 43:22
**Wolf** 7:16
**woman** 10:2
**word** 8:2 38:19
**wore** 22:12
**work** 6:4 7:3,9,13 8:2,4,15,18,19 9:22 12:17 14:14 15:2 22:14,15,20 23:6 24:2 25:19 33:1
**worked** 6:5 7:18 8:13,15,19 9:3 12:5,6,18,21 13:1 14:12,15 29:13 39:10 45:15 49:5 61:21
**working** 7:5 12:3 12:9,11 34:4
**works** 58:11
**wouldn't** 38:5 45:22
**wound** 33:5 48:11
**write** 18:4 20:4 29:11 44:9 46:21 57:8 60:8 60:11 62:20,21
**writing** 20:5
**written** 5:13 31:3 32:2 43:7 63:12
**wrong** 16:19 30:2
**wrote** 37:21 51:6

X

**X** 4:4

Y

**YC2** 8:15,15
**yeah** 6:22 24:16 29:16 30:17

32:17 49:7 51:15 55:21 62:12
**year** 7:6 8:16 9:5 52:6 53:3 60:10
**years** 7:17 8:20 9:3,17 10:13,17 10:17 11:1,21 16:5,6 56:19 57:2,5,5,5 59:16 59:20
**yesterday** 53:3
**Yorkstown** 7:21
**young** 10:2
**youngest** 7:3
**you're** 6:11 9:15 20:5,21 23:5,5 27:9 34:2 36:22 43:18 55:5 58:1 58:9 59:13,15
**you've** 5:14 9:11 43:19,19 61:15

**1**

**1** 1:21 12:3,5 13:1 13:4 24:20 28:6 28:22 29:2,3,5,9 30:7,8 31:12 32:16 38:22 45:4,14,15,15 45:20 46:2,3 49:4 53:8 60:16 60:17,20 61:5,7 61:10,16,19 63:6
**1-107049** 1:20
**10th** 1:11
**10:00** 37:5,5,6
**1010** 8:20
**14** 64:13
**15** 57:5
**15th** 38:14 52:10 64:11
**17** 9:17
**18th** 3:5
**19** 13:13,17
**1901** 3:5
**192** 2:6
**1923** 3:15
**1983** 7:7 8:14
**1985** 8:14

**2**

**2** 39:8 44:16,17 45:18 46:5,6 48:14,22 49:5 52:9
**2:10** 1:12
**20** 9:3,19 11:20 16:6 56:19 57:2 57:4,5 59:16
**20-day** 38:14
**2000** 9:5,9,12
**20001** 2:8 3:16
**20009** 3:6
**2006** 12:3 39:3 44:21
**2007** 1:11 64:12
**2011** 64:13
**202)232-1907** 3:7
**202)671-2069** 3:17
**21** 7:17 9:19
**24** 10:12,17
**25** 10:12
**29-year-old** 11:9

**3**

**3rd** 12:2 39:3,5 44:21 45:1 50:5 50:6,12,13 60:10
**3:17** 63:19
**31-year-old** 11:9

**4**

**42** 10:17

**6**

**64** 1:21

**8**

**88** 7:17

# EXHIBIT 59

Interview of Corporal Herbert Douglas before
Henry Lesansky, Ph.D., DOC Hearing Officer, on June 25, 2007 at 9:34 a.m.

Corporal Herbert Douglas grew up in Kenbridge, Virginia. In high school, Cpl. Douglas wanted to be an aeronautical engineer; however, his educational background precluded him from pursuing his dream. At the age of 18, Cpl. Douglas entered the United States Air Force and started his law enforcement career.

While stationed in Okinawa, Japan, Cpl. Douglas was assigned to the Resources Protection Program. Cpl. Douglas was later put in charge of the program. The position tasked him with inspecting and reporting base deficiencies. In addition to his regular duties, he established the Anti-Robbery Checklist, which was used by cashiers and others to assist with assailant descriptions after a robbery. This checklist was later adopted by the Air Force and by the public. During his twenty (20) year career with the Air Force, he achieved the rank of E-7, Master Sergeant.

In August 1969, Cpl. Douglas married and started his family with two (2) children. He later re-married and had two (2) additional children. His four (4) children are ages, 37, 31, 18 and 14. The two youngest children are the only ones currently living in the home. Cpl. Douglas loves his children and makes every effort to shield them from hearing any news or information related to the jail escape. Despite his best efforts, the children are aware of what occurred and the toll it has taken on the family. He is a family man who does every thing possible to keep his family happy.

His first job after leaving the Air Force was the Federal Reserve, where he also worked in law enforcement. Cpl. Douglas was responsible for doing patrols and maintaining security. He remained at the Federal Reserve for four (4) years before transitioning to the Department of Corrections.

Cpl. Douglas' first assignment within the Department of Corrections was at the Central Treatment Facility ("CTF"). During his CTF training at the academy in Lorton, VA, he was elected class leader. His class of approximately 130 students chose him as class leader because he was outspoken. As class leader, he was responsible for ensuring that the morning formation was correct and that class dress was proper. During his five (5) years at CTF, he was never injured or harmed despite single handedly escorting inmates around the facility. Cpl. Douglas attributed this to his method of handling inmates. He used a non-forceful method of communicating, without belittling the inmate. He prided himself on having to use little force when dealing with inmates. Cpl. Douglas' last assignment at CTF was as a Correctional Officer within the Male and Female cell blocks in the lockdown unit.

Cpl. Douglas left CTF and went to work at Lorton Maximum Security Facility ("Lorton"), where he stayed for approximately ten (10) years until the facility closed. While at Lorton, he performed Correctional Officer duties and ensured inmates were in their cells. Lorton was a locked down facility, meaning inmates had to be transported at all times. Since Lorton was a long-term facility, the inmate population was very tough. Due to this, the majority of incidences that occurred at the prison were inmate on inmate violence. In addition to his Correctional Officer duties, he also served as a Fire Marshall and was responsible for checking

fire extinguishers and having them serviced if necessary. His personality and work ethic led him to be frequently requested by the academy to train people as to the proper way to respond to fires.

Once Lorton closed, Cpl. Douglas was transferred to D.C. Central Detention Facility ("CDF"). Due to the conditions at CDF, Cpl. Douglas was initially nervous about working there. While at CDF, Cpl. Douglas had several assignments. The first assignment was in Housing Unit, North One. Next, he was assigned to the Northeast One for approximately one year. His next assignment was in South Three, which was the mental health unit. The mental health unit was an undesirable unit because officers could get feces and, or urine thrown on them at any moment. Despite the bad conditions, Cpl. Douglas remained in that unit for three (3) years, and eventually grew to enjoy the assignment because he was able to talk to the inmates.

Normally, three officers and a sergeant worked in the mental health unit. Because of Cpl. Douglas' administrative skills, he often worked in the bubble. His training for this assignment lasted only one week and did not occur until after he had been performing the job for a while. He was forced to learn the job by asking other officers and using the skills he learned at Lorton

Due to the understaffing at CDF, a draft procedure was used to fill empty shifts. Officers were frequently drafted for overtime, which led to officer fatigue. The draft list is rotating, and once an officer's name is called, he is forced to work the extra shift. Supervisors request volunteers before having to use the draft list. As a reward for volunteering, volunteers got the best assignments, and those who were drafted got the assignments that were left. Whether volunteering or being drafted, specialized training was not given for the new assignment. Notwithstanding the draft procedures, there were times when the draft list did not provide enough officers to cover all positions. Because of the frequent staff shortages, officers had radios, and officers on the floor were required to have a radio.

Cpl. Douglas rarely volunteered for overtime. The overtime hours he earned were a result of being frequently drafted. When drafted, Cpl. Douglas would be placed in another housing unit, or wherever the supervisor saw a need. He was often placed in another housing unit because of his experience. Despite his experience, Cpl. Douglas felt like a substitute teacher in the new housing unit because the inmates would try to take advantage of him.

CDF was attempting to gain accreditation and the environmental squad was a priority because jail cleanliness was an important part of the process. Because of the change of priority, the environmental detail suddenly expanded. The detail normally had about six (6) to nine (9) inmates, with three (3) officers supervising. Cpl. Douglas was assigned to the environmental squad at the request of the Warden, and was responsible for giving the assignments to the inmates and making sure the assignments were complete. Cpl. Douglas was chosen to work the environmental squad about three months before the escape. However, he was not officially assigned until one week before the escape occurred. The environmental squad was responsible for cleaning the visiting halls, administrative area, officer dining area and bathrooms located at the end of the hallways. Often, inmates were separated and working on different floors. To keep track of all inmates, officers, with the approval of supervising officers, had to leave inmates working unsupervised and travel between work sites.

Captain Holmes was the officer that oversaw the environmental squad. He held daily meetings with the officers in order to give them the assignments for the next day. When Cpl. Douglas first joined the environmental squad he followed the procedure and locked the cages. However, Captain Holmes ordered Cpl. Douglas to leave the cages open. Captain Holmes stated, “the inmates weren’t going anywhere.”

Cpl. Douglas was ordered by Captain Holmes to go to Southeast Three and get the name of twenty (20) inmates to be added to work detail. The jail was under review for accreditation and there was tremendous pressure to clean up the jail. Cpl. Douglas was perplexed as to why the inmates had to come from Southeast Three, because Southeast Three contained sentenced inmates and was a high custody area. However, because Southeast Three population had been there the longest, they were a more reliable source for continuing work details.

Following Captain Holmes’ orders, Cpl. Douglas chose inmates he knew from Lorton and others who indicated they wanted to work. Fifteen (15) of the twenty (20) inmates chosen by Cpl. Douglas were put on the environmental squad. Despite the sudden increase in the number of inmates working on the environmental squad, the number of supervising officers did not increase. In particular, on the day in question, there were only two officers assigned to the environmental squad. The second officer was drafted and had no experience with the squad. The second officer later disappeared while the inmates were working.

One of the escapees, Leaks, was a permanent member of the environmental detail. Inmate Leaks was assigned to the environmental squad before Cpl. Douglas was even assigned to the squad; therefore, Cpl. Douglas had no input in Leaks’ placement on the squad. On the day of the escape, Leaks was assigned to clean the administrative side of the second floor. Following another one of Captain Holmes’ orders, Cpl. Douglas left the cages open. After giving the assignments to the inmates, Cpl. Douglas began roving between jobsites to check on the inmates. While checking on the various jobsites, Cpl. Douglas noticed the third-floor visiting hall was not clean. He then ran to the second floor where he saw inmates sitting with equipment outside the visiting hall. The second officer assigned to the squad had disappeared. Cpl. Douglas let the inmates inside the visiting hall to clean, and once that job was completed he let the inmates back out. Cpl. Douglas then went to check on another jobsite. While checking on the other jobsite, it was then that Cpl. Douglas noticed that inmate Leaks was missing. Soon after discovering inmates Leaks was missing, an announcement came over the intercom to send all inmates back to their units. After hearing the announcement, Cpl. Douglas sent his inmates back to their units. Cpl. Douglas learned about the escape when two officers informed him while he was in the process of sending his inmates back to their housing units.

Later that evening, Internal Affairs interviewed Cpl. Douglas and he was accused of leaving the cage insecure so Leaks could have access to the buffer used in the escape. The report issued by Internal Affairs had inmate Leaks stating that Cpl. Douglas brought in contraband as a way to enhance his credibility with the investigators. However, the specific piece of contraband was never identified in the report. The report also stated that Leaks told Cpl. Douglas that something was going to happen and he should leave. Cpl. Douglas denied bringing in any contraband or ever being told that something would occur. No transcript or report of the Leaks interview has been provided in these disciplinary hearings. There is no reason anyone should believe Leaks over sworn corrections officers.

During, Cpl. Douglas' career, he has never been disciplined.  He was never disciplined in the Air Force, or at the Federal Reserve, CTF, Lorton or CDF.  Cpl. Douglas was not responsible for monitoring the inmates every minute they were working; and by leaving the cage open, he was following the orders of Captain Holmes.  Cpl. Douglas feels as if he was punished for doing his job and doing the best job he could.

Captain Holmes was initially placed on administrative leave with pay, but subsequently brought back to work on the same day Cpl. Douglas was fired.  Captain Holmes was also removed from the environmental detail for about one month.  Of all the officers disciplined for the escape, Captain Holmes was the only person to return to work.  Since the escape, Cpl. Douglas thinks Captain Holmes has received a promotion and may now be Major Holmes.

Cpl. Douglas enjoys being a Correctional Officer and wants to return to that position.  He feels that it takes a special person to serve in that position because one must be able to deal with many different personalities.  Cpl. Douglas asserts he did nothing wrong and he followed the orders of a Captain.  Captain Holmes outranked him; therefore, Cpl. Douglas had to follow his orders.

Since the escape, Cpl. Douglas has suffered in various ways.  His name became public and he was forced to explain the situation to his friends, neighbors and family.  His health has suffered because he has grayed fast, and been diagnosed with high blood pressure.  Cpl. Douglas also does not believe the escape has changed the way the jail operates.  He thinks inmates are probably still unsupervised while cleaning the facility.

# EXHIBIT 60

DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

ORAL HEARING OF LORENZO JENNINGS
Washington, D.C.
Monday, June 25, 2007
2:30 p.m.

Job No.: 1-106540
Pages 1 - 70
Reported by Janie Arriaga

ORAL HEARING OF LORENZO JENNINGS held at the offices of:

D.C. DEPARTMENT OF CORRECTIONS
GRIMKE CENTER
1923 Vermont Avenue, Northwest
Washington, D.C. 20401
202-673-7316

Pursuant to agreement, before Janie Arriaga, Court Reporter in and for District of Columbia.

A P P E A R A N C E S

ON BEHALF OF LORENZO JENNINGS

J. MICHAEL HANNON, ESQUIRE
The Hannon Law Group, LLP
1901 18th Street, Northwest
Washington, D.C. 20009
202-232-1907

ON BEHALF OF D.C. DEPARTMENT OF CORRECTIONS:
DR. HENRY LESANSKY
D.C. Department of Corrections
1923 Vermont Avenue, Northwest
Washington, D.C. 20401
202-673-7316

ALSO PRESENT: ERICA WHITE

MR. HANNON: We have asked a reporter to come in and take notes on this. We will give a copy also to Dr. Lesansky so we don't have to take too many notes. So we have to make sure that we don't talk over each other. And you need to make sure that that lady over there is able to hear you. I know you are nervous about that day.

MR. JENNINGS: I'm pretty cool. I'm not nervous at all.

MR. HANNON: Before we started, Dr. Lesansky and Lorenzo Jennings were introduced.

What we're going to do here is, I'm going to be asking you questions to assist you in having Dr. Lesansky understand a little bit about you and your career and these allegations against you. He's free to interrupt and ask questions. I want you to direct your questions to Dr. Lesansky.

What were the accusations made against you that resulted in your initial firing as you understood it?

MR. JENNINGS: That I didn't discard the proper identification, the work pass. I didn't discard

it properly.

MR. HANNON: For Inmate Beachum?

MR. JENNINGS: Right.

MR. HANNON: This incident with Inmate Beachum, did that happen on the day of the escape?

MR. JENNINGS: No, three weeks prior.

MR. HANNON: Were you working the day of the escape?

MR. JENNINGS: No, I was off that day.

MR. HANNON: Why don't we start off by addressing those accusations. We've given Dr. Lesansky a written report of your position on that, but I'd invite you to tell him yourself in your own words your response to that allegation.

MR. JENNINGS: Well, on the badge itself, the actual badge is a laundry detail badge. It's not even an environmental badge. So it's in the paperwork that they keep saying that Beachum was on environmental, which is totally wrong. Beachum was on the laundry detail, which an officer by the name of Corporal Hudson was in charge of. And the -- he was -- I spoke with Officer Hudson the day he came out of the bathroom.

Now, Hudson was in the --

MR. HANNON: When Beachum came out of the bathroom?

MR. JENNINGS: Yes, when Beachum came out of the bathroom. The whole incident happened before I even seen Hudson. I never knew Hudson was in the other room. The incident I'm talking about is when Beachum came out of the staff bathroom.

MR. HANNON: This is three weeks before the escape?

MR. JENNINGS: Three weeks before the escape. The bathroom said, staff only. He's not allowed to use the restroom, but he came out of the bathroom. I just happened to see him coming out because I was going to the unit to pick up my detailed men, not knowing that Hudson was already in the unit, a second unit.

So Beachum was outside waiting to be picked up by Hudson, but Hudson had to get a few more men out of another unit. So as I'm walking down the corridor, and I see Beachum come out of the bathroom --

MR. HANNON: Let me interrupt so I can understand where in the jail the bathroom is located.

MR. JENNINGS: The bathroom is located right adjacent to all three units. There is a unit in the middle and two units on the side. The bathroom is to the left of the unit.

MR. HANNON: Is the bathroom inside the unit or outside the unit?

MR. JENNINGS: Outside the unit, in the hallway.

MR. HANNON: So when you encountered Beachum coming out of the bathroom, he was in the administrative area?

MR. JENNINGS: He was in the hallway, which is right -- right in the area where the units are.

MR. HANNON: But it's not part of the unit?

MR. JENNINGS: No, it's not part of the unit.

MR. HANNON: So someone would have had to let him out of the unit?

MR. JENNINGS: Right.

MR. HANNON: So when he came out of the bathroom, there were no correctional officers with him?

MR. JENNINGS: No one was in sight.

MR. HANNON: Okay. And you were headed to do what?

MR. JENNINGS: I was headed to go to the North One unit to pick up my men.

MR. HANNON: What were you responsible for that day?

MR. JENNINGS: Environmental -- I was on the environmental team.

MR. HANNON: And that's your senior leader, Captain Holmes?

MR. JENNINGS: Correct.

MR. HANNON: What time of day was this?

MR. JENNINGS: This was 6:00 in the morning.

MR. HANNON: All right. I'm sorry, continue. When you saw Inmate Beachum come out --

MR. JENNINGS: Okay. Once I saw Beachum come out of the bathroom, I asked him, what are you doing in the bathroom? He said, I was looking in the mirror. I said, you was doing what? He said, looking in the mirror. I said, come here, I said, show me the mirror you was looking at. In actuality, there isn't a mirror in the bathroom. So I said, show me the mirror, there is no mirror in there. I said, stand against the wall

and put your hands on the wall. He said what for? I said, I'm going to shake you down, because you lied to me about looking in the mirror; maybe you might have some contraband.

I shook him down pretty good everywhere I could, but he didn't have anything. He began to get boisterous about why I shook him down. I said, you can just go back in your unit; you don't have to go to work today.

MR. HANNON: Did you know him by the way?

MR. JENNINGS: No, I didn't know him at all.

MR. HANNON: Had you seen him at all before?

MR. JENNINGS: No, not that I remember. I probably did see him before but not recognized him because he was not one of the members in my squad. So I asked him to step back in the unit. I said, step back in the unit, I said, because you're displaying -- you're not being fair. I said, so what I need you to do is step back in the unit. I yelled into the unit, open one gate. I said, step back in your unit. He went back in his unit, went back in his cell.

But before he left, I took his card. I took

his I.D. card. I said, you know what, you need to just lay down for a day or two. I said, I'm going to let you stay in, and I will give your supervisor your card.

MR. HANNON: Did you understand how it was that he got out of his unit?

MR. JENNINGS: No, I didn't -- well, he told me, I'm waiting on Hudson. I said, okay, you need to step inside; I'm going to talk to Hudson when I go in and get my men. So at the time when we was talking, I didn't even know that Hudson was his officer that he was supposed to pick up until after he told me. Then I went inside, spoke with Hudson. So after he went inside his cell -- I escorted him to his cell and came back.

I proceeded back to North One to pick up my men. Hudson was already in the bubble at the time, because he was getting the names and the I.D. cards. I said, Hudson, this is your man right here. I said, I caught him coming out of the bathroom and he lied to me. So what I'm going to do is lay him down.

MR. HANNON: Why don't you direct your answers to Dr. Lesansky.

MR. JENNINGS: I said, I'm going to lay him

down for a couple of days, because he didn't have any contraband on him or anything like that, thank God, but what I'm going to do is I'm not going to fire him, I'm just going to hold his I.D. until I speak with my supervisor, which is Captain Holmes, because Captain Holmes said if you get in trouble with an inmate, let him know.

So that's what I did. I kept the I.D. card and I proceeded to let Captain Holmes know that I had a problem with the inmate. I told Hudson, I don't plan to fire him or take him off your detail, because he is your man. If something was to happen, I'd rather you do it. So I said, I'll just lay him down for a day or two.

MR. HANNON: Was he okay with that?

MR. JENNINGS: He said, cool, he said, okay, that's cool. I said, but I'm not going to give you the I.D. because I've got to talk to Captain Holmes first. He said, no problem. So I proceeded on getting my men to go to work.

So the next day, I turned the I.D. card into Captain Holmes. This was at the end of the day when we were doing our little turning out equipment, taking the

paint stuff up, turning equipment. I said, Captain Holmes, by the way -- this was like at the end of the day; we'd just talk about the things we accomplished and the things we need to do for the next day and everything like that. So Douglas was in there with me.

MR. HANNON: Herbert Douglas?

MR. JENNINGS: Herbert Douglas. He was in the office with us because after we finish all our work, we always meet in the office at 2:30, because the inmates have to go back to the unit at 2:30 for the count, and we all go to Captain Holmes' office to get a briefing on what we're going to do the next day and things we accomplished that day.

MR. HANNON: You understand "count"?

DR. LESANSKY: Yes.

MR. JENNINGS: At the time we were there, we came in. Me and Douglas came in together. Captain Holmes was already in the office. He was on the computer and he was eating at the same time. He had his food in front of him and, you know, eating and typing on the computer at the same time. So I said, oh, yeah, I'm getting ready to roll, Doug. I said, let me have a

13

water out of the refrigerator. I got a water.

I said, by the way, Captain Holmes, here's the I.D. card from the inmate that I had a problem with yesterday, because he was coming out of the unit and he lied to me. He was one of Hudson's men. So here is his I.D. card. You always told me if we had a problem with anybody to let you know. So he said -- I was standing there with the I.D. card. He said, what are you doing? I said, I'm waiting to give you the I.D. card. It's right here. He said, you see what I'm doing, just set it on the desk.

So I took the I.D. card and I stood it up right on the hard drive. It's like the hard drive, and the screen is sitting on top of the hard drive, but there's a space where you can put a little ink or a pencil. I stood it up to be sure that he seen it. It's standing by the screen. Here is the I.D. card, I'm gone. Doug, you all take care, and you all have a good day, and I'll see you all tomorrow, and I left.

MR. HANNON: Did you explain to him what happened with Beachum?

MR. JENNINGS: Yeah, I did explain. I said,

14

Beachum was the person that I caught coming out of the bathroom. He's one of Hudson's men. I said, as you can see, this is a laundry detail badge. I said, I told Hudson, I'm not going to give him the I.D. card back until I speak with you or give you the I.D. card or let you make the decision. He said, okay.

He said, okay, and I set the card down, and I left. Douglas remained in the office because he didn't get off at 2:30. Douglas don't get off until 4:00. I'm the only one that comes out at 6:00. That is why I was there at 6:30 in the morning to pick up my men from the unit.

Doug was right there, witnessed everything, as far as me giving Captain Holmes the I.D. card and everything. I didn't actually place it in his hand, but he told me, you see what I'm doing, I'm eating, so just set it down right there, I'll get it.

MR. HANNON: When you were -- let's back up. You weren't working on the day of the escape. How did you hear about the escape?

MR. JENNINGS: My fiancee called me on my cell phone, and I was out of town. I was in Baltimore on a

15

shopping trip. She called me and she told me somebody called me from the job and you need to contact them ASAP. I said, who was it? She said, deputy warden -- I can't recall his name. What is his name? Anyway, she told me the name. And I said, who? She said, deputy warden, blah, blah, blah, you know, the deputy warden's name. I said, are you sure. I said, I'm off today; I don't need to call him. She said no, it's very important that you get in touch with him because something happened at the jail.

I said, okay, I'll call. I got off the phone with her and I called immediately. I called him. I called the Command Center. I don't know if they transferred me or I called his direct line. He said, how are you doing? I said, what's going on, sir? He said, you need to come into the jail. I said, I'm off today; why do I need to come in? He said, because we had a situation at the jail and I can't go into what happened, but you need to come in. I said, right now I'm in Baltimore on a shopping trip. I did not drive. I'm on a bus trip. He said okay, well, what time are you expected in? I said, I really don't know, whenever

16

the people get finished. We probably won't leave until about 6:00 or 7:00. He said, whenever you get back in town, you come directly to the jail immediately. I said, okay, sir, no problem.

We stayed there for a while. We left, and I reported to the jail. I must have got there around between 6:00 and 7:00, 6:30, 7:00, something like that. That's when they told me -- I said, why did I need to come here? I don't even know what happened. I just had to go there and find out what happened for myself.

MR. HANNON: What happened when you got to the jail? Were you interviewed?

MR. JENNINGS: I was interviewed when I got there, but before I got there, before I got to the jail, I seen -- I mean before I got up to the first floor, I seen a couple of people before I got there, before I was going up. I was hearing little stuff going on. People was talking and talking, but I couldn't really understand what they were saying. I was like -- they said, you need to hurry up and get here; it's kind of urgent.

I get up there, and when I get up there, the

first person I see is Douglas. He is in the hallway waiting to be interviewed, but he is down by the stairwell. And then I seen Captain Holmes. When I came around the corner, both of them were together or in the same area, Douglas and Captain Holmes.

MR. HANNON: I've got to ask you a question.

MR. JENNINGS: Go ahead.

MR. HANNON: When you are reciting what occurred, are you seeing it like a movie?

MR. JENNINGS: Yes.

MR. HANNON: The reason I ask you that is because you kind of look off like you are looking at a screen.

MR. JENNINGS: It's coming to me.

MR. HANNON: Is that sort of your habit?

MR. JENNINGS: No. It's just plain as day. I can see it as I'm speaking and ** reliving it.

MR. HANNON: The reason I wanted to ask you is sometimes you're looking at Dr. Lesansky; other times it looks like you are looking at a movie. That's okay.

MR. JENNINGS: I'm trying to relive everything that happened.

MR. HANNON: He is the expert on that; I'm not.

Okay. So you see Captain Holmes and --

MR. JENNINGS: -- and Douglas. They were at the top of the stairwell, like before you come around the corner to go to the warden's office. I said, Doug, what's going on? He said man, you won't believe what happened. I said, what's going on? He said, Leaks and another inmate took the buffer, broke out the warden's window and escaped. They're gone. I said, Doug, man, stop playing, man, stop playing; what really happened? Why am I here? He said, do I look like I'm laughing? I said, what? Are you serious?

Yep. I said, say that again. He said, Leaks and another inmate, took the buffer, bust the warden's window and escaped.

MR. HANNON: Was Holmes there at the time?

MR. JENNINGS: Holmes was in the area, but he wasn't right up front where Doug was telling me. He was saying it kind of low so just me and him can hear.

MR. HANNON: You were supposed to be reporting to the warden's office?

MR. JENNINGS: Yeah. I said, did they catch them? He said, no. I was like, oh my -- I said, let me get where I need to be.

When I was coming down the hallway, I seen Captain Holmes. I said, Captain, what is going on? He said, man -- he had a stack of I.D. cards in his hands along with another envelope and a lot of other things.

MR. HANNON: Captain Holmes did?

MR. JENNINGS: Captain Holmes did. He said, I've got all of the other I.D.s except -- he showed me. He said, I've got all of the other I.D.s except for the one you gave me a while back. I had no clue that the I.D. had something to do with the escape. I said, well, I gave it to you before I left. I said, let me get around here and see who I need to go see. I need to report to the warden. So right there he admitted to me that --

MR. HANNON: No, no, no, just tell the story. It's not an argument.

MR. JENNINGS: Okay. So what happened is I went and said, let me go around there and see what they tell me. I go around there. They had somebody they

were already speaking with. Someone was in there or waiting to be seen. So I'm standing outside waiting to be called next or to see who is going to be interviewed next.

So right shortly after, he called me in, he said, come on in, Jennings. I'm speaking with him.

MR. HANNON: Who is this?

MR. JENNINGS: This is the deputy warden.

MR. HANNON: Whose name you can't recall?

MR. JENNINGS: Whose name I cannot recall right now, but it's in the paperwork. Anyway, I said, what's going on? He told me everything that went on about the escape, that the guys came -- it was the guy from environmental. It was the guy who's our detail man. He said, Jennings, this is a guy you work with every day. He said Leaks, are you familiar with him? I said, yeah, I'm familiar with him.

So he said okay, you're going to have to be -- you're going to have to see Internal Affairs. I had to go in and talk to them shortly after I got finished talking to deputy warden. I said, well, why am I being interviewed? I said, I'm off -- I'm off today; I'm

coming in from a trip. You're telling me that I need to speak to Internal Affairs about something that went on that I don't know nothing about? He said it's just standard procedure.

MR. HANNON: Did he say anything to you about the badge?

MR. JENNINGS: No, he never said anything to me about the badge.

MR. HANNON: Did you talk to IA that evening?

MR. JENNINGS: Yes, that evening I spoke to Internal Affairs.

MR. HANNON: How many people were interviewed?

MR. JENNINGS: I think it was two. Jenkins was in there with me as the union person. There was a young lady and another guy, kind of a heavy-set guy.

MR. HANNON: Did they have Beachum's badge?

MR. JENNINGS: I think they had a photostat copy of it, of the badge. They asked me did I know this guy. I said, no, he don't look familiar. They showed me Leaks. They said, do you know this guy? I said, yeah, I work with him every day. He's on my environmental squad. That guy, I don't know him because

this was three weeks ago. I mean, a while back --

MR. HANNON: Wait a minute. Did they show you a picture of Beachum or did they show you a picture of the badge or did they show you a picture of Jones?

MR. JENNINGS: They may have showed me -- I don't recall exactly what it was, but they showed me a picture of Beachum. I don't know if it was a photocopy of the badge or if it was his mug shot. I think it may have been a shot like from an I.D. card or something like that, because I think it was smaller than the actual badge, because on the badge, the pictures are a little bit larger.

MR. HANNON: Now, when you were talking to internal affairs, did they ask you whether you did any paperwork for, quote, disciplining, unquote, Beachum? Did they ask you about that?

MR. JENNINGS: Yes, they did. Go ahead.

MR. HANNON: Did they address that with you?

MR. JENNINGS: They asked me about the badge, because I wasn't really clear when I -- I said, oh, yeah -- they said, this is Beachum, this is someone that you took a badge from a couple of weeks ago. I said,

yeah, I took a badge from him because he was caught coming out of the bathroom. The reason why I turned it into Captain Holmes is because anytime we have a problem with an inmate, we need to let Captain Holmes know. I said, but I spoke with Hudson, his supervisor, and I told him I had no intention of writing him up. I was just going to lay him down for a day or two.

MR. HANNON: Let me ask you a question. We have indicated in your presentation that a union representative saw Captain Holmes with 15 or 20 inmate identification badges.

MR. JENNINGS: Yeah.

MR. HANNON: Who was that?

MR. JENNINGS: That was Jenkins, because he was --

MR. HANNON: Tyrone Jenkins?

MR. JENNINGS: Tyrone Jenkins.

MR. HANNON: Now, the proposal that Dr. Lesansky is considering indicates that you're accused of not doing the proper paperwork regarding your discipline of Beachum. What I want to know is, what is your response to that? What was the procedure as far as

you understood it for preparing paperwork in connection with what you did with Beachum?

MR. JENNINGS: Anytime there is a disciplinary action taken on an inmate, it's up to the officer's discretion as to whatever he chooses to do, either write the inmate up on a disciplinary report or you can either counsel the inmate. You can just counsel the inmate without any paperwork being involved. If you counsel the inmate and identify him properly, then a write-up is not necessarily.

Now, I think that -- I'm sure that if I were to have shook him down -- by him lying to me at the bathroom and thinking that he may have some contraband, if I would have -- I mean, if I would have found some contraband on him that he was trying to hide or anything, then I would have took more severe punishment or more severe -- I would have written him up and I would have followed the disciplinary channels as far as disciplinary action.

MR. HANNON: What is the procedure when you write somebody up?

MR. JENNINGS: Write a disciplinary report,

and you submit it to the immediate supervisor.

MR. HANNON: In your case it would be --

MR. JENNINGS: Captain Holmes, but you can let his supervisor know because he is not my man. He's Hudson's detail man.

MR. HANNON: Beachum?

MR. JENNINGS: Yeah, Beachum. I would tell Hudson, your inmate, I'm going to write a disciplinary report on him.

MR. HANNON: Have you talked to -- Hudson, what rank is he?

MR. JENNINGS: Corporal, like I am.

MR. HANNON: Have you talked to Hudson since this happened?

MR. JENNINGS: No.

MR. HANNON: Why is that?

MR. JENNINGS: Because I just didn't.

MR. HANNON: Okay.

MR. JENNINGS: He wasn't even questioned or even asked to give a statement or nothing as far as being Internal Affairs or anything like that. I would have thought he would be the next person behind me to

see what happened, just to see if I was telling the truth.

MR. HANNON: Did anybody tell you they had spoken with Inmate Beachum, that you can remember?

MR. JENNINGS: No, not that I can remember.

MR. HANNON: Okay. Let's talk about the badge itself. Have you ever worked -- what is the badge for?

MR. JENNINGS: Laundry.

MR. HANNON: Have you ever worked laundry detail?

MR. JENNINGS: No.

MR. HANNON: So how long have you worked environmental?

MR. JENNINGS: I was in environmental for not quite a year, almost a year, but not quite a year.

MR. HANNON: At the time of this incident, what was the procedure for issuance of detail badges for environmental?

MR. JENNINGS: For my squad, environmental?

MR. HANNON: Yeah.

MR. JENNINGS: They would have to be checked with the C&P to make sure of his classification, that he

is eligible.

MR. HANNON: Whose job is that?

MR. JENNINGS: For the C&Ps.

MR. HANNON: I'm just talking about the people already on environmental detail.

MR. JENNINGS: Captain Holmes gave it to them.

MR. HANNON: When do they get them?

MR. JENNINGS: They get them whenever they find out the information is clear on the day they've been -- whenever they've been hired. They can't actually work until they actually get a badge.

MR. HANNON: Who actually prepares the badge? Who makes them?

MR. JENNINGS: A guy by the name of Mr. Parker. Parker works the -- what is that called? The unit where they print up the badges or take the pictures. There is a name for that, but I just can't recall it.

MR. HANNON: How does Parker need to be made up for a particular inmate?

MR. JENNINGS: Captain Holmes tells them.

MR. HANNON: And then when he produces the

badge, it goes to whom?

MR. JENNINGS: Captain Holmes takes it directly to the unit and he would give it to the man that's being hired because he wants to know -- he talks to the guy that interviewed the people before they are actually being hired; as long as you don't have any problem getting up in the morning, and we're going to be needing you maybe two to three times a day, I mean, so if you are not going to be able to get up, then I can't use you. Most of the time the guys that apply, they want to work, so they'll say, okay, I'll get up.

MR. HANNON: So as far as you understand, Captain Holmes at some point has a face-to-face with the people that he's recruited?

MR. JENNINGS: Correct.

MR. HANNON: Now, did you know that Leaks came out of Southwest Three?

MR. JENNINGS: Soughtwest Three? No, I had no knowledge of that.

MR. HANNON: Does the inmate on the environmental patrol keep the badge with them?

MR. JENNINGS: During -- while they are out of

29

the unit and they're performing their duty, the badge has to be displayed on them at all times.

MR. HANNON: When they're not performing their duties, where is the badge?

MR. JENNINGS: Kept in command -- I mean, in the office of the unit, in the bubble.

MR. HANNON: So the inmate, when it's time for him to go to work -- in your case, you go pick up the men on your detail; is that right?

MR. JENNINGS: Correct.

MR. HANNON: The people in the bubble will give them their badges?

MR. JENNINGS: No, I go in the bubble myself, and I go and retrieve the badges, because a lot of times there would be so many in there, and the people that work in there don't actually know which particular badges go with who. All they know is they're color-coded.

MR. HANNON: Okay.

MR. JENNINGS: So the people that work, I go in there and I tell them, I am getting a badge for environmental. They get a correct count of how many

30

people I've got, and I have to perform a count slip to give to them as the people go out. As they come out, we both, the officer in the bubble and myself, count the people as they come out, match the face with the picture on the badge, because the picture is right on the badge.

MR. HANNON: Now, when Beachum went back in his unit, did you already have the badge?

MR. JENNINGS: Yes, uh-huh

MR. HANNON: So you walked him back into the unit?

MR. JENNINGS: I walked him into the unit and to the cell.

MR. HANNON: Now, to your knowledge -- I'm asking about your personal knowledge, did Captain Holmes have other passes, other badges in his office?

MR. JENNINGS: Yes.

MR. HANNON: How do you know that?

MR. JENNINGS: Because I'm the one that turns the badges into the captain.

MR. HANNON: Now, I'm talking about other badges besides --

MR. JENNINGS: From another detail you mean?

31

MR. HANNON: Well, you've already told us about Beachum's badge.

MR. JENNINGS: Right.

MR. HANNON: Were there other occasions in which you turned badges into Captain Holmes?

MR. JENNINGS: Yes.

MR. HANNON: Explain to Dr. Lesansky what circumstances would arise that would cause that?

MR. JENNINGS: If a person has went to another institution or he went to another unit or he's no longer in North One and he's just not in our detail, he gets lock down or he either goes to another unit, I take the badges that are left and he's no longer in there, and I turn them into Captain Holmes.

MR. HANNON: So badges that are no longer authorized for one reason or another --

MR. JENNINGS: Right.

MR. HANNON: -- they go back to Captain Holmes?

MR. JENNINGS: Right.

MR. HANNON: Is there a written procedure regarding that or is that --

32

MR. JENNINGS: No, that's just protocol, what we were doing, because you don't want a badge just lingering for someone else to get, so I be sure that I turn them into my immediate supervisor.

MR. HANNON: So you either go to the bubble and get them or --

MR. JENNINGS: Right, because when I go to the bubble to pick up my men, they'll say, you know, Johnson he's not here anymore; he went to the FEDs today; and Jackson, he left to go to the hospital today; and such and such, he's not going to be here either.

So I take the badge and I collect them for the ones who are no longer on the squad and I turn them into Captain Holmes. This was an ongoing thing, because I didn't want the remaining badges to be lingering in the unit, so I take them and just give them to Captain Holmes.

MR. HANNON: What would he do with --

MR. JENNINGS: Put them in his drawer, in his desk, the same desk that he would be sitting at. He would open the drawer and put them in the drawer.

MR. HANNON: Now, is Captain Holmes' office

33

kept locked?

MR. JENNINGS: Most of the time, yes.

MR. HANNON: Do you have keys to his office?

MR. JENNINGS: I have keys.

MR. HANNON: Who else has keys?

MR. JENNINGS: Douglas has keys.

MR. HANNON: Who else?

MR. HANNON: Fire Marshall Jenkins, which is another officer that was sharing an office with Captain Holmes. That was about it. And himself, he had a key.

MR. HANNON: You talked about having discretion in terms of how to deal with misconduct by an inmate. Is that in writing?

MR. JENNINGS: Yes.

MR. HANNON: What do you think -- what do you think it says?

MR. JENNINGS: As far as a minor, a minor infraction, if it's something like a minor infraction, it's up to the officer's discretion, whether he thinks about like writing a disciplinary report or whether he can be counseled by the officer.

MR. HANNON: You don't have to do any

34

paperwork for a counseling session?

MR. JENNINGS: No.

MR. HANNON: How long have you worked for the Department of Corrections?

MR. JENNINGS: Approximately -- it will be 22 years in July.

MR. HANNON: 22 years?

MR. JENNINGS: 22 years in July.

MR. HANNON: Now, you either started young or you look young.

DR. LESANSKY: Both.

MR. HANNON: You're right.

MR. HANNON: Just some background. Where did you grow up and how did you find your way to the Department of Corrections?

MR. JENNINGS: I grew up in Washington D.C. and have been here most of my life. I had been in the Marines for four years. When I departed the Marines, my cousin was working for the Department of Corrections. He was telling me about trying to seek employment when I got out, that I should try the Department of Corrections.

35

MR. HANNON: What was your rank when you left the Marines?

MR. JENNINGS: I was corporal.

MR. HANNON: You enlisted, I guess?

MR. JENNINGS: Yes.

MR. HANNON: How long were you enlisted?

MR. JENNINGS: 19 -- when I went in, you mean?

MR. HANNON: Yes.

MR. JENNINGS: 19.

MR. HANNON: Where did you go to high school?

MR. JENNINGS: Eastern High School.

MR. HANNON: So you enlisted shortly after Eastern?

MR. JENNINGS: The year I graduated. I think I graduated in -- the year I graduated, I went in the service; joined the Marines.

MR. HANNON: Did any of your other classmates try to influence you to do that?

MR. JENNINGS: To do what? Corrections?

MR. HANNON: To go to the Marines.

MR. JENNINGS: No, I pretty much had my mind set.

36

MR. HANNON: Where did they have you go?

MR. JENNINGS: Who? My friends?

MR. HANNON: No, the Marines.

MR. JENNINGS: Everywhere. Places I have visited?

MR. HANNON: No, places on duty.

MR. JENNINGS: A lot of places. Do you want me to name them?

MR. HANNON: Yeah.

MR. JENNINGS: Japan, I was in the Philippines, Honduras, Diego Garcia -- are you familiar with that?

MR. HANNON: I've heard of it.

MR. JENNINGS: Diego Garcia, Japan, Tokyo.

MR. HANNON: You had easy tours.

MR. JENNINGS: No, not really. I was in Beirut, too.

MR. HANNON: When were you promoted to corporal?

MR. JENNINGS: I can't remember when. It was my -- just before my last year-and-a-half before we was getting out, because I was too short to go on another

flow.

MR. HANNON: Say that again.

MR. JENNINGS: I was too short to go on another flow. I mean, my time was too short. I was getting close to my time getting out. They wanted me to ** reenlist, they'd give me a bonus, give me another promotion, give me a change of duty, station, and I turned it down. I said I wanted to be home with my family. So thanks, but no thanks.

MR. HANNON: Is your family still in the area?

MR. JENNINGS: Yes.

MR. HANNON: Who is here?

MR. JENNINGS: I'm still with my fiance and my daughter, and my mother and my sister and my cousin.

MR. HANNON: How old is your daughter?

MR. JENNINGS: 25.

MR. HANNON: What does she do?

MR. JENNINGS: She works for the Smithsonian. She is a Federal Officer for the Smithsonian.

MR. HANNON: Following in your footsteps?

MR. JENNINGS: I guess you can say that.

MR. HANNON: Was she ever in the service?

MR. JENNINGS: No, she was not in the service.

MR. HANNON: You didn't push that?

MR. JENNINGS: No, she didn't want to go and I didn't push her.

MR. HANNON: So you had four years in the Marine Corp., 22 years in the --

MR. JENNINGS: In July coming up.

MR. HANNON: -- Department of Corrections?

MR. JENNINGS: Right.

MR. HANNON: So how young a man are you?

MR. JENNINGS: Right now I'm 44.

MR. HANNON: What has been your record with the Department of Corrections in terms of getting in trouble?

MR. JENNINGS: I have not gotten in trouble since I have been there, that I can recall.

MR. HANNON: Did you get evaluations -- you're supposed to get evaluations annually.

MR. JENNINGS: Sometimes we do and sometimes we don't.

MR. HANNON: What have your evaluations been?

MR. JENNINGS: Outstanding.

MR. HANNON: You've had some outstandings?

MR. JENNINGS: Yes, outstanding.

MR. HANNON: That's the top?

MR. JENNINGS: That's the top.

MR. HANNON: Have you always gotten outstandings?

MR. JENNINGS: Not only one, quite a few.

MR. HANNON: Quite a few?

MR. JENNINGS: In my 22 years, I've had outstandings. I can say most were -- some were excellent, never below excellent.

MR. HANNON: Have you ever aspired to any additional rank in the Department of Corrections? I guess the next step would be sergeant?

MR. JENNINGS: Well, I did. I did at the time.

MR. HANNON: When?

MR. JENNINGS: When I was there. When I was actually working day-to-day, I had expectations of being a sergeant.

MR. HANNON: Did you ever take the exam?

MR. JENNINGS: Yes, I took the exam.

MR. HANNON: How many times?

MR. JENNINGS: One time, and I passed it.

MR. HANNON: What happened?

MR. HANNON: You had to go to -- there's three phases when you go for sergeant. I passed the first phase, and then you have to go to the second phase, which is a written board and an oral board. At first they told me that I failed the second part, but then they gave us letters, gave people letters to say that your additional points were added to your score, and your actual score is this particular amount, which is like a point shy of what you need to pass the second phase. So I didn't really -- I didn't pass the second phase.

MR. HANNON: How long ago was that?

MR. JENNINGS: This was -- I can't really recall. I'm going to give a guess. I'd say probably three years ago -- I would say four years ago.

MR. HANNON: Were you disappointed?

MR. JENNINGS: Yes, I was very disappointed. But the test, it was a test that was redone, because a lot of people had points that they had gave to them for

various reasons. The whole test had to be ** revamped, had to be done all over again.

MR. HANNON: I'm curious as to why you were selected to the environmental detail. Do you have any thoughts on that?

MR. JENNINGS: No. I mean, I inquired about it a couple of years ago. One of the other officers had it, and then when the spot became available, Captain Holmes came to me and asked me would I mind working with environmental.

MR. HANNON: Does Captain Holmes have any military background, to your knowledge?

MR. JENNINGS: I think so, yes.

MR. HANNON: And you know that Herbert Douglas was in the Air Force?

MR. JENNINGS: Correct.

MR. HANNON: Do you know any other men or women who work in environmental?

MR. JENNINGS: The guy that's on -- I can't recall his name.

MR. HANNON: Does he have prior military?

MR. JENNINGS: Sergeant Ford.

MR. HANNON: Sergeant Ford, does he have prior military?

MR. JENNINGS: Yes, he has prior military.

MR. HANNON: So do you think your experience attributed to that?

MR. JENNINGS: Maybe.

MR. HANNON: Did you like doing the environmental details?

MR. JENNINGS: I enjoyed it.

MR. HANNON: And were you able to get the work done?

MR. JENNINGS: Yes.

MR. HANNON: What was the goal that Captain Holmes pushed for in environmental detail?

MR. JENNINGS: To keep the jail as clean as possible with the number of people that we had in a short period of time.

MR. HANNON: I understand there was a point when the number of inmates on environmental detail increased significantly?

MR. JENNINGS: Yes.

MR. HANNON: What was the reason for that?

MR. JENNINGS: They had different details that were -- that came up as far as painting.

MR. HANNON: They had more work.

MR. JENNINGS: Yeah, they had more work, because we were basically -- we were basically concentrating on the cleanliness of the jail and getting it to a capacity where it was more presentable. And it was being done, it was being noticed, very noticed.

MR. HANNON: So you were successful?

MR. JENNINGS: Correct.

MR. HANNON: And is it true that given the number of correction officers on the environmental detail and the number of men on the environmental detail, that there were times when they would be working without a correctional officer necessarily in visual contact?

MR. JENNINGS: Every day.

MR. HANNON: Do you want to go back to -- do you want to continue to work for the Department of Corrections?

MR. JENNINGS: Yes, I do.

MR. HANNON: Why?

MR. JENNINGS: Because I enjoy it.

MR. HANNON: Aren't you -- I mean, you've been -- you were out of work for a year?

MR. JENNINGS: Yeah, but life goes on and my bills have to be paid.

MR. HANNON: You've got a background where you could --

MR. JENNINGS: Go anywhere.

MR. HANNON: -- go anywhere you want.

MR. JENNINGS: Well, I probably will. After I get there and get established and get things straight, I probably will apply for a transfer. If it meets my needs, maybe I will.

MR. HANNON: But as far as Dr. Lesansky is concerned, you're basically here because you'd like to go back?

MR. JENNINGS: Correct.

MR. HANNON: Do you feel that there is anything that you did that you would change or do differently the next time around?

MR. JENNINGS: Yes.

MR. HANNON: What's that?

45

MR. JENNINGS: As far as reporting to the supervisor everything that's being done, to my immediate supervisor and the shift manager, so just it won't just be one person that knows what's going on; it would be more than one.

MR. HANNON: So you're taking more steps to CYA, is that the way to describe it?

MR. JENNINGS: To what? CYA?

MR. HANNON: Taking more steps to protect yourself?

MR. JENNINGS: Right.

MR. HANNON: Won't that require additional work, additional contacts, additional communication?

MR. JENNINGS: Yeah. If so, then so be it. I don't have any problems with that.

MR. JENNINGS: And did you work overtime?

MR. JENNINGS: Yes, some, I did.

MR. HANNON: Voluntary or draft?

MR. JENNINGS: Both. Some drafted, some voluntarily.

MR. HANNON: Other than being on the block and working details, in your 22 years, what else have you

46

done?

MR. JENNINGS: I worked at maximum security in Lorton.

MR. HANNON: So you were at Lorton?

MR. JENNINGS: I was at Lorton before they closed.

MR. HANNON: Is that where you started?

MR. JENNINGS: Yeah, I started at Lorton.

MR. HANNON: When you come up from Lorton, did you get any special training on how to operate the jail?

MR. JENNINGS: Yes, we had a little training. It was a refresher course. We were in a refresher course at the jail so we can get a pretty good view of how the jail was run because it was different than the way Lorton runs.

MR. HANNON: Right. That's all I'm going to ask you about. Is there anything else that I have not asked you that you would like to say to Dr. Lesansky before we wrap up?

MR. JENNINGS: Yes, about the evidence that shows in the transcript on the Internal Affairs interview, how come all of the paperwork -- or how all

47

that everything that was said on the, you know, recording device, it wasn't transferred over to the paperwork so you can see everything that was said, because I'm more than sure, I'm positive that when I was interviewed, that I told them that I turned the I.D. cards into Captain Holmes on several occasions.

And Jenkins, who was the union guy, he was there with me, and he even mentioned it and told them that I did say that I turned the I.D. card into Captain Holmes, but in the transcript, in the paperwork, nothing is shown, nothing is said, even the actual footage of the audiotape, I never heard that we even had that.

MR. HANNON: We weren't given the audiotape?

MR. JENNINGS: Right.

MR. HANNON: But there was no person like this lovely lady taking this down; was there?

MR. JENNINGS: No.

MR. HANNON: They had a tape recorder?

MR. JENNINGS: Yeah, and they cut it off several times.

MR. HANNON: Who interviewed you? A woman?

MR. JENNINGS: A lady.

48

MR. HANNON: Wanda Patton?

MR. JENNINGS: Yeah, and a gentleman, and I don't recall his name either.

MR. HANNON: Collins?

MR. JENNINGS: Yes, that's who it was.

MR. HANNON: Anything else? You were a corporal?

MR. JENNINGS: Yes.

MR. HANNON: When were you promoted to corporal?

MR. JENNINGS: Long ago.

MR. HANNON: All right. Dr. Lesansky may have some questions.

DR. LESANSKY: Yeah, I have a couple of things. One, I wanted to go back a little bit to this issue of what the policy is regarding the discipline for the employees, at least your understanding. I know in your response, you mentioned it here, you talked about the discretion that's left to an officer with regard to disciplinary reports. I believe your response says, you know, that you exercised that discretion and you described here what you did and what you said you were

going to do in terms of talking to Captain Holmes before you did anything further.

I noticed in the charges that were included, when they presented you the letter, they quote this correctional officers general order number nine, are you familiar with that?

MR. JENNINGS: I can't quote it right offhand.

DR. LESANSKY: It says, prepare and submit to the shift supervisor disciplinary reports on all inmates who commit violations, orders, rules, and regulations. That's one of the items that's quoted in the specifications as one of the basic regulations for all employees that have violated, in your case -- in this case.

I was wondering, are you familiar with that? Do you -- if that's being quoted correctly in its entirety, that's different from what you described as to the discretion is left to --

MR. HANNON: Can you read that again?

DR. LESANSKY: On page three of -- this is a March 15th letter to you when they're describing about the middle of page three, where they talk about

correctional officers general order number nine. And reading those words alone, not in context -- and I'm not saying the words in correct order or complete, but that language says that where an inmate -- although I realize it was not an inmate that was on detail, but nevertheless, you were the one that discovered him -- I forgot the exact words you said -- saw him in the bathroom. And then you go on to describe that he definitely was not authorized to be in the bathroom.

MR. JENNINGS: Right.

DR. LESANSKY: He misrepresented -- or I think you used the words he lied about why he said he was there since there are no mirrors. This language seems -- says that -- says that a disciplinary report is supposed to be prepared anytime an inmate commits a violation of the rules, separate and apart now from what you did when you confiscated his badge.

MR. JENNINGS: Right.

DR. LESANSKY: Since you have 22 years of experience, I was wondering if you could elaborate a little bit in terms of either your own personal knowledge of the other times that you did that or you

didn't do that or what -- what you understand is the general order regarding an inmate who violates rules and regulations requiring this discipline or not.

MR. HANNON: I actually have a copy of it. I don't know if you do.

DR. LESANSKY: Is it in here?

MR. HANNON: Let me just show it to Officer Jennings, Corporal Jennings. It's form 2.177 DCDC form, dated June of 1984, stock number 5945, captioned, correctional officers general orders.

Have you ever seen that before, this document?

MR. JENNINGS: It looks vaguely familiar.

MR. HANNON: I don't want you to guess, because that's what the doctor is asking you about. Number nine here is the one he's referring to, talking about, the DR. Do you know what a DR is?

MR. JENNINGS: Yes.

MR. HANNON: What's a DR?

MR. JENNINGS: Disciplinary report.

MR. HANNON: Is that what you would have used if you had found contraband on him?

MR. JENNINGS: Yes.

MR. HANNON: Were there any orders or rules or regulations that you specifically had in mind when you saw Beachum come out of the staff bathroom?

MR. JENNINGS: Well, as far as him coming out of the bathroom, I didn't -- by him being up -- I mean, the infraction was, it says, staff only, and they're not supposed to use the bathroom.

MR. HANNON: Okay.

MR. JENNINGS: But I did report it to my supervisor, but a disciplinary report was not -- wasn't drafted.

MR. HANNON: Now, Dr. Lesansky wants to know what your experience is when drafting a DR or not drafting a DR, particularly in light of the general order that seems to say that you have to do it every day for any violation.

MR. JENNINGS: Well, I mean, for all violations you're supposed to do it, but it's not always done. Even in my case right there, it wasn't done. It was an infraction, but such a small infraction. I guess I didn't really think that disciplinary would be suitable for the act.

Now, I can't say that that was the reason why I did shake him down, because I was looking for more or a larger infraction or seeing that he lied to me, and maybe he may have had something on him, and he didn't. So that's why a disciplinary wasn't drafted, but it was reported to my immediate supervisor.

MR. HANNON: Well, it sounds like what you are telling the doctor is you exercised your judgment in this particular case not to do a written report. Is that something that you have done in your 22 years, exercise your judgment to determine whether it's appropriate or not?

MR. JENNINGS: No.

MR. HANNON: Does every single inmate's infraction get written up every day?

MR. JENNINGS: Definitely not. Not from the people -- I don't think so. I know it is not.

MR. HANNON: So you would have done a DR if you had found contraband?

MR. JENNINGS: Yes, if it was something more severe or anything. Even if he would have given me a reason to do it, but he didn't, so I didn't.

MR. HANNON: I'm sorry, I interrupted you.

DR. LESANSKY: I guess I was just also wanting to follow up. So you're saying there are occasions certainly that you can recall that you did write a disciplinary report --

MR. JENNINGS: Oh, yeah.

DR. LESANSKY: -- for infraction? Contraband is, I know, the one you expressed?

MR. JENNINGS: Right.

DR. LESANSKY: You said had he had contraband -- I mean, I know you can't say necessarily what you would have done, but you're saying contraband would definitely be a case where a disciplinary report, in your understanding, should be written up?

MR. JENNINGS: Definitely.

DR. LESANSKY: And you would have done it?

MR. JENNINGS: Right.

DR. LESANSKY: Have you ever done one for contraband before?

MR. JENNINGS: Yes, plenty of times.

DR. LESANSKY: What other things, if I could

ask you, what kinds of infractions would you customarily write a disciplinary report for? What types of things have you, in fact -- I'm not asking you to name every one of them, but what types of things?

MR. JENNINGS: For disrespecting an officer. I mean telling me what you're not going to do and just refusing to comply with the rules, major contraband, throwing things on people, stuff like that.

DR. LESANSKY: I want to go back to the --

MR. HANNON: Can I follow up on that?

DR. LESANSKY: Of course.

MR. HANNON: There are times when I'm sure you have been disrespected and you hadn't done a disciplinary report?

MR. JENNINGS: Yes.

MR. HANNON: There has to reach a certain threshold?

MR. JENNINGS: I mean, as far as -- I mean, just by -- exactly, it has to reach a certain area. I mean, as far as words, if you write a disciplinary every time somebody cusses you out, you would be writing disciplinary reports every day. So I'm saying, as long

as the person don't really -- don't really, really get out of hand or pose a physical threat towards you or even act towards a physical way, like he's going to come towards you or even just be too boisterous or something, just being mean to you or saying things, then that's when a discriminatory report --

MR. HANNON: Have they made threats to kill you?

MR. JENNINGS: They have before when I was -- not since I have been at the jail, but at maximum, behind the wall, yeah.

DR. LESANSKY: I wanted to ask you a follow-up about Inmate Beachum's badge. You indicated earlier that you actually were asking about the omission -- if that's the right word -- from the IA report. Your memory is that you did tell the investigators that you gave the badge, though not physically, to Captain Holmes, that you put it on his desk at his request. He was eating or working on the computer. Officer Douglas was present when you did that?

MR. JENNINGS: Can I say something?

DR. LESANSKY: Please.

MR. JENNINGS: I think, they -- when I was giving -- when I was giving the statement, I think they may have misinterpreted it as far as me saying that I put the I.D. badge on the desk. I guess they were thinking that I put it on the desk and he wasn't present. He wasn't in the room or he wasn't there, but he was there, because he is the one that told me to place it on the desk. I think in their response, they were saying or even thinking that he wasn't there. That is the way they worded it or that's the way they perceived it.

DR. LESANSKY: I did want to ask you about that. That's why I'm spending a little time on it. Page two of the specifications where they're describing what you said to the investigators, they said when asked what you did with the I.D. card -- this is them talking -- you stated that you kept the card for that day and then put it in Captain Holmes' office. This is what they wrote.

MR. JENNINGS: That's not true.

DR. LESANSKY: You acknowledged that when Captain Holmes had not arrived at work at the time and

that you put the I.D. in his office, but you were able to enter the office because you had a key. You acknowledged that when Corporal Hudson questioned you about the I.D. card, you informed him that you would give the I.D. back to him -- Corporal Hudson -- when you checked with Captain Holmes -- and you talked about checking with Captain Holmes here -- however, you did not discuss the incident with Captain Holmes.

You stated a couple of days later, I just passed on the information to him and that was that. When asked if you returned the I.D. to North One, you responded, quote, not that I know of.

And the reason I'm asking about this, Corporal Jennings, is that description is a bit different than, you know, certainly what you said here today, you know, that you didn't hesitate when describing --

MR. JENNINGS: That's not --

DR. LESANSKY: -- your memory of what occurred, including going into Captain Holmes' office --

MR. JENNINGS: Correct.

DR. LESANSKY: -- when he was eating at the computer or --

MR. JENNINGS: Right.

DR. LESANSKY: I was just wondering if you --

MR. JENNINGS: That is not correct.

DR. LESANSKY: I was trying to get a little more clarity on exactly -- I don't want to say which version, but what actually --

MR. JENNINGS: Transpired?

DR. LESANSKY: -- transpired and occurred.

MR. JENNINGS: What I just said today. And I questioned about them asking -- I mean, the way they elaborated on that, when I first read that, I said that's not true. What they're saying in there and what I actually said was different, because I gave -- when I said on there that I gave Captain Holmes the I.D. badge, I kept asking, where is the audiotape? Let's see what the audiotape says, because what they're saying on that and what the audiotape is, is different, because myself and Jenkins even talked about that I said several times that I gave the I.D. card to Captain Holmes myself.

When I came -- when I went in his office, I had a key, and I wouldn't just leave the I.D. card on his desk, because I wanted to put it in his hands,

because when I first gave it to him, I wanted to give it to him in his hand, and he wouldn't accept it. He said, do you see what I'm doing?

DR. LESANSKY: Just staying on that general point for a minute, can we go back to when you arrived at the facility later that day once you returned from Baltimore, from your trip, and then, as directed, to the facility in the process of trying to find out what's going on and why you're there and what's up. Today you talked about seeing Officer Douglas and Captain Holmes in the hall, and that there was this moment as you described today where Captain Holmes actually came over to you and made comments to the effect of, I've got all of these I.D. cards -- and you said that you actually saw that he had stack of them. And you do repeat this in your response.

Basically, he said, well, I've got them all except the one that you gave me a while back. My understanding is that you were pretty soon after that interviewed by IA; correct, like within -- do you remember how long it was?

MR. HANNON: I have a copy of the transcript.

61

It was June 3rd. Sometimes they put the times on there, but they didn't put it. It's a total of 31 pages. And it's page seven -- if you have it --

DR. LESANSKY: I do.

MR. HANNON: Line eight -- well, line five, it says, once you took his I.D. card, what did you do with it? I kept the I.D. card.

For how long? For that day. I came back and I gave it to -- I turned it in to Captain Holmes who was my supervisor on the ground level.

MR. HANNON: So that's what you told them?

MR. JENNINGS: Yes.

MR. HANNON: If you read the interview, they didn't ask him detailed questions about who was there and where he put it on the table, but he clearly told them that he gave Captain Holmes the I.D., and so what is in the -- what does appear in the transcript is inconsistent with what they reflect in the report.

DR. LESANSKY: I know it's not necessarily reflected here, but do you recall saying to them that, in fact, Captain Holmes as recently as, I guess, that same day said to you -- asked you about the I.D. card

62

that you had turned into them, although I don't believe you said that he said it was Beachum or whether it was Beachum's name.

MR. JENNINGS: Are you saying if I said that the day I was interviewed?

DR. LESANSKY: Yes.

MR. JENNINGS: No, because they didn't ask me that. If they would have asked me, I would have told them.

DR. LESANSKY: Had they asked you, you would have said that --

MR. JENNINGS: I just had a few words --

DR. LESANSKY: Captain Holmes had said to you that you turned it into him?

MR. JENNINGS: Yes.

DR. LESANSKY: Even though, am I correct, he did not say Beachum; correct? He said what you said?

MR. JENNINGS: He said the --

DR. LESANSKY: -- which is the I.D. that you turned into me a while back --

MR. JENNINGS: Right. He didn't know -- I don't know what he knew as far as whose I.D. card it

63

was, because it was always -- he always kept I.D. cards in his drawer. There was several, not just one or two. It was like 15 or 25 I.D. cards from all of the I.D. cards that I gave him over the period that I have been in environmental, people that were in there that had gone to other institutions or got out. Some people were so short and they only had a couple of weeks to work, and they had left. They were gone.

So me and Douglas were turning I.D.s into Captain Holmes that were no longer needed because the inmate was no longer in the jail.

DR. LESANSKY: That was basically the last thing I wanted to ask you. In terms of when you mentioned, I think, in response to a question from Mr. Hannon about what cards you had -- badges that you had turned in, you know, over a period of time, were all of those badges environmental badges or were there some badges that were not environmental badges?

MR. JENNINGS: They had to be different badges because the one that he used was not an environmental badge.

DR. LESANSKY: Yeah, you said that his badge

64

was actually -- I think you said his badge was actually laundry?

MR. JENNINGS: Right.

DR. LESANSKY: And you said that you have seen places where they make a reference to it being an environmental badge?

MR. JENNINGS: Right.

DR. LESANSKY: When, in fact, Beachum's badge was a laundry badge, not an environmental badge?

MR. JENNINGS: Exactly.

DR. LESANSKY: But you are saying on other occasions, not that day, obviously, you have turned in badges to Captain Holmes that were not environmental badges?

MR. JENNINGS: No. Most of them that I turned in were environmental badges, because I had no need to take anybody else's from another detail, because I don't have no interaction with another detail. Only that one man, because that was the time he had a laundry badge and he was out of place. So if it's not really environmental men, anybody else I don't even deal with as far as me turning in the badge, because I really

don't have no reason to confiscate that badge, unless there's an infraction or one of the guys have gone home.

DR. LESANSKY: Can I ask you just as a last follow-up as to Inmate Beachum's badge which you confiscated following your contact with him, confrontation --

MR. JENNINGS: Right, it was Beachum's badge.

DR. LESANSKY: Was that among the few times or do you recall if it was the only time that you had ever confiscated a badge from an inmate?

MR. JENNINGS: The only time.

DR. LESANSKY: That was the only time that you recall in your 22 years that you confiscated a badge from an inmate and turned it in to your supervisor?

MR. JENNINGS: Correct.

DR. LESANSKY: That was the only time.

MR. JENNINGS: Right, outside of my environmental squad, yes.

DR. LESANSKY: That's all my questions.

MR. HANNON: One more thing I want to clarify. We did it with some of the other officers. In the proposal for discipline, they attached a bunch of

different orders. I mean, the dates on the orders, 2002, 1985, 1984, they haven't had any in-service training on general orders; have they?

MR. JENNINGS: Not that I know of.

MR. HANNON: Do they give you a book that has the general orders on it?

MR. JENNINGS: When you first start, there's like a book that they give you that's attached to the back of the book, all of the items in the back.

MR. HANNON: They gave you that when?

MR. JENNINGS: In '85, when I first started.

MR. HANNON: Since that time, did they do any updates on it?

MR. JENNINGS: Not that I know of.

DR. LESANSKY: Or reminders?

MR. JENNINGS: No, not as far as I know. And in-service training, it only deals with, you, know different things that we --

MR. HANNON: HIV?

MR. JENNINGS: HIV, hepatitis, health problems, or health reasons. Especially by us being in environmental, they are the ones throwing feces and

throwing urine, and we have to protect ourselves and things like that. And us being in environmental, we are the ones who come in contact with that a lot because we are the ones that keep it clean.

MR. HANNON: Let me ask you a different question. When they issue an order -- well, since you have started work, have they issued new general orders for various things?

MR. JENNINGS: Not that I recall.

MR. HANNON: So you don't remember an occasion while you've worked there where they have said, okay, we have a new general order and make you sign for it --

MR. JENNINGS: No.

MR. HANNON: -- to prove that you've been given it? You haven't had to do that?

MR. JENNINGS: No.

MR. HANNON: You don't even know if the general order was ever looked at from June of '84 was in your book in '85?

MR. JENNINGS: I really don't.

MR. HANNON: Do they assign the books out to you?

MR. JENNINGS: No, they just hand them out, like handout books. You don't sign for it. You receive it, you got it, and that's just it.

MR. HANNON: So to your knowledge, if that general order was in your book in 1985, would there ever be any reason for you to read it again?

MR. JENNINGS: Yeah, if you come up on a situation where you may need it.

DR. LESANSKY: But nobody instructs you on a regular basis to go to the general orders?

MR. JENNINGS: No.

DR. LESANSKY: I want ask you one more thing. I apologize for not asking you. How long -- over what period had Inmate Leaks been on your detail?

MR. JENNINGS: I can't recall exactly how long he had been there, but he was on there before he came on -- I know I was there when he came on. It was around about the time when Officer Washington retired. He was the officer that was Environmental Two, but then he retired. It was right after Leaks was brought in and stayed on for a while. That is when Officer Washington retired. So I would say maybe a month, a

69

month-and-a-half before Officer Washington left, if I can recall.

MR. HANNON: So you were short one officer on the environmental detail?

MR. JENNINGS: Correct, because when Washington left, no one took his place, so it was just me and Douglas only, just me and Doug.

(The Oral Hearing of Lorenzo Jennings was concluded at 4:15 p.m.)

70

CERTIFICATE OF SHORTHAND REPORTER

I, JANIE ARRIAGA, court reporter, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

______________________________

JANIE ARRIAGA
COURT REPORTER FOR
DISTRICT OF COLUMBIA

**A**

**able** 4:6 28:9 42:10 58:1
**accept** 60:2
**accomplished** 12:3,13
**accusations** 4:18 5:11
**accused** 23:20
**acknowledged** 57:21 58:3
**act** 52:22 56:3
**action** 24:4,19
**actual** 5:16 22:11 40:11 47:11
**actuality** 8:20
**added** 40:10
**additional** 39:13 40:10 45:12,13 45:13
**address** 22:18
**addressing** 5:11
**adjacent** 7:2
**administrative** 7:10
**admitted** 19:16
**affairs** 20:19 21:2 21:11 22:14 25:21 46:21
**ago** 22:1,22 40:15 40:18,18 41:7 48:11
**agreement** 2:15
**ahead** 17:7 22:17
**Air** 41:15
**allegation** 5:14
**allegations** 4:15
**allowed** 6:12
**amount** 40:11
**annually** 38:18
**answers** 10:20
**anybody** 13:7 26:3 64:17,21
**anymore** 32:9
**anytime** 23:3 24:3 50:15
**Anyway** 15:4 20:11
**apart** 50:16
**apologize** 68:13
**appear** 61:17
**apply** 28:10 44:12
**appropriate** 53:12
**Approximately** 34:5
**area** 7:11,13 17:5 18:18 37:10 55:19
**Aren't** 44:2
**argument** 19:19
**Arriaga** 1:20 2:15 70:2,14
**arrived** 57:22 60:5
**ASAP** 15:3
**asked** 4:1 8:16 9:16 21:18 22:19 25:20 41:9 46:18 57:15 58:11 61:22 62:8,10
**asking** 4:13 30:14 51:14 55:3 56:14 58:13 59:10,15 68:13
**aspired** 39:12
**assign** 67:21
**assist** 4:13
**attached** 65:22 66:8
**attributed** 42:5
**audiotape** 47:12 47:13 59:15,16 59:17
**authorized** 31:16 50:9
**available** 41:8
**Avenue** 2:7 3:15

**B**

**back** 9:8,16,16,19 9:20,20,21 10:13,14 12:10 14:4,18 16:2 19:12 22:1 30:6 30:9 31:18 43:18 44:16 48:15 55:9 58:5 60:5,18 61:8 62:20 66:9,9
**background** 34:13 41:12 44:6
**badge** 5:15,16,16 5:17 14:3 21:6,8 21:16,18 22:4,8 22:11,11,19,22 23:1 26:6,7 27:11,12 28:1 28:21 29:1,4,21 30:5,5,7 31:2 32:2,12 50:17 56:13,17 57:4 59:14 63:21,22 64:1,6,8,9,9,19 64:22 65:1,4,7 65:10,13
**badges** 23:11 26:17 27:16 29:12,14,17 30:15,19,21 31:5,13,15 32:15 63:15,17 63:17,18,18,19 64:13,14,16
**Baltimore** 14:22 15:20 60:7
**basic** 49:12
**basically** 43:5,5 44:15 60:17 63:12
**basis** 68:10
**bathroom** 5:22 6:3,5,8,12,13,20 6:22 7:1,3,5,10 7:20 8:16,17,21 10:18 14:2 23:2 24:13 50:8,9 52:3,5,7
**Beachum** 5:2,5,18 5:19 6:2,4,7,17 6:20 7:9 8:14,15 13:21 14:1 22:3 22:7,15,21 23:21 24:2 25:6 25:7 26:4 30:6 52:3 62:2,17
**Beachum's** 21:16 31:2 56:13 62:3 64:8 65:4,7
**began** 9:6
**BEHALF** 3:2,12
**Beirut** 36:17
**believe** 18:7 48:20 62:1
**bills** 44:5
**bit** 4:14 22:12 48:15 50:21 58:14
**blah** 15:6,6,6
**block** 45:21
**board** 40:7,7
**boisterous** 9:7 56:4
**bonus** 37:6
**book** 66:5,8,9 67:19 68:5
**books** 67:21 68:2
**briefing** 12:11
**broke** 18:9
**brought** 68:20
**bubble** 10:15 29:6 29:11,13 30:3 32:5,8
**buffer** 18:9,15
**bunch** 65:22
**bus** 15:21
**bust** 18:15

**C**

**C** 3:1
**call** 15:8,11
**called** 14:21 15:1 15:2,12,12,13 15:14 20:3,5 27:15
**can't** 15:4,18 20:9 27:10,17 28:9 36:20 40:16 41:19 49:7 53:1 54:11 68:15
**capacity** 43:7
**captain** 8:9 11:5,5 11:9,17,21 12:1 12:11,17 13:2 14:14 17:3,5 18:3 19:5,5,8,9 23:3,4,10 25:3 27:6,21 28:2,13 30:14,19 31:5 31:14,18 32:14 32:16,22 33:9 41:8,11 42:13 47:6,9 49:1 56:17 57:18,22 58:6,7,8,19 59:14,19 60:10 60:12 61:9,16 61:21 62:13 63:10 64:13
**captioned** 51:9
**card** 9:22 10:1,3 11:8,20 13:3,6,8 13:9,12,17 14:4 14:5,7,14 22:9 47:9 57:16,17 58:4 59:19,21 61:6,7,22 62:22
**cards** 10:16 19:6 47:6 60:14 63:1 63:3,4,15
**care** 13:18
**career** 4:15
**case** 25:2 29:8 49:13,14 52:19 53:9 54:13 70:8
**catch** 19:1
**caught** 10:18 14:1 23:1
**cause** 31:8
**cell** 9:21 10:13,13 14:21 30:12
**Center** 2:6 15:13
**certain** 55:16,19
**certainly** 54:4 58:15
**CERTIFICATE** 70:1
**certify** 70:2

**change** 37:7 44:19
**channels** 24:18
**charge** 5:21
**charges** 49:3
**checked** 26:21 58:6
**checking** 58:7
**chooses** 24:5
**circumstances** 31:8
**clarify** 65:20
**clarity** 59:5
**classification** 26:22
**classmates** 35:17
**clean** 42:15 67:4
**cleanliness** 43:6
**clear** 22:20 27:9
**clearly** 61:15
**close** 37:5
**closed** 46:6
**clue** 19:12
**collect** 32:12
**Collins** 48:4
**color-coded** 29:18
**Columbia** 1:1 2:16 70:15
**come** 4:1 6:20 8:14,15,19 15:16,17,19 16:3,9 18:5 20:6 30:2,4 46:9,22 52:3 56:3 67:3 68:7
**comes** 14:10
**coming** 6:14 7:10 10:18 13:4 14:1 17:14 19:4 21:1 23:2 38:7 52:4
**command** 15:13 29:5
**comments** 60:13
**commit** 49:10
**commits** 50:15
**communication** 45:13
**complete** 50:3
**comply** 55:7
**computer** 12:19 12:21 56:19 58:22
**concentrating** 43:6
**concerned** 44:15
**concluded** 69:9
**confiscate** 65:1
**confiscated** 50:17 65:5,10,13
**confrontation** 65:6
**connection** 24:1
**considering** 23:19
**contact** 15:2 43:16 65:5 67:3
**contacts** 45:13
**context** 50:2
**continue** 8:13 43:19
**contraband** 9:4 11:2 24:13,15 51:21 53:19 54:7,11,13,20 55:7
**cool** 4:8 11:15,16
**copy** 4:2 21:18 51:4 60:22
**corner** 17:4 18:6
**Corp** 38:6
**corporal** 5:20 25:12 35:3 36:19 48:7,10 51:8 58:3,5,13
**correct** 8:10 28:15 29:10,22 41:16 43:10 44:17 50:3 58:20 59:3 60:20 62:16,17 65:15 69:5 70:3
**correction** 43:12
**correctional** 7:20 43:15 49:5 50:1 51:10
**Corrections** 1:2 2:5 3:12,14 34:4 34:15,19,22 35:19 38:8,13 39:13 43:20
**correctly** 49:16
**corridor** 6:19
**couldn't** 16:18
**counsel** 24:7,7,8 70:7
**counseled** 33:21
**counseling** 34:1
**count** 12:10,14 29:22 30:1,3
**couple** 11:1 16:16 22:22 41:7 48:14 58:9 63:7
**course** 46:12,13 55:11
**court** 2:15 70:2 70:14
**cousin** 34:19 37:14
**curious** 41:3
**cusses** 55:21
**customarily** 55:1
**cut** 47:19
**CYA** 45:7,8
**C&P** 26:22
**C&Ps** 27:3

**D**

**dated** 51:9
**dates** 66:1
**daughter** 37:14 37:15
**day** 4:7 5:5,7,9,22 8:5,11 10:2 11:13,20,21 12:3,4,12,13 13:19 14:19 17:16 20:16 21:21 23:7 27:9 28:8 43:17 52:15 53:15 55:22 57:17 60:6 61:8,22 62:5 64:12
**days** 11:1 58:9
**day-to-day** 39:19
**DCDC** 51:8
**deal** 33:12 64:21
**deals** 66:17
**decision** 14:6
**definitely** 50:9 53:16 54:13,16
**departed** 34:18
**Department** 1:2 2:5 3:12,14 34:4 34:15,19,21 38:8,13 39:13 43:19
**deputy** 15:3,5,6 20:8,21
**describe** 45:7 50:8
**described** 48:22 49:17 60:12
**describing** 49:21 57:14 58:16
**description** 58:14
**desk** 13:11 32:20 32:20 56:18 57:4,5,8 59:22
**detail** 5:16,20 11:11 14:3 20:14 25:5 26:10,17 27:5 29:9 30:22 31:11 41:4 42:14,19 43:13 43:14 50:5 64:17,18 68:14 69:4
**detailed** 6:15 61:14
**details** 42:8 43:1 45:22
**determine** 53:11
**device** 47:2
**didn't** 4:21,22 9:6 9:11 10:6,10 11:1 14:8,15 25:17 32:15 38:2,3,4 40:13 40:13 51:1 52:5 52:21 53:4,22 53:22 58:16 61:2,14 62:7,21
**Diego** 36:11,14
**different** 43:1 46:14 49:17 58:14 59:13,17 63:19 66:1,18 67:5
**differently** 44:20
**direct** 4:16 10:20 15:14
**directed** 60:7
**directly** 16:3 28:3
**disappointed** 40:19,20
**discard** 4:21,22
**disciplinary** 24:3 24:6,18,19,22 25:8 33:20 48:20 49:9 50:14 51:19 52:10,21 53:5 54:5,14 55:2,14 55:20,22
**discipline** 23:21 48:16 51:3 65:22
**disciplining** 22:15
**discovered** 50:6
**discretion** 24:5 33:12,19 48:19 48:21 49:18
**discriminatory** 56:6
**discuss** 58:8
**displayed** 29:2
**displaying** 9:17
**disrespected** 55:13
**disrespecting** 55:5
**District** 1:1 2:16 70:15
**doctor** 51:14 53:8
**document** 51:11
**doing** 8:16,18 11:22 13:8,10 14:16 15:15 23:20 32:2 42:7

60:3
**don't** 4:3,4 5:10 9:8 10:20 11:10 14:9 15:8,13,22 16:9 21:3,19,22 22:6,7 28:6 29:16 32:2 33:22 38:20 45:15 48:3 51:5 51:13 53:17 56:1,1 59:5 62:1 62:22 64:17,21 65:1 67:10,17 67:20 68:2
**Doug** 12:22 13:18 14:13 18:6,10 18:19 69:7
**Douglas** 12:5,6,7 12:17 14:8,9 17:1,5 18:4 33:6 41:14 56:19 60:10 63:9 69:7
**Dr** 3:13 4:3,10,14 4:17 5:11 10:21 12:15 17:19 23:19 31:7 34:11 44:14 46:18 48:12,14 49:8,20 50:11 50:19 51:6,16 51:16,18 52:12 52:13,14 53:18 54:2,7,10,17,19 54:22 55:9,11 56:12,22 57:12 57:21 58:18,21 59:2,4,8 60:4 61:4,19 62:6,10 62:13,16,19 63:12,22 64:4,8 64:11 65:3,8,12 65:16,19 66:15 68:9,12
**draft** 45:18
**drafted** 45:19 52:11 53:5
**drafting** 52:13,14
**drawer** 32:19,21 32:21 63:2
**drive** 13:13,13,14 15:20
**duties** 29:4
**duty** 29:1 36:6 37:7
**D.C** 1:13 2:5,8 3:8,12,14,16 34:16

**E**

**E** 3:1,1
**earlier** 56:13
**Eastern** 35:11,13
**easy** 36:15
**eating** 12:19,20 14:16 56:19 58:21
**effect** 60:13
**eight** 61:5
**either** 24:5,6 31:12 32:5,11 34:9 48:3 50:21
**elaborate** 50:20
**elaborated** 59:11
**eligible** 27:1
**else's** 64:17
**employed** 70:7
**employees** 48:17 49:13
**employment** 34:20
**encountered** 7:9
**enjoy** 44:1
**enjoyed** 42:9
**enlisted** 35:4,6,12
**enter** 58:2
**entirety** 49:17
**envelope** 19:7
**environmental** 5:17,18 8:6,7 20:14 21:22 26:13,14,18,19 27:5 28:21 29:22 41:4,10 41:18 42:8,14 42:19 43:12,13 63:5,17,18,20 64:6,9,13,16,21 65:18 66:22 67:2 68:19 69:4
**equipment** 11:22 12:1
**ERICA** 3:20
**escape** 5:5,8 6:10 6:11 14:19,20 19:13 20:13
**escaped** 18:10,16
**escorted** 10:13
**Especially** 66:21
**ESQUIRE** 3:5
**established** 44:11
**evaluations** 38:17 38:18,21
**evening** 21:9,10
**evidence** 46:20
**exact** 50:7
**exactly** 22:6 55:19 59:5 64:10 68:15
**exam** 39:21,22
**excellent** 39:11,11
**exercise** 53:11
**exercised** 48:21 53:8
**expectations** 39:19
**expected** 15:22
**experience** 42:4 50:20 52:13
**expert** 18:1
**explain** 13:20,22 31:7
**expressed** 54:8

**F**

**face** 30:4
**face-to-face** 28:13
**facility** 60:6,8
**fact** 55:3 61:21 64:8
**failed** 40:8
**fair** 9:18
**familiar** 20:16,17 21:19 36:11 49:6,15 51:12
**family** 37:9,10
**far** 14:14 23:22 24:18 25:20 28:12 33:17 43:2 44:14 45:1 52:4 55:18,20 57:3 62:22 64:22 66:16
**feces** 66:22
**Federal** 37:19
**FEDs** 32:9
**feel** 44:18
**fiance** 37:13
**fiancee** 14:21
**financial** 70:8
**find** 16:10 27:9 34:14 60:8
**finish** 12:8
**finished** 16:1 20:20
**fire** 11:3,11 33:8
**firing** 4:19
**first** 11:17 16:15 17:1 40:5,7 59:11 60:1 66:7 66:11
**five** 61:5
**floor** 16:15
**flow** 37:1,4
**follow** 54:3 55:10
**followed** 24:18
**following** 37:20 65:5
**follow-up** 56:12 65:4
**food** 12:20
**footage** 47:11
**footsteps** 37:20
**Force** 41:15
**Ford** 41:22 42:1
**foregoing** 70:3
**forgot** 50:7
**form** 51:8,8
**found** 24:14 51:21 53:19
**four** 34:18 38:5 40:18
**free** 4:15
**friends** 36:2
**front** 12:20 18:19
**further** 49:2

**G**

**Garcia** 36:11,14
**gate** 9:20
**general** 49:5 50:1 51:2,10 52:14 60:4 66:3,6 67:7 67:12,18 68:5 68:10
**gentleman** 48:2
**getting** 10:16 11:18 12:22 28:7 29:21 36:22 37:5,5 38:13 43:6
**give** 4:2 10:3 11:16 13:9 14:4 14:5 25:20 28:3 29:12 30:2 32:16 37:6,6,7 40:17 58:5 60:1 66:5,8
**given** 5:11 43:11 47:13 53:21 67:15
**giving** 14:14 57:2 57:2
**go** 8:2 9:8,8 10:8 11:19 12:10,11 15:18 16:10 17:7 18:6 19:15 19:21,22 20:20 22:17 29:8,8,13 29:14,17,20 30:2 31:18 32:5 32:7,10 35:10 35:20 36:1,22 37:3 38:3 40:4,5 40:6 43:18 44:8 44:9,16 48:15 50:8 55:9 60:5 68:10
**goal** 42:13
**God** 11:2
**goes** 28:1 31:12

44:4
**going** 4:12,12 6:14 9:2 10:2,8 10:19,22 11:3,3 11:4,16 12:12 14:4 15:15 16:17,17 18:7,8 19:5 20:3,12,18 20:19 23:7 25:8 28:7,9 32:11 40:17 45:4 46:16 49:1 55:6 56:3 58:19 60:9
**good** 9:5 13:18 46:13
**gotten** 38:15 39:5
**graduated** 35:14 35:15,15
**grew** 34:16
**GRIMKE** 2:6
**ground** 61:10
**Group** 3:6
**grow** 34:14
**guess** 35:4 37:21 39:14 40:17 51:13 52:20 54:2 57:4 61:21
**guy** 20:13,14,15 21:15,15,19,20 21:22 27:14 28:5 41:19 47:7
**guys** 20:13 28:10 65:2

**H**

**habit** 17:15
**hadn't** 55:13
**hall** 60:11
**hallway** 7:8,12 17:1 19:4
**hand** 14:15 56:2 60:2 68:1
**handout** 68:2
**hands** 9:1 19:6 59:22
**Hannon** 3:5,6 4:1 4:10 5:2,4,7,10 6:2,9,21 7:5,9 7:14,16,19,22 8:4,8,11,13 9:10 9:12 10:4,20 11:14 12:6,14 13:20 14:18 16:11 17:6,8,11 17:15,18 18:1 18:17,21 19:8 19:18 20:7,9 21:5,9,12,16 22:2,13,18 23:8 23:13,16,18 24:20 25:2,6,10 25:13,16,18 26:3,6,9,12,16 26:20 27:2,4,7 27:12,19,22 28:12,16,20 29:3,7,11,19 30:6,9,13,17,20 31:1,4,7,15,18 31:21 32:5,18 32:22 33:3,5,7,8 33:11,15,22 34:3,7,9,12,13 35:1,4,6,8,10,12 35:17,20 36:1,3 36:6,9,13,15,18 37:2,10,12,15 37:17,20,22 38:2,5,8,10,12 38:17,21 39:1,3 39:5,8,12,17,21 40:1,3,4,15,19 41:3,11,14,17 41:21 42:1,4,7 42:10,13,18,22 43:3,9,11,18,22 44:2,6,9,14,18 44:22 45:6,9,12 45:18,21 46:4,7 46:9,16 47:13 47:15,18,21 48:1,4,6,9,12 49:19 51:4,7,13 51:18,20 52:1,8 52:12 53:7,14 53:18 54:1 55:10,12,16 56:7 60:22 61:5 61:11,13 63:15 65:20 66:5,10 66:12,19 67:5 67:10,14,17,21 68:4 69:3
**happen** 5:5 11:12
**happened** 6:5,14 13:21 15:10,19 16:9,10,11 17:22 18:8,11 19:20 25:14 26:1 40:3
**hard** 13:13,13,14
**haven't** 66:2 67:15
**headed** 7:22 8:2
**health** 66:20,21
**hear** 4:6 14:20 18:20
**heard** 36:13 47:12
**hearing** 1:12 2:1 16:17 69:8
**heavy-set** 21:15
**held** 2:2
**HENRY** 3:13
**hepatitis** 66:20
**Herbert** 12:6,7 41:14
**here's** 13:2
**hesitate** 58:16
**he's** 4:15 6:12 14:2 21:21 25:4 28:14 31:10,11 31:13 32:9,11 51:15 56:3
**hide** 24:15
**high** 35:10,11
**hired** 27:10 28:4 28:6
**HIV** 66:19,20
**hold** 11:4
**Holmes** 8:9 11:5,6 11:9,17,21 12:2 12:11,18 13:2 14:14 17:3,5 18:3,17,18 19:5 19:8,9 23:3,4,10 25:3 27:6,21 28:2,13 30:14 31:5,14,19 32:14,17,22 33:10 41:9,11 42:14 47:6,10 49:1 56:18 57:18,22 58:6,7 58:8,19 59:14 59:19 60:10,12 61:9,16,21 62:13 63:10 64:13
**home** 37:8 65:2
**Honduras** 36:11
**hospital** 32:10
**Hudson** 5:20,22 6:1,6,6,16,18,18 10:7,8,10,12,15 10:17 11:10 14:4 23:5 25:8 25:10,13 58:3,5
**Hudson's** 13:5 14:2 25:5
**hurry** 16:20

**I**

**IA** 21:9 56:15 60:20
**identification** 4:22 23:11
**identify** 24:9
**immediate** 25:1 32:4 45:2 53:6
**immediately** 15:12 16:3
**important** 15:9
**incident** 5:4 6:5,7 26:16 58:8
**included** 49:3
**including** 58:19
**inconsistent** 61:18
**increased** 42:20
**indicated** 23:9 56:13
**indicates** 23:19
**influence** 35:18
**information** 27:9 58:10
**informed** 58:4
**infraction** 33:18 33:18 52:6,20 52:20 53:3,15 54:7 65:2
**infractions** 55:1
**initial** 4:19
**ink** 13:15
**inmate** 5:2,4 8:14 11:6,10 13:3 18:9,15 23:4,10 24:4,6,7,7,9 25:8 26:4 27:20 28:20 29:7 33:13 50:4,5,15 51:2 56:13 63:11 65:4,10 65:14 68:14
**inmates** 12:9 42:19 49:9
**inmate's** 53:14
**inquired** 41:6
**inside** 7:5 10:8,12 10:12
**institution** 31:10
**institutions** 63:6
**instructs** 68:9
**intention** 23:6
**interaction** 64:18
**interest** 70:8
**internal** 20:19 21:2,11 22:14 25:21 46:21
**interrupt** 4:16 6:21
**interrupted** 54:1
**interview** 46:22 61:13
**interviewed** 16:12,13 17:2 20:3,22 21:12 28:5 47:5,21 60:20 62:5
**introduced** 4:11

**investigators** 56:16 57:15
**invite** 5:13
**involved** 24:8
**in-service** 66:2,17
**isn't** 8:20
**issuance** 26:17
**issue** 48:16 67:6
**issued** 67:7
**items** 49:11 66:9
**it's** 5:16,17 7:14 7:15 13:9,13,16 15:8 16:20 17:14,16 19:19 20:11 21:3 24:4 29:7 33:18,19 51:8 52:18 53:11 61:2,3,19 64:20
**I'd** 5:12 11:12 40:17
**I'll** 11:13 13:19 14:17 15:11 28:11
**I'm** 4:8,8,12 6:7 6:19 8:13 9:2 10:2,7,8,19,22 11:3,3,3,16 12:21 13:9,10 13:17 14:4,9,16 14:16 15:7,16 15:20,21 17:17 17:21 18:1,12 20:2,6,17,22,22 20:22 24:11 25:8 27:4 30:13 30:18,20 37:13 38:11 40:17 41:3 46:16 47:4 47:4 50:2 54:1 55:3,12,22 57:13 58:13 60:3
**I've** 11:17 17:6 19:10,11 30:1 36:13 39:9 60:13,17
**I.D** 10:1,16 11:4,8 11:17,20 13:3,6 13:8,9,12,17 14:4,5,14 19:6 19:13 22:9 47:5 47:9 57:4,16 58:1,4,5,11 59:14,19,21 60:14 61:6,7,16 61:22 62:19,22 63:1,3,3
**I.D.s** 19:10,11 63:9

**J**

**J** 3:5
**Jackson** 32:10
**jail** 6:22 15:10,16 15:18 16:3,6,12 16:14 42:15 43:6 46:10,13 46:14 56:10 63:11
**Janie** 1:20 2:15 70:2,14
**Japan** 36:10,14
**Jenkins** 21:13 23:14,16,17 33:8 47:7 59:18
**Jennings** 1:12 2:1 3:2 4:8,11,21 5:3,6,9,15 6:4 6:11 7:1,7,12,15 7:18,21 8:2,6,10 8:12,15 9:11,13 10:6,22 11:15 12:7,16 13:22 14:21 16:13 17:7,10,14,16 17:21 18:4,18 19:1,9,20 20:6,8 20:10,15 21:7 21:10,13,17 22:5,17,19 23:12,14,17 24:3,22 25:3,7 25:12,15,17,19 26:5,8,11,14,19 26:21 27:3,6,8 27:14,21 28:2 28:15,18,22 29:5,10,13,20 30:8,11,16,18 30:22 31:3,6,9 31:17,20 32:1,7 32:19 33:2,4,6 33:14,17 34:2,5 34:8,16 35:3,5,7 35:9,11,14,19 35:21 36:2,4,7 36:10,14,16,20 37:3,11,13,16 37:18,21 38:1,3 38:7,9,11,15,19 38:22 39:2,4,7,9 39:15,18,22 40:2,16,20 41:6 41:13,16,19,22 42:3,6,9,12,15 42:21 43:1,4,10 43:17,21 44:1,4 44:8,10,17,21 45:1,8,11,14,16 45:17,19 46:2,5 46:8,11,20 47:14,17,19,22 48:2,5,8,11 49:7 50:10,18 51:8,8 51:12,17,19,22 52:4,9,17 53:13 53:16,20 54:6,9 54:16,18,21 55:5,15,18 56:9 56:21 57:1,20 58:14,17,20 59:1,3,7,9 61:12 62:4,7,12,15,18 62:21 63:19 64:3,7,10,15 65:7,11,15,17 66:4,7,11,14,16 66:20 67:9,13 67:16,20 68:1,7 68:11,15 69:5,8
**job** 1:18 15:2 27:2
**Johnson** 32:8
**joined** 35:16
**Jones** 22:4
**judgment** 53:8,11
**July** 34:6,8 38:7
**June** 1:14 51:9 61:1 67:18

**K**

**keep** 5:18 28:21 42:15 67:4
**kept** 11:8 29:5 33:1 57:17 59:15 61:7 63:1
**key** 33:10 58:2 59:21
**keys** 33:3,4,5,6
**kill** 56:7
**kind** 16:20 17:12 18:20 21:15
**kinds** 55:1
**knew** 6:6 62:22
**know** 4:6 9:10,11 10:1,10 11:7,9 12:20 13:7 15:6 15:13,22 16:9 21:3,18,20,22 22:7 23:4,21 25:4 28:4,16 29:16,17 30:17 32:8 41:14,17 47:1 48:17,21 51:5,16 52:12 53:17 54:8,11 58:12,15,15 61:19 62:21,22 63:16 66:4,14 66:16,17 67:17 68:17
**knowing** 6:15
**knowledge** 28:19 30:13,14 41:12 50:22 68:4
**knows** 45:4

**L**

**lady** 4:5 21:15 47:16,22
**language** 50:4,13
**larger** 22:12 53:3
**laughing** 18:12
**laundry** 5:16,19 14:3 26:8,9 64:2 64:9,19
**Law** 3:6
**lay** 10:2,19,22 11:13 23:7
**leader** 8:8
**Leaks** 18:8,14 20:16 21:20 28:16 68:14,20
**leave** 16:1 59:21
**left** 7:4 9:22 13:19 14:8 16:5 19:14 31:13 32:10 35:1 48:19 49:18 63:8 69:1 69:6
**Lesansky** 3:13 4:3,10,14,17 5:11 10:21 12:15 17:19 23:19 31:7 34:11 44:14 46:18 48:12,14 49:8,20 50:11 50:19 51:6 52:12 54:2,7,10 54:17,19,22 55:9,11 56:12 56:22 57:12,21 58:18,21 59:2,4 59:8 60:4 61:4 61:19 62:6,10 62:13,16,19 63:12,22 64:4,8 64:11 65:3,8,12 65:16,19 66:15 68:9,12
**letter** 49:4,21
**letters** 40:9,9
**let's** 14:18 26:6 59:15
**level** 61:10
**lied** 9:2 10:18 13:5 50:12 53:3
**life** 34:17 44:4
**light** 52:14
**line** 15:14 61:5,5

**lingering** 32:3,15
**little** 4:14 11:22 13:15 16:17 22:12 46:11 48:15 50:21 57:13 59:4
**LLP** 3:6
**located** 6:22 7:1
**lock** 31:12
**locked** 33:1
**long** 26:12 28:6 34:3 35:6 40:15 48:11 55:22 60:21 61:8 68:13,15
**longer** 31:10,13 31:15 32:13 63:10,11
**look** 17:12 18:12 21:19 34:10
**looked** 67:18
**looking** 8:17,18 8:20 9:3 17:12 17:19,20 53:2
**looks** 17:20 51:12
**Lorenzo** 1:12 2:1 3:2 4:11 69:8
**Lorton** 46:3,4,5,8 46:9,15
**lot** 19:7 29:14 36:7 40:22 67:3
**lovely** 47:16
**low** 18:20
**lying** 24:12

**M**

**major** 55:7
**man** 10:17 11:12 18:7,10,11 19:6 20:15 25:4,5 28:3 38:10 64:19
**manager** 45:3
**March** 49:21
**Marine** 38:6
**Marines** 34:18,18 35:2,16,20 36:3
**Marshall** 33:8
**match** 30:4
**maximum** 46:2 56:10
**may** 22:5,8 24:13 48:12 53:4 57:3 68:8
**mean** 16:15 22:1 24:14 28:8 29:5 30:22 35:7 37:4 41:6 44:2 52:5 52:17 54:11 55:6,18,18,20 56:5 59:10 66:1
**meet** 12:9
**meets** 44:12
**members** 9:15
**memory** 56:16 58:18
**men** 6:15,18 8:3 10:9,15 11:18 13:5 14:2,11 29:9 32:8 41:17 43:13 64:21
**mentioned** 47:8 48:18 63:14
**MICHAEL** 3:5
**middle** 7:3 49:22
**military** 41:12,21 42:2,3
**mind** 35:21 41:9 52:2
**minor** 33:17,17 33:18
**minute** 22:2 60:5
**mirror** 8:17,19,19 8:20,21,22 9:3
**mirrors** 50:13
**misconduct** 33:12
**misinterpreted** 57:3
**misrepresented** 50:11
**moment** 60:11
**Monday** 1:14
**month** 68:22
**month-and-a-h...** 69:1
**morning** 8:12
14:11 28:7
**mother** 37:14
**movie** 17:9,20
**mug** 22:8

**N**

**N** 3:1
**name** 5:20 15:4,4 15:5,7 20:9,10 27:14,17 36:8 41:20 48:3 55:3 62:3
**names** 10:16
**necessarily** 24:10 43:15 54:12 61:19
**need** 4:5 9:18 10:1,7 12:4 15:2 15:8,16,17,19 16:8,20 19:3,15 19:15 21:1 23:4 27:19 40:12 64:16 68:8
**needed** 63:10
**needing** 28:8
**needs** 44:13
**neither** 70:6
**nervous** 4:6,9
**never** 6:6 21:7 39:11 47:12
**nevertheless** 50:6
**new** 67:7,12
**nine** 49:5 50:1 51:15
**North** 8:2 10:14 31:11 58:11
**Northwest** 2:7 3:7 3:15
**notes** 4:2,3
**noticed** 43:8,8 49:3
**number** 42:16,19 43:12,13 49:5 50:1 51:9,15

**O**

**obviously** 64:12
**occasion** 67:10
**occasions** 31:4
47:6 54:3 64:12
**occurred** 17:9 58:19 59:8
**offhand** 49:7
**office** 12:8,9,11 12:18 14:8 18:6 18:22 29:6 30:15 32:22 33:3,9 57:18 58:1,2,19 59:20
**officer** 5:20,22 10:10 30:3 33:9 33:21 37:19 43:15 48:19 51:7 55:5 56:19 60:10 68:18,19 68:21 69:1,3
**officers** 7:20 41:7 43:12 49:5 50:1 51:10 65:21
**officer's** 24:4 33:19
**offices** 2:2
**oh** 12:21 19:2 22:20 54:6
**okay** 7:22 8:15 10:7 11:14,15 14:6,7 15:11,21 16:4 17:20 18:3 19:20 20:18 25:18 26:6 28:11 29:19 52:8 67:11
**old** 37:15
**omission** 56:14
**once** 8:15 60:6 61:6
**ones** 32:13 66:22 67:3,4
**ongoing** 32:14
**open** 9:19 32:21
**operate** 46:10
**oral** 1:12 2:1 40:7 69:8
**order** 49:5 50:1,3 51:2 52:15 67:6 67:12,18 68:5
**orders** 49:10
51:10 52:1 66:1 66:1,3,6 67:7 68:10
**outcome** 70:9
**outside** 6:17 7:6,7 20:2 65:17
**outstanding** 38:22 39:2
**outstandings** 39:1 39:6,10
**overtime** 45:16

**P**

**P** 3:1,1
**page** 49:20,22 57:14 61:3
**pages** 1:19 61:2
**paid** 44:5
**paint** 12:1
**painting** 43:2
**paperwork** 5:17 20:11 22:15 23:20 24:1,8 34:1 46:22 47:3 47:10
**Parker** 27:15,15 27:19
**part** 7:14,15 40:8
**particular** 27:20 29:16 40:11 53:9
**particularly** 52:14
**parties** 70:8
**pass** 4:22 40:12 40:13
**passed** 40:2,5 58:10
**passes** 30:15
**patrol** 28:21
**Patton** 48:1
**pencil** 13:16
**people** 16:1,16,17 21:12 27:4 28:5 28:14 29:11,15 29:20 30:1,2,4 40:9,22 42:16 53:17 55:8 63:5

63:6
**perceived** 57:11
**perform** 30:1
**performing** 29:1 29:3
**period** 42:17 63:4 63:16 68:14
**person** 14:1 17:1 21:14 25:22 31:9 45:4 47:15 56:1
**personal** 30:14 50:21
**phase** 40:6,6,13 40:14
**phases** 40:5
**Philippines** 36:11
**phone** 14:22 15:11
**photocopy** 22:7
**photostat** 21:17
**physical** 56:2,3
**physically** 56:17
**pick** 6:15 8:3 10:11,14 14:11 29:8 32:8
**picked** 6:17
**picture** 22:3,3,4,7 30:4,5
**pictures** 22:11 27:17
**place** 14:15 57:8 64:20 69:6
**places** 36:4,6,7 64:5
**plain** 17:16
**plan** 11:10
**playing** 18:11,11
**Please** 56:22
**plenty** 54:21
**point** 28:13 40:12 42:18 60:5
**points** 40:10,22
**policy** 48:16
**pose** 56:2
**position** 5:12
**positive** 47:4
**possible** 42:16
**prepare** 49:8
**prepared** 50:15
**prepares** 27:12
**preparing** 24:1
**present** 3:20 56:20 57:6
**presentable** 43:7
**presentation** 23:9
**presented** 49:4
**pretty** 4:8 9:5 35:21 46:13 60:19
**print** 27:16
**prior** 5:6 41:21 42:1,3
**probably** 9:14 16:1 40:17 44:10,12
**problem** 11:10,18 13:3,6 16:4 23:3 28:7
**problems** 45:15 66:21
**procedure** 21:4 23:22 24:20 26:17 31:21
**proceeded** 10:14 11:9,18
**proceedings** 70:4 70:4
**process** 60:8
**produces** 27:22
**promoted** 36:18 48:9
**promotion** 37:7
**proper** 4:22 23:20
**properly** 5:1 24:9
**proposal** 23:18 65:22
**protect** 45:9 67:1
**protocol** 32:1
**prove** 67:14
**punishment** 24:16
**Pursuant** 2:15
**push** 38:2,4
**pushed** 42:14
**put** 9:1 13:15
32:19,21 56:18 57:4,5,18 58:1 59:22 61:1,2,15
**p.m** 1:15 69:9

**Q**

**question** 17:6 23:8 63:14 67:6
**questioned** 25:19 58:3 59:10
**questions** 4:13,16 4:17 48:13 61:14 65:19
**quite** 26:15,15 39:7,8
**quote** 22:15 49:4 49:7 58:12
**quoted** 49:11,16

**R**

**R** 3:1
**rank** 25:11 35:1 39:13
**reach** 55:16,19
**read** 49:19 59:11 61:13 68:6
**reading** 50:2
**ready** 12:22
**realize** 50:4
**really** 15:22 16:18 18:11 22:20 36:16 40:13,16 52:21 56:1,1,1 64:20,22 67:20
**reason** 17:11,18 23:2 31:16 42:22 53:1,22 58:13 65:1 68:6
**reasons** 41:1 66:21
**recall** 15:4 20:9 20:10 22:6 27:18 38:16 40:17 41:20 48:3 54:4 61:20 65:9,13 67:9 68:15 69:2
**receive** 68:2
**reciting** 17:8
**recognized** 9:14
**record** 38:12 70:4
**recorder** 47:18
**recording** 47:2
**recruited** 28:14
**redone** 40:21
**reduced** 70:5
**reenlist** 37:6
**reference** 64:5
**referring** 51:15
**reflect** 61:18
**reflected** 61:20
**refresher** 46:12 46:12
**refrigerator** 13:1
**refusing** 55:7
**regard** 48:19
**regarding** 23:20 31:22 48:16 51:2
**regular** 68:10
**regulations** 49:10 49:12 51:3 52:2
**related** 70:7
**relive** 17:21
**reliving** 17:17
**remained** 14:8
**remaining** 32:15
**remember** 9:13 26:4,5 36:20 60:21 67:10
**reminders** 66:15
**repeat** 60:15
**report** 5:12 19:16 24:6,22 25:9 33:20 50:14 51:19 52:9,10 53:9 54:5,14 55:2,14 56:6,15 61:18
**reported** 1:20 16:6 53:6
**reporter** 2:16 4:1 70:1,2,14
**reporting** 18:21 45:1
**reports** 48:20 49:9 55:22
**representative** 23:10
**request** 56:18
**require** 45:12
**requiring** 51:3
**responded** 58:12
**response** 5:14 23:22 48:18,20 57:8 60:16 63:14
**responsible** 8:4
**restroom** 6:13
**resulted** 4:19
**retired** 68:18,20 68:22
**retrieve** 29:14
**returned** 58:11 60:6
**revamped** 41:1
**right** 5:3 7:1,13 7:13,18 8:13 10:17 13:10,13 14:13,17 15:19 18:19 19:16 20:5,11 29:9 30:5 31:3,17,20 32:7 34:12 38:9 38:11 45:11 46:16 47:14 48:12 49:7 50:10,18 52:19 54:9,18 56:15 59:1 62:21 64:3 64:7 65:7,17 68:20
**roll** 12:22
**room** 6:6 57:6
**rules** 49:10 50:16 51:2 52:1 55:7
**run** 46:14
**runs** 46:15

**S**

**S** 3:1
**saw** 8:14,15 23:10 50:7 52:3 60:15
**saying** 5:18 16:19 18:20 50:3 54:3

54:12 55:22 56:5 57:3,9 59:12,16 61:20 62:4 64:11
**says** 33:16 48:20 49:8 50:4,14,14 52:6 59:16 61:6
**school** 35:10,11
**score** 40:10,11
**screen** 13:14,17 17:13
**second** 6:16 40:6 40:8,12,13
**security** 46:2
**see** 6:14,20 9:14 13:10,19 14:3 14:16 17:1,17 18:3 19:15,15 19:21 20:3,19 26:1,1 47:3 59:15 60:3
**seeing** 17:9 53:3 60:10
**seek** 34:20
**seen** 6:6 9:12 13:16 16:15,16 17:3 19:4 20:2 51:11 64:4
**selected** 41:4
**senior** 8:8
**separate** 50:16
**sergeant** 39:14,20 40:5 41:22 42:1
**serious** 18:13
**service** 35:16 37:22 38:1
**session** 34:1
**set** 13:10 14:7,17 35:22
**seven** 61:3
**severe** 24:16,17 53:21
**shake** 9:2 53:2
**sharing** 33:9
**shift** 45:3 49:9
**shook** 9:5,7 24:12
**shopping** 15:1,20
**short** 36:22 37:3 37:4 42:17 63:7 69:3
**SHORTHAND** 70:1
**shortly** 20:5,20 35:12
**shot** 22:8,9
**show** 8:19,21 22:2 22:3,4 51:7
**showed** 19:10 21:19 22:5,6
**shown** 47:11
**shows** 46:21
**shy** 40:12
**side** 7:3
**sight** 7:21
**sign** 67:12 68:2
**significantly** 42:20
**single** 53:14
**sir** 15:15 16:4
**sister** 37:14
**sitting** 13:14 32:20
**situation** 15:18 68:8
**slip** 30:1
**small** 52:20
**smaller** 22:10
**Smithsonian** 37:18,19
**somebody** 15:1 19:22 24:21 55:21
**soon** 60:19
**sorry** 8:13 54:1
**sort** 17:15
**Soughtwest** 28:18
**sounds** 53:7
**Southwest** 28:17
**space** 13:15
**speak** 11:4 14:5 21:2
**speaking** 17:17 20:1,6
**special** 46:10
**specifically** 52:2
**specifications** 49:12 57:14
**spending** 57:13
**spoke** 5:21 10:12 21:10 23:5
**spoken** 26:4
**spot** 41:8
**squad** 9:15 21:22 26:19 32:13 65:18
**stack** 19:6 60:15
**staff** 6:8,12 52:3,6
**stairwell** 17:3 18:5
**stand** 8:22
**standard** 21:4
**standing** 13:7,17 20:2
**start** 5:10 66:7
**started** 4:10 34:9 46:7,8 66:11 67:7
**stated** 57:17 58:9
**statement** 25:20 57:2
**station** 37:7
**stay** 10:3
**stayed** 16:5 68:21
**staying** 60:4
**stenographically** 70:5
**step** 9:16,16,19,20 10:8 39:14
**steps** 45:6,9
**stock** 51:9
**stood** 13:12,16
**stop** 18:11,11
**story** 19:18
**straight** 44:11
**Street** 3:7
**stuff** 12:1 16:17 55:8
**submit** 25:1 49:8
**successful** 43:9
**suitable** 52:22
**supervision** 70:6
**supervisor** 10:3 11:5 23:5 25:1,4 32:4 45:2,3 49:9 52:10 53:6 61:10 65:14
**supposed** 10:11 18:21 38:18 50:15 52:7,18
**sure** 4:4,5 13:16 15:7 24:11 26:22 32:3 47:4 55:12

**T**

**table** 61:15
**take** 4:2,3 11:11 13:18 27:16 31:12 32:12,16 39:21 64:17
**taken** 24:4 70:5
**takes** 28:2
**talk** 4:4 10:8 11:17 12:3 20:20 21:9 26:6 49:22
**talked** 25:10,13 33:11 48:18 58:6 59:18 60:10
**talking** 6:7 10:9 16:18,18 20:21 22:13 27:4 30:20 49:1 51:15 57:16
**talks** 28:4
**tape** 47:18
**team** 8:7
**tell** 5:13 19:18,22 25:7 26:3 29:21 56:16
**telling** 18:19 21:1 26:1 34:20 53:8 55:6
**tells** 27:21
**terms** 33:12 38:13 49:1 50:21 63:13
**test** 40:21,21 41:1
**thank** 11:2
**thanks** 37:9,9
**that's** 8:8 11:8,16 16:8 17:20 28:4 32:1 39:3,4 41:19 45:2 46:16 48:5,19 49:11,11,16,17 51:14 53:5 56:5 56:15 57:10,13 57:20 58:17 59:12 61:11 65:19 66:8 68:3
**there's** 13:15 40:4 65:2 66:7
**they'd** 37:6
**they'll** 28:11 32:8
**they're** 18:10 29:1,3,17 49:21 52:6 57:14 59:12,16
**they've** 27:9,10
**thing** 32:14 63:13 65:20 68:12
**things** 12:3,4,12 19:7 44:11 48:15 54:22 55:2,4,8 56:5 66:18 67:2,8
**think** 21:13,17 22:8,10 24:11 33:15,16 35:14 41:13 42:4 50:11 52:21 53:17 57:1,2,8 63:14 64:1
**thinking** 24:13 57:5,9
**thinks** 33:19
**thought** 25:22
**thoughts** 41:5
**threat** 56:2
**threats** 56:7
**three** 5:6 6:9,11 7:2 22:1 28:8,17 28:18 40:4,18 49:20,22
**threshold** 55:17
**throwing** 55:8 66:22 67:1
**time** 8:11 10:9,15

12:16,19,21 15:21 18:17 26:16 28:10 29:7 33:2 37:4,5 39:16 40:2 42:17 44:20 55:21 57:13,22 63:16 64:19 65:9,11,12,16 66:12 68:18
**times** 17:19 28:8 29:2,14 40:1 43:14 47:20 50:22 54:21 55:12 59:18 61:1 65:8
**today** 9:9 15:7,17 20:22 32:9,10 58:15 59:9 60:9 60:12
**Tokyo** 36:14
**told** 10:6,11 11:10 13:6 14:3,16 15:1,5 16:8 20:12 23:6 31:1 40:8 47:5,8 57:7 61:11,15 62:8
**tomorrow** 13:19
**top** 13:14 18:5 39:3,4
**total** 61:2
**totally** 5:19
**touch** 15:9
**tours** 36:15
**town** 14:22 16:3
**training** 46:10,11 66:3,17
**transcript** 46:21 47:10 60:22 61:17 70:3
**transfer** 44:12
**transferred** 15:14 47:2
**transpired** 59:7,8
**trip** 15:1,20,21 21:1 60:7
**trouble** 11:6 38:14,15
**true** 43:11 57:20 59:12 70:3
**truth** 26:2
**try** 34:21 35:18
**trying** 17:21 24:15 34:20 59:4 60:8
**turn** 31:14 32:4 32:13
**turned** 11:20 23:2 31:5 37:8 47:5,9 61:9 62:1,14,20 63:16 64:12,15 65:14
**turning** 11:22 12:1 63:9 64:22
**turns** 30:18
**two** 7:3 10:2 11:13 21:13 23:7 28:8 57:14 63:2 68:19
**types** 55:2,4
**typewriting** 70:6
**typing** 12:20
**Tyrone** 23:16,17

U

**uh-huh** 30:8
**understand** 4:14 6:22 10:4 12:14 16:19 28:12 42:18 51:1
**understanding** 48:17 54:14 60:19
**understood** 4:19 24:1
**union** 21:14 23:9 47:7
**unit** 6:15,16,16,19 7:2,4,5,6,7,14 7:15,17 8:3 9:8 9:16,17,19,19 9:20,21 10:5 12:10 13:4 14:12 27:16 28:3 29:1,6 30:7 30:10,11 31:10 31:12 32:16
**units** 7:2,3,13
**unquote** 22:15
**updates** 66:13
**urgent** 16:21
**urine** 67:1
**use** 6:12 28:10 52:7

V

**vaguely** 51:12
**various** 41:1 67:8
**Vermont** 2:7 3:15
**version** 59:6
**view** 46:13
**violated** 49:13
**violates** 51:2
**violation** 50:16 52:16
**violations** 49:10 52:18
**visited** 36:5
**visual** 43:15
**voluntarily** 45:20
**Voluntary** 45:18

W

**Wait** 22:2
**waiting** 6:17 10:7 13:9 17:2 20:2,2
**walked** 30:9,11
**walking** 6:19
**wall** 8:22 9:1 56:11
**Wanda** 48:1
**want** 4:16 23:21 28:11 32:2,15 36:7 38:3 43:18 43:19 44:9 51:13 55:9 57:12 59:5 65:20 68:12
**wanted** 17:18 37:5,8 48:15 56:12 59:22 60:1 63:13
**wanting** 54:2
**wants** 28:4 52:12
**warden** 15:3,6 19:16 20:8,21
**warden's** 15:6 18:6,9,15,22
**Washington** 1:13 2:8 3:8,16 34:16 68:18,21 69:1,6
**wasn't** 18:19 22:20 25:19 47:2 52:10,19 53:5 57:5,6,6,9
**water** 13:1,1
**way** 9:10 12:2 13:2 34:14 45:7 46:15 56:3 57:10,10 59:10
**weeks** 5:6 6:9,11 22:1,22 63:7
**went** 9:20,21 10:11,12 19:21 20:12 21:2 30:6 31:9,10 32:9 35:7,15 59:20
**weren't** 14:19 47:13
**we'd** 12:3
**we're** 4:12 12:12 28:7
**We've** 5:11
**what's** 15:15 18:7 18:8 20:12 44:22 45:4 51:18 60:8,9
**WHITE** 3:20
**who's** 20:14
**window** 18:10,16
**witnessed** 14:13
**woman** 47:21
**women** 41:18
**wondering** 49:15 50:20 59:2
**won't** 16:1 18:7 45:3,12
**word** 56:15
**worded** 57:10
**words** 5:13 50:2,3 50:7,12 55:20 62:12
**work** 4:22 9:8 11:19 12:8 20:15 21:21 27:11 28:11 29:8,16,20 41:18 42:10 43:3,4,19 44:3 45:13,16 57:22 63:7 67:7
**worked** 26:7,9,12 34:3 46:2 67:11
**working** 5:7 14:19 34:19 39:19 41:9 43:14 45:22 56:19
**works** 27:15 37:18
**wouldn't** 59:21 60:2
**wrap** 46:19
**write** 24:5,21,22 25:8 54:4 55:2 55:20
**write-up** 24:9
**writing** 23:6 33:13,20 55:21
**written** 5:12 24:17 31:21 40:7 53:9,15 54:15
**wrong** 5:19
**wrote** 57:19

Y

**yeah** 12:21 13:22 19:1 20:17 21:21 22:21 23:1,12 25:7 26:20 36:9 43:4 44:4 45:14 46:8 47:19 48:2,14 54:6 56:11 63:22 68:7
**year** 26:15,15,15 35:14,15 44:3
**years** 34:6,7,8,18 38:5,6 39:9 40:18,18 41:7

45:22 50:19 53:10 65:13
**year-and-a-half** 36:21
**yelled** 9:19
**Yep** 18:14
**yesterday** 13:4
**young** 21:15 34:9 34:10 38:10
**you'd** 44:15
**you're** 9:17,17 17:19 20:18,19 21:1 23:19 34:12 38:17 44:15 45:6 52:18 54:3,12 55:6 60:9
**you've** 31:1 39:1 44:2,6 67:11,14

**1**

**1** 1:19
**1-106540** 1:18
**15** 23:10 63:3
**15th** 49:21
**18th** 3:7
**19** 35:7,9
**1901** 3:7
**1923** 2:7 3:15
**1984** 51:9 66:2
**1985** 66:2 68:5

**2**

**2.177** 51:8
**2:30** 1:15 12:9,10 14:9
**20** 23:10
**20009** 3:8
**2002** 66:2
**2007** 1:14
**202-232-1907** 3:9
**202-673-7316** 2:9 3:17
**20401** 2:8 3:16
**22** 34:5,7,8 38:6 39:9 45:22 50:19 53:10 65:13
**25** 1:14 37:16 63:3

**3**

**3rd** 61:1
**31** 61:2

**4**

**4:00** 14:9
**4:15** 69:9
**44** 38:11

**5**

**5945** 51:9

**6**

**6:00** 8:12 14:10 16:2,7
**6:30** 14:11 16:7

**7**

**7:00** 16:2,7,7
**70** 1:19

**8**

**84** 67:18
**85** 66:11 67:19

# EXHIBIT 61

D.C. DEPARTMENT OF CORRECTIONS

ORAL PRESENTATION
on behalf of
SERGEANT DIONNE MAKINS

Washington, D.C.
Tuesday, July 10th, 2007
9:30 a.m.

Job No. 1-107049
Pages 1 - 181
Reported by: Laurie Bangart-Smith

Oral Presentation on Behalf of
SERGEANT DIONNE MAKINS

Held at the offices of:
D.C. Department of Corrections
192 Vermont Avenue, N.W.
Grimke Building, Room N119
Washington, D.C. 20001

Taken pursuant to notice, before Laurie Bangart-Smith, Registered Professional Reporter, Certified Realtime Reporter, and Notary public in and for the District of Columbia.

A P P E A R A N C E S

ON BEHALF OF DIONNE MAKINS:
J. MICHAEL HANNON, ESQUIRE
The Hannon Law Group, L.L.P.
1901 18th Street, N.W.
Washington, D.C. 20009
(202)232-1907

HEARING OFFICER:
Henry R. Lesansky, Ph.D.
Health Services Administrator
D.C. Department of Corrections
1923 Vermont Avenue, N.W.
Washington, D.C. 20001
(202)671-2069

E X H I B I T S
(None)

5

PROCEEDINGS

MR. HANNON: This is the oral presentation of Sergeant Dionne Makins to Dr. Henry Lesansky, the Hearing Officer in this proceeding for the Department of Corrections, and Sergeant Makins is here, as is Dr. Lesansky, and I'm J. Michael Hannon. I represent Sergeant Makins.

What I'd like to do, Sergeant Makins, is to help you tell Dr. Lesansky a little bit about yourself and your career, and then we'll get to the allegations that have been made against you in this matter and ask you to discuss your response to those allegations. I'll ask you some questions about things that have happened to you since then, and then Dr. Lesansky, when we're done, will probably ask you some additional questions, and I'll probably participate in that as well.

MS. MAKINS: Okay.

MR. HANNON: And although I'm sitting over here maybe prompting you or asking you some questions, try to direct your answers to Dr. Lesansky.

What we want to start with is to have you

6

give him some understanding as to who you are, where you grew up, what your education was and how you got into corrections.

MS. MAKINS: Okay. First of all, my name is Dionne Makins. I am 38 years old. I am -- I was born and raised in Washington, D.C. I went to school, elementary all through school, in the District of Columbia. Graduated from HD Wilson High School. I went to Strayer College in 1988. I obtained some college from UDC through the Department of Corrections. Prior to me -- I worked in the District Government since 1986. I was in the out-of-school program then.

MR. HANNON: The what program?

MS. MAKINS: Out-of-school program. They had a program for District of Columbia residents who were graduates, I mean high school graduates or GEDs, and what it was, Mayberry had a program for the people that were age 18 to 25, and you could go there, you made minimum wage of $3.50, no benefits, but it was a job. And I worked there in the Tax Division under Vicki Clemens, who was the supervisor at the time.

7

After that I worked in -- in April 1987 I obtained another job within the Department of Employment Services, and that job, I was a Miscellaneous Documents Clerk for unemployment claims, claims that were not entered in the computer. I had to do the research for those, for Greg and Ms. Johnson, and I was under the directive of Ms. Weaver.

In 1988 I obtained another job in the District of Columbia Government with the Department of Public Works. I worked at D.C. Motor Vehicle Services, and there I gave out tags, stickers, reciprocities, renewal applications, renewal -- I didn't do driver's licenses; just tags. And I stayed there until 1990, July 16, 1990, and that's when I came to the Department of Corrections.

I entered the Department in 1990. I was a probationary officer. In 1991 I went to the Major's Office as the Major's aide, and I was the Major's aide at the Youth Center. I worked for Major Arnold Golden, Major Leroy Clayborn, and Acting Major Steven Young during that time. I was in the Major's Office

8

from 1991 until 2002 when the Youth Center had closed.

Then I worked with the Closure Team under Major Michelle Giles. She was in charge of the Closure Team. I was one of the chosen people to help close the Youth Center. I kept records of all documents that were entering and leaving the Youth Center, the documents for destruction. I went to training at the National Records Center for how to store records for the Department of Corrections. Also, we did a symposium and things of that nature for the historical reviews of the department. We destroyed approximately 143,000 tons of paperwork under the program statement, record retention and disposal process.

From there I went to -- from the closure of Lorton, I came here to Grimke School. I worked with Ms. Murphy, Joan Murphy, and there I helped her organize her filing system for the employees, past and present. I processed new -- I processed rehires at the time, because we had a RIF. The Department had a RIF March 22nd, 2002. October 2002 they started bringing personnel back. So Moran (?) had taught me

how to process the people in, because we had an abundance of people at one time. Sometime we had new. Sometime we had more.

I left Grimke School under Ms. Murphy's supervision in May of 2003. My detail was terminated. I went to --

MR. HANNON: So you were here for three years?

MS. MAKINS: No, I was not here at Grimke School for three years. I was here for maybe nine months. I was here for about nine months. Also, I worked at the D.C. Jail. I went there in 2003, May 2003, when my detail was terminated. I worked in the Command Center under Captain Talley, and -- who else?

MR. HANNON: Captain Burns?

MS. MAKINS: Yes, Captain Burns -- I shouldn't forget him -- William Burns, until I was promoted to a sergeant.

(Discussion was held off the record.)

MS. MAKINS: While I worked in the Command Center, I was the Second Officer. I was there during

the June -- I mean the December 20th incident that happened at D.C. Jail. I assisted the Captain, which was Captain Talley, with deploying staff to the incident. And I assisted her with the master rosters as far as keeping track of the staff and whether people was going, coming on the shift and going off the shift.

And from there in March I was promoted to sergeant, March '06, and I went to -- which was my biddable post, master roster bid post was Southeast 1. From there I was an OIC up until the time the incident had occurred on June the 3rd.

MR. HANNON: So that brings you up to --

MS. MAKINS: June 3rd.

MR. HANNON: Okay. I want to go back and ask you a few questions about the work history that you've just described for us. You were 21 when you started in the Department of Corrections; is that right?

MS. MAKINS: Right.

MR. HANNON: And you attained the rank of sergeant at the age of 37?

MS. MAKINS: Yes.

MR. HANNON: And that was a competitive process, was it not?

MS. MAKINS: Yes. I took a test. I studied for a test and took a test to obtain the next rank, which would be sergeant.

MR. HANNON: There were other criteria besides your score on the test, were there not?

MS. MAKINS: Yes. No disciplinary actions, no adverse or corrective actions. Those basically was the criteria. I had good attendance, came to work every day. I didn't give anybody any problems. I just did what I was told to do.

MR. HANNON: And how many were in your class who were promoted to sergeant?

MS. MAKINS: I believe there was 20.

MR. HANNON: Was there any special training for sergeants at that time?

MS. MAKINS: No, but they had -- the sergeants that were promoted prior to the second group of sergeants -- because there were two promotions. One was the first group, which was lieutenants and

sergeants were promoted. They gave them a week of training, the sergeants -- the newly sergeants and lieutenants. And when I was promoted, we didn't get any of that.

MR. HANNON: Okay. When you were a probationary officer at Youth Center 1 at Lorton, I think you mentioned that you acted as the Major's aide?

MS. MAKINS: Yes.

MR. HANNON: And the major was Major Golden?

MS. MAKINS: Yes. Arnold Golden.

MR. HANNON: And you would handle detailing the squad?

MS. MAKINS: Yes. I was in charge of basically the Admin Building Detail Squad, which was a group of ten inmates, to keep the building clean, make sure the offices were done, each office, the Warden's office, the -- well, at that time they called them Administrator, Assistant Administrator, the Major's Office, the Command Center. The hallways, the bathrooms and everything, I was in charge of those guys, and I also had to make sure that their monthly

pays were done, that they got paid monthly.
MR. HANNON: And you handled petty cash?
MS. MAKINS: Yes.
MR. HANNON: You handled purchasing for the inmates?
MS. MAKINS: Yes.
MR. HANNON: You handled ordering supplies?
MS. MAKINS: Yes.
MR. HANNON: Chapter 16 actions?
MS. MAKINS: Yes.
MR. HANNON: Can you explain -- do you know what Chapter 16 actions are?
DR. LESANSKY: Yes.
MR. HANNON: Okay. Maybe for those who might read this record, you can explain what a Chapter 16 action is.
MS. MAKINS: A Chapter 16 is a disciplinary action imposed on an employee who has violated some rule or regulation of the Department of Corrections. Mr. Golden would actually write it up, handwrite it and do the interview, and I would type it up, and he would check it, and we would forward it to the proper

authority, which was the Administrator.
MR. HANNON: And you assisted in establishing and disseminating post orders?
MS. MAKINS: Yes.
MR. HANNON: And you've worked under six wardens. I have a list here that goes from John Henderson to Steven Young.
MS. MAKINS: Okay. John Henderson was the Warden when I first went into the Major's Office and when I first came to the Youth Center in 1990. Angela Brown, who was the next Administrator, Vincent Gibbons, Charles Kirkland, and then it was back to Mr. Golden, who was the Warden at the time of the closure of the Youth Center.
MR. HANNON: Okay.
MS. MAKINS: And the majors were Mr. Golden -- I also worked with Mr. Golden as his secretary when he was promoted to Assistant Administrator, which they now call it the Deputy Warden. I worked with -- I went back on shift under Captain Pendergrass, then Major Clayborn. Captain Clayborn was promoted to major, and I was there with

him until he retired at the closure of Lorton. And Steven Young, who was the Acting Major at the time during -- not during the closure, but Major Clayborn had started to use up his sick leave for -- basically retire, and I worked with him.
MR. HANNON: And you were selected for the Closure Team for Lorton?
MS. MAKINS: Yes.
MR. HANNON: And in addition to the things you've already described, you also worked on the Inventory Transfer Program?
MS. MAKINS: Yes.
MR. HANNON: And you also worked in assisting in the litigation that arose in connection with that?
MS. MAKINS: Yes.
MR. HANNON: So that brought you to your work with Ms. Murphy here at the Grimke Building?
MS. MAKINS: Yes.
MR. HANNON: Did you also do work with Internal Affairs when you were with Ms. Murphy?
MS. MAKINS: Yes. I organized their filing

system.
MR. HANNON: And did you assist the Deputy Director with the filing system as well?
MS. MAKINS: Yes, who was James Anthony at the time, and his assistant was Patsy Dyson.
MR. HANNON: And were you offered a job as a result of your work with Ms. Murphy?
MS. MAKINS: Yes.
MR. HANNON: What position were you offered?
MS. MAKINS: I think it was going to be the Records Manager.
MR. HANNON: That would be in Human Resources?
MS. MAKINS: Yes.
MR. HANNON: And did you take that job?
MS. MAKINS: No.
MR. HANNON: Why is that?
MS. MAKINS: I didn't take the job because I wanted to be promoted to a sergeant first. That job had no career enhancement besides the grade, which was a nine.
MR. HANNON: And they were disappointed, I'm

sure.

MS. MAKINS: Yes, they were.

MR. HANNON: And you told us that in May of 2003 you went to the Command Center?

MS. MAKINS: Yes, at the D.C. Jail.

MR. HANNON: And how were you selected for that position?

MS. MAKINS: I had worked in the Command Center prior, might have been a couple of weeks prior to me going into the Major's Office, and when I was placed back on shift at the Youth Center, I worked the Command Center by myself when no one else was available, which was, everything was manual. You did inmate movements manually on the typewriter. You moved inmates manually. You called codes on the radio. You did radio checks.

You communicated with the supervisors, of course. You typed up all the paperwork, and you basically -- it was a lot of work, and you basically kept up with the keys, key control and things of that nature, and Sergeant Booahbing (phonetic), he had told -- one day they needed someone to go in the

Command Center at the D.C. Jail, and he had told them that I had experience, so that's how they were enlightened that I knew how to do that.

And when I came -- when I did all the time when I was out on detail, which was the weekends, most of the time my post would be Command Center. And when I came to the jail after my detail, Captain Talley, she picked me or chose me to go in the Command Center to help.

MR. HANNON: Now, the Command Center at the jail, you handled the master roster?

MS. MAKINS: Yes.

MR. HANNON: Time and attendance?

MS. MAKINS: Yes.

MR. HANNON: The daily shift reports?

MS. MAKINS: Yes.

MR. HANNON: Any staffing emergencies?

MS. MAKINS: Yes.

MR. HANNON: And the telephones?

MS. MAKINS: Yes.

MR. HANNON: Now, before you were promoted to sergeant in March of 2006, you became aware of a

gun incident in approximately December of 2004; is that correct?

MS. MAKINS: Yes. That's the incident that had happened in 2004 where three inmates were shot at the D.C. Jail. It was highly publicized through the media. I got the phone call that day from the officer. I told the supervisor. She told us to shut the jail down, deploy staff. I assisted her with the paperwork as far as the report that she had to run, the Shift Report and all the paperwork that pertained to that incident, that was pertinent, important to that particular incident on that day.

MR. HANNON: Did you become aware of the facts that were uncovered in the investigation?

MS. MAKINS: No.

MR. HANNON: Was it reported as to how these three inmates were shot?

MS. MAKINS: No. The concern at the time was staff -- the concern was the inmates, but the concern was getting enough staff to the incident to help and assist with any inmates with proper medical care and proper treatment and to shut the jail down so

that nothing else would occur during the time of that particular incident.

MR. HANNON: As a result of that incident, to your knowledge, were there any corrections officers or employees who were disciplined?

MS. MAKINS: Not to my knowledge.

MR. HANNON: Now, when you became the sergeant, why did you bid for Southeast 1?

MS. MAKINS: Well, at the time I bidded for Southeast 1, because that was the -- I liked the post. The unit was very clean. It was organized. It wasn't too many incidents that had occurred in that unit. Also, the officers that were assigned thereto, which was L.A. Wilson and Philip Thompson, both of them I knew were excellent officers, because I had worked with Philip Thompson under several occasions when I was doing overtime, and I knew the kind of person he was and knew the kind of officer he was.

Corporal L.A. Wilson, I had worked with him numerous times in the Command Center when the sergeant was on leave -- which was Sergeant Bishop -- or he wasn't there. He was like the third or fourth backup

21

person that could operate the Command Center. And it was a biddable post, and I had to bid for a sergeant's post, because I was newly promoted.

MR. HANNON: Now, were you trained at all in terms of how to operate the post at Southeast 1?

MS. MAKINS: No.

MR. HANNON: Were there any specific post orders with respect to how to run the post in Southeast 1?

MS. MAKINS: Yes.

MR. HANNON: So were you able to learn how to run the post by reference to the post orders?

MS. MAKINS: Yes, if you got a chance to read the post orders for the unit. The day -- I think it was April 2006 when the shift change had occurred. I did get a chance to glance at some of the post orders, and I observed a lot on my first week or two there, because I basically wanted to get the feel of the unit and get the operations -- feel the operations of the unit and how the unit was ran, and looked at the post orders, too.

MR. HANNON: Were there any post orders that

22

discussed the procedure for sick leave for inmates from Southeast 1?

MS. MAKINS: I don't recall that.

MR. HANNON: Well, how did you know what the procedure was for processing inmates who were going to sick leave or going to sick call?

MS. MAKINS: Well, the process I knew basically from when I had worked in the unit prior to going to the Command Center. You receive a call from the -- you receive a call -- the officer calls from sick call, which is upstairs in the infirmary, and they request that inmates be sent to sick call. You write the pass, the inmate call-out pass. You give it to the inmate. The inmate comes to the Control Bubble, which they call it just the Bubble. You identify the inmate. You write his name, DCDC number, the time, the time that he leaves the unit and where he's going. Upon the inmate's return, you write the time that he returns, he or she returns, which that is called an Inmate Movement Sheet.

MR. HANNON: Was any of that process in writing, to your knowledge?

23

MS. MAKINS: Not to my knowledge.

MR. HANNON: So you just learned that by experience?

MS. MAKINS: Yes.

MR. HANNON: Was there anything in writing that required you, when working Southeast 1, to recontact the Medical Center to confirm that a particular inmate was on sick call?

MS. MAKINS: No.

MR. HANNON: Now, what if the inmate didn't appear to require any medical care? Were you required to consider that in determining whether to give them a pass?

MS. MAKINS: Yes, but -- hold on. Let me explain this. If an inmate complains, if he or she complains that anything medically is wrong with him or her, the officer that gets the complaint is the person that should call the Urgent Care Unit. The Urgent Care Unit most likely would tell you -- you give the inmate's name, you give the urgent care nurse his name, first and last name, his DCDC number, which is his inmate number -- which is six digits -- the nature

24

of the call, whatever he or she is reporting to you is medically wrong with them. They'll tell you, okay, we'll call you back. The urgent care desk nurse or doctor will call back and tell you to send that inmate to the infirmary if they feel that it is a medical emergency, that they need to see the doctor.

MR. HANNON: Now, what about circumstances under which an inmate has a preexisting appointment, somebody wants to see him?

MS. MAKINS: Okay. Under the circumstances that the inmate has a preexisting appointment, if you work the unit regularly, you kind of know who's going to go to sick call and who's not going to go to sick call, but you also get verification when the sick call officer calls down there and tells you send so-and-so, so-and-so and so-and-so to the infirmary for wound change, for methadone, or maybe the doctor want to see him or her.

In other cases the -- I know that they have like an HIV clinic or something of that nature that the person from that particular area will call down to the unit and they would tell you to send an inmate.

25

They'll give their name and they'll tell you to send the inmate to them.

MR. HANNON: When the medical unit calls down, do they ever advise you about the medical condition of the inmate?

MS. MAKINS: No. That's a violation of the HIPAA Act.

MR. HANNON: So it would be inappropriate for you to discuss the medical condition with the inmate?

MS. MAKINS: Yes, because that's a violation of the HIPAA Act. You're not supposed to know basically an inmate's medical history, actually, and it should not be discussed, because you can be sued for that by the inmate.

MR. HANNON: Well, how did you learn that?

MS. MAKINS: I went to training.

MR. HANNON: And when did you get that training?

MS. MAKINS: I don't remember, but I got a certificate in it. It was right here in Grimke School. It was upstairs in the conference room,

26

upstairs in the main conference room, the Director's conference room.

MR. HANNON: Were you a sergeant at the time?

MS. MAKINS: No. No, I wasn't.

MR. HANNON: And how was it that you received that training as opposed to other corrections officers?

MS. MAKINS: Mr. Hannon, I don't even recall that, but I believe they had a training for the Agency, period, and I had to go upstairs for the training. I think the training took about an hour, maybe two hours, and they came and discussed with us about the medical issues about the inmates as well as the public, and you're not supposed to discuss it. I know that.

MR. HANNON: Was any of that information in the post orders for Southeast 1 regarding how to handle medical visit procedures?

MS. MAKINS: I don't recall that.

MR. HANNON: Now, you mentioned a Movement Sheet. Is the Movement Sheet an official document

27

that is created by the Department of Corrections that someone on a housing unit is obligated to complete?

MS. MAKINS: Oh, no. You are -- that is not an official document, but the document can be used. I do know that. Inmate Movement Sheets is a way for you to keep up with the inmates that's going and coming into the unit and leaving the unit as to where their whereabouts are, but it's not something that you have to pass in every day. Each shift does one. That's a good way to keep up with the inmate movement throughout the day, who went where, who came back from where, who may be still at the destination.

Like the unit, Southeast 1, had -- they had detail squad, details, outside details within the unit. You had a paint squad, which was two inmates. You had chapel, guys that went to the chapel that worked at the chapel. So those people would sometime be gone all day. They would be -- the person would call for them and tell them they was ready to do their outside detail, and you write the pass and send the pass with the inmate, and the inmate goes to the destination.

28

And upon his return -- he could be gone for four or five hours. Upon his return, he would give you the same pass that you gave him that morning back, but the Movement Sheet would allow you to keep up with the inmates and have a basis as to their whereabouts.

MR. HANNON: Do the general orders for Southeast 1 require the keeping of a Movement Sheet?

MS. MAKINS: I don't recall that. No, I don't, I don't recall that.

MR. HANNON: What's done with the Movement Sheets?

MS. MAKINS: It's thrown in the trash at the end of the shift. If there's inmates still out, it helps you identify who's out and where they are, and it's helpful for you to do a -- start a new Movement Sheet for the next shift, indicating who the inmate is, his DCDC number, his cell number and where he is. And basically that inmate at the count, the shift change, which we count, you can tell where that person is.

MR. HANNON: The sick leave passes; what do they look like?

29

MS. MAKINS: The sick call passes?

MR. HANNON: Yes.

MS. MAKINS: They look like the rest of the passes in the jail.

MR. HANNON: It's just a piece of paper?

MS. MAKINS: It's a piece of paper indicating the inmate's name, DCDC number, his or her destination, what floor they're going to. That's what it indicates.

MR. HANNON: That's a paper-and-pencil document?

MS. MAKINS: Yes, it is.

MR. HANNON: Is there any sort of electronic procedure for keeping track of inmate movement in a housing unit?

MS. MAKINS: No, other than what they call the -- you could use the computer, put in the inmate's DCDC number, but it will tell you who -- what unit they're in and the cell number, but it's nothing specifically for a unit, not unless you get it from the Count Book, where it could give you the names and DCDC numbers of every inmate in your housing unit or a

30

separate housing unit.

MR. HANNON: So the only record of an inmate going in and out of the housing unit is a paper record?

MS. MAKINS: Yes.

MR. HANNON: There's no way to electronically record who goes through the gate at any particular time?

MS. MAKINS: No, other than a paper. Also, the Count Book, they do a whole Movement Sheet for the jail, and that is also a paper document, but once the inmate moves in and out of the unit going to another unit in the jail, it's recorded into the big computer system. I don't even know the name of it, but it's recorded in data on the computer.

MR. HANNON: Where is that done?

MS. MAKINS: That's done at the Count Book.

MR. HANNON: Which is at what; the Control Center?

MS. MAKINS: It's across from the Command Center. You have a Count Book officer, and then you have a compliance officer.

31

MR. HANNON: And the information that they input is received from all the different housing units?

MS. MAKINS: The information that they input into the computer system is what actual movements have been done throughout the jail.

MR. HANNON: And that information is reported to them by the various housing units; is that correct?

MS. MAKINS: No.

MR. HANNON: How do they learn about the movement?

MS. MAKINS: Okay. To my -- I don't know the actual job, but I know somewhat of how it's done. The compliance officer checks all the, all the empty spaces inside the jail. He does that through some type of computer data, the classification of the inmates, and then he goes and finds -- tries to find bare space if bare space is needed. Then the compliance officer actually is the person that tells you to move this inmate in or out of the unit to another unit, or they can tell you also that the

32

inmate is going home, which they would call you and say -- Male R&D will probably call you. It all works together. You got compliance, you got Male R&D and you have Female R&D Unit, and when the inmate is going home or something, they'll call you and say this is so-and-so from Male R&D. Send so-and-so's bag and baggage. So when you do your Movement Sheet, you write the inmate's name and DCDC number down, where he's coming from in your unit, and you put "R&D."

MR. HANNON: Sergeant, does that main record keep track of people who go on sick leave or go on work detail and come back to their assigned cell?

MS. MAKINS: No.

MR. HANNON: All right. Now, how is the count done?

MS. MAKINS: The count is done -- there's two officers that do count, and you compare your counts. Two officers does the count of a housing unit.

MR. HANNON: And when do they report that count and to whom do they report it?

MS. MAKINS: You have times, specific times.

33

You have an 8:00 count, which is 8:00 a.m. You have a 3:00 count, which is 3:00 p.m. You have another 8:00 p.m. count, and you have an 11:30 p.m. count. And then you have one every hour, on the hour, up until 5:00 or 6:00 a.m. for midnight shift.

MR. HANNON: And to whom do you report the count?

MS. MAKINS: You actually physically -- you physically go count bodies, every person. You open the cells or identify the movement of a body, of a human body, by shaking it or whatever. You look in there and you count. There's usually two to a bunk. There may be one. People may be on the floor. You have to physically see the actual person and the body in that cell.

MR. HANNON: To whom do you report the numbers?

MS. MAKINS: Oh, I'm sorry. You report the numbers to the Count Book, which the supervisor usually is the person that is taking the count at the time for which -- those times that are specified, they take the count.

34

MR. HANNON: And what do you do with respect to those inmates that you know are out of the housing unit when a count is taken?

MS. MAKINS: Okay. The ones that you are aware that's out of the housing unit when you are counting, if that person is not there, you make some type of indication of his name and DCDC number and his cell number. If the inmate is actually still there from the count record, and you tell them -- your count may be 145 and two out, so you will say 145 and two out. On the Count Sheet it would indicate that you have 145 inmates in and you have two out, and your total may be 147, and you will indicate each inmate's name and DCDC number on the Count Sheet and his assigned cell.

MR. HANNON: And someone who is out might be out on a sick pass or a detail?

MS. MAKINS: Yes.

MR. HANNON: Or could be out on a family visit?

MS. MAKINS: Someone -- well, at 8:00 in the morning --

35

MR. HANNON: It depends on when the count is?

MS. MAKINS: Right.

MR. HANNON: Some could be out for an attorney consultation?

MS. MAKINS: Right. Some could be out on an attorney consultation, some could be on sick call, some could be down Male R&D, some could be seeing a specific person; as I stated before, the HIV clinic or something like that.

MR. HANNON: Okay. Now, do you know whether, when count is taken, anyone does anything to confirm the location, the actual physical location, of the people that you report out?

MS. MAKINS: The officer that -- before you call in the count, the officer in the housing unit that takes the count should verify where the inmate actually physically is.

MR. HANNON: Well, how do you do that?

MS. MAKINS: You call -- if it says the inmate is in Male R&D, you call Male R&D and you say do you have inmate so-and-so, DCDC number from my

36

housing unit. He or she will say yes, I do. So, okay, that means that the inmate is going to be counted in the Male R&D Unit, and he is going to be on your out count, which basically should coincide with the numbers.

MR. HANNON: And the people doing the count then rely upon that?

MS. MAKINS: Yes. They should check it.

MR. HANNON: Now, what if somebody is en route back from the doctor?

MS. MAKINS: If someone is en route back from the doctor, the infirmary should be able to -- if he or she is coming from the infirmary, when you call the infirmary they say -- you say, well, do you have inmate so-and-so, and they'll tell you no -- they'll tell you yes, no, or the inmate just left. So then you be kind of looking for he or she in the corridors or coming down the hall for the actual count.

MR. HANNON: So there's no way to do the count electronically?

MS. MAKINS: No.

MR. HANNON: And what sort of identification

do the inmates have on them?
MS. MAKINS: The inmates are supposed to have an armband showing their first and last name, DCDC number, and a picture of them on their wrist.
MR. HANNON: Is there a picture on the sick pass?
MS. MAKINS: No.
MR. HANNON: The day of the jail escape was June 3rd, 2006, could you tell Dr. Lesansky what you were doing that day.
MS. MAKINS: I was late for work. I contacted Captain Ames, who was the shift supervisor that day, and told her that I was running late because I had left my uniforms in the cleaners, and I told her I was going to pick them up and I was coming to work.
So I got to work, I think it was around 7:40 or 7:35, because the cleaners open at 7:00. I got dressed in Female R&D. I took my street clothes back outside to my car. I had my other uniforms in my car. They were hidden up underneath the panel of my station wagon.
I went to the Command Center. I went

inside. I sat there for a little while. I asked -- I didn't, I didn't speak with Captain Ames other than that morning just to let her know that I was there.
I contacted my housing unit, which was Southeast 1. I asked the officer, which was Ms. Hatton -- she was there that day -- I asked her did Captain Ames call me for the housing unit. She said yes. I said, okay, I'm on my way, and I left the Command Center and I went to my housing unit, which was Southeast 1.
When I arrived in the unit, there were two officers inside the unit. No officer -- it was two. It was Ms. Hatton -- hold on. Ms. Washington was in the unit when I arrived. She was there, I believe, by herself, and I questioned that immediately, because I asked her who was her Second Officer from the midnight shift. She tells me Officer Izzariki. I told her, I said, well, Ms. Washington, Izzariki ain't have no business leaving you here by yourself. Then I think Ms. Hatton came in the unit.
MR. HANNON: Ms. Patton?
MS. MAKINS: Ms. Hatton. Me and Ms. Hatton

was getting ready to perform the count. Ms. Washington said no, Sarge, I'll do it. Me and Ms. Hatton will do the count, so they proceeded with doing the inmate count. I watched them the whole time as they were counting the inmates. If any cell doors needed to be popped open to verify whether or not the inmate was in the cell during the count, I did pop the gate, but I watched them the whole time.
When they completed the count, they told me it was 145 inmates, which was the correct count, indicating the count from the midnight shift. The count was verified. I called the count in to -- I think it was Lieutenant Diaz, and I told him that it was 145 inmates and they all were present. And we proceeded to do the housing unit paperwork, which is four sheets that you have to do every day.
You do the Inmate Search Sheet, which is to show what five cells that were shaken down and the inmates where contraband was found. You do a Window and Bar Sheet, which is to indicate any discrepancies with the windows or the bars in the housing unit. You do -- I know those two.

You do an Environmental Inspection Sheet, which indicates whether or not the cells that you have to do, whether everything is working in there, and there's no Priority 1's, which Priority 1's are water, toilet, lights, lighting or anything of that nature, where a maintenance person would have to come immediately to fix the problem.
There's another sheet. I don't remember the other sheet, but I know it's four, and you take those to the Command Center every day.
MR. HANNON: Let me back up and ask you some more specific questions. How many corrections officers were supposed to be at Southeast 1?
MS. MAKINS: Four.
MR. HANNON: And how many were there when you arrived?
MS. MAKINS: One, which was Ms. Washington.
MR. HANNON: And so you arrived, that was two, and then Ms. Hatton arrived?
MS. MAKINS: It was three, uh-huh.
MR. HANNON: And there should have been four?

MS. MAKINS: Yeah.
MR. HANNON: And did you raise that issue with anyone?
MS. MAKINS: Yes.
MR. HANNON: Would you tell Dr. Lesansky about that.
MS. MAKINS: I called Captain Ames and asked her where was my fourth officer. She said that Mr. Walter had told her to close down that post, it was a shutdown post for the day, and I said, well, Captain Ames, I said there's three females in here, because that was the issue with me, because it was an all-male housing unit, and we had to do recreation and things of that nature. And even though you work in a penal institution, you still supposed to conduct yourself -- the female/male thing don't never change.
And I asked her, I said, well, there's three females in here, could you give me a male officer. She said no, you got -- all three of y'all are going to be in that housing unit. I'll send you a relief officer for the lunch break, but I don't discriminate. And I was kind of -- I was very upset, but she was the

supervisor. What can I do?
MR. HANNON: Were you aware of the level of understaffing that existed that day at the jail?
MS. MAKINS: No.
MR. HANNON: Were you aware of anyone asking that the jail be shut down because of understaffing?
MS. MAKINS: No.
MR. HANNON: I'm going to show you a document that's called the "Number 2 Shift Daily Roster for Saturday, June 3rd of 2006." Do you know what that is?
MS. MAKINS: This is the Number 2 Shift Roster. I see that there were several posts that were shut down that should not have been because of the amount of inmates. Most of the time -- there's a ratio of the inmates to officers, and this was not -- this would not constitute -- it wouldn't constitute this, so you had a lot of shutdown posts that should not have been shut down. So that means that the jail was basically -- it was unsafe.
MR. HANNON: Were there -- from looking at that document, were there corrections officers who

were assigned to posts that were really sort of irrelevant to the need to provide security in housing units?
MS. MAKINS: Yes.
MR. HANNON: Explain what you mean by that.
MS. MAKINS: The post -- that these officers here, they should have been in the posts that were shut down. Christopher Smith, and I guess there's somebody Gray, I don't know who that is, they should have been in one of these housing units that were shut down.
MR. HANNON: Where does it show they were assigned?
MS. MAKINS: It doesn't say where they were assigned. Basically it has an indication, so he must have been assigned to the south side, which was the side that I was on that day, because she did tell me that he was going to come and give us lunch break.
MR. HANNON: So that's a male, Scott?
MS. MAKINS: Uh-huh.
MR. HANNON: Did you ever see him that day?
MS. MAKINS: I seen him at the end of the

day when Captain Ames -- after everything that happened, Captain Ames told me to come downstairs immediately, and I told her I didn't want to leave Ms. Washington and Ms. Hatton until my replacement got there, because it just wasn't -- it was not professionally, to me, correct, because you're not supposed to leave a post and you don't have -- and you got inmates out or whatever and you're waiting on relief. You're just not supposed to do that. I asked could I have him that day, and she told me no, she don't discriminate. He could have -- and I asked for a fourth officer, too. He could have been in that housing unit with us.
MR. HANNON: Do you know why he was allowed to float?
MS. MAKINS: No.
MR. HANNON: Now, I'm also going to give you, Dr. Lesansky, the Overtime Justification Report for the Number 2 Shift for June 3rd of 2006.
I don't know whether you're familiar with this document, Sergeant Makins. Are you?
MS. MAKINS: No, I'm not familiar with it.

45

MR. HANNON: Okay. I have just one copy, but we're going to kind of explain it. It says on June 3rd, 2006 -- this is a memo from Captain Ames to Robert Clay, the Interim Warden. "Per your authorization, 41 officers and two supervisors in the authorized correctional operating staff complement for the facility," so what that's saying is that for that shift, 41 officers and two supervisors were authorized for overtime?

MS. MAKINS: Yes.

MR. HANNON: Now, on the left-hand side it says "Complement Breakdown." It says, "Roster Post 121."

MS. MAKINS: Yes.

MR. HANNON: What's that mean?

MS. MAKINS: That means that's how many roster posts there were for that day.

MR. HANNON: So that's how many positions need to be staffed by corrections officers?

MS. MAKINS: Yes.

MR. HANNON: And then "B" says, "Officers on Duty, 63 plus 3." What's that mean?

46

MS. MAKINS: 63 indicates the number of officers that was on duty, which would be 63. And 3 is three supervisors.

MR. HANNON: So that's 66, so if we do the math of the reporting officers and supervisors on duty, they were 54 short; is that correct?

MS. MAKINS: Yeah, that's what it would say, yes.

MR. HANNON: Of the actual number of posts that needed to be manned?

MS. MAKINS: Right.

MR. HANNON: And then under "C" there's a category called "Shut-down Closed Posts," and it says "17." What's that mean?

MS. MAKINS: That means 17 posts were shut down.

MR. HANNON: So that means they didn't need 17 officers --

MS. MAKINS: It doesn't --

MR. HANNON: Well, it means that they --

MS. MAKINS: They shut them down. It's not that they didn't need them, but they shut them down.

47

MR. HANNON: Okay. Then they have a figure which says "Posts to Cover," which is "A minus B minus C equals D." It would be the total roster post of 121, minus the officers and supervisors on duty, minus the shut-down posts, and so what they concluded is that they would be able to run this shift with 41 officers plus two supervisors. Is that what that means?

MS. MAKINS: Okay. The officers on duty is 63 plus three, which is the officers and the supervisors. Shut-down posts is 17. The posts to be covered for overtime is 41 plus two.

MR. HANNON: Right.

MS. MAKINS: That means 41 officers plus two supervisors will cover the shift for overtime, who accommodate the 63.

MR. HANNON: So that means that there were 63 plus 41 of the 104 officers and five supervisors when there needed to be 121 posts covered; is that correct?

MS. MAKINS: Yes.

MR. HANNON: Okay. I will send you,

48

Dr. Lesansky, the other Overtime Justification Reports which will show that, up to that date, that was the largest number of vacant posts in the history of the Department of Corrections since this information -- since they began to collect this information, at least from the documents that I've seen, and they haven't been collecting this information for a great deal of time. Sergeant Makins may know of other times when it was even worse, but I'll show you what data we have.

Do you have anything to add to that?

MS. MAKINS: No.

MR. HANNON: Okay. What were you accused of doing on the day of the escape?

MS. MAKINS: On the day of the escape, I basically wasn't accused of anything. I was fired under malfeasance and negligence.

MR. HANNON: And when you were fired, what did they accuse you of?

MS. MAKINS: They accused me of not checking to make sure that Inmate Jones was supposed to go to the infirmary.

MR. HANNON: Could you tell Dr. Lesansky

what occurred that day that you can recall in terms of Inmate Jones going to the infirmary.

MS. MAKINS: Okay. I had worked that week, and I worked overtime Monday and Tuesday -- I mean Sunday and Monday, which were my days off, so I got a chance to observe some of what was going on on Sundays and Mondays in the housing units.

On that Saturday when we completed doing -- after we did the count, the count was verified, we called the count in to the Count Book, talked to Lieutenant Diaz. We told Lieutenant Diaz that there was 145. Everybody was present. We proceeded to do the paperwork for the -- the daily paperwork that has to be passed to the Command Center.

Okay. Then I proceeded to do some presigned passes. I didn't know whether or not we was going to get another officer, because sometime people -- they will call people in on overtime, and they will be late. So I did approximately 18 presigned passes, which was the housing unit -- it had the housing unit and my signature and the date, which was June 3rd.

I wrote five -- no, I wrote four passes at

first for four inmates that I knew would probably go to the infirmary for bandage change. They were -- let me think. I think one of them was cell -- I believe one of them was cell 18. His name was Vincent Jones. One was for cell 54 or 53. I'm not sure. I think it was 54. It was 54 or 53. He was a Spanish guy.

Another one was for an older guy. He was down on the bottom tier. I think it was 74, between cell 74 and 71. It's been a while, so I don't quite remember everything, but -- and then I wrote a pass for one more. He was on this side. I don't remember his name, but I believe he was in cell -- he was in cell 40 something. I don't remember exactly what it was, but I wrote four passes for inmates that I knew that were going to wound care. And I had their passes on the clipboard. One side was their passes. The other side was the presigned passes.

So I went out on the floor of the housing unit to make sure everything -- because we had indoor, in-unit recreation, which the inmates on my right-hand side were going to be coming out that Saturday. The left-hand side inmates were going to be locked down,

according to the way that they do the in-house recreation in the jail.

So we was sitting there, we was having girl talk, me and Ms. Hatton and Ms. Washington, just, you know. Once I came back in from the floor about 9:30, 9:40, somewhere around there, probably I think it was 9:40, I noticed that -- before then, the inmates from the culinary came in and dropped off the juice, the juice container, which you had to manually put the juice in the cups for the inmates. That Monday I -- it was just -- it was chaotic in there, because the inmates -- they was rowdy that Monday, because all of them didn't get their juice at the same time.

So Saturday we ran one bread tray short, so I stepped out of the housing unit to go to South 1 to get a bread tray so that everybody, each tier during the feeding would have their juices, because I really didn't want nothing to happen that day, no incidents, no rowdiness or nothing where I had to basically shut the unit down, because I felt that it was a security issue on my safety or the other officers' safety and the inmates' safety.

And when I came back in, I noticed that Southwest 1 had their inmates out, so I called downstairs and I confirmed that the count was cleared by Ms. Williams, who was in the Command Center at the time, and she said the count was cleared. I said okay. So I told Ms. Hatton and Ms. Washington that the count was clear and that we was going to, you know, we was going to run the unit.

At that time I also proceeded to contact Ms. Ames, which is Captain Ames, and I asked her where was my fourth officer, and she said that she don't discriminate and that Christopher Smith was going to be our relief officer for our lunch break. I said okay. So I told Ms. Hatton and Ms. Washington that we working with what we had. It's just us. I said I'm going on the floor. Ms. Hatton was left in the Bubble, and Ms. Washington went on the floor with me.

The inmates were aware that the count was clear. The inmates had already had their passes, the ones that were going to the infirmary. The ones on the right-hand side flashed their passes, which it was three of them, because I also noted before I left out

53

of the Bubble that one of the inmates didn't get their pass, which was cell 74, I believe. He didn't get his pass, so he may have left or was reassigned to another housing unit, but the three that I had wrote, they got their passes.

So we looked on the floor and they flashed their passes, and I told Ms. Hatton to pop the doors. On the left-hand side, Ricardo Jones, 18 cell, had a pass, too. Eighteen cell had a pass. He flashed his pass. I told Ms. Hatton to pop the door on 18 cell. She popped 19. Me and Ms. Washington both turned around and said, no, 18. Inmate Jones came out of the, came out of the cell, he came down the steps, and I looked at him. I said where are you going. He said the infirmary. I said, okay, take your pass to Ms. Hatton in the Bubble so that she can check you out.

The other inmates that were coming out for on-unit rec that had passes, they proceeded to the Bubble so that they can go to the infirmary also.

We was operating the unit, so I was checking, making the housing unit check. I had the

54

radio in my hand. I was checking the right-hand side, because those were the inmates that were coming out, and Ms. Prophet, which is Lieutenant Prophet, she said, shut the jail down, shut the jail down, on the radio transmission.

I proceeded to shut the jail down. I told all the inmates they had to go back to their cells. They was like, what's wrong? I said I don't know, but y'all got to go back. Me and Ms. Washington -- I said, Ms. Washington, I'll take the top tier, you take the bottom tier to make sure all the doors are secure. I don't know what's going on.

So when I got all the inmates secured and they were back into their cells, I walked up to the Bubble and I said, Ms. Hatton, what's going on? She said, an escape. I said, huh? She said, yeah, that's what they saying. So I called the Command Center to confirm, and Ms. Williams told me that it was an escape. I was like, okay. We just sat there and waited for further instructions.

I received a call from Lieutenant -- I think it was Prophet. She called. She said, Makins? I

55

said, what? She said, where is Inmate Ricardo Jones? I said he went to the infirmary, so she said okay. I hung up the phone with her. She hung up the phone with me.

Next thing you know, the inmates were coming back from the infirmary, and every person -- I had wrote another pass, too, for an inmate. I forgot his name, but he was on the floor, because me and Lieutenant Datcher, who was our zone supervisor that day, Zone 1 supervisor, I had told him that the inmate in -- I think his cell was 63, he had a bruise up under his eye that I had observed that Saturday, and I said I think the guy in the cell is doing something to him or something, something is being done to him that shouldn't be done to him. I said he needs to go on PC or something, because I can't have that on my conscience about the guy getting hurt or something really bad happening to him while I'm in here.

And I also told him that it was only three females in my housing unit, it was only the three of us, me, Ms. Hatton and Ms. Washington, assigned to the housing unit, because I didn't feel comfortable

56

operating a unit like that. He said, I know, I'm on my way, you know, I'm going to come up there. He told me to send the guy to the infirmary, and he would take care of it from there and place him on involuntary PC.

I said okay, and I then wrote another pass for the guy in 63 cell, and I told him that he was going to the infirmary, so he gave the pass to Ms. Hatton. She put it on the Movement Sheet and checked the man out, and he went to the infirmary.

Upon the lockdown, everybody -- they wanted everything, everybody, all the inmates to go back to their housing units, so the ones from the infirmary were returned. Upon the return of the inmates, all the inmates were returned except for Ricardo Jones and the last guy that I sent out, which was cell 63. So I called the infirmary and I asked -- I think it was Kennard who answered the phone. I said, well, is Ricardo Jones up there? He said no. I said, well, could you check and make sure, check all the corridors and everything to make sure that he's, you know, where he is, I said, and call me back. Officer Kennard never called me back.

So then I got another call. The inmates were returned. They came back to the unit. They went back. They gave Ms. Hatton their passes. They went back to the unit. Ms. Hatton was a little nervous, and she had plussed everybody back in. I looked at her and I said Ricardo Jones is not here. I said everybody else is here except for him and the other guy. I said Ricardo Jones did not come back in the unit. I said that Movement Sheet, you got to make it correct. That Movement Sheet has to be correct. She said, what you want me to do? I said you make that Movement Sheet correct that reflects that inmate not being in this housing unit and not returned.

Then we got a call from Lieutenant Prophet again. No. Lieutenant Diaz. Diaz told me to pull Inmate Ricardo Jones' wing card. He asked me what was his first and last name. He asked me what was his DCDC number. He asked me what cell he was assigned to. I gave him all that information.

(Discussion was held off the record.).

MS. MAKINS: So then Ms. Washington said we should do a count. That's fine. We go and physically

count just to make sure that we have -- you know, everybody is in here. By then I kind of assumed that Inmate Ricardo Jones was one of the guys that had escaped.

It came over the loudspeaker to do a census count, so I said I'm going to do census count. Ms. Hatton stayed -- huh-uh. Ms. Washington and Ms. Hatton was doing -- they did the little initial count that we had.

So Ms. Hatton had yelled to me and said Ricardo Jones is not here. She came off the top tier, the top left-hand tier. I said okay. So when she got back in the Bubble, I told her why would you yell the man's name out loud on the tier. The unit was quiet. And she just looked at me and I looked at her. I said you don't do that. You just come back to the unit and we can discuss whatever needs to be discussed in here. So Ms. Washington didn't yell. Ms. Hatton did. Ms. Hatton did the yelling that Ricardo Jones was not there.

So then we sat down. All three of us was in the Bubble. I noticed that Ms. Hatton and

Ms. Washington was a little nervous. I looked at both of them. The phone call, the intercom system say for us to do a census count. I say, well, I'm going to go ahead and do the count. Me and Ms. Washington was on the tier, doing the census count. The discrepancies I wrote on the back of the census during the census count.

Then when I got to cell 6, I received -- Ms. Hatton told me I had a phone call. So when I went to the Bubble, I got the phone. It was Captain Ames. Captain Ames told me to report to Command Center immediately. I said, well, Captain, is only Ms. Washington and Ms. Hatton in here. She said, Makins, Christopher Smith is coming to the housing unit to relieve you, she said, but I need you to come down here now. I said okay.

I said, well, look -- after I hung up the phone with her, I told Ms. Hatton and Ms. Washington, I said, look, I got to go downstairs. I said I don't know what's going on, but I got to go downstairs. So when I was getting ready -- when I just happened to look over in the hallway towards the door of the gate,

I saw Christopher Smith. I said okay, your relief is here, because I wasn't going to leave them two by theirselves. So when Christopher Smith got there, I left the housing unit. I proceeded to the Command Center for further instructions from Captain Ames.

She told me, she said, Makins, I want you to help them with the Chronological Report. The Chronological Report is done when any incident, when basically a major incident occurs within the jail. And I started writing down the information and the facts about what had happened up until the point of the escape.

Mr. Brown, the Director, he came into the Command Center from the visitor's control, and he came in and talked to Captain Ames in the back. I think Mr. Clay, he was the Interim Warden at the time. So they came back from the back where the supervisor's office was. She told me to go with Mr. Brown to take his personal notes.

I proceeded with Mr. Brown to the first floor, which was the floor where the Warden's office was. I followed Mr. Brown throughout the place and

wrote down things that he told me to write down, and up until when it was time for the officers of Southeast 1 to be interviewed, I gave Mr. Brown his notes and I told him that I was Sergeant Makins, I was assigned to Southeast 1. I was the Officer In Charge of the unit where the incident had occurred and that it was time for me to be interviewed and I was to see Internal Affairs. I was interviewed by Ben Collins of Internal Affairs.

MR. HANNON: How did you learn that you were put on administrative leave?

MS. MAKINS: I was called Monday, which was the 5th.

MR. HANNON: How did you learn that you were fired, summarily fired?

MS. MAKINS: The media. On the news.

MR. HANNON: You saw it on the news?

MS. MAKINS: Yeah, I saw it on the news. I got several calls. Prior to me turning the news on, I got a call from some close friends of mine. Then the last call I got from Ms. Hatton. She told me to look at the news. I looked at the news, and that was on

the news. It was on Channel 4, as a matter of fact.

MR. HANNON: And how has your summary removal and what's happened since then affected you?

MS. MAKINS: It affected me, because I mean I didn't -- I've been in a lot of -- this is the longest job I ever had, and I took my job very seriously, and one incident had occurred and I was fired. I didn't feel that I was given a fair chance at anything.

MR. HANNON: I want to ask you once again: When the medical unit calls down and says that an inmate is needed for a medical appointment, is there anything in writing that requires any corrections officer in that unit to call back and confirm that?

MS. MAKINS: No. Not to my knowledge, no.

MR. HANNON: And have you ever -- I think you've already told us that you've never had any disciplinary actions against you.

MS. MAKINS: No.

MR. HANNON: And what sort of evaluations have you received?

MS. MAKINS: Outstanding and excellent.

MR. HANNON: And do you desire to return to the Department of Corrections?

MS. MAKINS: Yes.

MR. HANNON: Dr. Lesansky, you're welcome to ask questions if you have them.

DR. LESANSKY: Okay, thanks.

If I can just start at the very end there, Ms. Makins, when you said that you had heard about the firings on the news, or actually I think you said somebody called you --

MS. MAKINS: Somebody called me around 12:30. A friend of mine called me at 12:30. She said, did you hear y'all have been fired? I said no. She said, it's on the news. It was on the news. It was on News Channel 8. I said no, I said I'm not going to claim that, I said, because I don't -- I just told her I wasn't going to claim that, because I just didn't want to put that in my mind.

And then I got a phone call. I left out, came back. It was about 4:00 or 5:00, between 4:00 and 5:00. I got a call from Ms. Hatton. She said, Makins, you see the stuff on the news? I said

no. She said turn on Channel 4, and she said there's some bullshit. I said, yeah, there's some bullshit, but I can't worry about that. Mr. Bobb was coming out of a file cabinet, Mr. Brown was behind him, and he said, "Just fire 'em all. Fire 'em all. Let 'em fight their jobs back. Just fire 'em all." This was on Channel 4 news, and then Mr. Bobb had made a press conference, and so did Mr. Brown, saying that all of the 11 employees have been terminated, fired from their positions, effective today, which was the 27th of July.

DR. LESANSKY: Okay. So this news report that you're referring to on Channel 4 was July 27th?

MS. MAKINS: Uh-huh, or the 26th. What day was we fired; the 26th or the 27th?

DR. LESANSKY: Okay. So it was either the 26th or the 27th?

MS. MAKINS: Hold on. He's going to find it.

MR. HANNON: I'll find it. You go on.

DR. LESANSKY: Yeah, so you mentioned earlier about June 5th, which would have been --

MS. MAKINS: The date I was placed on administrative leave. I had -- I received the call saying that I had -- telling me to report to the jail. I thought that I was going in for a second interview with Internal Affairs. I had to report to the first floor to see Mr. Waldren, and he gave me a letter placing me on administrative leave until the investigation was concluded. Also he told me to give him my IDs and my badge. I explained to him that I did not have my badge, but I had my ID, and I gave him both the IDs that I had for that, for the Department of Corrections. I told him I did not want to come back to the jail at that time, so I asked him could I give my badge to the Major, and could she bring it in for me, and he said yeah.

DR. LESANSKY: Okay, just to clarify for me, so Mr. Waldren told you you're being placed on administrative leave. Did he say why, or he just said you're being placed on administrative leave, or did he relate it to what happened June 3rd, or was it --

MS. MAKINS: He said I was being placed on administrative leave. He just told me I was being

placed on -- I remember that part, and the rest of it I really don't quite remember.

DR. LESANSKY: Okay.

MS. MAKINS: But it was -- he said you being placed -- this is what he said. He said you being placed on administrative leave pending investigation of the incident that happened Saturday night.

DR. LESANSKY: On that point, just in terms of your experience at the CDF, had you ever heard of other employees being placed on administrative leave, not yourself, but have you ever heard of employees being placed on administrative leave?

MS. MAKINS: Throughout my tenure, yes.

DR. LESANSKY: And had you ever heard of someone being placed on administrative leave pending an investigation?

MS. MAKINS: No.

DR. LESANSKY: But you had heard of people being placed on administrative leave before?

MS. MAKINS: Right.

DR. LESANSKY: And you had never been placed on administrative leave before?

MS. MAKINS: No.

DR. LESANSKY: I don't mean to keep dwelling on the news report, but just because you had brought it up, they didn't name names on the news report?

MS. MAKINS: No. They said 11 employees, they said 11 officers from the D.C. Jail have all been removed from their positions as of the date, either the 26th or the 27th of July, they will be removed from the roll.

MR. HANNON: For your information, the Department of Corrections released the names in the investigative report to the press.

DR. LESANSKY: Okay.

Ms. Makins, Mr. Hannon had said that the Department released the names to the press.

MS. MAKINS: I read it in the Inquirer about three weeks ago. The Examiner. I'm sorry. On that particular day --

DR. LESANSKY: Okay. I'm still back on this news report that you made a reference to.

MS. MAKINS: I don't recall that. They just said all 11 employees have been fired from their

position at the D.C. Jail because of the incident, the escape on June 3rd.

MR. HANNON: Summary removal was July 26th.

DR. LESANSKY: The 26th? Okay.

So at that point you're saying on June 5th you were placed on administrative leave --

MS. MAKINS: Yes.

DR. LESANSKY: -- by Mr. Waldren, who didn't, as you recall, really tell you the reason for the administrative leave. Is that correct that you can't recall whether he gave a reason or not?

MS. MAKINS: He read the information that was in the letter, but it was basically because of the incident that had occurred on June 3rd. It said pending investigation, you're being placed on administrative leave effective this day. You are to call in at 8:30. I believe that letter came from Mr. Brown. Mr. Brown -- that was the letter from the -- the first letter from the Director placing me on administrative leave. I was to call the Major's Office between 8:30 and 9:00, Monday through Friday, and I don't think I read that it was -- it was pending

investigation. I don't think it specified . . .

DR. LESANSKY: So can I ask you, so when you heard about this news report July 26th with Mr. Bobb, from what I understand, saying --

MS. MAKINS: Mr. Bobb and Mr. Brown.

DR. LESANSKY: And Director Brown --

MS. MAKINS: Yes.

DR. LESANSKY: -- saying words to the effect of, you know, "fire them all," all the officers are going to be fired, words to that effect.

MS. MAKINS: Yeah.

DR. LESANSKY: Can I just ask you why you thought you were one of those people?

MS. MAKINS: Because I was placed on administrative leave because of the jail break, and it was only -- it was 12 of us actually placed on administrative leave. One person was exonerated, which was Captain Holmes.

MR. HANNON: Well, Captain Holmes was returned to work.

MS. MAKINS: Yeah, he was exonerated from the termination, and he returned to work approximately

two weeks after that, a week and a half or two weeks after we were fired.

MR. HANNON: What makes you say that he was exonerated?

MS. MAKINS: That's what the news media had said. He was exonerated from that.

MR. HANNON: Okay.

MS. MAKINS: There is only one person exonerated. That's what they said.

DR. LESANSKY: Okay, thanks. I wanted to then go back to your discussion with Officer Hatton when she filled out the sheet indicating that everybody was back in their cells, which you said occurred after you were told that the jail was in lockdown and everybody was to be returned to the cells.

MS. MAKINS: Right.

DR. LESANSKY: And you're her Officer In Charge, right?

MS. MAKINS: Yeah.

DR. LESANSKY: She's under your command as to OIC, right?

MS. MAKINS: Okay.

DR. LESANSKY: Correct?

MS. MAKINS: I'm not going to say she under my command, but she supposed to be. She was supposed to follow my orders, yes.

DR. LESANSKY: Because you're the Officer In Charge?

MS. MAKINS: Yes.

DR. LESANSKY: Which I wanted to follow up just a little bit, but anyway, you said that, quote, "She was nervous." I think you said it a couple of times, and then I think you also said Officer Washington was nervous.

MS. MAKINS: They were.

DR. LESANSKY: And you then said she checked off with plusses --

MS. MAKINS: The guys were coming back. She took the passes. She went down -- she didn't look at the passes to make sure, to check them off according to the passes. She just went down -- she went down on the Movement Sheet and she drew the line to make a plus to say that they were in there. When the inmate

leaves on Movement Sheet, you minus him, meaning he's gone. You plus him to say he's returned back to the unit.

DR. LESANSKY: So she's going down the Movement Sheet. She's got the passes --

MS. MAKINS: Right.

DR. LESANSKY: -- and she's looking at the passes?

MS. MAKINS: She's didn't look at the pass.

DR. LESANSKY: Okay. She's not looking at the passes?

MS. MAKINS: She just took it. She just took the passes.

DR. LESANSKY: She's not looking at the passes?

MS. MAKINS: Right. She just took the passes; okay? Then she opened the gate. Then she went down and started plussing the inmates. All the people that were out on the Movement Sheets, she started plussing them back. I said he not back and he not back. I said and this Movement Sheet is wrong, which was indicating Ricardo Jones and cell 63 -- I

73

don't remember his name. It's been a while. But the inmates, it was two inmates -- the other inmates had returned, and those two did not return. One was Inmate Ricardo Jones, and then the other one, it was the light-skinned guy. He was in 63 cell.

Then before we was doing the count or we was sitting in the Bubble, the other inmate had returned, the light-skinned one, the last one I had wrote the pass for, cell 63. His pass, he gave to Ms. Hatton. She plussed him in. She X'd him out and then she plussed him back in. And I just told her, I said that Movement Sheet is wrong. I said Ricardo Jones did not return to this unit. You need to get the Movement Sheet correct to reflect that Ricardo Jones is not in the housing unit. She said, well, what you want me to do; change it? I told her no. I didn't tell her no; I told her to make the necessary corrections on the Movement Sheet that needs to be made to indicate that Inmate Jones was not in the housing unit.

DR. LESANSKY: Did you ask her why she had shown --

MS. MAKINS: That he was back.

74

DR. LESANSKY: An inmate apparently -- am I correct that there were two inmates that she had checked off as a plus that they were back in their cells, who you were telling her, to your knowledge, were not back in their cells? Am I -- I'm just trying to --

MR. HANNON: I think there are two different procedures here.

DR. LESANSKY: Okay.

MR. HANNON: One is to check off passes, and the next is to go and look at bodies.

DR. LESANSKY: Well, no, I'm asking about this, what you're reporting, where you said she was nervous or she at least appeared nervous to you, or maybe you said she was nervous, and that she had these passes. This was after the order for the lockdown with everybody being returned. You said she had the passes, but my understanding from what you're saying -- and correct me if I didn't get it correct -- is that you saw her or she had gone down the Movement Sheet, putting plusses, which indicates that an inmate is back in their cell.

75

MS. MAKINS: Right.

DR. LESANSKY: She had the passes, she was making plusses, but she wasn't looking at the passes. She wasn't verifying that from the pass. She was making plusses, but she wasn't -- from what I understand, she wasn't verifying it from the pass.

MS. MAKINS: That's correct.

DR. LESANSKY: And so I'm trying to understand a little better. Since you're her OIC and you also have worked with her, from what I understand earlier --

MS. MAKINS: These are the passes. The inmates handed us -- handed her the passes. She took the passes, stacked them up. Either she set them down, but I know she went down that sheet and she plussed off every person that was on the Movement Sheet, indicating that they were there. I looked at the inmates to verify who I had wrote passes for to go to and from and who basically had left the unit. Ricardo Jones did not return to the unit.

DR. LESANSKY: I'm sorry. On the passes that you looked at, you're saying you looked through

76

the stack?

MR. HANNON: No, I didn't look through the stack. I knew the inmates by face.

DR. LESANSKY: Okay. You knew them by their face?

MS. MAKINS: Right. Facial identification.

DR. LESANSKY: But you didn't look at their wristband; you just looked at them and you --

MS. MAKINS: I knew that they were assigned to the unit.

DR. LESANSKY: Those were the ones that you had personally written the passes for?

MS. MAKINS: Three of them were here. I think -- I don't know how many exactly was on the Movement Sheet, but I know three of them that I had wrote a pass for. The last person that was returned to the unit was the last pass that I had written, which was for cell 63, and the officer brought him back down to the unit. I said, and that's him. The last one, I think, that was on our Movement Sheet, I said that's him. I said he's coming back. The officer is bringing him back.

77

DR. LESANSKY: Okay.

MS. MAKINS: So I looked to make sure that everybody was in. I noticed that she had plussed Ricardo Jones' name in, indicating that -- it would indicate, if I didn't know, that the man was back in the unit, and he wasn't, because he didn't return back to the unit. So I told her that he's not back in here. That Movement Sheet needs to be corrected. Do what you need to do to make it correct. That's what I told her.

DR. LESANSKY: And what -- did you observe what she then did to make it correct?

MS. MAKINS: She wrote another Movement Sheet.

DR. LESANSKY: She threw that one out?

MS. MAKINS: She copied from that Movement Sheet to a new Movement Sheet.

DR. LESANSKY: Okay. She copied from that -- the Movement Sheet that you told her was incorrect?

MS. MAKINS: Right.

DR. LESANSKY: She then -- you said "do what

78

you have to do" or words to that effect, "do what you have to do to make it correct"?

MS. MAKINS: Make it correct.

DR. LESANSKY: After she asked you what do you want me to do, do you want me to change it, and you said --

MS. MAKINS: I told her do what she needed to do to make it correct, that reflects that Inmate Ricardo Jones was not in the housing unit.

DR. LESANSKY: Did you tell her to take the passes and go pass by pass and verify, by looking at the pass, who had returned to the unit and then plussing that on the sheet, or what -- I'm -- did you say -- did you give her any instructions, if that's the right word?

MS. MAKINS: I don't recall her -- I just -- I knew the guys that were coming back in the housing unit. The passes, I think she put them on the desk, put them on the table inside the Bubble. Then she started plussing them down. Then I believe she came back and she threw them in the trash.

DR. LESANSKY: She threw the passes in the

79

trash?

MS. MAKINS: Yeah, the inmates that had returned at that time, she threw them in the trash.

DR. LESANSKY: I'm sorry, Sergeant. I'm sorry to interrupt you. She threw the passes that she hadn't looked at yet --

MS. MAKINS: Right.

DR. LESANSKY: -- into the trash?

MS. MAKINS: Yes.

DR. LESANSKY: After she had checked off plusses that these inmates had returned --

MS. MAKINS: Right.

DR. LESANSKY: -- she checked off the plusses, she hadn't looked at the passes, and then she threw the passes in the trash?

MS. MAKINS: Yes.

DR. LESANSKY: And then you pointed out to her that this Movement Sheet was incorrect, at least to the extent that you knew --

MS. MAKINS: That Ricardo Jones had not returned, and I knew cell 63 had not returned.

DR. LESANSKY: Right. Now, how did you know

80

that Ricardo Jones hadn't returned?

MS. MAKINS: Face. He didn't return. I knew that he did not return to the unit, because he did not come in the gate. As the inmates was coming in the gate, I was identifying them with my eyes as to who went. I didn't see them go out, but as to who was coming in and were they assigned to Southeast 1, those inmates that came back into the housing unit were assigned to Southeast 1, and those were the inmates that I had wrote the passes for for the infirmary.

DR. LESANSKY: Those were the three inmates that you made reference to that you personally knew, and then there was --

MS. MAKINS: That's correct.

DR. LESANSKY: -- this fourth inmate, cell number 63. Was that the fourth pass?

MS. MAKINS: That I wrote, yes.

DR. LESANSKY: That you personally wrote?

MS. MAKINS: Right, and gave it to them, because I gave it to him on the floor, and I told him he was getting his ass out of there, because something was going on, and I can't take that with me home.

That's what I told him. I gave him his pass, and I said, now, you go to the infirmary and you go now. That was during the time inmate recreation was going on, and the inmates were coming out to use the telephone. And also the ones that were going to the infirmary on the right-hand side, they were going to the Bubble to go to the infirmary for wound care. I did not identify Ricardo Jones coming back into the housing unit.

DR. LESANSKY: You did not see him come back from the infirmary?

MS. MAKINS: No, I didn't. That's correct.

DR. LESANSKY: So he could have been still in the infirmary or he could have been on his way back with another officer, or --

MS. MAKINS: It could have been all of those possibilities.

DR. LESANSKY: I mean there are a number -- I don't want to put any words in your mouth or say that you --

MS. MAKINS: It could have been that an officer had him, bringing him back down, it could have

been that he still was in the infirmary, because I never got a call back from Officer Kennard indicating that he was there or not.

DR. LESANSKY: Right, although, from what I remember you saying, that Kennard did tell you that Jones was not up there.

MS. MAKINS: That's correct.

DR. LESANSKY: Talking about Ricardo Jones was not up there.

MS. MAKINS: Correct.

DR. LESANSKY: And you then asked him to check and be absolutely sure that he was not there --

MS. MAKINS: Yes, I did.

DR. LESANSKY: -- or on his way back, because you said sometimes Medical will tell you that an inmate has left and is on their way back, so they're in transit.

MS. MAKINS: Yeah, he didn't give me any indication.

DR. LESANSKY: Okay. So this group of inmates came back, you recognized them by face, these three inmates that you had done the prewritten passes?

MS. MAKINS: Uh-huh.

DR. LESANSKY: And were there other inmates that you recognized?

MS. MAKINS: That was assigned to my unit?

DR. LESANSKY: Yes.

MS. MAKINS: I don't know exactly how many of them went to the infirmary. I'm not absolutely sure, but I know that I wrote four passes originally. Three of them were given out when I came back on the floor. Who gave the inmates the passes, I don't know, because I probably had stepped out over to South 1 to get another bread thing for the feeding. Those three I recognized coming through the door; okay? Ricardo Jones came out on the left-hand side. He was the only one that came out on the left-hand side.

MR. HANNON: We seem to be repeating a lot of stuff. It may be helpful to understand that they then did a count and went to each cell to make sure that there was a body in the cell, so this wasn't the only process that they were going through.

DR. LESANSKY: Right.

MR. HANNON: Okay.

DR. LESANSKY: Thank you.

So, Sergeant Makins, I wanted to go back to the point where Officer Hatton threw the passes into the trash and was now -- had she started the new sheet yet? You said she was -- you told her to do whatever you needed to do to make it correct, the Movement Sheet?

MS. MAKINS: Uh-huh.

DR. LESANSKY: And you said she started a new sheet, using the old sheet?

MS. MAKINS: Uh-huh.

DR. LESANSKY: Can you explain that a little bit to me, because you said that the old sheet she had checked off plusses --

MS. MAKINS: This is the old sheet. It indicated -- because I went over there and I looked at it. It indicated that the inmates were present; okay? The inmates, I know the ones that I had wrote their passes for. They were back in the unit; okay? Ricardo Jones, I believe he was the second or third inmate on that Movement Sheet, he was indicated that he was there, and he wasn't. He was not back in the

85

unit at that time. The little guy at the bottom, 63 cell, I wrote his pass, gave it to him personally. I believe it indicated that he was there, too. And I said this one and this one, Ricardo Jones didn't come back and neither did the other guy.

MR. HANNON: The question was: What did Ms. Hatton do when she prepared the new sheet?

MS. MAKINS: She transferred the information from the old sheet to the new sheet.

DR. LESANSKY: "The information" meaning the names?

MS. MAKINS: Names, DCDC numbers.

DR. LESANSKY: Okay, that's all she transferred? She just copied the names and the DCDC numbers from the old sheet, which you told her was incorrect with regard to the movement?

MS. MAKINS: The whole sheet should have been copied. Whatever was indicated on this sheet should have been indicated on the new sheet.

DR. LESANSKY: Yes, Sergeant Makins. What I'm trying to just understand is how she prepared -- your instruction to her, as I understand what you

86

said, is to do whatever she had to do to make the Movement Sheet, to get it right.

MS. MAKINS: I told Ms. Hatton to get it right, uh-huh.

DR. LESANSKY: Get it right or make it correct, words to that effect, so she now copies the names and DCDC numbers from the sheet that you have told her is not correct.

MS. MAKINS: Uh.

DR. LESANSKY: And you're the Officer In Charge, and you told her it's not correct, do whatever you have to do to make it correct or get it right.

MS. MAKINS: Uh-huh.

DR. LESANSKY: So she then copies the names and the DCDC numbers off the incorrect sheet onto this new sheet. Then what did she do?

MS. MAKINS: She indicated the inmates that were present and the inmates that was not.

DR. LESANSKY: And how did she indicate, how did she know which inmates were present? You said she had thrown the passes into the trash at that point.

MR. HANNON: She told her what inmates were

87

not present.

DR. LESANSKY: Okay. Is Mr. Hannon correct; you told her, inmate by inmate, which inmates were back in their cells? Is that how she was making the sheet -- doing whatever she had to do to make the sheet correct, get it right, you then went down with her, each inmate, telling her that that inmate was there?

MS. MAKINS: No.

DR. LESANSKY: How did Officer Hatton know which inmates to check off as plus that they were back in their cells?

MS. MAKINS: If I told her that Jones and the last inmate in 63 cell was not there, everybody else was present. My issue was Jones and the last inmate, and you should indicate which inmate is there, and he or she is not there.

DR. LESANSKY: Okay, so I understand, you're saying that you verified that the Movement Sheet was correct except for two inmates. That would be Ricardo Jones, who you did not recognize by face as having returned back from the infirmary --

88

MS. MAKINS: Or the last guy.

DR. LESANSKY: -- or this cell Number 63 --

MS. MAKINS: Right.

DR. LESANSKY: -- quote, "light-skinned" inmate that you had sent, you had personally wrote a pass out for him --

MS. MAKINS: Uh-huh.

DR. LESANSKY: -- based on your observing that he had a black eye or something.

MS. MAKINS: Yeah.

DR. LESANSKY: But you had verified that the rest of the Movement Sheet was correct except for these two?

MS. MAKINS: I believe I did.

DR. LESANSKY: Okay, and you told her that Jones was not there so she would have had to put a minus there, and is that what she did?

MS. MAKINS: Yes.

DR. LESANSKY: She put a minus for Ricardo Jones?

MS. MAKINS: Yes.

DR. LESANSKY: And she put a minus for this

inmate in cell number 63, correct?
MS. MAKINS: Okay.
DR. LESANSKY: Okay, great. Thank you.
I'm sorry to jump back. Earlier on you said --
MR. HANNON: Can I interject?
DR. LESANSKY: Please, please.
MR. HANNON: And after that process, the light-skinned fellow returned; is that right?
MS. MAKINS: Yes.
MR. HANNON: And you did a count?
MS. MAKINS: Yes.
MR. HANNON: And the count required you to go to each cell and make sure that the person who was in that cell was in that cell?
MS. MAKINS: Yes.
MR. HANNON: And then the count confirmed that everybody was there except for Jones?
MS. MAKINS: Yes.
MR. HANNON: Okay. Thank you.
DR. LESANSKY: And so she -- just to follow up what Mr. Hannon said, so she then left the minus

sign for Jones, correct?
MS. MAKINS: Yes.
DR. LESANSKY: And there was now a plus for this inmate from cell 63?
MS. MAKINS: Yeah, I think he had returned.
DR. LESANSKY: And so the Movement Sheet at that point showed only one minus, which was Ricardo Jones?
MS. MAKINS: Yes, sir.
MR. HANNON: Thank you.
DR. LESANSKY: Thanks a lot. I appreciate that.
Earlier I wrote a note, when you were talking about these presigned passes, that you had -- you did 18. That's what I wrote down.
MS. MAKINS: Uh-huh.
DR. LESANSKY: And that you had signed them.
MS. MAKINS: Uh-huh.
DR. LESANSKY: And then you talked about the four that you knew personally were going to wound care.
MS. MAKINS: Yes.

DR. LESANSKY: And I'm not sure I got it correct. You mentioned an inmate in cell number 18 whose name was Vincent Jones. That's what I wrote down.
MS. MAKINS: No. He was in 48. I'm sorry. I believe he was in 48. His name was Vincent Jones.
DR. LESANSKY: That was 48, not 18?
MS. MAKINS: Right.
DR. LESANSKY: Okay. This process that you used to do these presigned passes; how did you know how to do that? Was that listed in a procedure or a post order or a program statement, or --
MS. MAKINS: No.
DR. LESANSKY: How did you know how to do this process?
MS. MAKINS: I did them to accommodate the -- on Saturdays at that time they had visiting. I know, by working in the Bubble, it can be chaotic. The presigned pass basically would help you to make the process of getting the inmates to where they were called to go to visiting, to the infirmary, it will make the process a lot easier, and also it

accommodated for the fourth officer being missing.
DR. LESANSKY: Did you develop that procedure on your own?
MS. MAKINS: No.
DR. LESANSKY: Was that your own procedure?
MS. MAKINS: No, but every officer in the jail does it. Every OIC in the jail does it.
DR. LESANSKY: And to your knowledge, none of those Officers In Charge, these other officers, you said every Officer In Charge in the jail does it; that is, the presigned passes?
MS. MAKINS: Uh-huh.
DR. LESANSKY: And to your knowledge, they -- how did they know how to do it?
MS. MAKINS: I don't know. I don't know.
DR. LESANSKY: Did you ever have an opportunity to talk to any of the other officers who were OICs at one time or another that you knew?
MS. MAKINS: No.
DR. LESANSKY: You've never talked to any other officers who were OICs?
MS. MAKINS: I talked to some OICs, but I

93

never asked them about -- that question never came up about the presigned passes.

DR. LESANSKY: But it was a process that was used?

MS. MAKINS: It was a common practice that was used throughout the whole time that I had been coming to the jail, working at the jail.

DR. LESANSKY: Earlier, Sergeant Makins, you talked about -- I think you mentioned several different times -- I made notes -- about the staffing and about -- I think I'm quoting you or virtually quoting you, that the jail was unsafe based on what you believed to be were less staff than should be on post.

MS. MAKINS: According to the information from this roster and from the Overtime Justification Sheet.

DR. LESANSKY: Well, not -- I don't want to put any words in your mouth, but I understood you to say that on June 3rd this was not the first time that you had concerns about staffing at the jail. Did I misunderstand you or did I not hear you correctly?

94

MS. MAKINS: I didn't say that. June the 3rd, according to what I see here and on this, which is the Daily Master Roster and the Overtime Justification Sheet, it wasn't safe. The jail, it was understaffed.

MR. HANNON: She also made the comment about having three women in an all-male housing unit that should have had four officers. I think her comment on that was that was unprofessional.

MS. MAKINS: I thought it was -- it was -- basically I thought it was -- it was a safety issue for three females to be in an all-male housing unit. It's 145 inmates. It's no male officer present. I hadn't got a chance to call Southwest 1 or South 1 to tell them one of the male officers just to come in the housing unit, just to give the inmates some type of illusion that the male officer was assigned so that nothing would happen as far as one of our safety. You dealing with a male ratio with a male and a female, a male is going to always win, and that was my concern, my safety. It was my safety, the inmates' safety and the staff's safety.

95

MR. HANNON: And during in-block recreation, approximately 72 inmates would be out of their cells, having in-unit recreation?

MS. MAKINS: Eighty. That housing unit, yeah, approximately 80.

MR. HANNON: And there would be --

MS. MAKINS: They would be taking a shower --

MR. HANNON: There would be one officer in the Bubble?

MS. MAKINS: Right.

MR. HANNON: And two on the floor?

MS. MAKINS: Three. Sometime it would be two, depending on the volume of calls and the volume of inmate movement, and it always should be two on the floor.

MR. HANNON: So it would be 80 men on the floor, including men who were showering and using the facilities.

MS. MAKINS: No. The facilities are in their cells.

MR. HANNON: Right.

96

MS. MAKINS: But they would be showering, using the phone. You got basketball. Sometime they would -- some inmates would take their jump bottoms -- they had jumpsuits off. They would be in their drawers. I mean those were all issues to me.

DR. LESANSKY: Just following that up, Sergeant Makins, you had talked about -- when you were talking about the issue of all female officers on duty in an all-male unit, and you had said it was unprofessional.

MS. MAKINS: I thought it was unprofessional when you had a male officer available that was not assigned to any, any post actually. He wasn't assigned to no post. He was hired for overtime. He was hired from 8:00 to 2:30. That would be 6.5 hours of overtime. He was being paid more than we were.

DR. LESANSKY: And you -- on that same point, and you actually called Captain Ames --

MS. MAKINS: Uh-huh.

DR. LESANSKY: -- and made that point about three females in this all-male unit?

MS. MAKINS: Right. I was even willing to

switch up a female for a male.

DR. LESANSKY: And you said, if I wrote my note correctly, that Captain Ames was not going to or could not give you a male officer; she was going to send this relief, Christopher Smith, I think, at lunch.

MS. MAKINS: Yes.

DR. LESANSKY: And she said words to the effect that she "doesn't discriminate" with regard to --

MS. MAKINS: That's what she said.

DR. LESANSKY: -- male inmates and all female officers.

MS. MAKINS: That's what she said.

DR. LESANSKY: Do you know of a policy or a program statement or anything in the Department of Corrections or maybe even outside the Department of Corrections, in the law of the District of Columbia or anything that goes to the point of female officers, all female officers in an all-male unit?

MS. MAKINS: No, I don't. I don't recall that.

DR. LESANSKY: But you do believe it to be unprofessional to have all females officers with no male officer present in an all-male unit?

MS. MAKINS: Yes, I do, because it's a safety issue. It really is a safety issue, because a man can overpower a female, and you have approximately 80 inmates out. They could have took over the unit. They could have made it very uncomfortable for us to go on the floor. They could have made it uncomfortable for us to do our jobs. That was my issue. And most of the time when a male is present, sometime the inmates act accordingly and sometime they don't.

MR. HANNON: Sergeant Makins, in a circumstance where, as you say, the inmates are making it uncomfortable on the floor, sounds as if you're saying that the correctional officers might retreat to the Bubble; is that correct?

MS. MAKINS: They could make it uncomfortable on the floor.

MR. HANNON: I'm assuming that.

MS. MAKINS: Yeah.

MR. HANNON: And then the officers could retreat to the Bubble; is that correct?

MS. MAKINS: Correct.

MR. HANNON: And where would assistance come from?

MS. MAKINS: They would come from -- you would call the Command Center, let the Command Center know and let the supervisor know, and they would deploy staff.

MR. HANNON: Well, the staff that would be deployed, where would they come from?

MS. MAKINS: All over the jail.

MR. HANNON: Other posts?

MS. MAKINS: Yes.

MR. HANNON: Well, where would they come from if the jail was 60 officers short?

MS. MAKINS: I don't know.

DR. LESANSKY: Thank you, but, Sergeant Makins, if I could ask you, I thought earlier you had said that prior to Mr. Hannon showing you the Strength Report for June 3rd, which he then said to his knowledge had the largest number of vacant posts in

the history of the D.O.C. at least --

MR. HANNON: As long as they've been keeping these records.

DR. LESANSKY: Right, as long as this documentation has been kept, but you had said prior to that that, quote -- I think I'm quoting you -- that you were not aware of a staffing shortage that day.

MS. MAKINS: No, not until she told me that I was not getting a fourth officer and that Mr. Waldren told her to shut the post down. And I had said to Captain Ames, I said, Captain, Mr. Waldren told you to shut the post down, I said, so what do I need to do? I need to talk to Mr. Waldren, because I don't think it's fair that this post was shut down, I said, and it's just three of us in here, and it's females, could you give me a male officer. She said you going to have Christopher Smith who going to give y'all lunch break, and I don't discriminate. That's what she said.

DR. LESANSKY: Okay.

MS. MAKINS: So I immediately caught an attitude, but what could I do? Nothing. She the

supervisor. She was in charge.

DR. LESANSKY: You said you caught an attitude?

MS. MAKINS: Yeah, I was mad.

DR. LESANSKY: Oh, okay.

MS. MAKINS: When she said she don't discriminate, I was really upset with her.

DR. LESANSKY: Okay. Also, earlier when you were talking about the staffing shortage, both before and after Mr. Hannon showed you the Strength Report for June 3rd, you had talked about the jail being unsafe or was a safety issue, and you talked about the ratio of inmates to officers. Could you tell me what the established ratio of officers to inmates is supposed to be.

MS. MAKINS: I don't know what it is for the D.C. Jail, but by me working with management for years and years, I know that there is a ratio to officer/inmate. There is some way that they come up with it to get the post.

DR. LESANSKY: But am I correct that when you were cataloging your extensive experience working

under I think at least six wardens and majors, and to your personal knowledge you never looked at a document or anything that -- at least that you can recollect or maybe you can or cannot -- stated what the officer-to-staff ratio is in the Department of Corrections?

MS. MAKINS: I have seen some of them, but they varied from institution to institution, depending on what was the actual number of inmates being housed at the institution.

DR. LESANSKY: So you had seen --

MS. MAKINS: I have seen it.

DR. LESANSKY: And do you recall like where that was and what the ratio was?

MS. MAKINS: It was at the Youth Center. The ratios I believe was 43 to one or something like that.

MR. HANNON: Henry, I can send you a report that was commissioned by the Department of Corrections in 2004 that provides that information.

DR. LESANSKY: Okay. My question was just -- since the sergeant had talked about the safety

issue and brought up the issue of ratio of inmates to officers, I just was trying to -- I was asking Sergeant Makins whether she had ever seen anything, perhaps the document that you're referencing or some other document, that listed or detailed what the ratio with inmates to officers should be, and she did say she had seen something from when you worked at the Youth Center.

MS. MAKINS: Yes.

DR. LESANSKY: That was 43 inmates per officer?

MS. MAKINS: I believe it was.

MR. HANNON: The 2004 report indicates that the jail was designed as a single-cell facility, and it's double-cell.

(Discussion was held off the record.)

DR. LESANSKY: Sergeant Makins, you were talking at one point about the sick hall pass process, and it has the inmate name and the DCDC and the destination, and I think in response to a question Mr. Hannon asked you that it's paper and pencil, it's not computerized, it's just a piece of paper.

MS. MAKINS: Yeah.

DR. LESANSKY: I wanted to ask you: Does an officer sign those passes?

MS. MAKINS: Yes.

DR. LESANSKY: So every -- this piece of paper, this sick call pass --

MS. MAKINS: It should have an officer's signature on it.

DR. LESANSKY: It's supposed to be signed by an officer?

MS. MAKINS: Yes.

DR. LESANSKY: And if it's not signed by an officer, is that, from your experience, considered to be a valid pass?

MS. MAKINS: No.

DR. LESANSKY: And what would happen if you looked at a pass, you or -- well, I'll limit it to you. If you saw a pass, as the Officer In Charge, that was not signed by you or somebody authorized to sign it, what would happen, from your experience, if you have any experience with regard to --

MS. MAKINS: If the pass has not been

105

signed, basically it's not official, but I will take the pass from the inmate, probably wait for a little while, send the inmate back to wherever he or she is assigned. Are you pertaining to in the hallway, in the housing unit, or just in general?

DR. LESANSKY: For me, in general the issue of a pass, sick call passes --

MS. MAKINS: I would find out -- I would look at his armband, find out who he is, take him to a destination, take him somewhere, probably to the infirmary or somewhere where I know that he could be identified or down to the Command Center or the Count Book or the compliance, identify this inmate, find out where his housing unit is, and I would escort him back to his housing unit.

MR. HANNON: Let's take a break for the reporter, because I think we may be longer than we had planned.

DR. LESANSKY: Okay.

(Whereupon, a short recess was taken.)

DR. LESANSKY: Sergeant Makins, I'm sorry to keep you going, but I just have a couple more

106

questions.

Did I understand that you were promoted to sergeant in February of 2006?

MS. MAKINS: March.

DR. LESANSKY: March --

MS. MAKINS: March 19, 2006.

DR. LESANSKY: March 19, 2006. And so as a sergeant, would you have people under your command as a sergeant or not?

MS. MAKINS: I wouldn't say "command." Probably supervision.

DR. LESANSKY: So you do supervise other officers?

MS. MAKINS: Yes.

DR. LESANSKY: Could you tell me how many? Is there a set number, or -- maybe you could tell me that since March of '06 up until the date of the administrative leave, I guess, on June 5th, how many officers --

MS. MAKINS: Did I supervise?

DR. LESANSKY: Yes, ma'am.

MS. MAKINS: Just officers that were

107

assigned to my unit. Every day it was always four of us, so that means three. Myself and three other officers.

DR. LESANSKY: Three officers plus you as the supervisor?

MS. MAKINS: Right, and the inmates.

DR. LESANSKY: And in terms of the officers that you supervised, did you instruct them to read post orders? What was their requirement in terms of knowing how they were to perform their duties and responsibilities?

MS. MAKINS: They were already previously assigned to that housing unit before I even got there.

DR. LESANSKY: Okay, but as their supervisor, when you became their supervisor -- you said you were promoted to sergeant --

MS. MAKINS: Yes.

DR. LESANSKY: -- which now meant you were a supervisor, correct?

MS. MAKINS: Correct.

DR. LESANSKY: Or could be a supervisor. Could you just tell me generally or specifically if

108

you have specific examples of how did you -- as a supervisor, how would you ensure that they were knowledgable about what they were supposed to do? How did you know that they knew what they were supposed to do in terms of compliance with policy and procedure or post orders? I know you talked about there was a compliance officer as well.

MR. HANNON: Henry --

MS. MAKINS: The compliance officer deals with --

MR. HANNON: Excuse me for a moment. That assumes that it's part of her job to make sure that they know what they're supposed to do there. I think maybe --

DR. LESANSKY: Well, I was just trying to ask her as a supervisor -- maybe I should ask you then: What is your responsibility as the supervisor?

MR. HANNON: As a sergeant, because I think --

DR. LESANSKY: As a sergeant.

MR. HANNON: Because sergeants are not management; they are still members of the bargaining

unit, covered by the Collective Bargaining Agreement. They are not management. So, in essence, you have corrections officers, you have corporals, and you have sergeants, and the questions that you're asking are very important, and it seems to me the questions are: Were you ever trained in what the sergeant's responsibilities are, is there a job description for sergeants, and what do you understand a sergeant is supposed to do?

MS. MAKINS: Okay. Well, my understanding of what a sergeant supposed to do -- I know that the sergeant is in charge of a housing unit. They can -- you supervise the officers as well as the staff.

DR. LESANSKY: Excuse me. You said they can supervise officers as well as staff?

MS. MAKINS: They can supervise officers under them as well as inmates. I'm sorry.

DR. LESANSKY: Oh, okay. Inmates. Okay. And so when you say they're in charge of the housing unit, can you tell me a little bit more about what that means.

MS. MAKINS: They're the person that's

responsible for everything that goes on in the housing unit.

DR. LESANSKY: You said they are responsible for everything that goes on in the housing unit?

MS. MAKINS: Basically, yes.

DR. LESANSKY: And I don't want to put any words in your mouth, but would that include whatever it is that the officers who you're supervising do or don't do?

MS. MAKINS: I would say it includes that.

DR. LESANSKY: Just in your experience, in terms of a Movement Sheet being filled out incorrectly, does that -- from your understanding of policy and procedure in the department or post orders or anything that you know of, is that a violation of anything that you know of in terms of --

MS. MAKINS: No.

DR. LESANSKY: -- any of those things?

MS. MAKINS: No. It's not an official document. It's just something that's used within the housing unit.

DR. LESANSKY: And earlier when we were

talking about a pass that an inmate is issued that would not -- is supposed to be signed by an officer and it's not signed, and in the case that it's not signed, that it's not a valid pass, and I believe you said that it would be normally taken from the inmate or that --

MS. MAKINS: It should be taken. If you see an inmate out in the corridor or in the housing unit that has a pass, you should check the pass. Yeah, you should check the pass.

DR. LESANSKY: You should check the pass?

MS. MAKINS: You should look at the pass to see if it's a signature on it. If there's not a signature on it, that means it's not a valid pass.

DR. LESANSKY: And why is that not a valid pass? How do you know that that's not a valid pass?

MS. MAKINS: Because it does not have an authorized signature. Not only officers sign call-out passes, C&P's, the Warden, any official person in the correctional agency can sign a pass, including yourself.

DR. LESANSKY: And is it written down

anywhere, to your knowledge, as far as a procedure or a post order related to valid passes that should be signed versus a pass not signed, if you know?

MS. MAKINS: Not to my knowledge.

MR. HANNON: Henry, do you know that, in fact, the pass was signed in this case?

DR. LESANSKY: Oh, no, I don't know.

MR. HANNON: Yeah, it was signed.

DR. LESANSKY: I don't know anything. I was just asking procedurally.

MR. HANNON: Yeah, the Jones sick pass was signed.

DR. LESANSKY: Yeah, I was just asking just procedurally, not in the instance of -- I don't think I asked about Ricardo Jones' pass.

Earlier, Sergeant Makins, you talked about -- and I believe it was mentioned in the document that stated why you were being charged or "accused" -- if that's the right word -- of negligence, that inmates had waved passes but that they weren't checked.

MS. MAKINS: They was checked by the person

in the Bubble. They always check by the person in the Bubble, because they can't -- they're not going to be able to leave the unit, not unless it's checked by the person in the Bubble.

DR. LESANSKY: Okay. Let me -- maybe I can then just focus on --

MR. HANNON: They wave the pass from the cell.

DR. LESANSKY: When the Department wrote you on March 15, 2007 -- and this was the letter that they wrote notifying you of this 20-day notice of proposal to terminate you, and they then talked about specifications charging you with negligence, and on Page 2 the letter says the following.

MR. HANNON: Where are you?

DR. LESANSKY: I'm on Page 2, the first paragraph, one, two, three, four, five, six, seven lines down or six lines. You stated that the inmates -- "you" talking about you, Sergeant Makins, stated that "the inmates that were going to the infirmary already had their passes, so all they had to do was wave their hands with their passes." You stated

"Inmate Ricardo Jones, who was in cell 18, flagged out he had a pass." You said -- you asked him where he was going. He responded, quote, "To the infirmary," unquote. You admitted that you only glanced at the call-out pass and stated, quote, "I didn't pay attention to whether he had it. I told him to give it to Ms. Hatton."

MS. MAKINS: He had the pass, because otherwise he wouldn't have got out of that cell. He had that pass, because he flagged the pass out. That was only way that we -- he had that pass. He flagged the pass out. I told Ms. Hatton to open cell 18. She opened 19, and me and Ms. Washington told her no, 18. Then she opened 18. Ricardo Jones came out. He had the pass in his hand. Just like that. I asked him where was he going. He said I'm going to the infirmary. I said okay. I did just like this. I said give the pass to Ms. Hatton in the Bubble so she can check you out. That's what I told him.

DR. LESANSKY: Thank you, and then this says -- the Department's letter says you indicated that Ms. Hatton signed the pass and put him on the

Movement Sheet, and I wanted to ask you: You saw her sign the pass or you verified that she had signed the pass?

MS. MAKINS: She had to put some type of indication on the pass that shows her handwriting. I saw the pass myself, Dr. Lesansky. The pass is actually supposed to be the time the inmate left -- it's the second section of the pass -- the time the inmate left and the authorizing signature of when he or she left the unit. She had -- she had indicated on the pass the time the inmate left, which was the same time on the Movement Sheet, the first Movement Sheet that she had did that was incorrect.

DR. LESANSKY: I'm sorry, Sergeant Makins. I was talking about this -- this makes reference to -- I am interpreting this as talking about when Inmate Ricardo Jones left.

MS. MAKINS: Uh-huh.

DR. LESANSKY: You said you asked him where he was going. He responded, "To the infirmary."

MS. MAKINS: Uh-huh.

DR. LESANSKY: You admitted that you only

glanced at the call-out pass and stated, "I didn't pay attention to whether he had it. I told him to give it to Ms. Hatton." Then it says you indicated that Ms. Hatton signed the pass and put him on the Movement Sheet.

MS. MAKINS: Uh-huh.

DR. LESANSKY: So what I wanted to ask you is: So you -- this is when Inmate Ricardo Jones is leaving to go to the infirmary. This says that you told him -- "him" being Ricardo Jones -- to give the pass to Ms. Hatton to be signed, so obviously -- not obviously -- it would appear it was not signed at that point.

MR. HANNON: Wait. She saw the pass, and it's not in the record.

Why don't you describe the handwriting on the pass when you saw it.

MS. MAKINS: The pass, it was a presigned -- one of the 18 presigned passes that I had did when we first got into the unit. It had the date, which was 6/3/07; the housing unit, which was Southeast 1; and my signature. On Ricardo's pass, Ms. Hatton's

handwriting was on the pass for his name, his DCDC number, his cell number, and the time he left the unit. She finished filling the blanks in on the pass.

DR. LESANSKY: So Jones' pass was one of -- Ricardo Jones' pass was one of the 18 presigned passes that you talked about earlier?

MS. MAKINS: Yes.

DR. LESANSKY: That you signed?

MS. MAKINS: Yes.

DR. LESANSKY: Because that's why it's called, I assume, a "presigned pass," because the person preparing it, which was you, signed it, correct?

MS. MAKINS: Yes.

DR. LESANSKY: So now just help me -- and it's just me. "I didn't pay attention to whether he had it," meaning the presigned pass, because that was one of the 18 that you presigned. "I didn't pay attention to whether he had it. I told him to give it to Ms. Hatton."

MS. MAKINS: Uh-huh.

DR. LESANSKY: You indicated that Ms. Hatton

signed the pass, so she counter-signs the pass, so in addition --

MR. HANNON: No. That's what the allegation says.

DR. LESANSKY: And that's why I'm asking her a question.

MR. HANNON: Okay.

DR. LESANSKY: I said this is what the letter that the Department wrote to you on March 15th says, and, you know, it's one of the documents that --

MS. MAKINS: Okay.

DR. LESANSKY: -- that I'm looking at.

MS. MAKINS: I did not pay attention to -- I know he had the pass when he came out of the Bubble; okay? He also had the pass in his hand when I asked him where was he going. He told me that he was going to the infirmary. I directed him and pointed to the Bubble. I said give the pass to Ms. Hatton so she can check you out. Now, what this paper is saying is not what I said. I gave the information accurately. I don't know where some of this came from.

DR. LESANSKY: So in the Department's letter where it says you indicated that Ms. Hatton signed the pass, you already had signed the pass, so --

MS. MAKINS: I only have knowledge of that because I actually seen the pass after this incident had occurred, Dr. Lesansky, is what I'm saying.

DR. LESANSKY: Okay. I'm really sorry, Sergeant Makins. I'm not trying to be difficult.

MS. MAKINS: No, I never seen -- I know the inmate had the pass. Let's just go back to this date. I'm going to say I haven't seen the pass; okay? The man -- the count cleared. I was indicating, letting the inmates know that the count was cleared. Infirmary, the people had already had their passes for the infirmary. They flashed their passes. Ricardo Jones flashed his pass, which was in cell 18. I indicated to Ms. Hatton to open cell 18. I'm out on the floor in front of the Bubble, but I yelled to her and I told her to open 18. She clicked 19. I said no, me and Ms. Washington said 18. She opened 18.

Ricardo Jones came down the stairs. He had the pass in his hand. I said where you going. He

said to the infirmary. I indicated my hands like this. I said take it to Ms. Hatton so she can check you out, "check you out" meaning write your name and DCDC number on the Movement Sheet, your cell number, what time you leaving and where you going. She supposed to put the time that the inmate left on the pass and her signature, too. She supposed to put her signature on that pass.

DR. LESANSKY: So she also would sign the pass in addition to --

MS. MAKINS: Right. She's supposed to sign that pass.

DR. LESANSKY: Right, and one of the things that she looks for would be another signature, correct?

MS. MAKINS: No, she don't have to look for another signature.

DR. LESANSKY: But in this case, from what I understand you're saying, that was one of the 18 presigned passes that you personally prepared and signed, correct?

MS. MAKINS: Yes.

DR. LESANSKY: That was authorizing Inmate Ricardo Jones to go to the infirmary, right?

MS. MAKINS: Yes.

DR. LESANSKY: Okay, so, but you're saying that not in every case -- in this case you had signed it because it was one of the presigned, so she would then also have to sign it and enter the information on the Movement Sheet, correct?

MS. MAKINS: Yes.

DR. LESANSKY: But are there other cases of passes that would not have two signatures but would only have one signature?

MS. MAKINS: All the passes should have two signatures, because there's two authorizing places where it can have two signatures. Have you ever seen a pass, Mr. Lesansky?

DR. LESANSKY: Yes, ma'am, I have.

MS. MAKINS: Okay. At the bottom it says "left unit" or "time left unit." Then it has the time at the bottom, and then it has signature. Then it says "destination," I think, wherever you going to. It will have the time that you got there and the

officer's signature, and then it says "return time" and "signature." Yes, they all should have -- they can have different signatures on them.

DR. LESANSKY: And from your understanding and experience, if a pass that was supposed to have two signatures didn't have two signatures, would that be a valid pass?

MS. MAKINS: I would say no. No. I would say no.

MR. HANNON: Do you have a copy of Mr. Jones' actual pass?

DR. LESANSKY: I don't think I do in this pile. I don't think I do. I may have it. I'm not sure.

Earlier, Sergeant Makins, we were talking about -- I asked you about an unsigned pass, not in the case of Inmate Ricardo Jones, because you had presigned his pass. You then looked at the pass after you signed it, and officer Hatton had also signed it, so it had the two required signatures, correct?

MS. MAKINS: Yes.

DR. LESANSKY: But in the case where a pass

might not be signed, you said generally what was supposed to be happening, since it's not an authorized pass, would be that that pass would be taken from the inmate.

MS. MAKINS: It should be taken from the inmate and you should be able to take the inmate with you to identify him, his housing unit. Once you identify him, his housing unit, you can take him back to his housing unit with the pass and give it to the officer.

DR. LESANSKY: Is it a violation of policy or post order or anything that you know of if an inmate is found with a pass that's not an authorized pass?

MS. MAKINS: It's a violation to the inmate.

DR. LESANSKY: It's a violation to the inmate?

MS. MAKINS: Uh-huh.

DR. LESANSKY: To have a pass that's not an authorized pass?

MS. MAKINS: Yes.

DR. LESANSKY: And what happens with regard

to this inmate violation? Is it something that a report has to be written, or --

MS. MAKINS: A disciplinary.

DR. LESANSKY: Okay. Is that the "DR"?

MS. MAKINS: Yes, and you can write a DCDC 1. The incident report for the Department, you can write one of those, depending on the severity.

DR. LESANSKY: When you filled out the presigned pass, one of the 18, for Inmate Ricardo Jones to go to the infirmary -- I'm sorry?

MS. MAKINS: (Shakes head.)

DR. LESANSKY: You said that Inmate Ricardo Jones' pass was one of the 18 presigned passes that you prepared, correct?

MS. MAKINS: Yes, by me having knowledge otherwise.

DR. LESANSKY: On June 3rd?

MS. MAKINS: On June the 3rd I was not aware that he had a presigned pass from me, because when he passed me I never looked at the pass. I directed him straight to Ms. Hatton to check him out.

DR. LESANSKY: I'm sorry. Then I may have

misunderstood. You do recall preparing a presigned pass --

MS. MAKINS: I prepared --

DR. LESANSKY: -- for Inmate Ricardo Jones?

MS. MAKINS: No.

DR. LESANSKY: Oh, you don't recall preparing the pass?

MS. MAKINS: I did not prepare a presigned pass for Ricardo Jones. I prepared a presigned pass for Vincent Jones in cell 48. You can go back to your notes.

MR. HANNON: We're spending an enormous amount of time on this and also asking questions that I think are completely hypothetical, but, Sergeant Makins, you prepared passes with the names of people that you knew were going out?

MS. MAKINS: To the infirmary, that's correct.

MR. HANNON: Plus you prepared presigned passes without any names, because you knew there were going to be additional folks going out to the infirmary?

MS. MAKINS: It didn't necessarily -- we had visiting going on that day, you had chapel services going on, infirmary, urgent care. It could have been for any of them.

MR. HANNON: So you had on your clipboard the passes that you had signed, that you had put inmate names on that you knew were going to the infirmary?

MS. MAKINS: That's correct.

MR. HANNON: You had on your clipboard extra passes that you had presigned with the date and the name of your unit to be used for the other inmates that you anticipated going out?

MS. MAKINS: That's correct.

MR. HANNON: And those presigned passes without inmate names on them were available to you and the other officers in that housing unit for other inmates who were summoned to go to various different places; is that correct?

MS. MAKINS: Yes.

MR. HANNON: So you didn't give Ricardo Jones the presigned pass?

MS. MAKINS: No.

MR. HANNON: But when it came time to send people out, he waved a pass out of his cell?

MS. MAKINS: That's correct.

MR. HANNON: So somebody else had given him the pass?

MS. MAKINS: That's correct.

MR. HANNON: So he came out and he told you he was going to the infirmary, correct?

MS. MAKINS: That's correct.

MR. HANNON: And you directed him to another one of the officers. Was it Ms. Hatton?

MS. MAKINS: Yes.

MR. HANNON: Who would then be responsible for putting his sign-out time on the pass, correct?

MS. MAKINS: Yes.

MR. HANNON: And logging in the time that he left on the Movement Sheet that was being kept, correct?

MS. MAKINS: Yes.

MR. HANNON: Okay. Now, who showed you the pass; was it the investigators?

MS. MAKINS: The FBI.

MR. HANNON: Okay, and on the pass it was --

DR. LESANSKY: I'm sorry. You said the FBI showed you the pass?

MS. MAKINS: Yes, sir.

MR. HANNON: And on the pass it had your signature?

MS. MAKINS: Yes.

MR. HANNON: So that's how you knew it was one of your presigned ones?

MS. MAKINS: Yes.

MR. HANNON: And it had the time out; is that right?

MS. MAKINS: It had a time out, but I didn't --

MR. HANNON: I understand that.

MS. MAKINS: -- I didn't do that.

MR. HANNON: Right, and the time out was accurate as far as your recollection?

MS. MAKINS: Yeah.

MR. HANNON: And then you noted that the Movement Sheet had the same time on it?

MS. MAKINS: Yes.
MR. HANNON: And that was the Movement Sheet that was being prepared by Ms. Hatton?
MS. MAKINS: Yes.
MR. HANNON: Did it have Ms. Hatton's signature on it?
MS. MAKINS: That pass didn't have a signature on it.
MR. HANNON: But it had the times?
MS. MAKINS: It had the times.
DR. LESANSKY: Okay. I'm really sorry.
MS. MAKINS: I'm not trying to confuse you.
DR. LESANSKY: No, but I regret to say I am now unclear. I wrote down earlier -- and it might have been my error -- that I thought you said Ricardo Jones was one of the 18 presigned passes, and that's incorrect. Vincent Jones was one of the 18 presigned passes, correct?
MS. MAKINS: Hold on. As I stated and I said, how do I know that it was one of the presigned passes, is because I had saw the pass. I physically saw the pass at the FBI investigation.

MR. HANNON: You're using the expression -- the two of you are using the expression "presigned passes" differently. You're using the expression "presigned passes" for those people who had passes whose names were already on it. Sergeant Makins is using the expression "presigned passes" for the passes that she signed in blank.
DR. LESANSKY: Yeah, I guess so. Maybe. I'm trying to just understand, because it is, from the Department's letter, key, at least one of the items that is being cited in support of the Department's claim that you were negligent, from this March 15th letter. So I'm sorry to take additional time, but I do think it's important.
When you were having the discussion earlier about that this process for presigned passes, you talked about preparing presigned passes and that this was a process that was used, quote, "by every OIC at the jail."
MS. MAKINS: Uh-huh.
DR. LESANSKY: It was not a process that you created?

MS. MAKINS: No.
DR. LESANSKY: And you then described the process, and you then, I thought, said that Inmate Ricardo Jones' pass was one of the 18 presigned passes, because you made reference to 18 presigned passes.
MS. MAKINS: Yes, I did. That was the amount of passes that I had presigned prior to putting any inmates' name.
DR. LESANSKY: That you personally had presigned?
MS. MAKINS: Yes.
DR. LESANSKY: A blank pass with no information on it; is that correct?
MS. MAKINS: I presigned 18.
DR. LESANSKY: You presigned 18?
MS. MAKINS: Uh-huh.
DR. LESANSKY: So then subsequently -- if I'm understanding it correctly, subsequently, when it came time for Inmate Ricardo Jones to leave the block and go to the infirmary, or there came a time when cell 18 was opened, 19 was inadvertently opened, 18

was then correctly opened, because you knew that Ricardo Jones was scheduled to leave the block, right?
MS. MAKINS: (Shakes head.)
DR. LESANSKY: Okay. How did you -- when cell 19 was inadvertently opened, you said no, it should be 18 --
MS. MAKINS: Because I counted -- where I was standing, I count the number -- I know the last cell is 20, the next one is 19, the next one would be 18. I didn't know Ricardo Jones was going out until he flashed that pass, sir. When he flashed the pass, then that made me aware that he had to basically go to the infirmary or somebody had called for him.
DR. LESANSKY: Well, earlier -- if I could follow up on that, earlier you talked about inmates going to the infirmary in general.
MS. MAKINS: And I said I did four personally.
DR. LESANSKY: Right.
MS. MAKINS: And then I said I did one more, which would have been five. Only four inmates went out the unit on the ones that I had wrote. I was not

aware that Ricardo Jones was going to anywhere until he flashed a pass and he came down. I said open the cell, because the rest of the inmates had their passes. They were going -- usually the beginning of the day, it's usually the infirmary.

MR. HANNON: Excuse me. You're going to learn, which is in the report, that someone called from the medical unit to have Ricardo Jones come to the medical unit, so that's why he was given one of the passes that was presigned by Sergeant Makins. Sergeant Makins didn't give it to him.

Did you receive that telephone call?

MS. MAKINS: No, sir.

MR. HANNON: Okay. And if you want corroboration of this, you can look at Page 22 of the transcript of her interview where she talked about Ms. Hatton opening 19 and her instructing her to open 18, and then Sergeant Makins says, "I don't recall whether I touched the pass or whether I didn't, but I did tell him to see Ms. Hatton in the Bubble so she could write it up for him."

DR. LESANSKY: Okay, and when the FBI showed

you the pass, it had your signature on it as well as Officer Hatton's signature, correct?

MS. MAKINS: It had -- yeah. Hatton's signature was not on the pass.

DR. LESANSKY: Her signature was not on the pass?

MS. MAKINS: No, the time -- she wrote the pass, because she did it in her -- it was three different actual handwritings on the pass, sir.

DR. LESANSKY: Okay. I haven't seen the pass, so --

MS. MAKINS: Okay. Well, it was three different handwritings.

DR. LESANSKY: Okay.

MS. MAKINS: The date, the unit, the first signature was mine. I wrote that. The name, the DCDC number and the time -- I believe the time the inmate left was on the pass. That was wrote by Ms. Hatton. Then it has something that looked like "CW," which was Ms. Washington's handwriting.

DR. LESANSKY: So in the case of inmate Ricardo Jones' pass, it actually had three -- if I

understand you correctly, it was signed by three different people; yourself --

MS. MAKINS: It was three different handwritings, yes.

DR. LESANSKY: -- by Officer Hatton and Officer Washington?

MS. MAKINS: Yes.

MR. HANNON: I know this is difficult to puzzle through. It took me quite some time to do it as well. It wasn't the greatest initial investigation.

DR. LESANSKY: On Page 2 of again of the D.O.C. letter to you, in the third paragraph, which you might want to make sure I'm reading it correctly, it says, "The OIA investigation substantiates that Inmate Jones" -- meaning Ricardo Jones -- "was not on the sick call list scheduled for medical care on June 3rd, 2006."

My first question is: Did you look at a sick call list for that day?

MS. MAKINS: No.

MR. HANNON: Did you have a sick call list?

MS. MAKINS: No.

MR. HANNON: The sick call list is not --

MS. MAKINS: It's not disseminated every day. The only time they give you a sick call list is when they come in the unit to actually see the inmate.

DR. LESANSKY: So what you're saying is, first of all, there was not a sick call list on the unit?

MS. MAKINS: No, sir.

DR. LESANSKY: At least on Shift 2 when you were there?

MR. HANNON: There never are. The sick call lists are in the medical unit.

DR. LESANSKY: And so obviously you would not have known whether or not Inmate Ricardo Jones was or was not on a sick call list that is kept in the infirmary?

MS. MAKINS: That's correct.

MR. HANNON: If you got a phone call.

MS. MAKINS: Oh, I'm sorry. If I got a phone call. I said previously the inmates are called from the sick call officer, and they tell you who is

going to the infirmary. I did do four presigned passes. Three of them obviously had appointments to go to the infirmary. The fourth one, he must have left the unit on another shift or was discharged from the jail. I don't really know, but that pass never went out the housing unit, period.

DR. LESANSKY: On the three presigned passes that you said they were -- you just said they were "obviously" on the list to go to the infirmary?

MS. MAKINS: They were on the list, because they left out the housing unit.

DR. LESANSKY: What list?

MS. MAKINS: They were on the sick call list at the sick call desk. The officers calls downstairs to each housing unit, tell them to send inmate so-and-so, this is Officer so-and-so or Sergeant so-and-so, infirmary, send inmate this name, DCDC number, cell this, that and the other. Send inmate, name, DCDC number, cell whatever; okay? You write the list down, or basically, if you know who's going on a daily basis, you can do a presigned pass. You could do a pass with the man's name, DCDC number, the

housing unit and authorize the signature. When the man -- you can pass out the passes upon the count clearing or just wait until the count clear. That's at your discretion.

DR. LESANSKY: Okay.

MS. MAKINS: Okay. The passes, they were already passed out when I got back in the unit and came on the floor.

DR. LESANSKY: Okay. Then the Department's letter of March 15th goes on in that third paragraph to say, "You confirmed that you did not receive a phone call from the infirmary."

MS. MAKINS: Yeah, I did.

DR. LESANSKY: And my question is: Did you ever learn whether anybody received a call from the infirmary saying Inmate Ricardo Jones needs to come to the infirmary? This would be the officer in the third floor medical.

MS. MAKINS: No, I didn't confirm it, Dr. Lesansky, because I did not take the call from whomever, and I did not write the entire pass of Ricardo Jones', no.

DR. LESANSKY: So it's true then that you did not receive a phone call personally from the infirmary saying Inmate Ricardo Jones needs to come to the infirmary?

MS. MAKINS: That's correct, sir.

DR. LESANSKY: And subsequently or before, you weren't aware that anybody got a phone call; you don't know whether they did or whether they didn't?

MS. MAKINS: A note for them to go to the infirmary, Dr. Lesansky, it's going to be a call from the infirmary to tell you exactly who, which inmate, which cell, name, DCDC numbers of each inmate in your housing unit thats going to come to the infirmary and what they're coming from. They will tell you wound care, methadone. You know, other ailments they will not tell you.

DR. LESANSKY: How about, though, I thought you said another time that inmates can go to te infirmary is where an officer will observe them or see something --

MS. MAKINS: That's urgent care. You call urgent care then.

DR. LESANSKY: -- or something, and they will make a call to medical --

MS. MAKINS: The officer, yes.

DR. LESANSKY: -- the officer, and, as you said, give the name, the first name, last name, DCDC number, what's the issue, and then you're supposed to get a call back --

MS. MAKINS: Yes.

DR. LESANSKY: -- saying --

MS. MAKINS: They can call you back and tell you to send he or she up at that time or escort the person, depending on the severity of the nature of the medical condition.

DR. LESANSKY: And that would be another type of situation in which an inmate would then be going to the infirmary?

MS. MAKINS: Yes.

DR. LESANSKY: And they would need a pass to do that?

MS. MAKINS: Yes, or they would have to be escorted.

DR. LESANSKY: Or they might go out a pass?

MS. MAKINS: They can be placed on the Movement Sheet. They can be placed on the Movement Sheet, and they can go without a pass only on an escort.

DR. LESANSKY: Okay.

MS. MAKINS: Only if they escorted by an officer.

DR. LESANSKY: With an escort?

MS. MAKINS: Right.

DR. LESANSKY: And then it goes on at the end of that sentence, "You confirmed that you did not receive a phone call from the infirmary or anywhere else for Inmate Jones to report to medical, that you did not recall Inmate Jones complaining to you"; that's true?

MS. MAKINS: No. He ain't said nothing to me.

DR. LESANSKY: Or any of the officers in the unit about him being sick?

MS. MAKINS: Not to my knowledge. None of them said anything to me about that, no.

DR. LESANSKY: And you never made a call-out

pass for Inmate Ricardo Jones?

MS. MAKINS: No, sir.

MR. HANNON: Except as she's already described. We understand.

DR. LESANSKY: Seriously, I'm not in any way trying to trap you or anything. I'm just trying to understand.

MR. HANNON: It's clear. It's clear.

MS. MAKINS: Okay. Are you clear about --

MR. HANNON: Yes.

MS. MAKINS: -- the passes and the presigned pass? Are you absolutely clear, Dr. Lesansky?

DR. LESANSKY: I'm absolutely clear that a pass for Inmate Ricardo Jones has three different handwritings on it, one of which is your signature --

MS. MAKINS: Yes.

DR. LESANSKY: -- one of which is Officer Hatton's signature, and there's also other blocks filled in, name, DCDC number, and then there is a "CW." If I had it in front of me, I would see, apparently, a "CW" there, which --

MS. MAKINS: Do you have a copy of the pass?

DR. LESANSKY: I don't have it with me, but I will certainly look at it.

MR. HANNON: If you do, would you provide it to me, please.

DR. LESANSKY: Yeah, I don't think I have it, but I will see if it's available.

MR. HANNON: Because I don't.

DR. LESANSKY: In the letter that the D.O.C. wrote to you in the fourth paragraph, it said, "As stated previously, the OIA investigation revealed that there were six inmates scheduled and authorized movement to the infirmary for medical treatment on June 3rd, 2006." Is that true, from what you know? Since you were the OIC on Shift 2 -- I understand that -- were there, to your knowledge, six inmates scheduled and authorized movement to the infirmary for medical treatment on June 3rd, 2006, to your knowledge?

MS. MAKINS: I don't know. Not to my knowledge.

DR. LESANSKY: And could you just repeat for me how many, to your knowledge, were authorized, to

your personal knowledge.

MS. MAKINS: My personal knowledge, I know three, because those were the three that I had wrote the passes.

MR. HANNON: Let's make clear here. When the OIA investigation revealed there were, quote, "six inmates scheduled an authorized movement to the infirmary for medical treatment," unquote, that's talking about the list that the medical office has.

DR. LESANSKY: Okay.

MR. HANNON: And --

DR. LESANSKY: The one that's kept up in the infirmary?

MR. HANNON: Right, and Sergeant Makins wouldn't know how many are on that list or who was on that list, which is something obviously that was known to Leaks and Jones, having been at the jail as long as they had been.

DR. LESANSKY: I'm not privy to that. I just wanted to stick to what Sergeant Makins' letter from the Department says, and I'm just trying to go through some of what's in here to --

MR. HANNON: Well, somebody made the call.
DR. LESANSKY: -- confirm with her what at least she -- which of these statements, at least to her knowledge, she's able to agree with or confirm --
MR. HANNON: Okay.
DR. LESANSKY: -- or say are not true to her knowledge. And it says, "Inmate Jones was not included within this group." Am I correct that you wouldn't know whether he was in the group that's on the sick call list that's maintained in medical; the only ones you knew about would be the three that you made reference to that you personally filled out?
MS. MAKINS: Yes.
DR. LESANSKY: And you got those names because you got a call from the infirmary officer or urgent care?
MS. MAKINS: I didn't take any calls for any call-out passes that day, Dr. Lesansky. That would have been confirmed by the officer in the Bubble, because the officer in the sick call would have called the officer that answered the phone in the Bubble, and I was not in the Bubble taking sick calls, taking

calls for sick call.
DR. LESANSKY: Okay. It says in the next sentence, "As the OIC of the unit, it was your responsibility, as well as the subordinate officers (Washington and Hatton) assigned to the unit, to confirm Inmate Jones' need for medical treatment."
Is that true?
MS. MAKINS: You didn't have to get no confirmation as to whether Inmate Jones was on the sick call list or not, because you don't have to call back. You can take the calls in, but you don't have to call back to say I'm sending so-and-so, I'm sending so-and-so, I'm sending so-and-so. Sick call calls are usually just incoming. They're not outgoing to confirmation that this person, that person, that person. You don't have to do that.
DR. LESANSKY: Okay.
MS. MAKINS: It's not a check and balance system.
DR. LESANSKY: Then the Department's letter goes on to say, "The availability of medical staff to check Inmate Jones." Is that your understanding?

MS. MAKINS: The availability to check Inmate Jones?
DR. LESANSKY: It says, "As the OIC of the unit, it was your responsibility, as well as the subordinate officers (Washington and Hatton) assigned to the unit, to confirm Inmate Jones' need for medical treatment," which you said that's not so, "and it was your responsibility as well as the subordinate officers assigned to the unit to confirm the availability of medical staff to check Inmate Jones." You wouldn't agree with that, would you?
MS. MAKINS: No.
DR. LESANSKY: Or do you agree with that?
MS. MAKINS: No, I don't agree with that.
DR. LESANSKY: Okay, and the last thing is, "and seek authorization for his movement to the infirmary via a call-out pass or escort," which you just mentioned about the escort, "pursuant to sick call and infirmary protocols."
MS. MAKINS: Could you --
MR. HANNON: It's right here.
DR. LESANSKY: Yeah, those aren't my words.

I'm just reading from the --
MR. HANNON: "Seek authorization for his movement to the infirmary via a call-out pass or escort."
MS. MAKINS: We couldn't escort, because there have to be three people on the unit. We was only three.
MR. HANNON: So in this case it was a call-out pass.
MS. MAKINS: Yeah. I'm not clear about that. I'm really not clear about that.
DR. LESANSKY: Okay, and then at the top of the Page 3, the Department went on to say that "the investigation," talking about the OIA investigation, "further revealed that neither you nor the officers assigned to the unit, Washington and Hatton, had knowledge or indicated as to why or by what authorization Inmate Jones was permitted to exit the unit."
MS. MAKINS: He had to have a call to go to the infirmary. As I stated previously, you get incoming calls. You don't have to call back to the

149

infirmary to confirm, because if they want that person, they're going to continue to call until they get him.

DR. LESANSKY: Okay. Then it says in the second paragraph on Page 3, "The OIA investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment. The investigation further concluded that each correctional officer assigned to SE-1 housing unit," to include you, "was culpable, because it was the responsibility of each employee assigned individually and collectively to ensure the accurate accountability of each inmate assigned to the housing unit."

Do you agree that it was the responsibility of each employee assigned individually and collectively to ensure the accurate accountability of each inmate assigned to the housing unit? Do you agree with that statement?

MS. MAKINS: Yes.

DR. LESANSKY: Okay. And then the

150

Department says, "Therefore" -- in your letter, the March 15th letter, "Therefore, you failed to properly carry out your assigned duties," period. And it says, "Your negligence is aggravated by the fact that you were the Lead Officer In Charge." And can you tell me what a Lead Officer -- well, what does it mean you were the Lead Officer In Charge? I know you said you were the OIC because you were senior in rank.

MR. HANNON: Well --

DR. LESANSKY: But was there --

MS. MAKINS: That's the job description.

DR. LESANSKY: What's the Lead Officer In Charge? Is that different from --

MS. MAKINS: My job title would be Lead Correctional Officer.

DR. LESANSKY: Oh, Lead Correctional Officer, okay.

MS. MAKINS: Lead would be the Officer In Charge.

DR. LESANSKY: So the Lead Correctional Officer, and you were the Officer In Charge because you were --

151

MS. MAKINS: In this paragraph, "Lead" would be meaning the Officer In Charge.

DR. LESANSKY: I think I promise just a last couple of things. You had mentioned when you were reviewing what was happening on June 3rd, you talked about you and Officer Hatton and Officer Washington, if I'm correct, you know, got together and were doing "girl talk," I think you described.

MS. MAKINS: That was at the beginning of the shift. It was personal things, Mr. Lesansky. I don't discuss them.

DR. LESANSKY: No, no, I don't want you to tell me what you were discussing.

MS. MAKINS: Okay.

DR. LESANSKY: So that was happening at the beginning of the shift?

MS. MAKINS: That's when we had first come on duty, after we had completed the count and called the count in.

DR. LESANSKY: So it was after the count had been called in?

MS. MAKINS: Uh-huh.

152

DR. LESANSKY: And did I understand you to say that you were actually one officer down at that time, that there was supposed to be four officers?

MS. MAKINS: Yes, sir.

DR. LESANSKY: Not three?

MS. MAKINS: Yes, sir.

DR. LESANSKY: And could you just tell me where is it that it specifies and talks about the requirement for four officers. Is it in a program statement or is it a policy?

MS. MAKINS: It's right here, too. It says, "Asterisk or equal as shut-down post, other shut-down posts may be approved by the Warden," at the bottom right there.

MR. HANNON: And it shows the four posts for Southeast 1, Makins, Hatton, and then Angela Alston wasn't there, and Cynthia Washington took her place, and then the fourth person for Southeast 1 was supposed to be Eleanor Nivens, and it says "SD." That was "shut down."

DR. LESANSKY: So the requirement for the four officers comes from the --

MR. HANNON: The staffing.

DR. LESANSKY: -- the staffing, the Strength Report, slash --

MS. MAKINS: The Daily Roster.

DR. LESANSKY: The Daily Roster, okay.

Sergeant Makins, I think this will be the last thing. I know I've been saying that. You talked about that you actually competed to become the sergeant, that you successfully competed, obviously, because you were promoted in March of 2006, which put you in a position to be a supervisor. And when we were talking about that, you talked about -- I think it was actually Mr. Hannon asking you why you bid for Southeast 1, and you talked about it being clean and organized and there were few incidents, and you actually knew and had worked with some of the officers there that you considered good officers.

MS. MAKINS: Yeah.

DR. LESANSKY: And then I think in response to questioning from Mr. Hannon, he asked you about post orders, and you said yes, you definitely knew about post orders and whether or not you were familiar

with them and read them, and I think I wrote down words to the effect that you read them if you had a chance to read them, and that you, quote, "glanced at them" for the first two weeks that you were there.

MS. MAKINS: I said I observed the unit operation the first two weeks I was there.

DR. LESANSKY: Okay, you observed; you didn't glance -- okay, you observed. Okay.

In terms of the post orders, did you ever have a chance to read them?

MS. MAKINS: After this incident. After this incident had actually occurred, Dr. Lesansky, because the housing units on a day-to-day basis is very busy, and to take my attention span from the officers on the floor and observing, basically watching the inmates, and the telephone calls, it just would be a madhouse. Every day is like five to six different things going on every day, and some of it sometime is going on at the same time, and then to take my attention span from the officers on the floor, making sure that they are okay and safe where I didn't have to get staff up there to help or assist, it would

have been kind of like a hardship to actually take time out and really read it.

DR. LESANSKY: Okay, but am I correct in saying that as a supervisor, which makes you, as you've said, responsible for inmate safety and officer safety and security and order and ensuring -- I think you said your responsibility is for everything that happens on the unit, that being familiar with post orders -- I guess I should ask you -- I mean do you not consider that -- wouldn't you consider that an important part of being able to do that?

MS. MAKINS: Yes. Yes, it's important.

MR. HANNON: If it's important, why didn't they train her in it?

DR. LESANSKY: And is it true that officers, including sergeants but not limited to sergeants, are required to be familiar with and comply with the Department policy, procedure and post orders?

MS. MAKINS: Yes.

DR. LESANSKY: And isn't it also true that as a supervisor you would be responsible for ensuring that any staff that you supervise and any inmates that

you're responsible for -- I think you said 145 in this particular --

MS. MAKINS: On that particular day.

DR. LESANSKY: -- on that particular day -- that you would be responsible for them being familiar with post orders? Would that be a true statement?

MS. MAKINS: All I can do is just ask them to read it or become familiar with it.

MR. HANNON: Well, the question is: Do you know if it's part of your job as Lead Officer In Charge to make sure that the other officers are informed about the post orders?

MS. MAKINS: No.

DR. LESANSKY: So you're saying it's not -- your understanding is that as the Officer In Charge or as the supervisor in this case, a sergeant, you would -- it's not your understanding that you would be responsible for ensuring that --

MS. MAKINS: They know the post orders?

DR. LESANSKY: Yes.

MS. MAKINS: It shouldn't be, but probably.

DR. LESANSKY: Well, it is part of your

157

responsibility to ensure that they're complying with post orders.

MS. MAKINS: Well, it's not my responsibility for me to make sure that they know.

MR. HANNON: There's no documentation that's been presented to you that sets forth her duties as Lead Officer In Charge. And you're asking her what they are, and she's told you that she was never trained as a sergeant. Now, if there's some document that sets out what her responsibilities are, then let's have it, but to ask her what her understanding is when she hasn't been trained as a sergeant is whistling in the dark.

DR. LESANSKY: I was asking you, Sergeant Makins, about that, because you did say, when I asked you in terms of your responsibilities, if I understood you correctly, you said that, quote, "you're in charge of the housing unit and responsible for everything that happens on the unit."

MS. MAKINS: That's what I said.

DR. LESANSKY: And you do agree with that, correct?

158

MS. MAKINS: Yes.

DR. LESANSKY: And that includes holding officers that you supervise and inmates that are under your charge to comply with department policy and procedure, correct?

MR. HANNON: Don't answer that question unless you know that that's your job.

DR. LESANSKY: Well, no, I'm asking her -- excuse me, Mr. Hannon. I was just asking you if she thought that, if she -- I believe I said "if."

MR. HANNON: I don't understand. If that's her job?

DR. LESANSKY: I was asking her if -- I'm trying to follow up on her statement that she said that she was in charge of the housing unit and, quote, or words to the effect of she's "responsible for everything that happens on the unit."

MR. HANNON: If you're trying to have her say that she's supposed to train the other officers there and make sure that they know their jobs, what are you trying to put on this lady?

DR. LESANSKY: I'm not trying to put

159

anything on.

MR. HANNON: Sure you are.

DR. LESANSKY: Well, Mr. Hannon, I'd appreciate it if you would let me at least ask my question, and if she doesn't want to answer -- this is her hearing, not my hearing, and if she doesn't want to answer, that's fine.

I was just simply trying to direct myself to the Department's letter that talks about her being the Lead Officer In Charge and that she competitively sought the position as sergeant and successfully competed against other candidates and was promoted three months before, a little less than three months or four months before this -- three months before this incident, and I was just trying to get her understanding of what the expectations, as she understood them, of the job of sergeant, including being the Officer In Charge or the Lead Officer In Charge.

MR. HANNON: Let's take time. Just ask your questions if you would.

DR. LESANSKY: Well, I thought I did

160

already, but what I was asking, Sergeant Makins, is whether, in following up on your statement, that you're in charge of the housing unit, that's your understanding, and that your understanding is that you're responsible for everything that happens on the unit, and I thought I had then asked you whether that included ensuring that staff officers who you supervise and the inmates who are under your charge -- on this day it was 145 -- did your responsibility include ensuring that they complied with Department policy, procedure, rules, regulations and post orders?

MS. MAKINS: Answer?

MR. HANNON: Sure, if you can.

MS. MAKINS: Could you state the question again.

DR. LESANSKY: Sure. I'm not trying to be difficult. I'm going back to your statement which was in response to a question I asked you about your duties and responsibilities, and you said that your understanding as a sergeant who supervises and who also has responsibility for the inmates on that day, the count was 145 inmates, and you said -- I may not

161

exactly be quoting, but you said you were in charge of the housing unit, and then I think I asked you, well, could you expand on that and tell me a little more about what that means, and you said that it means you're responsible for everything that happens on the unit.

MS. MAKINS: Yes, I said that.

DR. LESANSKY: Okay, and then I was asking you whether that would include the officers and the inmates who were required to comply with various program, statements, and policy and procedure and post orders and other rules and regulations, whether your responsibility for everything that happens on the unit would include ensuring that those officers and inmates complied with rules, regulations, policy and procedure, and in terms of the post orders, the officers who you supervise.

MS. MAKINS: I would say yes.

DR. LESANSKY: And my last question is, again following up that you -- you consider yourself responsible for everything that happens on the unit --

MR. HANNON: No, no, no. Responsible for

162

everything that happens on the unit?

DR. LESANSKY: I thought that was her, her words. Maybe I didn't get it right. Did I not get that right?

MR. HANNON: Be responsible for if an inmate strangled another inmate?

DR. LESANSKY: No, I think what I -- in response to a question, she said that she was in charge of the housing unit, and I believe -- I mean maybe the transcript will confirm that, I don't know -- that I then asked her to expand on that, what did she mean by that, what did it mean to be in charge of the housing unit, and I thought Sergeant Makins said that she was responsible -- that, to her, meant that she was responsible for everything that happened on the unit.

And my follow-up to that, if that's true, is: Would that include everything that happens in accordance with policy and procedure? It includes that, correct?

MR. HANNON: What; that if something goes wrong, it's her responsibility?

163

DR. LESANSKY: Mr. Hannon, I'm trying to ask -- I'm trying to ask Sergeant Makins what her understanding is.

MR. HANNON: "Responsibility" is a loaded question. You're asking her is she responsible --

DR. LESANSKY: I --

MR. HANNON: We got to take turns. Is she responsible for anything that happens on the housing unit? That's ridiculous. That would be holding you responsible for somebody who commits suicide.

DR. LESANSKY: No, Mr. Hannon, I didn't say that. I was just trying to follow up to her statement. I mean I'll certainly -- if she wants to expand on her statement of what it means when she said -- which I believe she said that it meant she was responsible for everything that happened on the unit. I'm certainly -- Sergeant Makins, if you want to elaborate on that, please do. I thought I was quoting what you said. I didn't say that you --

MS. MAKINS: That's what I said, Mr. Lesansky.

DR. LESANSKY: Okay, and do you want to

164

expand on that?

MS. MAKINS: No.

DR. LESANSKY: Okay. I think that's I guess finally the end of my questions.

MR. HANNON: I have a few more to see if there was any regulation -- you had in-service training on HIPAA?

MS. MAKINS: We did some training upstairs for about an hour.

MR. HANNON: Okay. Have you had any in-service training at the Department of Corrections since you were first trained?

MS. MAKINS: Since I was first trained?

MR. HANNON: Right.

MS. MAKINS: Yeah. We did training for like two years in a row, but it wasn't nothing recently.

MR. HANNON: Okay, when were the two years that you had in-service training at the Department of Corrections?

MS. MAKINS: I think we did it in '03 and '04 if I'm not mistaken.

MR. HANNON: Do you recall what in-service

165

training modules you had?
MS. MAKINS: No.
MR. HANNON: Do you recall how many?
MS. MAKINS: How many modules? We did a 40-hour training.
MR. HANNON: Each year?
MS. MAKINS: Some of them was 32 and some of them was 40.
MR. HANNON: How many did you do in that two-year time period?
MS. MAKINS: One session -- how much training? I don't recall, Mr. Hannon. You probably have to refer back to my training program, because I don't quite remember.
MR. HANNON: How many sessions there were each of those years?
MS. MAKINS: One, and then you went to range training, too, because you have to be qualified to carry a pistol.
MR. HANNON: Other than range training in 2003/2004, what I want to know is your best recollection as to how many hours of in-service

166

training you had in each of those years.
MS. MAKINS: Forty hours. That was just the in-service training.
MR. HANNON: Each of those years?
MS. MAKINS: Uh-huh.
MR. HANNON: And who was the Warden then, if you recall?
MS. MAKINS: In '03 was Steve Smith.
MR. HANNON: And '04?
MS. MAKINS: I believe it was him, too.
MR. HANNON: And have you had any in-service training since Warden Smith?
MS. MAKINS: No.
MR. HANNON: Did you have any in-service training before 2003 and after your initial training?
MS. MAKINS: Yeah.
MR. HANNON: How much in-service training do you recall during that time period?
MS. MAKINS: They vary, because they was so long apart. We had one 9/11, when 9/11 happened, when they did the Towers. What year was that; 9/11/01?
MR. HANNON: Yes.

167

MS. MAKINS: Okay. I had training that year.
MR. HANNON: That was because of 9/11?
MS. MAKINS: No. It was in-service training. It was mandatory.
MR. HANNON: Okay.
MS. MAKINS: I had in-service training again when I got to the jail in '03, and I had it the following year in '04.
MR. HANNON: But none since?
MS. MAKINS: Not to my knowledge.
MR. HANNON: Okay. Is there a written job description of Lead Officer In Charge, to your knowledge?
MS. MAKINS: Yes.
MR. HANNON: Has that been produced in any of the paperwork that was submitted in this disciplinary proceeding? Have you seen that attached to any of the documents?
MS. MAKINS: No.
MR. HANNON: I think you've already told us that after you became a sergeant, you never had any

168

training in the duties of a sergeant.
MS. MAKINS: That is correct.
MR. HANNON: Did you have any training in the duties of a Lead Officer In Charge?
MS. MAKINS: No.
MR. HANNON: Were you ever given a copy of the job description?
MS. MAKINS: No.
MR. HANNON: How do you know that such a job description exists?
MS. MAKINS: Because I have a copy at home when I was filling out my application to try to find me another job when I was unemployed.
MR. HANNON: So where did you go to get that?
MS. MAKINS: I called Human Resources Management.
MR. HANNON: And basically you got that to be able to tell other prospective employers what you did at the jail?
MS. MAKINS: Correct.
MR. HANNON: But no one had ever given you a

copy of that before?

MS. MAKINS: No. It's not given. You have to request it.

DR. LESANSKY: Excuse me. Can I just ask you: Did you ever -- prior to the time that you did, I guess, call Human Resources, was that after June 5th?

MS. MAKINS: That was after July 26th.

DR. LESANSKY: After July 26th, 2006?

MS. MAKINS: Yeah, right.

DR. LESANSKY: Had you ever called Human Resources prior to July 26th to get a copy of your position description?

MS. MAKINS: No.

MR. HANNON: Did you know before then that there was a written position description for Lead Officer In Charge?

MS. MAKINS: Yes.

MR. HANNON: And how did you know that?

MS. MAKINS: Because I have -- we used to look for this stuff down in Human Resources Management, and basically it's supposedly kept in the

institution and supposed to be upon your request.

MR. HANNON: Where is it kept in the institution?

MS. MAKINS: I don't know.

MR. HANNON: So you're aware of it only because you worked in Human Resources?

MS. MAKINS: Yeah. That's the main source where everything is generated from, as far as the job descriptions and stuff like that.

MR. HANNON: No, but my point is: If you hadn't worked in Human Resources, you wouldn't know that there was a written job description for Lead Officer In Charge.

MS. MAKINS: No. I knew before then.

MR. HANNON: How did you know before then?

MS. MAKINS: Because I seen it in the institution where I worked. I used to work with the Administrator.

MR. HANNON: Okay, but that's because you were working in the administrative section?

MS. MAKINS: But I never read it.

MR. HANNON: Understood. You had no reason

to then.

MS. MAKINS: Right.

DR. LESANSKY: Excuse me. Did I understand you to say, Sergeant Makins, just then that you never had a reason to read your job description?

MR. HANNON: That was when she was working back in the administrative section.

DR. LESANSKY: Oh, okay.

MS. MAKINS: I never had a reason to read the job description for a Sergeant Lead Correctional Officer, no.

MR. HANNON: The rules and regulations that were relied upon in the Letter of Discipline to you are attached to that letter, including the transcript of your testimony, and the first -- I want to go through these. The first document says, "Chapter 1, Basic Regulations for all Employees," and it has Page 3 on it, and I don't see any date on this document. It has "Chapter 2, Basic Correctional Regulations." I don't see any date on that. Do you know where these came from?

MS. MAKINS: What?

MR. HANNON: These documents, Chapter 1 and Chapter 2, that are attached to this disciplinary letter.

MS. MAKINS: They came from where I picked up my paperwork from.

MR. HANNON: I understand that, but before -- do you recall ever being provided these regulations?

MS. MAKINS: The basic regulations for all the employees, they have little booklets.

MR. HANNON: Were you ever provided the booklets?

MS. MAKINS: Huh-uh. They had a lot of them when we closed down Lorton, so I just took one, but I never read it.

MR. HANNON: In your training, your initial training for the Department of Corrections, were you provided with these regulations?

MS. MAKINS: That was back in 1990, and I really don't remember.

MR. HANNON: Okay. Do you have any idea when this particular group of regulations was

173

promulgated or enacted?

MS. MAKINS: They're probably old.

MR. HANNON: Well, do you know?

MS. MAKINS: No.

MR. HANNON: Okay. The next document they have here is called the "Correctional Officer's General Orders," which is dated June of 1984. Before you got this disciplinary paperwork, had you ever seen that document, to your knowledge?

MS. MAKINS: Yes.

MR. HANNON: And under what circumstances did you see this document?

MS. MAKINS: That particular document, I saw that in my disciplinary action.

MR. HANNON: I know, but before you got your disciplinary action packet, had you ever seen this document before?

MS. MAKINS: Yes. It's a card. It's a card. When you first come in the Department, they give it to you and they say keep it in your wallet or your purse.

MR. HANNON: Okay, and you did that?

174

MS. MAKINS: Yes.

MR. HANNON: Now, the next document is Program Statement Number 5010.2(c), dated July 1st, 2004. This is a Program Statement, and it says "Accountability For Inmates." Before you got your disciplinary practice, had you ever been given this document?

MS. MAKINS: I'm not sure, but if we was given, Mr. Hannon, it was given in I believe training, in-service training.

MR. HANNON: In 2003 or 2004?

MS. MAKINS: In 2004, I believe.

MR. HANNON: Do you recall if you had to sign for this document?

MS. MAKINS: Not to my knowledge.

MR. HANNON: Do you know if you have a copy of this in your possession?

MS. MAKINS: Yeah, I have a copy of it in my possession for my paperwork.

MR. HANNON: Now, you mean the paperwork related to this discipline?

MS. MAKINS: Yes.

175

MR. HANNON: But did you have a copy of it in your possession from the time that you were in the department before this?

MS. MAKINS: If I did, I think it's in the in-service paperwork, but I don't have it, huh-uh.

MR. HANNON: All right. This document --

DR. LESANSKY: May I interrupt?

MR. HANNON: Sure.

DR. LESANSKY: And I apologize. Sergeant Makins, just on this point, am I correct that your understanding is that all correctional officers, all correctional officers are required to comply with the laws of the District of Columbia and the rules and regulations and program statements and policy and procedure of the Department of Corrections as an employee of the Department of Corrections?

MS. MAKINS: Yes.

DR. LESANSKY: Thanks.

MR. HANNON: So your recollection is that you saw this in in-service training in 2004?

MS. MAKINS: Yes.

MR. HANNON: Okay. Now, I don't know if you have this, but Page 7 of this document, the last page signed by Odie Washington, the Director, pertains to inmate call-out passes, correct?

176

MS. MAKINS: Yes.

MR. HANNON: Is that what we're talking about with Mr. Ricardo Jones, an inmate call-out pass?

MS. MAKINS: Yes.

MR. HANNON: I want to read into the record what this Program Statement says regarding inmate call-out passes, and I'm quoting now.

"Number 1: Inmates shalt be issued call-out passes for authorized movement on a one-time basis.

"Number 2: The staff member requesting the inmate movement shall contact the inmate's housing unit and provide the following information: (A) Name of the requesting staff member; (B) Name and DCDC number of the inmate; (C) Date and time of the appointment; and (D) Location of the appointment.

"Number 3: Housing unit officer shall fill out and issue the call-out pass. When the inmate

leaves the housing unit for the scheduled appointment, the housing unit officer shall record the time on the call-out pass. The staff member in charge of the location of the appointment shall record the time of the inmate's arrival and departure.

"Number 4: When the inmate returns to the housing unit, the officer shall record the time and retain the pass."

That's the end of that.

Is there anything in that Program Statement that requires an officer in a housing unit to call back and confirm when somebody in the medical staff calls down asking for an inmate?

MS. MAKINS: No.

DR. LESANSKY: Could I just interrupt again. I'm sorry, Mr. Hannon.

Sergeant Makins, based on what Mr. Hannon just read, is it part of the responsibility of a sergeant who is supervising officers on a unit and as an Officer In Charge, a Lead Officer In Charge, is it part of their responsibility, as you understand it, to

ensure that that information which Mr. Hannon just read as part of the call-out pass procedure is accurate?

MS. MAKINS: If I am aware of it, I would say yeah, but if I'm not, no. I wouldn't want to be responsible for that.

DR. LESANSKY: Just so I get it correctly, so you're saying if you're aware of it, you would be responsible, but if you're not aware of it, you would not be responsible; is that fair?

MS. MAKINS: I don't think I should be, sir, if I was not aware of it, no.

DR. LESANSKY: Okay.

MR. HANNON: Then there also is attached the Southeast 1 Housing Unit Post Orders, dated February 14, 2005. Were these post orders at the actual post?

MS. MAKINS: I'm not sure, Mr. Hannon.

MR. HANNON: At Page 10 of this post order for Southeast 1, Section 11 is "Movement Control." It says, "A: All inmate movement in and out of the unit, except for supervised group movement or under officer

escort, shall be controlled by call-out pass. The identity of all inmates exiting the unit shall be verified by the control module officer using the picture on the 3-by-5 wing card." I'm going to interrupt here.

Do you know what a 3-by-5 wing card is?

MS. MAKINS: That's the little -- the identification card on the inmate.

MR. HANNON: And where is that located?

MS. MAKINS: In a card file.

MR. HANNON: Card file? Okay.

"B: Each unit shall maintain a running count of inmate movement to reflect an accurate total of all inmates in the unit. C: The running Count Sheet shall reflect name, DCDC number, time in, time out, and movement to and from the total count of inmates in the unit. D: Between the hours of 8:00 p.m. and 8:00 a.m., inmate movement shall be by officer escort only."

Is there anything that you're aware of either in that section or anywhere else in the post orders that would require an officer in the housing

unit to call back to the medical unit to confirm that someone has an appointment?

MS. MAKINS: No.

MR. HANNON: Is there anything else you'd like to say?

MS. MAKINS: No.

MR. HANNON: Okay.

DR. LESANSKY: My last question, Sergeant Makins, is my asking you if there's anything else not included in your written response of March 22nd or otherwise that you would want to make me aware of or would like me to consider.

MS. MAKINS: I don't have anything else to say. I'm just ready to go.

DR. LESANSKY: I don't have any more questions.

MR. HANNON: Okay. We're off the record.

DR. LESANSKY: Thanks a lot.

(Whereupon, the Oral Presentation of SERGEANT DIONNE MAKINS was concluded at 1:26 p.m.)

CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

I, Laurie Bangart-Smith, Registered Professional Reporter, the officer before whom the foregoing oral presentation was taken, do hereby certify that the foregoing transcript is a true and correct record of the presentation given; that said presentation was taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 15th day of July, 2007.

My commission expires: March 14, 2011

_____________________________

LAURIE BANGART-SMITH
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

**A**

**able** 21:11 36:12
47:6 113:3
123:6 145:4
155:11 168:19
**absolutely** 82:12
83:7 142:12,13
**abundance** 9:2
**accommodate**
47:16 91:16
**accommodated**
92:1
**accountability**
149:14,18 174:5
**accounts** 149:6
**accurate** 128:19
149:14,18 178:3
179:13
**accurately** 118:21
**accuse** 48:18
**accused** 48:12,15
48:19 112:19
**act** 25:7,12 98:12
**acted** 12:7
**Acting** 7:21 15:2
**action** 13:16,18
173:14,16
**actions** 11:9,10
13:9,12 62:18
**actual** 31:5,14
33:14 35:13
36:18 46:9
102:9 122:11
134:9 178:17
**add** 48:10
**addition** 15:9
118:2 120:10
**additional** 5:15
125:21 130:13
**Admin** 12:15
**administrative**
61:11 65:2,7,18
65:19,22 66:6
66:10,12,15,19
66:22 68:6,10
68:16,20 69:15
69:17 106:18
170:20 171:7

**Administrator**
3:13 12:19,19
14:1,11,19
170:18
**admitted** 114:4
115:22
**adverse** 11:10
**advise** 25:4
**Affairs** 15:21
61:8,9 65:5
**affixed** 181:10
**age** 6:19 10:22
**agency** 26:11
111:20
**aggravated** 150:4
**ago** 67:17
**agree** 145:4
147:11,13,14
149:16,20
157:21
**Agreement** 109:1
**ahead** 59:4
**aide** 7:19,19 12:8
**ailments** 139:15
**ain't** 38:18 141:16
**allegation** 118:3
**allegations** 5:10
5:12
**allow** 28:4
**allowed** 44:14
149:7
**all-male** 41:13
94:7,12 96:9,21
97:20 98:3
**Alston** 152:16
**Ames** 37:12 38:2
38:7 41:7,11
44:1,2 45:3
52:10,10 59:10
59:11 60:5,15
96:18 97:3
100:11
**amount** 42:15
125:13 131:8
**Angela** 14:10
152:16
**answer** 158:6
159:5,7 160:12

**answered** 56:17
145:21
**answers** 5:21
**Anthony** 16:4
**anticipated**
126:13
**anybody** 11:12
138:15 139:7
**anyway** 71:10
**apart** 166:20
**apologize** 175:9
**apparently** 74:1
142:21
**appear** 23:11
116:12
**appeared** 74:14
**application**
168:12
**applications** 7:13
**appointment** 24:8
24:11 62:12
149:9 176:19,20
177:2,5 180:2
**appointments**
137:2
**appreciate** 90:11
159:4
**approved** 152:13
**approximately**
8:12 19:1 49:19
69:22 95:2,5
98:6
**April** 7:1 21:15
**area** 24:21
**aren't** 147:22
**armband** 37:3
105:9
**Arnold** 7:20
12:11
**arose** 15:14
**arrival** 177:6
**arrived** 38:11,14
40:16,18,19
**asked** 38:1,5,6,16
41:7,17 44:9,11
52:10 56:16
57:16,17,18
65:13 78:4

82:11 93:1
103:21 112:15
114:2,15 115:19
118:16 122:16
153:20 157:15
160:6,18 161:2
162:11
**asking** 5:20 42:5
74:12 103:2
109:4 112:10,13
118:5 125:13
153:13 157:7,14
158:8,9,13
160:1 161:8
163:5 177:14
180:9
**ass** 80:21
**assigned** 20:13
32:12 34:15
43:1,13,15,16
55:21 57:18
61:5 76:9 80:7,9
83:4 94:17
96:13,14 105:4
107:1,13 146:5
147:5,9 148:16
149:10,13,14,17
149:19 150:3
**assist** 16:2 19:21
154:22
**assistance** 99:4
**assistant** 12:19
14:18 16:5
**assisted** 10:2,4
14:2 19:8
**assisting** 15:14
**assume** 117:11
**assumed** 58:2
**assumes** 108:12
**assuming** 98:21
**Asterisk** 152:12
**attached** 167:18
171:14 172:2
178:14
**attained** 10:21
**attendance** 11:11
18:13
**attention** 114:6

116:2 117:16,19
118:14 154:14
154:20
**attitude** 100:22
101:3
**attorney** 35:5,7
**authority** 14:1
**authorization**
45:5 147:16
148:2,18
**authorize** 138:1
**authorized** 45:6,8
104:19 111:18
123:2,13,20
143:11,16,22
144:7 176:12
**authorizing** 115:9
121:1,14
**availability**
146:21 147:1,10
**available** 17:13
96:12 126:16
143:6
**Avenue** 2:6 3:15
**aware** 18:22
19:13 34:5 42:2
42:5 52:18
100:7 124:18
132:12 133:1
139:7 170:5
178:4,8,9,12
179:20 180:11
**a.m** 1:12 33:1,5
179:18

**B**

**B** 4:4 45:21 47:2
176:18 179:12
**back** 8:22 10:15
14:12,20 17:11
24:3,4 27:11
28:3 32:12
36:10,11 37:18
40:11 51:5 52:1
54:7,9,14 55:6
56:11,21,22
57:2,3,4,5,8
58:13,16 59:6

60:15,17,17 62:14 63:20 64:6 65:13 67:19 70:11,13 71:17 72:2,20 72:20,21 73:11 73:22 74:3,5,22 76:19,21,22 77:5,6,7 78:17 78:21 80:8 81:8 81:10,14,22 82:2,14,16,21 83:9 84:2,19,22 85:5 87:4,11,22 89:4 105:3,14 119:10 123:8 125:10 138:7 140:7,10 146:11 146:12 148:22 160:17 165:13 171:7 172:19 177:13 180:1
**backup** 20:22
**bad** 55:18
**badge** 65:9,10,14
**bag** 32:6
**baggage** 32:7
**balance** 146:18
**bandage** 50:2
**Bangart-Smith** 1:22 2:18 181:4 181:16
**Bar** 39:20
**bare** 31:19,19
**bargaining** 108:22 109:1
**bars** 39:21
**based** 88:8 93:12 177:18
**basic** 171:17,19 172:9
**basically** 11:10 12:15 15:4 17:19,19 21:18 22:8 25:13 28:18 36:4 42:20 43:15 48:15 51:19 60:9 68:13 75:19 91:19 94:11 105:1 110:5 132:12 137:20 154:15 168:18 169:22
**basis** 28:5 137:21 154:13 176:13
**basketball** 96:2
**bathrooms** 12:21
**began** 48:5
**beginning** 133:4 151:9,16
**behalf** 1:6 2:1 3:2
**believe** 11:16 26:10 38:14 50:3,12 53:2 68:17 78:20 84:20 85:3 88:14 91:6 98:1 102:16 103:12 111:4 112:17 134:17 158:10 162:9 163:15 166:10 174:9,12
**believed** 93:13
**Ben** 61:8
**benefits** 6:20
**best** 165:21
**better** 75:9
**bid** 10:10 20:8 21:2 153:13
**biddable** 10:10 21:2
**bidded** 20:9
**big** 30:13
**Bishop** 20:21
**bit** 5:9 71:10 84:13 109:20
**black** 88:9
**blank** 130:7 131:13
**blanks** 117:3
**block** 131:20 132:2
**blocks** 142:18
**Bobb** 64:3,7 69:3 69:5
**bodies** 33:9 74:11
**body** 33:10,11,14 83:19
**Booahbing** 17:21
**Book** 29:21 30:10 30:17,21 33:19 49:10 105:13
**booklets** 172:10 172:12
**born** 6:5
**bottom** 50:8 54:11 85:1 121:18,20 152:13
**bottoms** 96:3
**bread** 51:14,16 83:12
**break** 41:21 43:18 52:13 69:15 100:18 105:16
**Breakdown** 45:12
**bring** 65:14
**bringing** 8:22 76:22 81:22
**brings** 10:13
**brought** 15:17 67:3 76:18 103:1
**Brown** 14:11 60:13,18,20,22 61:3 64:4,8 68:18,18 69:5,6
**bruise** 55:11
**Bubble** 22:15,15 52:17 53:1,16 53:20 54:15 58:13,22 59:10 73:7 78:19 81:7 91:18 95:10 98:18 99:2 113:1,2,4 114:18 118:15 118:19 119:18 133:20 145:19 145:21,22
**building** 2:7 12:15,16 15:18
**bullshit** 64:2,2
**bunk** 33:12
**Burns** 9:16,17,18
**business** 38:19
**busy** 154:14

C

**C** 3:1 5:1 46:12 47:3 176:19 179:14
**cabinet** 64:4
**call** 14:19 19:6 22:6,9,10,11,12 22:15 23:8,18 24:1,3,4,13,14 24:14,21 27:19 29:1,16 32:1,2,5 35:7,16,20,21 36:13 38:7 49:18 54:21 56:21 57:1,14 59:2,9 61:20,21 62:14 63:19,21 65:2 68:17,20 82:2 94:14 99:7 104:6 105:7 133:12 135:17 135:20,22 136:2 136:4,7,12,16 136:19,21,22 137:13,14 138:12,15,20 139:2,7,10,21 140:2,7,10 141:12 145:1,10 145:15,20 146:1 146:10,10,12,13 147:19 148:20 148:22 149:2 169:6 177:12 180:1
**called** 12:18 17:15 22:20 39:12 41:7 42:9 46:13 49:10 52:2 54:17,22 56:16,22 61:12 63:10,11,12 91:21 96:18 117:11 132:13 133:7 136:21 145:20 151:18 151:21 168:16 169:11 173:6
**calls** 22:10 24:15 25:3 61:19 62:11 95:14 137:14 145:17 145:22 146:1,11 146:13 148:22 154:16 177:14
**call-out** 22:13 111:18 114:5 116:1 141:22 145:18 147:17 148:3,9 176:3,6 176:10,11,22 177:3 178:2 179:1
**candidates** 159:12
**can't** 55:16 64:3 68:11 80:22 113:2
**Captain** 9:14,16 9:17 10:2,3 14:21,21 18:7 37:12 38:2,7 41:7,11 44:1,2 45:3 52:10 59:10,11,12 60:5,15 69:18 69:19 96:18 97:3 100:11,11
**car** 37:19,19
**card** 57:16 173:18 173:19 179:4,6 179:8,10,11
**care** 19:22 23:11 23:18,19,20 24:3 50:15 56:4 81:7 90:21 126:3 135:17 139:15,21,22 145:16
**career** 5:10 16:20

**carry** 150:3
165:19
**case** 111:3 112:6
120:18 121:5,5
122:17,22
134:21 148:8
156:16 181:8
**cases** 24:19
121:10
**cash** 13:2
**cataloging** 101:22
**category** 46:13
**caught** 100:21
101:2
**CDF** 66:9
**cell** 28:17 29:19
32:12 33:15
34:8,15 39:5,7
50:3,4,5,9,12,13
53:2,8,9,10,13
55:11,13 56:6
56:15 57:18
59:8 72:22 73:5
73:9 74:22
76:18 79:21
80:15 83:18,19
85:2 87:14 88:2
89:1,14,15,15
90:4 91:2 113:8
114:1,9,12
117:2 119:16,17
120:4 125:10
127:3 131:22
132:5,9 133:3
137:18,19
139:12
**cells** 33:10 39:18
40:2 54:7,14
70:13,16 74:4,5
87:4,12 95:2,21
**census** 58:5,6
59:3,5,6,6
**Center** 7:20 8:1,5
8:7,8 9:14,22
12:6,20 14:10
14:14 17:4,9,11
17:12 18:1,6,8
18:10 20:20

21:1 22:9 23:7
30:19,21 37:22
38:9 40:10
49:14 52:4
54:17 59:11
60:5,14 99:7,7
102:15 103:8
105:12
**certainly** 143:2
163:13,17
**certificate** 25:21
181:3
**Certified** 2:19
**certify** 181:5
**chance** 21:13,16
49:6 62:8 94:14
154:3,10
**change** 21:15
24:17 28:19
41:16 50:2
73:16 78:5
**Channel** 62:1
63:15 64:1,7,13
**chaotic** 51:11
91:18
**chapel** 27:16,16
27:17 126:2
**Chapter** 13:9,12
13:15,17 171:16
171:19 172:1,2
**charge** 8:3 12:14
12:21 61:5
70:19 71:7
86:11 92:9,10
101:1 104:18
109:12,19 150:5
150:7,13,19,21
151:2 156:11,15
157:7,17 158:4
158:15 159:10
159:18,19 160:3
160:8 161:1
162:9,12 167:13
168:4 169:17
170:13 177:4,21
177:21
**charged** 112:18
**charging** 113:13

**Charles** 14:12
**check** 13:22 36:8
53:16,22 56:19
56:19 71:19
74:10 82:12
87:11 111:9,10
111:11 113:1
114:19 118:20
120:2,3 124:21
146:18,22 147:1
147:10
**checked** 56:9
71:15 74:3
79:10,13 84:14
112:21,22 113:3
**checking** 48:19
53:22 54:1
**checks** 17:16
31:15
**chose** 18:8
**chosen** 8:4
**Christopher** 43:8
52:12 59:14
60:1,3 97:5
100:17
**Chronological**
60:7,8
**circumstance**
98:15
**circumstances**
24:7,10 149:7
173:11
**cited** 130:11
**claim** 63:16,17
130:12
**claims** 7:4,5
**clarify** 65:16
**class** 11:14
**classification**
31:17
**Clay** 45:4 60:16
**Clayborn** 7:21
14:21,22 15:3
**clean** 12:16 20:11
153:14
**cleaners** 37:14,17
**clear** 52:7,19
138:3 142:8,8,9

142:12,13 144:5
148:10,11
**cleared** 52:3,5
119:12,13
**clearing** 138:3
**Clemens** 6:22
**Clerk** 7:4
**clicked** 119:19
**clinic** 24:20 35:9
**clipboard** 50:16
126:5,10
**close** 8:5 41:9
61:20
**closed** 8:1 46:13
172:14
**closure** 8:2,4,15
14:14 15:1,3,7
**clothes** 37:18
**codes** 17:15
**coincide** 36:4
**collect** 48:5
**collecting** 48:7
**Collective** 109:1
**collectively**
149:13,18
**college** 6:9,10
**Collins** 61:8
**Columbia** 2:20
6:8,16 7:10
97:18 175:13
181:17
**come** 32:12 40:6
43:18 44:2 56:2
57:8 58:16
59:15 65:12
80:4 81:10 85:4
94:15 99:4,6,11
99:15 101:19
133:8 136:5
138:16 139:3,13
151:17 173:19
**comes** 22:14
152:22
**comfortable**
55:22
**coming** 10:6 27:6
32:9 36:13,18
37:15 50:21

53:18 54:2 55:5
59:14 64:3
71:17 76:21
78:17 80:4,7
81:4,8 83:13
93:7 139:14
**command** 9:14,21
12:20 17:4,8,12
18:1,6,8,10
20:20 21:1 22:9
30:20 37:22
38:9 40:10
49:14 52:4
54:17 59:11
60:4,14 70:21
71:4 99:7,7
105:12 106:8,10
**comment** 94:6,8
**commission**
181:12
**commissioned**
102:19
**commits** 163:10
**common** 93:5
**communicated**
17:17
**compare** 32:17
**competed** 153:8,9
159:12
**competitive** 11:2
**competitively**
159:10
**complaining**
141:14
**complains** 23:15
23:16
**complaint** 23:17
**complement** 45:6
45:12
**complete** 27:2
**completed** 39:9
49:8 151:18
**completely**
125:14
**compliance** 30:22
31:15,20 32:3
105:13 108:5,7
108:9

**complied** 160:10 161:15
**comply** 155:17 158:4 161:10 175:12
**complying** 157:1
**computer** 7:5 29:17 30:13,15 31:5,17
**computerized** 103:22
**concern** 19:18,19 19:20 94:20
**concerns** 93:21
**concluded** 47:5 65:8 149:6,10 180:20
**condition** 25:5,9 140:13
**conduct** 41:15
**conference** 25:22 26:1,2 64:8
**confirm** 23:7 35:13 54:18 62:14 138:19 145:2,4 146:6 147:6,9 149:1 162:10 177:13 180:1
**confirmation** 146:9,15
**confirmed** 52:3 89:17 138:11 141:11 145:19
**conflicting** 149:6
**confuse** 129:12
**connection** 15:14
**conscience** 55:17
**consider** 23:12 155:10,10 161:20 180:12
**considered** 104:13 153:17
**constitute** 42:17 42:17
**consultation** 35:5 35:7
**contact** 52:9 176:15
**contacted** 37:12 38:4
**container** 51:9
**continue** 149:2
**contraband** 39:19
**control** 17:20 22:14 30:18 60:14 178:20 179:3
**controlled** 179:1
**copied** 77:16,18 85:14,18
**copies** 86:6,14
**copy** 45:1 122:10 142:22 168:6,11 169:1,12 174:16 174:18 175:1
**Corporal** 20:19
**corporals** 109:3
**correct** 19:2 31:9 39:10 44:6 46:6 47:20 57:10,10 57:12 68:10 71:2 73:14 74:2 74:19,19 75:7 77:9,12 78:2,3,8 80:14 81:12 82:7,10 84:6 86:6,8,11,12 87:2,6,20 88:12 89:1 90:1 91:2 98:18 99:2,3 101:21 107:19 107:20 117:13 120:15,21 121:8 122:20 124:14 125:18 126:9,14 126:19 127:4,7 127:9,10,15,19 129:18 131:14 134:2 136:18 139:5 145:8 151:7 155:3 157:22 158:5 162:20 168:2,21 175:10 176:3 181:6
**corrected** 77:8
**correctional** 45:6 98:17 111:20 149:10 150:15 150:16,20 171:10,19 173:6 175:11,12
**corrections** 1:1 2:5 3:14 5:5 6:3 6:11 7:16 8:9 10:18 13:19 20:4 26:7 27:1 40:12 42:22 45:19 48:4 62:13 63:2 65:12 67:11 73:17 97:17,18 102:6,19 109:3 164:11,19 172:17 175:15 175:16
**corrective** 11:10
**correctly** 93:22 97:3 131:19 132:1 135:1,14 157:17 178:7
**corridor** 111:8
**corridors** 36:17 56:19
**corroboration** 133:15
**couldn't** 148:5
**counsel** 181:7
**count** 28:18,19 29:21 30:10,17 30:21 32:15,16 32:17,18,21 33:1,2,3,3,7,9 33:12,19,20,22 34:3,9,9,11,14 35:1,12,16,17 36:4,6,18,20 39:1,3,4,7,9,10 39:11,12,12 49:9,9,10,10 52:3,5,7,18 57:22 58:1,6,6,9 59:3,4,5,7 73:6 83:18 89:11,13 89:17 105:12 119:12,13 132:8 138:2,3 151:18 151:19,20 160:22 179:13 179:14,16
**counted** 36:3 132:7
**counter-signs** 118:1
**counting** 34:6 39:5
**counts** 32:18
**couple** 17:9 71:11 105:22 151:4
**course** 17:18
**cover** 47:2,15
**covered** 47:12,19 109:1
**created** 27:1 130:22
**criteria** 11:7,11
**culinary** 51:8
**culpable** 149:11
**cups** 51:10
**CW** 134:19 142:20,21
**Cynthia** 152:17
**C&P's** 111:19

D

**D** 5:1 47:3 176:19 179:17
**daily** 18:15 42:9 49:13 94:3 137:21 153:4,5
**dark** 157:13
**data** 30:15 31:17 48:9
**Datcher** 55:9
**date** 48:2 49:21 65:1 67:7 106:17 116:20 119:10 126:11 134:15 171:18 171:20 176:19
**dated** 173:7 174:3 178:15
**day** 11:12 17:22 19:6,12 21:14 27:9,11,18 37:8 37:10,13 38:6 39:16 40:10 41:10 42:3 43:17,21 44:1 44:10 45:17 48:13,14 49:1 51:18 55:10 64:14 67:18 68:16 100:7 107:1 126:2 133:5 135:20 136:4 145:18 154:17,18 156:3 156:4 160:9,21 181:10
**days** 49:5
**day-to-day** 154:13
**DCDC** 22:16 23:21 28:17 29:7,18,22 32:8 34:7,14 35:22 37:4 57:18 85:12,14 86:7 86:15 103:19 117:1 120:4 124:6 134:16 137:17,19,22 139:12 140:5 142:19 176:18 179:15
**deal** 48:7
**dealing** 94:19
**deals** 108:9
**December** 10:1 19:1
**definitely** 153:21
**department** 1:1 2:5 3:14 5:4 6:10 7:2,10,16 7:17 8:9,11,20 10:18 13:19 27:1 48:4 63:2 65:11 67:11,15

97:16,17 102:5
102:19 110:14
113:9 118:9
124:6 144:21
148:13 150:1
155:18 158:4
160:10 164:11
164:18 172:17
173:19 175:3,15
175:16
**Department's**
114:21 119:1
130:10,11 138:9
146:20 159:9
**departure** 177:6
**depending** 95:14
102:8 124:7
140:12
**depends** 35:1
**deploy** 19:8 99:9
**deployed** 99:11
**deploying** 10:3
**Deputy** 14:19
16:2
**describe** 116:16
**described** 10:17
15:10 131:2
142:4 151:8
**description** 109:7
150:11 167:13
168:7,10 169:13
169:16 170:12
171:5,10
**descriptions**
170:9
**designed** 103:14
**desire** 63:1
**desk** 24:3 78:18
137:14
**destination** 27:12
27:22 29:8
103:20 105:10
121:21
**destroyed** 8:12
**destruction** 8:7
**detail** 9:5,13
12:15 18:5,7
27:14,20 32:12

34:17
**detailed** 103:5
**detailing** 12:12
**details** 27:14,14
**determining**
23:12
**develop** 92:2
**Diaz** 39:13 49:11
49:11 57:15,15
**didn't** 7:14 11:12
12:3 16:18
23:10 38:2,2
44:3 46:17,22
49:16 51:13,18
53:1,2 55:22
58:18 62:5,8
63:18 67:4 68:9
71:18 72:9
73:16 74:19
76:2,7 77:5,6
80:2,6 81:12
82:18 85:4 94:1
114:5 116:1
117:16,18 122:6
126:1,21 128:15
128:17 129:7
132:10 133:11
133:19 138:19
139:8 145:17
146:8 154:8,21
155:13 162:3
163:11,19
**different** 31:2
74:7 93:10
122:3 126:18
134:9,13 135:2
135:3 142:14
150:13 154:18
**differently** 130:3
**difficult** 119:8
135:8 160:17
**digits** 23:22
**Dionne** 1:7 2:2
3:2 5:3 6:5
180:20
**direct** 5:21 159:8
**directed** 118:18
124:20 127:11

**directive** 7:7
**Director** 16:3
60:13 68:19
69:6 176:2
**Director's** 26:1
**disappointed**
16:22
**discharged** 137:4
**disciplinary** 11:9
13:17 62:18
124:3 167:18
172:2 173:8,14
173:16 174:6
**discipline** 171:13
174:21
**disciplined** 20:5
**discrepancies**
39:20 59:5
**discretion** 138:4
**discriminate**
41:21 44:11
52:12 97:9
100:18 101:7
**discuss** 5:12 25:9
26:15 58:17
151:11
**discussed** 22:1
25:14 26:13
58:17
**discussing** 151:13
**discussion** 9:20
57:20 70:11
103:16 130:15
**disposal** 8:14
**disseminated**
136:3
**disseminating**
14:3
**District** 2:20 6:7
6:11,16 7:10
97:18 175:13
181:17
**Division** 6:21
**doctor** 24:4,6,17
36:10,12
**document** 26:22
27:4,4 29:11
30:11 42:9,22

44:21 102:2
103:4,5 110:20
112:18 157:9
171:16,19 173:5
173:9,12,13,17
174:2,7,14
175:6 176:1
**documentation**
100:5 157:5
**documents** 7:4
8:6,7 48:6
118:11 167:19
172:1
**doesn't** 43:14
46:19 97:9
159:5,6
**doing** 20:17 36:6
37:10 39:4
48:13 49:8
55:13 58:8 59:5
73:6 87:5 151:7
**don't** 22:3 25:20
26:9,20 28:8,9,9
30:14 31:13
40:8 41:16,21
43:9 44:7,11,20
50:9,11,13
52:11 54:8,12
58:16 59:19
63:16 66:2 67:2
67:21 68:22
69:1 73:1 76:14
78:16 81:19
83:6,10 92:15
92:15 93:18
97:21,21 98:13
99:17 100:14,18
101:6,16 110:6
110:9 112:7,9
112:14 116:16
118:22 120:16
122:12,13 125:6
133:18 137:5
139:8 143:1,5,7
143:19 146:10
146:11,16
147:14 148:22
151:11,12 158:6

158:11 162:10
165:12,14 170:4
171:18,20
172:20 175:5,22
178:11 180:13
180:15
**door** 53:10 59:22
83:13
**doors** 39:5 53:7
54:11
**double-cell**
103:15
**downstairs** 44:2
52:3 59:19,20
137:14
**Dr** 5:3,6,9,14,21
13:13 37:9 41:5
44:18 48:1,22
63:4,6 64:12,16
64:21 65:16
66:3,8,14,18,21
67:2,13,19 68:4
68:8 69:2,6,8,12
70:10,18,21
71:2,6,9,15 72:4
72:7,10,14
73:20 74:1,9,12
75:2,8,21 76:4,7
76:11 77:1,11
77:15,18,22
78:4,10,22 79:4
79:8,10,13,17
79:22 80:11,15
80:18 81:10,13
81:18 82:4,8,11
82:14,20 83:2,5
83:21 84:1,9,12
85:10,13,20
86:5,10,14,19
87:2,10,18 88:2
88:4,8,11,15,19
88:22 89:3,7,21
90:3,6,11,17,19
91:1,7,9,14 92:2
92:5,8,13,16,20
93:3,8,18 96:6
96:17,20 97:2,8
97:12,15 98:1

99:18 100:4,20 101:2,5,8,21 102:11,13,21 103:10,17 104:2 104:5,9,12,16 105:6,19,21 106:5,7,12,15 106:21 107:4,7 107:14,18,21 108:15,20 109:14,18 110:3 110:6,11,18,22 111:11,15,22 112:7,9,13 113:5,9,16 114:20 115:6,14 115:19,22 116:7 117:4,8,10,15 117:22 118:5,8 118:13 119:1,6 119:7 120:9,13 120:18 121:1,4 121:10,17 122:4 122:12,22 123:11,16,19,22 124:4,4,8,12,17 124:22 125:4,6 128:3 129:11,13 130:8,21 131:2 131:10,13,16,18 132:4,14,19 133:22 134:5,10 134:14,21 135:5 135:12 136:6,10 136:14 137:7,12 138:5,9,14,20 139:1,6,10,17 140:1,4,9,14,18 140:22 141:5,8 141:10,18,22 142:5,12,13,17 143:1,5,8,21 144:10,12,19 145:2,6,14,18 146:2,17,20 147:3,13,15,22 148:12 149:4,22 150:10,12,16,20 151:3,12,15,20 152:1,5,7,21 153:2,5,19 154:7,12 155:3 155:15,20 156:4 156:14,20,22 157:14,21 158:2 158:8,13,22 159:3,22 160:16 161:8,19 162:2 162:7 163:1,6 163:11,22 164:3 169:4,9,11 171:3,8 175:7,9 175:18 177:16 178:7,13 180:8 180:15,18
**drawers** 96:5
**dressed** 37:18
**drew** 71:21
**driver's** 7:14
**dropped** 51:8
**duties** 107:10 150:3 157:6 160:19 168:1,4
**duty** 45:22 46:2,6 47:4,9 96:8 151:18
**dwelling** 67:2
**Dyson** 16:5
**D.C** 1:1,10 2:5,8 3:6,14,16 6:6 7:11 9:12 10:2 17:5 18:1 19:5 67:6 68:1 101:17
**D.O.C** 100:1 135:13 143:8

**E**

**E** 3:1,1 4:4 5:1,1
**earlier** 64:22 75:11 89:4 90:13 93:8 99:19 101:8 110:22 112:16 117:6 122:15 129:14 130:15 132:14,15
**easier** 91:22
**education** 6:2
**effect** 69:8,10 78:1 86:6 97:9 154:2 158:16
**effective** 64:10 68:16
**Eighteen** 53:9
**Eighty** 95:4
**either** 64:16 67:7 75:14 179:21
**elaborate** 163:18
**Eleanor** 152:19
**electronic** 29:13
**electronically** 30:7 36:20
**elementary** 6:7
**em** 64:5,5,5,6
**emergencies** 18:17
**emergency** 24:6
**employed** 181:8
**employee** 13:18 149:12,17 175:16
**employees** 8:18 20:5 64:9 66:10 66:11 67:5,22 171:17 172:10
**employers** 168:19
**Employment** 7:3
**empty** 31:15
**en** 36:9,11
**enacted** 173:1
**enhancement** 16:20
**enlightened** 18:3
**enormous** 125:12
**ensure** 108:2 149:13,18 157:1 178:1
**ensuring** 155:6,21 156:18 160:7,10 161:14
**enter** 121:7
**entered** 7:5,17
**entering** 8:6
**entire** 138:21
**Environmental** 40:1
**equal** 152:12
**equals** 47:3
**error** 129:15
**escape** 37:8 48:13 48:14 54:16,19 60:12 68:2
**escaped** 58:4
**escort** 105:14 140:11 141:4,8 147:17,18 148:4 148:5 179:1,19
**escorted** 140:21 141:6
**ESQUIRE** 3:3
**essence** 109:2
**established** 101:14
**establishing** 14:3
**evaluations** 62:20
**everybody** 49:12 51:16 56:10,11 57:5,7 58:2 70:13,15 74:17 77:3 87:14 89:18
**exactly** 50:13 76:14 83:6 139:11 161:1
**Examiner** 67:17
**examples** 108:1
**excellent** 20:15 62:22
**excuse** 108:11 109:14 133:6 158:9 169:4 171:3
**existed** 42:3
**exists** 168:10
**exit** 148:18
**exiting** 179:2
**exonerated** 69:17 69:21 70:4,6,9
**expand** 161:3 162:11 163:14 164:1
**expectations** 159:16
**experience** 18:2 23:3 66:9 101:22 104:13 104:20,21 110:11 122:5
**expires** 181:12
**explain** 13:11,15 23:15 43:5 45:2 84:12
**explained** 65:9
**expression** 130:1 130:2,3,6
**extensive** 101:22
**extent** 79:19
**extra** 126:10
**eye** 55:12 88:9
**eyes** 80:5

**F**

**face** 76:3,5 80:2 82:21 87:21
**Facial** 76:6
**facilities** 95:19,20
**facility** 45:7 103:14
**fact** 62:1 112:6 150:4
**facts** 19:14 60:11
**failed** 150:2
**fair** 62:8 100:14 178:10
**familiar** 44:20,22 153:22 155:8,17 156:5,8
**family** 34:19
**far** 10:5 19:9 94:18 112:1 128:19 170:8
**FBI** 128:1,3 129:22 133:22
**February** 106:3 178:16
**feeding** 51:17 83:12
**feel** 21:18,19 24:5 55:22 62:8

**fellow** 89:9
**felt** 51:20
**female** 32:4 37:18 94:19 96:8 97:1 97:13,19,20 98:6
**females** 41:11,18 55:20 94:12 96:21 98:2 100:16
**female/male** 41:16
**fight** 64:6
**figure** 47:1
**file** 64:4 179:10 179:11
**filing** 8:18 15:22 16:3
**fill** 176:21
**filled** 70:12 110:12 124:8 142:19 145:12
**filling** 117:3 168:12
**finally** 164:4
**financial** 181:8
**find** 31:18 64:18 64:20 105:8,9 105:13 168:12
**finds** 31:18
**fine** 57:22 159:7
**finished** 117:3
**fire** 64:5,5,6 69:9
**fired** 48:15,17 61:15,15 62:8 63:13 64:9,15 67:22 69:10 70:2
**firings** 63:9
**first** 6:4 11:22 14:9,10 16:19 21:17 23:21 37:3 50:1 57:17 60:20 65:5 68:19 93:20 113:16 115:12 116:20 134:15 135:19 136:7 140:5 151:17 154:4,6 164:12 164:13 171:15 171:16 173:19
**five** 28:2 39:18 47:18 49:22 113:17 132:21 154:17
**fix** 40:7
**flagged** 114:1,10 114:11
**flashed** 52:21 53:6,9 119:15 119:16 132:11 132:11 133:2
**float** 44:15
**floor** 29:8 33:13 50:18 51:5 52:16,17 53:6 55:8 60:21,21 65:6 80:20 83:10 95:12,16 95:18 98:9,16 98:20 119:18 138:8,18 154:15 154:20
**focus** 113:6
**folks** 125:21
**follow** 71:5,9 89:21 132:15 158:14 163:12
**followed** 60:22
**following** 96:6 113:14 160:2 161:20 167:9 176:16
**follow-up** 162:17
**foregoing** 181:5,5
**forget** 9:18
**forgot** 55:7
**forth** 157:6
**Forty** 166:2
**forward** 13:22
**found** 39:19 123:13
**four** 28:2 39:16 40:9,14,22 49:22 50:1,14 83:8 90:20 94:8 107:1 113:17 132:17,21 137:1 152:3,9,15,22 159:14
**fourth** 20:22 41:8 44:12 52:11 80:15,16 92:1 100:9 137:3 143:9 152:18
**Friday** 68:21
**friend** 63:12
**friends** 61:20
**front** 119:18 142:20
**further** 54:20 60:5 148:15 149:9

G

**G** 5:1
**gate** 30:7 39:8 59:22 72:17 80:4,5
**GEDs** 6:17
**general** 28:6 105:5,6 132:16 173:7
**generally** 107:22 123:1
**generated** 170:8
**getting** 19:20 39:1 55:17 59:21 80:21 91:20 100:9
**Gibbons** 14:12
**Giles** 8:3
**girl** 51:3 151:8
**give** 6:1 11:12 22:13 23:12,19 23:20 25:1 28:2 29:21 41:18 43:18 44:17 65:8,14 78:14 82:18 94:16 97:4 100:16,17 114:6,18 116:2 116:10 117:19 118:19 123:9 126:21 133:11 136:4 140:5 173:20
**given** 62:8 83:9 127:5 133:9 168:6,22 169:2 174:6,9,9 181:6
**glance** 21:16 154:8
**glanced** 114:4 116:1 154:3
**go** 6:19 10:15 17:22 18:8 24:13,13 26:11 32:11,11 33:9 48:20 50:1 51:15 53:20 54:7,9 55:15 56:11 57:22 59:3,19,20 60:18 64:20 70:11 74:11 75:18 78:11 80:6 81:2,2,7 84:2 89:14 91:21 98:9 116:9 119:10 121:2 124:10 125:10 126:18 131:21 132:12 137:3,9 139:9 139:18 140:22 141:3 144:21 148:20 168:14 171:15 180:14
**goes** 14:6 27:21 30:7 31:18 97:19 110:1,4 138:10 141:10 146:21 162:21
**going** 10:6,6 16:10 17:10 22:5,6,9,18 24:12,13 27:6 29:8 30:3,12 32:1,4 36:2,3 37:15 41:19 42:8 43:18 44:17 45:2 49:2 49:6,16 50:15 50:21,22 52:7,8 52:12,16,20 53:14 54:12,15 56:2,7 58:6 59:3 59:20 60:2 63:16,17 64:18 65:4 69:10 71:3 72:4 80:22 81:3 81:5,6 83:20 90:20 94:20 97:3,4 100:17 100:17 105:22 113:2,20 114:3 114:16,16 115:20 118:17 118:17 119:11 119:22 120:5 121:21 125:16 125:21,21 126:2 126:3,7,13 127:9 132:10,16 133:1,4,6 137:1 137:20 139:10 139:13 140:16 149:2 154:18,19 160:17 179:4
**Golden** 7:21 12:10,11 13:20 14:13,17,17
**good** 11:11 27:10 153:17
**Government** 6:12 7:10
**grade** 16:20
**Graduated** 6:8
**graduates** 6:17,17
**Gray** 43:9
**great** 48:7 89:3
**greatest** 135:10
**Greg** 7:6
**grew** 6:2
**Grimke** 2:7 8:16 9:4,9 15:18 25:21
**group** 3:4 11:20

11:22 12:16
82:20 145:8,9
172:22 178:22
**guess** 43:8 106:18
130:8 155:9
164:3 169:6
**gun** 19:1
**guy** 50:6,7 55:13
55:17 56:3,6,15
57:8 73:5 85:1,5
88:1
**guys** 12:22 27:16
58:3 71:17
78:17

**H**

**H** 4:4
**hadn't** 79:6,14
80:1 94:14
170:11
**half** 70:1
**hall** 36:18 103:18
**hallway** 59:22
105:4
**hallways** 12:20
**hand** 54:1 114:15
118:16 119:22
181:10
**handed** 75:13,13
**handle** 12:12
26:19
**handled** 13:2,4,7
18:11
**hands** 113:22
120:1
**handwrite** 13:20
**handwriting**
115:5 116:16
117:1 134:20
**handwritings**
134:9,13 135:4
142:15
**Hannon** 3:3,4 5:2
5:6,19 6:14 9:7
9:16 10:13,15
10:21 11:2,7,14
11:17 12:5,10
12:12 13:2,4,7,9

13:11,14 14:2,5
14:15 15:6,9,13
15:17,20 16:2,6
16:9,12,15,17
16:22 17:3,6
18:10,13,15,17
18:19,21 19:13
19:16 20:3,7
21:4,7,11,22
22:4,21 23:2,5
23:10 24:7 25:3
25:8,16,18 26:3
26:6,9,17,21
28:6,10,21 29:2
29:5,10,13 30:2
30:6,16,18 31:1
31:7,11 32:10
32:14,20 33:6
33:16 34:1,16
34:19 35:1,4,11
35:19 36:6,9,19
36:22 37:5,8
38:21 40:11,15
40:18,21 41:2,5
42:2,5,8,21 43:5
43:12,19,21
44:14,17 45:1
45:11,15,18,21
46:4,9,12,17,20
47:1,13,17,22
48:12,17,22
61:10,14,17
62:2,10,16,20
63:1,4 64:20
67:10,14 68:3
69:19 70:3,7
74:7,10 76:2
83:16,22 85:6
86:22 87:2 89:6
89:8,11,13,17
89:20,22 90:10
94:6 95:1,6,9,12
95:17,22 98:14
98:21 99:1,4,10
99:13,15,20
100:2 101:10
102:18 103:13
103:21 105:16

108:8,11,18,21
112:5,8,11
113:7,15 116:14
118:3,7 122:10
125:12,19 126:5
126:10,15,21
127:2,5,8,11,14
127:17,21 128:2
128:6,9,12,16
128:18,21 129:2
129:5,9 130:1
133:6,14 135:8
135:22 136:2,12
136:19 142:3,8
142:10 143:3,7
144:5,11,14
145:1,5 147:21
148:2,8 150:9
152:15 153:1,13
153:20 155:13
156:9 157:5
158:6,9,11,18
159:2,3,20
160:13 161:22
162:5,21 163:1
163:4,7,11
164:5,10,14,17
164:22 165:3,6
165:9,12,15,20
166:4,6,9,11,14
166:17,22 167:3
167:6,10,12,16
167:21 168:3,6
168:9,14,18,22
169:15,19 170:2
170:5,10,15,19
170:22 171:6,12
172:1,6,11,16
172:21 173:3,5
173:11,15,22
174:2,9,11,13
174:16,20 175:1
175:6,8,19,22
176:5,8 177:17
177:18 178:1,14
178:18,19 179:9
179:11 180:4,7
180:17

**happen** 51:18
94:18 104:16,20
**happened** 5:14
10:2 19:4 44:2
59:21 60:11
62:3 65:20 66:7
162:15 163:16
166:20
**happening** 55:18
123:2 151:5,15
**happens** 123:22
155:8 157:19
158:17 160:5
161:5,13,21
162:1,18 163:8
**hardship** 155:1
**hasn't** 157:12
**Hatton** 38:6,13
38:20,22,22
39:3 40:19 44:4
51:4 52:6,14,16
53:7,10,16
54:15 55:21
56:8 57:3,4 58:7
58:8,10,18,19
58:22 59:9,13
59:18 61:21
63:21 70:11
73:9 84:3 85:7
86:3 87:10
114:7,12,18,22
116:3,4,11
117:20,22
118:19 119:2,17
120:2 122:19
124:21 127:12
129:3 133:17,20
134:18 135:5
146:5 147:5
148:16 151:6
152:16
**Hatton's** 116:22
129:5 134:2,3
142:18
**haven't** 48:6
119:11 134:10
**HD** 6:8
**head** 124:11

132:3
**Health** 3:13
**hear** 63:13 93:22
**heard** 63:8 66:9
66:11,14,18
69:3
**hearing** 3:11 5:4
159:6,6
**held** 2:4 9:20
57:20 103:16
**help** 5:9 8:4 18:9
19:21 60:7
91:19 117:15
154:22
**helped** 8:17
**helpful** 28:15
83:17
**helps** 28:14
**Henderson** 14:7,8
**Henry** 3:12 5:3
102:18 108:8
112:5
**hereunto** 181:10
**he's** 22:18 32:9
56:20 64:18
72:1,2 76:21
77:7
**hidden** 37:20
**high** 6:8,17
**highly** 19:5
**HIPAA** 25:7,12
164:7
**hired** 96:14,15
**historical** 8:11
**history** 10:16
25:13 48:3
100:1
**HIV** 24:20 35:9
**hold** 23:14 38:13
64:18 129:19
**holding** 158:2
163:9
**Holmes** 69:18,19
**home** 32:1,5
80:22 168:11
**hour** 26:12 33:4,4
164:9
**hours** 26:13 28:2

96:15 165:22 166:2 179:17
**housed** 102:9
**housing** 27:2 29:15,22 30:1,3 31:2,8 32:18 34:2,5 35:16 36:1 38:4,7,9 39:15,21 41:13 41:20 43:2,10 44:13 49:7,20 49:20 50:18 51:15 53:4,22 55:20,22 56:12 57:13 59:14 60:4 73:15,19 78:9,17 80:8 81:9 94:7,12,16 95:4 105:5,14 105:15 107:13 109:12,19 110:1 110:4,21 111:8 116:21 123:7,8 123:9 126:17 137:6,11,15 138:1 139:13 149:8,11,15,19 154:13 157:18 158:15 160:3 161:2 162:9,13 163:8 176:16,21 177:1,2,8,12 178:15 179:22
**huh** 54:16
**huh-uh** 58:7 172:13 175:5
**human** 16:12 33:11 168:16 169:6,11,21 170:6,11
**hung** 55:3,3 59:17
**hurt** 55:17
**hypothetical** 125:14

**I**

**idea** 172:21
**identification** 36:22 76:6 179:8
**identified** 105:12
**identify** 22:16 28:14 33:10 81:8 105:13 123:7,8
**identifying** 80:5
**identity** 179:2
**IDs** 65:9,11
**illusion** 94:17
**immediately** 38:15 40:7 44:3 59:12 100:21
**important** 19:11 109:5 130:14 155:11,12,13
**imposed** 13:18
**inadvertently** 131:22 132:5
**inappropriate** 25:8
**incident** 10:1,4,11 19:1,3,11,12,20 20:2,3 60:8,9 61:6 62:7 66:7 68:1,14 119:5 124:6 154:11,12 159:15
**incidents** 20:12 51:18 153:15
**include** 110:7 149:11 160:10 161:9,14 162:18
**included** 145:8 160:7 180:10
**includes** 110:10 158:2 162:19
**including** 95:18 111:20 155:16 159:17 171:14
**incoming** 146:14 148:22
**incorrect** 77:20 79:18 85:16 86:15 115:13 129:17
**incorrectly** 110:13
**indicate** 34:11,13 39:20 73:18 77:5 86:19 87:16
**indicated** 84:16 84:17,21 85:3 85:18,19 86:17 114:21 115:10 116:3 117:22 119:2,17 120:1 148:17
**indicates** 29:9 40:2 46:1 74:21 103:13
**indicating** 28:16 29:7 39:11 70:12 72:22 75:17 77:4 82:2 119:12
**indication** 34:7 43:15 82:19 115:5
**individually** 149:13,17
**indoor** 50:19
**infirmary** 22:11 24:5,16 36:12 36:13,14 48:21 49:2 50:2 52:20 53:15,20 55:2,6 56:3,7,9,12,16 80:10 81:2,6,7 81:11,14 82:1 83:7 87:22 91:21 105:11 113:20 114:3,17 115:20 116:9 118:18 119:14 119:15 120:1 121:2 124:10 125:17,22 126:3 126:8 127:9 131:21 132:13 132:16 133:5 136:17 137:1,3 137:9,17 138:12 138:16,17 139:3 139:4,10,11,13 139:19 140:16 141:12 143:12 143:16 144:8,13 145:15 147:17 147:19 148:3,21 149:1,9
**information** 26:17 31:1,4,7 48:4,5,7 57:19 60:10 67:10 68:12 85:8,10 93:15 102:20 118:21 121:7 131:14 176:17 178:1
**informed** 156:12
**initial** 58:8 135:10 166:15 172:16
**inmate** 17:14 22:13,14,14,16 22:20 23:8,10 23:15,22 24:4,8 24:11,22 25:2,5 25:10,15 27:5 27:10,21,21 28:16,18 29:14 29:22 30:2,12 31:21 32:1,4 34:8 35:17,21 35:22 36:2,15 36:16 39:4,7,17 48:20 49:2 53:12 55:1,7,10 57:12,16 58:3 62:12 71:22 73:4,7,19 74:1 74:21 78:8 80:15 81:3 82:16 84:21 87:3,3,7,7,14,16 87:16 88:5 89:1 90:4 91:2 95:15 103:19 105:2,3 105:13 111:1,5 111:8 114:1 115:7,9,11,16 116:8 119:10 120:6 121:1 122:17 123:4,6 123:6,13,15,17 124:1,9,12 125:4 126:7,16 131:3,20 134:17 134:21 135:16 136:5,15 137:15 137:17,18 138:16 139:3,11 139:12 140:15 141:13,14 142:1 142:14 145:7 146:6,9,22 147:2,6,10 148:18 149:7,14 149:19 155:5 162:5,6 176:3,6 176:9,15,18,22 177:7,14 178:21 179:8,13,18
**inmates** 12:16 13:5 17:15 19:4 19:17,19,21 22:1,5,12 26:14 27:6,15 28:5,13 31:18 34:2,12 37:1,2 39:5,10 39:14,19 42:15 42:16 44:8 50:1 50:14,20,22 51:7,10,12,22 52:2,18,19 53:1 53:18 54:2,7,13 55:5 56:11,13 56:14 57:1 72:18 73:2,2,2 74:2 75:13,18 76:3 79:2,11 80:4,8,9,11 81:4 82:21,22 83:2 83:10 84:17,18 86:17,18,20,22 87:3,11,20 91:20 94:13,16 94:21 95:2 96:3 97:12 98:7,12

98:15 101:13,14 102:9 103:1,6 103:10 107:6 109:17,18 112:20 113:18 113:20 119:13 126:12,18 131:9 132:15,21 133:3 136:21 139:18 143:11,15 144:7 154:16 155:22 158:3 160:8,21 160:22 161:10 161:14 174:5 176:11 179:2,14 179:17
**inmate's** 22:18 23:20 25:13 29:7,17 32:8 34:13 176:15 177:5
**input** 31:2,4
**Inquirer** 67:16
**inside** 31:16 38:1 38:12 78:19
**Inspection** 40:1
**instance** 112:14
**institution** 41:15 102:8,8,10 170:1,3,17
**instruct** 107:8
**instructing** 133:17
**instruction** 85:22
**instructions** 54:20 60:5 78:14
**intercom** 59:2
**interest** 181:8
**Interim** 45:4 60:16
**interject** 89:6
**Internal** 15:21 61:8,9 65:5
**interpreting** 115:16
**interrupt** 79:5 175:7 177:16
179:5
**interview** 13:21 65:4 133:16
**interviewed** 61:3 61:7,8
**Inventory** 15:11
**investigation** 19:14 65:8 66:6 66:16 68:15 69:1 129:22 135:11,15 143:10 144:6 148:14,14 149:5 149:9
**investigative** 67:12
**investigators** 127:22
**involuntary** 56:4
**in-block** 95:1
**in-house** 51:1
**in-service** 164:6 164:11,18,22 165:22 166:3,11 166:14,17 167:4 167:7 174:10 175:5,20
**in-unit** 50:20 95:3
**irrelevant** 43:2
**isn't** 155:20
**issue** 41:2,12 51:21 87:15 94:11 96:8 98:5 98:5,11 101:12 103:1,1 105:6 140:6 176:22
**issued** 111:1 176:11
**issues** 26:14 96:5
**items** 130:10
**it's** 27:8 28:12,15 29:5,6,19 30:13 30:14,20 31:14 40:9 46:21 50:9 52:15 63:14 73:1 86:11 94:13,13 98:4 100:14,15,15
103:15,21,21,22 104:9,12 105:1 108:12 110:19 110:20 111:3,3 111:4,13,14 113:3 115:8 116:15 117:10 117:16 118:10 123:2,15,16 130:14 133:5 136:3 139:1,10 142:8,8 143:6 146:18 147:21 152:11 155:12 155:13 156:10 156:14,17 157:3 162:22 169:2,22 173:18,18 175:4
**Izzariki** 38:17,18
**I'd** 5:8 159:3
**I'll** 5:13,16 39:2 41:20 48:9 54:10 64:20 104:17 163:13
**I'm** 5:6,19 16:22 33:18 38:8 42:8 44:17,22 50:5 52:15 55:18 56:1,2 58:6 59:3 63:15 67:17,19 71:3 74:5,12 75:8,21 78:13 79:4,4 83:7 85:21 89:4 91:1 91:5 93:11 98:21 100:6 105:21 109:17 113:16 114:16 115:14 118:5,13 119:6,7,8,11,17 122:13 124:10 124:22 128:3 129:11,12 130:9 130:13 131:19 135:14 136:20 142:5,6,13 144:19,21 146:12,12,13
148:1,10,11 151:7 158:8,13 158:22 160:16 160:17 163:1,2 163:17 164:21 174:8 176:10 177:17 178:5,18 179:4 180:14
**I've** 48:6 62:5 153:7

**J**

**J** 3:3 5:6
**jail** 9:12 10:2 17:5 18:1,7,11 19:5,8 19:22 29:4 30:11,13 31:6 31:16 37:8 42:3 42:6,19 51:2 54:4,4,6 60:9 65:3,13 67:6 68:1 69:15 70:14 92:7,7,10 93:7,7,12,21 94:4 99:12,16 101:11,17 103:14 130:19 137:5 144:17 167:8 168:20
**James** 16:4
**Joan** 8:17
**job** 1:20 6:21 7:2 7:3,9 16:6,15,18 16:19 31:14 62:6,6 108:12 109:7 150:11,14 156:10 158:7,12 159:17 167:12 168:7,9,13 170:8,12 171:5 171:10
**jobs** 64:6 98:10 158:20
**John** 14:6,8
**Johnson** 7:7
**Jones** 48:20 49:2 50:4 53:8,12 55:1 56:14,18
57:6,8,16 58:3 58:11,19 72:22 73:4,12,14,19 75:20 77:4 78:9 79:20 80:1 81:8 82:6,8 83:14 84:20 85:4 87:13,15,21 88:16,20 89:18 90:1,8 91:3,6 112:11,15 114:1 114:14 115:17 116:8,10 117:4 117:5 119:16,21 121:2 122:11,17 124:10,13 125:4 125:9,10 126:22 129:16,17 131:4 131:20 132:2,10 133:1,8 134:22 135:16,16 136:15 138:16 138:22 139:3 141:13,14 142:1 142:14 144:17 145:7 146:6,9 146:22 147:2,6 147:10 148:18 149:7 176:6
**juice** 51:8,9,10,13
**juices** 51:17
**July** 1:11 7:15 64:11,13 67:8 68:3 69:3 169:8 169:9,12 174:3 181:11
**jump** 89:4 96:3
**jumpsuits** 96:4
**June** 10:1,12,14 37:9 42:10 44:19 45:3 49:21 64:22 65:20 68:2,5,14 93:20 94:1 99:21 101:11 106:18 124:17 124:18 135:18 143:13,17 151:5

169:7 173:7
**Justification** 44:18 48:1 93:16 94:4

K

**keep** 12:16 27:6 27:10 28:4 32:11 67:2 105:22 173:20
**keeping** 10:5 28:7 29:14 100:2
**Kennard** 56:17 56:21 82:2,5
**kept** 8:5 17:20 100:5 127:18 136:16 144:12 169:22 170:2
**key** 17:20 130:10
**keys** 17:20
**kind** 20:17,18 24:12 36:17 41:22 45:2 58:2 155:1
**Kirkland** 14:12
**knew** 18:3 20:15 20:17,18 22:7 50:1,14 76:3,4,9 78:17 79:19,21 80:3,12 90:20 92:18 108:4 125:16,20 126:7 128:9 132:1 145:11 153:16 153:21 170:14
**know** 13:11 22:4 24:12,19 25:12 26:16 27:5 30:14 31:13,14 34:2 35:11 38:3 39:22 40:9 42:10 43:9 44:14,20 48:8 49:16 51:5 52:8 54:8,12 55:5 56:1,2,20 58:1 59:20 69:9 75:15 76:14,15 77:5 79:22 83:6 83:8,10 84:18 86:20 87:10 91:10,14,18 92:14,15,15 97:15 99:8,8,17 101:16,18 105:11 108:4,6 108:13 109:11 110:15,16 111:16 112:3,5 112:7,9 118:10 118:15,22 119:9 119:13 123:12 129:20 132:8,10 135:8 137:5,20 139:8,15 143:13 143:19 144:2,15 145:9 150:7 151:7 153:7 156:10,19 157:4 158:7,20 162:11 165:21 168:9 169:15,19 170:4 170:11,15 171:21 173:3,15 174:16 175:22 179:6
**knowing** 107:10
**knowledgable** 108:3
**knowledge** 20:4,6 22:22 23:1 62:15 74:4 92:8 92:13 99:22 102:2 112:1,4 119:4 124:15 141:20 143:15 143:18,20,22 144:1,2 145:4,7 148:17 167:11 167:14 173:9 174:15
**known** 136:15 144:16

L

**lady** 158:21
**largest** 48:3 99:22
**late** 37:11,13 49:19
**Laurie** 1:22 2:17 181:4,16
**law** 3:4 97:18
**laws** 175:13
**Lead** 150:5,6,7,12 150:14,16,18,20 151:1 156:10 157:7 159:10,18 167:13 168:4 169:16 170:12 171:10 177:21
**Leaks** 144:17
**learn** 21:11 25:16 31:11 61:10,14 133:7 138:15
**learned** 23:2
**leave** 15:4 20:21 22:1,6 28:21 32:11 44:3,7 60:2 61:11 65:2 65:7,18,19,22 66:6,10,12,15 66:19,22 68:6 68:10,16,20 69:15,17 106:18 113:3 131:20 132:2 149:8
**leaves** 22:17 72:1 177:1
**leaving** 8:6 27:7 38:19 116:9 120:5
**left** 9:4 36:16 37:14 38:8 52:16,22 53:3 60:4 63:19 75:19 82:16 89:22 115:7,9 115:10,11,17 117:2 120:6 121:19,19 127:18 134:18 137:4,11
**left-hand** 45:11 50:22 53:8 58:12 83:14,15
**Leroy** 7:21
**Lesansky** 3:12 5:3,6,9,14,21 13:13 37:9 41:5 44:18 48:1,22 63:4,6 64:12,16 64:21 65:16 66:3,8,14,18,21 67:2,13,19 68:4 68:8 69:2,6,8,12 70:10,18,21 71:2,6,9,15 72:4 72:7,10,14 73:20 74:1,9,12 75:2,8,21 76:4,7 76:11 77:1,11 77:15,18,22 78:4,10,22 79:4 79:8,10,13,17 79:22 80:11,15 80:18 81:10,13 81:18 82:4,8,11 82:14,20 83:2,5 83:21 84:1,9,12 85:10,13,20 86:5,10,14,19 87:2,10,18 88:2 88:4,8,11,15,19 88:22 89:3,7,21 90:3,6,11,17,19 91:1,7,9,14 92:2 92:5,8,13,16,20 93:3,8,18 96:6 96:17,20 97:2,8 97:12,15 98:1 99:18 100:4,20 101:2,5,8,21 102:11,13,21 103:10,17 104:2 104:5,9,12,16 105:6,19,21 106:5,7,12,15 106:21 107:4,7 107:14,18,21 108:15,20 109:14,18 110:3 110:6,11,18,22 111:11,15,22 112:7,9,13 113:5,9,16 114:20 115:6,14 115:19,22 116:7 117:4,8,10,15 117:22 118:5,8 118:13 119:1,6 119:7 120:9,13 120:18 121:1,4 121:10,16,17 122:4,12,22 123:11,16,19,22 124:4,8,12,17 124:22 125:4,6 128:3 129:11,13 130:8,21 131:2 131:10,13,16,18 132:4,14,19 133:22 134:5,10 134:14,21 135:5 135:12 136:6,10 136:14 137:7,12 138:5,9,14,20 139:1,6,10,17 140:1,4,9,14,18 140:22 141:5,8 141:10,18,22 142:5,12,13,17 143:1,5,8,21 144:10,12,19 145:2,6,14,18 146:2,17,20 147:3,13,15,22 148:12 149:4,22 150:10,12,16,20 151:3,10,12,15 151:20 152:1,5 152:7,21 153:2 153:5,19 154:7 154:12 155:3,15 155:20 156:4,14 156:20,22 157:14,21 158:2 158:8,13,22 159:3,22 160:16 161:8,19 162:2 162:7 163:1,6

163:11,21,22 164:3 169:4,9 169:11 171:3,8 175:7,9,18 177:16 178:7,13 180:8,15,18
**letter** 65:6 68:13 68:17,18,19 113:10,14 114:21 118:9 119:1 130:10,13 135:13 138:10 143:8 144:20 146:20 150:1,2 159:9 171:13,14 172:3
**letting** 119:12
**let's** 105:16 119:10 144:5 157:11 159:20
**level** 42:2
**licenses** 7:14
**Lieutenant** 39:13 49:11,11 54:3 54:21 55:9 57:14,15
**lieutenants** 11:22 12:3
**lighting** 40:5
**lights** 40:5
**light-skinned** 73:5,8 88:4 89:9
**liked** 20:10
**limit** 104:17
**limited** 155:16
**line** 71:21
**lines** 113:18,18
**list** 14:6 135:17 135:20,22 136:2 136:4,7,16 137:9,10,12,13 137:20 144:9,15 144:16 145:10 146:10
**listed** 91:11 103:5
**lists** 136:13
**litigation** 15:14
**little** 5:9 38:1 57:4 58:8 59:1 71:10 75:9 84:12 85:1 105:2 109:20 159:13 161:3 172:10 179:7
**loaded** 163:4
**located** 179:9
**location** 35:13,13 176:20 177:4
**lockdown** 56:10 70:15 74:16
**locked** 50:22
**logging** 127:17
**long** 100:2,4 144:17 166:20
**longer** 105:17
**longest** 62:6
**look** 28:22 29:3 33:11 59:17,19 59:22 61:21 71:18 72:9 74:11 76:2,7 105:9 111:12 120:16 133:15 135:19 143:2 169:21
**looked** 21:20 53:6 53:14 57:5 58:15,15 59:1 61:22 75:17,22 75:22 76:8 77:2 79:6,14 84:16 102:2 104:17 122:18 124:20 134:19
**looking** 36:17 42:21 72:7,10 72:14 75:3 78:11 118:13
**looks** 120:14
**Lorton** 8:16 12:6 15:1,7 172:14
**lot** 17:19 21:17 42:18 62:5 83:16 90:11 91:22 172:13 180:18
**loud** 58:14
**loudspeaker** 58:5
**lunch** 41:21 43:18 52:13 97:6 100:18
**L.A** 20:14,19
**L.L.P** 3:4

**M**

**mad** 101:4
**madhouse** 154:17
**main** 26:1 32:10 170:7
**maintain** 179:12
**maintained** 145:10
**maintenance** 40:6
**major** 7:20,21,21 8:3 12:10,10 14:21,22 15:2,3 60:9 65:14
**majors** 14:16 102:1
**Major's** 7:18,19 7:19,22 12:7,19 14:9 17:10 68:20
**making** 53:22 75:3,5 87:4 98:15 154:21
**Makins** 1:7 2:2 3:2 5:3,5,7,8,18 6:4,5,15 9:9,17 9:21 10:14,20 11:1,4,9,16,19 12:9,11,14 13:3 13:6,8,10,17 14:4,8,16 15:8 15:12,16,19,22 16:4,8,10,14,16 16:18 17:2,5,8 18:12,14,16,18 18:20 19:3,15 19:18 20:6,9 21:6,10,13 22:3 22:7 23:1,4,9,14 24:10 25:6,11 25:17,20 26:5,9 26:20 27:3 28:8 28:12 29:1,3,6 29:12,16 30:5,9 30:17,20 31:4 31:10,13 32:13 32:16,22 33:8 33:18 34:4,18 34:21 35:3,6,15 35:20 36:8,11 36:21 37:2,7,11 38:22 40:14,17 40:20 41:1,4,7 42:4,7,12 43:4,6 43:14,20,22 44:16,21,22 45:10,14,16,20 46:1,7,11,15,19 46:21 47:9,14 47:21 48:8,11 48:14,19 49:3 54:22 57:21 59:14 60:6 61:4 61:12,16,18 62:4,15,19,22 63:3,8,11,22 64:14,18 65:1 65:21 66:4,13 66:17,20 67:1,5 67:14,16,21 68:7,12 69:5,7 69:11,14,21 70:5,8,17,20 71:1,3,8,14,17 72:6,9,12,16 73:22 75:1,7,12 76:6,9,13 77:2 77:13,16,21 78:3,7,16 79:2,7 79:9,12,16,20 80:2,14,17,19 81:12,16,21 82:7,10,13,18 83:1,4,6 84:2,8 84:11,15 85:8 85:12,17,20 86:3,9,13,17 87:9,13 88:1,3,7 88:10,14,18,21 89:2,10,12,16 89:19 90:2,5,9 90:16,18,22 91:5,8,13,16 92:4,6,12,15,19 92:22 93:5,8,15 94:1,10 95:4,7 95:11,13,20 96:1,7,11,19,22 97:7,11,14,21 98:4,14,19,22 99:3,6,12,14,17 99:19 100:8,21 101:4,6,16 102:7,12,15 103:3,9,12,17 104:1,4,7,11,15 104:22 105:8,21 106:4,6,10,14 106:20,22 107:6 107:12,17,20 108:9 109:10,16 109:22 110:5,10 110:17,19 111:7 111:12,17 112:4 112:16,22 113:19 114:8 115:4,14,18,21 116:6,18 117:7 117:9,14,21 118:12,14 119:4 119:8,9 120:11 120:16,22 121:3 121:9,13,18 122:8,15,21 123:5,15,18,21 124:3,5,11,15 124:18 125:3,5 125:8,15,17 126:1,9,14,20 127:1,4,7,10,13 127:16,20 128:1 128:5,8,11,14 128:17,20 129:1 129:4,7,10,12 129:19 130:5,20 131:1,7,12,15 131:17 132:3,7

132:17,20
133:10,11,13,18
134:3,7,12,15
135:3,7,21
136:1,3,9,18,20
137:10,13 138:6
138:13,19 139:5
139:9,21 140:3
140:8,10,17,20
141:1,6,9,16,20
142:2,9,11,16
142:22 143:19
144:2,14,20
145:13,17 146:8
146:18 147:1,12
147:14,20 148:5
148:10,20
149:21 150:11
150:14,18 151:1
151:9,14,17,22
152:4,6,11,16
153:4,6,18
154:5,11 155:12
155:19 156:3,7
156:13,19,21
157:3,15,20
158:1 160:1,12
160:14 161:7,18
162:13 163:2,17
163:20 164:2,8
164:13,15,20
165:2,4,7,11,17
166:2,5,8,10,13
166:16,19 167:1
167:4,7,11,15
167:20 168:2,5
168:8,11,16,21
169:2,8,10,14
169:18,20 170:4
170:7,14,16,21
171:2,4,9,22
172:4,9,13,19
173:2,4,10,13
173:18 174:1,8
174:12,15,18,22
175:4,10,17,21
176:4,7 177:15
177:18 178:4,11
178:18 179:7,10
180:3,6,9,13,20
**male** 32:2,3,6 35:8,21,21 36:3 41:18 43:19 94:13,15,17,19 94:19,20 96:12 97:1,4,12 98:3 98:11 100:16
**malfeasance** 48:16
**man** 56:9 77:5 98:6 119:12 138:2
**management** 101:17 108:22 109:2 168:17 169:22
**Manager** 16:11
**mandatory** 167:5
**manned** 46:10
**manual** 17:13
**manually** 17:14 17:15 51:9
**man's** 58:14 137:22
**March** 8:21 10:8 10:9 18:22 106:4,5,6,7,17 113:10 118:10 130:13 138:10 150:2 153:10 180:10 181:12
**master** 10:4,10 18:11 94:3
**math** 46:5
**matter** 5:11 62:1
**may** 9:5,13 17:3 27:12 33:13,13 34:10,13 48:8 53:3 83:17 105:17 122:13 124:22 152:13 160:22 175:7
**Mayberry** 6:18
**ma'am** 106:21 121:17
**mean** 6:17 10:1 43:5 45:15,22 46:14 49:4 62:4 67:2 81:18 96:5 150:6 155:9 162:9,12,12 163:13 174:20
**meaning** 72:1 85:10 117:17 120:3 135:16 151:2
**means** 36:2 42:19 45:16 46:15,17 46:20 47:8,14 47:17 107:2 109:21 111:14 161:4,4 163:14
**meant** 107:18 162:14 163:15
**media** 19:6 61:16 70:5
**medical** 19:21 23:7,11 24:5 25:3,4,9,13 26:14,19 62:11 62:12 82:15 133:8,9 135:17 136:13 138:18 140:2,13 141:13 143:12,17 144:8 144:9 145:10 146:6,21 147:6 147:10 177:13 180:1
**medically** 23:16 24:2
**member** 176:14 176:18 177:4
**members** 108:22
**memo** 45:3
**men** 95:17,18
**mentioned** 12:7 26:21 64:21 91:2 93:9 112:17 147:18 151:4
**methadone** 24:17 139:15
**Michael** 3:3 5:6
**Michelle** 8:3
**midnight** 33:5 38:16 39:11
**mind** 63:18
**mine** 61:20 63:12 134:16
**minimum** 6:20
**minus** 47:2,2,4,4 72:1 88:17,19 88:22 89:22 90:7
**Miscellaneous** 7:4
**missing** 92:1
**mistaken** 164:21
**misunderstand** 93:22
**misunderstood** 125:1
**module** 179:3
**modules** 165:1,4
**moment** 108:11
**Monday** 49:4,5 51:10,12 61:12 68:21
**Mondays** 49:7
**monthly** 12:22 13:1
**months** 9:11,11 159:13,13,14,14
**Moran** 8:22
**morning** 28:3 34:22 38:3
**Motor** 7:11
**mouth** 81:19 93:19 110:7
**move** 31:21
**moved** 17:15
**movement** 22:20 26:21,22 27:5 27:10 28:4,7,10 28:15 29:14 30:10 31:12 32:7 33:10 56:8 57:9,10,12 71:21 72:1,5,19 72:21 73:12,13 73:18 74:20 75:16 76:15,20 77:8,13,16,17 77:19 79:18 84:6,21 85:16 86:2 87:19 88:12 90:6 95:15 110:12 115:1,12,12 116:4 120:4 121:8 127:18 128:22 129:2 141:2,2 143:12 143:16 144:7 147:16 148:3 176:12,15 178:20,21,22 179:13,16,18
**movements** 17:14 31:5
**moves** 30:12
**Murphy** 8:17,17 15:18,21 16:7
**Murphy's** 9:4

## N

**N** 3:1 5:1
**name** 6:4 22:16 23:20,21,21 25:1 29:7 30:14 32:8 34:7,14 37:3 50:4,12 55:8 57:17 58:14 67:4 73:1 77:4 91:3,6 103:19 117:1 120:3 126:12 131:9 134:16 137:17,19,22 139:12 140:5,5 140:5 142:19 176:17,18 179:15
**names** 29:21 67:4 67:11,15 85:11 85:12,14 86:7 86:14 125:15,20 126:7,16 130:5 145:14

**National** 8:8
**nature** 8:10 17:21 23:22 24:20 40:5 41:14 140:12
**necessarily** 126:1
**necessary** 73:17
**need** 24:6 43:2 45:19 46:17,22 59:15 73:13 77:9 100:13,13 140:18 146:6 147:6
**needed** 17:22 31:19 39:6 46:10 47:19 62:12 78:7 84:6
**needs** 55:15 58:17 73:18 77:8 138:16 139:3
**negligence** 48:16 112:20 113:13 150:4
**negligent** 130:12
**neither** 85:5 148:15 181:7
**nervous** 57:4 59:1 71:11,13 74:14 74:14,15
**never** 41:16 56:22 62:17 66:21 82:2 92:20 93:1 93:1 102:2 119:9 124:20 136:12 137:5 141:22 157:8 167:22 170:21 171:4,9 172:15
**new** 8:19 9:2 28:15 77:17 84:4,10 85:7,9 85:19 86:16
**newly** 12:2 21:3
**news** 61:16,17,18 61:19,22,22 62:1 63:9,14,14 63:15,22 64:7 64:12 67:3,4,20 69:3 70:5
**night** 66:7
**nine** 9:10,11 16:21
**Nivens** 152:19
**normally** 111:5
**notarial** 181:10
**Notary** 2:19 181:3,16
**note** 90:13 97:3 139:9
**noted** 52:22 128:21
**notes** 60:19 61:4 93:10 125:11
**notice** 2:17 113:11
**noticed** 51:7 52:1 58:22 77:3
**notifying** 113:11
**number** 22:16 23:21,22 28:17 28:17 29:7,18 29:19 32:8 34:7 34:8,14 35:22 37:4 42:9,12 44:19 46:1,9 48:3 57:18 80:16 81:18 88:2 89:1 91:2 99:22 102:9 106:16 117:2,2 120:4,4 132:8 134:17 137:18 137:19,22 140:6 142:19 174:3 176:11,14,18,21 177:7 179:15
**numbers** 29:22 33:17,19 36:5 85:12,15 86:7 86:15 139:12
**numerous** 20:20
**nurse** 23:20 24:3
**N.W** 2:6 3:5,15
**N119** 2:7

**O**

**O** 5:1
**obligated** 27:2
**observe** 49:6 77:11 139:19
**observed** 21:17 55:12 154:5,7,8
**observing** 88:8 154:15
**obtain** 11:5
**obtained** 6:9 7:2 7:9
**obviously** 116:11 116:12 136:14 137:2,9 144:16 153:9
**occasions** 20:16
**occur** 20:1
**occurred** 10:12 20:12 21:15 49:1 61:6 62:7 68:14 70:14 119:6 154:12
**occurs** 60:9
**October** 8:21
**Odie** 176:2
**offered** 16:6,9 149:6
**office** 7:19,22 12:17,18,20 14:9 17:10 60:18,21 68:21 144:9
**officer** 3:11 5:4 7:18 9:22 12:6 19:7 20:18 22:10 23:17 24:15 30:21,22 31:15,20 35:15 35:16 38:5,12 38:16,17 41:8 41:18,21 44:12 49:17 52:11,13 56:21 61:5 62:14 70:11,18 71:6,12 76:18 76:22 81:15,22 82:2 84:3 86:10 87:10 92:1,6,10 94:13,17 95:9 96:12 97:4 98:3 100:9,16 103:11 104:3,10,13,18 108:7,9 111:2 122:19 123:10 134:2 135:5,6 136:22 137:16 138:17 139:19 140:3,4 141:7 142:17 145:15 145:19,20,21 149:10 150:5,6 150:7,12,15,17 150:18,21,21 151:2,6,6 152:2 155:5 156:10,15 157:7 159:10,18 159:18 167:13 168:4 169:17 170:13 171:11 176:21 177:2,8 177:12,21,21 178:22 179:3,19 179:22 181:4
**officers** 20:4,13 20:15 26:8 32:17,18 38:12 40:13 42:16,22 43:6 45:5,8,19 45:21 46:2,5,18 47:4,7,9,10,14 47:18 51:21 61:2 67:6 69:9 92:9,9,17,21 94:8,15 96:8 97:13,19,20 98:2,17 99:1,16 101:13,14 103:2 103:6 106:13,19 106:22 107:3,4 107:7 109:3,13 109:15,16 110:8 111:18 126:17 127:12 137:14 141:18 146:4 147:5,9 148:15 152:3,9,22 153:16,17 154:15,20 155:15 156:11 158:3,19 160:7 161:9,14,17 175:11,12 177:20
**officer's** 104:7 122:1 173:6
**officer-to-staff** 102:5
**officer/inmate** 101:19
**offices** 2:4 12:17
**official** 26:22 27:4 105:1 110:19 111:19
**Oh** 27:3 33:18 101:5 109:18 112:7 125:6 136:20 150:16 171:8
**OIA** 135:15 143:10 144:6 148:14 149:5
**OIC** 10:11 70:22 75:9 92:7 130:18 143:14 146:3 147:3 150:8
**OICs** 92:18,21,22
**okay** 5:18 6:4 10:15 12:5 13:14 14:8,15 24:2,10 31:13 34:4 35:11 36:2 38:8 45:1 47:1,9 47:22 48:12 49:3,15 52:6,14 53:15 54:19 55:2 56:5 58:12 59:16 60:1 63:6 64:12,16 65:16 66:3 67:13,19 68:4 70:7,10 71:1 72:10,17 74:9 76:4 77:1 77:18 82:20

83:13,22 84:17 84:19 85:13 87:2,18 88:15 89:2,3,20 91:9 100:20 101:5,8 102:21 105:19 107:14 109:10 109:18,18 113:5 114:17 118:7,12 118:16 119:7,11 121:4,18 124:4 127:21 128:2 129:11 132:4 133:14,22 134:10,12,14 137:19 138:5,6 138:9 141:5 142:9 144:10 145:5 146:2,17 147:15 148:12 149:4,22 150:17 151:14 153:5 154:7,8,8,21 155:3 161:8 163:22 164:3,10 164:17 167:1,6 167:12 170:19 171:8 172:21 173:5,22 175:22 178:13 179:11 180:7,17
**old** 6:5 84:10,13 84:15 85:9,15 173:2
**older** 50:7
**once** 30:11 51:5 62:10 123:7
**ones** 34:4 52:20 52:20 56:12 76:11 81:5 84:18 128:10 132:22 145:11
**one-time** 176:12
**on-unit** 53:19
**open** 33:9 37:17 39:6 114:12 119:17,19 133:2 133:17
**opened** 72:17 114:13,14 119:20 131:22 131:22 132:1,5
**opening** 133:17
**operate** 21:1,5
**operating** 45:6 53:21 56:1
**operation** 154:6
**operations** 21:19 21:19
**opportunity** 92:17
**opposed** 26:7
**oral** 1:5 2:1 5:2 180:19 181:5
**order** 74:16 91:12 112:2 123:12 155:6 178:19
**ordering** 13:7
**orders** 14:3 21:8 21:12,14,17,21 21:22 26:18 28:6 71:5 107:9 108:6 110:14 153:21,22 154:9 155:9,18 156:6 156:12,19 157:2 160:11 161:12 161:16 173:7 178:15,16 179:22
**organize** 8:18
**organized** 15:22 20:11 153:15
**originally** 83:8
**outcome** 181:9
**outgoing** 146:14
**outside** 27:14,20 37:19 97:17
**Outstanding** 62:22
**out-of-school** 6:12,15
**overpower** 98:6
**overtime** 20:17 44:18 45:9 47:12,15 48:1 49:4,18 93:16 94:3 96:14,16

**P**

**P** 3:1,1 5:1
**packet** 173:16
**page** 113:14,16 133:15 135:12 148:13 149:5 171:18 176:1,1 178:19
**Pages** 1:21
**paid** 13:1 96:16
**paint** 27:15
**panel** 37:20
**paper** 29:5,6 30:3 30:9,11 103:21 103:22 104:6 118:20
**paperwork** 8:12 17:18 19:9,10 39:15 49:13,13 167:17 172:5 173:8 174:19,20 175:5
**paper-and-pencil** 29:10
**paragraph** 113:17 135:13 138:10 143:9 149:5 151:1
**part** 66:1 108:12 155:11 156:10 156:22 177:19 177:22 178:2
**participate** 5:16
**particular** 19:12 20:2 23:8 24:21 30:8 67:18 156:2,3,4 172:22 173:13
**parties** 181:8
**pass** 22:13,13 23:13 27:9,20 27:21 28:3 34:17 37:6 50:10 53:2,3,9,9 53:10,15 55:7 56:5,7 72:9 73:9 73:9 75:4,6 76:16,17 78:11 78:11,12 80:16 81:1 85:2 88:6 91:19 103:18 104:6,14,17,18 104:22 105:2,7 111:1,4,9,9,10 111:11,12,14,16 111:16,20 112:3 112:6,11,15 113:7 114:2,5,8 114:10,10,11,12 114:15,18,22 115:2,3,5,6,6,8 115:11 116:1,4 116:11,14,17,18 116:22 117:1,3 117:4,5,11,17 118:1,1,15,16 118:19 119:3,3 119:5,10,11,16 119:22 120:7,8 120:10,12 121:16 122:5,7 122:11,16,18,18 122:22 123:3,3 123:9,13,14,19 123:20 124:9,13 124:19,20 125:2 125:7,9,9 126:22 127:3,6 127:15,22 128:2 128:4,6 129:7 129:21,22 131:4 131:13 132:11 132:11 133:2,19 134:1,4,6,8,9,11 134:18,22 137:5 137:21,22 138:2 138:21 140:18 140:22 141:3 142:1,12,14,22 147:17 148:3,9 176:6,22 177:3 177:9 178:2 179:1
**passed** 49:14 124:20 138:7
**passes** 28:21 29:1 29:4 49:16,19 49:22 50:14,15 50:16,17 52:19 52:21 53:5,7,19 57:3 71:18,19 71:20 72:5,8,11 72:13,15,17 74:10,16,18 75:2,3,12,13,14 75:18,21 76:12 78:11,18,22 79:5,14,15 80:10 82:22 83:8,10 84:3,19 86:21 90:14 91:10 92:11 93:2 104:3 105:7 111:19 112:2,20 113:21 113:22 116:19 117:5 119:14,15 120:20 121:11 121:13 124:13 125:15,20 126:6 126:11,15 129:16,18,21 130:3,4,4,6,6,16 130:17 131:5,6 131:8 133:4,10 137:2,7 138:2,6 142:11 144:4 145:18 176:3,10 176:12
**Patsy** 16:5
**Patton** 38:21
**pay** 114:5 116:1 117:16,18 118:14
**pays** 13:1
**PC** 55:15 56:4
**penal** 41:15
**pencil** 103:21
**Pendergrass** 14:21
**pending** 66:6,15

68:15,22
**people** 6:18 8:4 9:1,2 10:6 27:17 32:11 33:13 35:14 36:6 49:17,18 66:18 69:13 72:19 106:8 119:14 125:15 127:3 130:4 135:2 148:6
**perform** 39:1 107:10
**period** 26:11 137:6 150:3 165:10 166:18
**permitted** 148:18
**person** 20:17 21:1 23:17 24:21 27:18 28:19 31:20 33:9,14 33:20 34:6 35:9 40:6 55:6 69:17 70:8 75:16 76:16 89:14 109:22 111:19 112:22 113:1,4 117:12 140:12 146:15,15,16 149:2 152:18
**personal** 60:19 102:2 144:1,2 151:10
**personally** 76:12 80:12,18 85:2 88:5 90:20 120:20 131:10 132:18 139:2 145:12
**personnel** 8:22
**pertained** 19:10
**pertaining** 105:4
**pertains** 176:2
**pertinent** 19:11
**petty** 13:2
**Philip** 20:14,16
**phone** 19:6 55:3,3 56:17 59:2,9,10 59:18 63:19 96:2 136:19,21 138:12 139:2,7 141:12 145:21
**phonetic** 17:21
**physical** 35:13
**physically** 33:8,9 33:14 35:18 57:22 129:21
**Ph.D** 3:12
**pick** 37:15
**picked** 18:8 172:4
**picture** 37:4,5 179:4
**piece** 29:5,6 103:22 104:5
**pile** 122:13
**pistol** 165:19
**place** 56:4 60:22 152:17
**placed** 17:11 65:1 65:17,19,21 66:1,5,6,10,12 66:15,19,21 68:6,15 69:14 69:16 141:1,2
**places** 121:14 126:19
**placing** 65:7 68:19
**planned** 105:18
**please** 89:7,7 143:4 163:18
**plus** 45:22 47:7 47:10,12,14,18 71:22 72:2 74:3 87:11 90:3 107:4 125:19
**plussed** 57:5 73:10,11 75:16 77:3
**plusses** 71:16 74:21 75:3,5 79:11,14 84:14
**plussing** 72:18,20 78:13,20
**point** 60:11 66:8 68:5 84:3 86:21 90:7 96:18,20 97:19 103:18 116:13 170:10 175:10
**pointed** 79:17 118:18
**policy** 97:15 108:5 110:14 123:11 152:10 155:18 158:4 160:11 161:11 161:15 162:19 175:14
**pop** 39:7 53:7,10
**popped** 39:6 53:11
**position** 16:9 17:7 68:1 153:11 159:11 169:13 169:16
**positions** 45:18 64:10 67:7
**possession** 174:17 174:19 175:2
**possibilities** 81:17
**post** 10:10,10 14:3 18:6 20:10 21:2,3,5,7,8,12 21:12,14,16,21 21:22 26:18 41:9,10 43:6 44:7 45:12 47:3 91:12 93:14 96:13,14 100:10 100:12,14 101:20 107:9 108:6 110:14 112:2 123:12 152:12 153:21 153:22 154:9 155:8,18 156:6 156:12,19 157:2 160:11 161:11 161:16 178:15 178:16,17,19 179:21
**posts** 42:13,18 43:1,7 45:17 46:9,13,15 47:2 47:5,11,11,19 48:3 99:13,22 152:13,15
**practice** 93:5 174:6
**preexisting** 24:8 24:11
**prepare** 125:8
**prepared** 85:7,21 120:20 124:14 125:3,9,15,19 129:3
**preparing** 117:12 125:1,7 130:17
**present** 8:19 39:14 49:12 84:17 86:18,20 87:1,15 94:13 98:3,11
**presentation** 1:5 2:1 5:2 180:19 181:5,6,6
**presented** 157:6
**presigned** 49:15 49:19 50:17 90:14 91:10,19 92:11 93:2 116:18,19 117:5 117:11,17,18 120:20 121:6 122:18 124:9,13 124:19 125:1,8 125:9,19 126:11 126:15,22 128:10 129:16 129:17,20 130:2 130:4,6,16,17 131:4,5,8,11,15 131:16 133:10 137:1,7,21 142:11
**press** 64:7 67:12 67:15
**previously** 107:12 136:21 143:10 148:21
**prewritten** 82:22
**prior** 6:11 11:20 17:9,9 22:8 61:19 99:20 100:5 131:8 169:5,12
**Priority** 40:4,4
**privy** 144:19
**probably** 5:15,16 32:2 50:1 51:6 83:11 105:2,10 106:11 156:21 165:12 173:2
**probationary** 7:18 12:6
**problem** 40:7
**problems** 11:12
**procedurally** 112:10,14
**procedure** 22:1,5 29:14 91:11 92:3,5 108:5 110:14 112:1 155:18 158:5 160:11 161:11 161:16 162:19 175:15 178:2
**procedures** 26:19 74:8
**proceeded** 39:3 39:15 49:12,15 52:9 53:19 54:6 60:4,20
**proceeding** 5:4 167:18
**process** 8:14 9:1 11:3 22:7,21 83:20 89:8 91:9 91:15,20,22 93:3 103:18 130:16,18,21 131:3
**processed** 8:19,19
**processing** 22:5
**produced** 167:16
**Professional** 2:18 181:4
**professionally** 44:6

**program** 6:13,14 6:15,16,18 8:13 15:11 91:12 97:16 152:9 161:11 165:13 174:3,4 175:14 176:9 177:11
**promise** 151:3
**promoted** 9:19 10:8 11:15,20 12:1,3 14:18,22 16:19 18:21 21:3 106:2 107:16 153:10 159:12
**promotions** 11:21
**prompting** 5:20
**promulgated** 173:1
**proper** 13:22 19:21,22
**properly** 150:2
**Prophet** 54:3,3,22 57:14
**proposal** 113:11
**prospective** 168:19
**protocols** 147:19
**provide** 43:2 143:3 176:16
**provided** 172:7 172:11,18
**provides** 102:20
**public** 2:19 7:11 26:15 181:3,16
**publicized** 19:5
**pull** 57:15
**purchasing** 13:4
**purse** 173:21
**pursuant** 2:17 147:18
**put** 29:17 32:9 51:9 56:8 61:11 63:18 78:18,19 81:19 88:16,19 88:22 93:19 110:6 114:22 115:4 116:4 120:6,7 126:6 153:10 158:21 158:22
**putting** 74:21 127:15 131:8
**puzzle** 135:9
**p.m** 33:2,3,3 179:18 180:21

**Q**

**qualified** 165:18
**question** 85:6 93:1 102:21 103:20 118:6 135:19 138:14 156:9 158:6 159:5 160:14,18 161:19 162:8 163:5 180:8
**questioned** 38:15
**questioning** 153:20
**questions** 5:13,16 5:20 10:16 40:12 63:5 106:1 109:4,5 125:13 159:21 164:4 180:16
**quiet** 58:14
**quite** 50:9 66:2 135:9 165:14
**quote** 71:10 88:4 100:6 114:3,5 130:18 144:6 154:3 157:17 158:15
**quoting** 93:11,12 100:6 161:1 163:18 176:10

**R**

**R** 3:1,12 5:1
**radio** 17:16,16 54:1,5
**raise** 41:2
**raised** 6:6
**ran** 21:20 51:14
**range** 165:17,20
**rank** 10:21 11:5 150:8
**ratio** 42:16 94:19 101:13,14,18 102:5,14 103:1 103:5
**ratios** 102:16
**read** 13:15 21:14 67:16 68:12,22 107:8 154:1,2,3 154:10 155:2 156:8 170:21 171:5,9 172:15 176:8 177:19 178:2
**reading** 135:14 148:1
**ready** 27:19 39:1 59:21 180:14
**really** 43:1 51:17 55:18 66:2 68:9 98:5 101:7 119:7 129:11 137:5 148:11 155:2 172:20
**Realtime** 2:19
**reason** 68:9,11 170:22 171:5,9
**reassigned** 53:3
**rec** 53:19
**recall** 22:3 26:9 26:20 28:8,9 49:1 67:21 68:9 68:11 78:16 97:21 102:13 125:1,6 133:18 141:14 164:22 165:3,12 166:7 166:18 172:7 174:13
**receive** 22:9,10 133:12 138:11 139:2 141:12
**received** 26:7 31:2 54:21 59:8 62:21 65:2 138:15
**recess** 105:20
**reciprocities** 7:13
**recognize** 87:21
**recognized** 82:21 83:3,13
**recollect** 102:3
**recollection** 128:19 165:22 175:19
**recontact** 23:7
**record** 8:13 9:20 13:15 30:2,4,7 32:10 34:9 57:20 103:16 116:15 176:8 177:3,5,8 180:17 181:6
**recorded** 30:13 30:15
**records** 8:5,8,9 16:11 100:3
**recreation** 41:13 50:20 51:2 81:3 95:1,3
**reduced** 181:7
**refer** 165:13
**reference** 21:12 67:20 80:12 115:15 131:5 145:12
**referencing** 103:4
**referring** 64:13
**reflect** 73:14 179:13,15
**reflects** 57:12 78:8
**regard** 85:16 97:9 104:21 123:22
**regarding** 26:18 176:9
**Registered** 2:18 181:4
**regret** 129:13
**regularly** 24:12
**regulation** 13:19 164:6
**regulations** 160:11 161:12 161:15 171:12 171:17,20 172:8 172:9,18,22 175:14
**rehires** 8:19
**relate** 65:20
**related** 112:2 174:21 181:8
**released** 67:11,15
**relied** 171:13
**relief** 41:20 44:9 52:13 60:1 97:5
**relieve** 59:15
**rely** 36:7
**remember** 25:20 40:8 50:10,11 50:13 66:1,2 73:1 82:5 165:14 172:20
**removal** 62:3 68:3
**removed** 67:7,8
**renewal** 7:13,13
**repeat** 143:21
**repeating** 83:16
**replacement** 44:4
**report** 19:9,10 32:20,21 33:6 33:16,18 35:14 44:18 59:11 60:7,8 64:12 65:3,5 67:3,4,12 67:20 69:3 99:21 101:10 102:18 103:13 124:2,6 133:7 141:13 153:3
**reported** 1:22 19:16 31:8
**reporter** 2:18,19 105:17 181:3,4
**reporting** 24:1 46:5 74:13
**reports** 18:15 48:1
**represent** 5:6
**request** 22:12 169:3 170:1
**requesting** 176:14,17

**require** 23:11 28:7 179:22
**required** 23:6,11 89:13 122:20 155:17 161:10 175:12
**requirement** 107:9 152:9,21
**requires** 62:13 177:12
**research** 7:6
**residents** 6:16
**Resources** 16:13 168:16 169:6,12 169:21 170:6,11
**respect** 21:8 34:1
**responded** 114:3 115:20
**response** 5:12 103:20 153:19 160:18 162:8 180:10
**responsibilities** 107:11 109:7 157:10,16 160:19
**responsibility** 108:17 146:4 147:4,8 149:12 149:16 155:7 157:1,4 160:9 160:21 161:13 162:22 163:4 177:19,22
**responsible** 110:1 110:3 127:14 155:5,21 156:1 156:5,18 157:18 158:16 160:5 161:5,21,22 162:5,14,15 163:5,8,10,16 178:6,9,10
**rest** 29:3 66:1 88:12 133:3
**result** 16:7 20:3
**retain** 177:9
**retention** 8:13
**retire** 15:5
**retired** 15:1
**retreat** 98:17 99:2
**return** 22:18 28:1 28:2 56:13 63:1 73:3,13 75:20 77:6 80:2,3 122:1
**returned** 56:13 56:14 57:2,13 69:20,22 70:15 72:2 73:3,7 74:17 76:16 78:12 79:3,11 79:21,21 80:1 87:22 89:9 90:5
**returns** 22:19,19 177:7
**revealed** 143:10 144:6 148:15
**reviewing** 151:5
**reviews** 8:11
**Ricardo** 53:8 55:1 56:14,18 57:6,8 57:16 58:3,11 58:19 72:22 73:4,12,14 75:20 77:4 78:9 79:20 80:1 81:8 82:8 83:13 84:20 85:4 87:20 88:19 90:7 112:15 114:1,14 115:17 116:8,10 117:5 119:15,21 121:2 122:17 124:9,12 125:4,9 126:21 129:15 131:4,20 132:2,10 133:1 133:8 134:22 135:16 136:15 138:16,22 139:3 142:1,14 176:6
**Ricardo's** 116:22
**ridiculous** 163:9
**RIF** 8:20,21
**right** 10:19,20 25:21 32:14 35:3,6 46:11 47:13 66:20 70:17,19,22 72:6,16 75:1 76:6 77:21 78:15 79:7,12 79:22 80:19 82:4 83:21 86:2 86:4,5,12 87:6 88:3 89:9 91:8 95:11,22 96:22 100:4 107:6 112:19 120:11 120:13 121:2 128:13,18 132:2 132:19 141:9 144:14 147:21 152:11,14 162:3 162:4 164:14 169:10 171:2 175:6
**right-hand** 50:20 52:21 54:1 81:6
**Robert** 45:4
**roll** 67:9
**room** 2:7 25:22 26:1,2
**roster** 10:10 18:11 42:10,13 45:12,17 47:3 93:16 94:3 153:4,5
**rosters** 10:4
**route** 36:10,11
**row** 164:16
**rowdiness** 51:19
**rowdy** 51:12
**rule** 13:19
**rules** 160:11 161:12,15 171:12 175:13
**run** 19:9 21:8,12 47:6 52:8
**running** 37:13 179:12,14
**R&D** 32:2,3,4,6,9 35:8,21,21 36:3 37:18

**S**

**S** 3:1 4:4 5:1
**safe** 94:4 154:21
**safety** 51:21,21 51:22 94:11,18 94:21,21,21,22 98:5,5 101:12 102:22 155:5,6
**Sarge** 39:2
**sat** 38:1 54:19 58:21
**Saturday** 42:10 49:8 50:21 51:14 55:12 66:7
**Saturdays** 91:17
**saw** 60:1 61:17,18 74:20 104:18 115:1,6 116:14 116:17 129:21 129:22 173:13 175:20
**saying** 45:7 54:17 64:8 65:3 68:5 69:4,8 74:19 75:22 82:5 87:19 98:17 118:20 119:6 120:19 121:4 136:6 138:16 139:3 140:9 153:7 155:4 156:14 178:8
**says** 35:20 45:2 45:12,12,21 46:13 47:2 62:11 113:14 114:21,21 116:3 116:9 118:4,10 119:2 121:18,21 122:1 133:18 135:15 144:21 145:7 146:2 147:3 149:4 150:1,3 152:11 152:19 171:16 174:4 176:9 178:21
**scheduled** 132:2 135:17 143:11 143:16 144:7 149:8 177:1
**school** 6:6,7,8,17 8:16 9:4,10 25:22
**score** 11:8
**Scott** 43:19
**SD** 152:19
**seal** 181:10
**Search** 39:17
**second** 9:22 11:20 38:16 65:4 84:20 115:8 149:5
**secretary** 14:18
**section** 115:8 170:20 171:7 178:20 179:21
**secure** 54:11
**secured** 54:13
**security** 43:2 51:20 155:6
**see** 24:6,9,17 33:14 42:13 43:21 61:7 63:22 65:6 80:6 81:10 94:2 111:7,13 133:20 136:5 139:19 142:20 143:6 164:5 171:18,20 173:12
**seeing** 35:8
**seek** 147:16 148:2
**seen** 43:22 48:6 102:7,11,12 103:3,7 119:5,9 119:11 121:15 134:10 167:18 170:16 173:8,16
**selected** 15:6 17:6
**send** 24:4,15,22 25:1 27:20 32:6 41:20 47:22

56:3 97:5 102:18 105:3 127:2 137:15,17 137:18 140:11
**sending** 146:12 146:12,13
**senior** 150:8
**sent** 22:12 56:15 88:5
**sentence** 141:11 146:3
**separate** 30:1
**sergeant** 1:7 2:2 5:3,5,7,8 9:19 10:9,22 11:6,15 16:19 17:21 18:22 20:8,20 20:21 26:3 32:10 44:21 48:8 61:4 79:4 84:2 85:20 93:8 96:7 98:14 99:18 102:22 103:3,17 105:21 106:3,8,9 107:16 108:18 108:20 109:8,11 109:12 112:16 113:19 115:14 119:8 122:15 125:14 130:5 133:10,11,18 137:16 144:14 144:20 153:6,9 156:16 157:9,12 157:14 159:11 159:17 160:1,20 162:13 163:2,17 167:22 168:1 171:4,10 175:9 177:18,20 180:8 180:20
**sergeants** 11:18 11:20,21 12:1,2 12:2 108:21 109:4,8 155:16 155:16
**sergeant's** 21:2 109:6
**seriously** 62:7 142:5
**services** 3:13 7:3 7:12 126:2
**session** 165:11
**sessions** 165:15
**set** 75:14 106:16 181:10
**sets** 157:6,10
**seven** 113:17
**severity** 124:7 140:12
**SE-1** 149:11
**shaken** 39:18
**Shakes** 124:11 132:3
**shaking** 33:11
**shalt** 176:11
**sheet** 22:20 26:22 26:22 28:4,7,16 30:10 32:7 34:11,14 39:17 39:20 40:1,8,9 56:8 57:9,10,12 70:12 71:21 72:1,5,21 73:12 73:14,18 74:21 75:15,17 76:15 76:20 77:8,14 77:17,17,19 78:13 79:18 84:4,7,10,10,13 84:15,21 85:7,9 85:9,15,17,18 85:19 86:2,7,15 86:16 87:5,6,19 88:12 90:6 93:17 94:4 110:12 115:1,12 115:12 116:5 120:4 121:8 127:18 128:22 129:2 141:2,3 179:15
**sheets** 27:5 28:11 39:16 72:19
**she's** 70:21 72:4,5 72:7,9,10,14 120:11 142:3 145:4 157:8 158:16,19
**shift** 10:6,7 14:20 17:11 18:15 19:10 21:15 27:9 28:13,16 28:18 33:5 37:12 38:17 39:11 42:9,12 44:19 45:8 47:6 47:15 136:10 137:4 143:14 151:10,16
**short** 46:6 51:14 99:16 105:20
**shortage** 100:7 101:9
**SHORTHAND** 181:3
**shot** 19:4,17
**shouldn't** 9:18 55:15 156:21
**show** 39:18 42:8 43:12 48:2,9
**showed** 90:7 101:10 127:21 128:4 133:22
**shower** 95:8
**showering** 95:18 96:1
**showing** 37:3 99:20
**shown** 73:21
**shows** 115:5 152:15
**shut** 19:7,22 42:6 42:14,19 43:8 43:10 46:15,21 46:22 51:19 54:4,4,6 100:10 100:12,14 152:20
**shutdown** 41:10 42:18
**shut-down** 46:13 47:5,11 152:12 152:12
**sick** 15:4 22:1,6,6 22:11,12 23:8 24:13,13,14 28:21 29:1 32:11 34:17 35:7 37:5 103:18 104:6 105:7 112:11 135:17,20,22 136:2,4,7,12,16 136:22 137:13 137:14 141:19 145:10,20,22 146:1,10,13 147:18
**side** 43:16,17 45:11 50:11,16 50:17,21,22 52:21 53:8 54:1 81:6 83:14,15
**sign** 90:1 104:3 104:20 111:18 111:20 115:2 120:9,11 121:7 174:14
**signature** 49:21 104:8 111:13,14 111:18 115:9 116:22 120:7,8 120:14,17 121:12,20 122:1 122:2 128:7 129:6,8 134:1,2 134:4,5,16 138:1 142:15,18
**signatures** 121:11 121:14,15 122:3 122:6,6,20
**signed** 90:17 104:9,12,19 105:1 111:2,3,4 112:3,3,6,8,12 114:22 115:2 116:4,11,12 117:8,12 118:1 119:2,3 120:21 121:5 122:19,19 123:1 126:6 130:7 135:1 176:2
**sign-out** 127:15
**simply** 159:8
**single-cell** 103:14
**sir** 90:9 128:5 132:11 133:13 134:9 136:9 139:5 142:2 152:4,6 178:11
**sitting** 5:19 51:3 73:7
**situation** 140:15
**six** 14:5 23:22 102:1 113:17,18 143:11,15 144:6 154:17
**slash** 153:3
**Smith** 43:8 52:12 59:14 60:1,3 97:5 100:17 166:8,12
**somebody** 24:9 36:9 43:9 63:10 63:11 104:19 127:5 132:13 145:1 163:10 177:13
**somewhat** 31:14
**sorry** 33:18 67:17 75:21 79:4,5 89:4 91:5 105:21 109:17 115:14 119:7 124:10,22 128:3 129:11 130:13 136:20 177:17
**sort** 29:13 36:22 43:1 62:20
**sought** 159:11
**sounds** 98:16
**source** 170:7
**south** 43:16 51:15 83:11 94:14
**Southeast** 10:10 20:8,10 21:5,9 22:2 23:6 26:18

27:13 28:7 38:5 38:10 40:13 61:3,5 80:7,9 116:21 152:16 152:18 153:14 178:15,20
**Southwest** 52:2 94:14
**so-and-so** 24:15 24:16,16 32:6 35:22 36:15 137:16,16,17 146:12,13,13
**so-and-so's** 32:6
**space** 31:19,19
**spaces** 31:16
**span** 154:14,20
**Spanish** 50:6
**speak** 38:2
**special** 11:17
**specific** 21:7 32:22 35:9 40:12 108:1
**specifically** 29:20 107:22
**specifications** 113:13
**specified** 33:21 69:1
**specifies** 152:8
**spending** 125:12
**squad** 12:13,15 27:14,15
**stack** 76:1,3
**stacked** 75:14
**staff** 10:3,5 19:8 19:19,20 45:6 93:13 99:9,10 109:13,15 146:21 147:10 154:22 155:22 160:7 176:14,17 177:3,13
**staffed** 45:19
**staffing** 18:17 93:10,21 100:7 101:9 153:1,2
**staff's** 94:22
**stairs** 119:21
**standing** 132:8
**start** 5:22 28:15 63:7
**started** 8:21 10:18 15:4 60:10 72:18,20 78:20 84:4,9
**state** 160:14
**stated** 35:9 102:4 112:18 113:18 113:19,22 114:5 116:1 129:19 143:10 148:21
**statement** 8:13 91:12 97:16 149:20 152:10 156:6 158:14 160:2,17 163:13 163:14 174:3,4 176:9 177:11
**statements** 145:3 161:11 175:14
**station** 37:20
**stayed** 7:14 58:7
**stenographically** 181:6
**stepped** 51:15 83:11
**steps** 53:13
**Steve** 166:8
**Steven** 7:21 14:7 15:2
**stick** 144:20
**stickers** 7:12
**store** 8:9
**straight** 124:21
**strangled** 162:6
**Strayer** 6:9
**street** 3:5 37:18
**Strength** 99:20 101:10 153:2
**studied** 11:4
**stuff** 63:22 83:17 169:21 170:9
**submitted** 167:17
**subordinate** 146:4 147:5,8
**subsequently** 131:18,19 139:6
**substantiates** 135:15
**successfully** 153:9 159:11
**sued** 25:14
**suicide** 163:10
**summarily** 61:15
**summary** 62:2 68:3
**summoned** 126:18
**Sunday** 49:5
**Sundays** 49:6
**supervise** 106:12 106:20 109:13 109:15,16 155:22 158:3 160:8 161:17
**supervised** 107:8 178:22
**supervises** 160:20
**supervising** 110:8 177:20
**supervision** 9:5 106:11 181:7
**supervisor** 6:22 19:7 33:19 37:12 42:1 55:9 55:10 99:8 101:1 107:5,15 107:15,19,21 108:2,16,17 153:11 155:4,21 156:16
**supervisors** 17:17 45:5,8 46:3,5 47:4,7,11,15,18
**supervisor's** 60:17
**supplies** 13:7
**support** 130:11
**supposed** 25:12 26:15 37:2 40:13 41:15 44:7,9 48:20 71:4,4 101:15 104:9 108:3,4 108:13 109:9,11 111:2 115:7 120:6,7,11 122:5 123:2 140:6 152:3,19 158:19 170:1
**supposedly** 169:22
**sure** 12:17,22 17:1 48:20 50:5 50:19 54:11 56:19,20 58:1 71:19 77:2 82:12 83:8,18 89:14 91:1 108:12 122:14 135:14 154:21 156:11 157:4 158:20 159:2 160:13,16 174:8 175:8 178:18
**surrounding** 149:7
**switch** 97:1
**symposium** 8:10
**system** 8:18 16:1 16:3 30:14 31:5 59:2 146:19

**T**

**T** 4:4
**table** 78:19
**tags** 7:12,14
**take** 16:15,18 33:22 40:9 53:15 54:10,10 56:3 60:18 78:10 80:22 96:3 105:1,9,10 105:16 120:2 123:6,8 130:13 138:20 145:17 146:11 154:14 154:20 155:1 159:20 163:7
**taken** 2:17 34:3 35:12 105:20 111:5,7 123:3,5 181:5,6
**takes** 35:17
**talk** 51:4 92:17 100:13 151:8
**talked** 49:10 60:15 90:19 92:20,22 93:9 96:7 101:11,12 102:22 108:6 112:16 113:12 117:6 130:17 132:15 133:16 151:5 153:7,12 153:14
**talking** 82:8 90:14 96:8 101:9 103:18 111:1 113:19 115:15,16 122:15 144:9 148:14 153:12 176:5
**talks** 152:8 159:9
**Talley** 9:14 10:3 18:7
**taught** 8:22
**Tax** 6:21
**te** 139:18
**Team** 8:2,4 15:7
**telephone** 81:5 133:12 154:16
**telephones** 18:19
**tell** 5:9 23:19 24:2 24:4,22 25:1 27:19 28:19 29:18 31:22 34:9 36:15,16 37:9 41:5 43:17 48:22 68:9 73:16 78:10 82:5,15 94:15 101:13 106:15 106:16 107:22 109:20 133:20 136:22 137:15 139:11,14,16 140:10 150:5

151:13 152:7 161:3 168:19
**telling** 65:3 74:4 87:7
**tells** 24:15 31:20 38:17
**ten** 12:16
**tenure** 66:13
**terminate** 113:12
**terminated** 9:5,13 64:9
**termination** 69:22
**terms** 21:5 49:1 66:8 107:7,9 108:5 110:12,16 154:9 157:16 161:16
**test** 11:4,5,5,8
**testimony** 171:15
**Thank** 84:1 89:3 89:20 90:10 99:18 114:20
**thanks** 63:6 70:10 90:11 175:18 180:18
**that's** 7:15 18:2 19:3 25:6,11 27:6,9 29:8,10 30:17 34:5 42:9 43:19 45:7,16 45:18 46:4,7 54:16 57:22 70:5,9 75:7 76:19,21 77:9 78:14 80:14 81:1,12 82:7 85:13 90:15 91:3 97:11,14 100:18 109:22 110:20 111:16 112:19 114:19 117:10 118:3,5 123:13,19 125:17 126:9,14 127:4,7,10 128:9 129:16 133:9 136:18 138:3 139:5,21 141:15 144:8,12 145:9,10 147:7 150:11 151:17 157:5,20 158:7 158:11 159:7 160:3 162:17 163:9,20 164:3 170:7,19 177:10 179:7
**theirselves** 60:3
**thereto** 20:13
**there's** 28:13 30:6 32:16 33:12 36:19 40:4,8 41:11,17 42:15 43:8 46:12 64:1 64:2 111:13 121:14 142:18 157:5,9 180:9
**they'll** 24:2 25:1,1 32:5 36:15,15
**they're** 29:8,19 82:17 108:13 109:19,22 113:2 139:14 146:14 149:2 157:1 173:2
**they've** 100:2
**thing** 41:16 55:5 83:12 147:15 153:7
**things** 5:13 8:10 15:9 17:20 41:14 61:1 110:18 120:13 151:4,10 154:18
**think** 12:7 16:10 21:14 26:12 37:16 38:19 39:13 50:3,3,5,8 51:6 54:21 55:11,13 56:16 60:15 62:16 63:9 68:22 69:1 71:11,12 74:7 76:14,20 78:18 90:5 93:9,11 94:8 97:5 100:6 100:14 102:1 103:20 105:17 108:13,19 112:14 121:21 122:12,13 125:14 130:14 143:5 151:3,8 153:6,12,19 154:1 155:6 156:1 161:2 162:7 164:3,20 167:21 175:4 178:11
**third** 20:22 84:20 135:13 138:10 138:17
**Thompson** 20:14 20:16
**thought** 65:4 69:13 94:10,11 96:11 99:19 129:15 131:3 139:17 158:10 159:22 160:6 162:2,13 163:18
**three** 9:7,10 19:4 19:17 40:20 41:11,17,19 46:3 47:10 52:22 53:4 55:19,20 58:21 67:17 76:13,15 80:11 82:22 83:9,12 94:7,12 95:13 96:21 100:15 107:2,2 107:4 113:17 134:8,12,22 135:1,3 137:2,7 142:14 144:3,3 145:11 148:6,7 152:5 159:13,13 159:14
**threw** 77:15 78:21,22 79:3,5 79:15 84:3
**thrown** 28:12 86:21
**tier** 50:8 51:16 54:10,11 58:11 58:12,14 59:5
**time** 6:22 7:22 8:20 9:2 10:11 11:18 12:18 14:13 15:2 16:5 18:4,6,13 19:18 20:1,9 22:17,17 22:19 26:4 30:8 33:21 39:4,8 42:15 48:8 51:13 52:5,9 60:16 61:2,7 65:13 79:3 81:3 85:1 91:17 92:18 93:6,20 98:11 115:7,8 115:11,12 117:2 120:5,6 121:19 121:19,22 122:1 125:13 127:2,15 127:17 128:12 128:14,18,22 130:14 131:20 131:21 134:7,17 134:17 135:9 136:4 139:18 140:11 152:3 154:19 155:2 159:20 165:10 166:18 169:5 175:2 176:19 177:3,5,8 179:15,15
**times** 20:20 32:22 32:22 33:21 48:8 71:12 93:10 129:9,10
**title** 150:14
**today** 64:10
**toilet** 40:5
**told** 11:13 17:3,22 18:1 19:7,7 37:13,14 38:17 39:9,13 41:9 44:2,3,10 49:11 52:6,14 53:7,10 54:6,18 55:10 55:19 56:2,6 57:15 58:13 59:9,11,18 60:6 60:18 61:1,4,21 62:17 63:17 65:8,12,17,22 70:14 73:11,16 73:17 77:7,10 77:19 78:7 80:20 81:1 84:5 85:15 86:3,8,11 86:22 87:3,13 88:15 100:8,10 100:12 114:6,12 114:13,19 116:2 116:10 117:19 118:17 119:19 127:8 157:8 167:21
**tons** 8:12
**top** 54:10 58:11 58:12 148:12
**total** 34:13 47:3 179:13,16
**touched** 133:19
**Towers** 166:21
**track** 10:5 29:14 32:11
**train** 155:14 158:19
**trained** 21:4 109:6 157:9,12 164:12,13
**training** 8:8 11:17 12:2 25:17,19 26:7,10,12,12 164:7,8,11,15 164:18 165:1,5 165:12,13,18,20 166:1,3,12,15 166:15,17 167:1 167:5,7 168:1,3 172:16,17 174:9 174:10 175:20
**transcript** 133:16 162:10 171:14

181:5
**Transfer** 15:11
**transferred** 85:8 85:14
**transit** 82:17
**transmission** 54:5
**trap** 142:6
**trash** 28:12 78:21 79:1,3,8,15 84:4 86:21
**tray** 51:14,16
**treatment** 19:22 143:12,17 144:8 146:6 147:7
**tries** 31:18
**true** 139:1 141:15 143:13 145:6 146:7 155:15,20 156:6 162:17 181:5
**try** 5:21 168:12
**trying** 74:5 75:8 85:21 103:2 108:15 119:8 129:12 130:9 142:6,6 144:21 158:14,18,21,22 159:8,15 160:16 163:1,2,12
**Tuesday** 1:11 49:4
**turn** 64:1
**turned** 53:11
**turning** 61:19
**turns** 163:7
**two** 11:21 21:17 26:13 27:15 32:17,18 33:12 34:10,10,12 38:11,12 39:22 40:19 45:5,8 47:7,12,14 60:2 70:1,1 73:2,3 74:2,7 87:20 88:13 95:12,14 95:15 113:17 121:11,13,14,15 122:6,6,20 130:2 154:4,6 164:16,17
**two-year** 165:10
**type** 13:21 31:17 34:7 94:16 115:4 140:15
**typed** 17:18
**typewriter** 17:14
**typewriting** 181:7

**U**

**UDC** 6:10
**Uh** 86:9
**uh-huh** 40:20 43:20 64:14 83:1 84:8,11 86:4,13 88:7 90:16,18 92:12 96:19 115:18,21 116:6 117:21 123:18 130:20 131:17 151:22 166:5
**unclear** 129:14
**uncomfortable** 98:8,10,16,20
**uncovered** 19:14
**underneath** 37:20
**understaffed** 94:5
**understaffing** 42:3,6
**understand** 69:4 75:6,9,10 83:17 85:21,22 87:18 106:2 109:8 120:19 128:16 130:9 135:1 142:4,7 143:14 152:1 158:11 171:3 172:6 177:22
**understanding** 6:1 74:18 109:10 110:13 122:4 131:19 146:22 156:15 156:17 157:11 159:16 160:4,4 160:20 163:3 175:11
**understood** 93:19 157:16 159:17 170:22
**unemployed** 168:13
**unemployment** 7:4
**uniforms** 37:14 37:19
**unit** 20:11,12 21:14,19,20,20 22:8,17 23:18 23:19 24:12,22 25:3 27:2,7,7,13 27:15 29:15,18 29:20,22 30:1,3 30:12,13 31:21 31:22 32:4,9,19 34:3,5 35:16 36:1,3 38:4,7,9 38:11,12,14,20 39:15,21 41:13 41:20 44:13 49:20,20 50:19 51:15,20 52:8 53:4,21,22 55:20,22 56:1 57:2,4,9,13 58:14,16 59:15 60:4 61:6 62:11 62:14 72:3 73:13,15,19 75:19,20 76:10 76:17,19 77:6,7 78:9,12,18 80:3 80:8 81:9 83:4 84:19 85:1 94:7 94:12,16 95:4 96:9,21 97:20 98:3,7 105:5,14 105:15 107:1,13 109:1,12,20 110:2,4,21 111:8 113:3 115:10 116:20 116:21 117:3 121:19,19 123:7 123:8,9 126:12 126:17 132:22 133:8,9 134:15 136:5,8,13 137:4,6,11,15 138:1,7 139:13 141:19 146:3,5 147:4,6,9 148:6 148:16,19 149:8 149:11,15,19 154:5 155:8 157:18,19 158:15,17 160:3 160:6 161:2,6 161:13,21 162:1 162:9,13,16 163:9,16 176:16 176:21 177:1,2 177:8,12,20 178:15,21 179:2 179:12,14,17 180:1,1
**units** 31:3,8 43:3 43:10 49:7 56:12 154:13
**unprofessional** 94:9 96:10,11 98:2
**unquote** 114:4 144:8
**unsafe** 42:20 93:12 101:12
**unsigned** 122:16
**upset** 41:22 101:7
**upstairs** 22:11 25:22 26:1,11 164:8
**urgent** 23:18,18 23:20 24:3 126:3 139:21,22 145:16
**use** 15:4 29:17 81:4
**usually** 33:12,20 133:4,5 146:14

**V**

**vacant** 48:3 99:22
**valid** 104:14 111:4,14,15,16 112:2 122:7
**varied** 102:8
**various** 31:8 126:18 161:10
**vary** 166:19
**Vehicle** 7:11
**verification** 24:14
**verified** 39:12 49:9 87:19 88:11 115:2 179:3
**verify** 35:17 39:6 75:18 78:11
**verifying** 75:4,6
**Vermont** 2:6 3:15
**versus** 112:3
**Vicki** 6:22
**Vincent** 14:11 50:4 91:3,6 125:10 129:17
**violated** 13:18
**violation** 25:6,11 110:15 123:11 123:15,16 124:1
**virtually** 93:11
**visit** 26:19 34:20
**visiting** 91:17,21 126:2
**visitor's** 60:14
**volume** 95:14,14

**W**

**wage** 6:20
**wagon** 37:21
**wait** 105:2 116:14 138:3
**waited** 54:20
**waiting** 44:8
**Waldren** 65:6,17 68:8 100:10,11 100:13
**walked** 54:14
**wallet** 173:20
**Walter** 41:9
**want** 5:22 10:15

24:17 44:3 51:18 57:11 60:6 62:10 63:18 65:12 73:15 78:5,5 81:19 93:18 110:6 133:14 135:14 149:1 151:12 159:5,6 163:17,22 165:21 171:15 176:8 178:5 180:11
**wanted** 16:19 21:18 56:10 70:10 71:9 84:2 104:2 115:1 116:7 144:20
**wants** 24:9 163:13
**Warden** 14:9,13 14:20 45:4 60:16 111:19 152:13 166:6,12
**wardens** 14:6 102:1
**Warden's** 12:17 60:21
**Washington** 1:10 2:8 3:6,16 6:6 38:13,18 39:2 40:17 44:4 51:4 52:6,14,17 53:11 54:9,10 55:21 57:21 58:7,18 59:1,4 59:13,18 71:13 114:13 119:20 135:6 146:5 147:5 148:16 151:6 152:17 176:2
**Washington's** 134:20
**wasn't** 20:11,22 26:5 44:5 48:15 60:2 63:17 75:3 75:4,5,6 77:6
83:19 84:22 94:4 96:13 135:10 152:17 164:16
**watched** 39:4,8
**watching** 154:16
**water** 40:4
**wave** 113:7,22
**waved** 112:20 127:3
**way** 27:5,10 30:6 36:19 38:8 51:1 56:2 81:14 82:14,16 101:19 114:11 142:5
**Weaver** 7:8
**week** 12:1 21:17 49:3 70:1
**weekends** 18:5
**weeks** 17:9 67:17 70:1,1 154:4,6
**welcome** 63:4
**went** 6:6,9 7:18 8:7,15 9:6,12 10:9 14:9,20 17:4 25:17 27:11,16 37:22 37:22 38:9 50:18 52:17 55:2 56:9 57:2,3 59:9 71:18,20 71:20 72:18 75:15 80:6 83:7 83:18 84:16 87:6 132:21 137:6 148:13 165:17
**weren't** 112:21 139:7
**we'll** 5:10 24:3
**we're** 5:15 45:2 125:12 176:5 180:17
**what's** 28:10 45:15,22 46:14 54:8,12,15 59:20 62:3 140:6 144:22
150:12
**whereabouts** 27:8 28:5
**WHEREOF** 181:10
**whistling** 157:13
**who's** 24:12,13 28:14 137:20
**William** 9:18
**Williams** 52:4 54:18
**willing** 96:22
**Wilson** 6:8 20:14 20:19
**win** 94:20
**Window** 39:19
**windows** 39:21
**wing** 57:16 179:4 179:6
**WITNESS** 181:10
**women** 94:7
**word** 78:15 112:19
**words** 69:8,10 78:1 81:19 86:6 93:19 97:8 110:7 147:22 154:2 158:16 162:3
**work** 10:16 11:11 15:18,20 16:7 17:19 24:12 32:12 37:11,15 37:16 41:14 69:20,22 170:17
**worked** 6:11,21 7:1,11,20 8:2,16 9:12,13,21 14:5 14:17,20 15:5 15:10,13 17:8 17:11 20:15,19 22:8 27:17 49:3 49:4 75:10 103:7 153:16 170:6,11,17
**working** 23:6 40:3 52:15
91:18 93:7 101:17,22 170:20 171:6
**works** 7:11 32:2
**worry** 64:3
**worse** 48:9
**wouldn't** 42:17 106:10 114:9 144:15 145:9 147:11 155:10 170:11 178:5
**wound** 24:16 50:15 81:7 90:20 139:14
**wrist** 37:4
**wristband** 76:8
**write** 13:20 22:13 22:16,18 27:20 32:8 61:1 120:3 124:5,7 133:21 137:19 138:21
**writing** 22:22 23:5 60:10 62:13
**written** 76:12,17 111:22 124:2 167:12 169:16 170:12 180:10
**wrong** 23:16 24:2 54:8 72:21 73:12 162:22
**wrote** 49:22,22 50:10,14 53:4 55:7 56:5 59:6 61:1 73:8 75:18 76:16 77:13 80:10,17,18 83:8 84:18 85:2 88:5 90:13,15 91:3 97:2 113:9 113:11 118:9 129:14 132:22 134:7,16,18 143:9 144:3 154:1

**X**

**X** 4:4
**X'd** 73:10

**Y**

**yeah** 41:1 46:7 54:16 61:18 64:2,21 65:15 69:11,21 70:20 79:2 82:18 88:10 90:5 95:5 98:22 101:4 104:1 111:9 112:8,11,13 128:20 130:8 134:3 138:13 143:5 147:22 148:10 153:18 164:15 166:16 169:10 170:7 174:18 178:5
**year** 165:6 166:21 167:2,9
**years** 6:5 9:8,10 101:17,18 164:16,17 165:16 166:1,4
**yell** 58:13,18
**yelled** 58:10 119:18
**yelling** 58:19
**Young** 7:22 14:7 15:2
**Youth** 7:20 8:1,5 8:6 12:6 14:10 14:14 17:11 102:15 103:8
**you'd** 180:4
**you're** 25:12 26:15 44:6,8,9 44:20 63:4 64:13 65:17,19 68:5,15 70:18 71:6 74:13,18 75:9,22 86:10 87:18 98:16 103:4 109:4 110:8 120:19 121:4 130:1,3 133:6 136:6

140:6 156:1,14 157:7,17 158:18 160:3,5 161:5 163:5 170:5 178:8,8,9 179:20
**you've** 10:17 14:5 15:10 62:17,17 92:20 155:5 167:21
**y'all** 41:19 54:9 63:13 100:18

**Z**

**zone** 55:9,10

**$**

**$3.50** 6:20

**0**

**03** 164:20 166:8 167:8
**04** 164:21 166:9 167:9
**06** 10:9 106:17

**1**

**1** 1:21 10:10 12:6 20:8,10 21:5,9 22:2 23:6 26:18 27:13 28:7 38:5 38:10 40:13 51:15 52:2 55:10 61:3,5 80:7,9 83:11 94:14,14 116:21 124:6 152:16,18 153:14 171:16 172:1 176:11 178:15,20
**1st** 174:3
**1's** 40:4,4
**1-107049** 1:20
**1:26** 180:21
**10** 178:19
**10th** 1:11
**104** 47:18
**11** 64:9 67:5,6,22 178:20
**11:30** 33:3
**12** 69:16
**12:30** 63:12,12
**121** 45:13 47:4,19
**14** 178:16 181:12
**143,000** 8:12
**145** 34:10,10,12 39:10,14 49:12 94:13 156:1 160:9,22
**147** 34:13
**15** 113:10
**15th** 118:10 130:13 138:10 150:2 181:10
**16** 7:15 13:9,12 13:16,17
**17** 46:14,15,18 47:11
**18** 6:19 49:19 50:4 53:8,10,12 90:15 91:2,7 114:1,12,13,14 116:19 117:5,18 119:16,17,19,20 119:20 120:19 124:9,13 129:16 129:17 131:4,5 131:15,16,22,22 132:6,10 133:18
**18th** 3:5
**181** 1:21
**19** 53:11 106:6,7 114:13 119:19 131:22 132:5,9 133:17
**1901** 3:5
**192** 2:6
**1923** 3:15
**1984** 173:7
**1986** 6:12
**1987** 7:1
**1988** 6:9 7:9
**1990** 7:15,15,17 14:10 172:19
**1991** 7:18 8:1

**2**

**2** 42:9,12 44:19 113:14,16 135:12 136:10 143:14 171:19 172:2 176:14
**2:30** 96:15
**20** 11:16 132:9
**20th** 10:1
**20-day** 113:11
**20001** 2:8 3:16
**20009** 3:6
**2002** 8:1,21,21
**2003** 9:5,12,13 17:4 166:15 174:11
**2003/2004** 165:21
**2004** 19:1,4 102:20 103:13 174:4,11,12 175:20
**2005** 178:16
**2006** 18:22 21:15 37:9 42:10 44:19 45:3 106:3,6,7 135:18 143:13 143:17 153:10 169:9
**2007** 1:11 113:10 181:11
**2011** 181:12
**202)232-1907** 3:7
**202)671-2069** 3:17
**21** 10:17
**22** 133:15
**22nd** 8:21 180:10
**25** 6:19
**26th** 64:14,15,17 67:8 68:3,4 69:3 169:8,9,12
**27th** 64:10,13,15 64:17 67:8

**3**

**3** 45:22 46:2 148:13 149:5 171:18 176:21
**3rd** 10:12,14 37:9 42:10 44:19 45:3 49:21 65:20 68:2,14 93:20 94:2 99:21 101:11 124:17,18 135:18 143:13 143:17 151:5
**3-by-5** 179:4,6
**3:00** 33:2,2
**32** 165:7
**37** 10:22
**38** 6:5

**4**

**4** 62:1 64:1,7,13 177:7
**4:00** 63:20,21
**40** 50:13 165:8
**40-hour** 165:5
**41** 45:5,8 47:6,12 47:14,18
**43** 102:16 103:10
**48** 91:5,6,7 125:10

**5**

**5th** 61:13 64:22 68:5 106:18 169:7
**5:00** 33:5 63:20 63:21
**5010.2(c)** 174:3
**53** 50:5,6
**54** 46:6 50:5,6,6

**6**

**6** 59:8
**6.5** 96:15
**6/3/07** 116:21
**6:00** 33:5
**60** 99:16
**63** 45:22 46:1,2 47:10,16,18 55:11 56:6,15 72:22 73:5,9 76:18 79:21 80:16 85:1 87:14 88:2 89:1 90:4
**66** 46:4

**7**

**7** 176:1
**7:00** 37:17
**7:35** 37:17
**7:40** 37:16
**71** 50:9
**72** 95:2
**74** 50:8,9 53:2

**8**

**8** 63:15
**8:00** 33:1,1,3 34:21 96:15 179:18,18
**8:30** 68:17,21
**80** 95:5,17 98:7

**9**

**9/11** 166:20,20 167:3
**9/11/01** 166:21
**9:00** 68:21
**9:30** 1:12 51:5
**9:40** 51:6,7

# EXHIBIT 62

DEPARTMENT OF CORRECTIONS
DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -x
:
:
ORAL PRESENTATION OF: :
:
ALPHONSO BRYANT :
:
- - - - - - - - - - - - - - -x

Washington, D.C.

Monday, July 9, 2007

11:30 a.m.

B E F O R E:

HENRY R. LESANSKY, Hearing Officer
Health Services Administrator
District of Columbia Department of Corrections
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001

Job No. 1-107046
Pages 1 - 51
Reported by: Paula J. Eastes

Oral Presentation of ALPHONSO BRYANT, held at the offices of:

D.C. Department of Corrections
Grimke Building
1923 Vermont Avenue, N.W.
Room N119
Washington, D.C. 20009

Pursuant to agreement, before Paula J. Eastes, Court Reporter.

A P P E A R A N C E S

ON BEHALF OF ALPHONSO BRYANT:

J. MICHAEL HANNON, ESQUIRE
The Hannon Law Group, LLP
1901 18th Street, N.W.
Washington, D.C. 20009
(202) 232-1907

P R O C E E D I N G S

MR. HANNON: This is the Oral Hearing for Alphonso Bryant. Present is Mr. Bryant, myself, J. Michael Hannon, his attorney, and Dr. Henry R. Lesansky, who is the Hearing Officer for this proceeding.

EXAMINATION

BY MR. HANNON:

Q The way we are going to handle this, Mr. Bryant, if you don't mind, is for me to sort of assist you in telling Dr. Lesansky a little bit about yourself and the incident that has brought us here.

**A Yes.**

Q So, although I am sitting over here, I would like you to direct your answers to Dr. Lesansky.

**A Sure.**

Q The first thing I would ask you to do is just tell him about your background, your education, your work experience and how you got into Corrections?

**A Sure.**

**My name is Al Bryant.**

**My background is I have a BS degree in**

5

**Graphic Arts with a minor in Mathematics.**

**Initially when I graduated I taught in the Richmond School System briefly. Then when I moved back to D.C. I taught in the D.C. Public School System at the Nannie Helen Burroughs School, which is on Nannie Hellen Burroughs Street in Northeast.**

Q Where did you grow up?

**A I grew up in D.C. and in New York.**

Q Where do you go to high school?

**A I went to high school at Calvin Coolidge in D.C.**

Q When did you graduate from Coolidge?

**A I graduated from Coolidge in June of 1976.**

Q And you received your BS degree from where?

**A Virginia State University in Petersburg, Virginia.**

Q What year did you graduate?

**A That was 1981.**

Q How long did you teach in Richmond?

**A I taught in Richmond about six months. Briefly.**

Q Then you came from Richmond?

6

**A Then I moved to D.C. I came back home.**

Q And went into the D.C. Public School System?

**A Yes.**

Q How many years did you teach there?

**A I taught there about a year-and-a-half. Yes.**

**Then after that I applied for the Classification Parole Officer position.**

Q At Department of Corrections?

**A Yes.**

**At that time they indicated that they were all filled, that I should to get in take the Corrections Officer job.**

Q Did you do that?

**A Yes. I did.**

Q So, when did you start with the Department of Corrections?

**A June of 1984. I don't know the exact date.**

Q Is your family still in this area?

**A Yes.**

Q Are your parents still living?

7

**A My mother.**

Q Living here in D.C.?

**A No. She lives in Landover, Maryland.**

Q Would you tell Dr. Lesansky what positions you have held at the Department of Corrections since you started in June of '84?

**A I held the position as an Officer.**

**Then I escalated to the rank of -- I can't remember the specific title, but a two stripe, a Corporal. I wasn't a Senior. Well, Senior Corrections Officer, not a Lead Corrections Officer. In that position I worked in Receiving and Discharge. That is where I was transferred to.**

**I worked there the majority of the time until I was transferred to the Correctional Community Center on North Capitol and K Street, where I worked as -- what is the program? It was the Halfway Back Program. I worked there as one of the Officers.**

Q What position were you in at the time of the jail escape?

**A Classification Parole Officer.**

**Well, Case Manager.**

8

Q How long had you been a Case Manager?

**A I made Case Manager while I was in the Halfway Correctional Community Center and that was in '88 and from there I was transferred to the Lorton Facility, Central Facility, in October of 1990 and I remained there until it closed.**

Q What were your duties in 2006 as a Case Manager?

**A As a Case Manager I was a Detail Case Manager.**

Q What does that mean?

**A That I screened inmates who were requesting detail placement at the jail, Central Detention Facility.**

Q What training did you have to act as the Detail Case Manager?

**A Well, we had the post orders that dictated the Detail Case Manager, what their duties were.**

**Specific training, I wouldn't say that we had that because we would use the prior training, the experience of being a Case Manager. But we followed the post orders of any inmate requesting a detail**

9

**placement.**

Q So, there was no specific new training for the Detail Case Manager, but you would follow the post orders in your work?

**A Yes.**

Q How many Detail Case Managers were there in 2006?

**A I believe beside myself there was another one, but they placed him in another housing unit. I replaced the one that I basically was a tutelage under.**

Q What were the allegations against you after the jail escape?

**A That I failed to screen the individual. Gross misconduct of my job.**

Q Do you remember which inmate you were accused of misclassifying?

**A Screening? I don't classify. Screening.**

Q I'm sorry. Screening.

**A Joseph Leaks.**

Q What can you tell Dr. Lesansky about your screening of Joseph Leaks for work detail?

10

**A What I do remember is that the post orders indicate we utilize an inmate's record along with the JACCS and the PRISM system.**

**At that time I didn't have all the records because the majority of the records, some of the records, could not be found. And when I asked for assistance from the individuals in the Record Office, they were so busy that they said, well, check over here, check in this section, check over there, check the file cabinets.**

**Records were being moved to and fro because the Record Office recently -- I forget her name. She is a white woman. She took over the jail and records and she reconfigured the Record Office.**

**The Record Office was constantly being reconfigured by supervisors due to the turnover rate of the supervisors. The Record Office is constantly being reconfigured.**

**I must add during that time, or prior to that time, I believe around September of 2005, when DOC had the responsibilities of placing inmates in Halfway Houses and Correctional Community Centers,**

11

**prior to that that was the responsibility of the courts and when we picked up that responsibility we had a difficult time placing individuals in the Correctional Community Centers because we couldn't access all the information, mainly the record, and sometimes the JACCS system would fail and some of the information that was needed in JACCS wasn't input, such as classification or an individual's history or new offenses.**

**So, we had a difficult time in doing this. So, we approached our supervisor. Her name was Ms. Bennett. And she approached her supervisor and said this is the problem that we are experiencing, that we don't have accessibility to the records because we constantly had to look for the records.**

**At that time we were short on detail because individuals who met the basic criteria for detail, those were the ones that were being placed in the Halfway House. So, as we were losing detail, we would try to fill the detail, but they were going to the Halfway Houses. Then on top of that, we had a difficult time because then that became hindered**

12

**because we couldn't find the records.**

**That also transcended on to the Case Managers who were doing classifications because we had a large back-up of individuals who needed to be classified because we couldn't find the records.**

**It has been almost a year. I remember grabbing some records and I know that I said, look, I can't find these records. And we were instructed that if we can't find the record, then we were to rely on the JACCS system and the PRISM system.**

Q JACCS is --

**A Jail Area Community Corrections.**

Q The initials are J-A-C-C-S?

**A Yes. It is.**

Q And the PRISM system is P-R-I-S-M.

**A Yes. Pretrial Information Systems Management.**

Q I am looking at the August 24th, 2006 -- actually I want to find the more recent one. I will use the August 26th. It states that, quote:

"The OIA investigation substantiated the following.

"The OIA further determined that a Separation Order was placed in Inmates Leaks and Jones institutional files and in the JACCS system at the request of the U.S. Attorney's Office on August 26, 2005. This Order required that Inmate Leaks and Jones be kept apart at all times, including while being transported to and from court.

"On February 14th, 2006 you approved Inmate Leaks Personnel Action Request Form for placement on work detail. In the comments section of the form you wrote, quotation marks, "separations (see attached)", close quote.

"During your interview with the OIA Investigators on June 27, 2006 you were asked, quote, "Specifically how do you determine if an inmate is eligible for work detail?" End quote. You stated that you used the NIPS, capital N-I-P-S, Post Order which clearly outlines the eligibility of inmates for possible detail placement. You stated that when you screened Inmate Leaks in February 2006 you utilized the information database system JACCS and PRISM. You acknowledge that you did not use Inmate Leaks

institutional file.

"You explained that when screening an inmate for detail you initially look at his custody level, then his offense, to determine if he has any flags, such as Separation Order or outstanding warrants, detainers, medical flags and prior criminal history.

"You further explained that your responsibility was to screen inmates to determine if they are suitable candidates for placement on work detail. You stated that you either write okay or no on the inmate's NIP Personnel Action Form to indicate eligibility. You admitted that you indicated okay on Inmate Leaks NIPS Personnel Action. You also admitted that you indicated on the form that Inmate Leaks had a Separation Order." End quote.

Is that accurate?

**A Yes.**

Q Now, the charge was that you were negligent in the performance of your duties and that you failed to thoroughly screen Inmate Leaks for an off-duty work detail in accordance with NIPS regulations.

Were you negligent in that process?

**A No.**

Q Could you explain to Dr. Lesansky why you weren't?

**A Sure. I wasn't negligent.**

**First of all, I couldn't find the record. The record could not be found. And again, as I indicated earlier, when I asked for assistance from individuals in the Record Office they were just so busy.**

Q So, what did you use?

**A I used the JACCS and the PRISM database systems.**

Q Now, would a Separation Order have made him ineligible?

**A If his separatee was at the jail.**

Q If what?

**A If the inmates separatee was housed at the jail.**

Q Okay.

**A The NIPS clearly indicates that if an individual has a Separation Order, the separatee is at**

**the jail, he cannot work.**

Q What about Leaks? How was it that he was approved for the detail?

**A Because the separatee was not at the jail.**

Q Where was the separatee?

**A I don't know.**

**The jail, when I utilized the JACCS system, it indicated that, if I can remember, he had three separatees.**

**The JACCS system is color coded. If the inmate's name is in black, that means that he is housed at the Central Detention Facility. If his name is in red, he is no longer housed at the Facility.**

**That is what we were trained back in around '96 or '97 when the JACCS system was being instituted, being incorporated in the jail system.**

Q So, any separatees for Leaks would have been in red?

**A Any separatees for Leaks would have been in black, which indicated that the inmate that any Case Manager is screening has a Separation Order and the separatee is housed in the jail. Not only that. It**

**would give more specific information, the housing unit and the cell number, that that individual, that separatee, is housed in.**

Q So, with Inmate Leaks then, if there was a Separation Order when you reviewed JACCS, it must have been in red, meaning that separatee was not in the jail?

**A Right. The separatee was not housed at the jail at that time.**

Q Now, you didn't have the institutional file, the paper file, for Leaks.

**A No.**

Q Would the paper file have provided any information as to whether the separatees were in the jail or not?

**A As far as the paper file?**

Q Yes.

**A The record itself would have indicated that that individual was housed at the jail. When you utilize the JACCS system in my position as Detail Case Manager that is the first thing. The JACCS will say separations.**

Q Right.

But the institutional file itself might show a Separation Order?

**A Yes. But it is not going to show that the inmate is there.**

Q It is not going to show where the other inmates are?

**A Right. It won't show that.**

Q What are the other criteria that you reviewed?

**A Background. Prior history. And any escapes.**

Q What are the criteria that would exclude someone from work detail besides the Separation Order?

**A The Separation Order. You would look at a parole violation. If they go beyond the excess of the date that is timed, that is indicated in the program statement.**

Q Do you also rely upon the classification?

**A Yes. Classification is very important. That is one of the first, the main focal point, that I look at, the classification. He must be at least**

**medium custody, medium or minimum custody.**

Q Was Leaks medium?

**A Leaks was medium custody.**

Q Now, after you were summarily removed from the Department of Corrections, you applied for worker's compensation benefits; is that correct?

**A Yes. I did.**

Q I'm sorry. You applied for unemployment compensation?

**A Unemployment compensation. Yes.**

Q Did the Department contest your application?

**A Yes. They did.**

Q I am showing you a document that I have given to Dr. Lesansky. It is called the Final Order of the Office of Administrative Hearings in Case Number ES-P-06-105641.

Is this the Final Order in your case?

**A Yes. It is.**

Q Could you tell Dr. Lesansky the position that the Department took initially and what happened at that Hearing?

**A Well, the Department's position was to recommend denial of unemployment benefits.**

Q What reason did they give?

**A Gross misconduct.**

Q Was there testimony at that Hearing by persons from the Department?

**A Yes.**

Q And who testified for the Department?

**A I believe one of the Investigators. I believe her name was Ms. Beard. And my supervisor.**

Q I want to direct your attention to a particular section in the decision at page 10. I have blocked it in yellow.

This makes a reference to the testimony of Leona Bennett, correct?

**A Yes.**

Q She testified?

**A Yes. She did.**

Q And she testified it was not uncommon for the institutional file to be missing; is that correct?

**A Absolutely.**

Q And she testified that in the majority of

cases the NIPS program statement is followed unless the institutional file is unavailable, if the file is unavailable, the staff utilizes other sources such as JACCS and PRISM.

**A Yes.**

Q She testified to that?

**A Yes. She did.**

Q What was the decision of the Hearing Officer in your unemployment compensation case?

**A The judge recommended unemployment benefits based on he couldn't find any grounds of gross misconduct.**

Q Well, there is also a section having to do with the custody level.

**A Yes.**

Q And at page 12 he concludes, quote: "There was no evidence presented to suggest that there was anything in the initial request that should have alerted Claimant, that is you, that Inmate Leaks' custody level was incorrect. Claimant did not deliberately ignore information presented to him. Therefore, Claimant's actions were not deliberate or

willful and were not a disregard for standards of behavior which the employer had a right to expect." End quote.

So, that is a reference to the classification information?

**A Yes, sir.**

Q And then there is a section called Separation Order.

**A Yes.**

Q At the bottom of page 12 the Administrative Judge reports that, quote: "The Investigative Report confirmed that Claimant's testimony was correct about the information he saw." End quote.

That is in the JACCS system?

**A Yes.**

Q He goes on to say, quote: "The investigation further revealed that proper booking procedures were not followed when Inmate Jones was booked into CDF, which resulted in the inmates not being properly highlighted in black as enemies to each other and resulted in their being assigned to the same housing unit." End quote.

Do you remember that evidence?

**A Yes.**

Q It goes on to say, quote: "Claimant had no role in the improper booking or misinformation placed in JACCS. Claimant relied on the institutional electronic record which was incorrect. Employer's suggestion that this could have been remedied by Claimant checking the, quote, "institutional file," unquote, is unpersuasive as the testimony supports that it is the practice of the relevant Department of Corrections employees to rely on the information obtained from JACCS and PRISM. Therefore, Claimant's actions were not deliberate or willful and were not a disregard for standards of behavior which the employee had a right to expect." End quote.

That was the evidence?

**A Yes. That was the evidence.**

Q Then there is a section on Inmate Leaks escape history.

At page 14 the Hearing Judge concludes, quote: "The lack of details regarding an escape in prison, coupled with Inmate Leaks not being placed on

Special Handling status, suggests there may not have been supportable evidence of an escape. In addition, three of Inmate Leaks' reclassifications assigned him zero points for history of escapes or attempts to escape. Therefore, even if it is the Department of Corrections position that an escape history renders an inmate ineligible for off unit detail, there is no evidence that Claimant deliberately or willfully threatened or violated the employer's interests, showed a repeated disregard for the employee's obligation to the employer or disregarded standards of behavior which an employer has a right to expect of its employees as required by 7 DCMR 312.3. Accordingly, I find that Claimant's failure to be aware of or attach significance to Inmate Leaks escape history did not constitute misconduct as defined in the law."

Was that the evidence and finding as you recall it?

**A Yes. That is the evidence and finding as I recall it.**

Q So, therefore, although your employer

contested your application for unemployment benefits, you received them as a result of this proceeding?

**A Yes.**

Q Was the Department of Corrections represented by an attorney?

**A Yes. By I believe Mr. McDougal.**

Q Do you wish to return to the Department of Corrections?

**A Yes.**

Q Dr. Lesansky may have some questions for you.

**A Sure.**

Q But before I give him the floor, is there anything that you haven't had an opportunity to say to Dr. Lesansky that you would like to say now?

**A Well, no. I guess not right offhand. Everything has been said, as I said before, in the initial investigation that I did follow the protocol as dictated in the program statement and that I made a decision on what information that was available to me, the information that was available in the database system.**

Q I provided Dr. Lesansky a copy of the Final Order from the Office of Administrative Hearings for his use in making his decision.

**A Okay.**

DR. LESANSKY: Thank you.

I wanted to ask you about as a Detail Case Manager if you could tell me a little bit in more detail everything that that entails.

MR. BRYANT: Basically it is supplying the Central Detention Facility with eligible qualified, quote-unquote, "laborers" to assist in maintaining the Facility.

As indicated in the program statement, we have a protocol to follow. And that is based on the individual's custody, the individual's offensive history, if there is an escape history, and basically behavior because the individual's offensive history entails giving a picture, a snapshot, of an individual's behavior on listening to or being observant to orders or following the Officer's orders.

And the majority of the time the individuals who I recommend -- I don't approve. I

only recommend individuals who could be considered for detail. The final word falls on the Deputy Warden for Support Services.

EXAMINATION

BY MR. HANNON:

Q I'm sorry. Could you explain that?

Your word is not the final word?

**A No. I do not have the final word.**

**What I do, I only recommend to the Deputy Warden for Support Services that this individual could be considered for detail. I am not the final authority.**

Q Who was the Deputy Warden who approved Leaks?

**A At the time it was Mr. Michael DuBois. He is the final authority.**

**I mean, there have been times that I may have considered individuals may be an excellent or an outstanding prospective candidate for detail and he might say, no, I don't need him, I don't want him on detail.**

**I don't question his authority. There must**

**be a reason.**

Q We stated in the letter we sent Dr. Lesansky, this is at page 7 of the letter, quote: "At the time of the escape the position" -- I'm sorry. Let me back-up.

Now I am quoting from my letter.

"The final authority for assigning that inmate to the detail belongs to the Deputy Warden. At the time of the escape the position was filled by Patricia Timony."

**A No. Ms. Timony, at that time she was, if I can recollect, she was the Deputy Warden for Case Management Services. Mr. DuBois was the Deputy Warden for Support Services.**

Q At the time of the escape?

**A At the time of the escape Ms. Timony I believe she was acting for Mr. DuBois. I really can't recollect.**

Q My recollection is that at the time of your approval of Leaks for the detail, perhaps Michael DuBois was responsible for reviewing that, but at the time of the escape Patricia Timony was in that

position.
**A I believe so. I remember she was in that position.**
Q Then what we said in our letter is, quote: "Coincidently Ms. Timony was allowed to retire abruptly after the escape." End quote.
**A Yes. Absolutely.**
Q Is that true?
**A That is so true.**
**I was surprised when that happened.**
**Furthermore, to go on, it is true that we utilized the record and we utilized the electronic database systems.**
**I do not classify inmates. When they come to the Detail Housing Unit they are already classified.**
Q The report indicated that there was an error made at the time of Jones booking.
**A Yes.**
Q Was that person disciplined, to your knowledge?
**A No. That falls on either Personnel in ADP**

**or the Records Office.**
**I was surprised because at the time I guess when the media fan fired it all over the world the time that I screened him and the time of the escape we are looking at a period of from February, March, April, May, June. The question is we don't know when Mr. Jones came back to the jail. But normally the procedures are once any inmate, if he has a Separation Order, and that separatee, let's say, for instance, if he is transferred to another facility or another jurisdiction, he comes back to the jail, that separatee, his color is automatically changed from red to black citing that he is at the jail.**
Q But when does someone who is on work detail have his situation reviewed?
**A Well, that is by the NIPS Officer. The NIPS Officer, he would have caught that.**
Q How soon after the return?
**A Probably within less than -- I am just sort of speculating. I am thinking less than 24 hours.**
Q Were you aware of any pressure to put inmates on work detail to get the jail cleaned up for

accreditation?
**A Yes.**
**As a matter of fact, as I indicated earlier, back in September of '05 we were hard-pressed to fill those Community Centers up with inmates because the agency was throwing away money if we didn't have those beds filled.**
Q I am talking about inmates on cleanup detail in the jail.
**A Yes. Yes. And we were losing them. We were drastically short on inmate detail. And I couldn't screen them because our supervisors told us, which comes from what we consider downtown, which is the executive head of the agency, that we want inmates who meet the eligible qualifications for community house placement, we want them moved.**
Q And so that explains your earlier statement about pushing people out into the community facilities you are draining your population of persons that are eligible for work detail?
**A We were draining our detail resource.**
Q We have heard earlier from another

individual that the person in charge of getting the jail cleaned up was going to a population of prisoners that were likely to be there on longer sentences in order to have persistence in the work staff.
**A I have heard of that, Mr. Hannon. Do I explicitly know? No. I don't. But I have heard that was done. I don't know who was in charge of that.**
**I do know that if they did do that, they were outside of the guidelines of the program statement because everything had to follow the protocol of every inmate being placed on detail.**
**Because there is a chance that someone could say, well, who are you, do you want to work for this day or do you want to work for a week, and grabbing someone out of the housing unit, they could be separated from someone maybe on the first, second or third floor.**
**So, I have heard of that. But do I know of that? That I really don't know because you have to follow the protocol for an inmate to be placed on detail.**
Q Were you aware of your superiors

temporarily drafting people for work details?

**A Again I have heard rumors of that. But that specifically I don't know. Because whoever did it, they were out of the guideline. They were basically dead wrong in doing that.**

Q Well, you don't know the details?

**A I don't know the details.**

DR. LESANSKY: Thank you.

I was trying to get back a little bit to sort of increase my understanding about the Detail Case Manager and their duties and responsibilities and their level of expertise in terms of what the screening is all about and why the screening is performed and at least from what you know, is it significant, what is its role in the process.

I did understand you to say that the bottom line is obviously that, according to what you said, that you merely recommend.

MR. BRYANT: Yes.

MR. LESANSKY: That your job is to recommend candidates. Not you personally, but that position.

MR. BRYANT: Yes. I recommend if they are within the parameters of a placement for detail.

Basically what I look for is character. I look at an inmate's record. First I am looking for any detainers, looking for any Separation Orders. I am looking for any red flags or anything that is out of the norm. I look for if the inmate might have incurred any disciplinary infractions. I look for if an inmate might have besides some disciplinary infractions, may have some medical. But basically medical is not listed in there. I am looking for his classification, minimum, medium or max. I am looking for basically anything outside the norm of the program statement. That is basically what I am looking for.

Then from there I go to the electronic files to see if the information in the record is running parallel with the information in the electronic database systems.

I am looking for escapes. I am looking for education levels. I am looking for if the inmate might have submitted a positive urine sample. I am looking for all of these components.

Then I go and look at prior history of offenses and that entails, for instance, if an inmate may have a history of violence or a history of substance abuse or just petty or misdemeanor offenses.

MR. LESANSKY: And that all comes from the electronic record?

MR. BRYANT: That comes from the electronic record.

So, basically the record indicates the inmate's commitment papers, separation orders, escape history, disciplinary infractions and possibly urine samples and a copy of his classification, which is done by a Case Manager when he comes into the jail as a new intake.

MR. LESANSKY: And that is in the electronic record also?

MR. BRYANT: No. Not necessarily.

I mean, the paper file of the classification, yes, that is there.

MR. LESANSKY: But the results of it and the scoring is all in the electronic?

MR. BRYANT: It is all in the electronic

file. Absolutely.

MR. LESANSKY: How many screenings had you done?

I mean, I am not looking for an exact number.

MR. BRYANT: I can't give you an exact number, but I can assure you that normally I attempt to screen inmates daily unless my supervisor says we have some other pressing situation that we have to attend to. Normally I may screen approximately anywhere from 30 to 40 requests, trying to do it per day, but normally out of the five-day week I try to do it at least three times.

MR. LESANSKY: So, during the time that you were the Detail Case Manager, how many years was that did you say?

MR. BRYANT: This was going on approximately about 17 years.

MR. LESANSKY: Could you just give me some kind of a rough idea of how many of these screenings/recommendations that you recommend?

MR. BRYANT: That I recommend when I do

screening?

MR. LESANSKY: No. I am actually trying to find out, one, how many screenings roughly that you have done.

MR. BRYANT: Since that time?

MR. LESANSKY: Yes. During the time that you describe yourself as a Detail Case Manager.

MR. BRYANT: That is a broad number that I gave you. Normally it could be in excess of 130 or sometimes 140 per week.

MR. LESANSKY: 140 per week?

MR. BRYANT: Per week.

MR. LESANSKY: So, doing the math, you are saying 50 weeks a year or 48?

MR. BRYANT: Let's say, for instance, if we say 140 per week multiplied by four, we are looking at --

MR. LESANSKY: That would be 5,000?

MR. BRYANT: Yes.

MR. LESANSKY: In a year?

MR. BRYANT: That is possible.

MR. LESANSKY: Does that sound credible or

reasonable?

MR. BRYANT: It is credible because when inmates come in they don't want to be in the cells, they want to be out on detail, so at least they can walk around in the jail. If they are minimum custody, there is a possibility they could be working outside the jail.

MR. LESANSKY: So 5,000 a year would not be crazy? That wouldn't sound strange?

MR. BRYANT: It wouldn't sound strange. But I really don't keep statistics.

MR. LESANSKY: I know.

MR. BRYANT: That sounds plausible.

MR. LESANSKY: And you did that for many years?

MR. BRYANT: Well, no. Not many. The only time I did that was when I was assigned as a Detail Case Manager for that.

As a matter of fact, when I was assigned a Detail Case Manager, it was in '05. As a matter of fact, it was early spring of '05. It was around that time, early spring. I really can't give you the exact

or specific month, but I know it was becoming warm outside.

MR. LESANSKY: So, from the early spring of '05 until June of '06 you were a Detail Case Manager?

MR. BRYANT: Yes. Recently assigned.

MR. LESANSKY: So, that is a little over a year?

MR. BRYANT: Close. About close to a year.

MR. LESANSKY: Can you tell me in your normal routine for doing your screening how often would you not be able to find, use, or include a review of the institutional record?

MR. BRYANT: I will tell you that is a good question that you ask because when I look for the records it depends on what the need of the Record Office is. Because sometimes the Record Office needs those records immediately.

So, normally I attempt to screen inmates during mid morning when the Record Office is somewhat slow because in the afternoon they start picking up, they start releasing inmates, information is coming back and forth from the courts to the Record Office,

from the Record Office to the courts.

But I could tell you each time I would attempt to look for the records some I find and some I don't find. And I have complained about that, as Mr. Hannon had indicated, in my unemployment hearing. I submitted that to my supervisor that it is difficult to find records.

Ms. Daily, when I go in there, Mr. Bryant, just look over here, look over there, they should be in these files. If it is not in the file, well, we can't get to you, you have to wait, because we have priority business we have to attend to in the Record Office as far as releases, transfers, detainers, and so forth.

MR. LESANSKY: Was it in a majority of the cases you would be able to find the record or it was found for you?

MR. BRYANT: A majority of the cases I found them. I would say 50/50.

MR. LESANSKY: You would say 50/50?

MR. BRYANT: Well, let's go like 60/40.

MR. LESANSKY: Okay.

MR. BRYANT: I would find the records or someone would assist me in finding the records.

But during that particular time when we were placing individuals in the Correctional Community Centers records were being difficult to find. In some cases we would have to force the Warden's hands to tell the person who was in charge of the Record Office to find the records that we need.

MR. HANNON: Let me intervene here and ask a question.

EXAMINATION

BY MR. HANNON:

Q How many Detail Case Managers were there? Just one or two?

**A I was the only one.**

Q You were the only one.

How many Case Managers were there?

**A We were short on Case Managers too.**

**Technically from what I understand we should have had about approximately 18 case managers, but we were short. I know we were short. We didn't meet that quota.**

**I can't remember how many Case Managers we were short. Maybe three.**

Q How many people staffed the Records Office where the institution files were kept?

**A I am not too sure what the quota is, but I know they were always short.**

Q Is it your understanding that if the Case Manager load was fully staffed, that would be 18 Case Managers?

**A Yes.**

Q And one Detail Case Manager.

That would mean that you might have 19 people who would be going into the Records Office to find institutional files?

**A Yes.**

**The Case Managers are going in every hour on the hour attempting to look for records and the frustration that we had is that we couldn't find the records.**

MR. HANNON: Okay.

DR. LESANSKY: Mr. Bryant, in the 60 percent roughly of the cases where you were able to

go to the institutional record and look at it, was it helpful?

MR. BRYANT: Yes.

You mean finding the records in what I do?

MR. LESANSKY: Yes.

MR. BRYANT: Yes. It was always helpful.

But basically the record only entailed the inmate's commitment papers. Let's say if he didn't have a separation or if he didn't have any flags, whereas a new inmate's will say you will do let's say 12 months at the jail and the only thing you would find in there is the court papers bringing that individual to the jail. And then you would find if he didn't have any flags, basically other court information papers. Sometimes if he had a detainer, sometimes the detainers didn't come until late. Sometimes Separation Orders were there.

If when I interviewed the inmate he said I have a Separation Order, and I may look at the record and say, what Separation Order, then I have to immediately notify my supervisor and then I will notify the Record Office and the Adjustment Board

Chairman that this subject indicated that he has a separatee but it is not listed in the record, we have to do an Emergency Housing Hearing on it to pursue a separation. Sometimes we were working with incomplete records.

For instance, if an individual may request detail and I look on the electronic file and I don't see any detainers, then all of a sudden the Record Office may call me and say: Hey, look, Mr. Bryant, you have Joe Blow's file? I will say yes. Is it D.C. number 123456? Yes. You have to bring it down here because we just got a detainer let's say from another jurisdiction.

MR. LESANSKY: So, you are saying that the institutional record is useful?

MR. BRYANT: It is useful as far as commitment, making sure that the individual is properly and lawfully committed to the jail. And it does have Separation Orders, it has escapes and it has other pertinent information.

MR. LESANSKY: So, you are saying it is things like Separation Orders and escapes would be

45

things that you would find in the institutional record?

MR. BRYANT: Yes. You would find them if the information came with the inmate, if all the information has come with him when he has been committed by the courts to the D.C. Jail. Because sometimes that information will come hours later or sometimes days later.

That is the reason why in my situation when I looked at Mr. Leaks custody score, it was medium. I saw the separations. I immediately go to the separations. And I say, okay, are his separatees here?

Now, I have to trust the people because the people in the Record Office input that information. I only have basically reading rights. I don't have input rights. I only have reading rights. So, the information that is placed in there I have to give faith on it that this information was screened by the Record Office and that it is true.

MR. LESANSKY: So, you are saying you have to have a certain amount of faith that the information

46

there is true?

MR. BRYANT: Yes.

And I still say to this day, even though I am on administrative leave, I still have faith in the personnel in the Record Office. I do. I still have faith in the electronic database system.

MR. LESANSKY: In your experience did you ever find any errors in the electronic record?

MR. BRYANT: Only for this particular time, this specific time with Inmate Leaks. The majority of the time I find that the database system is pretty accurate. But this particular time is the only time that it has failed me.

EXAMINATION

BY MR. HANNON:

Q To your knowledge?

**A To my knowledge that it has failed me.**

**I don't know about the other Case Managers. I can speak for me specifically.**

**That is the reason why when I didn't see the separatees from Inmate Leaks, they were not at the jail, I took it as faith that they were not there.**

47

**That is the reason that I indicated, okay, he could be considered, however, he has separations, if any of those separatees that he is separated from would come from any jurisdiction, if they come back to the jail, Inmate Leaks is to be immediately removed and the NIPS Officer would have done that.**

Q And that is why you included a printout of the JACCS?

**A Yes. I always give a printout of any inmate who has Separation Orders and they are no longer at the jail, so that in turn if that inmate, the separatee, comes back to the jail, that inmate is immediately removed from detail.**

Q Understood.

DR. LESANSKY: I guess my last question is when you go to look for the institutional record, and I heard you say earlier that in your case you even try to schedule kind of when you look for it when you know at least sometimes when the Record Office isn't as busy, because you are trying to look at the record, you are trying to get the record.

MR. BRYANT: Yes.

48

MR. LESANSKY: When you look for it and you don't find it, then you proceed with doing what you are doing with the electronic record?

MR. BRYANT: No. I ask for assistance from any personnel in the Records Office.

MR. LESANSKY: And then if they are not able to help you, at least in the time frame that you are working with, you will then rely on the electronic?

MR. BRYANT: Well, I will rely on it, but if they tell me, okay, Mr. Bryant, give us about a couple of minutes, I will say, okay, I will go and use these records that I have here and when you finish doing what you need to do, could you assist me, and have time to assist me in looking for the record?

But I remember during that particular time we were just under so much pressure. Even the Record Office was so much under pressure. Things were being moved, reconfigured, moved again, reassigned again. The Record Office personnel was going from one shift to another.

It didn't have any hindering because the

Record Office personnel is the Record Office personnel. But we were left at our own will to find records.

MR. LESANSKY: But you generally once you either looked for it yourself or you asked for the assistance and you are not able to get the record, for whatever reason, you don't generally go back, do you, later on?

MR. BRYANT: Yes.

MR. LESANSKY: And try and get it?

MR. BRYANT: Yes.

The majority of my time during the course of an eight hour day I believe about a third of that is in the Record Office.

MR. LESANSKY: But after you make a recommendation you wouldn't go back and look for it, would you? Once you make your recommendation that is it?

MR. BRYANT: That is it. I will proceed forward. And if anything comes up a day or hours later, then I would double review whatever may come up.

But the majority of my time was in the Record Office and I was reviewing records and searching for records.

DR. LESANSKY: Okay.

I think that is it.

MR. HANNON: Thank you very much.

We are off the record.

(Whereupon, at 12:30 p.m. the proceedings adjourned.)

CERTIFICATE OF REPORTER

I, Paula J. Eastes, the reporter by whom the foregoing proceedings were reported, do hereby certify that these proceedings were reported by me verbatim and thereafter reduced to typewriting under my direction; that this transcript is a true and accurate record of such proceedings; that I am neither counsel for, related to, nor employed by, any of the parties to the action in which this proceeding was held, nor financially or otherwise interested in the outcome of this action.

PAULA J. EASTES

A

**able** 39:11 40:16 42:22 48:7 49:6
**abruptly** 29:6
**Absolutely** 20:21 29:7 36:1
**abuse** 35:4
**access** 11:5
**accessibility** 11:14
**accreditation** 31:1
**accurate** 14:17 46:12 51:7
**accused** 9:17
**acknowledge** 13:22
**act** 8:15
**acting** 28:17
**action** 13:9 14:12 14:14 51:10,12
**actions** 21:22 23:13
**add** 10:19
**addition** 24:2
**adjourned** 50:9
**Adjustment** 43:22
**administrative** 19:16 22:10 26:2 46:4
**Administrator** 1:14
**admitted** 14:13 14:14
**ADP** 29:22
**afternoon** 39:20
**agency** 31:6,14
**agreement** 2:18
**Al** 4:21
**alerted** 21:19
**allegations** 9:12
**allowed** 29:5
**Alphonso** 1:5 2:1 3:3 4:3
**amount** 45:22
**answers** 4:15
**apart** 13:6
**application** 19:12 25:1
**applied** 6:8 19:5,8
**approached** 11:11,12
**approval** 28:20
**approve** 26:22
**approved** 13:8 16:3 27:13
**approximately** 36:10,18 41:20
**April** 30:6
**area** 6:20 12:12
**Arts** 5:1
**asked** 10:6 13:14 15:8 49:5
**assigned** 22:21 24:3 38:17,19 39:5
**assigning** 28:7
**assist** 4:11 26:11 41:2 48:14,15
**assistance** 10:7 15:8 48:4 49:6
**assure** 36:7
**attach** 24:15
**attached** 13:11
**attempt** 36:7 39:18 40:3
**attempting** 42:17
**attempts** 24:4
**attend** 36:10 40:12
**attention** 20:11
**attorney** 4:4 25:5
**Attorney's** 13:4
**August** 12:18,20 13:4
**authority** 27:12 27:16,22 28:7
**automatically** 30:12
**available** 25:20 25:21
**Avenue** 1:15 2:6
**aware** 24:15 30:21 32:22
**a.m** 1:10

B

**B** 1:12
**back** 5:4 6:1 7:17 16:14 30:7,11 31:4 33:9 39:22 47:4,12 49:7,16
**background** 4:18 4:22 18:11
**back-up** 12:4 28:5
**based** 21:11 26:14
**basic** 11:17
**basically** 9:10 26:9,16 33:5 34:3,10,13,14 35:9 43:7,14 45:16
**Beard** 20:10
**becoming** 39:1
**beds** 31:7
**BEHALF** 3:3
**behavior** 22:2 23:14 24:12 26:17,19
**believe** 9:8 10:20 20:9,10 25:6 28:17 29:2 49:13
**belongs** 28:8
**benefits** 19:6 20:2 21:10 25:1
**Bennett** 11:12 20:15
**beyond** 18:16
**bit** 4:11 26:7 33:9
**black** 16:11,20 22:20 30:13
**blocked** 20:13
**Blow's** 44:10
**Board** 43:22
**booked** 22:19
**booking** 22:17 23:4 29:18
**bottom** 22:10 33:16
**briefly** 5:3,21
**bring** 44:11
**bringing** 43:12
**broad** 37:8
**brought** 4:12
**Bryant** 1:5 2:1 3:3 4:3,3,10,21 26:9 33:19 34:1 35:7,17,22 36:6 36:17,22 37:5,8 37:12,15,19,21 38:2,10,13,16 39:5,8,13 40:8 40:18,21 41:1 42:21 43:3,6 44:9,16 45:3 46:2,9 47:22 48:4,10,11 49:9 49:11,19
**BS** 4:22 5:14
**Building** 2:5
**Burroughs** 5:5,6
**business** 40:12
**busy** 10:8 15:10 47:20

C

**C** 3:1 4:1
**cabinets** 10:10
**call** 44:9
**called** 19:15 22:7
**Calvin** 5:10
**candidate** 27:19
**candidates** 14:10 33:21
**can't** 7:8 12:8,9 28:17 36:6 38:22 40:11 42:1
**capital** 13:17
**Capitol** 7:16
**case** 7:22 8:1,2,7 8:9,9,16,18,21 9:3,6 12:2 16:20 17:20 19:16,18 21:9 26:6 28:12 33:11 35:13 36:15 37:7 38:18,20 39:4 41:13,17,18,20 42:1,7,8,11,16 46:18 47:17
**cases** 21:1 40:16 40:18 41:6 42:22
**caught** 30:17
**CDF** 22:19
**cell** 17:2
**cells** 38:3
**Center** 7:16 8:3
**Centers** 10:22 11:4 31:5 41:5
**Central** 8:5,13 16:12 26:10
**certain** 45:22
**CERTIFICATE** 51:1
**certify** 51:4
**Chairman** 44:1
**chance** 32:12
**changed** 30:12
**character** 34:3
**charge** 14:19 32:1 32:7 41:7
**check** 10:8,9,9,9
**checking** 23:8
**citing** 30:13
**Claimant** 21:19 21:20 23:3,5,8 24:8
**Claimant's** 21:22 22:12 23:12 24:14
**classification** 6:9 7:21 11:8 18:19 18:20,22 22:5 34:12 35:12,19
**classifications** 12:3
**classified** 12:5 29:16
**classify** 9:18 29:14
**cleaned** 30:22 32:2
**cleanup** 31:8
**clearly** 13:18 15:21
**close** 13:12 39:8,8
**closed** 8:6
**coded** 16:10
**Coincidently** 29:5
**color** 16:10 30:12
**Columbia** 1:1,14

**come** 29:14 38:3 43:16 45:5,7 47:4,4 49:21
**comes** 30:11 31:13 35:5,7,13 47:12 49:20
**coming** 39:21
**comments** 13:10
**commitment** 35:10 43:8 44:17
**committed** 44:18 45:6
**community** 7:15 8:3 10:22 11:4 12:12 31:5,15 31:18 41:4
**compensation** 19:6,9,10 21:9
**complained** 40:4
**components** 34:22
**concludes** 21:16 23:20
**confirmed** 22:12
**consider** 31:13
**considered** 27:1 27:11,18 47:2
**constantly** 10:15 10:17 11:15
**constitute** 24:16
**contest** 19:11
**contested** 25:1
**Coolidge** 5:10,12 5:13
**copy** 26:1 35:12
**Corporal** 7:10
**correct** 19:6 20:15,20 22:12
**Correctional** 7:15 8:3 10:22 11:4 41:4
**Corrections** 1:1 1:15 2:4 4:19 6:10,14,18 7:5 7:11,11 12:12 19:5 23:11 24:6 25:4,8
**couldn't** 11:4 12:1 12:5 15:6 21:11 31:12 42:18
**counsel** 51:8
**couple** 48:12
**coupled** 23:22
**course** 49:12
**court** 2:19 13:7 43:12,14
**courts** 11:2 39:22 40:1 45:6
**crazy** 38:9
**credible** 37:22 38:2
**criminal** 14:6
**criteria** 11:17 18:9,13
**custody** 14:3 19:1 19:1,3 21:14,20 26:15 38:5 45:10

**D**

**D** 4:1
**daily** 36:8 40:8
**database** 13:21 15:12 25:21 29:13 34:18 46:6,11
**date** 6:19 18:17
**day** 32:14 36:12 46:3 49:13,20
**days** 45:8
**DCMR** 24:13
**dead** 33:5
**decision** 20:12 21:8 25:20 26:3
**defined** 24:16
**degree** 4:22 5:14
**deliberate** 21:22 23:13
**deliberately** 21:21 24:8
**denial** 20:2
**Department** 1:1 1:14 2:4 6:10,17 7:5 19:5,11,21 20:6,8 23:10 24:5 25:4,7
**Department's** 20:1
**depends** 39:15
**Deputy** 27:2,9,13 28:8,12,13
**describe** 37:7
**detail** 8:9,13,16 8:18,22 9:3,6,22 11:16,18,19,20 13:10,16,19 14:3,11,22 16:3 17:20 18:14 24:7 26:6,8 27:2 27:11,19,21 28:8,20 29:15 30:14,22 31:9 31:11,20,21 32:11,21 33:10 34:2 36:15 37:7 38:4,17,20 39:4 41:13 42:11 44:7 47:13
**details** 23:21 33:1 33:6,7
**detainer** 43:15 44:12
**detainers** 14:6 34:5 40:13 43:16 44:8
**Detention** 8:13 16:12 26:10
**determine** 13:15 14:4,9
**determined** 13:1
**dictated** 8:17 25:19
**didn't** 10:4 17:10 31:7 41:21 43:8 43:9,14,16 46:20 48:22
**difficult** 11:3,10 11:22 40:6 41:5
**direct** 4:15 20:11
**direction** 51:7
**Discharge** 7:12
**disciplinary** 34:8 34:9 35:11
**disciplined** 29:20
**disregard** 22:1 23:14 24:10
**disregarded** 24:11
**District** 1:1,14
**DOC** 10:21
**document** 19:14
**doing** 11:10 12:3 33:5 37:13 39:10 48:2,3,14
**don't** 4:10 6:19 9:18 11:14 16:6 26:22 27:20,20 27:22 30:6 32:6 32:7,19 33:3,6,7 38:3,11 40:4 44:7 45:16 46:18 48:2 49:7
**double** 49:21
**downtown** 31:13
**Dr** 4:4,11,15 7:4 9:21 15:3 19:15 19:20 25:10,15 26:1,5 28:3 33:8 42:21 47:15 50:4
**drafting** 33:1
**draining** 31:19,21
**drastically** 31:11
**DuBois** 27:15 28:13,17,21
**due** 10:16
**duties** 8:7,18 14:20 33:11
**D.C** 1:8,16 2:4,8 3:8 5:4,4,8,11 6:1,2 7:2 44:10 45:6

**E**

**E** 1:12,12 3:1,1 4:1,1
**earlier** 15:8 31:4 31:17,22 47:17
**early** 38:21,22 39:3
**Eastes** 1:22 2:19 51:3,16
**education** 4:18 34:20
**eight** 49:13
**either** 14:11 29:22 49:5
**electronic** 23:6 29:12 34:15,18 35:6,7,16,21,22 44:7 46:6,8 48:3 48:9
**eligibility** 13:18 14:13
**eligible** 13:16 26:10 31:15,20
**Emergency** 44:3
**employed** 51:9
**employee** 23:14
**employees** 23:11 24:13
**employee's** 24:10
**employer** 22:2 24:11,12,22
**employer's** 23:6 24:9
**enemies** 22:20
**entailed** 43:7
**entails** 26:8,18 35:2
**error** 29:18
**errors** 46:8
**escalated** 7:8
**escape** 7:20 9:13 23:19,21 24:2,5 24:6,15 26:16 28:4,9,15,16,22 29:6 30:4 35:10
**escapes** 18:12 24:4 34:19 44:19,22
**ESQUIRE** 3:5
**ES-P-06-105641** 19:17
**evidence** 21:17 23:1,16,17 24:2 24:8,18,20
**exact** 6:19 36:4,6 38:22
**EXAMINATION** 4:7 27:4 41:11 46:14
**excellent** 27:18
**excess** 18:16 37:9

**exclude** 18:13
**executive** 31:14
**expect** 22:2 23:15 24:12
**experience** 4:19 8:21 46:7
**experiencing** 11:13
**expertise** 33:12
**explain** 15:3 27:6
**explained** 14:2,8
**explains** 31:17
**explicitly** 32:6

**F**

**F** 1:12
**facilities** 31:18
**facility** 8:5,5,14 16:12,13 26:10 26:12 30:10
**fact** 31:3 38:19,21
**fail** 11:6
**failed** 9:14 14:20 46:13,17
**failure** 24:14
**faith** 45:19,22 46:4,6,22
**falls** 27:2 29:22
**family** 6:20
**fan** 30:3
**far** 17:16 40:13 44:16
**February** 13:8,20 30:5
**file** 10:10 14:1 17:11,11,13,16 18:2 20:20 21:2 21:2 23:8 35:18 36:1 40:10 44:7 44:10
**files** 13:3 34:16 40:10 42:4,14
**fill** 11:20 31:5
**filled** 6:13 28:9 31:7
**final** 19:15,18 26:1 27:2,7,8,11 27:16 28:7
**financially** 51:11
**find** 12:1,5,8,9,19 15:6 21:11 24:14 37:3 39:11 40:3,4,7 40:16 41:1,5,8 42:14,18 43:12 43:13 45:1,3 46:8,11 48:2 49:2
**finding** 24:18,20 41:2 43:4
**finish** 48:13
**fired** 30:3
**first** 4:17 15:6 17:21 18:21 32:16 34:4
**five-day** 36:12
**flags** 14:5,6 34:6 43:9,14
**floor** 25:13 32:17
**focal** 18:21
**follow** 9:3 25:18 26:14 32:10,20
**followed** 8:21 21:1 22:18
**following** 12:22 26:20
**force** 41:6
**foregoing** 51:4
**forget** 10:12
**form** 13:9,10 14:12,15
**forth** 39:22 40:14
**forward** 49:20
**found** 10:6 15:7 40:17,19
**four** 37:16
**frame** 48:7
**fro** 10:11
**frustration** 42:18
**fully** 42:8
**further** 13:1 14:8 22:17
**Furthermore** 29:11

**G**

**G** 4:1
**generally** 49:4,7
**getting** 32:1
**give** 17:1 20:3 25:13 36:6,19 38:22 45:18 47:9 48:11
**given** 19:15
**giving** 26:18
**go** 5:9 18:16 29:11 34:15 35:1 40:8,21 43:1 45:11 47:16 48:12 49:7,16
**goes** 22:16 23:3
**going** 4:9 11:20 18:4,6 32:2 36:17 42:13,16 48:20
**good** 39:13
**grabbing** 12:7 32:15
**graduate** 5:12,17
**graduated** 5:2,13
**Graphic** 5:1
**grew** 5:8
**Grimke** 2:5
**gross** 9:15 20:4 21:11
**grounds** 21:11
**Group** 3:6
**grow** 5:7
**guess** 25:16 30:2 47:15
**guideline** 33:4
**guidelines** 32:9

**H**

**Halfway** 7:17 8:3 10:22 11:19,21
**handle** 4:9
**Handling** 24:1
**hands** 41:6
**Hannon** 3:5,6 4:2 4:4,8 27:5 32:5 40:5 41:9,12 42:20 46:15 50:6
**happened** 19:21 29:10
**hard-pressed** 31:4
**haven't** 25:14
**head** 31:14
**Health** 1:14
**heard** 31:22 32:5 32:6,18 33:2 47:17
**hearing** 1:13 4:2 4:5 19:22 20:5 21:8 23:20 40:5 44:3
**Hearings** 19:16 26:2
**held** 2:1 7:5,7 51:10
**Helen** 5:5
**Hellen** 5:6
**help** 48:7
**helpful** 43:2,6
**Henry** 1:13 4:4
**Hey** 44:9
**high** 5:9,10
**highlighted** 22:20
**hindered** 11:22
**hindering** 48:22
**history** 11:8 14:7 18:11 23:19 24:4,6,16 26:16 26:16,17 35:1,3 35:3,11
**home** 6:1
**hour** 42:16,17 49:13
**hours** 30:20 45:7 49:20
**house** 11:19 31:16
**housed** 15:18 16:12,13,22 17:3,8,19
**Houses** 10:22 11:21
**housing** 9:9 17:1 22:22 29:15 32:15 44:3

**I**

**idea** 36:20
**ignore** 21:21
**immediately** 39:17 43:21 45:11 47:5,13
**important** 18:20
**improper** 23:4
**incident** 4:12
**include** 39:11
**included** 47:7
**including** 13:6
**incomplete** 44:4
**incorporated** 16:16
**incorrect** 21:20 23:6
**increase** 33:10
**incurred** 34:8
**indicate** 10:2 14:12
**indicated** 6:12 14:13,15 15:8 16:8,20 17:18 18:17 26:13 29:17 31:3 40:5 44:1 47:1
**indicates** 15:21 35:9
**individual** 9:14 15:22 17:2,19 27:10 32:1 43:13 44:6,17
**individuals** 10:7 11:3,17 12:4 15:9 26:22 27:1 27:18 41:4
**individual's** 11:8 26:15,15,17,19
**ineligible** 15:15 24:7
**information** 11:5 11:7 12:16 13:21 17:1,14 21:21 22:5,13 23:11 25:20,21 34:16,17 39:21 43:15 44:20 45:4,5,7,15,18 45:19,22
**infractions** 34:8 34:10 35:11

**initial** 21:18 25:18
**initially** 5:2 14:3 19:21
**initials** 12:13
**inmate** 8:22 9:16 13:5,8,15,20,22 14:3,14,15,21 16:20 17:4 18:5 21:19 22:18 23:18,22 24:3,7 24:15 28:8 30:8 31:11 32:11,20 34:7,9,20 35:2 43:18 45:4 46:10,21 47:5 47:10,11,12
**inmates** 8:12 10:21 13:2,18 14:9 15:18 18:7 22:19 29:14 30:22 31:5,8,14 36:8 38:3 39:18 39:21
**inmate's** 10:2 14:12 16:11 34:4 35:10 43:8 43:10
**input** 11:7 45:15 45:17
**instance** 30:9 35:2 37:15 44:6
**instituted** 16:15
**institution** 42:4
**institutional** 13:3 14:1 17:10 18:2 20:20 21:2 23:5 23:8 39:12 42:14 43:1 44:15 45:1 47:16
**instructed** 12:8
**intake** 35:14
**interested** 51:11
**interests** 24:9
**intervene** 41:9
**interview** 13:13
**interviewed** 43:18
**investigation** 12:21 22:17 25:18
**Investigative** 22:11
**Investigators** 13:14 20:9
**isn't** 47:19
**I'm** 9:19 19:8 27:6 28:4

**J**

**J** 1:22 2:18 3:5 4:4 51:3,16
**JACCS** 10:3 11:6 11:7 12:10,11 13:3,21 15:12 16:7,10,15 17:5 17:20,21 21:4 22:14 23:5,12 47:8
**jail** 7:20 8:13 9:13 10:13 12:12 15:16,19 16:1,4 16:7,16,22 17:7 17:9,15,19 30:7 30:11,13,22 31:9 32:2 35:13 38:5,7 43:11,13 44:18 45:6 46:22 47:5,11 47:12
**job** 1:20 6:14 9:15 33:20
**Joe** 44:10
**Jones** 13:2,5 22:18 29:18 30:7
**Joseph** 9:20,22
**judge** 21:10 22:11 23:20
**July** 1:9
**June** 5:13 6:19 7:6 13:14 30:6 39:4
**jurisdiction** 30:11 44:13 47:4
**J-A-C-C-S** 12:13

**K**

**K** 7:16
**keep** 38:11
**kept** 13:6 42:4
**kind** 36:20 47:18
**know** 6:19 12:7 16:6 30:6 32:6,7 32:8,18,19 33:3 33:6,7,14 38:12 39:1 41:21 42:6 46:18 47:18
**knowledge** 29:21 46:16,17

**L**

**laborers** 26:11
**lack** 23:21
**Landover** 7:3
**large** 12:4
**late** 43:16
**law** 3:6 24:17
**lawfully** 44:18
**Lead** 7:11
**Leaks** 9:20,22 13:2,5,9,20,22 14:14,15,21 16:2,17,19 17:4 17:11 19:2,3 21:19 23:18,22 24:3,15 27:14 28:20 45:10 46:10,21 47:5
**leave** 46:4
**left** 49:2
**Leona** 20:15
**Lesansky** 1:13 4:5 4:11,15 7:4 9:21 15:3 19:15,20 25:10,15 26:1,5 28:3 33:8,20 35:5,15,20 36:2 36:14,19 37:2,6 37:11,13,18,20 37:22 38:8,12 38:14 39:3,6,9 40:15,20,22 42:21 43:5 44:14,21 45:21 46:7 47:15 48:1 48:6 49:4,10,15 50:4
**letter** 28:2,3,6 29:4
**let's** 30:9 37:15 40:21 43:8,10 44:12
**level** 14:4 21:14 21:20 33:12
**levels** 34:20
**line** 33:17
**listed** 34:11 44:2
**listening** 26:19
**little** 4:11 26:7 33:9 39:6
**lives** 7:3
**living** 6:22 7:2
**LLP** 3:6
**load** 42:8
**long** 5:19 8:1
**longer** 16:13 32:3 47:11
**look** 11:15 12:7 14:3 18:15,22 34:3,4,7,8 35:1 39:14 40:3,9,9 42:17 43:1,19 44:7,9 47:16,18 47:20 48:1 49:16
**looked** 45:10 49:5
**looking** 12:18 30:5 34:4,5,6,11 34:12,14,19,19 34:20,22 36:4 37:16 48:15
**Lorton** 8:4
**losing** 11:19 31:10

**M**

**main** 18:21
**maintaining** 26:11
**majority** 7:14 10:5 20:22 26:21 40:15,18 46:10 49:12 50:1
**making** 26:3 44:17
**Management** 12:17 28:13
**Manager** 7:22 8:1 8:2,8,9,10,16,18 8:21 9:3 16:21 17:21 26:7 33:11 35:13 36:15 37:7 38:18,20 39:4 42:8,11
**managers** 9:6 12:3 41:13,17 41:18,20 42:1,9 42:16 46:18
**March** 30:5
**marks** 13:11
**Maryland** 7:3
**math** 37:13
**Mathematics** 5:1
**matter** 31:3 38:19 38:20
**max** 34:12
**may** 24:1 25:10 27:17,18 30:6 34:10 35:3 36:10 43:19 44:6,9 49:21
**McDougal** 25:6
**mean** 8:11 27:17 35:18 36:4 42:12 43:4
**meaning** 17:6
**means** 16:11
**media** 30:3
**medical** 14:6 34:10,11
**medium** 19:1,1,2 19:3 34:12 45:10
**meet** 31:15 41:22
**merely** 33:18
**met** 11:17
**Michael** 3:5 4:4 27:15 28:20
**mid** 39:19
**mind** 4:10
**minimum** 19:1 34:12 38:5
**minor** 5:1

**minutes** 48:12
**misclassifying** 9:17
**misconduct** 9:15 20:4 21:12 24:16
**misdemeanor** 35:4
**misinformation** 23:4
**missing** 20:20
**Monday** 1:9
**money** 31:6
**month** 39:1
**months** 5:20 43:11
**morning** 39:19
**mother** 7:1
**moved** 5:3 6:1 10:11 31:16 48:19,19
**multiplied** 37:16

**N**

**N** 3:1 4:1
**name** 4:21 10:12 11:11 16:11,12 20:10
**Nannie** 5:5,6
**necessarily** 35:17
**need** 27:20 39:15 41:8 48:14
**needed** 11:7 12:4
**needs** 39:16
**negligent** 14:19 15:1,5
**neither** 51:8
**new** 5:8 9:2 11:9 35:14 43:10
**NIP** 14:12
**NIPS** 13:17 14:14 14:22 15:21 21:1 30:16,17 47:6
**norm** 34:7,13
**normal** 39:10
**normally** 30:7 36:7,10,12 37:9 39:18
**North** 7:16
**Northeast** 5:6
**notify** 43:21,22
**number** 17:2 19:17 36:5,7 37:8 44:11
**N-I-P-S** 13:17
**N-121** 1:16
**N.W** 1:15 2:6 3:7
**N119** 2:7

**O**

**O** 1:12 4:1
**obligation** 24:11
**observant** 26:20
**obtained** 23:12
**obviously** 33:17
**October** 8:5
**offense** 14:4
**offenses** 11:9 35:2 35:4
**offensive** 26:15,17
**offhand** 25:16
**Office** 10:7,12,14 10:15,17 13:4 15:9 19:16 26:2 30:1 39:16,16 39:19,22 40:1 40:13 41:7 42:3 42:13 43:22 44:9 45:15,20 46:5 47:19 48:5 48:18,20 49:1,1 49:14 50:2
**Officer** 1:13 4:5 6:9,14 7:7,11,11 7:21 21:9 30:16 30:17 47:6
**Officers** 7:18
**Officer's** 26:20
**offices** 2:2
**off-duty** 14:21
**OIA** 12:21 13:1 13:13
**okay** 14:11,13 15:20 26:4 40:22 42:20 45:12 47:1 48:11,12 50:4
**once** 30:8 49:4,17
**ones** 11:18
**opportunity** 25:14
**Oral** 1:4 2:1 4:2
**order** 13:2,5,17 14:5,16 15:14 15:22 16:21 17:5 18:3,14,15 19:15,18 22:8 26:2 30:9 32:4 43:19,20
**orders** 8:17,22 9:4 10:1 26:20 26:20 34:5 35:10 43:17 44:19,22 47:10
**outcome** 51:11
**outlines** 13:18
**outside** 32:9 34:13 38:6 39:2
**outstanding** 14:5 27:19

**P**

**P** 3:1,1 4:1
**page** 20:12 21:16 22:10 23:20 28:3
**Pages** 1:21
**paper** 17:11,13,16 35:18
**papers** 35:10 43:8 43:12,15
**parallel** 34:17
**parameters** 34:2
**parents** 6:22
**parole** 6:9 7:21 18:16
**particular** 20:12 41:3 46:9,12 48:16
**parties** 51:9
**Patricia** 28:10,22
**Paula** 1:22 2:18 51:3,16
**people** 31:18 33:1 42:3,13 45:14 45:15
**percent** 42:22
**performance** 14:20
**performed** 33:14
**period** 30:5
**persistence** 32:4
**person** 29:20 32:1 41:7
**personally** 33:21
**personnel** 13:9 14:12,14 29:22 46:5 48:5,20 49:1,2
**persons** 20:6 31:19
**pertinent** 44:20
**Petersburg** 5:15
**petty** 35:4
**picked** 11:2
**picking** 39:20
**picture** 26:18
**placed** 9:9 11:18 13:2 23:4,22 32:11,20 45:18
**placement** 8:13 9:1 13:9,19 14:10 31:16 34:2
**placing** 10:21 11:3 41:4
**plausible** 38:13
**point** 18:21
**points** 24:4
**population** 31:19 32:2
**position** 6:9 7:7 7:12,19 17:20 19:20 20:1 24:6 28:4,9 29:1,3 33:22
**positions** 7:4
**positive** 34:21
**possibility** 38:6
**possible** 13:19 37:21
**possibly** 35:11
**post** 8:17,22 9:3 10:1 13:17
**practice** 23:10
**Present** 4:3
**Presentation** 1:4 2:1
**presented** 21:17 21:21
**pressing** 36:9
**pressure** 30:21 48:17,18
**Pretrial** 12:16
**pretty** 46:11
**printout** 47:7,9
**prior** 8:20 10:19 11:1 14:6 18:11 35:1
**priority** 40:12
**PRISM** 10:3 12:10,15 13:21 15:12 21:4 23:12
**prison** 23:22
**prisoners** 32:2
**Probably** 30:19
**problem** 11:13
**procedures** 22:18 30:8
**proceed** 48:2 49:19
**proceeding** 4:6 25:2 51:10
**proceedings** 50:8 51:4,5,8
**process** 15:1 33:15
**program** 7:17,18 18:17 21:1 25:19 26:13 32:9 34:13
**proper** 22:17
**properly** 22:20 44:18
**prospective** 27:19
**protocol** 25:18 26:14 32:11,20
**provided** 17:13 26:1
**Public** 5:4 6:2
**Pursuant** 2:18
**pursue** 44:3
**pushing** 31:18

**put** 30:21
**P-R-I-S-M** 12:15
**p.m** 50:8

**Q**

**qualifications** 31:15
**qualified** 26:10
**question** 27:22 30:6 39:14 41:10 47:15
**questions** 25:10
**quota** 41:22 42:5
**quotation** 13:11
**quote** 12:20 13:12 13:14,16 14:16 21:16 22:3,11 22:13,16,22 23:3,8,15,21 28:3 29:4,6
**quote-unquote** 26:11
**quoting** 28:6

**R**

**R** 1:12,13 3:1 4:1 4:4
**rank** 7:8
**rate** 10:16
**reading** 45:16,17
**really** 28:17 32:19 38:11,22
**reason** 20:3 28:1 45:9 46:20 47:1 49:7
**reasonable** 38:1
**reassigned** 48:19
**recall** 24:19,21
**received** 5:14 25:2
**Receiving** 7:12
**reclassifications** 24:3
**recollect** 28:12,18
**recollection** 28:19
**recommend** 20:2 26:22 27:1,9 33:18,21 34:1 36:21,22
**recommendation** 49:16,17
**recommended** 21:10
**reconfigured** 10:14,16,18 48:19
**record** 10:2,7,12 10:14,15,17 11:5 12:9 15:6,7 15:9 17:18 23:6 29:12 34:4,16 35:6,8,9,16 39:12,15,16,19 39:22 40:1,12 40:16 41:7 43:1 43:7,19,22 44:2 44:8,15 45:2,15 45:20 46:5,8 47:16,19,20,21 48:3,15,17,20 49:1,1,6,14 50:2 50:7 51:8
**records** 10:4,5,6 10:11,13 11:14 11:15 12:1,5,7,8 30:1 39:15,17 40:3,7 41:1,2,5 41:8 42:3,13,17 42:19 43:4 44:5 48:5,13 49:3 50:2,3
**red** 16:13,18 17:6 30:12 34:6
**reduced** 51:6
**reference** 20:14 22:4
**regarding** 23:21
**regulations** 14:22
**related** 51:9
**releases** 40:13
**releasing** 39:21
**relevant** 23:10
**relied** 23:5
**rely** 12:9 18:19 23:11 48:8,10
**remained** 8:6
**remedied** 23:7
**remember** 7:9 9:16 10:1 12:6 16:8 23:1 29:2 42:1 48:16
**removed** 19:4 47:5,13
**renders** 24:6
**repeated** 24:10
**replaced** 9:10
**report** 22:11 29:17
**reported** 1:22 51:4,5
**reporter** 2:19 51:1,3
**reports** 22:11
**represented** 25:5
**request** 13:4,9 21:18 44:6
**requesting** 8:12 8:22
**requests** 36:11
**required** 13:5 24:13
**resource** 31:21
**responsibilities** 10:21 33:11
**responsibility** 11:1,2 14:9
**responsible** 28:21
**result** 25:2
**resulted** 22:19,21
**results** 35:20
**retire** 29:5
**return** 25:7 30:18
**revealed** 22:17
**review** 39:12 49:21
**reviewed** 17:5 18:10 30:15
**reviewing** 28:21 50:2
**Richmond** 5:3,19 5:20,22
**right** 17:8 18:1,8 22:2 23:15 24:12 25:16
**rights** 45:16,17,17
**role** 23:4 33:15
**Room** 2:7
**rough** 36:20
**roughly** 37:3 42:22
**routine** 39:10
**rumors** 33:2
**running** 34:17

**S**

**S** 3:1 4:1
**sample** 34:21
**samples** 35:12
**saw** 22:13 45:11
**saying** 37:14 44:14,21 45:21
**says** 36:8
**schedule** 47:18
**school** 5:3,4,5,9 5:10 6:2
**score** 45:10
**scoring** 35:21
**screen** 9:14 14:9 14:21 31:12 36:8,10 39:18
**screened** 8:12 13:20 30:4 45:19
**screening** 9:18,18 9:19,22 14:2 16:21 33:13,13 37:1 39:10
**screenings** 36:2 37:3
**screenings/reco...** 36:21
**searching** 50:3
**second** 32:16
**section** 10:9 13:10 20:12 21:13 22:7 23:18
**see** 13:11 34:16 44:8 46:20
**Senior** 7:10,10
**sent** 28:2
**sentences** 32:3
**separated** 32:16 47:3
**separatee** 15:16 15:18,22 16:4,5 16:22 17:3,6,8 30:9,12 44:2 47:12
**separatees** 16:9 16:17,19 17:14 45:12 46:21 47:3
**separation** 13:2 14:5,16 15:14 15:22 16:21 17:5 18:3,14,15 22:8 30:8 34:5 35:10 43:9,17 43:19,20 44:4 44:19,22 47:10
**separations** 13:11 17:22 45:11,12 47:2
**September** 10:20 31:4
**Services** 1:14 27:3 27:10 28:13,14
**shift** 48:20
**short** 11:16 31:11 41:18,21,21 42:2,6
**show** 18:3,4,6,8
**showed** 24:10
**showing** 19:14
**significance** 24:15
**significant** 33:15
**sir** 22:6
**sitting** 4:14
**situation** 30:15 36:9 45:9
**six** 5:20
**slow** 39:20
**snapshot** 26:18
**somewhat** 39:19
**soon** 30:18
**sorry** 9:19 19:8 27:6 28:4
**sort** 4:10 30:19 33:10
**sound** 37:22 38:9 38:10
**sounds** 38:13
**sources** 21:3
**speak** 46:19
**Special** 24:1

**specific** 7:9 8:19 9:2 17:1 39:1 46:10
**specifically** 13:15 33:3 46:19
**speculating** 30:20
**spring** 38:21,22 39:3
**staff** 21:3 32:4
**staffed** 42:3,8
**standards** 22:1 23:14 24:11
**start** 6:17 39:20 39:21
**started** 7:6
**State** 5:15
**stated** 13:16,19 14:11 28:2
**statement** 18:18 21:1 25:19 26:13 31:17 32:10 34:14
**states** 12:20
**statistics** 38:11
**status** 24:1
**strange** 38:9,10
**Street** 3:7 5:6 7:16
**stripe** 7:9
**subject** 44:1
**submitted** 34:21 40:6
**substance** 35:4
**substantiated** 12:21
**sudden** 44:8
**suggest** 21:17
**suggestion** 23:7
**suggests** 24:1
**suitable** 14:10
**Suite** 1:16
**summarily** 19:4
**superiors** 32:22
**supervisor** 11:11 11:12 20:10 36:8 40:6 43:21
**supervisors** 10:16 10:17 31:12
**supplying** 26:9
**Support** 27:3,10 28:14
**supportable** 24:2
**supports** 23:9
**sure** 4:16,20 15:5 25:12 42:5 44:17
**surprised** 29:10 30:2
**system** 5:3,4 6:3 10:3 11:6 12:10 12:10,15 13:3 13:21 16:7,10 16:15,16 17:20 22:14 25:22 46:6,11
**systems** 12:16 15:13 29:13 34:18

**T**

**take** 6:13
**talking** 31:8
**taught** 5:2,4,20 6:6
**teach** 5:19 6:5
**Technically** 41:19
**tell** 4:18 7:4 9:21 19:20 26:7 39:9 39:13 40:2 41:7 48:11
**telling** 4:11
**temporarily** 33:1
**terms** 33:12
**testified** 20:8,17 20:19,22 21:6
**testimony** 20:5,14 22:12 23:9
**Thank** 26:5 33:8 50:6
**thing** 4:17 17:21 43:11
**things** 44:22 45:1 48:18
**think** 50:5
**thinking** 30:20
**third** 32:17 49:13
**thoroughly** 14:21
**threatened** 24:9
**three** 16:8 24:3 36:13 42:2
**throwing** 31:6
**time** 6:12 7:14,19 10:4,19,20 11:3 11:10,16,22 17:9 26:21 27:15 28:4,9,11 28:15,16,19,22 29:18 30:2,4,4 36:14 37:5,6 38:17,22 40:2 41:3 46:9,10,11 46:12,12 48:7 48:15,16 49:12 50:1
**timed** 18:17
**times** 13:6 27:17 36:13
**Timony** 28:10,11 28:16,22 29:5
**title** 7:9
**told** 31:12
**top** 11:21
**trained** 16:14
**training** 8:15,19 8:20 9:2
**transcended** 12:2
**transcript** 51:7
**transferred** 7:13 7:15 8:4 30:10
**transfers** 40:13
**transported** 13:7
**true** 29:8,9,11 45:20 46:1 51:7
**trust** 45:14
**try** 11:20 36:12 47:17 49:10
**trying** 33:9 36:11 37:2 47:20,21
**turn** 47:11
**turnover** 10:16
**tutelage** 9:10
**two** 7:9 41:14
**typewriting** 51:6

**U**

**unavailable** 21:2 21:3
**uncommon** 20:19
**understand** 33:16 41:19
**understanding** 33:10 42:7
**Understood** 47:14
**unemployment** 19:8,10 20:2 21:9,10 25:1 40:5
**unit** 9:9 17:1 22:22 24:7 29:15 32:15
**University** 5:15
**unpersuasive** 23:9
**unquote** 23:9
**urine** 34:21 35:11
**use** 8:20 12:20 13:22 15:11 26:3 39:11 48:12
**useful** 44:15,16
**utilize** 10:2 17:20
**utilized** 13:20 16:7 29:12,12
**utilizes** 21:3
**U.S** 13:4

**V**

**verbatim** 51:5
**Vermont** 1:15 2:6
**violated** 24:9
**violation** 18:16
**violence** 35:3
**Virginia** 5:15,16

**W**

**wait** 40:11
**walk** 38:5
**want** 12:19 20:11 27:20 31:14,16 32:13,14 38:3,4
**wanted** 26:6
**Warden** 27:2,10 27:13 28:8,12 28:13
**Warden's** 41:6
**warm** 39:1
**warrants** 14:6
**Washington** 1:8 1:16 2:8 3:8
**wasn't** 7:10 11:7 15:5
**way** 4:9
**week** 32:14 36:12 37:10,11,12,16
**weeks** 37:14
**went** 5:10 6:2
**weren't** 15:4
**white** 10:13
**willful** 22:1 23:13
**willfully** 24:8
**wish** 25:7
**woman** 10:13
**won't** 18:8
**word** 27:2,7,7,8
**work** 4:19 9:4,22 13:10,16 14:10 14:21 16:1 18:14 30:14,22 31:20 32:4,13 32:14 33:1
**worked** 7:12,14 7:16,18
**worker's** 19:6
**working** 38:6 44:4 48:8
**world** 30:3
**wouldn't** 8:19 38:9,10 49:16
**write** 14:11
**wrong** 33:5
**wrote** 13:11

**X**

**x** 1:3,7

**Y**

**year** 5:17 12:6 37:14,20 38:8 39:7,8
**years** 6:5 36:15 36:18 38:15
**year-and-a-half** 6:6
**yellow** 20:13
**York** 5:8

**Z**

**zero** 24:4

**0**

**05** 31:4 38:20,21
   39:4
**06** 39:4

**1**

**1** 1:21
**1-107046** 1:20
**10** 20:12
**11:30** 1:10
**12** 21:16 22:10
   43:11
**12:30** 50:8
**123456** 44:11
**130** 37:9
**14** 23:20
**14th** 13:8
**140** 37:10,11,16
**17** 36:18
**18** 41:20 42:8
**18th** 3:7
**19** 42:13
**1901** 3:7
**1923** 1:15 2:6
**1976** 5:13
**1981** 5:18
**1984** 6:19
**1990** 8:5

**2**

**20001** 1:16
**20009** 2:8 3:8
**2005** 10:20 13:5
**2006** 8:7 9:7
   12:18 13:8,14
   13:20
**2007** 1:9
**202** 3:9
**232-1907** 3:9
**24** 30:20
**24th** 12:18
**26** 13:4
**26th** 12:20
**27** 13:14

**3**

**30** 36:11

**312.3** 24:13

**4**

**40** 36:11
**48** 37:14

**5**

**5,000** 37:18 38:8
**50** 37:14
**50/50** 40:19,20
**51** 1:21

**6**

**60** 42:22
**60/40** 40:21

**7**

**7** 24:13 28:3

**8**

**84** 7:6
**88** 8:4

**9**

**9** 1:9
**96** 16:15
**97** 16:15

# EXHIBIT 63

DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

ORAL HEARING OF LOWANDA HINTON-SAUNDERS,
Washington, D.C.
Monday, June 25, 2007
12:20 p.m.

Job No.: 1-106540
Pages 1 - 105
Reported by Janie Arriaga

ORAL HEARING OF LOWANDA HINTON-SAUNDERS held at the offices of:

D.C. DEPARTMENT OF CORRECTIONS
GRIMKE CENTER
1923 Vermont Avenue, Northwest
Washington, D.C. 20401
202-673-7316

Pursuant to agreement, before Janie Arriaga, Court Reporter in and for District of COLUMBIA.

A P P E A R A N C E S

ON BEHALF OF LOWANDA HINTON-SAUNDERS:

J. MICHAEL HANNON, ESQUIRE
The Hannon Law Group, LLP
1901 18th Street, Northwest
Washington, D.C. 20009
202-232-1907

ON BEHALF OF D.C. DEPARTMENT OF CORRECTIONS:
DR. HENRY LESANSKY
D.C. Department of Corrections
1923 Vermont Avenue, Northwest
Washington, D.C. 20401
202-673-7316

ALSO PRESENT: ERICA WHITE

P R O C E E D I N G S

MR. HANNON: This should be captioned Oral Hearing of Lowanda, L-o-w-a-n-d-a, Hinton-Saunders, S-a-u-n-d-e-r-s. You can caption it District of Columbia Department of Corrections.

Present is myself, J. Michael Hannon, also, Dr. Lesansky, the Hearing officer, and my law clerk, Erica White.

You don't need to be distracted by the fact that we're having this recorded. This way, we don't have to take really detailed notes, but Erica is going to be doing some of that anyway.

The way this is going to work is that I'm going to ask you to tell your story, so to speak, and to give you an opportunity to talk to Dr. Lesansky who is charged with making a recommendation, specifically in reference to you and the others to the director. You've seen all of the paperwork we have presented to him on your behalf.

I meant to ask you earlier, other than the materials that we presented to you and those that are part of the proposed discipline, is there anything else

that you have been provided?

DR. LESANSKY: No, I have not been provided anything else, although I would say it's probably not a good idea, though, based on the materials to contact.

MR. HANNON: I just want to know what you have.

DR. LESANSKY: No, that's everything that I should have.

MR. HANNON: Even though I'm sitting over here, I might be talking to you by asking you some questions, try to direct your answers to Dr. Lesansky.

We'll just begin by telling Dr. Lesansky where you are from and how did you get into corrections.

MS. HINTON-SAUNDERS: I'm from D.C. I got into corrections because of a cousin of mine, and have been there since then. I've been in corrections for 13 years.

MR. HANNON: MR. HANNON: You grew up here?

MS. HINTON-SAUNDERS: I have been in D.C. all of my life.

MS. HINTON-SAUNDERS: Where did you go to High School?

MS. HINTON-SAUNDERS: Coolidge High School, '82. I went two years of college in North Carolina. I went to Tech College for computers, graduated from there, and left the Department and went to work at Lucent Technology and ADT, went back to the Department, been working since then.

MR. HANNON: Okay. Let's back up and go through that in a little more detail. Tell us about the two years of college, where was that?

MS. HINTON-SAUNDERS: Bowie Creek, North Carolina. I didn't have a major. I was there for two years.

MR. HANNON: Off the record.

(Discussion off the record.)

MR. HANNON: So what did you study the two years that you were at Bowie?

MS. HINTON-SAUNDERS: It was an undecided major.

MR. HANNON: So you went there for two years?

MS. HINTON-SAUNDERS: Two years, came home, correction was -- was working for corrections for a long period of time. I would say about 10 or 11 years.

MR. HANNON: So the two years after college you went to work for corrections right away?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Corrections here in Washington?

MS. HINTON-SAUNDERS: D.C.

MR. HANNON: When did you start with the Department of Corrections?

MS. HINTON-SAUNDERS: 1990.

MR. HANNON: Tell Dr. Lesansky what your work was when you first started with them?

MS. HINTON-SAUNDERS: When I first started corrections, my post was female R&D in the blocks.

MR. HANNON: Now, how many years did you work for corrections your first time?

MS. HINTON-SAUNDERS: Ten years, the first time.

MR. HANNON: Ten years the first time?

MS. HINTON-SAUNDERS: D.C. General?

MS. HINTON-SAUNDERS: D.C. General.

MR. HANNON: Now, when you say "the block," during that ten-year period, did you work only in the women's unit?

MS. HINTON-SAUNDERS: Men's unit and women's unit.

MR. HANNON: So even then there was a nondiscriminatory policy, I suppose you want to call it?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: In the first ten years, was there a policy about how many women would be on a male block at any given point in time?

MS. HINTON-SAUNDERS: No.

MR. HANNON: In that first ten-year period, when you were on a block, how many correction officers would typically be assigned to a block?

MS. HINTON-SAUNDERS: Four years.

MR. HANNON: During that -- during that first ten-year stint, how often would there be officers on that shift?

MS. HINTON-SAUNDERS: Not even most of the time, because they would pull the foreperson to do something else.

MR. HANNON: How often would there be another woman on your shift in the first-ten year period?

MS. HINTON-SAUNDERS: All of the time.

9

MR. HANNON: Ever times when there were two other women on a male block?

MS. HINTON-SAUNDERS: Sometimes there would be three women and one man.

MR. HANNON: Was there ever a time in your first ten years when there was no men at all on a shift?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: How often did that occur?

MS. HINTON-SAUNDERS: Periodically.

MR. HANNON: Give me an idea of the frequency.

MS. HINTON-SAUNDERS: It could have been maybe a good three months that women can work on one block, something like that.

MR. HANNON: It wasn't very frequent that there would be no men?

MS. HINTON-SAUNDERS: Right. It would be all women. Eventually they would bring one whenever they got ready.

MR. HANNON: So the goal, at least informally, was to make sure there was at least one man when a woman was in a male block?

MS. HINTON-SAUNDERS: Correct.

10

MR. HANNON: So during the ten years in your first stint with corrections, did you do any studying during that time period on your own time?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Tell Dr. Lesansky what you did.

MS. HINTON-SAUNDERS: I was in computer electronics. I was taking it at night while I was still working.

MR. HANNON: What school?

MS. HINTON-SAUNDERS: Tech College.

MR. HANNON: I'm sorry, you said that. What is your -- what is your rank now?

MS. HINTON-SAUNDERS: Corporal. I was a corporal and still a corporal.

MR. HANNON: Corporals can speak up?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: Why were you going to school evenings during the first ten years?

MS. HINTON-SAUNDERS: I felt I wasn't progressing with the Department because everything was so stagnant, so I wanted to better myself, so I went to school.

11

MR. HANNON: Did you get any degree?

Yes, I did.

MR. HANNON: What was it in?

MS. HINTON-SAUNDERS: Computer electronics.

MR. HANNON: Was that the basis for your leaving corrections the first time?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: You went to work then for Lucent?

MS. HINTON-SAUNDERS: Lucent Technology.

MR. HANNON: What year was it that you went to work for Lucent?

MS. HINTON-SAUNDERS: I think it was April of '99.

MR. HANNON: How long did you work for Lucent?

MS. HINTON-SAUNDERS: I worked for Lucent for two-and-a-half years before they closed down because money got stolen or something like that.

MR. HANNON: At the particular location you were working?

MS. HINTON-SAUNDERS: I was enrolled in the wireless service.

MR. HANNON: So you would be out on the road?

12

MS. HINTON-SAUNDERS: Yes, traveling.

MR. HANNON: Did you like that?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: How did the pay and benefits compare to the corrections?

MS. HINTON-SAUNDERS: It paid real well. I made almost $2,000 a week, all per diem, and excellent training, but then when somebody stole money from the company, they had to let us go.

MR. HANNON: How was your performance?

MS. HINTON-SAUNDERS: I learned fire block cables, I learned a variety of skills, many things.

MR. HANNON: You said you went to work for ADT?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: I take it when you were at Lucent, you had a good record?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Favorable evaluation?

MS. HINTON-SAUNDERS: Yes, I did.

MR. HANNON: Did you get any promotions or were you there long enough?

MS. HINTON-SAUNDERS: Not really long enough. You had to be there three years or more. You had a lot of people all over. Even though it was two-and-a-half and something years, I was still in training because there was a lot to learn.

MR. HANNON: So you left on good terms?

MS. HINTON-SAUNDERS: Good terms.

MR. HANNON: No disciplines against you?

MS. HINTON-SAUNDERS: No.

MR. HANNON: How about the ten years you were with corrections, did you have any disciplinary actions against you?

MS. HINTON-SAUNDERS: No.

MR. HANNON: What rank were you when you left corrections and went to work for Lucent?

MS. HINTON-SAUNDERS: Corporal.

MR. HANNON: What year were you promoted to corporal?

MS. HINTON-SAUNDERS: Seven years.

MR. HANNON: Is that unusual?

MS. HINTON-SAUNDERS: Yeah, because once you know your job performance, you can request to move up.

That is what I did.

MR. HANNON: Tell Dr. Lesansky your work for ADT, how long did you work for them?

MS. HINTON-SAUNDERS: I worked for two-and-a-half years before I came back doing alarm systems, in-camera, and commercial.

MR. HANNON: Where were you headquartered when you were working for ADT?

MS. HINTON-SAUNDERS: Springfield, Virginia.

MR. HANNON: Why did you leave ADT?

MS. HINTON-SAUNDERS: Well, the Department was rehiring back at the time. They called my husband back to work for the Department and asked if I wanted to come back, so I told them I would come back with my same rank and grade.

MR. HANNON: So this -- this gentleman, your prince charming, when did you and he get married?

MS. HINTON-SAUNDERS: 1990.

MR. HANNON: And he was in corrections at the time?

MS. HINTON-SAUNDERS: Yes. He has been in corrections since '86.

MR. HANNON: And you were in corrections at the time?

MS. HINTON-SAUNDERS: Yes, I was.

MR. HANNON: Is that where you met?

MS. HINTON-SAUNDERS: I met him when he was in the Coast Guard and they brought him in. When they closed Lorton, they brought him to the jail.

MR. HANNON: Does he still work at the jail?

MS. HINTON-SAUNDERS: Yes, he does.

MR. HANNON: Where do you live?

MS. HINTON-SAUNDERS: I live in Fort Washington, Maryland.

MR. HANNON: With your husband?

MS. HINTON-SAUNDERS: No, we are separated.

MR. HANNON: Any kids?

MS. HINTON-SAUNDERS: One son.

MR. HANNON: What's he doing?

MS. HINTON-SAUNDERS: He's in college.

MR. HANNON: Where is he in college?

MS. HINTON-SAUNDERS: Delaware State.

MR. HANNON: That's right. Playing basketball, you said that off the record.

So you decided to go back to corrections even though you were working with ADT. Why?

MS. HINTON-SAUNDERS: Well, at ADT, once you get as far as you can get as a tech, it will be middle 35 a year. Corrections was paying more. You couldn't really progress more with a management rate. And really I didn't want to go to management with ADT. I enjoyed installation, but the pay kind of stopped right there.

MR. HANNON: So you went back to corrections when?

MS. HINTON-SAUNDERS: I went back to corrections almost two years ago. Two-and-a-half-years ago, I believe it was. I don't remember exactly when.

MR. HANNON: This is June of 2007?

MS. HINTON-SAUNDERS: I went back in 2004.

MR. HANNON: The jail escape was June of 2006.

MS. HINTON-SAUNDERS: I went back in 2004.

MR. HANNON: Do you know approximately what month it was?

MS. HINTON-SAUNDERS: I believe it was in November.

MR. HANNON: So you were back working at the

jail almost a year-and-a-half when the incident occurred?

MS. HINTON-SAUNDERS: Yes because my probationary time when I came back was done. So I was made full.

MR. HANNON: Now, when you returned in 2004, in November, what assignments did you generally work?

MS. HINTON-SAUNDERS: Female R&D in Northwest One.

MR. HANNON: Were you working Northwest One the day of this incident?

MS. HINTON-SAUNDERS: No, I wasn't.

MR. HANNON: Where were you assigned the day this incident occurred?

MS. HINTON-SAUNDERS: Admin. Two.

MR. HANNON: Was that your regular assignment?

MS. HINTON-SAUNDERS: No.

MR. HANNON: What was your regular assignment?

MS. HINTON-SAUNDERS: Female R&D in Northwest One.

MR. HANNON: So that had been your assignment since you came back.

MS. HINTON-SAUNDERS: Some South Two Female Block.

MR. HANNON: Why were you working Admin. Two the day of the incident?

MS. HINTON-SAUNDERS: They had this big Walk for Cancer, and they just assigned it to me when I went to roll call. They were short of staff.

MR. HANNON: So you were scheduled to work that day, either at R&D or Northwest One?

MS. HINTON-SAUNDERS: Northwest One.

MR. HANNON: And they assigned you to Admin. Two.

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: So this wasn't overtime; this was your ordinary shift?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Did you have an understanding as to why they assigned you to Admin. Two?

MS. HINTON-SAUNDERS: No, I was surprised.

MR. HANNON: Had you ever worked Admin. Two before?

MS. HINTON-SAUNDERS: No.

MR. HANNON: Had you ever been trained to work Admin. Two?

MS. HINTON-SAUNDERS: No, I had not.

MR. HANNON: What is Admin. Two?

MS. HINTON-SAUNDERS: It's where you go get the lawyers from downstairs. Because you don't have anybody to relieve you, you pick up the lawyers, bring them back, you put them in the visitor hall, you get your status inmates, bring them back, you put them in the visiting hall. Those types of things.

MR. HANNON: How did you know how to do it?

MS. HINTON-SAUNDERS: Well, I watched other people do it.

MR. HANNON: You mean the same day?

MS. HINTON-SAUNDERS: Well, no, I've seen my friend. I would come down and watch her work that post all of the time. I asked her and she told me. I asked her.

MR. HANNON: When did you ask her that?

MS. HINTON-SAUNDERS: I asked her that when I seen her. One week I saw her working. I was just curious about what she was doing weekends. She always

worked there every weekend. I was just curious about it.

MR. HANNON: She worked as a regular assignment or an overtime assignment?

MS. HINTON-SAUNDERS: Regular assignment. I just wanted to see what was the big deal working that post.

MR. HANNON: They were short of people?

MS. HINTON-SAUNDERS: Yes, they were very short.

MR. HANNON: How did you know that?

MS. HINTON-SAUNDERS: Because they were announcing it earlier. When they made the draft, they needed about 50 people.

MR. HANNON: Were you supposed to work Southwest -- I'm sorry, Northwest -- what was your regular assignment?

MS. HINTON-SAUNDERS: Northwest One.

MR. HANNON: Were you supposed to work Northwest One that day?

MS. HINTON-SAUNDERS: Either Northwest One or South Two, I was supposed to work that day.

MR. HANNON: Did you know whether those posts were short?

MS. HINTON-SAUNDERS: I'm not sure.

MR. HANNON: Who was working Admin. Two with you, if anyone?

MS. HINTON-SAUNDERS: No one. It's just a visiting hall. The one that assigned the visiting was Judy Brown.

MR. HANNON: Judy Brown is a corrections officer?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: So she was inside the --

MS. HINTON-SAUNDERS: -- visiting hall.

MR. HANNON: Your job was to shuttle inmates back and forth?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: When you were proposed for discipline, the first time, what were you accused of?

MS. HINTON-SAUNDERS: Not properly checking the inmate's I.D. I guess that's aiding and abetting.

MR. HANNON: Who or what?

MS. HINTON-SAUNDERS: My charges -- Internal

Affairs were saying they just wanted to talk to me about the door and about the inmates' I.D.s, stuff like that.

MR. HANNON: Why? What did -- what did they think you were doing that had contributed to the escape?

MS. HINTON-SAUNDERS: They assumed I just let them walk through the door.

MR. HANNON: Let who walk through?

MS. HINTON-SAUNDERS: The two inmates, Jones and Leaks.

MR. HANNON: Before this incident, did you know Jones?

MS. HINTON-SAUNDERS: No.

Had you ever see Jones before, to your knowledge?

MS. HINTON-SAUNDERS: No.

MR. HANNON: Did you know Leaks?

MS. HINTON-SAUNDERS: No.

MR. HANNON: Had you ever seen Leaks before, to your knowledge?

MS. HINTON-SAUNDERS: No.

MR. HANNON: Do you remember seeing somebody later identified to you as Jones or Leaks?

MS. HINTON-SAUNDERS: No.

MR. HANNON: Did you remember seeing any of them that day?

MS. HINTON-SAUNDERS: Except for a BOLO Internal Affairs showed me.

MR. HANNON: Did you recognize the person in the photo?

MS. HINTON-SAUNDERS: No, it was the back of his head.

MR. HANNON: It was a surveillance shot.

MS. HINTON-SAUNDERS: Yes, the back of his head.

MR. HANNON: What door were they talking about?

MS. HINTON-SAUNDERS: Admin. door.

MR. HANNON: So let's talk about the admin. door. Where does it go and where does it come from?

MS. HINTON-SAUNDERS: If you come up from the inmate side up through the -- it's a big hall where you have the floor control. The floor control, you come through the gates, and you have the visiting hall here

and you have Admin Two door here. Admin. doors lead to the cafeteria, bathrooms, and the major office and all that. That is what they lead to. It doesn't lead anywhere to the warden's office downstairs.

MR. HANNON: What was your understanding as to when Jones and Leaks was to have gone through the admin. door?

MS. HINTON-SAUNDERS: Well, like I told them -- they asked me the first time, did I let them through the door, and I told them, no, because I didn't. So when they talked to Inmate Mohammed, when the refrigerator came up from the culinary -- because that's my job, to check the refrigerator. When I checked the refrigerator, my fellow officer was -- my fellow officer was there with me. So when I checked the refrigerator to make sure there was no contraband, I locked the door and continued to do what I had to do.

MR. HANNON: Did you have keys to the admin. door?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Was the admin. door supposed to be kept locked during that time period?

MS. HINTON-SAUNDERS: It's always locked unless I opened it or other people that has the key opened it.

MR. HANNON: Okay. Why would you open the Admin. Two door to let -- under what circumstances?

MS. HINTON-SAUNDERS: To pick up attorneys and come back through or if culinary had to pick up trays or carts, I had to let them through.

MR. HANNON: Was there ever any need or reason for inmates to go through the Admin. Two door?

MS. HINTON-SAUNDERS: No, only when I brought environmental down.

MR. HANNON: So inmates on environmental detail --

MS. HINTON-SAUNDERS: -- are separate from -- I only -- when they come up, they wait in the room with their officer, and then they can go through the door with them.

MR. HANNON: When you say "go through the door with them" --

MS. HINTON-SAUNDERS: Because they had details. Some guys were cleaning. When I came to roll

call, they were just all over there.

MR. HANNON: So it wouldn't be part of your job to monitor inmates on environmental detail --

MS. HINTON-SAUNDERS: No.

MR. HANNON: -- that day?

MS. HINTON-SAUNDERS: No.

MR. HANNON: So if any inmates on environmental detail had to go through Admin. Two, that would be with --

MS. HINTON-SAUNDERS: Environmental officer.

MR. HANNON: With the environmental officers?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: The environmental officers would have been --

MS. HINTON-SAUNDERS: In charge of those people.

MR. HANNON: All right. Would they have been accompanying them necessarily or do you know? Have you worked environmental?

MS. HINTON-SAUNDERS: I worked it when I was there at first, but it changed so much when I came back that morning when we worked. They had people painting

that didn't even have I.D.s on them, so you really didn't know who they were really. They didn't have any I.D.s on them at all.

MR. HANNON: How do you know that?

MS. HINTON-SAUNDERS: Because a couple of them walked -- when roll call was coming out -- they usually have the badge right here (indicating), and none of them had a badge on. Some of them had a badge with a letter "T" with no face. This was before I even came out of the roll call or took the post that they were all out like that.

MR. HANNON: What were they painting?

MS. HINTON-SAUNDERS: The hallways on the second floor.

MR. HANNON: How many of them were there?

MS. HINTON-SAUNDERS: I only saw maybe three or four.

MR. HANNON: Did you see any correction officers with them at that point in time?

MS. HINTON-SAUNDERS: No.

MR. HANNON: Now, the badge with the "T" on it, what is that?

MS. HINTON-SAUNDERS: That's temporary. Some had a purple "T" or yellow "T." Some of them didn't even have a face on it.

MR. HANNON: Had you ever -- you never worked environmental detail?

MS. HINTON-SAUNDERS: No.

MR. HANNON: You never worked at Admin. Two before?

MS. HINTON-SAUNDERS: No.

MR. HANNON: Had you ever worked any other admin. position for any other visiting halls?

MS. HINTON-SAUNDERS: I relieved Visiting One for lunch, but that was just 30 minutes, when they would go up to lunch, when I was on the inside.

MR. HANNON: Like Judy Brown?

MS. HINTON-SAUNDERS: Yeah, but not her. It would be on the first floor.

MR. HANNON: So you had never done this job before that you were assigned to that day?

MS. HINTON-SAUNDERS: Right.

MR. HANNON: You had never done environmental detail?

MS. HINTON-SAUNDERS: Not since I had been there.

MR. HANNON: And I think you told Dr. Lesansky that there were no post orders for admin.?

MS. HINTON-SAUNDERS: No post orders. The only post orders were inside the Visiting Hall One. They've got them now, but it wasn't there at the time.

MR. HANNON: How do you know they now have them?

MS. HINTON-SAUNDERS: Because my friend that works the post told me they added post orders to Admin. Two, and now have someone sitting on the other side of the door, which they never had before.

MR. HANNON: So they've added post orders and they've added a new --

MS. HINTON-SAUNDERS: -- another officer on the other side of the door.

MR. HANNON: Another officer?

MS. HINTON-SAUNDERS: Right. And they took all the keys where people in security had the key to the door, environmental had keys to that door. So they supposedly took all of the keys to that door.

MR. HANNON: So at the time of the incident, there was no one assigned to the door?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: And you had keys to go through the door; correct?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: And then the environmental officers would have keys to go through the doors?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Who else would have keys to go through that door on a Saturday?

MS. HINTON-SAUNDERS: Security. They would have keys if they were there. Command Center would have an extra set of keys in case there was a code -- if a status person --

MR. HANNON: Slow down.

MS. HINTON-SAUNDERS: If I'm not with a status inmate that I had to take back, then they would have the key.

MR. HANNON: Now, if you had to escort the inmate to Visiting Hall Two, tell me how you would do that.

MS. HINTON-SAUNDERS: I would call my officer on the inside, let them know that I was going to pick up a status inmate. I would go pick up the status inmate, go in the block and pick them up, hook them up.

MR. HANNON: What do you mean, "hook them up"?

MS. HINTON-SAUNDERS: Hook them up (indicating).

MR. HANNON: Okay.

MS. HINTON-SAUNDERS: Bring them back to the visiting hall, walk them all the way to the attorney's holding booth, and come back out and sit down and wait.

MR. HANNON: Were there any other correction officers working Admin. Two the day this happened?

MS. HINTON-SAUNDERS: No.

MR. HANNON: Does that mean that only one inmate can talk to a lawyer at a time?

MS. HINTON-SAUNDERS: No. It's like six booths in there. So if I have to go get another inmate, she would call me, and I would have to leave and go get them.

MR. HANNON: And the inmate who is in the booth, what kind of security is there for that inmate?

MS. HINTON-SAUNDERS: None, just the visiting hall officer. She has a radio to call if something happens, like if the inmate starts fighting with the attorney.

MR. HANNON: Can the inmate leave the interview area and go back to the block?

MS. HINTON-SAUNDERS: No, because she controls the door. It's a separate door from the admin. door.

MR. HANNON: All right. When we -- I know the area from the other side.

DR. LESANSKY: Yes.

MR. HANNON: When the inmate is in a confined location, they can't get out of the area without somebody opening the door?

MS. HINTON-SAUNDERS: Right.

MR. HANNON: So while that inmate is there, you might get another two or three?

MS. HINTON-SAUNDERS: Or pick up an attorney downstairs.

MR. HANNON: Now, when you said you call somebody on the inside for a status inmate, who are you talking about?

MS. HINTON-SAUNDERS: Judy Brown, inside the visiting hall.

MR. HANNON: Okay. So she would tell you who you were picking up?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: And where they were?

MS. HINTON-SAUNDERS: Yes, would tell me where to go and who to pick up.

MR. HANNON: When you got to the location, what was the process for you picking up the inmate?

MS. HINTON-SAUNDERS: The block would normally have them -- if they weren't on a real bad status, they would have them in a solid part, already hooked for me, or I had to go inside the block, hook them up, and pick them up.

MR. HANNON: Was there any kind of paperwork done on the block to indicate that you had picked up an inmate for a status call?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Is there somebody by the name of Datcher?

MS. HINTON-SAUNDERS: Lieutenant Datcher.

MR. HANNON: Did you have any contact with Lieutenant Datcher that day?

MS. HINTON-SAUNDERS: Yes, I did.

MR. HANNON: What was that about?

MS. HINTON-SAUNDERS: My rating.

MR. HANNON: Tell Dr. Lesansky what happened.

MS. HINTON-SAUNDERS: After I went downstairs to check on any attorneys that were downstairs, Lieutenant Datcher was sitting in the cafeteria. He saw me coming through the door to unlock it, but I locked it back because he told me to come in. I went to him, and he was reading me my rating, which was an excellent rating. After I signed it, we both went back through the door, the double doors.

MR. HANNON: The two of you?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: So you met with him on the admin. side of the door?

MS. HINTON-SAUNDERS: On the officers' side.

MR. HANNON: On the officers' side?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Of the Admin. Two door?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: And you went back through the Admin. Two door; the two of you went back through it together?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Who used the key?

MS. HINTON-SAUNDERS: I did.

MR. HANNON: So where was he headed?

MS. HINTON-SAUNDERS: He was heading back to his zone and I was sitting down waiting.

MR. HANNON: And you were sitting down waiting for what?

MS. HINTON-SAUNDERS: Any inmates that had to come up, that could walk on a pass to go to the visiting hall to see their attorney.

MR. HANNON: Do you have to go and collect them at the block?

MS. HINTON-SAUNDERS: No, not the people that can walk, only the status.

MR. HANNON: Now, what's the difference between the status inmates and the people who can walk?

MS. HINTON-SAUNDERS: Because some people on

population can just get a pass from the block and come to the visiting wall, show me their pass, I'll call inside and see if their attorneys are there. The status people are the ones, like on PC, special handling, AF, the troublemakers who got beef with other inmates who walk by themselves.

MR. HANNON: Okay. That day do you remember any inmates who were on, for want of a better term, walk status who came through?

MS. HINTON-SAUNDERS: There was one that came up. I called the visiting hall, let him in. He came back out -- he came back on the other side -- he came back out at 10:04, and then about ten minutes later they called about the escape.

MR. HANNON: Now, the one that came out at 10:04, that was from the block to go into the visiting hall?

MS. HINTON-SAUNDERS: He had finished -- he had came up to visit his attorney and he had finished, I signed his pass, and he went back to the block.

MR. HANNON: Are you familiar with those passes?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Because you have to fill them out?

MS. HINTON-SAUNDERS: In the block.

MR. HANNON: When you're working the block?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: The environmental, are you at all familiar with them?

MS. HINTON-SAUNDERS: Yes, some were culinary -- I'm more familiar with the culinary passes because that's what Northwest One, they have the yellow passes.

MR. HANNON: Those passes are to allow those inmates to --

MS. HINTON-SAUNDERS: -- to go to the culinary and to the other side of the admin to work in the kitchen.

MR. HANNON: But you know that from the cell block side of things?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Not the kitchen side of things?

MS. HINTON-SAUNDERS: Right.

MR. HANNON: On this occasion, had you worked the previous shift?

MS. HINTON-SAUNDERS: Yes, I worked on the 4:00 to 12:00.

MR. HANNON: So you worked 4:00 to 12:00?

MS. HINTON-SAUNDERS: The day before.

MR. HANNON: The day before. Was that an assigned shift?

MS. HINTON-SAUNDERS: No, it was not an assigned shift. It was overtime.

MR. HANNON: All right. So the day before the Friday, did you work the day shift?

MS. HINTON-SAUNDERS: I always worked the day shift when I worked overtime.

MR. HANNON: I understand. So on that Friday, you worked the regular day shift?

MS. HINTON-SAUNDERS: I worked the day shift.

MR. HANNON: How was it that you worked the 4:00 to 12:00 shift?

MS. HINTON-SAUNDERS: I got it confused. I did not work that evening. I thought you meant the day before. After I finished my activities that day, I went home and they called me to come back for the internal affairs.

MR. HANNON: The day of the incident was the -- was it a Saturday?

MS. HINTON-SAUNDERS: It was -- I guess.

MR. HANNON: So you were working your --

MS. HINTON-SAUNDERS: -- regular shift.

MR. HANNON: Regular shift, but they put you at Admin. Two?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: And on Friday, you worked your regular shift?

MS. HINTON-SAUNDERS: At Northwest One.

MR. HANNON: You didn't work evenings or midnights Friday to Saturday?

MS. HINTON-SAUNDERS: Right.

MR. HANNON: Okay. It's kind of difficult to discuss the allegations --

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: -- when you didn't have responsibility or you don't remember seeing these folks. We put a note in here that we sent to Dr. Lesansky that you talked to Ben Collins of Internal Affairs?

MS. HINTON-SAUNDERS: Yes, I did.

MR. HANNON: Could you tell him about that conversation?

MS. HINTON-SAUNDERS: Well, when he called me the second time to meet with him, we discussed about the inmates, but I was thinking he was trying to confuse me on the time when the first two inmates went through the door earlier. So when I was finished talking to him, I said, wait a minute, did he confuse me on the time or what? So I called him to make sure he had the correct time.

I was like, did I give you the correct time when the two inmates left earlier that day, because he was trying to confuse me with the times. So that's when I tried to clear it up. I said, I'm glad you clarified it, because you confused me. The time he was trying to give me, I lost track of it. I wanted to clear it up.

MR. HANNON: Was that conversation recorded anywhere? Is there a transcript made of that?

MS. HINTON-SAUNDERS: I don't know, because I called him on the phone when I left. I was like, did he confuse my time? It was puzzling me, so I called him on

41

the phone. I was like, I don't know if you got the time right; you confused me on the time. I called him on the phone. He tried to make it seem in the transcript that I was trying to change it or coerce, and I said, no, that's not it.

MR. HANNON: How many times were you interviewed?

MS. HINTON-SAUNDERS: Twice.

MR. HANNON: Did they explain to you the reason for interviewing the second time?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: What did they tell you?

MS. HINTON-SAUNDERS: That I had some information that they needed, that I was okay and cleared, but they wanted to talk to me about the refrigerator, which they never asked me the first time, because he told me to only answer questions that he asked me.

MR. HANNON: Right.

MS. HINTON-SAUNDERS: So I never got a chance to tell him about the refrigerator. So I guess when they interviewed the inmate, he told him the

42

refrigerator had came up and I had checked it. That's why he called me the second time, to clarify it.

MR. HANNON: Well, did they accuse you of lying because the inmate had talked about the refrigerator incident and you hadn't?

MS. HINTON-SAUNDERS: I believe so, but I wanted to tell him that wasn't a question you asked me the first time. You told me to only answer questions that you gave me.

MR. HANNON: In our presentation, we said that one of the inmates who was on the environmental detail arrived at your post with the refrigerator.

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: The refrigerator had just been cleaned?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Where was that inmate coming from?

MS. HINTON-SAUNDERS: Culinary.

MR. HANNON: Where was the inmate going to?

MS. HINTON-SAUNDERS: Back to environmental office, back where Captain Holmes worked, where they

43

keep the refrigerator.

MR. HANNON: What, if anything, were you supposed to do with respect to the refrigerator?

MS. HINTON-SAUNDERS: Check it for contraband.

MR. HANNON: How did you know that you needed to do that?

MS. HINTON-SAUNDERS: Well, that's what -- anything that came out of the kitchen -- not only the visiting hall, but I have to check whatever comes out of the kitchen, all of the people, I have to look at it and check it.

MR. HANNON: How did you know that you had to do that; you never worked the shift before?

MS. HINTON-SAUNDERS: I talked to my girlfriend. She kind of explained it to me.

MR. HANNON: When did you talk to your girlfriend, because you didn't know you were going to get this assignment?

MS. HINTON-SAUNDERS: I didn't know, but I had called her at home when I got the post.

MR. HANNON: So you were told you had this assignment?

44

MS. HINTON-SAUNDERS: And I called her when I was at the post.

MR. HANNON: You had your cell phone?

MS. HINTON-SAUNDERS: I used the hall phone.

MR. HANNON: So you were assigned to the post. You go to the post; is that right?

MS. HINTON-SAUNDERS: That's correct.

MR. HANNON: And you used a wire telephone that is at the post?

MS. HINTON-SAUNDERS: It was at the post.

MR. HANNON: And you called her?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: On what number? Her cell phone or --

MS. HINTON-SAUNDERS: Home number.

MR. HANNON: Home number. She was there?

MS. HINTON-SAUNDERS: She was at home. She also explained to me prior to that when I would see her at her post, she would explain to me the things she was doing at the post.

MR. HANNON: Okay. But she didn't explain that to you to train you or anything?

MS. HINTON-SAUNDERS: No, I just was asking her. It was like me and her sitting -- you are not supposed to be sitting there -- but when me and her were sitting there and people would come up with the foods, I would see her go up and check it.

MR. HANNON: So there were occasions where you would see her, see her work and do her job?

MS. HINTON-SAUNDERS: Correct, but she would also escort the C&P people, because when she worked, she had the C&P, the visiting hall, culinary, attorneys. She had to do all of that herself.

MR. HANNON: Who was it that told you you were going to have to work Admin. Two that day?

MS. HINTON-SAUNDERS: Captain Aims.

MR. HANNON: Tell us about the conversation you had with Captain Aims. Did you tell Captain Aims you'd never worked Admin. Two?

MS. HINTON-SAUNDERS: No, when she said, Admin. Two, I said, are you sure Admin. Two? She said, Admin. Two. I was like, wow, I thought I was going to be in the block or Northwest One. She said, Admin. Two, we are short handed. That was it.

MR. HANNON: To your knowledge, did Captain Aims know whether you'd ever worked Admin. Two?

MS. HINTON-SAUNDERS: No. I think they were so pressed to put people anywhere because they were really short that day. They said before roll call you can be anywhere, just work your post.

MR. HANNON: So before roll call, they were actually addressing the problem that they knew about 50 short?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: Who was it that was talking to you at roll call about that?

MS. HINTON-SAUNDERS: Captain Aims.

MR. HANNON: To your knowledge, did anyone ask that the jail be shut down?

MS. HINTON-SAUNDERS: Yes, they did. I believe there was a union person in there that was telling them, the jail should be shut down because we were short in posts. People didn't know where they were going. People that were working different posts, didn't even know, and inmates were just running around.

MR. HANNON: Do you know who it was that

raised the issue?

MS. HINTON-SAUNDERS: I'm not even sure.

MR. HANNON: How did you hear about it?

MS. HINTON-SAUNDERS: I was standing in the roll call. I don't know who voiced it out, because I was on this end, but I could hear the voice, you know, we shouldn't be working; the jail should be shut down, because we were already short in staff at roll call. They were drafting people on 4:00 to 12:00 like crazy, because half of them were already walking out.

MR. HANNON: So you called your friend once you got to the post?

MS. HINTON-SAUNDERS: Yes. After I went and got my keys and talked to Ms. Brown, she told me some things that was going to go on at the post. Two inmates were cleaning up, so me and her sat down and talked for a while.

MR. HANNON: Two inmates were in the --

MS. HINTON-SAUNDERS: -- hall cleaning, two Hispanics were cleaning.

MR. HANNON: Were there any correction officers present with the two Hispanic inmates who were

cleaning?

MS. HINTON-SAUNDERS: No, they were just inside the visiting hall cleaning.

MR. HANNON: Was that, in your experience, unusual that inmates who were cleaning might not be accompanied by a corrections officer?

MS. HINTON-SAUNDERS: Yeah, because she -- Judy Brown can receive them, so they have full access of this visiting hall and the bathrooms, and you don't know what people left prior to the visiting hall in the bathrooms.

MR. HANNON: So you asked Judy Brown how to do your job?

MS. HINTON-SAUNDERS: I asked her earlier because there was an environmental guy that had to go downstairs to the first floor with some inmate, and I didn't know how he could get downstairs until she told me I had to go down with the inmate on the inmate side. And while he went down the step, that's what I did. I didn't know how it worked. I didn't know if they could just walk through or not. I had to physically take his inmates downstairs and wait until he went around to the

Visiting Hall One.

MR. HANNON: Now, even after talking to Judy Brown, you went back on the telephone and you called your friend to get more information about how to do your job?

MS. HINTON-SAUNDERS: Right, because I was kind of nervous about it because I was like, wow.

MR. HANNON: "What am I doing?"

MS. HINTON-SAUNDERS: Yeah. And then I knew there was only one person on the post, so I had to pick up attorneys. So I had to leave -- Internal Affairs asked me, you didn't call for relief? You never have relief. I called the Control Center to say, am I just supposed to leave? They said, just make it happen, make it work. I said, okay, fine, so I made it work.

MR. HANNON: So for the Admin. Two post, the only paperwork that you would be responsible for would be the paperwork for the walking inmates?

MS. HINTON-SAUNDERS: Correct, that would be it.

MR. HANNON: And they would come to your door with a pass?

MS. HINTON-SAUNDERS: They would come to the gate with a pass, and I would look at it and call inside.

MR. HANNON: Now, for those inmates, what did that pass look like?

MS. HINTON-SAUNDERS: It was just a white pass with their name, D.C. number, the housing unit, the officer that signed it, and then they would come in and I would assign the time they went in.

MR. HANNON: Just a handwritten slip of paper?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: A handwritten slip of paper?

MS. HINTON-SAUNDERS: That's it.

MR. HANNON: That's it?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: There is no verification?

MS. HINTON-SAUNDERS: No. Inmates in the housing block don't have I.D.s. It's just a handwritten paper and an arm band, which they could easily slip off and put on. That's all you had.

MR. HANNON: What does the hand band have on it?

MS. HINTON-SAUNDERS: It's supposed to have their picture, but sometimes the machine is broken, and it just has the D.C. number. It doesn't have the picture at all.

MR. HANNON: Okay. So if an inmate is observed without a wrist band on, is that a cause for a concern?

MS. HINTON-SAUNDERS: No, because he could have a handwritten pass and go, I'm going to get an arm band put on.

MR. HANNON: That would be handwritten?

MS. HINTON-SAUNDERS: Handwritten.

MR. HANNON: So nobody calls you to tell you that somebody is coming?

MS. HINTON-SAUNDERS: No.

MR. HANNON: Now when somebody with a walking pass came to you at Admin. Two, do you call into the hall to verify?

MS. HINTON-SAUNDERS: Yes, I call inside to make sure that they have a visitor.

MR. HANNON: Who do you talk to?

MS. HINTON-SAUNDERS: Ms. Judy Brown.

MR. HANNON: How does she know they have a visitor?

MS. HINTON-SAUNDERS: She has the lawyer's form or I have already brought up the lawyer, because like there was one time when I was inside the visiting hall when the inmates were cleaning; I don't know who let the attorneys in, but somebody let the attorneys in because they were at the door, and I wasn't even at the door, so we let them come through the visiting door.

MR. HANNON: The attorney form gets filled out by the attorney?

MS. HINTON-SAUNDERS: Yes, staff badges.

MR. HANNON: So that's what Ms. Brown relies upon --

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: -- to tell you to go ahead and send the inmate through?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: Okay. The day of the incident, you encountered some lawyers that you were surprised they were --

MS. HINTON-SAUNDERS: -- at the door.

53

MR. HANNON: At the door?
MS. HINTON-SAUNDERS: Right.
MR. HANNON: Why were you surprised they were at the door?
MS. HINTON-SAUNDERS: Because I didn't let them through.
MR. HANNON: That was the admin. door?
MS. HINTON-SAUNDERS: Right.
MR. HANNON: Now, how do you know they were lawyers?
MS. HINTON-SAUNDERS: They were standing at the window with the white paper showing me. And we let them in and walked around and looked at the paper to see.
MR. HANNON: It was the lawyer visiting form?
MS. HINTON-SAUNDERS: Yes.
MR. HANNON: So it sounds like, in that instance, the lawyers brought the forms themselves and went to the location to get the clients?
MS. HINTON-SAUNDERS: No, they was just at the door. I don't know who opened the admin. door to let them in, but somebody had to let them through that side,

54

and they were right at the door.
MR. HANNON: On the inmate side?
MS. HINTON-SAUNDERS: On the inmate side. So we electronically opened the door where they can come in.
MR. HANNON: All right. So the very same day that this happened, you received your evaluation?
MS. HINTON-SAUNDERS: Yes.
MR. HANNON: And the rating was what?
MS. HINTON-SAUNDERS: Excellent.
MR. HANNON: Is there a higher rating?
MS. HINTON-SAUNDERS: Outstanding.
MR. HANNON: How many times have you been rated?
MS. HINTON-SAUNDERS: That was my first time.
MR. HANNON: What's the frequency with which you're rated?
MS. HINTON-SAUNDERS: I believe it's every year, and it's determined on your post, you know, the blocks you work, the post assignment, your attendance, and how you get along with your officer.
MR. HANNON: Those are some of the criteria

55

for your rating?
MS. HINTON-SAUNDERS: Yes.
MR. HANNON: Who was it that rated you?
MS. HINTON-SAUNDERS: Lieutenant Datcher.
MR. HANNON: You were supposed to be rated every year. Was your rating overdue?
MS. HINTON-SAUNDERS: Yes, it was.
MR. HANNON: You smiled. Was that an issue between you and Lieutenant Datcher?
MS. HINTON-SAUNDERS: No, it's a normal thing in the Department. They know they're supposed to have the raises in. They wait to the last minute to rush them and they take their time.
MR. HANNON: In your first term with corrections, were you rated every year?
MS. HINTON-SAUNDERS: Yes.
MR. HANNON: What were your ratings the first time for corrections?
MS. HINTON-SAUNDERS: Some were satisfactory and some were excellent.
MR. HANNON: Did you have any outstanding?
MS. HINTON-SAUNDERS: No, not yet.

56

MR. HANNON: What's your understanding as to the frequency of which somebody is rated outstanding? Is that -- is there some kind of benchmark? Is that the top 5 percent, top 10 percent, or does it depend on who is rating you?
MS. HINTON-SAUNDERS: It depends on who is rating you.
MR. HANNON: Were you ever told by anyone with OIA that you were going to be disciplined?
MS. HINTON-SAUNDERS: No. Mr. Collins said that I was okay. He said, you will probably get some time on the street, but when he was interviewing me, he turned the table and was like -- I guess he thought I was lying about whatever. He was like, you can tell us the truth if you're covering for somebody. I said, I'm not covering for anybody, I'm just telling you the truth. And then he turned the tables. Then he was like, I'm through with this conversation.
MR. HANNON: Then you talked to him -- you were interviewed a second time?
MS. HINTON-SAUNDERS: A second time, way later.

MR. HANNON: And then you had a telephone conversation?

MS. HINTON-SAUNDERS: That's when I called him to make sure he had the correct times. It seemed like he was trying to confuse me on the time.

MR. HANNON: Okay. Actually it's kind of confusing to me, too.

MS. HINTON-SAUNDERS: Yeah, it was like he was trying to confuse me. You know, he told me that the environmental guy went through with two guys earlier that day. Then he tried to switch it to like the second time when they walked through the door. I was like, no, that doesn't sound right. He went through the door with two guys earlier that morning. They were on the paint crew.

I felt like he was trying to like manipulate the time, so I had to call to make sure he got the proper time.

MR. HANNON: Didn't you assume he was confused?

MS. HINTON-SAUNDERS: I guess, because I was confused.

MR. HANNON: Well, I'm confused a little bit, too.

MS. HINTON-SAUNDERS: Right. I was like, wait a minute. So I just called him back to make sure. He was like, is this a union call? I said, no, I just wanted to make sure that we had everything correct and the proper time, because I think you tried to confuse me on the time.

MR. HANNON: Now, did he ever indicate to you that Jones or Leaks went through the Admin. Two while you were there?

MS. HINTON-SAUNDERS: Yes, he did. I told him, I cannot be sure of that, because once I did my job with the refrigerator and let the people with the refrigerator through with the guy, the environmental guy went through with all of his people, so I cannot specifically tell you that I saw them two people, because he went through with some guys. So I cannot specifically say I saw them. So that's what they tried to say, that I didn't pay attention to the badges.

MR. HANNON: So you were aware that some inmates on environmental detail went through Admin. Two?

MS. HINTON-SAUNDERS: Right.

MR. HANNON: So were you accused of not checking the badges of the inmates who were on environmental detail going through the Admin. Two door?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Do you have any idea whether that's part of the job of the corrections officer assigned to Admin. Two?

MS. HINTON-SAUNDERS: No, that's not part of the job. I asked the lady that worked the post after everything went down, she said, no, that's not your job. I even asked the union lady, Ms. Jacobs, she got what's written down that that's not part of my performance, to check environmental detail, because they're with him, and he knows who is people are. Before I even get there, he had people painting that didn't have a pass.

So I said, you say I'm responsible for the people that were painting that didn't have a badge or the people on the other side cleaning up with just the letter "T," am I responsible for them, too? That's impossible. They don't even have a picture on that.

MR. HANNON: Did you know that they were

trying to clean up the jail for accreditation?

MS. HINTON-SAUNDERS: Yes, I knew they were cleaning up for accreditation.

MR. HANNON: How did you know that?

MS. HINTON-SAUNDERS: Because they had been announcing it every day on roll call, that we had to clean the blocks.

MR. HANNON: Who is "we"

MS. HINTON-SAUNDERS: Officers in the blocks, just everybody in the jail. Inmates were cleaning up all over the place, painting all over the place.

MR. HANNON: This was a priority?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Were correction officers actually doing cleaning themselves as well?

MS. HINTON-SAUNDERS: Well, some, but mainly supervising, but some were actually, like, helping clean; but we really are supposed to supervise.

MR. HANNON: I understand that. But who was it that had put out the word that we need to get everything cleaned up?

MS. HINTON-SAUNDERS: Captain Holmes, he is

head of the hiring of these inmates. He will come to Northwest One and pull people out that weren't assigned to the block to paint the block. They would come from Southwest Two, and just because he went and got them, they allowed him to bring in people to paint and clean the block or something like that or buff the floors, and they really shouldn't even have been in the block.

MR. HANNON: Was that true of the block that you worked, that they would come and take people on a temporary basis?

MS. HINTON-SAUNDERS: Yes, they had people working in the kitchen, but he would bring people from other blocks into our block to paint. They really weren't even assigned to the block. They would paint, buff floors, and stuff like that, because the people in the kitchen were always gone down in culinary cooking.

MR. HANNON: Okay. I'm looking through what are called the Douglas Factors here. Your performance was excellent?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: Did you get along with your fellow workers?

MS. HINTON-SAUNDERS: Yes, I did.

MR. HANNON: Were you dependable?

MS. HINTON-SAUNDERS: Never late.

MR. HANNON: Did you work overtime when called to?

MS. HINTON-SAUNDERS: Yes, I did.

MR. HANNON: Did you volunteer for overtime?

MS. HINTON-SAUNDERS: Yes, I have.

MR. HANNON: Now, do you think this incident will prevent you from being able to do your job?

MS. HINTON-SAUNDERS: No. This incident has only hurt me, because while I was working at the jail, I also was working at the Marshal Service, and when the incident happened, they let me go, the Marshal Service, pending an investigation.

MR. HANNON: Well, that only happened recently; right?

MS. HINTON-SAUNDERS: That was before. When it actually happened, I was working in a cell block.

MR. HANNON: So you were a contract employee with the Marshal Service working the cell block at the courthouse?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: When this incident occurred, you were disciplined or put on leave?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: They also discharged you?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: But then you were able to go back?

MS. HINTON-SAUNDERS: Once I got fully reinstated, they were -- they were confident enough. They said once you get reinstated back, you can come back. So once I got fully reinstated back, I worked in the courtroom this time. And when the article came out, The Examiner --

MR. HANNON: Let's back up. By reinstatement --

MS. HINTON-SAUNDERS: -- the letter of Devon Brown.

MR. HANNON: Saying to come back to work?

MS. HINTON-SAUNDERS: I was fully reinstated.

MR. HANNON: Get back pay?

MS. HINTON-SAUNDERS: Back pay.

MR. HANNON: Let's take it one step at a time. How did you learn that you were being brought back?

MS. HINTON-SAUNDERS: I got a phone call from someone in personnel. I'm trying to remember -- was the name Murphy -- saying I was fully reinstated back to work. I said, this isn't like this 20-day temporary thing, is it? She said, no, you're fully reinstated back to work; come on in and sign the papers or whatever. I said, okay, because I don't want to be like Ms. Copeland brought in to sign some papers and 20 days later you're getting fired. She said, no, no.

MR. HANNON: You came to this building?

MS. HINTON-SAUNDERS: This building.

MR. HANNON: What did you think was going to happen?

MS. HINTON-SAUNDERS: Well, I got the letter from her, Ms. Copeland. I went to go see Devon, and he showed me the reinstatement letter, and then he also pulled out another letter. I said, well, you didn't tell me this part, about the proposed termination. I mean, you're telling me I was fully reinstated, but when I called and asked the lady about it, she said I didn't

have this. So now I have a letter stating that I have this proposed annual leave, administrative leave. So I was like -- I felt I was tricked.

MR. HANNON: But when they reinstated you on the admin. leave, that was enough for the Marshal Service to allow you to go back to work?

MS. HINTON-SAUNDERS: That was enough for me to go back to work.

MR. HANNON: Then what happened that caused the Marshal Service to change their position?

MS. HINTON-SAUNDERS: Well, while I was working down at the courthouse, something in The Examiner came out about the one-year anniversary. My name was down in a little blue box saying, scapegoat or silent partner, which had my name, my years, and that I allegedly let the inmates through the door. They said, we can't let you work. We thought you were reinstated. I said, I am reinstated. So they had to let me go until I get cleared again to go back. Once I get cleared again this time, they will take me back again.

MR. HANNON: So they weren't having any problems with your performance?

MS. HINTON-SAUNDERS: No, my performance is excellent. In fact, they are waiting for me to come back, because while I was gone, some people were fired. So Mr. Rivers and the head Marshal, Mr. Patrick, said, whenever you get finished up --

MR. HANNON: So you were being trained to work in the courtroom by the Marshal Service?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: Now, do you know of any other contract employees who are allowed to work in the courtroom?

MS. HINTON-SAUNDERS: No, I'm the only one.

MR. HANNON: Ordinarily, only the --

MS. HINTON-SAUNDERS: -- the marshals are.

MR. HANNON: -- deputy marshals can actually work in the courtroom?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: But you were being trained to work in the courtroom?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: And you would be the only contract employee --

MS. HINTON-SAUNDERS: -- to work in the courtroom, yes.

MR. HANNON: And --

MS. HINTON-SAUNDERS: Because everybody else is like transportation and in the cell block.

MR. HANNON: Right.

MS. HINTON-SAUNDERS: I was the only one that went to the courtroom.

MR. HANNON: And what's your understanding as to why they were willing to train you for that work?

MS. HINTON-SAUNDERS: Well, I was dependable; they trust me for the time I was there; I was on time; always done my work; voluntarily stayed late when they needed it. So they figured I would be a good candidate to work there.

MR. HANNON: To make it clear -- I was a prosecutor for eight years, so I know the way this works. It would be you in the courtroom, the bandit in the courtroom --

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: -- who could very well come up from the cell block --

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: -- who would be in handcuffs unless there was a jury in the box?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: And the judge would be in the courtroom; correct?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: The courtroom staff?

MS. HINTON-SAUNDERS: Yes.

MS. HINTON-SAUNDERS: The people out in the audience?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: The lawyers?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: When the bandit was in the courtroom, what was your job?

MR. HANNON: I would assist with the marshals as far as being behind the inmates or help escorting them up or taking them back to the cell block when they finished. That would be my job.

MR. HANNON: And in the courtroom, you would be making certain that everybody there was protected?

MS. HINTON-SAUNDERS: Safe, yes.

MR. HANNON: Is that part of your training?

MS. HINTON-SAUNDERS: Yes, they trained me for that. So it really hurt me when --

MR. HANNON: So as far as your violation of the Marshall Service, except for the D.C. Examiner article, they have confidence for you?

MS. HINTON-SAUNDERS: Yes, I would still be working right now.

MR. HANNON: If it weren't for that newspaper article?

MS. HINTON-SAUNDERS: If it weren't for that newspaper article.

MR. HANNON: Even before Dr. Lesansky?

MS. HINTON-SAUNDERS: I would be working right now, in the courtroom right now.

MR. HANNON: Now, have you ever been told in the time that you have worked for the Department of Corrections that there is a schedule of penalties for particular types of misconduct?

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: When was that?

MS. HINTON-SAUNDERS: When there was a guy who lost a weapon in the D.C. General. I was wondering about -- when he lost his weapon, somehow somebody found it and buried it. He got 56 days in the street for it. And another incident happened where someone shot a weapon in the tower, they haven't been disciplined yet for it, but, yet, this man got like 56 days, and this other person didn't get anything. And I also feel --

MR. HANNON: Well, what does it have to do with there being a list of penalties?

MS. HINTON-SAUNDERS: Because my thing is that the penalty for like -- he was so worried about being fired that I was like, if this is your first offense -- I questioned him about it. He said he could do 45 days. So when he got 56 days, I'm like, isn't it in the union contract saying that you'd get 45 days for like a first-time offense? And then they said -- I never heard about mal (inaudible) until this happened. I was like, what is that? I never heard of it. So when I heard that, I'm like, what's that?

MR. HANNON: Let's back up a second now. The two incidents where the officer, what, lost a gun?

MS. HINTON-SAUNDERS: Lost a gun at D.C. General. They had quite a few incidents.

MR. HANNON: Let's just focus on these two. An officer lost a gun at D.C. General and got 56 days.

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: And then you became aware that an officer discharged a firearm in the tower?

MS. HINTON-SAUNDERS: In the tower, and nothing has happened to this day.

MR. HANNON: Okay. And my impression is that it raised a question in your mind --

MS. HINTON-SAUNDERS: Yes.

MR. HANNON: -- as to whether there is some kind of a list?

MS. HINTON-SAUNDERS: Yes, because I was thinking to the point where, okay, well, if I just got charged for not looking at an I.D., how serious is me not looking at an I.D. when a person is still in jail compared to firing a weapon and losing a weapon that someone buried and brings it up?

MR. HANNON: Did you ever discover whether there was a list of penalties for particular things?

MS. HINTON-SAUNDERS: I asked the union lady about it.

MR. HANNON: And there isn't any; is there?

MS. HINTON-SAUNDERS: No. I thought there was. I just don't understand.

MR. HANNON: So you've never been told as a corrections officer that, look, here is the deal, if you do this, then, the range of penalty for the first offense is going to be "X," the second offense is going to be "Y," the third offense is going to be "Z" until you know all the way --

MS. HINTON-SAUNDERS: No, I have never been told that.

MR. HANNON: Nothing?

MS. HINTON-SAUNDERS: No.

MR. HANNON: So your impression is -- it sounds as if you're telling Dr. Lesansky that you're aware of all kinds of people who have done all kinds of things who get different kinds of penalties?

MS. HINTON-SAUNDERS: Like they make it up as they go.

MR. HANNON: What do you think about that?

MS. HINTON-SAUNDERS: I don't think it's fair, because, to me, I feel I've done nothing wrong. I've done my job. I checked the refrigerator. The guy was with his people. I let him go through with the refrigerator. He took his people through there. What else am I supposed to do?

MR. HANNON: And somebody who discharged the firearm --

MS. HINTON-SAUNDERS: -- didn't get in trouble at all, not even a release at the jail, nothing happened to them, period.

MR. HANNON: So why do you think you've been --

MS. HINTON-SAUNDERS: The media? I don't know why. I don't know why.

MR. HANNON: Sure you do.

MS. HINTON-SAUNDERS: Just the media pressure, I believe. I don't know. One minute I thought I was going to be coming back and the next thing I seen in the news I was fired.

MR. HANNON: Did the discharge of the firearm in the tower, was that publicized?

MS. HINTON-SAUNDERS: No, it was quiet.

MR. HANNON: That wasn't in the Washington Post?

MS. HINTON-SAUNDERS: No. And the same person that fired the weapon wrecked a car and it was quiet.

MR. HANNON: And that wasn't in the Washington Post?

MS. HINTON-SAUNDERS: No.

MR. HANNON: If Dr. Lesansky recommends that you've done something wrong, he has to answer the question as to whether you could be rehabilitated. Do you need to be rehabilitated?

MS. HINTON-SAUNDERS: No, I can perform my duties as I always have.

MR. HANNON: Do you want to go back?

MS. HINTON-SAUNDERS: Yes, I do.

MR. HANNON: Are you interested in continuing to pursue your career in corrections?

MS. HINTON-SAUNDERS: Yes, I am.

MR. HANNON: Even though this has happened to you?

MS. HINTON-SAUNDERS: Yes, it was -- it was

unfortunate. I was angry, but, you know, I have to make a living. I want to continue my career and finish it up and just move on with my life.

MR. HANNON: Are you anxious for a promotion?

MS. HINTON-SAUNDERS: Of course, yes. I was upset that I wasn't able to take the sergeant test. I was real upset about that being that I would like to get a promotion.

MR. HANNON: Why were you not able to take the test?

MS. HINTON-SAUNDERS: I've been fired, so I was not able to take the test.

MR. HANNON: You have very good technical training; don't you?

MS. HINTON-SAUNDERS: Yes, I do.

MR. HANNON: You are a pretty smart person; right?

MS. HINTON-SAUNDERS: Yes, I am.

MR. HANNON: Where did you grow up?

MS. HINTON-SAUNDERS: D.C., by Walter Reed Hospital, Northwest.

MR. HANNON: Do you have any brothers and

sisters?

MS. HINTON-SAUNDERS: Two brothers and two sisters.

MR. HANNON: Have they all done well?

MS. HINTON-SAUNDERS: Some have and some have not. I'm the oldest of five.

MR. HANNON: Are your folks still living?

MS. HINTON-SAUNDERS: My mom is. She lives in D.C.

MR. HANNON: Your mom still lives there?

MS. HINTON-SAUNDERS: Well, she is going to be living with me.

MR. HANNON: Does she have health problem?

MS. HINTON-SAUNDERS: She has a drug habit. I'm trying to get her in a program.

MR. HANNON: Are you responsible for her?

MS. HINTON-SAUNDERS: I'm her main provider.

MR. HANNON: How about your siblings?

MS. HINTON-SAUNDERS: They help a little bit. They got down a little with the drug problems.

MR. HANNON: You seem like a happy person.

MS. HINTON-SAUNDERS: I'm always happy.

MR. HANNON: How about your husband, is he the same way?

MS. HINTON-SAUNDERS: He's not talking to me right now.

MR. HANNON: That's all I'm going to ask you. Is there anything that we haven't talked about that you would like to tell Dr. Lesansky before we get out of here?

MS. HINTON-SAUNDERS: I just believe I was misled and treated unfairly as far as the -- they want you to check, do your job, whatever, and I'm not in charge of MAs, I'm in charge of a post. If someone is with their people and they do something wrong, then that's their fault.

MR. HANNON: But you don't know that -- you don't know that they did anything wrong?

MS. HINTON-SAUNDERS: If they're with their people, that's their people. I'm not responsible for nobody's people. I'm responsible for a post. I just feel like we just got a raw deal in this thing.

MR. HANNON: I'm done. Doc?

DR. LESANSKY: I want to ask you a couple of

things. I want to go back to make sure that I don't get confused about what you said about the sequence with the Marshal Service. Did I understand you to say that when you were fired the first time, originally, that fact led the marshals to then discharge you from your position; is that correct?

MS. HINTON-SAUNDERS: Right.

DR. LESANSKY: Then what I heard you say, I think, is that then when you were reinstated, based on the decision, they then rehired you; is that right?

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: And that reinstatement, when they did, that was before you came here to -- you got the call from Ms. Murphy, from personnel, saying you were coming to Grimke and you were going to be --

MS. HINTON-SAUNDERS: -- reinstated. I had to get the letter first.

DR. LESANSKY: They had to physically get the letter?

MS. HINTON-SAUNDERS: Yes.

DR. LESANSKY: So the marshals had not reinstated you yet; correct?

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: They had not rehired you?

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: So then you came to Grimke that day to --

MS. HINTON-SAUNDERS: Yes.

DR. LESANSKY: -- from what you understood, to be reinstated, blah, blah, blah?

MS. HINTON-SAUNDERS: Yes.

DR. LESANSKY: You come and you then get this second letter that's presented to you saying they were going to give this 20-day --

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: So then after that, the marshals reinstated you -- hired you back?

MS. HINTON-SAUNDERS: Yes, I took the letter physically and they reinstated me back.

DR. LESANSKY: You took both letters or you took one letter?

MS. HINTON-SAUNDERS: The one letter.

DR. LESANSKY: The reinstatement letter. So the marshals at that point didn't know that you had a

second letter?

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: You didn't tell them you had a second letter?

MS. HINTON-SAUNDERS: No, I did not.

DR. LESANSKY: So then you're working for the marshals and then the article comes out in The Examiner?

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: Which says words to the effect of that you were --

MS. HINTON-SAUNDERS: -- allegedly --

DR. LESANSKY: -- listed there somewhere that you had now been --

MS. HINTON-SAUNDERS: -- a scapegoat or a silent partner and a question mark.

DR. LESANSKY: And so then they, what, called you in or how did they --

MS. HINTON-SAUNDERS: Well, I was working in the courtroom and a guy said, can I talk to you a minute, Ms. Hinton? I said, sure. He said, your name is in the paper. I said, my name is in the paper? I said, are you sure my name is in the paper? He said,

yes; once you get it straightened out, then come back. I was like, okay.

Then I inquired about The Examiner, because I didn't even see it. I didn't even know my name was in the paper until some people handed it and I read it, and I was like, wow. I didn't even know it was in the paper, and then when I met up with him again, I told him about it, you know, it cost me my job again.

DR. LESANSKY: So the Marshal Service was saying that to you, that because your name is appearing in the newspaper, The Examiner, that that means you can't work for the Marshal Service right now?

MS. HINTON-SAUNDERS: Right.

DR. LESANSKY: Okay. And at that -- at any point did you tell them that there was this second --

MS. HINTON-SAUNDERS: Well, I told them --

DR. LESANSKY: -- that you had seen the second letter that was given to you on the same day that was saying, you are now proposed --

MS. HINTON-SAUNDERS: I explained to Mr. Rivers that I had a meeting on the 25th of this month to meet with a designee about what was going on with this

case. He said, well, we're going to have to fully wait then, because since my name is -- as long as -- I guess my name wasn't in this paper and I came to the hearing and the outcome would have been, then I probably would have stayed or -- but since it came in the paper, I guess it was too public or whatever.

DR. LESANSKY: It just sounded to me, and I wanted to be clear, that it sounded to me as though what you are saying is that the Marshal Service did not know anything about the second letter or --

MS. HINTON-SAUNDERS: Well, they knew I had a second hearing. I explained to him that I had to come and see you on the 25th. I did let him know it. I told him whatever the outcome is, bad, good, positive, I would let him know. I guess they were going to make their decision. But they had done my background and everything.

MR. HANNON: So the concern that Dr. Lesansky has is that when you were mislead into believing you were coming back to work, you then misled the Marshal Service into believing that you had been taken back to work.

MS. HINTON-SAUNDERS: No. See, I told them officers that we were arranging for a hearing, because we had to get a letter stating that I would work certain hours. So I faxed him the letter that I could not work day shift because I still had a hearing to go to. This is before we got the dates.

MR. HANNON: Right.

MS. HINTON-SAUNDERS: When I got the date, I told Rivers that I will go on the 25th, and whether it is good or bad, I will let you know eventually --

MR. HANNON: But the point is that he -- you had to get a letter from corrections because they took the position that while you were on admin. leave, you couldn't take another job during your shift?

MS. HINTON-SAUNDERS: Correct.

MR. HANNON: So you had to, in order to go back to work for the Marshal Service --

MS. HINTON-SAUNDERS: Right.

MR. HANNON: -- get a letter from corrections that said that you could work --

MS. HINTON-SAUNDERS: -- a certain amount of hours.

MR. HANNON: Right, evening shift. And Deputy Rivers, your supervisor, knew that you were on admin. leave?

MS. HINTON-SAUNDERS: Right. I told him that I could not do day work. I could only do evening because I was on administrative leave and I had to call and I would go see the people on the 25th.

MR. HANNON: And that will be the next step?

MS. HINTON-SAUNDERS: The next step, good or bad, I'll tell you where the ball bounces.

MR. HANNON: And to be clear, if you go back to work at the Department of Corrections, you don't get the back pay you lost from the Marshall Service because that was a contract job?

MS. HINTON-SAUNDERS: Right, I would go back to work.

MR. HANNON: How much were you making a week?

MS. HINTON-SAUNDERS: Every two weeks, about $900.

MR. HANNON: For how many hours?

MS. HINTON-SAUNDERS: Six.

MS. HINTON-SAUNDERS: Six a day?

MS. HINTON-SAUNDERS: Uh-huh.
MR. HANNON: For how many days?
MS. HINTON-SAUNDERS: I would work five days, sometimes six, because I would work Monday through Friday and then I could work Saturday.
DR. LESANSKY: The other thing I wanted to ask you was about where you were getting your information, your guidance, on how to work the Admin. Two.
MS. HINTON-SAUNDERS: Right. And I thought we could -- I was going to let her come down --
MR. HANNON: Let me interrupt. I sent you a letter about admin. leave.
DR. LESANSKY: Right.
MR. HANNON: We were contacted and told that none of these people would be permitted to present witnesses.
DR. LESANSKY: Right.
MS. HINTON-SAUNDERS: She wanted to fully come in and explain herself, too.
MR. HANNON: Well, this is not a hearing.
DR. LESANSKY: Well, me just follow up with, am I correct that the first thing you did was ask your

supervisor --
MS. HINTON-SAUNDERS: Correct.
DR. LESANSKY: -- what am I supposed to do; this is the first time, even though the supervisor may not have known it?
MS. HINTON-SAUNDERS: She knew it, but --
DR. LESANSKY: That this was the first time you were working Admin. Two?
MS. HINTON-SAUNDERS: Correct.
DR. LESANSKY: So what -- what did you do?
MS. HINTON-SAUNDERS: She said, just ride with it. She knew we were short. Her mentality was to make it work.
DR. LESANSKY: But did not --
MS. HINTON-SAUNDERS: That's how she is.
DR. LESANSKY: But she did not offer --
MS. HINTON-SAUNDERS: -- any training. No, we were short.
DR. LESANSKY: -- information. I imagine you asked her questions, I mean, obviously --
MS. HINTON-SAUNDERS: Well, she was -- you know, the person she is, she just was like, make it

work.
DR. LESANSKY: No, I don't know her, so I need you to tell me.
MS. HINTON-SAUNDERS: And if you challenge her more about it, it's like getting into an argument with her.
DR. LESANSKY: So in fairness to Captain Aims, she had the whole jail room --
MS. HINTON-SAUNDERS: So I'm not sure she could make the time --
DR. LESANSKY: -- to teach you to do your new job when there was plenty of people --
MS. HINTON-SAUNDERS: A whole lot of people complaining and she told people to make it work.
DR. LESANSKY: So, obviously, you did get as much information as you thought from your friend who --
MS. HINTON-SAUNDERS: Correct.
DR. LESANSKY: -- had the post?
MS. HINTON-SAUNDERS: Correct.
DR. LESANSKY: Was there anyone else that you asked questions of regarding how you were --
MS. HINTON-SAUNDERS: Well, the inside lady,

Judy Brown, she could just tell me as much as she can, because she was always on the inside. We just kind of worked it the best we could.
DR. LESANSKY: Other than the friend that you called at home on the phone, was there any other officers that you worked with that could --
MS. HINTON-SAUNDERS: No, everybody was scattered around that day.
MR. HANNON: Can you just expand a little bit on what your understanding of that job that day was when -- I know you said you were basically -- I wrote it down.
MS. HINTON-SAUNDERS: Pick up attorneys, pick up status inmates, work the visiting hall for the legal visits, and whenever the time the social visits start, I'm just there at the post right there. I'm not in charge of any inmates.
DR. LESANSKY: So on this door that you are --
MS. HINTON-SAUNDERS: It was separate admin. --
DR. LESANSKY: So what's your understanding of this door in terms of your duties relative to people --

89

MS. HINTON-SAUNDERS: -- passing through.

DR. LESANSKY: -- passing through. Obviously, you have a key?

MS. HINTON-SAUNDERS: I'm only supposed to pass through like attorneys or people coming from the culinary.

DR. LESANSKY: Those are the only people that you are authorized to let through?

MS. HINTON-SAUNDERS: To let through.

DR. LESANSKY: You are not authorized to let anyone else come through, no one else can come through?

MS. HINTON-SAUNDERS: No, except the attorneys and culinary, and environmental has a key and they can come through.

DR. LESANSKY: So anyone else that's going to come through that door --

MS. HINTON-SAUNDERS: -- has the key.

DR. LESANSKY: -- is going to have a key?

MR. HANNON: Or the correction officer; is that correct? If the environmental corrections officer --

MS. HINTON-SAUNDERS: He has a key.

90

DR. LESANSKY: So just help me understand what you are saying. If I'm a captain and I come up to your door and I don't have a key, you don't let me through unless you said, your understanding is, culinary and attorneys?

MS. HINTON-SAUNDERS: And attorneys. If you order me to let you go through the door, I can let you.

DR. LESANSKY: As a captain?

MS. HINTON-SAUNDERS: As a captain. If you order me --

DR. LESANSKY: That's an order?

MS. HINTON-SAUNDERS: That's an order.

DR. LESANSKY: But based on your understanding of who you're authorized to let through the door would be just culinary and attorneys?

MR. HANNON: I think that's unfair.

DR. LESANSKY: I'm trying to understand the issue of the door. It seems pretty significant since that was their post.

MR. HANNON: No, that wasn't their post. She is -- she already said her job wasn't to guard that door. Her job was to bring inmates out to the visiting

91

hall.

MS. HINTON-SAUNDERS: You've been at the jail. The admin. doors are here and the visiting doors are right here. This is my area right here (indicating).

DR. LESANSKY: So you had nothing to do with the admin. door?

MS. HINTON-SAUNDERS: Correct. This is me right here (indicating). If somebody comes up from the kitchen, like some food that has got to be fed to the officers, I have to check that and do the door.

MR. HANNON: But in terms of the Admin. Two, the issue --

DR. LESANSKY: I don't mean to interrupt you. I'm trying to understand that you had a key to a door.

MS. HINTON-SAUNDERS: Uh-huh, because I had to go through that door to pick up attorneys because I can't bring them through the jail. So I had to go down there, get the attorneys, bring them back to the door, because I can't take them through the jail.

DR. LESANSKY: So in terms of your connection to the Admin. Two door, you have a key to that door?

MS. HINTON-SAUNDERS: Correct.

92

DR. LESANSKY: So you can allow culinary and the attorneys to come through that door so they can --

MS. HINTON-SAUNDERS: -- go out that door. They can go out the door, because there is no other way for them to get out of the jail but through that door in the early morning hours.

MR. HANNON: So anyone else who comes up to the Admin. Two door --

MR. HANNON: No, no, that's unfair.

DR. LESANSKY: Help me. I'm trying to --

MR. HANNON: Did inmates on environmental detail go through that door the day you were there?

MS. HINTON-SAUNDERS: Not by themselves.

MR. HANNON: Who were they with?

MS. HINTON-SAUNDERS: The environmental guy.

MR. HANNON: Now, Dr. Lesansky wants to know whether it was your job to not allow the corrections officer who is with the environmental detail to go through the door?

MS. HINTON-SAUNDERS: He can go through the door.

MR. HANNON: All right. Is it your job to

make sure that the inmates with him have their passes?

MS. HINTON-SAUNDERS: Yes -- no, no, it's not my job.

DR. LESANSKY: I wasn't getting with the inmates with the badges yet. I was trying to get a clear responsibility that you had with this key for opening and closing the door, and for whom you are supposed to open and close it.

MS. HINTON-SAUNDERS: But that doesn't preclude other people going through for other reasons.

DR. LESANSKY: Right, and that's why I'm asking. So anyone else who comes through that door would either have a key to that door, except, if I understand correctly, someone higher in rank orders you to open the door?

MR. HANNON: I don't agree with that either.

DR. LESANSKY: Okay. All right. I'm not trying to put any words in any mouth. I'm trying to understand what your responsibility was because it's mentioned specifically your responsibility for this Admin. Two door.

MR. HANNON: What she knew of her

responsibility was what Judy Brown and her friend told her. That's the extent of it.

DR. LESANSKY: Right.

MR. HANNON: And there was no general order.

MS. HINTON-SAUNDERS: There was nothing there.

DR. LESANSKY: I understand there was no post orders.

MR. HANNON: So if you're asking her what would she have done if the captain had come up to the door without a key, she let the captain do what he wanted or any other correctional officer, for that matter. She's not -- that's not part of the job. So let's try to stick with --

DR. LESANSKY: Yeah, I was only talking about what -- I was asking in terms of what either -- you asked Judy Brown like, what I am supposed to do. You had said earlier at one point you were a little nervous about it. First of all, it was the first time you were there on that post?

MS. HINTON-SAUNDERS: Right.

DR. LESANSKY: So from your understanding, there was no post orders, so there was nothing for you

to read. So your supervisor, Captain Aims, said, just do it, is what you're saying?

MS. HINTON-SAUNDERS: Uh-huh.

DR. LESANSKY: So based on what Judy Brown and your friend who you called told you, that's where your understanding came from, that you are to use the key to culinary to come through?

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: You would use the key for the attorneys because obviously that wasn't your responsibility. One of your responsibilities was to retrieve the attorneys and bring them up?

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: In terms of your key to that door, that's what they say is what your responsibility was?

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: In your response, you talked about other people having keys, and you talked about this case that you mentioned here where suddenly, I think four attorneys with their paper appeared at your window and showed you their paper?

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: And you were a bit surprised because you knew you were there so you didn't let them in, so somebody --

MS. HINTON-SAUNDERS: -- let them in.

DR. LESANSKY: -- would have had to have opened the door and let them in, and it was obviously not you because you were on the other side of the door?

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: But you didn't -- you never found out or you don't know who let them in?

MS. HINTON-SAUNDERS: No, I never found out, and when we went around asking, no one knew who let them in.

DR. LESANSKY: All right. My last question is the issue of checking badges. Can you tell me in terms of what you understood in terms related to the key, opening the door for culinary and attorneys, can you tell me just a little bit about did you check any badges that day?

MS. HINTON-SAUNDERS: Yes. I knew the culinary badges are yellow and they had a face, because

I worked that block, so I know everybody that works culinary and I know their badge.

DR. LESANSKY: So you would look -- that day -- I'm talking about the day of the escape.

MS. HINTON-SAUNDERS: Yeah, it was just Mohammed, and I knew Mohammed's badge.

DR. LESANSKY: And what did you do? You see this yellow badge --

MS. HINTON-SAUNDERS: It has a face, and they come up to you, and you look at it and you check the refrigerator.

DR. LESANSKY: And then you talked about the other badges that you saw?

MS. HINTON-SAUNDERS: Yeah. They have like a letter, but they don't have a face. They just have a letter. If you look in the back, it's empty, no face, just a letter "T" on it.

DR. LESANSKY: And you had never seen those before that day?

MS. HINTON-SAUNDERS: They started coming up when we started cleaning up. They started ordering this ACA and just pulling people from the blocks to work.

DR. LESANSKY: So you had seen them before that day?

MS. HINTON-SAUNDERS: Yes, in the halls.

DR. LESANSKY: You had seen them in --

MS. HINTON-SAUNDERS: Just in the halls, but in our block, they all had yellow culinary badges.

DR. LESANSKY: And you don't recall anybody telling you what those were?

MS. HINTON-SAUNDERS: No.

MR. HANNON: And some of the folks that you saw painting had no badges at all?

MS. HINTON-SAUNDERS: Yes, they didn't have any at all. That was right after roll call when they came up, they didn't have any badges.

DR. LESANSKY: I don't mean to -- I wanted to ask you about the two different interviews that you had with the officer and attorney, interviews, one was June 3rd and the other was July 3rd, and then the phone call. Can you just tell me a little bit more about the two different interviews. Did you -- I know you had said here that Mr. Collins said in the first interview to only answer the questions that he asks you.

MS. HINTON-SAUNDERS: Right.

DR. LESANSKY: That's what you did. In your answer, in your response it appears that in the second interview, you clarified certain information and you changed --

MS. HINTON-SAUNDERS: I clarified.

DR. LESANSKY: Can you just help me a little bit, elaborate just a little bit, beyond what is in the response, if you care to, about what -- what was different or what it was that you clarified on the July 3rd interview from your June 3rd interview or if it may have been that you may have added something -- or I don't want to put any words in your mouth at all. I'm trying to --

MS. HINTON-SAUNDERS: I believe when they caught the inmate, that's when the issue came up about the refrigerator, because he never asked me about it. He only told me to only answer questions that he asked me. So I guess when they interviewed the inmates and the issue came up about the refrigerator, that's when he called me back up to clarify that.

DR. LESANSKY: So that's where you then told

him what's described here about this refrigerator --

MS. HINTON-SAUNDERS: Correct.

DR. LESANSKY: -- that it came up and that you were examining it, because it was culinary, and the examining of the refrigerator was also something that either Ms. Brown or your friend told you was something that you needed to do before it would be permitted to --

MS. HINTON-SAUNDERS: -- come out on the other side.

DR. LESANSKY: Okay. And then what I understood you to say is after the second interview -- it's also reflected in the response -- you then called Mr. Collins back?

MS. HINTON-SAUNDERS: After I left here -- he was talking about, he said, you said two inmates went through the doors early. Somehow he changed the time on here where he said the two inmates went through the door. I was like, did he just change the time? I told him two inmates came through the door earlier. It seemed to me like he tried to change the time of the escape. So I wanted to clarify that time between us, because I told him, no, two inmates went through the

101

door earlier that day.

DR. LESANSKY: On the day of the escape?

MS. HINTON-SAUNDERS: Right, earlier.

DR. LESANSKY: Earlier on June 3rd?

MS. HINTON-SAUNDERS: Right, early.

DR. LESANSKY: Did you tell him what time on June 3rd it was?

MS. HINTON-SAUNDERS: Right, it had to be like -- I got to the post like quarter to 9:00 or -- it was early. It seemed like he was trying to confuse me on the time, and I didn't want to leave him confused on the time. I wanted to clarify it.

MR. HANNON: Your concern was --

MS. HINTON-SAUNDERS: -- to make sure he didn't think I was changing it, so I wanted to clarify the time, make sure he had the correct time, because I left here puzzled thinking, did I say the right time or did he get confused?

DR. LESANSKY: But the bottom line was that they let in the second interview to make clear that there were these two inmates --

MS. HINTON-SAUNDERS: Not the two escape

102

inmates, two other inmates.

DR. LESANSKY: -- two other inmates --

MS. HINTON-SAUNDERS: Earlier that day --

DR. LESANSKY: Earlier about 8:45?

MS. HINTON-SAUNDERS: Right.

DR. LESANSKY: Earlier in the morning --

MS. HINTON-SAUNDERS: Right.

DR. LESANSKY: -- had come through the admin. two door?

MS. HINTON-SAUNDERS: Right.

DR. LESANSKY: But you didn't let him through?

MS. HINTON-SAUNDERS: No.

DR. LESANSKY: What did you tell him about as to how did they get through?

MS. HINTON-SAUNDERS: Well, they came from the other side with the environmental guy to get some stuff for paint.

DR. LESANSKY: They were on the other side?

MS. HINTON-SAUNDERS: Right, they were already on the other side. So they came through with the environmental to get some stuff out of the room to paint.

103

DR. LESANSKY: He opened the door --

MS. HINTON-SAUNDERS: Yes.

DR. LESANSKY: -- and then you told Mr. Collins that --

MS. HINTON-SAUNDERS: Yes, I told him.

DR. LESANSKY: -- that he opened the door and they went through?

MS. HINTON-SAUNDERS: Right.

DR. LESANSKY: And then when they came back, who --

MS. HINTON-SAUNDERS: Well, they didn't go all the way. There's a door right here, admin. door --

DR. LESANSKY: Okay.

MS. HINTON-SAUNDERS: -- they got the paint and went back.

DR. LESANSKY: So that's what you clarified when you called him?

MS. HINTON-SAUNDERS: Right, because I felt it wasn't clarified.

DR. LESANSKY: Okay. I think that's all my questions.

(The Oral Hearing of Lowanda Hinton-Saunders

104

concluded at 2:00 p.m.)

CERTIFICATE OF SHORTHAND REPORTER

I, JANIE ARRIAGA, court reporter, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

______________________________

JANIE G. ARRIAGA
DISTRICT OF COLUMBIA

A
**abetting** 21:20
**able** 62:10 63:7 75:6,9,12
**ACA** 97:22
**access** 48:8
**accompanied** 48:6
**accompanying** 26:18
**accreditation** 60:1,3
**accuse** 42:3
**accused** 21:18 59:2
**actions** 13:11
**activities** 38:21
**added** 29:11,14 29:15 99:12
**addressing** 46:8
**admin** 17:15 18:3 18:12,18,20 19:2,4 21:4 23:15,17 24:1,1 24:6,19,21 25:5 25:10 26:8 28:7 28:11 29:4,11 31:13 32:8 34:17,22 35:3 37:15 39:8 45:13,17,19,19 45:20,21 46:2 49:16 51:17 53:7,21 58:10 58:22 59:4,8 65:5 83:13 84:2 85:8,12 86:8 88:19 91:3,6,11 91:21 92:8 93:21 102:8 103:12
**administrative** 65:2 84:6
**ADT** 6:5 12:14 14:3,8,10 16:2,3 16:7
**AF** 36:4
**affairs** 22:1 23:5 39:1,22 49:11
**ago** 16:12,13
**agree** 93:16
**agreement** 2:15
**ahead** 52:16
**aiding** 21:20
**Aims** 45:14,16,16 46:2,13 87:7 95:1
**alarm** 14:5
**allegations** 39:17
**allegedly** 65:16 80:11
**allow** 37:12 65:6 92:1,17
**allowed** 61:5 66:10
**amount** 83:21
**angry** 75:1
**anniversary** 65:13
**announcing** 20:13 60:6
**annual** 65:2
**answer** 41:17 42:8 74:10 98:22 99:3,18
**answers** 5:11
**anxious** 75:4
**anybody** 19:7 56:16 98:7
**anyway** 4:12
**appeared** 95:21
**appearing** 81:10
**appears** 99:3
**approximately** 16:18
**April** 11:12
**area** 32:6,10,13 91:4
**argument** 87:5
**arm** 50:19 51:9
**arranging** 83:2
**Arriaga** 1:20 2:15 105:2,15
**arrived** 42:12
**article** 63:13 69:7 69:11,13 80:7
**asked** 14:13 19:17 19:17,20 24:9 41:16,18 42:7 48:12,14 49:12 59:10,12 64:22 72:1 86:20 87:21 94:16 99:17,19
**asking** 5:10 45:1 93:12 94:8,15 96:13
**asks** 98:22
**assign** 50:9
**assigned** 8:12 17:13 18:6,11 18:18 21:7 28:19 30:2 38:7 38:9 44:5 59:8 61:2,14
**assignment** 17:16 17:18,21 20:4,4 20:5,17 43:18 43:22 54:20
**assignments** 17:7
**assist** 68:17
**assume** 57:19
**assumed** 22:6
**attendance** 54:20
**attention** 58:20
**attorney** 32:4,18 35:15 36:19 52:10,11 98:17
**attorneys** 25:6 34:8 36:3 45:10 49:11 52:7,7 88:13 89:5,12 90:5,6,15 91:16 91:18 92:2 95:10,12,21 96:18
**attorney's** 31:10
**audience** 68:11
**authorized** 89:8 89:10 90:14
**Avenue** 2:7 3:14
**aware** 58:21 71:6 72:18

B
**back** 6:5,7 14:5 14:12,12,14,14 16:1,9,11,15,17 16:22 17:4,22 19:8,9 21:15 23:8,11 25:7 26:21 30:18 31:9,11 32:6 34:11,13 35:2,3 35:9 36:12,12 36:13,20 38:22 42:21,22 49:3 58:4 63:8,11,12 63:12,15,19,21 63:22 64:2,5,8 65:6,8,19,20 66:3 68:19 70:21 73:19 74:15 78:1 79:15,17 81:1 82:20,21 83:17 84:11,13,15 91:18 97:16 99:21 100:13 103:9,15
**background** 82:16
**bad** 33:12 82:14 83:10 84:10
**badge** 27:7,8,8,21 59:18 97:2,6,8
**badges** 52:12 58:20 59:3 93:5 96:16,19,22 97:13 98:6,11 98:14
**ball** 84:10
**band** 50:19,21 51:6,10
**bandit** 67:18 68:15
**based** 5:4 78:9 90:13 95:4
**basically** 88:11
**basis** 11:5 61:10
**basketball** 15:22
**bathrooms** 24:2 48:9,11
**beef** 36:5
**behalf** 3:2,11 4:19
**believe** 16:13,20 42:6 46:17 54:18 73:18 77:9 99:15
**believing** 82:19 82:21
**Ben** 39:22
**benchmark** 56:3
**benefits** 12:4
**best** 88:3
**better** 10:21 36:8
**beyond** 99:8
**big** 18:5 20:6 23:20
**bit** 58:1 76:19 88:9 96:2,19 98:19 99:8,8
**blah** 79:8,8,8
**block** 7:20 8:7,11 8:12 9:2,12,21 12:11 18:2 31:4 32:6 33:11,14 33:17 35:17 36:1,16,20 37:4 37:5,18 45:21 50:18 61:3,3,6,7 61:8,13,14 62:19,21 67:5 67:22 68:19 97:1 98:6
**blocks** 7:12 54:20 60:7,9 61:13 97:22
**blue** 65:14
**BOLO** 23:4
**booth** 31:11,22
**booths** 31:18
**bottom** 101:19
**bounces** 84:10
**Bowie** 6:10,16
**box** 65:14 68:3
**bring** 9:17 19:7,9 31:9 61:5,12 90:22 91:17,18 95:12

**brings** 71:20
**broken** 51:2
**brothers** 75:22 76:2
**brought** 15:6,7 25:11 52:4 53:18 64:2,10
**Brown** 21:8,9 28:15 33:1 47:14 48:8,12 49:3 51:22 52:13 63:18 88:1 94:1,16 95:4 100:6
**buff** 61:6,15
**building** 64:12,13
**buried** 70:4 71:20

C

**C** 3:1 4:1
**cables** 12:12
**cafeteria** 24:2 34:9
**call** 8:4 18:7 26:1 27:6,10 31:1,19 32:2,20 33:18 36:2 46:5,7,12 47:5,8 49:12 50:2 51:17,19 57:17 58:5 60:6 64:3 78:14 84:6 98:13,18
**called** 14:12 36:11,14 38:22 40:4,10,21,22 41:2 42:2 43:20 44:1,11 47:11 49:3,13 57:3 58:4 61:18 62:4 64:22 80:16 88:5 95:5 99:21 100:12 103:17
**calls** 51:13
**Cancer** 18:6
**candidate** 67:14
**can't** 32:13 65:17 81:12 91:17,19
**captain** 42:22 45:14,16,16 46:1,13 60:22 87:7 90:2,8,9 94:9,10 95:1
**caption** 4:4
**captioned** 4:2
**car** 74:5
**care** 99:9
**career** 74:18 75:2
**Carolina** 6:2,11
**carts** 25:8
**case** 30:14 82:1 95:20 105:8
**caught** 99:16
**cause** 51:6
**caused** 65:9
**cell** 37:17 44:3,13 62:19,21 67:5 67:22 68:19
**Center** 2:6 30:13 49:13
**certain** 68:22 83:3,21 99:4
**CERTIFICATE** 105:1
**certify** 105:2
**challenge** 87:4
**chance** 41:20
**change** 41:4 65:10 100:18,20
**changed** 26:21 99:5 100:16
**changing** 101:15
**charge** 26:15 77:12,12 88:17
**charged** 4:16 71:17
**charges** 21:22
**charming** 14:17
**check** 24:13 34:8 43:4,9,11 45:5 59:14 77:11 91:10 96:19 97:10
**checked** 24:13,15 42:1 73:3
**checking** 21:19 59:3 96:16
**circumstances** 25:5
**clarified** 40:15 99:4,6,10 103:16,19
**clarify** 42:2 99:21 100:21 101:12 101:15
**clean** 60:1,7,18 61:5
**cleaned** 42:15 60:21
**cleaning** 25:22 47:16,19,20 48:1,3,5 52:6 59:19 60:3,10 60:15 97:21
**clear** 40:15,17 67:16 82:8 84:11 93:6 101:20
**cleared** 41:15 65:19,19
**clerk** 4:7
**clients** 53:19
**close** 93:8
**closed** 11:16 15:7
**closing** 93:7
**Coast** 15:6
**code** 30:14
**coerce** 41:4
**collect** 35:16
**college** 6:2,3,9 7:1 10:10 15:18,19
**Collins** 39:22 56:10 98:21 100:13 103:4
**Columbia** 1:1 2:16 4:5 105:15
**come** 14:13,14 19:16 23:17,19 23:21 25:7,16 31:11 34:11 35:14 36:1 38:22 45:4 49:21 50:1,8 52:9 54:4 61:1,3 61:9 63:11,19 64:8 66:2 67:21 79:10 81:1 82:12 85:10,18 89:11,11,14,16 90:2 92:2 94:9 95:7 97:10 100:8 102:8
**comes** 43:9 80:7 91:8 92:7 93:12
**coming** 27:6 34:10 42:17 51:14 73:19 78:15 82:20 89:5 97:20
**Command** 30:13
**commercial** 14:6
**company** 12:9
**compare** 12:5
**compared** 71:19
**complaining** 87:14
**computer** 10:6 11:4
**computers** 6:3
**concern** 51:7 82:18 101:13
**concluded** 104:1
**confidence** 69:7
**confident** 63:10
**confined** 32:12
**confuse** 40:6,9,14 40:22 57:5,9 58:7 101:10
**confused** 38:19 40:16 41:2 57:20,22 58:1 78:2 101:11,18
**confusing** 57:7
**connection** 91:20
**contact** 5:4 34:1
**contacted** 85:14
**continue** 75:2
**continued** 24:17
**continuing** 74:17
**contraband** 24:16 43:4
**contract** 62:20 66:10,22 70:16 84:14
**contributed** 22:5
**control** 23:21,21 49:13
**controls** 32:7
**conversation** 40:3 40:18 45:15 56:18 57:2
**cooking** 61:16
**Coolidge** 6:1
**Copeland** 64:10 64:17
**corporal** 10:13,14 10:14 13:16,18
**Corporals** 10:15
**correct** 9:22 10:16 30:3,5 40:10,12 42:13 44:7 45:8 46:10 49:19 52:18 57:4 58:6 63:1,4 66:8,17,20 67:20 68:1,6,7 68:12,14 71:5 78:6,11,22 79:1 79:3,13 80:2,8 83:15 85:22 86:2,9 87:17,19 89:20 91:7,22 95:8,13,17 96:1 96:9 100:2 101:16 105:3
**correction** 6:21 8:11 27:18 31:12 47:21 60:14 89:19
**correctional** 94:11
**corrections** 1:2 2:5 3:11,13 4:5 5:13,15,16 6:21 7:2,4,7,12,14 10:2 11:6 12:5 13:11,15 14:19 14:22 15:1 16:1 16:5,9,12 21:9 48:6 55:15,18 59:7 69:19 72:7

74:18 83:12,19 84:12 89:20 92:17
**correctly** 93:14
**cost** 81:8
**couldn't** 16:5 83:14
**counsel** 105:7
**couple** 27:5 77:22
**course** 75:5
**court** 2:15 105:2
**courthouse** 62:22 65:12
**courtroom** 63:13 66:7,11,16,19 67:2,8,18,19 68:6,8,16,21 69:16 80:19
**cousin** 5:15
**covering** 56:15,16
**crazy** 47:9
**Creek** 6:10
**crew** 57:15
**criteria** 54:22
**culinary** 24:12 25:7 37:9,10,14 42:19 45:10 61:16 89:6,13 90:4,15 92:1 95:7 96:18,22 97:2 98:6 100:4
**curious** 19:22 20:1
**C&P** 45:9,10

**D**

**D** 4:1
**Datcher** 33:21,22 34:2,9 55:4,9
**date** 83:8
**dates** 83:6
**day** 17:11,13 18:4 18:9 19:14 20:20,22 23:3 26:5 28:19 31:13 34:2 36:7 38:5,6,10,11,12 38:15,16,21,21 39:2 40:13 45:13 46:5 52:19 54:6 57:11 60:6 71:9 79:5 81:18 83:5 84:5,22 88:8,10 92:12 96:20 97:4,4,19 98:2 101:1,2 102:3
**days** 64:10 70:4,7 70:14,15,16 71:4 85:2,3
**deal** 20:6 72:7 77:20
**decided** 16:1
**decision** 78:10 82:16
**degree** 11:1
**Delaware** 15:20
**Department** 1:2 2:5 3:11,13 4:5 6:4,5 7:7 10:20 14:11,13 55:11 69:18 84:12
**depend** 56:4
**dependable** 62:2 67:11
**depends** 56:6
**deputy** 66:15 84:1
**described** 100:1
**designee** 81:22
**detail** 6:8 25:14 26:3,8 28:5,22 42:11 58:22 59:4,14 92:12 92:18
**detailed** 4:11
**details** 25:22
**determined** 54:19
**Devon** 63:17 64:17
**didn't** 6:11 16:7 24:10 27:1,2,2 28:2 39:13,19 43:17,19 44:21 46:19,20 48:17 48:20,20 49:12 53:5 57:19 58:20 59:16,18 64:19,22 70:8 73:9 79:22 80:3 81:4,4,6 96:3,10 98:12,14 101:11 101:15 102:11 103:11
**diem** 12:7
**difference** 35:20
**different** 46:20 72:19 98:16,20 99:10
**difficult** 39:16
**direct** 5:11
**director** 4:17
**discharge** 73:21 78:5
**discharged** 63:5 71:7 73:7
**disciplinary** 13:11
**discipline** 4:22 21:18
**disciplined** 56:9 63:3 70:6
**disciplines** 13:8
**discover** 71:21
**discuss** 39:17
**discussed** 40:5
**Discussion** 6:14
**distracted** 4:9
**District** 1:1 2:16 4:4 105:15
**Doc** 77:21
**doesn't** 24:3 51:3 57:13 93:9
**doing** 4:12 14:5 15:17 19:22 22:5 44:20 49:8 60:15
**don't** 4:9,10 16:13 19:6 39:20 40:20 41:1 47:5 48:9 50:18 52:6 53:21 59:21 64:9 72:5 73:1 73:14,15,18 75:14 77:15,16 78:1 84:12 87:2 90:3,3 91:13 93:16 96:11 97:15 98:7,15 99:13
**door** 22:2,7 23:13 23:15,17 24:1,7 24:10,16,19,21 25:5,10,17,19 29:13,17,21,21 29:22 30:2,5,11 32:8,8,8,14 34:10,14,18,22 35:3 40:8 49:21 52:8,9,9,22 53:1 53:4,7,21,21 54:1,4 57:12,13 59:4 65:16 88:18,22 89:16 90:3,7,14,18,22 91:6,10,14,16 91:18,21,21 92:2,3,4,5,8,12 92:19,21 93:7 93:12,13,15,21 94:10 95:15 96:7,8,18 100:18,19 101:1 102:9 103:1,6 103:12,12
**doors** 24:1 30:8 34:14 91:3,3 100:16
**double** 34:14
**Douglas** 61:18
**downstairs** 19:6 24:4 32:19 34:7 34:8 48:16,17 48:22
**Dr** 3:12 4:7,15 5:2 5:7,11,12 7:9 10:5 14:2 29:3 32:11 34:6 39:21 69:14 72:17 74:9 77:7 77:22 78:8,12 78:18,21 79:2,4 79:7,10,14,18 79:21 80:3,6,9 80:12,16 81:9 81:14,17 82:7 82:18 85:6,13 85:17,21 86:3,7 86:10,14,16,19 87:2,7,11,15,18 87:20 88:4,18 88:21 89:2,7,10 89:15,18 90:1,8 90:11,13,17 91:5,13,20 92:1 92:10,16 93:4 93:11,17 94:3,6 94:14,21 95:4,9 95:14,18 96:2,6 96:10,15 97:3,7 97:12,18 98:1,4 98:7,15 99:2,7 99:22 100:3,10 101:2,4,6,19 102:2,4,6,8,11 102:13,18 103:1 103:3,6,9,13,16 103:20
**draft** 20:13
**drafting** 47:9
**drug** 76:14,20
**duties** 74:14 88:22
**D.C** 1:13 2:5,8 3:7,11,13,15 5:14,19 7:5,18 7:19 50:7 51:3 69:6 70:2 71:1,4 75:20 76:9

**E**

**E** 3:1,1 4:1,1
**earlier** 4:20 20:13 40:8,13 48:14 57:10,14 94:17 100:19 101:1,3 101:4 102:3,4,6
**early** 92:6 100:16 101:5,10
**easily** 50:19

**effect** 80:9
**eight** 67:17
**either** 18:9 20:21 93:13,16 94:15 100:6
**elaborate** 99:8
**electronically** 54:4
**electronics** 10:7 11:4
**employed** 105:7
**employee** 62:20 66:22
**employees** 66:10
**empty** 97:16
**encountered** 52:20
**enjoyed** 16:7
**enrolled** 11:20
**environmental** 25:12,13 26:3,8 26:10,11,13,19 28:5,21 29:21 30:7 37:7 42:11 42:21 48:15 57:10 58:15,22 59:4,14 89:13 89:20 92:11,15 92:18 102:16,21
**Erica** 3:19 4:8,11
**escape** 16:16 22:5 36:14 97:4 100:21 101:2,22
**escort** 30:20 45:9
**escorting** 68:18
**ESQUIRE** 3:4
**evaluation** 12:19 54:7
**evening** 38:20 84:1,5
**evenings** 10:18 39:13
**eventually** 9:17 83:10
**everybody** 60:10 67:4 68:22 88:7 97:1
**exactly** 16:13
**Examiner** 63:14 65:13 69:6 80:7 81:3,11
**examining** 100:4 100:5
**excellent** 12:7 34:12 54:10 55:20 61:19 66:2
**expand** 88:9
**experience** 48:4
**explain** 41:9 44:19,21 85:19
**explained** 43:15 44:18 81:20 82:12
**extent** 94:2
**extra** 30:14

**F**

**face** 27:9 28:3 96:22 97:9,15 97:16
**fact** 4:9 66:2 78:4
**Factors** 61:18
**fair** 73:1
**fairness** 87:7
**familiar** 36:21 37:8,10
**far** 16:4 68:18 69:5 77:10
**fault** 77:14
**Favorable** 12:19
**faxed** 83:4
**fed** 91:9
**feel** 70:8 73:2 77:20
**fellow** 24:14,14 61:22
**felt** 10:19 57:16 65:3 103:18
**female** 7:12 17:8 17:19 18:1
**fighting** 32:3
**figured** 67:14
**fill** 37:2
**filled** 52:10
**financial** 105:8
**fine** 49:15
**finish** 75:2
**finished** 36:18,19 38:21 40:8 66:5 68:20
**fire** 12:11
**firearm** 71:7 73:8 73:21
**fired** 64:11 66:3 70:13 73:20 74:5 75:11 78:4
**firing** 71:19
**first** 7:10,11,14 7:15,17 8:6,10 8:14 9:6 10:2,18 11:6 21:18 24:9 26:21 28:17 40:7 41:16 42:8 48:16 54:15 55:14,17 70:13 72:8 78:4,17 85:22 86:4,7 94:18,18 98:21
**first-ten** 8:21
**first-time** 70:17
**five** 76:6 85:3
**floor** 23:21,21 27:14 28:17 48:16
**floors** 61:6,15
**focus** 71:3
**folks** 39:20 76:7 98:10
**follow** 85:21
**food** 91:9
**foods** 45:4
**foregoing** 105:3
**foreperson** 8:18
**form** 52:4,10 53:15
**forms** 53:18
**Fort** 15:11
**forth** 21:15
**found** 70:3 96:11 96:12
**four** 8:13 27:17 95:21
**frequency** 9:10
54:16 56:2
**frequent** 9:14
**Friday** 38:11,14 39:10,14 85:5
**friend** 19:16 29:10 47:11 49:4 87:16 88:4 94:1 95:5 100:6
**full** 17:5 48:8
**fully** 63:9,12,20 64:5,7,21 82:1 85:18

**G**

**G** 4:1 105:15
**gate** 50:2
**gates** 23:22
**general** 7:18,19 70:2 71:2,4 94:4
**generally** 17:7
**gentleman** 14:16
**getting** 64:11 85:7 87:5 93:4
**girlfriend** 43:15 43:17
**give** 4:15 9:10 40:12,17 79:12
**given** 8:8 81:18
**glad** 40:15
**go** 5:21 6:7 12:9 16:1,7 19:5 23:17 25:10,17 25:19 26:8 28:14 30:4,8,10 31:3,4,18,19 32:6 33:8,14 35:14,16 36:16 37:14 44:6 45:5 47:15 48:15,18 51:9 52:16 62:14 63:7 64:17 65:6,8,18 65:19 72:21 73:4 74:15 78:1 83:5,9,16 84:7 84:11,15 90:7 91:16,17 92:3,4 92:12,18,20
103:11
**goal** 9:19
**going** 4:11,13,14 10:17 31:2 42:20 43:17 45:13,20 46:20 47:15 51:9 56:9 59:4 64:14 72:9 72:9,10 73:19 76:11 77:5 78:15 79:12 81:22 82:1,15 85:10 89:15,18 93:10
**good** 5:4 9:12 12:17 13:6,7 67:14 75:13 82:14 83:10 84:9
**grade** 14:15
**graduated** 6:3
**grew** 5:18
**Grimke** 2:6 78:15 79:4
**Group** 3:5
**grow** 75:19
**guard** 15:6 90:21
**guess** 21:20 39:4 41:21 56:13 57:21 82:2,6,15 99:19
**guidance** 85:8
**gun** 70:22 71:1,4
**guy** 48:15 57:10 58:15,15 70:1 73:3 80:19 92:15 102:16
**guys** 25:22 57:10 57:14 58:18

**H**

**habit** 76:14
**hadn't** 42:5
**half** 47:10
**hall** 19:8,10 21:7 21:13 23:20,22 29:6 30:21 31:10 32:2 33:2

35:15 36:11,17 43:9 44:4 45:10 47:19 48:3,9,10 49:1 51:18 52:6 88:14 91:1
**halls** 28:11 98:3,5
**hallways** 27:13
**hand** 50:21
**handcuffs** 68:2
**handed** 45:22 81:5
**handling** 36:4
**handwritten** 50:10,12,18 51:9,11,12
**Hannon** 3:4,5 4:2 4:6 5:5,9,18,18 6:7,13,15,19 7:1 7:4,6,9,13,17,20 8:3,6,10,14,20 9:1,5,8,10,14,19 10:1,5,9,11,15 10:17 11:1,3,5,8 11:10,14,18,22 12:2,4,10,13,16 12:19,21 13:6,8 13:10,14,17,20 14:2,7,10,16,19 15:1,4,8,10,13 15:15,17,19,21 16:9,14,16,18 16:22 17:6,10 17:13,16,18,21 18:3,8,11,14,17 18:20 19:1,4,11 19:14,19 20:3,8 20:11,15,19 21:1,4,9,12,14 21:17,21 22:4,8 22:11,16,18,21 23:2,6,10,13,16 24:5,18,21 25:4 25:9,13,19 26:2 26:5,7,11,13,17 27:4,12,15,18 27:21 28:4,7,10 28:15,18,21 29:3,8,14,18 30:1,4,7,10,16 30:20 31:5,8,12 31:15,21 32:5,9 32:12,16,20 33:3,6,9,16,20 34:1,4,6,15,17 34:20,22 35:2,6 35:8,11,16,20 36:7,15,21 37:2 37:5,7,12,17,20 37:22 38:4,6,10 38:14,17 39:2,5 39:7,10,13,16 39:19 40:2,18 41:6,9,12,19 42:3,10,14,17 42:20 43:2,5,12 43:16,21 44:3,5 44:8,11,13,16 44:21 45:6,12 45:15 46:1,7,11 46:14,22 47:3 47:11,18,21 48:4,12 49:2,8 49:16,21 50:4 50:10,12,14,16 50:21 51:5,11 51:13,16,21 52:1,10,13,16 52:19 53:1,3,7,9 53:15,17 54:2,6 54:9,11,13,16 54:22 55:3,5,8 55:14,17,21 56:1,8,19 57:1,6 57:19 58:1,9,21 59:2,6,22 60:4,8 60:12,14,19 61:8,17,21 62:2 62:4,7,9,16,20 63:2,5,7,15,19 63:21 64:1,12 64:14 65:4,9,21 66:6,9,13,15,18 66:21 67:3,6,9 67:16,21 68:2,5 68:8,13,15,17 68:21 69:2,5,10 69:14,17,22 70:9,21 71:3,6 71:10,13,21 72:3,6,14,16,22 73:7,12,16,21 74:2,6,9,15,17 74:20 75:4,9,13 75:16,19,22 76:4,7,10,13,16 76:18,21 77:1,5 77:15,21 82:18 83:7,11,16,19 84:1,8,11,17,20 85:2,11,14,20 88:9 89:19 90:16,20 91:11 92:7,9,11,14,16 92:22 93:16,22 94:4,8 98:10 101:13
**happen** 49:14 64:15
**happened** 31:13 34:6 54:7 62:14 62:16,19 65:9 70:5,18 71:9 73:10 74:20
**happens** 32:3
**happy** 76:21,22
**haven't** 70:6 77:6
**head** 23:9,12 61:1 66:4
**headed** 35:8
**heading** 35:9
**headquartered** 14:7
**health** 76:13
**hear** 47:3,6
**heard** 70:17,19 70:19 78:8
**hearing** 1:12 2:1 4:3,7 82:3,12 83:2,5 85:20 103:22
**held** 2:2
**help** 68:18 76:19 90:1 92:10 99:7
**helping** 60:17
**HENRY** 3:12
**He's** 15:18 77:3
**High** 5:21 6:1
**higher** 54:11 93:14
**Hinton** 80:20
**Hinton-Saunders** 1:12 2:1 3:2 4:3 5:14,19,21 6:1 6:10,17,20 7:3,5 7:8,11,15,18,19 8:1,5,9,13,17,22 9:3,7,9,11,16,22 10:4,6,10,13,16 10:19 11:4,7,9 11:12,15,20 12:1,3,6,11,15 12:18,20 13:1,7 13:9,13,16,19 13:21 14:4,9,11 14:18,21 15:3,5 15:9,11,14,16 15:18,20 16:3 16:11,15,17,20 17:3,8,12,15,17 17:19 18:1,5,10 18:13,16,19,22 19:3,5,12,15,20 20:5,9,12,18,21 21:3,6,11,13,16 21:19,22 22:6,9 22:13,15,17,20 23:1,4,8,11,15 23:19 24:8,20 25:1,6,11,15,21 26:4,6,10,12,15 26:20 27:5,13 27:16,20 28:1,6 28:9,12,16,20 29:1,5,10,16,19 30:3,6,9,12,17 31:1,6,9,14,17 32:1,7,15,18 33:1,5,7,11,19 33:22 34:3,5,7 34:16,19,21 35:1,5,7,9,13,18 35:22 36:10,18 37:1,4,6,9,14,19 37:21 38:2,5,8 38:12,16,19 39:4,6,9,12,15 39:18 40:1,4,20 41:8,11,13,20 42:6,13,16,19 42:21 43:4,7,14 43:19 44:1,4,7 44:10,12,15,17 45:1,8,14,18 46:3,10,13,16 47:2,4,13,19 48:2,7,14 49:6,9 49:19 50:1,6,11 50:13,15,17 51:1,8,12,15,19 51:22 52:3,12 52:15,18,22 53:2,5,8,11,16 53:20 54:3,8,10 54:12,15,18 55:2,4,7,10,16 55:19,22 56:6 56:10,21 57:3,8 57:21 58:3,12 59:1,5,9 60:2,5 60:9,13,16,22 61:11,20 62:1,3 62:6,8,11,18 63:1,4,6,9,17,20 63:22 64:3,13 64:16 65:7,11 66:1,8,12,14,17 66:20 67:1,4,7 67:11,20 68:1,4 68:7,9,10,12,14 69:1,3,8,12,15 69:21 70:1,11 71:1,5,8,12,15 72:1,4,12,15,20 73:1,9,14,17 74:1,4,8,13,16 74:19,22 75:5 75:11,15,18,20 76:2,5,8,11,14 76:17,19,22 77:3,9,17 78:7

78:11,16,20 79:1,3,6,9,13,16 79:20 80:2,5,8 80:11,14,18 81:13,16,20 82:11 83:1,8,15 83:18,21 84:4,9 84:15,18,21,22 85:1,3,9,18 86:2 86:6,9,11,15,17 86:21 87:4,9,13 87:17,19,22 88:7,13,19 89:1 89:4,9,12,17,22 90:6,9,12 91:2,7 91:15,22 92:3 92:13,15,20 93:2,9 94:5,20 95:3,8,13,17 96:1,5,9,12,21 97:5,9,14,20 98:3,5,9,12 99:1 99:6,15 100:2,8 100:14 101:3,5 101:8,14,22 102:3,5,7,10,12 102:15,19 103:2 103:5,8,11,14 103:18,22
**hired** 79:15
**hiring** 61:1
**Hispanic** 47:22
**Hispanics** 47:20
**holding** 31:11
**Holmes** 42:22 60:22
**home** 6:20 38:22 43:20 44:15,16 44:17 88:5
**hook** 31:4,5,6 33:14
**hooked** 33:13
**Hospital** 75:21
**hours** 83:4,22 84:20 92:6
**housing** 50:7,18
**hurt** 62:12 69:4
**husband** 14:12
15:13 77:1

**I**

**idea** 5:4 9:10 59:6
**identified** 22:22
**imagine** 86:19
**impossible** 59:21
**impression** 71:10 72:16
**inaudible** 70:18
**incident** 17:1,11 17:14 18:4 22:11 30:1 39:2 42:5 52:19 62:9 62:11,14 63:2 70:5
**incidents** 70:22 71:2
**indicate** 33:17 58:9
**indicating** 27:7 31:7 91:4,8
**informally** 9:19
**information** 41:14 49:4 85:7 86:19 87:16 99:4
**inmate** 23:20 24:11 30:18,21 31:3,3,16,18,21 31:22 32:3,5,12 32:16,21 33:10 33:18 41:22 42:4,17,20 48:16,18,18 51:5 52:17 54:2 54:3 99:16
**inmates** 19:9 21:14 22:2,9 25:10,13 26:3,7 35:13,21 36:5,8 37:13 40:6,7,13 42:11 46:21 47:15,18,22 48:5,22 49:18 50:4,17 52:6 58:22 59:3 60:10 61:1 65:16 68:18 88:14,17 90:22 92:11 93:1,5 99:19 100:15,17 100:19,22 101:21 102:1,1 102:2
**inmate's** 21:20
**inquired** 81:3
**inside** 21:12 28:14 29:6 31:2 32:21 33:1,14 36:3 48:3 50:3 51:19 52:5 87:22 88:2
**installation** 16:8
**instance** 53:18
**interest** 105:8
**interested** 74:17
**internal** 21:22 23:5 39:1,22 49:11
**interrupt** 85:11 91:13
**interview** 32:6 98:21 99:4,11 99:11 100:11 101:20
**interviewed** 41:7 41:22 56:20 99:19
**interviewing** 41:10 56:12
**interviews** 98:16 98:17,20
**investigation** 62:15
**in-camera** 14:6
**isn't** 64:6 70:15 72:3
**issue** 47:1 55:8 90:18 91:12 96:16 99:16,20
**it's** 5:3 19:5 21:6 23:20 25:1 31:17 32:8 39:16 50:18 51:1 54:18,19 55:10 57:6 73:1 87:5 93:2,19 97:16 100:12
**I'll** 36:2 84:10
**I'm** 4:13 5:9,14 10:11 20:16 21:3 30:17 37:10 40:15 47:2 51:9 56:15 56:16,18 58:1 59:17 61:17 64:4 66:12 70:15,20 76:6 76:15,17,22 77:5,11,12,18 77:19,21 87:9 88:16,16 89:4 90:2,17 91:14 92:10 93:11,17 93:18 97:4 99:13
**I've** 5:16 19:15 73:2,2 75:11
**I.D** 21:20 71:17 71:18
**I.D.s** 22:2 27:1,3 50:18

**J**

**J** 3:4 4:6
**Jacobs** 59:12
**jail** 15:7,8 16:16 17:1 46:15,18 47:7 60:1,10 62:12 71:18 73:10 87:8 91:2 91:17,19 92:5
**Janie** 1:20 2:15 105:2,15
**job** 1:18 13:22 21:14 24:13 26:3 28:18 45:7 48:13 49:5 58:13 59:7,10 59:11 62:10 68:16,20 73:3 77:11 81:8 83:14 84:14 87:12 88:10 90:21,22 92:17 92:22 93:3 94:12
**Jones** 22:9,12,14 22:22 24:6 58:10
**judge** 68:5
**Judy** 21:8,9 28:15 33:1 48:8,12 49:2 51:22 88:1 94:1,16 95:4
**July** 98:18 99:10
**June** 1:14 16:14 16:16 98:17 99:11 101:4,7
**jury** 68:3

**K**

**keep** 43:1
**kept** 24:22
**key** 25:2 29:20 30:19 35:6 89:3 89:13,17,18,22 90:3 91:14,21 93:6,13 94:10 95:6,9,14 96:17
**keys** 24:18 29:20 29:21,22 30:4,8 30:10,13,14 47:14 95:19
**kids** 15:15
**kind** 16:8 31:22 33:16 39:16 43:15 49:7 56:3 57:6 71:14 88:2
**kinds** 72:18,18,19
**kitchen** 37:16,20 43:8,10 61:12 61:16 91:9
**knew** 46:8 49:9 60:2 82:11 84:2 86:6,12 93:22 96:3,13,21 97:6
**know** 5:5 13:22 16:18 19:11 20:11 21:1 22:12,16 26:18

27:2,4 29:8 31:2 32:9 37:17 40:20 41:1 43:5 43:12,17,19 46:2,19,21,22 47:5,6 48:9,17 48:20,20 52:1,6 53:9,21 54:19 55:11 57:9 59:22 60:4 66:9 67:17 72:11 73:14,15,18 75:1 77:15,16 79:22 81:4,6,8 82:9,13,15 83:10 86:22 87:2 88:11 92:16 96:11 97:1,2 98:20
**knowledge** 22:14 22:19 46:1,14
**known** 86:5
**knows** 59:15

**L**

**lady** 59:10,12 64:22 72:1 87:22
**late** 62:3 67:13
**law** 3:5 4:7
**lawyer** 31:16 52:4 53:15
**lawyers** 19:6,7 52:20 53:10,18 68:13
**lawyer's** 52:3
**lead** 24:1,3,3
**Leaks** 22:10,16 22:18,22 24:6 58:10
**learn** 13:5 64:2
**learned** 12:11,12
**leave** 14:10 31:19 32:5 49:11,14 63:3 65:2,2,5 83:13 84:3,6 85:12 101:11
**leaving** 11:6
**led** 78:4
**left** 6:4 13:6,14 40:13,21 48:10 100:14 101:17
**legal** 88:15
**Lesansky** 3:12 4:7,15 5:2,7,11 5:12 7:9 10:5 14:2 29:3 32:11 34:6 39:21 69:14 72:17 74:9 77:7,22 78:8,12,18,21 79:2,4,7,10,14 79:18,21 80:3,6 80:9,12,16 81:9 81:14,17 82:7 82:18 85:6,13 85:17,21 86:3,7 86:10,14,16,19 87:2,7,11,15,18 87:20 88:4,18 88:21 89:2,7,10 89:15,18 90:1,8 90:11,13,17 91:5,13,20 92:1 92:10,16 93:4 93:11,17 94:3,6 94:14,21 95:4,9 95:14,18 96:2,6 96:10,15 97:3,7 97:12,18 98:1,4 98:7,15 99:2,7 99:22 100:3,10 101:2,4,6,19 102:2,4,6,8,11 102:13,18 103:1 103:3,6,9,13,16 103:20
**letter** 27:8 59:20 63:17 64:16,18 64:19 65:1 78:17,19 79:11 79:16,19,20,21 80:1,4 81:18 82:10 83:3,4,12 83:19 85:12 97:15,16,17
**letters** 79:18
**let's** 6:7 23:16 63:15 64:1 70:21 71:3 94:13
**Lieutenant** 33:22 34:2,9 55:4,9
**life** 5:20 75:3
**line** 101:19
**list** 70:10 71:14 71:22
**listed** 80:12
**little** 6:8 58:1 65:14 76:19,20 88:9 94:17 96:19 98:19 99:7,8
**live** 15:10,11
**lives** 76:8,10
**living** 75:2 76:7 76:12
**LLP** 3:5
**location** 11:18 32:13 33:9 53:19
**locked** 24:16,22 25:1 34:10
**long** 6:21 11:14 12:22 13:1 14:3 82:2
**look** 43:10 50:2,5 72:7 97:3,10,16
**looked** 53:13
**looking** 61:17 71:17,18
**Lorton** 15:7
**losing** 71:19
**lost** 40:17 70:2,3 70:22 71:1,4 84:13
**lot** 13:2,5 87:13
**Lowanda** 1:12 2:1 3:2 4:3 103:22
**Lucent** 6:5 11:8,9 11:11,14,15 12:17 13:15
**lunch** 28:13,14
**lying** 42:4 56:14
**L-o-w-a-n-d-a** 4:3

**M**

**machine** 51:2
**main** 76:17
**major** 6:11,18 24:2
**making** 4:16 68:22 84:17
**mal** 70:18
**male** 8:7 9:2,21
**man** 9:4,20 70:7
**management** 16:6 16:7
**manipulate** 57:16
**mark** 80:15
**married** 14:17
**Marshal** 62:13,14 62:21 65:5,10 66:4,7 78:3 81:9 81:12 82:9,20 83:17
**Marshall** 69:6 84:13
**marshals** 66:14 66:15 68:17 78:5,21 79:15 79:22 80:7
**Maryland** 15:12
**MAs** 77:12
**materials** 4:21 5:4
**matter** 94:12
**may** 86:4 99:11 99:12
**mean** 19:14 31:5 31:15 64:21 86:20 91:13 98:15
**means** 81:11
**meant** 4:20 38:20
**media** 73:14,17
**meet** 40:5 81:22
**meeting** 81:21
**men** 9:6,15
**mentality** 86:12
**mentioned** 93:20 95:20
**Men's** 8:1
**met** 15:4,5 34:17 81:7
**Michael** 3:4 4:6
**middle** 16:4
**midnights** 39:14
**mind** 71:11
**mine** 5:15
**minute** 40:9 55:12 58:4 73:18 80:20
**minutes** 28:13 36:13
**misconduct** 69:20
**mislead** 82:19
**misled** 77:10 82:20
**Mohammed** 24:11 97:6
**Mohammed's** 97:6
**mom** 76:8,10
**Monday** 1:14 85:4
**money** 11:17 12:8
**monitor** 26:3
**month** 16:19 81:21
**months** 9:12
**morning** 26:22 57:14 92:6 102:6
**mouth** 93:18 99:13
**move** 13:22 75:3
**Murphy** 64:5 78:14

**N**

**N** 3:1 4:1
**name** 33:20 50:7 64:5 65:14,15 80:20,21,22 81:4,10 82:2,3
**necessarily** 26:18
**need** 4:9 25:9

60:20 74:12 87:2
**needed** 20:14 41:14 43:5 67:14 100:7
**neither** 105:6
**nervous** 49:7 94:17
**never** 28:4,7,18 28:21 29:13 41:16,20 43:13 45:17 49:12 62:3 70:17,19 72:6,12 96:10 96:12 97:18 99:17
**new** 29:15 87:11
**news** 73:20
**newspaper** 69:10 69:13 81:11
**night** 10:7
**nobody's** 77:19
**nondiscriminat...** 8:4
**normal** 55:10
**normally** 33:11
**North** 6:2,10
**Northwest** 2:7 3:6 3:14 17:8,10,19 18:9,10 20:16 20:18,20,21 37:11 39:12 45:21 61:2 75:21
**note** 39:21
**notes** 4:11
**November** 16:21 17:7
**number** 44:13,15 44:16 50:7 51:3

**O**

**O** 4:1
**observed** 51:6
**obviously** 86:20 87:15 89:2 95:10 96:7
**occasion** 37:22
**occasions** 45:6
**occur** 9:8
**occurred** 17:2,14 63:2
**offense** 70:13,17 72:9,9,10
**offer** 86:16
**office** 24:2,4 42:22
**officer** 4:7 21:10 24:14,14 25:17 26:10 29:16,18 31:1 32:2 48:6 50:8 54:21 59:7 70:22 71:4,7 72:7 89:19,21 92:18 94:11 98:17
**officers** 8:11,15 26:11,13 27:19 30:8 31:13 34:19,20 47:22 60:9,14 83:2 88:6 91:10
**offices** 2:2
**OIA** 56:9
**okay** 6:7 25:4 31:8 33:3 36:7 39:16 41:14 44:21 49:15 51:5 52:19 56:11 57:6 61:17 64:9 71:10,16 81:2 81:14 93:17 100:10 103:13 103:20
**oldest** 76:6
**once** 13:21 16:3 47:11 58:13 63:9,11,12 65:19 81:1
**ones** 36:4
**one-year** 65:13
**open** 25:4 93:8,15
**opened** 25:2,3 53:21 54:4 96:7 103:1,6
**opening** 32:14 93:7 96:18
**opportunity** 4:15
**Oral** 1:12 2:1 4:2 103:22
**order** 83:16 90:7 90:10,11,12 94:4
**ordering** 97:21
**orders** 29:4,5,6 29:11,14 93:14 94:7,22
**Ordinarily** 66:13
**ordinary** 18:15
**originally** 78:4
**outcome** 82:4,14 105:9
**outstanding** 54:12 55:21 56:2
**overdue** 55:6
**overtime** 18:14 20:4 38:9,13 62:4,7

**P**

**P** 3:1,1 4:1
**Pages** 1:19
**paid** 12:6
**paint** 57:14 61:3 61:5,13,14 102:17,22 103:14
**painting** 26:22 27:12 59:16,18 60:11 98:11
**paper** 50:10,12 50:19 53:12,13 80:21,21,22 81:5,7 82:3,5 95:21,22
**papers** 64:8,10
**paperwork** 4:18 33:16 49:17,18
**part** 4:22 26:2 33:13 59:7,9,13 64:20 69:2 94:12
**particular** 11:18 69:20 71:22
**parties** 105:8
**partner** 65:15 80:15
**pass** 35:14 36:1,2 36:20 49:22 50:2,5,6 51:9,17 59:16 89:5
**passes** 36:22 37:10,11,12 93:1
**passing** 89:1,2
**Patrick** 66:4
**pay** 12:4 16:8 58:20 63:21,22 84:13
**paying** 16:5
**PC** 36:4
**penalties** 69:19 70:10 71:22 72:19
**penalty** 70:12 72:8
**pending** 62:15
**people** 13:3 19:13 20:8,14 25:2 26:16,22 29:20 35:18,21,22 36:4 43:10 45:4 45:9 46:4,19,20 47:9 48:10 58:14,16,17 59:15,16,18,19 61:2,5,9,11,12 61:15 66:3 68:10 72:18 73:4,5 77:13,18 77:18,19 81:5 84:7 85:15 87:12,13,14 88:22 89:5,7 93:10 95:19 97:22
**percent** 56:4,4
**perform** 74:13
**performance** 12:10 13:22 59:13 61:18 65:22 66:1
**period** 6:22 7:21 8:10,21 10:3 24:22 73:11
**Periodically** 9:9
**permitted** 85:15 100:7
**person** 23:6 30:15 46:17 49:10 70:8 71:18 74:4 75:16 76:21 86:22
**personnel** 64:4 78:14
**phone** 40:21 41:1 41:3 44:3,4,13 64:3 88:5 98:18
**photo** 23:7
**physically** 48:21 78:18 79:17
**pick** 19:7 25:6,7 31:2,3,4 32:18 33:8,14 49:10 88:13,14 91:16
**picked** 33:17
**picking** 33:4,10
**picture** 51:2,4 59:21
**place** 60:11,11
**Playing** 15:21
**plenty** 87:12
**point** 8:8 27:19 71:16 79:22 81:15 83:11 94:17
**policy** 8:4,7
**population** 36:1
**position** 28:11 65:10 78:5 83:13
**positive** 82:14
**post** 7:12 19:16 20:7 27:10 29:4 29:5,6,11,11,14 42:12 43:20 44:2,5,6,9,10,19 44:20 46:6

47:12,15 49:10 49:16 54:19,20 59:10 74:3,7 77:12,19 87:18 88:16 90:19,20 94:6,19,22 101:9
**posts** 21:1 46:19 46:20
**preclude** 93:10
**present** 3:19 4:6 47:22 85:15
**presentation** 42:10
**presented** 4:18,21 79:11
**pressed** 46:4
**pressure** 73:17
**pretty** 75:16 90:18
**prevent** 62:10
**previous** 38:1
**prince** 14:17
**prior** 44:18 48:10
**priority** 60:12
**probably** 5:3 56:11 82:4
**probationary** 17:4
**problem** 46:8 76:13
**problems** 65:22 76:20
**proceedings** 105:4,4
**process** 33:10
**program** 76:15
**progress** 16:6
**progressing** 10:20
**promoted** 13:17
**promotion** 75:4,8
**promotions** 12:21
**proper** 57:18 58:7
**properly** 21:19
**proposed** 4:22 21:17 64:20 65:2 81:19
**prosecutor** 67:17
**protected** 68:22
**provided** 5:1,2
**provider** 76:17
**public** 82:6
**publicized** 73:22
**pull** 8:18 61:2
**pulled** 64:19
**pulling** 97:22
**purple** 28:2
**Pursuant** 2:15
**pursue** 74:18
**put** 19:8,9 39:7,21 46:4 50:20 51:10 60:20 63:3 93:18 99:13
**puzzled** 101:17
**puzzling** 40:22
**p.m** 1:15 104:1

**Q**

**quarter** 101:9
**question** 42:7 71:11 74:11 80:15 96:15
**questioned** 70:14
**questions** 5:11 41:17 42:8 86:20 87:21 98:22 99:18 103:21
**quiet** 74:1,5
**quite** 71:2

**R**

**R** 3:1 4:1
**radio** 32:2
**raised** 47:1 71:11
**raises** 55:12
**range** 72:8
**rank** 10:12 13:14 14:14 93:14
**rate** 16:6
**rated** 54:14,17 55:3,5,15 56:2
**rating** 34:5,12,13 54:9,11 55:1,6 56:5,7
**ratings** 55:17
**raw** 77:20
**read** 81:5 95:1
**reading** 34:12
**ready** 9:18
**real** 12:6 33:12 75:7
**really** 4:11 13:1 16:6,6 27:1,2 46:5 60:18 61:7 61:13 69:4
**reason** 25:9 41:10
**reasons** 93:10
**recall** 98:7
**receive** 48:8
**received** 54:7
**recognize** 23:6
**recommendation** 4:16
**recommends** 74:9
**record** 6:13,14 12:17 15:22 105:4
**recorded** 4:10 40:18
**reduced** 105:5
**Reed** 75:20
**reference** 4:17
**reflected** 100:12
**refrigerator** 24:12,13,14,15 41:16,21 42:1,5 42:12,14 43:1,3 58:14,15 73:3,5 97:11 99:17,20 100:1,5
**regarding** 87:21
**regular** 17:16,18 20:3,5,17 38:15 39:6,7,11
**rehabilitated** 74:11,12
**rehired** 78:10 79:2
**rehiring** 14:12
**reinstated** 63:10 63:11,12,20 64:5,7,21 65:4 65:17,18 78:9 78:16,22 79:8 79:15,17
**reinstatement** 63:16 64:18 78:12 79:21
**related** 96:17 105:7
**relative** 88:22
**release** 73:10
**relief** 49:12,13
**relies** 52:13
**relieve** 19:7
**relieved** 28:12
**remember** 16:13 22:21 23:2 36:7 39:20 64:4
**Reported** 1:20
**reporter** 2:16 105:1,2
**request** 13:22
**respect** 43:3
**response** 95:18 99:3,9 100:12
**responsibilities** 95:11
**responsibility** 39:20 93:6,19 93:20 94:1 95:11,15
**responsible** 49:17 59:17,20 76:16 77:18,19
**retrieve** 95:12
**returned** 17:6
**ride** 86:11
**right** 7:2 9:16 15:21 16:8 26:17 27:7 28:20 29:19 32:9,15 37:21 38:10 39:15 41:2,19 44:6 49:6 53:2,8 54:1 54:6 57:13 58:3 59:1 62:17 67:6 69:9,15,16 75:17 77:4 78:7 78:10 81:12,13 83:7,18 84:1,4 84:15 85:9,13 85:17 88:16 91:4,4,8 92:22 93:11,17 94:3 94:20 96:15 98:13 99:1 101:3,5,8,17 102:5,7,10,19 103:8,12,18
**Rivers** 66:4 81:21 83:9 84:2
**road** 11:22
**roll** 18:7 25:22 27:6,10 46:5,7 46:12 47:5,8 60:6 98:13
**room** 25:16 87:8 102:21
**running** 46:21
**rush** 55:12
**R&D** 7:12 17:8 17:19 18:9

**S**

**S** 3:1 4:1
**Safe** 69:1
**sat** 47:16
**satisfactory** 55:19
**Saturday** 30:11 39:3,14 85:5
**saw** 19:21 27:16 34:9 58:17,19 97:13 98:11
**saying** 22:1 63:19 64:5 65:14 70:16 78:14 79:11 81:10,19 82:9 90:2 95:2
**says** 80:9
**scapegoat** 65:14 80:14
**scattered** 88:8
**schedule** 69:19
**scheduled** 18:8
**school** 5:22 6:1 10:9,17,22

**second** 27:14 40:5 41:10 42:2 56:20,21 57:11 70:21 72:9 79:11 80:1,4 81:15,17 82:10 82:12 99:3 100:11 101:20
**security** 29:20 30:12 31:22
**see** 20:6 22:14 27:18 35:15 36:3 44:18 45:5 45:7,7 53:14 64:17 81:4 82:13 83:1 84:7 97:7
**seeing** 22:21 23:2 39:20
**seen** 4:18 19:15 19:21 22:18 73:19 81:17 97:18 98:1,4
**send** 52:17
**sent** 39:21 85:11
**separate** 25:15 32:8 88:19
**separated** 15:14
**sequence** 78:2
**sergeant** 75:6
**serious** 71:17
**service** 11:21 62:13,14,21 65:6,10 66:7 69:6 78:3 81:9 81:12 82:9,21 83:17 84:13
**set** 30:14
**Seven** 13:19
**She's** 94:12
**shift** 8:16,21 9:6 18:15 38:1,7,9 38:11,13,15,16 38:18 39:6,7,11 43:13 83:5,14 84:1
**short** 18:7 20:8 20:10 21:2 45:22 46:5,9,19 47:8 86:12,18
**SHORTHAND** 105:1
**shot** 23:10 70:5
**shouldn't** 47:7 61:7
**show** 36:2
**showed** 23:5 64:18 95:22
**showing** 53:12
**shut** 46:15,18 47:7
**shuttle** 21:14
**siblings** 76:18
**side** 23:20 29:12 29:17 32:10 34:18,19,20 36:12 37:15,18 37:20 48:18 53:22 54:2,3 59:19 96:8 100:9 102:16,18 102:20
**sign** 64:8,10
**signed** 34:13 36:20 50:8
**significant** 90:18
**silent** 65:15 80:15
**sisters** 76:1,3
**sit** 31:11
**sitting** 5:9 29:12 34:9 35:10,11 45:2,3,4
**six** 31:17 84:21,22 85:4
**skills** 12:12
**slip** 50:10,12,19
**Slow** 30:16
**smart** 75:16
**smiled** 55:8
**social** 88:15
**solid** 33:13
**somebody** 12:8 22:21 32:14,21 33:20 51:14,16 52:7 53:22 56:2 56:15 70:3 73:7 91:8 96:4
**son** 15:16
**sorry** 10:11 20:16
**sound** 57:13
**sounded** 82:7,8
**sounds** 53:17 72:17
**South** 18:1 20:22
**Southwest** 20:16 61:4
**speak** 4:14 10:15
**special** 36:4
**specifically** 4:16 58:17,19 93:20
**Springfield** 14:9
**staff** 18:7 47:8 52:12 68:8
**stagnant** 10:21
**standing** 47:4 53:11
**start** 7:6 88:16
**started** 7:10,11 97:20,21,21
**starts** 32:3
**State** 15:20
**stating** 65:1 83:3
**status** 19:9 30:15 30:17 31:3,3 32:21 33:12,18 35:19,21 36:3,9 88:14
**stayed** 67:13 82:5
**stenographically** 105:5
**step** 48:19 64:1 84:8,9
**stick** 94:13
**stint** 8:15 10:2
**stole** 12:8
**stolen** 11:17
**stopped** 16:8
**story** 4:14
**straightened** 81:1
**street** 3:6 56:12 70:4
**study** 6:15
**studying** 10:2
**stuff** 22:2 61:15 102:16,21
**suddenly** 95:20
**supervise** 60:18
**supervising** 60:17
**supervision** 105:6
**supervisor** 84:2 86:1,4 95:1
**suppose** 8:4
**supposed** 20:15 20:19,22 24:21 43:3 45:3 49:14 51:1 55:5,11 60:18 73:6 86:3 89:4 93:8 94:16
**supposedly** 29:22
**sure** 9:20 21:3 24:16 40:10 45:19 47:2 51:20 57:4,17 58:4,6,13 73:16 78:1 80:20,22 87:9 93:1 101:14,16
**surprised** 18:19 52:20 53:3 96:2
**surveillance** 23:10
**switch** 57:11
**systems** 14:6
**S-a-u-n-d-e-r-s** 4:4

**T**

**T** 27:9,21 28:2,2 59:20 97:17
**table** 56:13
**tables** 56:17
**take** 4:11 12:16 30:18 48:21 55:13 61:9 64:1 65:20 75:6,9,12 83:14 91:19
**taken** 82:21 105:5
**talk** 4:15 22:1 23:16 31:16 41:15 43:16 51:21 80:19
**talked** 24:11 39:22 42:4 43:14 47:14,16 56:19 77:6 95:18,19 97:12
**talking** 5:10 23:13 32:22 40:8 46:11 49:2 77:3 94:14 97:4 100:15
**teach** 87:11
**tech** 6:3 10:10 16:4
**technical** 75:13
**Technology** 6:5 11:9
**telephone** 44:8 49:3 57:1
**tell** 4:14 6:8 7:9 10:5 14:2 30:21 33:3,7 34:6 40:2 41:12,21 42:7 45:15,16 51:13 52:16 56:14 58:17 64:20 77:7 80:3 81:15 84:10 87:3 88:1 96:16,19 98:19 101:6 102:13
**telling** 5:12 46:18 56:16 64:21 72:17 98:8
**temporary** 28:1 61:10 64:6
**ten** 7:15,17 8:6 9:6 10:1,18 13:10 36:13
**ten-year** 7:21 8:10,15
**term** 36:8 55:14
**termination** 64:20
**terms** 13:6,7 88:22 91:11,20 94:15 95:14 96:16,17
**test** 75:6,10,12
**that's** 5:7 15:21 21:20 24:12

28:1 37:11 40:14 41:5 42:1 43:7 44:7 48:19 50:13,14,20 52:13 57:3 58:19 59:7,9,11 59:13,20 77:5 77:14,18 79:11 86:15 89:15 90:11,12,16 92:9 93:11 94:2 94:12 95:5,15 99:2,16,20,22 103:16,20
**There's** 103:12
**they're** 55:11 59:14 77:17
**they've** 29:7,14 29:15
**thing** 55:10 64:7 70:11 73:19 77:20 85:6,22
**things** 12:12 19:10 37:18,20 44:19 47:15 71:22 72:19 78:1
**think** 11:12 22:5 29:3 46:3 58:7 62:9 64:14 72:22 73:1,12 78:9 90:16 95:21 101:15 103:20
**thinking** 40:6 71:16 101:17
**third** 72:10
**thought** 38:20 45:20 56:13 65:17 72:4 73:18 85:9 87:16
**three** 9:4,12 13:2 27:16 32:17
**time** 6:22 7:14,16 7:17 8:8,18,22 9:5 10:3,3 11:6 14:12,20 15:2 17:4 19:17 21:18 24:9,22 27:19 29:7 30:1 31:16 40:5,7,9 40:11,12,16,22 41:1,2,10,16 42:2,8 50:9 52:5 54:15 55:13,18 56:12,20,21 57:5,12,17,18 58:7,8 63:13 64:1 65:20 67:12,12 69:18 78:4 86:4,7 87:10 88:15 94:18 100:16,18 100:20,21 101:6 101:11,12,16,16 101:17
**times** 9:1 40:14 41:6 54:13 57:4
**told** 14:14 19:17 24:8,10 29:3,11 34:11 41:17,22 42:8 43:21 45:12 47:14 48:17 56:8 57:9 58:12 69:17 72:6,13 81:7,16 82:13 83:1,9 84:4 85:14 87:14 94:1 95:5 99:18,22 100:6 100:18,22 103:3 103:5
**top** 56:4,4
**tower** 70:6 71:7,8 73:22
**track** 40:17
**train** 44:22 67:10
**trained** 19:1 66:6 66:18 69:3
**training** 12:8 13:4 69:2 75:14 86:17
**transcript** 40:19 41:3 105:3
**transportation** 67:5
**traveling** 12:1
**trays** 25:7
**treated** 77:10
**tricked** 65:3
**tried** 40:15 41:3 57:11 58:7,19 100:20
**trouble** 73:9
**troublemakers** 36:5
**true** 61:8 105:3
**trust** 67:12
**truth** 56:15,17
**try** 5:11 94:13
**trying** 40:6,14,16 41:4 57:5,9,16 60:1 64:4 76:15 90:17 91:14 92:10 93:5,18 93:18 99:14 101:10
**turned** 56:13,17
**Twice** 41:8
**two** 6:2,9,11,15 6:19,20 7:1 9:1 16:12 17:15 18:1,3,12,18,20 19:2,4 20:22 21:4 22:9 24:1 25:5,10 26:8 28:7 29:12 30:21 31:13 32:17 34:15,22 35:3,3 39:8 40:7 40:13 45:13,17 45:19,19,20,21 46:2 47:15,18 47:19,22 49:16 51:17 57:10,14 58:10,17,22 59:4,8 61:4 70:22 71:3 76:2 76:2 84:18 85:8 86:8 91:11,21 92:8 93:21 98:16,19 100:15 100:17,19,22 101:21,22 102:1 102:2,9
**two-and-a-half** 11:16 13:3 14:5
**Two-and-a-half...** 16:12
**types** 19:10 69:20
**typewriting** 105:6
**typically** 8:12

U

**Uh-huh** 85:1 91:15 95:3
**undecided** 6:17
**understand** 38:14 60:19 72:5 78:3 90:1,17 91:14 93:14,19 94:6
**understanding** 18:17 24:5 56:1 67:9 88:10,21 90:4,13 94:21 95:6
**understood** 79:7 96:17 100:11
**unfair** 90:16 92:9
**unfairly** 77:10
**unfortunate** 75:1
**union** 46:17 58:5 59:12 70:15 72:1
**unit** 7:22 8:1,2 50:7
**unlock** 34:10
**unusual** 13:20 48:5
**upset** 75:6,7
**use** 95:6,9
**usually** 27:6

V

**variety** 12:12
**verification** 50:16
**verify** 51:18
**Vermont** 2:7 3:14
**violation** 69:5
**Virginia** 14:9
**visit** 36:19
**visiting** 19:10 21:7,7,13 23:22 28:11,12 29:6 30:21 31:10 32:1 33:2 35:14 36:2,11,16 43:9 45:10 48:3,9,10 49:1 52:5,9 53:15 88:14 90:22 91:3
**visitor** 19:8 51:20 52:2
**visits** 88:15,15
**voice** 47:6
**voiced** 47:5
**voluntarily** 67:13
**volunteer** 62:7

W

**wait** 25:16 31:11 40:9 48:22 55:12 58:3 82:1
**waiting** 35:10,11 66:2
**walk** 18:5 22:7,8 31:10 35:14,19 35:21 36:6,8 48:21
**walked** 27:6 53:13 57:12
**walking** 47:10 49:18 51:16
**wall** 36:2
**Walter** 75:20
**want** 5:5 8:4 16:7 36:8 64:9 74:15 75:2 77:10,22 78:1 99:13 101:11
**wanted** 10:21 14:13 20:6 22:1 40:17 41:15 42:7 58:6 82:8 85:6,18 94:11 98:15 100:21 101:12,15
**wants** 92:16
**warden's** 24:4
**Washington** 1:13

2:8 3:7,15 7:4 15:12 74:2,6
**wasn't** 9:14 10:19 17:12 18:14 29:7 42:7 52:8 74:2,6 75:6 82:3 90:20,21 93:4 95:10 103:19
**watch** 19:16
**watched** 19:12
**way** 4:10,13 31:10 56:21 67:17 72:11 77:2 92:4 103:12
**weapon** 70:2,3,6 71:19,19 74:5
**week** 12:7 19:21 84:17
**weekend** 20:1
**weekends** 19:22
**weeks** 84:18
**went** 6:2,3,4,5,19 7:2 10:21 11:8 11:10 12:13 13:15 16:9,11 16:15,17 18:6 34:7,11,13 35:2 35:3 36:20 38:22 40:7 47:13 48:19,22 49:3 50:9 53:19 57:10,13 58:10 58:16,18,22 59:11 61:4 64:17 67:8 96:13 100:15,17 100:22 103:7,15
**weren't** 33:12 61:2,14 65:21 69:10,12
**We'll** 5:12
**we're** 4:10 82:1
**what's** 15:17 35:20 54:16 56:1 59:12 67:9 70:20 88:21 100:1
**white** 3:19 4:8 50:6 53:12
**willing** 67:10
**window** 53:12 95:22
**wire** 44:8
**wireless** 11:21
**witnesses** 85:16
**woman** 8:21 9:20
**women** 8:7 9:2,4 9:12,17
**women's** 7:22 8:1
**wondering** 70:2
**word** 60:20
**words** 80:9 93:18 99:13
**work** 4:13 6:4 7:2 7:9,13,21 9:12 11:8,11,14 12:13 13:15 14:2,3,13 15:8 17:7 18:8 19:1 19:16 20:15,19 20:22 37:15 38:11,20 39:13 45:7,13 46:6 49:15,15 54:20 62:4 63:19 64:6 64:8 65:6,8,17 66:6,10,16,19 67:1,10,13,15 81:12 82:20,22 83:3,4,17,20 84:5,12,16 85:3 85:4,5,8 86:13 87:1,14 88:14 97:22
**worked** 11:15 14:4 18:20 20:1 20:3 26:19,20 26:22 28:4,7,10 37:22 38:2,4,12 38:13,15,16,17 39:10 42:22 43:13 45:9,17 46:2 48:20 59:10 61:9 63:12 69:18
88:3,6 97:1
**workers** 61:22
**working** 6:6,21 10:8 11:19 14:8 16:2,22 17:10 18:3 19:21 20:6 21:4 31:13 37:5 39:5 46:20 47:7 61:12 62:12,13 62:19,21 65:12 69:9,15 80:6,18 86:8
**works** 29:11 67:18 97:1
**worried** 70:12
**wouldn't** 26:2
**wow** 45:20 49:7 81:6
**wrecked** 74:5
**wrist** 51:6
**written** 59:13
**wrong** 73:2 74:10 77:13,16
**wrote** 88:11

**X**
**X** 72:9

**Y**
**Y** 72:10
**Yeah** 13:21 28:16 48:7 49:9 57:8 94:14 97:5,14
**year** 8:21 11:10 13:17 16:5 54:19 55:6,15
**years** 5:17 6:2,9 6:12,16,19,20 6:22 7:1,13,15 7:17 8:6,13 9:6 10:1,18 11:16 13:2,4,10,19 14:5 16:12 65:15 67:17
**year-and-a-half** 17:1
**yellow** 28:2 37:11 96:22 97:8 98:6
**you'd** 45:17 46:2
70:16
**you're** 37:5 54:17 56:15 64:7,11 64:21 72:17,17 80:6 90:14 94:8 95:2
**you've** 4:17 72:6 73:12 74:10 91:2

**Z**
**Z** 72:10
**zone** 35:10

**$**
**$2,000** 12:7
**$900** 84:19

**1**
**1** 1:19
**1-106540** 1:18
**10** 6:22 56:4
**10:04** 36:13,16
**105** 1:19
**11** 6:22
**12:00** 38:3,4,18 47:9
**12:20** 1:15
**13** 5:16
**18th** 3:6
**1901** 3:6
**1923** 2:7 3:14
**1990** 7:8 14:18

**2**
**2:00** 104:1
**20** 64:10
**20-day** 64:6 79:12
**20009** 3:7
**2004** 16:15,17 17:6
**2006** 16:16
**2007** 1:14 16:14
**202-232-1907** 3:8
**202-673-7316** 2:9 3:16
**20401** 2:8 3:15
**25** 1:14
**25th** 81:21 82:13
83:9 84:7

**3**
**3rd** 98:18,18 99:11,11 101:4 101:7
**30** 28:13
**35** 16:5

**4**
**4:00** 38:3,4,18 47:9
**45** 70:14,16

**5**
**5** 56:4
**50** 20:14 46:8
**56** 70:4,7,15 71:4

**8**
**8:45** 102:4
**82** 6:2
**86** 14:22

**9**
**9:00** 101:9
**99** 11:13

# EXHIBIT 64

1

DEPARTMENT OF CORRECTIONS
DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -x
:
:
ORAL PRESENTATION OF: :
:
DARRYL S. LOVE :
:
- - - - - - - - - - - - - - -x

Washington, D.C.

Monday, July 9, 2007

9:45 a.m.

B E F O R E:

HENRY R. LESANSKY, Hearing Officer
Health Services Administrator
District of Columbia Department of Corrections
1923 Vermont Avenue, N.W.
Suite N-121
Washington, D.C. 20001

Job No. 1-107046
Pages 1 - 70
Reported by: Paula J. Eastes

2

Oral Presentation of DARRYL S. LOVE, held at the offices of:

D.C. Department of Corrections
Grimke Building
1923 Vermont Avenue, N.W.
Room N119
Washington, D.C. 20009

Pursuant to agreement, before Paula J. Eastes, Court Reporter.

3

A P P E A R A N C E S

ON BEHALF OF DARRYL S. LOVE:

J. MICHAEL HANNON, ESQUIRE
The Hannon Law Group, LLP
1901 18th Street, N.W.
Washington, D.C. 20009
(202) 232-1907

4

P R O C E E D I N G S

MR. HANNON: This is the Oral Presentation of Darrell S. Love in the Department of Corrections matter.

Present is Mr. Love, myself, his attorney, J. Michael Hannon, and Dr. Henry R. Lesansky, who is the Hearing Officer for this matter.

Good morning, everyone.

DR. LESANSKY: Good morning.

MR. LOVE: Good morning.

EXAMINATION

BY MR. HANNON:

Q Mr. Love, could you give Dr. Lesansky some background on yourself, where you grew up and where you were educated and how you got into the Corrections business?

**A Sure.**

**To begin with, my name is Darrell Love. I was born in Georgia and grew up in the Washington, D.C. area.**

**I attended college at Towson State and Johns Hopkins University. I graduated from Towson and**

5

went to ROTC at Johns Hopkins University where I was a Second Lieutenant.

I got out of the Army and applied for a job. I looked around. I did jobs initially and then heard about the Department of Corrections and I applied there. After the second time I heard from them. The first time nobody ever called me about my application or anything. The second time I guess a few months later they got that application and hired me.

Q When did you get your degree from Towson?

A 1980.

Q What field was that in?

A Health Administration.

Q You were eventually commissioned as Second Lieutenant in the Army?

A Yes, sir.

Q How did that happen?

A I went to ROTC. First it was Towson State College and then it got accredited and it was a University. They didn't have an ROTC program. The closest one was Johns Hopkins. So, I went to Johns

6

Hopkins and got commissioned as a Second Lieutenant and went to Fort Sill, Oklahoma, and was in field artillery.

Q Fort Sill?

A Fort Sill. S-I-L-L.

Q I take it then that you were commissioned upon graduation from Towson?

A Yes.

Q Did that help pay your undergraduate tuition or not?

A It helped out. But in 1980 it wasn't as expensive as it is now. I mean, there was a lot more grants and loans and everything. But it did help out.

Q Where did you go to high school?

A Frank W. Ballou Senior High School in Washington, D.C.

Q When did you graduate Ballou?

A 1975. June of '75.

Q Is your family still living in the area?

A They certainly are. They still reside in Washington, D.C. and been at the same address since about 1965. Probably about '65.

7

Q Are your folks still living?

A Yes, sir. Mother and father. I saw my mom on Saturday.

Q Are they still working?

A No. They are getting up in age. Mom and dad will be 79 or 80. Well, my father will turn 79 or 80 in July. And I saw my mother this Saturday.

Q What careers did they have?

A He did 30 years in the military in the U.S. Army and retired.

She did about 32 years with the D.C. Public Schools.

Q Your father retired with what rank?

A He was a Master Sergeant.

Q He ran the Army.

Was your mother a teacher?

A No. She was a supervisory of the cafeteria. Supervisor of a cafeteria. Food service.

Q How about your siblings? Do you have siblings?

A I have two other brothers living and a younger sister, who is the youngest. I have one

8

brother who is deceased.

My youngest brother resides in Atlanta and my older brother resides in Washington, D.C.

Q Where do you reside today?

A I reside in Washington, D.C.

Q With whom do you live?

A Me and my friend, we have a house out in Southeast.

Q You completed your military service when?

A In 1980 I believe. It was six months because I was eligible to get out after I got my initial training.

Q Really?

A And then there wasn't any job.

I didn't see it being a future with being a used cannon salesman. There wasn't any future staying in there with artillery.

Q Approximately what year was it that you applied to Corrections?

A Corrections I applied in 1981. It was early 1981 and I didn't get accepted until November 1st, 1982.

Q What did you do in the interim?

**A In the interim I did a variety of odd jobs. I was a nursing assistant. I worked a couple of local stores. I did a lot of everything until I could get a career.**

Q What was your first position with the Department of Corrections?

**A My first position with the Department of Corrections was a Correctional Officer. I was assigned to the day shift and I worked in cell blocks.**

**Before that you know you would go through your six weeks of training and then be assigned. It was one of the largest classes at the time. We had 50 people. Out of 50 individuals, 48 of them I believe were transferred or assigned to the jail and the other two were assigned to Lorton.**

**Then we rotated through the three various shifts, shift one being midnight, shift two during the day, and shift three 4:00 to 12:00.**

**So, I stayed in the cell blocks for approximately two years. Then from the cell blocks I went to Visitors Control. From Visitors Control I**

**went to the Command.**

**I rotated to various critical posts, Visitors Control to the Command Center, R & D Control, and learned and worked all those posts. I stayed there throughout that jail for about six years.**

**After the six years I had applied to be a Correctional Treatment Specialist and was accepted and I was reassigned to the Halfway House. It was 1825 13th Street, Northwest. That was the youth house at the time, the YRA house.**

**I stayed there for four or five years, maybe six, and from there I was transferred to Community Correctional Center Number 3, which housed at the time males and female adult offenders. Subsequently it went back to half youth and half adult males. And I stayed there a while.**

**Then after that I was reassigned to CCC Number 1, and that was known as 1010 North Capitol, and I stayed there a couple of years.**

**Finally I ended up going to CCC Number 4, Community Correctional Center 4. I worked for the Department on Halfway Houses 1, 2, 3 and 4, and stayed**

**there and then I eventually went to Headquarters and worked at 300 Indiana Avenue and was the Assistant with the Director of the Halfway Houses.**

**In all it was approximately I would say roughly 16 or 17 years in the Halfway Houses. But during that time I accumulated out of the 16 or 17 years no less than 13 or 14 Outstanding awards, you know, Outstanding evaluations.**

Q What was your most recent evaluation?

**A My most recent evaluation was Excellent.**

Q And when was that?

**A That would have been last year, 2006. Probably about March of 2006.**

Q Who signed your most recent evaluation?

**A It would have been either Leona Bennett or Brenda Ward.**

Q What positions do they hold?

**A Leona Bennett at the time was Chief Case Manager. So, she was my immediate supervisor.**

**Brenda Ward was the Deputy Warden for Programs, who was Ms. Bennett's supervisor.**

Q I am curious. Why did you go to the youth

house originally when you went into CTS?

**A It was the only position that they had. When I filled out the application I filled it out for Correctional Treatment Specialist, but the position was for the Halfway House. So, when I was accepted that is where the position was and that is where they transferred me to, reassigned me to.**

Q How did you like the work at the youth house?

**A I really enjoyed that. I was able to make a difference.**

**You are working with offenders anywhere from 18 to 30 and 30 being due to the Youth Act. You might have a Youth Act that might be 15 or 20 years and they come back and forth.**

**But I could relate to them and they could relate to me. I see some of the individuals now, I will see them on the street, and they say you made a difference.**

Q A little more satisfying than necessarily being on the block?

**A Well, both of them have their good and**

13

**their bad, but being satisfied was when you treat people fair. I treated people fair. So, I never feared anything.**

**It is like when I go on the street, when I am out in the street and in public now, guys will come up to me and they will say, how are you doing? I don't know where I know them from, but in the end I know it was at the jail. They tell me they are doing great and that makes me feel good because I treated them fair and they said you did a good job and it was their fault that they were in trouble and they should be more like me. So, I never had a problem or feared anything.**

**The Halfway House is the same thing. I still see guys coming through now as adult offenders. When I was at the jail I would see them coming through as adult offenders and they would remind me that: Remember me. I was in the youth house with you, Mr. Love. Mr. Love, you are still doing this.**

Q And you say what are you doing here?

**A Yes. They tell me it is a long story. But I have time to listen to them because everybody has**

14

**problems. You treat people the way you want to be treated and everything has a tendency to work out with them.**

Q When the jail escape occurred what position did you hold?

**A I was a Case Manager when the jail escape occurred.**

Q How long had you been a Case Manager?

**A I had been a Case Manager probably about 18 years, approximately 18 years.**

Q What was the job of the Case Manager at the jail?

**A The job of the Case Manager is to monitor each inmate and help them with his needs.**

**Each unit is a different unit. At the time I was working in a maximum security block, a special handling block, at the time. But before that I was working a unit that was comprised where it had a metal barrier that separated the two sides. It was detailed inmates on one side and administrative segregation inmates on the other side. And before that I worked maximum security blocks. I worked Southwest 2,**

15

**Northeast 3.**

Q This is all as a CTS?

**A A CTF.**

Q CTF. I'm sorry.

**A Well, the D.C. Jail is not the CTF. CDF.**

Q But in your position as a Correctional Treatment Specialist?

**A Yes.**

Q Where were you physically located?

**A During which time?**

Q When you were working as a Correctional Treatment Specialist at the jail.

**A My office would be in the cell blocks.**

Q What would your caseload be like?

**A I maintained 160 on my caseload up until I was picked to manage the special handling block. I was selected to manage that block.**

Q When was that?

**A That was the last block I was in and that was probably from approximately either February or March until the escape occurred.**

Q So, February of --

16

**A 2006.**

Q -- 2006.

Why were you selected to go into the Special Handling Unit?

**A They had interviewed three individuals and out of the three individuals I guess they deemed I had possessed the right skills and was best able to work with the special handling inmates, as well as work with the staff.**

Q So, when you went to special handling where were you physically located?

**A I was on the Special Handling Unit.**

Q How many inmates were on your caseload then?

**A It varied anywhere from 20 to 50.**

Q What sort of inmates were in special handling?

**A Special handling inmates are the most dangerous in the jail or those that might have a crime of notoriety.**

**The last ones I had were the guys -- this is just an example -- the guys who were going out**

**robbing those banks with automatic weapons. I had those six guys.**

**Then the guy who had -- I can't pronounce the name right now. He was the guy who had stabbed the guy at the U Street Club and then subsequently they found that he might be involved in four or five more murders.**

**I had guys of that notoriety and guys who had previous escape histories from the jail, guys who would assault the correctional staff and guys who were severe management problems.**

Q What did you do on a weekly basis in the Special Handling Unit?

**A In the Special Handling Unit on a daily basis I would interview the guys, I would see what they needed, make sure their needs were taken care of or addressed, call them down and talk with them, counsel them, let them speak with their attorneys, see if all their medical concerns were being met, find out if they had any specific requests that I needed to address, and periodically let them use the phone if they needed to make a phone call.**

Q Were you responsible for the reclassification of Inmate Joseph Leaks when you were on the Special Handling Unit?

**A Joseph Leaks was an inmate who was with me in my prior unit, which was Northeast 1, which housed 80 Administrative Segregation Unit inmates, who were problem inmates, and on the other side was 80 detail inmates. He was in the detail inmate unit on the detail side. That is when I reclassified Mr. Leaks, Inmate Leaks.**

Q The dates that are alleged as the dates that you reclassified him were March 11th, 2006 and May 15th, 2006.

Is that correct?

**A That probably would be correct because we were on a mandate to reclassify the guys every 90 days I believe.**

Q Why would you be reclassifying Inmate Leaks if you were on Special Handling?

**A I was assigned to that unit, Northeast 1, at the time when he was a detail inmate eligible to be on detail and I was working that unit.**

**I worked that unit for approximately a year, Northeast 1, which housed half administrative segregation inmates and half detail. Joseph Leaks was a detail inmate and I was assigned to that unit.**

**Subsequently after that then I went to the Special Handling Unit and he remained on the detail unit.**

Q Were you in Special Handling on the dates that you reclassified him?

**A No. I was in the Detail Unit and the Administrative Segregation Unit.**

Q So, you went to Special Handling after May 15th of 2006?

**A Yes.**

Q When did you go to the Special Handling Unit, to the best of your knowledge?

Was it after the jail escapes?

**A No. That was before the jail escapes. That was before the jail escapes.**

**That would have had to have been sometime -- I am trying to figure it out.**

**When you say March, was that March of 2006 and May of 2006?**

Q Well, that is what I said. That is what I have.

**A That would have had to have been 2005.**

Q I may have it wrong.

**A Because I was at the Special Handling Unit in May. Because I had been there approximately three or four months. So, that would have had to have been 2005.**

Q Let's see. In the March 15th, 2007 20-day notice it states: The OIA investigation determined that you conducted a custody reclassification of Inmate Leaks on March 11, 2006.

**A I may have done one on March 11, 2006, but I couldn't have done one in May because I was in the Special Handling Unit.**

Q All right. Then that is probably my error.

**A Because I had been there approximately four months, three or four months, before that occurred.**

Q Well, page 2 of the charging document says you conducted a subsequent reclassification of Inmate Leaks on May 15th, 2006. Your scoring of this

reclassification produced a total custody score of five.

**A I mean, I know the escape occurred in June.**

Q Correct.

**A I had been in South 1, the Special Handling block, for three or four months prior to that.**

Q Let's see if we can find a copy of the document.

I am looking at the original August 24, 2006 summary removal letter and that also says that you conducted a custody reclassification on March 11, 2006.

**A Like I said, I may have done one March 11th, 2006, but I know for a fact that I was assigned to South 1 and that was where I was presently working when the escape occurred. I had been there well over two or three months. So, it couldn't have been in May.**

Q It goes on to say you conducted a subsequent reclassification of Inmate Leaks on May 15th, 2006.

Let's see if we can find any underlying

documents.

DR. LESANSKY: I am looking too.

It definitely says what you said. I mean it definitely refers to that. I am looking for the paper now as well. It refers to March 11th, as well as the May 15th. It definitely says that.

I don't think I have the sheets here with me. I have to go across the hall. I don't have that in this package.

MR. HANNON: Hold on one moment.

I am looking at page 21 of the investigation and it states with respect to CTS-4, quote: "On March 11, 2006 CTS-4 conducted his initial reclassification of Inmate Leaks and a subsequent reclassification of Inmate Leaks on April 15th, 2006."

DR. LESANSKY: April 15th.

MR. HANNON: That is what this page says.

MR. LOVE: That could have conceivably been right. I may have been in South 1 two months, but I think it was closer to three or four months.

But I can say I know probably the one in March is correct, but I definitely know May is

incorrect. I was in South 1 during May.

MR. HANNON: Could we take a break and see if you can find the actual document?

DR. LESANSKY: Yes.

MR. HANNON: Which ought to be an exhibit to the jail investigation.

DR. LESANSKY: Let me go across the way. If you could just give me a minute.

(Recess.)

MR. HANNON: We found a page in the Investigative Report which summarizes the classification done on March 11, 2006 and summarizes the reclassification done by CTS-4, but it says here May 15th of 2006.

DR. LESANSKY: May 15th.

MR. HANNON: Yes. That may again be an error.

DR. LESANSKY: I guess we certainly need to clarify the date.

MR. HANNON: If it exists in the record, it should be part of the exhibits to the Investigative Report which I see you going through.

DR. LESANSKY: Right.

On page 8 it makes reference to the subsequent reclassification of Inmate Leaks on May 15th, 2006 and then it talks about the custody evaluation and the merit designations read as follows. And I am looking for the document itself to verify that date listed here as May 15th.

It makes a second reference to a May 15th, 2006 reclassification. And I am looking for the actual document, which would be the reclassification, which obviously should be dated.

I do see the reference on page 21 that you made reference to earlier talking about referring to the subsequent reclassification of Inmate Leaks on April 15th, 2006.

Then it makes another reference on page 22 during his, according to CTS-4, which is you, during his subsequent reclassification of Inmate Leaks on April 15th, 2006.

Let me just see what I have here.

In that appendix, which is labeled Appendix B, Inmate Leaks and Jones Criminal History, I

don't see them there in terms of the reclassifications that we are talking about. I don't see either one actually. Let me make sure.

No. I don't see it in here. There may be additional appendices maybe, but I don't see it in the Appendix B.

(Hearing Interruption.)

DR. LESANSKY: Excuse me.

(Off the record.)

MR. HANNON: I think we can proceed.

DR. LESANSKY: Okay.

MR. HANNON: What I would like to do is to ask you if you have the decision of the Administrative Hearing Judge in Mr. Love's case?

DR. LESANSKY: I think I do.

MR. HANNON: Because we are going to go through that in discussing whether the classification was erroneous or not. It would be one of the exhibits.

DR. LESANSKY: Yes. Let me see.

MR. HANNON: The date of it is November 22nd of 2006, if that helps.

There you go.

DR. LESANSKY: Is that it?

MR. HANNON: Yes.

Which exhibit is it?

DR. LESANSKY: 37.

MR. HANNON: Let's go to page 12.

At the bottom it says the investigative report charges that on March 11, 2006 Mr. Love incorrectly scored Inmate Leaks as follows.

DR. LESANSKY: Right.

BY MR. HANNON:

Q What I would like to do is just ask you, Mr. Love, to explain why you made that classification on March 11th, 2006?

**A To begin with, the basis for classification is zero to four would be minimum custody, five to 11 would be medium, and anything above 11 would be maximum, except in the following case. Your first two classifications are ten or greater.**

**So, to begin with, the severity of his current offense was graded a moderate and was three. That is because I graded the obstruction of justice**

**charge as a three. Everybody was under the influence and impression that it would be accessory to murder. They saw the word murder and panicked.**

**Look under the Department's own guidelines. Any accessory, accessory to kill the world, accessory to destroy anything, any accessory is a one. The rules and guidelines say grade the most severe. The most severe was obstruction of justice, not accessory to murder.**

MR. HANNON: I would also refer you to the D.C. Code on the penalties for accessory to murder. They are obviously much less significant because you can do fairly little to be an accessory to murder.

So, that is the basis for the three.

MR. LOVE: Then it refers to prior criminal convictions. The prior criminal conviction was I believe an assault with a dangerous weapon or something. So, that merited a five. That would give him eight at that point.

Then you go down to escapes or attempt to escape. I gave him a zero because in reviewing his electronic file he was not prosecuted for a walk away

from the Halfway House and we were trained that if a guy is not prosecuted by the courts, we cannot hold it against him. There is the basis for them putting guys in the Halfway House and primarily if they escape from the Halfway House and the court did not prosecute them for it, then we can't hold it against them. So, that would have been a zero.

Had he been prosecuted for the escape, it would have been a walk away and it would have been greater than a year and he would have received a one. That would have brought him to nine.

BY MR. HANNON:

Q Let me interrupt here for a moment.

Isn't it correct that the Investigators who did this report, the initial report, from Internal Affairs, acknowledged that there is no documentation of the escape?

**A They are saying that he had a perimeter escape in October 1986, but they didn't have any information to substantiate that. They couldn't tell you what date it was or where he escaped from. And there was no information in his file to indicate he**

29

**had a permanent escape. The only escape that was mentioned was in the electronic file that he had a walk away from a Halfway House and that it wasn't prosecuted.**

Q Okay.

Then history of institutional violence.

**A Inmate Leaks remained on detail because he didn't have any infractions or DRs, which are reports of misconduct. So, he didn't have any misconduct against him. So, he would have scored a zero on that.**

**Prior felony convictions in the past two years, he had two. He had I believe the accessory and the ADW.**

**Then the number of disciplinary reports, which were the DRs for misconduct, he didn't have any. So, that would have gave him a negative two.**

**Then his age, I am not exactly sure, but if you are like 24, 25 or younger, you would get a point. If you are older, you don't receive any points. He was older than 25. So, he got a zero in that.**

**His program and work detail history was satisfactory. So, he picked up another negative one**

30

**on that.**

**His education was a zero because he was a high school graduate. Had he not graduated from high school or got his GED, he would have picked up a minus one. But he had a high school diploma.**

Q And so you total up A through D?

**A You total up the first two, A and B. If that was a ten, he would have been maximum custody. But since it was an eight, you total up A through F and that would give you eight points.**

Q Okay.

So, what custody level is that?

**A Anywhere between five and 11 would be a medium custody.**

Q And that is what you recorded in that classification?

**A Correct.**

Q Now, let's take a look at the way that judge -- I am sure you remember the name of the judge.

**A Paul Handy.**

Q -- the way that Paul Handy classified. And that is on page 18.

31

At the top he shows a classification for March 11th of 2006. He has severity of current offense three points.

Is that correct?

**A That is correct.**

Q Is that what you gave him?

**A Yes, sir.**

**He got a three for the obstruction of justice because accessory would have been a one, that would have been lower, so he gave him the higher one, such as I did.**

Q Then B, severity of prior criminal convictions, he gives him a five.

**A That is because the prior criminal conviction was a parole violation for assault with a dangerous weapon. I gave him a five I believe also.**

Q Then he has history of escapes or attempts to escape and he gives him a one.

**A He should have given him a zero because we have been trained that if he had a walk away from a Halfway House and the court did not prosecute that walk away from the Halfway House, I couldn't hold it**

32

**against him. And the reason being that the guy may have had a problem and been in the hospital and when they found out he was in the hospital he had a legitimate excuse not to have reported on time.**

**So, obviously when the courts investigated they found that it wasn't a real escape from a Halfway House, he wasn't a failure to return. So, that is why he shouldn't have gotten that one.**

Q And he gives him a zero, like you, for history of institutional violence.

**A Correct.**

Q He gives him a two, like you, for prior felony convictions.

**A Correct.**

Q He gives him a minus two for no DRs.

**A Correct.**

Q And he gives him zero for age and a minus one for work detail and a zero for education.

**A Correct.**

Q His total points are eight.

**A Right.**

Q And that would make him medium?

**A Medium custody.**

Q So, even though you and Judge Handy disagree on the one point for history of escapes, both of you classify him as medium?

**A That is correct.**

Q I want to take a look at what Judge Handy relies upon for the one point for prior escape.

On page 17 he says, and I am going to read all this into the record, so this is a quote.

"With regard to the escape charge, the OIA Investigators did not question Mr. Love about why he failed to score one point for prior institutional escapes. The Investigative Report states that Inmate Leaks had a history of prior escape from an institution and that the initial classification employee in August 2005 properly scored one point for prior escapes.

"The manual at Chapter 2-3.C.3 provides that if the inmate escaped or attempted to escape from a low security or community corrections facility over one year ago, the employee should score one point for escape history under Part C." End quote.

So, that is what it says in the manual, but that is not the way the manual is applied. One has to have a determination that there in fact was an escape as a matter of law?

**A Correct.**

Q Perhaps that is the reason why the OIA Investigators didn't question you about that?

**A That probably is correct why they didn't ask me about the escape from the Halfway House.**

Q How did you find out about the escapes?

**A Watching TV. I believe watching TV Monday.**

Q When were you interviewed?

**A Tuesday.**

Q You were not given any warnings about the statements that you were providing?

**A My supervisor, Ms. Bennett, told me to report to Grimke Tuesday at 1:00 o'clock and that was it.**

Q And when you sat down with the Investigators did they advise you that you had to answer questions and that nothing you said could be used against you criminally and that if you didn't

answer questions, you could be disciplined?

**A They implied that I had to answer all their questions regarding the escape.**

Q I understand that. But did they give you a document listing your rights in connection with the interview they were conducting?

**A No. I don't believe so.**

**I think they just sat me down, told me who they were, had the file before them, and started asking me questions.**

Q Did you have a union representative present?

**A No.**

Q Did they ever ask you if you wanted a union representative?

**A You know, Ms. Bennett didn't tell me that I needed a union representative and didn't offer me one and they didn't mention anything about it. I went there by myself. I showed up and it was just me against three.**

Q How did you first learn about your discipline?

**A Are you saying when I was placed on administrative leave?**

Q Yes.

**A I served myself.**

Q I'm sorry?

**A I served myself my own paperwork.**

Q Explain that.

**A I happened to be in the main office for the CMPs. I came upstairs to I believe photocopy some documents for an inmate. The mail runner was up there with some mail. He said, is there a Malcomb Pointer up here? I said, no, I think he is in his unit I believe. He said, is there a Darrell Love? I said, yes, that is me. And the mail runner handed me this envelope. He may have said to sign for this. I signed for it and took it and about two or three minutes later I opened it up because he had left and it said I was being placed on administrative leave.**

**So, I go and tell my supervisor I am on administrative leave, give her my ID and my keys, and they walk me out of the building.**

Q And when did you learn that the Director,

even though you were on administrative leave and weren't in the building, summarily fired you?

**A I was at home and I think it was like 5:00 o'clock and I can't recall who, but somebody called me and said turn to Channel 5, all of you have been fired.**

**I turned to Channel 5 and there was the Director and a few other people on the TV saying that all the people who participated in the escape had been fired and they are under criminal investigation, we all aided and abetted in attempting somebody to collaborate an escape.**

Q How did you react to that?

**A Well, it was a shock. Because I mean after 25 years of being in the Department and I don't have any infractions and to learn over the TV that you have been fired and then to be accused of assisting somebody in an escape and being in a conspiracy, I knew that was completely wrong.**

**I mean, 25 years and I am four months from retirement and I am going to get caught up in something like that?**

Q Dr. Lesansky is I hope going to consider the Douglas Factors.

First of all, I don't think he ever gets to the Douglas Factors unless he finds that you have done something wrong.

You, of course, believe today you didn't do anything wrong. Is that true?

**A I didn't do anything.**

**I mean, the guidelines of the Department says that an inmate -- they may have changed since then, I don't know, but at the time an inmate in medium custody was eligible to be on an off unit detail.**

Q Let me back-up just for a moment before we talk about the Douglas Factors.

You are knowledgeable about conversations with your supervisors in connection with whether Leaks was accurately classified; is that right?

**A Yes.**

Q Could you tell Dr. Lesansky about those conversations?

**A An individual by the name of Jim Austin constructed the instrument for classification.**

Q How is his last name spelled, if you know?

**A A-U-S-T-I-N.**

Q Who is he?

**A He was a consultant that I believe prior worked with the Federal Bureau of Prisons and he had a contract I guess with the Department to construct a classification tool and he constructed a classification and reclassification instrument. And although it was never signed off on as being authorized, it was the instrument we were using to reclassify and classify guys.**

**Jim Austin is in California and he has a residence in D.C. and for whatever reason around October, September or October, he met with Ms. Bennett, who was my immediate supervisor, and met with Brenda Ward, her supervisor, who was the Deputy Warden for Programs, and they went over the classification.**

**I am telling you this because Ms. Bennett called me at my house, and unfortunately I don't have it, I didn't keep the voice mail, but she called me at my house and left a message and said, quote: "Love, I met with Jim Austin, me and Ms. Ward, and you classified the guy correctly."**

DR. LESANSKY: When was that? I'm sorry.

MR. LOVE: It was probably late September, but I believe more accurately it was October, between the beginning and the middle of October.

DR. LESANSKY: Of '06?

MR. LOVE: '06. Yes, sir.

BY MR. HANNON:

Q What is your work history in terms of taking leave?

**A When I started with the Department in November 1982 I was working in Visitors Control and you accumulate up until your 15th year, it is like four hours a pay period, then six, then after 15 it is eight.**

**So, my first year or second year I hadn't taken any sick leave and I hadn't taken any vacation my first three years because I wanted to get to the status of where everybody that I knew maintained 208 hours of annual leave. And I had no need, I**

**wasn't sick, so I didn't take any sick leave.**

**So, one day I am working Visitors Control, but I am working overtime. My supervisor then was Captain Evans and he had put me on overtime for Visitors Control. So, that day it was a Saturday and I went out with my brother and we went somewhere in Virginia and my car broke down. I was supposed to report for work and I had to call in that one day and I called in and said I won't be able to make it, I am sick. I could have requested emergency annual, but I am new and didn't know. So, I said I am sick. So, I used eight hours.**

**For the next 23 years I never used any sick leave. So, I had like 2300 and 2400 hours of sick leave and only my second year at the jail, like in 2002 or 2003, I used about 300 hours and right now on the books I have well over 2100 hours of sick leave. So, it is not like I would just take off sick to be sick. I always would keep 208 hours of use or lose on the books.**

Q I take it you believe you can continue to perform your services as a CTS at a satisfactory

level?

**A At the minimum it would be satisfactory, but I always do the best I can.**

Q Do you wish to return to the Department of Corrections?

**A Yes. I do.**

Q Are you aware of any other, other than this jail escape matter and some of your colleagues, are you aware of any time when a Correctional Treatment Specialist has been disciplined for misclassifying an inmate?

**A No. Not really.**

**That would be a personnel matter and the Correctional Treatment Specialist may be disciplined, but I wouldn't know what the reason was because I wasn't in management.**

Q Have you ever been presented with a table of penalties for specific offenses in your employment at the Department of Corrections?

**A Are you talking about for inmates or for staff?**

Q For staff.

**A No.**

Q So, there is no such thing?

**A I don't know if there is. There probably is something, but I have never even received it.**

**I have heard of things that you might counsel somebody first and it is gradual progressive sanctions. But you would think that you would counsel somebody, give them a chance to correct themselves, then you would maybe give them a day or two on the street, but to fire somebody, that is severe without even hearing their side of the story.**

Q Well, what you are saying is sort of common sense. You have a system like that for inmates, right?

**A Yes.**

Q But not, as far as you are aware, a written system for Corrections Officers?

**A Well, a written system that applied to me.**

Q Is there anything else that you would like to say to Dr. Lesansky before we wrap-up?

**A Well, what I just said is the written system that applies to me because my records will show**

**that that is the first time I had been involved in any type of incident such as that and for 24 or 25 years I think I did pretty good and then to try and take my pension for something that is not my fault, and I did my work and I classified the guy correctly, and I am still being sanctioned for it.**

MR. HANNON: Doctor, do you have some questions for Mr. Love?

DR. LESANSKY: Yes. Thank you.

Mr. Love, can you tell me about this reference to you allegedly striking the wrong key regarding this with a three instead of a five?

MR. LOVE: Yes.

That primarily was when I went in there and I had three Investigators pressuring me and I just inadvertently jokingly said I probably inadvertently should have hit the five instead of three.

But to be honest, even if it was a five, he would have still been medium custody. The guy was classified correctly. And by their own scoring, it wouldn't have changed it. He would have been eligible for detail.

I probably did say that. It wasn't a mistake when you look at it. The guy was classified correctly. And it was probably with three Investigators looking at you, nobody on my side, and never before being under that type of situation, that I said something that I probably shouldn't have.

EXAMINATION

BY MR. HANNON:

Q Do you remember if they had the actual documents when they interviewed you?

**A They had a file. They had the original file, but they didn't open up the file to show me the original form. If they did, it was a copy probably.**

Q We haven't seen the original form here in the process.

But the allegations against you are that in the second reclassification under B, severity of prior criminal convictions, you gave a three instead of a five.

**A That was correct because that parole violation had been -- what do they call it -- the warrant had been executed. So, since the warrant had**

**been executed, I used the next thing and that was the obstruction of justice. That was the next charge. That is why it became a three, because the warrant had been executed.**

Q And because the warrant had been executed a three would have been justified under severity of prior criminal convictions?

**A Yes.**

Q So, even a three, in your opinion, would be accurate?

**A Yes.**

Q Of course, there is no evidence that you did a reclassification other than this report.

**A Well, as I said earlier, it couldn't have been May 15th.**

Q Let me just ask you this question.

After your March 11th, 2006 classification, would anyone reclassifying the same inmate have before them the March 11th, 2006 classification that you did?

**A Say that again now.**

Q If you did the March 11th, 2006 classification, anyone reclassifying this inmate

afterwards, would that CTS have before them your March 11, 2006 classification?

**A It would be in his file. If they had the original file, they would have seen it.**

Q Do you remember today whether you reclassified Leaks after March 11th, 2006 without seeing your original documentation?

**A I believe I may have. But, as I say, I know I didn't reclassify him in May because May I was working in South 1 with Special Handling inmates.**

Q As you sit here today, do you recall whether you gave him a three on a subsequent reclassification because it was for the parole violation or do you have a recollection at all?

**A I can't recall on that one. But if that is what is down there, then that is what I put, a three.**

Q And you believe a three would be justified?

**A A three would be justified if the warrant had been executed.**

Q What is it that taught you that if the warrant is executed, that is what you do?

**A Through a training class. I think it was a**

**one hour training class we had in the training room with Ms. Bennett and there may have been Ms. Ward there.**

Q Is there any documentation of that particular policy?

**A It might be in the technical manual.**

MR. HANNON: I'm sorry.

DR. LESANSKY: Thank you.

Mr. Love, there was a reference to you not having access to the paper file.

MR. LOVE: That was probably correct.

DR. LESANSKY: Can you just give me a little more background on this access to a paper file and what that is?

MR. LOVE: Sure.

The paper file is his institutional paper file and it has his whole criminal history and his social history, et cetera, medical history. Some of the medical history. The medical records are kept separate.

What should actually happen is we should go to the Record Office and request the file and they

should find it for us and have it ready when we request it. But in actuality what happens the records person will tell you it is understood you go find the file, we have too much other work to do.

So, I am -- I am not going to say the best, but I worked in the Record Office when I worked in Compliance and I have a good, well rounded understanding of where records are and how they are kept and which ones go where because I am aware when they needed records to be found, they would ask me. That is the records personnel asking me to find their own records, as well as my Case Manager, Ms. Bennett. I would be detailed sometimes days at a time to find files. And if I couldn't find a file, nine times out of ten it wasn't in the Record Office, somebody else had it.

To make a long story short, if I couldn't find the file, we are trained to use the electronic file, and the electronic file is the one on the computer and that is what I would have had to use if I couldn't find the paper file.

DR. LESANSKY: So, you said just a moment

ago I think that -- I don't know whether you used the word trained -- but you said that you should go get the paper file?

MR. LOVE: No.

DR. LESANSKY: I am not trying to put any words in your mouth. I may not have gotten it exactly.

MR. LOVE: I will elaborate.

Our first training is to search for the paper file and if you can't find the paper file in a reasonable amount of time, then you have to use the electronic file.

A lot of these files, it may take you two or three days to locate them. But we are under a mandate. They classify guys every 30, 60, 90 days and at that time we may have been classifying them every 60 or 90 days and you could get penalized or sanctioned through your supervisors if you were late in classifying or reclassifying the guy. They had a certain amount of time. So, you couldn't spend three or four days searching for a file. So, you would have to use the electronic file if your file could not be

located.

EXAMINATION

BY MR. HANNON:

Q Were Correctional Treatment Specialists specifically permitted to search for files in R & D?

**A You mean the Record Office?**

Q The Record Office. I'm sorry.

**A Yes.**

Q But whose job was it?

**A It is the Records Office job to locate and maintain custody of the files. They should sign them out to you and when you return them, they should sign them back in. But in actuality you were signing them out and signing them in.**

Q But they were too busy?

**A Yes. They were too busy.**

Q You don't question that?

I mean, Records is busy.

**A Of course, it is busy, but I am busy too.**

Q I understand that.

**A Records are busy, but that was part of their job to locate the files.**

**If you were at Lorton, the way they did their files, they had them caged in and you couldn't even access records. You had to stand at a gate and give them a D.C. number and a name and they would tell you when you could come back and pick the file up.**

**Records here they buzz you in, you go to the files and start searching. You might go to carts, desks, tables, on the floor.**

Q But that is an informal process?

**A Yes.**

Q That is not the way it is supposed to work?

**A No. That is not the way it is supposed to work, but that is the way they made it work.**

MR. HANNON: Okay.

DR. LESANSKY: Mr. Love, in this case then you did not ask the Records Office for the paper file?

Well, let me stop there.

Did you ask the Records Office, I need to look at the institutional record on this guy?

MR. LOVE: I would ask them for all of the files. But I might that day be reclassifying 30 guys and after I ask them and they say we will look for it

and then I come back three or four hours later and ask did anybody find the file, I will look myself. And if I can't find it, then I will use the electronic file.

But before I even ask them and they say they will look for it, I will go look for it myself, I will look for a file, and if I find a file, I will give it to them and say, here is the file, can you sign it out to me? And they will take the file, sign it out to me and give it to me and then I will bring it back and give it to them.

But if I look and I can't find it, then I will go and they tell me they will look for it and then I come back and they can't find it, I will look again for it. I might spend 30 minutes, 40 minutes, looking for that particular file because I pride myself in being able to find the files and if I can't find it, then I go and wait for them to retrieve it for me.

DR. LESANSKY: So, in this case, is that what actually happened in this case, at least as best you can remember, if you can remember?

MR. LOVE: No. I can remember. Because

that is the way I always do it.

If they tell me they will get it, I will look for it first myself because if they are too busy, I can take the time to look for it and if I find it, I will give it to them and let them sign it out to me. But if I can't find it, then I will come back and then I will look again and if I can't find it, I will wait for them to retrieve it for me.

DR. LESANSKY: And so you did not locate the file yourself?

MR. LOVE: No. I didn't locate the file.

DR. LESANSKY: And they did not locate it for you?

MR. LOVE: No.

DR. LESANSKY: So, you went ahead then?

MR. LOVE: I used the electronic file.

That is what we were trained through Ms. Bennett. If the paper file is not available, the electronic file is the back-up.

MR. HANNON: Could I interrupt?

DR. LESANSKY: Please.

EXAMINATION

BY MR. HANNON:

Q Are you the last call on this?

After you do the classification, isn't there some further review that is supposed to occur?

**A Ms. Bennett should review my classification or my supervisor should review my classifications after I complete them.**

Q That is the procedure?

**A Yes.**

Q Is that what you were trained?

**A That is who is responsible for doing it. And if it was a classification that she felt was done incorrectly, she had the ability to override it.**

DR. LESANSKY: I was going to ask you a little bit more about this review which you just touched on.

In the case of your classifications, plural, of Mr. Leaks, as far as you know, they were not reviewed or do you know if they were reviewed?

MR. LOVE: I don't know if they were reviewed. But I do know that she had the ability if they were incorrect, to override it and classify them

to what she felt they should be.

It is important to note too that Ms. Bennett said in her report that the guy was classified incorrectly and he should have been a maximum custody, but subsequently she found out that the guy was classified correctly as a medium custody.

DR. LESANSKY: Had you ever done any reclassifications in the past?

MR. LOVE: Hundreds.

DR. LESANSKY: You did hundreds.

Like 100, 200? I am not going to hold you to it. Just generally.

MR. LOVE: I understand.

I am just saying because prior, before I went to South 1, which was the Special Handling block, the Special Management Unit, they had a maximum of 50 or 60 inmates in it, every block I worked in 60 inmates, and I might be required to reclassify those guys three or four times a year. So, you multiply four times 60 for three years. So, it was hundreds.

DR. LESANSKY: In these hundreds that had been done by you over the years had you ever had any

of those reviewed, to your knowledge?

Had you ever had a supervisor do a review and come to you and say, I have reviewed X, this reclassification, and it is not okay or it doesn't look right or ask you a question about it or say it was erroneous?

MR. LOVE: Nobody ever approached me from a supervisory standpoint and questioned my initial classification or reclassification. And had they, I would have welcomed it because if I was making a mistake, I would appreciate somebody telling me.

DR. LESANSKY: In terms of rating a CTS's performance, do they ever consider the reclassification actions as part of the performance evaluation, as far as you know?

MR. LOVE: It is incorporated into the general criteria of his work performance. And that is part of your work performance, as well as the other factors.

I am sure you have seen the performance evaluations that they give out yearly. So, that would be one of the factors that would be incorporated, your

work performance, how fast you get your work done, your ability to take the initiatives.

DR. LESANSKY: Thank you.

You made a reference a couple of times to the training, which I think you described as about an hour of training related to how the reclassification is performed, the technical reference and, I am not sure, but the program statement as well.

MR. LOVE: Yes.

Well, when they had a new block of training they would call everybody together and you would go to a training room, everybody would sit down. Somebody would go over it briefly, and briefly being an hour, no more than an hour or two, and that would be the last you heard of it and it was always finished with if you have any questions, come see me. And there was never any follow-up.

DR. LESANSKY: Did I understand you to say that it was the training class, training session, this one hour training, in which the instructions are given regarding this issue of escape history and how the escape history is to be considered in terms of the

scoring?

MR. LOVE: Okay.

No. I wouldn't say that that occurred in a training session. That was just the rule of thumb because when processing Halfway House packages me and another guy, Alphonso Bryant, you will probably meet him, we would stay late putting together these Halfway House packages and during the course of staying late working with Ms. Bennett we were told that, okay, this guy has an escape, well, if it is a year old or over ten years old, then he is eligible for a Halfway House, if he has not been prosecuted for the escape, you cannot hold it against him. And that is how we were all trained. If it has not been held against him through the courts, then we cannot hold it against him.

EXAMINATION

BY MR. HANNON:

Q I can't imagine what a prior escape is if not something that is adjudicated. It would be like giving him a criminal history of five because he was arrested for murder but acquitted.

**A Exactly. And that is what we were trained. You can't hold it against them. If the courts don't hold it against them, you cannot hold it against them, which makes sense.**

**I don't know the underlying factors that prohibited him from returning to the Halfway House on time. As I say, he may have been in the hospital. He may have been stopped by the police and they picked him up and just wanted to question him which delayed his return.**

**Then when the courts investigate the incident, they find out it was reasonable cause for him to be late returning to the Halfway House, so they aren't going to prosecute. So, I can't prosecute him on that escape.**

DR. LESANSKY: Thank you.

I wanted to ask you about your reference to basically the way you always did these reclassifications. And I believe you made a reference to the fact that you normally do a face-to-face with an offender.

MR. LOVE: Exactly. Yes.

I call each guy in and sit down before him and talk with him and explain it to him. I don't just take a shortcut and do it off somebody else's reclassification. I normally would have the folder in there and I would stay sometimes -- I mean, depending on how many I had to do, I might stay until 8:00 or 9:00 at night or come in on a Saturday to get these guys done so that I could keep up with my case work.

Since at that time it was a detail block, the best time to catch them would sometimes be on the weekend. Or I would have to stay until 8:00, 9:00, 10:00 o'clock at night because they would be out working and it is hard to catch them in the unit, depending on what detail they are on.

I would have to see them face-to-face and find out how they are doing, talk with some of their work supervisors, see how they are doing on the job, and just overall observe them whenever I could, and then they would sit before me, I would have the file, and we would go down everything.

DR. LESANSKY: It is my understanding that in the case of Inmate Leaks that did not happen or is

that what you did with Inmate Leaks?

MR. LOVE: No. Leaks worked on the second floor by the ODR. So, it was not a problem with me catching him.

A lot of times what I would do is I would tell the other guys or call down to their units and I would post lists saying the following guys --

DR. LESANSKY: Excuse me just a minute.

(Pause.)

MR. LOVE: I would do several things to get a guy because I always want to see him in front of me.

I would either post a list on the inside of the bubble, which is the control unit in the unit, saying the following inmates need to report to me on such and such a date at such and such a time for reclassification. Otherwise, if it was real difficult, I would call down to whatever detail they are on and tell the supervisor to send this guy up to see me.

But with Leaks working there, I could tell Leaks when I passed there daily that I need to see him so I could classify him and he would say what time, I

would tell him what time, and then I would say on your lunch break come on down and see me. I would wait down there. He would come down there and I could reclassify him. And if I had the file, I would have the file with me.

Otherwise I would tell some of the other inmates to tell so-and-so that I need to see them, have the supervisor call me so that they can send up so-and-so. And the supervisors on the work squad would call me and say, you need to see so-and-so? Yes. When can I get him? Well, I am going to send him up right now.

They are moving around so much that I would have to do one, two or three of those things in order to insure that they would be there before me.

DR. LESANSKY: So, you did interview, you did do a face-to-face with Leaks?

MR. LOVE: Definitely. I know I did.

DR. LESANSKY: Because I thought I saw a reference that you weren't able to do it because there were like 60, you had 60 some inmates. I thought I read that you were not able to do a face-to-face with

Leaks.

MR. LOVE: I try to do them face-to-face.

No. I do face-to-face with all of them. And those that are late I just have to explain it until I see them.

DR. LESANSKY: So, you did a face-to-face with Leaks on both of the reclassifications, March and we are not sure I guess whether it is April 15th or May 15th?

MR. HANNON: Or if there was one.

DR. LESANSKY: Right.

MR. LOVE: If I did it, it would have probably been because he wasn't a hard guy to catch. So, I am pretty sure that I did a face-to-face with him.

DR. LESANSKY: Did I understand you to say that basically you always did a face-to-face?

MR. LOVE: There were probably an instance or two where I couldn't because the guy may have been in the hospital or something. But 90 percent of the time, that is just roughly, I tried to do a face-to-face with all of them. And, of course, there

are going to be some exceptions.

DR. LESANSKY: But it would be rare?

MR. LOVE: Yes.

DR. LESANSKY: It would be not the usual?

MR. LOVE: Not the usual for me.

DR. LESANSKY: I know earlier there was a reference about you not having a union representative with you at the interview on the 20th of June.

MR. LOVE: Right. With Internal Affairs. No. I didn't have one. Nobody advised me that I needed one. I was just advised to report to Grimke like Tuesday at 1:00 o'clock.

DR. LESANSKY: So, I guess my question is you would have a right to one if you wanted one?

MR. LOVE: Yes. I would have had a right to one if I knew I needed one. I really didn't know what I was going for.

DR. LESANSKY: The reason I am asking, and I don't mean to interrupt you, I am not a member of the union, so I am just trying to understand a little bit better.

MR. LOVE: This is the first time I have

been in any type of incident like this. So, I never had a need to have one.

But something as serious as this, I would have had one with me if somebody said you need to get a union rep or Ms. Bennett said, Love, do you want me to call a union rep for you? But nobody called anybody and just told me to report and then that is when I found everything that was happening.

DR. LESANSKY: During the interview, as the interview progressed, you didn't ask?

MR. LOVE: Well, you are under the impression that if you don't answer these questions, you can probably be terminated because this is an official investigation. So, it is not like I could just stop and say, hold up, I want to get my lawyer, I want to get a union rep. If they had asked me did I want union representation, I would have said yes.

MR. HANNON: But I should point out that he is not charged with the obligation to know what his rights are and, in fact, he doesn't know what his rights are.

DR. LESANSKY: And that is what I was just

trying to get in my mind since this issue had come up. I was making sure I understood what the issue was.

Now, you did mention that you had talked to Inmate Leaks.

MR. LOVE: Yes.

DR. LESANSKY: You talked to him obviously other than at the reclassification?

MR. LOVE: He was in my unit and he worked on the second floor. So, I saw him occasionally.

He was polite and well-mannered and I guess very smart because he would have been the guy you wouldn't have thought would do that because he was low profile, very polite, very respectful, didn't cause any trouble, and if you said do something, he did it. He knew his role and he stayed within his bounds.

So, I mean, as I said earlier, I treated people the way I wanted to be treated. So, it is not like I am going to run at him and just yell at him and curse at him because he treated me with respect and it was mutual. And I think it was that way with everybody.

Had they deemed him a threat, they would

not have had him on that outside detail. Everybody saw him every day because he was positioned right by the door that separates the ODR from the CMP area and you walk past him every day.

And if somebody knew that he had a history of escape, they should have wrote a report on him saying this, this and this.

Also, if he had all this serious escapes and everything, he should have been Special Handling. When he immediately came through R & D control they should have flagged him, the Record Office should have flagged him, compliance should have flagged him, and the CMP, Ms. Lightner, should have flagged him as a Special Handling since she had the file when he first came through. Because they don't normally classify somebody initially without the file.

DR. LESANSKY: I think that is all my questions.

MR. HANNON: Thank you.

Anything else, Darrell?

MR. LOVE: No.

MR. HANNON: We are off the record.

69

(Whereupon, at 11:25 a.m. the proceedings adjourned.)

70

CERTIFICATE OF REPORTER

I, Paula J. Eastes, the reporter by whom the foregoing proceedings were reported, do hereby certify that these proceedings were reported by me verbatim and thereafter reduced to typewriting under my direction; that this transcript is a true and accurate record of such proceedings; that I am neither counsel for, related to, nor employed by, any of the parties to the action in which this proceeding was held, nor financially or otherwise interested in the outcome of this action.

PAULA J. EASTES

**A**

**abetted** 37:11
**ability** 55:13,21 58:2
**able** 12:10 16:7 41:9 53:16 63:20,22
**accepted** 8:21 10:7 12:5
**access** 48:10,13 52:3
**accessory** 27:2,5 27:5,5,6,8,11,13 29:12 31:9
**accredited** 5:20
**accumulate** 40:15
**accumulated** 11:6
**accurate** 46:10 70:7
**accurately** 38:18 40:6
**accused** 37:17
**acknowledged** 28:16
**acquitted** 59:22
**Act** 12:13,14
**action** 70:10,12
**actions** 57:14
**actual** 23:3 24:10 45:9
**actuality** 49:2 51:13
**additional** 25:5
**address** 6:21 17:21
**addressed** 17:17
**adjourned** 69:2
**adjudicated** 59:20
**Administration** 5:14
**administrative** 14:20 18:6 19:2 19:11 25:13 36:2,18,20 37:1
**Administrator** 1:14
**adult** 10:14,15 13:15,17
**advise** 34:20
**advised** 65:10,11
**ADW** 29:13
**Affairs** 28:16 65:9
**age** 7:5 29:17 32:17
**ago** 33:21 50:1
**agreement** 2:18
**ahead** 54:15
**aided** 37:11
**allegations** 45:16
**alleged** 18:11
**allegedly** 44:11
**Alphonso** 59:6
**amount** 50:11,20
**annual** 40:22 41:10
**answer** 34:21 35:1,2 66:12
**anybody** 53:2 66:7
**appendices** 25:5
**appendix** 24:21 24:22 25:6
**application** 5:8,9 12:3
**applied** 5:3,6 8:19 8:20 10:6 34:2 43:18
**applies** 43:22
**appreciate** 57:11
**approached** 57:7
**approximately** 8:18 9:21 11:4 14:10 15:20 19:1 20:7,18
**April** 22:15,16 24:15,19 64:8
**area** 4:20 6:19 68:3
**aren't** 60:14
**Army** 5:3,16 7:10 7:15
**arrested** 59:22
**artillery** 6:3 8:17
**asked** 66:16
**asking** 35:10 49:11 65:18
**assault** 17:10
27:17 31:15
**assigned** 9:10,12 9:15,16 18:20 19:4 21:15
**assistant** 9:3 11:2
**assisting** 37:17
**Atlanta** 8:2
**attempt** 27:20
**attempted** 33:19
**attempting** 37:11
**attempts** 31:17
**attended** 4:21
**attorney** 4:5
**attorneys** 17:18
**August** 21:9 33:16
**Austin** 38:22 39:13 40:2
**authorized** 39:11
**automatic** 17:1
**available** 54:18
**Avenue** 1:15 2:6 11:2
**awards** 11:7
**aware** 42:7,9 43:16 49:9
**A-U-S-T-I-N** 39:3
**a.m** 1:10 69:1

**B**

**B** 1:12 24:22 25:6 30:7 31:12 45:17
**back** 10:15 12:15 51:13 52:5 53:1 53:10,13 54:6
**background** 4:14 48:13
**back-up** 38:14 54:19
**bad** 13:1
**Ballou** 6:15,17
**banks** 17:1
**barrier** 14:19
**basically** 60:18 64:17
**basis** 17:12,15 26:15 27:14 28:3
**beginning** 40:7
**BEHALF** 3:3
**believe** 8:10 9:15 18:17 27:17 29:12 31:16 34:11 35:7 36:9 36:13 38:6 39:5 40:6 41:21 47:8 47:17 60:19
**Bennett** 11:15,18 34:16 35:16 39:16,20 48:2 49:12 54:18 55:5 56:3 59:9 66:5
**Bennett's** 11:21
**best** 16:7 19:16 42:3 49:5 53:20 61:10
**better** 65:21
**bit** 55:15 65:21
**block** 12:21 14:16 14:17 15:16,17 15:19 21:6 56:15,17 58:10 61:9
**blocks** 9:10,20,21 14:22 15:13
**books** 41:17,20
**born** 4:19
**bottom** 26:7
**bounds** 67:15
**break** 23:2 63:2
**Brenda** 11:16,20 39:17
**briefly** 58:13,13
**bring** 53:9
**broke** 41:7
**brother** 8:1,2,3 41:6
**brothers** 7:21
**brought** 28:11
**Bryant** 59:6
**bubble** 62:13
**building** 2:5 36:21 37:2
**Bureau** 39:6
**business** 4:16
**busy** 51:15,16,18
51:19,19,21 54:3
**buzz** 52:6

**C**

**C** 3:1 4:1 33:22
**cafeteria** 7:18,18
**caged** 52:2
**California** 39:13
**call** 17:17,22 41:8 45:21 55:2 58:11 61:1 62:6 62:17 63:8,10 66:6
**called** 5:7 37:5 39:21,22 41:9 66:6
**cannon** 8:16
**can't** 17:3 28:6 37:4 47:15 50:10 53:3,11 53:13,16 54:6,7 59:19 60:2,14
**Capitol** 10:18
**Captain** 41:4
**car** 41:7
**care** 17:16
**career** 9:5
**careers** 7:8
**carts** 52:7
**case** 11:18 14:6,8 14:9,11,13 25:14 26:18 49:12 52:15 53:19,20 55:17 61:8,22
**caseload** 15:14,15 16:13
**catch** 61:10,13 64:13
**catching** 62:4
**caught** 37:21
**cause** 60:12 67:13
**CCC** 10:17,20
**CDF** 15:5
**cell** 9:10,20,21 15:13
**Center** 10:3,13,21
**certain** 50:20

**certainly** 6:20 23:18
**CERTIFICATE** 70:1
**certify** 70:4
**cetera** 48:18
**chance** 43:8
**changed** 38:10 44:21
**Channel** 37:5,7
**Chapter** 33:18
**charge** 27:1 33:10 46:2
**charged** 66:19
**charges** 26:8
**charging** 20:20
**Chief** 11:18
**clarify** 23:19
**class** 47:22 48:1 58:19
**classes** 9:13
**classification** 23:12 25:17 26:13,15 30:16 31:1 33:15 39:1 39:8,9,19 46:17 46:19,22 47:2 55:3,5,12 57:9
**classifications** 26:19 55:6,17
**classified** 30:21 38:18 40:3 44:5 44:20 45:2 56:4 56:6
**classify** 33:4 39:12 50:15 55:22 62:22 68:15
**classifying** 50:16 50:19
**closer** 22:20
**closest** 5:22
**Club** 17:5
**CMP** 68:3,13
**CMPs** 36:9
**Code** 27:11
**collaborate** 37:12
**colleagues** 42:8
**college** 4:21 5:20
**Columbia** 1:1,14
**come** 12:15 13:5 52:5 53:1,13 54:6 57:3 58:16 61:7 63:2,3 67:1
**coming** 13:15,16
**Command** 10:1,3
**commissioned** 5:15 6:1,6
**common** 43:12
**community** 10:13 10:21 33:20
**complete** 55:7
**completed** 8:9
**completely** 37:19
**compliance** 49:7 68:12
**comprised** 14:18
**computer** 49:20
**conceivably** 22:18
**concerns** 17:19
**conducted** 20:12 20:21 21:11,19 22:13
**conducting** 35:6
**connection** 35:5 38:17
**consider** 38:1 57:13
**considered** 58:22
**conspiracy** 37:18
**construct** 39:7
**constructed** 39:1 39:8
**consultant** 39:5
**continue** 41:21
**contract** 39:7
**control** 9:22,22 10:3,3 40:14 41:2,5 62:13 68:10
**conversations** 38:16,21
**conviction** 27:16 31:15
**convictions** 27:16 29:11 31:13 32:13 45:18 46:7
**copy** 21:7 45:13
**correct** 18:14,15 21:4 22:22 28:14 30:17 31:4,5 32:11,14 32:16,19 33:5 34:5,8 43:8 45:20 48:11
**correctional** 9:9 10:7,13,21 12:4 15:6,11 17:10 42:9,14 51:4
**corrections** 1:1,15 2:4 4:3,15 5:5 8:19,20 9:7,9 33:20 42:5,19 43:17
**correctly** 40:3 44:5,20 45:3 56:6
**couldn't** 20:15 21:17 28:20 31:22 46:14 49:14,17,21 50:20 52:2 64:19
**counsel** 17:18 43:6,7 70:8
**couple** 9:3 10:19 58:4
**course** 38:6 46:12 51:19 59:8 64:22
**court** 2:19 28:5 31:21
**courts** 28:2 32:5 59:15 60:2,11
**crime** 16:19
**criminal** 24:22 27:15,16 31:12 31:14 37:10 45:18 46:7 48:17 59:21
**criminally** 34:22
**criteria** 57:17
**critical** 10:2
**CTF** 15:3,4,5
**CTS** 12:1 15:2 41:22 47:1
**CTS's** 57:12
**CTS-4** 22:12,13 23:13 24:17
**curious** 11:22
**current** 26:21 31:2
**curse** 67:19
**custody** 20:12 21:1,11 24:4 26:16 30:8,12 30:14 33:1 38:12 44:19 51:11 56:5,6

**D**

**D** 4:1 10:3 30:6 51:5 68:10
**dad** 7:6
**daily** 17:14 62:21
**dangerous** 16:19 27:17 31:16
**Darrell** 4:3,18 36:13 68:20
**DARRYL** 1:5 2:1 3:3
**date** 23:19 24:7 25:21 28:21 62:15
**dated** 24:11
**dates** 18:11,11 19:8
**day** 9:10,19 41:2 41:5,8 43:9 52:21 68:2,4
**days** 18:16 49:13 50:14,15,17,21
**deceased** 8:1
**decision** 25:13
**deemed** 16:6 67:22
**definitely** 22:3,4,6 22:22 63:18
**degree** 5:11
**delayed** 60:9
**Department** 1:1 1:14 2:4 4:3 5:5 9:7,8 10:22 37:15 38:9 39:7 40:13 42:4,19
**Department's** 27:4
**depending** 61:5 61:14
**Deputy** 11:20 39:17
**described** 58:5
**designations** 24:5
**desks** 52:8
**destroy** 27:6
**detail** 18:7,8,9,21 18:22 19:3,4,6 19:10 29:7,21 32:18 38:13 44:22 61:9,14 62:17 68:1
**detailed** 14:19 49:13
**determination** 34:3
**determined** 20:11
**didn't** 5:21 8:15 8:21 28:19 29:8 29:9,15 34:7,8 34:22 35:16,17 35:18 38:6,8 39:22 41:1,11 45:12 47:9 54:11 65:10,16 66:10 67:13
**difference** 12:11 12:19
**different** 14:15
**difficult** 62:17
**diploma** 30:5
**direction** 70:7
**Director** 11:3 36:22 37:8
**disagree** 33:3
**disciplinary** 29:14
**discipline** 35:22
**disciplined** 35:1 42:10,14
**discussing** 25:17
**District** 1:1,14
**Doctor** 44:7
**document** 20:20 21:8 23:3 24:6

24:10 35:5
**documentation** 28:16 47:7 48:4
**documents** 22:1 36:10 45:10
**doesn't** 57:4 66:20
**doing** 13:6,8,19 13:20 55:11 61:16,17
**don't** 13:7 22:7,8 25:1,2,4,5 29:19 35:7 37:15 38:3 38:11 39:21 43:3 50:1 51:17 55:20 60:2,5 61:2 65:19 66:12 68:15
**door** 68:3
**Douglas** 38:2,4,15
**Dr** 4:6,9,13 22:2 22:16 23:4,7,15 23:18 24:1 25:8 25:11,15,20 26:2,5,10 38:1 38:20 40:4,8 43:20 44:9 48:8 48:12 49:22 50:5 52:15 53:19 54:9,12 54:15,21 55:14 56:7,10,21 57:12 58:3,18 60:16 61:21 62:8 63:16,19 64:6,11,16 65:2 65:4,6,13,18 66:9,22 67:6 68:17
**DRs** 29:8,15 32:15
**due** 12:13
**D.C** 1:8,16 2:4,8 3:8 4:20 6:16,21 7:11 8:3,5 15:5 27:11 39:14 52:4

**E**

**E** 1:12,12 3:1,1 4:1,1
**earlier** 24:13 46:14 65:6 67:16
**early** 8:21
**Eastes** 1:22 2:19 70:3,16
**educated** 4:15
**education** 30:2 32:18
**eight** 27:19 30:9 30:10 32:20 40:17 41:12
**either** 11:15 15:20 25:2 62:12
**elaborate** 50:8
**electronic** 27:22 29:2 49:18,19 50:12,22 53:3 54:16,19
**eligible** 8:11 18:21 38:12 44:21 59:11
**else's** 61:3
**emergency** 41:10
**employed** 70:9
**employee** 33:16 33:21
**employment** 42:18
**ended** 10:20
**enjoyed** 12:10
**envelope** 36:15
**erroneous** 25:18 57:6
**error** 20:17 23:17
**escape** 14:4,6 15:21 17:9 21:3 21:16 27:21 28:4,8,17,19 29:1,1 31:18 32:6 33:7,10,14 33:19,22 34:3,9 35:3 37:9,12,18 42:8 58:21,22 59:10,12,19 60:15 68:6
**escaped** 28:21
33:19
**escapes** 19:17,18 19:19 27:20 31:17 33:3,13 33:17 34:10 68:8
**ESQUIRE** 3:5
**et** 48:18
**evaluation** 11:9 11:10,14 24:5 57:15
**evaluations** 11:8 57:21
**Evans** 41:4
**eventually** 5:15 11:1
**everybody** 13:22 27:1 40:21 58:11,12 67:21 68:1
**evidence** 46:12
**exactly** 29:17 50:7 60:1,22
**EXAMINATION** 4:11 45:7 51:2 54:22 59:17
**example** 16:22
**Excellent** 11:10
**exceptions** 65:1
**excuse** 25:8 32:4 62:8
**executed** 45:22 46:1,4,5 47:19 47:21
**exhibit** 23:5 26:4
**exhibits** 23:21 25:19
**exists** 23:20
**expensive** 6:12
**explain** 26:13 36:7 61:2 64:4

**F**

**F** 1:12 30:9
**face-to-face** 60:20 61:15 63:17,22 64:2,3,6,14,17 64:22
**facility** 33:20
**fact** 21:14 34:3 60:20 66:20
**factors** 38:2,4,15 57:19,22 60:5
**failed** 33:12
**failure** 32:7
**fair** 13:2,2,10
**fairly** 27:13
**family** 6:19
**far** 43:16 55:18 57:15
**fast** 58:1
**father** 7:2,6,13
**fault** 13:11 44:4
**feared** 13:3,12
**February** 15:20 15:22
**Federal** 39:6
**feel** 13:9
**felony** 29:11 32:13
**felt** 55:12 56:1
**female** 10:14
**field** 5:13 6:2
**figure** 19:21
**file** 27:22 28:22 29:2 35:9 45:11 45:12,12 47:3,4 48:10,13,16,17 48:22 49:4,14 49:18,19,19,21 50:3,10,10,12 50:21,22,22 52:5,16 53:2,3,6 53:6,7,8,15 54:10,11,16,18 54:19 61:19 63:4,5 68:14,16
**files** 49:14 50:13 51:5,11,22 52:2 52:7,21 53:16
**filled** 12:3,3
**Finally** 10:20
**financially** 70:11
**find** 17:19 21:7,22 23:3 34:10 49:1 49:3,11,13,14 49:18,21 50:10 53:2,3,6,11,13
53:16,17 54:4,6 54:7 60:12 61:16
**finds** 38:4
**finished** 58:15
**fire** 43:10
**fired** 37:2,6,10,17
**first** 5:7,19 9:6,8 26:18 30:7 35:21 38:3 40:18,20 43:6 44:1 50:9 54:3 65:22 68:14
**five** 10:11 17:6 21:2 26:16 27:18 30:13 31:13,16 44:12 44:17,18 45:19 59:21
**flagged** 68:11,12 68:12,13
**floor** 52:8 62:3 67:9
**folder** 61:4
**folks** 7:1
**following** 26:18 62:7,14
**follows** 24:5 26:9
**follow-up** 58:17
**Food** 7:18
**foregoing** 70:4
**form** 45:13,14
**Fort** 6:2,4,5
**forth** 12:15
**found** 17:6 23:10 32:3,6 49:10 56:5 66:8
**four** 10:11 17:6 20:8,18,19 21:6 22:20 26:16 37:20 40:16 50:21 53:1 56:19,20
**Frank** 6:15
**friend** 8:7
**front** 62:11
**further** 55:4
**future** 8:15,16

**G**

**G** 4:1
**gate** 52:3
**GED** 30:4
**general** 57:17
**generally** 56:12
**Georgia** 4:19
**getting** 7:5
**give** 4:13 23:8 27:18 30:10 35:4 36:20 43:8 43:9 48:12 52:4 53:7,9,10 54:5 57:21
**given** 31:19 34:14 58:20
**gives** 31:13,18 32:9,12,15,17
**giving** 59:21
**go** 6:14 9:11 11:22 13:4 16:3 19:15 22:8 23:7 25:16 26:1,6 27:20 36:19 48:21 49:3,9 50:2 52:6,7 53:5 53:12,17 58:11 58:13 61:20
**goes** 21:19
**going** 10:20 16:22 23:22 25:16 33:8 37:21 38:1 49:5 55:14 56:11 60:14 63:11 65:1,17 67:18
**good** 4:8,9,10 12:22 13:9,10 44:3 49:7
**gotten** 32:8 50:6
**grade** 27:7
**graded** 26:21,22
**gradual** 43:6
**graduate** 6:17 30:3
**graduated** 4:22 30:3
**graduation** 6:7
**grants** 6:13
**great** 13:9
**greater** 26:19 28:10
**grew** 4:14,19
**Grimke** 2:5 34:17 65:11
**Group** 3:6
**guess** 5:8 16:6 23:18 39:7 64:8 65:13 67:10
**guidelines** 27:4,7 38:9
**guy** 17:3,4,5 28:2 32:1 40:3 44:5 44:19 45:2 50:19 52:19 56:3,6 59:6,10 61:1 62:11,18 64:13,19 67:11
**guys** 13:5,15 16:21,22 17:2,8 17:8,9,10,15 18:16 28:3 39:12 50:15 52:21 56:19 61:8 62:6,7

**H**

**hadn't** 40:18,19
**half** 10:15,15 19:2 19:3
**Halfway** 10:8,22 11:3,5 12:5 13:14 28:1,4,5 29:3 31:21,22 32:6 34:9 59:5,7 59:11 60:6,13
**hall** 22:8
**handed** 36:14
**handling** 14:17 15:16 16:4,8,10 16:12,17,18 17:13,14 18:3 18:19 19:6,8,12 19:15 20:6,16 21:5 47:10 56:15 68:9,14
**Handy** 30:20,21 33:2,6
**Hannon** 3:5,6 4:2 4:6,12 22:10,17 23:2,5,10,16,20 25:10,12,16,21 26:3,6,11 27:10 28:12 40:10 44:7 45:8 48:7 51:3 52:14 54:20 55:1 59:18 64:10 66:18 68:19,22
**happen** 5:18 48:21 61:22
**happened** 36:8 53:20
**happening** 66:8
**happens** 49:2
**hard** 61:13 64:13
**haven't** 45:14
**Headquarters** 11:1
**Health** 1:14 5:14
**heard** 5:5,6 43:5 58:15
**hearing** 1:13 4:7 25:7,14 43:11
**held** 2:1 59:14 70:10
**help** 6:9,13 14:14
**helped** 6:11
**helps** 25:22
**Henry** 1:13 4:6
**high** 6:14,15 30:3 30:3,5
**higher** 31:10
**hired** 5:9
**histories** 17:9
**history** 24:22 29:6 29:21 31:17 32:10 33:3,14 33:22 40:11 48:17,18,18,19 58:21,22 59:21 68:5
**hit** 44:17
**hold** 11:17 14:5 22:10 28:2,6 31:22 56:11 59:13,15 60:2,3 60:3 66:15
**home** 37:3
**honest** 44:18
**hope** 38:1
**Hopkins** 4:22 5:1 5:22 6:1
**hospital** 32:2,3 60:7 64:20
**hour** 48:1 58:6,13 58:14,20
**hours** 40:16,22 41:12,14,16,17 41:19 53:1
**house** 8:7 10:8,9 10:10 12:1,5,9 13:14,18 28:1,4 28:5 29:3 31:21 31:22 32:7 34:9 39:21 40:1 59:5 59:8,12 60:6,13
**housed** 10:13 18:5 19:2
**Houses** 10:22 11:3,5
**hundreds** 56:9,10 56:20,21

**I**

**imagine** 59:19
**immediate** 11:19 39:16
**immediately** 68:10
**implied** 35:2
**important** 56:2
**impression** 27:2 66:12
**inadvertently** 44:16,16
**incident** 44:2 60:12 66:1
**incorporated** 57:16,22
**incorrect** 23:1 55:22
**incorrectly** 26:9 55:13 56:4
**Indiana** 11:2
**indicate** 28:22
**individual** 38:22
**individuals** 9:14 12:17 16:5,6
**influence** 27:1
**informal** 52:9
**information** 28:20,22
**infractions** 29:8 37:16
**initial** 8:12 22:13 28:15 33:15 57:8
**initially** 5:4 68:16
**initiatives** 58:2
**inmate** 14:14 18:2 18:4,8,10,18,21 19:4 20:13,21 21:20 22:14,15 24:3,14,18,22 26:9 29:7 33:13 33:19 36:10 38:10,11 42:11 46:18,22 61:22 62:1 67:4
**inmates** 14:20,21 16:8,13,16,18 18:6,7,8 19:3 42:20 43:13 47:10 56:17,18 62:14 63:7,21
**inside** 62:12
**instance** 64:18
**institution** 33:15
**institutional** 29:6 32:10 33:12 48:16 52:19
**instructions** 58:20
**instrument** 39:1,9 39:11
**insure** 63:15
**interested** 70:11
**interim** 9:1,2
**Internal** 28:15 65:9
**interrupt** 28:13 54:20 65:19
**Interruption** 25:7
**interview** 17:15

35:6 63:16 65:8 66:9,10
**interviewed** 16:5 34:12 45:10
**investigate** 60:11
**investigated** 32:5
**investigation** 20:11 22:12 23:6 37:10 66:14
**investigative** 23:11,21 26:7 33:13
**Investigators** 28:14 33:11 34:7,20 44:15 45:4
**involved** 17:6 44:1
**isn't** 28:14 55:3
**issue** 58:21 67:1,2
**I'm** 15:4 36:5 40:4 48:7 51:7

J

**J** 1:22 2:18 3:5 4:6 70:3,16
**jail** 9:15 10:5 13:8 13:16 14:4,6,12 15:5,12 16:19 17:9 19:17,18 19:19 23:6 41:15 42:8
**Jim** 38:22 39:13 40:2
**job** 1:20 5:4 8:14 13:10 14:11,13 51:9,10,22 61:17
**jobs** 5:4 9:2
**Johns** 4:22 5:1,22 5:22
**jokingly** 44:16
**Jones** 24:22
**Joseph** 18:2,4 19:3
**judge** 25:14 30:19 30:19 33:2,6
**July** 1:9 7:7
**June** 6:18 21:3 65:8
**justice** 26:22 27:8 31:9 46:2
**justified** 46:6 47:17,18

K

**keep** 39:22 41:19 61:8
**kept** 48:19 49:9
**key** 44:11
**keys** 36:20
**kill** 27:5
**knew** 37:19 40:21 65:16 67:15 68:5
**know** 9:11 11:8 13:7,7,8 21:3,14 22:21,22 35:16 38:11 39:2 41:11 42:15 43:3 47:9 50:1 55:18,19,20,21 57:15 60:5 63:18 65:6,16 66:19,20
**knowledge** 19:16 57:1
**knowledgeable** 38:16
**known** 10:18

L

**labeled** 24:21
**largest** 9:13
**late** 40:5 50:18 59:7,8 60:13 64:4
**law** 3:6 34:4
**lawyer** 66:15
**Leaks** 18:2,4,9,10 18:18 19:3 20:13,22 21:20 22:14,15 24:3 24:14,18,22 26:9 29:7 33:14 38:17 47:6 55:18 61:22
62:1,2,20,21 63:17 64:1,7 67:4
**learn** 35:21 36:22 37:16
**learned** 10:4
**leave** 36:2,18,20 37:1 40:12,19 40:22 41:1,14 41:15,17
**left** 36:17 40:1
**legitimate** 32:4
**Leona** 11:15,18
**Lesansky** 1:13 4:6 4:9,13 22:2,16 23:4,7,15,18 24:1 25:8,11,15 25:20 26:2,5,10 38:1,20 40:4,8 43:20 44:9 48:8 48:12 49:22 50:5 52:15 53:19 54:9,12 54:15,21 55:14 56:7,10,21 57:12 58:3,18 60:16 61:21 62:8 63:16,19 64:6,11,16 65:2 65:4,6,13,18 66:9,22 67:6 68:17
**letter** 21:10
**let's** 20:10 21:7,22 26:6 30:18
**level** 30:12 42:1
**Lieutenant** 5:2,16 6:1
**Lightner** 68:13
**list** 62:12
**listed** 24:7
**listen** 13:22
**listing** 35:5
**lists** 62:7
**little** 12:20 27:13 48:13 55:15 65:20
**live** 8:6
**living** 6:19 7:1,21
**LLP** 3:6
**loans** 6:13
**local** 9:3
**locate** 50:14 51:10 51:22 54:9,11 54:12
**located** 15:9 16:11 51:1
**long** 13:21 14:8 49:17
**look** 27:4 30:18 33:6 45:2 52:19 52:22 53:2,5,5,6 53:11,12,13 54:3,4,7 57:5
**looked** 5:4
**looking** 21:9 22:2 22:4,11 24:6,9 45:4 53:15
**Lorton** 9:16 52:1
**lose** 41:19
**lot** 6:12 9:4 50:13 62:5
**Love** 1:5 2:1 3:3 4:3,5,10,13,18 13:19,19 22:18 26:8,13 27:15 33:11 36:13 40:1,5,9 44:8,10 44:13 48:9,11 48:15 50:4,8 52:15,20 53:22 54:11,14,16 55:20 56:9,13 57:7,16 58:9 59:2 60:22 62:2 62:10 63:18 64:2,12,18 65:3 65:5,9,15,22 66:5,11 67:5,8 68:21
**Love's** 25:14
**low** 33:20 67:12
**lower** 31:10
**lunch** 63:2

M

**mail** 36:10,11,14 39:22
**main** 36:8
**maintain** 51:11
**maintained** 15:15 40:21
**making** 57:10 67:2
**Malcomb** 36:11
**males** 10:14,16
**manage** 15:16,17
**management** 17:11 42:16 56:16
**Manager** 11:19 14:6,8,9,11,13 49:12
**mandate** 18:16 50:15
**manual** 33:18 34:1,2 48:6
**March** 11:13 15:21 18:12 19:22,22 20:10 20:13,14 21:11 21:14 22:5,13 22:22 23:12 26:8,14 31:2 46:17,19,21 47:2,6 64:7
**Master** 7:14
**matter** 4:4,7 34:4 42:8,13
**maximum** 14:16 14:22 26:18 30:8 56:5,16
**may** 18:13 19:13 20:1,5,7,14,15 20:22 21:13,18 21:21 22:6,19 22:22 23:1,14 23:15,16 24:4,7 24:8 25:4 32:1 36:15 38:10 42:14 46:15 47:8,9,9 48:2 50:6,13,16 60:7 60:8 64:9,19
**mean** 6:12 21:3 22:3 37:14,20 38:9 51:6,18

61:5 65:19 67:16
**medical** 17:19 48:18,19,19
**medium** 26:17 30:14 32:22 33:1,4 38:12 44:19 56:6
**meet** 59:6
**member** 65:19
**mention** 35:18 67:3
**mentioned** 29:2
**merit** 24:5
**merited** 27:18
**message** 40:1
**met** 17:19 39:15 39:16 40:2
**metal** 14:18
**Michael** 3:5 4:6
**middle** 40:7
**midnight** 9:18
**military** 7:9 8:9
**mind** 67:1
**minimum** 26:16 42:2
**minus** 30:4 32:15 32:17
**minute** 23:8 62:8
**minutes** 36:17 53:14,14
**misclassifying** 42:10
**misconduct** 29:9 29:9,15
**mistake** 45:2 57:11
**moderate** 26:21
**mom** 7:2,5
**moment** 22:10 28:13 38:14 49:22
**Monday** 1:9 34:11
**monitor** 14:13
**months** 5:9 8:10 20:8,19,19 21:6 21:17 22:19,20 37:20
**morning** 4:8,9,10
**mother** 7:2,7,16
**mouth** 50:6
**moving** 63:13
**multiply** 56:19
**murder** 27:2,3,9 27:11,13 59:22
**murders** 17:7
**mutual** 67:20

N

**N** 3:1 4:1
**name** 4:18 17:4 30:19 38:22 39:2 52:4
**necessarily** 12:20
**need** 23:18 40:22 52:18 62:14,21 63:7,10 66:2,4
**needed** 17:16,20 17:22 35:17 49:10 65:11,16
**needs** 14:14 17:16
**negative** 29:16,22
**neither** 70:8
**never** 13:2,12 39:10 41:13 43:4 45:5 58:17 66:1
**new** 41:11 58:10
**night** 61:7,12
**nine** 28:11 49:14
**normally** 60:20 61:4 68:15
**North** 10:18
**Northeast** 15:1 18:5,20 19:2
**Northwest** 10:9
**note** 56:2
**notice** 20:11
**notoriety** 16:20 17:8
**November** 8:22 25:22 40:14
**number** 10:13,18 10:20 29:14 52:4
**nursing** 9:3
**N-121** 1:16
**N.W** 1:15 2:6 3:7
**N119** 2:7

O

**O** 1:12 4:1
**obligation** 66:19
**observe** 61:18
**obstruction** 26:22 27:8 31:8 46:2
**obviously** 24:11 27:12 32:5 67:6
**occasionally** 67:9
**occur** 55:4
**occurred** 14:4,7 15:21 20:19 21:3,16 59:3
**October** 28:19 39:15,15 40:6,7
**odd** 9:2
**ODR** 62:3 68:3
**offender** 60:21
**offenders** 10:14 12:12 13:15,17
**offense** 26:21 31:3
**offenses** 42:18
**offer** 35:17
**office** 15:13 36:8 48:22 49:6,15 51:6,7,10 52:16 52:18 68:11
**Officer** 1:13 4:7 9:9
**Officers** 43:17
**offices** 2:2
**official** 66:14
**OIA** 20:11 33:10 34:6
**okay** 25:11 29:5 30:11 52:14 57:4 59:2,9
**Oklahoma** 6:2
**old** 59:10,11
**older** 8:3 29:19,20
**ones** 16:21 49:9
**open** 45:12
**opened** 36:17
**opinion** 46:9
**Oral** 1:4 2:1 4:2
**order** 63:14
**original** 21:9 45:11,13,14 47:4,7
**originally** 12:1
**ought** 23:5
**outcome** 70:11
**outside** 68:1
**Outstanding** 11:7 11:8
**overall** 61:18
**override** 55:13,22
**overtime** 41:3,4
**o'clock** 34:17 37:4 61:12 65:12

P

**P** 3:1,1 4:1
**package** 22:9
**packages** 59:5,8
**page** 20:20 22:11 22:17 23:10 24:2,12,16 26:6 30:22 33:8
**Pages** 1:21
**panicked** 27:3
**paper** 22:5 48:10 48:13,16,16 49:21 50:3,10 50:10 52:16 54:18
**paperwork** 36:6
**parole** 31:15 45:20 47:13
**part** 23:21 33:22 51:21 57:14,18
**participated** 37:9
**particular** 48:5 53:15
**parties** 70:9
**passed** 62:21
**Paul** 30:20,21
**Paula** 1:22 2:18 70:3,16
**Pause** 62:9
**pay** 6:9 40:16
**penalized** 50:17
**penalties** 27:11 42:18
**pension** 44:4
**people** 9:14 13:2 13:2 14:1 37:8,9 67:17
**percent** 64:20
**perform** 41:22
**performance** 57:13,14,17,18 57:20 58:1
**performed** 58:7
**perimeter** 28:18
**period** 40:16
**periodically** 17:21
**permanent** 29:1
**permitted** 51:5
**person** 49:3
**personnel** 42:13 49:11
**phone** 17:21,22
**photocopy** 36:9
**physically** 15:9 16:11
**pick** 52:5
**picked** 15:16 29:22 30:4 60:8
**placed** 36:1,18
**Please** 54:21
**plural** 55:18
**point** 27:19 29:18 33:3,7,12,16,21 66:18
**Pointer** 36:11
**points** 29:19 30:10 31:3 32:20
**police** 60:8
**policy** 48:5
**polite** 67:10,13
**position** 9:6,8 12:2,4,6 14:4 15:6
**positioned** 68:2
**positions** 11:17
**possessed** 16:7
**post** 62:7,12
**posts** 10:2,4
**present** 4:5 35:12
**Presentation** 1:4

2:1 4:2
**presented** 42:17
**presently** 21:15
**pressuring** 44:15
**pretty** 44:3 64:14
**previous** 17:9
**pride** 53:15
**primarily** 28:4 44:14
**prior** 18:5 21:6 27:15,16 29:11 31:12,14 32:12 33:7,12,14,17 39:5 45:17 46:7 56:14 59:19
**Prisons** 39:6
**probably** 6:22 11:13 14:9 15:20 18:15 20:17 22:21 34:8 40:5 43:3 44:16 45:1,3,6 45:13 48:11 59:6 64:13,18 66:13
**problem** 13:12 18:7 32:2 62:3
**problems** 14:1 17:11
**procedure** 55:8
**proceed** 25:10
**proceeding** 70:10
**proceedings** 69:1 70:4,5,8
**process** 45:15 52:9
**processing** 59:5
**produced** 21:1
**profile** 67:13
**program** 5:21 29:21 58:8
**Programs** 11:21 39:18
**progressed** 66:10
**progressive** 43:6
**prohibited** 60:6
**pronounce** 17:3
**properly** 33:16
**prosecute** 28:5
31:21 60:14,14
**prosecuted** 27:22 28:2,8 29:4 59:12
**provides** 33:18
**providing** 34:15
**public** 7:11 13:5
**Pursuant** 2:18
**put** 41:4 47:16 50:5
**putting** 28:3 59:7

**Q**

**question** 33:11 34:7 46:16 51:17 57:5 60:9 65:13
**questioned** 57:8
**questions** 34:21 35:1,3,10 44:8 58:16 66:12 68:18
**quote** 22:13 33:9 33:22 40:1

**R**

**R** 1:12,13 3:1 4:1 4:6 10:3 51:5 68:10
**ran** 7:15
**rank** 7:13
**rare** 65:2
**rating** 57:12
**react** 37:13
**read** 24:5 33:8 63:22
**ready** 49:1
**real** 32:6 62:16
**really** 8:13 12:10 42:12 65:16
**reason** 32:1 34:6 39:14 42:15 65:18
**reasonable** 50:11 60:12
**reassigned** 10:8 10:17 12:7
**recall** 37:4 47:11 47:15
**receive** 29:19
**received** 28:10 43:4
**Recess** 23:9
**reclassification** 18:2 20:12,21 21:1,11,20 22:14,15 23:13 24:3,9,10,14,18 39:9 45:17 46:13 47:13 57:4,9,14 58:6 61:4 62:16 67:7
**reclassifications** 25:1 56:8 60:19 64:7
**reclassified** 18:9 18:12 19:9 47:6
**reclassify** 18:16 39:12 47:9 56:18 63:4
**reclassifying** 18:18 46:18,22 50:19 52:21
**recollection** 47:14
**record** 23:20 25:9 33:9 48:22 49:6 49:15 51:6,7 52:19 68:11,22 70:8
**recorded** 30:15
**records** 43:22 48:19 49:2,8,10 49:11,12 51:10 51:18,21 52:3,6 52:16,18
**reduced** 70:6
**refer** 27:10
**reference** 24:2,8 24:12,13,16 44:11 48:9 58:4 58:7 60:17,19 63:20 65:7
**referring** 24:13
**refers** 22:4,5 27:15
**regard** 33:10
**regarding** 35:3 44:12 58:21
**relate** 12:16,17
**related** 58:6 70:9
**relies** 33:7
**remained** 19:6 29:7
**remember** 13:18 30:19 45:9 47:5 53:21,21,22
**remind** 13:17
**removal** 21:10
**rep** 66:5,6,16
**report** 23:11,22 26:8 28:15,15 33:13 34:17 41:8 46:13 56:3 62:14 65:11 66:7 68:6
**reported** 1:22 32:4 70:4,5
**reporter** 2:19 70:1,3
**reports** 29:8,14
**representation** 66:17
**representative** 35:11,15,17 65:7
**request** 48:22 49:2
**requested** 41:10
**requests** 17:20
**required** 56:18
**reside** 6:20 8:4,5
**residence** 39:14
**resides** 8:2,3
**respect** 22:12 67:19
**respectful** 67:13
**responsible** 18:1 55:11
**retired** 7:10,13
**retirement** 37:21
**retrieve** 53:17 54:8
**return** 32:7 42:4 51:12 60:10
**returning** 60:6,13
**review** 55:4,5,6 55:15 57:2
**reviewed** 55:19 55:19,21 57:1,3
**reviewing** 27:21
**right** 16:7 17:4 20:17 22:19 24:1 26:10 32:21 38:18 41:16 43:14 57:5 63:12 64:11 65:9,14 65:15 68:2
**rights** 35:5 66:20 66:21
**robbing** 17:1
**role** 67:15
**room** 2:7 48:1 58:12
**rotated** 9:17 10:2
**ROTC** 5:1,19,21
**roughly** 11:5 64:21
**rounded** 49:7
**rule** 59:4
**rules** 27:7
**run** 67:18
**runner** 36:10,14

**S**

**S** 1:5 2:1 3:1,3 4:1 4:3
**salesman** 8:16
**sanctioned** 44:6 50:18
**sanctions** 43:7
**sat** 34:19 35:8
**satisfactory** 29:22 41:22 42:2
**satisfied** 13:1
**satisfying** 12:20
**Saturday** 7:3,7 41:5 61:7
**saw** 7:2,7 27:3 63:19 67:9 68:2
**saying** 28:18 36:1 37:8 43:12 56:14 62:7,14 68:7
**says** 20:20 21:10 22:3,6,17 23:13

26:7 33:8 34:1 38:10
**school** 6:14,15 30:3,4,5
**Schools** 7:12
**score** 21:1 33:12 33:21
**scored** 26:9 29:10 33:16
**scoring** 20:22 44:20 59:1
**search** 50:9 51:5
**searching** 50:21 52:7
**second** 5:2,6,8,15 6:1 24:8 40:18 41:15 45:17 62:2 67:9
**security** 14:16,22 33:20
**see** 8:15 12:17,18 13:15,16 17:15 17:18 20:10 21:7,22 23:2,22 24:12,20 25:1,2 25:4,5,20 58:16 61:15,17 62:11 62:19,21 63:2,7 63:10 64:5
**seeing** 47:7
**seen** 45:14 47:4 57:20
**segregation** 14:20 18:6 19:3,11
**selected** 15:17 16:3
**send** 62:18 63:8 63:11
**Senior** 6:15
**sense** 43:13 60:4
**separate** 48:20
**separated** 14:19
**separates** 68:3
**September** 39:15 40:5
**Sergeant** 7:14
**serious** 66:3 68:8
**served** 36:4,6
**service** 7:18 8:9
**services** 1:14 41:22
**session** 58:19 59:4
**severe** 17:11 27:7 27:8 43:10
**severity** 26:20 31:2,12 45:17 46:6
**sheets** 22:7
**shift** 9:10,18,18 9:19
**shifts** 9:18
**shock** 37:14
**short** 49:17
**shortcut** 61:3
**shouldn't** 32:8 45:6
**show** 43:22 45:12
**showed** 35:19
**shows** 31:1
**siblings** 7:19,20
**sick** 40:19 41:1,1 41:10,11,13,14 41:17,18,19
**side** 14:20,21 18:7 18:9 43:11 45:4
**sides** 14:19
**sign** 36:15 51:11 51:12 53:8,8 54:5
**signed** 11:14 36:16 39:10
**significant** 27:12
**signing** 51:13,14
**Sill** 6:2,4,5
**sir** 5:17 7:2 31:7 40:9
**sister** 7:22
**sit** 47:11 58:12 61:1,19
**situation** 45:5
**six** 8:10 9:12 10:5 10:6,12 17:2 40:16
**skills** 16:7
**smart** 67:11
**social** 48:18
**somebody** 37:4,11 37:18 43:6,8,10
49:15 57:11 58:12 61:3 66:4 68:5,16
**sorry** 15:4 36:5 40:4 48:7 51:7
**sort** 16:16 43:12
**South** 21:5,15 22:19 23:1 47:10 56:15
**Southeast** 8:8
**Southwest** 14:22
**so-and-so** 63:7,9 63:10
**speak** 17:18
**special** 14:16 15:16 16:4,8,10 16:12,16,18 17:13,14 18:3 18:19 19:6,8,12 19:15 20:6,16 21:5 47:10 56:15,16 68:9 68:14
**Specialist** 10:7 12:4 15:7,12 42:10,14
**Specialists** 51:4
**specific** 17:20 42:18
**specifically** 51:5
**spelled** 39:2
**spend** 50:20 53:14
**squad** 63:9
**stabbed** 17:4
**staff** 16:9 17:10 42:21,22
**stand** 52:3
**standpoint** 57:8
**start** 52:7
**started** 35:9 40:13
**State** 4:21 5:19
**statement** 58:8
**statements** 34:15
**states** 20:11 22:12 33:13
**status** 40:21
**stay** 59:7 61:5,6 61:11
**stayed** 9:20 10:4
10:11,16,19,22 67:15
**staying** 8:16 59:8
**stop** 52:17 66:15
**stopped** 60:8
**stores** 9:4
**story** 13:21 43:11 49:17
**street** 3:7 10:9 12:18 13:4,5 17:5 43:10
**striking** 44:11
**subsequent** 20:21 21:20 22:14 24:3,14,18 47:12
**subsequently** 10:15 17:5 19:5 56:5
**substantiate** 28:20
**Suite** 1:16
**summarily** 37:2
**summarizes** 23:11,12
**summary** 21:10
**supervisor** 7:18 11:19,21 34:16 36:19 39:16,17 41:3 55:6 57:2 62:18 63:8
**supervisors** 38:17 50:18 61:17 63:9
**supervisory** 7:17 57:8
**supposed** 41:7 52:11,12 55:4
**sure** 4:17 17:16 25:3 29:17 30:19 48:15 57:20 58:8 64:8 64:14 67:2
**system** 43:13,17 43:18,22
**S-I-L-L** 6:5

**T**

**table** 42:17
**tables** 52:8
**take** 6:6 23:2 30:18 33:6 41:1 41:18,21 44:3 50:13 53:8 54:4 58:2 61:3
**taken** 17:16 40:19 40:19
**talk** 17:17 38:15 61:2,16
**talked** 67:3,6
**talking** 24:13 25:2 42:20
**talks** 24:4
**taught** 47:20
**teacher** 7:16
**technical** 48:6 58:7
**tell** 13:8,21 28:20 35:16 36:19 38:20 44:10 49:3 52:4 53:12 54:2 62:6,18,20 63:1,6,7
**telling** 39:20 57:11
**ten** 26:19 30:8 49:15 59:11
**tendency** 14:2
**terminated** 66:13
**terms** 25:1 40:11 57:12 58:22
**Thank** 44:9 48:8 58:3 60:16 68:19
**thing** 13:14 43:2 46:1
**things** 43:5 62:10 63:14
**think** 22:7,20 25:10,15 35:8 36:12 37:3 38:3 43:7 44:3 47:22 50:1 58:5 67:20 68:17
**thought** 63:19,21 67:12
**threat** 67:22
**three** 9:17,19 16:5

16:6 20:7,19 21:6,17 22:20 26:21 27:1,14 31:3,8 35:20 36:16 40:20 44:12,15,17 45:3,18 46:3,6,9 47:12,16,17,18 50:14,20 53:1 56:19,20 63:14
**thumb** 59:4
**time** 5:6,7,8 9:13 10:10,14 11:6 11:18 13:22 14:15,17 15:10 18:21 32:4 38:11 42:9 44:1 49:13 50:11,16 50:20 54:4 60:7 61:9,10 62:15 62:22 63:1 64:21 65:22
**times** 49:14 56:19 56:20 58:4 62:5
**today** 8:4 38:6 47:5,11
**told** 34:16 35:8 59:9 66:7
**tool** 39:8
**top** 31:1
**total** 21:1 30:6,7,9 32:20
**touched** 55:16
**Towson** 4:21,22 5:11,19 6:7
**trained** 28:1 31:20 49:18 50:2 54:17 55:10 59:14 60:1
**training** 8:12 9:12 47:22 48:1,1 50:9 58:5,6,10 58:12,19,19,20 59:4
**transcript** 70:7
**transferred** 9:15 10:12 12:7
**treat** 13:1 14:1
**treated** 13:2,9 14:2 67:16,17 67:19
**Treatment** 10:7 12:4 15:7,12 42:9,14 51:4
**tried** 64:21
**trouble** 13:11 67:14
**true** 38:7 70:7
**try** 44:3 64:2
**trying** 19:21 50:5 65:20 67:1
**Tuesday** 34:13,17 65:12
**tuition** 6:10
**turn** 7:6 37:5
**turned** 37:7
**TV** 34:11,11 37:8 37:16
**two** 7:21 9:16,18 9:21 14:19 21:17 22:19 26:18 29:11,12 29:16 30:7 32:12,15 36:16 43:9 50:13 58:14 63:14 64:19
**type** 44:2 45:5 66:1
**typewriting** 70:6

**U**

**U** 17:5
**undergraduate** 6:9
**underlying** 21:22 60:5
**understand** 35:4 51:20 56:13 58:18 64:16 65:20
**understanding** 49:8 61:21
**understood** 49:3 67:2
**unfortunately** 39:21
**union** 35:11,14,17 65:7,20 66:5,6 66:16,17
**unit** 14:15,15,18 16:4,12 17:13 17:14 18:3,5,6,8 18:20,22 19:1,4 19:6,7,10,11,16 20:6,16 36:12 38:12 56:16 61:13 62:13,13 67:8
**units** 62:6
**University** 4:22 5:1,21
**upstairs** 36:9
**use** 17:21 41:19 49:18,20 50:11 50:22 53:3
**usual** 65:4,5
**U.S** 7:9

**V**

**vacation** 40:19
**varied** 16:15
**variety** 9:2
**various** 9:17 10:2
**verbatim** 70:5
**verify** 24:6
**Vermont** 1:15 2:6
**violation** 31:15 45:21 47:14
**violence** 29:6 32:10
**Virginia** 41:7
**Visitors** 9:22,22 10:3 40:14 41:2 41:5
**voice** 39:22

**W**

**W** 6:15
**wait** 53:17 54:7 63:2
**walk** 27:22 28:9 29:3 31:20,22 36:21 68:4
**want** 14:1 33:6 62:11 66:5,15
66:16,17
**wanted** 35:14 40:20 60:9,17 65:14 67:17
**Ward** 11:16,20 39:17 40:2 48:2
**Warden** 11:20 39:18
**warnings** 34:14
**warrant** 45:22,22 46:3,5 47:18,21
**Washington** 1:8 1:16 2:8 3:8 4:19 6:16,21 8:3 8:5
**wasn't** 6:11 8:14 8:16 29:3 32:6,7 41:1 42:16 45:1 49:15 64:13
**watching** 34:11 34:11
**way** 14:1 23:7 30:18,21 34:2 52:1,11,12,13 54:1 60:18 67:17,20
**weapon** 27:17 31:16
**weapons** 17:1
**weekend** 61:11
**weekly** 17:12
**weeks** 9:12
**welcomed** 57:10
**well-mannered** 67:10
**went** 5:1,19,22 6:2 9:22 10:1,15 11:1 12:1 16:10 19:5,12 35:18 39:18 41:6,6 44:14 54:15 56:15
**weren't** 37:2 63:20
**wish** 42:4
**won't** 41:9
**word** 27:3 50:2
**words** 50:6
**work** 12:8 14:2
16:7,8 29:21 32:18 40:11 41:8 44:5 49:4 52:11,13,13 57:17,18 58:1,1 61:8,17 63:9
**worked** 9:3,10 10:4,21 11:2 14:21,22 19:1 39:6 49:6,6 56:17 62:2 67:8
**working** 7:4 12:12 14:16,18 15:11 18:22 21:16 40:14 41:2,3 47:10 59:9 61:13 62:20
**world** 27:5
**wouldn't** 42:15 44:21 59:3 67:12
**wrap-up** 43:20
**written** 43:16,18 43:21
**wrong** 20:5 37:19 38:5,7 44:11
**wrote** 68:6

**X**

**x** 1:3,7 57:3

**Y**

**year** 8:18 11:12 19:2 28:10 33:21 40:15,18 40:18 41:15 56:19 59:10
**yearly** 57:21
**years** 7:9,11 9:21 10:5,6,11,19 11:5,7 12:14 14:10,10 29:12 37:15,20 40:20 41:13 44:2 56:20,22 59:11
**yell** 67:18
**younger** 7:22 29:18

**youngest** 7:22 8:2
**youth** 10:9,15 11:22 12:8,13 12:14 13:18
**YRA** 10:10

**Z**

**zero** 26:16 27:21 28:7 29:10,20 30:2 31:19 32:9 32:17,18

**0**

**06** 40:8,9

**1**

**1** 1:21 10:18,22 18:5,20 19:2 21:5,15 22:19 23:1 47:10 56:15
**1st** 8:22
**1-107046** 1:20
**1:00** 34:17 65:12
**10:00** 61:12
**100** 56:11
**1010** 10:18
**11** 20:13,14 21:11 22:13 23:12 26:8,16,17 30:13 47:2
**11th** 18:12 21:14 22:5 26:14 31:2 46:17,19,21 47:6
**11:25** 69:1
**12** 26:6
**12:00** 9:19
**13** 11:7
**13th** 10:9
**14** 11:7
**15** 12:14 40:16
**15th** 18:13 19:13 20:10,22 21:21 22:6,15,16 23:14,15 24:4,7 24:8,15,19 40:15 46:15 64:8,9
**16** 11:5,6
**160** 15:15
**17** 11:5,6 33:8
**18** 12:13 14:10,10 30:22
**18th** 3:7
**1825** 10:9
**1901** 3:7
**1923** 1:15 2:6
**1965** 6:22
**1975** 6:18
**1980** 5:12 6:11 8:10
**1981** 8:20,21
**1982** 8:22 40:14
**1986** 28:19

**2**

**2** 10:22 14:22 20:20
**2-3.C.3** 33:18
**20** 12:14 16:15
**20th** 65:8
**20-day** 20:10
**200** 56:11
**20001** 1:16
**20009** 2:8 3:8
**2002** 41:16
**2003** 41:16
**2005** 20:4,9 33:16
**2006** 11:12,13 16:1,2 18:12,13 19:13,22 20:1 20:13,14,22 21:10,12,14,21 22:13,15 23:12 23:14 24:4,9,15 24:19 25:22 26:8,14 31:2 46:17,19,21 47:2,6
**2007** 1:9 20:10
**202** 3:9
**208** 40:22 41:19
**21** 22:11 24:12
**2100** 41:17
**22** 24:16
**22nd** 25:22
**23** 41:13
**2300** 41:14
**232-1907** 3:9
**24** 21:9 29:18 44:2
**2400** 41:14
**25** 29:18,20 37:15 37:20 44:2

**3**

**3** 10:13,22 15:1
**30** 7:9 12:13,13 50:15 52:21 53:14
**300** 11:2 41:16
**32** 7:11
**37** 26:5

**4**

**4** 10:20,21,22
**4:00** 9:19
**40** 53:14
**48** 9:14

**5**

**5** 37:5,7
**5:00** 37:4
**50** 9:14,14 16:15 56:16

**6**

**60** 50:15,17 56:17 56:17,20 63:21 63:21
**65** 6:22

**7**

**70** 1:21
**75** 6:18
**79** 7:6,6

**8**

**8** 24:2
**8:00** 61:6,11
**80** 7:6,7 18:6,7

**9**

**9** 1:9
**9:00** 61:7,11
**9:45** 1:10
**90** 18:16 50:15,17 64:20

# EXHIBIT 65

D.C. DEPARTMENT OF CORRECTIONS

ORAL PRESENTATION
on behalf of
SHANTELL HATTON

Washington, D.C.
Tuesday, July 10th, 2007
3:30 p.m.

Job No. 1-107049
Pages 1 - 99
Reported by: Laurie Bangart-Smith

Oral Presentation on Behalf of
SHANTELL HATTON

Held at the offices of:
D.C. Department of Corrections
192 Vermont Avenue, N.W.
Grimke Building, Room N119
Washington, D.C. 20001

Taken pursuant to notice, before Laurie Bangart-Smith, Registered Professional Reporter, Certified Realtime Reporter, and Notary public in and for the District of Columbia.

A P P E A R A N C E S

ON BEHALF OF DIONNE MAKINS:
J. MICHAEL HANNON, ESQUIRE
The Hannon Law Group, L.L.P.
1901 18th Street, N.W.
Washington, D.C. 20009
(202)232-1907

HEARING OFFICER:
Henry R. Lesansky, Ph.D.
Health Services Administrator
D.C. Department of Corrections
1923 Vermont Avenue, N.W.
Washington, D.C. 20001
(202)671-2069

E X H I B I T S
(None)

P R O C E E D I N G S

MR. HANNON: This is the oral hearing for Shantell Hatton. Ms. Hatton is here. Dr. Lesansky, the Hearing Officer, is here, and I am Mr. Hannon, her attorney.

Ms. Hatton, what we're going to do here is I'm going to help you tell your story to Dr. Lesansky, and even though I'm sitting over here, try to direct your answers to him.

MS. HATTON: Yes, sir.

MR. HANNON: And he has the written submission that we have presented.

Before we went on the record, I asked you about something we said in our written presentation, that you've always received excellent performance evaluations.?

MS. HATTON: Yes, sir.

MR. HANNON: And how many years have you worked for the Department of Corrections?

MS. HATTON: I started with the Department of Corrections in 1995, and I was RIF'd in 2002, and from there I went to Oak Hill facility for the

juveniles, and then I came back in 2004 up until this time of the escape.

MR. HANNON: Okay. You have been accused of being negligent in your duties in connection with Inmate Ricardo Jones leaving your unit on June 3rd, 2006, with a medical pass; is that correct?

MS. HATTON: Yes, sir.

MR. HANNON: Could you tell Dr. Lesansky what you recall occurring that day in terms of Ricardo Jones getting a pass.

MS. HATTON: That day, sir, when I entered Southeast 1, Ms. Washington was already there, and I greeted her, and I went on to my tour of duty to count the inmates again, you know, all accounted for. We did the morning count, me and Ms. Washington.

Sergeant Makins, she later came in, and we reported the count to her, because she's the sergeant. I'm not sure who called the count in, if I did or Ms. Washington or Sergeant Makins. I just know me and Ms. Washington made the official count for that morning.

Once that official count was conducted, what

I can recall was Sergeant Makins was on the telephone speaking with Captain Betty Ames about us being short in the unit and because it was only three females working that day, and that was myself, Ms. Washington and Sergeant Makins, and we was like short-handed, you know, and she was complaining about us being short and with three females. She was actually requesting for another person in the unit and actually requesting for a male officer, but her request was denied. So once the count cleared, we went on with our normal operations of duty.

Before the count cleared, I came into the Bubble after we had got finished the counting, and the inmates -- Sergeant Makins was presigning the passes for the infirmary load. I don't know what calls that came in at that time or what, but I just know that she was presigning the passes, to my knowledge. And once the count cleared -- remember, we was all in the Bubble together, we was all in the Bubble together before the count cleared. After the count cleared, we was still all in the Bubble together, but when Sergeant Makins, when she started giving the passes

out to the inmates to go to the infirmary or wherever they was going, her and Ms. Washington would go on the floor and they would also both come back into the Bubble with me.

And I guess as time went on throughout that day, we got a call to lock down our unit, which we did. Nobody actually said what we was actually locking the unit down for. We thought or I thought that an inmate had gotten stabbed or something, because the Major and -- it was the Major and some more officers, they was going over to -- I believe that was South 1, right next to our unit, and I thought something was going on over there instead of something going on in my unit, but it wasn't. So that's all I could basically tell you.

MR. HANNON: What did you do in Southeast 1 once the lockdown was announced in terms of doing your count and locating the inmates at that location?

MS. HATTON: What I did at this time -- when they said for the unit to be locked down, they didn't actually say that an inmate had escaped. They asked for all the inmates to return back to the block over

the intercom, and they asked all the officers to lock all the inmates down. At this time me and Corporal Washington -- she was a Corporal at that time -- we proceeded to lock all the inmates down. No, it did not go that way. I'm sorry. Washington and Makins was locking the inmates down, and I was taking the passes as the inmates was coming back in the unit. I had forgot about that. Is that okay?

MR. HANNON: And what did you do with the passes that the inmates were returning with?

MS. HATTON: Some of them I put on the counter and some of them I just threw in the trash, because we don't save them.

MR. HANNON: And who was in charge of keeping track of the Movement Sheet that you were using?

MS. HATTON: I was keeping track of the Movement Sheet.

MR. HANNON: After the lockdown what did you do with the Movement Sheet?

MS. HATTON: After the lockdown, Mr. Hannon, what I did was I was writing all the inmates -- you

know how all the inmates was like bomb rushing to come back into the unit? You know how you rush through the door real quickly, and when they was giving me their passes, I would put them on the counter, some of them I would just throw in the trash, because the trash can was right here, and everything was going so fast, and I was logging them back in by just writing their names on the log-in sheet.

And I did all that, and then when I had to count the unit, okay, me and Ms. Washington, after all the inmates was locked down, they called for a count. Makins asked me and Ms. Washington to go and count. Me and Ms. Washington, we went to go count. Once I realized we had gotten to Ricardo Jones' cell and he wasn't in there, I said, Ms. Washington, I logged Mr. Ricardo Jones back in, and I said let me go and tell Ms. Makins he's not here, but I logged him back in, but it was a mistake. Do you understand that, sir?

DR. LESANSKY: I'm listening.

MS. HATTON: It was a mistake and I logged him back in, so Makins said, well, Ms. Hatton, don't

worry about it. Just tear the paper up and redo the log-in sheet, and that's what I did. She said just put it in the trash, and that's what I did.

MR. HANNON: You redid the log book to show that he hadn't returned?

MS. HATTON: Just to show he was still out of the unit.

MR. HANNON: The obvious question is: How did you make the mistake of logging him back in?

MS. HATTON: I made the mistake of logging him back in because when he came back -- well, he didn't come back in, but when all the inmates was coming in together, I just knew I had all of the passes and all of our inmates. I thought they was all accounted for, but when I went to the cell, they wasn't all accounted for.

MR. HANNON: So you didn't actually go through the passes to log everybody back in?

MS. HATTON: I thought I did, but apparently I didn't do it the correct way.

MR. HANNON: But at the time did you know that there was an escape?

MS. HATTON: No. We didn't know it was an escape.

MR. HANNON: Right, and you thought the problem was at another --

MS. HATTON: We thought that someone had basically gotten stabbed or something in South 1, or hurt. We did not even know it was an escape.

MR. HANNON: So when you were checking everybody back in, they had not asked you yet to do a count?

MS. HATTON: No.

MR. HANNON: And so later they asked you to do a count, and you realized you had erroneously marked --

MS. HATTON: Jones back in. You know how I made that mistake, Mr. Hannon? I made that mistake, because there was actually two Joneses.

MR. HANNON: Two Joneses out on the sick leave list?

MS. HATTON: I believe so, and I wasn't really --

MR. HANNON: Focused?

MS. HATTON: I didn't really, you know, catch the names. I believe it was like two Joneses that had went out that day.

MR. HANNON: But at that particular point in time you weren't alerted to the notion that there was an escape, that somebody was missing?

MS. HATTON: We didn't know that there was an escape.

And what's your name again?

DR. LESANSKY: Henry.

MR. HANNON: It's actually Dr. Lesansky.

MS. HATTON: Okay. Doctor, at this time we didn't know it was an escape. I never even seen these guys before, neither one of them. If one of them were to walk in this room right now with a suit and tie on, I could not recognize them, because I never seen them before. And when the escape went down, we didn't even know that these two guys had escaped -- that the one guy had escaped out of our unit. We didn't even know it. When they said over the intercom to put the inmates up, you know, lock the inmates down, we still didn't know why we was actually locking the inmates

down. We could just assume we was locking them down because somebody had gotten stabbed or something had happened in another unit.

The furthest thing from my mind was an escape, because I had never really actually heard of an inmate escaping out of the unit, okay, to be honest with you, because it's bars. It's no way you can get out. It's no way you can come out of the unit.

MR. HANNON: Did you ever, in the course of the investigation, see the pass, the medical pass that Ricardo Jones used?

MS. HATTON: Did I ever see it?

MR. HANNON: Yes.

MS. HATTON: Uh-huh.

MR. HANNON: When did you see it?

MS. HATTON: When I went to the FBI.

MR. HANNON: Okay, and could you tell Dr. Lesansky what you remember about what was on the pass, because it's not part of the record that has been presented to Dr. Lesansky. If you recall.

MS. HATTON: Why is it not part of the record if this is an investigation?

MR. HANNON: Well, that's --

MS. HATTON: See, because, sir, this is serious to me. I love my job and I miss my job. I have two kids to take care of, and two homes and a husband. I love my job. This should be part of the record, because it's important.

So anyway, what happened was Ms. Washington called me up one day, and she say that she had hired this attorney, and she said that the attorney --

MR. HANNON: Don't talk about the attorney. You ended up voluntarily --

MS. HATTON: Voluntarily going to see the FBI, because it was supposed to clear me and put me back to work when you go down there and tell the truth. And when he showed me, when the FBI agent -- I forgot his name, but when he showed me the pass, what I can remember is it was the white pass, you know, the same passes that all the inmates get that go out daily, and that Sergeant Makins had signed the pass, I had initialed the pass, and I believe I put the time on the pass, and Ms. Washington had initialed it and timed it.

MR. HANNON: And do you remember that day dealing with that pass and having Ricardo Jones go out of the unit? Do you remember signing the pass?

MS. HATTON: I couldn't really remember signing that pass, but I probably did sign it, because it looked like it was my handwriting.

MR. HANNON: Okay.

MS. HATTON: But let me say this to you. It appeared to be that it was my handwriting on that pass.

MR. HANNON: Okay, and you have no reason to deny that was your handwriting on it?

MS. HATTON: No.

MR. HANNON: It looked like yours?

MS. HATTON: It looked -- it looked like I, you know, did that.

MR. HANNON: So explain in the ordinary course how you would have put your handwriting on it.

MS. HATTON: What happened was when -- what I could recall about the inmate, I could recall him banging on the cell, and Ms. Makins was on the top of the tier, and she was telling me and Ms. Washington,

because me and Ms. Washington was in the Bubble, to open up the inmate's cell because the inmate was going to the infirmary. So Ms. Washington was saying, Makins, how you know he going to the infirmary? You know, that's what Ms. Washington was saying. So Ms. Makins was like, open up his cell, he going to the infirmary, you know.

So I went ahead and opened up the cell, which she had told Ms. Washington, but I did it. I opened up the inmate's cell, and when the inmate came down, the inmate gave Ms. Washington a pass. Ms. Washington initialed the pass and then gave me the pass, and I initialed the pass -- either I initialed the pass and I timed the pass, and I wrote the time on the Movement Sheet and gave the pass back to the inmate.

MR. HANNON: And then he had an authorized pass to go to --

MS. HATTON: He had an authorized pass, and you know what, sir? He was accounted for, so I was not negligent. He was accounted for.

MR. HANNON: Was there a phone call from the

infirmary?

MS. HATTON: Now, that's the only thing that bothers me, sir. I'm not sure who took that phone call throughout the course of that day, okay, because all three of us participated in that pass, all three of us participated in that Bubble. We all worked together on that day. We worked with what we had to work with: Three females in an all-male dormitory. And we were short-handed. We all worked together and we was all -- we just worked together, and when you -- have you ever been inside the jail?

You have like a lot of banging, and you in the Bubble, the phone ringing off the hook, and you doing -- you multitasking. You doing 99 things at one time, instead of just being able to slow down and go at your own pace, it's hard to do that, because then you get behind. And you want to do a good job and you want to do a successful job, but you don't want to neglect your duties and you don't want to be negligent with anything either, but you don't know that you going to be negligent throughout that day, because who knows that this is going to happen?

MR. HANNON: Do you recall if you received a call?

MS. HATTON: I don't recall if I received that call for the inmate or not, and let me tell you this. I could have, and it is a big possibility that I did, and it's a big possibility that I did not, okay, because I did work in that Bubble, but we all worked in that Bubble.

MR. HANNON: Okay, but he wouldn't have been able to have a pass if there weren't a call down?

MS. HATTON: No, he would not have had a pass. He would not have had a pass unless one of us took that phone call and gave that inmate that pass. And let me say something to you, sir. That's fine, too, because calls come in for the inmates to go to the infirmary, and you don't know who want it. If I say, "Hello, this is Corporal Hatton, how may I help you," you may say on the other end, my name is Dr. Lesansky, and I need for Inmate Ricardo Jones to come up to the infirmary, you know, ASAP, and I'm going to say okay.

And what am I going to do? You're not going

to tell me why he's coming. You already introduced yourself to me. You already done told me who you were. You going to tell me I need Inmate Ricardo Jones to come to the infirmary. You know what I'm going to say? What cell is he in and what is his DC number? You going to write that on the pass when you fill out that pass, and then you're going to put it on the log-in sheet. So the inmate's done been accounted for, so therefore Sergeant Makins or myself or Ms. Washington can say, okay, he's accounted for, let him go.

MR. HANNON: And you put him down on the Movement Sheet?

MS. HATTON: Right, exactly.

MR. HANNON: Okay.

MS. HATTON: And why that inmate didn't come back, I don't know.

MR. HANNON: Well, a lot of people don't know.

Do inmates have access -- when they get out in the area, do they have access to telephones?

MS. HATTON: When they get out to what area?

MR. HANNON: Well, if they're out of the block with a pass or if they're out of the block on a work detail.

MS. HATTON: Okay. Now, to be honest with you, you know, when you go into the unit, there's phones on the walls; okay? I don't know whether he used a phone on the wall or not that day, but when you go into other areas, when you walk out the hallway, you walk down this long hallway and you look up, it's supposed to be an officer, and it's called floor control. That's one officer up there. She's supposed to be directing all the traffic once the inmate leaves off the block.

That's why it's so hard to escape from D.C. Jail. You have to have a plan. It's hard to get out of D.C. Jail, but this day it wasn't that hard, but it's the officers up on the floor control. Once you leave out my unit, you got officers on the floor control. Then you supposed to have an officer down on the floor outside the floor control, Mr. Hannon. That's called the "Admin Officer"; okay?

And you know what that admin officer is

doing, sir? That admin officer is checking the inmate's pass. It's like this. This is the pass. You going to show that officer your pass. Bam. That's your pass? Okay, that's you. You can come on and go through this door. So where was that officer? I don't know.

MR. HANNON: Well, my question was: Are there --

MS. HATTON: Yes.

MR. HANNON: -- phones that are accessible?

MS. HATTON: Yes. There is a phone right there at that Admin Office, right there in the hallway. You can use that telephone, sir. There's a phone beside the ODR, which is roll call, from 7:30 in the morning, but around 10:00, 9:30, 8:00, is what is on the ODR, where we all go eat lunch at. All the inmates go in there and eat.

You got music playing in there. Did anybody mention that, by the way? You got music playing in there for the inmates. They're playing the music in there, because the ODR is where the stewards do the cooking at. You got inmates doing the cooking, you

got inmates in there mopping and waxing the floors. Who to say can't nobody sneak in and use the phone right there? Can they? Yes, they can.

Then you got the Captain's office all the way back in the ODR, Mr. Hannon. You got the Captain's office right there. That's Captain Holmes' office. His office is right there. The inmates could use the officer's phone right there, and then the Warden's phone, and guess what. I never even been in the Warden's office. You got -- you got phones all over D.C. Jail on every floor on the wall.

Can the inmate go into the infirmary and use the phone to call down to the unit? You want to know that? Yes. How? Because there's phones everywhere upstairs. But you know what's sad? We caught the beef for all this. Who to say the inmate didn't call from up there, they call down to the unit? This is so wrong the way they fired me. It's not right.

MR. HANNON: Do you know if they changed the system after you were fired?

MS. HATTON: No, it's still going on. It's still going on.

MR. HANNON: Okay.

MS. HATTON: And you know one thing we don't do, sir? When you as a doctor call downstairs and you want to see an inmate, which this inmate is now your patient, once I find out who you are and who you want and the inmate's DC number, because you got to tell me who this man is and what cell he in, that's how you identifying this inmate to me; once you tell me these things, I don't call you back and ask you, are you going to see so-and-so. We don't do that. We don't do that. Nobody does it. No one is doing it. The course of the day is too busy and too hectic.

MR. HANNON: Do you think that, from your observations, there's any kind of a progressive discipline procedure so that if you know that you do this kind of thing wrong, you're going to get counseled; if you do this kind of thing wrong, you're going to get five days; if you do this kind of thing wrong, you're going to get fired? Do you think that --

MS. HATTON: Yes, that's in place, but it wasn't in place for us. They overlooked that site for

us, because you know what? I have only been counseled for being late, okay, but not on that day. You know, I may be tardy for work every now and then, and may not be counseled then.

MR. HANNON: Before Dr. Henry asks you questions, is there anything else that you'd like to say?

MS. HATTON: Dr. Henry, you know what I want to say to you? I should have my job, because I love my job, and I don't feel as though I did anything wrong. I could see if this inmate was my boyfriend, my cousin, my father, if he meant anything to me. You mean to tell me I'm just going to go along with someone escaping and not get anything out the deal? And if I was to -- if somebody was going to tell me I was going to get something out of the deal, don't you know I would have been the first one to turn this thing in? I would have never taken a bribe. You understand what I'm saying? I think this is totally wrong what they have done us. I don't think they have done us right.

MR. HANNON: Well, did you think that you

were going back to work after you talked to the FBI?

MS. HATTON: Yeah, I thought I was going back to work. I didn't see no need for me not to go back to work. I never thought I was going to get fired, because I cooperated with everyone and I told the truth.

MR. HANNON: When you met with the FBI, was that before you were summarily fired, on the news?

MS. HATTON: Wait a minute. I'm not sure.

MR. HANNON: Not sure? Okay. And how did you learn that you had been summarily fired?

MS. HATTON: I was at home looking at my stories, "The Young and the Restless." I like my stories. And you know how they -- they had done a news conference, and they said it over the news, and I started calling everyone. I called Miss -- I was calling different people in the Union, and they were saying no, that didn't happen, no, that didn't happen.

MR. HANNON: They couldn't believe it.

MS. HATTON: Huh-uh.

MR. HANNON: And you got a call to come down to Grimke Building because you were going to go back

to work, right?

MS. HATTON: Yes.

MR. HANNON: Who called you? Was it Ms. Murphy?

MS. HATTON: It was Ms. Murphy.

MR. HANNON: And what --

MS. HATTON: She told me that I was coming back to work and that all my sick leave and everything was going to be given back to me, and for me to report down to the Grimke Building, and that we was going to receive our uniforms and everything, and I was happy, and I told my children that I had won my job back and everything. And you know what, sir? This has affected me a great deal. It really has.

MR. HANNON: What happened when you got down here?

MS. HATTON: I cried, because I didn't get my job back. I was placed on administrative leave. They said I was negligent.

MR. HANNON: So it just started the process over again?

MS. HATTON: It started the process all over

again. It's like they getting two bites out of the same apple, and it's totally unfair. It's totally unfair the way they doing to us. There's something I wanted to say to you, but I forgot it just now.

MR. HANNON: Well, you went through the process with the Office of Administrative Hearings, and they said that you should go back to work.

MS. HATTON: Right, and the judge that looked over my paperwork, the judge didn't see me being negligent with anything. They seen that I did my job as if I was to do my job every day that I had ever walked into the institution. Why am I going to wait all this time to help somebody escape that I don't even know, have not even -- I never even had a conversation with the guy.

MR. HANNON: Did you apply for unemployment?

MS. HATTON: Yes.

MR. HANNON: And did you get it?

MS. HATTON: Yes, and at first I was denied my unemployment, because they didn't have us down for being terminated.

MR. HANNON: But did the Department ever

contest your getting unemployment; in other words, was there ever a hearing?

MS. HATTON: No, I didn't have a hearing.

MR. HANNON: So the Department -- the Administrative Review granted you your unemployment?

MS. HATTON: Yes, sir.

MR. HANNON: And the Department never challenged it?

MS. HATTON: No, they never challenged it.

MR. HANNON: So there was never a hearing before a judge?

MS. HATTON: No, sir, not for unemployment, no.

MR. HANNON: Okay, thank you.

DR. LESANSKY: Thank you. Thanks for coming in.

Ms. Hatton, you mentioned earlier in your discussion about Sergeant Makins telling you to tear up a sheet and throw it in the trash and redo this sheet, and I think you were saying that was also at a time when you had thrown some passes into the trash.

MS. HATTON: Uh-huh, and I got them passes

out of the trash, and I put all the inmates back on the sheet, and the inmates that came in, I plussed them back in.

DR. LESANSKY: Well, can you tell me first, when you were preparing this first sheet that you made reference to --

MS. HATTON: Where did I get the sheet from that we do?

DR. LESANSKY: -- where you were indicating that inmates were back in their cells.

MS. HATTON: I got it off the original sheet.

DR. LESANSKY: The original sheet?

MS. HATTON: Uh-huh, the one that I tore up.

DR. LESANSKY: No, I'm talking now about the one that you tore up.

MS. HATTON: Right.

DR. LESANSKY: Can you tell me how you prepared that sheet.

MS. HATTON: The one that I tore up?

DR. LESANSKY: Yes. My understanding is, from what you said, is you tore that sheet up because

Sergeant Makins told you to tear it up.

MS. HATTON: Right. She told me to tear it up and redo another one.

DR. LESANSKY: Why did she tell you that?

MS. HATTON: Because she wanted the sheet accurate, sir, and keep in mind -- and I know that may not sound right, but she could vouch for that, Ms. Washington should be able to vouch for that, but the thing about it is she wanted all the inmates accounted for. If that man didn't come back in, she didn't want him back in the unit as being plussed back in. I made that mistake. I plussed that inmate back in, that was my mistake, and I told her, and I didn't realize that until I counted the unit. And you know what? I told Internal Affairs that. I told the FBI that.

DR. LESANSKY: Yeah, I was trying to understand exactly -- if you can remember exactly what you did in preparing that first sheet.

MS. HATTON: What I recall, sir, when all the inmates came back in, I plussed every last one of them inmates back in, because they had rushed in so

quickly, and I said "bomb rushed," but they had rushed in so quickly, and I plussed all the inmates back in, but once I realized all these inmates was not back in, when I went up to the cell, once I was counting the unit, we went up to the cell, and that meant -- you know how you counting the whole tier, we counting the tier, then you stop here; okay?

Once you got to do everybody else, and when you stop here, you're gonna -- this man is not here, and I done plussed this man back in. I knew that much. And I went and I informed Sergeant Makins. Sergeant Makins, I plussed the inmate back in, and this inmate is not here, but guess what. At that time I still didn't think he had escaped; okay? I felt maybe he just had not come back from that infirmary yet.

And you want to hear something else? Sergeant Makins said, Ms. Hatton, just tear the sheet up and redo a new one, and that's what I did. Before I tore it up, I redid -- I put all the inmates back on the sheet; okay? Then I tore it up like she said, and I put it in the trash.

MR. HANNON: Now, the new sheet that you made that correctly showed that Ricardo Jones had not come back in --

MS. HATTON: The sheet showed that Ricardo Jones had not come back in.

MR. HANNON: What I want to ask you about is: When you made the new sheet, did you know then that there had been an escape?

MS. HATTON: No. We still didn't know. See, that's the thing about it. We still did not know that the man had escaped. We still did not know.

DR. LESANSKY: My understanding, from what you said, Ms. Hatton, was that over the loudspeaker there came a point at which there was a lockdown.

MS. HATTON: A lockdown. A lockdown is not an escape.

DR. LESANSKY: What is a lockdown?

MS. HATTON: Something they probably doing right now, locking the jail down.

DR. LESANSKY: And had you ever been through a lockdown before?

MS. HATTON: Yes. You go through it all way

down. They lock the inmates down all day long. There was a lockdown before the inmates even came out, because it was a thing about if the inmates was going to come out that day, because we was 56 officers short, and the inmates was not supposed to been out of them cells. That's why Ms. Makins was on the phone with the Captain, because she knew the jail was supposed to been on lockdown that day, but Captain Ames said -- I mean the Director, somebody, the Major or somebody said let the inmates out that way, and the inmates came out.

DR. LESANSKY: I was -- you're going a little too fast for me. I can't think as fast as you can. I wanted to go back to what you do during the lockdown, that you had been through lockdowns before.

MS. HATTON: Listen to this.

DR. LESANSKY: Okay.

MS. HATTON: When they called the lockdown over the loudspeaker, all officers locked all the inmates down; okay? All inmates, report back to your unit; okay? All the inmates did not report back, because that Ricardo Jones did not come back into the

unit; okay? But I put him back in the unit by a mistake. When Makins and Ms. Washington, they locked all the inmates down, I'm still in the Bubble, and once all the inmates was locked down, that's a lockdown, when there is no inmates out on the floor, no inmates out in the whole facility. It's a lockdown.

DR. LESANSKY: All right. I'm just trying to get real clear for me when this lockdown was called and then inmates were coming back into the facility.

MS. HATTON: The unit.

DR. LESANSKY: Into the block, correct?

MS. HATTON: Uh-huh.

DR. LESANSKY: And you hadn't done a count yet --

MS. HATTON: No.

DR. LESANSKY: -- because my understanding, from what you said, is the request to do a count came later, right?

MS. HATTON: Right. Oh, wait one minute. I'm sorry, Mr. Hannon. Me and Ms. Washington did a count before they even said do a count.

DR. LESANSKY: You did your own count before they told you to do a count?

MS. HATTON: Right. That's what I think happened.

DR. LESANSKY: And did you do that count before you prepared this first sheet that you ended up tearing up because Sergeant Makins told you to tear it up, because she said it was not accurate and she only wants accurate sheets?

MS. HATTON: No, what happened was -- wait a minute. Wait a minute. No, that count that me and Ms. Washington done, it was later. Don't put that down there. I'm wrong. That count that me and Ms. Washington done on our own, it was after the escape, okay, but we still didn't know that the escape had taken place. You got me now?

And let me tell you why we did that count again, because when the inmates all came back, I was logging them in, and I logged Ricardo Jones in, and I should not have, because he was not in, but I made a mistake. Once they called down for a lockdown, they said for the unit to be locked down, we locked the

unit down. When they called for the recount, we went and counted the unit, me and Ms. Washington.

While we counting the unit, Makins, she was on the telephone talking to somebody, and we counted, and I was up on the tier, and I say, Makins, that damn Ricardo Jones ain't back yet, and I done plussed him in, and she said, well, Ms. Hatton -- and when I was coming off the tier and I was still fussing about it, saying, damn, I've done plussed this inmate back in and he ain't in, so when I went in the Bubble, she said, Ms. Hatton, just go on and tear the sheet up and just redo it, and that was all, because she was like still upset because of the situation for that day, not the escape, because the escape hadn't even taken place.

DR. LESANSKY: I wanted to ask you about -- you said that -- earlier I believe you had said that when the inmates came back, you knew that all your inmates had come back.

MS. HATTON: Yeah, I thought all of them had came back, but I was wrong, sir.

DR. LESANSKY: And I wanted to ask you what

made you think that. How would you --

MS. HATTON: Determine that all of them came back?

DR. LESANSKY: -- determine that all your inmates came back? Did you know them by face, or how would you --

MS. HATTON: No, because it was like when they came back in --

DR. LESANSKY: It's a lockdown situation, correct?

MS. HATTON: It's a lockdown situation, but when they came back in, sir, it's like -- it's four of us here, right? I'm not saying it was four inmates that came back, I'm saying it's four of us here, and all four of them at the Bubble, but don't write this down. This is just a little scenario. They all giving me their pass, and while they giving it to me, I'm probably not even looking, because I'm being nosy, first of all, trying to figure out what's going on in that hallway, okay, because everybody was going over to South 1. I'm thinking somebody had gotten hit, you know, gotten stabbed.

And I'm taking the inmates' passes, and I was just like plussing them in, plussing them in, and telling them go the hell to your cell, and they were standing there talking, you know, getting on my nerves at that Bubble, telling me they wasn't ready to go in their cell and bucking not to go in their cell, and I'm saying go the hell in your cell, sir. Leave me alone. Go in your cell right now. We'll talk later, and that was it, and then you get confused.

DR. LESANSKY: You say you got confused, or --

MS. HATTON: No, it's like the whole day is like confusion, because the loudspeaker is constantly lock the inmates down, lock the inmates down. The inmates at the Bubble, they giving you a hard time not wanting to go in the cell.

DR. LESANSKY: But I thought you had said this was not the first lockdown --

MS. HATTON: No, it's not.

DR. LESANSKY: -- you had been through, so you're saying each of the lockdowns that you had been through before -- do you know about how many lockdowns

you had been through?

MS. HATTON: No, but I think we may be confusing something. This is the first lockdown escape.

DR. LESANSKY: No, I'm sorry to interrupt you, Ms. Hatton, but you said you didn't know anything about an escape.

MS. HATTON: No, but you saying this is not the first lockdown I been through.

DR. LESANSKY: Right, so I was taking what you said to be so, that at that point -- and I think Mr. Hannon also asked you about --

MS. HATTON: Right, because listen, listen.

DR. LESANSKY: -- about no --

MS. HATTON: It's like, sir -- I want you to understand what I'm saying. When they say a lockdown, they not talking about escape. They saying lock the units down.

MR. HANNON: Just wait a minute. All he wants to know is your experience in other lockdowns. Do the inmates behave the same way on other occasions, in your experience, when there has been a lockdown?

MS. HATTON: Yeah. Sir, to be honest with you, it's like the lockdown -- they say a lockdown, right? You locking all the inmates down. The inmates at the Bubble, they going to give you a hard time regardless. They going to -- whether somebody escaped, whether somebody got stabbed, whether it's just a normal beautiful day, they going to give you a hard time.

DR. LESANSKY: So would it be fair to say that based on your prior experiences with a lockdown, on this day, the lockdown for June 3, you didn't know it had anything to do with an escape. It was a lockdown, you had been through other lockdowns --

MS. HATTON: And it was still a normal day.

MR. HANNON: Let him finish his question. She can't take down what people are saying if they don't take turns.

DR. LESANSKY: And you said that the inmates in prior lockdowns that you personally had been through, you had had the experience where the inmates come back to the Bubble during a lockdown, and they're asking you questions or they don't want to go back

into their cell.

MS. HATTON: Yes.

DR. LESANSKY: And so you said on June 3rd there was a lockdown, you didn't know anything about an escape, so for you this was -- as far as you knew, it was a lockdown, nothing about an escape, lockdown related to an escape, so the inmates were coming to the Bubble as you had experienced before, correct?

MS. HATTON: Uh-huh.

DR. LESANSKY: And wouldn't go back in their cells. You even gave this example where you had to tell one or more inmates, you know, get back in your cell and I'll deal with you later.

MS. HATTON: Right.

DR. LESANSKY: So I'm trying to understand what was it about this lockdown that was different from the other lockdowns that you said you were -- there was -- it was very frantic and it was very busy, and I guess I should ask you: Did that have something to do with --

MS. HATTON: It's always like that.

DR. LESANSKY: -- you making this sheet out

incorrectly?

MS. HATTON: No. It's always like that. And sir, to be honest with you, this -- how can I say this? Sometimes you don't even use a log-in sheet to log the inmates in and out. Throughout that course of the day, it would have been so many inmates going out, you may have even forgot to put inmates on the sheet, because the phones are ringing off the hook. You may have forgotten. You understand what I'm saying? This wasn't the case here, but it happens. And throughout the course of the day, you can't think that the inmate is not -- nor do I tell Makins the inmate didn't come back. Makins didn't think the inmate wasn't coming back. She felt as though the inmate was coming back. We didn't even think the inmate wasn't coming back. The inmate was supposed to be in the infirmary. The inmates, they take their time to come back to the unit.

MR. HANNON: Can we interrupt for a moment. I need to call my office, because I'm due there at 4:00.

DR. LESANSKY: Oh, okay.

(Discussion was held off the record.).

DR. LESANSKY: Can you just tell me again what your normal process is for checking passes for inmates who are leaving the block and going to the infirmary and elsewhere?

MS. HATTON: How do we check them out?

DR. LESANSKY: Yes.

MS. HATTON: What we do is when the inmate give us his pass, it's like a slide in the glass. They slide the pass through the glass. You look at the inmate's pass; okay? You look at that inmate's armband. You look that inmate in his face. Everything is matching. You go on. You look at the clock. You write the time down, what time the inmate left. You put that inmate on that Movement Sheet.

DR. LESANSKY: Okay. So you look at the clock, you check the wristband?

MS. HATTON: Yes, sir.

DR. LESANSKY: You look at the pass, right?

MS. HATTON: Uh-huh.

DR. LESANSKY: And then you said you also like look at his face or her face?

MS. HATTON: Uh-huh, you make sure you have who it's supposed to be, you know, to identify them.

DR. LESANSKY: And on June 3rd, which was the day of the escape, for the people that were -- for the inmates that had passes and were leaving the block to go to the infirmary, and maybe they were going elsewhere other than the infirmary, is that the process that you followed?

MS. HATTON: Say that again, sir.

DR. LESANSKY: I had asked you what the process was for checking passes for inmates that are leaving the block, and then you told me that there was a process, and it included you looked, checked the wristband, you looked at the face, you see if it matches, you look at the clock to see what time it is, you look at the pass. And I then asked you did you do -- is that the process that you used on June 3rd for all the inmates that were leaving the block with a pass to go to the infirmary --

MS. HATTON: Yes, and you ask Sergeant Makins is it okay for the inmates to go.

DR. LESANSKY: So part of the process is

also to ask the sergeant or the Officer In Charge or a supervisor, or who is it that you would normally ask?

MS. HATTON: The Officer In Charge.

DR. LESANSKY: Okay. You ask the OIC if it's okay for the inmate to go?

MS. HATTON: Right. Where is the inmate going.

DR. LESANSKY: And so on June 3rd, for all of the inmates that were -- your understanding, from all of the inmates as you understood it, who were leaving the block who had a pass, this is the process that you followed, that you described?

MS. HATTON: Yes.

DR. LESANSKY: There was nothing different on June 3rd than you did any other time?

MS. HATTON: There was nothing different.

DR. LESANSKY: Okay. Now, my last question really goes to the letter that the Department wrote you on March 15th. This was the letter where they gave you the 20-day notice to terminate you from your position, and they said that the action is based on the charge of negligence, and then they had what they

called "specifications" for several pages.

MR. HANNON: He'll tell you what part he wants you to --

DR. LESANSKY: I have questions on some of the statements that the Department is making in this letter to you. On the bottom of Page 1 the sentence starts, "The OIA investigators conducted taped interviews with you regarding this matter on Saturday, June 3rd, and on Sunday, June 4th." So is that correct, that they interviewed you twice?

MS. HATTON: Yes, they did.

DR. LESANSKY: Okay, and was it the same investigator both times?

MS. HATTON: No.

DR. LESANSKY: It was a different investigator? Was it one investigator or two investigators, if you remember?

MS. HATTON: What I recall is I know Collins was one of the investigators. He was one person. I know he was one that had interviewed me, and then the second time two people interviewed me together, and it was him again and a young lady.

DR. LESANSKY: Okay. A young lady? Okay. The other investigator was a young lady. Okay.

And continuing on Page 2 in that same paragraph, they're quoting you as saying that you stated that you made passes but could not recall how many passes you made or who you made them for.

MS. HATTON: Correct.

DR. LESANSKY: That was correct then, and that's still your recollection?

MS. HATTON: Uh-huh.

DR. LESANSKY: Okay, and you also stated that you observed Sergeant Makins prepare call-out passes?

MS. HATTON: Uh-huh.

DR. LESANSKY: But you were not sure if Corporal Washington prepared any?

MS. HATTON: I wasn't sure.

DR. LESANSKY: Well, it does say, "but you were not sure," okay, so that's correct, that you were unsure?

MS. HATTON: Right.

DR. LESANSKY: Is that still the case;

you're not sure?

MS. HATTON: See, the only thing about that, sir, when we got down to the FBI and I seen the pass, I never even knew that Ms. Washington had even initialed the pass or anything, so I was actually telling the truth. I just didn't know then.

DR. LESANSKY: That's fine.

Now, it says you stated that you received a call from Ms. Tony in the infirmary.

MS. HATTON: Right.

DR. LESANSKY: And she gave you the names of three inmates.

MS. HATTON: Uh-huh.

DR. LESANSKY: But you were not sure who the three inmates were.

MS. HATTON: Right.

DR. LESANSKY: But that you wrote the names down on the running count sheet.

MS. HATTON: I told them that.

DR. LESANSKY: And then if I could skip down to the third paragraph, it says --

MR. HANNON: Can we -- just so the record is

coherent here, the next sentence is, "You stated that you could not recall if you received any other calls from the infirmary." Okay, go ahead. It was just for clarity of the record.

DR. LESANSKY: It's right there, uh-huh. It says you received this call from a Ms. Tony in the infirmary, and she gave you the names of three inmates. However, you were not sure who the three names were but that you had written the names on the running count sheet, and you stated that you could not recall if you received any other calls from the infirmary.

MS. HATTON: Okay.

DR. LESANSKY: Is that accurate?

MS. HATTON: That was accurate, yes.

DR. LESANSKY: Okay. Then the next paragraph says that you acknowledge that you opened cell 18 where Inmate Ricardo Jones was housed, and that you stated that you observed Inmate Jones walk out of the cell to the Bubble, where you gave him his pass.

MS. HATTON: Right, but that wasn't true. I

was like confused, and I'm going to tell you why, because when the inmate came out of his cell, he was like -- what I recall is the inmate was waving his hand out of the cell, and Ms. Makins was saying, you know, open his cell. I opened his cell, and when he came to the Bubble, he had already had his pass, because Ms. Washington had initialed his pass, and I had timed his pass and initialed it, so it could not have been true.

DR. LESANSKY: Okay. So what you're saying is that, in fact, your recollection of what happened is that he, Inmate Jones, was in his cell, and he was waving a pass or his pass?

MS. HATTON: Right.

DR. LESANSKY: And then cell 18 was opened?

MS. HATTON: Right, because Sergeant Makins asked us to open the cell. She actually asked Ms. Washington to open it, and I opened it because I was closer to the tracking system, and I opened his cell.

DR. LESANSKY: So you actually opened cell 18?

MS. HATTON: I opened his cell and I let him out the block. I did all that.

DR. LESANSKY: And you didn't speak to him?

MS. HATTON: No, probably -- speak to him how?

DR. LESANSKY: No, I'm asking you: Did you speak to him?

MS. HATTON: I probably said, "Hello, young man." I'm not sure.

DR. LESANSKY: Okay. It says, "You stated that you observed Inmate Jones walk out of the cell to the Bubble, where you gave him his pass," and which you then have clarified that to say he was actually waving his pass in the cell, and then you were told to open cell 18, and you opened cell 18, and then he came out, and then did he come up to the Bubble where you were?

MS. HATTON: Actually --

DR. LESANSKY: Because you can only open the cell from the Bubble.

MS. HATTON: Right, I can only open the cell from the Bubble. At this time when he came up to the

Bubble -- he had come up to the Bubble, sir, and when he came up to the Bubble, he had his pass, and that's how I initialed it, because I can't initial the pass outside the Bubble unless I'm not in the Bubble at this time.

DR. LESANSKY: So he came up to the Bubble --

MS. HATTON: He had come up to the Bubble.

DR. LESANSKY: And why did he come up to the Bubble?

MS. HATTON: Because that's the only way he can get out is that I got to see his pass, and that's how I end up seeing his pass. Do you understand that?

DR. LESANSKY: What did you do at that point? You took the pass from him? Because I don't see that in the letter, Ms. Hatton, on Page 2, so that's why I'm asking you.

MS. HATTON: Remember I was telling you about five minutes ago where you take the inmate's pass from him, I'm in the Bubble. I take his pass, I look at the pass. Sergeant Makins had already let the inmate out, so I already got the clarification from

her that this inmate is going to the infirmary. You jotted that down. Then I look at the pass, I look at his armband, I look at who he is, it's already written down who this inmate is. Then I initial it, and then I time it.

DR. LESANSKY: So you knew he was going to the infirmary, because the destination said "infirmary"?

MS. HATTON: Yes.

DR. LESANSKY: Did he ever say he was going to the infirmary?

MS. HATTON: Sir, to be honest with you, I don't even remember having a conversation with that inmate. I'm not sure if I had a conversation with him.

DR. LESANSKY: That's fine.

MR. HANNON: The two of you have to take turns.

DR. LESANSKY: And then it says back on Page 2 of the Department's letter to you from March 15th, "You stated that you were not sure if you had made his pass."

MS. HATTON: Exactly.

DR. LESANSKY: At the time, though, you did take his pass, right? I think you just said -- I don't want to put any words in your mouth -- that you took his pass and you looked at it, and you went through a process that you've described to verify the pass.

MS. HATTON: But is that making the pass out if I time it and initial it? The pass is already made out when it comes to me, sir.

DR. LESANSKY: So your initials are not -- from your point of view, you don't consider your initials part of making out the pass?

MS. HATTON: You know what I honestly consider? I consider that I did my job and I signed that pass with my initials and my time. That's what -- but you're saying actually making the pass out. I don't understand you.

DR. LESANSKY: Well, can I ask you this? If you had not signed it, could he have gotten -- would that have been a valid pass, from your experience?

MS. HATTON: If I had not signed it?

DR. LESANSKY: Uh-huh.

MS. HATTON: I didn't sign it. I initialed it.

DR. LESANSKY: I'm sorry. I meant to say initialed it. If you had not initialed it, would it be a valid pass?

MS. HATTON: Yes.

DR. LESANSKY: From your experience?

MS. HATTON: Yes.

DR. LESANSKY: So the fact that you initialed it did not make it a valid pass or an invalid pass, correct?

MS. HATTON: You know what, sir, I don't really know what to say there, because let's say, for instance, if I would have left out the Bubble, my initials wouldn't have been on the pass. With my initials being on the pass, that made the pass look even better. I did my job, so yes, it was valid.

DR. LESANSKY: But I'm just trying to understand, because I haven't worked in the Bubble. He came to the Bubble, he had a pass already. He came to the Bubble, and he came to the Bubble because --

MS. HATTON: He needed that pass initialed so he could get out of that unit.

DR. LESANSKY: Okay. Now, that -- I don't want to put any words in your mouth. You said he came to the Bubble because he, quote, "needed that pass initialed to get out."

MS. HATTON: Right.

DR. LESANSKY: So if you -- if it was not initialed by you who was in the Bubble, he still could have gotten out?

MS. HATTON: Yeah, because Ms. Washington had initialed it and Makins had signed it, but he gave me the pass, and I took it and I initialed and I put the time on it, like I did everybody else's pass.

DR. LESANSKY: I'm just trying to understand the process, because the Department, in this letter to you on Page 2, talks about the pass, talking about Ricardo Jones' pass, and that the procedure for reviewing and approving the pass, because according to Page 2, it was the pass that got Ricardo Jones out of his cell and ultimately the unit. So that's why I'm asking you about -- the cell door is opened.

MS. HATTON: Yes.

DR. LESANSKY: He's waving the pass. The door is open, because you're told to open the door. He comes out and he comes over to the Bubble. He doesn't walk out. He comes over to the Bubble. As I understand it, he came over to the Bubble, and I believe it was you who has said he came over to the Bubble because he needed to come to the Bubble to have you sign his pass, initial his pass or do something, or he couldn't get out of the Bubble.

MR. HANNON: Couldn't get out of the cell block.

DR. LESANSKY: Couldn't get out of the cell block. I'm sorry. So, to me, that's why -- I'm just trying to follow up. It sounds to me then that if he hadn't come over to the Bubble and gotten you to do whatever it is according to the process that you used to complete the pass -- I don't want to maybe use the word that says --

MS. HATTON: Complete.

DR. LESANSKY: -- made his pass, but to do whatever it is you're supposed to do with his pass,

you made it sound to me -- and I don't want to put any words in your mouth -- that had you not done that, he could not have gotten out of the block.

MS. HATTON: Correct.

MR. HANNON: Let me interrupt here. For the jail door to the block to be opened, who does that?

MS. HATTON: Me.

MR. HANNON: From the Bubble?

MS. HATTON: From the Bubble.

MR. HANNON: Okay, so he wouldn't have been able to get out the door unless --

MS. HATTON: Unless he had the pass and I initialed it.

MR. HANNON: Okay.

DR. LESANSKY: Okay, so if I wrote down that, according to what you're saying today, that since you're also -- because you happen to be in the Bubble, and the Bubble is where the doors are secured, so you would also be the person to open the door to let him out of the cell block, not just him, any inmate --

MS. HATTON: And you know what, sir?

DR. LESANSKY: -- correct?

MS. HATTON: That's correct, and that doesn't sound right, but you know what? That's just how it is, because if I work in the Bubble, I have to pop the cell door, I have to open the Bubble door -- I mean not the Bubble door. I have to open the -- what is it called? Not the Bubble door, because the Bubble door is where they come in and kill me. I have to open the doors so the inmates can leave out to go to the infirmary.

DR. LESANSKY: Right. My understanding from what you said is that you're in the Bubble, and the Bubble officer, which was you at that moment, is the one that controls the door opening and closing --

MS. HATTON: Yes.

DR. LESANSKY: -- for the cell block, and that is what lets the inmate at that point out of the block.

MS. HATTON: Can I also say --

DR. LESANSKY: And you're also the person to whom the inmate came that day --

MS. HATTON: To.

DR. LESANSKY: -- to do something, to sign, to complete his pass, which is what has to happen before you'll open the door; isn't that true?

MS. HATTON: Yes. Let me say something to you. Before this inmate got to me, he went through two officers, which was Sergeant Makins, he had to go through her to get out the cell, okay, and then once he get out the cell, he made it to Ms. Washington, which at this time Ms. Washington was on that floor, and she initialed his pass. And then I initialed it and signed it. I mean I initialed it and timed it as well.

DR. LESANSKY: So when he gave you the pass, it already had been signed?

MS. HATTON: And initialed.

DR. LESANSKY: Signed by Sergeant Makins, with her signature, and you're saying that officer Washington initialed it?

MS. HATTON: Yes.

DR. LESANSKY: And then is it a third step to then come to you at the Bubble -- and you happened to be in the Bubble -- to then initial it and put

additional -- was there any additional information you needed to put on the pass?

MS. HATTON: When Sergeant Makins came down the steps, when the inmate was waving his hand out, sir, Sergeant Makins and that inmate walked down them steps together to that Bubble, and Ms. Washington was at that Bubble door, and that's how Ms. Washington initialed it. And Ms. Washington and Makins was standing right there with all the inmates going out the door.

DR. LESANSKY: Okay, I'm not trying to be a hardhead. I'm just trying to understand the process for the completing or making the pass so that the Bubble officer, who in this case was you that morning, can open the door, because you said you don't open the door unless they have a pass that's been made out that's valid, right?

MS. HATTON: Right.

DR. LESANSKY: And I'm just trying to understand. To be a valid pass that day -- I'm talking about, only talking about Inmate Jones, Ricardo Jones, on that day, June 3rd, the day you were

the Bubble officer, the person who opened the door to cell number 18 at the direction of Sergeant Makins, correct? And you were also the person in the Bubble. Inmate Ricardo Jones, according to what you said, came to the Bubble for you to do something with his pass, and then you would also, as the Bubble officer, be the person to open the door to let him out of the cell block.

And so that's why I'm asking you, trying for me to understand, when he came over to the Bubble, Inmate Jones, Ricardo Jones, he came over there for you to do something, and I'm trying to find out what it was that he came over for you to do with his pass, because you said he handed you the pass, his pass.

MR. HANNON: Can I --

DR. LESANSKY: I'm sorry. I'm actually addressing a part of Paragraph 2, just trying to follow the sequence as best as you can recollect it.

Now, I understand that you gave an interview on June 3rd, which was the same day of the escape, and then you gave another interview on Sunday, which was the day after, and so the Department's letter from

Page 2 is saying that you acknowledge -- and you either said this on June 3rd -- I don't have the transcript in front of me, but you either said it on June 3rd, or at least they say you said it on June 3rd or June 4th, that you acknowledge that you opened cell 18 where Inmate Ricardo Jones was housed, and today you said yes, I was directed to open the cell, and that's what I did, I opened cell 18.

"You stated that you observed Inmate Jones walk out of the cell to the Bubble, where you gave him his pass." Now, today you have said -- you have added additional information today, that that's not actually how it occurred, now that you're thinking about it today, because you're saying, if I have written it down correctly --

MR. HANNON: Everything you've said is correct, but keep in mind that between the time of the interview and the preparation of the report by the investigators, after that time she got to see the actual pass. After that time.

DR. LESANSKY: You know, Ms. Hatton and Mr. Hannon, I understand about when you're saying

about the FBI, I think you told me, showed you the pass, but according to what you're saying today, you saw the pass on that day. You saw Inmate Ricardo Jones' pass on June 3rd, because he came to the Bubble and gave it to you, and that's why I'm focusing on -- when he came to the Bubble after you opened the door, my understanding from what you said today -- and please correct me if I'm wrong -- is that your memory now is that he was waving this pass while he was still in his cell number 18, and that Sergeant Makins told you, directed you, asked you, requested you to open cell number 18 where Inmate Ricardo Jones was, which you said today you did.

And you also said it in one of your two interviews with the OIA. You acknowledged that you opened cell 18 where Inmate Ricardo Jones was housed. Today you said you did that --

MS. HATTON: You know what, sir? Let me stop you.

DR. LESANSKY: Okay. Please.

MS. HATTON: Because one thing I do know, and I'm not here to argue with you or debate.

DR. LESANSKY: That's okay. It's your hearing.

MS. HATTON: It's my hearing, but guess what I do know. A lot of things that I said in that interview, it was not recorded on this paperwork, and I know I told them people that Sergeant Makins told me to open up that inmate's door, and I don't want you to make it look like I just opened up his door because he waving a pass. I'm not like that.

DR. LESANSKY: Oh, no. I'm taking what you said.

MS. HATTON: Is it in there that Sergeant Makins informed me to open up the door?

DR. LESANSKY: No. What this says verbatim from Page 22, "You acknowledged that you opened cell 18, where Inmate Ricardo Jones was housed." This does not say that --

MS. HATTON: Sergeant Makins told me.

DR. LESANSKY: -- that you did that at the direction of Sergeant Makins.

MS. HATTON: You know why it doesn't say that? Because they did not put that there.

DR. LESANSKY: Okay, and I have the transcript, so I will certainly look at the transcript.

MS. HATTON: And let me say this. Regardless of what the transcript may say, it may not have been asked like that; okay? I know that Sergeant Makins told me to open up the cell door. I would have never opened it up if she wouldn't have told me to.

DR. LESANSKY: Okay, but today I'm just trying to -- you know, it's okay to say whatever you need to say at the hearing.

MS. HATTON: And it's okay for me to add to it --

DR. LESANSKY: Absolutely.

MR. HANNON: -- because it's what I remember now, and I know she told me to open up the cell. I'm not putting anything on anyone. All we did was our job that day.

DR. LESANSKY: Okay, and I'm trying to --

MS. HATTON: I can't open up an inmate's cell unless it's directed to me.

DR. LESANSKY: I apologize for interrupting.

And when you said you did your job that day, you said earlier you didn't do anything wrong, so, for me, I mean here's a letter from the Department, and I'm trying -- and they made certain "specifications" is the word that they used, and I'm trying to --

MS. HATTON: But the Department knows, sir, I can't open up a cell unless I'm directed to.

MR. HANNON: Just a moment. On Page 15 of the transcript of the June 3rd, 2006 interview, the following questions and answers were given, and I'm quoting:

"Investigator Collins: Do you recall, while you were working, Sergeant Makins or Corporal Washington telling you to open and check the cells, if anybody needs to go to the infirmary?

"Corporal Hatton: Yes.

"Investigator Collins: Yes. Do you remember opening up 18 cell?

"Corporal Hatton: Yes.

"Investigator Collins: Did you see the inmate when he walked out of the cell?

"Corporal Hatton: Yes.

"Investigator Collins: Do you know where he went after he walked out of there?

"Corporal Hatton: To the Bubble.

"Investigator Collins: So he came towards you?

"Corporal Hatton: Uh-huh.

"Investigator Collins: Did you give him his pass?

"Corporal Hatton: Yes.

"Investigator Collins: Then the pass that you gave him, did you make that pass?

"Corporal Hatton: I'm not sure if I made that pass."

Okay. So in the transcript you said that Sergeant Makins and Corporal Washington directed the opening of the cells, right?

MS. HATTON: Yes, sir.

MR. HANNON: And the difference is that you recall that he had the pass before he came to you?

MS. HATTON: Uh-huh.

MR. HANNON: That is correct?

MS. HATTON: Yes. He already had the pass.

MR. HANNON: Okay.

MS. HATTON: And can I say something? If he wouldn't have had a pass, how could Sergeant Makins know to tell me to open up the cell or to inform me and Ms. Washington to open up the cell? She would not have known.

DR. LESANSKY: Well, my question, Ms. Hatton, is that, as was just referenced by Mr. Hannon, on Page 2 of the letter the Department sent you, it says that you stated that you observed Inmate Jones walk out of his cell to the Bubble, which is reflected in the transcript from June 3rd, and then it says, "where you gave him his pass." And my understanding from what Mr. Hannon just read, that is what you said on June 3rd.

MS. HATTON: Yeah, because remember the inmate gave me the pass, and I got to give it back to him in order to go out the Bubble, because I got to initial it and time it, so I gave him the pass.

DR. LESANSKY: Okay, and that's why I'm asking you additional questions about -- and I'm comfortable in understanding that you were directed to

open cell number 18 where Inmate Ricardo Jones was housed. You opened cell 18. He came out. You observed him coming out, and you said he came over to the Bubble.

MS. HATTON: Uh-huh.

DR. LESANSKY: Now, at this point is where you're saying that you didn't give him his pass yet; he came to your Bubble with a pass?

MS. HATTON: He had the pass already.

DR. LESANSKY: Okay, and so he then gave you his pass?

MS. HATTON: Right.

DR. LESANSKY: Where he gave you his pass --

MS. HATTON: Right.

DR. LESANSKY: -- not where you gave him his pass --

MS. HATTON: Huh-uh.

DR. LESANSKY: -- which is what you said on June 3, correct?

MR. HANNON: Hold on. It's not inconsistent. She did give him his pass. He came with his pass. He gave it to her. She initialed it,

put the time on it and gave him his pass.

DR. LESANSKY: Yes, thank you, and that's why I'm asking you these additional questions, so I can be very clear about -- have the complete sequence or at least as complete as it can be recalled and documented as to what happened. You're the Bubble officer. You're the person opening and closing doors that morning, so that's why I am focusing on the opening and closing of the doors, what's required in order for a door to be opened and closed, a cell door, and what's required to open and close the door to the cell block.

And the Department has made certain statements in the form of a specification in their letter to you, and I'm trying to make sure that I have all of the picture clear and all of the relevant facts or recollections clear. So if I could just pick up, so he comes over to the Bubble with a pass, and you take the pass, so at that point -- this is now June 3rd, the morning of June 3rd -- you're looking at Inmate Ricardo Jones' pass; is that correct?

MS. HATTON: Uh-huh.

DR. LESANSKY: That he gave you?

MS. HATTON: Uh-huh.

DR. LESANSKY: Could you just tell me again, when you looked at the pass -- since I don't have a copy of the pass with me here at the moment --

MR. HANNON: We have a blank one. I think that would be helpful.

DR. LESANSKY: What did you see when you looked at his pass?

MS. HATTON: I can't actually tell you what I seen.

DR. LESANSKY: Okay, that's fine.

MS. HATTON: But I know Sergeant Makins' name was on the pass.

DR. LESANSKY: You remember Sergeant Makins' name being on the pass?

MS. HATTON: And I remember the pass being made out.

DR. LESANSKY: And the pass was made out in terms of his name --

MS. HATTON: Uh-huh.

DR. LESANSKY: -- his first name, his last

name --

MS. HATTON: Where he was going.

DR. LESANSKY: And where did it say he was going?

MS. HATTON: Infirmary.

DR. LESANSKY: And did it have a time on it?

MS. HATTON: No. I put the time on it, sir. I'm not sure whether there was another time on it or not. I know what I did.

DR. LESANSKY: What other blocks did you put information on? You said the time was blank and you put in the time; is that correct?

MS. HATTON: What other blocks?

MR. HANNON: We have a copy right there.

DR. LESANSKY: On the pass. Maybe you could look at the blank pass that Mr. Hannon has provided you a copy of, and then I'm trying to --

MS. HATTON: Sir, I'm going to say this to you. The reason why -- when I went down to the FBI, I told the FBI this looks like my initials. It looks like my handwriting. And I told the FBI that I signed -- I mean I initialed the pass and I timed the

pass.

DR. LESANSKY: Okay, but Ms. Hatton, I understand about your meeting with the FBI where they showed you a copy of the pass.

MS. HATTON: So when the inmate brought the pass to me, the inmate pass was already made out. All I had to do was initial it and time it.

MR. HANNON: Did you do it here where it says "left unit"?

MS. HATTON: You know what? I'm not sure -- I'm not sure if I put it over here. Maybe I did, you know, "SH."

MR. HANNON: And the time would be the "time left unit," so you put it there?

MS. HATTON: Uh-huh.

MR. HANNON: And everything else above it was already filled out.

MS. HATTON: Yes.

MR. HANNON: Including the portion that says "Signature of Authorizing Official."

MS. HATTON: Yes.

MR. HANNON: Okay.

DR. LESANSKY: Okay, so just to complete my understanding, he handed you the pass through the Bubble, you looked at it -- you did look at it?

MS. HATTON: Yes, sir.

DR. LESANSKY: Okay, and the only two things you did to the pass was you put in the time that he was leaving the block, "Time Out" I believe is --

MS. HATTON: That I can recall. At that time there is nothing else to do, sir, to the pass.

DR. LESANSKY: And you initialed it?

MS. HATTON: Yes, sir.

DR. LESANSKY: You wrote --

MS. HATTON: I initialed the pass. I put my initials, "SH," and the time.

DR. LESANSKY: And then I'm also now -- at this point I'm also now trying to understand your earlier statement that that's part of the process, or is it part of the process required for the Bubble officer to open the door to let the inmate out, who goes out unescorted, because this is Southeast 1, which is low custody, and they don't -- they're not escorted?

MS. HATTON: Correct.

DR. LESANSKY: So is the time out and your initials, was that required in order for you to open the door and let him out?

MS. HATTON: Yeah, I have to do that.

DR. LESANSKY: And is it fair for me to say that if you had not put the time on there and/or your initials, would that be a valid pass that would allow the Bubble officer to let that inmate out, from your experience? The way I'm reading Page 2 from the letter from the Department of March 15th, it appears to me, when I read this, that the issue of -- their charge of negligence that you're being charged with, accused of, includes what went on with the pass and the authorization for Inmate Ricardo Jones to leave the cell block.

MS. HATTON: Why?

MR. HANNON: Well, hang on. Let's go back so I can understand what Dr. Henry is driving at here.

Where are you on Page 2?

DR. LESANSKY: I'm in the second paragraph.

MR. HANNON: Okay. "You acknowledge that

you opened cell 18. You stated you observed him walk out of his cell to the Bubble, where you gave him his pass. You stated that you were not sure if you had made his pass. You said you gave him his pass, and he walked out the door." Okay.

DR. LESANSKY: Yes, that is where I'm at. I'm asking questions to get additional information, and which additional information has been provided as to what occurred, as you recalled to the investigator, the OIA investigator, on June 3rd, some hours after the escape occurred -- that is, the same day of the escape -- and the following day, Sunday, June 4th, you said certain things to the investigator. And I understand that you have said that -- and Mr. Hannon read verbatim from -- or I believe it would be verbatim from the transcript of June 3rd, that not everything that you said to the investigator is included on Page 2 or is included in this letter.

And so I'm asking some questions so I can find out, at least as you can best recall, what it is that you said to the investigators on June 3rd and June 4th, and what you may now, at your hearing, can

add to what you said or it may be different from what you said.

And one of the reasons -- if I may, Mr. Hannon -- one of the reasons, Ms. Hatton, that I'm spending time on it is included in the specifications on Page 3 in the second paragraph -- and this is in the Department's letter of March 15th to you. It said, "The OIA investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment."

MS. HATTON: Sir --

MR. HANNON: If I may?

DR. LESANSKY: And so I just want to clarify that that's why I'm asking you additional questions.

MR. HANNON: If I may?

DR. LESANSKY: Yes, sir.

MR. HANNON: That's not a charge.

DR. LESANSKY: Well, I'm just reading from the letter --

MR. HANNON: My point here is that that is

not a charge. There is no rule or regulation that says that you have to make sure that the people who are conducting the investigation aren't confused. That's what they're saying. That's their opinion.

DR. LESANSKY: Yes, I --

MR. HANNON: Let me finish. That's their opinion; okay? And you can read the transcript yourself and decide whether you agree with that or not. The charges are listed specifically below. "Your negligence violates the following departmental policy," and they list the policies here. And none of those policies say that you have to make sure that the OIA investigators don't feel that you've been given conflicting accounts.

I will say here, as you've obviously learned in talking to all of these folks over the past few days, that this investigation was completely incompetent, because they didn't get the information that you're getting, so to try to ask her why they think that she offered conflicting accounts is a waste of time.

DR. LESANSKY: Mr. Hannon, I don't

believe -- if we read back the transcript, I was not asking her any questions about the OIA conclusion. It says, "The OIA investigation concluded." I was addressing it because in the Department's letter and --

MR. HANNON: I'm reading from the Department's letter. You read from the Department's letter.

DR. LESANSKY: Right. Correct, and I was saying to Ms. Hatton, I'm asking additional questions because included in the letter on Page 3, the letter makes reference to "the OIA investigation concluded that you offered conflicting accounts of the circumstances surrounding how Inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment."

MS. HATTON: Let me ask you something.

MR. HANNON: Just --

DR. LESANSKY: And that sentence says that "the OIA investigation concluded," so it was their conclusion, and that's what the letter says.

MR. HANNON: No. It's their -- yeah, the

conclusion of conflicting accounts.

DR. LESANSKY: Their conclusion, yes.

MR. HANNON: All right. What questions do you want to ask related to that?

DR. LESANSKY: Well, I'm saying -- I thought I had said I'm asking additional questions so I can get, to the best of what the documentation shows and Ms. Hatton's recollection of that day, what the sequence was from her opening the door to cell 18, as she says, as directed by Sergeant Makins, Inmate Ricardo Jones comes out of his cell and he comes over to the Bubble.

MR. HANNON: We've gone through this six times, and she's agreed with you six times, and there's nothing inconsistent with what she's said here today that's in the transcript.

MS. HATTON: Mr. Hannon, can I say something? Do you remember where he say something about a scheduled appointment? We don't know if these inmates have a scheduled appointment. What is he speaking of there?

MR. HANNON: I understand. I really want to

find out what Dr. Lesansky is concerned about.

DR. LESANSKY: I don't know if I would call it a "concern." I'm just trying to get Ms. Hatton's best recollection today in her hearing --

MS. HATTON: But I told you everything.

DR. LESANSKY: -- of when Inmate Jones came over to the Bubble, handed her his pass which he already had, she saw his pass, and she looked at it, if I understand her correctly, and she made two entries, two entries on the pass. She filled in the time that he left the cell block, "Time Out," I believe you said it was, and she put her initials, "SH," somewhere on the pass, and I had asked her, Ms. Hatton, if that was part of the process -- from her experience, was that part of the process to create a valid pass for the inmate -- in this case Inmate Jones specifically -- to have the Bubble officer, who also happened to be her that day, to open the door to let the inmate out with a valid pass, unescorted, because it was low custody in Southeast 1, and I followed up, I think -- I believe I did -- with, if it was part of the process to create a valid pass, was I

fair in saying that if she had not put her, the time out on the pass and initialed it, my question was, from her experience, would that still have been a valid pass for the Bubble officer to open the door and let him out. That's I thought the question that I was asking.

MR. HANNON: Well, it's a hypothetical question, and you used the word "valid pass," but --

DR. LESANSKY: Well, I believe she said "valid pass."

MR. HANNON: No, sir. Whatever a "valid pass" is, I haven't a clue, but can you answer his question? If hypothetically he had come to the Bubble, given you the pass that was signed by Sergeant Makins and completed and said go to the infirmary, and you hadn't put your initials and the time out on it, would that be a valid pass?

MS. HATTON: Sergeant Makins already said let the inmate go to the infirmary.

DR. LESANSKY: Okay.

MS. HATTON: The pass is already valid when the sergeant signed it and when the sergeant said let

the man go to the infirmary.

MR. HANNON: But you agree that the reason why somebody is supposed to put down the time out and the time arrived at the destination and the time left to come back, that information is in there so that people know --

MS. HATTON: Where he's going.

MR. HANNON: -- where he's going --

MS. HATTON: And what he's doing.

MR. HANNON: -- and that he doesn't lollygag on the way back.

MS. HATTON: What all three of us did was we basically had accountability of where this inmate was going.

MR. HANNON: All right, so if the hypothetical occurs -- has that ever happened to you where you, to your recollection, have let somebody out who has a pass to go to the infirmary without putting your initials and the time on it?

MS. HATTON: It's never happened. I always do it. You always do it. Somebody got to sign it, somebody got to initial it, and we've got to time it.

MR. HANNON: So if the inmate is walking through the facility on the way to the infirmary and he has an infirmary pass that's signed by the authorizing official but doesn't have an initial and time out on it, and somebody encounters him, then what happens?

MS. HATTON: Nothing. He still going where he need to go, because it's been signed. So if I would have never initialed it and never timed it, he could still go to that infirmary.

MR. HANNON: But who knows, because that's never happened to you, and you don't know?

MS. HATTON: Right. Nobody never questioned it. The inmates normally come back.

DR. LESANSKY: No, this was -- my questions were not in coming back. My questions were related to him leaving the block, not coming back to the block. My questions were, when he came to the Bubble, for him to leave to go to the infirmary.

MS. HATTON: What makes the pass valid is when Sergeant Makins signed it.

MR. HANNON: Anyway, Corporal Hatton readily

admits that it would be her job to write her initials and the time left on the pass. What that means in terms of whether it's valid or not is for somebody else to determine even if that's relevant.

MS. HATTON: And they're saying in this transcript like I did something wrong by opening up the door. How else is he going to go to the infirmary? How else is he going to leave out the unit? How else is anybody going to leave out the unit unless you open the door?

DR. LESANSKY: Okay. I believe you just mentioned -- and I believe this will be my last question. You just mentioned -- I think I heard you say that you talked about having accountability for the inmates or that there was accountability for the inmates?

MR. HANNON: She didn't say anything about that.

DR. LESANSKY: Just a second ago I thought there was --

MR. HANNON: No.

DR. LESANSKY: You made mention of --

MR. HANNON: That's one of the charges. Program statement 5010.2(c), accountability for inmates, which states that "correctional officers are responsible for maintaining accountability for all inmates in their area of responsibility," end quote.

You agree with that, right?

MS. HATTON: Yes, sir.

MR. HANNON: Okay.

DR. LESANSKY: Okay, and just as a follow-up to that, on Page 3 in the second paragraph, the Department makes this statement. It says, "The OIA investigation further concluded" -- they're talking now about the conclusions of the OIA investigation. "The OIA investigation further concluded that each correctional officer assigned to Southeast 1 housing unit, SE-1 housing unit, to include you, was culpable because it was the responsibility of each employee assigned, individually and collectively, to ensure the accurate accountability of each inmate assigned to the housing unit." And my question --

MR. HANNON: Well, the next sentence is, "Therefore, you failed to properly carry out your

assigned duties."

DR. LESANSKY: Yes. It follows and says, "Therefore, you failed to properly carry out your assigned duties," and my question is: Is your understanding that part of your assigned duties is to individually ensure the accurate accountability of each inmate assigned to the housing unit?

MS. HATTON: Did we do that? We did that.

DR. LESANSKY: And that is -- you agree that that's part of your assigned duties?

MS. HATTON: What I agree to is that this statement is totally wrong, because --

MR. HANNON: You agree those are your duties; you disagree that you failed to properly carry them out?

MS. HATTON: Right. I disagree that I failed properly to carry it out.

DR. LESANSKY: Yeah, my understanding from earlier is that you had said that as far as you're concerned, you did nothing wrong that day.

MS. HATTON: I didn't do nothing wrong that day. I counted that unit. That was my assigned duty.

That inmate was accounted for.

DR. LESANSKY: Okay.

MS. HATTON: When we counted that unit again, that inmate was accounted for by not being in that unit.

DR. LESANSKY: Okay. I think that's --

MR. HANNON: And if you believe otherwise, she's entitled to know what your concern is.

DR. LESANSKY: Well, I'm not sure I'm talking -- I'm referring to it as a "concern." I'm trying to get -- as I had said several times, I'm trying to get between what was stated to the investigators on June 3rd and June 4th, which was the day of the escape and the day after the escape --

MS. HATTON: Sir, you know --

MR. HANNON: Just a minute.

DR. LESANSKY: -- and then what is reflected in the letter that the Department wrote to you on March 15th, included under "Specifications" and beyond specifications, perhaps, and what's reflected in the printed transcript of these recorded interviews, and additional information or other information that

you're able to provide today; I'm trying to get a complete and accurate picture of what happened in terms of the pass for Inmate Ricardo Jones in terms of looking at it and reviewing it and touching it and putting initials on it or filling in information, looking at signatures, and what then happened after the pass was "completed," if that's the right word, and handed back to the inmate, Inmate Jones, and you as the Bubble officer on June 3rd opened the door for him to leave the cell block.

MS. HATTON: Yeah, but you make that sound --

MR. HANNON: No, he's just making a statement.

DR. LESANSKY: That's --

MR. HANNON: Do you have any other questions?

DR. LESANSKY: No, I don't think I do.

MR. HANNON: Okay. Now that we've heard from all three of the officers, the women who were on Southeast 1, to summarize the evidence as I see it, the only way for this inmate to have an infirmary pass

would be for somebody to call from the infirmary and request that he be sent up. The belief is that there was such a call. Sergeant Makins denies that she received the call. Ms. Washington indicates that she doesn't believe that she received the call. Ms. Hatton doesn't know one way or the other.

A pass was created for him that was signed by an authorizing officer, Sergeant Makins, which was presented at the Bubble, which was initialed by Ms. Hatton with the time out. And in addition, beyond that, it was initialed by Ms. Washington, and with that pass he left, them believing that he was headed to the infirmary.

Now, the only way that these three officers would have learned that he wasn't, in fact, being requested by the infirmary would be for one of them to call the infirmary back and say do you have an appointment, do you want Ricardo Jones. That would be the only way for them to have foiled his plan to get out of that cell block with a medical pass that day, and there is no rule or regulation that requires them to do that.

In fact, I read the entirety of the provision in Program Statement 5010, and all it says that if there is a request made, you do the paperwork and you send them on, which is, as far as they know, what they did. How the OIA investigators can suggest that there was negligence here is beyond me, because it's not part of their job to do that.

And the system that they have for doing this is not the system they created. The system is the system that was probably created 20 years ago, as far as we know, and hasn't been altered to this date, and includes procedures for inmates to go to an officer and get a pass based upon their statement that they're sick, which apparently it seems is something that you haven't heard before, but if an inmate does that -- and there's nothing in writing about that. If an inmate does that and says that they're sick or ill, and the officers in the unit don't give them a pass, they will be disciplined. They will be disciplined.

You're aware of that?

MS. HATTON: Uh-huh.

MR. HANNON: And they make the contact with

the health unit, and if the health unit decides they're not going to receive him under the circumstances, it's on them, because they're the medical folks. They're making a medical decision. You can understand that they don't require these folks to make the medical decisions.

Now, none of that is in writing. If the leadership of the Department of Corrections wanted to make sure that on a day when the jail was dangerously low of correctional officers, somebody wasn't going to take advantage of this system, then they should have had a different system, but there's absolutely nothing in the rules and regulations or in their job descriptions that required them to foil Ricardo Jones' plan to get a medical pass to come out of his unit on that day.

And I think probably the OIA investigation conclusions result from their not doing what you've done, and that is finding out all the facts and not drawing inferences from incomplete information or perhaps trying to prepare a report that casts blame on others.

That's my take on it, and that's the key to it. If somebody can show that any one of these women had an obligation to call up to the infirmary, then maybe they did something wrong. And if you can find that, present it to us, and we'll look at it. Then the next question becomes: Should they be fired?

Anything else from anyone?

MS. HATTON: I just don't like what happened, sir. I don't like this at all. I don't appreciate it. I don't appreciate it at all.

MR. HANNON: Okay. The final thing we'll say when we're on the record is that we have one more hearing, but I think it's fair to say -- and you're an expert at this -- that you have met some extraordinary people with fascinating backgrounds from diverse fields, all of whom are very intelligent, committed to their jobs, born and raised in Washington, D.C., and, but for different circumstances, economic and otherwise, might have found themselves in different professions.

They might have been psychologists or aeronautical engineers or lawyers, but they worked

with the hand that they were dealt, and they're human beings, and none of that was taken into consideration into this whole process.

And as we've said in our statement about the whole process, we believe that they were victims of a political situation where they were treated as chattel that could be dispensed with without any harm or significance to society or them to serve other purposes. And there were things that were done to them intentionally and through scheming to humiliate them even after they had been summarily fired. I hope -- I appreciate your indulging me in a little bit of passion.

DR. LESANSKY: Ms. Hatton, I wanted to give you the opportunity, since, as I said before, it's your hearing, if there was anything else that you wanted to provide at the hearing that you think would be useful for me to hear or know or anything you wanted to add or clarify.

MS. HATTON: I just would like for you to have mercy on me, sir, and make sure I get my job back, because I don't feel as if I've done anything

wrong. And really look at this, you know, before you make a decision, because I didn't do anything wrong. And I feel as though the Department is not really telling the whole truth, because they keep saying that the inmate didn't have a scheduled appointment. They don't normally have a scheduled appointment in Southeast 1, and they know they don't. It's just not true.

Weren't they say that in the paperwork, that they are supposed to have a scheduled appointment, Mr. Hannon?

MR. HANNON: Yep.

MS. HATTON: And they don't have to have a scheduled appointment to go to the infirmary. And that's totally wrong the way they fired us. And the only thing that I did on that day was acted as my sergeant asked me to do. I followed orders and I took instructions from my sergeant, and I didn't do anything wrong.

MR. HANNON: Well, that's more important. You don't follow orders that are wrong.

MS. HATTON: Right.

MR. HANNON: You didn't do anything wrong.

MS. HATTON: I didn't do anything wrong, and it was stated in roll call what we had to work with, and we worked with what we had to work with, three officers. If we had a fourth officer, guess what. Maybe something would have been stopped that day, but we didn't. We didn't see anything wrong that day. It was normal. We was 56 officers short, and we was placed in the housing unit, three females, three officers, with all these men.

MR. HANNON: Okay. Thank you.

DR. LESANSKY: Thank you very much for coming.

MR. HANNON: We're off the record.

(Whereupon, the ORAL PRESENTATION of SHANTELL HATTON was concluded at 5:13 p.m.)

CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

I, Laurie Bangart-Smith, Registered Professional Reporter, the officer before whom the foregoing oral presentation was taken, do hereby certify that the foregoing transcript is a true and correct record of the presentation given; that said presentation was taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 15th day of July, 2007.

My commission expires: March 14, 2011

_____________________________

LAURIE BANGART-SMITH
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

**A**

**able** 18:15 19:10 31:8 59:11 91:1
**absolutely** 67:14 94:12
**access** 20:20,21
**accessible** 22:10
**accountability** 85:13 87:14,15 88:2,4,19 89:6
**accounted** 6:14 11:15,16 17:20 17:21 20:8,10 31:10 90:1,4
**accounts** 79:9 80:14,20 81:13 82:1
**accurate** 31:6 36:8,9 50:14,15 88:19 89:6 91:2
**accused** 6:3 77:14
**acknowledge** 50:17 64:1,5 77:22
**acknowledged** 65:15 66:15
**acted** 97:16
**action** 46:21
**actual** 64:20
**add** 67:12 79:1 96:19
**added** 64:11
**addition** 92:10
**additional** 62:1,1 64:12 70:21 72:3 78:7,8 79:16 81:10 82:6 90:22
**addressing** 63:17 81:4
**admin** 21:21,22 22:1,12
**administrative** 27:18 28:6 29:5
**Administrator** 3:13
**admits** 87:1
**advantage** 94:11
**aeronautical** 95:22
**Affairs** 31:15
**affixed** 99:10
**agent** 15:15
**ago** 53:19 87:19 93:10
**agree** 80:8 85:2 88:6 89:9,11,13
**agreed** 82:14
**ahead** 17:8 50:3
**ain't** 37:6,10
**alerted** 13:5
**allow** 77:8
**allowed** 79:10 81:14
**all-male** 18:8
**altered** 93:11
**Ames** 7:2 34:9
**and/or** 77:7
**announced** 8:17
**answer** 84:12
**answers** 5:9 68:10
**anybody** 22:18 68:15 87:9
**anyway** 15:7 86:22
**apologize** 67:22
**apparently** 11:19 93:14
**appeared** 16:9
**appears** 77:11
**apple** 28:2
**apply** 28:16
**appointment** 79:12 81:16 82:19,20 92:18 97:5,6,10,14
**appreciate** 95:10 95:10 96:12
**approving** 57:19
**area** 20:21,22 88:5
**areas** 21:8
**aren't** 80:3
**argue** 65:22
**armband** 44:12 54:3
**arrived** 85:4
**ASAP** 19:20
**asked** 5:13 8:21 9:1 10:12 12:9 12:12 40:12 45:10,16 51:17 51:17 65:11 67:6 83:13 97:17
**asking** 41:22 52:6 53:17 57:22 63:9 70:21 72:3 78:7,19 79:16 81:2,10 82:6 84:6
**asks** 25:5
**assigned** 88:15,18 88:19 89:1,4,5,7 89:10,22
**assume** 14:1
**attorney** 5:5 15:9 15:9,10
**authorization** 77:15
**authorized** 17:17 17:19
**authorizing** 75:20 86:4 92:8
**Avenue** 2:6 3:15
**aware** 93:20

**B**

**B** 4:4
**back** 6:1 8:3,22 9:7 10:2,7,16,17 10:22 11:9,11 11:11,12,18 12:9,15 15:14 17:15 20:17 23:5 24:9 26:1,3 26:4,22 27:8,9 27:12,18 28:7 30:1,3,10 31:10 31:11,11,12,21 31:22 32:2,3,10 32:12,15,20 33:3,5 34:14,20 34:21,22 35:1 35:10 36:18 37:6,9,18,19,21 38:3,5,8,12,14 41:21,22 42:10 42:12 43:13,14 43:14,15,17 54:19 70:17 77:18 81:1 85:5 85:11 86:14,16 86:17 91:8 92:17 96:22
**backgrounds** 95:15
**Bam** 22:3
**Bangart-Smith** 1:22 2:18 99:4 99:16
**banging** 16:21 18:12
**bars** 14:7
**based** 41:10 46:21 93:13
**basically** 8:15 12:6 85:13
**beautiful** 41:7
**beef** 23:16
**behalf** 1:5 2:1 3:2
**behave** 40:21
**beings** 96:2
**belief** 92:2
**believe** 8:11 12:20 13:2 15:20 26:19 37:17 58:7 76:7 78:15 81:1 83:12,21 84:9 87:11,12 90:7 92:5 96:5
**believing** 92:12
**best** 63:18 78:20 82:7 83:4
**better** 56:18
**Betty** 7:2
**beyond** 90:19 92:10 93:6
**big** 19:5,6
**bit** 96:12
**bites** 28:1
**blame** 94:21
**blank** 73:6 74:11 74:16
**block** 8:22 21:2,2 21:13 35:12 44:4 45:5,12,18 46:11 52:2 58:12,14 59:3,6 59:20 60:16,18 63:8 72:12 76:7 77:16 83:11 86:17,17 91:10 92:20
**blocks** 74:10,13
**bomb** 10:1 32:1
**book** 11:4
**born** 95:17
**bothers** 18:3
**bottom** 47:6
**boyfriend** 25:11
**bribe** 25:18
**brought** 75:5
**Bubble** 7:13,19 7:19,21 8:4 17:1 18:6,13 19:7,8 35:3 37:10 38:15 39:5,15 41:4,21 42:8 50:20 51:6 52:12,16,20,22 53:1,1,2,4,4,7,8 53:10,20 56:15 56:20,21,22,22 57:5,9 58:4,5,6 58:8,8,10,16 59:8,9,18,18 60:4,5,6,7,7,12 60:13 61:21,22 62:6,7,14 63:1,3 63:5,6,10 64:10 65:4,6 69:3 70:11,18 71:4,8 72:6,18 76:3,18 77:9 78:2 82:12 83:7,17 84:4,14 86:18 91:9 92:9
**bucking** 39:6
**Building** 2:7 26:22 27:10

**busy** 24:12 42:18

C

**C** 3:1 5:1
**call** 8:6 17:22 18:4 19:2,4,10 19:13 22:14 23:13,16,17 24:3,9 26:21 43:20 49:9 50:6 83:2 92:1,3,4,5 92:17 95:3 98:3
**called** 6:18 10:11 15:8 21:10,21 26:16 27:3 34:18 35:9 36:21 37:1 47:1 60:7
**calling** 26:16,17
**calls** 7:15 19:15 50:2,11
**call-out** 48:12
**can't** 23:2 34:13 41:16 43:11 53:3 67:20 68:7 73:10
**Captain** 7:2 23:6 34:7,8
**Captain's** 23:4,6
**care** 15:4
**carry** 88:22 89:3 89:14,17
**case** 43:10 48:22 62:14 83:16 99:8
**casts** 94:21
**catch** 13:2
**caught** 23:15
**cell** 10:14 11:15 16:21 17:2,6,8 17:10 20:5 24:7 32:4,5 39:3,6,6 39:7,8,16 42:1 42:13 50:18,20 51:2,4,5,5,12,15 51:17,20,21 52:1,11,14,15 52:15,20,21 57:21,22 58:11 58:13 59:20 60:5,16 61:7,8 63:2,7 64:5,7,8 64:10 65:10,12 65:16 66:15 67:7,16,21 68:7 68:18,21 70:4,5 70:11 71:1,2 72:10,12 77:16 78:1,2 82:9,11 83:11 91:10 92:20
**cells** 30:10 34:6 42:11 68:15 69:16
**certain** 68:4 72:13 78:13
**certainly** 67:2
**CERTIFICATE** 99:3
**Certified** 2:19
**certify** 99:5
**challenged** 29:8,9
**changed** 23:19
**charge** 9:14 46:1 46:3,22 77:13 79:19 80:1
**charged** 77:13
**charges** 80:9 88:1
**chattel** 96:6
**check** 44:6,17 68:14
**checked** 45:13
**checking** 12:8 22:1 44:3 45:11
**children** 27:12
**circumstances** 79:9 81:14 94:3 95:18
**clarification** 53:22
**clarified** 52:13
**clarify** 79:15 96:19
**clarity** 50:4
**clear** 15:13 35:9 72:4,16,17
**cleared** 7:10,12 7:18,20,20
**clock** 44:14,17 45:15
**close** 72:11
**closed** 72:10
**closer** 51:19
**closing** 60:14 72:7 72:9
**clue** 84:12
**coherent** 50:1
**collectively** 88:18
**Collins** 47:18 68:12,17,20 69:1,4,7,10
**Columbia** 2:20 99:17
**come** 8:3 10:1 11:12 14:8 19:15,20 20:4 20:16 22:4 26:21 31:10 32:15 33:3,5 34:4,22 37:19 41:21 43:12,17 52:16 53:1,8,9 58:8,16 60:8 61:21 84:13 85:5 86:14 94:15
**comes** 55:10 58:4 58:4,5 72:18 82:11,11
**comfortable** 70:22
**coming** 9:7 11:13 20:1 27:7 29:15 35:10 37:8 42:7 43:13,14,15 71:3 86:16,17 98:13
**commission** 99:12
**committed** 95:16
**complaining** 7:6
**complete** 58:18 58:20 61:2 72:4 72:5 76:1 91:2
**completed** 84:15 91:7
**completely** 80:17
**completing** 62:13
**concern** 83:3 90:8 90:10
**concerned** 83:1 89:20
**concluded** 79:8 81:3,12,20 88:12,14 98:16
**conclusion** 81:2 81:21 82:1,2
**conclusions** 88:13 94:18
**conducted** 6:22 47:7
**conducting** 80:3
**conference** 26:15
**conflicting** 79:9 80:14,20 81:13 82:1
**confused** 39:9,10 51:1 80:3
**confusing** 40:3
**confusion** 39:13
**connection** 6:4
**consider** 55:12,15 55:15
**consideration** 96:2
**constantly** 39:13
**contact** 93:22
**contest** 29:1
**continuing** 48:3
**control** 21:11,17 21:19,20
**controls** 60:14
**conversation** 28:15 54:13,14
**cooking** 22:22,22
**cooperated** 26:5
**copy** 73:5 74:14 74:17 75:4
**Corporal** 9:2,3 19:17 48:16 68:13,16,19,22 69:3,6,9,12,15 86:22
**correct** 6:6 11:20 35:12 38:10 42:8 47:10 48:7 48:8,19 56:12 59:4 60:1,2 63:3 64:17 65:8 69:21 71:19 72:21 74:12 77:1 81:9 99:6
**correctional** 88:3 88:15 94:10
**Corrections** 1:1 2:5 3:14 5:19,21 94:8
**correctly** 33:2 64:15 83:9
**couldn't** 16:4 26:19 58:10,11 58:13
**counsel** 99:7
**counseled** 24:17 25:1,4
**count** 6:13,15,17 6:18,20,22 7:10 7:12,18,20,20 8:18 10:10,11 10:12,13 12:10 12:13 35:14,18 35:22,22 36:1,2 36:5,11,13,17 49:18 50:10
**counted** 31:14 37:2,4 89:22 90:3
**counter** 9:12 10:4
**counting** 7:13 32:4,6,6 37:3
**course** 14:9 16:18 18:4 24:12 43:5 43:11
**cousin** 25:12
**create** 83:15,22
**created** 92:7 93:9 93:10
**cried** 27:17
**culpable** 88:16
**custody** 76:21 83:20

D

**D** 5:1
**daily** 15:19
**damn** 37:5,9
**dangerously** 94:9
**date** 93:11
**day** 6:9,11 7:4 8:6 13:3 15:8 16:1 18:4,7,21 21:7 21:16 24:12 25:2 28:11 34:1 34:4,8 37:13 39:12 41:7,11 41:14 43:6,11 45:4 60:21 62:20,22,22 63:20,22 65:3 67:18 68:1 78:11,12 82:8 83:18 89:20,22 90:14,14 92:20 94:9,16 97:16 98:6,7 99:10
**days** 24:18 80:17
**DC** 20:5 24:6
**deal** 25:14,16 27:14 42:13
**dealing** 16:2
**dealt** 96:1
**debate** 65:22
**decide** 80:8
**decides** 94:1
**decision** 94:4 97:2
**decisions** 94:6
**denied** 7:9 28:19
**denies** 92:3
**deny** 16:12
**Department** 1:1 2:5 3:14 5:19,20 28:22 29:4,7 46:18 47:5 57:16 68:3,6 70:9 72:13 77:11 88:11 90:18 94:8 97:3
**departmental** 80:10
**Department's** 54:20 63:22 79:7 81:4,7,7
**described** 46:12 55:6
**descriptions** 94:14
**destination** 54:7 85:4
**detail** 21:3
**determine** 38:2,4 87:4
**didn't** 8:20 11:12 11:17,20 12:1 13:1,7,13,17,19 13:22 20:16 23:16 26:3,18 26:18 27:17 28:9,20 29:3 31:10,11,13 32:14 33:9 36:15 40:6 41:11 42:4 43:12,13,15 49:6 52:3 56:2 68:2 71:7 80:18 87:17 89:21 97:2,5,18 98:1,2 98:7,7
**difference** 69:18
**different** 26:17 42:16 46:14,16 47:15 79:1 94:12 95:18,19
**DIONNE** 3:2
**direct** 5:8
**directed** 64:7 65:11 67:21 68:7 69:15 70:22 82:10
**directing** 21:12
**direction** 63:2 66:20
**Director** 34:9
**disagree** 89:14,16
**discipline** 24:15
**disciplined** 93:19 93:19
**discussion** 29:18 44:1
**dispensed** 96:7
**District** 2:20 99:17
**diverse** 95:15
**doctor** 13:12 24:3
**documentation** 82:7
**documented** 72:6
**doesn't** 58:5 60:3 66:21 85:10 86:4 92:5,6
**doing** 8:17 18:14 18:14 22:1,22 24:11 28:3 33:18 85:9 93:8 94:18
**don't** 7:15 9:13 10:22 15:10 18:18,19,20 19:3,16 20:17 20:18 21:6 22:6 24:2,9,10,10 25:10,16,20 28:14 36:12 38:15 41:17,22 43:4 53:15 54:13 55:4,12 55:18 56:13 57:3 58:18 59:1 62:15 64:2 66:7 73:4 76:21 80:13,22 82:19 83:2 86:12 91:18 93:18 94:5 95:8,9,9,10 96:22 97:6,7,13 97:21
**door** 10:3 22:5 57:22 58:3,3 59:6,11,19 60:5 60:5,6,7,8,14 61:3 62:7,10,15 62:16 63:1,7 65:6 66:7,8,13 67:7 72:10,10 72:11 76:19 77:4 78:5 82:9 83:18 84:4 87:7 87:10 91:9
**doors** 59:18 60:9 72:7,9
**dormitory** 18:8
**downstairs** 24:3
**Dr** 5:3,7 6:8 10:20 13:10,11 14:18 14:20 19:19 25:5,8 29:15 30:4,9,13,15,18 30:21 31:4,17 33:12,17,20 34:12,17 35:8 35:12,14,17 36:1,5 37:16,22 38:4,9 39:10,17 39:20 40:5,10 40:14 41:9,18 42:3,10,15,22 43:22 44:2,7,16 44:19,21 45:3 45:10,22 46:4,8 46:14,17 47:4 47:12,15 48:1,8 48:11,15,18,22 49:7,11,14,17 49:20 50:5,14 50:16 51:10,15 51:21 52:3,6,10 52:19 53:6,9,14 54:6,10,16,19 55:2,11,19 56:1 56:4,8,10,19 57:3,8,15 58:2 58:13,21 59:15 60:1,11,16,20 61:1,13,16,20 62:11,19 63:16 64:21 65:20 66:1,10,14,19 67:1,9,14,19,22 70:7,20 71:6,10 71:13,15,18 72:2 73:1,3,8,12 73:15,19,22 74:3,6,10,15 75:2 76:1,5,10 76:12,15 77:2,6 77:19,21 78:6 79:15,18,20 80:5,22 81:9,19 82:2,5 83:1,2,6 84:9,20 86:15 87:11,19,22 88:9 89:2,9,18 90:2,6,9,17 91:15,18 96:14 98:12
**drawing** 94:20
**driving** 77:19
**due** 43:20
**duties** 6:4 18:19 89:1,4,5,10,14
**duty** 6:13 7:11 89:22
**D.C** 1:1,9 2:5,8 3:6,14,16 21:15 21:16 23:11 95:17

E

**E** 3:1,1 4:4 5:1,1
**earlier** 29:17 37:17 68:2 76:17 89:19
**eat** 22:16,17
**economic** 95:18
**either** 17:13 18:20 64:2,3
**else's** 57:14
**employed** 99:8
**employee** 88:17
**encounters** 86:5
**ended** 15:11 36:6
**engineers** 95:22
**ensure** 88:18 89:6
**entered** 6:11
**entirety** 93:1
**entitled** 90:8
**entries** 83:10,10
**erroneously** 12:13
**escape** 6:2 11:22 12:2,7 13:6,8,13 13:17 14:5

21:14 28:13 33:8,16 36:15 36:15 37:14,14 40:4,7,17 41:12 42:5,6,7 45:4 63:20 78:11,12 90:14,14
**escaped** 8:21 13:18,19 32:14 33:11 41:6
**escaping** 14:6 25:14
**escorted** 76:22
**ESQUIRE** 3:3
**evaluations** 5:16
**everybody** 11:18 12:9 32:8 38:20 57:14
**evidence** 91:21
**exactly** 20:14 31:18,18 55:1
**example** 42:11
**excellent** 5:15
**experience** 40:20 40:22 41:20 55:21 56:8 77:10 83:15 84:3
**experienced** 42:8
**experiences** 41:10
**expert** 95:14
**expires** 99:12
**explain** 16:17
**extraordinary** 95:14

F

**face** 38:5 44:12 44:22,22 45:14
**facility** 5:22 35:6 35:10 86:2
**fact** 51:11 56:10 92:15 93:1
**facts** 72:16 94:19
**failed** 88:22 89:3 89:14,17
**fair** 41:9 77:6 84:1 95:13
**far** 42:5 89:19 93:4,10
**fascinating** 95:15
**fast** 10:6 34:13,13
**father** 25:12
**FBI** 14:16 15:13 15:15 26:1,7 31:15 49:3 65:1 74:19,20,21 75:3
**feel** 25:10 80:13 96:22 97:3
**felt** 32:14 43:14
**females** 7:3,7 18:8 98:9
**fields** 95:16
**figure** 38:19
**fill** 20:7
**filled** 75:17 83:10
**filling** 91:5
**final** 95:11
**financial** 99:8
**find** 24:5 63:12 78:20 83:1 95:4
**finding** 94:19
**fine** 19:14 49:7 54:16 73:12
**finish** 41:15 80:6
**finished** 7:13
**fired** 23:18,20 24:19 26:5,8,11 95:6 96:11 97:15
**first** 25:17 28:19 30:4,5 31:19 36:6 38:19 39:18 40:3,9 73:22
**five** 24:18 53:19
**floor** 8:3 21:10,17 21:18,20,20 23:11 35:5 61:9
**floors** 23:1
**Focused** 12:22
**focusing** 65:5 72:8
**foil** 94:14
**foiled** 92:19
**folks** 80:16 94:4,5
**follow** 58:15 63:18 97:21
**followed** 45:8 46:12 83:21 97:17
**following** 68:10 78:12 80:10
**follows** 89:2
**follow-up** 88:9
**foregoing** 99:5,5
**forgot** 9:8 15:16 28:4 43:7
**forgotten** 43:9
**form** 72:14
**found** 95:19
**four** 38:12,13,14 38:15
**fourth** 98:5
**frantic** 42:18
**front** 64:3
**further** 88:12,14
**furthest** 14:4
**fussing** 37:8

G

**G** 5:1
**getting** 6:10 28:1 29:1 39:4 80:19
**give** 41:4,7 44:9 69:7 70:17 71:7 71:21 93:18 96:14
**given** 27:9 68:10 80:13 84:14 99:6
**giving** 7:22 10:3 38:17,17 39:15
**glass** 44:9,10
**go** 8:1,2 9:5 10:12 10:13,16 11:17 15:14,18 16:2 17:18 18:15 19:15 20:11 21:5,8 22:5,16 22:17 23:12 25:13 26:3,22 28:7 33:22 34:14 37:11 39:3,5,6,7,8,16 41:22 42:10 44:13 45:6,19 45:21 46:5 50:3 60:9 61:6 68:15 70:18 77:18 84:15,19 85:1 85:18 86:8,10 86:19 87:7 93:12 97:14
**goes** 46:18 76:20
**going** 5:6,7 8:2,11 8:13,14 10:6 15:12 17:2,4,6 18:21,22 19:21 19:22,22 20:3,5 20:6,7 22:3 23:21,22 24:10 24:16,18,19 25:13,15,16 26:1,2,4,22 27:9 27:10 28:12 34:3,12 38:19 38:20 41:4,5,7 43:6 44:4 45:6 46:7 51:1 54:1,6 54:10 62:9 74:2 74:4,18 85:7,8 85:14 86:7 87:7 87:8,9 94:2,10
**gonna** 32:9
**good** 18:17
**gotten** 8:9 10:14 12:6 14:2 38:21 38:22 55:20 57:10 58:16 59:3
**granted** 29:5
**great** 27:14
**greeted** 6:13
**Grimke** 2:7 26:22 27:10
**Group** 3:4
**guess** 8:5 23:9 32:13 42:19 66:3 98:5
**guy** 13:19 28:15
**guys** 13:14,18

H

**H** 4:4
**hadn't** 11:5 35:14 37:14 58:16 84:16
**hallway** 21:8,9 22:13 38:20
**hand** 51:4 62:4 96:1 99:10
**handed** 63:14 76:2 83:7 91:8
**handwriting** 16:6 16:9,12,18 74:21
**hang** 77:18
**Hannon** 3:3,4 5:2 5:4,11,18 6:3,8 8:16 9:9,14,19 9:21 11:4,8,17 11:21 12:3,8,12 12:16,18,22 13:4,11 14:9,13 14:15,17 15:1 15:10 16:1,7,11 16:14,17 17:17 17:22 19:1,9 20:12,15,18 21:1,20 22:7,10 23:5,19 24:1,13 25:5,22 26:7,10 26:19,21 27:3,6 27:15,20 28:5 28:16,18,22 29:4,7,10,14 33:1,6 35:21 40:12,19 41:15 43:19 47:2 49:22 54:17 58:11 59:5,8,10 59:14 63:15 64:16,22 67:15 68:8 69:18,21 70:1,9,14 71:20 73:6 74:14,16 75:8,13,16,19 75:22 77:18,22

78:14 79:4,14 79:17,19,22 80:6,22 81:6,18 81:22 82:3,13 82:17,22 84:7 84:11 85:2,8,10 85:15 86:1,11 86:22 87:17,21 88:1,8,21 89:13 90:7,16 91:13 91:16,19 93:22 95:11 97:11,12 97:20 98:1,11 98:14
**happen** 18:22 26:18,18 59:17 61:2
**happened** 14:3 15:7 16:19 27:15 36:4,10 51:11 61:21 72:6 83:18 85:16,20 86:12 91:2,6 95:9
**happens** 43:10 86:6
**happy** 27:11
**hard** 18:16 21:14 21:15,16 39:15 41:4,8
**hardhead** 62:12
**harm** 96:7
**hasn't** 93:11
**Hatton** 1:6 2:2 5:3,3,6,10,17,20 6:7,11 8:19 9:11 9:17,21 10:21 10:22 11:6,10 11:19 12:1,5,11 12:15,20 13:1,7 13:12 14:12,14 14:16,21 15:2 15:12 16:4,8,13 16:15,19 17:19 18:2 19:3,11,17 20:14,16,22 21:4 22:9,11 23:21 24:2,21 25:8 26:2,9,12 26:20 27:2,5,7 27:17,22 28:8 28:17,19 29:3,6 29:9,12,17,22 30:7,11,14,17 30:20 31:2,5,20 32:18 33:4,9,13 33:15,18,22 34:16,18 35:11 35:13,16,20 36:3,10 37:7,11 37:20 38:2,7,11 39:12,19 40:2,6 40:8,13,15 41:1 41:14 42:2,9,14 42:21 43:2 44:6 44:8,18,20 45:1 45:9,20 46:3,6 46:13,16 47:11 47:14,18 48:7 48:10,14,17,21 49:2,10,13,16 49:19 50:13,15 50:22 51:14,16 52:1,4,8,18,21 53:8,11,16,18 54:9,12 55:1,8 55:14,22 56:2,7 56:9,13 57:1,7 57:11 58:1,20 59:4,7,9,12,22 60:2,15,19,22 61:4,15,19 62:3 62:18 64:21 65:18,21 66:3 66:12,18,21 67:4,12,20 68:6 68:16,19,22 69:3,6,9,12,17 69:20,22 70:2,8 70:16 71:5,9,12 71:14,17 72:22 73:2,10,13,17 73:21 74:2,5,7 74:13,18 75:2,5 75:10,15,18,21 76:4,8,11,13 77:1,5,17 79:4 79:13 81:10,17 82:17 83:5,14 84:18,21 85:7,9 85:12,20 86:7 86:13,20,22 87:5 88:7 89:8 89:11,16,21 90:3,15 91:11 92:6,10 93:21 95:8 96:14,20 97:13,22 98:2 98:16
**Hatton's** 82:8 83:3
**haven't** 56:20 84:12 93:15
**headed** 92:12
**health** 3:13 94:1,1
**hear** 32:17 96:18
**heard** 14:5 87:13 91:19 93:15
**hearing** 3:11 5:2 5:4 29:2,3,10 66:2,3 67:11 78:22 83:4 95:13 96:16,17
**Hearings** 28:6
**hectic** 24:12
**held** 2:4 44:1
**hell** 39:3,7
**Hello** 19:17 52:8
**help** 5:7 19:17 28:13
**helpful** 73:7
**Henry** 3:12 13:10 25:5,8 77:19
**hereunto** 99:10
**here's** 68:3
**He'll** 47:2
**he's** 10:17 20:1,10 58:2 85:7,8,9 91:13
**Hill** 5:22
**hired** 15:8
**hit** 38:21
**Hold** 71:20
**Holmes** 23:6
**home** 26:12
**homes** 15:4
**honest** 14:6 21:4 41:1 43:3 54:12
**honestly** 55:14
**hook** 18:13 43:8
**hope** 96:12
**hours** 78:10
**housed** 50:18 64:6 65:16 66:16 71:2
**housing** 79:11 81:15 88:15,16 88:20 89:7 98:9
**Huh-uh** 26:20 71:17
**human** 96:1
**humiliate** 96:10
**hurt** 12:7
**husband** 15:5
**hypothetical** 84:7 85:16
**hypothetically** 84:13

**I**

**identify** 45:2
**identifying** 24:8
**important** 15:6 97:20
**include** 88:16
**included** 45:13 78:18,18 79:5 81:11 90:19
**includes** 77:14 93:12
**Including** 75:19
**incompetent** 80:18
**incomplete** 94:20
**inconsistent** 71:21 82:15
**incorrectly** 43:1
**indicates** 92:4
**indicating** 30:9
**individually** 88:18 89:6
**indulging** 96:12
**inferences** 94:20
**infirmary** 7:15 8:1 17:3,4,7 18:1 19:16,20 20:4 23:12 32:15 43:16 44:5 45:6,7,19 49:9 50:3,7,12 54:1,7,8,11 60:10 68:15 74:5 79:11 81:16 84:15,19 85:1,18 86:2,3 86:10,19 87:8 91:22 92:1,13 92:16,17 95:3 97:14
**inform** 70:4
**information** 62:1 64:12 74:11 78:7,8 80:18 85:5 90:22,22 91:5 94:20
**informed** 32:11 66:13
**initial** 53:3 54:4 55:9 58:9 61:22 70:19 75:7 85:22 86:4
**initialed** 15:20,21 17:12,13,13 49:5 51:7,8 53:3 56:2,5,5,11 57:1 57:6,9,12,13 59:13 61:10,10 61:11,15,18 62:8 71:22 74:22 76:10,13 84:2 86:9 92:9 92:11
**initials** 55:11,13 55:16 56:16,17 74:20 76:14 77:3,8 83:12 84:16 85:19 87:1 91:5
**inmate** 6:5 8:9,21 14:6 16:20 17:2

17:10,11,16 19:4,13,19 20:3 20:16 21:12 23:12,16 24:4,4 24:8 25:11 31:12 32:12,13 37:9 43:11,12 43:13,14,15,16 44:8,12,14,15 46:5,6 50:18,19 51:2,3,12 52:11 53:22 54:1,4,14 59:21 60:17,21 61:5 62:4,5,21 63:4,11 64:6,9 65:3,12,16 66:16 68:21 70:11,17 71:1 72:21 75:5,6 76:19 77:9,15 79:10 81:14 82:10 83:6,16 83:16,19 84:19 85:13 86:1 88:19 89:7 90:1 90:4 91:3,8,8,22 93:15,17 97:5
**inmates** 6:14 7:14 8:1,18,22 9:2,4 9:6,7,10,22 10:1 10:11 11:12,14 13:21,21,22 15:18 19:15 20:20 22:17,20 22:22 23:1,7 30:1,2,10 31:9 31:21,22 32:2,3 32:20 34:1,2,3,5 34:10,11,20,20 34:21 35:3,4,5,6 35:10 36:18 37:18,19 38:5 38:13 39:1,14 39:14,15 40:21 41:3,3,18,20 42:7,12 43:5,6,7 43:17 44:4 45:5 45:11,18,21
46:9,10 49:12 49:15 50:8 60:9 62:9 82:20 86:14 87:15,16 88:3,5 93:12
**inmate's** 17:2,10 20:8 22:2 24:6 44:11,11 53:19 66:7 67:20
**inside** 18:11
**instance** 56:15
**institution** 28:12
**instructions** 97:18
**intelligent** 95:16
**intentionally** 96:10
**intercom** 9:1 13:20
**interest** 99:8
**Internal** 31:15
**interrupt** 40:5 43:19 59:5
**interrupting** 67:22
**interview** 63:19 63:21 64:18 66:5 68:9
**interviewed** 47:10,20,21
**interviews** 47:8 65:15 90:21
**introduced** 20:1
**invalid** 56:12
**investigation** 14:10,22 79:8 80:3,17 81:3,12 81:20 88:12,13 88:14 94:17
**investigator** 47:13,16,16 48:2 68:12,17 68:20 69:1,4,7 69:10 78:9,10 78:13,17
**investigators** 47:7 47:17,19 64:19 78:21 80:13
90:13 93:5
**isn't** 61:3
**issue** 77:12
**it's** 13:11 14:7,7,8 14:19 15:6 18:16 19:6 21:9 21:10,14,15,17 22:2 23:18,21 23:21 28:1,2,2 35:6 38:9,11,12 38:12,14 39:12 39:19 40:15 41:2,6 42:21 43:2 44:9 45:2 46:5 50:5 54:3 66:1,3 67:10,12 67:15,21 71:20 81:22 84:7 85:20 86:8 87:3 93:7 94:3 95:13 96:15 97:7
**I'll** 42:13
**I'm** 5:7,8 6:18 9:5 10:20 18:3 19:20 20:4 25:13,19 26:9 30:15 35:3,8,21 36:13 38:13,14 38:18,18,21 39:1,7 40:5,16 42:15 43:9,20 51:1 52:6,9 53:4 53:17,20 54:14 56:4,19 57:15 57:21 58:14,14 62:11,12,19,20 63:9,12,16,16 65:5,8,22 66:9 66:10 67:9,16 67:19 68:3,5,7 68:10 69:12 70:20,21 72:3 72:15 74:8,17 74:18 75:10,11 76:15,16 77:10 77:21 78:6,7,19 79:4,16,20 81:6 81:10 82:5,6
83:3 90:9,9,10 90:10,11 91:1
**I've** 37:9 96:22

J

**J** 3:3
**jail** 18:11 21:15 21:16 23:11 33:19 34:7 59:6 94:9
**job** 1:20 15:3,3,5 18:17,18 25:9 25:10 27:12,18 28:11,11 55:15 56:18 67:18 68:1 87:1 93:7 94:13 96:21
**jobs** 95:17
**Jones** 6:5,10 10:14,16 12:15 14:11 16:2 19:19 20:4 33:2 33:5 34:22 36:19 37:6 50:18,19 51:12 52:11 57:18,20 62:21,22 63:4 63:11,11 64:6,9 65:4,12,16 66:16 70:11 71:1 72:21 77:15 79:10 81:14 82:11 83:6,17 91:3,8 92:18 94:14
**Joneses** 12:17,18 13:2
**jotted** 54:2
**judge** 28:8,9 29:11
**July** 1:10 99:11
**June** 6:5 41:11 42:3 45:3,17 46:8,15 47:9,9 62:22 63:20 64:2,4,4,5 65:4 68:9 70:12,15 71:19 72:20,20
78:10,12,16,21 78:22 90:13,13 91:9
**juveniles** 6:1

K

**keep** 31:6 64:17 97:4
**keeping** 9:15,17
**key** 95:1
**kids** 15:4
**kill** 60:8
**kind** 24:14,16,17 24:18
**knew** 11:13 32:10 34:7 37:18 42:5 49:4 54:6
**know** 6:14,19 7:6 7:15,16 10:1,2 11:21 12:1,7,15 13:1,7,13,18,19 13:21,22 15:17 16:16 17:4,5,7 17:20 18:20 19:16,20 20:4 20:17,19 21:5,6 21:22 22:6 23:13,15,19 24:2,15 25:1,2,8 25:17 26:14 27:13 28:14 31:6,14 32:6 33:7,9,10,11 36:15 38:5,22 39:4,22 40:6,20 41:11 42:4,12 45:2 47:18,20 49:6 51:5 55:14 56:13,14 59:22 60:3 64:21 65:18,21 66:4,6 66:21 67:6,10 67:16 69:1 70:4 73:13 74:9 75:10,12 82:19 83:2 85:6 86:12 90:8,15 92:6 93:4,11 96:18

97:1,7
**knowledge** 7:17
**known** 70:6
**knows** 18:22 68:6 86:11

L

**lady** 47:22 48:1,2
**late** 25:2
**Laurie** 1:22 2:17 99:4,16
**Law** 3:4
**lawyers** 95:22
**leadership** 94:8
**learn** 26:11
**learned** 80:15 92:15
**leave** 12:19 21:18 27:8,18 39:7 60:9 77:15 79:10 81:15 86:19 87:8,9 91:10
**leaves** 21:12
**leaving** 6:5 44:4 45:5,12,18 46:11 76:7 86:17
**left** 44:15 56:15 75:9,14 83:11 85:4 87:2 92:12
**Lesansky** 3:12 5:3,7 6:8 10:20 13:10,11 14:18 14:20 19:19 29:15 30:4,9,13 30:15,18,21 31:4,17 33:12 33:17,20 34:12 34:17 35:8,12 35:14,17 36:1,5 37:16,22 38:4,9 39:10,17,20 40:5,10,14 41:9 41:18 42:3,10 42:15,22 43:22 44:2,7,16,19,21 45:3,10,22 46:4 46:8,14,17 47:4 47:12,15 48:1,8 48:11,15,18,22 49:7,11,14,17 49:20 50:5,14 50:16 51:10,15 51:21 52:3,6,10 52:19 53:6,9,14 54:6,10,16,19 55:2,11,19 56:1 56:4,8,10,19 57:3,8,15 58:2 58:13,21 59:15 60:1,11,16,20 61:1,13,16,20 62:11,19 63:16 64:21 65:20 66:1,10,14,19 67:1,9,14,19,22 70:7,20 71:6,10 71:13,15,18 72:2 73:1,3,8,12 73:15,19,22 74:3,6,10,15 75:2 76:1,5,10 76:12,15 77:2,6 77:21 78:6 79:15,18,20 80:5,22 81:9,19 82:2,5 83:1,2,6 84:9,20 86:15 87:11,19,22 88:9 89:2,9,18 90:2,6,9,17 91:15,18 96:14 98:12
**letter** 46:18,19 47:6 53:16 54:20 57:16 63:22 68:3 70:9 72:15 77:11 78:18 79:7,21 81:4,7,8,11,11 81:21 90:18
**let's** 56:14 77:18
**list** 12:19 80:11
**listed** 80:9
**listen** 34:16 40:13 40:13
**listening** 10:20
**little** 34:13 38:16 96:12
**load** 7:15
**locating** 8:18
**location** 8:18
**lock** 8:6 9:1,4 13:21 34:1 39:14,14 40:17
**lockdown** 8:17 9:19,21 33:14 33:15,15,17,21 34:2,8,15,18 35:5,7,9 36:21 38:9,11 39:18 40:3,9,16,22 41:2,2,10,11,13 41:21 42:4,6,6 42:16
**lockdowns** 34:15 39:21,22 40:20 41:13,19 42:17
**locked** 8:20 10:11 34:19 35:2,4 36:22,22
**locking** 8:8 9:6 13:22 14:1 33:19 41:3
**log** 11:4,18 43:5
**logged** 10:15,17 10:21 36:19
**logging** 10:7 11:9 11:10 36:19
**log-in** 10:8 11:2 20:8 43:4
**lollygag** 85:10
**long** 21:9 34:1
**look** 21:9 44:10 44:11,12,13,16 44:19,22 45:15 45:16 53:21 54:2,2,3 56:17 66:8 67:2 74:16 76:3 95:5 97:1
**looked** 16:6,14,15 16:15 28:9 45:13,14 55:5 73:4,9 76:3 83:8
**looking** 26:12 38:18 72:20 91:4,6
**looks** 74:20,20
**lot** 18:12 20:18 66:4
**loudspeaker** 33:13 34:19 39:13
**love** 15:3,5 25:9
**low** 76:21 83:20 94:10
**lunch** 22:16
**L.L.P** 3:4

M

**maintaining** 88:4
**Major** 8:10,10 34:9
**making** 42:22 47:5 55:8,13,17 62:13 91:13 94:4
**Makins** 3:2 6:16 6:19 7:1,5,14,22 9:5 10:12,17,22 15:19 16:21 17:4,6 20:9 29:18 31:1 32:11,12,18 34:6 35:2 36:7 37:3,5 43:12,13 45:21 48:12 51:4,16 53:21 57:12 61:6,16 62:3,5,8 63:2 65:10 66:6,13 66:18,20 67:7 68:13 69:15 70:3 73:13,15 82:10 84:15,18 86:21 92:3,8
**male** 7:9
**man** 24:7 31:10 32:9,10 33:11 52:9 85:1
**March** 46:19 54:21 77:11 79:7 90:19 99:12
**marked** 12:14
**matches** 45:15
**matching** 44:13
**matter** 47:8
**may** 19:17,18 25:3,3 31:6 40:2 43:7,8 67:5,5 78:22 79:1,3,14 79:17
**mean** 25:13 34:9 60:6 61:11 68:3 74:22
**means** 87:2
**meant** 25:12 32:5 56:4
**medical** 6:6 14:10 92:20 94:4,4,6 94:15
**meeting** 75:3
**memory** 65:8
**men** 98:10
**mention** 22:19 87:22
**mentioned** 29:17 87:12,13
**mercy** 96:21
**met** 26:7 95:14
**MICHAEL** 3:3
**mind** 14:4 31:6 64:17
**minute** 26:9 35:20 36:11,11 40:19 90:16
**minutes** 53:19
**missing** 13:6
**mistake** 10:18,21 11:9,10 12:16 12:16 31:12,13 35:2 36:21
**moment** 43:19 60:13 68:8 73:5
**mopping** 23:1
**morning** 6:15,21 22:15 62:14 72:8,20

**mouth** 55:4 57:4 59:2
**Movement** 9:15 9:18,20 17:15 20:13 44:15
**multitasking** 18:14
**Murphy** 27:4,5
**music** 22:18,19,20

**N**

**N** 3:1 5:1
**name** 13:9 15:16 19:18 73:14,16 73:20,22 74:1
**names** 10:7 13:2 49:11,17 50:7,9 50:9
**need** 19:19 20:3 26:3 43:20 67:11 86:8
**needed** 57:1,5 58:8 62:2
**needs** 68:15
**neglect** 18:19
**negligence** 46:22 77:13 80:10 93:6
**negligent** 6:4 17:21 18:19,21 27:19 28:10
**neither** 13:14 99:7
**nerves** 39:4
**never** 13:13,16 14:5 23:9 25:18 26:4 28:14 29:7 29:9,10 49:4 67:8 85:20 86:9 86:9,12,13
**new** 32:19 33:1,7
**news** 26:8,15,15
**normal** 7:10 41:7 41:14 44:3 98:8
**normally** 46:2 86:14 97:6
**nosy** 38:18
**notarial** 99:10
**Notary** 2:19 99:3 99:16
**notice** 2:17 46:20
**notion** 13:5
**number** 20:6 24:6 63:2 65:10,12 71:1
**N.W** 2:6 3:5,15
**N119** 2:7

**O**

**O** 5:1
**Oak** 5:22
**obligation** 95:3
**observations** 24:14
**observed** 48:12 50:19 52:11 64:9 70:10 71:3 78:1
**obvious** 11:8
**obviously** 80:15
**occasions** 40:21
**occurred** 64:13 78:9,11
**occurring** 6:9
**occurs** 85:16
**ODR** 22:14,16,21 23:5
**offered** 79:9 80:20 81:13
**office** 22:12 23:4 23:6,7,7,10 28:6 43:20
**officer** 3:11 5:4 7:9 21:10,11,19 21:21,22 22:1,3 22:5 46:1,3 60:13 61:17 62:14 63:1,6 72:7 76:19 77:9 83:17 84:4 88:15 91:9 92:8 93:12 98:5 99:4
**officers** 8:11 9:1 21:17,18 34:4 34:19 61:6 88:3 91:20 92:14 93:18 94:10 98:5,8,10
**officer's** 23:8
**offices** 2:4
**official** 6:20,22 75:20 86:4
**Oh** 35:20 43:22 66:10
**OIA** 47:7 65:15 78:10 79:8 80:13 81:2,3,12 81:20 88:11,13 88:14 93:5 94:17
**OIC** 46:4
**okay** 6:3 9:8 10:10 13:12 14:6,17 16:7,11 18:4 19:7,9,21 20:10,15 21:4,6 21:21 22:4 24:1 25:2 26:10 29:14 32:7,14 32:21 34:17,20 34:21 35:1 36:15 38:20 43:22 44:11,16 45:21 46:4,5,17 47:12 48:1,1,2 48:11,19 50:3 50:13,16 51:10 52:10 57:3 59:10,14,15 61:7 62:11 65:20 66:1 67:1 67:6,9,10,12,19 69:14 70:1,20 71:10 73:12 75:2,22 76:1,5 77:22 78:5 80:7 84:20 87:11 88:8,9 90:2,6 91:19 95:11 98:11
**once** 6:22 7:9,17 8:17 10:13 21:12,17 24:5,8 32:3,4,8 35:4 36:21 61:7
**open** 17:2,6 51:5 51:17,18 52:15 52:19,21 58:3,3 59:19 60:5,6,9 61:3 62:15,15 63:7 64:7 65:11 66:7,13 67:7,16 67:20 68:7,14 70:4,5 71:1 72:11 76:19 77:3 83:18 84:4 87:10
**opened** 17:8,10 50:17 51:5,15 51:18,19,21 52:1,15 57:22 59:6 63:1 64:5,8 65:6,16 66:8,15 67:8 71:2 72:10 78:1 91:9
**opening** 60:14 68:18 69:16 72:7,9 82:9 87:6
**operations** 7:11
**opinion** 80:4,7
**opportunity** 96:15
**oral** 1:4 2:1 5:2 98:15 99:5
**order** 70:18 72:10 77:3
**orders** 97:17,21
**ordinary** 16:17
**original** 30:11,13
**outcome** 99:9
**outside** 21:20 53:4
**overlooked** 24:22

**P**

**P** 3:1,1 5:1
**pace** 18:16
**Page** 47:6 48:3 53:16 54:20 57:17,20 64:1 66:15 68:8 70:9 77:10,20 78:18 79:6 81:11 88:10
**pages** 1:21 47:1
**paper** 11:1
**paperwork** 28:9 66:5 93:3 97:9
**paragraph** 48:4 49:21 50:17 63:17 77:21 79:6 88:10
**part** 14:19,21 15:5 45:22 47:2 55:13 63:17 76:17,18 83:14 83:15,22 89:5 89:10 93:7
**participated** 18:5 18:6
**particular** 13:4
**parties** 99:8
**pass** 6:6,10 14:10 14:10,19 15:16 15:17,19,20,21 16:2,3,5,10 17:11,12,13,13 17:14,14,15,18 17:19 18:5 19:10,12,12,13 20:6,7 21:2 22:2 22:2,3,4 38:17 44:9,10,11,19 45:16,19 46:11 49:3,5 50:21 51:6,7,8,13,13 52:12,14 53:2,3 53:12,13,15,20 53:20,21 54:2 54:22 55:3,5,7,8 55:9,13,16,17 55:21 56:6,11 56:12,16,17,17 56:21 57:1,5,13 57:14,17,18,19 57:20 58:2,9,9 58:18,21,22 59:12 61:2,10 61:13 62:2,13 62:16,20 63:5

Case 1:07-cv-01031-RMU Document 18-20 Filed 12/20/2007 Page 35 of 39

63:13,14,14 64:11,20 65:2,3 65:4,9 66:9 69:8 69:10,11,13,19 69:22 70:3,13 70:17,19 71:7,8 71:9,11,13,16 71:21,22 72:1 72:18,19,21 73:4,5,9,14,16 73:17,19 74:15 74:16,22 75:1,4 75:6,6 76:2,6,9 76:13 77:8,14 78:3,4,4 83:7,8 83:10,13,16,19 83:22 84:2,4,8 84:10,12,14,17 84:21 85:18 86:3,20 87:2 91:3,7,22 92:7 92:12,20 93:13 93:18 94:15
**passes** 7:14,17,22 9:7,10 10:4 11:14,18 15:18 29:21,22 39:1 44:3 45:5,11 48:5,6,13
**passion** 96:13
**patient** 24:5
**people** 20:18 26:17 41:16 45:4 47:21 66:6 80:2 85:6 95:15
**performance** 5:15
**person** 7:8 47:19 59:19 60:20 63:1,3,7 72:7
**personally** 41:19
**phone** 17:22 18:3 18:13 19:13 21:7 22:11,14 23:2,8,9,13 34:6
**phones** 21:6 22:10 23:10,14 43:8
**Ph.D** 3:12
**pick** 72:17
**picture** 72:16 91:2
**place** 24:21,22 36:16 37:15
**placed** 27:18 98:9
**plan** 21:15 92:19 94:15
**playing** 22:18,19 22:20
**please** 65:8,20
**plussed** 30:2 31:11,12,21 32:2,10,12 37:6 37:9
**plussing** 39:2,2
**point** 13:4 33:14 40:11 53:15 55:12 60:17 71:6 72:19 76:16 79:22
**policies** 80:11,12
**policy** 80:11
**political** 96:6
**pop** 60:5
**portion** 75:19
**position** 46:21
**possibility** 19:5,6
**preparation** 64:18
**prepare** 48:12 94:21
**prepared** 30:19 36:6 48:16
**preparing** 30:5 31:19
**present** 95:5
**presentation** 1:4 2:1 5:14 98:15 99:5,6,6
**presented** 5:12 14:20 92:9
**presigning** 7:14 7:17
**printed** 90:21
**prior** 41:10,19
**probably** 16:5 33:18 38:18
52:4,8 93:10 94:17
**problem** 12:4
**procedure** 24:15 57:18
**procedures** 93:12
**proceeded** 9:4
**process** 27:20,22 28:6 44:3 45:8 45:11,13,17,22 46:11 55:6 57:16 58:17 62:12 76:17,18 83:14,15,22 96:3,5
**Professional** 2:18 99:4
**professions** 95:20
**Program** 88:2 93:2
**progressive** 24:14
**properly** 88:22 89:3,14,17
**provide** 91:1 96:17
**provided** 74:16 78:8
**provision** 93:2
**psychologists** 95:21
**public** 2:19 99:3 99:16
**purposes** 96:9
**pursuant** 2:17
**put** 9:11 10:4 11:3 13:20 15:13,20 16:18 20:7,12 30:1 32:20,22 35:1 36:12 43:7 44:15 55:4 57:4 57:13 59:1 61:22 62:2 66:22 72:1 74:7 74:10,12 75:11 75:14 76:6,13 77:7 83:12 84:1 84:16 85:3
**putting** 67:17 85:18 91:5
**p.m** 1:11 98:16

**Q**

**question** 11:8 22:7 41:15 46:17 70:7 84:2 84:5,8,13 87:13 88:20 89:4 95:6
**questioned** 86:13
**questions** 25:6 41:22 47:4 68:10 70:21 72:3 78:7,19 79:16 81:2,10 82:3,6 86:15,16 86:18 91:17
**quickly** 10:3 32:1 32:2
**quote** 57:5 88:5
**quoting** 48:4 68:11

**R**

**R** 3:1,12 5:1
**raised** 95:17
**read** 70:14 77:12 78:15 80:7 81:1 81:7 93:1
**readily** 86:22
**reading** 77:10 79:20 81:6
**ready** 39:5
**real** 10:3 35:9
**realize** 31:14
**realized** 10:14 12:13 32:3
**really** 12:21 13:1 14:5 16:4 27:14 46:18 56:14 82:22 97:1,3
**Realtime** 2:19
**reason** 16:11 74:19 85:2
**reasons** 79:3,4
**recall** 6:9 7:1 14:20 16:20,20 19:1,3 31:20
47:18 48:5 50:2 50:11 51:3 68:12 69:19 76:8 78:20
**recalled** 72:5 78:9
**receive** 27:11 94:2
**received** 5:15 19:1,3 49:8 50:2 50:6,11 92:4,5
**recognize** 13:16
**recollect** 63:18
**recollection** 48:9 51:11 82:8 83:4 85:17
**recollections** 72:17
**record** 5:13 14:19 14:22 15:6 44:1 49:22 50:4 95:12 98:14 99:6
**recorded** 66:5 90:21
**recount** 37:1
**redid** 11:4 32:20
**redo** 11:1 29:19 31:3 32:19 37:12
**reduced** 99:7
**reference** 30:6 81:12
**referenced** 70:8
**referring** 90:10
**reflected** 70:12 90:17,20
**regarding** 47:8
**regardless** 41:5 67:5
**Registered** 2:18 99:4
**regulation** 80:1 92:21
**regulations** 94:13
**related** 42:7 82:4 86:16 99:8
**relevant** 72:16 87:4

**remember** 7:18 14:18 15:17 16:1,3,4 31:18 47:17 53:18 54:13 67:15 68:18 70:16 73:15,17 82:18
**report** 27:9 34:20 34:21 64:18 94:21
**reported** 1:22 6:17
**Reporter** 2:18,19 99:3,4
**request** 7:9 35:18 92:2 93:3
**requested** 65:11 92:16
**requesting** 7:7,8
**require** 94:5
**required** 72:9,11 76:18 77:3 94:14
**requires** 92:21
**responsibility** 88:5,17
**responsible** 88:4
**Restless** 26:13
**result** 94:18
**return** 8:22
**returned** 11:5
**returning** 9:10
**Review** 29:5
**reviewing** 57:19 91:4
**Ricardo** 6:5,9 10:14,16 14:11 16:2 19:19 20:3 33:2,4 34:22 36:19 37:6 50:18 57:18,20 62:22 63:4,11 64:6 65:3,12,16 66:16 71:1 72:21 77:15 82:11 91:3 92:18 94:14
**RIF'd** 5:21
**right** 8:12 10:6 12:3 13:15 20:14 22:11,12 23:3,6,7,8,18 25:21 27:1 28:8 30:17 31:2,7 33:19 35:8,19 35:20 36:3 38:13 39:8 40:10,13 41:3 42:14 44:19 46:6 48:21 49:10,16 50:5 50:22 51:14,16 52:21 55:3 57:7 60:3,11 62:9,17 62:18 69:16 71:12,14 74:14 81:9 82:3 85:15 86:13 88:6 89:16 91:7 97:22
**ringing** 18:13 43:8
**roll** 22:14 98:3
**room** 2:7 13:15
**rule** 80:1 92:21
**rules** 94:13
**running** 49:18 50:10
**rush** 10:2
**rushed** 31:22 32:1 32:1
**rushing** 10:1

**S**

**S** 3:1 4:4 5:1
**sad** 23:15
**Saturday** 47:8
**save** 9:13
**saw** 65:3,3 83:8
**saying** 17:3,5 25:19 26:18 29:20 37:9 38:13,14 39:7 39:21 40:8,16 40:17 41:16 43:9 48:4 51:4 51:10 55:17 59:16 61:17 64:1,14,22 65:2 71:7 80:4 81:10 82:5 84:1 87:5 97:4
**says** 49:8,21 50:6 50:17 52:10 54:19 58:19 66:14 70:10,13 75:9,19 80:2 81:3,19,21 82:10 88:11 89:2 93:2,17
**scenario** 38:16
**scheduled** 79:11 81:15 82:19,20 97:5,6,10,14
**scheming** 96:10
**seal** 99:10
**second** 47:21 77:21 79:6 87:19 88:10
**secured** 59:18
**see** 14:10,12,15 15:2,12 24:4,10 25:11 26:3 28:9 33:10 45:14,15 49:2 53:12,16 64:19 68:20 73:8 91:21 98:7
**seeing** 53:13
**seen** 13:13,16 28:10 49:3 73:11
**send** 93:4
**sent** 70:10 92:2
**sentence** 47:6 50:1 81:19 88:21
**sequence** 63:18 72:4 82:9
**sergeant** 6:16,17 6:19 7:1,5,14,22 15:19 20:9 29:18 31:1 32:11,12,18 36:7 45:20 46:1 48:12 51:16 53:21 61:6,16 62:3,5 63:2 65:10 66:6,12 66:18,20 67:6 68:13 69:15 70:3 73:13,15 82:10 84:14,18 84:22,22 86:21 92:3,8 97:17,18
**serious** 15:3
**serve** 96:8
**Services** 3:13
**set** 99:10
**SE-1** 88:16
**SH** 75:12 76:14 83:13
**Shantell** 1:6 2:2 5:3 98:16
**sheet** 9:15,18,20 10:8 11:2 17:15 20:8,13 29:19 29:20 30:2,5,7 30:12,13,19,22 31:5,19 32:18 32:21 33:1,4,7 36:6 37:11 42:22 43:4,7 44:15 49:18 50:10
**sheets** 36:9
**she's** 6:17 21:11 82:14,15 90:8
**short** 7:2,6 34:5 98:8
**SHORTHAND** 99:3
**short-handed** 7:5 18:9
**show** 11:4,6 22:3 95:2
**showed** 15:15,16 33:2,4 65:1 75:4
**shows** 82:7
**sick** 12:18 27:8 93:14,17
**sign** 16:5 56:2 58:9 61:1 85:21
**signature** 61:17 75:20
**signatures** 91:6
**signed** 15:19 55:15,20,22 57:12 61:11,14 61:16 74:22 84:14,22 86:3,8 86:21 92:7
**significance** 96:8
**signing** 16:3,5
**sir** 5:10,17 6:7,11 10:19 15:2 17:20 18:3 19:14 22:1,13 24:3 27:13 29:6 29:12 31:6,20 37:21 38:12 39:7 40:15 41:1 43:3 44:18 45:9 49:3 53:1 54:12 55:10 56:13 59:22 62:5 65:18 68:6 69:17 74:7,18 76:4,9,11 79:13 79:18 84:11 88:7 90:15 95:9 96:21
**site** 24:22
**sitting** 5:8
**situation** 37:13 38:9,11 96:6
**six** 82:13,14
**skip** 49:20
**slide** 44:9,10
**slow** 18:15
**sneak** 23:2
**society** 96:8
**somebody** 13:6 14:2 25:15 28:13 34:9,10 37:4 38:21 41:5 41:6 85:3,17,21 85:22 86:5 87:3 92:1 94:10 95:2
**sorry** 9:5 35:21 40:5 56:4 58:14

63:16
**sound** 31:7 59:1 60:3 91:12
**sounds** 58:15
**South** 8:12 12:6 38:21
**Southeast** 6:12 8:16 76:20 83:20 88:15 91:21 97:7
**so-and-so** 24:10
**speak** 52:3,4,7
**speaking** 7:2 82:21
**specifically** 80:9 83:17
**specification** 72:14
**specifications** 47:1 68:4 79:5 90:19,20
**spending** 79:5
**stabbed** 8:9 12:6 14:2 38:22 41:6
**standing** 39:4 62:9
**started** 5:20 7:22 26:16 27:20,22
**starts** 47:7
**stated** 48:5,11 49:8 50:1,10,19 52:10 54:21 64:9 70:10 78:1 78:3 90:12 98:3
**statement** 76:17 88:2,11 89:12 91:14 93:2,13 96:4
**statements** 47:5 72:14
**states** 88:3
**stenographically** 99:6
**step** 61:20
**steps** 62:4,6
**stewards** 22:21
**stop** 32:7,9 65:19
**stopped** 98:6
**stories** 26:13,14
**story** 5:7
**Street** 3:5
**submission** 5:12
**successful** 18:18
**suggest** 93:5
**suit** 13:15
**summarily** 26:8 26:11 96:11
**summarize** 91:21
**Sunday** 47:9 63:21 78:12
**supervision** 99:7
**supervisor** 46:2
**supposed** 15:13 21:10,11,19 34:5,8 43:16 45:2 58:22 85:3 97:10
**sure** 6:18 18:3 26:9,10 45:1 48:15,17,19 49:1,14 50:8 52:9 54:14,21 69:12 72:15 74:8 75:10,11 78:3 80:2,12 90:9 94:9 96:21
**surrounding** 79:10 81:14
**system** 23:20 51:19 93:8,9,9 93:10 94:11,12

**T**

**T** 4:4
**take** 15:4 41:16 41:17 43:17 53:19,20 54:17 55:3 72:19 94:11 95:1
**taken** 2:17 25:18 36:16 37:14 96:2 99:5,6
**talk** 15:10 39:8
**talked** 26:1 87:14
**talking** 30:15 37:4 39:4 40:17 57:17 62:21,21 80:16 88:12 90:10
**talks** 57:17
**taped** 47:7
**tardy** 25:3
**tear** 11:1 29:18 31:1,2 32:18 36:7 37:11
**tearing** 36:7
**telephone** 7:1 22:13 37:4
**telephones** 20:21
**tell** 5:7 6:8 8:15 10:17 14:17 15:14 19:4 20:1 20:3 24:6,8 25:13,15 30:4 30:18 31:4 36:17 42:12 43:12 44:2 47:2 51:1 70:4 73:3 73:10
**telling** 16:22 29:18 39:3,5 49:6 53:18 68:14 97:4
**terminate** 46:20
**terminated** 28:21
**terms** 6:9 8:17 73:20 87:3 91:3 91:3
**thank** 29:14,15 72:2 98:11,12
**Thanks** 29:15
**that's** 8:15 11:2,3 15:1 17:5 18:2 19:14 21:11,14 21:21 22:4,4 23:6 24:7,21 32:19 33:10 34:6 35:4 36:3 48:9,19 49:7 53:2,11,12,17 54:16 55:16 57:21 58:14 60:2,3 62:7,16 62:17 63:9 64:8 64:12 65:5 66:1 70:20 72:2,8 73:12 76:17 79:16,19 80:4,4 80:6 81:21 82:16 84:5 86:3 86:11 87:4 88:1 89:10 90:6 91:7 91:15 95:1,1 97:15,20
**there's** 21:5 22:13 23:14 24:14 28:3 82:15 93:16 94:12
**they're** 21:1,2 22:20 41:21 48:4 76:21 80:4 87:5 88:12 93:13,17 94:2,3 94:4 96:1
**thing** 14:4 18:2 24:2,16,17,18 25:18 31:9 33:10 34:3 49:2 65:21 95:11 97:16
**things** 18:14 24:9 66:4 76:5 78:13 96:9
**think** 24:13,19 25:19,20,22 29:20 32:14 34:13 36:3 38:1 40:2,11 43:11 43:13,15 55:3 65:1 73:6 80:20 83:21 87:13 90:6 91:18 94:17 95:13 96:17
**thinking** 38:21 64:13
**third** 49:21 61:20
**thought** 8:8,8,13 11:14,19 12:3,5 26:2,4 37:20 39:17 82:5 84:5 87:19
**three** 7:3,7 18:5,5 18:8 49:12,15 50:7,8 85:12 91:20 92:14 98:4,9,9
**threw** 9:12
**throw** 10:5 29:19
**thrown** 29:21
**tie** 13:15
**tier** 16:22 32:6,7 37:5,8
**time** 6:2 7:16 8:5 8:19 9:2,3 11:21 13:5,12 15:20 17:14 18:15 28:13 29:21 32:13 39:15 41:4,8 43:17 44:14,14 45:15 46:15 47:21 52:22 53:5 54:5 55:2,9,16 57:14 61:9 64:17,19 64:20 70:19 72:1 74:6,7,8,11 74:12 75:7,13 75:13 76:6,7,9 76:14 77:2,7 79:5 80:21 83:11,11 84:1 84:16 85:3,4,4 85:19,22 86:5 87:2 92:10
**timed** 15:22 17:14 51:8 61:11 74:22 86:9
**times** 47:13 82:14 82:14 90:11
**today** 59:16 64:6 64:11,12,14 65:2,7,13,17 67:9 82:16 83:4 91:1
**told** 17:9 20:2 26:5 27:7,12 31:1,2,13,15,15 36:2,7 45:12 49:19 52:14

58:3 65:1,10 66:6,6,18 67:7,8 67:16 74:20,21 83:5
**Tony** 49:9 50:6
**top** 16:21
**tore** 30:14,16,20 30:22 32:20,21
**totally** 25:19 28:2 28:2 89:12 97:15
**touching** 91:4
**tour** 6:13
**track** 9:15,17
**tracking** 51:19
**traffic** 21:12
**transcript** 64:3 67:2,3,5 68:9 69:14 70:12 78:16 80:7 81:1 82:16 87:6 90:21 99:5
**trash** 9:12 10:5,5 11:3 29:19,21 30:1 32:22
**treated** 96:6
**true** 50:22 51:9 61:3 97:8 99:5
**truth** 15:15 26:6 49:6 97:4
**try** 5:8 80:19
**trying** 31:17 35:8 38:19 42:15 56:19 57:15 58:15 62:11,12 62:19 63:9,12 63:17 67:10,19 68:4,5 72:15 74:17 76:16 83:3 90:11,12 91:1 94:21
**Tuesday** 1:10
**turn** 25:17
**turns** 41:17 54:18
**twice** 47:10
**two** 12:17,18 13:2 13:18 15:4,4 28:1 47:16,21 54:17 61:6 65:14 76:5 83:9 83:10
**typewriting** 99:7

**U**

**uh-huh** 14:14 29:22 30:14 35:13 42:9 44:20 45:1 48:10,14 49:13 50:5 56:1 69:6 69:20 71:5 72:22 73:2,21 75:15 93:21
**ultimately** 57:21
**understand** 10:18 25:19 31:18 40:16 42:15 43:9 53:13 55:18 56:20 57:15 58:6 62:12,20 63:10 63:19 64:22 75:3 76:16 77:19 78:14 82:22 83:9 94:5
**understanding** 30:21 33:12 35:17 46:9 60:11 65:7 70:14,22 76:2 89:5,18
**understood** 46:10
**unemployment** 28:16,20 29:1,5 29:12
**unescorted** 76:20 83:19
**unfair** 28:2,3
**uniforms** 27:11
**Union** 26:17
**unit** 6:5 7:3,8 8:6 8:8,12,14,20 9:7 10:2,10 11:7 13:19 14:3,6,8 16:3 21:5,18 23:13,17 31:11 31:14 32:5 34:21 35:1,1,11 36:22 37:1,2,3 43:18 57:2,21 75:9,14 79:11 81:15 87:9,9 88:16,16,20 89:7,22 90:3,5 93:18 94:1,1,15 98:9
**units** 40:18
**unsure** 48:20
**upset** 37:13
**upstairs** 23:15
**use** 22:13 23:2,8 23:12 43:4 58:18
**useful** 96:18

**V**

**valid** 55:21 56:6 56:11,18 62:17 62:20 77:8 83:16,19,22 84:4,8,10,11,17 84:21 86:20 87:3
**verbatim** 66:14 78:15,16
**verify** 55:6
**Vermont** 2:6 3:15
**victims** 96:5
**view** 55:12
**violates** 80:10
**voluntarily** 15:11 15:12
**vouch** 31:7,8

**W**

**wait** 26:9 28:13 35:20 36:10,11 40:19
**walk** 13:15 21:8,9 50:19 52:11 58:5 64:10 70:11 78:1
**walked** 28:12 62:5 68:21 69:2 78:5
**walking** 86:1
**wall** 21:7 23:11
**walls** 21:6
**want** 18:17,18,18 18:19 19:16 23:13 24:4,5 25:8 31:11 32:17 33:6 40:15 41:22 55:4 57:4 58:18 59:1 66:7 79:15 82:4,22 92:18
**wanted** 28:4 31:5 31:9 34:14 37:16,22 94:8 96:14,17,19
**wanting** 39:16
**wants** 36:9 40:20 47:3
**Warden's** 23:9,10
**Washington** 1:9 2:8 3:6,16 6:12 6:15,19,20 7:4 8:2 9:3,5 10:10 10:12,13,15 15:7,21 16:22 17:1,3,5,9,11,12 20:10 31:8 35:2 35:21 36:12,14 37:2 48:16 49:4 51:7,18 57:11 61:8,9,18 62:6,7 62:8 68:14 69:15 70:5 92:4 92:11 95:17
**wasn't** 8:14 10:15 11:16 12:20 21:16 24:22 39:5 43:10,13 43:15 48:17 50:22 92:15 94:10
**waste** 80:20
**waving** 51:3,13 52:14 58:2 62:4 65:9 66:9
**waxing** 23:1
**way** 9:5 11:20 14:7,8 22:19 23:5,18 28:3 33:22 34:10 40:21 53:11 77:10 85:11 86:2 91:22 92:6 92:14,19 97:15
**went** 5:13,22 6:13 7:10 8:5 10:13 11:15 13:3,17 14:16 17:8 28:5 32:4,5,11 37:1 37:10 55:5 61:5 69:2 74:19 77:14
**weren't** 13:5 19:10 97:9
**we'll** 39:8 95:5,11
**we're** 5:6 95:12 98:14
**we've** 82:13 85:22 91:19 96:4
**what's** 13:9 23:15 38:19 72:9,11 90:20
**WHEREOF** 99:10
**white** 15:17
**WITNESS** 99:10
**women** 91:20 95:2
**won** 27:12
**word** 58:19 68:5 84:8 91:7
**words** 29:1 55:4 57:4 59:2
**work** 15:14 18:8 19:7 21:3 25:3 26:1,3,4 27:1,8 28:7 60:4 98:3,4
**worked** 5:19 18:6 18:7,9,10 19:8 56:20 95:22 98:4
**working** 7:4 68:13
**worry** 11:1
**wouldn't** 19:9

42:10 56:16 59:10 67:8 70:3
**wristband** 44:17 45:14
**write** 20:6 38:15 44:14 87:1
**writing** 9:22 10:7 93:16 94:7
**written** 5:11,14 50:9 54:3 64:14
**wrong** 23:18 24:16,17,19 25:11,20 36:13 37:21 65:8 68:2 87:6 89:12,20 89:21 95:4 97:1 97:2,15,19,21 98:1,2,7
**wrote** 17:14 46:18 49:17 59:15 76:12 90:18

X

**X** 4:4

Y

**yeah** 26:2 31:17 37:20 41:1 57:11 70:16 77:5 81:22 89:18 91:11
**years** 5:18 93:10
**Yep** 97:12
**young** 26:13 47:22 48:1,2 52:8
**you'd** 25:6
**you'll** 61:3
**you're** 19:22 20:7 24:16,17,19 32:9 34:12 39:21 49:1 51:10 55:17 58:3,22 59:16 59:17 60:12,20 61:17 64:13,14 64:22 65:2 71:7 72:6,7,20 77:13 80:19 89:19
91:1 93:20 95:13
**you've** 5:15 55:6 64:16 80:13,15 94:18

1

**1** 1:21 6:12 8:12 8:16 12:6 38:21 47:6 76:20 83:20 88:15 91:21 97:7
**1-107049** 1:20
**10th** 1:10
**10:00** 22:15
**14** 99:12
**15** 68:8
**15th** 46:19 54:21 77:11 79:7 90:19 99:10
**18** 50:18 51:15,22 52:15,15 63:2 64:6,8 65:10,12 65:16 66:16 68:18 71:1,2 78:1 82:9
**18th** 3:5
**1901** 3:5
**192** 2:6
**1923** 3:15
**1995** 5:21

2

**2** 48:3 53:16 54:20 57:17,20 63:17 64:1 70:9 77:10,20 78:18
**20** 93:10
**20-day** 46:20
**20001** 2:8 3:16
**20009** 3:6
**2002** 5:21
**2004** 6:1
**2006** 6:6 68:9
**2007** 1:10 99:11
**2011** 99:12
**202)232-1907** 3:7
**202)671-2069** 3:17
**22** 66:15

3

**3** 41:11 71:19 79:6 81:11 88:10
**3rd** 6:5 42:3 45:3 45:17 46:8,15 47:9 62:22 63:20 64:2,4,4 65:4 68:9 70:12 70:15 72:20,20 78:10,16,21 90:13 91:9
**3:30** 1:11

4

**4th** 47:9 64:5 78:12,22 90:13
**4:00** 43:21

5

**5:13** 98:16
**5010** 93:2
**5010.2(c)** 88:2
**56** 34:4 98:8

7

**7:30** 22:14

8

**8:00** 22:15

9

**9:30** 22:15
**99** 1:21 18:14

# EXHIBIT 66

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director

December 14, 2007

Cynthia Washington
12303 Windbrook Drive
Clinton, Maryland 20735

Dear Ms. Washington:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1613, this correspondence constitutes official notification of the final decision regarding the proposal to remove you from your position of Correctional Officer with the D.C. Department of Corrections. This action is based on the charge of Negligence. The charge and specification were set forth in the advance notice dated March 15, 2007, which also advised you of your right to review any material upon which the proposed action was based and to respond in writing within six (6) days of receipt of the written notice.

Following an evaluation of the issues and facts in your case, Henry R. Lesansky, Hearing Officer submitted a written report and recommendation stating in relevant parts that:

"The administrative review of the present case addresses two (2) substantive issues in evaluating the proposed termination: (1) Whether there are reasonable grounds to believe that the charges are true based upon a preponderance of the evidence (DC Personnel Regulations, Chapter 1603.10), and (2) Whether there are reasonable grounds to believe that the charges, if true, support the proposed termination including the extent and weight of mitigating or aggravating circumstances as deemed appropriate (DC Personnel Regulations, Chapter 1603.9). With regard to the first question, Corporal Washington argues in her above-referenced written response that her conduct was not negligent as charged (at pages 6 and 7 of the Response) because "correctional officers have the discretion to issue infirmary passes for urgent care or inmate distress," and that "it is routine for correctional officers to issue passes to inmates for the infirmary that cannot be verified based on a telephone call." Not only are these contentions contrary to the policies, general orders and basic regulations of the DOC for accountability and control of inmates enumerated in the Specifications against Corporal Washington, but these arguments do not rebut the charges in the Specifications that she did not take reasonable steps to determine why or by what authority inmate Jones was allowed to leave the unit through an infirmary pass. Further, Corporal Washington' contention that everything she did

was with the knowledge or approval of the Officer-In-Charge (OIC) on the day of the escape and that none of the passes she completed for inmates to go the infirmary included inmate Jones, also does not rebut the fact that she did not verify the authenticity of inmate Jones' infirmary pass. Corporal Washington' argument that there is no way to verify information on an inmate's pass is also rebutted by the existing policies, general orders and basic regulations governing inmate accountability and control.

Neither in her written Response nor through evidence or information disclosed at her above-referenced administrative review Hearing before me, Corporal Washington did not rebut nor reconcile the referenced Specifications with regard to the lack of credibility in her conflicting accounts of the circumstances for permitting inmate Jones to leave the unit through use of an infirmary pass. Corporal Washington also did not rebut her failure, to adhere to the policies, general orders, and basic regulations as itemized in the Specifications governing, among other things, accountability for inmates and attention to duty. Nor did Corporal Washington provide a reasonable defense of her failure to verify the passes of the inmates to whom access was granted to leave the housing unit, including inmate Jones who had an unauthorized pass. Whenever an employee exercises the judgment or discretion to act or fail to act contrary to policy and procedure whether as a result of convenience, comfort or familiarity, he or she reasonably bears the burden of accountability for the risk of adverse consequences whether or not intended or anticipated.

Based upon these credibly undisputed facts, I conclude that (1) the agency has met its burden by a preponderance of the evidence that these facts as presented are true and support a charge of Negligence against Corporal Washington; (2) her Negligence violated the regulations and policies detailed in the above-referenced Specifications and demonstrably contributed to the successful escape of inmates Leaks and Jones; and (3) her Negligence meets the standard of an act that "interferes with the efficiency or integrity of government operations" (DC Personnel Regulations, Chapter 1603.3).

In evaluating the second substantive question as to whether there are reasonable grounds to support termination as the appropriate agency remedy in this case, I have taken notice of the so-called "*Douglas*" factors deemed relevant for considering mitigating or aggravating circumstances in assessing the penalty to be imposed. In summary form, these include the nature and seriousness of the offense; the employee's job level and type of employment, disciplinary record, and prior work record; impact of the offense on the employee's ability to perform effectively in the future; consistency of the penalty with those imposed for the same or similar offenses including any applicable matrix for progressive discipline; notoriety of the

offense or the impact on the agency's reputation; the clarity of notice or warnings to the employee of any violations of rules or regulations related to the offense; potential for rehabilitation; mitigating circumstances surrounding the offense; and adequacy and effectiveness of alternative sanctions to deter future offenses. While evidence and reports have been presented illustrating identifiable mitigating factors on behalf of the employee--such as longevity of service, little or no history of prior disciplinary action, positive performance ratings, workplace challenges outside employees' control resulting from staffing shortages and mandatory "drafting" of officers for overtime, weaknesses in some applicable agency policy, procedure and practice as well as inadequacies in certain technology and support mechanisms-- these elements are individually and collectively outweighed by the seriousness of the offense and its adverse impact on the integrity of the agency. Specifically, the Negligence of this employee demonstrably contributed to the escape of inmates Leaks and Jones, which fundamentally compromised the core mission of the agency, violated the sworn oath of the employee, and harmed the citizens' collective trust in the agency to protect and preserve public safety."

"Based upon the foregoing, I recommend that the charge of Negligence be sustained and that the proposed penalty of Termination be imposed."

As the Deciding Official, I have thoroughly reviewed the evidence of record, which consists of all documents giving rise to issuance of the written advance notice, your response and the Hearing Officer's written report and recommendation. Based on my review, I find that the evidence supports the cause of Negligence and the proposed penalty of removal. My decision is premised on the following.

On June 3, 2006, inmates Joseph Leaks and Ricardo Jones escaped from the Central Detention Facility. The evidence shows that on June 3, 2006 you were assigned to Southeast One (SE-1) Housing Unit where Inmate Jones was housed. At approximately 9:42 a.m., inmate Jones walked out of the SE-1 housing unit under the pretense of going to the infirmary, although he was not one of the six inmates from SE-1 scheduled for medical care on June 3, 2006.

During your interview with Internal Affairs (IA) on Saturday, June 3, 2006, you admitted that you made approximately three call-out passes, but not for any specific place and they were unnamed. You further stated that Sergeant Dionne Makins also made call-out passes. You further stated, "I don't recall me giving anybody a pass. I'm thinking that Miss Hatton gave the passes." You could not recall if you were on the floor or in the bubble during the time the cells were opened. You stated that you were in and out and at that particular time, you really could not say if you were in or out of the bubble. You further indicated that there were times when more than one officer was in the bubble at a time. However, according to the Southeast One

Cynthia Washington
December 14, 2007
Page 4

Housing Unit Post Orders, dated February 14, 2005, Section V. 6(g): "Only one
officer shall be in the Control Module at a time. No chairs or other furniture shall
be in the sally-port area. Only one chair shall be allowed in the Control Module.

During your interview with Hearing Officer Lesansky, your assigned Hearing
Officer and Mr. Hannon, your attorney, you stated, "Ms. Hatton opened cell 19, and,
well, Ms. Makins took the pass up, and the inmate was given the pass, and he prepared
himself to get dressed or whatever he had to do to prepare himself to leave out of
the unit, and when he came to the Bubble to hand us the pass, I was standing
outside the Bubble and I took the pass and put my initial on it." You further stated that
after initialing the pass and putting the time on it, you handed the pass to Ms. Hatton.
You also stated Ms. Hatton put his name on the Movement Board and put the time on the
Movement Board and handed the pass back to the inmate.

You also confirmed that you did not receive a call from the sick call officer for
inmate Jones to report for medical care; nor did you know who received the call. When
asked, "What was the purpose of you initialing the pass?" You stated that on that
day it was really quiet and that the block was secured and peaceful. You said that
you thought only ten inmates were out at the time and there wasn't really that much
to do. You stated that the vast majority of the inmates was still asleep therefore;
everybody had time to put their initials on one pass. You further stated that as far as
you could remember inmate Jones' pass was the only pass that you initialed. When
asked if you recalled if the sick call list, which was generated by the medical unit
was in the block during the #2 shift, you stated, "I want to say yes, but I can't
swear."

You further expressed that the officers assigned to the unit are responsible for the
inmate as long as they are in your view, but once they leave that housing unit, you
have a control officer in the bubble in the hallway, and they're then responsible for
the inmate, and then you have the officers who's in the admin. area responsible for
the inmates. You stated, "They didn't escape from out of our –you understand what
I'm saying? They did not go out of our window. It wasn't like we sitting here and
they went out of the window."

You maintained that (1) you did not receive a call from the sick call officer for
inmate Jones to report for medical care; (2) you did not recall inmate Jones
complaining to you or any of the officers in the unit of being sick; and (3) you did
not give the pass to inmate Jones. However, believing that the sick call list, which was
generated by the medical unit, was available in the housing unit, you initialed the pass
authorizing inmate Jones movement without even checking the sick call list.

By initialing the pass that inmate Jones had in his possession, you created opportunity and authorization for Inmate Jones' movement out of the SE-1 housing unit. As an officer assigned to the unit, you had a specific responsibility for the security and accountability of all inmates under your charge. Your negligence in the performance of a clearly defined duty not only made inmate Jones' escape possible, but it made it easy for him to pass through the facility.

The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility. [You] as an employee compromised the integrity and credibility of the Agency to maintain a safe and secure facility when you allowed Inmate Jones to walk out of the SE-1 housing unit, thereby, breaching the public's trust.

The evidence makes clear that your negligence on June 3, 2006, was a major contributing factor to inmate Jones being able to team-up with his co-defendant (Joseph Leaks) and effect their escape from the confines of D.C. Jail. The escapes generated colossal public notoriety and immeasurable embarrassment to the Department of Corrections and the government of the District of Columbia. Accordingly, I am sustaining the proposed cause of Negligence and proposed penalty of removal.

In rendering my final decision to sustain the removal action against you, I relied on Douglas Factors (1), (2), (5) (6) and (8).

Factor (1): The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

Public safety, community protection and the orderly, safe and secure operation of the jail constitute the primary mission of any correctional facility. Here, you had a specific responsibility for the accountability of inmate under your charge you were negligent in doing so.

Factor (2): The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

The failure to follow standard security practices resulted in the ultimate negative consequence that can occur in a Jail, an escape of two violent criminals into the community, thus constituting a most serious crime.

Factor (5): Considers the effects of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the the supervisors' confidence in the employee's ability to perform assigned duties;

The breach of the most ordinary security practices and the severity of the consequences, render it impossible to trust you with the day-to-day responsibilities of the position of Correctional Officer.

Acts of this nature casts doubt on an employee's integrity and credibility as well as creates an environment of distrust and uncertainty among co-workers.

Factor (6): Consistency of the penalty with those imposed upon other employees for the same or similar offenses; and

All employees found to be negligent in their duties regarding the Jail escapes have or will have their employment terminated.

Factor (8): The notoriety of the offense or its impact upon the reputation of the agency:

The escapes were highly publicized, caused fear and concern in the community and grossly compromised the public trust in the agency to an extent that persists until now. The criticism of the agency and its employees has been pernicious to staff morale and the credibility of the agency. The public confidence has been shaken, as evidenced by Council hearings, community complaints, newspaper articles, editorials and televised news broadcasts. It will require a prolonged period for the agency to rehabilitate its reputation and standing in the District of Columbia and the correctional community.

Accordingly, you will be removed from your position of Correctional Officer with the D.C. Department of Corrections effective the close of business on Monday, December 17, 2007.

You are herewith informed of your right to grieve this final decision either through the negotiated grievance procedures set forth in the Collective Bargaining Agreement between the Agency and the FOP; or Appeal to the Office of Employee Appeals (OEA).

You may elect only one (1) of the grievance procedures. Once you have selected a grievance procedure, [it] is binding.

If you elect to appeal through the negotiated grievance procedure, your appeal should be forwarded to me Devon Brown, Director, D.C. Department of Corrections, 1923 Vermont Avenue, N.W., Suite 201, Washington, DC 20001. Your appeal may be made by completing a grievance resolution form and forwarding it to the above address during the period beginning with the day after the effective date of this letter, but not later than ten (10) calendar days after the effective date.

If you have questions concerning your appeal rights through the negotiated grievance procedure, they should be directed to the Fraternal Order of Police (FOP) Union. The office is located at 711-4th Street N.W., Washington, D.C. 20001, and may be reached by telephone on (202) 737-3505.

If you elect to file an appeal with the Office of Employee Appeals (OEA), it must be filed within thirty (30) calendar days of receipt of this notice. The OEA is located at 717-14th Street, N.W., Third Floor, Washington, D.C. 20005. Enclosed are the OEA appeal form and a copy of the OEA regulations. For additional information on filing an appeal, you should contact OEA on (202) 727-0004.

On the effective date of your termination, you are required to turn in all issued keys, security badge(s), identification card, telephone, computer, JACCS password, procurement card, driver's license and all other government properties issued to you as a District Government employee. The attached Employee Clearance Record must be used to process the clearances.

Sincerely,

Devon Brown
Director

Enclosures

# EXHIBIT 67

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director

December 14, 2007

Herbert Douglas
3808 71st Avenue
Landover, Hills, Maryland 20784

Dear Mr. Douglas:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1613, this correspondence constitutes official notification of the final decision regarding the proposal to remove you from your position of Correctional Officer with the D.C. Department of Corrections. This action is based on the charge of Negligence. The charge and specification were set forth in the advance notice dated March 15, 2007, which also advised you of your right to review any material upon which the proposed action was based and to respond in writing within six (6) days of receipt of the written notice.

Following an evaluation of the issues and facts in your case, Henry R. Lesansky, Hearing Officer submitted a written report and recommendation stating in relevant parts that:

"The administrative review of the present case addresses two (2) substantive issues in evaluating the proposed termination: (1) Whether there are reasonable grounds to believe that the charges are true based upon a preponderance of the evidence (DC Personnel Regulations, Chapter 1603.10) and (2) Whether there are reasonable grounds to believe that the charges, if true, support the proposed termination including the extent and weight of mitigating or aggravating circumstances as deemed appropriate (DC Personnel Regulations, Chapter 1603.9). With regard to the first question, Corporal Douglas argues in his above-referenced written response that his conduct was not negligent as charged (at pages 6 and 7 of the Response) because it was "accepted practice" for either Corporal Douglas (as the detail's supervisor) or the detail inmates themselves--which included inmate Joseph Leaks to have unsupervised access at will to the supply locker for necessary supplies/ equipment to work, including access to the buffer subsequently used to accomplish the escape on that day. Corporal Douglas also argues that detail inmates, including inmate Leaks, "were often left unsupervised" as an "accepted practice" throughout the Central Detention Facility (CDF), and that he "almost always" moved between floors to check on detail inmates "leaving all of the other inmates in his charge

unsupervised." Finally, Corporal Douglas argues his actions regarding the inmate detail on the day of the escape (and at all other times that he supervised detail inmates) were accomplished with the knowledge, approval and direct orders of his immediate supervisor. In short, Corporal Douglas contends that "nothing" he did in managing detail inmates on the day of the escape or on any other day was improper.

However, neither in his written Response nor through evidence or information disclosed at his above-referenced administrative review Hearing before me, Corporal Douglas has not disputed or rebutted as fact that he left inmates, including Joseph Leaks, unattended or unsupervised while he "floated" among the detail inmate work groups on different floors of CDF. Corporal Douglas further admits that he left the supply holding area unlocked and freely accessible to inmates under his charge, including inmate Leaks, who obtained from this same supply area the equipment which was subsequently used to effect the escape of inmates Leaks and Jones. Based upon these undisputed facts, I conclude that the agency has met its burden by a preponderance of the evidence that these facts are true and support a Charge of Negligence against Corporal Douglas; that he abandoned his responsibilities to ensure proper supervision of inmates in his custody; that his Negligence violated the regulations and policies detailed in the above-referenced Specifications and demonstrably contributed to the successful escape of inmates Leaks and Jones; and that his Negligence meets the standard of an act that "interferes with the efficiency or integrity of government operations" (DC Personnel Regulations, Chapter 1603.3).

In evaluating the second substantive question as to whether there are reasonable grounds to support termination as the appropriate agency remedy in this case, I have taken notice of the so-called "*Douglas*" factors deemed relevant for considering mitigating or aggravating circumstances in assessing the penalty to be imposed. In summary form, these include the nature and seriousness of the offense; the employee's job level and type of employment, disciplinary record, and prior work record; impact of the offense on the employee's ability to perform effectively in the future; consistency of the penalty with those imposed for the same or similar offenses including any applicable matrix for progressive discipline; notoriety of the offense or the impact on the agency's reputation; the clarity of notice or warnings to the employee of any violations of rules or regulations related to the offense; potential for rehabilitation; mitigating circumstances surrounding the offense; and adequacy and effectiveness of alternative sanctions to deter future offenses. While evidence and reports have been presented illustrating identifiable mitigating factors on behalf of the employee--such as longevity of service, little or no history of prior disciplinary action, positive performance ratings, workplace challenges outside employees' control resulting from staffing shortages and mandatory "drafting" of officers for overtime, weaknesses in some applicable agency policy, procedure

and practice as well as inadequacies in certain technology and support mechanisms--these elements are individually and collectively outweighed by the seriousness of the offense and its adverse impact on the integrity of the agency. Specifically, the Negligence of this employee demonstrably contributed to the escape of inmates Leaks and Jones, which fundamentally compromised the core mission of the agency, violated the sworn oath of the employee, and harmed the citizens' collective trust in the agency to protect and preserve public safety.

Based upon the foregoing, I recommend that the charge of Negligence be sustained and that the proposed penalty of Termination be imposed."

As the Deciding Official, I have thoroughly reviewed the evidence of record, which consists of all documents giving rise to issuance of the written advance notice, your response and the Hearing Officer's written report and recommendation. It is clear that on June 3, 2006 you were assigned to supervise the environmental work detail squad. Inmate Joseph Leaks was assigned to your environmental detail squad on June 3, 2006. According to Inmate Leaks, prior to his initial departure from the second floor of the administrative module, he told you to "leave the area because something was about to happen." Inmate Leaks stated that you complied with this request, leaving him and other inmates unattended and unsupervised. It was during this time that inmate Leaks left his assigned detail post assignment and proceeded through the Administrative Two door into the inmate housing unit area where he met up with inmate Ricardo Jones. Upon their return to the second floor administrative module, inmates Leaks and Jones removed a buffer from the supply locker, which you left unsecured and which was used to facilitate their escape.

It is undisputed that on June 3, 2006, you had the direct charge and specific responsibility of supervising environmental work detail inmates, to include escapee Joseph Leaks. By your own admission, you left inmate Leaks unsupervised while you went to oversee the inmates that were cleaning the visiting hall. The policy is positively clear that Correctional Officers are responsible for maintaining accountability of all inmates in their area of responsibility. However, because of your negligence in maintaining supervision and control of the work detail, inmates Leaks and Jones were able to successfully effect their escaped from confinement at the D.C. Jail.

Based on my substantial review, I find that the evidence supports your removal for negligence; that your conduct threatened the integrity of government operations; and that it constitutes an immediate hazard to the agency, the District of Columbia at large and to public safety in general. Consequently, I have decided to sustain the cause of Negligence and the proposed action of removal.

In rendering my final decision to sustain the removal action, I relied on Douglas Factors (1), (2), (5), (6) and (8).

Factor (1): Considers the nature and seriousness of the offense, and its relation to the employee's duties, including whether the offense was intentional or technical or inadvertent, or was committed intentionally or maliciously or for gain, or was frequently repeated.

Correctional Officers occupy a position of trust, reliance and confidence. Each correctional employee has fiduciary responsibilities to the citizens of the District of Columbia to provide: Public safety, community protection and the orderly, safe and secure operation of the D.C. Jail. Your failure to supervise your assigned environmental detail squad contributed to Inmate Leaks and Jones successful escape from the CDF, which placed staff, inmates and the public at large in considerable capricious danger.

Factor (2): The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

I incorporate herein my response to Factor (1) above.

Factor (5): Considers the effects of the offense upon the employee's Ability to perform at a satisfactory level and its effect upon the supervisors' confidence in the employee's ability to perform assigned duties;

Acts of this nature casts doubt on an employee's integrity and credibility as well as creates an environment of distrust and uncertainty among co-workers.

Factor (6): Consistency of the penalty with those imposed upon other employees for the same or similar offenses; and

All employees negligent in their duties resulting in this jail escape have or will be discharged.

Factor (8): The notoriety of the offense or its impact upon the reputation of the agency:

The escapes were highly publicized, caused fear and concern in the community and grossly compromised the public trust in the agency to an extent that persists until now. The criticism of the agency and its employees has been pernicious to staff

morale and credibility of the agency. The public confidence has been shaken, as evidenced by Council hearings, community complaints, newspaper articles, editorials and televised news broadcasts. It will require a prolonged period for the agency to rehabilitate its reputation and standing in the District of Columbia and the correctional community.

Accordingly, you will be removed from your position of Correctional Officer with the D.C. Department of Corrections effective the close of business on Monday, December 17, 2007.

You are herewith informed of your right to grieve this final decision either through the negotiated grievance procedures set forth in the Collective Bargaining Agreement between the Agency and the FOP; or Appeal to the Office of Employee Appeals (OEA).

You may elect only one (1) of the grievance procedures. Once you have selected a grievance procedure, [it] is binding.

If you elect to appeal through the negotiated grievance procedure, your appeal should be forwarded to me Devon Brown, Director, D.C. Department of Corrections, 1923 Vermont Avenue, N.W., Suite 201, Washington, DC 20001. Your appeal may be made by completing a grievance resolution form and forwarding it to the above address during the period beginning with the day after the effective date of this letter, but not later than ten (10) calendar days after the effective date.

If you have questions concerning your appeal rights through the negotiated grievance procedure, they should be directed to the Fraternal Order of Police (FOP) Union. The office is located at 711-4th Street N.W., Washington, D.C. 20001, and may be reached by telephone on (202) 737-3505.

If you elect to file an appeal with the Office of Employee Appeals (OEA), it must be filed within thirty (30) calendar days of receipt of this notice. The OEA is located at 717-14th Street, N.W., Third Floor, Washington, D.C. 20005. Enclosed are the OEA appeal form and a copy of the OEA regulations. For additional information on filing an appeal, you should contact OEA on (202) 727-0004.

On the effective date of your termination, you are required to turn in all issued keys, security badge(s), identification card, telephone, computer, JACCS password, procurement card, driver's license and all other government properties issued to you as a

Dec-17-2007 12:52pm From- T-979 P.025/058 F-185

Herbert Douglas
December 14, 2007
Page 6

District Government employee. The attached Employee Clearance Record must be used to process the clearances.

Sincerely,

Devon Brown
Director

Enclosures

# EXHIBIT 68

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director



December 14, 2007

Lorenzo Jennings
9701 Varus Pl.
Upper Marlboro, Maryland  20772

Dear Officer Jennings:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1613, this correspondence constitutes official notification of the final decision regarding the proposal to remove you from your position of Correctional Officer with the D.C. Department of Corrections. This action is based on the charge of Negligence. The charge and specification were set forth in the advance notice dated March 15, 2007, which also advised you of your right to review any material upon which the proposed action was based and to respond in writing within six (6) days of receipt of the written notice.

Following an evaluation of the issues and facts in your case, Henry R. Lesansky, Hearing Officer submitted a written report and recommendation stating in relevant parts that:

"The administrative review of the present case addresses two (2) substantive issues in evaluating the proposed termination: (1) Whether there are reasonable grounds to believe that the charges are true based upon a preponderance of the evidence (DC Personnel Regulations, Chapter 1603.10) and (2) Whether there are reasonable grounds to believe that the charges, if true, support the proposed termination including the extent and weight of mitigating or aggravating circumstances as deemed appropriate (DC Personnel Regulations, Chapter 1603.9). With regard to the first question, Corporal Jennings argues in his above-referenced written response that his conduct was not negligent as charged (at pages 6 and 7 of the Response) because "correctional officers have the discretion to discipline inmates when the situation so warrants...[and] correctional officers are not required to follow one specific protocol in disciplining an inmate." Further, Corporal Jennings argues that "The issuance of a disciplinary report is within the full discretion of the correctional officer" but is not required. In addition, he maintains that "There is no written protocol for the disposal of inmate identification badges, nor is there a protocol for replacement." Finally, Corporal Jennings claims that he "followed the pattern and practice of the jail" in performing his duties to the "best of his ability with the resources available to him at the time.

However, neither in his written Response nor through evidence or information disclosed at his above-referenced administrative review Hearing before me, Corporal Jennings did not rebut the referenced Specifications with regard to the credibility of his account regarding the chain of custody and disposition of inmate Beachum's ID card--which was first seized by Corporal Jennings and which was subsequently used by inmate Jones in directly facilitating the escape. Moreover, Corporal Jennings has not rebutted his failure to meet the requirement under the referenced General Order #9 to "prepare and submit to the shift supervisor disciplinary reports on *all* [emphasis added] inmates who commit violations of orders, rules and regulations." The requirement for a disciplinary report further mandates that "a copy of the disciplinary report must be attached to the request for personnel action form," consistent with the referenced CDF Post Order for "Squad Removal/Changes." While I was not persuaded by the evidence that Corporal Jennings' failure to prepare the referenced disciplinary report and related personnel action form on inmate Beachum--who was not implicated in the escape--in and of itself resulted in the escape, his failure to adhere to established policy in this regard was part of a series of closely-related actions and omissions that facilitated in the escape of inmates Leaks and Jones. Whenever an employee exercises the judgment or discretion to act or fail to act contrary to policy and procedure whether as a result of convenience, comfort or familiarity, he or she reasonably bears the burden of accountability for the risk of adverse consequences whether or not intended or anticipated.

Based upon these credibly undisputed facts, I conclude that (1) the agency has met its burden by a preponderance of the evidence that these facts as presented are true and support a charge of Negligence against Corporal Jennings; (2) his Negligence violated the regulations and policies detailed in the above-referenced Specifications and demonstrably contributed to the successful escape of inmates Leaks and Jones; and (3) his Negligence meets the standard of an act that "interferes with the efficiency or integrity of government operations" (DC Personnel Regulations, Chapter 1603.3).

In evaluating the second substantive question as to whether there are reasonable grounds to support termination as the appropriate agency remedy in this case, I have taken notice of the so-called "*Douglas*" factors deemed relevant for considering mitigating or aggravating circumstances in assessing the penalty to be imposed. In summary form, these include the nature and seriousness of the offense; the employee's job level and type of employment, disciplinary record, and prior work record; impact of the offense on the employee's ability to perform effectively in the future; consistency of the penalty with those imposed for the same or similar offenses including any applicable matrix for progressive discipline; notoriety of the offense or the impact on the agency's reputation; the clarity of notice or warnings to the employee of any violations of rules or regulations related to the offense;

potential for rehabilitation; mitigating circumstances surrounding the offense; and adequacy and effectiveness of alternative sanctions to deter future offenses. While evidence and reports have been presented illustrating identifiable mitigating factors on behalf of the employee--such as longevity of service, little or no history of prior disciplinary action, positive performance ratings, workplace challenges outside employees' control resulting from staffing shortages and mandatory "drafting" of officers for overtime, weaknesses in some applicable agency policy, procedure and practice as well as inadequacies in certain technology and support mechanisms--these elements are individually and collectively outweighed by the seriousness of the offense and its adverse impact on the integrity of the agency. Specifically, the Negligence of this employee demonstrably contributed to the escape of inmates Leaks and Jones, which fundamentally compromised the core mission of the agency, violated the sworn oath of the employee, and harmed the citizens' collective trust in the agency to protect and preserve public safety.

Based upon the foregoing, I recommend that the charge of Negligence be sustained and that the proposed penalty of Termination be imposed."

As the Deciding Official, I have thoroughly reviewed the evidence of record, which consists of all documents giving rise to issuance of the written advance notice, your written response and the Hearing Officer's written report and recommendation. It is clear by your own admission that approximately three weeks prior to the escape, you observed inmate Carlton Beachum, environmental squad inmate, walk out of the staff restroom, which is not permitted. As a result, of this violation, you confiscated inmate Beachum's environmental squad identification card and escorted him back to his cell. You stated that you kept inmate Beachum's ID card for that day, and then put the ID card in Captain Holmes' office. You said Captain Holmes wasn't there at the time and you were going to tell him later why you took the ID. You also admitted that maybe two days later you "just passed on the information to him, and that was that." You admitted you did not write a disciplinary report on inmate Beachum and that you could not be certain if you returned the ID to the unit where inmate Beachum was housed. According to the OIA investigation report, your account of where you placed inmate Beachum's environmental squad identification card was not substantiated. Notwithstanding, it is also highly probable that because inmate Ricardo Jones was wearing inmate Beachum's squad identification card, which had earlier been confiscated by you, [he] was able to gain access to the administrative area of the CDF; from which he and inmate Leaks successfully escaped from the D.C. Jail, and place the public at large in considerable capricious danger.

Based on my substantial review, I find that the evidence supports your removal for negligence; that your conduct threatened the integrity and security protocols of government operations; and that it constitutes an immediate hazard to the agency and the

District of Columbia at large. Consequently, I have decided to sustain the cause of negligence and the proposed removal action against you.

In rendering my final decision to sustain the removal action, I relied on Douglas Factors (1), (2), (5), (6) and (8).

Factor (1): Considers the nature and seriousness of the offense, and its relation to the employee's duties, including whether the offense was intentional or technical or inadvertent, or was committed intentionally or maliciously or for gain, or was frequently repeated.

Correctional Officers occupy a position of trust, reliance and confidence. Each correctional employee has fiduciary responsibilities to the citizens of the District of Columbia to provide: Public safety, community protection and the orderly, safe and secure operation of the D.C. Jail. Your negligence in securing inmate Beachum's ID card, which was seized by you, and subsequently used by inmate Jones to facilitate his escape placed staff, inmates and the public at large in considerable capricious danger.

Factor (2): The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

I incorporate herein my response to Factor (1) above.

Factor (5): Considers the effects of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisors' confidence in the employee's ability to perform assigned duties;

Acts of this nature casts doubt on an employee's integrity and credibility as well as creates an environment of distrust and uncertainty among co-workers.

Factor (6): Consistency of the penalty with those imposed upon other employees for the same or similar offenses; and

All employees negligent in their duties resulting in this jail escape have or will be discharged.

Factor (8): The notoriety of the offense or its impact upon the reputation of the agency:

The escapes were highly publicized, caused fear and concern in the community and grossly compromised the public trust in the agency to an extent that persists until now. The criticism of the agency and its employees has been pernicious to staff morale and the credibility of the agency. The public confidence has been shaken, as evidenced by Council hearings, community complaints, newspaper articles, editorials and televised news broadcasts. It will require a prolonged period for the agency to rehabilitate its reputation and standing in the District of Columbia and the correctional community.

Accordingly, you will be removed from your position of Correctional Officer with the D.C. Department of Corrections effective the close of business on Monday, December 17, 2007.

You are herewith informed of your right to grieve this final decision either through the negotiated grievance procedures set forth in the Collective Bargaining Agreement between the Agency and the FOP; or Appeal to the Office of Employee Appeals (OEA).

You may elect only one (1) of the grievance procedures. Once you have selected a grievance procedure, [it] is binding.

If you elect to appeal through the negotiated grievance procedure, your appeal should be forwarded to me Devon Brown, Director, D.C. Department of Corrections, 1923 Vermont Avenue, N.W., Suite 201, Washington, DC 20001. Your appeal may be made by completing a grievance resolution form and forwarding it to the above address during the period beginning with the day after the effective date of this letter, but not later than ten (10) calendar days after the effective date.

If you have questions concerning your appeal rights through the negotiated grievance procedure, they should be directed to the Fraternal Order of Police (FOP) Union. The office is located at 711-4th Street N.W., Washington, D.C. 20001, and may be reached by telephone on (202) 737-3505.

If you elect to file an appeal with the Office of Employee Appeals (OEA), it must be filed within thirty (30) calendar days of receipt of this notice. The OEA is located at 717-14th Street, N.W., Third Floor, Washington, D.C. 2005. Enclosed are the OEA appeal form and a copy of the OEA regulations. For additional information on filing an appeal, you should contact OEA on (202) 727-0004.

On the effective date of your termination, you are required to turn in all issued keys, security badge(s), identification card, telephone, computer, JACCS password, procurement card, driver's license and all other government properties issued to you as a District Government employee. The attached Employee Clearance Record must be used to process the clearances.

Sincerely,

Devon Brown
Director

Enclosures

# EXHIBIT 69

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director

December 14, 2007

Dionne Makins
7301 Flag Harbor Dr
District Heights, Maryland 20747

Dear Ms. Makins:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1613, this correspondence constitutes official notification of the final decision regarding the proposal to remove you from your position of Correctional Officer with the D.C. Department of Corrections. This action is based on the charge of Negligence. The charge and specification were set forth in the advance notice dated March 15, 2007, which also advised you of your right to review any material upon which the proposed action was based and to respond in writing within six (6) days of receipt of the written notice.

Following an evaluation of the issues and facts in your case, Henry Lesansky, Hearing Officer, submitted a written report and recommendation stating in relevant parts:

> "The administrative review of the present case addresses two (2) substantive issues in evaluating the proposed termination: (1) Whether there are reasonable grounds to believe that the charges are true based upon a preponderance of the evidence (DC Personnel Regulations, Chapter 1603.10), and (2) Whether there are reasonable grounds to believe that the charges, if true, support the proposed termination including the extent and weight of mitigating or aggravating circumstances as deemed appropriate (DC Personnel Regulations, Chapter 1603.9). With regard to the first question, Sergeant Makins argues in her above-referenced written response that her conduct was not negligent as charged (at pages 6 and 7 of the Response) because "there is no way to track an inmate once he is released from the housing unit" and "there is no pattern or practice of issuing an alert for that inmate until he has missed the next scheduled count." Not only are these contentions contrary to the policies, general orders and basic regulations of the DOC for accountability and control of inmates enumerated in the Specifications against Sergeant Makins, but these arguments do not rebut the charges in the Specifications that she, and those officers under her supervision, did not take reasonable steps to determine why or by what authority inmate Jones was allowed

to leave the unit through an infirmary pass. Further, Sergeant Makins' contention that "nothing" she did as the Officer-In-Charge (OIC) of Southeast One (1) housing unit on the day of the escape was improper because none of the passes she completed for inmates to go the infirmary included inmate Jones, does not rebut the fact that she did not verify, nor direct others to verify, the authenticity of inmate Jones' infirmary pass. Further, her claim that "as the OIC she knew of all the inmates who required infirmary care" undermines her contention that she is blameless in her failure to challenge the authenticity of inmate Jones infirmary pass. Sergeant Makins' argument that there is no way to verify information on an inmate's pass, on the contrary, "so long as an inmate has a white piece of paper that looks like a pass, he is assumed to have one," is also rebutted by the existing policies, general orders and basic regulations governing inmate accountability and control.

Neither in her written Response nor through evidence or information disclosed at her above-referenced administrative review Hearing before me, Sergeant Makins did not rebut nor reconcile the referenced Specifications with regard to the lack of credibility in her conflicting accounts of the circumstances for permitting inmate Jones to leave the unit through use of an infirmary pass. Sergeant Makins also did not rebut her failure, or those of her immediate subordinates, to adhere to the policies, general orders, and basic regulations as itemized in the Specifications governing, among other things, accountability for inmates and attention to duty. Nor did Sergeant Makins provide a reasonable defense of her failure, or those of her subordinate officers, to verify the passes of the inmates to whom access was granted to leave the housing unit under her command and control, including inmate Jones who had an unauthorized pass. Whenever an employee exercises the judgment or discretion to act or fail to act contrary to policy and procedure whether as a result of convenience, comfort or familiarity, he or she reasonably bears the burden of accountability for the risk of adverse consequences whether or not intended or anticipated.

Based upon these credibly undisputed facts, I conclude that (1) the agency has met its burden by a preponderance of the evidence that these facts as presented are true and support a charge of Negligence against Sergeant Makins; (2) her Negligence violated the regulations and policies detailed in the above-referenced Specifications and demonstrably contributed to the successful escape of inmates Leaks and Jones; and (3) her Negligence meets the standard of an act that "interferes with the efficiency or integrity of government operations" (DC Personnel Regulations, Chapter 1603.3).

In evaluating the second substantive question as to whether there are reasonable grounds to support termination as the appropriate agency remedy in this case, I have taken notice of the so-called "*Douglas*" factors deemed relevant for considering mitigating or aggravating circumstances in assessing the penalty to be imposed. In summary form, these include the nature and seriousness of the offense; the employee's job level and type of employment, disciplinary record, and prior work record; impact of the offense on the employee's ability to perform effectively in the future; consistency of the penalty with those imposed for the same or similar offenses including any applicable matrix for progressive discipline; notoriety of the offense or the impact on the agency's reputation; the clarity of notice or warnings to the employee of any violations of rules or regulations related to the offense; potential for rehabilitation; mitigating circumstances surrounding the offense; and adequacy and effectiveness of alternative sanctions to deter future offenses. While evidence and reports have been presented illustrating identifiable mitigating factors on behalf of the employee--such as longevity of service, little or no history of prior disciplinary action, positive performance ratings, workplace challenges outside employees' control resulting from staffing shortages and mandatory "drafting" of officers for overtime, weaknesses in some applicable agency policy, procedure and practice as well as inadequacies in certain technology and support mechanisms—these elements are individually and collectively outweighed by the seriousness of the offense and its adverse impact on the integrity of the agency. Specifically, the Negligence of this employee demonstrably contributed to the escape of inmates Leaks and Jones, which fundamentally compromised the core mission of the agency, violated the sworn oath of the employee, and harmed the citizens' collective trust in the agency to protect and preserve public safety.

Based upon the foregoing, I recommend that the charge of Negligence be sustained and that the proposed penalty of Termination be imposed."

As the Deciding Official, I have thoroughly reviewed the evidence of record, which consists of all documents giving rise to issuance of the written advance notice, your written response and the Hearing Officer's written report and recommendation. Based on my substantial review, I find that the evidence supports the cause of Negligence and the proposed penalty of removal. My decision is premised on the following.

On June 3, 2006, inmates Joseph Leaks and Ricardo Jones escaped from the Central Detention Facility. The evidence shows that on June 3, 2006 you were the Officer-In-Charge (OIC) of Southeast One (SE-1) Housing Unit where inmate Jones was housed. At approximately 9:42 a.m., inmate Jones walked out of the SE-1 housing unit under the pretense of going to the infirmary, although he was not one of the six inmates from SE-1 scheduled for medical care on June 3, 2006.

You confirmed that on June 3, 2006, you were the assigned OIC of SE-1 Housing Unit during the Number 2 Shift. You also confirm that Officers Shantell Hatton and Cynthia Washington worked in the unit with you on June 3, 2006. During your interviews with the Office of Internal Affairs (OIA) and Hearing Officer Lesansky, you stated that prior to the count clearing, the three of you were sitting in the Bubble lollygagging, talking about personal things, and having girl talk. During this time, you completed four or five passes for inmates that you knew would probably go to the infirmary for bandage changes. You stated that you also prepared several pre-signed passes, which included the housing unit, the date and your signature. You also stated that Officer Hatton wrote a set of passes. You explained, "Whoever got the phone calls for the infirmary and wherever they were going the person that's in the bubble, which were Miss Hatton and Miss Washington. I'm not sure which one of them wrote the pass." You also stated that Officer Hatton was assigned to the Bubble, but you and Ms. Washington were in and out. However, according to the Southeast One Housing Unit Post Orders, dated February 14, 2005, Section V. 6(g): "Only one officer shall be in the Control Module at a time. No chairs or other furniture shall be in the sally-port area. only one chair shall be allowed in the Control Module."

You stated that you stepped out of the housing unit for a short time and when you returned you and Officer Washington went on the floor and Officer Hatton remained in the Bubble. You further stated that the inmates that were going to the Infirmary already had their passes; so all they had to do was wave their hand with their passes. You stated that inmate Ricardo Jones who was in cell 18 flagged out, he had a pass. You asked him where he was going, he responded, "to the Infirmary." You admitted that you only glanced at the pass and stated, "I didn't pay attention to whether he had it." You told him to give the pass to Officer Hatton, and instructed Officer Hatton to open his cell. You stated that Officer Hatton signed the pass and put him on the movement sheet. By your own admission, you did not confirm whether inmate Jones' Name, DCDC number, and destination or the signature of the authorizing official was on the pass before ordering his cell opened.

You acknowledged that after the FBI showed you the pass, you realized that the pass inmate Jones had in his possession, which authorized his movement was one of the passes that you pre-signed. After reviewing the pass, you further determined that the pass contained three different handwritings. You confirmed that the date, the unit and the first signature, which is that of the Authorizing Official on the pass, were written by you. You stated the inmate's name, DCDC number and the time the inmate left was written by Ms. Hatton. However, Officer Hatton did not sign the pass. You also stated that something that looked like "CW" was Ms. Washington's handwriting.

Although you signed the pass authorizing Inmate Jones movement, you maintained that (1) you did not receive a call from the sick call officer for Inmate Jones to report for medical care; (2) you did not recall Inmate Jones complaining to you or any of the officers in the unit of being sick; (3) you did not give the pass to Inmate Jones; and (4) you didn't know who gave Inmate Jones the pass. However, according to Officers Hatton and Washington, you gave the pass to Inmate Jones.

Program Statement 5010.2C, Accountability for Inmates (dated July 1, 2004) Section 12 (i) provides the following in pertinent parts:

1) Inmates shall be issued call-out passes for authorized movement on a "one time basis."
2) The staff member requesting the inmate movement shall contact inmate's housing unit and provide the following information:
   a) Name of the requesting staff member;
   b) Name and DCDC number of the inmate;
   c) Date and time of the appointment; and
   d) Location of the appointment

3) Housing Unit officers shall fill out and issue the call-out pass. When the inmate leaves the housing unit for the scheduled appointment, the housing unit officer shall record the time on the call-out pass. The staff member in charge of the location of the appointment shall record the time of the inmate's arrival and departure.

Insomuch as you allowed more than one officer in the Control Module at same time, which is against SE-1 Post Orders, it cannot be determined who received the call to have inmate Jones report to the infirmary. By pre-signing the pass that inmate Jones had in his possession, which also is not the policy of the jail, and ordering his cell opened, you created opportunity and authorization for Inmate Jones movement out of the SE-1 housing unit. As the OIC of the unit, you had a specific responsibility for the security and accountability of all inmates under your charge, and to provide supervision to all subordinate officers assigned to your unit. Your negligence in the performance of your duties not only contributed to Inmate Jones' escape, it also gave him easy accessibility to navigate his path through the facility.

The citizens of the District of Columbia entrust correctional employees to comply and support the Agency's mission for public safety by providing an orderly, safe and secure environment for persons committed for safekeeping. Your negligence on June 3, 2006, compromised the integrity and credibility of the Agency to ensure public safety when you allowed inmate Jones to walk out of the SE-1 housing unit without proper execution of the security protocols.

It is abundantly clear that your negligence was a contributing factor to inmate Jones' being able to hook-up with his co-defendant (Joseph Leaks) and subsequently, effect their escapes from confinement at the D.C. Jail. The escapes brought to bear, brought notoriety and caused immeasurable embarrassment to the Department of Corrections and the District of Columbia at large.

In rendering my final decision to sustain the removal action against you, I relied on Douglas Factors (1), (2), (5) (6) and (8).

Factor (1): The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

Public safety, community protection and the orderly, safe and secure operation of the jail constitute the primary mission of any correctional facility.

Factor (2): The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

The failure to follow standard security practices resulted in the ultimate negative consequence that can occur in a Jail, an escape of two violent criminals into the community, thus constituting a most serious crime.

Factor (5): Considers the effects of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisors' confidence in the employee's ability to perform assigned duties;

The breach of the most ordinary security practices and the severity of the consequences, render it impossible to trust you with the day to day responsibilities of the position of Correctional Officer

Acts of this nature casts doubt on an employee's integrity and credibility as well as creates an environment of distrust and uncertainty among co-workers.

Factor (6): Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

All employees negligent in their duties resulting in this jail escape have or will be discharged.

Factor (8): The notoriety of the offense or its impact upon the reputation of the agency:

The escapes were highly publicized, caused fear and concern in the community and grossly compromised the public trust in the agency to an extent that persists until now. The criticism of the agency and its employees has been pernicious to staff morale and the credibility of the agency. The public confidence has been shaken, as evidenced by Council hearings, community complaints, newspaper articles, editorials and televised news broadcasts. It will require a prolonged period for the agency to rehabilitate its reputation and standing in the District of Columbia and the correctional community.

Accordingly, you will be removed from your position of Correctional Officer with the D.C. Department of Corrections effective the close of business on Monday, December 17, 2007.

You are herewith informed of your right to grieve this final decision either through the negotiated grievance procedures set forth in the Collective Bargaining Agreement between the Agency and the FOP; or Appeal to the Office of Employee Appeals (OEA).

You may elect only one (1) of the grievance procedures. Once you have selected a grievance procedure, [it] is binding.

If you elect to appeal through the negotiated grievance procedure, your appeal should be forwarded to me Devon Brown, Director, D.C. Department of Corrections, 1923 Vermont Avenue, N.W., Suite 201, Washington, DC 20001. Your appeal may be made by completing a grievance resolution form and forwarding it to the above address during the period beginning with the day after the effective date of this letter, but not later than ten (10) calendar days after the effective date.

If you have questions concerning your appeal rights through the negotiated grievance procedure, they should be directed to the Fraternal Order of Police (FOP) Union. The office is located at 711-4th Street N.W., Washington, D.C. 20001, and may be reached by telephone on (202) 737-3505.

If you elect to file an appeal with the Office of Employee Appeals (OEA), it must be filed within thirty (30) calendar days of receipt of this notice. The OEA is located at 717-14th Street, N.W., Third Floor, Washington, D.C. 20005. Enclosed are the OEA appeal form and a copy of the OEA regulations. For additional information on filing an appeal, you should contact OEA on (202) 727-0004.

On the effective date of your termination, you are required to turn in all issued keys, security badge(s), identification card, telephone, computer, JACCS password and all other government properties issued to you as a District Government employee. The attached Employee Clearance Record must be used to process the clearances.

Sincerely,

Devon Brown
Director

Enclosures

# EXHIBIT 70

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director

December 14, 2007

Alphonso Bryant
1273 Oats Street, N.E.
Washington, DC 20002

Dear Mr. Bryant:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1613, this correspondence constitutes official notification of the final decision regarding the proposal to remove you from your position of Correctional Treatment Specialist with the D.C. Department of Corrections. This action is based on the charge of Negligence. The charge and specification were set forth in the advance notice dated March 15, 2007, which also advised you of your right to review any material upon which the proposed action was based and to respond in writing within six (6) days of receipt of the written notice.

Following an evaluation of the issues and facts in your case, Henry R. Lesansky, Hearing Officer submitted a written report and recommendation stating in relevant parts that:

"The administrative review of the present case addresses two (2) substantive issues in evaluating the proposed termination: (1) Whether there are reasonable grounds to believe that the charges are true based upon a preponderance of the evidence (DC Personnel Regulations, Chapter 1603.10) and (2) Whether there are reasonable grounds to believe that the charges, if true, support the proposed termination including the extent and weight of mitigating or aggravating circumstances as deemed appropriate (DC Personnel Regulations, Chapter 1603.9). With regard to the first question, neither in his written Response nor through evidence or information disclosed at his above-referenced administrative review Hearing before me, Correctional Treatment Specialist Bryant did not rebut the referenced Specifications with regard to his failure to note inmate Leaks escape history, nor his failure to review the institutional record for valid Separation Orders, which would have made inmate Leaks ineligible for the detail. He is not compelled to approve any inmate for the detail in the absence of complete and correct information including consideration of the institutional records of the inmate. In fact, he is obligated to use the "best evidence" standard represented by the institutional record in making these evaluations related to inmate custody and security classification. His failure to adhere to established policy in this regard was part of a series of closely related

actions and omissions that facilitated in the escape of inmates Leaks and Jones. Whenever an employee exercises the judgment or discretion to act or fail to act contrary to policy and procedure whether as a result of convenience, comfort or familiarity, he or she reasonably bears the burden of accountability for the risk of adverse consequences whether or not intended or anticipated.

Based upon these credibly undisputed facts, I conclude that (1) the agency has met its burden by a preponderance of the evidence that these facts as presented are true and support a charge of Negligence against Correctional Treatment Specialist Bryant; (2) his Negligence violated the regulations and policies detailed in the above-referenced Specifications and demonstrably contributed to the successful escape of inmates Leaks and Jones; and (3) his Negligence meets the standard of an act that "interferes with the efficiency or integrity of government operations" (DC Personnel Regulations, Chapter 1603.3).

In evaluating the second substantive question as to whether there are reasonable grounds to support termination as the appropriate agency remedy in this case, I have taken notice of the so-called "*Douglas*" factors deemed relevant for considering mitigating or aggravating circumstances in assessing the penalty to be imposed. In summary form, these include the nature and seriousness of the offense; the employee's job level and type of employment, disciplinary record, and prior work record; impact of the offense on the employee's ability to perform effectively in the future; consistency of the penalty with those imposed for the same or similar offenses including any applicable matrix for progressive discipline; notoriety of the offense or the impact on the agency's reputation; the clarity of notice or warnings to the employee of any violations of rules or regulations related to the offense; potential for rehabilitation; mitigating circumstances surrounding the offense; and adequacy and effectiveness of alternative sanctions to deter future offenses. While evidence and reports have been presented illustrating identifiable mitigating factors on behalf of the employee--such as longevity of service, little or no history of prior disciplinary action, positive performance ratings, workplace challenges outside employees' control resulting from staffing shortages and mandatory "drafting" of officers for overtime, weaknesses in some applicable agency policy, procedure and practice as well as inadequacies in certain technology and support mechanisms--these elements are individually and collectively outweighed by the seriousness of the offense and its adverse impact on the integrity of the agency. Specifically, the Negligence of this employee demonstrably contributed to the escape of inmates Leaks and Jones, which fundamentally compromised the core mission of the agency, violated the sworn oath of the employee, and harmed the citizens' collective trust in the agency to protect and preserve public safety.

Based upon the foregoing, I recommend that the charge of Negligence be sustained and that the proposed penalty of Termination be imposed.'

As the Deciding Official, I have thoroughly reviewed the evidence of record, which consists of all documents giving rise to issuance of the written advance notice, your response and the Hearing Officer's written report and recommendation. Based on my substantial review, I find that the evidence supports the cause of Negligence and the proposed penalty of removal. My decision is premised on the following.

On June 3, 2006, Inmates Joseph Leaks and Ricardo Jones, violent co-defendants, with pending Murder One (1) related charges, and separation orders that mandated they be separated at all times, including when being transported to and from court, escaped together from the DC Jail; because inmate Leaks was on an improper work detail assignment that you recommended he be hired for. The evidence documents that the separation order was dated August 26, 2005, and was contained in inmate Leaks' institution file.

Moreover, according to the Non-Industrial Pay System (NIPS) Post Order dated April 19, 2002, Inmates with Separation Orders from other inmate housed at CDF are not considered appropriate for placement on off-unit work assignments. Notwithstanding, you affirmed your signature of approval on inmate Leak's Personnel Action Request Form (PARF) to "hire".

By your own admission and your notation "Separations (See attached)" in the comments section of inmate Leaks' Inmate "PARF", you were well aware of the Separation Order between Inmates Leaks and Jones, and consequently, were aware of the substantial risk and prohibition in recommending inmate Leaks for the work detail assignment. As a Correctional Treatment Specialist, whose duties include, but are not limited to: screening inmate requests for detail placements at the jail, you are relied upon to conduct thorough, in-depth and accurate classifications affecting terms, conditions and privileges of confinement. Given the plain language of the separation order, it was incumbent upon you to check inmate Ricardo Jones' institution file to determine if he was currently housed at the Jail.

The record also determined that you recommended inmate Leaks for work detail assignment without reviewing his institutional file. During your interview with the Office of Internal Affairs, you admitted that you screened inmate Leaks for work detail assignment utilizing information from the JACCS and PRISMS databases. You gave no plausible explanation for screening inmate Leaks without reviewing his institutional file other than "I just didn't have it at the time." As a seasoned Correctional Treatment Specialist you are aware that there is absolutely no substitute for an inmate's hard copy

institutional file. As a matter of fact, during your interview with Hearing Officer Lesansky, you admitted that the institution record is useful, stating, "It is useful, as far as commitment, making sure that the individual is properly and lawfully committed to the jail and it does have Separation Orders, it has escapes and it has other pertinent information."

The evidence makes clear, your negligence in this matter and subsequently, the scathing notoriety and immeasurable embarrassment brought to bear on the Department of Corrections and the District of Columbia at large.

In rendering my final decision to sustain the removal action against you, I relied on Douglas Factors (1), (2), (5) (6) and (8).

Factor (1): The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

Public safety, community protection and the orderly, safe and secure operation of the jail constitute the primary mission of any correctional facility. Here, you had a specific responsibility to accurately screen inmate Leaks for off-unit work detail, which you failed to do.

Factor (2): The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

The failure to follow jail protocol consistent with the Non-Industrial Pay System (NIPS) Post Order resulted in the ultimate negative consequence that can occur in a Jail, an escape of two violent criminals into the community, thus constituting a most serious crime.

Factor (5): Considers the effects of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisors' confidence in the employee's ability to perform assigned duties;

The breach of the most ordinary security practices and the severity of the consequences, render it impossible to trust you with the day-to-day responsibilities of the position of Correctional Treatment Specialist.

Acts of this nature casts doubt on an employee's integrity and credibility as well as creates an environment of distrust and uncertainty among co-workers.

Factor (6): Consistency of the penalty with those imposed upon other employees for the same or similar offenses; and

All employees found to be negligent in their duties regarding the jail escape have or will have their employment terminated.

Factor (8): The notoriety of the offense or its impact upon the reputation of the agency:

The escapes were highly publicized, caused fear and concern in the community and grossly compromised the public trust in the agency to an extent that persists until now. The criticism of the agency and its employees has been pernicious to staff morale and the credibility of the agency. The public confidence has been shaken, as evidenced by Council hearings, community complaints, newspaper articles, editorials and televised news broadcasts. It will require a prolonged period for the agency to rehabilitate its reputation and standing in the District of Columbia and the correctional community.

Accordingly, you will be removed from your position of Correctional Treatment Specialist with the D.C. Department of Corrections effective the close of business on Monday, December 17, 2007.

You are herewith informed of your right to grieve this final decision either through the negotiated grievance procedures set forth in the Collective Bargaining Agreement between the Agency and the FOP; or Appeal to the Office of Employee Appeals (OEA).

You may elect only one (1) of the grievance procedures. Once you have selected a grievance procedure, [it] is binding.

If you elect to appeal through the negotiated grievance procedure, your appeal should be forwarded to me Devon Brown, Director, D.C. Department of Corrections, 1923 Vermont Avenue, N.W., Suite 201, Washington, DC 20001. Your appeal may be made by completing a grievance resolution form and forwarding it to the above address during the period beginning with the day after the effective date of this letter, but not later than ten (10) calendar days after the effective date.

If you have questions concerning your appeal rights through the negotiated grievance procedure, they should be directed to the Fraternal Order of Police (FOP) Union. The office is located at 711-4th Street N.W., Washington, D.C. 20001, and may be reached by telephone on (202) 737-3505.

If you elect to file an appeal with the Office of Employee Appeals (OEA), it must be filed within thirty (30) calendar days of receipt of this notice. The OEA is located at 717-14th Street, N.W., Third Floor, Washington, D.C. 20005. Enclosed are the OEA appeal form and a copy of the OEA regulations. For additional information on filing an appeal, you should contact OEA on (202) 727-0004.

On the effective date of your termination, you are required to turn in all issued keys, security badge(s), identification card, telephone, computer, JACCS password, procurement card and all other government properties issued to you as a District Government employee. The attached Employee Clearance Record must be used to process the clearances.

Sincerely,

Devon Brown
Director

Enclosures

# EXHIBIT 71

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director

December 14, 2007

Lawanda Hinton-Saunders
11789 Majestic Place
Waldorf, Maryland 20601

Dear Ms. Hinton-Saunders:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1613, this correspondence constitutes official notification of the final decision regarding the proposal to remove you from your position of Correctional Officer with the D.C. Department of Corrections. This action is based on the charge of Negligence. The charge and specification were set forth in the advance notice dated March 15, 2007, which also advised you of your right to review any material upon which the proposed action was based and to respond in writing within six (6) days of receipt of the written notice.

Following an evaluation of the issues and facts in your case, Henry R. Lesansky, Hearing Officer submitted a written report and recommendation stating in relevant parts that:

> "The administrative review of the present case addresses two (2) substantive issues in evaluating the proposed termination: (1) Whether there are reasonable grounds to believe that the charges are true based upon a preponderance of the evidence (DC Personnel Regulations, Chapter 1603.10) and (2) Whether there are reasonable grounds to believe that the charges, if true, support the proposed termination including the extent and weight of mitigating or aggravating circumstances as deemed appropriate (DC Personnel Regulations, Chapter 1603.9). With regard to the first question, Corporal Hinton-Saunders argues in her above-referenced written response that her conduct was not negligent as charged (at pages 6 and 7 of the Response) in part because she never received copies of either the Basic Regulations of All Employees or Correctional Officers General Orders with which she was charged as having violated, nor was she aware of any post orders which would have given her appropriate operational guidelines governing her assigned post as Administrative Module Officer #2 on the day of the escape. Further, Corporal Hinton-Saunders claims that she was not the only officer with keys to the administrative door separating the inmate housing units from the administrative

areas of the CDF, a fact confirmed by the Investigative Report. Finally, she insists that she was not responsible for authenticating the Detail Identification Pass of each inmate whom she permitted to pass through the door under her control, because those inmates were in the custody of another officer--including inmate Jones who was wearing the ID badge of another inmate (Beachum) in violation of security procedures.

However, neither in her written Response nor through evidence or information disclosed at her above-referenced administrative review Hearing before me, Corporal Hinton-Saunders did not rebut nor reconcile the referenced Specifications with regard to the lack of credibility in her conflicting accounts of which inmates, at what times, and with whom they were escorted when she opened the door under her control and granted passage to the administrative module. Corporal Hinton-Saunders also did not rebut her failure to adhere to the policies, general orders, and basic regulations as itemized in the Specifications governing, among other things, accountability for inmates and attention to duty. Nor did Corporal Hinton-Saunders provide a reasonable defense of her failure to verify the ID badges of the inmates to whom she granted access through the door under her control, including inmate Jones who wore an unauthorized ID badge of another inmate. Whenever an employee exercises the judgment or discretion to act or fail to act contrary to policy and procedure whether as a result of convenience, comfort or familiarity, he or she reasonably bears the burden of accountability for the risk of adverse consequences whether or not intended or anticipated.

Based upon these credibly undisputed facts, I conclude that (1) the agency has met its burden by a preponderance of the evidence that these facts as presented are true and support a charge of Negligence against Corporal Hinton-Saunders; (2) her Negligence violated the regulations and policies detailed in the above-referenced Specifications and demonstrably contributed to the successful escape of inmates Leaks and Jones; and (3) her Negligence meets the standard of an act that "interferes with the efficiency or integrity of government operations" (DC Personnel Regulations, Chapter 1603.3).

In evaluating the second substantive question as to whether there are reasonable grounds to support termination as the appropriate agency remedy in this case, I have taken notice of the so-called "*Douglas*" factors deemed relevant for considering mitigating or aggravating circumstances in assessing the penalty to be imposed. In summary form, these include the nature and seriousness of the offense; the employee's job level and type of employment, disciplinary record, and prior work record; impact of the offense on the employee's ability to perform effectively in the future; consistency of the penalty with those imposed for the same or similar

offenses including any applicable matrix for progressive discipline; notoriety of the offense or the impact on the agency's reputation; the clarity of notice or warnings to the employee of any violations of rules or regulations related to the offense; potential for rehabilitation; mitigating circumstances surrounding the offense; and adequacy and effectiveness of alternative sanctions to deter future offenses. While evidence and reports have been presented illustrating identifiable mitigating factors on behalf of the employee--such as longevity of service, little or no history of prior disciplinary action, positive performance ratings, workplace challenges outside employees' control resulting from staffing shortages and mandatory "drafting" of officers for overtime, weaknesses in some applicable agency policy, procedure and practice as well as inadequacies in certain technology and support mechanisms--these elements are individually and collectively outweighed by the seriousness of the offense and its adverse impact on the integrity of the agency. Specifically, the Negligence of this employee demonstrably contributed to the escape of inmates Leaks and Jones, which fundamentally compromised the core mission of the agency, violated the sworn oath of the employee, and harmed the citizens' collective trust in the agency to protect and preserve public safety.

Based upon the foregoing, I recommend that the charge of Negligence be sustained and that the proposed penalty of termination be imposed."

As the Deciding Official, I have thoroughly reviewed the evidence of record, which consists of all documents giving rise to issuance of the written advance notice, your response and the Hearing Officer's written report and recommendation. Based on my review, I find the evidence supports the cause of Negligence and the proposed penalty of removal. My decision is premised on the following:

On June 3, 2006, inmates Joseph Leaks and Ricardo Jones escaped from the Central Detention Facility. The evidence shows that on June 3, 2006, your assigned post was Administrative Module Officer #2, on the #2 shift. Your specific duty was controlling and maintaining the gate for the Administrative Two Door that separates the inmate housing units from the administrative areas of the CDF. As the Administrative Module Officer #2, it was your responsibility to ensure that all inmates passing through the Administrative Two Door security area were authorized by screening identification cards, badges, armbands, and all other means of identification necessary for proper passage. The evidence makes clear that you were negligence in the performance of this duty, because on June 3, 2006, inmate Joseph Leaks, who was wearing a green environmental identification card, left his assigned detail post assignment, proceeded through the Administrative Two Door into the inmate housing unit were he met up with inmate Ricardo Jones. According to inmate Leaks, you unlocked the door and allowed him and inmate Ricardo Jones who was wearing a detail badge bearing the photo of inmate

Carlton Beachum through the Administrative Two door onto the second floor of the administrative module. In clear and concise language, you allowed inmate Jones to walk through your post without implementing the proper security identification protocols. Accountability, control and identification of inmate movement are basic fundamental principles of population management. If you had properly screened the identification in Inmate Jones' possession, you would have discovered that he was wearing the Detail Identification Pass belonging to inmate Carlton Beachum and the escape would have been averted. Your negligence in allowing Inmate Jones to pass through the Administrative Two Door was a contributing factor to inmate Jones and Leaks effecting escapes from the confines of D.C. Jail on June 3, 2006.

The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility for persons committed to its custody. More substantially, it is the public's expectation that these persons will be confined until they are properly released. You have breached the public's trust and stained the integrity and credibility of the Department of Corrections as a public safety agency.

Based on my substantial review, I find that the evidence supports your removal for negligence; that your conduct threatened the integrity of government operations; and that it constitutes an immediate hazard to the agency, and a detriment to public safety. Consequently, I have decided to sustain the cause and proposed removal action against you.

In rendering my final decision to sustain the removal action, I relied on Douglas Factors (1), (2), (5), (6) and (8).

Factor (1): Considers the nature and seriousness of the offense, and its relation to the employee's duties, including whether the offense was intentional or technical or inadvertent, or was committed intentionally or maliciously or for gain, or was frequently repeated.

Correctional Officers occupy a position of trust, reliance and confidence. Each correctional employee has fiduciary responsibilities to the citizens of the District of Columbia to provide: Public safety, community protection and the orderly, safe and secure operation of the D.C. Jail. Your failure to verify Inmate Ricardo Jones' identity, allowing him through the Administrative Two door contributed to his successful escape from the CDF, which placed staff, inmates and the public at large in considerable capricious danger.

Factor (2): The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

I incorporate herein my response to Factor (1) above.

Factor (5): Considers the effects of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisors' confidence in the employee's ability to perform assigned duties;

Acts of this nature casts doubt on an employee's integrity and credibility as well as creates an environment of distrust and uncertainty among co-workers.

Factor (6): Consistency of the penalty with those imposed upon other employees for the same or similar offenses; and

All employees negligent in their duties resulting in this jail escape have or will be discharged.

Factor (8): The notoriety of the offense or its impact upon the reputation of the agency:

The escapes were highly publicized, caused fear and concern in the community and grossly compromised the public trust in the agency to an extent that persists until now. The criticism of the agency and its employees has been pernicious to staff morale and the credibility of the agency. The public confidence has been shaken, as evidenced by Council hearings, community complaints, newspaper articles, editorials and televised news broadcasts. It will require a prolonged period for the agency to rehabilitate its reputation and standing in the District of Columbia and the correctional community.

Accordingly, you will be removed from your position of Correctional Officer with the D.C. Department of Corrections effective the close of business on Monday, December 17, 2007.

You are herewith informed of your right to grieve this final decision either through the negotiated grievance procedures set forth in the Collective Bargaining Agreement between the Agency and the FOP; or Appeal to the Office of Employee Appeals (OEA).

You may elect only one (1) of the grievance procedures. Once you have selected a grievance procedure, [it] is binding.

Lawanda Hinton-Saunders
December 14, 2007
Page 6

    If you elect to appeal through the negotiated grievance procedure, your appeal should be forwarded to me Devon Brown, Director, D.C. Department of Corrections, 1923 Vermont Avenue, N.W., Suite 201, Washington, DC 20001. Your appeal may be made by completing a grievance resolution form and forwarding it to the above address during the period beginning with the day after the effective date of this letter, but not later than ten (10) calendar days after the effective date.

    If you have questions concerning your appeal rights through the negotiated grievance procedure, they should be directed to the Fraternal Order of Police (FOP) Union. The office is located at 711-4th Street N.W., Washington, D.C. 20001, and may be reached by telephone on (202) 737-3505.

    If you elect to file an appeal with the Office of Employee Appeals (OEA), it must be filed within thirty (30) calendar days of receipt of this notice. The OEA is located at 717-14th Street, N.W., Third Floor, Washington, D.C. 20005. Enclosed are the OEA appeal form and a copy of the OEA regulations. For additional information on filing an appeal, you should contact OEA on (202) 727-0004.

    On the effective date of your termination, you are required to turn in all issued keys, security badge(s), identification card, telephone, computer, JACCS password and all other government properties issued to you as a District Government employee. The attached Employee Clearance Record must be used to process the clearances.

                             Sincerely,

                             Devon Brown
                             Director

Enclosures

# EXHIBIT 72

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director

December 14, 2007

Darryl Love
3221 Brothers Pl. SE
Washington, DC 20032.

Dear Mr. Love:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1613, this correspondence constitutes official notification of the final decision regarding the proposal to remove you from your position of Correctional Treatment Specialist with the D.C. Department of Corrections. This action is based on the charge of Negligence. The charge and specification were set forth in the advance notice dated March 15, 2007, which also advised you of your right to review any material upon which the proposed action was based and to respond in writing within six (6) days of receipt of the written notice.

Following an evaluation of the issues and facts in your case, Henry R. Lesansky, Hearing Officer submitted a written report and recommendation stating in relevant parts that:

"The administrative review of the present case addresses two (2) substantive issues in evaluating the proposed termination: (1) Whether there are reasonable grounds to believe that the charges are true based upon a preponderance of the evidence (DC Personnel Regulations, Chapter 1603.10) and (2) Whether there are reasonable grounds to believe that the charges, if true, support the proposed termination including the extent and weight of mitigating or aggravating circumstances as deemed appropriate (DC Personnel Regulations, Chapter 1603.9). With regard to the first question, neither in his written Response nor through evidence or information disclosed at his above-referenced administrative review Hearing before me, Correctional Treatment Specialist Love did not rebut the referenced Specifications with regard to his erroneous entries nor his failure to correctly review and score Inmate Leaks' escape history. He is not compelled to reclassify any inmate in the absence of complete and correct information including consideration of the institutional records of the inmate. In fact, he is obligated to use the "best evidence" standard represented by the institutional record in making these evaluations and calculations related to inmate custody and security classification. His failure to

adhere to established policy in this regard was part of a series of closely-related actions and omissions that facilitated in the escape of inmates Leaks and Jones."

Whenever an employee exercises the judgment or discretion to act or fail to act contrary to policy and procedure whether as a result of convenience, comfort or familiarity, he or she reasonably bears the burden of accountability for the risk of adverse consequences whether or not intended or anticipated."

Based upon these credibly undisputed facts, I conclude that (1) the agency has met its burden by a preponderance of the evidence that these facts as presented are true and support a charge of Negligence against Correctional Treatment Specialist Love; (2) his Negligence violated the regulations and policies detailed in the above-referenced Specifications and demonstrably contributed to the successful escape of inmates Leaks and Jones; and (3) his Negligence meets the standard of an act that "interferes with the efficiency or integrity of government operations" (DC Personnel Regulations, Chapter 1603.3).

In evaluating the second substantive question as to whether there are reasonable grounds to support termination as the appropriate agency remedy in this case, I have taken notice of the so-called "*Douglas*" factors deemed relevant for considering mitigating or aggravating circumstances in assessing the penalty to be imposed. In summary form, these include the nature and seriousness of the offense; the employee's job level and type of employment, disciplinary record, and prior work record; impact of the offense on the employee's ability to perform effectively in the future; consistency of the penalty with those imposed for the same or similar offenses including any applicable matrix for progressive discipline; notoriety of the offense or the impact on the agency's reputation; the clarity of notice or warnings to the employee of any violations of rules or regulations related to the offense; potential for rehabilitation; mitigating circumstances surrounding the offense; and adequacy and effectiveness of alternative sanctions to deter future offenses. While evidence and reports have been presented illustrating identifiable mitigating factors on behalf of the employee--such as longevity of service, little or no history of prior disciplinary action, positive performance ratings, workplace challenges outside employees' control resulting from staffing shortages and mandatory "drafting" of officers for overtime, weaknesses in some applicable agency policy, procedure and practice as well as inadequacies in certain technology and support mechanisms--these elements are individually and collectively outweighed by the seriousness of the offense and its adverse impact on the integrity of the agency. Specifically, the Negligence of this employee demonstrably contributed to the escape of inmates Leaks and Jones, which fundamentally compromised the core mission of the agency, violated the sworn oath of the employee, and harmed the citizens' collective trust in the agency to protect and preserve public safety.

Based upon the foregoing, I recommend that the charge of Negligence be sustained and that the proposed penalty of Termination be imposed."

As the Deciding Official, I have thoroughly reviewed the evidence of record, which consists of all documents giving rise to issuance of the written advance notice, your response and the Hearing Officer's written report and recommendation. Based on my substantial review, I find that the evidence supports the cause of Negligence and the proposed penalty of removal. My decision is premised on the following.

On June 3, 2006, inmates Joseph Leaks and Ricardo Jones escaped from the Central Detention Facility. The evidence shows that during your reclassification of inmate Leak on March 11 and May 15, 2006, you assigned him a custody security rating of Medium. However, according to Leona Bennett, Correctional Program Officer, and the Technical Reference Manual, Inmate Leaks should have been classified as a maximum custody inmate. The OIA Investigation determined that during your reclassification of inmate Leaks you: (1) failed to utilize Inmate Leak's institutional file during your reclassification; (2) failed to consider that he had a history of escape; and (3) failed to score his U.S. Parole Violation underlying charge.

By your own admission during the Internal Affairs Investigation, you intended to give inmate Leaks 5 points in Part B on the reclassification instrument (severity of prior criminal conviction). However, you inadvertently struck the 3 key in error. Notwithstanding, as a result of your misclassification, inmate Leaks, a maximum custody inmate with a history of escape was permitted to work on an Off Unit Detail. The evidence makes clear that your negligence was a significant contributing factor to the escapes and if you had exercised reasonable, prudent and ordinary care in complying with classification/reclassification procedures in the Technical Reference Manual, inmate Leaks would have been ineligible for the Off Unit Detail, and the escapes would not have occurred.

As a Correctional Treatment Specialist, you are well aware that Classification lies at the heart of inmate programming; that accurate classification and reclassification of inmates are among the most important prison management decisions made as it not only directly links to inmate privileges, such as work details, but it ensures secure jail operations and facilitates staff and public safety. Your negligence represents an ongoing threat of careless decision-making that threatens the safety and security of staff, inmates and the public at large.

Additionally, your negligence brought notoriety and caused immeasurable embarrassment to the Department of Corrections and the District of Columbia government.

In rendering my final decision to sustain the removal action against you, I relied on Douglas Factors (1), (2), (5) (6) and (8).

Factor (1): The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

Public safety, community protection and the orderly, safe and secure operation of the jail constitute the primary mission of any correctional facility. Here, you had a specific responsibility to accurately reclassify Inmate Leaks, which you failed to do.

Factor (2): The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

The failure to follow standard classification/reclassification practices resulted in the ultimate negative consequence that can occur in a Jail, an escape of two violent criminals into the community, thus constituting a most serious crime.

Factor (5): Considers the effects of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisors' confidence in the employee's ability to perform assigned duties;

The breach of the most ordinary security practices and the severity of the consequences, render it impossible to trust you with the day-to-day responsibilities of the position of Correctional Treatment Specialist.

Acts of this nature casts doubt on an employee's integrity and credibility as well as creates an environment of distrust and uncertainty among co-workers.

Factor (6): Consistency of the penalty with those imposed upon other employees for the same or similar offenses.

All employees found to be negligent in their duties regarding the Jail escapes have or will have their employment terminated.

Factor (8): The notoriety of the offense or its impact upon the reputation of the agency:

The escapes were highly publicized, caused fear and concern in the community and grossly compromised the public trust in the agency to an extent that persists until now. The criticism of the agency and its employees has been pernicious to staff morale and the credibility of the agency. The public confidence has been shaken, as evidenced by Council hearings, community complaints, newspaper articles, editorials and televised news broadcasts. It will require a prolonged period for the agency to rehabilitate its reputation and standing in the District of Columbia and the correctional community.

Accordingly, you will be removed from your position of Correctional Treatment Specialist with the D.C. Department of Corrections effective the close of business on Monday, December 17, 2007.

You are herewith informed of your right to grieve this final decision either through the negotiated grievance procedures set forth in the Collective Bargaining Agreement between the Agency and the FOP; or Appeal to the Office of Employee Appeals (OEA).

You may elect only one (1) of the grievance procedures. Once you have selected a grievance procedure, [it] is binding.

If you elect to appeal through the negotiated grievance procedure, your appeal should be forwarded to me Devon Brown, Director, D.C. Department of Corrections, 1923 Vermont Avenue, N.W., Suite 201, Washington, DC 20001. Your appeal may be made by completing a grievance resolution form and forwarding it to the above address during the period beginning with the day after the effective date of this letter, but not later than ten (10) calendar days after the effective date.

If you have questions concerning your appeal rights through the negotiated grievance procedure, they should be directed to the Fraternal Order of Police (FOP) Union. The office is located at 711-4th Street N.W., Washington, D.C. 20001, and may be reached by telephone on (202) 737-3505.

If you elect to file an appeal with the Office of Employee Appeals (OEA), it must be filed within thirty (30) calendar days of receipt of this notice. The OEA is located at 717-14th Street, N.W., Third Floor, Washington, D.C. 20005. Enclosed are the OEA appeal form and a copy of the OEA regulations. For additional information on filing an appeal, you should contact OEA on (202) 727-0004.

On the effective date of your termination, you are required to turn in all issued keys, security badge(s), identification card, telephone, computer, JACCS password and all

[2]

Darryl Love
December 14, 2007
Page 6

other government properties issued to you as a District Government employee. The attached Employee Clearance Record must be used to process the clearances.

Sincerely,

Devon Brown
Director

Enclosures

# EXHIBIT 73

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS

Office of the Director

December 14, 2007

Shantell Hatton
10394 Hallmark Lane
Waldorf, MD 20603

Dear Ms. Hatton:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1613, this correspondence constitutes official notification of the final decision regarding the proposal to remove you from your position of Correctional Officer with the D.C. Department of Corrections. This action is based on the charge of Negligence. The charge and specification were set forth in the advance notice dated March 15, 2007, which also advised you of your right to review any material upon which the proposed action was based and to respond in writing within six (6) days of receipt of the written notice.

Following an evaluation of the issues and facts in your case, Henry R. Lesansky, Hearing Officer submitted a written report and recommendation stating in relevant parts that:

> "The administrative review of the present case addresses two (2) substantive issues in evaluating the proposed termination: (1) Whether there are reasonable grounds to believe that the charges are true based upon a preponderance of the evidence (DC Personnel Regulations, Chapter 1603.10) and (2) Whether there are reasonable grounds to believe that the charges, if true, support the proposed termination including the extent and weight of mitigating or aggravating circumstances as deemed appropriate (DC Personnel Regulations, Chapter 1603.9). With regard to the first question, Corporal Hatton argued in the above-referenced written response that her conduct was not Negligent as charged (at pages 6 and 7 of the Response) because, in part, it was "pattern and practice" for correctional officers to issue infirmary passes based upon a telephone call to the housing unit from the infirmary, albeit unverified by the correctional officer that the call was legitimate. Further, Corporal Hatton argued that in meeting her responsibility for tracking inmates, she was not solely accountable for verification of inmate movement and that this was a "shared" responsibility with the Officer-in-Charge and other officers on the unit.

However, neither in her written Response nor through evidence or information disclosed at the above-referenced administrative review Hearing before me, Corporal Hatton did not rebut the referenced Specifications with regard to the lack of credibility of her account regarding her failure to verify the authenticity of infirmary passes in general, nor verifying the authenticity of Inmate Jones' infirmary pass in particular though she readily had the means to do so. Further, Corporal Hatton did not refute her admission in the Investigation Report that she personally handed inmate Jones his infirmary pass, nor did she offer any evidence to contradict her admission in the Investigation Report that she erroneously placed inmate Jones' name on the "movement/running count" sheet as having returned to his housing unit, when in fact he had not returned and had escaped from the facility. Whenever an employee exercises the judgment or discretion to act or fail to act contrary to policy and procedure whether as a result of convenience, comfort or familiarity, he or she reasonably bears the burden of accountability for the risk of adverse consequences whether or not intended or anticipated.

Based upon these credibly undisputed facts, I conclude that (1) the agency has met its burden by a preponderance of the evidence that these facts as presented are true and support a charge of Negligence against Corporal Hatton; (2) her Negligence violated the regulations and policies detailed in the above-referenced Specifications and demonstrably contributed to the successful escape of inmates Leaks and Jones; and (3) her Negligence meets the standard of an act that "interferes with the efficiency or integrity of government operations" (DC Personnel Regulations, Chapter 1603.3).

In evaluating the second substantive question as to whether there are reasonable grounds to support termination as the appropriate agency remedy in this case, I have taken notice of the so-called "*Douglas*" factors deemed relevant for considering mitigating or aggravating circumstances in assessing the penalty to be imposed. In summary form, these include the nature and seriousness of the offense; the employee's job level and type of employment, disciplinary record, and prior work record; impact of the offense on the employee's ability to perform effectively in the future; consistency of the penalty with those imposed for the same or similar offenses including any applicable matrix for progressive discipline; notoriety of the offense or the impact on the agency's reputation; the clarity of notice or warnings to the employee of any violations of rules or regulations related to the offense; potential for rehabilitation; mitigating circumstances surrounding the offense; and adequacy and effectiveness of alternative sanctions to deter future offenses. While evidence and reports have been presented illustrating identifiable mitigating factors on behalf of the employee--such as longevity of service, little or no history of prior disciplinary action, positive performance ratings, workplace challenges outside

employees' control resulting from staffing shortages and mandatory "drafting" of officers for overtime, weaknesses in some applicable agency policy, procedure and practice as well as inadequacies in certain technology and support mechanisms--these elements are individually and collectively outweighed by the seriousness of the offense and its adverse impact on the integrity of the agency. Specifically, the Negligence of this employee demonstrably contributed to the escape of inmates Leaks and Jones, which fundamentally compromised the core mission of the agency, violated the sworn oath of the employee, and harmed the citizens' collective trust in the agency to protect and preserve public safety.

Based upon the foregoing, I recommend that the charge of Negligence be sustained and that the proposed penalty of Termination be imposed."

As the Deciding Official, I have thoroughly reviewed the evidence of record, which consists of all documents giving rise to issuance of the written advance notice, your response and the Hearing Officer's written report and recommendation. Based on my substantial review, I find that the evidence supports the cause of Negligence and the proposed penalty of removal. My decision is premised on the following.

On June 3, 2006, inmates Joseph Leaks and Ricardo Jones escaped from the Central Detention Facility. The record shows that on June 3, 2006 you were assigned to Southeast One (SE-1) Housing Unit where Inmate Jones was housed. At approximately 9:42 a.m., inmate Jones walked out of the SE-1 housing unit under the pretense of going to the infirmary, although he was not one of the six inmates from SE-1 scheduled for medical care on June 3, 2006.

The Office of Internal Affairs interviewed you regarding the escape on June 3 and June 4, 2007. During your interview on June 3, 2007 you stated that Corporal Cynthia Washington and Sergeant Dionne Makins were also assigned to the SE-1 Housing Unit with you. You further stated, after the count was completed, you, Corporal Washington and Sergeant Makins engaged in a conversation while in the bubble. You also stated that you made passes but was not sure how many or for whom you made passes for. You stated you took a call from Miss. Toni in the infirmary, who gave you about three names, but you were not sure of the three names, nor were you sure if that was the only call that you received from the infirmary. However, you stated that you wrote the names down in the run account. You also stated that beside yourself, you recalled Sergeant Makins preparing call-out passes. You stated that you could not recall what you did after you made the passes. You stated you could not remember if you went back onto the floor or stayed in the bubble. You further stated, you recalled opening Inmate Jones' cell, him coming to the bubble and giving him his pass, but were unsure if you made the pass. You stated after you gave him the pass, he walked out the door.

Shantell Hatton
December 14, 2007
Page 4

During your interview on Sunday, June 4, 2007, you began by explaining the June 3, 2007, running count sheet; how inmates are "minused (-) and plused (+)" in and where you would have gotten the names to put on the sheet. You explained that you got the names from the passes. You stated that when you came into the unit on June 3rd, passes had already been written and were lying on the table in the bubble. You stated that you put inmate names that needed to be on the running count sheet from the passes that were lying on the table. You stated you received a call from the infirmary for three of the inmates that you put on the running count sheet. When asked if inmate Ricardo Jones was included in the passes that had already been written, you responded, "I'm gonna tell you what happened with that. inmate Ricardo Jones, he was on the log sheet when I made this movement sheet okay. He was actually number two on the movement sheet, on this movement sheet. What had happened, the reason why he's not on this sheet as number two is because when we let him out, his pass was already done, in a pile." Later during the interview, Investigator Collins asked, "So when you saw these passes, Ricardo Jones' was one of them. His was completely filled out?" You stated, "Yes, it had, I'm not sure. I'm not sure if I filled his out, if I took the call, I'm not sure, because I took calls; she took calls. Some passes were filled out, some passes was not. You further stated, I don't know how this man came about to go to the infirmary. I'm not sure"

You also stated that you had to redo the movement sheet because as the inmate were retuning to the unit you took their passes and plused them in on the movement sheet. You stated that because you thought you had nmate Ricardo Jones' pass you plused him in. You stated once you discovered that he was not in his cell you minused him back out. You also stated that because of this error you wrote a new sheet and threw the original sheet in the trash.

On Tuesday, July 10 2007, you and your attorney, Mr. Hannon met with Hearing Officer Lesansky, for an oral hearing. During the hearing you stated you and Corporal Washington conducted the morning count. You further stated that Sergeant Makins came in later and you reported the count to her. This procedure violates the Southeast One Housing Unit Post Orders, Section V(10)(c), which states: All officers assigned to the housing unit shall participate in the official count, and "**It is mandatory that the OIC of the unit be present for all official counts**."

You stated before the count cleared and while you, Corporal Washington and Sergeant Makins were all in the bubble together, Sergeant Makins was pre-signing passes for the infirmary load. You further stated that you did not know what calls came in at that time. You also stated once the count cleared, Sergeant Makins started giving the passes out to the inmates to go to the infirmary or wherever they were going. You stated that both Corporal Washington and Sergeant Makins went on the floor then they both came back into the bubble with you. However, the Southeast One Housing Unit Post Orders, Section V(6)(2)(g), states: Only one officer shall be in the Control Module at

a time. No chairs or other furniture shall be in the sally-port area. Only one chair shall be allowed in the Control Module.

During the oral hearing you were asked, if in the course of the investigation, if you saw the pass that inmate Jones used. You confirmed that you saw the pass when you went to the FBI. You also stated that Sergeant Makins had signed the pass; you had initialed the pass and believed you put the time on the pass and that Corporal Washington had also initialed and timed the pass. You also stated that you really did not remember signing the pass, but you probably did because it looked like your handwriting. When asked how you would have put your handwriting on it, you responded, "I could recall him banging on the cell, and Ms. Makins was on the top of the tier, and she was telling me and Ms. Washington, because me and Ms. Washington was in the bubble, to open up the inmate's cell because the inmate was going to the infirmary. So Ms. Washington was saying, Makins, how do you know he's going to the infirmary? So Ms. Makins was like, open up his cell, he going to the infirmary." You stated you opened the cell and when the inmate came down he gave Ms. Washington a pass. You stated Ms. Washington initialed the pass and then gave it to you; you initialed and timed the pass and wrote the time on the movement sheet and gave the pass back to the inmate.

When asked about the phone call from the infirmary, you stated that you were not sure who took that phone call because all three of you participated in that pass and all of you participated in the bubble. You further stated that you could have taken the call and it was a big possibility that you did and a big possibility that you didn't.

Also, during the interview, Hearing Officer Lesansky referred to your interview with Internal Affairs and made referenced your statement where you acknowledged that you opened inmate Ricardo Jones' cell and observed him walk out of the cell to the bubble, where you gave him his pass. You responded, "Right, but that wasn't true I was like confused and I'm going to tell you why, because when the inmate came out of his cell, he was like—what I recall is the inmate was waving his hand out the cell, and Ms. Makins was saying, you know, open his cell. I opened his cell, and when he came to the bubble, he had already has his pass, because Ms. Washington had initialed his pass, and I had timed his pass and initialed it, so it could not have been true. You then stated that to your recollection, inmate Jones was in his cell, and he was waving his pass.

Also, during the oral hearing, Attorney Hannon provided a blank pass for illustration purposes, and the Hearing Officer asked you, "What did you see when you looked at his pass?" You stated you couldn't actually tell him what you saw, but you stated that you know Sergeant Makin's name was on the pass; and you remember the pass being made out. When Hearing Officer asked, "And the pass was made out in terms of his name, you responded, "Uh-huh. However, earlier you stated that inmate Jones' pass was one of

the passes that had already been written and was lying on the table in the bubble when you reported to the unit on June 3rd.

The Internal Affairs Investigation Report (dated July 20, 2006) stated "All three officers assigned to the Southeast One (1) housing unit were interviewed and have given conflicting accounts of the circumstances surrounding how inmate Jones was allowed to leave his housing unit without a scheduled infirmary appointment." You also provided conflicting accounts of the instant matter during your oral hearing (July 10, 2007) which was taped and transcribed.

You stated for example, that (1) you are not sure whether or not you received a call from the sick call officer for inmate Jones to report for medical care; (2) you did not recall inmate Jones complaining to you or any of the officers in the unit of being sick; and (3) initially you thought you gave the pass to Inmate Jones; then you did not give the pass to inmate Jones. However, after reviewing the pass, you realized that you had initialed the pass authorizing inmate Jones movement.

By initialing the pass that inmate Jones had in his possession, and not being attentive to duty, you created opportunity and authorization for inmate Jones' movement out of the SE-1 housing unit. As an officer assigned to the unit, you had specific responsibilities for the security and accountability for all inmates assigned to the unit. Your negligence was a contributing factor in inmate Jones being able to hook-up with is co-defendant (Joseph Leaks) and effect their escapes from confinement at the D.C. Jail on June 3, 2006.

The citizens of the District of Columbia entrust correctional employees to provide a safe and secure facility for persons committed to its custody. More substantially, it is the public's expectation that these persons will be confined until they are properly released. You have breached the public's trust and stained the integrity and credibility of the department of Corrections as a public safety agency.

Based on my substantial review, I find that the evidence supports your removal for negligence; that your conduct threatened the integrity of government operations; and that it constitutes an immediate hazard to the agency, and a detriment to public safety.

In rendering my final decision to sustain the removal action against you, I relied on Douglas Factors (1), (2), (5) (6) and (8).

Factor (1): The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

Public safety, community protection and the orderly, safe and secure operation of the jail constitute the primary mission of any correctional facility. Here, you had a specific responsibility for the accountability of inmate under your charge you were negligent in doing so.

Factor (2): The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

The failure to follow standard security practices resulted in the ultimate negative consequence that can occur in a Jail, an escape of two violent criminals into the community, thus constituting a most serious crime.

Factor (5): Considers the effects of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisors' confidence in the employee's ability to perform assigned duties;

The breach of the most ordinary security practices and the severity of the consequences, render it impossible to trust you with the day-to-day responsibilities of the position of Correctional Officer

Acts of this nature casts doubt on an employee's integrity and credibility as well as creates an environment of distrust and uncertainty among co-workers.

Factor (6): Consistency of the penalty with those imposed upon other employees for the same or similar offenses; and

All employees negligent in their duties resulting in this jail escape have or will be discharged.

Factor (8): The notoriety of the offense or its impact upon the reputation of the agency:

The escapes were highly publicized, caused fear and concern in the community and grossly compromised the public trust in the agency to an extent that persists until now. The criticism of the agency and its employees has been pernicious to staff morale and the credibility of the agency. The public confidence has been shaken, as evidenced by Council hearings, community complaints, newspaper articles, editorials and televised news broadcasts. It will require a prolonged period for the agency to rehabilitate its reputation and standing in the District of Columbia and the correctional community.

Accordingly, you will be removed from your position of Correctional Officer with the D.C. Department of Corrections effective the close of business on Monday, December 17, 2007.

You are herewith informed of your right to grieve this final decision either through the negotiated grievance procedures set forth in the Collective Bargaining Agreement between the Agency and the FOP; or Appeal to the Office of Employee Appeals (OEA).

You may elect only one (1) of the grievance procedures. Once you have selected a grievance procedure, [it] is binding.

If you elect to appeal through the negotiated grievance procedure, your appeal should be forwarded to me Devon Brown, Director, D.C. Department of Corrections, 1923 Vermont Avenue, N.W., Suite 201, Washington, DC 20001. Your appeal may be made by completing a grievance resolution form and forwarding it to the above address during the period beginning with the day after the effective date of this letter, but not later than ten (10) calendar days after the effective date.

If you have questions concerning your appeal rights through the negotiated grievance procedure, they should be directed to the Fraternal Order of Police (FOP) Union. The office is located at 711-4th Street N.W., Washington, D.C. 20001, and may be reached by telephone on (202) 737-3505.

If you elect to file an appeal with the Office of Employee Appeals (OEA), it must be filed within thirty (30) calendar days of receipt of this notice. The OEA is located at 717-14th Street, N.W., Third Floor, Washington, D.C. 20005. Enclosed are the OEA appeal form and a copy of the OEA regulations. For additional information on filing an appeal, you should contact OEA on (202) 727-0004.

On the effective date of your termination, you are required to turn in all issued keys, security badge(s), identification card, telephone, computer, JACCS password, procurement card, driver's license and all other government properties issued to you as a District Government employee. The attached Employee Clearance Record must be used to process the clearances.

Sincerely,

Devon Brown
Director

Enslosures

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CYNTHIA WASHINGTON, *et al.*, :
:
:
Plaintiffs, : Case Number: 1:07-cv-01031 (RMU)
:
v. :
:
DISTRICT OF COLUMBIA, *et al.*, :
:
Defendants. :

**ORDER**

Upon consideration of the Plaintiffs' Motion for an Emergency Temporary Restraining Order and the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for an Emergency Temporary Restraining Order, it is by the Court this ____ day of December, 2007,

**ORDERED** that the Motion is **GRANTED**; and it is

**FURTHER ORDERED**, for the reasons outlined below that Defendants in this case are immediately barred from terminating the Plaintiffs from their current positions until which time the matters which are the subject of this case are resolved by this Court. A temporary restraining order has been issued in this matter for the foregoing reasons:

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

**IT IS FURTHER ORDERED** that the granted temporary restraining order is binding upon the parties to this action, as well as upon the parties' officers, agents, servants, employees, and attorneys.

______________________________________
THE HONORABLE RICARDO M. URBINA
District Court Judge

Copies to:

David Jackson, Esq.
Office of the Attorney General
441 Fourth Street, NW
6 South
Washington, DC 20001

J. Michael Hannon, Esq.
HANNON LAW GROUP, LLP
1901 18th Street, N.W.
Washington, D.C. 20009