## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CYNTHIA WASHINGTON, *et al.,* | : | |
| | : | |
| | : | |
| Plaintiffs, | : | Case Number: 1:07-cv-01031 (RMU) |
| | : | |
| v. | : | |
| | : | |
| DISTRICT OF COLUMBIA, *et al.,* | : | |
| | : | |
| Defendants. | : | |

## <u>NOTICE OF FILING</u>

The Clerk of the Court shall please accept for filing the attached Exhibits in support of

the **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** and the **PLAINTIFFS'**

**MOTION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER**, both

electronically filed on December 20, 2007:

- Exhibit A, Affidavit of Jessica V. Pimentel[1]

- Exhibit 74, Affidavit of Cynthia Washington

- Exhibit 75, Affidavit of Herbert Douglas

- Exhibit 76, Affidavit of Lorenzo Jennings

- Exhibit 77, Affidavit of Dionne Makins

- Exhibit 78, Affidavit of Alphonso Bryant

- Exhibit 79, Affidavit of Lowanda Hinton-Saunders

- Exhibit 80, Affidavit of Darryl Love

- Exhibit 81, Affidavit of Shantell Hatton

---

[1]     Exhibit A is referenced in Paragraph 1c of the Amended Statement of Material Facts Not in Dispute of Plaintiffs' Motion for Partial Summary Judgment and was inadvertently not filed with the Amended Statement on December 20, 2007.

- Exhibit 82, Selected Testimony of Joan E. Murphy

- Exhibit 83, Selected Testimony of Devon Brown

- Exhibit 84, Testimony of Neal Gross

Dated January 2, 2008                          Respectfully submitted,


                                               HANNON LAW GROUP, LLP


                                               _____/s/ J. Michael Hannon_____
                                               J. Michael Hannon, #352526
                                               1901 18th Street, N.W.
                                               Washington, D.C.  20009
                                               (202) 745-6880
                                               (202) 232-3704 Facsimile
                                               jhannon@hannonlawgroup.com



                        **CERTIFICATE OF SERVICE**

        **I HEREBY CERTIFY** that the foregoing **NOTICE OF FILING** was sent via electronic filing this 2nd day of January, 2008, to:

David Jackson, Esq.
Office of the Attorney General
441 Fourth Street, NW
6 South
Washington, DC 20001



                                               _____/s/ J. Michael Hannon_____
                                               J. Michael Hannon

2

# EXHIBIT A

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Department of Human Resources



### AFFIDAVIT OF JESSICA V. PIMENTEL

1. I, Jessica V. Pimentel, am the Policy Manager with the Policy & Planning Administration within the D.C. Department of Human Resources (DCHR). I have held this position since 2000. In this position, my duties involve drafting personnel regulations, policies and procedures, and legislation; as well as maintaining and updating the District Personnel Manual (DPM). I also respond to questions from other District government agencies and employees concerning the application of the personnel law, regulations, and the DPM.

2. On July 26, 2006, Ms. Joan Murphy, Special Projects Officer, Department of Corrections (DOC), called to request that the Director, DCHR, grant a variation to section 1616.4 of Chapter 16 of the D.C. personnel regulations, General Discipline and Grievances. Section 1616.4 of the regulations provides that in the case of a summary removal action, the agency head or designee taking the action shall provide the written notice to the affected employee within three (3) days of the summary removal. In accordance with Chapter 4 of the regulations, Organization for Personnel Management, the Director, DCHR, has the authority to grant a variation from the letter of the regulations if the variation is within the spirit of the regulations and the efficiency of the District government and the various services are protected and promoted.

3. I informed Lisa R. Marin, Director of the DCHR at the time, of the request for the variation, and Ms. Marin executed her authority and directed the use of the variation under the limited circumstances described by the DOC and reflected in the DPM issuance granting the variation, DPM Bulletin No. 4-25 & 16-1, dated July 26, 2006. As stated in the document, the variation extended the period for providing the written notice specified in section 1616.4 of the regulations to allow the DOC the time it needed to complete the transcription of the investigation on the summary removal actions taken.

4. At the request of the DOC, Ms. Marin approved and signed a second issuance on July 28, 2006 (DPM Bulletin No. 4-29 & 16-2) to change the expiration date of the bulletin from September 30, 2006 to December 31, 2006.

5. I drafted both of the DPM issuances, as directed and transmitted them to Director Marin who signed them on July 26, 2006, and July 28, 2006, respectively.

I affirm that this statement is true and accurate.

_Jessica V. Pimentel_     5/25/07
Jessica V. Pimentel        Date

District of Columbia : SS
Subscribed and sworn to before me
this 25th day of May , 2007
_Lela R. Hunter_    Notary Public
LELA R. HUNTER
My commission expires September 14, 2011

_____
Notary Public

# EXHIBIT 74

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CYNTHIA WASHINGTON, *et al.*,                :
                                             :
                                             :
          Plaintiffs,                        :          Case Number: 1:07-cv-01031 (RMU)
                                             :
     v.                                      :
                                             :
DISTRICT OF COLUMBIA, *et al.*,              :
                                             :
          Defendants.                        :

## AFFIDAVIT OF CYNTHIA WASHINGTON

My name is Cynthia Washington and I am competent to give this Affidavit.

1.    I am a plaintiff in the above-captioned matter.

2.    I am 50 years old.

3.    The highest level of education I have completed is high school. I have also completed a word processing program. I attended college, but did not complete a degree program. I have no significant training or experience in any field other than law enforcement.

4.    I have been employed with the Department of Corrections for 20 years. I worked from 1983 – 2000 and then returned to the Department in 2004.

5.    I have been a Correctional Officer for the duration of my employment with the Department of Corrections. Throughout my years of service, I have received numerous salary increases.

6.    Since being placed on administrative leave from my position in the Department of Corrections I have not attempted to obtain other employment because I am confident that I will be reinstated to my position at the D.C. Jail in the near future. Additionally, I have not attempted

to obtain other employment because I anticipate that potential employers will be unable to place a significant amount of trust in me as a result of the stigma associated with the D.C. Jail escape.

7.    Primarily because of my age and educational background, I expect that finding a comparable position, in terms of salary and responsibility, outside of the Department of Corrections would be difficult and unlikely. Furthermore, positions in law enforcement are effectively closed to me given the unfavorable information in my file with the Department of Corrections and released to the public regarding the D.C. Jail escape.

8.    Before I was placed on administrative leave, my family and I had grown accustomed to living a lifestyle in which we felt financially secure and comfortable. We were not forced to cut corners or make many sacrifices in our daily activities. Without a job and source of income, the Washington family will have to cut back tremendously to maintain our financial responsibilities.

9.    I am a homeowner. I have two mortgages on my home. Without employment and a source of income, both mortgages would be in jeopardy.

10.    Without a source of income, I have resorted to taking money out of my retirement account. There is approximately $10,000 remaining in my retirement account. This amount is not sufficient to support me during my retirement.

11.    I am currently eligible to retire. Despite my eligibility, I desire to return to my position with the Department of Corrections and to continue working there until I am no longer physically capable of performing the job. Additionally, if I was denied the opportunity to return to work at the Department of Corrections to retire from my position, I would be required to live off of social security benefits alone, as I have no other adequate retirement plan. Because social

security benefits and the amount of money I have set aside for retirement will not provide me with enough income, I am left with no other choice than to continue working.

FURTHER AFFIANT SAYETH NOT.

I HEREBY SWEAR under the penalties of perjury of the United States of America that the information I have provided above is true and correct to the best of my knowledge and belief.

Cynthia Washington

Dated: 12-31-07

# EXHIBIT 75

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CYNTHIA WASHINGTON, *et al.,*   :
             :
             :
   Plaintiffs,     :  Case Number: 1:07-cv-01031 (RMU)
             :
v.            :
             :
DISTRICT OF COLUMBIA, *et al.,*   :
             :
   Defendants.    :

## <u>AFFIDAVIT OF HERBERT DOUGLAS</u>

My name is Herbert Douglas and I am competent to give this Affidavit.

1. I am a plaintiff in the above-captioned matter.

2. I am 58 years old.

3. The highest level of education I have completed is one year of college. I have no significant training or experience in any field other than law enforcement.

4. I have been employed with the Department of Corrections for 16 years.

5. When I first started working with the Department of Corrections, my rank was Private. I was promoted to the rank of Corporal, also known as Senior Correctional Officer.

6. Since being placed on administrative leave I have attempted to obtain other employment outside of the Department of Corrections. I applied for several security positions and after several unsuccessful attempts to find employment I was finally fortunate to secure a position with a security company. As a security officer I am earning half the pay I earned as a Correctional Officer. Furthermore, this position offers no opportunity for advancement.

7.    After being placed on administrative leave from my position in the Department of Corrections, I have experienced difficulty in obtaining employment with other government agencies because of the pending proceedings with the Department of Corrections.

8.    Given my age, finding a comparable position, in terms of rank, responsibility and pay, outside of the Department of Corrections would be difficult and unlikely. Positions in law enforcement are effectively closed to me given the unfavorable information in my file with the Department of Corrections and released to the public regarding the D.C. Jail escape.

9.    Without a job and source of income, I will face a number of hardships. I am a homeowner and must maintain mortgage payments or face foreclosure. I will be unable to provide for my family. I am responsible for numerous financial obligations in supporting my family including my daughter's college tuition, car loan and insurance, several utility expenses, and repayment of unemployment compensation.

10.    I have resorted to withdrawing money from my retirement account in order to provide for my family and prevent losing my home and falling behind in my bills. I have approximately $15,000 left in my retirement fund.

11.    I am eligible to retire. I have a total of sixteen years, four with the federal government and seventeen in the military. I am past the required age of 57. Despite my eligibility to retire, I desire to return to my position with the Department of Corrections and to continue working there until I am no longer physically capable of performing the job. If I was denied the opportunity to return to work at the Department of Corrections, I would be required to live off of social security benefits, as I have no other adequate retirement plan. Because social security benefits and the small amount of money I have saved for retirement will not provide me with enough income, I am left with no other choice than to continue working.

FURTHER AFFIANT SAYETH NOT.

I HEREBY SWEAR under the penalties of perjury of the United States of America that

the information I have provided above is true and correct to the best of my knowledge and belief.

Herbert Douglas

Dated: 12/31/07

# EXHIBIT 76

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CYNTHIA WASHINGTON, *et al.*,      :

                         :

                         :

        Plaintiffs,        :      Case Number: 1:07-cv-01031 (RMU)

                         :

    v.                      :

                         :

DISTRICT OF COLUMBIA, *et al.*,     :

                         :

        Defendants.     :

## AFFIDAVIT OF LORENZO JENNINGS

My name is Lorenzo Jennings and I am competent to give this Affidavit.

1.     I am a plaintiff in the above-captioned matter.

2.     I am 45 years old.

3.     I am a high school graduate. I have no significant training or experience in any field other than law enforcement.

4.     I have been employed with the Department of Corrections for almost 23 years.

5.     I began with Department of Corrections as a Correctional Officer. I was promoted to Corporal. During the past year I would have been eligible for a promotion to Sergeant. I have already taken the Sergeant's exam but because I was on administration leave when the promotions were awarded, I was not able to be considered for the promotion.

6.     Since being placed on administrative leave I have attempted to obtain other employment outside of the Department of Corrections. After several unsuccessful attempts to find employment I was fortunate to secure a position with a private security company as a security officer. This position pays me substantially less than I would have been making at the Department of Corrections. Furthermore, this position offers no opportunity for advancement.

The potential employers that did not offer me a position stated that this situation involving my removal from my position with the Department of Corrections was a primary factor in their decision to reject me for employment.

7.    After being placed on administrative leave from my position with the Department of Corrections, I have experienced difficulty in obtaining employment with other government agencies. The government agencies that rejected me for employment did not reveal the reason for their decision.

8.    Given my education background, training and experience, finding a comparable position, in terms of pay and responsibility, outside of the Department of Corrections has been difficult. Positions in law enforcement are effectively closed to me given the unfavorable information in my file with the Department of Corrections and released to the public regarding the D.C. Jail escape.

9.    Without a job and source of income, I will not be able to afford to maintain my home, my mortgage will be in jeopardy, and I will not be able to provide the necessities for myself and my family. As a result, my health has suffered and worsened because of the stress of the situation.

10.    After being terminated from the Department of Corrections, during the time in which I was not receiving any income, I essentially depleted my personal savings. I did not resort to withdrawing money from my retirement account.

11.    I am eligible for retirement in five years. I desire to return to my position with the Department of Corrections and to continue working there until I am no longer physically capable of performing the job. I have been doing this job for the past 22 years and I truly enjoy the work. If I was denied the opportunity to return to work at the Department of Corrections, upon reaching

retirement age I would be required to live off of social security benefits, as I have no other

adequate retirement plan. Because social security benefits and the small amount of money I have

saved for retirement will not provide me with enough income, I am left with no other choice than

to continue working.

FURTHER AFFIANT SAYETH NOT.

I HEREBY SWEAR under the penalties of perjury of the United States of America that

the information I have provided above is true and correct to the best of my knowledge and belief.

Lorenzo Jennings

Dated: Dec. 31. 2007

3

EXHIBIT 77

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CYNTHIA WASHINGTON, *et al.,*              :
                                           :
                                           :
            Plaintiffs,                    :        Case Number: 1:07-cv-01031 (RMU)
                                           :
v.                                         :
                                           :
DISTRICT OF COLUMBIA, *et al.,*            :
                                           :
            Defendants.                    :

## AFFIDAVIT OF DIONNE MAKINS

My name is Dionne Makins and I am competent to give this Affidavit.

1.      I am a plaintiff in the above-captioned matter.

2.      I am 39 years old.

3.      I am a high school graduate and I have attended college at Strayer College and the University of the District of Columbia. I did not complete a degree program. I have no significant training or experience in any field other than law enforcement.

4.      I have worked for the Department of Corrections for 17 years.

5.      I came to the Department of Corrections in 1990 as a Probationary Officer at the rank of Private. In 1991, I was chosen to be the Major's Aide at the Youth Center Facility in Lorton, VA. This post was a highly confidential post. It required me to work in an administrative position and I was responsible for the Inmate Detail Squad in the Administration Building of the Facility. I was responsible for inmate pay and detailed assignment throughout the building. I was the second Officer in charge of the Command Center at the Central Detention Facility from 2003-2006. I was responsible for the daily reports pertaining to the shift and deployed staff to emergency situations. I was promoted to Lead Correctional Officer with the

rank of Sergeant in 2006 and my responsibilities were to oversee the operations of a housing unit.

6.      Since being placed on administrative leave from my position with the Department of Corrections I have attempted to obtain other employment outside of the Department of Corrections. I have been on several interviews for security jobs. I have had to disclose to these potential employers the reason for my termination from the Department of Corrections and, in some cases, I have had to submit written documentation. One potential employer rejected me for these positions because of an unfavorable reference from a previous employer, no doubt the Department of Corrections. Another potential employer communicated to me that I was not chosen for the position because of newspaper articles regarding the D.C. Jail escape and the possibility of prosecution alluded to by Director Brown in a public statement. A third potential employer stated that a position would not be offered to me because my employment status with the Department of Corrections was in the appeal process.

7.      I have not applied for any government job because of the stigma attached to the incident involving the jail escape on June 3, 2006.

8.      Finding a comparable position, in terms of rank and responsibility, outside of the Department of Corrections is not likely. Positions in law enforcement are effectively closed to me due to the unfavorable information in my file with the Department of Corrections and released to the public regarding the D.C. Jail escape.

9.      I have been a homeowner since 1997. Without a source of income, I will not be able to make my mortgage payments on time. As a result, I will not be able to maintain good credit. Without a job and source of income, I cannot afford to support myself and meet my

2

financial obligations. Additionally, many of my family members depend on me for financial support.

10. I am eligible for retirement in eleven years. I desire to return to my position with the Department of Corrections and to continue working there until I am no longer physically capable of performing the job. Additionally, if I was denied the opportunity to return to work at the Department of Corrections to finish out my time until retirement, I would be required to live off of social security benefits alone, as I have no other adequate retirement plan. Because social security benefits and the small amount of money I have set aside for retirement will not provide me with enough income, I have no other option but to continue working.

FURTHER AFFIANT SAYETH NOT.

I HEREBY SWEAR under the penalties of perjury of the United States of America that the information I have provided above is true and correct to the best of my knowledge and belief.

Dionne Makins

Dated: _12-31-07_

3

# EXHIBIT 78

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CYNTHIA WASHINGTON, *et al.,*    :
    :
    :
       Plaintiffs,    :    Case Number: 1:07-cv-01031 (RMU)
    :
v.    :
    :
DISTRICT OF COLUMBIA, *et al.,*    :
    :
       Defendants.    :

### <u>AFFIDAVIT OF ALPHONSO BRYANT</u>

My name is Alphonso Bryant and I am competent to give this Affidavit.

1.    I am a plaintiff in the above-captioned matter.

2.    I am 50 years old.

3.    The highest level of education I have completed is a four year college degree.  I have no significant training or experience in any field other than law enforcement.

4.    I have been employed by the Department of Corrections for the last 23 years.

5.    For the first five years of my employment with the Department of Corrections I worked as a Corrections Officer.  Thereafter, I became a Classification and Parole Officer, the position now referred to as Case Manager.

6.    Since being placed on administrative leave from my position with the Department of Corrections, I have attempted to obtain other employment but have experienced difficulty in securing a position.  No other government agency will hire me because I am currently on administrative leave from my position with the Department of Corrections.  Positions in law enforcement are effectively closed to me given the unfavorable information in my file with the Department of Corrections and released to the public regarding the D.C. Jail escape.

7.    Finding a comparable position, in terms of rank and responsibility, outside of the Department of Corrections would be difficult, especially a position outside of the D.C. government. If I were to obtain a job outside of the D.C. government I would be forced to start at a low position and work my way back up through promotions and upgrades to reach a point comparable to where I am now with the Department of Corrections. I would likely never reach that level given my age.

8.    Without a job and source of income, I will not be able to afford to maintain the financial obligations of my family such as college tuition for my two sons, household expenses, insurance, and daily living expenses. I am prevented from making any financial decisions or commitments. This situation has effectively put my life on hold. This situation has also put a tremendous stress on my marriage.

9.    I am eligible for retirement in approximately seven years. I desire to return to my position with the Department of Corrections and to continue working there until I am no longer physically capable of performing the job. I want to return to work and to finish out my career with the Department of Corrections. I truly enjoy my job and I am dedicated to the work. I enjoy the sense of helping those who do not have the means to help themselves. Additionally, if I was denied the opportunity to return to work at the Department of Corrections to finish out my time until retirement, I would be required to live off of social security benefits alone, as I have no other adequate retirement plan. Because social security benefits and the small amount of money I have put aside for retirement will not provide me with enough income to support myself, I have no other choice than to continue working.

2

FURTHER AFFIANT SAYETH NOT.

I HEREBY SWEAR under the penalties of perjury of the United States of America that

the information I have provided above is true and correct to the best of my knowledge and belief.

Alphonso Bryant

Dated: Dec. 31, 2007

EXHIBIT 79

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CYNTHIA WASHINGTON, *et al.,*      :

                               :

                               :

            Plaintiffs,         :      Case Number: 1:07-cv-01031 (RMU)

                               :

   v.                         :

                               :

DISTRICT OF COLUMBIA, *et al.,*     :

                               :

           Defendants.     :

## <u>AFFIDAVIT OF LOWANDA HINTON-SAUNDERS</u>

My name is Lowanda Hinton-Saunders and I am competent to give this Affidavit.

1.     I am a plaintiff in the above-captioned matter.

2.     I am 44 years old.

3.     I completed a two year Associate degree program.  I have no significant training or experience in any field other than law enforcement.

4.     I have been employed with the Department of Corrections for the last 14 years.

5.     I began with Department of Corrections as a Correctional Officer.  I was promoted two times and earned more pay and responsibility with each promotion.  Most recently I was promoted to Senior Correctional Officer.  Before the incident involving the jail escape, I had never been disciplined or written up and I had always received excellent ratings in my evaluations.  I am currently eligible to be considered for a promotion to Sergeant.  Had I not been placed on administrative leave, I would have been able to take Sergeant's exam, but I was on leave when it was administered and was not permitted to sit for it.

6.     Since being placed on administrative leave I have attempted to obtain other employment outside of the Department of Corrections.  Several potential employers informed me

that they could not offer me a position because there were criminal charges pending against me. After several unsuccessful attempts to find employment I was fortunate to secure a position with a private security company as a security officer. This position offers no opportunity for advancement. Furthermore, I am earning about half as much money as I was making at the Department of Corrections. Additionally, before I was placed on administrative leave, I had been working part time at the U.S. Marshals Service. When I was fired from the Department of Corrections, the U.S. Marshals Service fired me as well because the U.S. Marshals Service would not continue to employ me since I was fired from another law enforcement agency. This situation has cost me my second income.

7. I continue to seek employment in the government. However, obtaining a position in the government has been extremely difficult. After being terminated from a government job, especially a position in law enforcement, clearing my name and obtaining new employment with the government has not been easy. The Department of Corrections' position regarding the reason behind my termination has prevented me from making a living comparable to when I was employed with the Department of Corrections.

8. Finding a comparable position, in terms of pay, responsibility, and opportunity for advancement outside of the Department of Corrections has been difficult. Positions in law enforcement are effectively closed to me given the unfavorable information in my file with the Department of Corrections and released to the public regarding the D.C. Jail escape.

9. Since being placed on administrative leave from the Department of Corrections, I have faced numerous hardships. My marriage has suffered and I have struggled to keep a roof over my head and food on the table. I am constantly worried because of the financial strain and stress of providing for my family including taking care of my mother and son. My son has

suffered from this situation as well in that I had take my son out of the school he had been attending because I was no longer able to afford the tuition. In my current job I have no other option than to work a substantial amount of overtime to earn enough to meet my financial obligations. Finally, I constantly agonize about the stigma hanging over my head caused by the Department of Corrections when they accused me of being criminally involved in the escape.

10.    I am a homeowner. Without the same level of income I had earned with the Department of Corrections, I am in fear of facing foreclosure on my mortgage.

11.    During the time I was not receiving any income, I resorted to taking money out of my retirement fund. There is approximately $4,000 left in my retirement account. To make ends meet, I have had to borrow money from friends and family.

12.    I am eligible for retirement in six years. I desire to return to my position with the Department of Corrections and to continue working there until I am no longer physically capable of performing the job. I have been doing this job for the past 14 years and I truly love the work. I made this my career and it is my livelihood. If I was denied the opportunity to return to work at the Department of Corrections, upon reaching retirement age I would be required to live off of social security benefits, as I have no other adequate retirement plan. Because social security benefits and the small amount of money I have saved for retirement will not provide me with enough income, I am left with no other choice than to continue working.

FURTHER AFFIANT SAYETH NOT.

I HEREBY SWEAR under the penalties of perjury of the United States of America that the information I have provided above is true and correct to the best of my knowledge and belief.

_Lowanda Hinton-Saunders_
Lowanda Hinton-Saunders

Dated: _1 - 2 - 08_

4

# EXHIBIT 80

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CYNTHIA WASHINGTON, *et al.,* | : | |
| | : | |
| | : | |
| Plaintiffs, | : | Case Number: 1:07-cv-01031 (RMU) |
| | : | |
| v. | : | |
| | : | |
| DISTRICT OF COLUMBIA, *et al.,* | : | |
| | : | |
| Defendants. | : | |

**AFFIDAVIT OF DARRYL LOVE**

My name is Darryl Love and I am competent to give this Affidavit.

1.    I am a plaintiff in the above-captioned matter.

2.    I am 50 years old.

3.    The highest level of education I have completed is a four year college degree.  I have no significant training or experience in any field other than law enforcement.

4.    I have been employed with the Department of Corrections for the last 25 years.

5.    I began my career with the Department of Corrections as a Correctional Officer. Throughout the years I received numerous promotions and awards.  I was promoted to Sergeant on the Compliance Team and then became a Case Manager.  When I transferred to the Halfway House program, I was the Assistant Administrator and was thereafter named Acting Administrator.  When the Halfway House closed I transferred back to the jail and returned to my position as a Case Manager.

6.    Since being placed on administrative leave from my position in the Department of Corrections, I have attempted to obtain other employment but have experienced difficulty in securing a position.  Potential employers have expressed a reluctance to offer a position to me

due to the circumstances surrounding my summary removal from my position with the

Department of Corrections and the fact that the Department of Corrections classified my

involvement in the jail escape incident as gross negligence.

7.    Given my age, finding a comparable position, in terms of rank and responsibility,

outside of the Department of Corrections has been difficult and does not seem likely.

8.    Lack of stable employment and income will cause me tremendous hardship in that

I will develop bad credit from being delinquent on my bills. I am a homeowner with a mortgage

payment of over $2,500 per month in addition to utility expenses. I am concerned about the

possibility of losing my home and the ability to provide for my family. This situation has had a

significant impact on my health and lifestyle. I am depressed and I find myself in a constant

state of worry. This situation has left me feeling that I have no purpose in life. I do not feel like

going out or being around other people, even friends. I do not feel as though I have anyone to

talk to about my situation because when people hear that you have been fired they automatically

think that you have done something wrong.

9.    In order to meet my financial obligations and provide for my family I have taken

a $30,000 loan, withdrawn $15,000 from my retirement account, and borrowed $10,000 from

family members. I have experienced great difficulty in repaying these loans. Additionally,

because I have resorted to withdrawing funds from my retirement savings, the amount remaining

is not adequate to provide for myself throughout retirement, which means I will be forced to

continue working.

10.    I am currently eligible to retire. Despite my eligibility, I desire to return to my

position with the Department of Corrections and to continue working there until I am no longer

physically capable of performing the job. If I was denied the opportunity to return to work at the

Department of Corrections, I would be required to live off of social security benefits alone, as I have no other adequate retirement plan. Because social security benefits and the small amount of money I have saved for retirement will not provide me with enough income to support myself, I have no other choice than to continue working.

FURTHER AFFIANT SAYETH NOT.

I HEREBY SWEAR under the penalties of perjury of the United States of America that the information I have provided above is true and correct to the best of my knowledge and belief.

Darryl Love

Dated: 31 December 2007

# EXHIBIT 81

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CYNTHIA WASHINGTON, *et al.,*     :
     :
     :
     Plaintiffs,     :     Case Number: 1:07-cv-01031 (RMU)
     :
   v.     :
     :
DISTRICT OF COLUMBIA, *et al.,*     :
     :
     Defendants.     :

## AFFIDAVIT OF SHANTELL HATTON

My name is Shantell Hatton and I am competent to give this Affidavit.

1.     I am a plaintiff in the above-captioned matter.

2.     I am 42 years old.

3.     The highest level of education I have completed is two years of college. I have no significant training or experience in any field other than law enforcement.

4.     I have worked for the Department of Corrections for 12 years, and I have worked within the D.C. government for a total of 17 years.

5.     I have been a Correctional Officer for the duration of my employment with the Department of Corrections. Throughout my years of service, I have received numerous salary increases.

6.     Since being placed on administrative leave from my position with the Department of Corrections I was fortunate to obtain employment with a security company. With this position, I am earning substantially less than I earned as a Correctional Officer with the Department of Corrections. Furthermore, this position offers no opportunity for advancement. During the eight months I spent searching for a job I was told by several potential employers that

a position would not be offered to me because of an unfavorable reference from the Department of Corrections. My personnel files maintained by the Department of Corrections states that I was negligent in my duties as a correctional officer and that my negligence contributed to the escape of two inmates from the D.C. Jail.

7.      Finding a comparable position, in terms of pay and responsibility, outside of the Department of Corrections has not been easy and does not seem possible. Positions in law enforcement are effectively closed to me given the unfavorable information in my file with the Department of Corrections and released to the public regarding the D.C. Jail escape.

8.      Since being placed on administrative leave from the Department of Corrections, I have faced hardships. I am concerned about the possibility of losing my home and my marriage has suffered since there is now more pressure on my husband to maintain our financial responsibilities. My credit score has gone done because I was not able to meet my financial obligations during the time I was not being paid. This seemingly endless situation has caused my health to suffer. I worry constantly and my hair has been falling out because of the stress caused by this situation.

9.      My husband and I own a home. Without my contribution to the mortgage payment from the money I earned with the Department of Corrections, our mortgage will be in jeopardy. I have been trying to refinance my mortgage but doing so is not possible at this time due to the effect this situation has had on my credit score.

10.     Without a source of income, I have resorted to making withdrawals from the money I have set aside for my retirement in order to support myself, pay my mortgage, and attempt to keep up with my financial obligations. As a result, there is approximately $12,000

2

remaining in my retirement account. This amount is nowhere near the amount I would need to have a secure retirement.

11.    I am eligible for retirement in six years. I desire to return to my position with the Department of Corrections and to continue working there until I am no longer physically capable of performing the job. If I was denied the opportunity to return to work at the Department of Corrections, upon reaching retirement age I would be required to live off of social security benefits, as I have no other adequate retirement plan. Because social security benefits and the small amount of money I have saved for retirement will not provide me with enough income, I am left with no other choice than to continue working. I love my job and I really want to go back to work. I have been doing this job for 12 years, I am good at what I do, I enjoy the position, and I am qualified since it is what I have been trained to do.

FURTHER AFFIANT SAYETH NOT.

I HEREBY SWEAR under the penalties of perjury of the United States of America that the information I have provided above is true and correct to the best of my knowledge and belief.

Shantell Hatton

Dated:    1-2-08

EXHIBIT 82

990

<u>VOLUME 5</u>

GOVERNMENT OF THE DISTRICT OF COLUMBIA

PUBLIC EMPLOYEE RELATIONS BOARD

- - - - - - - - - - - - - - - x
                              :
In the Matter of:             :
                              :
FRATERNAL ORDER OF POLICE/    :
  DEPARTMENT OF CORRECTIONS   :
  LABOR COMMITTEE,            :
                              :
        Complainant,          :
                              :
    -vs-                      : PERB Case No. 06-U-50
                                :
DISTRICT OF COLUMBIA          :
  DEPARTMENT OF CORRECTIONS,  :
                              :
        Respondent.           :
                              :
- - - - - - - - - - - - - - - x

                              Washington, D.C.

                              Tuesday, November 20, 2007


        Proceedings took place, pursuant to notice,

on Tuesday, November 20, 2007, at 11:22 a.m., at the

District of Columbia Public Employee Relations Board,

717 14th Street, N.W., 11th Floor, Washington, D.C.

20005.

      BEFORE:

            GLORIA JOHNSON, Esq., Hearing Examiner


PRO-TYPISTS, INC.
PROFESSIONAL TRANSCRIPTION SERVICE
WASHINGTON, D.C.
(202) 347-5395
www.pro-typists.com

996

1     Whereupon,

2                          JOAN E. MURPHY

3     having been called as a witness by Counsel for the

4     Respondent, and having been duly sworn by the Hearing

5     Examiner, was examined and testified as follows:

6                    THE HEARING EXAMINER:  Would you state your

7     name for the record?

8                    THE WITNESS:  It's Joan, J-o-a-n, middle

9     initial E, last name Murphy, M-u-r-p-h-y.

10                   THE HEARING EXAMINER:  Thank you.

11                   MR. HANNON:  May I proceed, Ms. Johnson?

12                   THE HEARING EXAMINER:  Thank you.

13                         CROSS EXAMINATION

14                   BY MR. HANNON:

15         Q     Good morning, Ms. Murphy.

16         A     Good morning.  How are you?

17         Q     I'm fine.

18         A     Good.

19         Q     Is your position a Career Service position?

20         A     No.

21         Q     Are you Excepted Service?

22         A     No.

1005

1    would you just take a look at that to refresh your

2    recollection of those documents, including the

3    attachment, and look up when you've done so?

4        A    Okay.

5        Q    Did your office prepare this document?

6        A    Yes.

7            MR. HANNON:  And for the record, it places

8    Ms. Washington -- I'm sorry, it advises Ms. Washington

9    in the first paragraph that effective the close of

10   business on July 26, 2006, she's summarily removed.

11           BY MR. HANNON:  (Resuming)

12       Q    I believe you testified that this was the

13   date that you either witnessed or heard about the press

14   conference in which Mr. Bob and Director Brown

15   appeared, announcing the summary removals of the 11, is

16   that correct?

17       A    I watched the press conference on TV.

18       Q    And that was July 26th, is that correct?

19       A    Yes.

20       Q    And you told us that you immediately

21   recognized that something would need to be done with

22   respect to the three-day rule, for want of a better

1006

1    term, requiring a provision of notice to the employee

2    within three days.

3        A    I knew that Chapter 16 only addressed one

4    method of summary removal, which required the

5    specifications within three days.

6        Q    And this letter to Ms. Washington dated July

7    26th, 2006, the same day as the press conference,

8    advises her that Section 1616.4 of the regulations had

9    been revised by a variation, correct?

10       A    It actually says that the regulations, as

11   amended by DPM Bulletin Number 4-26 in 16-1 --

12       Q    Yes.  That's the change in 1616.4 that you

13   realized needed to be made to give you time to

14   transcribe the tapes and receive the investigation

15   conducted by Internal Affairs, correct?

16       A    No, I don't transcribe tapes, I review them.

17       Q    I'm sorry, to receive the transcriptions.

18       A    Yes.

19       Q    And to receive the report of the Office of

20   Internal Affairs into the jail escape.

21       A    That's correct.

22       Q    Now attached to this letter to Ms. Washington

1007

```
 1    is the variation that is referred to in Director

 2    Brown's letter, correct?

 3         A    Yes.

 4         Q    And the variation is dated July 26th of 2006,

 5    the same day as the press conference, correct?

 6         A    That's correct.

 7         Q    And if you turn to the second page of the

 8    variation, you'll see it's signed by Lisa Marin,

 9    M-a-r-n, the director of Personnel, correct?

10         A    M-a-r-i-n, yes.

11         Q    And on the second page, Paragraph 3 states,

12    quote, "As part of the investigation that resulted in

13    the summary removal actions taken by the DOC, the

14    Agency conducted an examination of witnesses

15    (interviews) via tape recorder.  However, as of July

16    26th, 2006, the process to transcribe the tapes of the

17    examination of witnesses has not been completed," end

18    quote.  Who provided Ms. Marin with that information?

19         A    My office.  I never spoke directly with Ms.

20    Marin.  My office provided the information to her

21    staff, the staff that was responsible for preparing

22    this document.
```

1008

1    Q    Who in your office was communicating with Ms.

2    Marin's staff regarding this variation?

3    A    I was.

4    Q    So someone else in your office, under your

5    direction, provided the information in Paragraph 3?

6    A    I spoke with Ms. Marin's office regarding

7    the development of the bulletin.

8    Q    Okay.  My question is who specifically, what

9    human being, if you know, provided the information in

10   Paragraph 3 to Ms. Marin's office?

11   A    I wouldn't know who provided it.

12   Q    Did you?

13   A    No, I never spoke directly with Ms. Marin.

14   Q    You were speaking with persons in her office.

15   A    That's correct.

16   Q    Did you provide this information, you

17   personally --

18   A    Yes.

19   Q    -- to persons in her office?

20   A    Yes, I did.

21   Q    And where did you receive the information

22   that as of July 26th, 2006, the process to transcribe

1009

1    the tapes of the examination of witnesses had not been

2    completed?

3        A    I received my information from the Office of

4    Internal Affairs.

5        Q    And who, in particular, in the Office of

6    Internal Affairs?

7        A    I don't remember right now if it was the

8    supervisor or one of her staff members.

9        Q    When you refer to "her," that's Ms. Wanda

10   Patton?

11       A    Yes, the chief of Internal Affairs.

12       Q    And Ms. Patton is the one that signed off on

13   the investigation report, is that correct?

14       A    I don't know if anybody actually signed off

15   on the investigation report.

16       Q    The investigation of the jail escape was

17   conducted by her office.

18       A    That's correct.

19       Q    And if it wasn't Ms. Patton who provided you

20   the information in Paragraph 3, who are the other

21   potential persons in her office who would have provided

22   you that information?

1010

1    A    Well, there are two investigators, Benjamin

2    Collins and Valerie Beard.

3    Q    Other than the communication that you've just

4    described, did you or anyone in your office do anything

5    else to obtain the information in Paragraph 3?

6    A    No.

7    Q    Paragraph 5 states, quote, "The DOC

8    anticipates that it will take approximately 30 days

9    from July 26th, 2006, for the transcription process to

10   be completed (plus time for the affected employees to

11   review/approve the transcripts) and for the written

12   summary removal notices to be drafted and issued to the

13   employees," closed quote.

14        Can you tell me who provided that information

15   to Ms. Marin's office?

16   A    I did.

17   Q    And do you remember to whom you provided that

18   information?

19   A    I think I only spoke with one person and that

20   was Jessica Pimentel.

21   Q    Could you spell her last name for us?

22   A    I can try.

1011

1       Q    Well, why don't you try it phonetically again

2   and I'll listen.

3       A    Pimentel, it's P-i-m-e-n, and I think it's

4   t-a-l, but it might be t-e-l, I'm not sure.

5       Q    Where did you get the information that it

6   would take 30 days for the transcription process to be

7   completed?

8       A    Well, does it say that it will take 30 days

9   for the transcriptions to be completed or does it say

10  something different?

11      Q    Well, it says what it says.  Let me just ask

12  you what your understanding was when you provided this

13  information to the director of Personnel as to the time

14  that it would take to complete the transcription

15  process.

16      A    The 30 days was to complete the process,

17  which included review of the transcripts and the

18  written summary removal notices to be drafted.

19      Q    Under the standard provisions of 1616.4, what

20  I refer to as the three-day rule, a written notice of

21  summary removal has to be provided within three days,

22  correct?

1012

1       A    A written -- a summary removal can be written

2    or verbal.  Within three days of the issuance of that,

3    it must be followed up with the specifications.

4       Q    So in the absence of an amendment to 1616.4,

5    the written notice of what you call specifications has

6    to be provided to the employee within three days in a

7    summary removal process, correct?

8       A    That's the normal process.

9       Q    Okay.  Did your communications with the

10   Office of Internal Affairs regarding the investigation

11   report and the tapes, was any of that communication

12   either in writing or by e-mail?

13      A    No.

14      Q    Did you keep notes of your communications

15   with the Office of Internal Affairs?

16      A    Mental only.

17      Q    The process of your contacting Internal

18   Affairs and communicating with Ms. Marin's office and

19   her signing of this variation all occurred on July 26,

20   2006, is that correct?

21      A    Yes.

22      Q    Can you tell me what else you did in

1013

1      connection with the preparation of this variation?

2           A    I don't know what you mean when you ask what

3      else I did.

4           Q    Well, did you have the authority to request

5      the variation from the Office of Personnel?

6           A    No, I didn't.  I have the -- I wouldn't say

7      the authority.  As the HR person, I had the right or

8      responsibility to do that and I did make the inquiry

9      request.

10          Q    I think you told us that you advised Director

11     Brown that this needed to be done.

12          A    This is the only way it could be done.

13          Q    My question is did you advise --

14          A    Yes, I did advise the director of that.

15          Q    So that would have been on July 26th, after

16     the press conference, correct?

17          A    That's correct.

18          Q    Exhibit 67 is a memorandum -- I'm sorry.

19     With respect to 66, so I'm clear, did your office

20     actually prepare the letter that was signed by Director

21     Brown?

22          A    Yes.

1014

1    Q    And who was it that would have drafted the

2    letter?

3    A    It was a team.

4    Q    Were you part of the team?

5    A    Yes.

6    Q    Who were the other members of the team?

7    A    Staff in the HR Office would have had

8    different roles in the process.

9    Q    How many other staff?

10    A    At least two or three.

11    Q    And the names of those persons who might have

12    participated?

13    A    Well, it depends on what the role was.

14    Q    Yes, I just want to know their names.

15    A    Well, the names were typed in by some of the

16    staff.

17    Q    I'm sorry, I'm asking for the names of the

18    two or three persons on your staff who might have

19    assisted in the preparation of these letters.

20    A    In what way?

21    Q    In any way, I don't know.

22    A    I may have had somebody to actually address

1044

1    issued.

2        Q    How did your office use this document?

3        A    We actually referred to the specifics and the

4    referenced documents, such as the program statement, to

5    generate the advance notice.

6            MS. NAYLOR:  That's all I have for Ms.

7    Murphy.

8            MR. O'NEILL:  Could we have one moment,

9    please?

10           THE HEARING EXAMINER:  Sure.

11           (Discussion off the record.)

12           THE HEARING EXAMINER:  Additional questions?

13           MS. NAYLOR:  Additional questions.

14           THE HEARING EXAMINER:  We're back on the

15   record.

16           BY MS. NAYLOR:  (Resuming)

17       Q    Ms. Murphy, did you ask for the variation

18   that extended the period to 30 days because you hate

19   the Union?

20           MR. HANNON:  I'm sorry, I didn't hear the

21   question.

22           MS. NAYLOR:  I asked her whether she asked

1045

1    DCOP or DCHR for the variation because she hated the

2    Union.

3              THE WITNESS:  No, I did not.

4              BY MS. NAYLOR:  (Resuming)

5        Q    Did you not complete the written or the

6    follow-up to the summary removal directive, that

7    written summary removal notice with specifications in

8    three days because you hated the Union?

9        A    No, I did not make the request for that

10   reason.

11       Q    Then what reasons did you make the request

12   for?

13       A    To ensure that we could be in compliance with

14   the announcement that was made in the press conference.

15       Q    And did you advise Director Brown that the

16   variation was necessary because you hated the Union?

17       A    No, I did not advise the director of the

18   request because I hated the Union.

19       Q    And do you recall any supervisors who were

20   summarily removed in this process?  I'm sorry, do you

21   recall any supervisors who have been summarily removed

22   in general, I'm sorry?

1054

1    Q    Would you take a look at Tab 4 and after

2    you've looked at the document, would you look up?

3    A    Okay.

4    Q    Have you seen this document before today?

5    A    No, I have not.

6    Q    Is Jessica V. Pimentel the person at the

7    Office of Human Resources whom you spoke to regarding

8    the variation?

9    A    Yes.  It was the D.C. Office of Personnel at

10   that time.

11   Q    Personnel, thank you.

12   A    You're welcome.

13   Q    And in Paragraph 3, under oath, Ms. Pimentel

14   states that, four lines up from the end, quote, "As

15   stated in the document, the variation extended the

16   period for providing the written notice specified in

17   Section 1616.4 of the regulations to allow the DOC the

18   time it needed to complete the transcription of the

19   investigation on the summary removal actions taken."

20   Did I read that correctly?

21   A    You read it correctly, yes.

22   Q    Would you turn to Tab 8, Page 14.  At the

1055

1    top, we have the text of 1616.4 of Chapter 16, correct?

2         A    Yes.

3         Q    And this states that the three-day rule

4    provides, quote, "Within three days of the summary

5    removal, the agency head or his or her designee shall

6    provide a written summary removal notice to the

7    employee.  That includes all of the following," end

8    quote.  Did I read that correctly?

9         A    Yes.

10        Q    Your comment earlier about there being an

11   oral opportunity in connection with summary removal,

12   where does that come from?

13        A    Page 13, 1616.3, under 1616, Summary Removal,

14   "An employee who is notified by written or oral

15   directive of a summary removal from his or her

16   position, pursuant to this section, shall immediately

17   leave his or her duty station of District government

18   facility."

19        Q    I see.  So the oral notification is in

20   connection only with getting them out of the premises,

21   correct?

22        A    The oral or written directive --

1056

1    Q    I'm sorry.

2    A    -- of summary removal.

3    Q    I'm sorry, is it your position that 1616.3

4    would permit an oral notification of summary removal

5    notice, pursuant to 1616.4?

6    A    It says, "An employee who is notified by

7    written or oral directive of summary removal from his

8    or her position, pursuant to this section, shall

9    immediately leave his or her duty station . . ."

10    Q    I'm just trying to understand from your prior

11    testimony.  Is it your position that the requirements

12    of a summary removal notice under 1616.4 can be met

13    simply by oral notification?  Is that the meaning of

14    your earlier testimony?

15    A    I quoted the DPM in my testimony.  I

16    indicated that it's just exactly what is in here under

17    1616, that the notice can be written or oral.

18    Q    If the notice under 1616.4 can be oral for

19    summary removal, you wouldn't need three days -- I'm

20    sorry, you wouldn't need 30 days, would you?

21    A    The director of an agency is delegated the

22    authority to reassign, hire, fire, terminate.  The

1057

1    director of the D.C. Department of Corrections did not

2    issue a notice until after the press conference.

3        Q    By "notice," what do you mean?

4        A    Well, if you look at the collective

5    bargaining agreement --

6        Q    No, I --

7        A    -- it says that the summary removals,

8    suspensions and enforced leave can only be executed by

9    the director.

10       Q    You said that --

11       A    And it also says that the union must be

12   notified within 48 hours.

13       Q    I'm sorry.  You said that after the press

14   conference, the director issued written notice of

15   removal.

16       A    Yes.

17       Q    Is that the document that you're referring to

18   dated July 26th?

19       A    That's correct.

20       Q    Now is it your testimony that the Department

21   of Corrections, under 1616.4, may meet the requirements

22   of this regulation by providing oral notice of summary

1058

1    removal, which includes the Items (a) through (h)?

2              THE HEARING EXAMINER:  I think she's

3    clarified what she meant, Mr. Hannon.

4              MR. HANNON:  Okay.  Those are all the

5    questions I have.

6              THE HEARING EXAMINER:  Thank you.

7              MS. NAYLOR:  One minute.

8              THE HEARING EXAMINER:  Okay.

9                FURTHER REDIRECT EXAMINATION

10             BY MS. NAYLOR:  (Resuming)

11        Q    Ms. Murphy, under 1616.3, the written or oral

12   directive of summary removal, did the agency comply

13   with this provision of providing a written or oral

14   directive of summary removal when the action was taken?

15        A    Yes, the agency complied with both the DPM

16   and the collective bargaining agreement.

17        Q    Okay -- sorry.

18        A    And when the DPM is silent, the collective

19   bargaining agreement supersedes it.  And in this

20   particular case, the director is the only person that

21   can execute summary removal, in accordance with the

22   CBA.

1059

1      Q    Okay.  Looking at Respondent's Exhibit

2   Number 66 --

3      A    Is that this book or another book?

4      Q    I'm sorry, it's this.  Is this the written

5   notification with specifications with respect to the

6   summary removal?

7      A    Yes.

8      Q    So this was issued on the day the employees

9   were summarily removed and it's stated as a written

10   directive.  Is this in compliance with 1616.3 to

11   provide a written or oral directive of a summary

12   removal?

13           MR. HANNON:  Objection.

14           THE WITNESS:  Yes.

15           MR. HANNON:  Asks for an opinion regarding

16   the law.

17           MS. NAYLOR:  It's the regulation I believe

18   Mr. Hannon was questioning this witness on, the very

19   same.

20           THE HEARING EXAMINER:  All right, go ahead.

21           BY MS. NAYLOR:  (Resuming)

22      Q    And so this was the first notice or the first

1060

1    written item that was sent to employees with respect to

2    the summary removal.

3        A    Yes, and it was the first notice that was

4    issued by the director.

5        Q    And attached to it was the variation.

6        A    Yes.

7        Q    After this, was a written summary removal

8    notice with specifications sent to the employees to

9    comply with 1616.4 under the DPM?

10       A    Yes.

11       Q    And what is that notice?  I'm looking at

12   Respondent's Exhibit 68.

13            THE HEARING EXAMINER:  Are you just giving

14   her the number?

15            MR. HANNON:  It's okay, I have no objection.

16            THE HEARING EXAMINER:  That's okay, it'll

17   speed it along.

18            BY MS. NAYLOR:  (Resuming)

19       Q    Looking at Exhibit 68 --

20       A    Exhibit 68 is a letter dated August 24th,

21   2006, specifically addressed to Cynthia Washington, and

22   it's pursuant to the provisions of DPM Chapter 16,

1061

1    1616.  "This is a written notice in follow-up to the

2    summary action that removed you from your position as a

3    correctional officer, effective July 26, 2006."

4         Q    Is this the notification that is required

5    under 1616.4?

6              MR. HANNON:  Objection to the form of the

7    question.

8              BY MS. NAYLOR:  (Resuming)

9         Q    Why was this notice provided to the employee?

10             THE HEARING EXAMINER:  Which one are you

11   referring to, 66?

12             MS. NAYLOR:  No, Number 68.

13             THE HEARING EXAMINER:  Okay.

14             THE WITNESS:  It was to comply with the

15   variance, the Bulletin Number 4-26 in 16-1.

16             BY MS. NAYLOR:  (Resuming)

17        Q    And the variance was in relation to what

18   notice that the employees needed to receive?

19        A    The three-day specification.

20             MS. NAYLOR:  That's all I have.

21             MR. HANNON:  To save time, can I propose for

22   you, Ms. Johnson, a stipulation that I think counsel

EXHIBIT 83

1195

<u>VOLUME 6</u>

GOVERNMENT OF THE DISTRICT OF COLUMBIA

PUBLIC EMPLOYEE RELATIONS BOARD

- - - - - - - - - - - - - - - x
                              :
In the Matter of:             :
                              :
FRATERNAL ORDER OF POLICE/    :
  DEPARTMENT OF CORRECTIONS   :
  LABOR COMMITTEE,            :
                              :
        Complainant,          :
                              :
    -vs-                      : PERB Case No. 06-U-50
                               :
DISTRICT OF COLUMBIA          :
  DEPARTMENT OF CORRECTIONS,  :
                              :
        Respondent.           :
                              :
- - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, December 6, 2007

Proceedings took place, pursuant to notice, on Thursday, December 6, 2007, at 10:52 a.m., at the District of Columbia Public Employee Relations Board, 717 14th Street, N.W., 11th Floor, Washington, D.C. 20005.

    BEFORE:

        GLORIA JOHNSON, Esq., Hearing Examiner

PRO-TYPISTS, INC.
PROFESSIONAL TRANSCRIPTION SERVICE
WASHINGTON, D.C.
(202) 347-5395
www.pro-typists.com

1258

1                  <u>AFTERNOON PROCEEDINGS</u>

2           (Whereupon, at 1:41 p.m., the hearing

3    resumed.)

4           THE HEARING EXAMINER:  Good afternoon.  My

5    name is Gloria Johnson, I'm the Hearing Examiner in

6    this case.  Could I have you raise your right hand,

7    please?

8    Whereupon,

9                    DEVON BROWN

10   having been called as a witness by Counsel for the

11   Respondent, and having been duly sworn by the Hearing

12   Examiner, was examined and testified as follows:

13          THE HEARING EXAMINER:  Thank you.  Can you

14   state your full name for the record, please?

15          THE WITNESS:  Devon Brown.

16          THE HEARING EXAMINER:  Ms. Naylor or Mr.

17   O'Neill.

18              DIRECT EXAMINATION

19          BY MS. NAYLOR:

20      Q    Director Brown, we've already established

21   this, but what is your official position with DOC?

22      A    I'm the director of the Department of

1268

1    He asked me what I had done, what action I

2    had taken.  I explained to him that it was our standard

3    procedure when employees are accused of serious

4    wrongdoing to place them on administrative leave

5    pending investigation.  And he said in this instance,

6    they were to be removed immediately.

7    And a press conference was held, I attended

8    the press conference with him and the Mayor, and

9    returned to my office afterwards.  I believe I called,

10   I called Joan Murphy while we were waiting in the press

11   office and instructed her, told her what the sentiment

12   of the Mayor's Office was and that we were to look for

13   a means by which we could effect those orders.

14   And when I returned to the office, I summoned

15   her, along with the certain members of the executive

16   team.  And Joan told me that there was only one way

17   that the District Personnel Regulations would allow for

18   such action, that was summary removal.

19   So I instructed her -- I again reiterated

20   what Mr. Bobb had told me and told her to do whatever

21   was necessary to comply with his orders.

22   Q    Did you authorize the variations, the request

1269

1   to seek the variation?

2       A    She informed me that it would be necessary,

3   that there would be I think a 30-day extension, I

4   believe she told me, that it was necessary to get an

5   extension in order for the summary removals to meet the

6   time frames that the code required.  And I instructed

7   her again, "Whatever is necessary, then we are to

8   pursue that."

9       Q    And what is the current status of the summary

10  removals?

11      A    The current status is that they have been

12  remanded to another hearing officer.  The hearing

13  officer has reviewed the findings and we're about to

14  issue them.

15      Q    In terms of the new hearing officer, that's

16  in line with the new advanced notices of termination

17  that were issued, is that correct?

18      A    That's correct.

19          MR. HANNON:  Excuse me, "in line with"?  Go

20  ahead.

21          BY MS. NAYLOR:  (Resuming)

22      Q    The initial summary removal actions that were

1315

1    Q    You didn't?  Did you have conversations with

2    Mr. Waldren about the escape?

3    A    No.

4    Q    so the information that led you to sign Ms.

5    Washington's letter on June 6th was what was being

6    reported to you by Ms. Patton?

7    A    That is correct.

8    Q    And had anyone from the Mayor's Office or

9    anyone else directed you to put any of these folks on

10   administrative leave?

11   A    No.

12   Q    Would you turn to 66, Exhibit 66?  This is

13   the July 26th letter to Ms. Washington indicating that

14   she is summarily removed.  Is this an example of the

15   actions that you took according to what Mr. Bobb told

16   you?

17   A    Yes.

18   Q    And this was around the time period, I

19   assume, when you had the conversation with Joan Murphy

20   about needing to have an amendment of a personnel

21   regulation.

22   A    As I testified, immediately following the

1316

1    press conference, I met with Ms. Murphy and informed

2    her of the need to move forward.  She explained to me

3    that the only means by which we could move forward was

4    the use of the summary removals.

5        Q    Did you consult with counsel before signing

6    this letter?

7        A    I don't recall whether the general counsel

8    was present during that discussion.

9        Q    You mean the discussion with Mr. Bobb.

10       A    No, the discussion with Ms. Murphy.

11       Q    Well, my question is before you signed the

12   letter, did you consult with counsel?

13       A    And my response was I don't recall.

14       Q    Who was present when Mr. Bobb directed you to

15   fire the employees?

16       A    Wanda Patton.

17       Q    Anyone else?

18       A    No.

19       Q    And where did that meeting take place?

20       A    It took place in his office, a large

21   conference room adjacent to his office.

22       Q    And you had a recollection of what day it

1317

1    was.  Do you, now that you see this letter -- you

2    signed this letter on the 26th.  Can you recall what

3    date it was that you had the meeting with Mr. Bobb?

4         A    It was a Wednesday, I believe it was either

5    the 25th or the 26th.  It was the Wednesday of that

6    week.

7         Q    The book in front of you, the black book,

8    contains some documents that I want to have you look at

9    in connection with my last question.  When you get that

10   book in front of you, if you'd turn to Tab 4, have you

11   seen this document before?

12        A    No, I don't recall this.

13        Q    The next document, Number 5, is the variation

14   on the personnel regulation that Ms. Murphy spoke to

15   you about.  Have you seen this document?

16        A    No.

17        Q    Exhibit 6, the next one, is an additional

18   variation that also applies.  Have you seen this

19   before?

20        A    No, sir.

21        Q    In the affidavit which is Exhibit 4 of

22   Jessica Pimentel in the black book, in Paragraph 2, Ms.

1318

1    Pimentel reports that on July 26th, Ms. Murphy called

2    to request a grant of a variation of Section 1616.4

3    regarding what we've called the three-day rule.

4        Now when Ms. Murphy spoke to you, did she

5    explain to you that summary removal requires action

6    within three days?

7    A    Yes, she did.

8    Q    And did she advise you what action needed to

9    be accomplished in those three days?

10   A    I don't recall her discussing that.

11   Q    Had you proposed or summarily removed any

12   employees prior to the jail escape in your capacity as

13   director?

14   A    I don't recall having done that.

15   Q    So as far as you know, you weren't familiar

16   with the processes for summary removal.

17   A    No.

18   Q    So it's fair to say, is it not, that had this

19   amendment, this variation, not been obtained, it

20   wouldn't have been possible to comply with Mr. Bobb's

21   direction to get rid of these people promptly.

22       MS. NAYLOR:  Objection, calls for

1319

1    speculation.

2          MR. HANNON:  This is the proposing official,

3    this is the man who took the action.

4          THE HEARING EXAMINER:  I'm sorry, would you

5    rephrase the question?

6          MR. HANNON:  I will.

7          BY MR. HANNON:  (Resuming)

8    Q    Is it correct to say that on July 26th, your

9    understanding was that if this variation to the

10   regulation, the three-day regulation, was not amended,

11   that the Department of Corrections would not be able to

12   accomplish what Mr. Bobb had directed you to do?

13   A    It's my understanding that we needed a

14   variation in order to effectuate the time frames that

15   were mandated under the summary removal regulations.

16   Q    And it was your understanding from Ms. Murphy

17   that the existing time frame of three days could not be

18   met.

19   A    She was fearful that they could not be met.

20   I think it was something about a transcript, that they

21   needed a transcript.

22   Q    Well, I assume that as the director of the

1320

1    Department of Corrections, when Ms. Murphy told you

2    that this needed to be done, you recognized that that

3    was the only way to effectuate the summary removal that

4    Mr. Bobb had already announced.

5        A    I think it's fair to assume.

6        Q    And your recollection is that Ms. Murphy said

7    something to you about having transcripts?

8        A    There was something about the need for either

9    documents -- but I think it was a transcript, something

10   about a transcript that we needed to make sure we had,

11   and in order to get that, we needed the variation, that

12   it wasn't possible to secure it within the three days.

13    That's my recollection.

14       Q    And you recall these were transcripts of the

15   interviews that were tape recorded by Ms. Patton and

16   her investigative team.

17       A    That is correct.

18       Q    And you knew that she was conducting tape

19   recorded interviews because she was keeping up to date

20   on the course of her investigation.

21       A    I knew that that was part of her procedures,

22   investigative procedures.

1321

1      Q    In Exhibit 4, Ms. Pimentel -- and I apologize

2    in her absence if I'm not pronouncing it correctly --

3    she says in that paragraph that she informed Lisa

4    Marin, the director of DCHR, her boss.

5           And she indicates in the last sentence of

6    Paragraph 3 that begins four lines up, and I'll quote

7    it, "As stated in the document, the variation extended

8    the period for providing the written notice specified

9    in Section 16.4 of the regulations to allow the DOC the

10   time it needed to complete the transcription of the

11   investigation on the summary removal actions taken,"

12   end quote.

13          Does that confirm your recollection that --

14     A    Yes.

15     Q    -- that was the reason for the variation?

16     A    Yes.

17     Q    And at any time prior to your receipt of the

18   investigative report prepared by Ms. Patton, did you

19   have occasion to read any of the transcripts of the

20   interviews conducted of the employees?

21     A    I did not.

22     Q    At any time prior to your receipt of the

1322

1    final report, had you listened to any tapes of the

2    interviews of the employees?

3        A    I had not.

4        Q    When Ms. Murphy reported to you that the

5    three-day rule needed to be extended because of these

6    transcriptions, did you inquire of her why that could

7    not be expedited?

8        A    No, I did not.

9        Q    Did you inquire of her why there simply

10   couldn't just be made duplicates of the tapes to

11   provide to the employees?

12       A    I did not.

13       Q    So it was your understanding that it was

14   impossible to comply with the three-day rule because of

15   this transcription problem.

16       A    That was my understanding.

17       Q    And did you have any conversations with Ms.

18   Patton about this transcription issue?

19       A    I don't recall whether I did or not.

20       Q    Did you attempt to corroborate what Ms.

21   Murphy was telling you?

22       A    No, I did not, she --

1323

1    Q    But it was clear to you that she was talking

2    about the tapes that were in the possession of Ms.

3    Patton.

4    A    Yes.

5    Q    Is Ms. Patton on leave today or ill?

6    A    I don't know, I've been at other meetings, I

7    haven't seen her today.

8    Q    But as far as you know, she's not on leave or

9    ill.

10    A    As far as I know.

11    Q    Did you report to anyone in the Mayor's

12    Office the fact that you had to authorize this request

13    in order to effectuate the summary removals?

14    A    I don't recall having any dialogue with

15    anyone in the Mayor's Office in terms of what we had to

16    do to move forward, I just don't recall.

17    Q    Did Ms. Murphy also advise you that under the

18    collective bargaining agreement, there was a 48-hour

19    rule that requires notification of the union in the

20    case --

21    A    Ms. Murphy did not, no.

22    Q    Excuse me.

1324

1    A    Ms. Murphy did not, I don't recall Ms.

2  Murphy, I remember maybe Paulette.  There was some

3  discussion about the 48 hours.  I don't know if Ms.

4  Murphy was part of that discussion, but I think

5  Paulette was the one that told me, to the best of my

6  recollection.

7    Q    And what was your response to the fact that

8  there was --

9    A    My response has always been --

10    Q    Excuse me.  Mr. Brown --

11    A    Oh, you haven't finished.

12    Q    I --

13    A    You paused.  I'm sorry, sir, I thought you

14  were finished.

15    Q    This is not ordinary human discourse because

16  this gentleman has to record everything we say.

17    A    Well, let me say this.  When you pause -- I

18  appreciate that, but I thought you had completed your

19  statement.  I'll be careful.

20    Q    Thank you.  I try to think sometimes before I

21  say my words.

22    A    Sometimes.

1325

1    THE HEARING EXAMINER:  Now, now.

2    MR. HANNON:  That's quite all right.  You're

3    going to have to get me back on track.

4    (Whereupon, the reporter reads from the

5    record.)

6    BY MR. HANNON:  (Resuming)

7    Q    We were talking about the 48-hour rule.  What

8    did you understand was the obstacle that the 48-hour

9    rule in the collective bargaining agreement posed to

10    summary removal?

11    A    It's my understanding that it wasn't

12    necessarily an obstacle, it's just that we had to make

13    notice.

14    Q    To whom?

15    A    To the union.

16    Q    And was that accomplished?

17    A    We made a concerted effort to accomplish it.

18    Q    Was notice provided to the union within 48

19    hours?

20    A    To be honest with you, I don't recall.  I

21    recall giving instructions that we needed to meet, once

22    I was told that, that we should make an effort to meet

1326

1   with the union to give notice.  I believe we sent a

2   letter.  There was some time frame in which I sent a

3   letter to the union requesting to meet with them or

4   regarding meeting with them, but I can't speak with any

5   certainty --

6        Q    Did you report --

7        A    -- as to the time frame.

8        Q    I did it to you.  Did you report to anyone on

9   the Mayor's staff that there was this concern over the

10  48-hour rule --

11       A    No, sir, I did not.

12       Q    -- in the collective bargaining agreement?

13       A    No, sir.

14       Q    Do you, of your own personal knowledge, know

15  when the tape recorded interviews were transcribed?

16       A    No, sir, I do not.

17       Q    When you received the written report from Ms.

18  Patton, you indicated that you studied it thoroughly.

19  Did that include studying the transcripts of all of the

20  interviews?

21       A    No, sir, it did not, it was the written

22  document.

1327

1    Q    Would you turn to Exhibit 9 in the

2    government's book?  This is the investigative report of

3    Wanda Patton regarding the jail escape, correct?

4    A    Yes, sir.

5    Q    And indicates at the bottom that this report

6    was prepared on July 20th of 2006.  You can see it at

7    the bottom of the first page.

8    A    Yes, sir.

9    Q    And the summary removal letter was dated July

10   26th.  Looking at those two dates, do you have a

11   recollection as to when you received the hard copy of

12   this report?

13   A    I believe I received this on a Thursday of

14   that week, which may have been the 20th.

15   Q    Were transcripts of the interviews attached

16   to the hard copy of the report that was given to you?

17   A    I don't recall, sir, I can only recall

18   reading the text proper, not the supporting document,

19   but the text.

20   Q    Do I understand your earlier testimony that

21   when you returned from your meeting with Mr. Bobb and

22   Ms. Murphy raised this issue with you about the

1328

1   three-day rule, you basically said to her, "Do whatever

2   you need to do to accomplish the directive that you

3   have received from the City Administrator"?

4        A     Ms. Murphy told me about -- I don't want to

5   do that.  Is it all right to respond, have you finished

6   with your question?

7        Q     Oh, I'm sorry.  Thank you, yes.

8        A     All right.  I recall Ms. Murphy telling me

9   about the three-day rule and that there would be need

10  to secure a variance.  And my response to her was to

11  proceed, "Do whatever you have to do to effectuate the

12  summary removals."

13       Q     Okay, that's what I thought you said.

14       A     Okay.

15       Q     Did anyone advise you that it would be

16  necessary for the department to consult with the union

17  about the revision of Chapter 16 because that

18  constituted a change in the conditions and

19  circumstances of employment?

20       A     No.

21       Q     I see.  And do you agree that the three-day

22  rule is the grant to an employee of an element of due

1329

 1    process?

 2            MS. NAYLOR:  Objection, calls for a legal

 3    conclusion.

 4            MR. HANNON:  I can rephrase.

 5            THE HEARING EXAMINER:  Please.

 6            BY MR. HANNON:  (Resuming)

 7        Q    In your capacity as director, you review and

 8    oversee, as you said earlier, employee discipline,

 9    correct?

10        A    Yes, sir.

11        Q    And you understand that there's a package of

12    procedures that the employee is entitled to receive the

13    benefit of before the employee can be penalized.

14        A    Yes, sir.

15        Q    With that understanding, did you view that

16    three-day notice provision as part of that package of

17    procedures that the employee was entitled to?

18        A    I perceived it as part of D.C. regulations

19    that had to be adhered to.

20        Q    The announcement of the summary removal took

21    place, I understand, at a Mayor's press conference, is

22    that correct?

1330

1     A     No, there was no expression of summary

2     removal made at the Mayor's press conference.

3     Q     What was said at the press conference?

4     A     There was discussion about the nature of the

5     escapes and what action the government, via Mr. Bobb,

6     was going to pursue.  But to use the term summary

7     removal, I don't remember that ever being discussed at

8     the press conference.

9     Q     Well, what did he say?  Did he say that they

10    would be fired?

11    A     That they would be removed from -- "As of

12    this point, as of this time, they're no longer on the

13    payroll," or something, words to that effect.

14    Q     And to your knowledge, had you caused anyone

15    in your office to provide notice to those employees of

16    what Mr. Bobb was about to announce?

17    A     I called Ms. Murphy and told Ms. Murphy what

18    he had said to us during our meeting prior to the press

19    conference and that he wished for these people to be

20    taken off the payroll immediately and to give her an

21    alert, because we had them on administrative leave.

22    Q     Did you cause anyone, prior to Mr. Bobb's

1331

1    announcement, to notify these employees that they were

2    being removed?

3        A    No.

4        Q    And that notification did not take place

5    until the letter that you signed on July 26th was

6    delivered to them.

7        A    That is probably so.

8        Q    Did you deliver the letter to the employees?

9        A    Absolutely not.

10       Q    Do you know who did?

11       A    No, I don't.

12       Q    Do you know when it was delivered?

13       A    No, sir, I don't recall.

14       Q    You are aware that several of the employees

15   who were on administrative leave learned of their

16   removal from watching that press conference.

17       A    No, I'm not aware of that.

18       Q    You're not?

19       A    No, sir, I don't know what they were

20   watching.

21       Q    I see.  Have you read any of the pleadings

22   that have been filed against you in the federal court

# EXHIBIT 84

1195

<u>VOLUME 6</u>

GOVERNMENT OF THE DISTRICT OF COLUMBIA

PUBLIC EMPLOYEE RELATIONS BOARD

```
- - - - - - - - - - - - - - - x
                              :
In the Matter of:            :
                              :
FRATERNAL ORDER OF POLICE/   :
  DEPARTMENT OF CORRECTIONS   :
  LABOR COMMITTEE,            :
                              :
        Complainant,          :
                              :
    -vs-                      : PERB Case No. 06-U-50
                               :
DISTRICT OF COLUMBIA          :
  DEPARTMENT OF CORRECTIONS,  :
                              :
        Respondent.           :
                              :
- - - - - - - - - - - - - - - x
```

Washington, D.C.

Thursday, December 6, 2007

Proceedings took place, pursuant to notice, on Thursday, December 6, 2007, at 10:52 a.m., at the District of Columbia Public Employee Relations Board, 717 14th Street, N.W., 11th Floor, Washington, D.C. 20005.

BEFORE:

GLORIA JOHNSON, Esq., Hearing Examiner

PRO-TYPISTS, INC.
PROFESSIONAL TRANSCRIPTION SERVICE
WASHINGTON, D.C.
(202) 347-5395
www.pro-typists.com

1398

1    have your affidavit and the attached documents.

2              MR. GROSS:  Okay.

3              THE HEARING EXAMINER:  I'm sorry, Mr. Gross,

4    could you raise your right hand, please?  This is

5    Arbitrator Johnson and we are currently in a hearing at

6    the Public Employee Relations Board.

7              MR. GROSS:  Yes.

8              THE HEARING EXAMINER:  You were told to

9    expect our call?

10             MR. GROSS:  Yes.

11             THE HEARING EXAMINER:  Is your hand raised?

12             MR. GROSS:  Yes.

13   Whereupon,

14                        NEAL GROSS

15   having been called as a witness by Counsel for the

16   Complainant, and having been duly sworn by the Hearing

17   Examiner, was examined and testified as follows

18   telephonically:

19             THE WITNESS:  The whole truth and nothing but

20   the truth, yes.

21             THE HEARING EXAMINER:  All right, thank you.

22    Would you state your full name for the record?

1399

1          THE WITNESS:  Neal R. Gross.

2          THE HEARING EXAMINER:  And Mr. Gross, what is

3    your affiliation with the Gross Company?

4          THE WITNESS:  Well, the company is named Neal

5    R. Gross and Company, Inc., Court Reporters and

6    Transcribers, and I'm the chairman of the corporation,

7    board of trustees, and also the chief executive

8    officer, and I own all the stock.

9          THE HEARING EXAMINER:  Okay.  Did there come

10   a time when you were asked to make transcripts for the

11   Department of Corrections?

12         THE WITNESS:  Yes.

13         THE HEARING EXAMINER:  Okay, fine.  Go ahead,

14   just maybe two or three questions.

15         MR. HANNON:  Yes.

16                   DIRECT EXAMINATION

17         BY MR. HANNON:

18   Q    Do you have your affidavit with you, Mr.

19   Gross?

20   A    Yes.

21   Q    And does it remain true and correct?

22   A    Yes.

1400

1    Q    Are all of the documents that are attached to

2    your affidavit true and correct copies of your original

3    documents?

4    A    Yes, they are.

5    Q    You've indicated that you've made some

6    redactions of some proprietary information.

7    A    Yes.

8    Q    Just describe what that is.

9    A    There's an internal office routing record

10   retention and the deliberations with regard to the

11   references to the contracts or purchase orders for

12   pricing and the counting of the pages and so on of an

13   internal nature.  They do not relate at all to the

14   substance of the work that is described on the forms.

15   Q    And are those documents kept by you in the

16   regular course of business?

17   A    Yes, indeed.

18   Q    And did you retrieve those documents for

19   purposes of this proceeding?

20   A    Yes, I did.

21   Q    And do those documents indicate that you

22   delivered a first set of transcripts via e-mail to the

1401

1    Department of Corrections on June 27th?  Paragraph 3.

2         A    Yeah, well, I'm looking at the original -- I

3    mean the copy or the original and if everyone will take

4    Page Number 1 in front of them --

5         Q    Yes.

6         A    -- and in the bottom two-thirds, on the left

7     side, it's in bold letters, it says "Ship To."

8         Q    Yes.

9         A    And on the righthand side, it says -- there's

10    a series of six line items with a "Via," slash, date

11    above it.  And if you look at the first line, it says,

12    "Trans.," for transcript and "EMO" in our office means

13    e-mail only, and the date following is a four-digit

14    replication of the regular calendar date.

15              THE HEARING EXAMINER:  On Page 2 --

16              THE WITNESS:  Go ahead.

17              THE HEARING EXAMINER:  -- you have a list of

18    names.  Are those the persons whose transcripts you

19    delivered?

20              THE WITNESS:  Well, I'll put it this way,

21    they are the people who were singularly identified as

22    having been the interviewee in the interview audios

1402

1    that I received.

2            THE HEARING EXAMINER:  What date were those

3    transcripts delivered to the Department of Corrections

4    by e-mail or otherwise?

5            THE WITNESS:  What date?

6            THE HEARING EXAMINER:  Yes.

7            THE WITNESS:  We just went through that.  I

8    e-mailed them, my records show that I e-mailed them --

9            THE HEARING EXAMINER:  Well, excuse me, but I

10   need you to tell me again.

11           THE WITNESS:  -- and e-mailed only.  In other

12   words, did not do at that time any other form of text

13   delivery.

14           THE HEARING EXAMINER:  Okay, my question --

15           THE WITNESS:  I e-mailed them on June 27th --

16           THE HEARING EXAMINER:  Mr. Neal, hello.

17           THE WITNESS:  -- that's what the records

18   show.

19           THE HEARING EXAMINER:  Hello.  Can you hear

20   me?

21           THE WITNESS:  Me?

22           THE HEARING EXAMINER:  Yes.

1403

1    THE WITNESS:  I can hear you.  Did you hear

2    me?

3    THE HEARING EXAMINER:  Answer just my

4    question.  On what date did you give the transcripts of

5    the people who are listed on your Pages 2 and 3 to the

6    Department of Corrections?  I only want a date.

7    THE WITNESS:  June 27th.

8    THE HEARING EXAMINER:  Thank you.

9    BY MR. HANNON:  (Resuming)

10   Q    And lastly, Mr. Neal, on Page 5 of the

11   documents attached to your affidavit, there is another

12   list of six employees whose transcripts you prepared.

13   Could you tell Ms. Johnson on what date those

14   transcripts were sent to the Department of Corrections?

15   A    My answer to that question is that if you

16   pick Page 4, which is the preceding immediately front

17   of that form --

18   THE HEARING EXAMINER:  Sir, I just want a

19   date, just --

20   THE WITNESS:  The date is indicated on Page 4

21   as July 27th.

22   THE HEARING EXAMINER:  Thank you.  Have a

1404

1    good day.

2              MR. HANNON:  Thank you, Mr. Gross.

3              THE WITNESS:  Is that it?

4              MR. HANNON:  Yes, that's it.

5              THE WITNESS:  Thank you, bye.

6              THE HEARING EXAMINER:  Off the record.

7              (Discussion off the record.)

8              THE HEARING EXAMINER:  Back on the record.

9    Okay, Ms. Naylor, Mr. O'Neill, what's your pleasure?

10             MR. O'NEILL:  Are we talking about the

11   briefing schedule or --

12             THE HEARING EXAMINER:  Yes.  I know the rule

13   is 15/10, but we're right at the holidays.  No brief?

14             MR. O'NEILL:  I'm sorry, is it your intention

15   that the union file its brief and then we file a

16   response?

17             THE HEARING EXAMINER:  What is your

18   suggestion?

19             MR. O'NEILL:  Well, given the complexity of

20   the case, I think that's how we wish to proceed.

21             MR. HANNON:  And then we get a reply?

22             MR. O'NEILL:  And then you get a reply, yes,